**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3747

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

       Plaintiffs, on their own behalf
       and of a class of similarly
       situated persons,

vs.

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, and DOES 1-10,000,

       Defendants.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

     COME NOW the Plaintiffs, through counsel, on behalf of themselves and of a class of

similarly situated persons, and bring this Complaint for damages, injunctive and declaratory

relief against the Defendants, and each of them, and, in support thereof, hereby state as follows:

## I. NATURE OF THE CASE

1.      This is a civil rights case brought by citizens of the United States of America, from different states across the Union, against the Defendants for, among other things, burdening the voting rights of 160 million people.

2.      The Plaintiffs allege the following on behalf of themselves and others similarly situated against Defendants for damages, declaratory relief, and to enjoin them from further unconstitutional and unlawful acts, omissions, orders, agreements and certifications concerning the Plaintiffs' rights of due process, equal protection, and to vote and speak freely.

3.      Plaintiffs, as citizens of the United States of America (American Citizen(s)), bring this action to halt, and seek redress from the unconstitutional acts and omissions of the Defendants enforced pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986 & 1988 (Civil Rights Act), and the Constitution of the United States of America.

4.      At all material times, the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other things, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution.

5.      The Plaintiffs have been damaged and, unless the Defendants are enjoined, will continue to suffer the loss of their individual right to vote, freedom of speech, due process and equal protection under the laws and Constitution of the United States of America (Constitution).

## II. PARTIES

### PLAINTIFFS

6.       Plaintiff, Kevin O'Rourke, is a natural person, Virginian, American citizen, certified public accountant and independent auditor, having a place of abode and registered to vote in Virginia. The *Affidavit of Kevin Patrick O'Rourke* is attached hereto as Exh. 1, as though fully contained herein.

7.       Plaintiff, Nathaniel L. Carter, is a natural person, Michigander, African-American citizen, married, having a place of abode and registered to vote in Michigan. The *Affidavit of Nathaniel L. Carter* is attached hereto as Exh. 2, as though fully contained herein.

8.       Plaintiff, Lori Cutunilli, is a natural person, Coloradan, American citizen, business owner, having a place of abode and registered to vote in Colorado. The *Affidavit of Lori Cutunilli* is attached hereto as Exh. 3 is, as though fully contained herein.

9.       Plaintiff, Alvin Criswell, is a natural person, Alaskan, American citizen, retired, having a place of abode and registered to vote in Alaska. The *Affidavit of Alvin Criswell* is attached hereto as Exh. 4, as though fully contained herein.

10.       Plaintiff, Larry D. Cook, is a natural person, Californian, American citizen, author, having a place of abode and registered to vote in California. The *Affidavit of Larry Cook* is attached hereto as Plaintiffs' Exh. 5, as though fully contained herein.

11.       Plaintiff, Kesha Crenshaw, is a natural person, Michigander, African-American citizen, having a place of abode and registered to vote in Michigan. The *Affidavit of Kesha Crenshaw* is attached hereto as Exh. 6, as though fully contained herein.

12.     Plaintiff, Neil Yarbrough, is a natural person, Coloradan, African-American citizen, licensed real estate agent, having a place of abode and registered to vote in Colorado. The *Statement of Neil Yarbrough* is attached hereto as Exh. 7, as though fully contained herein.

13.     Plaintiff, Amie Trapp, is a natural person, Alabamian, American citizen, mother of nine, having a place of abode in the state of Alabama, after having recently moved from the state of Missouri, where the Plaintiff voted as a registered voter in Missouri. The *Statement of Amie Trapp* is attached hereto as Exh. 8, as though fully contained herein.

## DEFENDANTS

14.     Defendant, DOMINION VOTING SYSTEMS, INC. (Dominion), is a corporation organized under the laws of the State of Delaware, doing business at 1201 18th Street, Suite 210, Denver, CO 80202-1421.

15.     Defendant, FACEBOOK, INC. (Facebook), is a corporation organized under the laws of the State of Delaware, a publicly traded company, doing business at 1601 Willow Road, Menlo Park, CA 94025. Facebook's businesses are in technologies that facilitate digital communications, including Facebook Blue, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and, WhatsApp, which provides mobile messaging services.

16.     Defendant, MARK E. ZUCKERBERG (Mr. Zuckerberg), is a resident of California and the chief executive officer of Facebook.

17.     Defendant, PRISCILLA CHAN (Ms. Chan), is a resident of California.

18.     Defendant, CENTER FOR TECH AND CIVIC LIFE (CTCL), is a non-profit organization, organized under the laws of the State of Illinois, with its principle offices at 233 North Michigan Ave, No. 1800, Chicago, IL 60601.

19.     Defendant, BRIAN KEMP (Mr. Kemp), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Governor of the State of Georgia.

20.     Defendant, BRAD RAFFENSPERGER (Mr. Raffensperger), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Secretary of State of the State of Georgia.

21.     Defendant, GRETCHEN WHITMER (Ms. Whitmer), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Governor of the State of Michigan.

22.     Defendant, JOCELYN BENSON (Ms. Benson), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the State of Michigan.

23.     Defendant, TOM WOLF (Mr. Wolf), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of his official authority as Governor of the Commonwealth of Pennsylvania.

24.     Defendant, KATHY BOOCKVAR (Ms. Boockvar), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the Commonwealth of Pennsylvania.

25.     Defendant, TONY EVERS (Mr. Evers), is a resident of Wisconsin, personally liable for his individual conduct, acting under color of his official authority as Governor of the State of Wisconsin.

26.     Defendants, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY,  DEAN KNUDSON, and ROBERT F. SPINDELL, JR., are all residents of Wisconsin, personally liable for their individual conduct, acting under color of their official authority as members of the Wisconsin Elections Commission (WEC Defendants).

27.     DOES 1 – 10,000 are herein named as co-conspirators, agents, employees or contractors, as their involvement is discovered though the course of this action.

### III. JURISDICTION

28.     Jurisdiction of the Court is invoked under from Article III, Section 2 of The Constitution of the United States of America (Constitution). U.S. Const., Art. III, § 2.

29.     Plaintiffs, as representatives of the people, have standing to exercise all rights reserved thereto under the Constitution. U.S. Const., amend IV, X.

30.     The Court has subject matter jurisdiction pursuant to the Supremacy Clause of the Constitution, wherein state laws or actions violating federal rights are invalid and subject to declaratory judgment. U.S. Const., Art. VI, cl. 2.

31.     Jurisdiction over the Defendants arises pursuant to 28 U.S.C. §§ 1331(a) (federal question), 1332 (diversity), 1343(a) (civil rights), and 2201-02 (declaratory judgment); and, under the Constitution.

32.     This Court also has jurisdiction over any common law claims pursuant to this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

33.     This Court is authorized to issue permanent injunctive relief requested under Rule 65 of the Federal Rules of Civil Procedure.

34.     Jurisdiction of this Court in vindication of rights arises under 42 U.S.C § 1983, 1985, 1986 and 1988, which also authorizes the Court to issue injunctive relief.

35.      Venue is proper pursuant to 28 U.S.C. §1391(a) & (b), because a substantial part of the acts and omissions occurred within the District of Colorado.

<h3 style="text-align:center">IV. GENERAL ALLEGATIONS</h3>

<h3 style="text-align:center">DOMINION</h3>

36.     Dominion is one of three election technology vendors that currently make up more than 80 percent of the voting machines in the United States.[1]

37.     Dominion's technology, in various forms, reached 71 Million Voters, and is involved in 1635 jurisdictions in the United States as of 2016. [2]



Figure 2b: **Vendor Marketplace Coverage by Number of Eligible Voters**

Note: Only vendors that reach more than 500,000 registrants are included.

---

[1] Ben Popken, *Voting Machine Makes Face Questions from House Lawmakers—But More Remain*, NBCNews.com, Jan. 9, 2020.

[2] Penn Wharton Public Policy Initiative, *The Business of Voting, Market Structure and Innovation in the Election Technology Industry*, University of Pennsylvania, 2017.

38.     Dominion is owned by DOMINION VOTING SYSTEMS CORP. (Dominion Corp), a Canadian corporation, established in 2003.

39.     In 2018, Dominion Corp was acquired by its senior management team and STAPLE STREET CAPITAL GROUP, L.L.C. (Staple Street).

40.     On December 6, 2019, U.S. Senator Elizabeth Warren, and other members of the Senate Banking, Housing, and Urban Affairs Committee, sent a letter to Staple Street requesting information about the role private equity investment in Dominion has played in the creation and perpetuation of concerns regarding "vulnerabilities and a lack of transparency in the election technology industry."[3]

41.     In an April 2020 letter in response to the request made by the House Committee Administration, CEO of Dominion Corp, John Poulos, confirmed that the corporation is 75.2% owned by Staple Street, and that he, a Canadian citizen, holds a 12% stake, with no other investor owning more than a 5% stake in the corporation.[4]

---

[3] In the letter, the Senators expressed concern about the "secretive and 'trouble-plagued companies,' owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, 'having long skimped on security in favor of convenience,' leaving voting systems across the country 'prone to security problems.'" *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, December 10, 2019. https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf  *See* Jessica Huseman, *The Market for Voting Machines Is Broken. This Company Has Thrived in It*, ProPublica, October 28, 2019. *See also* Frank Bajak, *US Election Integrity Depends on Security-Challenged Firms*, Associated Press, October 28, 2019.

[4] Ali Swenson, *Family of Hugh Chavez Does Not Own Dominion Voting System*, Associated Press, December 1, 2020.

42.     Scholars and industry experts have concluded that ballot-marking devices,

generally, including the voting machines used by Dominion:

    a.  produce ballots that do not necessarily record the vote expressed by the voter
        when they enter their selections on the touchscreen;

    b.  are associated with known risks, which include hacking, bugs and configuration
        errors that can cause the voting machine to print votes that differ from what the
        voter entered and verified electronically;

    c.  are not defensible, because there is no way to generate convincing public
        evidence that reported outcomes are correct despite any malfunctions that might
        have occurred;

    d.  are not software independent, and can mark a ballot after the voter has inspected
        it;

    e.  the original transaction, i.e., the voter's expression of the votes, is not
        documented in a verifiable way; and,

    f.  cannot ensure through an audit that the reported outcome is correct.

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs)
Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy,
Vol. 19, No. 3, September 17, 2020.

43.     In early 2020, the Dominion voting system was rejected by the Texas Board of

Elections, after the "examiner reports raise concerns about whether the Democracy Suite 5.5A

system is suitable for its intended purpose; operates efficiently and accurately; and is safe from

fraudulent or unauthorized manipulation."[5]

44.     Other experts have opined that Dominion's software is vulnerable to data

manipulation by unauthorized means, and permits data to be altered in states across the country:

---

[5] Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy
Suite 5.5-A*, State of Texas, January 24, 2020.

I conclude with high confidence that the election 2020 data were altered in all battleground states resulting in hundreds of thousands of votes that were cast for President Trump to be transferred to Vice President Biden. These alterations were the result of systemic and widespread exploitable vulnerabilities in DVS, Scytl/SOE Software and Smartmatic systems that enabled operators to achieve the desired results. In my view, the evidence is overwhelming and incontrovertible.[6]

## FACEBOOK

45.     Facebook is the largest social media platform for real-time interaction and dissemination of information across the internet.

46.     According to the Federal Trade Commission (FTC), Facebook is the world's dominant online social network with more than three billion people regularly using Facebook's services to connect to friends and family.[7]

47.     According to the FTC, Facebook and its Chief Executive Officer, Mr. Zuckerberg, have maintained a monopoly position through anti-competitive means reflecting Mr. Zuckerberg's view that "it is better to buy the competition than to compete."[8]

48.     Additionally, Facebook has come under scrutiny by the scheduled October 28, 2020, Congressional Hearing related to its status as a neutral media platform under Section 230 of the Communications Decency Act.[9]

---

[6] *See Declaration of Dr. Navid Keshavarez-Nia* (Doc. No. 1, Exh. 19), *King, et al., v. Whitmer*, *et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 9.

[7] *See Federal Trade Comm., v. Facebook, Inc.*, Case 1:20-cv-03590 (D.D.C. 2020).

[8] *Id*. at ¶ 5.

[9] Press Release, *Committee to Hold Hearing with Big Tech CEOs on Section 230*, U.S. Senate Committee on Commerce, Science & Transportation, Oct. 16, 2020.

49.     Facebook asserts protection from civil liability for its "Good Samaritan" blocking of content *it* considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected. 47 U.S.C. § 230(c)(2)(A).

50.     Although Mr. Zuckerberg appeared supportive of changes to Section 230, Facebook continues to censor conservative voices and coverage related to election irregularities.

51.     At all material times, Facebook has burdened the Plaintiffs' rights to free speech, free press, and online assembly, based upon the favored political and health related preferences of Defendants, Mr. Zuckerberg and Ms. Chan.

52.     At all material times, Facebook has actively disseminated political and health related content that supports the narrow cultural views of the Defendants, Mr. Zuckerberg and Ms. Chan, and the executives and employees of Facebook.

53.     Facebook employs algorithms to automatically censor posts based upon words that Defendant, Mr. Zuckerberg, and his employees find offensive to their political agenda, which create pop-up notifications that allegedly fact-check the post, with a warning label.

54.     The conduct of Facebook precludes protection under the "publisher" exclusion set forth in 47 U.S.C. § 230(c)(1).

## MARK ZUCKERBERG

55.     Defendant, Mr. Zuckerberg, is only the third person on Earth to exceed a net worth of $100 Billion.[10]

---

[10] Tanza Loudenback, Liz Knueven and Taylor Nicole Rogers, *Mark Zuckerberg just became the third person on Earth worth over $100 billion. Here's how the Facebook CEO makes and spends his fortune*, Business Insider, Aug. 6, 2020.

56.     Defendants, Mr. Zuckerberg and Ms. Chan, have used their alter-ego, Facebook, to dominate the competition in business, and now in politics, by funding their political ideology through alleged philanthropic charities, and other civic minded entities, such as CTCL[11].

57.     Defendants, Mr. Zuckerberg and Ms. Chan, have pledged 99 percent of their shares and profits from Facebook to their philanthropic efforts, which include extraordinary donations to non-profit organization that share their political ideologies.[12]



---

[11] Nicholas Riccardi, *Mark Zuckerberg Donates $100M More to Help Election Offices*, Assoc. Press, October 13, 2020 ("The contribution brings the total funding for the election from Zuckerberg and Chan to $400 million — the same amount that Congress allocated in March to help fund election offices as they dealt with the difficulties of adapting to new voting behavior during the coronavirus pandemic.")

[12] Reuters Staff, *Facebook's Zuckerberg to give 99 percent of shares to charity*, Reuters, Dec. 1, 2015.

58.     In 2020, Mr. Zuckerberg and Ms. Chan donated over $400 million to Defendant, CTCL, and the other organization, such as, the Center for Election Innovation and Research and the Chan and Zuckerberg Initiative.

59.     Here, after receiving the funds from Mr. Zuckerberg and Ms. Chan, CTCL in turn granted millions of dollars to select cities and counties, across the country.[13]

60.     As a non-profit, CTCL represents to the public that it is "bi-partisan."

61.     CTCL's executive directors and board members are progressives, and primarily register Democrat.[14]

62.     As a reporter for the New York Times observed:

The prospect of election administrators tapping large pools of private money has raised new legal and political questions. That is partly because it is unusual for elections to be subsidized by nongovernment funding at this level, but also because most of the cash is coming from nonprofit groups that have liberal ties, and the biggest source of the cash, Mr. Zuckerberg, has drawn fire from across the political spectrum.

Kenneth P. Vogel, *Short of Money to Run Elections, Local Authorities Turn to Private Funds*, New York Times, September 25, 2020.

63.     Through their donations to CTCL, and other entities, Mr. Zuckerberg and Ms. Chan have created a scheme and an organized device to provide funding to pursue their political ideology, which is used as a part of the governmental function of holding an election—while stifling the speech of the political opposition on Facebook.

---

[13] Scott Walter, *What is Mark Zuckerberg's Election Money Doing in Georgia?* The Federalist, December 7, 2020.

[14] The founders of CTCL, Ms. Tiana Epps-Johnson, Donny Bridges and Whitney May, were co-workers at the New Organizing Institute, dissolved in 2015, and described as "the Democratic Party's Hogwarts for digital wizardry." Brian Fung, *Inside the Democratic Party's Hogwarts for Digital Wizardry*, Washington Post, April 24, 2019.

64.     The founder and Executive Director of CTCL, Ms. Tiana Epps-Johnson, holds a Fellowship with the Obama Foundation, was a director of the progressive New Organizing Institute, a Democratic grassroots election training group, and sits on the Board of Directors for the Center for Civic Design.[15]

65.     The actions of Defendants, Mr. Zuckerberg and Ms. Chan, have been coordinated to use private donations to the CTCL, and other alter-egos, to fund public functions in a scheme that deprives the people in unfunded areas of equal protection under law.

66.     Senior Facebook Engineer, Brian Amerige, posted to an internal employee message board, "We are a political monoculture that's intolerant of different views."[16]

67.     Other employees have been pressured to leave Facebook for contributing to political organization that are in opposition to the ideals of Mr. Zuckerberg and the senior leadership of Facebook.[17]

68.     The funds received from Facebook, Zuckerberg and Chan, and funneled through CTCL, and others, were administered and directed to the most effective counties, as determined by certain secretaries of state, with knowledge of their agenda and the impact it would have on the 2020 presidential election.

---

[15] *See* Scott Walter, *Georgia Election Officials, a Billionaire, and the "Nonpartisan" Center for Tech & Civic Life*, Capital Research Center, November 27, 2020.

[16] Kate Conger and Sheera Frenkel, *Dozens at Facebook Unite to Challenge Its 'Intolerant' Liberal Culture*, New York Times, Aug. 28, 2018 ("We claim to welcome all perspectives, but are quick to attack-often in mobs- anyone who presents a view that appears to be in opposition to left-leaning ideology."

[17] Nick Wingfield, *Oculus Founder Plots a Comeback With a Virtual Border Wall*, New York Times, June 4, 2017.

69.     The unconstitutional acts and omissions of the other Defendants would not have been possible without the funding provided by Mr. Zuckerberg and Ms. Chan,  which was funneled through their alter-ego, CTCL, and others, for the intended purpose of influencing the 2020 presidential election to benefit themselves, and others supportive of their political ideology.

70.     Through the combination of the censorship by Mr. Zuckerberg and Facebook, and the use of alter-egos to fund Mr. Zuckerberg and Ms. Chan's political ideology through extraordinary donations to local counties and election administrators,  Mr. Zuckerberg and Ms. Chan have directly funded a scheme to unlawfully and unconstitutionally interfere with a presidential election, in violation of the Constitution and multiple state election laws.[18]

71.     At all relevant times, Defendants, Mr. Zuckerberg, Ms. Chan and CTCL, inextricably wove themselves into the presidential election, which effected all the states in the Union, qualifying their concerted conduct as actionable under the Civil Rights Act.

72.     CTCL was instrumental in providing vote-by-mail funding, from donations received from Mr. Zuckerberg and Ms. Chan, their alter-ego, Facebook, and others in the technology industry, under the false excuse of COVID-19 pandemic relief.

73.      These grants were also considered additional "support" to city and county election offices, who were primarily involved in the unlawful conduct asserted by the State of Texas in their *Motion for Leave to File Bill of Complaint*, filed with the Supreme Court.[19]

---

[18] The Director of CTCL also serves as the Executive Director of the Colorado County Clerks Association with direct access to the Colorado County Voting apparatus, and sits on the board of another of Mr. Zuckerberg and Ms. Chan's donee's, Center for Election Innovation and Research. The Executive Director and President of CTCL leads a "team that is doing groundbreaking work to make US elections more inclusive and secure."

[19] *Texas v. Pennsylvania*, case 22O155 (U.S. filed Dec. 7, 2020).

74.     A general break down of the grants awarded in the relevant states, herein, include:

a.      **Georgia Counties**: Cobb ($5.6M), Fulton (6M), Gwinnett (4.2M), Dougherty (300K), Macon-Bibb (557K);

b.      **Michigan Counties**: Wayne (3.5M), Ann Arbor (417K), Flint (467K), Lansing (443K), Muskegon (433K), Pontiac (405K), and Saginaw (402K);

c.      **Pennsylvania Counties**: Alleghany (2.02M), Berks (471K), Centre (863K), Delaware (2.2M), and the City of Philadelphia (10M);

d.      **Wisconsin Counties**:  Cities Milwaukie (2.15M), Madison (1.27M), Green Bay (1.09M), Kenosha (862K), Racine (942K), and Janesville (183K).[20]

75.     The unconstitutional conduct of these Defendants includes, but is not limited to:

a.      funding unmanned ballot boxes in violation of state and federal law to bypass and intercept the United States Mail;

b.      unequally funding wage increases and bonuses for poll workers and canvassers;

c.      facilitating the purchase of voting machines, software, high speed vote tabulators, and voting booths;

d.      the training and recruitment of poll workers, many of whom participated in a conspiracy to influence the presidential election, but all of whom owed a duty to perform a governmental function of providing a free and fair election for the people of the United States—not the political favorite of Mr. Zuckerberg, Ms. Chan and others; and,

e.      actively suppressing the speech of others who disagree with the views held by the monoculture of Facebook, its chief executive officer and others, both before and after the 2020 presidential election.

76.     This conduct in furtherance of a conspiracy, scheme, and device, that burdens the rights of every registered voter in America, was implemented in municipalities and counties where documented election fraud and irregularities have occurred.

---

[20] https://ballotpedia.org/Non-profits_providing_vote_by_mail_support_to_city_and_county election_offices.

77.     Prior to the election, Defendants, Facebook and Mr. Zuckerberg, censored important information that would have exposed misdeeds, scandal, and possible involvement of their preferred candidate, which violated the Plaintiffs' First Amendment rights.[21]

78.     This pre-election censorship is now under federal investigation.[22]

79.     The Media Research Center conducted a poll of voters related to eight specific issues involving Facebook and Mr. Zuckerberg's preferred candidates, and determined that 17% of said voters would have changed their vote had they been aware of the censored information.[23]

80.     Facebook and Zuckerberg continue to censor election information including, any post related to President Trump, and any user on Facebook that uses the phrase "voter fraud" or "election fraud" is similarly censored.

81.     Facebook and Zuckerberg have engaged in such conduct as part of a larger scheme and device to interfere with a federal election—which continued after election night, and presently continues as an unconstitutional effort to sway the electorate in a presidential election.

82.     A private corporation can be fairly be said to be a state actor for purposes of the Civil Rights Act, if there is a sufficiently close nexus between the state and the challenged action of the private entity, so that the action of the latter may fairly be treated as that of the state itself. *Blum v. Yaretshy*, 457 U.S. 991, 1004 (1982).

---

[21] Marl Moore, *Post's Expose on Hunter Biden Soars Online Despite Social Media Censorship*, N.Y. Post, October 20, 2020.

[22] Evan Perez and Pamela Brown, *Federal Criminal Investigation into Hunter Biden Focuses on His Business Dealing in China*, CNN Politics, December 10, 2020.

[23] Jordan Davidson, *Poll: One in Six Would Have Changed Their Vote if They Had Known About Scandals Suppressed By Media*, The Federalist, November 24, 2020.

## CENTER FOR TECH AND CIVIC LIFE

83.     Defendant, CTCL, is a non-profit organization providing federal election grants to local governments.

84.     On its website, CTCL's mission includes training public election officials in communication and technology and to inform and mobilize voters.

85.     CTCL states it is "a team of civic technologists, trainers, researchers, election administration and data experts working to foster a more informed and engaged democracy, and helping to modernize elections."

86.     The founders of CTCL all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democrat campaigns in digital campaigning strategies.

87.     NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012.

88.     Funders of CTCL include groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

89.     CTCL is associated with Rock the Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections.

90.     Along with Rock the Vote and The Skoll Foundation, CTCL also lists Facebook as a partner in their efforts.

91.     CTCL is a progressive organization that targets urban cities for its private federal election grants to turn out the progressive vote in those urban cities.

92.     On or after September 1, 2020, CTCL received approximately $250 million from Defendants, Mr. Zuckerberg and Ms. Chan.

93.     CTCL used that money for federal election grants to local election offices as "COVID- 19 response grants."

94.     On its website, CTCL stated:

(CTCL) is excited to expand our COVID- 19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants to local election jurisdictions across the country to help ensure you have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

95.     In 2020, Defendant, CTCL provided private federal election grants to cities and counties in Pennsylvania, Wisconsin, Michigan and Georgia.

96.     Said states do not accept CTCL's private elections grants.

97.     To accomplish its objectives, Defendant, CTCL, circumvented these state's legislatures, and recruited local governments to apply and agree to accept CTCL's private federal election grants.

98.     CTCL's private federal election grants to counties and cities in Michigan, Wisconsin, Pennsylvania and Georgia were not approved by Congress, nor by the respective state legislatures of the states, herein listed.

99.     In the *Help America Vote Act* (HAVA), Congress left discretion to the states on how to implement federal elections.[24]

100.    HAVA preempts CTCL's private federal election grants to the cities and counties.

---

[24] *See* 52 USC §§ 20901-21145.

101.    Under HAVA, and the Supremacy Clause of the Constitution, CTCL's private federal election grants are not legally authorized by federal law, nor the laws of the states, herein.

102.    Public-private partnerships are constitutionally impermissible in federal elections.

103.    CTCL private federal elections grants are a constitutionally impermissible public-private partnership.

104.    The entanglement of public and private interests involved with cities and counties accepting and using CTCL's private federal election grant are unconstitutionally impermissible.

105.    Federal and state governments exclusively fund federal elections to eliminate undue influence and the appearance of undue influence by private parties.

106.    CTCL's private funding of federal elections appeared to and, in fact, did unduly influence the 2020 presidential election.

107.    Congress enacted the *National Voter Registration Act* (NVRA)[25] to create "national procedures for voter registration for elections for Federal office." 52 U.S.C. § 20503.

108.    NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for, or renew a driver's license, and requires states to forward the completed application to the appropriate state or local election official. 52 U.S.C. § 20504.

109.    NVRA provides that citizens can register to vote by mail using mail-in forms developed by each state and the Election Assistance Commission (EAC). 52 U.S.C. § 20505.

110.    The purpose of the NVRA was to coordinate federal and state administration of voter registration for federal elections, and to create legally authorized, nationwide, and uniform standards for voter registration.

---

[25] *See* 52 U.S.C. §§ 20501-20511.

111.    NVRA does not legally authorize local governments to accept private federal election grants for voter registration.

112.    NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration.

113.    Under NVRA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way on voter registration for federal elections.

114.    The CTCL's private federal election grants circumvent the EAC and the states, and thus conflicts with NVRA.

115.    CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

116.    The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration.

117.    Local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration, which is not approved by the EAC, or the states.

118.    States are not allowed to deviate from the NVRA.

## THE ELECTION

119.    On November 3, 2020, a presidential election was held in every state of the Union (Election).

120.    Leading up to the Election, the Defendants conspired to change election laws, without consent of the people acting through their respective state legislatures.

121.    At all relevant times prior to and after the Election, in violation of the Constitution, Facebook, at the direction of Mr. Zuckerberg, censored certain media, press releases, articles, opinions and posts concerning the Election.

122.    During the late evening of November 3, 2020, many of the so-called "swing states," where reporting election results in favor of the incumbent presidential candidate.

123.    Thereafter, a number of states prematurely stopped counting ballots.

124.    During the early morning hours of November 4, 2020, the Defendants' preferred presidential candidate received a statistically impossible spike in votes.

125.    Dominion voting machines were used in over 1600 counties across the United States, many of which were set to flag a high rate of ballots for adjudication, which could then be used to alter or delete votes in favor of one candidate.

126.    The combination of unconstitutional acts and omission by the Defendants, as described herein, has created a constitutional crisis, destroyed the people's faith in elections, violated the rights of millions of people, weakened national security, triggered financial uncertainty and mental anguish, and increased the possibility of civil and world war, all of which has proximately caused damage to the Plaintiffs, and every registered voter similarly situated.

**MICHIGAN**

127.    In 2018, the Michigan constitution was amended to allow all registered voters the right to request and vote by absentee ballot without giving a reason. Mich. Const. art. 2, § 4.

128.    On May 19, 2020, Defendant, Ms. Benson, announced that the secretary of state would send unsolicited absentee-voter ballot applications by mail to all 7.7 million registered Michigan voters, prior to the primary and general elections.

129.    Ms. Benson's acts and omissions failed to ensure that Michigan's election systems and procedures were adequate to ensure the accuracy and legality of the historic flood of mail-in votes.[26]

130.    In fact, Ms. Benson's acts and omissions "did away with protections designed to deter voter fraud." *Texas v. Pennsylvania*, ¶ 81.

131.    As alleged by the State of Texas, joined by 20 other states in the Union, Ms. Benson's "flooding of Michigan with millions of absentee ballot applications prior to the 2020 general election violated" Michigan law. *Id.*

132.    M.C.L. § 168.759(3), states:

An application for an absent voter ballot under this section may be made in any of the following ways:

a.  By a written request signed by the voter;

b.  On an absent voter ballot application form provided for that purpose by the clerk of the city or township; and,

c.  On a federal postcard application.

---

[26] *See* Motion for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, case 22O155, (U.S. filed Dec. 7, 2020) (*Texas v. Pennsylvania*), ¶ 81.

133.    The Michigan Legislature did not include the secretary of state as a means for distributing unsolicited absentee ballots without application by a voter. *Id.* at § 168.759(3)(b).

134.    Under the statute's plain language, the Legislature explicitly gave only local clerks the power to distribute absentee voter ballots, upon application. *Id.*

135.    Because the Legislature declined to explicitly include the secretary of state as a vehicle for distributing absentee ballots applications, Defendant, Ms. Benson, "lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan." *Texas v. Pennsylvania*, ¶ 84.

136.    In June 2020, Defendant, Ms. Benson, also violated Michigan law when she launched a program allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. *Id.* at ¶ 85.

137.    The Michigan Legislature did not approve or authorize Ms. Benson's unilateral actions. *Id.*

138.    MCL § 168.759(4) states in relevant part:

An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application.

139.    Further, MCL § 168.761(2) states in relevant part:

The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot, and if the signatures do not agree sufficiently or [if] the signature is missing the ballot must be rejected.

140.    Ms. Benson's "unconstitutional modifications of Michigan's election rules resulted in the distribution of millions of absentee ballot applications without verifying voter signatures as required by MCL §§ 168.759(4) and 168.761(2)." *Texas v. Pennsylvania*, ¶ 89.

141.    Democrats in Michigan voted by mail at a ratio of approximately two to one compared to Republican voters.

142.    Defendant, Ms. Benson, "without legislative approval, unilaterally abrogated Michigan election statutes related to absentee ballot applications and signature verification." *Id*. at ¶ 79.

143.    Michigan's Legislature has not ratified these changes, and Michigan's election laws do not include a severability clause." *Id*.

144.    Michigan also requires that poll watchers and inspectors have access to vote counting and canvassing. M.C.L. §§ 168.674-.675. *Id*. at ¶ 90.

145.    Local election officials in Wayne County made a conscious and express policy decision not to follow M.C.L. §§ 168.674-.675 for the opening, counting, and recording of absentee ballots. *Id*. at ¶ 91.

146.    Michigan also has strict signature verification requirements for absentee ballots, including that the Elections Department place a written statement or stamp on each ballot envelope where the voter signature is placed, indicating that the voter signature was in fact checked and verified with the signature on file with the State. *See* MCL § 168.765a(6).

147.    However, Wayne County made the policy decision to ignore Michigan's statutory signature verification requirements for absentee ballots. *Id*. at ¶ 93.

148.    Thus, one presidential candidate, over the rest, materially benefited from those unconstitutional changes to Michigan's election law, who happens to be the choice of those involved in the scheme and device to interfere with the federal election process.

149.    As is outlined in *Texas v. Pennsylvania*, numerous poll challengers and an Election Department employee whistleblower have testified that the signature verification requirement was ignored in Wayne County. *Id.* at ¶ 94.[27]

150.    In *Johnson v. Benson*, Jesse Jacob, a decades-long City of Detroit employee assigned to work in the Elections Department for the 2020 election testified that:

   a.    absentee ballots that were received in the mail would have the voter's signature on the envelope;

   b.    while I was at the TCF Center, he was instructed not to look at any of the signatures on the absentee ballots; and that,

   c.    he was instructed not to compare the signature on the absentee ballot with the signature on file.[28]

151.    The TCF was the only facility within Wayne County authorized to count ballots for the City of Detroit. *Texas v. Pennsylvania*, ¶ 95.

152.    These non-legislative modifications to Michigan's election statutes resulted in a number of constitutionally tainted votes that far exceeds the margin of voters separating the presidential candidates in Michigan. *Id.* at ¶ 96.

---

[27] *See Johnson v. Benson*, Petition for Extraordinary Writs & Declaratory Relief, Case No. 162286, (Mich. 2020), ¶ 71, 138-39, App. 25a-51a.

[28] *Id.*, Affidavit of Jessy Jacob, App. 14 at ¶ 15.

153.    Additional, public information confirms the material adverse impact on the integrity of the vote in Wayne County, caused by these unconstitutional changes to Michigan's election law. *Id*. at ¶ 97.

154.    For example, the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit. *Id.*, Cicchetti Decl. at ¶ 27, App. 8a.

155.    The number of votes not tied to a registered voter by itself exceeds the margin of victory of the announced winner of the presidential election by more than 28,377 votes. *Id*. at ¶ 97.

156.    The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations. *Id*. at ¶ 97, and App. 25a-51a.

157.    After the election, "County Board of Canvassers ("Canvassers Board"), William Hartman, determined that 71% of Detroit's Absent Voter Counting Boards ("AVCBs") were unbalanced—*i.e.*, the number of people who checked in did not match the number of ballots cast—without explanation." *Id*. at ¶ 99, and App. 25a-51a, at ¶ 29.

158.    On November 17, 2020, the Canvassers Board deadlocked 2-2 over whether to certify the results of the presidential election based on numerous reports of fraud and unanswered material discrepancies in the county-wide election results. *Id*. at ¶ 100.

159.    A few hours later, the Republican Board members reversed their decision and voted to certify the results after severe harassment, including threats of violence. *Id*.

160.    The following day, the two Republican members of the Board *rescinded their votes* to certify the vote and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious irregularities in Detroit votes are resolved. *Id*. at ¶ 100, Cicchetti Decl. at ¶ 27, App. 8a.

161.    As determined by the State of Texas and many other states in support thereof, "[r]egardless of the number of votes that were affected by the unconstitutional modification of Michigan's election rules, the non-legislative changes to the election rules violates the Electors Clause." *Id*. at ¶ 100.

162.    "There exists sufficient evidence to place in doubt [Michigan's] presidential election results in identified key counties, including issues with transparency, fraudulent changing of dates, a software glitch, clerical errors, illegal votes, and many other issues and irregularities."[29]

163.    Additionally, Defendants, Mr. Zuckerberg, Ms. Chan and their alter-egos, Facebook and CTCL, funneled approximately $9.8 million to ten different, predominately Democrat, counties across the state of Michigan.

164.    This infusion of private money created an unfair, two-tier election system, which caused disparate treatment of voters and thus violated the civil and constitutional rights of millions of Michiganders and American citizens.[30]

---

[29] Verified Complaint for Declaratory and Injunctive Relief (Doc. 1), *Bally v. Whitmer*, case 1:20-cv-1088 (W.D. Mich. filed Nov. 11, 2020), ¶ 44.

[30] *See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson*, case MSC No. 162286 (Mich. filed Nov. 26, 2020).

165.    The money paid by Mr. Zuckerberg and Ms. Chan, through CTCL, was used to:

a.    Pay ballot harvesters;

b.    Fund mobile ballot pick-up units;

c.    Deputize and pay political activists to manage ballots;

d.    Pay poll workers, election judges, i.e., inspectors and adjudicators;

e.    Establish drop-boxes to bypass and intercept the United States Mail.

f.    Establish other satellite offices;

g.    Pay local election officials and agents "hazard pay" to recruit cities recognized as Democrat Party strongholds to apply for the non-profit grants;

h.    Consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots, without legally required observation;

i.    Implement a two-tiered ballot curing plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

j.    Subsidize and design a scheme to remove poll watchers from one political party so that the critical responsibility of counting the ballots could be done without oversight.[31]

166.    After an election, the secretary of state "on the receipt of the certified copies of the statements of votes given in the several counties," lays "before the board the statements received by [her] of the votes given at such election in the several counties." Mich. Code § 168.843.

167.    Thereafter, the Board of State Canvassers examines the statements received by the secretary of state of the votes cast in the several counties, and prepares a statement showing the total number of votes cast for all candidates. Mich. Code §§ 168.841-845.

---

[31] *Id., Expert Report of James Carlson*, App. 245-276.

168.     According to a Republican board member, the Board of State Canvassers duty is "ministerial," and there's "nothing in the law that gives me the authority to request an audit or block certification."[32]

169.     On November 23, 2020, the board-certified Michigan's election.

170.     The members of the board are executive officers under the supervision of the Governor, the latter of which is elected and sworn to uphold the Constitution.

171.     On November 23, 2020, Defendant, Ms. Whitmer, with knowledge of the numerous election irregularities and unconstitutional behavior of officers in her administration, released the following statement after the Michigan State Board of Canvassers voted to certify the results of the November 2020 election:

> I commend the three members of the State Board of Canvassers who voted to follow the law and certify the 2020 election results today. The people of Michigan have spoken. President-elect Biden won the State of Michigan by more than 154,000 votes, and he will be our next president on January 20th. I also want to thank Secretary of State Jocelyn Benson and the local clerks across Michigan who made sure this year's election was free, fair and secure, and the voters who turned out in record numbers to make their voices heard. Now, it's time to put this election behind us and come together as a state to defeat our common enemy: COVID-19.

172.     Thereafter, on December 14, 2020, Michigan's 16 electoral college delegates unanimously voted in support of the Democrat candidates for president and vice-president.[33]

---

[32] Ari Beerman, *In a Blow to Trump, Michigan's Canvassing Board Certifies Election Results*, Mother Jones, Nov. 23, 2020.

[33] Dave Boucher, *Michigan's Electoral College delegates cast all 16 votes for Joe Biden, Kamala Harris*, Detroit Free Press, Dec. 14, 2020. *See also* Pat Droney, *Governor Whitmer Has Police, 200 Troops Block Republican Electors From Michigan State Capital*, Law Enforcement Today, December 14, 2020.

173.   On that same day, Allied Security Operations Group "(ASOG"), released a report of an audit of the Dominion voting machines and software used in Antrim County, Michigan, in the 2020 election ("ASOG Report").[34] A copy of the *Revised Preliminary Summary V2* is attached hereto as Plaintiff's Exh. 9, as though fully contained herein.

174.   The ASOG Report concludes:

Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan. We further conclude that the results of Antrim County should not have been certified.

175.   Said report was generated after a Michigan voter petitioned the court for a temporary restraining order requiring Antrim County to preserve the Dominion machines and electronic data in the county, and to allow expert auditors to inspect the sequestered machines.

176.   On December 1, 2020, a memo from the Michigan Bureau of Elections, an agency overseen by Ms. Benson, ordered Michigan county clerks to '"delete Electronic Poll Book software and associated' even as calls to audit the election persist."[35]

177.   On December 4, 2020, said Michigan court granted the petitioning voter the right to have his experts inspect the Dominion Voting Machines and contributing date.

---

[34] *William Bailey v. Antrim County*, case 2020-CZ-9238 (13th Cir.Ct. Mich. filed Dec. 13, 2020).

[35] Frank Salvato, *Michigan Secretary of State Issues Order to Delete Election Data Amid Audit Calls,* National File, December 4, 2020.

178.    On December 9, 2020, Defendant, Ms. Benson, moved for a protective order to conceal the results of the examination—which was initially granted, but later removed by the court.

179.    On December 13, 2020, the Michigan Attorney General, Dana Nessel, tweeted:

 

**Dana Nessel** ✔
@dananessel

Fun fact: Lawyers who practice in Michigan are required to take an oath to support the MI and US Constitutions, not to file unjust and/or frivolous actions or mislead the court. The spate of Trump lawsuits in our state violates each of these tenets. It demeans our profession.

180.    Due to the unconstitutional acts of Defendant, Ms. Benson, and others, said statements from the several counties were constitutionally tainted and, thus, all of Ms. Benson's conduct involving the certification of Michigan's federal election is unconstitutional.

181.    As the United States Supreme Court has held many times:

[T]he Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law… when a state officer acts under a state law in a manner violative of the Federal Constitution, he 'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'

*Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (quoting *ex parte Young*, 209 U.S. 123, 159-160 (1908).

182.    In acting in said unconstitutional manner, as described herein, Defendant, Ms. Benson, was stripped of her official capacity as Secretary of State of the State of Michigan.

183.     As such, Defendant, Ms. Benson, was acting outside the scope of her official capacity when she certified said results of the presidential election.

184.     Defendant, Ms. Whitmer, as the state's chief executive officer, is responsible for the constitutional execution of the state's laws.

185.     The governor of Michigan is responsible for transmitting the state's results of an election to the United States for transmission to Congress and, by state law, to the United States secretary of state. *See* 3 U.S.C. § 6. Mich. Code § 168.46.

186.     This ministerial task has been unconstitutionally corrupted by her subordinate executive officers and other election officials, and Ms. Whitmer's "failure to meaningfully investigate and determine the proper lawful vote counts when the general election was marked with inaccuracy and loss of integrity over absentee ballots and other serious statutory violations such as failure to require bipartisan oversight at absent voting counting boards."[36]

187.     In allowing the board and secretary of state to certify an unconstitutional presidential election, as described herein, Ms. Whitmer was stripped of her official capacity as Governor of the State of Michigan.

188.     As such, Ms. Whitmer was acting outside the scope of her official capacity, when the results of the Election were certified, as above.

189.     Said certification of the Election is *ultra vires* and unconstitutional.

190.     Said certification of the Election is void *ab initio*.

---

[36] *See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson*, filed Nov. 26, 2020, MSC No. 162286 (Mich. filed Nov. 26, 2020), ¶ 38.

# GEORGIA

191.    In 2017, Georgia voters and a voting rights organization brought separate § 1983 actions, later consolidated, against Georgia state officials alleging that the state's reliance on a direct recording electronic ("DRE") voting system burdened their 14th Amendment rights to due process and equal protection.[37]

192.    Thereafter, on or about April 4, 2019, behind closed doors, Mr. Kemp signed a bill that, among other things, granted Dominion an estimated $150 million contract to replace Georgia's voting machines.[38]

193.    An expert witness in the *Curling* case in Georgia, Harri Hursti, observed Georgia's June 9, 2020, statewide primary, and August 11 runoff, and participated in a Rule 34 inspection of the ongoing updating of Dominion software in Fulton County, Georgia.[39]

194.    In a 48-page affidavit, Mr. Hursti noted "a wide range of well-known and publicly disclosed vulnerabilities."[40]

---

[37] *Curling, et al., v. Raffensperger, et al.,* Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.) ("*Curling* case"). *See also* Johnny Kaufman, *Federal Court Asked to Scrap Georgia's 27,000 Electronic Voting Machines*, NPR, September 12, 2018.

[38] Ben Nadler, *Georgia Gov. Kemp Signs New Touchscreen Voting Machines Bill*, Associated Press, April 4, 2019. *See also*, Greg Bluestein and Mark Niesse, *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal- Constitution, June 14, 2019("In a statement by [Fair Fight, a voting rights organization started by Stacey Abrams], the group called it "corruption at its worst.").

[39] *See Declaration of Harri Hursti*, October 4, 2020, *Curling* case, Doc. 942, Exh. A. *See also Id.*, Docs. 680-1, 800-2, 809-3, 860-1, 877, and 923-2 (prior declarations of Mr. Hursti).

[40] *See Declaration of Harri Hursti* (Doc. 809-3, Exh. 2), *Curling* case, August 24, 2020, ¶ 36.

195.    The security risks outlined in Mr. Hursti's affidavit, including, the "operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* at ¶ 49.

196.    On October 4, 2020, Mr. Hursti signed a supplemental affidavit concerning his observation and inspection "to review the ongoing software updating of the Dominion software for Fulton County ballot marking device ('BMD') touchscreen units to ICX software version 5.5.10.32."[41]

197.    Based upon Mr. Hursti expert opinion, the "methods and processes of adopting and installing this software change is completely unacceptable." *Id.* at ¶ 20.

198.    The "methods and processes adopted by Dominion in Fulton County do not meet national standards for managing voting system technical problems and remedies, and should not be accepted for use in a public election under any circumstances." *Id.*

199.    As is outlined in *Texas v. Pennsylvania*:

a.      Georgia law prohibited the opening of absentee ballots until after the polls open on Election Day. O.C.G.A. § 21-2-386(a)(2).

b.      Georgia law authorized and required a single registrar or clerk—after reviewing the outer envelope—to reject an absentee ballot if the voter: failed to sign the required oath or to provide the required information; the signature appears invalid; the required information does not conform with the information on file; or, if the voter is otherwise found ineligible to vote. O.C.G.A. § 21-2-386(a)(1)(B)-(C).

---

[41]    *Declaration of Harri Hursti* (Doc. 942, ¶ 3), *Curling* case, Oct 2, 2020.

c.   Georgia law provided absentee voters the chance to "cure a failure to sign the oath, an invalid signature, or missing information" on a ballot's outer envelope by the deadline for verifying provisional ballots (i.e., three days after the election). O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c)(2).

d.   To facilitate cures, Georgia law required the relevant election official to notify the voter in writing: "The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, a copy of which notification shall be retained in the files of the board of registrars or absentee ballot clerk for at least two years." O.C.G.A. § 21-2-386(a)(1)(B).

e.   On March 6, 2020, Georgia's Secretary of State entered a Compromise Settlement Agreement and Release with the Democratic Party of Georgia (the "Settlement") to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the express mandatory procedures set forth at O.C.G.A. § 21-2-386(a)(1)(B).[42]

f.   Among other things, before a ballot could be rejected, the Settlement required a registrar who found a defective signature to now seek a review by two other registrars, and only if a majority of the registrars agreed that the signature was defective could the ballot be rejected but not before all three registrars' names were written on the ballot envelope along with the reason for the rejection. *Texas v. Pennsylvania*, ¶ 71.

g.   These cumbersome procedures are in direct conflict with Georgia's statutory requirements, as is the Settlement's requirement that notice be provided by telephone (i.e., not in writing) if a telephone number is available. Finally, the Settlement purports to require State election officials to consider issuing guidance and training materials drafted by an expert retained by the Democratic Party of Georgia. *Id.*

h.   Georgia's legislature has not ratified these material changes to statutory law mandated by the Compromise Settlement Agreement and Release, including altered signature verification requirements and early opening of ballots. *Id.* at ¶ 72.

i.   This unconstitutional change in Georgia law materially benefitted one presidential candidate, over another. *Id.* at ¶ 74.

---

[42] *See Democratic Party of Georgia, Inc. v. Raffensperger,* case 1:19-cv-05028-WMR (N.D. Ga.).

j.  According to the Georgia Secretary of State's Office, the Democrat's nominee for president had almost double the number of absentee votes (65.32%) as the incumbent candidate. (34.68%). *Id.*, Cicchetti Decl. at ¶ 25, App. 7a-8a.

k.  The effect of this unconstitutional change in Georgia election law, which made it more likely that ballots without matching signatures would be counted, had a material impact on the outcome of the election. *Id.* at ¶ 65.

l.  Specifically, there were 1,305,659 absentee mail-in ballots submitted in Georgia in 2020. There were 4,786 absentee ballots rejected in 2020. This is a rejection rate of .37%. In contrast, in 2016, the 2016 rejection rate was 6.42% with 13,677 absentee mail-in ballots being rejected out of 213,033 submitted, which more than seventeen times greater than in 2020. *Id.*, Cicchetti Decl. at ¶ 24, App. 7a.

m.  If the rejection rate of mailed-in absentee ballots remained the same in 2020 as it was in 2016, there would be 83,517 less tabulated ballots in 2020. *Id.* at ¶ 76.

n.  The statewide split of absentee ballots was 34.68% for Trump and 65.2% for Biden. *Id.*

o.  Rejecting at the higher 2016 rate with the 2020 split between Trump and Biden would decrease Trump votes by 28,965 and Biden votes by 54,552, which would be a net gain for Trump of 25,587 votes. *Id.*

p.  This would be more than needed to overcome the Biden advantage of 12,670 votes, and Trump would win by 12,917 votes. *Id.*

q.  Regardless of the number of ballots affected, the non-legislative changes to the election rules violated the Electors Clause. *Id.*

200.  After the Election, local attorney, L. Lin Wood, Jr., Esq., filed a verified

complaint against Georgia's Secretary of State, Defendant, Mr. Raffensperger.

201. The complaint sued the secretary of state in his official capacity, wherein Attorney Wood accused Mr. Raffensperger of unilaterally abrogating Georgia law governing the signature verification process for absentee ballots.[43]

202. On November 25, 2020, former U.S. Attorney, Sidney Powell, Esq. (Attorney Powell), on behalf of a group of Georgia voters, filed a complaint in federal court for emergency relief to "de-certify the results of the General Election for the Office of President." (Pearson Complaint).[44]

203. In the Pearson Complaint, the Plaintiff's alleged that Georgia's certification of the Election was unconstitutional, based upon:

a. the conduct of Defendant, Mr. Raffensperger, acting in his official authority as the chairman of the State Election Board, wherein said board adopted Secretary of State Rule 183-1-14-0.9-.15, *Processing Ballots Prior to Election Day*, in direct conflict with O.C.G.A. § 21-2-386(a)(2);

b. the unconstitutional conduct of certain Georgia county election officials, who, after Defendant, Mr. Raffensperger, instructed Georgia counties to conduct an audit of said federal election in a manner consistent with O.C.G.A. § 21-2-498, did not provide certain political parties and candidates meaningful access and an opportunity to review the validity of mail-in ballots during the pre-canvassing meetings and, specifically, mishandled many other ballots—which established a pattern showing the absence of mistake. *Id*. at ¶¶ 64-91.

c. specific acts of fraud, including the counting of certain absentee ballots in Fulton County, Georgia, without observers, due to a false claim of a "pipe burst," which resulted in the tabulation center "shutting down" for 2 ½ hours, while said ballots were unlawfully counted, without observers present. *Id*. at ¶¶ 111-114.

---

[43] *See* Verified Amended Complaint, *Woods v. Raffensperger* (Doc. No. 5)*, Case 1:19-cv-05028-WMR (N.D. Ga. Nov. 15, 2020).

[44] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1), *Pearson, et al., v. Kemp.*, Case 1:20-cv-04809-TCM (N.D. Ga. Nov. 25, 2020).

d.      specific acts of fraud, including the identification of the Voting Systems
        Officer of Strategy and Security of the company that manufactured said
        voting machines, Dominion Voting Systems Corporation, who publicly
        made derogatory remarks about the incumbent, Presidential candidate, and
        has documented ties to a domestic terrorist organization. *Id.* at ¶ 120.

e.      numerous public records, expert reports and witness statements evidencing
        the Defendants' "egregious misconduct, including ignored legislative
        mandates concerning mail-in and ordinary ballots [that] led to
        disenfranchisement of an enormous number of Georgia voters." *Id.* at ¶ 122.

f.      statistical analysis performed by experts established: "lost votes;" "a pattern
        of widespread fraud;" votes casts by persons who have moved out of
        Georgia or had "fraudulent residence addresses;" analysis that established a
        "platykurtic distribution;" thousands of "missing and unlawful ballots;" and
        "data breaches in the Dominion software permitting rogue actors to
        penetrate and manipulate the software during the recent general election."
        *Id.* at ¶¶ 122-131.[45]

g.      the software used by the voting machines in Georgia, which allowed
        operators of the machines to: accept or discard batches of votes; mark
        certain ballots as "problem ballots" for *discretionary determination*; and,
        view and delete individual ballot scans—without "guarantee that electronic
        ballots accurately reflect the choices of voters because there's no paper
        backup to verify results," contrary to 50 U.S.C. § 20701. *Id.* at ¶¶ 92-102.

h.      evidence that said software used by the voting machines in Georgia was
        created to rig elections, facilitate vulnerability and to "allow a select few to
        determine which votes will be counted in any election." *Id.* at ¶ 103.

i.      evidence of a common scheme, plan and *modus operandi*, concerning the
        creation of said software to manipulate elections, worldwide, e.g. in
        Venezuela. *Id.* at ¶103.

j.      the foreign connections and ownership of said software and voting
        machines, used throughout Georgia. *Id.* at ¶104-105.

---

[45] *See*, An Analysis of Surveys Regarding Absentee Ballots Across Several States by William M
Biggs (Doc. No. 1-1), *Pearson Complaint*, Nov. 25, 2020. *See also* Declaration of Eric Quinnell
(Doc. No. 1-27), *Pearson Complaint*, Nov. 25, 2020.

k.      the numerous reports, articles and statements made by prominent political figures, newspaper articles, television news shows, and multiple interviews over the last fifteen years indicating the unreliability of said software and voting machines, many of which included warnings that the software and voting machines, herein used, created a treat to the national security of the United States. *Id*. at ¶¶ 104-115.

l.      analysis concluding that said system and software "have been accessible and were certainly compromised by rogue actors, such as Iran and China." *Id*. at ¶¶ 111-114.

204.    Also, within "the State of Georgia, private non-profits, state officials and local elected officials acted to systematically eviscerate Georgia's Election Law contrary to Title 21 of the Official Code of Georgia—failing to protect election integrity."[46]

205.    For example, as a part of the scheme herein described, Defendant, CTCL, using money given to it by Defendants, Mr. Zuckerberg and Ms. Chan, granted $6.3 million dollars to Fulton County, Georgia, which was primarily used to:

a.      pay ballot harvesters;

b.      fund mobile ballot pick-up units;

c.      deputize and pay political activists to manage ballots;

d.      pay election judges and poll workers;

e.      establish satellite offices, and fund drop-boxes to bypass and intercept United States Mail;

f.      pay local election officials and agents to recruit cities recognized as democratic strongholds to recruit other cities to apply for the grants from non-profits;

---

[46] Petition for Election Contest, *Wood v. Raffensperger*, case 2020CV342959 (Ga. Super. Ct. filed November 25, 2020), pp. 1-2.

g.      consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots, without legally required observation;

h.      initiate and implement a two-tiered ballot "curing" plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

i.      pay for and help design the plan to remove the poll watchers from one political party so that the critical responsibility of determining the validity of the ballot and the validity of the count could be conducted without oversight.[47]

206.    On November 20, 2020, Defendant, Mr. Raffensperger, unconstitutionally certified the Election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

207.    In acting in said unconstitutional manner, as described herein, Defendant, Mr. Raffensperger, was stripped of his official capacity as Secretary of State of the State of Georgia.

208.    As such, Mr. Raffensperger was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

209.    On November 20, 2020, Defendant, Mr. Kemp, unconstitutionally certified the election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

210.    In acting in said unconstitutional manner, as described herein, Mr. Kemp was stripped of his official capacity as Governor of the State of Georgia.

211.    As such, Mr. Kemp was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

212.    Said certifications of the Election are *ultra vires* and unconstitutional.

213.    Said certifications of the Election are void *ab initio*.

---

[47] *Id*., Harding Decl., Exh. A, B, C and F, to the original petition, ¶ 25, App. 7a-8a.

# PENNSYLVANIA

214.    In 2019, Pennsylvania enacted bipartisan election reforms that, among other things, set a deadline of 8:00 p.m. on election day for a county board of elections to receive a mail-in ballot. 25 Pa. Stat. §§ 3146.6(c), 3150.16(c).

215.    Later, the Pennsylvania's Supreme Court extended that deadline to three days after Election Day, and adopted a presumption that even non-postmarked ballots were presumptively timely.[48]

216.    On August 7, 2020, the League of Women Voters of Pennsylvania, and others, filed a complaint against Defendant, Ms. Boockvar, in her official capacity, and other local election officials, seeking "a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting" were unlawful for a number of reasons.[49]

217.    The Pennsylvania Department of State quickly settled with the plaintiffs, issuing revised guidance on September 11, 2020, stating in relevant part:

> The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

218.    This guidance is contrary to Pennsylvania law, and unconstitutional.[50]

---

[48] *Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020).

[49] *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT (E.D. Pa. filed Aug. 7, 2020).

[50] *Texas v. Pennsylvania*, ¶¶ 41-63.

219.     In *Texas* v. *Pennsylvania*, filed after the election in the U.S. Supreme Court, the

Attorney General of the State of Texas averred:

> Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval,
> unilaterally abrogated several Pennsylvania statutes requiring signature verification
> for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these
> changes, and the legislation did not include a severability clause.

*Texas v. Pennsylvania*, ¶ 43.

220.     As outlined in *Motion for Leave to File Bill of Complaint*:

a.     Prior to the election, Secretary Boockvar sent an email to local election
officials urging them to provide opportunities for various persons—
including political parties—to contact voters to "cure" defective mail-in
ballots. This process clearly violated several provisions of the state election
code;

b.     Section 3146.8(a) requires: "The county boards of election, upon receipt of
official absentee ballots in sealed official absentee ballot envelopes as
provided under this article and mail-in ballots as in sealed official mail-in
ballot envelopes as provided under Article XIII-D,1 shall safely keep the
ballots in sealed or locked containers until they are to be canvassed by the
county board of elections;"

c.     Section 3146.8(g)(1)(ii) provides that mail-in ballots shall be canvassed (if
they are received by eight o'clock p.m. on election day) in the manner
prescribed by this subsection.

d.     Section 3146.8(g)(1.1) provides that the first look at the ballots shall be "no
earlier than seven o'clock a.m. on election day." And the hour for this "pre-
canvas" must be publicly announced at least 48 hours in advance. Then the
votes are counted on election day.

e.     By removing the ballots for examination prior to seven o'clock a.m. on
election day, Secretary Boockvar created a system whereby local officials
could review ballots without the proper announcements, observation, and
security. This entire scheme, which was only followed in Democrat majority
counties, was blatantly illegal in that it permitted the illegal removal of
ballots from their locked containers prematurely.

*Id*. at ¶¶ 50-51.

221.    As a result of Ms. Boockvar's unconstitutional acts, state and local election officials in Philadelphia and Allegheny Counties violated Pennsylvania's election law by adopting different standards for voters in Philadelphia and Allegheny Counties, with the intent to favor one presidential candidate, over another. *Id.* at ¶ 52.[51]

222.    As a result of said unconstitutional acts by Ms. Boockvar, absentee and mail-in ballots in Pennsylvania were evaluated under an illegal standard regarding signature verification. *Texas v. Pennsylvania*, ¶ 53.

223.    As stated by Texas, "It is now impossible to determine which ballots were properly cast and which ballots were not." *Id.*

224.    The changed process allowing the curing of absentee and mail-in ballots in Allegheny and Philadelphia counties is a separate basis resulting in an unknown number of ballots being treated in an unconstitutional manner, inconsistent with Pennsylvania statute. *Id.* at ¶ 54.

225.    In addition, a great number of ballots were received after the statutory deadline, and yet were counted by virtue of the fact that Pennsylvania did not segregate all ballots received after 8:00 pm on November 3, 2020. *Id.* at ¶ 55.

226.    As stated by Texas:

Boockvar's claim that only about 10,000 ballots were received after this deadline has no way of being proven since Pennsylvania broke its promise to the Court to segregate ballots and co-mingled perhaps tens, or even hundreds of thousands, of illegal late ballots.

*Id.*

---

[51]  *See also* Verified Complaint (Doc. 1), *Donald J. Trump for President, Inc. v. Boockvar*, case 4:20-cv-02078-MWB (M.D. Pa. filed Nov. 18, 2020), ¶¶ 3-6, 9, 11, 100-143.

227.     On December 4, 2020, fifteen members of the Pennsylvania House of

Representatives, led by Rep. Francis X. Ryan, issued a report to U.S. Congressman Scott Perry

(Ryan Report).[52]

228.     The Ryan Report states:

> The general election of 2020 in Pennsylvania was fraught with inconsistencies,
> documented irregularities and improprieties associated with mail-in balloting, pre-
> canvassing, and canvassing that the reliability of the mail-in votes in the
> Commonwealth of Pennsylvania is impossible to rely upon.

Ryan Report, *Texas v. Pennsylvania*, App. 139a-144a.

229.     The Ryan Report's findings include:

a.       Ballots with NO MAILED date total is 9,005;

b.       Ballots Returned on or BEFORE the Mailed Date total is 58,221; and,

c.       Ballots Returned one day after Mailed Date. That total is 51,200.

*Id*. at App. 143a.

230.     The State of Texas plead to the U.S. Supreme Court that these "nonsensical

numbers alone total 118,426 ballots and exceed" the margin of votes that determined

Pennsylvania's presidential election. *Id*. at ¶ 58.

231.     The Ryan Report also states:

> [I]n a data file received on November 4, 2020, the Commonwealth's PA Open Data
> sites reported over 3.1 million mail in ballots sent out. The CSV file from the state
> on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the
> information was provided that only 2.7 million ballots had been sent out. This
> discrepancy of approximately 400,000 ballots from November 2 to November 4 has
> not been explained.

> *Id*. at 143a-44a.

---

[52] *Texas v. Pennsylvania*, App. 139a-144a.

232.    In its *Motion for Leave to File Bill of Complaint*, the State of Texas stated:

a.    Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these changes, and the legislation did not include a severability clause;

b.    These non-legislative modifications to Pennsylvania's election rules appear to have generated an outcome-determinative number of unlawful ballots that were cast in Pennsylvania;

c.    In 2020, Pennsylvania received more than 10 times the number of mail-in ballots compared to 2016, which were "treated in an unconstitutionally modified manner that included: (1) doing away with the Pennsylvania's signature verification requirements; (2) extending that deadline to three days after Election Day and adopting a presumption that even *non-postmarked ballots* were presumptively timely; and (3) blocking poll watchers in Philadelphia and Allegheny Counties in violation of State law;"

d.    Local election officials in Philadelphia and Allegheny Counties decided not to follow Pennsylvania law, which requires that poll-watchers be granted access to the opening, counting, and recording of absentee ballots;

e.    By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security;

f.    This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely;

g.    The number of votes affected by the various constitutional violations exceeds the margin of votes separating the candidates; and that,

h.    The blatant disregard of statutory law renders all mail-in ballots constitutionally tainted and cannot form the basis for appointing or certifying Pennsylvania's presidential electors to the Electoral College.

*Texas v. Pennsylvania*, ¶¶ 43-61.

233.    On October 31, 2019, Defendant, Mr. Wolf, signed Act 77,[53] which implemented

sweeping reforms to the elections process in Pennsylvania.[54]

234.    As outlined in *Kelly v. Commonwealth*, Act 77:

a.    created a new option to vote by mail without providing an excuse;

b.    allowed voters to request and submit mail-in or absentee ballots up to 50
        days before an election; and,

c.    established a semi-permanent mail-in and absentee ballot voter list.

*Kelly v. Commonwealth*, ¶ 55.

235.    The Election was administered by Pennsylvania election officials pursuant to Act

77, which included allowing for universal, no-excuse mail-in ballots to be counted in violation of

the Pennsylvania constitution. *Id*. at ¶ 62.

236.    The Plaintiffs in *Kelly v. Commonwealth* argued that Act 77 was unconstitutional,

because it expanded the scope of absentee voting to all voters, which, in effect:

a.    created an entire class of electors who are shown to have received a mail-in
        ballot, despite never actually receiving a mail-in ballot; and,

b.    similarly produced a whole class of voters who received unsolicited or
        unrequested mail-in ballots that never voted via mail-in ballot and never
        intended to vote by mail.

*Id*. at ¶ 56-57.

---

[53] Act of October 31, 2019, P.L. 552, No. 77 ("Act 77"). *See also* 25 Pa.Stat. §§ 3146.6(c),
3150.16(c).

[54] *See* Complaint for Declaratory and Injunctive Relief, *The Honorable Mick Kelley v.
Commonwealth of Pennsylvania*, Case 620 MD 2020 ("*Kelly v. Commonwealth*"),
(Commonwealth Ct. of Penn. filed November 21, 2020), ¶ 54.

237.    Act 77 does not provide Pennsylvania voters any meaningful method of disputing a mail-in or absentee ballot that has been submitted in their name, even where a ballot is improperly submitted by another individual. *Id.* at ¶ 58.

238.    Even under circumstances wherein the voter insists that he or she did not submit a mail-in ballot, "if the voting records suggest that such a ballot has purportedly been received from that voter, the voter is effectively deprived of their right to cast a vote as a direct and proximate result of the enactment of Act 77." *Id.* at ¶ 58.

239.    Based upon these facts, as alleged by bar members, state representatives, experts and states of the Union, no reasonable person could disagree that, in the light most favorable the Plaintiffs, the actions of Defendants, Ms. Boockvar, Mr. Wolf, and others, herein described, was unconstitutional.

240.    Governors and secretaries of state do not act unconstitutionally.

241.    All acts performed by a governor or secretary of state, in their official capacity, are performed on behalf of the state.

242.    States do not act unconstitutionally—unless they are in rebellion or insurrection.

243.    Unconstitutional acts and omissions of state actors strip those persons of their official and representative character and, thus, subjects them to the consequences of their individual conduct. *See ex parte Young*, 209 U.S. 123, 159-160 (1908).

244.    As in the other states, Defendants, Mr. Zuckerberg and Ms. Chan, engaged in a scheme in Pennsylvania with Defendant, CTCL, and others, to use their enormous wealth to unconstitutionally favor one presidential candidate, over the others, by, among other things:

a.      privately contracting with municipalities to accept grants that require the recipient to expend the grant money for the express purposes set forth in the grants;

b.      unlawfully paying the salaries of election officials;

c.      Employing the use of illegal drop boxes to intercept and bypass the United States Mail; and,

d.      Utilizing unauthorized mobile voting vehicles.[55]

245.    The State of Pennsylvania also contracts with Dominion to provide voting services for approximately 1.3 million voters whose ballots were tabulated by Dominion.[56]

246.    On November 20, 2020, Dominion cancelled a scheduled appearance to discuss voting irregularities with a state government committee.

247.    After the cancelation, Pennsylvania House Republicans tweeted:

Transparency is key for our election security. Dominion Voting Software is asking us to give them only blind trust. We're very disappointed in Dominion's last-minute cancelation in today's hearing.

248.    After the Election, the President of the United States tweeted:



**Donald J. Trump** ✔ @realDonaldTrump · Nov 12                        ○○○
"REPORT: DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN." @ChanelRion @OANN

---

[55] *See* Complaint for Declaratory and Injunctive Relief (Doc. 1), *Pennsylvania Voters Alliance, v. Centre County*, case 4:20-cv-01761 (M.D. Penn. filed Sept. 25, 2020).

[56] Hank Berrien, *Pennsylvania GOP Slams Dominion Systems For Canceling On Giving Testimony*, Dailywire, Nov. 20, 2020.

249.    On November 24, 2020, Defendant, Ms. Boockvar, unconstitutionally certified said election, under color of law and her official authority.

250.    In acting in said unconstitutional manner, as described herein, Ms. Boockvar was stripped of her official capacity as Secretary of State of the State of Pennsylvania.

251.    As such, Ms. Boockvar was acting individually, outside the scope of her official capacity, when she certified said results of the Election.

252.    On November 20, 2020, Defendant, Mr. Wolf, unconstitutionally certified said election, under color of law and his official authority.

253.    In acting in said unconstitutional manner, as described herein, Mr. Wolf was stripped of his official capacity as Governor of the State of Pennsylvania.

254.    As such, Mr. Wolf was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

255.    An "unconstitutional state enactment is void and…any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such is a nullity." *Pasasin v. Allain*, 478 U.S. 265, 276 (1986).

256.    Said certification of the Election in Pennsylvania is unconstitutional.

257.    Said certification of the Election in Pennsylvania is void *ab initio*.

## WISCONSIN

258.     On December 14, 2020, the Wisconsin Supreme Court determined that certain county clerks had erroneously interpreted Wisconsin election law.[57]

259.     Wisconsin allows voters to declare themselves indefinitely confined, provided they meet the statutory requirements. *See also* Wis. Stat. § 6.86(2)(a).

260.     On March 25, 2020, the Dane and Milwaukee County Clerks issued guidance *on Facebook* suggesting all voters could declare themselves confined because of the pandemic and the governor's then-existing Safer-at-Home Order.[58]

261.     Wisconsin's highest court concluded that the emergency order issued by the county clerks did not render Wisconsin electors "indefinitely confined," which obviated the legal requirement of valid photo identification to obtain absentee ballots.

262.     On March 31, 2020, the Wisconsin Supreme Court unanimously deemed that advice incorrect, and the "county clerks immediately updated their advice in accordance with our decision." *Trump v. Biden*, 2020 WI 90, ¶ 7.

263.     A blanket invalidation of votes casts by Wisconsin citizens receiving a ballot after claiming indefinitely confined status, "without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit." *Id*. at ¶8.

264.     Nonetheless, the number of indefinitely confined voters surged from just under 70,000 voters in 2019 to over 200,000 in 2020.

---

[57] *Jefferson v. Dade County*, 2020 WI 90 (Wis. 2020).

[58] *Trump v. Biden*, 2020 WI 91 (Wis. 2020).

265.    According to a report prepared by Director of the Office of Trade and Manufacturing Policy and Assistant to the President, Peter Navarro, the "130,000 vote increment of new indefinitely confined voters is more than five times" the margin of victory in Wisconsin. The Navarro Report, *The Immaculate Deception: Six Key Dimensions of Election Irregularities*, Dec. 17, 2020, p. 10, a copy of which is attached hereto as Plaintiff's Exh. 10, as though fully contained herein.

266.    During this same time period, Mr. Zuckerberg and Ms. Chan, funneled millions of dollars in private money, through CTCL, and others, to unlawfully and unconstitutionally circumvent Wisconsin's absentee ballot laws—using the COVID-19 pandemic as a pretext to create an exception to Wisconsin's photo identification requirements.

267.    Mr. Zuckerberg and Ms. Chan, through CTCL, and others, granted over six million dollars to the cities of Racine, Kenosha, Green Bay, Madison and Milwaukie.

268.    The use of private funding from Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and many others, undermines the existing *Help America Vote Act* (HAVA),[59] which requires state election plans be submitted for approval by federal officials to, among other things, preserve the equal protection and due process rights of registered voters across the country.[60]

269.    The National Voter's Registration Act (NVRA) also preempted CCTCL' private federal election grants.[61]

---

[59] *See* 52 USC §§ 20901-21145.

[60] *See* Complaint for Declaratory and Injunctive Relief, *Wisconsin Voters Alliance v. City of Racine*, case 1:20-cv-01487 (E.D. Wis), ¶¶ 127-149.

[61] *Id*. at ¶¶ 150-173. *See* 52 USC §§ 20501-20511.

270.     The private funding from Mr. Zuckerberg, Ms. Chan, Facebook and CTCL was utilized to place illegal ballot drop boxes in disparate proportion based upon Democrat concentrations, encouraging targeted demographics as a method of increasing voter turnout, and the suppression of political opposition.

271.     In Wisconsin, the margin of victory in the Election was slightly over 20,000 votes.

272.     In Wisconsin, the reported results of the Election are in invalid based upon the following facts:[62]

   a.     In the 2020 general election, 1,275,019 mail-in ballots were returned, nearly a 900 percent increase over 2016

   b.     Leading up to the 2020 general election, in contravention of Wisconsin law, the Wisconsin Elections Commission ("WEC"), and other local officials unconstitutionally modified Wisconsin election laws that weakened, or did away with, established security procedures and photo ID requirements put in place by the Wisconsin legislature to ensure absentee ballot integrity.

   c.     For example, the WEC undertook a campaign to position hundreds of drop boxes to collect absentee ballots—including the use of unmanned drop boxes.

   d.     The mayors of Wisconsin's five largest cities—Green Bay, Kenosha, Madison, Milwaukee, and Racine, which all have Democrat majorities— joined in this effort, and together, developed a plan use purportedly "secure drop-boxes to facilitate return of absentee ballots."[63]

---

[62] *Texas v. Pennsylvania*, ¶¶ 104-108.

[63] *See* Wisconsin Safe Voting Plan 2020, Submitted to CTCL, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf

e.     In a summary of resources needed, the plan outlined a need for $6,324,567;[64]

**Table 3: Summary of Resources Needed to Robustly Implement All Four Recommendations**

| Recommendation | Green Bay | Kenosha | Madison | Milwaukee | Racine | Totals |
|---|---|---|---|---|---|---|
| Encourage and Increase Absentee Voting By Mail and Early, In-Person | $277,000 | $455,239 | $548,500 | $998,500 | $293,600 | **$2,572,839** |
| Dramatically Expand Strategic Voter Education & Outreach Efforts | $215,000 | $58,000 | $175,000 | $280,000 | $337,000 | **$1,065,000** |
| Launch Poll Worker Recruitment, Training & Safety Efforts | $174,900 | $145,840 | $507,788 | $800,000 | $181,500 | **$1,810,028** |
| Ensure Safe & Efficient Election Day Administration | $426,500 | $203,700 | $40,500 | $76,000 | $130,000 | **$876,700** |
| **Totals:** | **$1,093,400** | **$862,779** | **$1,271,788** | **$2,154,500** | **$942,100** | **$6,324,567** |

f.     In August 2020, CTCL announced that it had donated $6.3 million dollars to five cities in Wisconsin, meant to ensure that Wisconsin has a "safe, inclusive, and secure election."[65]

g.     Over five hundred unmanned, illegal absentee ballot drop boxes were used in the Election in Wisconsin.[66]

---

[64] *Id*. at p. 5.

[65] *CTCL Announces COVID-19 Response Rural Grants Program*, Center for Tech and Civic Life, August 7, 2020, *available at:* https://www.techandcivilife.org/covid-19-rural-grants/.

[66] *See* Complaint (Doc. No. 1), *Donald J. Trump, Candidate for President of the United States of America v. The Wisconsin Election Commission*, Case 2:20-cv-01785-BHL (E.D. Wisc. filed Dec. 2, 2020), ¶¶ 188-89.

h.     The use of *any* drop box, manned or unmanned, is directly prohibited by Wisconsin statute.[67]

i.     Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. 6.855(3);

j.     "In a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed." Wis. Stat. 7.15(2m).

k.     Unmanned absentee ballot drop-off sites are prohibited by the Wisconsin Legislature as they do not comply with Wisconsin law expressly defining "[a]lternate absentee ballot site[s]". Wis. Stat. 6.855(1), (3);

l.     The use of drop boxes for the collection of absentee ballots, positioned predominantly in Wisconsin's largest cities, is directly contrary to Wisconsin law providing that absentee ballots may only be "mailed by the elector, or delivered in person to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b);

m.     The fact that other methods of delivering absentee ballots, such as through unmanned drop boxes, is not permitted by Wisconsin law, which mandates that "[a]ny ballot not mailed or delivered as provided in this subsection may not be counted." Wis. Stat. § 6.87(6).

n.     "Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election." Wis. Stat. § 6.84(2);

o.     Through Facebook, WEC and local election officials encouraged voters to unlawfully declare themselves "indefinitely confined"—which under Wisconsin law allows the voter to avoid security measures like signature verification and photo ID requirements;

---

[67] The Wisconsin legislature specifically described in their Election Code "Alternate absentee ballot site[s]," and detailed the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1).

p.      Specifically, registering to vote by absentee ballot requires photo identification, except for those who register as "indefinitely confined" or "hospitalized." Wis. Stat. § 6.86(2)(a), (3)(a);

q.      Registering for indefinite confinement requires certifying confinement "because of age, physical illness or infirmity or [because the voter] is disabled for an indefinite period." Id. § 6.86(2)(a).

r.      Should indefinite confinement cease, the voter must notify the county clerk, id., who must remove the voter from indefinite-confinement status. Id. § 6.86(2)(b);

s.      On May 13, 2020, the Administrator of WEC issued a directive to the Wisconsin clerks prohibiting removal of voters from the registry for indefinite-confinement status if the voter is no longer "indefinitely confined;"

t.      Said directive violates Wisconsin law, which provides that "any [indefinitely confined] elector [who] is no longer indefinitely confined ... shall so notify the municipal clerk" who "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service." Wis. Stat. § 6.86(2)(a)&(b);

u.      According to statistics kept by the WEC, nearly 216,000 voters said they were indefinitely confined in the 2020 election, nearly a fourfold increase from nearly 57,000 voters in 2016;

v.      In Dane and Milwaukee counties, more than 68,000 voters said they were indefinitely confined in 2020, a fourfold increase from the roughly 17,000 indefinitely confined voters in those counties in 2016;

w.      The fourfold increase in absentee ballots under the "indefinitely confined" interpretation creates sufficient illegal ballots to exceed the Wisconsin final ballot margin.

x.      Under Wisconsin law, voting by absentee ballot requires voters to complete a certification, including their address, and have the envelope witnessed by an adult who also must sign and indicate their address on the envelope. Wis. Stat. § 6.87;

y.      The sole remedy to cure an "improperly completed certificate or [ballot] with no certificate" is for "the clerk [to] return the ballot to the elector[.]" Wis. Stat. § 6.87(9);

z.      "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(9);

aa.     However, in a training video issued April 1, 2020, the Administrator of the City of Milwaukee Elections Commission unilaterally declared that a "witness address may be written in red and that is because we were able to locate the witnesses' address for the voter" to add an address missing from the certifications on absentee ballots. The Administrator's instruction violated Wisc. Stat. § 6.87(6d);

bb.     The WEC issued similar guidance on October 19, 2020, in violation of this statute as well.

cc.     In the Wisconsin *Trump Campaign Complaint*, it is alleged, supported by the sworn affidavits of poll watchers, that canvas workers carried out this unlawful policy, and acting pursuant to this guidance, in Milwaukee used red-ink pens to alter the certificates on the absentee envelope and then cast and count the absentee ballot, in violation of Wis. Stat. § 6.87(6d);

dd.     Wisconsin's legislature has not ratified these changes, and its election laws do not include a severability clause.

ee.     In addition, a box truck delivery driver subcontracted to the U.S. Postal Service (USPS) to deliver truckloads of mail-in ballots to the sorting center in Madison, WI, testified that USPS employees were backdating ballots received after November 3, 2020.[68]

ff.     This same USPS subcontractor testified how a senior USPS employee told him on November 4, 2020 that "[a]n order came down from the Wisconsin/Illinois Chapter of the Postal Service that 100,000 ballots were missing" and how the USPS dispatched employees to "find…the ballots." *Id.* ¶¶ 8-10.

---

[68] *See* Motion for Expedited Consideration*, Texas v. Pennsylvania*, Decl. of Ethan J. Pease, App. 149a-151a, ¶¶ 3-13.

273.    On November 20, 2020, the WEC Defendants unconstitutionally certified the Election, under color of Wis. Stat 7.70(5), and their official authority.

274.    In acting in said unconstitutional manner, as described herein, said WEC Defendants were stripped of their official capacity as members of the Wisconsin Elections Commission.

275.    As such, Defendants, WEC Defendants were acting individually, outside the scope of their official capacity, when they participated in certifying said results of the Election, as described herein.

276.    On November 20, 2020, Defendant, Mr. Evers, unconstitutionally certified said election under color of Wis. Stat. § 7.70(5)(b), and his official authority.

277.    In acting in said unconstitutional manner, as described herein, Mr. Evers was stripped of his official capacity as Governor of the State of Wisconsin.

278.    As such, Mr. Evers was acting individually, outside the scope of his official capacity, when he certified said results of the Election.

279.    The "theory of [*ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States." *Pennhurst State School and Hospital v. Halderman*, 475 U.S. 89, 102 (1984) (quoting *ex parte Young*, 209 U.S. 123, 160 (1908)("Since the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct.' *Ibid.*")

280.    Said certification of the Election in Wisconsin is *ultra vires* and unconstitutional.

281.    Said certification of the Election in Wisconsin is void *ab initio*.

282.     As in Georgia, on December 1, 2020, Attorney Powell, on behalf of two Wisconsin voters, filed a complaint in federal court for declaratory, emergency and permanent injunctive, naming Defendants, herein, WEC Defendants and Mr. Evers, in their official capacity (Feehan Complaint).[69]

283.     The Feehan Complaint "brings to light a massive election fraud" and "multiple violations of the Wisconsin Election Code." Feehan Complaint, p. 1.

284.     In attached affidavits, experts on statistical and data analysis, opined, among other things, that:

a.     Wisconsin's database for the Election showed 96,711 voters whom the state marked as having requested and been sent an absentee ballot, who did not return it;

b.     of those 96,711, at least 16,316 people did not request an absentee ballot;

c.     of those 96,711, at least 13,991 of those did in fact mail back an absentee ballot to the clerk's office; and, accordingly,

d.     there are 29,594 "troublesome ballots in Wisconsin."[70]

285.     The Feehan Complaint includes the affidavit of Seth Keshel, who noted:

New York Times live vote reporting shows a dump of 168,541 votes at 3:42:20 (a.m.) on November 4, 2020. Of those votes, 143,378 (85.07%) went to Biden, and just 25,163 (14.93%) went for Trump. This dump was enough to flip the race with almost no transparency to the viewing public. The live graph showing this vote dump (circled) is attached as Exhibit D to this document.

---

[69] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1), *Feehan., v. Wisconsin Elections* Commission, Case 2:20-cv-1771 (E.D. Wis. Nov. 25, 2020).

[70] See William M. Briggs, PhD, *An Analysis of Surveys Regarding Absentee Ballots In Wisconsin,* Feehan Complaint, Exh. 4. *See also* Matthew Braynard, *Expert Report of Matthew Braynard,* Feehan Complaint, Exh. 9 (as filed in *Wisconsin Voters Alliance v. Wisconsin Elections Commission,* case 2020PA1930 (Wis. filed Nov. 24, 2020).



Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

286.     The Feehan Complaint further contained evidence that senior management of Dominion had public expressed hostility to the incumbent president, and opposition to his election.[71]

287.     Dr. Eric Coomer is listed as the co-inventor of several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion. *See* Feehan Complaint, ¶ 93, fn. 10.

288.     In an affidavit, Dr. Coomer is documented as: having admitted that Dominion Voting machines can be manipulated; making previous public statements that are "highly partisan;" and, assuring a group that, "Trump is not going to win. I made f---ing sure of that."[72]

_____

[71] Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

[72] Feehan Complaint (Doc. 1-13), *Affidavit of Joseph T. Oltmann*, p. 2.

289.     On  December 14, 2020, Phill Kline of the Amistad Project of the non-partisan Thomas More Society released a report that "alleged Facebook founder Mark Zuckerberg and his wife made $419.5 million in contributions to non-profits organizations during the 2020 election cycle--$350 million to the 'Safe Election' Project of the Center for Technology and Civic Life and another 69.5 million to the Center for Election Innovation and Research—that, 'improperly influence[d] the 2020 presidential election on behalf of one particular candidate and party.'"[73] A copy of J.P. Carlson's, The Legitimacy and Effect of Private Funding in Federal and State Electoral Processes, is attached hereto as Plaintiff's Exhibit 11, as though fully contained herein.

290.     Based upon the foregoing, the Plaintiffs and all those similarly situated as registered voters have suffered individualized, concrete injuries and damage, caused by the unlawful and unconstitutional acts and omission of the Defendants, which has damaged the reputation of the country, violated the civil rights of hundreds of millions of people, includes incalculable financial loss due to lack of productivity and mental anguish, destroyed the people's faith in their government and elected officials, caused massive internal strife inside the United States and, among many other things, has increased the risks of civil war, and other violent and uncivil behavior.

291.     Judgement in favor of the Plaintiffs and those similarly situated will redress the Plaintiffs' injuries and allow them to enjoy their rights to legally authorized, uniform and fair presidential elections guaranteed under federal law and the Constitution.

---

[73] Michael Patrick Leahy, *Report: Mark Zuckerberg's $419 Million Non-Profit Contributions 'Improperly Influenced 2020 Presidential Election,'* Brietbart, Dec. 18, 2020.

## V. CLAIMS FOR RELIEF

## COUNT I

**U.S. Const. art. II § 1, cl. 2, & Amend. XIV, § 2**
**As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988**
**Violation of Electors Clause**
**Unconstitutional Burden on the Fundamental Right**
**to Vote for the President and Vice-President of the United States of America**
(All Defendants)

292.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

293.     The Civil Rights Act specifically prohibits any person who, under color of any statute, ordinance, regulation, custom, or usage of a State, subjects any citizen of the United States to the deprivation of any rights, privileges or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.

294.     Every person who subjects, or causes to subject, any citizen of the United States to said deprivation "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *Id.*

295.     The Electors Clause mandates that each state appoint, in such manner as the legislature thereof may direct, a number of Electors, equal to the whole number of Senators and Representatives to which a state may be entitled in the Congress. U.S. Const. art. II, § 1, cl. 2.

296.     None of the Defendants, herein named, are part of any state legislature, nor do any have legislative power.

297.     The Supremacy Clause ensures that local governments do not act contrary to federal and state law regarding federal elections. U.S. Const. art. I, § 4, cl. 1.

298.     The historic events that shaped America include the unanimous Declaration of

Independence of the original thirteen states that enshrined the rights to life, liberty and the

pursuit of happiness, which thereafter instituted a government among those who pledged their

lives, fortunes and sacred honor to the United States of America.

299.     Later, under the Constitution, all rights not granted to the United States, in trust,

were reserved to the states and the people.

300.     The most fundamental right in creation of a representative government is the

people's right to choose their representatives.

301.     The continuing method of preserving the will of the people necessarily includes

the right of assembly, free speech, free press, and to the redress of grievances.

302.     No right is more precious in a free country than that of having a voice in the

election of those who make the laws under which, as good citizens, we must live.

303.     Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)

("Though not regarded strictly as a natural right, [voting is a] privilege…regarded as a

fundamental political right, because preservative of all rights").

304.     A person's right to vote is individual and personal in nature, thus voters who

allege facts showing disadvantage to themselves as individuals have standing to sue to remedy

that disadvantage. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).

305.     This Complaint involves the protection of a right to vote for the President,

Commander-in-Chief, and Vice President, under a process enumerated by the Constitution.

306.   This right is further supported through Public Laws, federal election laws, and by the legal administration of elections by the states, for as long as the latter is not administered in contravention with federal law or the Constitution.

307.   In that regard, the conduct and actions of the Defendants, acting under color of law and official capacity, violated the rights of the Plaintiffs and others similarly situated, individually, as every registered voter has an interest in selecting the president and vice-president.

308.   Governors, secretaries and election officials of Georgia, Wisconsin, Michigan and Pennsylvania, do not legislate, nor do they engage in unconstitutional behavior.

309.   Accordingly, the state actors herein named stepped out of their official capacity and are personally liable for violating the voting rights of the Plaintiffs and others similarly situated.

310.   Defendants, Facebook, Dominion, CTCL, Mr. Zuckerberg and Ms. Chan, having so inextricably woven their interests into the presidential election process and said state actors, they are thus defined as persons subject to 42 U.S.C. § 1983, 1985, and 1988.

311.   The Defendants, and each of them, acted in concert with each other, and other persons, to unconstitutionally legislate rules, change procedures, and implement a scheme and device to interfere and manipulate the Election, with their common goal to remove the incumbent, by any means necessary.

312.   The Supreme Court has "found state action present in the exercise of a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352 (1974).

313.    Defendant, CTCL, acting under the influence of Mr. Zuckerberg and Ms. Chan, induced other Defendants to use grant funding from CTCL, and to solicit other municipalities to apply for and use the same—creating a symbiotic relationship between and among the parties sufficient to make them state actors. *Luger v. Edmonson Oil Co.*, 457 U.S. 922, 941 (1982).

314.    Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the Civil Rights Act.

315.    To act under color of law does not require that the accused be an officer of the State," as it "is enough that he is a willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966).

316.    Even assuming the private defendants did not take specific action to qualify them as state actors, the conspired actions between the parties to achieve the desired result holds them within the context of parties conspiring against rights under 42 U.S.C. § 1985, and 18 U.S.C. § 241.[74]

317.    **This claim is not a generalized grievance.**

318.    As established by the facts averred, and with forthcoming evidence, the Plaintiffs and those similarly situated were personally harmed, and continue to suffer financial damages required to protect their rights through this lawsuit.

319.    The evidence establishes that the Defendants have engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country, no matter whose side the voter is on. Other than the nefarious, the honest American voter wants every vote counted to legally determine the president and vice-president.

---

[74] https://www.justice.gov/crt/conspiracy-against-rights.

320.     Because illegal votes and unconstitutional procedures dilute the votes of the legally registered voter, persons that create policies and procedures that authorize, encourage, and cover-up unconstitutional behavior are liable for the damages they cause to Plaintiffs with proper standing.

321.     The criminal laws of the United States make it illegal for administrative employees of the United States, the States, their political subdivisions and municipalities, to use their official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner. *See* 18 U.S.C. § 595.

322.     Additional penalties under federal criminal law support and restrict actions taken under color of law and conspiracy against rights, pursuant to 18 U.S.C. § 241 & 242.

323.     Recently, the Supreme Court confirmed that appropriate relief includes claims for money damages against Government officials in their individual capacities. *Tanzin v. Tanvir*, 140 S. Ct 861, (2020).

324.     The principle of the "Private Attorney General" was codified into law with the enactment of the *Civil Rights Attorney's Fees Award Act of 1976.* 42 U.S.C. § 1988.

325.     The actions of the Defendants were and are the direct and proximate cause of the violations of Plaintiffs' rights, injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT II

### U.S. Const. Amend. XIV, § 1 & Amend. XV, § 1
### As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
### Violation of Equal Protection
(All Defendants)

326.　Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

327.　At all times relevant herein, Plaintiffs and those similarly situated have certain inalienable and civil rights protected by the Constitution, federal and state statutes.

328.　The Defendants listed herein are persons, subject to 42 U.S.C. § 1983, 1985, 1986 and 1988.

329.　The Defendants, and each of them, are responsible for the actions of their employees, agents, or attorneys under the legal doctrine of *Respondeat Superior*.

330.　The Equal Protection Clause of the Fourteenth Amendment prohibits persons acting under color of law from abridging or burdening the rights or immunities of citizens of the United States. U.S. Const. amend. XIV.

331.　The Equal Protection Clause prohibits the use of differential standards in the treatment and tabulation of ballots within a State. *Bush v. Gore*, 531 U.S. 98, 107 (2000).

332.　One-person, one-vote jurisprudence arises when persons acting under color of authority influence arbitrary and disparate treatment among voters of different jurisdictions.

333.　Acting under the color of law and authority, Defendants violated Plaintiffs' rights, privileges and immunities secured by the Constitution, and guaranteed by the Fourteenth Amendment.

334.    The Defendants, and each of them, have participated in conduct and actions resulting in, among other things, unconstitutional agreements, illegal modifications of election law, illegal administration of the federal election process, the unconstitutional certification of the Election, all of which has damaged the Plaintiffs, but, more broadly, every registered voter in America, all of whom have an interest in free and fair elections to determine the President of the United States of America.

335.    Among other things, the Defendants have funded, influenced, and participated in acts of subterfuge and other manipulations aimed directly at the election machinery including the unequal distribution of unsecured ballot boxes with the intent to bypass the United States Post Office, and to otherwise intercept ballots that should have been mailed, or dropped off at polling stations, primarily in certain demographic areas—which, when inevitably discovered, was designed to defend any challenge thereto as "racist."

336.    The Fifteenth Amendment forbids the denial or abridgment of the right to vote on account of race or ethnicity. U.S. Const. amend. XV.

337.    Because a discriminatory motive may hide behind legislation that appears neutral on its face, the U.S. Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent: 1) evidence that defendants' decision bears more heavily on one race than another; 2) the historical background of the decision; 3) the specific sequence of events leading up to the decision; 4) departures from the normal procedural sequence; 5) substantive departures; and, 6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–28 (1977).

338.    Both constitutional protections guard against any deprivation of the right to vote that is motivated by race. *Rogers v. Lodge*, 458 U.S. 613, 621–25 (1982).

339.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the U.S. Constitution. *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 378–79 (1975).

340.    Defendants acts and omissions contribute to a scheme or device aimed at camouflaging their election interference behind certain areas of concentrated demographic and racial groups, under the deception, as here, to promote a belief that to challenge the scheme would be tantamount to disparaging the racial group.

341.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights v. Metropolitan Housing and Development Corp.*, 429 U.S. 252, 265 (1977).

342.    Instead, the plaintiff's burden is to show that the discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

343.    By the shared enterprise of the entire nation electing the President and Vice President, equal protection violations in one state can and do adversely affect and diminish the weight of votes cast by citizens of other states that lawfully abide by the election structure set forth in the Constitution.

344.    The Defendants, and each of them, have conspired together, and with other persons known and unknown, to carry out their actions with concerted and orchestrated effort, the effect of which is actionable under the Civil Rights Act.

345. The Defendants, and each of them, have used electronic communication and mail to send and receive documents to and from each other, and to the separate election officials across the states of the Union, and others, beyond the borders of their respective states.

346. At all relevant times herein, the Defendants, and each of them, engaged in a pattern of unconstitutional behavior and obfuscation, which Plaintiffs have recently discovered through public reports, news articles, complaints and affidavits filed by other persons, regarding the Election.

347. Defendants, and unknown DOES 1-10,000, had knowledge of the wrongs done or about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglected and failed to do so. 42 U.S.C. § 1986.

348. Defendants, and each of them, have conspired and acted in concert to injure, oppress, threaten, or intimidate the Plaintiffs and all similarly situated in the free exercise or enjoyment of their rights and privileges secured to them by the Constitution, and the laws of the United States, or because of having so exercised the same. 18 U.S.C. § 241

349. Plaintiffs and all others similarly situated have been injured by the actions of the Defendants, as related to rights secured to them by Constitution, herein described.

350. Plaintiffs and others similarly situated have suffered concrete and particularized damages, injuries and losses, as a direct and proximate cause of the Defendants' unconstitutional conduct, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT III

### U.S. Const. Amend. XIV, § 1
### As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
### Violation of Due Process
(All Defendants)

351.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

352.    Voting is a fundamental right, protected by the Fourteenth Amendment to the United States Constitution.

353.    A state, having once granted the right to vote on equal terms, may not later by arbitrary and disparate treatment, value one person's vote over that of another.

354.    The Constitution protects the right of all qualified citizens to vote in a federal election. *Reynolds v. Simms*, 377 U.S. 533, 554 (1964).

355.    The right to vote can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise thereof. *Id*. at 555.

356.    All qualified voters have a constitutionally protected right to vote, and to have his or her vote count. *ex parte Yarbrough*, 110 U.S. 651, 665 (1884). *See also United States v. Mosley*, 238 U.S. 383, 386 (1915).

357.    The conduct of the Defendants violated the rights of the Plaintiffs and all registered voters in the United States, protected by the Fourteenth Amendment to the Constitution. U.S. Const., Amend XIV.

358.    As a result of the Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs and those similarly situated are deprived of their right to substantive due process of law, in violation of the Fifth and Fourteenth Amendments of the Constitution.

359.     When election practices reach "the point of patent and fundamental unfairness," the integrity of the election itself violates substantive due process. *Griffen v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978).

360.     Under Supreme Court precedents on procedural due process, not only intentional failure to follow election law as enacted by a state's legislature, but also unauthorized acts and omissions by persons acting under color of official law and capacity, and their designees in local government can violate the Due Process Clause.

361.     The Defendants, and each of them, acted unconstitutionally to lower election standards and miscalculate votes with the express intent to not only favor one candidate, but, more obviously, to defeat an incumbent, with who they so vehemently oppose.

362.     As a direct and proximate result of Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their right to procedural due process of law, in violation of the Fifth and Fourteenth Amendments of the Constitution, and have and continue to suffer damages, mental distress, anguish, humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT IV

**U.S. Const. Amend. I & Amend. XIV, § 1**
**As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988**
**Burden on Political Speech, Right to Associate and Freedom of Press**
(Defendants Facebook and Mr. Zuckerberg)

363.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

364.    Plaintiffs and all others similarly situated have a right to speak, associate, assemble, and act independently and collectively with others, whether said speech is politically motivated, or not.

365.    Plaintiffs and all others similarly situated have a right to a free press, with access to information, which includes print, radio, television and all related journalistic media.

366.    The named Defendants, herein, provide interactive computer services to the internet by various platforms for real-time public input.

367.    Defendants, Facebook and Mr. Zuckerberg, deny that they are publishers or content providers, and assert that they are immune from civil liability for the content posted by others, pursuant to 47 U.S.C. § 230(c)(2) (Section 230).

368.    Section 230 allows the Defendants to block and screen offensive material, through the use of enabling tools and means to filter, screen, allow and disallow content, pick, choose, analyze or digest content for the purpose of transmission, receipt, display, forwarding, cache, search, subset, organize, reorganize or translate such content.

369.    However, at all times material hereto, Facebook, under the direction and control of Mr. Zuckerberg, intentionally censored non-offensive, politically relevant, journalistic articles and opinion, posted by users for other users, with the intention to limit the exposure thereof.

370.    The Congressional intent of Section 230 was to promote and expand the dissemination of educational, informative, cultural and entertainment material to stimulate diversity of political discourse and other intellectual activity.

371.  In pursuance thereof, Section 230 also sought to limit exposure of illegal content for the purpose of ensuring "vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." Section 230(b)(5).

372.  Here, Facebook, under the control and direction of Mr. Zuckerberg, unconstitutionally relied upon Section 230 to suppress the 1st Amendment rights of others having a different political and cultural ideology than Mr. Zuckerberg, and monoculture of the left-leaning agents and employees of Facebook.

373.  At all relevant times, Defendants, Facebook and Mr. Zuckerberg, through his agents, third party contractors, fact checkers, and employees, censored news articles, opinions, editorials, and other content by setting specific parameters, algorithms and other methods to suppress content related to the Election, including threats or actions to ban or terminate individual users or groups or Pages who did not comply with the censorship rules.

374.  The named Defendants, and each of them, and others identified as DOES 1-10,000, intended to censor, block, delete, screen, disallow, qualify or otherwise interfere with the content posted to Facebook and its affiliates by unilaterally determining that such content was "offensive" to the Defendants' political ideology.

375.  The named Defendants specifically and intentionally acted in direct contravention of the Congressional intent of Section 230 by censoring, filtering, blocking and deleting content that was contrary to their political ideology.

376.  The named Defendants have intentionally determined that all statements related to the ongoing investigations into election misconduct would be filtered and censored.

377.    The Defendants have participated in conduct and actions resulting in, among other things, unconstitutional suppression of Plaintiffs' right to a free press, right to assemble, speak *and* hear the legitimate thoughts and ideas of others.

378.    Defendants knowingly and intentionally, created, utilized, and conspired to implement policies, procedures, algorithms and other means to suppress the 1st Amendment rights of its users, with knowledge that this would impact the Plaintiffs and all others similarly situated, whether the voter is a user of Facebook, or not.

379.    Defendants, Facebook and Mr. Zuckerberg, conspired with others, herein identified as DOES  1-10,000, to cooperate in the censorship and join in the labeling and banning of certain political ideology in opposition to that shared by Mr. Zuckerberg, in which he had invested so much.

380.    By becoming intricately involved in the funding of the non-profit organizations that worked closely with targeted cities and counties, against state law and with federal regulation, which involved the machinery of the elections, themselves, Mr. Zuckerberg and Ms. Chan, may fairly be treated as the state itself.

381.    Private persons "jointly engaged with state officials in the challenged action, are acting `under color' of law for purposes of § 1983." *Dennis v. Spark*, 449 U.S. 24, 28 (1980).

382.    Ordinarily, a state pays for the costs of an election.

383.    Defendant, Mr. Zuckerberg, voluntarily became part of a state mechanism, while he used his personal control over the largest social media platform in the world to suppress the speech of those, with whom *he* disagreed.

384.     Said behavior, coupled with the clearly documented and overwhelming evidence of unconstitutional behavior, called out, by name, by 20 Attorneys General across the country, amounts to probable evidence of concerted action between the Defendants, and many others.

385.      The suppression by Defendants, Facebook and Mr. Zuckerberg of the First Amendment rights of the Plaintiffs and all others similarly situated was part of a greater plan to influence the Election.

386.     The Defendants knowingly and intentionally engaged in this unconstitutional conduct with malice aforethought, believing that no one would do anything about it.

387.     As a direct and proximate result of Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their rights, in violation of the First and Fourteenth Amendments of the Constitution, and have and continue to suffer damages, mental distress, anguish, humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

## COUNT V

**Constitutional Challenge**
**47 U.S.C.  230(c), as applied**
**(Defendants Facebook and Mr. Zuckerberg)**

388.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

389.     The unlawful and unconstitutional actions of Defendants, Facebook, and Mr. Zuckerberg, their agents and employees, in violation of, among other things, Plaintiffs' protected

right of free speech, free press, and right to assemble has caused an ongoing and imminent threat of the loss of Plaintiffs' rights, and of all others similarly situated.

390.    This ongoing contravention of rights has burdened the Plaintiffs' right to vote, as well.

391.    The Supreme Court has held that if a private party is "a willful participant in joint activity with the State or its agents," then state action is present. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

392.    As has been demonstrated, Defendants, Mr. Zuckerberg and Ms. Chan, utilized Defendant, CTCL, as the conduit to interact with, and fund select municipalities and counties.

393.    Defendants, Mr. Zuckerberg and Ms. Chan, derived the money to fund their political agenda from their alter-ego, Defendant, Facebook.

394.    Defendant, Facebook, at the direction of Mr. Zuckerberg, uses the exemption from civil liability, provided under Section 230, to label and censor content that opposes their preferred cultural and political ideology, as offensive, harassing, and violent.

395.    Additionally, Defendant Facebook, at the direction of Mr. Zuckerberg, publishes their own content to support their political ideology and, thus, preserve their investment in the Election.

396.    Defendants, Facebook and Mr. Zuckerberg, have participated in overt and covert acts to block and restrict access and availability of material in a politically motivated and biased manner.

397.    Defendants, Facebook and Mr. Zuckerberg, by publishing and providing their own politically charged content, lost their immunity and protection as a "Good Samaritan" in contravention of Section 230.

398.    Plaintiffs seek review of the constitutionality of Section 230, as applied to Defendants, Facebook and Mr. Zuckerberg.

399.    Plaintiffs' claims are supported by ongoing congressional review of Facebook's censorship and blocking conduct, especially as it relates to the intentional manipulation and interference in the public election process, nationwide.

400.    Plaintiff's claims are supported by substantial evidence being disclosed that Facebook, Mr. Zuckerberg, and others herein identified as DOES 1-10,000,  interfered in the public election process, by blocking and censoring content in opposition to, and by actively publishing content in support of one political ideology—which disparately impacted the incumbent candidate, and his supporters.

401.    Therefore, good cause exists for this Court to determine the constitutionality of 47 U.S.C. § 230(c), as applied to the Defendants, Facebook and Mr. Zuckerberg.

402.    Plaintiffs and all others similarly situated will continue to suffer irreparable harm without legal remedy from the civil liability shield created by said "Good Samaritan" protection.

403.    Plaintiffs are informed and aware of the notice requirements of F.R.C.P. 5.1, and shall provide all notices required by law, and hereby seek certification by the Court, pursuant to F.R.C.P. 5.1(b) and 28 U.S.C. § 2403(a), of the following question:

Whether the "Good Samaritan" protection, pursuant to 47 U.S.C. § 230(c), applies to the acts and omissions of Facebook.

## COUNT VI

### REQUEST FOR DECLARATORY JUDGEMENT
### 42 U.S.C. § 1988
### 28 U.S.C. § 2201, 2202
### Federal Rule of Civil Procedure 65
(Against all Defendants)

404.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

405.    Defendants, each of them, acted in contravention to the limitations imposed by the Constitution and the laws related to a federal presidential election to the injury of Plaintiffs.

406.    Plaintiffs seek declaratory judgment for all unconstitutional acts, which shall be evidenced and established by these proceedings.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT VII

### PERMANENT INJUNCTIVE RELIEF
(Against all Defendants)

407.    Plaintiffs incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

408.    Plaintiffs seek permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters.

409.    Federal courts have broad discretion for an award of equitable relief. *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980).

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## VI. PRAYER FOR RELIEF

The people created the Constitution to protect themselves from the loss of liberty. In that manner, certain rights were delegated to the states and federal government, the latter of which has the exclusive power to declare war, create money and interpret the laws of the land.

Corporations are creations of a state, and often hold enormous power and wealth. The Constitution protects the people from the states and their corporate creations. The Constitution guarantees a republican form of government and prohibits Congress, and the states, from unduly burdening free speech and the right of assembly. No state shall violate the constitutional rights of the people, which include rights to due process, equal protection and, for some, to vote. These are fundamental rights, which must be protected by the people, federal government and the states—in that order.

Here, a multi-billionaire, his corporation and many others, infused hundreds of millions of dollars into a presidential election. These persons became personally and voluntarily involved in the most important function of government, granted to the states through the Constitution. Having done so, even through alter-egos and non-profits, Mr. Zuckerberg, and others, became inextricably woven into the functioning of government, and thus owed a duty to the people to conduct themselves within the boundaries of public law and the Constitution.

It is not satire to suggest that Mr. Zuckerberg and Ms. Chan are not the Masters of the Universe. They are U.S. Citizens and are no more important than any other person in the United States. No one is above the law. How many times have the people heard that? Yet, it is true. No matter how much money certain persons have, and no matter who is cooperating with those persons, free and fair elections are the most scared right of the people.

Everyone has a right to free speech, but not everyone can vote. That right is bestowed upon a citizen as a civil right, granted by the authority of the created state. Once granted, that right becomes a fundamental right of the individual.

Collectively, the people have been voting since before the Revolution. Only through a right to vote can the people elect those who will honestly protect their liberties. Without fair elections, inevitably, tyranny will prevail. In such an event, all of the people's rights are at risk.

The Defendants acting under color of their official authority are personally liable for the damages caused to the Plaintiffs. Suffice it to say, the violation of a person's constitutional rights carry a monetary value, to be determined by the jury. More importantly, however, those persons must be enjoined from any further unconstitutional behavior that, if not enjoined, they will commit in future presidential elections, conducted in their respective states.

On the other hand, Defendants, Dominion, Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and others herein listed as DOES 1-10,000, collectively, have enormous wealth. Just the contracts between Dominion and the several states, herein, are in excess of one hundred million dollars in public funds. Mr. Zuckerberg, Ms. Chan, Facebook, CTCL and others, are sued herein precisely because these Defendants used their almost unlimited financial resources to unlawfully interfere with the Election.

Their conduct has negatively affected the entire World. However, the Plaintiffs represent a designated class of persons that have standing to sue, i.e., the registered voter. The Plaintiffs and those similarly situated have birth certificates, driver licenses, social security cards and are on the jury rolls. These registered voters have an interest in choosing the President of the United States, as the chief executive officer, and Commander in Chief of the armed forces.

Although a voter may cast a ballot in a state holding a lawful and fair election, when other actors operate an unconstitutional presidential election in another state, every registered voter has an interstate interest in that matter, and is potentially harmed by the unlawful conduct.

Here, the damages are continuing. The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty. Those who support the challenger need only suffer a loss in the House of Representatives, pursuant to the Twelfth Amendment, to feel the anguish being endured by those who support the incumbent. Unfair elections have a way of devolving in that manner.  Thus, this lawsuit is being filed to give the people a civil mechanism to redress their grievances.

In a products liability case where, say, a ladder was defectively designed and thousands were hurt, the manufacturer and others would likely be sued, and the rest would learn from it. The Plaintiffs have fallen off the ladder, and the damage is done. Now, their goal is to ensure that ladders manufactured in the future don't have the same defects—or at least have a warning label on the top step.

With that, there must be a substantial monetary judgment imposed upon certain Defendants liable for the damages caused to the Plaintiffs and those similarly situated.

A nominal amount of $1,000 per registered voter equals damages in the approximate amount of $160 billion dollars. The Defendants, and others likely to be added, referenced herein as DOES 1-10,000 (some of which are foreign countries), can easily pay such a judgment, and would serve to discourage this behavior in the future.

Accordingly, a judgment of such an amount, or more, is the price of doing business.

WHEREFORE, Plaintiffs request that judgment be entered against the Defendants, and that the Court grant the following:

   a.   Certification of the constitutional question, pursuant to F.R.C.P. 5.1 and 28 U.S.C.§ 2403;

   b.   Declare Defendant, Facebook, is not protected by the "Good Samaritan" provision in 47 U.S.C. § 230(c);

   c.   Declare that 47 U.S.C. § 230(c) is unconstitutional, as applied, to the actions of Defendants, Facebook and Mr. Zuckerberg;

   d.   Declare the actions of the Defendants, as herein described, as unconstitutional and ultra vires, thereby making them legal nullities;

   e.   Declare the unconstitutional actions of the Defendants have stripped them of their official character;

   f.   Permanently restrain the Defendants from any further unconstitutional behavior, as herein described;

   g.   Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class; Assume jurisdiction over the action;

   h.   Enter judgment against Defendants in favor of Plaintiffs and the Class;

   i.   Award the Class damages, that is, three times their damages, in an amount to be determined at trial;

   j.   Award actual, compensatory, statutory, and consequential damages;

   k.   Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's ill-gotten gains, to ensure a remedy;

   l.   Grant permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct;

    m.  Award pre-judgment and post-judgment interest at the highest rate allowed by law;

    n.  Award Plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and,

    o.  Award such other relief as is just and proper, and any other equitable relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand trial by jury on all claims so triable as a matter of right.

Dated: December 22, 2020                      Respectfully submitted,


*/s/ Gary D. Fielder*
**Gary D. Fielder**  (CO 19757)
LAW OFFICE OF GARY FIELDER
2325 W. 72nd Ave.
Denver, CO 80221
(303) 650-1505
criminaldefense@fielderlaw.net


*/s/ Ernest J. Walker*
**Ernest J. Walker** (MI P58635)*
ERNEST J. WALKER LAW OFFICE
3368 Riverside Road
Benton Harbor, Michigan
(*pro hac vice* forthcoming)*