



Exhibit 11

# The Legitimacy and Effect
## of
## Private Funding
### in
## Federal and State Electoral Processes

Prepared for:

Phill Kline
Thomas More Society
309 West Washington Street,
Suite 1250
Chicago, IL 60606



*"Complex Problems Solved Well"*

Principal Author:

J.R. Carlson

Stillwater Technical Solutions
PO Box 93
Garden City, KS 67846
jcarlson@stillwateroffice.net

December 14, 2020

# Executive Summary

The 2020 presidential election witnessed an unprecedented and coordinated public-private partnership to improperly influence the 2020 presidential election on behalf of one particular candidate and party.

Funded by hundreds of millions of dollars from Facebook founder Mark Zuckerberg and other high-tech interests, activist organizations created a two-tiered election system that treated voters differently depending on whether they lived in Democrat or Republican strongholds.

Private monies dictated city and county election management contrary to both federal law and state election plans endorsed and developed by state legislatures with authority granted by the United States Constitution.

Moreover, executive officials in swing states facilitated, through unique and novel contracts, the sharing of private and sensitive information about citizens within those states with private interests, some whom actively promote leftist candidates and agendas.

This data sharing allowed direct access to data of unique political value to leftist causes, and created new vulnerabilities for digital manipulation of state electronic poll books and counting systems and machines.

This public-private partnership in these swing states effectively placed government's thumb on the scale to help these private interests achieve their objectives and to benefit the candidates of one political party.

The Amistad Project began monitoring these activities beginning in the spring of 2019, originally focusing on the digital vulnerabilities of state election systems.

Amistad became aware that states and local election officials failed to maintain the legal right to access computer logs on the machines

counting ballots. The first step to engage any computer forensic examination is to gain access to machine logs, yet scores of election officials failed to maintain the right to even review such information, much less establish a method for bipartisan review.

In effect, America purchased a complex ballot box (computer) into which its votes would be deposited, but didn't have the right to open the box and review the count.

As COVID escalated in March of 2020, The Amistad Project began witnessing troubling efforts to undermine the integrity of the 2020 by assaulting laws designed to protect the integrity of the absentee ballot.

The use of absentee ballots is uniquely vulnerable to fraud, as detailed in a special bipartisan congressional report authored by former President Jimmy Carter and James Baker.

In-person voting occurs with trained election officials present. These officials deter voter intimidation and coercion and are trained to educate, not mislead, the voter when completing the ballot. Moreover, in-person voting allows for voter identification. When the ballot leaves government controls, new challenges are present. There are few identity checks and no assurance the ballot was completed without intimidation, coercion, inducement, or by a person other than the voter.

Accordingly, states have basic, common-sense laws protecting the integrity of the absentee, advance, or mailed ballot.

Beginning in the spring of 2020, left-leaning organizations filed a massive number of lawsuits to challenge these integrity laws. Lawsuits sought to set aside witness requirements, identification requirements, deadlines, delivery requirements, ballot deadlines, signature requirements, application requirements, and even argued that the Constitution required all returned ballot envelopes be postage prepaid due to COVID.

Swing state governors also started issuing emergency executive orders shutting down in-person voting while pouring new state resources into encouraging persons to vote in advance.

Polling data revealed this coordinated assault on in-person voting generally favored Democrat Party voters who preferred to vote in advance, while placing Republicans, who preferred to vote in person, at a disadvantage.

These actions represent the beginning of the formation of a two-tier election system favoring one demographic while disadvantaging another demographic.

Also in March 2020, David Plouffe, former campaign manager for President Barak Obama, published his book entitled *A Citizen's Guide to Defeating Donald Trump.* At the time, Plouffe was working for the charitable initiative of Mark Zuckerberg and his wife Priscilla Chan.

On page 81 of his book, Plouffe correctly identifies that the 2020 general election will come down to a "block by block street fight" to turn out the vote in the urban core, a key stronghold of Democrat Party votes. Plouffe specifically highlighted high turnouts in Milwaukee, Detroit, and Philadelphia as the key to a Democrat victory.

Soon after, we witnessed the rumblings of a previously sleepy 501(c)(3) organization entitled the Center for Tech and Civic Life (CTCL) whose previous annual revenues never exceeded $1.2 million.

CTCL began sending agents into states to recruit certain Democrat strongholds to prepare grants requesting monies from CTCL.

For example, CTCL inked a $100,000 grant to the Mayor of Racine, WI in May of 2020 directing the Mayor to recruit four other cities (Green Bay, Kenosha, Madison, and Milwaukee) to develop a joint grant request of CTCL. This effort results in these cities submitting a "Wisconsin Safe Election Plan" on June 15, 2020 to CTCL and, in turn,

receiving $6.3 million to implement the plan. This privatization of elections undermines the Help America Vote Act (HAVA), which requires state election plans to be submitted to federal officials and approved and requires respect for equal protection by making all resources available equally to all voters.

The provision of Zuckerberg-CTCL funds allowed these Democrat strongholds to spend roughly $47 per voter, compared to $4 to $7 per voter in traditionally Republican areas of the state.

Moreover, this recruiting of targeted jurisdictions for specific government action and funding runs contrary to legislative election plans and invites government to play favorites in the election process.

The "Wisconsin Safe Election Plan" was not authored by the state, and considered state election integrity laws as obstacles and nuisances to be ignored or circumvented. Moreover, CTCL retained the right, in the grant document, to, in its sole discretion, order all funds returned if the grantee cities did not conduct the election consistent with CTCL dictates.

Effectively, CTCL managed the election in these five cities. And this plan violated state law in, at least, the following fashion:

1) The plan circumvented voter identification requirements for absentee ballots by attempting to classify all voters as "indefinitely confined" due to COVID and later, after Wisconsin Supreme Court criticism, by ordering election clerks to not question such claims.
2) The plan initiated the use of drop boxes for ballot collection, significantly breaching the chain of custody of the ballot and failing to maintain proper logs and reviews to ensure all properly cast ballots were counted and all improperly cast ballots were not counted.
3) Initiated the consolidation of counting centers, justifying the flow of hundreds of thousands of ballots to one location and the marginalization of Republican poll watchers such that bipartisan

participation in the management, handling, and counting of the ballots was compromised.

These are but examples of radical changes in election processes that opened the door for significant fraud.

The disparate impact of Zuckerberg funding is also present in the analysis of CTCL funding in Pennsylvania. Documents obtained through court order revealed communication between the City of Philadelphia and CTCL emphasizing that CTCL paid election judges in Philadelphia and other election officials. CTCL mandated Philadelphia to increase its polling locations and to use drop boxes and eventually mobile pick-up units. Moreover, Zuckerberg monies allowed Philadelphia to "cure" absentee ballots in a manner not provided for in Republican areas of the state.

In Democrat Delaware County, Pennsylvania, one drop box was placed every four square miles and for every 4,000 voters. In the 59 counties carried by Trump in 2016, there was one drop box for every 1,100 square miles and every 72,000 voters. Government encouraging a targeted demographic to turn out the vote is the opposite side of the same coin as government targeting a demographic to suppress the vote.

This two-tiered election system allowed voters in Democrat strongholds to stroll down the street to vote while voters in Republican strongholds had to go on the equivalent of a "where's Waldo" hunt.

These irregularities existed wherever Zuckerberg's money was granted to local election officials. In effect, Mark Zuckerberg was invited into the counting room, and the American people were kicked out.

Additionally, Amistad became alarmed at the new vulnerabilities created in our election system with "data sharing agreements" that gave left-leaning third-party organizations front door access to electronic poll books.

Rock the Vote and other organizations inked agreements with blue state election officials to enter new registrations into state poll books. Such agreements are unprecedented and unwise.

Previously, voter registrations were entered solely by election clerks, who have three important checks on their authority. These checks are: 1) they must be transparent subject to FOIA and open records laws; 2) they are geographically limited rendering audits manageable; and 3) they are politically accountable. No such checks apply to Rock the Vote.

Allowing such access creates new digital vulnerabilities easily allowing nefarious actors to access poll books and alter entries.

The Amistad Project's concerns were amplified by the nature of a contract offered by Michigan's health director to a subsidiary of NGP VAN, a Democrat fundraiser and data services company.

Michigan granted the COVID tracing contract to Michigan VAN as a subsidiary of NGP VAN. The contract allowed this leftist organization to demand sensitive information from Michigan citizens at the threat of arrest. Citizens could be ordered to turn over medical records, travel information, the names of associates and friends, and other information with a significant privacy interest and of significant monetary value to a political fundraiser.

Emails later obtained through FOIA requests demonstrate Governor Whitmer's political director was involved in suggesting to the health department that they not directly contract with NGP VAN because of possible political fallout. Governor Whitmer's staffer recommended NGP VAN create a Michigan subsidiary and that the subsidiary become a subcontractor so as to conceal NGP VAN's involvement. When this information became public, Whitmer claimed she was unaware of the agreement and faced with public pressure, she rescinded the contract.

At this time, The Amistad Project decided to retain the services of Stillwater and Mr. Carlson to develop this report. Stillwater has and will

continue to play a critical role in The Amistad Project's understanding of the privatization of the 2020 election.

Stillwater has engaged in extensive research of law, procedures, city documents, and public documents to reveal the workings of these private interests directing the 2020 election.

This report reveals those relationships and the method in which public officials partnered with private interests to improperly influence the 2020 election.

Managing elections is a core government function that cannot be trusted to private interests. We must not privatize our elections. Such privatization threatens democracy, silences the voice of the electorate, and undermines election integrity. These concerns should transcend party affiliation and this threat requires a bipartisan response. We will continue to expose these issues so our nation may adequately respond to this threat to the election process.

-- Phill Kline, Director of the Amistad Project of the Thomas More Society

# AUTHORS PREFACE

Using the COVID-19 flu pandemic as justification and the excuse that local elections lacked funding to facilitate safe elections, a well-funded network of foundations and non-profit organizations gave hundreds of millions of dollars of private funding directly to counties and municipalities across Michigan, Wisconsin, and Pennsylvania for electoral purposes.

The illegitimate infusion of private funding and third-party promotion of training, equipment, security, staffing and reporting programs by a network of private nonprofits at the local level bypassed state administrative processes, violated legislative prerogatives codified in state Help America Vote Plans (HAVA), and resulted in questions about the integrity of the US electoral system.

This report places in context and raises substantive questions about last minute gifting of private funding by five progressive, non-profit foundations and ten non-profit organizations into the local elections of swing states.

We begin by documenting longstanding federal and state authorities through which elections are to be funded and administered, factually demonstrating the adequacy and availability of public funding for the 2020 general election.

Because the availability of adequate public funding severely contrasted the narrative by the Center for Technology and Civic Life (CTCL) that private monies were needed for safe administration of public elections, we explored the background of CTCL and discovered a deep and integrated apparatus of progressive foundations and affiliated non-profits whose mission is to transition the bottom-up, electoral system of the United States to a top down, electronic system that centralizes voter information, interfaces with state registration databases, and promotes advocacy, all of which could, over time, have the capacity to exert strong local influence on the electoral processes of the United States.

It is not difficult for even the most casual of observers to conclude that the presence of private funding in public elections simply is not a good idea. In fact, the use of public/private partnerships for elections is neither wise nor legal, and if allowed to continue unchecked will create a dependency of local governments on funding from a select group of people who can afford to promote their own causes.

Our particular concern lies not with the influence of foundations and their cooperating non-profits, but instead with the elected officials who accessed the funding and Secretaries of State who understood - even enabled - the influence of non-profits to take place within their states.

We leave it to the readers of this report and those in authority to investigate our findings, buttress the existing electoral system, or take the necessary actions to ensure electoral processes are truly safe and secure.

# Table of Contents

**1.0 BACKGROUND** ...................................................................................1

    1.1 *Introduction; Situation Appraisal* ................................................. 1

    1.2 *State Electoral Authority; The Help America Vote Act* ................................. 1

    1.3 *Supplementary Funding for Administration of 2020 General Election*......... 2

    1.4 *The Structure and Role of Non-Profits in Affecting Elections* ....................3

**2.0 STATEMENT OF ISSUES** ....................................................................4

    2.1 *Focus Topics* ...............................................................................4

**3.0 CONFLICT ANALYSIS** ......................................................................7

**4.0 CONCLUDING REMARKS** ...............................................................16

## Tables

Table of Private Non-profit Associations in Elections - Policy......................................... 5

Table of Private Non-profit Associations in Elections - Advocacy.................................... 6

HAVA and CARES Funding Plus State Matching Funds for 2020 Elections .................. 9

Estimated CARES Act Expenditures 20 Days Post Primary Election ............................. 9

Government Funding and CTCL Grant Funding.............................................................. 9

## ATTACHMENTS

ATTACHMENT A:   Flowchart: The Relationship of Foundations and Non-profit Organizations Involved in US Electoral Policy

ATTACHMENT B:   Charts, Graphs, and Tables

# 1.0 BACKGROUND

## 1.1 Situation Appraisal -

Disruption of the 2020 US general election can be traced to infusion of private funding from non-profit foundations and organizations to local counties and municipalities of swing states. The injection of **hundreds of millions of dollars** in early summer of 2020 violated legislatively adopted regulatory plans, bypassed adequately funded state electoral programs, and resulted in an unbalanced distribution of funding among precincts.

The early infusion of funding and non-profit advisory services, when combined with errant directives from senior state electoral officials, confused and encouraged county officials into appointing untrained personal, installing unapproved ballot processing equipment, illegitimately relocating precincts or ballot boxes, or otherwise making decisions that had a disparate influence on specific voting blocs of swing states. Ultimately, infusion of private funding brought about a nationwide level of confusion that has resulted in lawsuits that has led to a loss of confidence in the US electoral system.

This report explores the legitimacy, legality, and wisdom of blending the governmental administration of elections with the influence brought about by embracing private/public partnership through grants into elections. Historically, public officials have been skeptical of lowering the bright line distinction between the public and private sectors - and the example of disruption caused by private funding into Michigan, Wisconsin, and Pennsylvania during the 2020 elections demonstrates why.

Having demonstrated the adequacy of existing federal appropriations and the soundness of the existing electoral framework, we then explore the background, structure, and mission of a foundation/non-profit apparatus whose mission is to erode confidence in US electoral processes, blend government and private sector functions, and gain access to state-by-state voter information.

Following a review of the adequacy of public funding and the structure and intent of non-profits and foundations to access state databases and influence elections, we then present data to demonstrate that the infusion of private funding in the 2020 election cycle had a disparate and political end – to increase the total number of votes in select Democrat leaning precincts.

## 1.2 State Electoral Authority; The Help America Vote Act -

The authority to administer state and federal elections is the sole prerogative of the Michigan, Wisconsin, Pennsylvania, and other state legislatures.[1] These state legislatures maintain authority to enact statutes, make fiscal appropriations, and delegate responsibility to executive electoral commissions - who in turn are responsible for the integrity, security, and administration of elections throughout the state.

---

[1]   U.S. Const. Art. I, § 4

State electoral commissions who receive Help America Vote Act HAVA funding enact policies, support county and municipal officials in their individual precincts, and have a responsibility to administer policy in accordance with the HAVA and Elections Assistance Commission (EAC) mandates and standards. The mechanism for ensuring electoral policy administration at the state and county level is the legislatively appointed state HAVA implementation plan. The states of Michigan,[2] Wisconsin,[3] and Pennsylvania[4] all have a longstanding regulatory system based upon certified HAVA Plans that govern elections and implement electoral policies.  For their part, counties and municipalities who receive HAVA funding are required to maintain HAVA compliance agreements with their respective state.

The state HAVA implementation plans contain specific requirements and protocols for: 1) ensuring the security and integrity of voter information systems; 2) effecting voter communication; 3) recruiting and training poll workers; 4) enacting plans to improve voter access; and 5) auditing and reporting under HAVA funding programs.[5,6]

Preparation and revision of State HAVA implementation plans are subject to the Administrative Procedure Act (APA) of the individual states. State APA procedures impose public notification, opportunities for public comment, and other protective, procedural constraints on electoral commissions before HAVA implementation plans may legitimately be enacted or substantively modified. Promoting or undertaking activities outside the HAVA system bypasses state APA procedures and violates state APA requirements.

*1.3 Supplementary Funding for Administration of 2020 General Election -*

On March 27, 2020, the Congress enacted the Coronavirus Aid Relief and Economic Security (CARES) Act[7,8] which appropriated an additional $400 million dollars to the EAC for dissemination to the states:

> "*to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle.*"

The CARES Act requires state agencies to coordinate with the Pandemic Response Accountability Committee, and funding from the CARES Act was to be disseminated to counties through the HAVA state implementation system. In response to mounting election-related costs from COVID-19, some states appropriated even more funding for administration of county and municipal elections. In Wisconsin, the state legislature

---

[2]   Certified Michigan HAVA State Plan of 2003.  Terri Lynn Land Secretary.  FR Vol. 69 No. 57 March 24 2004

[3]   Certified Wisconsin HAVA State Plan of 2003.  WI Elections Board.  FR Vol. 69 No. 57 March 24 2004

[4]   Certified Pennsylvania HAVA State Plan of 2003. Edward Rendell Governor, P.A. Cortes Secretary FR Vol. 69 No. 57 March 24 2004

[5]   41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments*

[6]   OMB Circular A 133 Audits of States, Local Governments and Non Profit Organizations, June, 2003

[7]   Elections Assistance Commission. Plans for Use of CARES Act Funds. Report to Pandemic Response Committee.

[8]   Federal Election Assistance Commission.  *Post Primary CARES Act Expenditure Report. September 22, 2020*

funded an aid program called *Wisconsin Routes to Recovery.*[9] The *Routes to Recovery* program was enacted to reimburse local governments for unbudgeted expenditures due to the COVID-19 pandemic.

In late November 2020, Wisconsin reported that of its 1,850 municipalities, only 1,265 had applied for CARES election funding. After the November general election, Wisconsin reported a CARES funding surplus of $1,198,511. [10] As of November 23, 2020, Pennsylvania reported surplus CARES funds of $953,839.[11] As of this report, Michigan had not submitted a November report to the EAC as required; however, following the primary election Michigan CARES had a fund surplus of $4,663,819.[12]

During the same timeframe, the Wisconsin municipalities of Racine, Madison, Milwaukee, Green Bay, and Kenosha actively pursued private grant funding from the Center for Technology and Civic Life (CTCL) for funding of elections expenses that included equipment, salary, training, and even a $250,000 motor home.[13] The grant applications, governmental approval documents, and other information was previously reported by STS.[14]

Because adequate funding for elections administration was available in Michigan, Wisconsin, and Pennsylvania, the CTCL narrative that it needed to provide funding for safe and secure elections was at best naïve, and at worst, an outright falsehood. The presence of ample sources of public funding rendered the infusion of any private funding unjustified, unnecessary, and disruptive to electoral processes.

## 1.4 The Structure and Role of Non-profits in Affecting Elections -

Shortly following the inauguration of President Obama in 2009, a network of special-use non-profit organizations was created to collect, aggregate, and analyze information collected from third party users, such as Turbo Vote, who have access to state databases for the purpose of influencing US elections and electoral policy. These well-funded non-profits share leadership, are centrally coordinated, and have the common mission of amassing and analyzing voter information to influence campaigns, promote activism, and affect elections. Attachment A presents an organizational chart of foundations and non-profits involved in US electoral policy.

The multiple layered, special-use non-profit model also provides an outward appearance of strength, assures political cover for donors, and affords a convenient conduit to quickly channel funding to loosely knit street activists. This special-use non-profit apparatus is not unique to elections, as progressive activists have been using similar networks to influence public lands policy, for expansion of the environmental movement, and in influence of administrative government policy.[15]

---

9   Guidance. Wisconsin Routes to Recovery Reimbursement Program. September 25 2020
10   Wisconsin Cares Nov 23 Report
11   Pennsylvania Cares Nov 23 Report
12   Michigan Cares Aug 24 Report
13   Wisconsin Safe Voting Plan
14   STS Timeline of Electoral Activities FINAL12/14/20
15   *The Chain of Command.  How Billionaires and Foundations Control Environmental Movement.  US Senate Report July 30 2014*

The multi-level non-profit structure also affords a convenient way to shield donors, because non-profits can shift resources among themselves, making tracing and discovery more difficult and time consuming. Specialization also gives a perception of separation and impartiality, traits which are particularly important for those non-profits who seek to influence electoral policy, promote academic standards, or influence cyber security policy.

## 2.0 STATEMENT OF ISSUES

*2.1 Focus Topics -*

1) Whether state certified HAVA implementation plans or state legislative prerogatives were compromised through the infusion of private grants from the Center for Technology and Civic Life (CTCL) into local elections;

2) If appropriations from federal, state, or local sources were sufficient to completely fund the 2020 general election, rendering funding from public/private partnerships unnecessary;

3) Whether the reporting and claw back provisions in private grant agreements between CTCL and local governments presents a future audit, bonding, or pension liability to counties who received the CTCL grants.[16]

---

[16]  41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments*

**Private Non-profit Associations Involved in Elections - Policy**

| Organization | Function | Key People | Funders |
|---|---|---|---|
| **Electronic Registration Information Center (ERIC)** | ▪ Governmental Association of State Secretaries<br>▪ Access to motor vehicle information<br>▪ Promotes centralized access and sharing of state registration and motor vehicle databases<br>▪ Funded by states; subject to IRS Instrumentalities rules and FOIA | ▪ David Becker - CEO<br>▪ Pam Anderson - EO of Colorado County Clerks<br>▪ Kevin Kennedy - Former Wisconsin Chief Election official | ▪ Democracy Works |
| **National Vote at Home Institute (NVHI)** | ▪ Promotes comprehensive at-home voting and mail-in balloting<br>▪ Bypasses HAVA State Plans and commissions by providing privately generated " tool kits" and " calculators" to educate local officials in elections administration | ▪ Co-Chair Jocelyn Benson, Michigan<br>▪ Tiana Epps-Johnson - CTCL<br>▪ Carolyn De Witt - Rock the Vote<br>▪ Dana Chisnel - Center for Civic Design<br>▪ Jake Matilsky - Center for Secure & Modern Elections<br>▪ Jennifer Morrell - Democracy Fund<br>▪ Seth Flaxman - Democracy Works | ▪ Democracy Fund<br>▪ Center for Civic Design<br>▪ Rock the Vote |
| **Center for Technology and Civic Life (CTCL)** | ▪ Founded by Tiana Epps-Johnson<br>▪ CTCL promotes national API interface agreements between federal, state, and local systems<br>▪ Bypasses state HAVA training requirements by providing tool kits and education<br>▪ Circumvents state appropriations by providing grant funding to local counties<br>▪ Collects and analyzes voter information from local county clerks<br>▪ Grants contain future liabilities for counties and present audit issues<br>▪ Data sharing with Big Tech, Face Book, and Google | ▪ Tiana Epps-Johnson - Executive Director and Founder*<br>▪ Whitney May - Government Services Department*<br>▪ Donny Bridges - Civic Data Department*<br><br><br>*previously employed by *New Organizing Institute* | ▪ Knight Foundation<br>▪ Skoll Foundation<br>▪ The Democracy Fund<br>▪ Rockefeller Brothers Fund<br>▪ Mark Zuckerberg and Priscilla Chan |
| **Center for Civic Design** | ▪ Research arm of electoral non-profits<br>▪ Drives government policy through white papers, security standards, and science<br>▪ Promotes intergovernmental data sharing and automatic voter registration | ▪ Dana Chisnel - Director<br>▪ Whitney Quesenbery – CTCL<br>▪ Tiana Epps Johnson - CTCL<br>▪ Katy Peterson - Democracy Works<br>▪ Jennifer Morrell - Democracy Fund | ▪ Democracy Fund<br>▪ MacArthur Foundation<br>▪ Center for Secure and Modern Elections<br>▪ Mark Zuckerberg and Priscilla Chan |
| **Center for Secure and Modern Elections** | ▪ Election policy at state and local level<br>▪ Promotes voter registration at state and federal government offices and during social program enrollment | ▪ Jake Matilssky - Director | ▪ New Venture Fund |

POLICY

**Private Non-profit Associations Involved in Elections -Advocacy**

| Organization | Function | Key People | Funders |
|---|---|---|---|
| **US Vote Foundation** | ▪ Created in 2005; rebranded in 2012<br>▪ Third party aggregation of voter information<br>▪ Maintains database of public officials for advocacy<br>▪ Advocates for federal absentee voting<br>▪ Data aggregator for other non-profits | ▪ Dana Chisnel | ▪ Democracy Fund<br>▪ Knight Foundation<br>▪ Pew Trust<br>▪ Carnegie<br>▪ JEHI Foundation |
| **Democracy Works; dba Turbo Vote** | ▪ Promotes mail in and absentee voting for all 50 states<br>▪ Targets and recruits college students<br>▪ Collects and aggregates information from users accessing websites<br>▪ Model integrated and replicated throughout several states (with name changes) | ▪ Seth Flaxman - Also sits on NVHI Board<br>▪ Trey Grayson | |
| **Rock the Vote (RTV)** | ▪ " Rocky" actively recruits college students and inner-city youth for activism<br>▪ Affiliated with 300 academic institutions and colleges<br>▪ Collector and aggregator of information<br>▪ Has third party access to Pennsylvania voter registration system<br>▪ Promotes " full integration" of state API registration databases<br>▪ Remote access for batch loading of voter information | ▪ Carolyn DeWitt - Director<br>▪ Jeff Ayeroff - Founder<br>*Board Members:*<br>▪ Wayne Jordan<br>▪ Michael Skolnick<br>▪ DeRay Mckesson - National BLM Leader and Co-Founder of Campaign Zero and Our States.org.<br>▪ Jesse Moore - Founder Common Thread Strategies | |

**ADVOCACY**

### 3.0 CONFLICT ANALYSIS -

I.  **Injection of private funding into county and municipal elections circumvents State and Federal appropriations processes, violates protocols in HAVA state implementation plans, and results in inaccurate reporting under HAVA 254(a)(5):**

    a.  The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the U.S. Election Assistance Commission (EAC), state legislatures, and delegated state commissions.

    b.  The authority for administration of HAVA mandates and for HAVA and CARES Act appropriation funding is prescribed in the Michigan, Wisconsin, and Pennsylvania state certified HAVA plans.

    c.  The individual state HAVA implementation plans incorporate detailed requirements for the 13 HAVA categories, including election security protocols; standards for voter systems; equipment procurement requirements; voter and electoral official training procedures; provisional voting and balloting processes; provisions to improve voting access; mail-in voter registration requirements; voter complaint resolution protocols; and appropriations monitoring, auditing and reporting protocols. The state HAVA implementation plans provide measures to upgrade voter systems, standards for database integrity, methods of voter communication, requirements for recruitment and training of poll workers, and many other policies to be implemented by elected officials at the local level.

    d.  The claw back and reporting provisions in contracts between CTCL and local counties and municipalities, if exercised, will result in inaccurate recordkeeping and state reporting under *HAVA 254(a)(5)* and the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments at 41 CFR Part 105-71.*

    e.  The claw back language in the CTCL agreements represents a long-term, contingent liability for counties and municipalities who received the CTCL grants. These liabilities pose long-term audit, bonding, or pension risks to those counties who received CTCL grants.

    f.  Scaled up across the 15 states of known CTCL grant funding activity, the inaccuracies in state/federal HAVA Title II reporting and auditing resulting from unreported funding or claw back provisions is substantial.

    g.  The appropriate mechanism for charitable donations for electoral purposes is through donations earmarked into the general fund of the individual state legislatures. There is no state or federal statutory authority for counties, municipalities, or other local electoral jurisdictions to solicit, receive, or appropriate private funding outside of state HAVA implementation plans.

## II.   HAVA, CARES, and state appropriations for local elections in Michigan, Wisconsin and Pennsylvania were sufficient to fund administration of the entire 2020 election cycle, rendering CTCL funding unnecessary:

a.   Public appropriations for federal elections through the U.S. Election Assistance Commission (EAC) and state matching funds are the only legitimate funding sources for administration of U.S. elections. State-level funding formulas provide for proportional and equitable allocation of funds across electoral precincts, ensuring resources are evenly distributed so as not to result in funding disparities.

b.   For the 2020 general election, federal and state appropriations for administration of local elections were substantially augmented to account for the COVID-19 pandemic.

c.   Additional COVID-19 pandemic response funding for election administration was made available through state appropriations and similar allocations of public funding. As example, the State of Wisconsin used CARES Act funding and state matches for its *Routes to Recovery Program*.

d.   The combination of the HAVA and CARES Act funding, along with any state matches, was more than adequate for electoral operations, upgrade of election-specific hardware and software, cybersecurity, training for voter and elections officials, and COVID-19 specific needs. The infusion of private funding was unnecessary. (Tables 1, 2, and 3)

e.   Local electoral officials in Michigan who performed due diligence on CTCL grants observed the sufficiency of CARES Act funding and remarked as to the non-necessity of CTCL grants. As example, Michigan's Oakland County Clerk Lisa Brown decided not to seek CTCL funding stating: "*We already had an opportunity through the CARES Act to get extra equipment and things we would need at the county level. It seemed to me that they were offering up the same sort of thing.*" [17]

f.   The December 2019 HAVA Title II 251 Report to the EAC from Michigan Secretary Jocelyn Benson documented an unexpended HAVA surplus for administration of statewide elections of $1,285,975.[18] The public record also indicates that Secretary Benson was aware of the availability of adequate public funding for dissemination to Ann Arbor, Flint, Lansing, East Lansing, Muskegon, Pontiac, Romulus, Kalamazoo, and Saginaw – jurisdictions that received CTCL grants.

g.   On April 13, 2020 Michigan Secretary Benson corresponded with the EAC and certified the use of $11,299,561 CARES funding for COVID-19 electoral administration. This stands in stark contrast to Secretary Bensons public advocacy for CTCL and its funding, and ultimately the CARES funding solicited by Secretary Benson was unspent and supplanted by CTCL grants.[19]

---

[17]   *Benson accused of letting 'partisan operatives' influence election.* Detroit News. October 6, 2020.

[18]   Michigan HAVA 251 Funds Report. December 2019.

[19]   Bureau of Elections  Audit Report Michigan Auditor

h. The 2016 IRS Form 990 for the Southern Law and Poverty Center lists Michigan Secretary Jocelyn Benson as the Director of that non-profit corporation.

i. Concerns with CTCL funding include lack of public accountability, no state legislative or EAC oversight, and agreements that require reporting of voter information from county clerks back to a non-governmental organization.

| Table 1 - HAVA and CARES Funding Plus State Matching Funds for 2020 Elections[20] | | | | | | |
|---|---|---|---|---|---|---|
| | **2019 HAVA Carryover** | **Election Security** | **Match** | **CARES** | **Match** | **Total** |
| **MI** | $6,635,744 | $12,053,705 | $2,410,741 | $11,299,561 | $2,259,912 | $34,689,663 |
| **MN** | $6,548,440 | $7,418,672 | $1,483,734 | $6,958,233 | $1,391,647 | $23,800,726 |
| **PA** | $3,531,998 | $15,175,567 | $3,035,113 | $14,233,603 | $2,844,721 | $38,821,002 |
| **WI** | $4,316,403 | $7,850,124 | $1,570,025 | $7,362,345 | $1,472,469 | $22,531,366 |

| Table 2 - Estimated CARES Act Expenditures 20 Days Post Primary Election[21] | | | | | |
|---|---|---|---|---|---|
| | **Amount Appropriated** | **State Match** | **Initial Total Available** | **Estimated Expenditure** | **Available Funds** |
| **MI** | $11,299,561 | $2,249,551 | $13,549,112 | $6,821,392 | $6,727,720 49% |
| **MN** | $6,958,233 | $1,386,122 | $8,344,355 | $363,867 | $7,980,488 92% |
| **PA** | $14,233,603 | $2,831,101 | $17,064,704 | $3,511,525 | $13,553,179 79% |
| **WI** | $7,362,345 | $1,472,469 | $8,834,814 | $3,228,484 | $5,303,330 60% |

| Table 3 – Government Funding and CTCL Grant Funding | | |
|---|---|---|
| | **2020 HAVA + CARES Funding[22]** | **2020 CTCL Grants[23, 24]** |
| **MI** | $28,023,919 | $6,369,753   (22.7%) |
| **MN** | $17,252,286 | $2,297,342   (13.3%) |
| **PA** | $35,289,004 | $15,824,895   (44.8%) |
| **WI** | $18,254,963 | $6,946,767   (38.1%) |

---

[20] *Election Assistance Commission—Election Security Grant Funding Chart July 16, 2020* and *Election Assistance Commission—CARES Grant Funding Chart July 22, 2020*

[21] *ESTIMATED CARES Act Expenditures As Reported in 20 Day Post Primary Reports (September 22, 2020 Update)*

[22] Includes federal funding + state matching funds; does not include 2019 carryover.

[23] CTCL grant dollar amount accompanied with size as a percentage of total government funding for the state.

[24] CTCL grant values must be viewed as approximate because the numbers reported by news sources and local governments vary, and grant awards continue.

### III. When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate clear partisanship in grant funding awards:

a. A review of data for the 2020 CTCL grant-making actions in Michigan, Wisconsin, and Pennsylvania, along with 2016 presidential election voting records for recipients of CTCL grants reveals a distinct pattern of greater funding to jurisdictions where candidate Hillary Clinton won versus grant-receiving jurisdictions where candidate Donald Trump won. While CTCL maintains that it is a non-partisan organization and its grants are available to all local jurisdictions, the grant pattern is understood to have a distinct color of partisanship. Attachment B contains charts, graphs, and a table supporting this conclusion.

b. **Michigan -** CTCL awarded eleven grants in Michigan. Recipient cities were Detroit ($3,512,000); Lansing ($443,742); East Lansing ($43,850); Flint ($475,625); Ann Arbor ($417,000); Muskegon ($433,580); Pontiac ($405,564); Romulus ($16,645); Kalamazoo ($218,869); and Saginaw ($402,878). In the 2016 election, only Saginaw was won by candidate Donald Trump; the remainder were won by candidate Hillary Clinton. In total, **$5,939,235** was awarded to the ten jurisdictions where candidate Clinton won and only **$402,878** where candidate Trump won.[25]

c. **Pennsylvania -** CTCL awarded seven grants in Pennsylvania. Three of these grants were awarded to the cities of Philadelphia ($10,016,074); Erie ($148,729); and Lancaster ($474,202). Five grants were awarded to counties: Wayne County ($25,000); Northumberland County ($44,811); Center County ($863,828); Delaware County ($2,200,000); and Allegheny County ($2,052,251). A total of **$13,063,828** (94.7%) went to jurisdictions where candidate Hillary Clinton won in the 2016 presidential election; only **$692,742** (5.3%) went to jurisdictions where candidate Donald Trump won in 2016.[26]

d. **Wisconsin -** CTCL awarded multiple grants to five Wisconsin cities: Milwaukee - two for a total of $2,164,500; Madison - two for a total of $1,281,788; Green Bay - two for a total of $1,625,600; Racine - two for a total of $1,002,100; and Kenosha - two for a total of $872,779. The $60,000 grant to Racine is what remained of a $100,000 CTCL grant to that municipality which included a stipulation that Racine would distribute a $10,000 sub-grant to each of the other four cities. This placed Racine in the position of being an agent for CTCL with the purpose of distributing grant moneys.[27,28]

---

[25] CTCL Grant Charts
[26] CTCL Grant Chart
[27] Wisconsin Safe Voting Plan. June 15, 2020
[28] CTCL Grant Chart

IV. **Systemic mismanagement of voter registration databases and verification processes in Michigan and Pennsylvania deprived voters in the 2020 general election of a free and fair election:**

a. Registration is the first essential step in verifying legitimate voters, and protection of the state registration database is necessary to ensure the accuracy of voter rolls. The secretaries of Michigan and Pennsylvania allowed flawed administrative procedures that gave third party access to state voter information in the QVF and SURE systems. The voter registration databases of both Michigan and Pennsylvania fail to fully comply with the Help America Vote Act (HAVA) standards required by National Institutes of Standards (NIST) for certified technologic security.

b. HAVA established the U.S. Election Assistance Commission (EAC) which provides funding to states, sets requirements for administration of elections, and identifies NIST as the agency charged with setting performance standards for:

    1. Systems maintaining Personally Identifiable Information (PII) in voter registration databases, and;

    2. Voting systems allowing votes to be cast, tabulated, and reported.

    3. Requires states to ensure data exchanges between state drivers' registration and licensing databases and the Social Security Administration databases.

c. HAVA Section 303, "*Computerized statewide voter registration list requirements and requirements for voters who register by mail*" requires those states receiving HAVA funding to **secure** their state-wide voter registration databases.

d. HAVA Section 303(a)(5)(F) requires states receiving federal funds to **ensure protection of voter Social Security information**. This Section explicitly requires that protection protocols extend to all state employees and state contractors who have access to the Michigan QVF and Pennsylvania SURE systems.

    1 Michigan has entered into an API contract with the third-party, non-profit Rock the Vote (RTV) granting RTV remote access to the QVF database. As of 2020, the public record is silent on Michigan's certification that RTV has adhered to Michigan or NIST standards to protect information or assure compliance with Michigan technologic security standards. A review of the RTV contract indicates the last RTV audit was conducted in 2018. The absence a certification of compliance for RTVs access to QVF could pose a security risk to the state voter information system. There is no assurance that the voter rolls are only populated with legal, Michigan voters nor is there assurance that voter data has not been exfiltrated or misused.

2. A comprehensive review of Michigan's use of third-party contractors accessing the registration databases is needed, along with an Organizational Conflict of Interest (OCI) risk review of Michigan election staff who have access to the registration database. The OCI review is a central component of NIST standards.

3. In 2005, the Pennsylvania Legislature certified a state HAVA plan that enabled access to federal funds. Pennsylvania then used federal funding to establish its Statewide Uniform Registry of Electors (SURE) system, the repository for sensitive voter information. The Pennsylvania state HAVA plan is silent regarding whether their SURE system is secure and correctly manages Social Security Administration (SSA) information as required by HAVA. In a press release dated September 2016, the non-profit Rock the Vote is documented to have an application linked to 25,000 "partners." The public record is silent as to how the Pennsylvania Secretary ensures certification of its registration system for RTV's 25,000 partners. Without public review, it is not possible to ascertain the security of the Pennsylvania SURE system under HAVA and NIST.

4. In an audit cover letter of the Pennsylvania SURE system performed between January 2016 and April, 2019 Pennsylvania Auditor General Eugene DePasquale issued a **scathing** letter to Governor Wolf of noncompliance of the SURE system with HAVA and federal auditing standards, excessive redactions by Pennsylvania Secretary of State, and impediments to the auditing process by the Pennsylvania Department of Transportation. The public record is silent as to whether in 2020 Secretary Boockvar remedied any of noncompliance issues prior to the 2020 election. Pennsylvania Secretary of State Boockvar has deep affiliations with far left voting related advocacy groups.[29]

## V. Michigan's 2020 electoral administration and tabulation of election results is fatally flawed and involves potentially fraudulent use of federal funds to implement and maintain their HAVA state Plan:[30]

a. The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the US election assistance Commission (EAC), state legislators and delegated state commissions. HAVA establishes the EAC, provides funding to states, sets requirements for election administration, and identifies the National Institute of Standards (NIST) as the agency charged was setting performance standards for voting systems.

---

[29] Performance Audit Report Pennsylvania Auditor General 121919
[30] FR Vol. 69, No 57. Wednesday, March 24, 2004; HAVA 101 (d), 301, 302, and 303.

b.  Based on the Michigan HAVA implementation plan the state obtained an excess of $71 million in federal funding for fiscal years 2004 - 2006 to establish voter training, voting systems, and a statewide voter registration database.

c.  Section 101 (d) of HAVA specifies that funds are to be used to train election officials and poll workers. In section 905 (a) **HAVA describes criminal penalties for individuals who conspire to deprive voters of a fair election**. HAVA also cites the 42 USC 1973i (c), which defines coercion, blocking of poll locations, and other forms of **voter intimidation or denial of access or voting monitoring as being potential criminal violations**. Based on observed behavior captured on video and news reporting, Michigan poll workers, election officials, and election staff demonstrated a lack of training in conflict with the HAVA law and the 1965 Voting Rights Act of 1965.

d.  Registration is the first critical step in determining who in this state can vote in an election. Protecting the registration rolls of voters is the first critical step in assuring a legal, accurate, election result. HAVA section 303 (a)(3) requires a state to provide technological security of state-wide Social Security information of voters. **This section specifically requires these protections extend to all state employees and state contractors** who work with voter data. The State of Michigan, in its HAVA plan, states that the Department of Technology, Management, and Budget (DTMB) governs technology contracts in Michigan. **Michigan has entered into a state contract with Rock the Vote (RTV) granting that third party non-profit organization access to the QVF database**.[31] As of mid-2020, there is no record that RTV has adhered to Michigan standards to protect voter information in the QVF, complied with Michigan technological security standards, or other standards that assures HAVA compliance. A comprehensive review of Michigan's use of third-party contractors assessing the registration is needed to assess the risk.

## VI. Infusion of private funding into electoral processes has altered the times, manner and places established by HAVA Plans and longstanding electoral practices in which elections were conducted.

a.  In Wisconsin, an elector who is Indefinitely Confined due to age, physical illness, or infirmity - or is disabled for an indefinite period - may by signing a statement to that effect that an absentee ballot be sent to the elector automatically for every election. The application form and instructions are prescribed by the Wisconsin Elections Commission and must furnished upon request to any elector by each municipality.[32]

---

[31]  Michigan RTV Contract
[32]  Indefinitely Confined Report

b.  High Speed Tabulators, Scanners, High Speed Industrial Printers, and Electronic Poll Books funded by CTCL raise questions of certification, training, or disparate access due to their installment of some but not other locations.[33]

c.  Election regulations in Michigan and the state HAVA implementation Plan detail training requirements for officers overseeing elections. Despite adequate funding from multiple public sources, poll workers in Detroit lacked adequate training, became frustrated, and walked off in response to training problems.[34]

d.  In Michigan, the process used for acquisition of electoral equipment on a statewide basis violated state funding, procurement, and legislative budget committee approval processes, as legislators were left out of the process.[35]

e.  CTCL funded **mobile** precincts used by election officials to collect ballots and register people to vote, resulted in a disparate, statewide access from precinct to precinct, favoring specific demographics.[36]

f.  The establishment of satellite polling places on several college campus using CTCL funding occurred at multiple locations. These offices were not mapped, favored a specific age and demographic group of citizens, and were established outside of HAVA plans and protocols.

g.  CTCL funds created and funded an official position of election workers called "**Voter Navigators.**" The Voter Navigators were not approved positions according to the state electoral process.[37]

h.  Unlike the HAVA Title I (303) requirement to maintain an electronic voter database in Michigan, ***not one*** **of the CTCL contracts – including those reviewed from swing and other states – included provisions for updating or purging of voter rolls**. A December 2019 Bureau of Elections report indicated more control was needed over the Qualified Voter File (QVF) system.

i.  In Detroit, poll watchers were instructed not to compare signatures on ballots, to back date the ballots, and to not require ID for people who were voting in person.[38]

j.  A 2019 Michigan lawsuit filed by Pacific Interest Legal foundation found noncompliance with the National Voter Registration Act of 1993.  Detroit had 2,503 dead people on its voter rolls, and 4,788 voters that were flagged for duplicate or triplicate concern.  Detroit had 511,786 registered voters but only 479,267 adults designated as eligible to vote.[39]  None of these items was addressed by Secretary Benson in a December 2019 Audit by the State of Michigan Auditors office.[40]

---

[33] Wisconsin Safe Voting Plan
[34] Detroit Training Issues
[35] Michigan Law Election Supplies
[36] Wisconsin Safe Voting Plan
[37] Wisconsin Safe Voting Plan
[38] Detroit Workers Did not Check Signatures
[39] Dead People on Voter Files
[40] Office of the Auditor General State of Michigan December 2019

k.  Wisconsin, Green Bay, Kenosha, Madison, Milwaukee, and Racine **all added ballot drop boxes to facilitate the return of absentee ballots throughout their cities**.[41] The locations and placement of ballot drop boxes raises questions of disparate access from precinct to precinct and across the state.

l.  In Detroit, Michigan, poll workers were restrained in their ability to verify signatures or handle ballots. The Michigan Election Law outlines the rules which were not adhered to in this process.[42,43]

---

[41] Wisconsin Safe Voting Plan
[42] Poll Watchers Denied Access
[43] Poll Watchers in Detroit Kicked Out

## 4.0 CONCLUDING REMARKS -

The confusion and negative effect from illegitimate infusion of private funding in Michigan, Wisconsin, Pennsylvania, and several other states during the 2020 election can be shown to have had a disparate and inequitable impact on the electorate.

Although history is replete with examples of elite groups attempting to gain influence, the current incidence of CTCL and other private donors purposefully injecting hundreds of millions of dollars into swing states is troubling because county officials who should know better actually *accepted* **the grants, to the exclusion of abundantly available public funding**. Even the most casual of observers can understand that acceptance of *any* private funding for administration of public elections creates inequity, dependency, and the potential for collusion, or even fraud.

It seems odd that while CTCL promotes having nationwide expertise in elections and electoral policy, its funding of local counties and municipalities in the 2020 general election blatantly circumvented well-funded and legislatively adopted state and federal HAVA plans.

Perhaps even more troubling is the collaboration of the Michigan and Pennsylvania Secretaries of State and representatives who sit on the election commission of Wisconsin in promoting CTCL grants, granting access to databases, or otherwise promoting non-profit activities while subordinating CARES funding and HAVA state implementation plans.  Several of these officials have longstanding affiliations with progressive non-profits and foundations who actively endeavor to collect voting information for purposes of affecting elections or altering electoral policies.

The presence of vast quantities of public funds for administration of the 2020 elections in Michigan, Wisconsin, and Pennsylvania raises questions as to whether CTCL and its supporting foundations understood that there **was no resource deficit** for administration of elections, including extra expenses due to COVID-19.

This warrants investigation.

Based upon the information in this report and related research, STS offers the following actions and activities for consideration:

1. The secretaries, attorneys general, and/or legislatures of states whose county governments received CTCL funds should commission a comprehensive, third-party audit of the consistency of private/public transactions with the HAVA implementation plans of their state.  This should include compliance with NIST standards, and state procurement requirements.

2. State secretaries, attorneys general and/or legislatures who have membership in the non-profit **Electronic Registration Information Center** (ERIC) should audit the information access, collection, storage, security and/or potential voter information sharing practices of ERIC with other states or third-party non-profit associations.

3. In the fall of 2020, the Center for Election Innovation (CEIR) issued grants to state secretaries, local governments, and non-profit associations for election-related purposes. Secretaries, attorneys general, and/or legislators of states receiving CEIR grants should request and evaluate CEIR contracts for HAVA compliance and the fiscal and procurement requirements of their individual states.

4. CTCL is a non-profit organization chartered in Illinois but who has negotiated grant contracts with county and municipal governments in multiple jurisdictions across many states. The public record is silent as to whether CTCL is licensed in all the states in which it continues to conduct contractual business.

5. The claw back language in CTCL agreements with counties and municipalities who received grants represents a long-term, contingent liability and is subject to federal audit, bonding, or pension risks. County commissioners should coordinate with their respective attorneys general or legislatures to understand and mitigate potential future liabilities.

**Attachment A**

Flowchart:
The Relationship of Foundations
and
Non-profit Organizations Involved in US Electoral Policy



**Attachment B**

Charts, Graphs and Tables

**Note:** Variations in grant amounts were reported by editors, the press and in meeting minutes from local governments. These variations might result in perceived inaccuracies in the dollar amounts of some CTCL grants. Because CTCL continues to make grants, source information in these calculations will outdate. The data presented is sufficient and reliable to conclude clear political trends in CTCL grant awarding patterns.

# Center for Tech and Civic Life's Grants to Democratic Strongholds in Battleground States

## State of Wisconsin

| City | CTCL Grant | Dem. Vote | Rep. Vote | Trump's 2016 WI Win | Trump's 2016 WI Win in Votes |
|---|---|---|---|---|---|
| Milwaukee | $2,164,500 | 85% | 14% | 0.77% | 22,748 |
| Madison | $1,281,788 | 70% | 23% | 0.77% | 22,748 |
| Green Bay | $1,625,600 | 58% | 42% | 0.77% | 22,748 |
| Racine | $1,002,100 | 72% | 28% | 0.77% | 22,748 |
| Kenosha | $872,779 | 69% | 31% | 0.77% | 22,748 |
| Total CTCL WI Grant | $6,946,767 | | | | |

The five Wisconsin cities above accounted for 82% of Hillary Clinton's vote in 2016. CTCL's $6.32 million grant to increase voter participation in only five of Wisconsin's 190 cities will produce a lopsided vote for Joe Biden in Wisconsin's five largest Democrat strongholds. If CTCl's $6.3 million Wisconsin voter participation grant increases the Biden vote in just the five Democratic strongholds by 2%, then Democrat Joe Biden will win Wisconsin. CTCL's  $6.3 million Wisconsin grant deliberately increases Joe Biden's chances of winning Wisconsin's popular vote and 10 electoral votes.

## State of Pennsylvania

| City/County | CTCL Grant | Clinton | Trump | Trump's 2016 Pa Win | Trump's 2016 PA Win in Votes |
|---|---|---|---|---|---|
| Delaware County | $2,200,000 | 65% | 35% | 0.72% | 44,292 |
| Philadelphia | $10,000,000 | 92.1% | 7.9% | 0.72% | 44,292 |
| Centre County | $863,828 | 48.71% | 46.32% | | |
| Wayne County | $25,000 | 67.63% | 29.18% | | |
| Erie | $148,729 | 48.57% | 46.99% | | |
| Total CTCL PA Grant | $13,237,557 | | | | |

CTCL's $10 million grant to Philadelphia is three times higher than CTCL's second largest grant. CTCL granted Philadelphia more money than anywhere else because President Trump can't win his reelection if he doesn't win Pennsylvania's electoral votes. If CTCL's $10 million voter participation grant increases just the Philadelphia Democratic voter turnout by 7.5%, then CTCL has flipped Pennsylvania for Democrat Joe Biden.

Hillary Clinton had her second largest winning percentage in Delaware County behind the City of Philadelphia. CTCL's Pennsylvania grants to Democratic strongholds in Philadelphia and Delaware County will play a significant role in determining whether Biden or Trump wins Pennsylvania.

**State of Michigan**

| City County | CTCL Grant | Clinton Vote | Trump Vote | + Clinton Votes | + Trump Votes |
|---|---|---|---|---|---|
| Detroit | $3,512,000 | 234,871 | 7,682 | 227,189 | 0 |
| Lansing | $443,742 | 65,272 | 22,390 | 42,882 | 0 |

| City County | CTCL Grant | Clinton Vote | Trump Vote | + Clinton Votes | + Trump Votes |
|---|---|---|---|---|---|
| East Lansing | $43,850 | 26,146 | 8,294 | 17,852 | 0 |
| Flint | $475,625 | 16,163 | 4,677 | 11,486 | 0 |
| Ann Arbor | $417,000 | 128,025 | 50,335 | 77,690 | 0 |
| Muskegon | $433,580 | 8,933 | 3,372 | 5,561 | 0 |
| Saginaw | | 10,263 | 11,077 | 0 | 814 |
| Pontiac | $405,564 | 14,351 | 2,735 | 11,616 | 0 |
| Romulus | $16,645 | 7,573 | 3,078 | 4,495 | 0 |
| Kalamazoo | $218,869 | 18,644 | 5,456 | 13,188 | 0 |
| | | | | | |
| Total CTCL MI | $5,966,875 | 530,241 | 119,096 | 411,959 | 814 |

If CTCL's $3.5 million Detroit grant increases Democrat Joe Biden's vote by 4.5% in just Detroit, CTCL's grant will have flipped Michigan from Red to Blue. CTCL's $3.96 million in Michigan grants to Democratic strongholds in Detroit, Flint, Lansing and East Lansing increase Democrat Joe Biden's chance of winning Michigan's statewide and 16 electoral votes.

**State of South Carolina**

| County | CTCL Grant | Clinton Vote | Trump Vote | Trump's 2016 SC Win | Trump's 2016 SC Win in Votes |
|---|---|---|---|---|---|
| Richland County | $730,000 | 108,000 | 52,469 | 14.1% | 300,016 |
| Charleston County | $695,000 | 89,299 | 75,443 | 14.1% | 300,016 |

| County | CTCL Grant | Clinton Vote | Trump Vote | Trump's 2016 SC Win | Trump's 2016 SC Win in Votes |
|---|---|---|---|---|---|
| Clarendon County | $102,373 | 7,732 | 7,386 | | |
| Greenville | $660,000 | 74,483 | 127,832 | | |
| Total CTCL SC Grant | $2,187,373 | | | | |

Republican Senator Lindsey Graham represents South Carolina and is on the November 3, 2020 ballot. CTCL's grants to South Carolina Democratic strongholds improperly increases Democratic votes in Richland and Charleston counties and makes President Trump and Senator Graham's reelection more difficult. State of Georgia

**Georgia**

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Fulton | $6,000,000 | 297,051 | 117,783 |
| Cobb | $5,600,000 | 160,121 | 152,912 |
| Dougherty | $295,235 | 23,311 | 10,232 |
| Dekalb | $4,800,000 | 251,370 | 51,468 |
| Total GA Grant | $16,695,235 | 731,853 | 332,395 |

Fulton County is one of the most reliable Democratic Counties in the country. Since 1876 Fulton County has voted Democratic in every presidential election, except in 1928 and 1973. Of the State of Georgia's 159 counties, Hillary Clinton received more votes in Fulton County than any other Georgia county. Clinton beat Donald Trump by 180,000 votes in Fulton County.

**Iowa**

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Black Hawk | $267,500 | 50.6% | 43.3% |
| Scott County | $286,870 | 47.5% | 46% |
| Woodbury | $156,000 | 57.4% | 37.5% |
| Cerro Gordo | $20,325 | 43.5% | 51.2% |
| Floyd | $7,302 | 39.8% | 54.7% |
| Louisa | $6,324 | 32.91% | 61.28% |
| Total IA Grant | $744,321 | | |

**Minnesota**

| City | CTCL Grant | | |
|---|---|---|---|
| Minneapolis | $3,000,000 | | |
| | | | |
| Total MN Grant | $3,000,000 | | |
| | | | |

**New Jersey**

| County | CTCL Grant | | |
|---|---|---|---|
| Atlantic County | $150,000 | | |
| | | | |
| Total NJ Grant | $150,000 | | |
| | | | |

**New York**

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Onondaga County | $286,960 | 53.89% | 40.13% |
| Warren County | $31,000 | 41.68% | 50.15% |
| Tompkins County | $69,000 | 67.69% | 24.3% |
| Total NY Grant | $386,960 | | |

Warren County which voted for Trump in 2016 received the smallest CTCL grant.

## Texas

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Dallas County | $15,130,433 | 461,080 | 262,945 |
| Bowie County | $62,095 | 8,838 | 24,924 |
| Hays County | $289,000 | 33,224 | 33,826 |
| Hopkins County | $19,952 | 2,510 | 10,707 |
| Cameroon County | $1,800,000 | 59,402 | 29,472 |
| Colorado | $14,990 | 1,987 | 6,325 |
| Bexar | $1,900,000 | 319,550 | 240,333 |
| Ellis | $86,424 | 16,253 | 44,941 |
| Williamson | $263,644 | 84,468 | 104,175 |
| Total Texas Grant | $19,566,538 | 987,312 | 757,648 |

In 2016 Clinton won Dallas County by 137,284 votes. In 2016 Bowie County only had 33,4470 votes. Trump won Bowie County by 16,082 votes over Clinton. Trump won Hays County by 602 votes over Clinton. Trump won Hopkins County by 5,412 votes over Clinton.

## Maine

| Town | CTCL Grant | | |
|---|---|---|---|
| Town of Union | $5,000 | | |
| | | | |
| Total Maine Grant | $5,000 | | |
| | | | |

## Maryland

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Washington | $90,512 | | |
| | | | |
| Total Maryland Grant | $90,512 | | |
| | | | |

## Arkansas

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Craighead | $59,856 | | |
| | | | |
| Total Arkansas Grant | $59,856 | | |
| | | | |

## Mississippi

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Hinds | $1,500,000 | 71.39% | 26.69% |
| | | | |
| Total MS Grant | $1,500,000 | | |
| | | | |

## Ohio

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Lucas | $544,624 | 56.10% | 38.32% |
| Lorain | $435,248 | 47.63% | 47.54% |
| Franklin | $975,188 | 60.43% | 34.30% |
| Ashtabula | $65,000 | 23,318 | 15,577 |
| Total Ohio Grant | $2,020,060 | | |
| | | | |

## Kansas

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Sedgwick | $816,458 | 36.88% | 55.28% |
| | | | |
| Total KS Grant | $816,458 | | |

## Total CTCL Grants

| State | Number of Grants | CTCL Grant Amount |
|---|---|---|
| Wisconsin | 6 | $7,324,567 |

| State | Number of Grants | CTCL Grant Amount |
|---|---|---|
| Pennsylvania | 5 | $13,237,557 |
| Michigan | 8 | $6,106,599 |
| South Carolina | 3 | $1,527,373 |
| Georgia | 2 | $11,600,000 |
| Iowa | 6 | $744,321 |
| Minnesota | 1 | $3,000,000 |
| New Jersey | 1 | $150,000 |
| Texas | 7 | $19,216,470 |
| New York | 3 | $386,960 |
| Maine | 1 | $5,000 |
| Maryland | 1 | $90,512 |
| Arkansas | 1 | $59,856 |
| Mississippi | 1 | $1,500,000 |
| Ohio | 1 | $544,624 |
| Total CTCL Grants | 47 | $65,493,839 |

The first 26 CTCL grants went only to Democratic strongholds in swing states. CTCL claim that its grants are for the purpose of protecting voters from the COVID-19 pandemic is a blatant lie. CTCL hidden COVID-19 grant agenda is to increase the votes for Democratic presidential candidate Joe Biden, Democratic U.S. Senate candidates and Democratic House of Representative candidates.