**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO**
**DEFENDANT DOMINION'S MOTION TO DISMISS**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Response and Brief in Opposition to Dominion Voting System's Inc.'s Motion to Dismiss and Motion to Strike [Doc. 22], and hereby respectfully requests that the motions be denied or, in the alternative, determined to be moot, for the reasons set forth below.

**I. INTRODUCTION**

DOMINION VOTING SYSTEMS INC. (Dominion) is a state actor, pursuant to 42 U.S.C. § 1983 (Civil Rights Act). The power to conduct elections is reserved exclusively to the State. By contracting with numerous states and counties across the country to, among other things, set up their elections, lease voting machines and other hardware, service and support the machines and electronic voting management system, store election data, lease election software, tabulate the results, authorize access to programs that determine which ballots are subject to adjudication, and provide the technology to electronically adjudicate those ballots, Dominion is subject to the Constitution, and the laws that protect the People from its violation.

1

The Plaintiffs, as registered voters from across the country, for themselves and others similarly situated, all have the fundamental right to vote for the President and Vice-President. State actors that burden those rights are liable for the damage they cause, even when perpetrated in another state. This Court has subject matter jurisdiction over the alleged violations of the civil rights of the Plaintiffs, and all other registered voters similarly situated, caused by Dominion, and/or through its agents, employees and assigns, through its respective administration of the 2020 Presidential election.

The actions of Defendants, including Dominion, have left the American people with legitimate and disturbing questions concerning the integrity the 2020 Presidential election. Of course, the Plaintiffs cannot overturn the results of the Presidential election. The Plaintiffs do not have standing, nor does the Court have jurisdiction to order a State to decertify an election. How can a federal court order a state legislature to send certain electors to Washington, D.C., to cast their electoral votes for a President and Vice President, pursuant to the Constitution? The Plaintiffs do not seek such extraordinary relief. The Presidential election is over.

Nonetheless, the public record is replete with instances of unconstitutional behavior by the Defendants, herein: either acting under the color of their official authority; as private entities who took it upon themselves to "help" administer the general and federal elections of States and counties, all over the country; and, as a private corporation administering the election, providing all the training and equipment, and (electronically) counting the actual vote.

As alleged, a substantial number of voters in the country now have little faith in their elections. Some might, if their candidate or initiative succeeded, but any rational reflection upon the conduct of the Defendants, herein, requires admission of the damage caused by their unconstitutional conduct concerning the 2020 Presidential election, all of which was foreseeable.

Forensic ballot and voter machine examinations continue to be resisted, maybe because of fear of uncovering fraud, but more likely because private election companies, like Dominion, claim their products and software are proprietary. Nothing could be more repugnant. Dominion stores the information of over 70 million voters. It organizes and provides, practically, all of the equipment and computer programs its State and county customers use to run their elections. All of the hardware, software, programs and data, allegedly, belongs to Dominion. What does it do with that information? Is it safe? Is it shared? Why can't the people see the software, and be able to freely speak about it. This is an unconstitutional flaw in our election framework.

Say a wrong word about Dominion and one might get sued for a billion dollars for defaming this private, for-profit, foreign run corporation that is responsible for running the election of over 1300 counties in 28 states.[1] Even here, for example, the Plaintiffs and counsel have been threatened with sanctions for filing a *frivolous* lawsuit. Apparently, anyone who dares challenge Dominion will suffer the full force of its private lawyers and corporate structure.

The factual dispute as to whether Dominion is a state actor is not frivolous. Ultimately, the issue may have to be determined by a jury.  With that said, even if Dominion counted every vote perfectly, and faultlessly tabulated the Presidential election results, Dominion is a state actor jointly cooperating with numerous other state actors within an exclusive function of the sovereign.  This voluntary conduct creates a symbiotic relationship between Dominion and these numerous States and counties. When so qualified, the right to vote in a Presidential election is absolute. The standard at this level is whether it is plausible that Dominion is a state actor. That is not a frivolous issue—but one that has led this country to brink of insurrection, or worse.

---

[1] *See US Dominion, Inc., et al. v. Powell*, D.C. Dist. Ct.1:21-cv-00040; *US Dominion, Inc., et al. v. Giuliani*, D.C. Dist. Ct.1:21-cv-00213; *US Dominion, Inc., v. My Pillow, Inc, et al.*, D.C. Dist. Ct.1:21-cv-00445.

In the 2020 Presidential election, millions of mail-in ballots were tabulated through and by Dominion's proprietary software. Dominion's ballot marking devices (BMDs) have their own known risks, but the majority of absentee and mail-in ballots were scanned by commercial, off-the-shelf (COTS) scanners, resulting in digital ballots being entered into Dominion's electronic management system (EMS). Afterwards, the computer's proprietary software adjudicates these "batches" of scans to determine which ballots need further adjudication.  Ballots determined by the artificial intelligence of the proprietary software to need further adjudication are placed, by the program, in a separate file for later review to determine the voter's intent.

Only election officials are supposed to "adjudicate" the ballots that are separated, but that activity is performed without observation by poll watchers, at all, and *can* be completed by any person with authorization, or the necessary credentials. None of this is subject to dispute.

The votes are counted by Dominion. How can this not be state action? Additionally, alleged, digital ballots set aside for adjudication by the systems automated program are sent out of the country, over the internet, and the data is manipulated to the detriment of the voters. Votes are changed and deleted. Dominion can protest, but the people do not trust this corporation.

Maybe some of the adjudicated votes were caused by crooked scanning, or Sharpie pen ink bleeding through to the other side of a ballot. These are known risks. How could a registered voter's ballot be illegal, however, due to no fault of her own? Such are the problems with Dominion's defectively designed software—which, as the scientific evidence establishes, is intentionally allows for a high error rate and, thus, an increased number of ballots in need of "adjudication." The adjudications are administered without due process or equal protection measures in place. Unfortunately, however, anyone challenging this unconstitutional system are retaliated against by civil lawsuits and other threats.

4

## II. BACKGROUND

Dominion is a Delaware corporation, with it primarily place of business in Denver, Colorado. On its own website, Dominion states:

> With decades of collective industry-leading experience in training, support and implementation, our team of professionals strives for delivery excellence to meet today's election challenges in system implementation and project management. We aim to provide transparency and accountability in all that we do – on every level, for every election.[2]

On Dominion's "ABOUT" page, the Defendant asserts:

> From initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up and system testing, we deliver. We also provide testing, Election Day support, training, preventative maintenance, project management and ongoing election consulting.

*Id.*

According to Dominion, its "core technology focuses on the two key aspects of the electoral process—accuracy and transparency." *Id*. In furtherance of that role, Dominion's contractual relationships with States and counties across the country go beyond that of a simple equipment vendor, as it effectively becomes the privatized election operator and cybersecurity provider for a part, or all of a particular State's federal and local elections. A copy of the Fresno County's Election Worker Training Guide, which is located on Fresno County's website and is a public document, is attached hereto as Ex. 1, as though fully contained herein. This Court may take judicial notice of its own files and records, as well as facts which are a matter of public record without converting a motion to dismiss into a motion for summary judgement. *Johnson v. Spencer*, 950 F. 3d 680, 705 (10th Cir. 2020).

The Guide describes, in detail, how a precinct's local election is set-up, and the Dominion equipment is to be used. There is a factual issue as to the extent of Dominion's

---

[2] https://www.dominionvoting.com/about/

involvement with the creation of this procedure in Fresno County, and hundreds of other counties. Apparently, Dominion controls the entire election set-up, procedure, training, equipment, technical service and tabulation software. This guide could not have been prepared without extensive input from Dominion. Throughout the guide, Dominion's trademark and other indicia of involvement are clearly demonstrated.

Thus, Dominion is an integral part of the country's Presidential elections—which are exclusively a public function.  These contractual relationships create a "sufficiently close nexus" between Dominion, and its State and county customers that "insinuates itself into a position of interdependence [so as] to create a symbiotic relationship." *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1448-1453 (10th Cir. 1995). Dominion and their contracting States and counties willfully participate in "joint activity" concerning a fundamental right. *Id*. at 1453-1456. Dominion has become the private prison of voting systems. *See Street v. Corrections Corporation of America*, 102 F.3d 810, 814 (6th Cir. 1996). "If a state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor." *Id*. at 1456 (*quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974).

Dominion can dispute the facts as asserted by the Plaintiffs, at trial. In its motion to dismiss, Dominion asserts without affidavit or evidence that its machines "were not subject to widespread manipulation during the 2020 election." Generally, statements of counsel maybe helpful to the court, but are not sufficient for purposes of granting a motion to dismiss.

Dominion's voting machines and EMS have not been subjected to widespread forensic testing, concerning the 2020 election. The proprietary character of Dominion's software naturally prohibits an easy and effective "audit" of its results. Nevertheless, when Dominion's voting machines and EMS have been forensically examined, the results have not supported its

contention of reliability—nor has the conduct of Dominion in allowing forensic analysis been transparent "on every level, for every election."[3]

Dominion's voting machine and software vulnerabilities were well-known and widely publicized prior to the election, including their relative ease of hacking and tampering.[4]  Notably, information that Dominion machines were subject to massive foreign cyber-attacks both before,[5] and during the election, have become widely publicized—despite attempts by others, including Defendants, herein, to suppress the free flow of this vital information. The evidence indicates that substantial vote totals were altered.[6]

Experts have further analyzed the results in precincts using Dominion machines in different parts of the country and discovered statistical anomalies with universally higher outcomes for President Biden, and lower for President Trump.[7]  This has been termed the "Dominion Effect." *Id*.  Interestingly, all apparent vote manipulation and "irregularities" (regardless of type or location) all favored President Biden.[8]

---

[3] *See* Plaintiff's Complaint Ex. 9, *Antrim County Forensics Report* (Dec. 13, 2020).

[4] *See, e.g., Senate Select Committee on Intelligence Report on Russian Active Measures, Campaigns and Interference in the 2016 U.S. Election Volume 1-5*, (Aug. 18, 2020); *see also Killchain: The Cyber War on America's Elections* (https://www.killchain.tv/); Philip B. Stark*, There is No Reliable Way to Detect Hacked Ballot-Marking Devices,* U. Cal. Berkeley (Aug. 21, 2019) (https://www.stat.berkeley.edu/~stark/Preprints/bmd-p19.pdf); *Congressional Letter to Staple Street Capital Group, LLC* (Dec. 6, 2019). (https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf);  Mark Niesse, *Hackers Highlight Vulnerabilities in Vote-Scanning Machines*, Government Technology (Sept. 27, 2019) (https://www.govtech.com/security/Hackers-Highlight-Vulnerabilities-in-Vote-Scanning-Machines.html).

[5] *See Solarwinds Orion Hack: How compromised as Dominion Voting Machines? See also CONFIRMED: Dominion Uses SolarWinds Software, Denies Using Software in Devastating Hack.*

[6] *See Absolute Proof (*https://rumble.com/vdle3v-mike-lindell-absolute-proof-full-video.html).

[7] *See* Ben Turner, *Statistical Evidence of Dominion Election Fraud?  Time to Audit Machines*, Fraudspotters (Nov. 21, 2020).

[8] *See Mathematician: Election Numbers Don't Add Up,* One America News (Jan. 27, 2021) (https://rumble.com/vdc0hb-mathematician-election-numbers-dont-add-up.html).

Finally, the Defendant's motion to dismiss and strike are moot. The Plaintiffs are now a diverse group of 148 people, all registered voters from across the country seeking to represent the class of all registered voters for and in the 2020 Presidential election.  Accordingly, the Plaintiffs will immediately file their amended complaint, with an accompanying motion for leave to amend. The Plaintiffs do not seek and cannot overturn the 2020 Presidential election. Plaintiffs seek damages, and ultimately injunctive relief, from the conduct of Dominion, and others, in violation of the Constitution, enforced through the Civil Rights Act.

### III. STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007). *See also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In ruling upon a motion pursuant to Rule 12(b)(6), the court is required to construe the complaint liberally, assume all facts are true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-557. Specific facts are not necessary in a Complaint. Instead, the Plaintiff need only "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Id*. at 555.

The Federal Rules embody "notice pleading" and require only a concise statement of claim. Thus, dismissal under Rule 12(b)(6) is proper only when the complaint lacks a cognizable legal theory or does not allege facts that, when taken as a whole, raise the claim for relief above mere speculation. *Id*. at 555-556.

As the 10th Circuit explained, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis in original).

IV.    **PLAINTIFFS HAVE PROPERLY ALLEGED THEIR CIVIL RIGHTS CLAIMS AGAINST DOMINION**

A.    **Dominion is a State Actor**

A § 1983 claim is only applicable to conduct occurring under color of law. Accordingly, the Supreme Court has developed several approaches to determine whether a private party is engaged in state action. As the 10th Circuit as observed:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case.  In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'  The Court has also inquired whether the State has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them.  In addition, the Court has held that if a private party is a 'willful participant in joint activity with the State or its agents,' then state action is present.  Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Gallagher*, 49 F.3d at 1447.

Although only one is required, Dominion qualifies as a state actor under every test. The most stringent is the public function test:

> While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State. One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158 (1978).

In a landmark 1953 case, the Jaybird Democratic Association had been organized since 1889 as a private club. *Terry v. Adams*, 345 U.S. 461 (1953). The group, which excluded African-Americans, regularly selected persons whom the organization endorsed "for election in the Democratic primary for county office." *Id*. at 470. Although the Court

was split with regard to the manner in which the Jaybirds became state-actors, the majority

agreed that the Jaybirds were, nonetheless, involved in state-action, as a part of an election.

A second line of cases under the public-function doctrine originated with *Marsh v.*

*Alabama*, wherein a corporation was found to have engaged in state-action by performing

all the necessary municipal functions of a town. 326 U.S. 501 (1946). As noted by Justice

Rehnquist in *Flagg Bros. v. Brooks*, these "two branches of the public-function doctrine

have in common the feature of exclusivity."

Exclusivity is generally defined as: pertaining to the subject alone; not including,

admitting, or pertaining to any others; shutting out; debarring from interference or

participation; vested in one person alone; apart from others; and, without the admission of

others to participation.

Dominion contracts with States and counties across the country from its domicile in Colorado.

These contracts go beyond the purchase of election equipment.  Instead, they privatize elections

in the jurisdictions, to which the privity extends.  Dominion becomes responsible for all

information and cybersecurity. Further, county officials are required to sign non-disclosure forms

with Dominion that requires the county to, among other things, notify Dominion of any requests

for information and to "take any and all action necessary or appropriate to assert all applicable or

potentially applicable exemptions from disclosure under the FOIA Statute and take all other

legally permissible steps to resist disclosure of the Information including, without limitation,

commencement or defense of any legal actions related to such disclosure."  Attached hereto as

Ex. 2 is a sample copy of a Software License Agreement between Dupage County, Illinois, and

Dominion, signed by its President & CEO, John Poulos, as though fully contained herein. Mr.

Poulos is a Canadian citizen.

The contract is clear. Dominion owns software—all of which must be returned to Dominion, or destroyed, upon the expiration of the contract's term. Further, Dominion's contract with the State of Michigan contains a detailed Statement of Work, which specifically requires it to maintain data privacy and information security. The contract states, in pertinent part:

> [Dominion is] responsible for *establishing and maintaining a data privacy and information security program, including physical, technical, administrative, and organizational safeguards*, that is designed to: (a) ensure the security and confidentiality of State Data; (b) protect against anticipated threats or hazards to security or integrity of State Data; (c) *protect against unauthorized disclosure, access to, or use of State Data*; (d) ensure the proper disposal of State Data; and (e) ensure that all employees, agents, and subcontractors of [Dominion], if any, comply with all of the foregoing. [Emphasis added].

Attached hereto as Ex. 3 is a contract between Dominion and the State of Michigan for Voting System Hardware, Software and Services, dated March 1, 2017.

> Dominion warrants that its machine software will not contain "Harmful Code:"
>
> virus, trojan horse, worm, backdoor or other software or hardware devices the effect of which is to *permit unauthorized access to, or to disable, erase, or otherwise harm any computer, systems or software* . . . [Emphasis added].

The State of Georgia's contract also exemplifies Dominion's vast authority:

> [Dominion provides] certain Services, Software, Equipment and/or any Licensed Programs or any combination of the foregoing (collectively, the "Solution") capable of *providing a new Statewide Voting System (a "SVS") with verifiable paper record which is sufficient to support all primaries and general elections.* [Emphasis added].

Attached hereto as Ex. 4 is the Master Solution Purchase and Services Agreement by and between Dominion and the State of Georgia, dated July 29, 2019.

The contract specifically notes that Georgia has "relied, and will rely on, Contractor's experience and expertise in installing, implementing, and servicing the Solution (¶ 4.1.1)." Dominion further agreed to indemnify Georgia for any and liability (¶ 15), provide training (¶4.3), hire managers (¶6.1) and contractors (¶6.2), establish information and cyber security programs (¶7.2), all to provide Georgia with "a new Statewide Voting System (¶ 1.1)."

Under the nexus test, a plaintiff must demonstrate that "there is a sufficiently close nexus" between the government and the challenged conduct such that the conduct "may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). The challenged conduct is that Dominion's voting systems do not count votes properly, which, in light of its influence and national coverage, burdened the right of every registered voter to *choose* the President and Vice President. The State is responsible for counting the vote. It cannot be simpler than that.

Nonetheless, as "is the case with all of the various tests for state action, the required inquiry is fact-specific." *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1448 (10th Cir. 1995).  Obviously, contracting alone does not automatically transform the conduct of an entity into state-action. *Id*. The choice of which candidate gets a vote is up to the systems provided by, owned and serviced by Dominion. Thus, Dominion's tablature of the votes "must in law be deemed to be that of the State." The local officials just upload the totals—through the Dominion electronic management system, of course.

State action is also present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961). Here, elections are typically held on public property in precincts across a state. Dominion works closely with government and election officials, concerning an essential function of government—not just the performance of some random non-essential governmental service. Without the election, there is no Dominion, and without Dominion (in contracted States and counties) there is no election.

Through these numerous, multi-million-dollar, multi-year contracts, Dominion has assumed a primary role in the administration of elections around the country—a function traditionally and exclusively reserved to the State. Of course, like the Jaybirds, this issue lies at the heart of Dominion's continued existence. Dominion enjoys its status as a private entity, without restraint by the Constitution, and the laws that support it. It's easier to run a private prison, or hold a private Democratic primary for over 60 years, when the private entity does not have to comply with the Constitution. Sunshine is the worst thing Dominion can imagine.

**B.      Dominion Fundamentally Mischaracterizes Plaintiffs' Claims**

Dominion erroneously believes this case is "substantially similar to other [election challenge] claims that have been consistently dismissed." But although the evidence presented in these election challenge lawsuits is certainly relevant to Plaintiffs' claims, Plaintiffs do not present the same claims as these election challenge lawsuits, nor do Plaintiffs assert a claim to overturn the Presidential election. More importantly, none of the election challenge lawsuits have made findings of facts with regard to issues, herein, concerning Dominion's status as a state actor, thus the constitutional propriety of having our votes counted by a computer the voters can't audit, without jumping over backwards.

**C.      Initial Evidence Against Dominion**

Election challenges across the country have revealed close to 1,000 affidavits attesting to irregularities occurring in swing States that question the legitimacy of the 2020 Presidential election.  This is not a challenge to that election, and the state-actors, herein, are being sued in their individual capacity. To sue persons in their official capacity would effectively amount to citizens suing a sovereign State. No attempt is made here to request that the Court "stop the count," decertify an election, or order a State to only send certain electors to Washington, D.C.

Nonetheless, with regard to the state action of Dominion:

> Dominion Voting Systems is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail.[9]

Mr. Russell J. Ramsland, Jr., has also filed two separate affidavits in federal courts regarding his group's expert opinion that "to a reasonable degree of professional certainty that election results have been manipulated within the Dominion system in Michigan."[10] Dominion admits that Mr. Ramsland's "views on these points have been a matter public record since 2018."[11] However, Dominion's assertion than he and others are unreliable is up to a jury.

Even when voters use Dominion's BMDs, which create a paper ballot for the voter to feed into Dominion's Imagecast®Evolution, i.e., "the ballot box," experts have concluded Dominion's system (1) does not necessarily record the vote expressed by the voter; (2) is subject to hacking, bugs and configuration errors that can cause its machines to print votes that differ from the vote entered; (3) cannot create a convincing public record; (4) can mark ballots after the voter has inspected it; (5) cannot document the original vote in a verifiable way; and (6) cannot ensure through audit that the reported outcome is correct.[12]  Are these law professors also unreliable?

---

[9] Complaint (Doc. 1 Ex. 9), *Antrim County Forensics Report*.

[10] *See* Affidavit of Russel James Ramsland, Jr. (Doc. No. 1, Ex. 14) *King, et al., v. Whitmer, et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 5-6. *See also* Corrected Affidavit of Russel J. Ramsland, Jr., *Wood v. Raffensperger*, 2:20-cv-04651(N.D. GA) (Doc. No. 70, Ex. 1).

[11] *See* Complaint and Demand for Jury Trial, *US Dominion, Inc., et al. v. Powell*, 1:21-cv-00040 (D.C. Dist. Ct.), p. 45.

[12] *See* Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3 (Sept. 17, 2020).

As examples, in Ware County, Georgia, an audit revealed a 26% vote flip.[13] The New Hampshire attorney general is moving to confiscate Dominion's voting machines after a report from Windham established evidence of Dominion machines "shorting" certain candidates by 6%, based on a post-election audit.[14]  Statistical anomalies were discovered in Colorado, which uses Dominion, wherein it was determined that 100% of Colorado's 450,000 new voters all voted for President Biden, who ultimately received 33% more votes than any past winner of the state.[15]

Experts in Michigan have determined that votes were added to totals faster than Dominion machines could physically count.[16]  Voting machines in Michigan also documented 100%, or more, of voter participation in 16 precincts, with the highest being close to 8 votes recorded for every 1 registered voter.[17]  Experts have also noted vote totals from Dominion's direct news feed that recorded fractionalized votes.[18] Moreover, Americans have witnessed at least 5 States where vote totals were switched during live television broadcasts.[19]

---

[13] *See* Joe Kovacs, *'Exceptionally Disturbing': Forensic Exam Shows Dominion Machine Switching Votes?,* WND (Dec. 7, 2020) (https://www.wnd.com/2020/12/exceptionally-disturbing-forensic-exam-shows-dominion-machine-switching-votes/) (reporting "They fed an equal number of votes for both Trump and Biden into the software, and it turns out an equal number of votes for Trump and Biden was spat out of the machine as a 26% lead for Biden").

[14] *See* Raymond Wolfe, *New Hampshire Will Confiscate Voting Machines that 'Shorted' Republicans by 6% of Vote*, Lifesite (Feb. 26, 2021) (https://www.lifesitenews.com/news/new-hampshire-will-confiscate-voting-machines-that-shorted-republicans-by-6-of-votes).

[15] *See Colorado Fraud – 450,000 New Voters, 100% went to Biden? Stats and Math Matter!,* New York Gazette (http://newyorkgazette.com/story/colorado-fraud-450-000-new-voters-100-went-to-biden-stats-and-math-matter-SrQqtq92LbTzS6h10Xxzr?fbclid=IwAR3ol0ULciKn0KN9mcO38f4Sg3Tr_7b8GMieUOYqbgqz7XxHvPy3VSHeykk.

[16] Affidavit of Russel James Ramsland, Jr. (Doc. No. 1, Exh. 14) *King, et al., v. Whitmer*, *et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 5-6.

[17] *Id*. at p. 3.  *See also*, The Wiz, *JUST-IN: Michigan Removes 177,000 Voters from Dirty Rolls After Legal Challenge*, The Election Wizard (Feb. 18, 2021).

[18] *Id*. at p. 4.

[19] *See* Jim Hoft, *Five Videos – Five States Where Votes Were Switched Live on TV Away from President Trump to Biden – Updated*, Gateway Pundit (Nov. 28, 2020).

Up to 80% of Dominion machines have been infected with "Q-Snatch" malware, which has captured and sent administrative credentials (i.e., full machine access) to foreign entities.[20] Even more significant, information has been widely publicized that Dominion machines were subject to massive foreign cyber-attacks and significant vote flipping during the election.[21]

Dominion has been using lawsuits to chill the speech of the people, and it is working. Recently, however, defendants sued by Dominion were granted an enlargement to file special motions to dismiss the allegations of defamation by a Dominion Executive "under Anti-SLAPP Law."[22] Strategic Lawsuits Against Public Participation (SLAPP) laws prohibit persons from filing such lawsuits for the purpose of suppressing a matter of importance to the public. Here, the lawsuits filed by Dominion against news agencies, pod-cast broadcasters, private-persons, lawyers of the President, and documentary filmmakers are for the expressed purpose of suppressing election challengers, and silence those who have been damaged by its conduct.

As the Superior Court Judge of Maricopa County recently noted regarding the "highly charged political dispute," "between the Senators and the County" where "[s]erious accusations have been made and emotions are raw:"

> Our government officials should not be spending valuable resources on lawyers, 'fighting' with another branch of government over what materials can be provided to another branch of government under a subpoena. Rather, the citizens expect their governmental officials to work cooperatively for the common good. It is highly unfortunate that that has not happened here. When government officials resort to 'name calling' and threats, something has gone terribly wrong.[23]

---

[20] *See* Shad Olson, *Q-Snatch: Malware Sent Vote Machine Admin Credentials to China, Dark Web*, The Shad Olson Show (Nov. 25, 2020).
[21] *See Absolute Proof, supra. See also Declaration of Dr. Navid Keshavarez-Nia* (Doc. No. 1, Exh. 19), *King, et al., v. Whitmer, et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 9.
[22] *See Eric Coomer v. Donald J. Trump for President Inc., et al.*, 2020CV34319.
[23] *See Maricopa County, et al. v. Karen Fann, et al.*, CV 2020-016840, Superior Court, Maricopa County, order of the Honorable Judge Timothy H. Thomason, February 25, 2021.

Chairman of the Senate Judiciary Committee recently stated that an audit of the vote in Maricopa was necessary to address the various claims and doubts and to "try and see if we can reinsert some confidence in our election process."[24] Dominion is responsible for that loss of confidence in Arizona's election process. As counsel types this response, reports are surfacing that physical ballots have been found shredded, prior to transport of the ballots from Maricopa County to the State of Arizona.[25] Plaintiff and their counsel hesitate to comment on the lawsuits filed by Dominion for defamation against those listed above for fear of being sued or grieved, as well. Suffice to say that a state-actor's skin should be a little thicker, and open to free and transparent review.

**D.      The Plaintiffs Have Standing to Bring Claims Under the Civil Rights Act**

A § 1983 claim requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

All qualified voters have a constitutionally protected right to vote. *ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

---

[24] Ben Giles, Lauren Gilger, *Arizona Republican Sen. Eddie Farnsworth Plans Subpoena of Maricopa County Voting Machines and Software*, Capital Media Services, December 14, 2020.
[25] *See* Jim Hoft, *Five Videos – Five States Where Votes Were Switched Live on TV Away from President Trump to Biden – Updated*, Gateway Pundit (Nov. 28, 2020).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election. Verifiable accuracy of ballot counting is essential for election legitimacy. The national interest in this election outweighs that of any one State. There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983). The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). The Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown*, 415 U. S. 724, 730 (1974)) (emphasis added).

> When a State adopts rules governing its *election machinery* or defining electoral boundaries, those rules must serve the interests of the entire community. If they serve no purpose other than to favor one segment — whether racial, ethnic, religious, economic, *or political* — that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection.

*Karcher v. Daggett*, 462 U.S. 725, 748 (1983) (citing *Reynolds v. Sims*, 377 U.S 533, 565-66 (1964)). [Emphasis added].

Moreover, the Plaintiffs have suffered a particularized injury-in-fact. Every constitutional right violation infers a damage. "Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Carey v. Piphus*, 435 U.S. 247, 255 (1978). The legislative history of § 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

## E.     The Civil Rights of the Plaintiffs Have Been Burdened By The Conduct And Defective Nature Of Dominion's Products And Services

"A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 213 (1989). Concurrently, the "Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

The "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to casts their votes effectively…rank among our most precious freedoms." *William v. Rhodes*, 393 U.S. 23, 30-31 (1968). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

The "President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983). In that regard, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Id.* at 795. Thus, in a Presidential election, the actions of state actors in one state have "an impact beyond its own borders." *Id.*

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds* at 555. Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*.

"Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 7 (1964). Here, the evidence of voter fraud, along with the distrust and fear generated by the unconstitutional conduct of Dominion, has shaken this country to her core. The Plaintiffs allege that their individual rights to vote in a Presidential election, and to be treated equally and fairly, have been burdened by the conduct of Dominion. The touchstone of due process is fundamental fairness. *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). Even for those voters in State's that do not utilize Dominion, their shared right to vote for the President and Vice President was burdened by this Colorado corporation.

Americans have been deprived of the reasonable appearance of a fair Presidential election. However, the "general interest of the members of the public" differs considerably from the Plaintiffs', as only registered voters have had their rights infringed—and thus the standing to bring suit.  Only registered voters are qualified and can legally participate in a Presidential election.  Those who were registered exercised their right to cast a ballot for one candidate, another or neither—while members of the general public are mere observers.  As such, the Plaintiffs claims are not simply a "generalized grievance."

As averred, every registered voter was deprived of a fair and legitimate process related to the 2020 Presidential election, much of it administered by Dominion. The "concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those

who meet the basic qualifications." *Gray v. Sanders*, 372 U.S. 368, 37-380 (1963). No right is more precious in a free country than that of having a voice in the elections of those who make the laws under which, as good citizens, we must live. *Wessberry v. Sanders*, 376, U.S. 1, 17-18.

Further, a lack of legitimacy not only devalues and dilutes the vote that was cast, but also reinforces the notion that individual votes do not matter, thereby diminishing the perceived present value of the right to vote in future elections, and suppressing subsequent voter turnout. Many registered voters spoil their ballots, and do not vote at all. Their rights have been violated, as well. History has long recognized that a voter's refusal to vote does not deny her right, once granted. In fact, the cases often cite to the fact that unconstitutional behavior discourages voters, and suppresses turnout.  For over a year, registered voters have been subjected to the dictates of individuals under color of authority, who have on several occasions in States described in the Complaint, unconstitutionally changed the rules governing their respective elections—which all include the Presidential election, as well. As stated by Justice Thomas in a recent dissent:

> Changing the rules in the middle of the game is bad enough. Such rule changes by officials who may lack authority to do so is even worse. When those changes alter election results, they can severely damage the electoral system on which our self-governance so heavily depends. If state officials have the authority they have claimed, we need to make it clear. If not, we need to put an end to this practice now before the consequences become catastrophic.

*Republican Party of Pennsylvania v. Degraffenreid*, 592 U.S.____(2021)(slip op. at 5-6)(Justice Thomas, J., dissenting from denial of certiorari).

### F.      Dominion's Motion to Dismiss And Motion to Strike Are Moot

The Plaintiffs are filing a motion for leave to amend the complaint, with an attached amended complaint. Accordingly, the amended complaint renders Dominion's motion to dismiss and strike moot.

Counsel for the Plaintiffs offered to stay the case for 30 days, less than 30 days ago, to allow Plaintiffs to file an amended complaint. Dominion refused and filed its motions.

A group of individuals may sue to protect the members of a class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. Pro. 23(a).

Here, the amended complaint will add 140 Plaintiffs, supplement the factual allegations, and cure any alleged defects in the original complaint with regard to Rule 23.

### G.    Plaintiff's Claims Are Redressable

Plaintiffs have alleged claims of violations of their Civil Rights, and are seeking nominal damages for these infringements.  Just yesterday, the Supreme Court reaffirmed the sufficiency of pleading nominal damages for Civil Rights violations. "A request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right.". *Uzuegbunam v. Preczewski*, 592 U.S._____ (Mar. 8, 2021)(slip op. at 2).

### V. CONCLUSION

For the reasons above, the Plaintiffs respectfully requests that this Court deny Defendant Dominion's motion to dismiss and motion to strike in their entirety, or, in the alternative deny the Defendant's motion as moot, in light of the Plaintiff's filing of their Amended Complaint.

Respectfully submitted this 9th day of March, 2021.

*PLAINTIFFS COUNSEL:*

By:    *s/ Gary D. Fielder*
Gary D. Fielder  (CO 19757)
LAW OFFICE OF GARY FIELDER
1444 Stuart St.
Denver, CO 80204
(720) 306-0007
gary@fielderlaw.net

By:    *s/Ernest J. Walker*
Ernest J. Walker (MI P58635)
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720) 306-0007
ernestjwalker@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 9, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net