**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et at.,
Plaintiff(s),

v.

DOMINION VOTING SYSTEMS INC., et al.
Defendants.

---

**PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO**
**DEFENDANT FACEBOOK'S MOTION TO DISMISS**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following

Response and Brief in Opposition to Facebook, Inc.'s Motion to Dismiss [Doc. 23], and hereby

respectfully requests that the motions be denied or, in the alternative, determined to be moot, for

the reasons set forth below.

**INTRODUCTION**

This case seeks redress for violations of the Civil Rights of all registered voters in

America, resulting from the actions of key players who participated in the administration of the

2020 Presidential election.  The actions of Defendants, including Facebook, have left the

American people still questioning the integrity of the recent Presidential, even several months

after the transition to a new executive administration.

The damages to the Plaintiffs, and to those similarly situated, were caused by the

immense power of Facebook, its Chief Executive Officer (CEO), Defendant, Mark Zuckerberg

(Zuckerberg), and the influence their unchallenged monopoly brought to bear on the entire

Presidential election process—which continues, and is not going away.

Facebook wrongly casts Plaintiffs' claims as "the latest in a series of failed attempts to overturn the 2020 Presidential election." The Plaintiffs have made no such request, and have not asked for such extraordinary relief. The Plaintiff's filed their complaint on December 22, 2020. At no time during the electoral process have the Plaintiffs moved the Court for a restraining order, nor have they requested an order to have a State to do this, or that. Nonetheless, States, like Texas, have put together lengthy and well researched pleadings for filing in the Supreme Court of the United States, which have outlined with specificity a long list of constitutional right violations, listing the individual actors, by name. Most of them are Defendants in this lawsuit.

Instead, Plaintiffs individually, and collectively as the people, claim violations of their civil rights, and seek damages to be determined at trial—even if nominal—for the injuries caused by the Defendants. These Defendants have a right to engage in discovery, and investigate, with their counsel as a private attorney general, the conduct and actions directed at the election machinery in the United States.

An obvious conspiracy existed among Defendants, Zuckerberg, Facebook and the Center for Tech and Civic Life (CTCL). The Plaintiffs complaint lays out in detail, the when, where, who, how and why of the whole operation. It started when the pandemic struck (or before). Zuckerberg donated close to $400 million dollars to certain non-profits organizations, the bulk of which went to CTCL. Millions of dollars in grants were given to counties and municipalities, in many states, much of which for the increased costs of running a safe, local election. No one objects to that. No one objects to voter registration drives. Everybody loves the Rock the Vote campaign. However, when private organizations work with local governments to place ballot drop boxes in primarily urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail—the philanthropy quickly turns into state action.

2

How many ballots do these drop boxes hold? Are they monitored? What stops a person from just stuffing that drop box full of fake ballots. If a person did that through the U.S. Mail, it would be scanned and detected. These programs promoted, paid, planned and encouraged voters to use these illegal drop boxes. Most importantly, who picks up and handles the ballots? A city worker? That's not the Post Office, or a sworn election official. This activity goes to the heart of our democratic process. Further, a finding of state action infers no wrongdoing, but at least the conduct of a party can be legally decided within the proper constitutional framework.

The Constitution guarantees a republican form of government. U.S. Constitution, Art. IV. As averred in the Complaint, the people thus have the power to enforce the Constitution, when necessary, and appropriate. Here, an action lies against *any* two parties that conspire to injure, oppress, threaten or intimidate any person in the free exercise or enjoyment of *any* right secured to him/her by the Constitution or laws of the United States, enforceable through the Civil Rights Act, codified by Title 42, §§ 1981 through 1986; and, through the Civil RICO laws, codified at Title 18, §§ 1961, 1962 and 1964.

Notably, Facebook and its CEO, Zuckerberg, played a vital role in a secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media information censorship, propaganda, media manipulation, and lawsuit suppression through the use of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.[1]

---

[1] *See* Molly Ball, *The Secret History of the Shadow Campaign that Saved the 2020 Election*, TIME, Feb. 4, 2021 https://time.com/5936036/secret-2020-election-campaign/.

Facebook's actions were directly and indirectly intertwined with several aspects of the plot, allowing it to exercise control and influence at a level equivalent to state action. All of this worked to the detriment of the Plaintiffs' right to vote in a free and fair Presidential election, along with every other voter in America. The right to vote for the President and Vice President, once granted, is individualized and protected by the Constitution. TIME Magazine doesn't print conspiracy theories, unless they're true.

Essential to the overall strategy was the dedication by Zuckerberg of 99% of his compensation received from his Facebook, alter-ego monopoly. He then directed money to non-profit, alter-egos, created and/or funded for the purpose of carrying out the implementation of the enterprise's master plan—all under cover of the COVID-19 crisis, yet directed at the election.

Facebook, Zuckerberg, and a large number of co-conspirators, funded and set into motion a dramatic increase in the number of absentee and mail-in ballots, and decreased the level of scrutiny the ballots received.[2]  The scheme and device, directed at the election machinery, needed a coordinated message and media subterfuge, Hundreds of Millions of Dollars (equal to or in excess of what the federal government allocated to all the States under its COVID-19 funding), and a network of progressives to make it work.[3]  Facebook is structured for that role, as a part of  Zuckerberg's anti-competitive[4] monopoly, which has the social-media horsepower to achieve the successful implementation of the enterprise's agenda.

Facebook is liable for violation of Plaintiffs' constitutional rights as a state actor, *and* as the administrator of a Public Forum exercising control and impairment by non-governmental

---

[2] *See* Peter Navarro, *The Art of the Steal, Volume Two of the Navarro Report* (Jan. 5, 2021).
[3] *See* Molly Ball, *The Secret History of the Shadow Campaign that Saved the 2020 Election*, TIME, Feb. 4, 202, *supra*.
[4] *See FTC v. Facebook Inc*, 1:20-cv-03590, Doc. 51, p. 3, ¶ 9.

discrimination, under color of state law. *See* 42 U.S.C. § 1981(c) — Protection against Impairment. Facebook, acting through and with Defendants, Zuckerberg, Priscilla Chan and CTCL, established a sufficiently close nexus with an essential and exclusive function of government, i.e., election administration. Under the shroud of "COVID" related grants, directed exclusively at the election machinery, specifically to cloak Facebook, Zuckerberg, Chan and CTCL from State election funding laws, and its role as a state actor.

Regardless, Facebook is liable as a participant in the enterprise, that engaged in racketeering activity, designed to unconstitutionally impact the outcome of the 2020 Presidential election. To do this, the enterprise needed to disseminate a public narrative, through exclusive partnerships with fact-checking and other censorship enterprise participants. This conduct is subject to regulation under the commerce clause, and does not require state action to trigger this Court's subject matter jurisdiction.

Facebook argues that it should not be accountable for its mass censorship because it is protected by 47 U.S.C. § 230. However, the Plaintiffs have challenged the constitutionality of Section 230, as applied to Facebook. Section 230 does not permit the Facebook monopoly to publish its own progressive political ideology and content, through its enterprise partnerships— while blocking, fact-checking, and labeling dissenting political speech under a false determination as "misinformation," or as "lewd, lascivious, filthy, and obscene."

These designations were adopted by Congress in 1996 to control pornographic content, not constitutionally protected political speech. Even if Section 230 is constitutional as applied, Facebook must be denied any safe-harbor protections, as its censorship was not done in *good faith*, as mandated by Section 230, when directed at political opponents of the enterprise.

Facebook also claims various pleadings flaws by Plaintiffs. However, Facebook chose to proceed with its motion, despite Plaintiffs' offer to amend their Complaint to clarify their claims and add more specific evidence to rectify any alleged deficiencies. In that regard, the Plaintiffs are close to filing their first amended complaint, as soon as these necessary responses have been filed. Certainly, any ambiguity in the record, and all factual inferences should be construed in Plaintiffs' favor, until discovery has been completed. Fed. R. Civ. Pro. 12(b)(6) and 12(f).

Plaintiffs have invoked the constitutional authority of this Court to vindicate their rights, under the provisions of the Civil Rights Act, which preserves the right to sue and to give evidence, to the full and equal benefit of all laws and proceedings for the security of persons and property. 42 U.S.C. § 1981(a).

## BACKGROUND

Facebook has dominated the social media universe, and the Federal Trade Commission (FTC), and 46 States, all of whom have sued Facebook, agree:

> Facebook is the world's dominant personal social networking service and has monopoly power in a market for personal social networking services. This unmatched position has provided Facebook with staggering profits. Last year alone, Facebook generated revenues of more than $70 billion and profits of more than $18.5 billion.[5]

> Facebooks dominance has virtual full control over America's online interactivity:

> If those who don't like a particular platforms censorship rules could go elsewhere to express their views . . . , they can't. YouTube dominates video platforms, Facebook dominates social platforms, Amazon dominates online book sales, etc. Thanks to network effects, *if you want to spread your views by book, by video, or by social media post, you have to use their platforms and live with their censorship regimes*.[6] [Emphasis added].

---

[5] *See FTC Sues Facebook for Illegal Monopolization*, FTC Press Release (Dec. 9, 2020) https://www.ftc.gov/news-events/press-releases/2020/12/ftc-sues-facebook-illegal-monopolization. *See also* Kelly Anne Smith, *What You Need to Know About the Facebook Antitrust Lawsuit*, Forbes Advisor (Jan. 28, 2021) https://www.forbes.com/advisor/investing/facebook-antitrust-lawsuit/.

[6] *See* Stewart Baker, *What Should We Do About Section 230?*, Reason (Feb. 20, 2020) https://reason.com/volokh/2020/02/20/what-should-we-do-about-section-230/.

The anti-competitive monopoly, as outlined by the FTC, allows Facebook to eliminate any other competitive social media platforms, allowing it to monetize Section 230 on behalf of the government, and has developed a "censorship industry" focusing its control over the Public Forum[7], and in support of the progressive enterprise which it partakes.

Speech in public forums in the purely physical, not cyberspace, was typically subject to time, place, and manner regulations that take into account control, traffic and scheduling of two meetings or demonstrations at the same time and place, the preventing of blockages of building entrances, and the like.[8] Such regulations are closely scrutinized in order to protect free expression, and, to be valid, must be justified without reference to the content or subject matter of speech,[9] must serve a significant governmental interest, and *must leave open ample alternative channels for communication of the information. ISKCON*, 452 U.S. at 650, 654-55. *See also Consolidated Edison Co. v. PSC*, 447 U.S. 530, 535 (1980).

Facebook's anti-competitive ideology leaves no alternative channels for communication of the social media platform finding that it is "better to buy than compete."[10] Facebook and other tech titans and business leaders, Amazon, Google, and Apple, have used their influence, control and monopoly to destroy other platforms that tried to take the overflow of censored conservative political voices.[11] They did so by attempting to label all conservative viewpoints as "conspiracy-theories," describing practically anyone who objects as a "right-wing activist."

---

[7] *See* A Comprehensive Review of the "Public Forum", Cornell Law, U.S. Constitution Annotated at: https://www.law.cornell.edu/constitution-conan/amendment-1/the-public-forum#fn1465amd1.
[8] *See, e.g.*, Heffron v. ISKCON, 452 U.S. 640, 647–50 (1981)
[9] *See Niemotko v. Maryland*, 340 U.S. 268 (1951). *See also Police Dep't of Chicago v. Mosle* 408 U.S. 92 (1972).
[10] *FTC v. Facebook*, 1:20-cv-03590 (Doc. 51), p. 2, ¶ 5.
[11] Chris Smith, Conservative Social Network Parler Taken Offline By Amazon Ban, MSN,  Jan. 11, 2021 https://www.msn.com/en-us/news/technology/conservative-social-network-parler-taken-offline-by-amazon-ban/ar-BB1cEvH2.

Facebook's monopoly of the Public Social Media Forum has created enormous wealth that it wields against any business, *or political* foe. Facebook has been censoring conservative political viewpoints for years, governed only by complex, self-serving and self-written "rules."

Over a year ago, *The New York Times* reported:

> *The Times* described a global network with more than 15,000 employees assessing content based on rulebooks more than 1,400 pages long.  The rules secretly designate groups as hate organizations and are so specific they even ban certain emoji use.  Hate speech mandates alone run "200 jargon-filled, head-spinning pages," wrote *The Times*.  *The result is chaos.  There's no consistency in what Facebook bans or doesn't ban — except that conservatives suffer*.  Pro-life, pro-gun and pro-Trump content all run afoul of Facebook's eager hate speech censors. Just days before the annual March for Life, Facebook blocked advertising for the new pro-life movie "*Roe v. Wade*."[12] [Emphasis added].

In April 2018, Facebook's secret rules were finally revealed.[13]  But in advance of the 2020 election, Facebook began a systematic plan to increase censorship to stifle opposing viewpoints, and shape election information to align with its preferred narrative.[14] Leading up to the 2020 Presidential election, Facebook exercised its dominance and increased its control over the flow of information across its platforms.

---

[12] L. Brent Bozell III, *Facebook Doesn't Really Believe in Free Speech.  What They Believe in (and Actively Practice) is censorship*, FoxNews (Jan. 22, 2019) https://www.foxnews.com/opinion/facebook-doesnt-really-believe-in-free-speech-what-they-believe-in-and-actively-practice-is-censorship.
[13] Todd Haselton, *Here's Facebook's Once-Secret List of Content That Can Get You Banned*, CNBC (Apr. 24, 2018) https://www.cnbc.com/2018/04/24/facebook-content-that-gets-you-banned-according-to-community-standards.html.
[14] *See* M. Dowling, *Facebook Prepares for 2020 with Pathetic New Censorship Rules*, Independent Sentinel (July 3, 2019) (https://www.independentsentinel.com/facebook-prepares-for-2020-with-pathetic-new-censorship-rules/.

In January 2020, Facebook began censoring information it believed would "delegitimize the US election"[15]  Facebook's political ideology and monoculture were weaponized against their political opponents, all under the alleged safe harbor of Section 230.

In June 2020, Facebook accelerated its crackdown on opposing viewpoints:

'We're going to start labeling content that we find newsworthy that might otherwise violate our policies,' [Zuckerberg] said. 'There's no newsworthy exemption to content that incites violence or suppresses voting . . . even if a politician or government official says it.  If we determine the content may lead to violence or deprive people of their right to vote, were going to take that content down no matter who says it.'[16]

By September 2020, Facebook had implemented even more drastic censorship rules "to help secure the integrity of the US elections" before, during, and after the election.[17]  Defendant Zuckerberg announced he was concerned about "the challenges people could face when voting," and was "worried that with our nation so divided and election results potentially taking days or even weeks to be finalized, there could be an increased risk of civil unrest across the country."[18]

Zuckerberg asserted that Facebook's censorship regime was needed to protect "our democracy" by "*helping people register and vote*," "clearing up confusion" about the elections, and "taking steps to reduce the chances of violence and unrest."[19] The agenda of the enterprise was not to help all voters, just the voters in support of the enterprise's preferred candidates.

---

[15] Aditya Sharma, *Facebook Bans US Ads that Claim Widespread Voting Fraud Ahead of Election*, DW (Jan. 10, 2020) https://www.dw.com/en/facebook-bans-us-ads-that-claim-widespread-voting-fraud-ahead-of-election/a-55113285.

[16] Andrea Morris, *Facebook Launches New Censorship Plan, Employees Reveal Anti-Conservative, Anti-Trump Agenda*, CBN News (Jun. 27, 2020) https://www1.cbn.com/cbnnews/us/2020/june/facebook-announces-new-censorship-plan-as-employees-reveal-their-anti-conservative-anti-trump-agenda.

[17] Kevin Reed, *Facebook Announces Political Censorship Plan in Advance of US Presidential Election*, World Socialist Web Site (Sept. 7, 2020) https://www.wsws.org/en/articles/2020/09/07/face-s07.html.

[18] *Id.*

[19] *Id.*

Within weeks, Facebook announced additional bans on actual evidence of election fraud:

> Rob Leathern, Facebook director of product management, said the policy applies to any ads that make false claims *about voting by mail or other methods of voting*.  It also *bans the use of isolated incidents of voter fraud* to discredit the result of an election.[20] [Emphasis added].

Facebook's censorship also extended to significant news stories appearing in advance of the Presidential election that were negative towards Facebook and Zuckerberg's preferred candidate.[21]  Internal whistleblowers within Facebook have revealed their own "shame" for censoring negative news, and exclaimed, "Facebook is almost an arm of the Democratic Party—an arm of the far-left wing of the Democratic Party."[22]  Importantly, post-election polling revealed that 82% of President Biden supporters in battleground states being unaware of at least one of eight significant election-related news stories—with 17% of them stating that they would have changed their vote if they had been aware of one of these stories.[23]

Facebook increased censorship after the 2020 Presidential election, as well, announcing within days that it would demote content "our systems predict may be misinformation" relating to election fraud.[24]

---

[20] Jessica Guynn, *Facebook Bans Ads That Seek to Delegitimize the Election or Make False Claims About Voting*, USA Today (Sep. 30, 2020)

[21] *See* Noah Manskar, *Facebook Limits Spread of The Post's Hunter Biden Expose*, New York Post (October 14, 2020) https://nypost.com/2020/10/14/facebook-limits-spread-of-the-posts-hunter-biden-expose/.

[22] Sohrab Ahmari, *Facebook Workers 'Ashamed' By Tech Giant's Censorship of Post's Hunter Files Reporting*, New York Post (October 19, 2020) https://nypost.com/2020/10/19/facebook-workers-ashamed-by-tech-giants-censorship-of-posts-reporting/.

[23] *See* Alexander Watson, *Poll Shows Media Censorship Cheated Voters of Vital Info, Robbed Trump of Second Term*, CNS News (Nov. 24, 2020) https://www.cnsnews.com/article/national/alexander-watson/poll-shows-media-censorship-cheated-voters-vital-info-robbed. *See also* Frank Salvato, *Facebook Engaged 'Emergency' Conservative Censorship Post-Election*, National File (Nov. 26, 2020).

[24] Lucas Nolan, *Facebook Censorship: Platform Will 'Temporarily Demote' Posts that Share 'Election Misinformation,'* Breitbart (Nov. 6, 2020). https://www.breitbart.com/tech/2020/11/06/facebook-censorship-platform-will-temporarily-demote-posts-that-share-election-misinformation/.

For example, *American Thinker* detailed being censored and "fact checked" by Facebook for a video posted to Rumble titled "*Smoking Gun: ES&S Transferring Vote Ratios Between Precincts in PA.*"[25]  Further, Facebook routinely censored the President of the United States.[26]

Even more insidious:

> [Facebook] made an 'emergency change' to its algorithm to suppress news sources that were spreading what the company believed to be 'election misinformation' [using] a 'secret internal ranking' of publishers that Facebook created based on 'signals about the quality of their journalism.'[27]

Facebook expanded its censorship to include all content that even mentioned certain words or phrases.[28]  This wove Facebook's electronic tentacles deeper into the election. All this, while Zuckerberg used his enormous wealth to fund his alter ego, non-profit organizations, namely, CTCL. Through cooperation with numerous municipalities and counties, all outlined in the Complaint, CTCL funded and participated in specific precincts in key swing states. Although CTCL's contribution to local communities was proposed as COVID relief funding, a substantial portion of the funding was directed at the election machinery. The Complaint outlines the time frame, locations, actions, identity of other state actors, and specific conduct of Facebook, Zuckerberg and CTCL. All of it is supported by the public record and none of it is in dispute.

---

[25] *See* Andrea Widburg, *Facebook is Censoring Information About the Election*, American Thinker (Dec. 1, 2020) https://www.americanthinker.com/blog/2020/12/facebook_is_censoring_information_about_the_election.html.
[26] *See* Ella Kietlinska, *Twitter, Facebook Censor Trump's Post About Election*, The Epoch Times (Nov. 8, 2020).
[27] Phil Shiver, *Report: Facebook Hatched 'Emergency' Plan Using 'Secret Internal Ranking' to Suppress 'Right-Wing' News Sources Post-Election*, Blaze Media (Nov. 25, 2020) https://www.theblaze.com/news/facebook-post-election-censorship-plan.
[28] *See, e.g.*, Janita Kan, *Facebook to Remove All Content That Mentions 'Stop the Steal' Ahead of Inauguration*, The Epoch Times (Jan. 11, 2021).

## STANDARD OF REVIEW

A sufficiently stated claim need only present sufficient facts that, when accepted as true,

plausibly state a valid claim:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable* for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, ____ (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, _____ (2007)) (emphasis added).

The Federal Rules embody "notice pleading" and require only a concise statement of

claim. Thus, dismissal under Rule 12(b)(6) is proper only when the complaint lacks a cognizable

legal theory or does not allege facts that, when taken as a whole, raise the claim for relief above

mere speculation. *Id.* at 555-556.

As the 10th Circuit explained, "the complaint must give the court reason to believe that

*this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at*

*Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis in original).

### ARGUMENT

### I.    PLAINTIFFS PROPERLY ALLEGE CLAIMS AGAINST FACEBOOK

### A.    Section 230 Does Not Shield Facebook from Liability

Facebook believes that they possess a "license to censor with impunity,"[29] and hides

behind  Section 230 to shield its unlawful censorship. The level of censorship has dramatically

increased since the start of the 2020 Presidential election, and the damage being done is

compounding:

---

[29] Philip Hamburber, *The Constitution Can Crack Section 230*, Wall Street Journal (Jan. 29, 2021).

Relying on [Section 230], tech companies including Google and Twitter increasingly pull the plug on disfavored posts, websites and even people.  Online moderation can be valuable, *but this censorship is different.  It harms Americans' livelihoods, muzzles them in the increasingly electronic public square, distorts political and cultural conversations, influences elections, and limits our freedom to sort out the truth for ourselves.*[30][Emphasis added].

Section 230 shields an interactive computer service, "Good Samaritan." from liability:

[For] any action voluntarily *taken in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*, whether or not such material is *constitutionally protected*.

47 U.S.C §230(c)(2)(A).

Section 230 is unconstitutional, on its face and as applied by Facebook, and cannot survive the strict scrutiny that must be applied.  Further, even if determined constitutional, Facebook cannot utilize Section 230 protection under these facts, because Facebook's censorship of politically dissenting speech was not done in good faith, and was directed at political opponents of the progressive enterprise.

### B.        Section 230 Is Unconstitutional

Section 230 should be declared unconstitutional as it violates protections afforded under the First Amendment of the Constitution.  However, the First Amendment severely limits the government's abilities to regulate political speech:

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation].  Although First Amendment protections are not confined to 'the exposition of ideas,' [Citation]. 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates. . . .' [Citation].  This no more than reflects our "profound national commitment to the principle that debate on public

---

[30] *Id.*

issues should be uninhibited, robust, and wide-open.' [Citation].  In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.  As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'

*Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976).

The Supreme Court in *Buckley* concluded that campaign expenditure limits were

unconstitutional, stating:

It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates.  The restrictions, while neutral as to the ideas expressed, limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'

*Id*. at 39 (*quoting Williams v. Rhodes*, 393 U. S. 23, 32 (1968)).

*Buckley* further clarified that speech should not be defined by the listener:

For the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application.  Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions.  Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.  In an analogous context, this Court…observed:

[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect.  No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation.  In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation *puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning*. Such a distinction offers no security for free discussion.  In these conditions it blankets with uncertainty whatever may be said.  *It compels the speaker to hedge and trim*.' [Emphasis added].

*Id*. at 42-43 (quoting *Thomas v. Collins,* 323 U.S. at 535).

As written, Section 230 encompasses an unconstitutionally broad swath of political speech because of the vagueness of its limits, specifically its applicability to whatever Facebook may deem "otherwise objectionable." "The use of so indefinite a phrase . . . fails to clearly mark the boundary between permissible and impermissible speech." *Id*. at 41.

Considering Section 230's enumeration of objectionable' material, the "vagueness of this term would be enough to make restrictions unconstitutional if Congress directly imposed it." [31] Clearly, Section 230 covers otherwise protected free speech, and states as much in the statute, which was primarily intended to limit pornography and lewd content.

Effectively, the Congress has privatized the regulation of free speech on social media platforms—a function the government could not do itself. This immunizes Facebook, and allows it to censor anything it deems objectionable. While this may not be as severe if applied to ordinary websites, because of Facebook's effective monopoly status, the potential for unconstitutional abuse is far greater:

> [T]he danger lies in the statutory protection for massive companies that are akin to common carriers and that function as public forums [like Facebook]. *The First Amendment protects Americans even in privately owned public forums*, such as company towns, and the law ordinarily obliges common carriers to *serve all customers* on terms that are *fair, reasonable and nondiscriminatory*.[32]

In *Marsh v. Alabama*, the Supreme Court held that residents of a company owned town possessed the same rights as those of a municipal town, even if the company:

> [o]wned all the homes, and all the stores, and all the streets, and all the sidewalks, all those owners together could not together have set up a municipal government with power to pass an ordinance completely barring the distribution of religious literature. [So then, *o]wnership does not always mean absolute dominion*. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Thus, the owners of privately held

---

[31] Philip Hamburger, *The Constitution Can Crack Section 230*, Wall Street Journal
[32] *Id*. [Emphasis added].

bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. *Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function*, it is subject to state regulation. [Emphasis added].

*Marsh v. Alabama*, 326 U.S. 501, 505-506 (1946) (citing *Republic Aviation Corp.* v. *Labor Board,* 324 U.S. 793, 798, 802, n. 8. (1945)).

In the United States, Facebook has become a virtual town square. Even though Facebook owns its platform, it was built for public use. Further, Facebook is more closely connected to the public as its users must interface with other Facebook users through end devices (i.e., computers or smartphones) not owned by Facebook. Facebook's platform is more analogous to phone use, where Facebook primarily allows connectivity to other users to permit communication and the exchange of information between users. No one could imagine a telephone carrier interrupting a phone call between users because it believed the content of the call was "otherwise objectionable" to it. Yet, Facebook's apps permit phone-like discussions and chat messaging. Facebook's extreme position would permit censorship of these activities as well.

Moreover, Section 230 unconstitutionally grants Facebook the power to regulate other businesses:

The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental function, since, *in the very nature of things, one person may not be entrusted with the power to regulate the business of another, and especially of a competitor.* And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. [Emphasis added].

*Carter v. Carter Coal Co*., 298 US 238, 311-312 (1936)(citing *Schechter Corp. v. United States*, 295 U.S. 495, 537(1935)).

Section 230 cannot survive strict constitutional scrutiny afforded fundamental rights, particularly as applied here to Facebook, a de facto monopoly and online town square.  Congress cannot grant to Facebook what it cannot do itself.  As such, Section 230 must be declared unconstitutional.

### C.    Facebook Censorship Lacks Good Faith

Even if determined to be constitutional, Facebook should still be denied liability protection under Section 230 because Facebook's mass censorship of material on its platform was not done in good faith and as here was used in an unlawful manner in support of a RICO enterprise and the agenda of politically motivated participants.  Examples of duplicity in application of standards by Facebook are too numerous to cite, but one of the more outrageous:

> Facebook flagged as 'hate speech' the Declaration of Independence on July 4th and pulled it down, until the backlash hit.  The very document that gave birth to our nation---which then gave us free speech, which the big tech companies thrive on---was pulled as 'hate speech.' This example says it all.[33]

But, leading up to and following the 2020 election, Facebook censorship became totally arbitrary and capricious by censoring every opposing narrative and completely suspending user accounts, including the President of the United States.[34]

Importantly, questions of good faith are measured by the objective reasonableness of the official's conduct:

> The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. *Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be*

---

[33] Jerry Newcombe, *Social Media Censorship Is Out of Control*, The Christian Post (Aug. 30, 2018) https://www.christianpost.com/voices/social-media-facebook-google-censorship-out-of-control.html.

[34] *See* James Murphy, *Twitter and Facebook Censor President Trump by Suspending his Account*, The New American (Jan. 7, 2021) https://thenewamerican.com/twitter-and-facebook-censor-president-trump-by-suspending-his-accounts/.

*made to hesitate*; and a person who suffers injury caused by such conduct may have a cause of action. [Emphasis added].

*Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982).

Here, the wholesale barring of information and entire accounts that *Facebook* deems objectionable is a clear infringement of First Amendment rights.  No reasonable official would believe he could permanently silence a citizen, and certainly not the present leader of the United States and Commander-in-Chief.  Facebook's partisan censorship must be declared outside the protections of Section 230 as lacking good faith, and in violation of Plaintiffs' First Amendment rights.

### D.    Facebook Became A State Actor Through Its Own Conduct

A § 1983 claim is only applicable to conduct occurring "under color of law." *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1447 (10th Cir. 1995). The Supreme Court developed several approaches to determine whether a private party engaged in State action:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case.  In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'  The Court has also inquired whether the State has "so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them.  In addition, the Court has held that if a private party is a "willful participant in joint activity with the State or its agents,' then state action is present.  Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Id*. at 1447.

A private party becomes a State actor if it assumes a traditionally State function:

> If the state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor.

*Id*. at 1456 (quoting *Jackson,* 419 U.S. at 352) (citing *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991).

> Notably, election administration is one of the 'very few' such recognized State functions: This test is difficult to satisfy. 'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'[Citation]. Nevertheless, the Supreme Court has found some functions to satisfy this test. *These traditional state functions include administering elections of public officials.*[35]

*Id.*

Here, Facebook, together with Zuckerberg, Chan, and CTCL, established privatized election operations in key Democrat strongholds designed specifically to influence the 2020 Presidential election. The sinister approach of using the COVID-19 health crisis as the basis of the non-profit grant funding, while directing the use of the funding at the election machinery, was unlawful, as described in the Complaint. This effort was far more than basic assistance with funding for PPE and election office supplies.  Zuckerberg and Chan funneled Hundreds of Millions of Dollars of their personal wealth, obtained from their alter ego Facebook, to fund and equip CTCL to direct local governments through grant funding contracts. These grants were used to make specific purchases of voting machines, placement of private ballot collection boxes, printing and mailing extra ballots, developing voting propaganda, recruiting potential voters, and hiring and training staff in select communities.[36]   Some communities received more private grant funding than their entire 2020 budget.[37]

Through funding agreements other state actors, CTCL used Zuckerberg's money, and Facebook's technical know-how, to assume a primary role in the administration of select elections in key precincts around the county, a function exclusively reserved to the State.

---

[35] *Id.* (citing *Terry v. Adams,* 345 U.S. 461, 468-70 (1953)) (emphasis added)
[36] *See* Geoff Hing, Sabby Robinson, Tom Scheck, and Gracie Stockton, *How Private Money Helped Save the Election*, APM Reports (December 7, 2020) https://www.apmreports.org/story/2020/12/07/private-grant-money-chan-zuckerburg-election.
[37] *Id.*

### E.   Enterprise Racketeering Activity Requires No State Action

The Plaintiffs have added claims for racketeering in their amended complaint. As a core funding participant in Defendants' racketeering activity through the enterprise, Facebook is not required to be a state actor.  Defendant Facebook played, and continues to play an integral role in certain Defendants' racketeering activities to influence to 2020 Presidential election. Through censorship, Facebook is a part of the enterprise, able to control the narrative available for public consumption on its platform—before and after the election.  Through cash and in-kind contributions, Facebook further enabled the effective privatization of election precincts in Democrat strongholds.  As such, Facebook's liability under 18 U.S.C §1962 remains, whether or not it is considered a state actor.

### F.   Facebook Is The Alter-Ego of Zuckerberg and Chan

Facebook operates globally from its headquarters in California, and is the alter ego of its CEO Zuckerberg, and the latter's ideology and political agenda.  Zuckerberg and Chan have pledged 99% of all their value received to their charitable alter egos, from and through which they execute their agenda and that of the enterprise.

The fact the FTC recognizes that Facebook operates under the anti-competitive and ideological control of its CEO, Zuckerberg, leaves little doubt that Zuckerberg and Facebook are united. Defendant Zuckerberg is in complete control of the technology and direction of Facebook.  As one of the wealthiest individuals in America, Zuckerberg has no need for the money generated from his ownership. It is the control of how Facebook is used by Zuckerberg that continues to drive the corporation's actions, both in the business sector and political realms. As well documented by the FTC, Facebook and its monopoly wields so much enormous power and influence that it must be dismantled.

The same applies to its political influence and Zuckerberg's use to Facebook to implement the racketeering activities that spawn from its enormous platform. The participation of Facebook in the activities of the enterprise confirms Zuckerberg's use of the media giant for a wrongful purpose, injurious to the Plaintiffs, and all others similarly situated.

### G.      Facebook Fundamentally Mischaracterizes Plaintiffs' Claims

Facebook erroneously believes this case is "the latest in a series of failed attempts to overturn the 2020 Presidential election."  Although the evidence presented in these election challenge lawsuits is certainly relevant to Plaintiffs' claims, Plaintiffs do not present the same claims as these election challenge lawsuits, nor do Plaintiffs seek to overturn the Presidential election.  More importantly, none of the election challenge lawsuits noted by Facebook have made sufficient findings of fact and law, concerning the issues, herein.

### H.      The Plaintiffs Have Standing to Bring Claims Under the Civil Rights Act

A § 1983 claim requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

All qualified voters have a constitutionally protected right to vote. *ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest."  *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the

Nation." *Id.* at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

The national interest in this election outweighs that of any one State. There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975).

Moreover, the Plaintiffs have suffered a particularized injury-in-fact. Every constitutional right violation infers a damage. "Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Carey v. Piphus*, 435 U.S. 247, 255 (1978). The legislative history of § 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

## I.     The Civil Rights Of All Members Of The Class Have Been Violated

While all Americans have been deprived of the appearance of a fair election, the "general interest of the members of the public" differs considerably, as only registered voters have had their rights infringed.  Only registered voters were qualified and could legally participate in the election.  Those who were registered exercised their right to cast a ballot for one candidate or the other (or neither), while members of public were mere observers.  As such, it is not simply a "generalized grievance." Here, every registered voter was deprived of a fair and legitimate process administered by the relevant state actors.  Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes

do not matter, thereby diminishing the perceived present value of the right to vote in future elections and suppressing subsequent voter turnout.  Registered voters have been subjected to tumult, mental anguish and division for months. These injuries are bipartisan, and have been suffered by all registered voters regardless of whom their vote was cast.  Although some registered voters may be content that the candidate of their choice was certified as the winner, questionable election integrity impacts all registered voters.

These injuries are not speculative.  Although the outcome of the election cannot be changed, the appearance of a fair election is in serious question.  Fair elections are open and transparent, not driven by private, billionaires and their gigantic, multi-media companies. When a nation, founded upon equal station and a one person, one vote guarantee as a republican form of government can fall prey to a "cabal" of well-funded actors seeking to use technology to change the outcome of an election, oversight and transparency must prevail.

**J.      Plaintiffs' Claims Are Redressable**

Plaintiffs have alleged claims of violations of their Civil Rights, and are seeking nominal damages for these infringements.  Just yesterday, the Supreme Court reaffirmed the sufficiency of pleading nominal damages for Civil Rights violations. "A request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right.". *Uzuegbunam v. Preczewski*, 592 U.S.\_\_\_\_\_ (Mar. 8, 2021)(slip op. at 2).

**II.      VENUE IS PROPER AND THIS COURT HAS PERSONAL
            JURISDICTION OVER FACEBOOK**

**A.      Minimal Contacts**

It is inconceivable to assert that Facebook fails to satisfy the minimum contacts standard within the forum. Certain Plaintiffs are located within the District of Colorado, and most of the

Plaintiffs and class members currently use Facebook services, have been targeted as users, have been shadow banned by Facebook or other members of the enterprise, or have been injured through the bad faith censorship of important content. Facebook undoubtedly services millions of users in the District of Colorado, has significant contacts, and has taken affirmative action to register to do business in the State.

Facebook's newly established "censorship industry" created as another arm and division of the enterprise, acting through its partnership with fact-checking entities such as LEAD STORIES, LLC, a Colorado Limited Liability Company (Lead Stories). This creates layers of integrated censorship agents, and contacts relevant to its actions taking place in Colorado. Facebook defines Lead Stories as a "Facebook Third Party Fact-Checking Partner."

Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional conceptions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945).

Where a defendant deliberately engages in significant activities within a state, purposely availing itself of the privilege of conducting business there, it is presumptively reasonable to require that defendant "submit to the burdens of litigation in that forum as well." *Burger King v. Rudzewicz*, 471 U.S. 462, 475-476 (1985).

In such instances, "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being hauled into court there." *Id.* at 474 (*citing World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Applying the "minimum contacts" analysis, a court may obtain either general or specific jurisdiction over a defendant. If the defendant's activities in the forum are substantial, continuous and systematic, general jurisdiction

is available; in other words, the foreign defendant is subject to suit even on matters unrelated to his or her contacts to the forum. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 446 (1952).

A court may exercise specific jurisdiction over a foreign defendant if his or her less substantial contacts with the forum give rise to the cause of action before the court. The question is "whether the cause of action arises out of or has a substantial connection with that activity." *Hanson v. Denckla*, 357 U.S. 235, 250-253 (1958)

Facebook maintains a registered agent for service of process listed as Corporation Service Company. Additionally, Facebook has filed a Statement of Foreign Entity Authority under registration number 20171961374, in anticipation of doing substantial business in or having minimal contacts with users in Colorado.

## CONCLUSION

For the reasons above, the Plaintiffs respectfully requests that this Court deny Defendant Facebook's motion to dismiss, or, in the alternative deny the Defendant's motion as moot, in light of the Plaintiff's filing of their Amended Complaint.

Respectfully submitted this 9th day of March, 2021.

By:    *s/ Gary D. Fielder*
Gary D. Fielder  (CO 19757)
LAW OFFICE OF GARY FIELDER
1444 Stuart St.
Denver, CO 80204
(720) 306-0007
gary@fielderlaw.net

By: *s/Ernest J. Walker*
   Ernest J. Walker (MI P58635)
   ERNEST J. WALKER LAW OFFICE
   1444 Stuart St.
   Denver, CO 80204
   (720) 306-0007
   ernestjwalker@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 10th, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net