# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK, ALVIN
CRISWELL, KESHA CRENSHAW, NEIL
YARBROUGH, AMIE TRAPP, PETER LITTLE,
SUSAN GREEN, BRYAN TYNER, WENDY
KAY, GEORGE FREEZE, JOHNNY TORRES,
CYNTHIA ST. DENIS, VINCENT FERRANTI,
EMMETT MCNEEL, AUDREY LEFTWICH,
JASON P. BEARCE, LAURIE L. BEARCE,
CATHERINE DAVIS, CHERYL CARUSO,
DORALEE CLEMENT, JACK GEIGLE, JERRY
LOVE, JOHN BANNES, KIMBERLY WILSON,
EDWARD CLEMENT, DAVID ATTKISSON,
GREGORY ANDELIN, STEPHANIE SEYMOUR,
FRANCIS BYTHEL GILLHAM, FLORITA
TOQUERO SHELDON, JESSICA BELL,
JOSEPHINE HELMS, MICHELLE
DOBROVOLNY, NICHOLAS CHAPMAN,
RAYMOND HESS, JR., THOMAS COOPER,
CLAUDIA GRAVER, BRYA MAIN, JOSEPH
DISMONT, TERI DISMONT, MARK
HANNAHEL, SANDRA MIARECKI, CARMEN
S. DE DISSE, GUY CUNNINGHAM, JULIE
GLOECKNER, STEVEN SAVINI, JESSE
CIFUNI, MICHAEL DION, DOUGLAS ADAMS,
FERMIN QUINONES, CYNTHIA CAGLE, AMY
LEWIS, ALLISON DEL BORRELLO, ANDREW
DUBOIS, KENNETH BELLETTI, LESLIE
SEXTON, MICHEAL CAGLE, PATRICE VENE,
ANNE ZIEGENHORN, SETH QUINTO, SUSAN
M. PARENT, LINCOLN ONG, DIANE
JACKSON, ANDREW SARKANY, KIRSTEN
KELLY-VARGAS, MICHAEL E. ZACHER,
RACHEL DOUGLAS, MICHELLE SALINAS,

STEFANIE COLLET, MICHAEL L. GILSTRAP, ASHLEY RIVERO, NELSON RIVERO, BRIAN MAYARD, TABBETHA LANGLEY, DANIQUE MCPHERSON, MONICA BOWDEN, LAWRENCE SMETANA, SHEILA MELLO, MARJORIE SPENCER, ALEX WHITAKER, DONALD BISHOP, ELIZABETH ROZMARIEWICZ, GLEN KANEKO, JANE BISHOP, JOSE SUAREZ, JOSEPH DAY, MICHAEL PRIESKORN, JOHN BAKER, WILLIAM HESS, LAURIE NICEWANER, TESSA LAQUA, HEIDI BENOWITZ, LAWRENCE SAAGER, BRADFORD HUTCHINSON, KATRINA LEAVENS, ROSEMARY KOLYNICH, SANDRA CICOTTA, ANGELIA EBBECKE, ONNIE SCRUTON, DIANNE BORNIA, HENRY ALLEN, MICHAEL BORNIA, STANLEY LATTA, LINDA PURCELL, JAMES HANSON, KATHLEEN HANSON, STEPHANIE STEPHENS, JEFF PAULK, ROMAN LEADER, ELAINE REDNER, KERRI ROSENBLATT, LAIRD HOLDER, RICHARD MCBRIDE, KEVIN SMITH, DELYNN EDWARDS, CHRISTOPHER EDWARDS, DENISE WESTON, DOMINICA AYALA, GEORGE MITCHELL, HENRY RUTKOWSKI, OWEN BURK, ROBERT MCCARTHY, ROBERT WESTON, COREY OLSEN, VINCENT FAVA, JENNIFER WILLIAMS, ME'SHELL MILLER, STACY LANG, WILLIAM SCHWAIBOLD, DEBORAH FALIN, BELLA STEVENSON, MILDRED SMITH, DAVID SMITH, JANET ROE, LYLE SMITH, RANDALL HODGES, GREGORY HOLLMANN, JAMES LUPO, JEFFERY ROGERS, VERONICA WATTS, CYNTHIA HEDGER, DONY J. WATTS, CAMERON ABBATICCHIO, SUZANNE ABBATICCHIO, MARK MARTIN, KEVIN L. KEMPTON, EVELYN E. KEMPTON, MATTHEW CHITTY, KATHERINE EVANS, ROGER KNIGHT, SEAN RATHGEBER, BRIANNA JONES MATTES, MICHAEL SHERMAN, MELISSA MITCHELL, RAYMOND KRAHN, FRANK HALL, LYNN ERICKSON, and CHERYL AGUIAR.

2

Plaintiffs, on their own behalf and of a class of similarly situated persons,

vs.

3

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
TECHNOLOGY AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, DANA NESSEL, in her official
capacity as Attorney General for the STATE OF
MICHIGAN, CHRIS CARR, in his official capacity
as Attorney General for the STATE OF GEORGIA,
JOSH SHAPIRO, in his official capacity as
Attorney General for the STATE OF
PENNSYLVANIA, JOSH KAUL in his official
capacity as Attorney General for the STATE OF
WISCONSIN, and DOES 1-10,000,

     Defendants.

---

**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

COME NOW the Plaintiffs, through counsel, on behalf of themselves and of a ~~class~~ Class

of similarly situated persons, and bring this Complaint for damages, injunctive and declaratory

relief against the Defendants, and each of them, and, in support thereof, hereby state as follows:

~~**I. NATURE OF THE CASE**~~

**I.** ~~This is a civil~~**INTRODUCTION**

    1.    The Constitution of the United States protects the right of all qualified citizens to

vote, in state as well as federal elections.[1]

---

[1] *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

2.      The right of the people to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to casts their votes effectively rank among our most precious freedoms.[2]

3.      Other rights case brought, even the most basic, are illusory if the right to vote is undermined.[3]

4.      The President and the Vice President of the United States are the only elected officials who represent all voters in the Nation.[4]

5.      The impact of the votes for President and Vice President cast in each State is affected by citizens of the United votes cast for the various candidates in other States.[5]

6.      In a Presidential election, the actions of state actors in one state have an impact beyond its own borders.

7.      The right to vote freely for the candidate of America, from different one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.[6]

8.      The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

9.      An election for the President and Vice President is a public function traditionally performed by governments and exclusively reserved to the states.[7]

10.     If a state delegates to a private party a function traditionally exclusively reserved to the State, then the private party is necessarily a state actor.[8]

---

[2] *William v. Rhodes*, 393 U.S. 23, 30-31 (1968).
[3] *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).
[4] *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).
[5] *Id*. at 795.
[6] *Reynolds*, 377 U.S. at 555.
[7] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).
[8] *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1447 (10th Cir. 1995).

11.     The people indisputably have a compelling interest in preserving the integrity of their election process.

12.     Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.[9]

13.     The 2020 Presidential election was unconstitutionally influenced by a well-funded cabal of powerful people, ranging across the Union, against the industries and ideologies, who worked together behind the scenes to influence perceptions, change rules and laws, steer media coverage and control the flow of information.[10]

14.     This well-funded group of persons, associated in fact as outlined herein, worked together for the common purpose of engaging in a course of conduct with intent to influence a Presidential election, is ongoing in nature both through formal contractual arrangements and informal association (enterprise).

15.     The enterprise was, in part, coordinated and orchestrated through the efforts of Mike Podhorzer who held "back-to-back Zoom meetings for hours a day with his network of contacts across the progressive universe."[11]

16.     The enterprise touched every aspect of the Presidential election.[12]

17.     The enterprise caused states to change voting systems and laws.

18.     The enterprise coordinated hundreds of millions of dollars in public and private funding.

19.     The enterprise successfully pressured social media companies to censor

---

[9] *Purcell v. Gonzalez*, 549 U.S. 1, 7 (1964).
[10] Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME, February 4, 2021.
[11] *Id.*
[12] *Id.*

information, and used data-driven strategies to fight opposition narrative.

20.     The enterprise used the US Mail system to distribute unsolicited mail-in ballots nationwide.

21.     The enterprise created devices to intercept the US Mail through unlawful ballot drop boxes.

22.     The enterprise used the US mail to exchange contractual agreements, correspondence, and other documents.

23.     The enterprise employed the use of wire communications to carry out the scheme, through the use of electronic mail communications, electronic devices and the internet.

1. .24.   As a part of the funding of the enterprise, Defendants for, among other things, burdening the voting rights of 160Mark Zuckerberg and Priscilla Chan, contributed over $350 million people.dollars to non-profit organizations, such as Defendant, Center for Technology and Civic Life (CTCL), to facilitate grants to local municipalities and counties to improperly influence the 2020 Presidential election.

25.     To qualify for the grants, the enterprise mandated specific state action by municipalities and counties through contractual terms and conditions, including the purchase and strategic placement of ballot "drop boxes" in designated communities, and other changes to local voting procedures, causing discriminatory voting access disparities between CTLC and non-CTCL contracted communities.

26.     The enterprise channeled the necessary funding through affiliated organizations, such as CTCL, with the specific purpose to avoid oversight by State and federal governments.

27.     The enterprise developed relationships at a local level with budget-constrained municipalities to incentivize poll workers to implement the goals of the enterprise.

7

28.     As a part of the enterprise, Defendant Facebook, Inc. (Facebook), of which Defendant Mark Zuckerberg (Zuckerberg), is the Chief Executive Officer (CEO), created more rigorous user rules and regulation to censor political dissenting speech and conceal negative information regarding the preferred candidates of the enterprise.

29.     As part of the enterprise, and at the direction and control of Zuckerberg, Facebook began banning conservative and religious groups, promoting one political ideology, and censoring the speech of users who disagreed with the progressive ideals of the enterprise.

30.     Facebook promoted the misperception that mail-in voting is not susceptible to fraud and that it is normal for states to not finish counting votes on election night.

31.     Facebook's misinformation campaign was created to neutralize the warnings of the United States Attorney General that Democrats were "playing with fire" over their "grossly irresponsible" push for wholesale mail-in voting.[13]

32.     Facebook is also described as a partner and funder by CTCL.

33.     As a part of the enterprise, the governors, certain secretaries of state, and other election officials involved in 2020 Presidential elections in Georgia, Pennsylvania, Wisconsin and Michigan were encouraged to authorize changes to election laws in their respective states, without legislative approval.

34.     Concurrently, Defendant Dominion Voting Systems, Inc. (Dominion) was contracted to administer the elections for approximately 1300 jurisdictions in 28 States across the country.

---

[13] Katelyn Polantz, Caroline Kelly, *Barr Says Voting By Mail Is 'Playing With Fire,'* CNN (Sept. 2, 2020).

35.     By administering said elections, Dominion is a person acting under color of law, i.e., a state actor, subject to 42 U.S.C §§ 1983 & 1985.

36.     As a part of Dominion's electronic voting system, mail-in and absentee ballots are scanned by commercial off-the-shelf (COTS) devices.

37.     The digitally scanned ballots are read and interpreted by Dominion's proprietary software.

38.     The proprietary software determines the choice of the voter, and segregates ballots for further adjudication.

39.     In above-referenced swing states, during the 2020 Presidential election, the adjudication of the segregated ballots was done without legal authority, oversight, or observation by bipartisan poll watchers.

40.     During the 2020 Presidential election, the mail-in and absentee ballots processed by Dominion, without adjudication, were tabulated by Dominion's proprietary software.

41.     In light of the proprietary nature of Dominion's software, and licensing and non-disclosure agreements with Dominion's State and county customers, Dominion's automated tabulation of absentee and mail-in ballots cannot be objectively audited or verified.

42.     During the 2020 Presidential election, Dominion's voting machines, tabulators, poll books, automated data, and other products and services were and are defective, and not deployed in a workmanlike manner sufficient to ensure the validity of the election results.

43.     The lack of transparency related to such proprietary limitations precludes objective oversight and scientific corroboration.

44.     Dominion's software and other products are susceptible to hacking, bugs, malware and configuration errors.

45.     During the 2020 Presidential election, Dominion failed to properly train its employees, contractors, and other election officials.

46.     Additionally, Dominion failed to hire qualified technicians and other contractors in the service of its voting machines and other products and software.

47.     Dominion intentionally and purposefully designed its voting system with inherent errors to create systemic fraud and influence election results.

48.     Dominion's voting systems intentionally generates a high number of ballot errors.

49.     As implemented, Dominion's voting systems violated due process and fundamental fairness.

2.     The Plaintiffs allege the following on behalf of themselves and others similarly situated against Defendants for damages, declaratory relief, and to enjoin them from further unconstitutional and unlawful acts, omissions, orders, agreements and certifications concerning the Plaintiffs' rights of due process, equal protection, and to vote and speak freely.

3. 50.     Plaintiffs, as citizens of the United States of America (American Citizen(s)), bring this action to halt, and seekpray for redress from the unconstitutional acts and omissions of the Defendants enforced, pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986 & 1988 (Civil Rights Act), and the Constitution of the United States of America.; and, to prevent and restrain violations of 18 U.S.C. § 1962; an order divesting any person of any interest in the enterprise, and any reasonable restrictions on the future activities or investments of any person.

4.     At all material times, the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other things, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress

10

~~the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution.~~

~~5.     The Plaintiffs have been damaged and, unless the Defendants are enjoined, will continue to suffer the loss of their individual right to vote, freedom of speech, due process and equal protection under the laws and Constitution of the United States of America (Constitution).~~

## II. PARTIES

## PLAINTIFFS

~~6.     Plaintiff, Kevin O'Rourke, is a natural person, Virginian, American citizen, certified public accountant and independent auditor, having a place of abode and registered to vote in Virginia. The *Affidavit of Kevin Patrick O'Rourke* is attached hereto as Exh. 1, as though fully contained herein.~~

51.     Plaintiffs are an assembly of the people of the United States of America, appearing on their own behalf and of a class of similarly situated natural persons, registered to vote for the 2020 Presidential election, each of whom having attested through a notarized affidavit to their character, personal knowledge and belief, and damages caused by Defendants.

### *Alabama*

~~7.     Plaintiff, Nathaniel L. Carter, is a natural person, Michigander, African-American citizen, married, having a place of abode and registered to vote in Michigan.~~ ~~The *Affidavit of Nathaniel L. Carter* is attached hereto as Exh. 2, as though fully contained herein.~~

11

8.      Plaintiff, Lori Cutunilli, is a natural person, Coloradan, American citizen, business owner, having a place of abode and registered to vote in Colorado. The *Affidavit of Lori Cutunilli* is attached hereto as Exh. 3 is, as though fully contained herein.

9.      Plaintiff, Alvin Criswell, is a natural person, Alaskan, American citizen, retired, having a place of abode and registered to vote in Alaska. The *Affidavit of Alvin Criswell* is attached hereto as Exh. 4, as though fully contained herein.

10.      Plaintiff, Larry D. Cook, is a natural person, Californian, American citizen, author, having a place of abode and registered to vote in California. The *Affidavit of Larry Cook* is attached hereto as Plaintiffs' Exh. 5, as though fully contained herein.

11.      Plaintiff, Kesha Crenshaw, is a natural person, Michigander, African-American citizen, having a place of abode and registered to vote in Michigan. The *Affidavit of Kesha Crenshaw* is attached hereto as Exh. 6, as though fully contained herein.

12.      Plaintiff, Neil Yarbrough, is a natural person, Coloradan, African-American citizen, licensed real estate agent, having a place of abode and registered to vote in Colorado. The *Statement of Neil Yarbrough* is attached hereto as Exh. 7, as though fully contained herein.

52.      Plaintiff, Amie Trapp, is a natural person, Alabamian, American citizen, mother of nine, having a place of abode in the state of Alabama, after having recently moved from the state of Missouri, where the Plaintiff voted as a registered voter in Missouri.[14]

53.      Plaintiff, Peter Little, is a natural person, Alabamian, American citizen, having a place of abode and registered to vote in the state of Alabama.

---

[14] *See* Doc. 1-9

54.    Plaintiff, Susan Green, is a natural person, Alabamian, American citizen, having a place of abode and registered to vote in the state of Alabama.

### *Alaska*

55.    Plaintiff, Alvin Criswell, is a natural person, Alaskan, American citizen, retired, having a place of abode and registered to vote in Alaska.[15]

### *Arizona*

56.    Plaintiff, Bryan Tyner, is a natural person, Arizonian, American citizen, and has a place of abode, is registered to vote, and maintains his profession in the state of Arizona.

57.    Plaintiff, Wendy Kay, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

58.    Plaintiff, George Freeze, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

59.    Plaintiff, Johnny Torres, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

60.    Plaintiff, Cynthia St. Denis, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

61.    Plaintiff, Vincent Ferranti, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

62.    Plaintiff, Emmett McNeel, is a natural person, Arizonian, American citizen, having a place of abode and registered to vote in Arizona.

63.    Plaintiff, Audrey Leftwich, is a natural person, Arizonian, American citizen, having a place of abode registered to vote in Arizona.

---

[15] *See* Doc. 1-5.

13

64.   Plaintiff, Jason P. Bearce, is a natural person, Arizonian, American citizen, having a place of abode registered to vote in Arizona.

65.   Plaintiff, Laurie L. Bearce, is a natural person, Arizonian, American citizen, having a place of abode registered to vote in Arizona.

### *California*

66.   Plaintiff, Larry D. Cook, is a natural person, Californian, American citizen, author, having a place of abode and registered to vote in California.[16]

67.   Plaintiff, Catherine Davis is a natural person, Californian, Japanese-American citizen, teacher, farmer, mother, having a place of abode and registered to vote in the state of California.

68.   Plaintiff, Cheryl Caruso, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

69.   Plaintiff, Doralee Clement, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

70.   Plaintiff, Jack Geigle, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

71.   Plaintiff, Jerry Love, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

72.   Plaintiff, John Bannes, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

73.   Plaintiff, Kimberly Wilson, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

---

[16] *See* Doc. 1-6.

14

74.    Plaintiff, Edward Clement, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

75.    Plaintiff, David Attkisson, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

76.    Plaintiff, Gregory Andelin, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

77.    Plaintiff, Stephanie Seymour, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

78.    Plaintiff, Francis Bythel Gillham, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

79.    Plaintiff, Florita Toquero Sheldon, is a natural person, Californian, American citizen, having a place of abode and registered to vote in California.

### *Colorado*

80.    Plaintiff, Lori Cutunilli, is a natural person, Coloradan, American citizen, business owner, having a place of abode and registered to vote in Colorado.[17]

81.    Plaintiff, Neil Yarbrough, is a natural person, Coloradan, African-American citizen, licensed real estate agent, having a place of abode and registered to vote in Colorado.[18]

82.    Plaintiff, Jessica Bell, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

83.    Plaintiff, Josephine Helms, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Douglas County, Colorado.

---

[17] *See* Doc. 1-4.
[18] *See* Doc. 1-8.

84.     Plaintiff, Michelle Dobrovolny, is a natural person, Coloradan, American citizen, registered voter since 1983 and having voted in every election since the age of 18, having a place of abode and registered to vote in Adams County, Colorado.

85.     Plaintiff, Nicholas Chapman, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

86.     Plaintiff, Raymond Hess Jr., is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

87.     Plaintiff, Thomas Cooper, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

88.     Plaintiff, Claudia Graver, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

89.     Plaintiff, Brya Main, is a natural person, Coloradan, American citizen, mother and small business owner, having a place of abode and registered to vote in Colorado.

90.     Plaintiff, Joseph Dismont, is a natural person, Coloradan, American citizen, having voted in every election for the past 22 years, husband and small business owner, having a place of abode and registered to vote in Colorado.

91.     Plaintiff, Teri Dismont, is a natural person, Coloradan, American citizen, having voted in every election for the last 39 years, wife and small business owner, having a place of abode and registered to vote in Colorado.

92.     Plaintiff, Mark Hannahel, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

93.     Plaintiff, Sandra Miarecki, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in Colorado.

94.     Plaintiff, Carmen S. de Disse, is a natural person, Coloradan, American citizen, having a place of abode and registered to vote in the state of Colorado.

### *Connecticut*

95.     Plaintiff, Guy Cunningham, is a natural person, Connecticuter, American citizen, having a place of abode and registered to vote in Connecticut.

96.     Plaintiff, Julie Gloeckner, is a natural person, Connecticuter, American citizen, having a place of abode and registered to vote in Connecticut.

### *Delaware*

97.     Plaintiff, Steven Savini, is a natural person, Delawarean, American citizen, having a place of abode and registered to vote in Delaware.

98.     Plaintiff, Jesse Cifuni, is a natural person, Delawarean, American citizen, having a place of abode and registered to vote in Delaware.

### *Florida*

99.     Plaintiff, Michael Dion, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

100.    Plaintiff, Douglas Adams, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

101.    Plaintiff, Fermin Quinones, is a natural person, Floridian, American citizen, having a place of abode and registered as a Democrat to vote in Florida.

102.    Plaintiff, Cynthia Cagle, is a natural person, Floridian, American citizen, wife of a disabled veteran, 51-year-old female having voted in every election since becoming an adult,

17

mother and small business owner, having a place of abode and registered to vote in Florida.

103.    Plaintiff, Amy Lewis, is a natural person, Floridian, American citizen, having voted in every major election since she was 18, having a place of abode and registered to vote in Florida.

104.    Plaintiff, Allison Del Borrello, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

105.    Plaintiff, Andrew Dubois, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

106.    Plaintiff, Kenneth Belletti, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

107.    Plaintiff, Leslie Sexton, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

108.    Plaintiff, Micheal Cagle, is a natural person, Floridian, American citizen, disable veteran who served in the Armed Forces of the United States of American for approximately 26 years, having voted in every election since becoming a legal adult, husband, father and small business owner, having a place of abode and registered in Florida.

109.    Plaintiff, Patrice Vene, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

110.    Plaintiff, Anne Ziegenhorn, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

111.    Plaintiff, Seth Quinto, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in Florida.

112.    Plaintiff, Susan M. Parent, is a natural person, Floridian, American citizen, having a place of abode and registered to vote in the state of Florida.

### *Georgia*

> **Formatted:** Font: Bold, Italic, Underline

113.    Plaintiff, Lincoln Ong, is a natural person, Georgian, American citizen, having a place of abode and registered to vote in Georgia.

114.    Plaintiff, Diane Jackson, is a natural person, Georgian, American citizen, having a place of abode and registered to vote in Georgia.

### *Idaho*

115.    Plaintiff, Andrew Sarkany, is a natural person, Idahoan, American citizen, having a place of abode and registered to vote in Idaho.

### *Illinois*

> **Formatted:** Font: Bold, Italic, Underline

116.    Plaintiff, Kirsten Kelly-Vargas, is a natural person, Illinoisian, American citizen, a wife and mother of three boys, a small business owner, registered to vote as a Democrat, having a place of abode and registered to vote in Will County, Illinois.

117.    Plaintiff, Michael E. Zacher, is a natural person, Illinoisian, American citizen, having a place of abode and registered to vote in Illinois.

### *Indiana*

118.    Plaintiff, Rachel Douglas, is a natural person, Indianan, American citizen, having a place of abode and registered to vote in Indiana.

### *Kansas*

119.    Plaintiff, Michelle Salinas, is a natural person, Kansan, American citizen, having

a place of abode and registered to vote in Kansas.

120.     Plaintiff, Stefanie Collet, is a natural person, Kansan, American citizen, having a place of abode and registered to vote in the state of Kansas.

121.     Plaintiff, Michael L. Gilstrap, is a natural person, Kansan, American citizen, having a place of abode and registered to vote in the state of Kansas.

### *Louisiana*

122.     Plaintiff, Ashley Rivero, is a natural person, Louisianian, American citizen, having a place of abode and registered to vote in Louisiana.

123.     Plaintiff, Nelson Rivero, is a natural person, Louisianian, American citizen, having a place of abode and registered to vote in Louisiana.

124.     Plaintiff, Brian Mayard, is a natural person, Louisianian, American citizen, having a place of abode and registered to vote in Louisiana.

125.     Plaintiff, Tabbetha Langley, is a natural person, Louisianian, American citizen, mother, teacher and small independent business owner, having a place of abode and registered to vote in Louisiana.

### *Maryland*

126.     Plaintiff, Danique McPherson, is a natural person, Marylander, American citizen, having a place of abode and registered to vote in Maryland.

127.     Plaintiff, Monica Bowden, is a natural person, Marylander, naturalized American citizen, having a place of abode and registered to vote in the state of Maryland.

### *Massachusetts*

128.     Plaintiff, Lawrence Smetana, is a natural person, Massachusettsan, American

20

citizen, having a place of abode and registered to vote in Massachusetts.

129.    Plaintiff, Sheila Mello, is a natural person, Massachusettsan, American citizen, having a place of abode and registered to vote in Massachusetts.

130.    Plaintiff, Marjorie Spencer, is a natural person, Massachusettsan, American citizen, having a place of abode and registered to vote in Massachusetts.

### *Michigan*

131.    Plaintiff, Nathaniel L. Carter, is a natural person, Michigander, African-American citizen, married, having a place of abode and registered to vote in Michigan. [19]

132.    Plaintiff, Kesha Crenshaw, is a natural person, Michigander, African-American citizen, having a place of abode and registered to vote in Michigan. [20]

133.    Plaintiff, Alex Whitaker, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

134.    Plaintiff, Donald Bishop, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

135.    Plaintiff, Elizabeth Rozmariewicz, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

136.    Plaintiff, Glen Kaneko, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

137.    Plaintiff, Jane Bishop, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

138.    Plaintiff, Jose Suarez, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

---

[19] *See* Doc. 1-3.
[20] *See* Doc. 1-7.

139.     Plaintiff, Joseph Day, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

140.     Plaintiff, Michael Prieskorn, is a natural person, Michigander, American citizen, having a place of abode and registered to vote in the state of Michigan.

### *Minnesota*

141.     Plaintiff, John Baker, is a natural person, Minnesotan, American citizen, having a place of abode and registered to vote in the state of Minnesota.

### *Missouri*

142.     Plaintiff, William Hess, is a natural person, Missourian, American citizen, having a place of abode and registered to vote in the state of Missouri.

143.     Plaintiff, Laurie Nicewaner, is a natural person, Missourian, American citizen, having a place of abode and registered to vote in the state of Missouri.

### *Montana*

144.     Plaintiff, Tessa LaQua, is a natural person, Montanan, American citizen, having a place of abode and registered to vote in the state of Montana.

145.     Plaintiff, Heidi Benowitz, is a natural person, Montanan, American citizen, having a place of abode and registered to vote in the state of Montana.

### *Nebraska*

146.     Plaintiff, Lawrence Saager, is a natural person, Nebraskan, American citizen, having a place of abode and registered to vote in the state of Nebraska.

### *New Hampshire*

147.     Plaintiff, Bradford Hutchinson, is a natural person, New Hampshirite, American

22

citizen, having a place of abode and registered to vote in the state of New Hampshire.

### *New York*

148.    Plaintiff, Katrina Leavens, is a natural person, New Yorker, American citizen, having a place of abode and registered to vote in the state of New York.

149.    Plaintiff, Rosemary Kolynich, is a natural person, New Yorker, American citizen, having a place of adobe and registered to vote in the state of New York.

150.    Plaintiff, Sandra Cicotta, is a natural person, New Yorker, American citizen, having a place of abode and registered to vote in the state of New York.

151.    Plaintiff, Angelia Ebbecke, is a natural person, New Yorker, American citizen, having a place of abode and registered to vote in the state of New York.

152.    Plaintiff, Connie Scruton, is a natural person, New Yorker, American citizen, having a place of abode and registered to vote in the state of New York.

### *North Carolina*

153.    Plaintiff, Dianne Bornia, is a natural person, North Carolinian, American citizen, having a place of abode and registered to vote in the state of North Carolina.

154.    Plaintiff, Henry Allen, is a natural person, North Carolinian, American citizen, having a place of abode and registered to vote in the state of North Carolina.

155.    Plaintiff, Michael Bornia, is a natural person, North Carolinian, American citizen, having a place of abode and registered to vote in the state of North Carolina.

156.    Plaintiff, Stanley Latta, is a natural person, North Carolinian, American citizen, having a place of abode and registered to vote in the state of North Carolina.

157.    Plaintiff, Linda Purcell, is a natural person, North Carolinian, American citizen, having a place of abode and registered to vote in the state of North Carolina.

**Formatted:** Font: Bold, Italic, Underline

### *Ohio*

158.    Plaintiff, James Hanson, is a natural person, Ohioan, American citizen, having a place of abode and registered to vote in the state of Ohio.

159.    Plaintiff, Kathleen Hanson, is a natural person, Ohioan, American citizen, having a place of abode and registered to vote in the state of Ohio.

160.    Plaintiff, Stephanie Stephens, is a natural person, Ohioan, American citizen, having a place of abode and registered to vote in the state of Ohio.

### *Oklahoma*

161.    Plaintiff, Jeff Paulk, is a natural person, Oklahoman, American citizen, having a place of abode and registered to vote only the state of Oklahoma.

162.    Plaintiff, Roman Leader, is a natural person, Oklahoman, American citizen, having a place of abode and registered to vote only the state of Oklahoma.

### *Oregon*

163.    Plaintiff, Elaine Redner, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

164.    Plaintiff, Kerri Rosenblatt, is a natural person, Oregonian, American citizen, having voted in every major election since the legal age of 18, having a place of abode and registered to vote in the state of Oregon.

165.    Plaintiff, Laird Holder, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

166.    Plaintiff, Richard McBride, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

167.    Plaintiff, Kevin Smith, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

168.    Plaintiff, Delynn Edwards, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

169.    Plaintiff, Christopher Edwards, is a natural person, Oregonian, American citizen, having a place of abode and registered to vote in the state of Oregon.

*Pennsylvania* ~~The *Statement of Amie Trapp* is attached hereto as Exh. 8, as though fully contained herein.~~

170.    Plaintiff, Denise Weston, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Pennsylvania.

171.    Plaintiff, Dominica Ayala, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Pennsylvania.

172.    Plaintiff, George Mitchell, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Pennsylvania.

173.    Plaintiff, Henry Rutkowski, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Allegheny County, Pennsylvania.

174.    Plaintiff, Owen Burk, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Pennsylvania.

175.    Plaintiff, Robert McCarthy, is a natural person, Pennsylvanian, American citizen, husband, veteran with an honorable discharge, served 25 years as a police officer and served 28 years as a police officer with the Federal Protective Service, having a place of abode and registered to vote in Pennsylvania.

176.    Plaintiff, Robert Weston, is a natural person, Pennsylvanian, American citizen,

Formatted: Font: Bold, Underline

having a place of abode and registered to vote in Pennsylvania.

177.    Plaintiff, Corey Olsen, is a natural person, Pennsylvanian, American citizen, having a place of abode and registered to vote in Pennsylvania.

### *Rhode Island*

178.    Plaintiff, Vincent Fava, is a natural person, Rhode Islander, American citizen, having a place of abode and registered to vote in Rhode Island.

### *South Carolina*

179.    Plaintiff, Jennifer Williams, is a natural person, South Carolinian, American citizen, having a place of abode and registered to vote in South Carolina.

180.    Plaintiff, Me'shell Miller, is a natural person, South Carolinian, American citizen, having a place of abode and registered to vote in South Carolina.

181.    Plaintiff, Stacy Lang, is a natural person, South Carolinian, American citizen, mother of four adult children, having a place of abode and registered to vote in South Carolina.

182.    Plaintiff, William Schwaibold, is a natural person, South Carolinian, American citizen, having a place of abode and registered to vote in South Carolina.

### *Tennessee*

183.    Plaintiff, Deborah Falin, is a natural person, Tennessean, American citizen, having a place of abode and registered to vote in South Carolina.

### *Texas*

184.    Plaintiff, Bella Stevenson, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

185.    Plaintiff, Mildred Smith, is a natural person, Texan, American citizen, having a

place of abode and registered to vote in Texas.

186.   Plaintiff, David Smith, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

187.   Plaintiff, Janet Roe, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

188.   Plaintiff, Lyle Smith, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

189.   Plaintiff, Randall Hodges, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

190.   Plaintiff, Gregory Hollmann, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

191.   Plaintiff, James Lupo, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

192.   Plaintiff, Jeffery Rogers, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

193.   Plaintiff, Veronica Watts, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

194.   Plaintiff, Cynthia Hedger, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

195.   Plaintiff, Dony J. Watts, is a natural person, Texan, American citizen, having a place of abode and registered to vote in Texas.

***Utah***

196.    Plaintiff, Cameron Abbaticchio, is a natural person, Utahn, American citizen, having a place of abode and registered to vote in Utah.

197.    Plaintiff, Suzanne Abbaticchio, is a natural person, Utahn, American citizen, having a place of abode and registered to vote in Utah.

198.    Plaintiff, Mark Martin, is a natural person, Utahn, American citizen, having a place of abode and registered to vote in Utah.

199.    Plaintiff, Kevin L. Kempton, is a natural person, Utahan, American citizen, having a place of abode and registered to vote in the state of Utah.

200.    Plaintiff, Evelyn E. Kempton, is a natural person, Utahan, American citizen, having a place of abode and registered to vote in the state of Utah.

### *Virginia*

201.    Plaintiff, Kevin O'Rourke, is a natural person, Virginian, American citizen, certified public accountant and independent auditor, having a place of abode and registered to vote in Virginia.[21]

202.    Plaintiff, Matthew Chitty, is a natural person, Virginian, American citizen, having a place of abode and registered to vote in Virginia.

203.    Plaintiff, Katherine Evans, is a natural person, Virginian, American citizen, having a place of abode and registered to vote in Virginia.

### *Washington*

204.    Plaintiff, Sean Rathgeber, is a natural person, Washingtonian, American citizen, having a place of abode and registered to vote in Washington.

205.    Plaintiff, Roger Knight, is a natural person, Washingtonian, American citizen,

---

[21] See Doc. 1-2

having a place of abode in the state of Washington and has registered to vote in King County, Washington on July 2, 1977, two days after his 18th birthday, and has voted in almost every election since.

206.     Plaintiff, Brianna Jones Mattes, is a natural person, Washingtonian, American citizen, having a place of abode and registered to vote in Washington.

207.     Plaintiff, Michael Sherman, is a natural person, Washingtonian, American citizen having a place of abode and registered to vote in Washington.

### *West Virginia*

208.     Plaintiff, Melissa Mitchell, is a natural person, West Virginian, American citizen, building maintenance technician and secure escort with a TS clearance for the US Consulate in Shanghai, having a place of abode and registered to vote in Berkley County, West Virginia.

### *Wisconsin*

209.     Plaintiff, Raymond Krahn, is a natural person, Wisconsinite, American citizen, having a place of abode and registered to vote in the state of Wisconsin.

210.     Plaintiff, Frank Hall, is a natural person, Wisconsinite, American citizen, having a place of abode and registered to vote in the state of Wisconsin.

### *Wyoming*

211.     Plaintiff, Lynn Erickson, is a natural person, Wyomingite, American citizen, having a place of abode and registered to vote in the state of Wyoming.

212.     Plaintiff, Cheryl Aguiar, is a natural person, Wyomingite, American citizen, having a place of abode and registered to vote in the state of Wyoming.

13.

## DEFENDANTS

14.213. Defendant, DOMINION VOTING SYSTEMS, INC. (Dominion), is a corporation organized under the laws of the State of Delaware, registered as doing business at 1201 18th Street, Suite 210, Denver, COColorado, 80202-1421.

15.214. Defendant, FACEBOOK, INC. (Facebook), is a corporation organized under the laws of the State of Delaware, a publicly traded company, doing business at 1601 Willow Road, Menlo Park, CA 94025. Facebook's businesses are in technologies that facilitate digital communications, including Facebook Blue, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and, WhatsApp, which provides mobile messaging servicespublicly traded, with registered offices located at 1900 W. Littleton Blvd., Littleton, Colorado 80120.

16.215. Defendant, MARK E. ZUCKERBERG (Mr. Zuckerberg), is a resident of California and the chief executive officerCEO of Facebook.

17.216. Defendant, PRISCILLA CHAN (Ms. Chan), is a resident of California.

18.217. Defendant, CENTER FOR TECHTECHNOLOGY AND CIVIC LIFE (CTCL), is a non-profit organization, organized under the laws of the State of Illinois, with its principleprincipal offices at 233 North Michigan Ave, No. 1800, Chicago, IL 60601.

19.218. Defendant, BRIAN KEMP (Mr. Kemp), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Governor of the State of Georgia.

20.219. Defendant, BRAD RAFFENSPERGER (Mr. Raffensperger), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Secretary of State of the State of Georgia.

220. Defendant, CHRIS CARR (Carr), is a resident of Georgia, and is named in his

official capacity as the Attorney General of the State of Georgia.

21.221. Defendant, GRETCHEN WHITMER (Ms. Whitmer), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Governor of the State of Michigan.

22.222. Defendant, JOCELYN BENSON (Ms. Benson), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the State of Michigan.

223.    Defendant, DANA NESSEL (Nessel), is a resident of Michigan, and is named in her official capacity as the Attorney General of the State of Michigan.

23.224. Defendant, TOM WOLF (Mr. Wolf), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of his official authority as Governor of the Commonwealth of Pennsylvania.

24.225. Defendant, KATHY BOOCKVAR (Ms. Boockvar), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the Commonwealth of Pennsylvania.

226.    Defendant, JOSH SHAPIRO (Shapiro), is a resident of Pennsylvania, and is named in his official capacity as the Attorney General of the State of Pennsylvania.

227.    Defendant, TONY EVERS (Mr. Evers), is a resident of Wisconsin, personally liable for his individual conduct, acting under color of his official authority as Governor of Wisconsin.

25.228. Defendant, JOSH KAUL (Kaul), is a resident of Wisconsin, and is named in his official capacity as the Attorney General of the State of Wisconsin.

26.229. Defendants, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN,

31

JULIE M. GLANCEY, DEAN KNUDSON, and ROBERT F. SPINDELL, JR., are all residents

of Wisconsin, personally liable for their individual conduct, acting under color of their official

authority as members of the Wisconsin Elections Commission (WEC Defendants).

27.230. DOES 1 – 10,000 are herein named as co-conspirators, agents, employees or

contractors, as their involvement in the enterprise is discovered though the course of this action.

**III. JURISDICTION**

28.231. Jurisdiction of the Court is invoked under from Article III, Section 2 of The the

Constitution of the United States of America (Constitution). U.S. Const., Art. III, § 2.

29.232. Plaintiffs, as representatives of the people, have standing to exercise all rights

reserved thereto under the Constitution. U.S. Const., amend IV, X.

30.233. The Court has subject matter jurisdiction pursuant to the Supremacy Clause of the

Constitution, wherein state laws or actions violating federal rights are invalid and subject to

declaratory judgment. U.S. Const., Art. VI, cl. 2.

31.234. Jurisdiction over the Defendants arises pursuant to 28 U.S.C. §§ 1331(a) (federal

question), 1332 (diversity), 1343(a) (civil rights), and 2201-02 (declaratory judgment); and,

under the Constitution.

32.235. This Court also has jurisdiction over any common law claims pursuant to this

Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

33.236. This Court is authorized to issue permanent injunctive relief requested under Rule

65 of the Federal Rules of Civil Procedure.

34.237. Jurisdiction of this Court in vindication of rights arises under 42 U.S.C § §§ 1983,

1985, 1986 and 1988, which also authorizes the Court to issue injunctive relief.

238.    Jurisdiction of this Court to prevent and restrain violations of section 18 U.S.C. §

1962 is established under 18 U.S.C. §§ 1964(a) and (c).

~~35.~~239. Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b), and 18 U.S.C. § 1695

because a substantial part of the acts and omissions occurred within the District of Colorado~~,~~.

Defendants conduct their affairs in Colorado, and have agents located in Colorado. .

~~IV~~

## IV. CLASS ALLEGATIONS

240.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a),

23(b)(2), and 23(c)(4), on behalf of themselves and the following "Nationwide Class:"

> All registered voters who were eligible to cast a ballot in the 2020 election for President and Vice President, and includes registered voters from each state and territory of the United States of America.

241.    Plaintiffs assert claims on behalf of a subclass of registered voters that shall

constitute the "Republican Voter Subclass," defined as follows:

> All voters that are registered to vote under the "Republican Party" who cast a ballot in the 2020 election for President and Vice President, and includes registered voters from each state and territory of the United States of America.

242.    Plaintiffs assert claims on behalf of a subclass of registered voters that shall

constitute the "Democrat Voter Subclass," defined as follows:

> All voters that are registered to vote under the "Democrat Party" who cast a ballot in the 2020 election for President and Vice President, and includes registered voters from each state and territory of the United States of America.

243.    Plaintiffs assert claims on behalf a subclass of registered voters that shall

constitute the "Third-Party Voter Subclass," defined as follows:

> All voters that are registered to vote under a "Third Party" who cast a ballot in the 2020 election for President and Vice President, and includes registered voters from each state and territory of the United States of America.

244.    Plaintiffs assert claims on behalf a subclass of registered voters that shall

**Formatted:** Font color: Text 1

**Formatted:** No widow/orphan control

**Formatted:** Font color: Text 1

**Formatted:** Font color: Text 1

**Formatted:** Font color: Text 1

constitute the "Independent Voter Subclass," defined as follows:

> All voters that are registered to vote as an Independent who cast a ballot in the 2020 election for President and Vice President, and includes registered voters from each state and territory of the United States of America.

245.   Plaintiffs assert claims on behalf a subclass of registered voters that shall constitute the "'Discouraged' Voter Subclass," defined as follows:

> All voters that are registered to vote in the 2020 election, who chose not to cast a ballot because they believed the election process established to administer the 2020 Presidential election had been corrupted, and that their vote would be diluted, discarded or disregarded.

246.   The Nationwide Class, Republican Voter Subclass, Democrat Voter Subclass, Third-Party Voter Subclass, Independent Voter Subclass, and Discouraged Voter Subclass are hereinafter referred to collectively as the "Classes."

247.   The Classes consist of millions of registered voters that make up the people of the United States of America, and whose rights and interests have been directly burdened.

248.   Due to the overwhelming size of the Classes, joinder of all members of the Classes is impracticable pursuant to Fed. R. Civ. P. 23(a)(1).

249.   The exact size of the Classes and the identities of the members are ascertainable through government voter registration rolls maintained as a matter of record.

250.   The claims of Plaintiffs are typical of the Classes and respective Subclasses.

251.   The claims of Plaintiffs and the Classes are based on the same legal theories, pattern of conduct, unconstitutional behavior, and other predicate acts of the enterprise, resulting in the damages and the loss of the protected rights of the Plaintiffs and Classes.

252.   The questions of law and fact are common to the claims of Plaintiffs and the

Classes, and those questions predominate over any that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

253.    Common questions of fact and law affecting Plaintiffs and the members of the Classes include, but are not limited to, the following:

a.    Whether Defendants engaged in a scheme and enterprise to improperly interfere with the 2020 Presidential election, by the use of devices and methods that affected or diluted the Plaintiffs' right to vote in a free and fair Presidential election;

b.    Whether Defendants used the US Mail to further their scheme and enterprise and improperly interfere with the 2020 Presidential election;

c.    Whether Defendants engaged in a scheme and enterprise to use electronic means and wire communication, to carry out its purpose to improperly interfere with election administration, ballot adjudication, tabulation, and transmission;

d.    Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by employing their scheme and enterprise aimed at the election machinery;

e.    Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by engaging in censorship of political and dissenting speech;

f.    Whether Defendants engaged in a pattern and practice of electioneering and interference in the federal election process, aimed at a specific Presidential and Vice Presidential candidate;

g.    Whether Defendants engaged in a pattern and practice of electioneering and interference in the election process, aimed or directed to benefit one major political party, to the of determent the other, including third parties, thus affecting the integrity of the political and Presidential election process for all registered voters;

h.    Whether Defendants violated laws against racketeering and organized crime, as codified under the federal RICO statutes, codified at 18 U.S.C. § 1962;

i.    Whether Dominion intentionally or negligently offered for use a defective product, technology and other services, through interstate commerce, that directly affected the voting rights of the Plaintiffs and other members of the Classes;

j.      Whether Dominion intentionally or negligently allowed foreign or domestic interference in the election tabulation or transmission of election results;

k.      Whether Dominion, acting as a foreign entity to the United States, was influenced by foreign actors, participated with foreign actors to interfere with, or allowed interference with the election process, to the determent of the national security of the United States;

l.      Whether Facebook and Zuckerberg used its global presence as a social media platform to censor, limit access to, omit, conceal and tamper with political or dissenting speech in favor of one political ideology, over all others;

m.      Whether Facebook's use of its social media platform to censor, limit access, omit and conceal content on its platform in favor of one political ideology, over all others, violates the platform's provisions and immunities created under Section 230, as a matter of applied constitutionality;

n.      Whether Facebook and Zuckerberg's use of its global presence as a social media platform, and its censorship tactics and scheme, to contribute to and influence one major political party, over the other, including third parties, burdening the freedoms and liberties of the Plaintiff and the Classes, and limiting access to information concerning a vital public interest, i.e., the election and retention of the President and Vice President;

o.      Whether Zuckerberg and Chan used Facebook, and their other so-called charitable entities, as alter egos to advance and fund the scheme and enterprise, aimed at the election machinery of the United States, as a whole;

p.      Whether the Defendants engaged in conduct designed to conceal, suppress access to, obstruct and obfuscate the peoples' access to election records, voting machines, tabulation software, and other critical information to ensure the accuracy and transparency needed to verify election results and instill confidence in the Presidential election process;

q.      Whether the Defendants engaged in censorship, suppression of and concealment of the scheme and participants in the enterprise;

r.      Whether the Defendants had knowledge of Dominion's defective products and services, and improperly influenced or sanctioned their implementation or use;

s.      Whether the Defendant politicians, herein, knowingly participated in, or negligently allowed, the scheme and enterprise to interfere with, exercise control over, or manipulate ballot tabulation and transmission in their respective states;

t.      Whether the Defendant politicians, herein, knowingly participated in, or negligently allowed, the scheme and enterprise to allow Facebook, Zuckerberg, Chan, CTCL and others, to improperly and illegally interfere with, exercise control over and administer important parts of the 2020 Presidential election inside the borders of their respective states;

u.      Whether the Defendant politicians ratified the enterprise's pattern and practice of electioneering, manipulation of election laws, and numerous RICO violations;

v.      Whether the unlawful collection, breach of chain of custody, interception, improper tampering with election ballots constitutes predicate acts of mail fraud;

w.      Whether the electronic manipulation through ballot adjudication, use of weighting algorithms, foreign adjudication transmission, interference with tabulations and other electronic ballot and vote manipulation constitutes predicate acts of wire fraud.

254.    Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would be denied an effective remedy.

255.    The class treatment of common questions of law and fact is superior to multiple individual actions, mass-joinder of parties, piecemeal litigation at a state or federal district level—particularly as it relates to the right to vote for the President and Vice President, federal election laws and administration, federal election interference, campaign contributions, and the violations of constitutionally protected rights under the supreme law of the land.

256.    A class action conserves the resources of the courts and the litigants, efficiently consolidates experts and investigative resources, and promotes the consistency and efficiency of adjudication.

257.    Absent a class action, the prosecution of separate actions would foster inconsistent enforcement of rights, varying adjudication with respect to individual class members or Classes and would create inefficient use of expert and investigatory resources establishing incompatible standards and practices for the parties opposing the Classes and would substantially

impede the ability of the Classes to protect and preserve their rights.

258.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.

259.    Plaintiffs have retained counsel with experience in prosecuting federal litigation and constitutional actions, have committed the resources necessary to dedicate staff and technological resources to adequately communicate with and vigorously prosecute this action on behalf of the other Class members, and have the financial resources to do so.

260.    Plaintiffs and counsel have committed to include and cooperate with any class members that choose to be represented by independent counsel and have created an internal culture of communication and cooperation necessary to effectively expand the legal team necessary to litigate the size and inclusion of a substantial and diverse number of subclasses.

261.    Counsel has investigated and continues to investigate the evolving landscape of the 2020 Presidential election, the past and current court decisions, the cases, controversies and investigations that are pending at the time of the filing of this Amended Complaint and has a good faith belief that this litigation is well founded in fact and that full adjudication of these matters is necessary to modify or reverse existing law, if necessary.

262.    Undersigned counsel has been contacted by a significant number of potential class members seeking to be designated as part of the Classes, or who have expressed interest in joining the lawsuit, by and through providing government issued ID, contact information, and preparing sworn affidavits of the injuries to rights sustained by the actions of the Defendants.[22]

---

[22] *See* Ex. 13, Declaration of Plaintiffs' Counsel

263.    Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Classes, and seek to protect the unalienable rights and civil rights of all subclasses effectively, and without prejudice to each subclass.

264.    Counsel for Plaintiffs have received an overwhelming response from prospective class members requesting to join the class.[23]

## V. GENERAL ALLEGATIONS

### DOMINION

36.265. Dominion is one of three election technology vendors that currently make up more than 80 percent of the voting machines in the United States.[24]

37.266. Dominion's technology, in various forms, reached 71 Million Voters,During the 2020 Presidential election, Dominion provided services, and is involved in 1635equipment to 28 states, and more than 1,300 jurisdictions, including 9 of the largest 20 counties, in the United States as of 2016. [25]

---

[23] *Id.*

[24] Ben Popken, *Voting Machine Makes Face Questions from House Lawmakers—But More Remain*, NBCNews.com, Jan. 9, 2020.

[25] Penn Wharton Public Policy Initiative, *The Business of Voting, Market Structure and Innovation in the Election Technology Industry*, University of Pennsylvania, 2017.



Figure 2b: **Vendor Marketplace Coverage by Number of Eligible Voters**

*Note: Only vendors that reach more than 500,000 registrants are included.*

38.    Dominion is owned by DOMINION VOTING SYSTEMS CORP. (Dominion Corp), a Canadian corporation, established in 2003.

267.    Dominion provides election support services, which include initial project implementation, election set-up, ballot layout, machine set-up, system testing, Election Day support, training, machine maintenance, project management and ongoing election consulting.

39.268.In 2018, Dominion Corp was acquired by its senior management team and STAPLE STREET CAPITAL GROUP, L.L.C. (Staple Street).

**Formatted:** Font color: Text 1

**Formatted:** No widow/orphan control

40.    On December 6, 2019, U.S. Senator Elizabeth Warren, and other members of the Senate Banking, Housing, and Urban Affairs Committee, sent a letter to Staple Street requesting information about the role private equity investment in Dominion has played in the creation and perpetuation of concerns regarding "vulnerabilities and a lack of transparency in the election technology industry."[26]

---

[26] In the letter, the Senators expressed concern about the "secretive and 'trouble-plagued companies,' owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, 'having long skimped on security in favor of convenience,' leaving voting systems across the country 'prone to security problems.'" *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, December 10, 2019.

~~41.    In an April 2020 letter in response to the request made by the House Committee Administration, CEO of Dominion Corp, John Poulos, confirmed that the corporation is 75.2% owned by Staple Street, and that he, a Canadian citizen, holds a 12% stake, with no other investor owning more than a 5% stake in the corporation.[27]~~

269.    ~~Scholars~~Staple Street owns approximately 75% of Dominion.

270.    Staple Street is a private equity firm founded in 2009 based in New York, allowing sale of the share equity in Dominion to foreign interests and influence.

271.    The Chief Executive Officer of Dominion, John Poulos, a Canadian citizen, owns approximately 12% of Dominion, creating foreign interference in the American election process.

272.    In early 2020, the Dominion voting system was rejected by the Texas Board of Elections, after the examiner reports raise concerns about whether Dominion's Democracy Suite 5.5A system is suitable for its intended purpose, operates efficiently and accurately, and is safe from fraudulent or unauthorized manipulation.

273.    During the 2020 Presidential election, Dominion's software was vulnerable to data manipulation by unauthorized means, and permitted data to be altered across the country.

274.    Based upon information and belief, as result of systemic and ~~industry experts have concluded that ballot-marking devices, generally, including~~widespread exploitable vulnerabilities in Dominion's software, during the 2020 Presidential election, significant numbers of votes across the country were transferred from President Trump to President Biden.

**Formatted:** Font color: Text 1

**Formatted:** Font color: Text 1

~~https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf  See Jessica Huseman, *The Market for Voting Machines Is Broken. This Company Has Thrived in It*, ProPublica, October 28, 2019. See also Frank Bajak, *US Election Integrity Depends on Security-Challenged Firms*, Associated Press, October 28, 2019.~~

[27] ~~Ali Swenson, *Family of Hugh Chavez Does Not Own Dominion Voting System*, Associated Press, December 1, 2020.~~

275.    For example, on or about April 4, 2019, Kemp, signed a bill that, among other things, granted Dominion an estimated $150 million multi-year contract to replace Georgia's voting machines.

276.    During Georgia's June 9, 2020, statewide primary, and August 11 runoff, Dominion's equipment and services created a wide range of well-known and publicly disclosed vulnerabilities.

277.    During said primaries and runoff, Dominion, through its equipment, employees, procedures and contractors, created operating system risks, failed to harden its computers, demonstrated lax control of memory cards, a lack of procedures, and potential for remote access.

278.    This conduct of unworkmanlike service and lack of quality control continued throughout the 2020 Presidential election across jurisdictions where Dominion was administering the Presidential election of its state and county customers.

279.    For example, only days before the 2020 Presidential election in Fulton County, Georgia's most populated county, Dominion updated the software of its ballot marking device ('BMD') touchscreen units.

280.    The methods and processes adopted by Dominion in Fulton County do not meet national standards for managing voting system technical problems and remedies, and should not have been accepted for use in a public election under any circumstances.

42.    BMDs used by Dominion:

a.281.    produce ballots that do not necessarily record the vote expressed by the voter when they enter their selections on the touchscreen;

b.282. Dominion's BMDs are associated with known risks, which include hacking, bugs

and configuration errors that can cause the voting machine to print votes that differ from what the voter entered and verified electronically.

e.283. Dominion's BMDs are not defensible, because there is no way to generate convincing public evidence that reported outcomes are correct despite any malfunctions that might have occurred.

d.284. Dominion's BMDs are not software independent, and can mark a ballot after the voter has inspected it.

e.285. the original transaction, i.e., the A voter's expression of the votes is not documented in a verifiable way; and, on Dominion's BMDs.

f.286. The accuracy of Dominion's BMDs cannot ensurebe ensured through an audit that the reported outcome is correct.

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3, September 17, 2020.

43. In early 2020, the Dominion voting system was rejected by the Texas Board of Elections, after the "examiner reports raise concerns about whether the Democracy Suite 5.5A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation."[28]

287. Other experts have opined that Dominion's election management system (EMS) is

---

[28] Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy Suite 5.5 A*, State of Texas, January 24, 2020.

Democracy Suite®.

288.    Democracy Suite® EMS software is vulnerable to data manipulation by unauthorized means, and permits data to powers the choice of Imagecast® devices offered by Dominion that, among other things, scan, mark ballots and tabulate results.

289.    Physical ballots, which include absentee and mail-in ballots not created by a Dominion BMD, are scanned into the Dominion's Imagecast® system.

290.    The Imagecast® system classifies ballots into two categories: 1) Normal ballots, and 2) adjudicated ballots.

291.    Adjudicated ballots are the digital scans of physical ballots that are flagged by the system's artificial intelligence, separated for later adjudication to determine the voter's intent.

44.292.Ballots sent to adjudication can be altered in states across the country: by administrators,

I conclude with high confidence that the election 2020 data were altered in all battleground states resulting in hundreds of thousands of votes that were cast for President Trump to be transferred to Vice President Biden. These alterations were the result of systemic and widespread exploitable vulnerabilities in DVS, Scytl/SOE Software and Smartmatic systems that enabled operators to achieve the desired results. In my view, the evidence is overwhelming and incontrovertible.[29]

293.    Adjudication files can be moved between different Results Tally and Reporting terminals (RTR) with no audit trial of which administrator actually adjudicated the ballot batch, designated for adjudication.

294.    Dominion's EMS provides no meaningful observation of the adjudication process, or audit trial concerning which administrator actually adjudicates the ballots, or the choice of which ballots required adjudication.

---

[29] See Declaration of Dr. Navid Keshavarez-Nia (Doc. No. 1, Exh. 19), *King, et al., v. Whitmer, et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 9.

295.     The adjudication process allows an administrator, or other person with access to a particular Dominion EMS, to manually manipulate votes.

296.     Dominion's adjudication software is patented.

297.     Dominion routinely enters into Software License Agreements, between itself and State and county customers that contract for its services and products, which require the State or county to pay a license fee, and outlines policies and procedures for not disclosing, to any third party, any information concerning Dominion's software and other proprietary products and services.

298.     Dominion's Software License Agreements required the customer to acknowledge that Dominion's software and related documentation constitutes confidential and proprietary trade secrets, exempt from disclosure under any applicable freedom of information or open public records act.

299.     Dominion's Software License Agreements prohibit the customer from altering or modifying the software.

300.     Dominion EMS software can be altered and/or modified.


301.     During the 2020 Presidential election, Dominion's EMS intentionally generated an enormously high number of ballot errors in multiple jurisdictions across the country.

302.     During the 2020 Presidential election, this greater number of ballot errors lead to bulk adjudication of ballots with no oversight or audit trail.

303.     Dominion's EMS uses Election Markup Language (EML).

304.     EML is susceptible to cross sit scripting (XSS) attacks.

305.     XSS is a web security vulnerability that allows an attacker to compromise the

interactions that users have with a vulnerable application, which includes an outside attacker's ability to carry out any actions that the user is able to perform, and access to any of the user's data.

306.    For example, Maricopa County, Arizona, the state's most populated county, is the only county in the state that contracts for the services and products of Dominion.

307.    Maricopa has 748 voting precincts, and approximately 2,599,000 registered voters.

308.    Maricopa utilizes equipment provided by Dominion, which includes the ImageCast®X (BMD), Imagecast®Precinct (Ballot Scanning Device).

309.    In Maricopa, for the 2020 Presidential election, mail-in and absentee ballots were processed by Dominion's Imagecast®Central, a batch-fed, central ballot scanner and tabulator.

310.    In Maricopa, for the 2020 Presidential election, physical ballots, absentee and mail-in ballots were scanned by commercial off-the-shelf (COTS) scanners, into Dominion's Imagecast®Central.

311.    The Imagecast®Central workstation is connected to the EMS Local Area Network for uploading results to the EMS server and the Adjudication module.

312.    Every county in the United States in which Dominion administered the 2020 Presidential election had and used an Imagecast®Central workstation.

313.    Dominion machines experienced extraordinarily high error rates forcing adjudication in multiple jurisdictions in the 2020 Presidential election.

314.    For example, there were over 200,000 adjudicated ballots in Maricopa County, Arizona.

315.    Additionally, there were approximately 210,000 adjudicated ballots in Clark

46

County, Nevada.

316.   There were over 106,000 adjudicated ballots (approximately 94%) in Fulton County, Georgia.

317.   Georgia's Gwinnette County reported that all or virtually all of its 5,900 batches of ballots were adjudicated.

318.   Antrim County, Michigan observed an adjudication error rate over 68%.

319.   Federal standards for acceptable error rates limit adjudications to 0.0008%.

320.   Mail in ballot rejection rates were also historically low in key states despite record numbers of mail in ballots being cast.

321.   For example, Georgia experienced 6.5% rejection rates in 2016, but only 0.03% in 2020.

322.   Pennsylvania rejected 1% in 2016, but only 0.03% in 2020.

323.   Michigan rejected 0.5% in 2016, but only 0.1% in 2020.

324.   Most of the States in which Dominion administers their elections, do not have laws and regulations concerning the above-described adjudication and voting counting process.

## FACEBOOK

45. 325. Facebook is the largest social media platform for real-time interaction and dissemination of information across the internet.

326.   Facebook has created a virtual public forum on its platforms for interactivity among and between users numbering approximately ten times the U.S. population.

327.   Facebook is also an advertised partner and funder of CTCL.

46. 328. According to the Federal Trade Commission (FTC), Facebook is the world's

47

dominant online social network with more than three billion people regularly using Facebook's services to connect to friends and family.[30]

47.329. According to the FTC, Facebook and its ~~Chief Executive Officer, Mr.~~ CEO Zuckerberg, have maintained a monopoly position through anti-competitive means reflecting ~~Mr. Zuckerberg's~~ Zuckerberg 's view that "it is better to buy the competition than to compete."[31]

48.330. ~~Additionally,~~ Facebook has ~~come~~ been under congressional scrutiny ~~by the scheduled October 28, 2020, Congressional Hearing~~ related to its status as a neutral media platform under Section 230 of the Communications Decency Act.[32]

331. Senior Facebook Engineer, Brian Amerige, posted to an internal employee message board, "We are a political monoculture that's intolerant of different views."[33]

332. Other employees have been pressured to leave Facebook for contributing to political organizations that are in opposition to the ideals of Zuckerberg, Chan and other senior leadership of Facebook.[34]

49.333. Facebook asserts protection from civil liability for its "Good Samaritan" blocking of content *it* considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected. ~~47 U.S.C. § 230(c)(2)(A).~~

---

[30] *See Federal Trade Comm., v. Facebook, Inc.*, Case 1:20-cv-03590 (D.D.C. 2020).

[31] *Id.* at ¶ 5.

[32] Press Release, *Committee to Hold Hearing with Big Tech CEOs on Section 230*, U.S. Senate Committee on Commerce, Science & Transportation, Oct. 16, 2020.

[33] Kate Conger and Sheera Frenkel, *Dozens at Facebook Unite to Challenge Its 'Intolerant' Liberal Culture*, New York Times, (Aug. 28, 2018) ("We claim to welcome all perspectives, but are quick to attack-often in mobs-anyone who presents a view that appears to be in opposition to left-leaning ideology.")

[34] Nick Wingfield, *Oculus Founder Plots a Comeback With a Virtual Border Wall*, New York Times (Jun. 4, 2017).

50.334.Although Mr. Zuckerberg appeared supportive of changes to Section 230, Facebook continues to censor conservative voices and coverage related to election-irregularities in the 2020 Presidential election, and election integrity, generally.

335.   At all material times, Facebook employs algorithms to automatically censor posts based upon words that Zuckerberg and the employees of Facebook find offensive to their political agenda, which create pop-up notifications that allegedly "fact-check" the post, with a warning label.

336.   Prior to the 2020 Presidential election, Facebook censored important information that would have exposed misdeeds, scandal, and possible involvement of their preferred Presidential candidate with foreign entanglements, which violated the First Amendment rights of the Plaintiffs and members of the Classes.[35]

337.   Facebook and Zuckerberg's monopoly of the public social media square has created enormous power that it wields against any business, or political foe to censor what it deems otherwise objectionable regardless of constitutional protections on speech or the economic harm it causes to its users.

338.   Facebook has been censoring conservative political viewpoints for years, governed only by complex, self-serving and self-written "rules."

339.   In advance of the 2020 election, Facebook and Zuckerberg began a systematic plan to increase censorship to stifle opposing viewpoints, and shape election information to align with its preferred narrative.

340.   In January 2020, Facebook began censoring information it believed would delegitimize the US election or question the veracity of mail-in voting.

---

[35] Marl Moore, *Post's Expose on Hunter Biden Soars Online Despite Social Media Censorship*, N.Y. Post, October 20, 2020.

341.    In June 2020, Facebook announced that it would censor material it deemed objectionable, even if newsworthy.

342.    By September 2020, Facebook heighted its level of censorship to significant news stories deemed by Facebook to be negative toward President Biden.

343.    Following the election, Facebook routinely censored information from the President of the United States, and entire news organizations.

344.    Facebook and Zuckerberg continue to censor election information after the election, including terms or phrases like "voter fraud" or "election fraud."

345.    This Presidential election censorship is now under federal investigation.[36]

346.    A poll of voters related to eight specific issues involving Facebook and Zuckerberg's preferred candidates, and determined that 17% of registered voters would have changed their vote had they been made aware of any one of the censored stories.[37]

51.347. Facebook has burdened the Plaintiffs' rights to free speech, free press, and online assembly, based upon the favored political and health related preferences of Defendants, Mr. Zuckerberg and Ms. Chanits CEO.

52.348. At all material times, Facebook has actively disseminated political and health related content that supports the narrow and monolithic cultural and political views of the Defendants, Mr. Zuckerberg and Ms., Chan, and theother executives and employees of Facebook.

---

[36] Evan Perez and Pamela Brown, *Federal Criminal Investigation into Hunter Biden Focuses on His Business Dealing in China*, CNN Politics, December 10, 2020.

[37] Jordan Davidson, *Poll: One in Six Would Have Changed Their Vote if They Had Known About Scandals Suppressed By Media*, The Federalist, November 24, 2020.

**Formatted:** No widow/orphan control

53.     Facebook employs algorithms to automatically censor posts based upon words that Defendant, Mr. Zuckerberg, and his employees find offensive to their political agenda, which create pop-up notifications that allegedly fact-check the post, with a warning label.

54.349. The conduct of Facebook precludes protection under the "publisher" exclusion set forth in 47 U.S.C. § 230(c)(1).

### ~~MARK~~ ZUCKERBERG and CHAN

55.350. ~~Defendant, Mr.~~ Zuckerberg, ~~is only the third person on Earth to exceed a~~ and Chan (also an executive with Facebook) are married with net worth ~~of~~exceeding $100 Billion.[38]

56.351. ~~Defendants, Mr.~~ Zuckerberg and ~~Ms.~~ Chan, have used their alter-ego, Facebook, to dominate the competition in business, and now in politics, by funding their political ideology through alleged philanthropic charities, and other civic minded entities, such as CTCL.[39]

57.352. ~~Defendants, Mr.~~ Zuckerberg and ~~Ms.~~ Chan, have pledged 99 percent of their shares and profits from Facebook to their philanthropic efforts, which include extraordinary donations to non-profit organization that share their political ideologies.[40]

**The New York Times**

---

[38] Tanza Loudenback, Liz Knueven and Taylor Niclole Rogers, *Mark Zuckerberg just became the third person on Earth worth over $100 billion. Here's how the Facebook CEO makes and spends his fortune*, Business Insider, Aug. 6, 2020.

[39] Nicholas Riccardi, *Mark Zuckerberg Donates $100M More to Help Election Offices*, Assoc. Press, October 13, 2020 ("The contribution brings the total funding for the election from Zuckerberg and Chan to $400 million — the same amount that Congress allocated in March to help fund election offices as they dealt with the difficulties of adapting to new voting behavior during the coronavirus pandemic.")

[40] Reuters Staff, *Facebook's Zuckerberg to give 99 percent of shares to charity*, Reuters, Dec. 1, 2015.

51

## How Would You Give Away Your Fortune?

By THE NEW YORK TIMES UPDATED December 2, 2015



58.353.In Concerning the 2020, Mr. Presidential election, and as a part of the enterprise described, Zuckerberg and Ms. Chan donated over $400 million to Defendant, CTCL and the other organizationorganizations, such as, the Center for Election Innovation and Research and the Chan and Zuckerberg Initiative.

59. Here, afterAfter receiving the funds from Mr.Zuckerberg and Ms.Chan, CTCL in turn granted millions of dollars to selectcertain cities and counties, across the country.[41]

60. As a non-profit, CTCL represents to the public that it is "bi-partisan."

61.354. CTCL's executive directors and board members are progressives, and primarily register Democrat.[42]

62.355.As a reporter for the New York Times observed:

The prospect of election administrators tapping large pools of private money has

---

[41] Scott Walter, *What is Mark Zuckerberg's Election Money Doing in Georgia?* The Federalist, December 7, 2020.

[42] The founders of CTCL, Ms. Tiana Epps-Johnson, Donny Bridges and Whitney May, were co-workers at the New Organizing Institute, dissolved in 2015, and described as "the Democratic Party's Hogwarts for digital wizardry." Brian Fung, *Inside the Democratic Party's Hogwarts for Digital Wizardry*, Washington Post, April 24, 2019.

raised new legal and political questions. That is partly because it is unusual for elections to be subsidized by nongovernment funding at this level, but also because most of the cash is coming from nonprofit groups that have liberal ties, and the biggest source of the cash, ~~Mr.~~ Zuckerberg, has drawn fire from across the political spectrum.[43]

~~Kenneth P. Vogel, *Short of Money to Run Elections, Local Authorities Turn to Private Funds, New York* Times, September 25, 2020.~~

~~63.~~356.Through their donations to CTCL, and other entities, ~~Mr.~~ Zuckerberg and ~~Ms.~~ Chan have created ~~a~~and participated in an enterprise and, scheme ~~and an~~, organized as a device to provide funding to pursue their political ideology, which in turn is used as a part of the governmental function of holding an election—while stifling the speech of ~~the~~ political opposition on Facebook.

~~64.      The founder and Executive Director of CTCL, Ms. Tiana Epps-Johnson, holds a Fellowship with the Obama Foundation, was a director of the progressive New Organizing Institute, a Democratic grassroots election training group, and sits on the Board of Directors for the Center for Civic Design.[44]~~

~~65.~~357.The actions of ~~Defendants, Mr.~~ Zuckerberg and ~~Ms.~~ Chan, have been coordinated to use private donations to the CTCL, and other alter-egos, to fund public functions, in a scheme that deprives the ~~people~~Plaintiffs and members of Classes in unfunded areas of equal protection under law.

~~66.~~1.     Senior Facebook Engineer, Brian Amerige, posted to an internal employee

---

[43] Kenneth P. Vogel, *Short of Money to Run Elections, Local Authorities Turn to Private Funds*, New York Times, (Sept. 25, 2020).
~~[44] *See* Scott Walter, *Georgia Election Officials, a Billionaire, and the "Nonpartisan" Center for Tech & Civic Life*, Capital Research Center, November 27, 2020.~~

message board, "We are a political monoculture that's intolerant of different views."[45]

358. Senior Facebook Engineer, Brian Amerige, posted to an internal employee message board, "We are a political monoculture that's intolerant of different views."[46]

67.359. Other employees have been pressured to leave Facebook for contributing to political organizationorganizations that are in opposition to the ideals of Mr. Zuckerberg, Chan, and theother senior leadership of Facebook.[47]

68.360. The funds received from Facebook, Zuckerberg and Chan, and funneled through CTCL, and others, were administered and directed to strategic Democrat stronghold precincts that were recruited to seek grant funding, based on and in accordance with the most effective counties, as determined by certain secretaries of state,enterprise's agenda—and with knowledge of their agenda and the impactthat it would have oninfluence the 2020 presidentialPresidential election.

69.361. The unconstitutional acts and omissions of the other Defendants would not have been possible without the funding provided by Mr. Zuckerberg and Ms. Chan, which was funneled through their alter-ego, CTCL, and others, for the intended purpose of improperly influencing the 2020 presidentialPresidential election to benefit themselves, and others supportive of their political ideology.

70.362. Through the combination of the censorship by Mr. Zuckerberg and Facebook, and

---

[45] Kate Conger and Sheera Frenkel, *Dozens at Facebook Unite to Challenge Its 'Intolerant' Liberal Culture*, New York Times, (Aug. 28, 2018) ("We claim to welcome all perspectives, but are quick to attack often in mobs anyone who presents a view that appears to be in opposition to left-leaning ideology.")

[46] Kate Conger and Sheera Frenkel, *Dozens at Facebook Unite to Challenge Its 'Intolerant' Liberal Culture*, New York Times (Aug. 28, 2018) ("We claim to welcome all perspectives, but are quick to attack often in mobs- anyone who presents a view that appears to be in opposition to left-leaning ideology.")

[47] Nick Wingfield, *Oculus Founder Plots a Comeback With a Virtual Border Wall*, New York Times, June (Jun, 4, 2017.).

the use of alter-egos to fund Mr. Zuckerberg and Ms. Chan's political ideology through extraordinary donations to local counties and election administrators, Mr. Zuckerberg and Ms. Chan have directly funded a scheme to unlawfully and unconstitutionally interfere with a presidentialthe 2020 Presidential election, in violation of the Constitution and multiple state election laws.[48]

71.363.At all relevant times, Defendants, Mr.Zuckerberg, Ms,Chan and CTCL, inextricably wove themselves into the presidential2020 Presidential election, which effected all unconstitutionally burdened the rights of the Plaintiffs and the states in the Union, qualifyingClasses, qualifies their concerted conduct as actionablestate action under the Civil Rights Act.

72.364.CTCL was instrumental in providing vote-by-mailfunneling conditional election funding, from donations received from Mr.Zuckerberg and Ms., Chan, their alter-ego, Facebook, and others in the technology industry, to manipulate the election machinery in key precincts under the false excusepremise of COVID-19 pandemic relief.

365.    Zuckerberg and Chan sourced grant funding provided to local communities was restricted by contract with CTCL and the terms and conditions of the grant, including directing specific unconstitutional action by state actors.

73.366. These grants were also considered additional "support" to city and county election offices, who were primarily involved in the unlawful conduct asserted by the State of Texas in their *Motion for Leave to File Bill of Complaint,* filed with theits U.S. Supreme Court

---

[48] The Director of CTCL also serves as the Executive Director of the Colorado County Clerks Association with direct access to the Colorado County Voting apparatus, and sits on the board of another of Mr. Zuckerberg and Ms. Chan's donee's, Center for Election Innovation and Research. The Executive Director and President of CTCL leads a "team that is doing groundbreaking work to make US elections more inclusive and secure."

complaint.[49]

74.367.AFor example, a general break down of the grants awarded in the relevantfour battleground states, herein, include:

a.  **Georgia Counties**: Cobb ($5.6M), Fulton (6M), Gwinnett (4.2M), Dougherty (300K), Macon-Bibb (557K);

b.  **Michigan Counties**: Wayne (3.5M), Ann Arbor (417K), Flint (467K), Lansing (443K), Muskegon (433K), Pontiac (405K), and Saginaw (402K);

c.  **Pennsylvania Counties**: Alleghany (2.02M), Berks (471K), Centre (863K), Delaware (2.2M), and the City of Philadelphia (10M);

d.  **Wisconsin Counties**: Cities Milwaukie (2.15M), Madison (1.27M), Green Bay (1.09M), Kenosha (862K), Racine (942K), and Janesville (183K).[50]

75.368.The unconstitutional conduct of these DefendantsZuckerberg and Chan includes, but is not limited to: :

a.  funding and directing the use of funds for unmanned ballot boxes in violation of state and federal law, to bypass and intercept the United Statesballots otherwise required to be sent and delivered by the US Mail;

b.  unequally funding and directing the use of funds for wage increases and bonuses for poll workers and canvassers;

c.  funding, facilitating and directing the use of funds for the purchase of voting machines, software, high speed vote tabulators, and voting booths;

d.  funding and directing the use of funds for the training and recruitment of poll workers, many of whom participated in a conspiracy to influence the presidential2020 Presidential election, but all of whom owed a duty to perform a governmental function of providing a free and fair election for the people of the United States—not the politicalPresidential favorite of Mr. Zuckerberg, Ms. Chan and others involved in the enterprise; and,

e.  actively suppressing the speech of others who disagreedisagreed with the views held by the monoculture of Facebook, its chief executive officerZuckerberg, Chan and others in the enterprise, both before and after the 2020 presidentialPresidential election.

---

[49] *Texas v. Pennsylvania*, case 22O155 (U.S. filed Dec. 7, 2020).
[50] https://ballotpedia.org/Non-profits_providing_vote_by_mail_support_to_city_and_county_election_offices.

Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font: 12 pt, Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font: Times New Roman, 12 pt, Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font: Times New Roman, Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: No widow/orphan control, Tab stops: Not at 1"
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: No widow/orphan control, Tab stops: Not at 1"
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Signature block line, Indent: First line: 0", No widow/orphan control
Formatted: Font color: Text 1
Formatted: No widow/orphan control, Tab stops: Not at 1"
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font color: Text 1
Formatted: Font: 10 pt
Formatted: Font: 10 pt

369.    This conduct in furtherance of a conspiracy, scheme, and device, ~~that~~ burdens the rights of every registered voter in America~~, was implemented in.~~

~~76.~~370. The enterprise targeted municipalities and counties where documented election fraud and irregularities have historically occurred.

~~77.     Prior to the election, Defendants, Facebook and Mr. Zuckerberg, censored important information that would have exposed misdeeds, scandal, and possible involvement of their preferred candidate, which violated the Plaintiffs' First Amendment rights.[51]~~

~~78.     This pre-election censorship is now under federal investigation.[52]~~

~~79.     The Media Research Center conducted a poll of voters related to eight specific issues involving Facebook and Mr. Zuckerberg's preferred candidates, and determined that 17% of said voters would have changed their vote had they been aware of the censored information.[53]~~

~~80.     Facebook and Zuckerberg continue to censor election information including, any post related to President Trump, and any user on Facebook that uses the phrase "voter fraud" or "election fraud" is similarly censored.~~

~~81.~~371 Facebook and Zuckerberg have engaged in such conduct as part of a larger scheme and device to improperly and unconstitutionally interfere with ~~a federal~~ the 2020 Presidential election—which continued after election night, and presently continues as an unconstitutional effort to sway the electorate ~~in a presidential election.~~ and burden the rights and

---

[51] ~~Marl Moore, *Post's Expose on Hunter Biden Soars Online Despite Social Media Censorship,* N.Y. Post, October 20, 2020.~~

[52] ~~Evan Perez and Pamela Brown, *Federal Criminal Investigation into Hunter Biden Focuses on His Business Dealing in China,* CNN Politics, December 10, 2020.~~

[53] ~~Jordan Davidson, *Poll: One in Six Would Have Changed Their Vote if They Had Known About Scandals Suppressed By Media,* The Federalist, November 24, 2020.~~

free speech.

82.372.A private corporation can be fairly be said to bebecome a state actor for purposes of the Civil Rights Act, if there is a sufficiently close nexus between the state and the challenged action of the private entity, so that the action of the latter may fairly be treated as that of the state itself. *Blum v. Yaretshy*, 457 U.S. 991, 1004 (1982).[54]

373.   At all material times, Facebook, Zuckerberg and Chan were state actors, subject to 42 U.S.C. § 1983.

**CENTER FOR TECH AND CIVIC LIFE**

83.374.Defendant, CTCL is a non-profit organization providing federal election grants to local governments.

84.375.On its website, CTCL's mission includes training public election officials in communication and technology and to inform and mobilize voters.

376.   CTCL states it is "claims to be a team of civic technologists, trainers, researchers, election administration and data experts working to foster.

377.   As a more informednon-profit, CTCL represents to the public that it is bipartisan.

378.   CTCL represents that it helps election officials adopt the tools and engaged democracy,skills necessary to meet the changing needs of today's public.

379.   CTCL claims to offer election officials affordable opportunities to expand their communication and helping to modernizetechnology skills through tools and trainings.

380.   CTCL claims its assistance allows election officials to conduct more trustworthy and inclusive elections, troubleshoot and prepare for problems in advance of Election Day, better inform their community with the information they need in order to vote, and increase civic

---

[54] *Blum v. Yaretshy*, 457 U.S. 991, 1004 (1982).

participation.

381.    CTCL offers various training courses to election officials.

382.    CTCL claims to help election officials use free tech solutions (e.g., Facebook) to promote civic engagement and make voting easier.

85.383.CTCL's executive directors and board members are progressives" and primarily registered Democrats.[55]

384.    The founder and Executive Director of CTCL, Ms. Tiana Epps-Johnson, holds a Fellowship with the Obama Foundation, was a director of the progressive New Organizing Institute, a Democratic grassroots election training group, and sits on the Board of Directors for CTCL.[56]

86.385.The founders of CTCL all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democrat campaigns in digital campaigning strategies.

87.386.NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012.

88.387.FundersOther funders of CTCL include groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

---

[55] The founders of CTCL, Ms. Tiana Epps-Johnson, Donny Bridges and Whitney May, were co-workers at the New Organizing Institute, dissolved in 2015, and described as "the Democratic Party's Hogwarts for digital wizardry." Brian Fung, *Inside the Democratic Party's Hogwarts for Digital Wizardry*, Washington Post (Apr. 24, 2019).
[56] *See* Scott Walter, *Georgia Election Officials, a Billionaire, and the "Nonpartisan" Center for Tech & Civic Life*, Capital Research Center, (Nov. 27, 2020).

89.388.CTCL is associated with Rock the Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections.

90.389.Along with Rock the Vote and The Skoll Foundation, CTCL also lists Facebook as a partner in their efforts.

91.390.CTCL is a progressive organization that targets urban cities for its private federal election grants to turn out the progressive vote in those urban cities.

92.391.On or after September 1, 2020, CTCL received approximatelyover $250 million from Defendants, Mr. Zuckerberg and Ms. Chan.

93.392.CTCL used that money for federal election grants to local election offices as "COVID-19 response grants."

94.393.On its website, CTCL stated:

(CTCL) is excited to expand our COVID-19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants toreceived grant applications from over 2,500 local election jurisdictions across the country to help ensure youthey have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

95.394.In 2020, DefendantConcerning the 2020 Presidential election, CTCL provided private federal election grants to cities and counties in Pennsylvania, Wisconsin, Michigan and Georgia.

96.395.Said states doStates did not directly accept CTCL's private elections grants.

97.396.To accomplish its objectives, Defendant, CTCL, circumvented these state'sStates' legislatures, and recruited local governments to apply and agree to accept CTCL's private federal election grants, and their terms and conditions.

98.397.CTCL's private federal election grants to counties and cities in Michigan, Wisconsin, Pennsylvania and Georgia were not approved by Congress, nor by the respective

state legislatures of the ~~states, herein listed~~States.

~~99.~~398. In the *Help America Vote Act* (HAVA), Congress left discretion to the ~~states~~States on how to implement federal elections.[57]

~~100.~~399.    HAVA preempts CTCL's private federal election grants to the cities and counties.

~~101.~~400.    Under HAVA, and the Supremacy Clause of the Constitution, CTCL's private ~~federal election~~ grants are not legally authorized by federal law, nor the laws of the states, herein.

~~102.~~401.    Public-private partnerships are constitutionally impermissible in federal elections.

~~103.~~402.    CTCL private ~~federal elections~~ grants a constitutionally impermissible public-private partnership.

~~104.~~403.    The entanglement of public and private interests involved with cities and counties accepting and using CTCL's private ~~federal election~~ grant ~~are unconstitutionally~~is constitutionally impermissible.

~~105.~~404.    Federal and state governments exclusively fund federal elections to eliminate undue influence and the appearance of undue influence by private parties.

~~106.~~405.    CTCL's private funding ~~of federal elections~~ appeared to and, in fact, did unduly influence the 2020 ~~presidential~~Presidential election.

~~107.~~406.    Congress enacted the *National Voter Registration Act* (NVRA)[58] to create "national procedures for voter registration for elections for ~~Federal~~federal office." ~~52 U.S.C. § 20503~~.

---

[57] *See* 52 USC §§ 20901-21145.
[58] *See* 52 U.S.C. §§ 20501-20511.

407. NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for, or renew a driver's license, and requires states to forward the completed application to the appropriate state or local election official.

408. NVRA provides that citizens can register to vote by mail using mail-in forms developed by each state and the Election Assistance Commission (EAC).

409. The purpose of the NVRA was to coordinate federal and state administration of voter registration for federal elections, and to create legally authorized, nationwide, and uniform standards for voter registration.

410. NVRA does not legally authorize local governments to accept private grants for voter registration.

411. NVRA's preemption prohibits local governments from accepting private grants for voter registration.

412. Under NVRA, the EAC is to be bipartisan and work with all the states in a bipartisan way on voter registration for federal elections.

413. CTCL's private grants circumvent the EAC and the States, and thus conflicts with NVRA.

414. CTCL's private grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

415. The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally authorized method, that is

approved by the ~~states~~States under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration funding.

~~117.~~416. Local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration, which is not approved by the EAC, or the ~~states~~States.

~~118.~~417. States are not allowed to deviate from the NVRA.

## THE ELECTION

~~119.~~418. On November 3, 2020, a ~~presidential~~Presidential election was held in every state of the Union (Election).

~~120.~~419. Leading up to the Election, the ~~Defendants~~enterprise conspired to change election laws, without consent of the people acting through their respective state legislatures.

~~121.~~420. At all relevant times prior to and after the Election, in violation of the Constitution, Facebook, at the direction of ~~Mr.~~ Zuckerberg, censored certain media, press releases, articles, opinions and posts concerning the Election.

~~122.~~421. During the late evening of November 3, 2020, many of the so-called "swing states~~," where~~" were reporting election results in favor of ~~the incumbent presidential candidate~~President Trump.

~~123.~~422. Thereafter, a number of states prematurely stopped counting ballots.

~~124.~~423. During the early morning hours of November 4, 2020, the Defendants' preferred presidential candidate received a statistically impossible spike in votes.

424.    ~~Dominion~~ Despite reported "irregularities" and ~~voting machines were used in over 1600 counties across~~ voting machine "glitches," election reporting concluded that President Biden had won ~~the United States, many~~ the election.

425.    Facebook quickly began censoring any reports of ~~which were set to flag a high rate~~ election fraud, including actual evidence of ~~ballots for~~ fraud.

426.    Rather than expose the inner workings of their machine to examination and audit, Dominion filed several lawsuits against vocal critics of Dominion's machine reliability to intimidate others from making similar claims.

427.    State officials quickly moved to certify the results, and maintained claims of election security.

~~125.~~428.    Despite submission of nearly 1,000 affidavits relating to potential election fraud, reports of foreign interference and hacking, abnormally high ballot adjudication~~, which could then be used to alter~~ rates, unusually low mail-in ballot rejection rates, and numerous election result anomalies, President Biden was ultimately inaugurated with little discussion or ~~delete votes in favor of one candidate.~~ investigation.

~~126.~~429.    The combination of unconstitutional acts and omission by the Defendants, ~~as~~ through an enterprise described herein, has created a constitutional crisis, destroyed the people's faith in elections, violated the rights of millions of people, weakened national security, triggered financial uncertainty and mental anguish, and increased the possibility of civil and world war, all of which has proximately caused damage to the Plaintiffs~~, and every registered voter similarly situated~~ and members of the Classes.

## MICHIGAN

~~127.~~430.  In 2018, the Michigan constitution was amended to allow all registered voters the right to request and vote by absentee ballot without giving a reason. ~~Mich. Const. art. 2, § 4.~~

~~128.~~431.  On May 19, 2020, ~~Defendant, Ms.~~ Benson, announced that the secretary of state would send unsolicited absentee-voter ballot applications by mail to all 7.7 million registered Michigan voters, prior to the primary and general elections.

~~129.~~432.  ~~Ms.~~ Benson's acts and omissions failed to ensure that Michigan's election systems and procedures were adequate to ensure the accuracy and legality of the historic flood of mail-in votes.[50]

~~130.~~433.  ~~In fact, Ms.~~ Benson's acts and omissions ~~"did away with~~removed protections designed to deter voter fraud.~~" Texas v. Pennsylvania, ¶ 81.~~

~~131.~~434.  ~~As alleged by~~Benson used the ~~State of Texas, joined by 20 other states in the Union,        Ms. Benson's "flooding of~~US Mail to flood Michigan with millions of absentee ballot applications prior to the 2020 general election violated~~"~~ Michigan law.~~ Id.~~

~~132.~~435.  M.C.L. § 168.759(3), states:

An application for an absent voter ballot under this section may be made in any of the following ways:

a.    By a written request signed by the voter;

b.    On an absent voter ballot application form provided for that purpose by the clerk of the city or township; and,

c.    On a federal postcard application.

~~133.~~436.  The Michigan Legislature did not include the secretary of state as a means

---

[50] ~~See~~ ~~Motion for Leave to File Bill of Complaint, Texas v. Pennsylvania, case 22O155, (U.S. filed Dec. 7, 2020) (Texas v. Pennsylvania), ¶ 81.~~

for distributing through the US Mail unsolicited absentee ballots without application by a voter. *Id.* at § 168.759(3)(b).

134.437.   Under the statute's plain language, the Legislature explicitly gave only local clerks the power to distribute absentee voter ballots, upon application. *Id.*

135.438.   Because the Legislature declined to explicitly include the secretary of state as a vehicle for distributing absentee ballots applications, Defendant, Ms. Benson, "" lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan." *Texas v.* through the mail *Pennsylvania*, ¶ 84.

136.439.   In June 2020, Defendant, Ms. Benson, also violated Michigan law when she launched a program allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. *Id.* at ¶ 85.

137.440.   The Michigan Legislature did not approve or authorize Ms. Benson's unilateral actions. *Id.*

138.441.   MCL § 168.759(4) states in relevant part:

An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application.

139.442.   Further, MCL § 168.761(2) states in relevant part:

The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot, and if the signatures do not agree sufficiently or [if] the signature is missing the ballot must be rejected.

140.443.   Ms. Benson's "unconstitutional modifications of Michigan's election rules resulted in the distribution of millions of absentee ballot applications without verifying voter

signatures as required by MCL §§ 168.759(4) and 168.761(2)." *Texas v. Pennsylvania*, ¶ 89. ).

141.444.    Democrats in Michigan voted by mail at a ratio of approximately two to one compared to Republican voters.

142.445.    Defendant, Ms. Benson, "without legislative approval, unilaterally abrogated Michigan election statutes related to absentee ballot applications and signature verification." *Id.* at ¶ 79. .

143.446.    Michigan's Legislature has not ratified these changes, and Michigan's election laws do not include a severability clause." *Id.*

144.447.    Michigan also requires that poll watchers and inspectors have access to vote counting and canvassing. M.C.L. §§ 168.674-.675. *Id.* at ¶ 90.

145.448.    Local election officials in Wayne County made a conscious and express policy decision not to follow M.C.L. §§ 168.674-.675 for the opening, counting, and recording of absentee ballots. *Id.* at ¶ 91.

449.    Dominion voting machines used in Michigan perform ballot adjudication through proprietary software and make decisions regarding which ballots require further adjudication electronically, which cannot be observed by poll watchers.

146.450.    Michigan also has strict signature verification requirements for absentee ballots, including that the Elections Department place a written statement or stamp on each ballot envelope where the voter signature is placed, indicating that the voter signature was in fact checked and verified with the signature on file with the State. *See* MCL § 168.765a(6).

147.451.    However, Wayne County made the policy decision to ignore Michigan's statutory signature verification requirements for absentee ballots. *Id.* at ¶ 93.

148.452. Thus, one presidential candidate, over the rest, materially benefited from those unconstitutional changes to Michigan's election law, who happens to be the choice of those involved in the scheme and device to interfere with the federal election process.

149.453. As is outlined in *Texas v. Pennsylvania*During the 2020 Presidential election in Michigan, numerous poll challengers and an Election Department employee whistleblower have testified that the signature verification requirement was ignored in Wayne County. *Id.* at ¶ 94.[60]

150. In *Johnson v. Benson*, Jesse Jacob, a decades-long City of Detroit employee assigned to work in the Elections Department for the 2020 election testified that:

a. absentee ballots that were received in the mail would have the voter's signature on the envelope;

b. while I was at the TCF Center, he was instructed not to look at any of the signatures on the absentee ballots; and that,

c. he was instructed not to compare the signature on the absentee ballot with the signature on file.[61]

151.454. The TCF was the only facility within Wayne County authorized to count ballots for the City of Detroit. *Texas v. Pennsylvania*, ¶ 95.

152.455. These non-legislative modifications to Michigan's election statutes resulted in a number of constitutionally tainted votes that far exceeds the margin of voters separating the presidential candidates in Michigan. *Id.* at ¶ 96.

153.456. AdditionalAdditionally, public information confirms the materialadverse impact on theto election integrity of the votein Wayne County, caused by theseunconstitutional

---

[60] *See Johnson v. Benson*, Petition for Extraordinary Writs & Declaratory Relief, Case No. 162286, (Mich. 2020), ¶ 71, 138-39, App. 25a-51a.

[61] *Id.*, Affidavit of Jessy Jacob, App. 14 at ¶ 15.

68

changes to ~~Michigan's~~Michigan election law. *Id.* at ¶ 97.

~~154.~~457. For example, the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit. *Id., Cicchetti Decl. at ¶ 27, App. 8a.*

~~155.~~458. The number of votes not tied to a registered voter by itself exceeds the margin of victory of the announced winner of the presidential election by more than 28,377 votes. *Id.* at ¶ 97.

~~156.~~459. The extra ballots cast ~~most likely~~ resulted from ~~the phenomenon of~~ Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations. *Id.* at ¶ 97, and App. 25a-51a.

~~157.~~460. After the election, "County Board of Canvassers ("Canvassers Board"), William Hartman, determined that 71% of Detroit's Absent Voter Counting Boards ("AVCBs") were unbalanced—*i.e.*, the number of people who checked in did not match the number of ballots cast—without explanation." *Id.* at ¶ 99, and App. 25a-51a, at ¶ 29.

~~158.~~461. On November 17, 2020, the Canvassers Board deadlocked 2-2 over whether to certify the results of the ~~presidential~~Presidential election based on numerous reports of fraud and unanswered material discrepancies in the county-wide election results. *Id.* at ¶ 100.

~~159.~~462. A few hours later, the Republican Board members reversed their decision and voted to certify the results after severe harassment, including threats of violence. *Id.*

~~160.~~463. The following day, the two Republican members of the Board *rescinded their votes* to certify the vote and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious

irregularities in Detroit votes are resolved. *Id.* at ¶ 100, Cicchetti Decl. at ¶ 27, App. 8a.

161.464. As determined by the State of Texas and many other states in support thereof, "[r]egardlessRegardless of the number of votes that were affected by the unconstitutional modification of Michigan's election rules, the non-legislative changes to the election rules violates the Electors Clause." *Id.* at ¶ 100.

162.465. "There exists sufficient evidence to place in doubt [Michigan's] presidential Presidential election results in identified key counties, including issues with transparency, fraudulent changing of dates, a software glitch, clerical errors, illegal votes, and many other issues and irregularities."[62].

163.466. Additionally, Defendants, Mr. Zuckerberg, Ms. Chan and their alter-egos, Facebook and CTCLthe enterprise, funneled approximately $9.8 million to ten different, predominately Democrat, counties across the state of Michigan.

164.467. This infusion of private money created an unfair, two-tier election system, which caused disparate treatment of voters and thus violated the civil and constitutional rights of millions of Michiganders and American citizens.[63]

165.468. The money paid by Mr. Zuckerberg and Ms. Chan, through CTCL, was used to:

    a.    Pay ballot harvesters;

    b.    Fund mobile ballot pick-up units;

    c.    Deputize and pay political activists to manage ballots;

---

[62] Verified Complaint for Declaratory and Injunctive Relief (Doc. 1), *Bally v. Whitmer*, case 1:20-cv-1088 (W.D. Mich. filed Nov. 11, 2020), ¶ 44.

[63] *See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson*, case MSC No. 162286 (Mich. filed Nov. 26, 2020).

d. Pay poll workers, election judges, i.e., inspectors and adjudicators;

e. Establish drop-boxes to bypass and intercept the ~~United States~~U.S. Mail~~.~~;

f. Establish other satellite offices;

g. Pay local election officials and agents "hazard pay" to recruit cities recognized as Democrat Party strongholds to apply for the non-profit grants;

h. Consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots without legally required observation;

i. Implement a two-tiered ballot curing plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

j. Subsidize and design a scheme to remove poll watchers from one political party so that the critical responsibility of counting the ballots could be done without oversight.[64]

~~166.~~469.    After an election, the secretary of state ~~"on the receipt of the~~receives certified copies of the ~~statements of votes~~county vote totals given in the several counties.~~" lays "before the board the statements received by [her] of the votes given at such election in the several counties." Mich. Code § 168.843~~.

~~167.~~470.    Thereafter, ~~t~~he Board of State Canvassers (Board) examines the ~~statements~~vote totals received by the secretary of state ~~of the votes cast in the several counties~~, and prepares a statement showing the total number of votes cast for all candidates. ~~Mich. Code §§ 168.841-845~~.

---

[64] ~~Id., Expert Report of James Carlson, App. 245-276.~~



168.    According to a Republican board member, the Board of State Canvassers duty is "ministerial," and there's "nothing in the law that gives me the authority to request an audit or block certification."[65]

169.471.    On November 23, 2020, the board The Board certified Michigan's election for President Biden.

472.    The members of the board Board are executive officers under the supervision of the Governor, the latter of which.

170.473.    The Michigan Governor is elected and sworn to uphold the Constitution.

171.474.    On November 23, 2020, Defendant, Ms. Gretchen Whitmer, (Whitmer), with knowledge of the numerous election irregularities and unconstitutional behavior of officers in her administration, released the following statement after the Michigan State Board of Canvassers voted to certify the results of the November 2020 election:

> I commend the three members of the State Board of Canvassers who voted to follow the law and certify the 2020 election results today. The people of Michigan have spoken. President-elect Biden won the State of Michigan by more than 154,000 votes, and he will be our next president on January 20th. I also want to thank Secretary of State Jocelyn Benson and the local clerks across Michigan who made sure this year's election was free, fair and secure, and the voters who turned out in record numbers to make their voices heard. Now, it's time to put this election behind us and come together as a state to defeat our common enemy: COVID-19.

475.    Thereafter, on December 14, 2020, Michigan's 16 electoral college delegates unanimously voted in support of the Democrat candidates for president President Biden.

172.476.    On December 1, 2020, a memo from the Michigan Bureau of Elections, overseen by Benson, ordered Michigan clerks to delete Electronic Poll Book software and vice-

---

[65] Ari Beerman, *In a Blow to Trump, Michigan's Canvassing Board Certifies Election Results*, Mother Jones, Nov. 23, 2020.

president.[66]associated data.

477.   On On December 4, 2020, following reports of a voting machine "glitch" that allegedly flipped 5,000 votes from Trump to Biden, a court order was issued to preserve the Dominion machines and electronic data in the county, and to allow expert auditors to inspect the sequestered machines.

478.   On December 9, 2020, Benson, moved for a protective order to conceal the results of the examination—which was initially granted, but later removed by the court.

479.   On December 13, 2020, the Michigan Attorney General, Dana Nessel, tweeted:



**Dana Nessel** ✓
@dananessel

Fun fact: Lawyers who practice in Michigan are required to take an oath to support the MI and US Constitutions, not to file unjust and/or frivolous actions or mislead the court. The spate of Trump lawsuits in our state violates each of these tenets. It demeans our profession.

same day

173.480.   On December 16, Allied Security Operations Group "(ASOG"), released a report of anthe audit of the Dominion voting machines and software used in Antrim County, Michigan, in the 2020 election ("(ASOG Report").[67] A copy of the Revised Preliminary Summary V2 is attached hereto as Plaintiff's Exh. 9, as though fully contained herein. ).

174.481.   The ASOG Report concludesconcluded;

Dominion Voting System is intentionally and purposefully designed with inherent

_____

[66] Dave Boucher, Michigan's Electoral College delegates cast all 16 votes for Joe Biden, Kamala Harris, Detroit Free Press, Dec. 14, 2020. See also Pat Droney, Governor Whitmer Has Police, 200 Troops Block Republican Electors From Michigan State Capital, Law Enforcement Today, December 14, 2020.

[67] William Bailey v. Antrim County, case 2020-CZ-9238 (13th Cir.Ct. Mich. filed Dec. 13, 2020).

errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan. We further conclude that the results of Antrim County should not have been certified.

175.   Said report was generated after a *Michigan* voter petitioned the court for a temporary restraining order requiring Antrim County to preserve the Dominion machines and electronic data in the county, and to allow expert auditors to inspect the sequestered machines.

176.   On December 1, 2020, a memo from the Michigan Bureau of Elections, an agency overseen by Ms. Benson, ordered Michigan county clerks to "'delete Electronic Poll Book software and associated' even as calls to audit the election persist."[68]

177.   On December 4, 2020, said Michigan court granted the petitioning voter the right to have his experts inspect the Dominion Voting Machines and contributing date.

178.1.   On December 9, 2020, Defendant, Ms. Benson, moved for a protective order to conceal the results of the examination—which was initially granted, but later removed by the court.

179.1.   On December 13, 2020, the Michigan Attorney General, Dana Nessel, tweeted:

---

[68] Frank Salvato, *Michigan Secretary of State Issues Order to Delete Election Data Amid Audit Calls,* National File, December 4, 2020.

 **Dana Nessel** 
@dananessel

Fun fact: Lawyers who practice in Michigan are required to take an oath to support the MI and US Constitutions, not to file unjust and/or frivolous actions or mislead the court. The spate of Trump lawsuits in our state violates each of these tenets. It demeans our profession.

~~180.~~482.      Due to the unconstitutional acts of ~~Defendant, Ms.~~Benson, and others, ~~said statements~~the reported vote totals from the several counties were constitutionally tainted and, thus, all of ~~Ms.~~Benson's conduct involving the certification of Michigan's federal election is unconstitutional.

~~181.~~483.      As the United States Supreme Court has held many times:

> [T]he Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law… when a state officer acts under a state law in a manner violative of the Federal Constitution, he 'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'[69]

~~*Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (quoting *ex parte Young*, 209 U.S. 123, 159-160 (1908).~~

~~182.~~484.      In acting in ~~said unconstitutional manner, as described herein, Defendant, Ms.~~unconstitutionally, Benson~~,~~ was stripped of her official capacity as Secretary of State of the State of Michigan.

~~183.~~485.      As such, ~~Defendant, Ms.~~Benson~~,~~ was acting outside the scope of her official capacity when she certified said results of the ~~presidential~~Presidential election.

~~184.~~486.      ~~Defendant, Ms.~~Whitmer, as the state's chief executive officer, is

_____

[69] *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (quoting *ex parte Young*, 209 U.S. 123, 159-160 (1908).

responsible for the constitutional execution of the state's laws.

185.487.   The ~~governor~~Governor of Michigan is responsible for transmitting the state's results of an election to the United States for transmission to Congress and, by state law, to the United States secretary of state. *See* 3 U.S.C. § 6. Mich. Code § 168.46.[70]

186.488.   This ministerial task has been unconstitutionally corrupted by her subordinate executive officers and other election officials, and ~~Ms.~~ Whitmer's "failure to meaningfully investigate and determine the proper lawful vote counts when the general election was marked with inaccuracy and loss of integrity over absentee ballots and other serious statutory violations such as failure to require bipartisan oversight at absent voting counting boards."[71]

187.489.   In allowing the board and secretary of state to certify an unconstitutional presidential election, as described herein, ~~Ms.~~ Whitmer was stripped of her official capacity as Governor of the State of Michigan.

188.490.   As such, ~~Ms.~~ Whitmer was acting outside the scope of her official capacity, when the results of the Election were certified, as above.

189.491.   Said certification of the Election is *ultra vires* and unconstitutional.

190.492.   Said certification of the Election is void *ab initio*.

## GEORGIA

---

[70] *See* 3 U.S.C. § 6. Mich. Code § 168.46.
[71] ~~*See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson,* filed Nov. 26, 2020, MSC No. 162286 (Mich. filed Nov. 26, 2020), ¶ 38.~~

191.   In 2017, Georgia voters and a voting rights organization brought separate § 1983 actions, later consolidated, against *Georgia* state officials alleging that the state's reliance on a direct recording electronic ("DRE") voting system burdened their 14th Amendment rights to due process and equal protection.[72]

192.   Thereafter, on or about April 4, 2019, behind closed doors, Mr. Kemp signed a bill that, among other things, granted Dominion an estimated $150 million contract to replace Georgia's voting machines.[73]

193.   An expert witness in the *Curling* case in Georgia, Harri Hursti, observed Georgia's June 9, 2020, statewide primary, and August 11 runoff, and participated in a Rule 34 inspection of the ongoing updating of Dominion software in Fulton County, Georgia.[74]

194.   In a 48-page affidavit, Mr. Hursti noted "a wide range of well known and publicly disclosed vulnerabilities."[75]

195.   The security risks outlined in Mr. Hursti's affidavit, including, the "operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are

---

[72] *Curling, et al., v. Raffensperger, et al.,* Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.) ("*Curling* case"). *See also* Johnny Kaufman, *Federal Court Asked to Scrap Georgia's 27,000 Electronic Voting Machines*, NPR, September 12, 2018.

[73] Ben Nadler, *Georgia Gov. Kemp Signs New Touchscreen Voting Machines Bill*, Associated Press, April 4, 2019. *See also*, Greg Bluestein and Mark Niesse, *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal- Constitution, June 14, 2019("In a statement by [Fair Fight, a voting rights organization started by Stacey Abrams], the group called it "corruption at its worst.").

[74] *See Declaration of Harri Hursti*, October 4, 2020, *Curling* case, Doc. 942, Exh. A. *See also Id.*, Docs. 680-1, 800-2, 809-3, 860-1, 877, and 923-2 (prior declarations of Mr. Hursti).

[75] *See Declaration of Harri Hursti* (Doc. 809-3, Exh. 2), *Curling* case, August 24, 2020, ¶ 36.

~~extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* at ¶ 49.~~

~~196. On October 4, 2020, Mr. Hursti signed a supplemental affidavit concerning his observation and inspection "to review the ongoing software updating of the Dominion software for Fulton County ballot marking device ('BMD') touchscreen units to ICX software version 5.5.10.32."[76]~~

~~197. Based upon Mr. Hursti expert opinion, the "methods and processes of adopting and installing this software change is completely unacceptable." *Id.* at ¶ 20.~~

~~198. The "methods and processes adopted by Dominion in Fulton County do not meet national standards for managing voting system technical problems and remedies, and should not be accepted for use in a public election under any circumstances." *Id.*~~

~~199. As is outlined in *Texas v. Pennsylvania*:~~

~~a.~~493. Georgia law prohibited the opening of absentee ballots until after the polls open on Election Day. ~~O.C.G.A. § 21-2-386(a)(2).~~

~~b.~~494. Georgia law authorized and required a single registrar or clerk—after reviewing the outer envelope—to reject an absentee ballot if the voter: failed to sign the required oath or to provide the required information; the signature appears invalid; the required information does not conform with the information on file; or, if the voter is otherwise found ineligible to vote. ~~O.C.G.A. § 21-2-386(a)(1)(B)–(C).~~

~~c.~~495. Georgia law provided absentee voters the chance to "cure a failure to sign the oath, an invalid signature, or missing information" on a ballot's outer envelope by the

---

[76] ~~*Declaration of Harri Hursti* (Doc. 942, ¶ 3), *Curling* case, Oct 2, 2020.~~

deadline for verifying provisional ballots (i.e., three days after the election). O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c)(2).

d. To facilitate cures, Georgia law required the relevant election official to notify the voter in writing. "The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, a copy of which notification shall be retained in the files of the board of registrars or absentee ballot clerk for at least two years." O.C.G.A. § 21-2-386(a)(1)(B).

496. , and a copy retained for two years.

e. 497. On March 6, 2020, Georgia's Secretary of State entered a Compromise Settlement Agreement and Release with the Democratic Party of Georgia (the "Settlement") to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the express mandatory statutory procedures set forth at O.C.G.A. § 21-2-386(a)(1)(B).[77]

f. 498. Among other things, before a ballot could be rejected, the Settlement required a registrar who found a defective signature to now seek a review by two other registrars, and only if a majority of the registrars agreed that the signature was defective could the ballot be rejected but not before all three registrars' names were written on the ballot envelope along with the reason for the rejection. Texas v. Pennsylvania, ¶ 71.

499. These cumbersome procedures are in direct conflict with Georgia's statutory requirements, as is the.

500. The Settlement's requirement that notice be provided by telephone (i.e., not in

---

[77] See Democratic Party of Georgia, Inc. v. Raffensperger, case 1:19-cv-05028-WMR (N.D. Ga.).

79

writing) if a telephone number is available. — also violates Georgia law.

g.501.  Finally, the Settlement purports to require State election officials to consider issuing guidance and training materials drafted by an expert retained by the Democratic Party of Georgia. Id.

h.502.  Georgia's legislature has not ratified these material changes to statutory law mandated by the Compromise Settlement Agreement and Release, including altered signature verification requirements and early opening of ballots. Id. at ¶ 72.

i.503. This unconstitutional change in Georgia law materially benefitted one presidential candidate over another. Id. at ¶ 74.

j.504. According to the Georgia Secretary of State's Office, the Democrat's nominee for presidentPresident had almost double the number of absentee votes (65.32%) as the incumbent candidate. (34.68%). Id., Cicchetti Decl. at ¶ 25, App. 7a-8a.

k.505.  The effect of this unconstitutional change in Georgia election law, which made it more likely that ballots without matching signatures would be counted, had a material impact on the outcome of the 2020 President election. Id. at ¶ 65.

l.506. Specifically, there were 1,305,659 absentee mail-in ballots submitted in Georgia in 2020. There were 4,786 absentee ballots rejected in 2020. This is a rejection rate of .37%. In contrast, in 2016, the 2016 rejection rate was 6.42% with 13,677 absentee mail-in ballots being rejected out of 213,033 submitted, which more than seventeen times greater than in 2020. Id., Cicchetti Decl. at ¶ 24, App. 7a.

m.507.     If the rejection rate of mailed-in absentee ballots remained the same in 2020 as it was in 2016, there would be 83,517 less tabulated ballots in 2020. *Id. at ¶ 76.*

n.508.     The statewide split of absentee ballots was 34.68% for Trump and 65.2% for Biden. *Id.*

o.509.     Rejecting at the higher 2016 rate with the 2020 split between Trump and Biden would decrease Trump votes by 28,965 and Biden votes by 54,552, which would be a net gain for Trump of 25,587 votes. *Id.*

p.510.     This would be more than needed to overcome the Biden advantage of 12,670 votes, and Trump would win by 12,917 votes. *Id.* if statistical norms prevailed.

q.511.     Regardless of the number of ballots affected, the non-legislative changes to the election rules violated the Electors Clause. *Id.*

200.     After the Election, local attorney, L. Lin Wood, Jr., Esq., filed a verified complaint against Georgia's Secretary of State, Defendant, Mr. Raffensperger.

201.512.     The complaint sued the secretary of state in his official capacity, wherein Attorney Wood accused Mr. Raffensperger of unilaterally abrogatingabrogated Georgia law governing the signature verification process for absentee ballots.[78]

---

[78] *See* Verified Amended Complaint, *Woods v. Raffensperger* (Doc. No. 5), Case 1:19-cv-05028-WMR (N.D. Ga. Nov. 15, 2020).

202.   On November 25, 2020, former U.S. Attorney, Sidney Powell, Esq. (Attorney Powell), on behalf of a group of Georgia voters, filed a complaint in federal court for emergency relief to "de-certify the results of the General Election for the Office of President." (Pearson Complaint).[79]

203.   In the Pearson Complaint, the Plaintiff's alleged that Georgia's certification of the Election was unconstitutional, based upon:

a.513.   the The conduct of Defendant, Mr. Raffensperger, acting in his official authority as the chairman of the State Election Board, wherein said board adopted Secretary of State Rule 183-1-14-0.9-.15, *Processing Ballots Prior to Election Day*, in direct conflict with O.C.G.A. § 21-2-386(a)(2);.).

b.514.   the The unconstitutional conduct of certain Georgia county election officials, who, after Defendant, Mr. Raffensperger, instructed Georgia counties to conduct an audit of said federal election in a manner consistent with O.C.G.A. § 21-2-498, did not provide certain political parties and candidates meaningful access and an opportunity to review the validity of mail-in ballots during the pre-canvassing meetings and, specifically, mishandled many other ballots—which established a pattern showing the absence of mistake. *Id.* at ¶¶ 64-91.

c.515.   specific acts of fraud, includingDuring the counting of certain absentee ballots 2020 Presidential election in Fulton County, Georgia, absentee ballots were counted without observers, due to a false claim of a "pipe burst," which resulted in the tabulation

---

[79] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1), *Pearson, et al., v. Kemp.*, Case 1:20-cv-04809-TCM (N.D. Ga. Nov. 25, 2020).

center ~~"~~shutting down~~"~~ for 2 ½ hours, while said ballots were unlawfully counted, without observers present. ~~*Id.* at ¶¶ 111-114.~~

~~d.      specific acts of fraud, including the identification of the Voting Systems Officer of Strategy and Security of the company that manufactured said voting machines, Dominion Voting Systems Corporation, who publicly made derogatory remarks about the incumbent, Presidential candidate, and has documented ties to a domestic terrorist organization. *Id.* at ¶ 120.~~

~~e.~~516.   Plaintiffs' numerous public records, expert reports and witness statements evidencing the Defendants' ~~"egregious~~misconduct, including ignored legislative mandates concerning mail-in and ordinary ballots ~~[that]~~, led to disenfranchisement of an enormous number of ~~Georgia~~ voters.~~"~~ ~~*Id.* at ¶ 122.~~

**Formatted:** Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control

~~f.      statistical analysis performed by experts established: "lost votes;" "a pattern of widespread fraud;" votes casts by persons who have moved out of Georgia or had "fraudulent residence addresses;" analysis that established a "platykurtic distribution;" thousands of "missing and unlawful ballots;" and "data breaches in the Dominion software permitting rogue actors to penetrate and manipulate the software during the recent general election." *Id.* at ¶¶ 122-131.~~[80]

~~g.      the software used by the voting machines in Georgia, which allowed operators of the machines to: accept or discard batches of votes; mark certain ballots as "problem ballots" for *discretionary determination*; and, view and delete individual ballot scans — without "guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results," contrary to 50 U.S.C. § 20701. *Id.* at ¶¶ 92-102.~~

~~h.      evidence that said software used by the voting machines in Georgia was created to rig elections, facilitate vulnerability and to "allow a select few to determine which votes will be counted in any~~Before the 2020 Presidential election.~~" *Id.* at ¶ 103.~~

**Formatted:** Font color: Text 1

---

[80] ~~*See,* An Analysis of Surveys Regarding Absentee Ballots Across Several States by William M Biggs (Doc. No. 1-1), *Pearson Complaint,* Nov. 25, 2020. *See also* Declaration of Eric Quinnell (Doc. No. 1-27), *Pearson Complaint,* Nov. 25, 2020.~~

i. ~~evidence of a common scheme, plan and *modus operandi*, concerning the creation of said software to manipulate elections, worldwide, e.g. in Venezuela. *Id*. at ¶103.~~

j. ~~the foreign connections and ownership of said software and voting machines, used throughout Georgia. *Id*. at ¶104-105.~~

k. ~~the numerous reports, articles and statements made by prominent political figures, newspaper articles, television news shows, and multiple interviews over the last fifteen years indicating the unreliability of said software and voting machines, many of which included warnings that the software and voting machines, herein used, created a treat to the national security of the United States. *Id*. at ¶¶ 104-115.~~

l. ~~analysis concluding that said system and software "have been accessible and were certainly compromised by rogue actors, such as Iran and China." *Id*. at ¶¶ 111-114.~~

~~204.~~517.    ~~Also, within "the State of,~~ in Georgia, private non-profits, state officials, and local elected officials acted to systematically eviscerate Georgia's Election Law, contrary to Title 21 of the Official Code of Georgia ~~failing to protect election integrity."[81]~~.

~~205.~~518.    ~~For example~~In Georgia, as a part of the scheme herein described, ~~Defendant,~~ CTCL, using money given to it by ~~Defendants, Mr.~~ Zuckerberg ~~and Ms.,~~ Chan and Facebook, as a part of the herein described enterprise, granted $6.3 million dollars to Fulton County, Georgia, which was primarily used ~~to~~:

a.    pay ballot harvesters;

b.    fund mobile ballot pick-up units;

c.    deputize and pay political activists to manage ballots;

d.    pay election judges and poll workers;

e.    establish satellite offices, and fund drop-boxes to bypass and intercept ~~United~~

---

[81] ~~Petition for Election Contest, *Wood v. Raffensperger*, case 2020CV342959 (Ga. Super. Ct. filed November 25, 2020), pp. 1-2.~~

~~States~~US Mail;

~~e.~~

f.    pay local election officials and agents to recruit cities recognized as democratic strongholds to recruit other cities to apply for the grants from non-profits;

g.    consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots, without legally required observation;

h.    initiate and implement a two-tiered ballot "curing" plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

i.    pay for and help design the plan to remove the poll watchers from one political party so that the critical responsibility of determining the validity of the ballot and the validity of the count could be conducted without oversight.[82]

~~206.~~519.    On November 20, 2020, ~~Defendant, Mr.~~ Raffensperger, unconstitutionally certified the Election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

~~207.~~520.    In acting in said unconstitutional manner, as described herein, ~~Defendant, Mr.~~ Raffensperger, was stripped of his official capacity as Secretary of State of the State of Georgia.

~~208.~~521.    As such, ~~Mr.~~ Raffensperger was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

~~209.~~522.    On November 20, 2020, ~~Defendant, Mr.~~ Kemp, unconstitutionally certified the election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

~~210.~~523.    In acting in said unconstitutional manner, as described herein, ~~Mr.~~ Kemp was stripped of his official capacity as Governor of the State of Georgia.

~~211.~~524.    As such, ~~Mr.~~ Kemp was acting individually, outside the scope of his

---

[82] ~~Id., Harding Decl., Exh. A, B, C and F, to the original petition, ¶ 25, App. 7a-8a.~~

official capacity, when he certified said results of the Election, as described herein.

212.525.   Said certifications of the Election are *ultra vires* and unconstitutional.

213.526.   Said certifications of the Election are void *ab initio*.

## PENNSYLVANIA

214.527.   In 2019, Pennsylvania enacted bipartisan election reforms that, among other things, set a deadline of 8:00 p.m. on election day for a county board of elections to receive a mail-in ballot. 25 Pa. Stat. §§ 3146.6(c), 3150.16(c).

215.528.   Later, the Pennsylvania's Supreme Court extended that deadline to three days after Election Day, and adopted a presumption that even non-postmarked ballots were presumptively timely.[83]

529.   On August 7, 2020, the League of Women Voters of Pennsylvania, and others, filed a complaint against Defendant, Ms. Boockvar, in her official capacity, and other local election officials, seeking "a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting" were unlawful for a number of reasons.[84]

216.

217.530.   The Pennsylvania Department of State quickly settled with the plaintiffs, issuing revised guidance on September 11, 2020, stating in relevant part:

> The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

---

[83] *Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020).

[84] *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT (E.D. Pa. filed Aug. 7, 2020).

218.531.    This guidance is contrary to Pennsylvania law, and unconstitutional.[85]

219.    In *Texas v. Pennsylvania*, filed after the election in the U.S. Supreme Court, the Attorney General of the State of Texas averred:

532.    Pennsylvania's Secretary of State, Kathy Boockvar without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these changes, and the legislation did not include a severability clause.

*Texas v. Pennsylvania*, ¶ 43.

220.    As outlined in *Motion for Leave to File Bill of Complaint*:

a.533.    Prior to the election, Secretary Boockvar sent an email to local election officials urging them to provide opportunities for various persons—including political parties—to contact voters to "cure" defective mail-in ballots. This process clearly violated several provisions of the state election code;

534.    This process clearly violated several provisions of the state election code.

b.535.    Section 3146.8(a) requires: "The county boards of election, upon receipt of official absentee ballots in sealed official absentee ballot envelopes as provided under this article and mail-in ballots as in sealed official mail-in ballot envelopes as provided under

---

[85] *Texas v. Pennsylvania*, ¶¶ 41-63.

87

Article XIII-D,1 shall safely keep the ballots in sealed or locked containers until they are to be canvassed by the county board of elections."

e.536. Section 3146.8(g)(1)(ii) provides that mail-in ballots shall be canvassed (if they are received by eight o'clock p.m. on election day) in the manner prescribed by this subsection.

537. Section 3146.8(g)(1.1) provides that the first look at the ballots shall be "no earlier than seven o'clock a.m. on election day. And, and the hour for this "pre-canvas" must be publicly announced at least 48 hours in advance. Then the votes

d.538. Votes are counted on election day.

539. By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security.

e.540. This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely.

*Id.* at ¶¶ 50-51.

221.541. As a result of Ms. Boockvar's unconstitutional acts, state and local election officials in Philadelphia and Allegheny Counties violated Pennsylvania's election law by adopting different standards for voters in Philadelphia and Allegheny Counties, with the

intent to favor one presidential candidate, over another. ~~*Id.* at ¶ 52.~~[86]

~~222.~~542. As a result of said unconstitutional acts by ~~Ms.~~ Boockvar, absentee and mail-in ballots in Pennsylvania were evaluated under an illegal standard regarding signature verification. ~~*Texas v. Pennsylvania*, ¶ 53.~~

~~223.~~543. ~~As stated by Texas, "~~It is now impossible to determine which ballots were properly cast and which ballots were not.~~" *Id.*~~

~~224.~~544. The changed process allowing the curing of absentee and mail-in ballots in Allegheny and Philadelphia counties is a separate basis resulting in an unknown number of ballots being treated in an unconstitutional manner, inconsistent with Pennsylvania statute. ~~*Id.* at ¶ 54.~~

~~225.~~545. In addition, a great number of ballots were received after the statutory deadline, and yet were counted by virtue of the fact that Pennsylvania did not segregate all ballots received after 8:00 pm on November 3, 2020. ~~*Id.* at ¶ 55.~~

~~226. As stated by Texas:~~

546. Boockvar's claim that only about 10,000 ballots were received after this deadline has no way of being proven since Pennsylvania broke its promise to the Court to segregate ballots and co-mingled perhaps tens, or even hundreds of thousands, of illegal late ballots.

~~*Id.*~~ ~~227.~~547. On December 4, 2020, fifteen members of the Pennsylvania House of Representatives, led by Rep. Francis ~~X.~~ Ryan, issued a report ~~to U.S. Congressman Scott Perry~~ (Ryan Report).[87]

---

[86] ~~*See also* Verified Complaint (Doc. 1), *Donald J. Trump for President, Inc. v. Boockvar*, case 4:20-cv-02078-MWB (M.D. Pa. filed Nov. 18, 2020), ¶¶ 3-6, 9, 11, 100-143.~~

[87] ~~*Texas v. Pennsylvania*, App. 139a-144a.~~

89

228.548.     The Ryan Report states:

The general election of 2020 in Pennsylvania was fraught with inconsistencies, documented irregularities and improprieties associated with mail-in balloting, pre-canvassing, and canvassing that the reliability of the mail-in votes in the Commonwealth of Pennsylvania is impossible to rely upon.

Ryan Report, *Texas v. Pennsylvania*, App. 139a-144a.

229.549.     The Ryan Report's findings include:

a.     Ballots with NO MAILEDno mailed date total istotaled 9,005;

b.     Ballots Returned on or BEFOREbefore the Mailed Date total ismailed date totaled 58,221; and,

c.     Ballots Returned one day after Mailed Date. That total ismailed date totaled 51,200.

*Id.* at App. 143a.

The State of Texas plead to the U.S. Supreme Court that these "nonsensical numbers alone total

230.550.     Said 118,426 ballots and exceed" the margin of votes that determined Pennsylvania's presidential2020 Presidential election. *Id.* at ¶ 58.

231.551.     The Ryan Report also states:

[I]n a data file received on November 4, 2020, the Commonwealth's PA Open Data sites reported over 3.1 million mail in ballots sent out. The CSV file from the state on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the information was provided that only 2.7 million ballots had been sent out. This discrepancy of approximately 400,000 ballots from November 2 to November 4 has not been explained.

Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. *Id.* at 143a-44a.

232.     In its *Motion for Leave to File Bill of Complaint*, the State of Texas stated:

552.     Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots.

a.553.  Pennsylvania's legislature has not ratified these changes, and the legislation did

90

not include a severability clause;.

b.554.  These non-legislative modifications to Pennsylvania's election rules appear to have generated an outcome-determinative number of unlawful ballots that were cast in Pennsylvania;.

555.  In 2020, Pennsylvania received more than 10 times the number of mail-in ballots compared to 2016, which were "treated in an unconstitutionally modified manner, that included: (1)

a.      doing away with the Pennsylvania's signature verification requirements; (2)

c.b.    extending that deadline to three days after Election Day and adopting a presumption that even *non-postmarked ballots* were presumptively timely; and (3) blocking poll watchers in Philadelphia and Allegheny Counties in violation of State law;".

c.      blocking poll watchers in Philadelphia and Allegheny Counties in violation of State law.

d.556.  Local election officials in Philadelphia and Allegheny Counties decided not to follow Pennsylvania law, which requires that poll-watchers be granted access to the opening, counting, and recording of absentee ballots;

e.557.  By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security;.

f.558 . This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely;.

g.559.  The number of votes affected by the various constitutional violations exceeds the

margin of votes separating the Presidential candidates, and that,.

h.560.  The blatant disregard of statutory law renders all mail-in ballots constitutionally

tainted and cannot form the basis for appointing or certifying Pennsylvania's presidential electors

to the Electoral College.

*Texas v. Pennsylvania*, ¶¶ 43-61.

233.561.      On October 31, 2019, Defendant, Mr. Wolf, signed Act 77,[88] which

implemented sweeping reforms to the elections process in Pennsylvania.[89]

234.   As outlined in *Kelly v. Commonwealth*, Act 77:

a.562.   created a new option to vote by mail without providing an excuse:.

b.563.  Said Act allowed voters to request and submit mail-in or absentee ballots up to 50

days before an election; and,.

c.564.  Said Act established a semi-permanent mail-in and absentee ballot voter list.

*Kelly v. Commonwealth*, ¶ 55.

235.565.      The 2020 Presidential Election was administered by Pennsylvania election

officials pursuant to Act 77, which included allowing for universal, no-excuse mail-in ballots to

---

[88] Act of October 31, 2019, P.L. 552, No. 77 ("Act 77"). *See also* 25 Pa.Stat. §§ 3146.6(c),
3150.16(c).

[89] *See* Complaint for Declaratory and Injunctive Relief, *The Honorable Mick Kelley v.
Commonwealth of Pennsylvania*, Case 620 MD 2020 ("*Kelly v. Commonwealth*"),
(Commonwealth Ct. of Penn. filed November 21, 2020), ¶ 54.

be counted in violation of the Pennsylvania constitution. *Id.* at ¶ 62.

236. The Plaintiffs in *Kelly v. Commonwealth* argued that Act 77 wasis

unconstitutional, because it expanded the scope of absentee voting to all voters, which, in effect:

a.566. created an entire class of electors who are shown to have received a mail-in

ballot, despite never actually receiving a mail-in ballot; and,.

b.567. Act 77 is unconstitutional, because it similarly produced a whole class of voters

who received unsolicited or unrequested mail-in ballots that never voted via mail-in ballot and

never intended to vote by mail.

*Id.* at ¶ 56-57.

237.568. Act 77 does not provide Pennsylvania voters any meaningful method of

disputing a mail-in or absentee ballot that has been submitted in their name, even where a ballot

is improperly submitted by another individual. *Id.* at ¶ 58.

238.569. Even under circumstances whereinwhere the voter insists that he or she

did not submit a mail-in ballot, "if the voting records suggest that such a ballot has purportedly

been received from that voter, the voter is effectively deprived of their right to cast a vote as a

direct and proximate result of the enactment of Act 77." *Id.* at ¶ 58.

239.570. Based upon these facts, as alleged by bar members, state representatives,

experts and states of the Union, no reasonable person could disagree that, in the light most

favorable the Plaintiffs, theThe actions of Defendants, Ms. Boockvar, Mr. and Wolf, and others,

herein described, was were unconstitutional.

240. Governors and secretaries of state do not act unconstitutionally.

241. All acts performed by a governor or secretary of state, in their official capacity, are performed on behalf of the state.

242. States do not act unconstitutionally—unless they are in rebellion or insurrection.

243. Unconstitutional acts and omissions of state actors strip those persons of their official and representative character and, thus, subjects them to the consequences of their individual conduct. *See ex parte Young*, 209 U.S. 123, 159-160 (1908).In Pennsylvania,

244.571.      As in the other states, Defendants, Mr. Zuckerberg and Ms. , Chan and the enterprise, engaged in a scheme in Pennsylvania with Defendant, CTCL, and others, to use their enormous wealth to unconstitutionally favor one presidential candidate, over the others, by, among other things:.

privately contracting with

a.572.  Before the 2020 Presidential election, with money provided by the enterprise, CTCL privately contracted certain municipalities to accept grants that require the recipient to expend the grant money for the express purposes set forth in the grants:.

b.573.  unlawfully payingSaid grants were used in Pennsylvania to pay the salaries of election officials:.

c.574.  EmployingSaid grants were used to employ the use of illegal drop boxes to

~~intercept and bypass~~collect ballots, which bypassed the ~~United States~~US Mail~~; and,~~.

~~d.~~575.   ~~Utilizing unauthorized~~Said grants were used to facilitate mobile voting vehicles.[90]

~~245.~~576.      The State of Pennsylvania also contracts with Dominion to provide voting services for approximately 1.3 million voters whose ballots were tabulated by Dominion.[91]

~~246.~~577.      On November 20, 2020, Dominion cancelled a scheduled appearance to discuss voting irregularities with a state government committee.

~~247.~~578.      After the cancelation, Pennsylvania House Republicans tweeted:

Transparency is key for our election security. Dominion Voting Software is asking us to give them only blind trust. We're very disappointed in Dominion's last-minute cancelation in today's hearing.

~~248.~~579.      After the Election, the President of the United States tweeted:

**Donald J. Trump** ✔ @realDonaldTrump · Nov 12

"REPORT: DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN." @ChanelRion @OANN

~~249.~~580.      On November 24, 2020,~~Defendant, Ms.~~ Boockvar, unconstitutionally certified said election, under color of law and her official authority.

~~250.~~581.      In acting in said unconstitutional manner, ~~as described herein, Ms.~~ Boockvar was stripped of her official capacity as Secretary of State of the State of Pennsylvania.

---

[90] ~~See~~ ~~Complaint for Declaratory and Injunctive Relief (Doc. 1),~~ *~~Pennsylvania Voters Alliance, v. Centre County,~~* ~~case 4:20-cv-01761 (M.D. Penn. filed Sept. 25, 2020).~~

[91] ~~Hank Berrien,~~ *~~Pennsylvania GOP Slams Dominion Systems For Canceling On Giving Testimony~~*~~, Dailywire, Nov. 20, 2020.~~

251.582.    As such, Ms. Boockvar was acting individually, outside the scope of her official capacity, when she certified said results of the Election.

252.583.    On November 20, 2020, Defendant, Mr. Wolf, unconstitutionally certified said election, under color of law and his official authority.

253.584.    In acting in said unconstitutional manner, as described herein, Mr. Wolf was stripped of his official capacity as Governor of the State of Pennsylvania.

254.585.    As such, Mr. Wolf was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

255.    An "unconstitutional state enactment is void and…any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such is a nullity." *Pasasin v. Allain*, 478 U.S. 265, 276 (1986).

256.586.    Said certification of the Election in Pennsylvania is unconstitutional.

257.587.    Said certification of the Election in Pennsylvania is void *ab initio*.

**WISCONSIN**

258.588.    On December 14, 2020, the Wisconsin Supreme Court determined that certain county clerks had erroneously interpreted Wisconsin election law.[92]

---

[92] *Jefferson v. Dade County*, 2020 WI 90 (Wis. 2020).

259.589.    Wisconsin allows voters to declare themselves indefinitely confined, provided they meet the statutory requirements. *See also* Wis. **Stat.** § 6.86(2)(a).

260.590.    On March 25, 2020, the Dane and Milwaukee County Clerks issued guidance on Facebook suggesting all voters could declare themselves confined because of the pandemic and the governor's then-existing Safer-at-Home Order.[93]

261.591.    Wisconsin's highest court concluded that the emergency order issued by the county clerks did not render Wisconsin electors "indefinitely confined," which obviated the legal requirement of valid photo identification to obtain absentee ballots.

262.592.    On March 31, 2020,But the Wisconsin Supreme Court unanimously deemeddeclared that advice incorrect, and the "county clerks immediately updated their advice in accordance with our decision." *Trump v. Biden*, 2020 WI 90, ¶ 7.

263.    A blanket invalidation of votes casts by Wisconsin citizens receiving a ballot after claiming indefinitely confined status, "without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit." *Id.* at ¶8.

264.593.    NonethelessIn Wisconsin, the number of indefinitely confined voters surged from just under 70,000 voters in 2019 to over 200,000 in 2020.

265.    According to a report prepared by Director of the Office of Trade and Manufacturing Policy and Assistant to the President, Peter Navarro, the "130,000 vote increment of new indefinitely confined voters is more than five times" the margin of victory in Wisconsin. The Navarro Report, *The Immaculate Deception: Six Key Dimensions of Election Irregularities*, Dec. 17, 2020, p. 10, a copy of which is attached hereto as Plaintiff's Exh. 10, as though fully contained herein.

---

[93] *Trump v. Biden*, 2020 WI 91 (Wis. 2020).

266.594.    During this same time period, Mr. Zuckerberg and Ms. Chan,the enterprise funneled millions of dollars in private money, through CTCL, and others, to unlawfully and unconstitutionally circumvent Wisconsin's absentee ballot laws—using the COVID-19 pandemic as a pretext to create an exception to Wisconsin's photo identificationID requirements.

267.595.    Mr. Zuckerberg and Ms. Chan,The enterprise, acting through CTCL, and others, granted over six million dollars to the cities of Racine, Kenosha, Green Bay, Madison and Milwaukie.

268.596.    The use of private funding from Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and many others,the enterprise undermines the existing *Help America Vote Act* (HAVA),[94] which requires state election plans be submitted for approval by federal officials to, among other things, preserve the equal protection and due process rights of registered voters across the country.[95]

269.597.    The National Voter's Registration Act (NVRA) also preempted CCTCL' private federal election grants.[96]

270.598.    The private funding from Mr. Zuckerberg, Ms. Chan, Facebook and CTCLthe enterprise was utilized to place illegal ballot drop boxes in disparate proportion based upon Democrat concentrations, encouraging targeted demographics as a method of increasing voter turnout, and the suppression of political opposition.

271.599.    In Wisconsin, the margin of victory in the Election was slightly over

---

[94] *See* 52 USC §§ 20901-21145.

[95] *See* Complaint for Declaratory and Injunctive Relief, *Wisconsin Voters Alliance v. City of Racine*, case 1:20-cv-01487 (E.D. Wis), ¶¶ 127-149.

[96] *Id.* at ¶¶ 150-173. *See* 52 USC §§ 20501-20511.

20,000 votes.

272.   In Wisconsin, the reported results of the Election are in invalid based upon the following facts.[97]

a.600.   In the 2020 general election, 1,275,019 mail-in ballots were returned, nearly a 900 percent increase over 2016.

b.601.   Leading up to the 2020 generalPresidential election, in contravention of Wisconsin law, the Wisconsin Elections Commission ("WEC"), and other local officials, unconstitutionally modified Wisconsin election laws that weakened, or did away with, established security procedures and photo ID requirements put in place by the Wisconsin legislature to ensure absentee ballot integrity.

c.602.   For example, the WEC undertook a campaign to position hundreds of drop boxes to collect absentee ballots—including the use of unmanned drop boxes.

d.603.   The mayors of Wisconsin's five largest cities—Green Bay, Kenosha, Madison, Milwaukee, and Racine, which all have Democrat majorities— joined in this effort, and together, developed a plan to use purportedly "secure drop-boxes to facilitate return of absentee ballots."[98]

---

[97] *Texas v. Pennsylvania*, ¶¶ 104-108.

[98] *See* Wisconsin Safe Voting Plan 2020, Submitted to CTCL, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay *available at*: https://www.techandcivellife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf

e.604.   In a summary of resources needed, the plan outlined a need for $6,324,567.[99]

**Table 3: Summary of Resources Needed to Robustly Implement All Four Recommendations**

| Recommendation | Green Bay | Kenosha | Madison | Milwaukee | Racine | Totals |
|---|---|---|---|---|---|---|
| Encourage and Increase Absentee Voting By Mail and Early, In-Person | $277,000 | $455,239 | $548,500 | $998,500 | $293,600 | $2,572,839 |
| Dramatically Expand Strategic Voter Education & Outreach Efforts | $215,000 | $58,000 | $175,000 | $280,000 | $337,000 | $1,065,000 |
| Launch Poll Worker Recruitment, Training & Safety Efforts | $174,900 | $145,840 | $507,788 | $800,000 | $181,500 | $1,810,028 |
| Ensure Safe & Efficient Election Day Administration | $426,500 | $203,700 | $40,500 | $76,000 | $130,000 | $876,700 |
| Totals: | $1,093,400 | $862,779 | $1,271,788 | $2,154,500 | $942,100 | $6,324,567 |

f.605.   In August 2020, CTCL announced that it had donated $6.3 million dollars to five cities in Wisconsin, meant to ensure that Wisconsin has a "safe, inclusive, and secure election."[100]

g.606.   Over five hundred unmanned, illegal absentee ballot drop boxes were used in the Election in Wisconsin.[101]

---

[99] *Id.* at p. 5.

[100] *CTCL Announces COVID-19 Response Rural Grants Program*, Center for Tech and Civic Life, August 7, 2020, *available at:* https://www.techandciviclife.org/covid-19-rural-grants/.

[101] *See* Complaint (Doc. No. 1), *Donald J. Trump, Candidate for President of the United States of America v. The Wisconsin Election Commission*, Case 2:20-cv-01785-BHL (E.D. Wisc. filed Dec. 2, 2020), ¶¶ 188–89.

h.607.  The use of *any* drop box, manned or unmanned, is directly prohibited by Wisconsin statute.[102]

i.608.  Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners."  Wis. Stat. 6.855(3);

j.609.  "In a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855site, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed."  Wis. Stat. 7.15(2m);

k.610.  Unmanned absentee ballot drop-off sites are prohibited by the Wisconsin Legislature as they do not comply with Wisconsin law expressly defining "[a]lternate absentee ballot site[s]". Wis. Stat. 6.855(1), (3);

l.611.  The use of drop boxes for the collection of absentee ballots, positioned predominantly in Wisconsin's largest cities, is directly contrary to Wisconsin law providing, which provides that absentee ballots may only be "mailed by the elector, or delivered in person to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b);.

m.612. The fact that otherOther methods of delivering absentee ballots, such as through

---

[102] The Wisconsin legislature specifically described in their Election Code "Alternate absentee ballot site[s]," and detailed the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1).

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

Formatted: Font color: Dark Gray

Formatted: Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers, Font Alignment: Baseline, Tab stops: Not at  1.38"

unmanned drop boxes, is not permitted by Wisconsin law, which mandates that "[a]ny ballot not mailed or delivered as provided in this subsection may not be counted." Wis. Stat. § 6.87(6).

n.613.  "Ballots cast in contravention of the procedures specified in those provisionsWisconsin statute may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be or included in the certified result of any election." Wis. Stat. § 6.84(2);

o.614.  Through Facebook, WEC and local election officials encouraged voters to unlawfully declare themselves "indefinitely confined"—which under Wisconsin law allows the voter to avoid security measures like signature verification and photo ID requirements.

p.615.      Specifically, registering to vote by absentee ballot requires photo identification, except for those who register as "indefinitely confined" or "hospitalized." Wis. Stat. § 6.86(2)(a), (3)(a);

q.616.      Registering for indefinite confinement requires certifying confinement "because of age, physical illness or infirmity or [because the voter] is disabled for an indefinite period." Id. § 6.86(2)(a)..

r.617. Should indefinite confinement cease, the voter must notify the county clerk, id., who must remove the voter from indefinite-confinement status. Id. § 6.86(2)(b);

s.618.      On May 13, 2020, the Administrator of WEC issued a directive to the Wisconsin clerks prohibiting removal of voters from the registry for indefinite-confinement status if the voter is no longer "indefinitely confined;"."

619. Said directive violates Wisconsin law, which provides that "any indefinitely confined elector who is no longer indefinitely confined . . . shall so notify the municipal clerk" who shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service." Wis. Stat. § 6.86(2)(a)&(b).

620. According to statistics kept by the WEC, nearly 216,000 voters said they were indefinitely confined in the 2020 election, a near fourfold increase from 57,000 in 2016.

621. In Dane and Milwaukee counties, more than 68,000 voters said they were indefinitely confined in 2020, a fourfold increase from the roughly 17,000 in 2016.

622. The fourfold increase in absentee ballots under the "indefinitely confined" interpretation creates sufficient illegal ballots to exceed the Wisconsin final ballot margin.

623. Under Wisconsin law, voting by absentee ballot requires voters to complete a certification, including their address, and have the envelope witnessed by an adult who also must sign and indicate their address on the envelope. Wis. Stat. § 6.87.

624. The sole remedy to cure an improperly completed certificate or ballot with no certificate is for the clerk return the ballot to the elector. Wis. Stat. § 6.87(9).

z.625.    "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(9).

aa.626.    However, in a training video issued April 1, 2020, the Administrator of the City of Milwaukee Elections Commission unilaterally declared that a "witness address may be written in red and that is because wethey were able to locate the witnesses' address for the voter" to add an address missing from the certifications on absentee ballots. The Administrator's instruction violated Wisc. Stat. § 6.87(6d).

627.    The Administrator's instruction violated Wisconsin law.

bb.628.    The WEC issued similar guidance on October 19, 2020, in violation of this statute, as well.

cc.629.    In the Wisconsin *Trump Campaign Complaint*, it is alleged, and supported by the sworn affidavits of poll watchers, that canvas workers carried out this unlawful policy, and acting pursuant to this guidance, in Milwaukee used red-ink pens to alter the certificates on the absentee envelope and then cast and count the absentee ballot, in violation of Wis. Stat. § 6.87(6d).Wisconsin law.

dd.630.    Wisconsin's legislature has not ratified these changes, and its election laws do not include a severability clause.

ee.631.    In addition, a box truck delivery driver subcontracted to the U.S. Postal Service (USPS) to deliver truckloads of mail-in ballots to the sorting center in Madison, WI,

testified that USPS employees were backdating ballots received after November 3, 2020.[103]

ff.632. This same USPS subcontractor testified how a senior USPS employee told him on November 4, 2020 that "[a]n order came down from the Wisconsin/postal employees were told *Illinois* Chapter of the Postal Service that 100,000 ballots were missing", and how the USPS dispatched employees to "find. the ballots . ." *Id.* ¶¶ 8-10.

273. On November 20, 2020, the WEC Defendants unconstitutionally certified the Election, under color of Wis. Stat 7.70(5), and their official authority.

274. In acting in said unconstitutional manner, as described herein, said WEC Defendants were stripped of their official capacity as members of the Wisconsin Elections Commission.

275. As such, Defendants, WEC Defendants were acting individually, outside the scope of their official capacity, when they participated in certifying said results of the Election, as described herein.

276. On November 20, 2020, Defendant, Mr. Evers, unconstitutionally certified said election under color of Wis. Stat. § 7.70(5)(b), and his official authority.

277. In acting in said unconstitutional manner, as described herein, Mr. Evers was stripped of his official capacity as Governor of the State of Wisconsin.

---

[103] *See* Motion for Expedited Consideration, *Texas v. Pennsylvania*, Decl. of Ethan J. Pease, App. 149a-151a, ¶¶ 3-13.

278.    As such, Mr. Evers was acting individually, outside the scope of his official capacity, when he certified said results of the Election.

279.    The "theory of [*ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States." *Pennhurst State School and Hospital v. Halderman*, 475 U.S. 89, 102 (1984) (quoting *ex parte Young*, 209 U.S. 123, 160 (1908)("Since the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct.' *Ibid.*")

280.1.   Said certification of the Election in Wisconsin is *ultra vires* and unconstitutional.

281.1.   Said certification of the Election in Wisconsin is void *ab initio*.

282.    As in Georgia, on December 1, 2020, Attorney Powell, on behalf of two Wisconsin voters, filed a complaint in federal court for declaratory, emergency and permanent injunctive, naming Defendants, herein, WEC Defendants and Mr. Evers, in their official capacity (Feehan Complaint).[104]

283.    The Feehan Complaint "brings to light a massive election fraud" and "multiple violations of the Wisconsin Election Code." Feehan Complaint, p. 1.

284.    In attached affidavits, experts on statistical and data analysis, opined, among other things, that:

a.633.   Wisconsin's database for the Election showed 96,711 voters whom the state marked as having requested and been sent an absentee ballot, who did not return it;.

b.634.   ofOf those 96,711, at least 16,316 people did not request an absentee ballot;.

---

[104] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1), *Feehan., v. Wisconsin Elections* Commission, Case 2:20-cv-1771 (E.D. Wis. Nov. 25, 2020).

c.635.   ofOf those 96,711, at least 13,991 of those did in fact mail back an absentee ballot to the clerk's office; and, accordingly,.

d.      there are 29,594 "troublesome ballotsOn November 4, 2020, in Wisconsin."[105]

285.   The Feehan Complaint includes, the affidavit of Seth Keshel, who noted:

636.   New York Times live vote reporting shows a dump of 168,541 votes at 3:42:20 (a.m.) on November 4, 2020..

637.   Of those votes, 143,378 (85.07%) went to Biden, and just 25,163 (14.93%) went for Trump.This dump was enough to flip

638.   On November 20, 2020, the race with almost no transparency toWEC Defendants unconstitutionally certified the viewing public. The live graph showing this vote dump (circled) is attachedElection, under color of law, and in their official authority.

639.   In acting in said unconstitutional manner, the WEC Defendants were stripped of their official capacity, as Exhibit D to this document.members of the Wisconsin Elections Commission.

640.   As such, WEC Defendants were acting individually, outside the scope of their official capacity, when they participated in certifying said results of the Election.

641.   On November 20, 2020, Evers unconstitutionally certified said election under color of law, and in his official authority.

---

[105] See William M. Briggs, PhD, *An Analysis of Surveys Regarding Absentee Ballots In Wisconsin,* Feehan Complaint, Exh. 4. *See also* Matthew Braynard, *Expert Report of Matthew Braynard,* Feehan Complaint, Exh. 9 (as filed in *Wisconsin Voters Alliance v. Wisconsin Elections Commission,* case 2020PA1930 (Wis. filed Nov. 24, 2020).

642.    In acting in said unconstitutional manner, Evers was stripped of his official capacity as Governor of the State of Wisconsin.

643.    As such, Evers was acting individually, outside the scope of his official capacity, when he certified said results of the Election.

644.    Said certification of the Election in Wisconsin is *ultra vires* and unconstitutional.

645.    Said certification of the Election in Wisconsin is void *ab initio*.



Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

286.    The Feehan Complaint further contained evidence that senior management of Dominion had public expressed hostility to the incumbent president, and opposition to his election.[106]

---

[106] Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

287.   Dr. Eric Coomer is listed as the co-inventor of several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion. *See* Feehan Complaint, ¶ 93, fn. 10.

288.   In an affidavit, Dr. Coomer is documented as: having admitted that Dominion Voting machines can be manipulated; making previous public statements that are "highly partisan;" and, assuring a group that, "Trump is not going to win. I made f---ing sure of that."[107]

289.   On December 14, 2020, Phill Kline of the Amistad Project of the non-partisan Thomas More Society released a report that "alleged Facebook founder Mark Zuckerberg and his wife made $419.5 million in contributions to non-profits organizations during the 2020 election cycle—$350 million to the 'Safe Election' Project of the Center for Technology and Civic Life and another 69.5 million to the Center for Election Innovation and Research—that, 'improperly influence[d] the 2020 presidential election on behalf of one particular candidate and party.'"[108] A copy of J.P. Carlson's, The Legitimacy and Effect of Private Funding in Federal and State Electoral Processes, is attached hereto as Plaintiff's Exhibit 11, as though fully contained herein.

290.646.    Based upon the foregoing paragraphs, the Plaintiffs and all those similarly situated as registered voters, have suffered individualized, concrete injuries and damage, caused by the unlawful and unconstitutional acts and omission of the Defendants, which has damaged the reputation of the country, violated the civil rights of hundreds of millions of people, includes incalculable financial loss due to lack of productivity and mental anguish, destroyed the people's faith in their government and elected officials, caused massive internal strife inside the United

---

[107] Feehan Complaint (Doc. 1-13), *Affidavit of Joseph T. Oltmann*, p. 2.

[108] Michael Patrick Leahy, *Report: Mark Zuckerberg's $419 Million Non-Profit Contributions 'Improperly Influenced 2020 Presidential Election,'* Brietbart, Dec. 18, 2020.

**Formatted:** No widow/orphan control

States and, among many other things, has increased the risks of civil war, and other violent and uncivil behavior.

647.    Judgement in favor of the Plaintiffs and those similarly situated will redress the Plaintiffs' injuries and allow them to enjoy their rights to legally authorized, uniform and fair Presidential elections guaranteed under federal law and the Constitution.

## V. CLAIMS FOR RELIEF

### COUNT I

**U.S. Const. art. II § 1, cl. 2, & Amend. XIV, § 2**
**As enforced by 42 U.S.C. §§ 1983, 1985, 1986 & 1988**
**Violation of Electors Clause**
**Unconstitutional Burden on the Fundamental Right**
**to Vote for the President and Vice-President of the United States of America**
(All Defendants)

648.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

649.    The Civil Rights Act specifically prohibits any person who, under color of any statute, ordinance, regulation, custom, or usage of a State, subjects any citizen of the United States to the deprivation of any rights, privileges or immunities secured by the Constitution and laws.

650.    Every person who subjects, or causes to subject, any citizen of the United States to said deprivation "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *Id.*

110

295.651.      The Electors Clause mandates that each state appoint, in such manner as the legislature thereof may direct, a number of Electors, equal to the whole number of Senators and Representatives to which a state may be entitled in the Congress. U.S. Const. art. II, § 1, cl. 2.

296.652.      None of the Defendants, herein named, are part of any state legislature, nor do any have legislative power.

653.      The Supremacy Clause ensures that local governments do not act contrary to federal and state law regarding federal elections. U.S. Const. art. I, § 4, cl. 1.

297.

298.654.      The historic events that shaped America include the unanimous Declaration of Independence of the original thirteen states that enshrined the rights to life, liberty and the pursuit of happiness, which thereafter instituted a government among those who pledged their lives, fortunes and sacred honor to the United States of America.

299.655.      Later, under the Constitution, all rights not granted to the United States, in trust, were reserved to the states and the people.

300.656.      The most fundamental right in creation of a representative government is the people's right to choose their representatives.

301.657.      The continuing method of preserving the will of the people necessarily includes the right of assembly, free speech, free press, and to the redress of grievances.

302.658.      No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.

659.      Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("

303.660.      Though not regarded strictly as a natural right, [voting is a] privilege...

regarded as a fundamental political right, because preservative of all rights").

304.661.      A person's right to vote is individual and personal in nature, thus voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).

305.662.      This Complaint involves the protection of a right to vote for the President, Commander-in-Chief, and Vice President, under a process enumerated by the Constitution.

306.663.      This right is further supported through Public Laws, federal election laws, and by the legal administration of elections by the states, for as long as the latter is not administered in contravention with federal law or the Constitution.

307.664.      In that regard, the conduct and actions of the Defendants, acting under color of law and official capacity, violated the rights of the Plaintiffs and others similarly situated, individually, as every registered voter has an interest in selecting the presidentPresident and vice-presidentVice-President.

308.665.      Governors, secretaries of state and election officials of Georgia, Wisconsin, Michigan and Pennsylvania, do not legislate, nor do they engage in unconstitutional behavior.

309.666.      Accordingly, the state actors herein named stepped out of their official capacity and are personally liable for violating the voting rights of the Plaintiffs and others similarly situated.

310.667.      Defendants, Facebook, Dominion, CTCL, Mr. Zuckerberg and Ms. Chan and the enterprise, having so inextricably woven their interests into the presidential election

process and said state actors, they are thus defined as persons subject to 42 U.S.C. §§§ 1983, 1985, and & 1988.

311.668.    The Defendants, and each of them, acted in concert with each other, and other persons, to unconstitutionally legislate rules, change procedures, and implement a scheme and device to interfere and manipulate the Election, with their a common goal to remove the incumbent, by any means necessary.

312.669.    The Supreme Court has "found state action present in the exercise of a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974).

313.670.    Defendant, CTCL, acting under the influence of Mr. Zuckerberg and Ms. Chan the enterprise, induced other Defendants to use grant funding from CTCL, and to solicit other municipalities to apply for and use the same—creating a symbiotic relationship between and among the parties sufficient to make them state actors. *Luger v. Edmonson Oil Co.*, 457 U.S. 922, 941 (1982).

314.671.    Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the Civil Rights Act.

315.672.    To act under color of law does not require that the accused be an officer of the State, as it "is enough that he is a willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966).

316.673.    Even assuming the private defendants did not take specific action to qualify them as state actors, the conspired actions between the parties to achieve the desired result holds them within the context of parties conspiring against rights under 42 U.S.C. § 1985,

and 18 U.S.C. § 241.[109]

317.674.    This claim is not a generalized grievance.

318.675.    As established by the facts averred, and with forthcoming evidence, the Plaintiffs and those similarly situated were personally harmed, and continue to suffer financial damages required to protect their rights through this lawsuit.

676.    The evidence establishes that the Defendants haveenterprise has engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another.

677.    This hurts every registered voter in the country, no matter whose side the irrespective of voter is on. affiliation.

319.678.    Other than the nefarious, the honest American voter wants every vote counted to legally determine the presidentPresident and vice-presidentVice President.

320.679.    Because illegal votes and unconstitutional procedures dilute the votes of the legally registered voter, persons that create policies and procedures that authorize, encourage, and cover-up unconstitutional behavior are liable for the damages they cause to Plaintiffs with proper standing.

321.680.    The criminal laws of the United States makecriminal law makes it illegal for administrative employees of the United States, the States, their political subdivisions and municipalities, to use their official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner. See 18 U.S.C. § 595..

322.681.    Additional penalties under federal criminal law support and restrict actions

---

[109] https://www.justice.gov/crt/conspiracy-against-rights.

taken under color of law and conspiracy against rights, pursuant to 18 U.S.C. §§§ 241 & 242.

323.682.    Recently, the Supreme Court confirmed that appropriate relief includes claims for money damages against Government officials in their individual capacities.[110]

*Tanzin v. Tanvir*, 140 S. Ct 861, (2020).

324.683.    The principle of the "Private Attorney General" was codified into law with the enactment of the *Civil Rights Attorney's Fees Award Act of 1976.* 42 U.S.C. § 1988.

325.684.    The actions of the Defendants were and are the direct and proximate cause of the violations of Plaintiffs' rights, injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses.

Wherefore, Plaintiffs requestsrequest that the Court grant the relief as described in the Plaintiff'sPlaintiffs' Prayer for Relief, below.

### COUNT II

**U.S. Const. Amend. XIV, § 1 & Amend. XV, § 1**
**As enforced by 42 U.S.C. § §§ 1983, 1985, 1986 & 1988**
**Violation of Equal Protection**
**(All Defendants)**

326.685.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

327.686.    At all times relevant herein, Plaintiffs and those similarly situated have certain inalienable and civil rights protected by the Constitution, federal and state statutes.

328.687.    The Defendants listed herein are persons, subject to 42 U.S.C. §§§ 1983, 1985, 1986 and 1988.

329.688.    The Defendants, and each of them, are responsible for the actions of their

---

[110] *Tanzin v. Tanvir*, 140 S. Ct 861, (2020).

employees, agents, or attorneys under the legal doctrine of *Respondeat Superior*.

330.689.    The Equal Protection Clause of the Fourteenth Amendment prohibits persons acting under color of law from abridging or burdening the rights or immunities of citizens of the United States. U.S. Const. amend. XIV.

331.690.    The Equal Protection Clause prohibits the use of differentialdifferent standards in the treatment and tabulation of ballots within a State. *Bush v. Gore*, 531 U.S. 98, 107 (2000).[111]

332.691.    One-person, one-vote jurisprudence arises when persons acting under color of authority influence arbitrary and disparate treatment among voters of different jurisdictions.

333.692.    Acting under the color of law and authority, Defendants violated Plaintiffs' rights, privileges and immunities secured by the Constitution, and guaranteed by the Fourteenth Amendment.

334.693.    The Defendants, and each of them, have participated in conduct and actions resulting in, among other things, unconstitutional agreements, illegal modifications of election law, illegal administration of the federal election process, the unconstitutional certification of the Election, all of which has damaged the Plaintiffs but, more broadly, every registered voter in America, all of whom have an interest in free and fair elections to determine the President of the United States of America.

335.694.    Among other things, the Defendants have funded, influenced, and participated in acts of subterfuge and other manipulations aimed directly at the election machinery including the unequal distribution of unsecured ballot boxes with the intent to bypass

---

[111] *Bush v. Gore*, 531 U.S. 98, 107 (2000).

the United States Post Office, and to otherwise intercept ballots that should have been mailed, or dropped off at polling stations, primarily in certain demographic areas—which, when inevitably discovered, was designed to defend any challenge thereto as "racist."

336.695. The Fifteenth Amendment forbids the denial or abridgment of the right to vote on account of race or ethnicity. U.S. Const. amend. XV.

337.696. Because a discriminatory motive may hide behind legislation that appears neutral on its face, the U.S. Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent: 1) evidence that defendants' decision bears more heavily on one race than another; 2) the historical background of the decision; 3) the specific sequence of events leading up to the decision; 4) departures from the normal procedural sequence; 5) substantive departures; and, 6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266–28 (1977).[112]

338.697. Both constitutional protections guard against any deprivation of the right to vote that is motivated by race. Rogers v. Lodge, 458 U.S. 613, 621–25 (1982).[113]

339.698. An official action taken for the purpose of discriminating on account of race has no legitimacy under the U.S. Constitution. City of Richmond, Va. v. U.S., 422 U.S. 358, 378–79 (1975).[114]

340.699. Defendants Defendants' acts and omissions contribute to a scheme or device aimed at camouflaging their election interference behind certain areas of concentrated demographic and racial groups, under the deception, as here, to promote a belief that to challenge

---

[112] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–28 (1977).
[113] *Rogers v. Lodge*, 458 U.S. 613, 621-25 (1982).
[114] *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 378–79 (1975).

the scheme would be tantamount to disparaging the racial group.

341.700.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights v. Metropolitan Housing and Development Corp.*, 429 U.S. 252, 265 (1977). [115]

342.701.    Instead, the plaintiff's burden is to show that the discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

343.702.    By the shared enterprise of the entire nation electing the President and Vice President, equal protection violations in one state can and do adversely affect and diminish the weight of votes cast by citizens of other states that lawfully abide by the election structure set forth in the Constitution.

344.703.    The Defendants, and each of them, have conspired together, and with other persons known and unknown, to carry out their actions with concerted and orchestrated effort, the effect of which is actionable under the Civil Rights Act.

345.704.    The Defendants, and each of them, have used electronic communication and mail to send and receive documents to and from each other, and to the separate election officials across the states of the Union, and others, beyond the borders of their respective states.

346.705.    At all relevant times herein, the Defendants, and each of them, engaged in a pattern of unconstitutional behavior and obfuscation, which Plaintiffs have recently discovered through public reports, news articles, complaints and affidavits filed by other persons, regarding the Election.

347.706.    Defendants, and unknown DOES 1-10,000, had knowledge of the wrongs done or about to be committed, and having the power to prevent or aid in preventing the

---

[115] *Arlington Heights v. Metropolitan Housing and Development Corp.*, 429 U.S. 252, 265 (1977).

commission of the same, neglected and failed to do so. 42 U.S.C. § 1986.

348.707.   Defendants, and each of them, have conspired and acted in concert to injure, oppress, threaten, or intimidate the Plaintiffs and all similarly situated in the free exercise or enjoyment of their rights and privileges secured to them by the Constitution, and the laws of the United States, or because of having so exercised the same. 18 U.S.C. § 241.

349.708.   Plaintiffs and all others similarly situated have been injured by the actions of the Defendants, as related to rights secured to them by Constitution, herein described.

350.709.   Plaintiffs and others similarly situated have suffered concrete and particularized damages, injuries and losses, as a direct and proximate cause of the Defendants' unconstitutional conduct, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff'sPlaintiffs' Prayer for Relief, below.

### COUNT III

**U.S. Const. Amend. XIV, § 1**
**As enforced by 42 U.S.C. § §§ 1983, 1985, 1986 & 1988**
**Violation of Due Process**
**(All Defendants)**

351.710.   Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

352.711.   Voting is a fundamental right, protected by the Fourteenth Amendment to the United States Constitution.

353.712.   A state, having once granted the right to vote on equal terms, may not later by arbitrary and disparate treatment, value one person's vote over that of another.

119

354.713.    The Constitution protects the right of all qualified citizens to vote in a federal election. *Reynolds v. Simms*, 377 U.S. 533, 554 (1964).[116]

355.714.    The right to vote can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise thereof. *Id.* at 555.

356.715.    All qualified voters have a constitutionally protected right to vote, and to have his or her vote count. *ex parte Yarbrough*, 110 U.S. 651, 665 (1884). *See also United States v. Mosley*, 238 U.S. 383, 386 (1915).[117]

357.716.    The conduct of the Defendants violated the rights of the Plaintiffs and all registered voters in the United States, protected by the Fourteenth Amendment to the Constitution. U.S. Const., Amend XIV.

358.717.    As a result of the Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs and those similarly situated are deprived of their right to substantive due process of law, in violation of the Fifth and Fourteenth Amendments of the Constitution.

359.718.    When election practices reach "the point of patent and fundamental unfairness," the integrity of the election itself violates substantive due process. *Griffen v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978).[118]

360.719.    Under Supreme Court precedents on procedural due process, not only intentional failure to follow election law as enacted by a state's legislature, but also unauthorized acts and omissions by persons acting under color of official law and capacity, and their designees

---

[116] *Reynolds v. Simms*, 377 U.S. 533, 554 (1964).
[117] *ex parte Yarbrough*, 110 U.S. 651, 665 (1884).  *See also United States v. Mosley*, 238 U.S. 383, 386 (1915).
[118] *Griffen v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978).

in local government can violate the Due Process Clause.

361.720.    The Defendants, and each of them, acted unconstitutionally to lower

election standards and miscalculate votes with the express intent to not only favor one candidate,

but, more obviously, to defeat an incumbent, with who they so vehemently opposeopposed.

362.721.    As a direct and proximate result of Defendants' collusive, concerted,

unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their right to

proceduralsubstantive due process of law, in violation of the Fifth and Fourteenth Amendments

of the Constitution, and have and continue to suffer damages, mental distress, anguish,

humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the

Plaintiff'sPlaintiffs' Prayer for Relief, below.

## COUNT IV

### U.S. Const. Amend. I & Amend. XIV, § 1

COUNT IV

U.S. Const. Amend. I & Amend. XIV, § 1

**As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988**

**Burden on Political Speech, Right to Associate and Freedom of Press**

Burden on Political Speech, Right to Associate and Freedom of Press

(Defendants Facebook and Mr. Zuckerberg)

363.722.    Plaintiffs incorporate herein by reference all of the allegations contained in

the foregoing paragraphs of this Complaint, as though fully contained herein.

364.723.    Plaintiffs and all others similarly situated have a right to speak, associate,

assemble, and act independently and collectively with others, whether said speech is politically

motivated, or not.

365.724.    Plaintiffs and all others similarly situated have a right to a free press, with

access to information, which includes print, radio, television and all related journalistic media.

366.725.    The named Defendants, herein, provide interactive computer services to the internet by various platforms for real-time public input.

367.726.    Defendants, Facebook and Mr. Zuckerberg, deny that they are publishers or content providers, and assert that they are immune from civil liability for the content posted by others, pursuant to 47 U.S.C. § 230(c)(2) (Section 230).

368.727.    Section 230 allows the Defendants to block and screen offensive material, through the use of enabling tools and means to filter, screen, allow and disallow content, pick, choose, analyze or digest content for the purpose of transmission, receipt, display, forwarding, cache, search, subset, organize, reorganize or translate such content.

369.728.    However, at all times material hereto, Facebook, under the direction and control of Mr. Zuckerberg, intentionally, and without good faith, censored non-offensive, politically relevant, journalistic articles and opinion, posted by users for other users, with the intention to limit the exposure thereof.

370.729.    The Congressional intent of Section 230 was to promote and expand the dissemination of educational, informative, cultural and entertainment material to stimulate diversity of political discourse and other intellectual activity.

371.730.    In pursuance thereof, Section 230 also sought to limit exposure of illegal content for the purpose of ensuring "vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." Section 230(b)(5).

372.731.    Here, Facebook, under the control and direction of Mr. Zuckerberg, unconstitutionally relied upon Section 230 to suppress the 1stFirst Amendment rights of others having a different political and cultural ideology than Mr. Zuckerberg, and monoculture of the

left-leaning agents and employees of Facebook.

373.732.    At all relevant times, Defendants, Facebook and Mr. Zuckerberg, through

histheir agents, third party contractors, fact checkers, and employees, censored news articles,

opinions, editorials, and other content by setting specific parameters, algorithms and other

methods to suppress content related to the Election, including threats or actions to ban or

terminate individual users or groups or Pages who did not comply with the censorship rules.

374.733.    The named Defendants, and each of them, and others identified as DOES

1-10,000, intended to censor, block, delete, screen, disallow, qualify or otherwise interfere with

the content posted to Facebook and its affiliates by unilaterally determining that such content

was "offensiveobjectionable" to the Defendants' political ideology.

375.734.    The named Defendants specifically and intentionally acted in direct

contravention of the Congressional intent of Section 230 by censoring, filtering, blocking and

deleting content that was contrary to their political ideology.

376.735.    The named Defendants have intentionally determined that all statements

related to the ongoing investigations into election misconduct would be filtered and censored.

377.736.    The Defendants have participated in conduct and actions resulting in,

among other things, unconstitutional suppression of Plaintiffs' right to a free press, right to

assemble, speak *and* hear the legitimate thoughts and ideas of others.

378.737.    Defendants knowingly and intentionally, created, utilized, and conspired

to implement policies, procedures, algorithms and other means to suppress the 1stFirst

Amendment rights of its users, with knowledge that this would impact the Plaintiffs and all

others similarly situated, whether the voter is a user of Facebook, or not.

123

738.     Facebook and Zuckerberg, conspired with others, herein identified as DOES, 1-10,000, to cooperate in the censorship and join in the labeling and banning of certain political ideology in opposition to that shared by Zuckerberg, in which he had invested so much.

739.     By becoming intricately involved in the funding of the non-profit organizations that worked closely with targeted cities and counties, against state law and with federal regulation, which involved the machinery of the elections, themselves, Zuckerberg, Facebook and CTCL may fairly be treated as the state itself.

740.     Private persons "jointly engaged with state officials in the challenged action, are acting 'under color of law', for purposes of section 1983." *Dennis v. Spark*, 449 U.S. 24, 28 (1980). [119]

741.     Ordinarily, a state pays for the costs of an election.

742.     Zuckerberg, voluntarily became part of a state mechanism, while he used his personal control over the largest social media platform in the world to suppress the speech of those with whom *he* disagreed.

743.     Said behavior, coupled with the clearly documented and overwhelming evidence of unconstitutional behavior, called out, by name, by 20 Attorneys General across the country, amounts to probable evidence of concerted action between the Defendants, and many others.

744.     The suppression by Facebook and Zuckerberg of the First Amendment rights of the Plaintiffs and all others similarly situated was part of a greater plan to influence the Election.

---

[119] *Dennis v. Spark*, 449 U.S. 24, 28 (980).

386.745.    The Defendants knowingly and intentionally engaged in this unconstitutional conduct with malice aforethought, believing that no one would do anything about it.

387.746.    As a direct and proximate result of Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their rights, in violation of the First and Fourteenth Amendments of the Constitution, and have and continue to suffer damages, mental distress, anguish, humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requestsrequest that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

## COUNT V

### VIOLATION OF 18 U.S.C. § 1962(C)
### ENTERPRISE RACKETEERING
(Facebook, CTCL, Zuckerberg and Chan)

747.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

748.    It is unlawful for any person to acquire or maintain any interest or control of an "enterprise" through a pattern of "racketeering activity."

749.    It is also unlawful for any person employed by or associated with any "enterprise" to conduct affairs of the enterprise through a pattern of racketeering activity.

750.    An unlawful "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated-in-fact, though not a legal entity.

751.    Racketeering activity includes state law crimes, and a specified list of federal

crimes that includes mail fraud, wire fraud, and the interstate transportation and sale of stolen and fraudulently obtained goods.

752.    Federal law makes it unlawful to acquire or maintain control of an enterprise through a pattern of criminal activity or conspire to do so.

753.    Federal law provides civil remedies, including treble damages, available to any person injured as a result of enterprise racketeering activity.

754.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

755.    Defendants are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

756.    The enterprise is an ongoing organization that functions as a continuing unit to affect the outcome of Presidential elections, and to influence, conceal, intimidate, sue, threaten, censor and fact-check those who attempt to expose its unlawful and unconstitutional activities— all in a scheme to protect the interests of the enterprise.

757.    The enterprise utilizes and assembles additional, loosely affiliated organizations and persons to cause unrest and civil discord, racial division, and other methods of intimidating the Nationwide Class, in violation of 18 U.S.C. § 151(b) and 18 U.S.C.§ 241.

758.    Defendants have conducted and participated in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), plotted a conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans" used to "fortify" the election through new voting machines,

126

new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media information censorship, propaganda and media manipulation, and lawsuit suppression, which includes multiple instances of filing strategic lawsuits against public participation, tampering with or intimidating class participants in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 241, and multiple instances of using its enormous political power and influence to continue its narrative, including using its political might and political majority to forever change the political and legislative rules and laws so that they may never be challenged in future elections.

759.    Defendants exerted and continue to exert control over the enterprise, and Defendants continue to participate as public officials in charge of the evidence of their misdeeds, use political influence and intimidation to conceal and block access to public records and election materials which belong to the people and the Nationwide Class, and threaten retaliatory action to silence dissent.

760.    Defendants exert control of the public platforms and media narrative, in concert, for the purpose of slander, doxing, blacklisting, threats and intimidation for the exercise of protected speech and other civil rights violations under 18 U.S.C. § 241.

761.    Defendants' enterprise maintained a common communication network by which co-conspirators shared and continue to share information and resources on a regular basis.

762.    The enterprise used and continues to use a common communication and financial network for the purpose of controlling the political and public perception and narrative against any attempts of the Classes to seek investigation or the public redress of grievances, and to maintain pressure over the public forum.

763.    Each participant in the enterprise had a systematic linkage with each other to coordinate their activities through corporate or non-profit organizational ties, political associations, civic societies, contractual relationships, and financial ties.

764.    The enterprise functioned, and continues to function, as a unit with the purpose of furthering, concealing and expanding their illegal scheme and common purposes.

765.    The enterprise used the mail and wires, and foreseeably caused others to use the same, for the transmission, delivery, communication, and shipment of the following:

a.   Contracts between state actors;

b.   Applications for COVID related grants, and other funding, to influence the ballot workers, staff and other third parties;

c.   Wires and emails among and between complicit parties and grant recipients;

d.   Wires and mail between Defendants, other state actors, attorneys and other participants related to the 2020 Presidential election;

e.   Payments to and for staff, agents, contractors, and others in relation to the enterprise's activities;

f.   Emails and letters between Defendants, and other complicit individuals;

g.   Emails and electronic means to "fact-check," censor, dox and troll the Nationwide Class, and others, from assembling in groups online;

h.   Electronic means on Facebook's platform to censor dissenting political speech, political views, information and other evidence of the enterprise's activities; and,

i.   Electronic means that distribute and construct political narratives, propaganda, and means of controlling the political message of the enterprise.

766.    The enterprise utilized interstate commerce, mail and wires for the purpose of maintaining the scheme.

767.    Defendants also used the Internet, social media platforms, digital networking, satellites, algorithms, connectivity and other electronic facilities to carry out the scheme, and to

conceal the ongoing fraudulent activities.

768.    Defendants communicated by US Mail, intercepted ballots through unlawful and disproportionately placed ballot "drop boxes" and other unsupervised mail activity, in coordination with municipalities, local government offices, and others, in furtherance of the scheme.

769.    To achieve the common goals of the enterprise, Defendants concealed their illegal activities from the general public, and justified the conduct of the enterprise as COVID-19 relief.

770.    The scheme of the enterprise, and racketeering activities described herein, was a common course of conduct intended to influence the 2020 Presidential election.

771.    The racketeering activities of the enterprise are related, have similar purpose and goals, and affected a class of similar victims, including Plaintiffs, the Nationwide Class and subclasses.

772.    The racketeering activities of the enterprise are part of the ongoing business, political agenda and common goals of the enterprise, which constitutes a continuing threat to the rights of the Plaintiffs and the Classes' members.

773.    Each act of the Defendants, as part of the pattern of racketeering activity, are separate and distinct from each other, and each act is a separate violation of law.

774.    Had Defendants not been complicit, and had they not concealed their scheme, the Plaintiffs and the Classes would not have suffered a loss of rights.

775.    The damages and injury to the Plaintiffs and the Classes were directly and proximately caused and continue to be caused by Defendants' racketeering activities of the enterprise.

776.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to

Plaintiffs and the Classes for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief below.

### COUNT VI

### VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)
(Facebook, CTCL, Zuckerberg and Chan)

777.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

778.    It is unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962.

779.    Defendants have violated § 1962(d) by conspiring to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise, through a pattern of racketeering activity.

780.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts, in furtherance of the enterprise.

781.    At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the enterprise, and intended to participate in it.

782.    As a direct and proximate result of Defendants' conspiracy to commit, and actual commission of overt predicate acts in furtherance of the enterprise, Plaintiffs and the Classes have been and are continuing to be injured, threaten to be substantially injured in the future, including injuries to their business or property, and set forth more fully herein.

783.    The damage caused by the conduct of the enterprise will continue unless the requested relief is grant and imposed by the Court.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

## COUNT VII

**Constitutional Challenge**
**47 U.S.C. 230(c), as applied**
**(Defendants Facebook and Mr. Zuckerberg)**

388.784.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Amended Complaint, as though fully contained herein.

785.    The Supremacy Clause of the Constitution establishes that the Constitution, federal laws made pursuant thereto, and treaties made under its authority or in existence prior to, are the supreme Law of the Land, and take priority over acts of Congress.

786.    The federal courts retain the authority to determine the constitutionality of laws established by Congress and may declare any such act void if it is inconsistent with the Constitution. *Marbury v. Madison*, 5 U.S. 137 (1803).

787.    Judicial Review is an inherent function of the district courts of the United States, and is the "very essence of judicial duty." *Id.* at 178.

389.788.    The unlawful and unconstitutional actions of Defendants, Facebook, and Mr. Zuckerberg, and their agents and employees, in violation of, among other things, Plaintiffs' protected right of free speech, free press, and right to assemble has caused an ongoing and imminent threat of the loss of Plaintiffs' rights, and those of all others similarly situated.

~~390.~~789.     This ongoing contravention of rights ~~has burdened~~burdens the Plaintiffs' right to vote, as well.

~~391.~~790.     ~~The Supreme Court has held that if~~State action is present when a private party ~~is "a willful participant~~willfully participants in joint activity with ~~the~~a State, or its agents.~~"~~ ~~then state action is present. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).~~

~~392.     As has been demonstrated, Defendants, Mr. Zuckerberg and Ms. Chan, utilized Defendant, CTCL, as the conduit to interact with, and fund select municipalities and counties.~~

~~393.     Defendants, Mr. Zuckerberg and Ms. Chan, derived the money to fund their political agenda from their alter-ego, Defendant, Facebook.~~

~~394.~~791.     ~~Defendant,~~ Facebook, at the direction of ~~Mr.~~ Zuckerberg, uses the exemption from civil liability, provided under Section 230, to label and censor content that opposes their preferred cultural and political ideology, as offensive, harassing, and violent.

~~395.~~792.     Additionally, ~~Defendant~~ Facebook, at the direction of ~~Mr.~~ Zuckerberg, publishes their own content to support their political ideology and, thus, preserve their investment in the Election.

~~396.~~793.     ~~Defendants,~~ Facebook and ~~Mr.~~ Zuckerberg have participated in overt and covert acts to block and restrict access and availability of material in a politically motivated and biased manner and without good faith.

~~397.~~794.     ~~Defendants,~~ Facebook and ~~Mr.~~ Zuckerberg, by publishing and providing their own politically charged content, lost their immunity and protection as a "Good Samaritan" ~~in contravention of~~under Section 230.

~~398.~~795.     Plaintiffs seek review of the constitutionality of Section 230, as applied to ~~Defendants,~~ Facebook and ~~Mr.~~ Zuckerberg.

399.796.   Plaintiffs' claims are supported by the ongoing congressional review of Facebook's censorship and blocking conduct, especially as it relates to the intentional manipulation and interference in the public election process, nationwide. Plaintiff's claims

797.   Section 230 does not permit the Facebook monopoly to publish its own progressive political ideology and content, through its enterprise partnerships—while blocking, fact-checking, and labeling dissenting political speech under a false determination as "misinformation," or as "lewd, lascivious, filthy, and obscene."

798.   These designations were adopted by Congress in 1996 to control pornographic content, not constitutionally protected political speech.

799.   Section 230 does not allow Facebook's conduct, directed at political opponents of the enterprise, as its censorship was not done in *good faith*, as mandated by Section 230,.

800.   Facebook's anti-competitive monopoly, as outlined by the Federal Trade Commission in its current Antitrust lawsuit against Facebook, allows it to eliminate any other competitive social media platforms, and monetize Section 230 on behalf of the government.

801.   Facebook as developed a "censorship industry," focusing its control over the Public Forum,[120] and in support of the enterprise, of which it is a part.

802.   Speech in public forums, are supported by substantial evidence being disclosedtypically subject to time, place, and manner regulations, that take into account control, traffic and scheduling of different meetings or demonstrations at the same time and place, thereby preventing the blockages of building entrances, and the like.[121]

---

[120] *See* A Comprehensive Review of the "Public Forum", Cornell Law, U.S. Constitution Annotated at: https://www.law.cornell.edu/constitution-conan/amendment-1/the-public-forum#fn1465amd1.
[121] *See, e.g.*, Heffron v. ISKCON, 452 U.S. 640, 647–50 (1981).

803.   Such regulations are closely scrutinized in order to protect free expression and, to be valid, must be justified without reference to the content or subject matter of the speech, serve a significant governmental interest, and leave open ample alternative channels for communication of the information. [122]

804.   Facebook's anti-competitive ideology leaves no alternative channels for communication on social media platforms, finding that it is "better to buy than compete."[123]

~~400.~~805.   Facebook, ~~Mr. and~~ Zuckerberg, ~~and others herein identified as DOES 1-10,000,~~ interfered in the ~~public~~ 2020 Presidential election ~~process,~~ by blocking and censoring content in opposition to their political narrative, and by actively publishing content in support of ~~one~~the other, political ideology—which disparately impacted the incumbent candidate, and his supporters.

~~401.~~806.   ~~Therefore, good~~Good cause exists for this Court to determine the constitutionality of 47 U.S.C. § 230(c), as applied to the Defendants, Facebook ~~and Mr.~~ Zuckerberg and the other enterprise participants,

~~402.~~807.   Plaintiffs and ~~all others similarly situated~~the Classes will continue to suffer irreparable harm without legal remedy from the civil liability shield, created by said "Good Samaritan" protection.

808.   Plaintiffs are informed and aware of the notice requirements of F.R.C.P. 5.1, and shall provide all notices required by law~~.~~.

~~403.~~809.   and hereby seek certification by the Court, pursuant to F.R.C.P. 5.1(b) and 28 U.S.C. § 2403(a), of the following question:

> Whether the "Good Samaritan" protection, pursuant to 47 U.S.C. § 230(c), applies to the acts and omissions of Facebook.

---

[122] *See Niemotko v. Maryland*, 340 U.S. 268 (1951).
[123] *FTC v. Facebook, Inc.*, 1:20-cv-03590, Amended Complaint (Doc. 51), p. 2, ¶ 5.

~~COUNT VI~~

~~**REQUEST FOR DECLARATORY JUDGEMENT**~~

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief below.

**COUNT VIII**

**Constitutional Challenge**
**Michigan State Law-M.C.L. 168.759(3), as applied**
(Defendant Nessel)

810.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

811.    The States shall appoint electors for the President and Vice President in such a manner as the state Legislators may direct.

812.    The administration of a Presidential election is an express public function of the States.

813.    Whether a state statute is unconstitutional is a Federal question for determination by the federal courts of the United States.

814.    The Attorney General of the State of Michigan, under her common law power and the state statutes, has the general authority imposed upon her of enforcing constitutional statutes of the State, and is a proper party defendant to a suit brought to prevent the enforcement of a State statute, on the grounds of its unconstitutionality.

815.    Judicial review of state laws is a function in actions for vindication of rights under 42 U.S.C. § 1983.

816.    State laws implemented in violation of the fundamental right of registered voters

to cast a ballot for the President and Vice President, or that conflict with federal civil or criminal laws that affect said national interest, are unconstitutional.

817.    The impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.

818.    There is a pervasive national interest in the selection of candidates for President and Vice President, and this national interest is greater than *any* interest of an individual State.

819.    State laws governing the election machinery must serve the entire national electorate community.

820.    The Michigan Legislature amended the Michigan Laws to allow registered voters to right to requests and vote by absentee ballot.

821.    Specifically, M.C.L. § 168.759(3) allows application for an absent voter ballot by: (a) a written request signed by the voter; (b) on an absent voter ballot application form provided for that purpose by the clerk of the city or township; or (c) on a federal postcard application.

822.    M.C.L. § 168.759(3) does not include the office of secretary of state as the means for distributing absent voter ballots, reserving said authority to local clerks.

823.    M.C.L. §§ 168.759(4) and 168.761(2) provide express provisions to obtain the signature of the absent voter, and that such signature be used to determine the genuineness of the signature relevant to the voter on the resulting ballot.

824.    Benson, without authority of law, usurped the provisions of the aforementioned statute, and used the US Mail system to mail unsolicited absentee ballots.

825.    Benson's unconstitutional modification of Michigan's election rules resulted in the unauthorized distribution of millions of absentee ballots, without any signature verification.

826.    Benson, without legislative authority, unilaterally abrogated the rights of

Michigan voters, protected by the Fourteenth Amendment of the Constitution.

827.    Benson's unconstitutional behavior, under color of state law, had a direct and profound effect on the validity of the 2020 Presidential election results in Michigan, and allowed for misconduct in the administration of the national election by other enterprise participants.

828.    Benson's unconstitutional behavior requires judicial review of the constitutionality of the Michigan laws, as applied, to determine if the actions of Benson are under color of law, or if the act itself is unconstitutional.

829.    The certification of the 2020 Presidential election results by Whitmer, with knowledge of the aforementioned, were based upon the unconstitutional acts of the parties, herein, under color of law.

830.    This judicial review must be determined by declaratory judgment in resolution of the justiciable controversy set forth herein.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

### COUNT IX

**Constitutional Challenge**
**Georgia State Law- O.C.G.A. 21-2-386 et seq., as applied**
(Defendant Carr)

831.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

832.    Georgia Laws provide strict construction for the use of absentee ballots and signature requirements, and for cures of defective ballots pursuant to O.C.G.A. § 21-2-386, et seq.

833.    The Attorney General of the State of Georgia, under his common law power and

137

the state statutes, has the general authority imposed upon her of enforcing constitutional statutes of the State, and is a proper party defendant to a suit brought to prevent the enforcement of a State statute, on the grounds of its unconstitutionality.

834.    On March 6, 2020, Raffensperger, without legislative authority, entered into the "Settlement," described above, to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the express mandatory procedures, as set forth at O.C.G.A. § 21-2-386(a)(1)(B).

835.    Georgia's legislature has not ratified these changes to statutory law mandated by the Settlement, including altered signature verification requirements and early opening of ballots.

836.    This unconstitutional change in Georgia law materially benefitted one presidential candidate over another, and had a profound effect on the 2020 Presidential election results, and thus the voting rights of the Plaintiffs and Classes.

837.    The effect of this unconstitutional change in Georgia election law, which made it more likely that ballots without matching signatures would be counted, had a material impact on the outcome of the 2020 President election.

838.    The unconstitutional change in election law allowed more absentee ballots to circulate, and for the mass volume of ballots to be intercepted and manipulated, in violation of the rights of Plaintiffs and Classes to a secure election.

839.    Raffensperger's unconstitutional modification of Georgia's election rules resulted in the unauthorized distribution of millions of absentee ballots without proper signature verification, thereby unilaterally abrogated the rights of all voters protected by the Fourteenth Amendment.

840.    Raffensperger's unconstitutional behavior, under color of state law, had a direct and profound effect on the validity of the 2020 Presidential election results in Georgia, and allowed for misconduct in the administration of said election by other enterprise participants.

841.    Raffensperger's unconstitutional behavior requires judicial review of the Settlement, and its effect on the constitutionality of O.C.G.A. § 21-2-386, et seq., as applied, to determine if the actions of Raffensperger were unconstitutional, and/or if the act itself is unconstitutional.

842.    The certification of the election results by Kemp with knowledge of the aforementioned, were based upon the unconstitutional acts of the parties, herein.


843.    This judicial review must be determined by declaratory judgment in resolution of the justiciable controversy set forth herein.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

### COUNT X

**Constitutional Challenge**
**Pennsylvania State Law-Act 77, on its face and as applied**
(Defendant Shapiro)

844.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

845.    The Attorney General of the State of Pennsylvania, under his common law power and the state statutes, has the general authority imposed upon his Office for enforcing constitutional statutes of the State, and is a proper party defendant to a suit brought to prevent the enforcement of a State statute on the ground of its unconstitutionality.

846.     On October 31, 2019, Wolf signed Act 77, which implemented sweeping reforms to the elections process in Pennsylvania.

847.     Act 77 created a new option to vote by mail, without providing an excuse.

848.     Said Act allowed voters to request and submit mail-in or absentee ballots up to 50 days before an election.

849.     Said Act established a semi-permanent, mail-in and absentee ballot voter list.

850.     The 2020 Presidential Election was administered by Pennsylvania election officials pursuant to Act 77, which included allowing for universal, no-excuse mail-in ballots to be counted in violation of the Pennsylvania constitution.

851.     Act 77 is unconstitutional because it expanded the scope of absentee voting to all voters, which, in effect created an entire class of electors who are shown to have received a mail-in ballot, despite never actually receiving a mail-in ballot.

852.     Act 77 is unconstitutional because it similarly produced a whole class of voters who received unsolicited or unrequested mail-in ballots that never voted via mail-in ballot and never intended to vote by mail.

853.     Act 77 does not provide Pennsylvania voters any meaningful method of disputing a mail-in or absentee ballot that has been submitted in their name, even where a ballot is improperly submitted by another individual.

854.     Even under circumstances wherein the voter insists that he or she did not submit a mail-in ballot, if the voting records suggest that such a ballot has purportedly been received from that voter, the voter is effectively deprived of their right to cast a vote as a direct and proximate result of the enactment of Act 77.

855.    Act 77 had a direct and profound effect on the validity of the 2020 Presidential election results in Pennsylvania, and allowed for misconduct in the administration of the national election by other enterprise participants.

856.    Act 77 requires judicial review of its constitutionality, on its face,

857.    The certification of the 2020 Presidential election results by Wolf with knowledge of the aforementioned, were based upon the unconstitutional law, challenged herein.

858.    This judicial review must be determined by declaratory judgment in resolution of the justiciable controversy set forth herein.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

### COUNT XI

**Constitutional Challenge**
**Wisconsin State Laws-Wis. Stat. 6.855(3) and 7.15(2m), as applied**
(Defendant Kaul)

859.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

860.    The Attorney General of the State of Wisconsin, under his common law power and the state statutes, has the general authority imposed upon his Office for enforcing constitutional statutes of the State, and is a proper party defendant to a suit brought to prevent the enforcement of a State statute on the ground of its unconstitutionality.

861.    Leading up to the 2020 Presidential election, in contravention of Wisconsin law, the WEC Defendants, and other local officials, unconstitutionally modified Wisconsin election laws that weakened, or did away with, established security procedures and photo ID requirements put in place by the Wisconsin legislature to ensure absentee ballot integrity.

Formatted: Font: Bold, Font color: Text 1

862.   For example, the WEC undertook a campaign to position hundreds of drop boxes to collect absentee ballots—including the use of unmanned drop boxes.

863.   Under Wisconsin Law, any alternate absentee ballot site shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners. Wis. Stat. 6.855(3).

864.   Unmanned absentee ballot drop-off sites are prohibited by Wisconsin law, as they do not comply with Wisconsin's expressly defined "[a]lternate absentee ballot site[s]." Wis. Stat. 6.855(1)(3).

865.   All ballot sites in Wisconsin must to be staffed pursuant to Wis. Stat. 7.15(2m).


866.   The use of drop boxes for the collection of absentee ballots, positioned predominantly in Wisconsin's largest cities, is directly contrary to Wisconsin law, that provides that absentee ballots may only be "mailed by the elector, or delivered in person to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b).

867.   In Wisconsin, any ballot not mailed or delivered as provided above, may not be counted. Wis. Stat. § 6.87(6).

868.   The unlawful use of unmanned ballot boxes violates federal law related to the interception of US Mail.

869.   Ballots are US Mail.

870.   The WEC Defendants, without authority of law, usurped the provisions of the aforementioned state laws, and used the US Mail system to carry out the agenda of the enterprise by mass mailing absentee ballots, and collecting them in said unmanned, ballot boxes.

871.   The WEC Defendants unconstitutional modification of Wisconsin's election rules

resulted in the unauthorized distribution of millions of absentee ballots, in violation of law.

872.    The Defendants' actions, without legislative authority, unilaterally abrogated the rights of All voters protected by the Fourteenth Amendment of the Constitution.

873.    The Defendants' unconstitutional behavior, under color of state law, had a direct and profound effect on the validity of the 2020 Presidential election results in Wisconsin, and allowed for misconduct in the administration of the national election by other enterprise participants.

874.    Defendants' unconstitutional behavior requires judicial review of the constitutionality of the Wisconsin laws, as applied, to determine if the actions of state actors are under color of law, or if the act itself is unconstitutional.

875.    The certification of the 2020 Presidential election results by Evers, with knowledge of the aforementioned, were based upon said unconstitutional acts of the parties, under color of law, which shall be determined herein.

876.    This judicial review must be determined by declaratory judgment in resolution of the justiciable controversy set forth herein.

Wherefore, Plaintiffs request that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

**COUNT XII**

**REQUEST FOR DECLARATORY JUDGEMENT**
**42 U.S.C. § 1988**
**28 U.S.C. § 2201, 2202**
**Federal Rule of Civil Procedure 65**
(Against all Defendants)

404.877.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

405.878.    Defendants, each of them, acted in contravention to the limitations imposed by the Constitution and the laws related to a federal presidentialPresidential election to the injury of Plaintiffs.

406.879.    Plaintiffs seek declaratory judgment for all unconstitutional acts, which shall be evidenced and established by these proceedings.

Wherefore, Plaintiffs requestsrequest that the Court grant the relief as described in the Plaintiff'sPlaintiffs' Prayer for Relief, below.

COUNT VII

COUNT XIII

**PERMANENT INJUNCTIVE RELIEF**

(Against all Defendants)

407.880.    Plaintiffs incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

408.881.    Plaintiffs seek permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters.

409.882.    Federal courts have broad discretion for an award of equitable relief. *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980).[124]

Wherefore, Plaintiffs requestsrequest that the Court grant the relief as described in the Plaintiff' sPlaintiffs' Prayer for Relief, below.

**VI. PRAYER FOR RELIEF**

The people created the Constitution to protect themselves from the loss of liberty. In that

---

[124] *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980).

144

manner, certain rights were delegated to the states and federal government, the latter of which has the exclusive power to declare war, create money and interpret the laws of the land.

Corporations are creations of a state, and often hold enormous power and wealth. The Constitution protects the people from the states and their corporate creations. The Constitution guarantees a republican form of government and prohibits Congress, and the states, from unduly burdening free speech and the right of assembly. No state shall violate the constitutional rights of the people, which include rights to due process, equal protection and, for some, to vote. These are fundamental rights, which must be protected by the people, federal government and the states—in that order.

Here, a multi-billionaire, his corporation and many others, infused hundreds of millions of dollars into a presidential election. These persons became personally and voluntarily involved in the most important function of government, granted to the states through the Constitution. Having done so, even through alter-egos and non-profits, Mr. Zuckerberg, and others, became inextricably woven into the functioning of government, and thus owed a duty to the people to conduct themselves within the boundaries of public law and the Constitution.

It is not satire to suggest that Mr. Zuckerberg and Ms. Chan are not the Masters of the Universe. They are U.S. Citizens and are no more important than any other person in the United States. No one is above the law. How many times have the people heard that? Yet, it is true. No matter how much money certain persons have, and no matter who is cooperating with those persons, free and fair elections are the most sacred right of the people.

Everyone has a right to free speech, but not everyone can vote. That right is bestowed upon a citizen as a civil right, granted by the authority of the created state. Once granted, that right becomes a fundamental right of the individual.

Collectively, the people have been voting since before the Revolution. Only through a right to vote can the people elect those who will honestly protect their liberties. Without fair elections, inevitably, tyranny will prevail. In such an event, all of the people's rights are at risk.

The Defendants acting under color of their official authority are personally liable for the damages caused to the Plaintiffs. Suffice it to say, the violation of a person's constitutional rights carry a monetary value, to be determined by the jury. More importantly, however, those persons must be enjoined from any further unconstitutional behavior that, if not enjoined, they will commit in future presidential elections, conducted in their respective states.

On the other hand, Defendants, Dominion, Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and others herein listed as DOES 1-10,000, collectively, have enormous wealth. Just the contracts between Dominion and the several states, herein, are in excess of one hundred million dollars in public funds. Mr. Zuckerberg, Ms. Chan, Facebook, CTCL and others, are sued herein precisely because these Defendants used their almost unlimited financial resources to unlawfully interfere with the Election.

Their conduct has negatively affected the entire World. However, the Plaintiffs represent a designated class of persons that have standing to sue, i.e., the registered voter. The Plaintiffs and those similarly situated have birth certificates, driver licenses, social security cards and are on the jury rolls. These registered voters have an interest in choosing the President of the United States, as the chief executive officer, and Commander in Chief of the armed forces.

Although a voter may cast a ballot in a state holding a lawful and fair election, when other actors operate an unconstitutional presidential election in another state, every registered voter has an interstate interest in that matter, and is potentially harmed by the unlawful conduct.

Here, the damages are continuing. The shared, foreboding feeling of impending doom is

presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty. Those who support the challenger need only suffer a loss in the House of Representatives, pursuant to the Twelfth Amendment, to feel the anguish being endured by those who support the incumbent. Unfair elections have a way of devolving in that manner.  Thus, this lawsuit is being filed to give the people a civil mechanism to redress their grievances.

In a products liability case where, say, a ladder was defectively designed and thousands were hurt, the manufacturer and others would likely be sued, and the rest would learn from it. The Plaintiffs have fallen off the ladder, and the damage is done. Now, their goal is to ensure that ladders manufactured in the future don't have the same defects—or at least have a warning label on the top step.

With that, there must be a substantial monetary judgment imposed upon certain Defendants liable for the damages caused to the Plaintiffs and those similarly situated.

A nominal amount of $1,000 per registered voter equals damages in the approximate amount of $160 billion dollars. The Defendants, and others likely to be added, referenced herein as DOES 1-10,000 (some of which are foreign countries), can easily pay such a judgment, and would serve to discourage this behavior in the future.

Accordingly, a judgment of such an amount, or more, is the price of doing business.

WHEREFORE, Plaintiffs request that judgment be entered against the Defendants, and that the Court grant the following:

a.   Certification of the constitutional question, pursuant to F.R.C.P. 5.1 and 28 U.S.C.§ 2403;

b.   Declare Defendant, Facebook, is not protected by the "Good Samaritan" provision in 47 U.S.C. § 230(c);

**Formatted:** List Paragraph, Right:  0", Widow/Orphan control

c. ~~Declare that 47 U.S.C. § 230(c) is unconstitutional, as applied, to the actions of Defendants, Facebook and Mr. Zuckerberg;~~

d. ~~Declare the actions of the Defendants, as herein described, as unconstitutional and ultra vires, thereby making them legal nullities;~~

e. ~~Declare the unconstitutional actions of the Defendants have stripped them of their official character;~~

f. ~~Permanently restrain the Defendants from any further unconstitutional behavior, as herein described;~~

g. a. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as ~~the~~ representatives of the action ~~Class; Assume jurisdiction over the action~~ Classes;

b. Certification of the constitutional and federal questions, pursuant to F.R.C.P. 5.1 and 28 U.S.C.§ 2403;

c. Declare Dominion, Facebook and CTCL as state actors for the purposes of granting 42 U.S.C. § 1983 relief.

d. Declare that the use of high-technology voting machines is unconstitutional for the use of artificial intelligence in adjudications without due process and equal protection.

e. Declare that Dominion's contractual agreements with the state and local municipalities is unconstitutional for the use of "proprietary" claims and non-disclosure clauses in violation of the Open Records and Sunshine Laws;

f. Declare Facebook, is not protected by the "Good Samaritan" provision in 47 U.S.C. § 230(c);

g. Declare that 47 U.S.C. § 230(c) is unconstitutional, as applied, to the actions of Facebook and Zuckerberg in furtherance of the enterprise;

h. Declare that Michigan law, M.C.L. § 168.759(3) is unconstitutional, as applied;

i. Declare that Georgia law, O.C.G.A. § 21-2-386, et. seq., is unconstitutional, as applied;



Formatted: List Paragraph, Right:  0", Widow/Orphan control

Formatted: Right:  0"

Formatted: Indent: Hanging:  0.5"

Formatted: Normal, Indent: Left:  0.5"

Formatted: List Paragraph, Right:  0", Widow/Orphan control

Formatted: List Paragraph, Right:  0", Widow/Orphan control

Formatted: Right:  0"

j.      Declare that Pennsylvania law, Act 77 is unconstitutional, on its face, and as applied;

k.      Declare that Wisconsin law, Wis. Stat. 6.855(3) and 7.15(2m), is unconstitutional, as applied;

l.      Enter judgment against Defendants in favor of Plaintiffs and the Classes;

m.      Award the Plaintiffs and Classes damages, in an amount to be determined at trial;

n.      Award the Plaintiffs and Classes treble damages, as an appropriate sanction for racketeering activity, pursuant to 18 U.S.C. § 1964(c);

o.      Grant orders pursuant to 18 U.S.C. § 1964(a), ordering each person involved in the enterprise, to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, and prohibiting any person from engaging in the same type of endeavor to include dissolution or reorganization of any enterprise as necessary or under the direction of the United States;

p.      Award actual, compensatory, statutory, and consequential damages;

q.      Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and impose a constructive trust upon, or otherwise, restricting the proceeds of Defendants' ill-gotten gains, to ensure a remedy;

r.      Grant permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct;

s.      Award pre-judgment and post-judgment interest at the highest rate allowed by law;

t.      Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees, as provided by law; and,

u.      Award such other relief as is just and proper, and any other equitable relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand trial by jury on all claims so triable as a matter of right.

Dated: ~~December 22~~March 15, 2020                Respectfully submitted,


/s/ Gary D. Fielder
**Gary D. Fielder** (CO 19757)
LAW OFFICE OF GARY FIELDER
~~2325 W. 72nd Ave~~1444 Stuart St.
Denver, CO ~~8022~~180204
(303) ~~650-1505~~306-0007
~~criminaldefense@fielderlaw.net~~


gary@fielderlaw.net


/s/ Ernest J. Walker
**Ernest J. Walker** (MI P58635~~*~~)
ERNEST J. WALKER LAW OFFICE
~~3368 Riverside Road~~
~~Benton Harbor, Michigan~~
~~(*pro hac vice* forthcoming)*~~


1444 Stuart St.
Denver, CO 80204
(O): (720)306-0007
(C): (303)995-4835
ernestjwalker@gmail.com

| Page 103: [1] Formatted | Plaintiffs' amandments | March 15, 2021 11:19:00 PM |
|---|---|---|

Signature block line, Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orph

| Page 103: [2] Formatted | Plaintiffs' amandments | March 15, 2021 11:19:00 PM |
|---|---|---|

Signature block line, Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orph

| Page 103: [3] Formatted | Plaintiffs' amandments | March 15, 2021 11:19:00 PM |
|---|---|---|

Signature block line, Right:  0", Add space between paragraphs of the same style, Line spacing:  Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  1" + Indent at:  0", No widow/orph