**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L.
CARTER, LORI CUTUNILLI, LARRY D.
COOK, ALVIN CRISWELL, KESHA
CRENSHAW, NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs, on their own behalf and of a class of
similarly situated persons,

v.

DOMINION VOTING SYSTEMS INC., a
Delaware corporation, FACEBOOK, INC., a
Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit
organization, MARK E. ZUCKERBERG,
individually, PRISCILLA CHAN,
individually, BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually, TOM
WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L.
THOMSEN, individually, MARGE
BOSTELMAN, individually, JULIE M.
GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

**DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF ITS MOTION TO
DISMISS**

**I.     INTRODUCTION**

Plaintiffs' opposition fails to overcome Facebook's dispositive arguments requiring dismissal of the Complaint.  Plaintiffs admit their claims rest on allegations about how the purported "actions of key players who participated in the administration of the 2020 President election" left them "questioning the integrity" of the election.  Dkt. 40 at 1.  They also concede that resolving their doubts about the election results is the purpose of their self-proclaimed "private attorney general" suit.  *Id.* at 2.  But Plaintiffs' general and subjective feelings about the election cannot satisfy the basic prerequisites for a cognizable claim against Facebook in this jurisdiction or anywhere else.

Plaintiffs cannot escape the fact that they have not alleged any specific Facebook conduct in Colorado that gives rise to their sweeping claims against Facebook about the election's administration in other states.  Nor have Plaintiffs explained how they have suffered any personal and particularized injury based on their general dissatisfaction with the election's administration, much less how any of the remedies they seek could redress that grievance.  Plaintiffs do not have standing as purported private attorneys general to raise claims based on the fact that others voted in the election or even to vindicate their own subjective perceptions about the integrity of the election.  Plaintiffs seek to litigate their generalized election grievances months after courts and legislatures in the relevant states affirmed their states' election rules, the relevant state legislatures and Congress confirmed the election results, a new President was inaugurated, and the U.S. Supreme Court agreed that actual state attorneys general lacked standing to bring the same sort of challenges to election conduct in other states.

1

Plaintiffs likewise cannot justify bringing any of their constitutional claims against Facebook—a private company. Facebook's ordinary private conduct in running a social media platform, allowing its employees to engage in private philanthropy, or publishing information about how to register to vote is a far cry from state conduct. And Plaintiffs cannot plead their claims around either the applicable Section 230 immunity or Facebook's entitlement to exercise its own well-settled First Amendment rights.

The Complaint should be dismissed with prejudice.[1]

## II. PLAINTIFFS FAIL TO SHOW THAT FACEBOOK'S CONDUCT AROSE OUT OF ITS CONTACTS WITH COLORADO

Plaintiffs assert that personal jurisdiction over Facebook lies in Colorado because "[c]ertain Plaintiffs are located within the District of Colorado, and most of the Plaintiffs and class members currently use Facebook services, have been targeted as users, have been shadow banned by Facebook, or other members of the enterprise, or have been injured through the bad faith censorship of important content." Dkt. 40 at 23-24. These allegations cannot establish either general or specific personal jurisdiction over Facebook in Colorado on the constitutional claims that Plaintiffs have alleged.

Plaintiffs premise their personal jurisdiction argument on an incorrect statement of the law. A court may not "obtain either general or specific jurisdiction over a defendant" by "[a]pplying

---

[1] While Plaintiffs' brief invokes 18 U.S.C. §§ 1961, 1962, and 1964 (Dkt. 40 at 3), and makes several vague references to racketeering (*e.g.*, *id.* at 20), their Complaint alleges no cause of action under these statutes. Plaintiffs further seek to rely on a litany of internet sources, which are not cited in the Complaint. "[A] document [that] is neither quoted nor referenced in the operative pleading, nor sufficiently alleged as authentic and undisputed, . . . may not be considered for a Rule 12(b)(6) analysis." *Stephens v. Embassy Cite Mgmt., LLC*, 2021 WL 857770, at *4 (D. Colo. Mar. 8, 2021).

2

the 'minimum contacts' analysis." Dkt. 40 at 24.  General jurisdiction instead lies over a corporation only in the jurisdiction where the corporation is "at home."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  There is no dispute that Facebook is not "at home" in Colorado because neither Facebook's "place of incorporation" nor its "principal place of business" are in the state.  *Id.*  In fact, Plaintiffs concede Facebook is a "Foreign Entity" to Colorado.  Dkt. 40 at 25 (citing Facebook's registration statement).

Plaintiffs' specific personal jurisdiction argument fares no better.  The mere fact that certain Plaintiffs reside in Colorado cannot confer specific jurisdiction over Facebook in this state—the question of specific personal jurisdiction looks at a defendant's conduct in the state, not the residency of the plaintiffs.  *See Anzures v. Flagship Restaurant Group*, 819 F.3d 1277, 1281 (10th Cir. 2016) (observing that "the fact that [Plaintiff] was affected in Colorado (because he resides there) is insufficient to authorize personal jurisdiction over defendants").  To establish specific personal jurisdiction, Plaintiffs must show that actual conduct by Facebook in Colorado gave rise to their specific claims related to the election's administration.  This they cannot do as their laundry list of purported election grievances pertain to events that took place wholly in other states.

The same holds true of Plaintiffs' new, unpled assertion that Facebook sometimes works with a non-defendant Colorado-based fact checking company, which, even if true, would not satisfy the requirements of specific personal jurisdiction over their election-related constitutional claims.  Plaintiffs do not plead that this fact checking entity engaged in any Colorado conduct related to their specific claims surrounding the election and voting in other states.  And Facebook having an agent in Colorado to accept service of process does not satisfy Plaintiffs' burden either

as "service, in and of itself, is an inadequate contact with the state . . . to create specific jurisdiction." *Costilla v. Hall & Ludlam*, 2017 WL 2591428, at *4 (D. Colo. June 15, 2017) (citation omitted). Given their conclusory allegations, Plaintiffs fail to establish any basis for this Court to conclude it has personal jurisdiction over Facebook in Colorado on these particular claims.

### III.   PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR CLAIMS

Plaintiffs assert several purported standing arguments, none of which hold water. In essence, Plaintiffs seem to contend that seeking nominal damages means they have satisfied Article III standing. Dkt. 40 at 21–22 (citing *Uzuegbunam v. Preczewski*, 592 U.S. ___ (Mar. 8, 2021) (slip op.)). But the mere fact that nominal damages *may* in appropriate circumstances redress a completed constitutional injury says nothing about whether Plaintiffs have alleged that they personally have suffered a cognizable injury here that is specific, concrete, and sufficiently particularized to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Nor does it show that any of Plaintiffs' general grievances with the election are fairly traceable to Facebook's conduct.

Plaintiffs continue to allege that "[a]ll qualified voters have a constitutionally protected right to vote," the purported denial of which they seek to vindicate. Dkt. 40 at 21–23. Yet Plaintiffs still fail to explain with any specificity how their right to vote has been denied by the fact that citizens in other states were allowed, encouraged, or helped to vote. *Id.* Quite the opposite, Plaintiffs attest they either voted or voluntarily chose not to vote based on subjective feelings about

4

whether their preferred choice in candidate would prevail.[2] Nor do they ever explain how any "alleged violation of the right to vote arises from an invidious classification … to which [they] are subject" that caused their votes to be "discounted." *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 358 (3d Cir. 2020) (quoting *Reynolds v. Sims*, 377 U.S. 533, 55 n.29 (1964)). Plaintiffs have no personal injury that can be redressed by their claims for relief or the courts generally— nominal damages or not.

Numerous federal courts have already reached this same conclusion in dismissing claims resting on the same purported injury to voters writ large or subjective perceptions related to the election's administration or outcome. *See, e.g., Feehan v. Wisc. Elections Comm.*, 2020 WL 7250219, at *8 (E.D. Wisc. Dec. 9, 2020) (dismissing case as voter has no judicially cognizable interest in challenging state and local regulations facilitating expanded voting options); *King v. Whitmer*, 2020 WL 7134198, at *9 (E.D. Mich. Dec. 7, 2020) (same); *Bowyer v. Ducey*, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020) (rejecting vote dilution claim based on alleged problems with election administration where "[a]bsent from the Complaint is an allegation that Plaintiffs . . . were deprived of their right to vote"). As the Eleventh Circuit explained in *Wood v. Raffensperger*,

---

[2] *See* Compl. Exh. 1 (Affidavit of Kevin Patrick O'Rourke), ¶ 11 ("I have, for the previous two presidential election cycles, not voted . . ."); *Id.* Exh. 2 (Affidavit of Nathaniel L. Carter), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America"); *Id.* Exh. 3 (Affidavit of Lori Ann Cutinilli), ¶ 4 ("I participated as a Colorado registered voter in the November 3, 2020 presidential election"); *Id.* Exh. 5 (Affidavit of Larry D. Cook), ¶ 3 (" I am a registered voter in Los Angeles County and have voted in most elections, including the 2020 Presidential election held on November 3rd, 2020"); *Id.* Exh. 6 (Affidavit of Kesha Charmaine Crenshaw), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America"); *Id.* Exh. 7 (Statement of Neil Yarbrough), ¶ 9 (Colorado Plaintiff stating "I'm sorry and embarrassed to say that I have no faith in our elections, and did not even vote in this last election"); *Id.* Exh. 8 (Statement of Amie D. Trapp), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America")

registered voters have no general standing to challenge the basic administration of an election, such as the counting of ballots, under the Electors Clause, Equal Protection Clause, and Due Process Clause as "no single voter is specifically disadvantaged if a vote is counted improperly." 981 F.3d 1307, 1314–15 (11th Cir. 2020). A voter's claims about "vote dilution in th[at] context" are nothing more than "a paradigmatic generalized grievance." *Id.*; *see also, e.g.*, *Gill v. Whitford*, 138 S.Ct. 1916, 1933 (2018) (plaintiffs cannot plead claims "about group political interests" rather than "individual legal rights" as federal courts are "not responsible for vindicating generalized partisan preferences"). So too here.

It is fatal to Plaintiffs' cause that they continue to base their standing arguments on the mere assertion that "every registered voter was deprived of a fair and legitimate process administered by the relevant state actors." Dkt. 40 at 22. These allegations, parroted from the litany of already dismissed cases, fail to establish standing and, on their face, are the sort of generalized "the law . . . has not been followed" grievance that cannot establish standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007); see *also* Dkt. 22 at 6 (collecting cases); Dkt. 41 at 6 (collecting cases).³ This suit is of the same ilk.

Nor do Plaintiffs ever address how Facebook's conduct as a private company is traceable in any way—much less "fairly traceable"—to their alleged grievance that voting rights were somehow infringed in the election. This is a separate and independent legal requirement for standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs do not and cannot

---

³ In fact, one court recently referred counsel in a similar case to the Grievance Committee for bringing election-related claims on debunked election fraud allegations and legal bases foreclosed by precedent, especially where counsel continued to press the same arguments after being confronted with obvious fatal problems with their suit. *Wisconsin Voters Alliance v. Pence*, 2021 WL 686359, at *2 (D.D.C. Feb. 19, 2021).

plausibly allege that Facebook's mere publication of content online from other users somehow prohibited them from being able to vote or have their vote counted, and certainly it could not have done so on the basis that they belong to a protected class of voters.

And, finally, Plaintiffs never address how most of the relief they seek beyond nominal damages could remedy any purported injury to general voting rights from the administration of the last election. For example, despite their contention that this suit is not "the latest in a series of failed attempts to overturn the 2020 Presidential election" (Dkt. 40 at 2), they in fact seek a declaration that "the actions of the Defendants," including state officials in Michigan, Georgia, Pennsylvania, and Wisconsin, related to the election were "unconstitutional and ultra vires, thereby making them legal nullities." Compl., Prayer for Relief. Plaintiffs are not entitled to re-litigate the results of the 2020 election and seek a re-do in every jurisdiction in America.

## IV.  PLAINTIFFS FAIL TO SHOW THAT FACEBOOK IS A STATE ACTOR

Plaintiffs concede their constitutional claims require Facebook be a state actor. Dkt. 40 at 18. Yet Plaintiffs make only two arguments—both of which are foreclosed by precedent—that Facebook's ordinary private business conduct is actually state action.

*First*, Plaintiffs allege that Facebook's monitoring of its social media platform is state action because its private social media platform is equivalent to a "company town." Dkt. 40 at 15-16 (citing *Marsh v. Alabama*, 326 U.S. 501, 505-06 (1946)). But the Supreme Court has rejected Plaintiffs' theory that merely providing a forum for speech transforms a private company into a state actor subject to the First Amendment's protections. *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (First Amendment "prohibits only *governmental* abridgement of speech" and "does not prohibit *private* abridgement of speech."). Multiple federal

7

courts likewise have confirmed that Facebook's provision of a social media forum does not transform its private editorial decisions about what to publish and what not to publish into state action or censorship. *See, e.g.*, *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. Oct. 2, 2020) ("To the extent that the constitutional claims are free speech claims premised on the blocking of the plaintiffs' accounts, they fail because Facebook is not a state actor."); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) (same).[4] Rather, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State''—which "'very few' functions fall into." *Manhattan*, 139 S.Ct. at 1928–29. The state has never—much less traditionally or exclusively—been known to operate social media platforms. *Id.* at 1929 (stating that "[t]he relevant function in this case is operation of public access channels on a cable system," and holding that function "has not traditionally and exclusively been performed by government"). Such a function is hardly equivalent to stepping into the shoes of the State to operate all the "municipal functions" of a town as the State typically does. There is no basis to treat Facebook as a state actor merely because it offers one popular online option among an endless multitude of online forums upon which Plaintiffs can post content. Indeed, Plaintiffs' efforts to

---

[4] *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) (dismissing First Amendment claims against Facebook, Google, and Twitter); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook cannot be deemed a state actor," and therefore "Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit"), *aff'd per curiam*, 774 F. App'x 162 (4th Cir. Aug. 7, 2019); *Fehrenbach v. Zeldin*, 2018 WL 4242452, at *2–3 (E.D.N.Y. Aug. 6, 2018) (dismissing claims against Facebook for failure to establish it is a state actor); *Nyabwa v. Facebook*, 2018 WL 585467, at *1–2 (S.D. Tex. Jan. 26, 2017) (same); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (same); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *2–3 (N.D. Cal. Oct. 25, 2010); *see also Green v. AOL*, 318 F.3d 465, 472 (3d Cir. 2003) (AOL is not "transformed" into a state actor because it "opens it network to the public"); *Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000) (same).

use the courts to force Facebook—a private company—to publish their preferred content would violate Facebook's First Amendment rights—not the other way around.  *See infra* at 11.

*Second*, Plaintiffs implausibly allege that Facebook "administer[ed the] elections of public officials" merely because it did not prevent its CEO from making private donations to certain organizations or published online content about how to register and vote.[5]  Dkt. 40 at 17–18.  Again, Plaintiffs fail to plead that Facebook itself ever donated anything to anyone.  But Plaintiffs also fail to provide any caselaw refuting Facebook's showing that "mere allegations regarding the donation of money are not sufficient to allege concerted activity between a private individual and a state actor for purposes of Section 1983."  Dkt. 23 at 11.  The well-established rule in the Tenth Circuit is that wholly conclusory assertions made about a "joint enterprise" involving a private actor is not enough to transform that private actor's conduct into state action.  *See Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983) ("mere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action"); *Silva v. US Bank, Nat'l Assoc.*, 294 F. Supp. 3d 1117, 1133 (D. Colo. 2018) (same).

It is also not enough for Plaintiffs to assert in conclusory fashion that Facebook's independent editorial decisions about what to publish on its platforms somehow transform Facebook into having administered an election.  A private entity's independent conduct is never

---

[5] Plaintiffs make several conclusory references to Facebook serving as the "alter ego" of Mark Zuckerberg.  Not only are their allegations against Mr. Zuckerberg absurd, Plaintiffs also fundamentally misunderstand, at best, or intentionally misstate, at worst, the legal framework for their conclusory alter ego references.  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 n.2 (10th Cir. 1993) (explaining alter ego tests allow a *principal* to be held liable for the actions of its agent where the *principal* "exercises extensive control over the acts of the" agent).  Regardless, Plaintiffs fail to explain how the conclusory allegations they recite could meet any possible alter ego test.

state conduct. And there is plainly no conduct to suggest that any of the state defendants "ha[ve] so far insinuated [themselves] into a position of interdependence with a private party that [they] must be recognized as a joint participant in the challenged activity.'" *Brill v. Correct Care Solutions, LLC*, 286 F. Supp. 3d 1210, 1216 (D. Colo. 2018) (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447, 1451 (10th Cir. 1995)).[6]

## V. PLAINTIFFS CANNOT STATE A CLAIM AGAINST SECTION 230'S CONSTITUTIONALITY

Plaintiffs summarily assert that Section 230 is unconstitutional both on its face and as applied to Facebook. As an initial matter, nowhere in Plaintiffs' Complaint do they bring a facial challenge to Section 230's constitutionality—nor could they bring that claim.

Plaintiffs have no standing to assert that Section 230 is unconstitutional because the statute merely provides immunity from liability to private "interactive computer service" providers based on content created by others. Section 230 does not compel speech or even require that any particular speech be published or removed by a company. Quite the opposite, it ensures the law will not be used to force private entities to censure or publish any particular speech out of a fear of liability for doing so. Plaintiffs have no First Amendment or any other constitutional right implicated by Section 230. *United States v. Ramos*, 695 F.3d 1035, 1047 (10th Cir. 2012) ("'A

---

[6] Moreover, a long line of courts have already rejected Plaintiffs' underlying arguments that the CTCL grants to which they point could give rise to any constitutional claim even against the organization that actually made these grants. Dkt. 41 at 1-2, fn. 1 (collecting eight federal district court cases, three unanimous appellate panels, and two Supreme Court Justice statements rejecting claims); *see also id.* at 9–10 (collecting cases that a private actor's mere donation of funds to state actors does not transform the private actor into a state actor). This correct and unanimous consensus that CTCL was not transformed into a state actor demonstrates Plaintiffs had no reasonable legal basis to bring these constitutional claims against Facebook, which is several steps further removed from these grants.

party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights.'") (quoting *Cty. Court v. Allen*, 442 U.S. 140, 154–55 (1979)).

Plaintiffs thus cannot state a constitutional claim against Section 230. Put simply, Section 230 is not government censorship. While "[t]he First Amendment … protects the right to be free from government abridgement of speech," the government "is not required to assist others in funding the expression of particular ideas, including political ones." *Ysursa v. Pocatello Ed. Ass'n*, 555 U.S. 353, 358 (2009). Facebook's decisions about what content appears on its platform, as exercised through its editorial decisions, is conduct protected by the First Amendment. *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) ("[W]e reaffirm unequivocally the protection afforded to editorial judgment.").

Indeed, numerous courts have already affirmed that an internet forum's "actions … in determining whether certain [content is] contrary to the [forum's] guidelines and thereby subject to removal" fall within the First Amendment's protections. *See, e.g.*, *La'Tiejira v. Facebook*, 272 F. Supp. 3d 981, 987 (S.D. Tex. 2017) (Facebook's editorial decisions "arise from the exercise of Facebook Defendants' free speech right to publish others' speech on its platform"); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) (website has a "First Amendment right to distribute and facilitate protected speech"); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) (online publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms because "the First Amendment's protections apply whether or not a speaker articulates, or even has, a coherent or precise message, and whether or not the speaker generated the underlying content in the first place"); *Davison*, 370 F. Supp. 3d at

629 ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit.").[7]

## VI. SECTION 230 BARS LIABILITY FOR PLAINTIFFS' CLAIMS

Plaintiffs fail to address the fact that Section 230(c)(1) provides Facebook with immunity for editorial decisions made on its platform, focusing instead entirely on Section 230(c)(2). Dkt. 23 at 12-14. Plaintiffs' failure to address Section 230(c)(1) thus alone compels dismissal because it implies that Plaintiffs either agree that Facebook is immune from liability under Section 230(c)(1) or they have no response. *Cf. Sands v. Integon Nat'l Ins. Co.*, 2020 WL 7027442, at *5 n.3 (D. Colo. Nov. 30, 2020) ("Defendants made additional arguments in their reply that are not in direct response to plaintiff's response brief. As a result, the Court will not consider those arguments.")

Rather than address Facebook's argument head on, Plaintiffs pivot to argue that Facebook is not immune under Section 230(c)(2). Dkt. 40 at 17-18. And their sole challenge to immunity under the statute rests on its conclusory allegation that Facebook lacked "good faith" under Section 230(c)(2). Dkt. 40 at 5, 12–13.

But it is well-settled law that Section 230(c)(1) applies with equal force to bar liability on Plaintiffs' claims. *See, e.g., Ben Ezra, Weinstein, & Co. v. AOL*, 206 F.3d 980, 986 (10th Cir. 2000) (Section 230 was enacted "to forbid the imposition of publisher liability on an [ICS] for the

---

[7] In seeking an order to prevent Facebook or its employees from donating money to private causes, publishing information about how to register to vote, and the like, Plaintiffs ironically seek to rely on *Buckley v. Valeo*, 424 U.S. 1 (1976), a case that held certain provisions in a statute seeking to impose campaign finance limits on private actors like Facebook and its employees were an unconstitutional restriction on the private entities' speech.

12

exercise of its editorial and self-regulatory functions."); *Green v. AOL*, 318 F.3d 465, 481 (3d Cir. 2003) ("Section 230 'specifically proscribes liability" "relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.").[8] Congress specifically recognized in enacting Section 230 that "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems" and thus expressly sought to give providers immunity to ensure any failure to achieve perfection in their moderation of content did not subject them to liability. *Zeran v. AOL*, 129 F.3d 327, 331 (4th Cir. 1997); *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("It would make nonsense of [Section 230] to say that [ICS] must lack the capacity to police content when the Act expressly provides them with immunity for doing just that."). And Section 230(c)(1) by its plain terms also does not impose any "good faith" requirement on a platform's editorial decisions.

Rather, Section 230(c)(2) covers Facebook's alleged content moderation under the good faith standard even assuming all of Plaintiffs' allegations as true. As courts have recognized,

---

[8] *See also Lancaster v. Alphabet Inc.*, 2016 WL 3648608, at *2-3 (N.D. Cal. July 8, 2016) (claim cannot be premised on decision to remove certain content); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (decision to "remov[e] content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher"); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (affirming Section 230 immunity barred liability on claims "arising from MySpace's decisions to delete Riggs's user profiles on its social networking website yet not delete other profiles"); *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) (Section 230 immunity applied to claims "seek[ing] to hold Facebook liable as a publisher for hosting, and later blocking, [plaintiff's] online content"); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007) ("Deciding whether or not to remove content or deciding when to remove content falls squarely within Ask.com's exercise of a publisher's traditional rule and is therefore subject to the CDA's broad immunity."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) ("so long as a third party willingly provides the essential published content, the [ICS] receives full immunity, regardless of the specific editing or selection process")

13

"traditional editorial functions often include subjective judgments" and "permitting litigation and scrutiny [of mere] motive could result in the 'death by ten thousand duck-bites'" that would fundamentally undermine Section 230. *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *8 (N.D. Cal. Oct. 26, 2011); *see also Domen v. Vimeo, Inc.*, 2021 WL 922749, at *2-4 (2d Cir. Mar. 10, 2021) (observing that Section 230(c)(2) "explicitly provides protection for restricting access to content that providers consider objectionable, . . . granting significant subjective discretion"). "[C]lose cases [thus] . . . must be resolved in favor of immunity, lest [courts] cut the heart out of section 230." *Roommates.Com*, 521 F.3d at 1174. Here, Plaintiffs at most seem to allege that they believe Facebook does not publish or moderate content in a manner consistent with the First Amendment's content neutral standards. But, again, the First Amendment does not apply to Facebook, and Facebook's decisions not to publish certain content cannot alone constitute bad faith as a result. *Domen*, 2021 WL 922749, at *4 ("Given the massive amount of user-generated content available on interactive platforms, imperfect exercise of content-policing discretion does not, without more, suggest that enforcement of content policies was not done in good faith"). Moreover, mere claims that a platform selectively enforces its content moderation policies are insufficient to survive a motion to dismiss under Section 230(c)(2). *See, e.g.*, *e360insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) (bad faith inadequately plead where plaintiff merely complained others were allowed to engage in similar conduct); *Holomaxx Techs v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1105 (N.D. Cal. 2011). Plaintiffs have neither alleged, nor plead, any bad faith conduct sufficient to avoid a motion to dismiss their claims.

Regardless, Plaintiffs' exclusive focus on the independent good faith exception in § 230(c)(2) is similarly misplaced. Plaintiffs nowhere allege any conduct by Facebook that could

rise to the level of "bad faith" here.  Instead, Plaintiffs conflate the test for the *reasonableness* of a *state actor's* conduct and the good faith exception in Section 230(c)(2), which governs an interactive computer service's conduct.  Dkt. 40 at 17-18.  These are not the same.

## VII.   CONCLUSION

For the reasons stated above, Plaintiffs' lawsuit and all of its claims are irrevocably and fundamentally flawed.  Plaintiffs also fail to address many of the arguments raised by Facebook in its Motion to Dismiss, including numerous pleading failures related to its various claims.  Dkt. 23 at 14–15.  This suit should be dismissed with prejudice.

Dated: March 23, 2021

Respectfully submitted,

/s/ Joshua S. Lipshutz

Joshua S. Lipshutz
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, NW
Washington, DC  20036
Telephone: 202.955.8217
Facsimile: 202.530.9614
Email: jlipshutz@gibsondunn.com

Ryan T. Bergsieker
Natalie J. Hausknecht
**GIBSON, DUNN & CRUTCHER LLP**
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone: 303.298.5700
Facsimile: 303.298.5907
Email: rbergsieker@gibsondunn.com
         nhausknecht@gibsondunn.com

Craig B. Streit
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone: 415.393.8225
Facsimile: 415.374.8487
Email: cstreit@gibsondunn.com

*Attorneys for Facebook, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2021, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.


*/s/ Joshua S. Lipshutz*
Joshua S. Lipshutz