IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO
DEFENDANT CENTER FOR TECH AND CIVIC LIFE'S MOTION TO DISMISS**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Response and Brief in Opposition to Defendant Center for Technology and Civic Life's Motion to Dismiss [Doc. 41], and hereby respectfully request that it be denied or, in the alternative, determined to be moot, for the reasons set forth below.

## I. INTRODUCTION

This is a civil rights case involving the deprivation of the fundamental, constitutional rights of all registered voters concerning the 2020 Presidential election (Election), which, as to Defendant, Center for Technology and Civic Life (CTCL), included a systematic plan and coordinated effort among members of an unlawful enterprise to infiltrate local elections and exert improper influence on election officials through payment of nation-state level funding to targeted municipalities for implementation of privatized election administration plans, including, but not limited to: purchasing preselected voting technology and alternate ballot collection machinery; training, directing and compensating election workers assisting with the effort, all of

1

which to inflate voter turnout in historically high Democrat voting areas; and, to illegally alter the results of the Election, as outlined in the Plaintiffs' complaint.

Because Big Tech giants, such as Defendants, Facebook and its CEO, Mark Zuckerberg, and others of the world's most wealthy elite, cannot simply buy local elections to exert their influence directly, in this instance, it was done with great media fanfare by funneling hundreds of millions of dollars, which included the monopoly power of social media influence, though CTCL's alleged charity.  Prior to the Election, CTCL had annually administered contributions of less than three-tenths of one percent (00.3%) of the level of funding in 2020—the overwhelming majority of which came from "charitable contributions" from Defendants, Mark Zuckerberg and Priscilla Chan. With evidence that would shock the consciousness of the public, during 2020, CTCL expanded its money-influence empire from its headquarters in Chicago, Illinois, to approximately 2,500 jurisdictions, wherein it executed private contracts (some in the tens of millions of dollars) with local counties and municipalities across the country. However, state records confirm that CTCL is not registered as a charity, nor is it registered to do business, in any state but Illinois.

CTLC's actions are profane to the Constitution on multiple levels.  At the macro level, CTCL's coordinated scheme sent significant private funding to select communities around the country, vastly disparate to what state legislators and Congress had authorized and allocated as each State's "fair share" of available election funding.  As a result, communities offered varying election processes, and voters were treated differently depending on location, even within the same state. These state actors intentionally created unfair, variable, and unequal levels of access and due process for the Election.

At the micro level, CTCL directed various unlawful activities, including, but not limited to: the purchase and placement of "Zuckerboxes" as an alternate means to intercept and collect ballots, otherwise destined for the US mail; the mass flooding of states with mail-in ballots; the purchase of ballot extractors used to strip ballots from security envelopes, thereby invalidating the votes; the purchase of defective vote counting machinery; and, compensation for colluding poll workers and "grant mentors."

CTCL's actions, however, are constrained by the Constitution, as the actions of CTCL transformed this otherwise private charity into a state actor. This is true, not just because it provided private funding at the level of a State, but because it inserted itself into, and dictated the administration of the Election, a traditionally exclusive function of the State. CTCL's interference with the Election harmed all registered voters across the country as it impacted the Office of President and Vice President, in which all registered voters possess an interest. Further, every registered voter has the right to vote for the Commander-in-Chief of the Armed Forces. This latter point cannot be overlooked. Additionally, the Plaintiffs have amended their complaint with the addition of RICO counts, wherein CTCL is separately liable for its participation as a member of the unlawful enterprise, associated-in-fact, as presented, in which state action is not necessary.

CTCL's source of funds and the illegal contracts it executed cannot be disputed. CTCL did not simply provide "COVID-19 relief." That was just the cover for election funding, evidenced by the contracts obligating communities to implement specific Election administration plans.

## II. BACKGROUND

Until 2020, CTCL had been a rather minor participant in previous election efforts having gross reported contributions of $666,904 (2015), $272,161 (2016), $738,060 (2017) and $560,319 (2018).[1] In the last year, however, those contributions skyrocketed by more than forty thousand percent (40,000%) when Zuckerberg and Chan put $350 million of their personal wealth into the coffers of CTCL, as part of the enterprise, outlined by the Plaintiffs.

CTCL began asserting influence with its initial $100,000 grant to Racine, Wisconsin, in May 2020, to not only pay for "planning safe and secure election administration in the City of Racine," but also by imposing a requirement that Racine then grant $10,000 each to Green Bay, Kenosha, Madison, and Milwaukee (collectively the five largest cities in Wisconsin) to pay for similar planning in those cities.[2] These funds ultimately produced a detailed Wisconsin Safe Voting Plan (WSVP), which included specific administration planning tied to Election funding, and added new administration positions that conflicted with duties of elected officials.[3] Despite noting significant challenges experienced with mail-in ballots and early voting during the Wisconsin primary, the WSVP's top strategic recommendation for the Election was to "Encourage and Increase Absentee Voting (By Mail and Early, In-Person)."[4]

By July 2020, CTCL contracted with each of the five Wisconsin cities, which totaled $6.3 million.[5] Racine received an additional $657,000 from CTCL in August 2020, primarily for more than 40 new election staff, additional compensation for staff, and extra ballot drop off boxes.[6]

---

[1] *See* CTCL IRS Form 990 Tax Returns.
[2] CTCL contract with City of Racine (May 28, 2020).
[3] Wisconsin Safe Voting Plan 2020 (Jun. 15, 2020).
[4] *Id.*
[5] Mary Spicuzza, *Wisconsin's Five Largest Cities Awarded $6.3 Million in Effort to Make Elections Safer Amid Coronavirus Pandemic*, Milwaukee Journal Sentinel (Jul. 6, 2020).
[6] CTCL contract with City of Racine (Aug. 31, 2020).

In August of 2020, CTCL entered into contracts with Delaware County, Pennsylvania,[7] worth approximately $2.2 million, and Philadelphia, Pennsylvania,[8] worth approximately $10 million. Both contracts were primarily for additional satellite offices, purchasing additional vote processing equipment, additional staff, and additional "hazard pay" for election workers.[9]

Centre County, Pennsylvania, approved a contract with CTCL for more than $860,000 for additional voting equipment, polling stations, and ballot drop boxes.[10] This happened all over the country, and is a matter of public record.

By September 2020, CTCL and Wayne County, Michigan, announced with Defendant Jocelyn Benson a "partnership to support Detroit elections," and funding totaling approximately $3.5 million, primarily for additional satellite clerk's offices, more than thirty (30) additional ballot drop boxes, and the hiring of more than six thousand (6,000) election workers.[11] Notably, the Detroit plan called for revising protocols for ballot counting and sorting.

Other Michigan cities like Lansing,[12] Pontiac,[13] East Lansing,[14] Flint,[15] Saginaw[16] and Muskegon[17] each received CTCL contracts valuing more than $400,000, largely for voting equipment and staff. Grand Rapids contracted with CTCL for over $280,000 for voting equipment, and staff.[18]

---

[7] Delaware County, Pennsylvania, press release (Aug. 19, 2020).
[8] CTCL contract with City of Philadelphia (Aug. 21, 2020).
[9] *See* Delaware County, Pennsylvania, press release (Aug. 19, 2020) and CTCL contract with City of Philadelphia (Aug. 21, 2020).
[10] Centre County, Pennsylvania, Board of Commissioners Agenda (Sept. 24, 2020).
[11] Secretary of State Jocelyn Benson press release dated (Sept. 2, 2020).
[12] Lansing, Michigan, press release (Sept. 4, 2020).
[13] City of Pontiac, Safe Voting Plan Application (Sept. 15, 2020).
[14] East Lansing, Michigan, Regular City Council Meeting Minutes (Sept. 8, 2020).
[15] CTCL contract with City of Flint (Sept. 10, 2020).
[16] Saginaw, Michigan, Council Communication (Sept. 3, 2020).
[17] CTCL contract with Muskegon City, Michigan (Sept. 16, 2020).
[18] City of Grand Rapids Agenda Action Request (Sept. 29, 2020).

Predictably, plans submitted to CTCL by communities in Michigan noted the exact same strategic recommendations as the WSVP.[19]

Fulton County, Georgia, received a contract from CTCL for new voting locations and vote counting equipment for more than $6.3 million.[20] DeKalb County, Georgia, received a CTCL contract for $4.8 million for early voting locations, additional election workers, and vote processing equipment.[21]

These contractual relationships created a "sufficiently close nexus" between CTCL, and its municipal customers that insinuated "itself into a position of interdependence [so as] to create a symbiotic relationship." *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1448-1453 (10th Cir. 1995). CTCL and their contracting partners willfully participated in "joint activity" concerning a fundamental right. *Id*. at 1453-1456. Simply put, CTCL was a private partner to local governments in literally thousands of voting jurisdictions. *See Street v. Corrections Corporation of America*, 102 F.3d 810, 814 (6th Cir. 1996). "If a state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor." *Id*. at 1456 (*quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)).

As alleged, CTCL's grant program used the existing COVID-19 crisis to bypass government sourced election funds with the intent to force contractual conditions, some of which have now been determined by state courts to be unlawful—instead of allowing the local governments to use the grants as the jurisdiction deemed fit. This had the effect of unlawfully influencing the Election, to the injury of the Plaintiffs' civil rights.

---

[19] *See, e.g.,* CTCL Contract with City of Lansing (Aug. 27, 2020), and City of Pontiac, Safe Voting Plan Application (Sept. 15, 2020).
[20] Fulton County, Georgia, Agenda Item Summary (Sept. 2, 2020).
[21] Dan Whisenhunt, *DeKalb County Receives Almost $5 Million Grant to Spend on Elections*, Decaturish.com (Oct. 6, 2020).

### III. STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In ruling upon a motion pursuant to Rule 12(b)(6), the court is required to construe the complaint liberally, assume all facts are true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-557. Specific facts are not necessary in a Complaint. Instead, the Plaintiff need only "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Id*. at 555.

The Federal Rules embody "notice pleading" and require only a concise statement of a claim. Thus, dismissal under Rule 12(b)(6) is proper only when the complaint lacks a cognizable legal theory or does not allege facts that, when taken as a whole, raise the claim for relief above mere speculation. *Id*. at 555-556.

As the 10th Circuit explained, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

### IV. PLAINTIFFS HAVE PROPERLY ALLEGED CIVIL RIGHTS CLAIMS AGAINST CTCL

#### A. CTCL IS A STATE ACTOR

A Section 1983 claim is only applicable to conduct occurring under color of law. The Supreme Court has developed several approaches to determine whether a private party is engaged in state action. As the 10th Circuit as observed:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the

> challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' The Court has also inquired whether the State has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them. In addition, the Court has held that if a private party is a 'willful participant in joint activity with the State or its agents,' then state action is present. Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Gallagher*, 49 F.3d at 1447.

Although only one is required, CTCL qualifies as a state actor under every test. The most stringent is the public function test:

> While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State. One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158 (1978).

In a landmark 1953 case, the Jaybird Democratic Association had been organized since 1889 as a private club. *Terry v. Adams*, 345 U.S. 461 (1953). The group, which excluded African-Americans, regularly selected persons whom the organization endorsed "for election in the Democratic primary for county office." *Id*. at 470.

Although the Court was split with regard to the manner in which the Jaybirds became state actors, the majority agreed that the Jaybirds were, nonetheless, involved in state action, as a part of an election.

A second line of cases under the public-function doctrine originated with *Marsh v. Alabama*, wherein a corporation was found to have engaged in state action by performing all the necessary municipal functions of a town. 326 U.S. 501 (1946). As noted by Justice Rehnquist in *Flagg Bros. v. Brooks*, these "two branches of the public-function doctrine have in common the feature of exclusivity."

Exclusivity is generally defined as: pertaining to the subject alone; not including, admitting, or pertaining to any others; shutting out; debarring from interference or participation; vested in one person alone; apart from others; and, without the admission of others to participation.

CTCL contracted with municipalities across the country from its domicile in Illinois, which conditioned its grant funds upon performance of specific Election activities. These contracts created extensive limitations on the funds, and mandated how the money was to be used. Additionally, CTCL was never in good standing with any of the states outside of Illinois to conduct business, to solicit or make donations, or to execute binding contracts with government agencies. Yet, through massive amounts of funding, CTCL essentially privatized the elections in those jurisdictions, under contract. Further, the conditions in CTCL contracts bound the local jurisdiction to do the bidding of the enterprise agenda. CTCL's election administration conditions attached to the grant funding must in law be deemed to be that of the State. Here, local election officials clearly followed CTCL's directives. This partnership between CTCL and other state actors created a relationship requiring CTCL to be designated as a state actor, as well.

Through these numerous, multi-million dollar, election activity contracts, CTCL assumed a primary role in the administration of elections around the country—a function traditionally and exclusively reserved to the State. CTCL enjoys its status as a private, non-taxable entity, without restraint by the Constitution, and the laws that support it. It is easier to run a private prison, or hold a private Democratic primary for over 60 years, when the private entity does not have to comply with the Constitution.

B.     PLAINTIFFS HAVE STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election. Verifiable accuracy of ballot counting is essential for election legitimacy. The national interest in this election outweighs that of any one State. There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added).

Moreover, the Plaintiffs have suffered a particularized injury-in-fact. Every constitutional right violation infers a damage. "Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Carey v. Piphus*, 435 U.S. 247, 255 (1978). The legislative history of section 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

### C.  CASES CITED BY CTCL ARE NOT DISPOSITIVE ON THE ISSUES

CTCL represents that "eight federal district courts, three unanimous appellate panels, and two Supreme Court Justices have rejected attacks on the legality of CTCL's COVID-19 response grant program." (CTCL Motion, p. 1, ¶ 3). However, the cases and decisions cited by CTCL were primarily filed against municipalities that received funding from Zuckerberg and Chan, through CTCL. There, the plaintiffs sought extraordinary relief, under a standard of likelihood of success on the merits, with pleadings that contained substantial defects. As the federal district court stated in Wisconsin:

> Though this is a federal lawsuit seeking relief in a federal court, Plaintiffs have offered only a political argument for prohibiting municipalities from accepting money from private entities to assist in the funding of elections for public offices. *They do not challenge any specific expenditure of the money; only its source. They make no argument that the municipalities that received the funds used them in an unlawful way to favor partisan manner*. Their brief is bereft of any legal argument that would support the kind of relief they seek. They cite Article I, section 4, of the United States Constitution, but that section governs the election of senators and representatives, and they fail to explain how, even if they had standing, the Cities' use of funds donated by a private party could have affected any such election.

*Wis. Voters All. v. City of Racine, Case Number:* 1:20-cv-1487, Docket #49, *Order Granting Defendant's Motion to Dismiss*. [Emphasis added].

Aside from the obvious pleading deficiencies of these various voter alliance groups, these plaintiffs where political action groups, not voters. Each of these cases sought to enjoin the national election process by requesting extraordinary relief on a scale that the federal district courts could not grant. Not one of the cases cited by CTCL was ever determined on the merits, all were denied injunctive relief, and all were dismissed ,either voluntarily or involuntarily. None of these cases involved any party to this lawsuit, nor did these decisions determine or reject the legality of CTCL's COVID-19 response grant program.

Here, the Plaintiffs' claims, in fact, challenge the specific expenditures of the money obtained and spent from CTCL, *and* the source of funds obtained from an association-in-fact of a well-funded cabal of wealthy progressives. The Plaintiffs, here, aver that the municipalities were obligated to use the funds received from CTCL in an unconstitutional and partisan manner—all while CTCL was not registered in the respective states, in which it was conducting business.

The Wisconsin Supreme Court recently determined that a county clerk's interpretation of Wisconsin law that rendered all Wisconsin voters as "indefinitely confined" (which allowed mass distribution of mail-in ballots) to be erroneous and unlawful.[22] Just this month, the Wisconsin House of Representative began an investigation[23] into the Zuckerberg and Chan donations funneled through CTCL, and the infiltration of Democrat activists into the State's election machinery.

CTCL is one person, under the law, and its legal capacity to enter into contracts with municipalities and counties across the country, while only registered to do business in Illinois, is a subject to be investigated, here—as is the tax deductibility of the so-called charitable contributions made by Zuckerberg and Chan.

---

[22] *Jefferson v. Dane County*, 2020 WI 90 (Wis. Sup. Ct. 2020).
[23] Wisconsin Spotlight: Special Investigation: Infiltrating the Election-M.D. Kittle, March 9, 2021

The facts indicate that Pennsylvania, Michigan, and Wisconsin, including the municipalities that eventually contracted with CTCL, may not have had budget shortfalls, due to the COVID-19 pandemic. These States each had an available surpluses of federal election HAVA funds in amounts of $9,577,386, $10,406,377, and $4,316,403 respectively.[24] Nonetheless, jurisdictions within those states accepted the money, with election administration conditions attached, in spite of having available federal funds to cover any shortfalls.

As is alleged with specificity, this was a coordinated effort by an association-in-fact of powerful and wealthy individuals to induce local governments to accept money under the guise of "COVID-19 relief." The scheme was purposefully designed to illegally influence the Election in favor of one candidate, that is, the one supported by Facebook, Zuckerberg, Chan, CTCL, and many others involved in the enterprise. The question remains, why did CTCL not simply donate the funds and allow the municipalities to administer it in a fair and constitutional manner? The answer is obvious: It was part of a scheme to remove a popular President, and replace him with their candidate. This motive is as old as the hills, and cannot be ignored because CTCL is mystified as to how anyone can question its objectives.

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion. Under claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.* at 748-749.

---

[24] Federal Financial Reports-OMB Number 4040-0014; Pennsylvania (01-09-2020); Michigan (12-23-2019); Wisconsin (12-30-2019).

### E.      THE CIVIL RIGHTS OF PLAINTIFFS HAVE BEEN BURDENED

"A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 213 (1989). Concurrently, the "Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

The "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to casts their votes effectively…rank among our most precious freedoms." *William v. Rhodes*, 393 U.S. 23, 30-31 (1968). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

The "President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson*, 460 U.S. at 794-795. In that regard, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Id*. at 795. Thus, in a Presidential election, the actions of state actors in one state have "an impact beyond its own borders." *Id*.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds* at 555. Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*.

"Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 7 (1964).

### F. CTCL'S MOTIONS ARE MOOT

Plaintiffs have filed their motion for leave to amend their complaint. Accordingly, acceptance of the amended complaint renders CTCL's motion moot. Here, the amended complaint adds over 150 Plaintiffs, supplements the factual allegations, and cures any alleged defects in the original complaint with regard to Rule 23.

### G. PLAINTIFFS CLAIMS ARE REDRESSABLE

Plaintiffs have alleged claims of violations of their Civil Rights, and are seeking nominal damages for these infringements. The Supreme Court recently reaffirmed the sufficiency of pleading nominal damages for Civil Rights violations to satisfy redressability:

> a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

*Uzuegbunam v. Preczewski*, ____ U.S._____ (Mar. 8, 2021).

### CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court deny Defendant CTCL's motion to dismiss in its entirety, or, in the alternative, deny Defendant's motion as moot, in light of the Plaintiffs' Amended Complaint.

Respectfully submitted this 31st day of March, 2021.

*PLAINTIFFS COUNSEL:*

| | |
|---|---|
| By: *s/Ernest J. Walker* | By: *s/ Gary D. Fielder* |
| Ernest J. Walker (MI P58635) | Gary D. Fielder (CO 19757) |
| ERNEST J. WALKER LAW OFFICE | LAW OFFICE OF GARY FIELDER |
| 1444 Stuart St. | 1444 Stuart St. |
| Denver, CO 80204 | Denver, CO 80204 |
| (720) 306-0007 | (720) 306-0007 |
| ernestjwalker@gmail.com | gary@fielderlaw.net |

**CERTIFICATE OF SERVICE**

   The undersigned hereby certifies that on March 31, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net