IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS (Dkt. ##22, 23, & 41) &
PLAINTIFFS' MOTION TO AMEND (Dkt. #48)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

1

This matter is before the Court with the consent of the Parties, referred for all purposes by Chief Judge Philip A. Brimmer pursuant to 28 U.S.C. § 636(c).

This lawsuit arises out of the 2020 election for President of the United States. The original Complaint, filed December 22, 2020 (Dkt. #1) and which purports to be a class action lawsuit brought on behalf of 160 million registered voters, alleges a vast conspiracy between four state governors; secretaries of state; and various election officials of Michigan, Wisconsin, Pennsylvania and Georgia; along with Dominion Voting Systems, Inc.—a private supplier of election and voting technology; the social media company Facebook, Inc.; the Center for Tech and Civic Life ("CTCL")—a non-profit organization dedicated to making elections more secure and inclusive; as well as Facebook founder Mark Zuckerberg and his wife Priscilla Chan.

I use the words "vast conspiracy" advisedly. That is what the Complaint, all 84 pages and 409-plus paragraphs, alleges: that "the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other thing, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Dkt. #1 at 2, ¶ 4.

The named Plaintiffs are from Virginia (Kevin O'Rourke), Michigan (Nathaniel Carter and Kesha Crenshaw), Colorado (Lori Cutunilli and Neil Yarbrough), Alaska (Alvin Criswell), California (Larry D. Cook), and Alabama (Amie Trapp).

Plaintiffs' affidavits, attached to the Complaint, shed light on the personal feelings and motivations in bringing this suit, highlighting their personal anguish stemming from the 2020 presidential election. For example, Mr. O'Rourke, a Virginia certified public accountant and a self-professed "free man, born of a free woman and free man," explains:

> I have lost any faith in the existing form of government and technology monopolies; I am angry; I am frustrated; I cannot sleep at night; I suffer from anxiety as a result of this uncertainty; I have lost my desire to communicate with most people openly and remain guarded as to my interactions and communication with every day people; I feel I have no voice, no rights, and I have been 100% abandoned by the government in all its forms[.]

Dkt. #1-2 at ¶ 36.

Mr. Carter, a 55-year old Michigander from Benton Harbor, swears that

> DOMINION and others were aware or should have been aware that machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside DOMINION. I believe that as a result, my vote during the 2020 Presidential Election was effectively not counted, and the results of the election were predetermined. . . . I believe my vote has be [sic] discounted or eliminated all-together from consideration regarding the choice for the country's highest office.

Dkt. #1-3 at ¶ 19–22.

And Ms. Cutunilli, a business owner and grandmother in Summit County, Colorado, believes that her "constitutional right to participate in fair and honest elections has been violated with [her] vote suppressed." She says, "While I once trusted in the fairness of the United States electoral system I no longer do, with the Dominion Voting System being utilized in Colorado and around the country as well as private 'donations' being unconstitutionally distributed and accepted to interfere with the legitimacy of our elections." *Id.*

The affidavits of the other Plaintiffs are similar in tone and reflect similar beliefs and sentiments,[1] summarized in the concluding pages of the Complaint, "The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty." Dkt. #1 at 82.

The Complaint asserts seven separate counts. Plaintiffs allege (1) violation of the Electors Clause and imposing of an unconstitutional burden on the right to vote for President and Vice-President; (2) violation of equal protection; (3) violation of due process; (4) the imposition of an unconstitutional burden on the rights to political speech, the right to associate, and freedom of the press; (5) a "Constitutional Challenge" to the actions of Facebook and Mr. Zuckerberg as somehow burdening the Plaintiffs' right to free speech and free press, and questioning whether 47 U.S.C. § 230(c) applies to Facebook; (6) a request for a declaratory judgment that each of the Defendants acted unconstitutionally; and (7) a permanent injunction.

For relief, Plaintiffs in their Complaint seek a mishmash of outcomes, ranging from a permanent injunction restraining Defendants from any further unconstitutional behavior, to a declaratory judgment that 47 U.S.C. §230(c) is unconstitutional as applied to the actions of the Facebook and Mr. Zuckerberg, to a declaration that the actions of the Defendants are unconstitutional and ultra vires "making them legal nullities," to a damage award in the "nominal amount of $1,000 per registered voter [which] equals

---

[1] Plaintiff Larry D. Cook, although convinced that there "was widespread vote fraud and manipulation during the 2020 Presidential Election" is somewhat anomalous, as his affidavit appears to focus on his anti-vaccination beliefs, his support of Q and other Qanon conspiracy theorists, and his distress at having had his anti-vaccine Facebook page and Qanon-related pages removed from the platform. *See* Dkt. #1-6.

damages in the approximate amount of $160 billion dollars" for the alleged

Constitutional wrongs Plaintiffs have suffered. Dkt. #1 at 82–83.

The Defendants who have been served moved to dismiss on a number of

grounds, including pursuant to Rule 12(b)(1) (lack of subject matter jurisdiction);

12(b)(2) (lack of personal jurisdiction), and 12(b)(6) (failure to state a claim). See Dkt.

##22, 23, 41, 46, 47, & 49.

**Procedural Background, Pending and Mooted Motions**

Plaintiffs filed suit on December 22, 2020.

On February 16, 2021, Dominion filed its Motion to Dismiss. *See* Dkt. #22.

Facebook filed its own Motion to Dismiss the same day. *See* Dkt. #23.

On February 26, 2021, the Court stayed all disclosures and discovery pending

resolution of the Motions to Dismiss. *See* Dkt. #28 (Minute Order).

Rather than filing an Amended Complaint as a matter of right, Plaintiffs filed

oppositions to the two Motions to Dismiss on March 9, 2021. *See* Dkt. ##38 & 39.

On March 10, 2021, the Center for Tech and Civic Life ("CTCL") filed its own

Motion to Dismiss. *See* Dkt. #41.

On March 15, 2021, Michigan Governor Gretchen Whitmer and Michigan

Secretary of State Jocelyn Benson filed a Motion to Dismiss. *See* Dkt. #46. The same

day, Georgia Governor Brian Kemp and Georgia Secretary of State Brad Raffensperger

also filed a Motion to Dismiss. *See* Dkt. #47. And on March 18, 2021, Pennsylvania

Governor Tom Wolf and Pennsylvania Acting Secretary of Commonwealth Veronica

Degraffenreid also filed a Motion to Dismiss. *See* Dkt. #49.

In the meantime, on March 15, 2021, Plaintiffs filed a Motion for Leave to File an Amended Complaint, attaching a redlined version of the proposed Amended Complaint. *See* Dkt. #48. The proposed Amended Complaint seeks to add 152 new plaintiffs from 33 different states and breaks the proposed national class of registered voters into subclasses of Republicans, Democrats, Third-Parties, Independents, and "Disgruntled Voters." The proposed Amended Complaint adds six causes of action (including racketeering claims under the federal Racketeer Influenced and Corrupt Organization Act ("RICO") against Facebook, CTCL, Zuckerberg and Chan) and 473 paragraphs.

On March 23, 2021, Facebook and Dominion filed their replies in support of their Motions to Dismiss. *See* Dkt. ##55 & 56.

On March 29, 2021, each of the Defendant groups filed responses objecting to Plaintiffs' Motion for Leave to File the Amended Complaint. *See* Dkt. #58 (Kemp/Raffensperger), #59 (Boockvar/Wolf), #60 (Benson/Whitmer), #61 (Dominion), #62 (CTCL), & #63 (Facebook.).

On April 8, 2021, Plaintiffs filed multiple replies in support of their Motion for Leave to File an Amended Complaint. *See* Dkt. ##71, 73, 74, 75, 76, & 77.

Plaintiffs initially filed responses opposing the various government official defendants' Motions to Dismiss. *See* Dkt. #72 (opposing Wolf and Degraffenreid's Motion to Dismiss), #79 (opposing Kemp and Raffensberger's Motion to Dismiss); & #80 (opposing Whitmer and Benson's Motion to Dismiss). But then, a few days later, on April 19 and 20, 2021, Plaintiffs' voluntarily dismissed the government official defendants from the case. *See* Dkt. ##82–85, & 87.

Thus, remaining for determination are the Motions to Dismiss of Defendants Dominion (Dkt. #22), Facebook (Dkt. #23), and CTCL (Dkt. #41), and Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. #48). The Motions to Dismiss filed by the government official defendants will be denied as moot, as those defendants have been voluntarily dismissed.

**Standard for Considering Rule 12(b)(1) Motion to Dismiss for Lack of Jurisdiction**

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**Standard for Failure to State a Claim Under Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

**Plaintiffs lack Article III standing so the Court lacks jurisdiction to hear the case.**

Defendants make numerous arguments as to why Plaintiffs' Complaint should be dismissed, including lack of personal jurisdiction, failure to state a constitutional claim because the remaining Defendants are not state actors, failure to plausibly allege violation of constitutional rights, and reliance on Section 230 of the Communications Decency Act. But one argument appears in all the Motions and, even without addressing the myriad others, it ultimately proves fatal to Plaintiffs' case. The decisive argument is that the Plaintiffs have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. With Plaintiffs not having standing to sue, there is no case or controversy, a necessary predicate for federal court jurisdiction under Article III of the Constitution.

Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that the jurisdiction of the federal courts reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, a federal court lacks the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Article III standing requires Plaintiffs to have personally suffered (1) a concrete and particularized injury (2) that is traceable to the conduct they challenge, and that (3) would likely be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the pleading stage, any complaint filed in federal court must

"clearly allege facts demonstrating each element." *Id.* (quotation marks and alterations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 1548 (internal quotation marks omitted).

The gravamen of Plaintiffs' Complaint, confirmed by a review of their attached affidavits, is the general assertion that allegedly illegal conduct occurred in multiple states across the country during the recent Presidential election, resulting in Plaintiffs' votes (to the extent each Plaintiff actually voted—some admit they did not) being diluted or discounted in some way, to the point where their votes did not matter.[2] The allegedly illegal conduct supposedly included facilitating the use of more absentee ballots than Plaintiffs think was permissible; the unequal placement of ballot drop boxes; the modification of various state voting rules in a way Plaintiffs believe was inconsistent with state law; the publication by Facebook of certain messages and Facebook's selective censorship of others; the implementation by municipalities across the country of allegedly inaccurate vote-counting technologies; and the charitable funding of certain municipalities' voting inclusion and security programs.

But whatever the grievances, the disputed conduct and the resulting claimed injury impacted 160 million voters in the same way. The Complaint, viewed as whole, is a generalized grievance about the operation of government, or about the actions of the

---

[2] *See* Aff. of Kesha Crenshaw (Dkt. #1-7) ("I am routinely told by people, even my husband, that my vote didn't matter, and that voting is just wasting my time. . . . I have watched what happened on Election Day and since, and now realize that the people who warned me that my vote didn't count were right. I know that I did cast a ballot and voted in the election, but based on reports that I have seen, I have no faith that the outcomes reported are actually the votes that were cast, or that my vote was counted at all. . . . I can see with my own eyes the 'irregularities' that have been reported, and know what I see is not right, has not been explained, and calls into doubt the legitimacy of the election.").

Defendants on the operation of government, resulting in abstract harm to all registered voting Americans. It is not the kind of controversy that is justiciable in a federal court. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (claimed interest in ensuring that "only lawful ballots are counted" is a generalized grievance).

As the Supreme Court of the United States has said in a case involving four Colorado voters who sought to challenge on federal constitutional grounds a Colorado Supreme Court decision relating to redistricting,

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan*, 504 U.S. at 573-74 (1992)). *See also Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance).

The Supreme Court in *Lance* was specific that a case where voters allege only that the law (in that case the Elections Clause) has not been followed will not support standing to sue:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. *See, e.g. Baker v. Carr*, 369 U.S. 186, 207–208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring the Elections Clause claim.

549 U.S. at 1198.

It should be no surprise to Plaintiffs or their counsel that their generalized grievances about their votes being diluted or other votes being improperly counted would be insufficient to grant them the standing required under Article III of the Constitution. Numerous other cases challenging the 2020 election and its surrounding circumstances have been dismissed for precisely this reason (among many other reasons).

For example, on December 11, 2020, the United States Supreme Court denied the State of Texas' attempt to file a bill of complaint challenging the Commonwealth of Pennsylvania's 2020 election procedures on the ground that "Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020).

In *Wood v. Raffensperger*, the Eleventh Circuit held that attorney Lin Wood lacked standing in federal court to enforce Georgia's election laws, in part because his claim that unlawfully processed absentee ballots diluted the weight of his vote was a generalized grievance "that cannot support standing." 981 F.3d at 1314-15.

In *Bognet v. Secretary Commonwealth of Pennsylvania*, where voters and a congressional candidate brought suit against the Secretary of the Commonwealth of Pennsylvania and county boards of election seeking to enjoin the counting of mail-in ballots during a three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and also seeking a declaration that the extension period was unconstitutional, the Third Circuit explained the doctrine of standing in clear terms:

> To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the

injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court.

980 F.3d 336, 348 (3d Cir. 2020), *cert. granted and judgment vacated with instructions to dismiss as moot*, ___ S. Ct.___, 2021 WL 1520777 (April 19, 2021). In *Bognet*, the court held that the plaintiffs lacked standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause, in part because the relief "would have no more directly benefitted them than the public at large." *Id.* at 349.[3]

In *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020), the Western District of Pennsylvania dismissed a legal challenge to election guidance given by the Secretary of the Commonwealth of Pennsylvania regarding manned security near absentee drop boxes, performing of signature comparisons for mail-in ballots, and a county-residency requirement for poll watchers. The claim had been that the plaintiffs would suffer an injury through the non-equal treatment or dilution of their legitimately cast votes by improperly verified absentee or mail-in ballots. The court there found the plaintiffs lacked the "concrete" and "particularized" injury necessary for Article III standing, agreeing that the "claimed injury of vote dilution caused by possible voter fraud . . . too speculative to be concrete." 2020 WL 5997680, at *32.

In *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020), the District of Nevada dismissed a lawsuit against Nevada's Secretary of State that sought to challenge a Nevada law that expanded mail-in voting due to the COVID-19 pandemic. The law directed city and county election officials to mail paper ballots to

---

[3] While the judgment in this case was vacated by the Supreme Court on mootness grounds, the reasoning on the issue of standing remains persuasive.

all active registered voters. Plaintiffs sued, claiming an individual right under the Constitution to have a vote fairly counted, "without being distorted by fraudulently cast votes"—i.e., vote dilution—and also for violations of the Equal Protection Clause. The court dismissed the case for lack of standing, finding the claimed injury "impermissibly generalized" and "speculative." 488 F.Supp.3d at 1000. "As with other '[g]enerally available grievance[s] about the government,' plaintiffs seek relief on behalf of their member voters that "no more directly and tangibly benefits them than it does the public at large." *Id.* (alteration omitted) (quoting *Lujan*, 504 U.S. at 573–74).

In *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020), the District of Arizona rejected a suit by Republican nominees for Arizona's Presidential Electors and Republican county chairs who sued Arizona's governor and secretary of state seeking to set aside results of the 2020 election on the basis of fraud and election misconduct. Claims under both the Elections Clause and the Equal Protection Clause based on vote dilution were deemed inadequate for lack of Article III standing: "Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed. The Court agrees." 2020 WL 7238261, at *5.

In *King v. Whitmer*, Civ. No. 20-13134, 2020 WL 7134198 (E.D. Mich. December 7, 2020), the Eastern District of Michigan rejected a lawsuit bringing claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots in the 2020 general election. The plaintiffs were registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of

the State of Michigan. They sued Michigan Governor Whitmer and Secretary of State Benson in their official capacities, as well as the Michigan Board of State Canvassers. Applying the doctrine of standing, the court there found that the plaintiffs had failed to establish that the alleged injury of vote dilution was redressable by a favorable court decision. 2020 WL 7134198, at *9. And with respect to the claimed violations of the Elections Clause and Electors Clause, the Court held that where "the only injury Plaintiffs have alleged is the Elections Clause has not been followed, the United States Supreme Court has made clear that '[the] injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance.'" *Id.* at *10 (quoting *Lance*, 549 U.S. at 442).

In *Feehan v. Wisconsin Elections Commission*, No. 20-cv-1771-pp, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020), a case involving a Wisconsin political party's nominee to be a Presidential Elector who brought suit alleging the election was the subject of wide-spread ballot fraud and violated the equal protection and due process clause, the court dismissed the suit for lack of standing because the claimed injury was not particularized:

> The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if the Wisconsin election process were, as the plaintiff alleges, "so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election." [ ] The plaintiff has not alleged that, as a voter, he has suffered a particularized, concrete injury sufficient to confer standing.

2020 WL 7250219, at *9 (internal citation omitted). Many of the allegations found in Plaintiffs' Complaint are identical to the allegations in the *Feehan* case. *See id.* at *2 (reciting the *Feehan* complaint as alleging "massive election fraud, multiple violations of the Wisconsin Election Code, see e.g., Wis. Stat. §§ 5.03, et seq., in addition to the

Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution" based on "dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses").

In *Texas Voters Alliance v. Dallas County*, Civ. No. 4:20-CV-00775, 2020 WL 6146248 (E.D. Tex. Oct. 10, 2020), the Eastern District of Texas denied a motion for a temporary restraining order in a suit brought by a Texas voting rights group and voters under the Elections Clause, Supremacy Clause and Help Americans Vote Act, which alleged (similar to the allegations in this case) that by accepting or using CTCL's private federal election grants, Texas counties acted ultra vires. The court found the plaintiffs lacked standing to challenge the counties' acceptance of the CTCL grants because the injury claimed was an "undifferentiated, generalized grievance about the conduct of government" and "merely alleging that the grants may influence the election result and lead to possible disenfranchisement is not an injury-in-fact." 2020 WL 6146248, at *4.

In *Iowa Voter Alliance v. Black Hawk County*, C20-2078-LTS, 2021 WL 276700 (N.D. Iowa January 27, 2021), the Northern District of Iowa dismissed a lawsuit brought by voters and a voter group, which also sought to challenge Iowa counties' acceptance of CTCL grants which were intended to assist with the unforeseen costs of conducting an election during the COVID-19 pandemic. The court found

> none of plaintiffs alleged injuries constitutes an injury in fact, as they have failed to allege facts showing that the counties' actions resulted in a concrete and particularized injury to their right to vote or to their rights under the Fourteenth and Ninth Amendments. Instead, they have done no more than assert generalized grievances against government conduct or which they do not approve.

2021 WL 276700, at *7 (internal quotation marks, citations, and alterations omitted).

In sum, federal courts addressing these issues, whether in the 2020 or other elections, are nearly uniform in finding the types of election-related harms of which the Plaintiffs complain insufficient to confer standing. The Middle District of North Carolina recently summarized some of these vote-dilution "generalized grievance" decisions:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. *See, e.g., Donald Trump for President, Inc. v. Cegavske*, Case No. 2:20-CV-1445 JCM (VCF), —— F. Supp. 3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); *Martel v. Condos*, Case No. 5:20-cv-131, —— F. Supp. 3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")
>
> Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," *Martel*, —— F. Supp. 3d at ——, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . ..

*Moore v. Circosta*, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020).

In contrast to the veritable tsunami of decisions finding no Article III standing in near identical cases to the instant suit, Plaintiffs' arguments in opposition to Defendants' Motions to Dismiss are cursory and neither cite nor distinguish any of the cases that have found a lack of standing among voter plaintiffs making challenges to the 2020 election. *See* Dkt. #64 at 10–11 (Plaintiffs' Opposition to CTCL's Motion to Dismiss citing cases from 1982, 1915, 1983, 1978, and 1976 and not discussing any of the many standing cases cited in CTLC's moving papers); Dkt. #40 at 21–22 (Plaintiffs' Opposition to Facebook's Motion to Dismiss making the same superficial arguments and citing the same cases); Dkt. #39 at 17–19 (Plaintiffs' Opposition to Dominion's Motion to Dismiss failing to cite or distinguish any of the other standing cases dismissing claims disputing the 2020 election). And in opposing the Motions to Dismiss, Plaintiffs paradoxically make arguments that implicitly concede the generalized, rather than particularized, nature of the injuries about which they complain.

For example, in responding to Dominion's Motion to Dismiss, Plaintiffs attempt to explain their claimed individualized injury as follows:

> The Plaintiffs alleged that their individual rights to vote in a Presidential election, and to be treated equally and fairly, have been burdened by the conduct of Dominion. [. . . ] Even for those voters in State's [sic] that do not utilize Dominion, their shared right to vote for the President and Vice President was burdened by this Colorado corporation.

Dkt. #39 at 20. In trying to explain how this injury is particularized to the individual plaintiffs and not all members of the public, Plaintiffs purport to clarify that it is only registered voters—all 160 million of them—who "have had their rights infringed –and this [have] the standing to bring suit." *Id.* But reducing the number of allegedly harmed Plaintiffs from 300 million total Americans to only 160 million registered voters does not make the harm complained of any less generalized nor any more particularized. As the

cases cited above make clear, a claim that "all voters" are affected the same way is no more particularized than a claim that the "general public" is so affected.

In opposing the motions to dismiss, Plaintiffs' only tangentially relevant citation is to a dissenting opinion by Justice Thomas in a denial of certiorari. *See* Dkt. #39 at 21 (citing Justice Thomas's dissent in *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) (denying petitions for writ of certiorari)). It should go without saying that denials of certiorari are not binding authority. *See House v. Mayo*, 324 U.S. 42, 48 (1945) ("[A] denial of certiorari by this Court imports no expression of opinion upon the merits of a case."). And dissenting opinions are, by definition, not the law. But even Justice Thomas's dissent to the denial of certiorari said nothing about the standing of registered voters to challenge a state's use of specific election technology, or standing to challenge a social network's editorial policies because of the impact it might have on the electorate at large, or standing to dispute a non-profit's donations to municipalities for election-related purposes.

Plaintiffs fare no better on the standing issue in their brief opposing Facebook's Motion to Dismiss. *See* Dkt. #40. The alleged complaint against Facebook is that the company, its founder Zuckerberg, and the non-profit CTCL, formed an "obvious conspiracy" working "with local governments to place ballot drop boxes primarily in urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail." *Id.* at 2. According to Plaintiffs, this was part of a

> secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media censorship, propaganda, media manipulation, and lawsuit suppression through the use

of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.

*Id.* at 3. In attempting to describe the supposedly individualized nature of the injury suffered by Plaintiffs at the hands of Facebook to justify standing their standing to sue, Plaintiffs refute their own argument:

> Here, *every registered voter* was deprived of a fair and legitimate process administered by the relevant state actors. Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes do not matter, thereby diminishing the perceived present value of the right to vote in future elections and suppressing subsequent voter turnout. *Registered voters* have been subjected to tumult, mental anguish and division for months. These injuries are bipartisan, and have been suffered by *all registered voters* regardless of whom their vote was cast. Although some registered voters may be content that the candidate of their choice was certified as the winner, questionable election integrity *impacts all registered voters*.

*Id.* at 22–23 (emphasis added). This is almost the hornbook definition of a generalized grievance that broadly affects all of a state's voters in the same way. It is lethal to Plaintiffs' claim to have standing to sue. *See Moore,* 2020 WL 6063332, at *14 ("This harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters."); *Bowyer*, 2020 WL 7238261, at *5 ("[T]hese allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed."); *King*, 2020 WL 7134198, at *10 ('[T]he injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that courts have refused to countenance.'") (alterations omitted) (quoting *Lance*, 549 U.S. at 442).

At oral argument on April 27, 2021, Plaintiffs' counsel tried to say that the numerous other similar cases denying standing were different because those cases involved suits against state actors or state agencies, and here Plaintiffs are suing

corporations (and a non-profit). This argument ignores that, until they were dismissed, Plaintiffs <u>had</u> sued a number of state governors and secretaries of state. More important, no case makes the distinction that Plaintiffs try to make. Standing, or at least the injury-in-fact element of standing, arises from a plaintiff's claimed injury, not the particular defendant it is seeking to sue, or in what capacity. Here, Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America.

Without Plaintiffs having standing to sue, there is no case or controversy for the Court to address. The complaint therefore will be dismissed for lack of federal jurisdiction.

**Amendment of the Complaint**

The Federal Rules of Civil Procedure grant amendment as of right where the amendment is made within 21 days after service of a motion under Rule 12(b). Fed. R. Civ. P. 15(a)(1)(B). After this period, amendment may only be granted with the court's leave. The grant or denial of an opportunity to amend is within the discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "The court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018).

The Supreme Court has approved denial of leave to amend when any amendment would be futile. *Foman*, 371 U.S. at 182. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007). *See also Midcities Metro. Dist. No. 1 v. U.S. Bank*

*Nat'l. Ass'n.*, 44 F. Supp. 3d 1062, 1068 (D. Colo. 2014) (denying leave to amend where Plaintiff had no standing). The factual allegations in a proposed amended complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

The proposed Amended Complaint adds 152 individual plaintiffs and grows in length to 882 paragraphs and 115 pages. *See* Dkt. #48-1. The newly added Plaintiffs are registered voters are from thirty-three different states, spanning from Alabama, Alaska, and Arizona, to West Virginia, Wisconsin, and Wyoming. In connection with the Amended Complaint, Plaintiffs' counsel has submitted an affidavit (Dkt. #48-3) describing how he and his staff have fielded hundreds of phone calls and e-mails while coordinating with individuals seeking to join this suit. According to Plaintiffs' counsel, "Every individual who has made contact has universally believed that they had been damaged and expressed a deep sense of loss of trust and confidence in the electoral process, specifically caused by the actions of the named Defendants." *Id.* at 2, ¶ 6. At oral argument, Plaintiffs' counsel explained that he has collected more than 400 additional affidavits describing the mental anguish and suffering these new prospective Plaintiffs have gone through as a result of the disputed election. He proposed to file those affidavits with the Court. (He should not file them.)

In addition to the existing claims for violation of the Electors Clause, Equal Protection Clause, Due Process Clause, undue burden on the rights to associate and freedom of the press, and the constitutional challenge to 47 U.S.C. § 230(c), the proposed Amended Complaint seeks to add claims for (1) violation of 18 U.S.C. § 1962(c)—enterprise racketeering against Facebook, CTCL, Zuckerberg and Chan; (2)

racketeering conspiracy against the same defendants; and (3) constitutional challenges to Michigan State Law (M.C.L. 168.759(3)); Georgia State law (O.C.G.A. 21-2-386 et seq.); Pennsylvania state law (Act 77); and Wisconsin state laws (Wis. Stat. 6.855(3) and 7.15(2m)).[4] The Amended Complaint continues to seek a declaratory judgment that each of the Defendants "acted in contravention to the limitations imposed by the Constitution and the laws relate to a federal Presidential election to the injury of Plaintiffs." Dkt. #48-1 at 113, ¶ 878. Plaintiffs also continue to seek "permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters." *Id.* at 114, ¶ 881.

In terms of the factual additions found in the Amended Complaint, Plaintiffs add numerous additional paragraphs. Many of those paragraphs use the language of the RICO statute to paint a picture of the Defendants as co-conspirators in a grand national-level effort to corrupt the Presidential election of 2020. *See* Dkt. 48-1 at 5–7, ¶ 13 ("The 2020 Presidential election was unconstitutionally influenced by a well-funded cabal of powerful people . . ."); ¶ 14 ("This well-funded group of persons, associated in fact . . ."); & ¶¶ 15–28 (describing the actions of the alleged "enterprise," including coordinating with non-profit organizations and local municipalities to make changes to voting procedures).

The new paragraphs also add details about alleged problems with Dominion's electronic voting systems and software. *See id.* at 8, ¶ 42 ("Dominion's voting machines, tabulators, poll books, automated data, and other products and services were and are

---

[4] Although at oral argument, Plaintiffs' counsel made clear that Plaintiffs' are withdrawing their claims purporting to challenge the various state election laws or provisions.

defective, and not deployed in a workmanlike manner sufficient to ensure the validity of the election results."); & ¶ 44 ("Dominion's software and other products are susceptible to hacking, bugs, malware and configuration errors.").

And, in support of the class action allegations, the proposed Amended Complaint lists a series of supposed "common questions" that could be determined on a class-wide basis, including, among others:

> Whether Defendants engaged in a scheme and enterprise to improperly interfere with the 2020 Presidential election, by the use of devices and methods that affected or diluted the Plaintiffs' right to vote in a free and fair Presidential election;

> Whether Defendants used the US Mail to further their scheme and enterprise and improperly interfere with the 2020 Presidential election;

> Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by employing their scheme and enterprise aimed at the election machinery; [and]

> Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by engaging in censorship of political and dissenting speech."

*Id.* at 32, ¶ 253(a), (b), (d), & (e). But the Amended Complaint adds nothing meaningful or different to the injuries claimed by the Plaintiffs.

Just as in the original Complaint, all the supposed injuries relate to Plaintiffs' votes and the alleged dilution thereof. *See, e.g.*, *id.* at 85, ¶¶ 676–79 ("The evidence establishes that the enterprise has engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country irrespective of voter affiliation. Other than the nefarious, the honest American voter wants every vote counted to legally determine the President and Vice President.").

Under normal circumstances and in a normal case, where a plaintiff seeks to amend the complaint for the first time relatively soon after the start of the litigation, even

after responding substantively to a motion to dismiss, it is near automatic for leave to amend to be granted. The exception is where, given the nature of the claims, no amendment can salvage a fatally flawed suit and it is everyone's interest that the litigation be ended. This is such a fatally flawed case.

On the critical question of standing, the proposed Amended Complaint fares no better than the original. Plaintiffs' claim to standing is that these new 152 Plaintiffs, and the class and subclasses that the Amended Complaint hopes to certify, all have "standing to vindicate the [sic] rights as registered voters in a federal Presidential Election." Dkt. #48 at 4. Plaintiffs insist that "it would improper for a federal court to deny registered voters . . . standing to vindicate their rights, protected under the Constitution." *Id.* Plaintiffs maintain that "each of them" has "a right to seek adjudication of federal questions of singular effect over Defendants." *Id.*

But Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury. If a plaintiff has suffered an identifiable, distinct, and particularized injury, redressable by court action, then standing exists. Here, by their own admission, Plaintiffs' claimed injuries are no different than the supposed injuries experienced by all registered voters. This is a generalized injury that does not support the standing required for a genuine case or controversy under Article III of the Constitution.

In their replies in support of the Motion for Leave to Amend, Plaintiffs cite the recent Supreme Court case of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). In *Uzuegbunam*, former students at a state college had wished to exercise their religion by

sharing their faith on campus. The students obtained a required permit and were distributing religious materials in a designated "free speech zone" when a campus police office asked the students to stop. Campus policy at the time prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of persons." The plaintiffs sued, arguing the policies violated the First Amendment. The college then changed the challenged policies rather than defend them, and argued that the case should be dismissed on the ground that the policy change rendered the request for injunctive relief moot, arguably leaving the students without standing to sue for lack of a redressable case or controversy. But the students had sought nominal damages in addition to injunctive relief. The question for the Supreme Court was whether a plea for nominal damages for an already completed constitutional injury could by itself establish the redressability element of standing.

The Court held that a request for nominal damages alone does satisfy the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right and the plaintiff establishes the first two elements of standing—injury and traceability. 141 S. Ct. at 801–02. But the *Uzuegbunam* decision is clear that a plea for nominal damages only satisfies the *redressability* element of standing, not the requirement for pleading particularized injury: "This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as particularized injury)." *Id.* at 802. In *Uzuegbunam,* there was no debate that the plaintiff had suffered particularized injury—he had tried to

exercise his right to free speech and religion and been stopped by the campus police from doing so.

In this case, by contrast, whether in the original Complaint or the proposed Amended Complaint, Plaintiffs allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted. As outlined in the section above, when the alleged injury is undifferentiated and common to all members of the public or a large group, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). And the injuries complained of in this case are general grievances shared by all registered voters that do not give standing to sue.

Asked at oral argument to direct the Court to the "best case" supporting Plaintiffs' position that they have standing to sue, Plaintiffs' counsel mentioned *Anderson v. Celebreze*, 460 U.S. 780 (1983). *Anderson* involved a suit by independent Presidential candidate John Anderson who challenged the State of Ohio's arguably discriminatory requirements for independent Presidential candidates who sought a place on the Ohio ballot. Ohio required an independent candidate to submit required documents, filing fees, and the requisite signatures many months in advance of the election (by March 20 for the November election), while political party nominees were automatically granted a place a ballot. While Anderson submitted all the necessary paperwork and obtained the requisite number of signatures, he did so after the early filing deadline had passed, and Ohio's Secretary of State refused to accept Anderson's nominating petition. Three days later, Anderson himself and three voters sued in the Southern District of Ohio

challenging the constitutionality of Ohio's early filing deadline for independent candidates. 460 U.S. at 782–83. While the *Anderson* opinion talks a great deal about the right to vote being "fundamental," i*d.* at 788, the case says nothing about standing. Anderson, as a candidate being denied a spot on the ballot, obviously had a particularized injury that granted him standing. The Anderson supporters too had a particularized injury: the candidate they sought to vote for was being denied a spot on the ballot. Their right to vote for the Presidential candidate of their choice was being denied. Even the dissent, which disagreed that Ohio's early registration requirements were unconstitutional, conceded the particularized nature of Anderson's and his supporters' injuries: "Anderson and his supporters would have been injured by Ohio's ballot access requirements; by failing to comply with the filing deadline for nonparty candidates Anderson would have been excluded from Ohio's 1980 general election ballot." *Id.* at 808 (Rehnquist, J., dissenting). Thus, even Plaintiffs' purported "best case" to justify standing provides no support at all.

Therefore, I find that any amendment of this Complaint which seeks to bring suit on behalf of all registered voters in the United States for alleged illegality in the conduct of the 2020 election and associated vote dilution is futile because Plaintiffs cannot allege particularized injury sufficient to establish Article III standing. Leave to amend will be denied. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (explaining that district court may dismiss without granting leave to amend when amendment would be futile, and affirming dismissal without leave to amend for lack of standing, but noting such dismissal should be without prejudice); *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (affirming dismissal for lack of standing and

approving denial of amendment of pleading on grounds of futility because proposed amendment would not cure the standing deficiency); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (affirming denial of leave to amend on grounds of futility and failure to show how any amendment would cure identified deficiencies). *See also Donald J. Trump for President*, 830 F. App'x at 389 (affirming denial of leave to amend suit challenging 2020 election on grounds of futility because the proposed Second Amended Complaint would not survive a motion to dismiss).

At oral argument, counsel for CTCL pointed out that although Plaintiffs filed an opposition to Dominion and Facebook's Motions to Dismiss and therefore forfeited their ability to amend the Complaint as a matter of right, the timing was different for CTCL's Motion to Dismiss. It is apparently not clear under Tenth Circuit caselaw whether Plaintiffs can still amend as a matter of right. CTCL's proposed solution to avoid any procedural confusion is to allow the amendment and then dismiss the Amended Complaint for lack of standing. As they say, "six of one and half dozen of the other." I deny the amendment on the grounds of futility. A proposed amendment is futile if it would not survive a motion to dismiss. To be clear, if the amendment were allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing. Nothing in the proposed Amended Complaint changes the standing analysis.

Because the Court lacks jurisdiction to hear Plaintiffs' suit, it will not address the many other bases for dismissal raised in Defendants' motions.

**Conclusion**

It is hereby **ORDERED** that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are **GRANTED.** It is further **ORDRED** that

Plaintiffs' Complaint (Dkt. #1) is **DISMISSED WITHOUT PREJUDICE** for lack of standing. *See Brereton*, 434 F.3d at 1219 (dismissal for lack of standing should be without prejudice).

Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further **ORDERED** that the Motions to Dismiss filed by those state official defendants (Dkt. ##46, 47, & 49) are **DENIED** as moot.

It is further **ORDERED** that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. #48) is **DENIED** on the grounds of futility.

Dated:    April 28, 2021              _____
          Denver, Colorado           N. Reid. Neureiter
                                      United States Magistrate Judge