1

<pre>
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF COLORADO
 2

 3   KEVIN O'ROURKE, NATHANIEL L.   .  Case No. 20-cv-03747-NRN
     CARTER, LORI CUTUNILLI,        .
 4   LARRY D. COOK, ALVIN           .
     CRISWELL, KESHA CRENSHAW,      .
 5   NEIL YARBROUGH, and AMIE       .
     TRAPP, on their own behalf     .
 6   and of a class of similarly    .
     situated persons,              .
 7                                  .
                  Plaintiffs,       .
 8                                  .
     vs.                            .
 9                                  .
     DOMINION VOTING SYSTEMS,       .
10   INC., a Delaware               .
     corporation, FACEBOOK,         .
11   INC., a Delaware               .
     corporation, CENTER FOR        .
12   TECH AND CIVIC LIFE, an        .  United States District Court
     Illinois non-profit            .  1929 Stout Street
13   corporation, MARK E.           .  Denver, CO  80294
     ZUCKERBERG, Individually,      .
14   PRISCILLA CHAN,                .
     Individually, BRIAN KEMP,      .
15   Individually, BRAD             .
     RAFFENSPERGER, Individually,   .
16   GRETCHEN WHITMER,              .
     Individually, JOCELYN          .
17   BENSON, Individually, TOM      .
     WOLF, Individually, KATHY      .
18   BROCKVAR, Individually,        .
     TONY EVERS, Individually,      .
19   ANN S. JACOBS, Individually,   .
     MARK L. THOMSEN,               .
20   Individually, MARGE            .
     BOSTELMAN, Individually,       .
21   JULIE M. GLANCEY,              .
     Individually, DEAN KNUDSON,    .
22   Individually, ROBERT F.        .
     SPINDELL, JR., Individually,   .
23   and DOES 1-10,000,             .
                                    .
24                  Defendants.     .
                                    .  April 27, 2021
25   . . . . . . . . . . . . . . .  .  2:01 p.m.
</pre>

```
 1          TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
            N. REID NEUREITER, UNITED STATES MAGISTRATE JUDGE
 2
     APPEARANCES:
 3
     For the Plaintiff:             Ernest J. Walker Law Offices
 4                                  By:  Ernest J. Walker*
                                    3368 Riverside Road
 5                                  Benton Harbor, MI  49022
                                    (303) 995-4835
 6
     For the Plaintiff:             Gary D. Fielder Law Offices
 7                                  By:  Gary D. Fielder*
                                    2325 West 72nd Avenue
 8                                  Denver, CO  80221
                                    (303) 650-1505
 9
     For the Defendant, Dominion    Brownstein Hyatt Farber
10   Voting Systems, Inc.:            Schreck, LLP
                                    By:  Stanley L. Garnett*
11                                  By:  David Meschke*
                                    410 17th Street
12                                  Suite 2200
                                    Denver, CO  80202
13                                  (303) 223-1100

14   For Defendant, Facebook,       Gibson Dunn & Crutcher, LLP
     Inc.:                          By:  Joshua S. Lipshutz*
15                                  1050 Connecticut Avenue N.W.
                                    Third Floor
16                                  Washington, DC  20036
                                    (202) 955-8217
17
                                    Gibson Dunn & Crutcher, LLP
18                                  By:  Ryan T. Bergsicker*
                                    1801 California Street
19                                  Suite 4200
                                    Denver, CO  80202
20                                  (303) 298-5774

21   For the Center for Tech and    Kaplan Hecker & Fink, LLP
     Civic Life:                    By:  Joshua A. Matz*
22                                  By:  Louis W. Fisher*
                                    By:  Marcella E. Coburn*
23                                  By:  Michael Skocpol*
                                    350 Fifth Avenue, Suite 7110
24                                  New York, NY  10118
                                    (646) 761-3270
25
```

```
 1   Appearances continued:

 2   For Defendant Brian Kemp        Georgia Attorney General
     and Brad Raffensperger:         By:  Charlene S. McGowan*
 3                                   40 Capitol Square S.W.
                                     Atlanta, GA  30334
 4                                   (404) 458-3658

 5   For Defendant Gretchen          Michigan Attorney General
     Whitmer and Jocelyn Benson:     By:  Heather S. Meingast*
 6                                   P. O. Box 30736
                                     Lansing, MI  48909
 7                                   (517) 335-7659

 8   For Defendant Tom Wolf          Pennsylvania Attorney General
     and Kathleen Boockvar:          By:  Jacob B. Boyer*
 9                                   1600 Arch Street
                                     Suite 300
10                                   Philadelphia, PA  19103
                                     (267) 768-3968
11
     Court Recorder:                 Clerk's Office
12                                   U.S. District Court
                                     1929 Stout Street
13                                   Denver, CO  80294

14   Transcription Service:          AB Litigation Services
                                     216 16th Street, Suite 600
15                                   Denver, CO  80202
                                     (303) 296-0017
16
     *All appearances telephonic.
17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1                    (Time noted:  2:01 p.m.)

 2              THE COURT CLERK:  Court is in session.

 3              THE COURT:  Good afternoon.  This is Magistrate

 4   Judge Reid Neureiter signing in from the Rogers Federal

 5   Courthouse in downtown Denver.

 6              I'm calling the case 20-cv-03747, O'Rourke versus

 7   Dominion Voting Systems.

 8              Could I have appearances for the Plaintiff,

 9   please?

10              MR. FIELDER:  This is Gary Fielder on behalf of

11   the Plaintiff.  I thought Ernie Walker was also on the line,

12   Your Honor.

13              THE COURT:  All right.  Mr. Fielder, you're a

14   little bit faint.  And are you not using the electronic --

15   the video tele-conference?

16              MR. FIELDER:  I wasn't able to get the link to

17   work, so I had to call in based on the time.

18              Mr. Walker was on the line viewing the courtroom

19   just minutes ago, but I could not get the link to work

20   despite 20 minutes of trying, Your Honor.

21              So I have to appear by telephone.

22              THE COURT:  Who is going to be making the argument

23   today on behalf of the Plaintiff?

24              MR. FIELDER:  I will be, Your Honor.

25              THE COURT:  Okay.  I really -- I need you to sign
```

1   in.   Did you talk to my courtroom -- I mean, I want to be

2   fair to you.   The reason why I shifted it from a telephone

3   call to video tele-conference is that I like the process to

4   be kind of interaction, and it's much more difficult over the

5   phone because you can see me when I'm like holding up my hand

6   to ask you to speak.

7           So, Ms. Libid, --

8           THE COURT CLERK:  I can email him the link, and

9   then he can just right click on it.

10          THE COURT:  We're going to email you a link that

11  you can just right click on.

12          THE COURT CLERK:  Copy it and paste it.

13          THE COURT:  Copy and paste it, rather than --

14          MR. FIELDER:  Okay.

15          THE COURT:  Okay?  It should work.

16          MR. FIELDER:  Well, I've been trying to copy and

17  paste.  I have been trying to copy and paste that one link

18  throughout.  So I just --

19          THE COURT:  All right, well we're going to send --

20  Ms. Libid, what's he supposed to do when he gets this link?

21          THE COURT CLERK:  You would copy the hyperlink and

22  paste it into either Edge or Chrome.  I just sent it.

23          THE COURT:  Okay, copy and paste into either Edge

24  or Chrome.

25          MR. FIELDER:  Could you please send that to

1    GaryFielder at Earthlink.net?

2              THE COURT:  Can you send it to GaryFielder at

3    Firstlink.net, Ms. Libid.

4              MR. FIELDER:  That was Earthlink.net, Your Honor.

5              THE COURT CLERK:  I sent it to your email that we

6    have on the record.  I didn't hear what he said.  I sent it

7    to the email we have on record.  I don't know --

8              THE COURT:  But send it also to Mr. Fielder, Ms.

9    Libid.

10             THE COURT CLERK:  That is who I sent it to.

11             THE COURT:  Okay.  And, Mr. Walker is there.  You

12   were able to sign on.

13             Okay, so Mr. Walker, you're present?

14             MR. WALKER:  I was able to click in.  Yes, Your

15   Honor.

16             THE COURT:  Okay.  All right.  Let's go down

17   through the Defendants, then.

18             We have everybody who is appearing for the

19   Plaintiffs, is that correct?

20             MR. WALKER:  That's correct, Your Honor.

21             THE COURT:  All right.  Let's move on.

22   Appearances for Facebook, please?

23             MR. LIPSHUTZ:  Good afternoon, Your Honor.  Joshua

24   Lipshutz for Facebook, from Gibson Dunn.

25             THE COURT:  Okay.

1          MR. BERGSICKER:  Good afternoon, Your Honor.  Ryan

2    Bergsicker, also from Gibson Dunn, for Facebook.

3          THE COURT:  All right.  Center for Tach and Civic

4    Life?

5          MR. MATZ:  Good afternoon, Your Honor.  This is

6    Joshua Matz appearing from Kaplan Hecker & Fink.  And I am

7    joined, I believe by phone, by my colleagues Michael Skocpol,

8    Marcy Coburn, and Louis Fisher.

9          THE COURT:  Okay, thank you.  And I assume, Mr.

10   Matz, you're going to be the only one speaking on behalf of

11   the Center for Tech and Civic Life?

12         MR. MATZ:  Yes, Your Honor.

13         THE COURT:  All right, thank you.  And the

14   Zuckerberg and Chan Defendants have not been served yet.

15         Is there anybody appearing for the Georgia

16   Attorney General's Office?  I understand that the government

17   official folks appear to have been voluntarily dismissed, but

18   if there's anybody on behalf of Brian Kemp?

19         MS. MCGOWAN:  Yes, Your Honor.  This is Charlene

20   McGowan from the Georgia Attorney General's Office here on

21   behalf of both Brian Kemp and Brad Raffensperger.

22         And the Court is correct that the Plaintiffs did

23   file a stipulation of dismissal as to those two Defendants.

24   I'm happy to answer any questions the Court has today, but I

25   don't intend to argue our motion.

1           THE COURT:  All right, thank you.  And on behalf

2    of Jocelyn Benson and Tom Wolf, I guess for the Commonwealth

3    of Pennsylvania?  Anybody here?

4           MS. MEINGAST:  Your Honor, this is Heather

5    Meingast from the State of Michigan.  My Defendants are

6    Gretchen Whitmer and Secretary of State Jocelyn Benson.

7           And so, like Ms. McGowan from Georgia, Michigan is

8    here but we have been dismissed, as well.  And so we're

9    simply just -- intend to listen to the hearing today, unless

10   the Court has any questions.

11          THE COURT:  Okay.  And the folks from

12   Pennsylvania?

13          MR. BOYER:  Good afternoon, Your Honor.  This is

14   Jacob Boyer from Pennsylvania Office of Attorney General on

15   behalf of Governor Wolf and former Secretary Kathleen

16   Boockvar.  The Plaintiffs have moved to dismiss each of those

17   Defendants.  So like Georgia and Michigan, we have no

18   intention of arguing the motions that are before you, but are

19   able to answer questions for the Court.

20          THE COURT:  Okay.  And then did we have -- we had

21   Georgia, Michigan.  Were there any other -- I guess the folks

22   from Wisconsin?  Anybody from Wisconsin here?

23       (No response)

24          THE COURT:  Hearing none.  Okay.  And then on

25   behalf of Dominion Voting Systems?

1          MR. GARNETT:  Good afternoon, Your Honor.  Stan

2     Garnett and Dave Meschke appearing on behalf of Dominion

3     Voting Systems.

4          THE COURT:  Okay.  And for some reason -- Ms.

5     Libid, can we turn up our volume a little bit?  I'll just ask

6     folks to speak up a little bit.  We seem to have a -- we've

7     got our volume turned all the way up and you're just a little

8     faint.  I don't know if other folks are having trouble

9     hearing Mr. Garnett, but if everybody could just speak up a

10     little bit, get close to the microphone, that would be

11     helpful.

12          All right.  So let me just ask whether our

13     Plaintiff's counsel has been able to sign in yet?  Did it

14     work?  Our new link?

15          MR. FIELDER:  Your Honor, I can get to the sign in

16     stage and I can punch sign in, but it doesn't -- I don't have

17     a user name or password.  I'm not sure if somebody could help

18     me with that, or if I could just sign directly in.  I haven't

19     gotten email from anyone.

20          THE COURT CLERK:  I sent the email to the one we

21     have on record.

22          THE COURT:  What email do you need, sir?

23          MR. FIELDER:  Well, I tried to cut and paste the

24     link.

25          THE COURT:  No, what email -- did you receive an

1    email from us here?

2              MR. FIELDER:  I have not received an email, no.

3              THE COURT:  Okay.

4              MR. WALKER:  I think you need it send to

5    GaryFielder at Earthlink.net in order for you to get it where

6    you're at.

7              THE COURT:  Okay.

8              THE COURT CLERK:  But that's not the one we have

9    on record.

10             THE COURT:  That's not the email we have on file,

11   but GaryFielder at Earthlink.net?

12             MR. FIELDER:  And I'm checking the other -- I'm

13   checking the -- I changed my email officially.  It's Gary at

14   FielderLaw.net.

15             THE COURT:  Well, what we have on file is

16   CriminalDefense at FielderLaw.net.  And you're supposed to

17   really update it.

18             MR. FIELDER:  Yes.  I changed that with a

19   pleading.  I changed that with a pleading.  And it's Gary at

20   FielderLaw.net.

21             THE COURT:  All right.  We just sent it to the

22   Earthlink one.

23             MR. FIELDER:  Okay.

24             THE COURT:  All right.  While you try and do that,

25   I'm going to ask some clarifying questions.

1              In your motion to --

2              MR. FIELDER:  Okay, thank you.

3              THE COURT:  Can you tell me what the status of all

4   the State Defendants is?  My understanding is that you've

5   moved to dismiss them all, and you filed a stipulation of

6   dismissal, which takes place automatically, essentially.

7              But I noticed in your amended complaint you have

8   -- you seek declarations as to the invalidity of certain

9   State Statutes.  Are you not seeking in your amended

10  complaint any relief against either State officials in their

11  official or individual capacity, or anything having to do

12  with the legality of certain -- Constitutionality of certain

13  State Statutes?

14             MR. FIELDER:  Yes.

15             THE COURT:  Mr. Fielder, go ahead again, and

16  please speak up.

17             MR. FIELDER:  We are not -- we are dismissing the

18  challenges to the State Statutes, not the challenge to the

19  Section 230.

20             THE COURT:  Okay.  All right.  So, none of the

21  State Defendants have any role to play in this litigation any

22  further, correct?

23             MR. FIELDER:  Correct.  That's correct, Your

24  Honor, not in this case.

25             THE COURT:  Okay.  All right.  So then -- so what

1    we have in front of us, then, are the motions to dismiss by

2    Dominion, the motion to dismiss by Facebook, the motion to

3    dismiss by CTCL, and your motion for leave to amend the

4    complaint.

5         That's my understanding of what's in front of us

6    today, is that correct?

7         MR. FIELDER:  That's correct.

8         THE COURT:  Okay.  I will first hear argument from

9    -- since they are named first as a Defendant, Dominion, on

10   the motion to dismiss.

11        And we'll go to Facebook, and then CTCL, and then

12   I'll hear Plaintiff's response.

13        MR. GARNETT:  Good afternoon, Your Honor, Stan

14   Garnett on behalf of Dominion.

15        And I've been fiddling around with the microphone.

16   Are you able to hear me a little bit better now?

17        THE COURT:  Yes.  If you could just speak up a

18   little bit more, you know, just raise your voice, and I can

19   hear you.  But a little bit louder.

20        MR. GARNETT:  Great.  I will speak as loudly as I

21   can.  And, obviously, if the Court has difficulty hearing me,

22   let me know and I'll up the volume even more.  And if that

23   doesn't work, we'll turn it over to Mr. Meschke, who will be

24   happy to take over the argument.

25        Your Honor, first of all, thank you very much for

1    the time this afternoon to argue these issues.

2              As I indicated, Mr. Meschke and I represent

3    Dominion.

4              We have briefed, I think quite thoroughly, the

5    concerns that we have that we think warrant dismissing the

6    complaint.  And I'm happy to at any time answer questions

7    from the Court with regard to those.

8              But let me briefly cover what we think the issues

9    are and why the Court should dismiss the complaint at this

10   time.

11             Let me also note, as the Court has indicated,

12   there is a motion to amend pending.  The Plaintiffs filed a

13   motion to amend and an amended complaint in March.

14             As we've indicated clearly in our pleadings, the

15   motion to amend, we think, should also be denied because it

16   does not correct the problems in the complaint that's been

17   stated by the Plaintiffs.

18             And under the futility prong of Rule 15, and the

19   cases in the Tenth Circuit, we think that the motion to amend

20   should be denied because it would be futile for the

21   Plaintiffs to amend and file the amended complaint, because

22   they would not be able to proceed, because they still have

23   not cured the fundamental problem of standing.

24             Now, as the Court knows, we have raised the issues

25   around standing in this case since our very earliest entries

1   of appearance several weeks ago.  And we have maintained that

2   the Plaintiffs have not stated a case or controversy, as

3   required under Article III, Section 2, Clause 1, of the

4   United States Constitution.

5            And let me just say a couple of things about

6   standing, Your Honor, before I get into the body of our

7   argument.

8            It is true that in some quarters, and, frankly,

9   among some of the organizations affiliated with the

10  Plaintiffs, standing is treated as if it's some kind of a

11  legal technicality.  Some would deride it as if it's just

12  sort of lawyer talk for an issue that isn't very important,

13  kind of trivial legal issue that keeps a meritorious

14  plaintiff from having their day in court.

15           But, of course, Your Honor, the United States

16  Supreme Court, from the very earliest days of the Republic,

17  has made it clear that standing is a fundamental concept that

18  must be addressed in every case brought in Federal Court.

19           And the reason is because it's essential to

20  maintain the fundamental Constitutional principle of

21  separation of powers, that if standing is not required, as

22  indicated by the Court's jurisprudence establishing what a

23  case in controversy is, then it -- you run the risk of the

24  Courts sliding into a position of essentially regulating the

25  political branches of Government in a way that the

1    Constitution does not envision, and certainly the Founders of

2    our country did not understand.

3            The standing cases, Your Honor, again, go back for

4    a couple hundred years.  But the most recent ones that are

5    always cited are *Lujan v. Defenders of Wildlife,* which was a

6    1992 United States Supreme Court case, and that is restated

7    in virtually every case since then, that standing requires

8    three essential components:

9            A concrete and particularized injury;

10           A injury that is fairly traceable to the

11   challenged conduct; and, finally,

12           An injury that is redressable by a favorable

13   judicial decision.

14           And in the -- both the complaint and the amended

15   complaint that the Plaintiffs have brought forward in this

16   case, they are lacking on the first two components of

17   standing, Your Honor, and that's why we believe they cannot

18   state a case in controversy, and that this case should both

19   be dismissed, and the motion to amend should be denied.

20           THE COURT:  On the third one, the issue of

21   redressability, I noticed you didn't mention that one.  But a

22   recent Supreme Court case seems to indicate that if you ask

23   for nominal damages for a Constitutional violation, that

24   satisfies the redressability element.

25           I thought some of the motions to dismiss said no

1   redressability, and some of the cases that I read about the

2   2020 election that if bounced them on standing also say no

3   redressability.

4          But in your view, does the asking for nominal

5   damages solve the Plaintiffs' redressability problem?

6          MR. GARNETT:  Well, Your Honor, I think that it

7   probably does.  The case that the Court is referring to, of

8   course, is the case that I still cannot pronounce very well

9   that starts with a U.  The Justice Thomas opinion relating to

10  the ability to proselytize on a small college campus.

11         And in that case, the Court clearly did hold that

12  a claim for nominal damages was sufficient to establish

13  redressability, as required by standing.

14         Now, of course, as we note, and I think all of the

15  Defendants have noted, we've been dealing with a moving

16  target as this case has developed and as we've been dealing

17  with both the two complaints, and then the arguments that

18  counsel has made in the briefs on the various issues.

19         I, in an effort to keep my argument this afternoon

20  focused and understandable, and hopefully helpful to the

21  Court, I am willing to concede that they are now asking for

22  nominal damages, and that issue alone would deal with the

23  redressability prong of the standing test.

24         Now, let me mention a couple of things in

25  connection with that.

1       In the early complaint, and in a subsequent --

2  some of the initial briefing, the Plaintiffs appeared to be

3  asking to overturn the 2020 Presidential election as a remedy

4  that they were seeking.  They appear to have abandoned that

5  and replaced it now.

6       And they also were seeking an astronomical amount

7  of damages, several hundred million dollars, which it was

8  difficult to tell what that was tied to.

9       Now they appear to be asking for nominal damages.

10      And because the issues are so fundamental, Your

11  Honor, with the first two prongs of the standing issue, I'm

12  willing to concede for the purpose of argument today that

13  they're now asking for nominal damages.  And if they could

14  meet the other requirements for standing, that would be

15  sufficient for that third prong here.

16      THE COURT:  I think if I read it correctly, they

17  are asking for nominal damages amount of $1,000.00 per

18  Plaintiff.  And you take 160 million registered voters times

19  $1,000.00, and that gives you a $1.6 billion dollar damage

20  figure.  So that was -- that's how you got your hundreds of

21  millions of damages, even while it was a nominal damage

22  request, if my multiplication is correct.

23      MR. GARNETT:  That sounds correct, Your Honor.

24  I'm not sure exactly how one gets to even $1,000.00 of

25  nominal damages, but then again, as we've all noted, we're

1  not yet into a discovery phase.  We don't think we should

2  ever get there to try to explore how they're coming up with

3  that.  But I think that's probably correct.

4            And, again, to answer the Court's question, for

5  the purpose of today's argument, I'm willing to concede to

6  nominal damages meets the redressability argument vis-à-vis

7  the claim has been made against Dominion.

8            THE COURT:  Okay.

9            MR. GARNETT:  Now, Your Honor, the standing cases,

10  of course, are very interesting in their discussions about

11  what the role of the Courts is, and when it is appropriate

12  for a Federal Court to accept jurisdiction of a case to

13  determine an allegation of a Constitutional violation.

14            And one of the most interesting cases is one

15  that's cited in several of the briefs.  And that, of course,

16  is Justice -- Chief Justice Roberts' opinion in the

17  *Hollingsworth v. Perry* decision in 2013, in which Justice

18  Roberts eventually concludes that there was no standing to

19  issue a ruling about the Constitutionality of a gay marriage

20  ban in the State of California, and goes out of his way to

21  stress that the sincerity of the plaintiffs, and the

22  sharpness of the disagreement between the plaintiffs and the

23  defendants in any particular case, which, of course, exists

24  in almost any litigation, has nothing to do with whether or

25  not there's standing.

1           The issue is, and particularly in an election

2    case, whether or not the Plaintiffs have been able to

3    establish a concrete and particularized injury that

4    specifically applies to their particular situation.

5           Now, the Court has the benefit of having a number

6    of Federal Courts address very similar issues, even about the

7    2020 election.

8           And one of them, of course, is the Eleventh

9    Circuit's decision out of Georgia, the *Linwood v.*

10   *Raffensperger* case,in which the Court specifically held the

11   problems with voting as alleged in that case, which, frankly,

12   are very similar to what's been brought forward by the

13   Plaintiffs in this case, are paradigmatic generalized

14   grievances applying equally to all members of the public,

15   and, therefore, they do not present the type of

16   particularized grievance needed for the injury in fact prong

17   of the *Lujon* test.

18           THE COURT:  So, Mr. Garnett, so the Plaintiffs'

19   response to that is "well, we're not seeking to represent

20   members of the public.  We're seeking to represent registered

21   voters."  That's the distinction I perceived in their

22   oppositions to your various motions to dismiss, is that we

23   are a smaller group than the general public.  We're all

24   registered voters, and as registered voters, we're in a

25   different situation than the general public.

1           MR. GARNETT:  Yes, Your Honor.  And I think that

2    effort at establishing a particularized injury sufficient for

3    standing was rejected not only in the *Raffensperger* case, but

4    also in the much older case of *Warth v. Seldon,* the 1975 U.S.

5    Supreme Court case, in which the Court stated that when the

6    assertive arm is shared in substantially equal measure by a

7    large class of citizens, it is not a particularized injury as

8    required to determine standing.

9           In other words, Your Honor, making a distinction,

10   and it's an interesting distinction in this case, since some

11   of the Plaintiffs admit in their declarations that they never

12   voted in the case, which creates some interesting -- in this

13   particular election, which creates its own set of interesting

14   issues.

15          But I think it's clear, Your Honor, under the *Wood

16   v. Raffensperger* and *Warth v. Seldon* that when you're talking

17   about a class of registered voters, that is not a significant

18   -- that is a large undifferentiated class of people that is

19   not sufficient to establish the kind of particularized injury

20   with a comparison point, as the Court notes is so necessary

21   in the *Raffensperger* case to determine standing.

22          And I would also --

23          THE COURT:  So out of curiosity, there are

24   election cases that go forward on the merits, not on

25   standing.  And for the person who does have standing to

1  challenge an election result, is it typically the candidate?

2  Is that the kind of particularized injury "if X hadn't

3  happened, I would have been elected.  Therefore, I have the

4  injury" that justifies the Court jumping in and saying "yeah,

5  there's a case for controversy here."

6          MR. GARNETT:  Yes, Your Honor.  The cases that

7  find standing sufficient to proceed will identify some

8  particular category for the Plaintiff that differentiates him

9  or her from the remaining members that gives it what, again,

10 what is called a necessary point of reference.

11          It can be a candidate, it can be, as indicated in

12 some of the apportionment case, it can be the possibility

13 that a certain class of voters based on traditional equal

14 protection forbidden classifications is burdened by a

15 particular approach.

16          It can be -- the other example, of course, is the

17 *Anderson* case in which the Court held in Ohio that the

18 requirement that independent candidates had a different set

19 of -- had different requirements to get on the ballot that

20 burdened them in a way that was distinct from what members of

21 the two political parties had.  And that then in that case

22 created a differentiation.

23          And, of course, we talk about this a little bit

24 with the issue of credential standing, because we weren't

25 clear whether the Plaintiffs were trying to claim credential

1   standing as they came forward.

2          And in that situation, occasionally, and every

3   occasionally, a court can find credential standing where a

4   claim of an individual plaintiff is so closely allied with

5   someone who would have standing, such as, as the Court

6   indicates, a candidate or perhaps a political party, or

7   perhaps a class of individuals who would be prohibited from

8   discrimination under the Equal Protection Clause, then the

9   Court could find credential standing.

10         As we note in our briefs, although we made that

11  argument and made it very forcefully, the Plaintiffs did not

12  respond to it.  And, again, it's pursuant to the cases

13  construing Rule 12.  They've essentially conceded that point.

14         But, yes, there are cases, Your Honor, where the

15  Court could find standing on those bases.  Or, of course, in

16  the apportionment cases where you're dealing with election

17  issues tied within the context of whether particular

18  individuals are being discounted or diluted in their vote

19  authority in a way that's different from others.

20         But, again, this brings forward only the

21  generalized complaints.

22         THE COURT:  So if I get to the standing issue and

23  decide it in your favor, do I need to go through all of the

24  other issues for dismissal?  I know Dominion didn't have a

25  personal jurisdiction issue, but Facebook did, and CTCL did.

1   Failure to state a claim you've all raised.

2          Do I need to get to all of the others if standing

3   is a impediment to bringing this lawsuit?

4          MR. GARNETT:  Your Honor, in Dominion's view, you

5   do not.  We are happy to talk about the problems we think

6   that exist with the complaint, and we do some of that in the

7   brief.

8          And, of course, under the amended complaint, the

9   claims against Dominion remained the same.  They all focus on

10  the three issues of the elections clause, the due process

11  clause, and equal protection clause.

12         But they did add a RICO claim against -- it's pled

13  against other Defendants.

14         But if there's no standing, Your Honor, the Court

15  doesn't need to wrestle with the particulars of those issues.

16         THE COURT:  And is the standing inquiry something

17  that has to be addressed on a claim-by-claim basis, you know,

18  with respect to the -- you know, equal protection is one

19  piece, and they have different claims.

20         Do you have to analyze standing with respect to

21  each claim that's brought?

22         MR. GARNETT:  Well, Your Honor, I don't think you

23  actually do with regard to the three claims that are stated

24  against Dominion, which are then restated as to declaratory

25  judgment claims at the end of the claim, because I think the

1    issues are identical.

2          I wouldn't mean to speak for my colleagues,

3    Facebook and the Center, with regard to the RICO and other

4    claims.  But the issues -- the fundamental problems stated --

5    established with standing with regard to all three claims for

6    relief, including the added on, the two declaratory claims,

7    are sufficient that the Court can determine there's no

8    standing and need not make further analysis beyond that with

9    regard to Dominion.

10          THE COURT:  Okay.  Help me on the traceability

11   piece.  I have a little trouble understanding what

12   traceability means.

13          But is seems that the injury complained of here is

14   that somehow a vote wasn't counted to the degree it should

15   have been because votes that shouldn't have been counted

16   were, or votes that should have been counted were not.

17          And all of that can be traced to Dominion's

18   allegedly flawed computer system for tabulating votes that

19   may be negligent, may be intentional, but somehow doesn't add

20   up correctly.

21          What's the traceability problem?  Because I think

22   you do make an argument about traceability of the injury to

23   the --

24          MR. GARNETT:  We do, Your Honor.  I'm sorry.

25          THE COURT:  Go ahead.

1           MR. GARNETT:  The traceability issue with regard

2    to Dominion is that Dominion's role in this case -- and

3    there's a lot of discussion about State action, of course, in

4    the Plaintiffs' complaint and then in their briefing.  And we

5    make the point that State action is essentially beside the

6    point here.

7           The State action doctrine, of course, has been

8    developed by the Courts as a way to limit the possibility of

9    Constitutional violations under the 1983 and the various

10   Constitutional claims that can be brought.  And there has to

11   be State action, and now and then there is, in a situation

12   like the *Marsh v. Alabama* case, in which a private entity has

13   completely taken over a State's function.

14          That's not what you have here.  Here in this case,

15   there are some contractual relationships between Dominion and

16   various States, but the issue -- there's nothing that

17   Dominion has done that is not essentially just clerical.  In

18   other words, tabulating, calculating, et cetera.

19          So the problem with traceability vis-à-vis

20   Dominion is that there is no remedy that the Court could

21   fashion relating to what Dominion's role as a contractor in

22   this case that would address the issues that the Plaintiffs

23   are complaining about.

24          Dominion, for example, does not certify elections.

25   Dominion does not step in and function as a Secretary of

1   State, as was alleged with the parties that were dismissed

2   here.

3           Dominion is simply a private company that has --

4   provides certain services in connection with elections, but

5   there's no way that a claimed Constitutional violation could

6   be traceable, meaning that this Court could fashion a remedy

7   that would address the issue that they're complaining about

8   here.

9           THE COURT:  Okay.  Well, why don't I hear from --

10  I don't need you to go through your other arguments.

11          MR. GARNETT:  That's fine.

12          THE COURT:  Why don't I hear from Facebook on the

13  issue of standing.  And I'm going to focus on the standing

14  question -- the Center next, but Facebook first.

15          MR. LIPSHUTZ:  Thank you, Your Honor.  Good

16  afternoon.  Joshua Lipshutz from Gibson Dunn.

17          We certainly agree with the arguments that

18  Dominion has presented on standing, although I'm not sure I

19  would concede the redressability point that was conceded by

20  prior counsel.  We can get into that.

21          The bottom line is that the Plaintiffs filed this

22  action after the 2020 election in a state that has no ties to

23  their actual claims, to their election related claims.

24          And this Court should dismiss this case with

25  prejudice for numerous reasons.

1      THE COURT:  Well, let me ask you about the

2   dismissal with prejudice.  I've looked at some Tenth Circuit

3   law, and it seems that a dismissal for lack of standing has

4   to be without prejudice.  Do you agree with that?

5      MR. LIPSHUTZ:  I do agree with that if there is --

6   because of the futility doctrine, Your Honor.  I think when

7   there is -- when it's been shown that amendment would be

8   futile -- and futile, I think -- then I think you cannot

9   dismiss the case with prejudice.

10      At some point a failure to establish standing,

11   like any other failure to plead a case, requires dismissal

12   with prejudice for finality purposes.

13      And I think what's interesting about this case is

14   that we've seen the futility in action.  Plaintiffs filed a

15   motion to amend their complaint, and in filing that motion,

16   have actually told the Court what they think they can do to

17   try and cure the very significant standing problems that

18   exist with this case.

19      And so much like -- we don't have to guess whether

20   the Plaintiffs can cure their defects.  We've seen what they

21   intend to do, and it plainly fails.

22      And, in fact, their proposed amended complaint

23   really makes things worse for them, because they seek to add

24   157 new Plaintiffs who they say they want to add because they

25   are, quote, and this is the amended complaint, paragraph 51,

1  "an assembly of the people of the United States of America."

2         And that is as plain a statement as possible, an

3  admission by the Plaintiff, as to why they lack standing to

4  pursue these claims, or any claims that they're hoping to

5  pursue.

6         They have signed up people, as I understand it, by

7  gathering names on a website that they put together.  They

8  did so purely on the fact -- purely on the basis of -- that

9  somebody clicked themselves and said that they were a citizen

10 of the United States, and collected names, and submitted

11 names in a list without inquiring as to anything, as far as I

12 could tell, about what injury those Plaintiffs suffered.

13        And it goes above and beyond the pleadings, Your

14 Honor, but there's actually a website,

15 DominionClassAction.com, that you can visit and see all of

16 this in action.  They actually just implore anyone to join

17 the class action lawsuit by just putting in their email

18 address and sending in an affidavit.  There's no particular

19 identity required at all, just that you are a voter in the

20 United States.

21        And so I think that really compounds the problem

22 for the Plaintiffs, and makes it clear that the dismissal

23 should be with prejudice and not without prejudice.

24        And there are other reasons beyond standing why

25 the dismissal should be with prejudice on the merits, if this

1  Court were to get there.

2          On the redressability point, I certainly agree

3  that the U.S. Supreme Court has said in its most recent

4  decision that a request for nominal damages may provide the

5  necessary redress for completed violation of a legal right.

6  It may.  But it also may not.

7          And I think there's several problems with the

8  nominal -- so-called nominal damages that are being sought

9  here.

10          First of all, they're not nominal damages.  They

11  are -- I think it's actually billions of dollars, as Your

12  Honor pointed out, that they are seeking.

13          And even on a per-Plaintiff level, it's $1,000.00.

14  $1,000.00 is not nominal damages.  In order to seek $1,000.00

15  per Plaintiff, they presumably have to show some right to

16  obtain $1,000.00.  Typically, there's a statutory right or

17  some other right that you would need to point to, to earn an

18  award of $1,000.00 for each Plaintiff.  That's not what we

19  normally conceive as nominal damages, even on a per-Plaintiff

20  basis.

21          So I would dispute that they're even seeking

22  nominal damages in the first place.  And even if we could say

23  that that is nominal damages, the Supreme Court in that same

24  case made it clear that a request for nominal damages itself

25  does not open the courthouse door.  It has to be the request

1    for nominal damages after the completion of a violation of a

2    legal right.

3              And, again, there I don't see where they have

4    demonstrated any violation of any cognizable legal right, or

5    even alleged as much.

6              So I would not concede the redressability point.

7    I think they fail on all three prongs of the standing

8    analysis.

9              And I certainly agree with counsel that just

10   argued that if Your Honor were to reach the standing analysis

11   and decide that the Plaintiffs have no standing, this Court

12   need not, and in fact should not, go any further in

13   evaluating the merits.

14             But I do think the dismissal should be with

15   prejudice because of the futility part that I raised earlier.

16             THE COURT:  Can I ask one question of Facebook?

17   The link between Facebook's alleged misconduct and the

18   claimed injury, and the claimed injury I perceive to be the

19   dilution of the vote or my vote didn't count, or somehow I

20   lost confidence in the American electoral system because of

21   all of these questionable aspects to the vote counting.

22             The allegation against Facebook, though, seems to

23   be that, you know, this whole censorship issue and you don't

24   allow certain statements to be made, and you do allow other

25   statements to be made, and so you're putting a thumb on the

1   scale with your editorial policies, and, hence, the section

2   of the -- is it 230, it's un-Constitutional somehow.

3          I'm having trouble, and maybe this is a question I

4   need to ask Plaintiffs' counsel, but did you perceive the

5   link between Facebook's alleged misconduct and the injury

6   that the Plaintiffs have suffered?

7          MR. LIPSHUTZ:  I have not, Your Honor.  And I have

8   to say it is somewhat -- it is very perplexing as to what

9   Facebook's connection to any of this is or is alleged to be.

10          And, again, I don't want to go, you know, beyond

11   the claims here, but I would note that on the website, they

12   mention the fact that they just dislike social media, and

13   that's apparently why Facebook is in this case.  The

14   Plaintiffs, on their website, say that you should join the

15   case if you dislike -- because they dislike social media.

16          And so I think that kind of says it all.

17          Facebook has no connection to this case

18   whatsoever.  Any of the Defendants, frankly, have a

19   connection to the case in the sense required by Article III.

20   I don't think there's a valid case or controversy here at

21   all.

22          And we also have many arguments on the merits,

23   section 240, there's a frivolous RICO claim that they try to

24   throw in to the amended complaint.

25          I mean, at the end of the day, Your Honor, I just

1   don't think this is a serious lawsuit.  Certainly not against

2   Facebook.

3           And so for that additional reason, I would ask the

4   Court to dismiss this case with prejudice.

5           And, of course, we have our personal jurisdiction

6   arguments, as well, which I'm happy to address if the Court

7   is interested in entertaining them.

8           THE COURT:  Yeah, the personal jurisdiction seems

9   problematic.  But let's -- why don't I -- I'll give you a

10  chance to rebut on that if the Plaintiffs have something to

11  say on personal jurisdiction.

12          Why don't I hear from the Center on the question

13  of standing.

14          MR. MATZ:  Thank you, Your Honor.  This is Joshua

15  Matz.  I represent the Center for Tech and Civic Life, or

16  CTCL.

17          Like counsel for Facebook, I'll focus on standing.

18  Like them, we feel that there obviously is an injury in facts

19  here.

20          Just to provide some context, because obviously

21  Dominion and Facebook -- CTCL is a non-profit organization

22  that is basically a group of civic technologists,

23  researchers, election administration, data experts, whose

24  goal is to work with jurisdictions around the country to

25  foster a more informed and engaged democracy and to modernize

1   the U.S. electoral system.

2           It is in pursuit of that goal that CTCL provided

3   services to over 2,500 cities and counties around the

4   country.  Many of them in jurisdictions -- in fact, I believe

5   the majority of the jurisdictions that had voted for the

6   Republican candidate in the prior election, but jurisdictions

7   of all stripes on a non-partisan basis to help support

8   election administration.

9           THE COURT:  So let me ask you about that, because

10  that's not in the complaint.  What's in the complaint is that

11  it's funded by Zuckerberg and Chan, and they've got -- you

12  know, their thumb on the scale and they're arguably

13  facilitating under the guise of COVID-19 under the guise of

14  assisting municipalities with COVID-19.

15          Instead, they're putting valid drop boxes only in

16  Democratic areas in order to assist that.

17          So I hear what you're saying, but I'm wondering

18  whether I'm allowed to take, you know, the reality that

19  you're representing into account in determining this motion,

20  or whether you're just giving me background, and I need to

21  just take that with a grain of salt because I can't consider

22  it on a motion to dismiss.

23          MR. MATZ:  It's purely background.  There is no

24  need for you to consider it.

25          One reason I started there was just because the

1  Court may not be aware what the organization does.  Another

2  reason is that although the Plaintiffs lack injury, they have

3  used this case as a soapbox to accuse CTCL, even outside the

4  complaint, of any number of tax frauds and business

5  irregularities, and federal crimes, statements that in the

6  litigation would be defamation.

7          And given their desire to use this soapbox to

8  slander my client, I just thought it would be helpful to open

9  by providing a context, which is not anything the Court needs

10 to account for.

11         On the standing issue, I actually think that the

12 easiest starting point, and, frankly, the end point for it,

13 is the Supreme Court's decision in *Lance v. Coffman,* which

14 has not yet been raised by the parties.

15         But, you know, I would emphasize it because, you

16 know, even more so than *Hollingsworth* and the other cases

17 that have come up, you know, that is one of the key cases in

18 which the Supreme Court made clear that in generalized limits

19 cannot support standing.

20         And it made that clear in the context of a

21 challenge, in fact here in Colorado, that had been brought by

22 a group of individual citizens on the theory that the

23 districts injured their interests in the proper

24 representation and structure.

25         And the Court said in response to this case by a

group of individual Coloradoans that was precisely the claim

of undifferentiated generalized pleadings about the conduct

of government that refused countenance.

THE COURT:  What's the citation to the *Lance v. Coffman* case?

MR. MATZ:  Oh, sorry, Your Honor.  I can pull that real quick.  It's stated in our papers.  It's 549 U.S. 437, from 2007.

THE COURT:  Okay.

MR. MATZ:  Your Honor, the reason I highlight the *Lance* case is because it has been stated repeatedly, including the myriad of cases surrounding the 2020 election, as the Court may have seen, as the foundation of the principle that when individual voters bring challenges in the generalized manner to the administration of the election, and they say that they were injured because the election wasn't administered in accordance with the law generally, or because candidates that we prefer, you know, have the tough end of it in house and other jurisdictions carried out its procedures.

*Lance* states the foundation of a line of cases, including *Raffensperger* in the Eleventh Circuit, and any number of other decisions.  And we cite well over a dozen of them in our briefs.  All of which made clear that that kind of complaint is a generalized grievance that is not an injury in fact.

1          As Chief Judge Pryor put it in the *Raffensperger*

2    case, when he rejected the suit attacking the administration

3    of the Presidential election in Georgia, he said "all

4    Americans, whether they voted in this election or whether

5    they reside in Georgia, could be said to share interest in

6    insuring that a Presidential election is properly

7    administered."

8          And on that basis, he said that the interests that

9    would advance was a generalized grievance.  And I'll

10   highlight -- and I'll come back to this point in just a

11   minute, is that's true of registered voters and everybody

12   else.  Everybody in the country has an interest in the proper

13   administration of the Presidential election.

14         I don't think they're interested in that just

15   because they're registered to vote.  And none of these

16   decisions have been written in a way that is linked to

17   whether someone registered to vote, or not.

18         And so the *Wood* case from Chief Judge Pryor, like

19   I said, a line of cases.  Another one that I would just call

20   to the Court's attention is *Behan v. Wisconsin Elections*

21   *Commission* case cited on December 9th of 2020.  We cite it in

22   our papers.

23         They are Chief Judge Epper in the Eastern District

24   of Wisconsin, survey a wide range of decisions in which a

25   voter or group of voters sued on the theory that their voted

1  had been diluted "by the possibility of unlawful or invalid

2  ballots being counted."

3           And she found that all of those decisions

4  concluded that such harm was too speculative and too

5  generalized to support standing.

6           And this is of particular interest to me as

7  counsel to CTCL.  A whole series of cases articulated that

8  very proposition while rejecting the lack of standing

9  challenges under State and Federal law to CTCL's COVID-19

10 response program.  We cite these cases in our brief.  They

11 are from Federal Districts in Minnesota, Wisconsin, Texas,

12 Pennsylvania, Iowa, and Michigan.

13          In all of those jurisdictions, courts held that

14 individual voter --

15          THE COURT:  Northern District of Iowa.

16          MR. MATZ:  Sorry, Your Honor.  Yes, exactly.

17          THE COURT:  Right.

18          MR. MATZ:  And so there are a whole slew of these

19 decisions in which courts held that challenges to cities and

20 counties that had accepted the CTCL grants, many of the

21 courts held that they failed to state any violation of State

22 or Federal law, but more relevantly here, all of them denied

23 preliminary injunctions, or TROs, or both, and in some cases

24 dismissed outright for lack of standing.

25          And may really shock through those rulings was the

1   very generalized grievance rule that controls here, too.

2            And, again, those cases, as I understand it,

3   mostly involved registered voters.  And the conclusion was

4   that their interests in the administration of the election

5   being generally done right, and votes generally being counted

6   right, is treated under *Lance v. Coffman* as the sort of

7   foundation case as a classic generalized interest.

8            And so when we came to the papers here, part of

9   what was so surprising to us is that, you know, the

10  Plaintiffs are clearly aware of those cases.  In fact, they

11  appear to have plagiarized significant parts of their

12  complaint from the complaints in those cases.

13           They had been put on notice by motions to dismiss

14  that there was a stipulation.  Your Honor asked at length

15  about standing at the March 11th conference.  And so if I

16  were the Plaintiffs, it would have been pretty clear to me

17  that there was a standing concern.

18           What was striking to me when I read their papers,

19  and Your Honor suggests that they're relying on a distinction

20  between the citizenry as a whole and registered voters, and

21  I've already addressed that, and I'll have another few

22  thoughts to share on it in a minute, I think that -- maybe

23  Your Honor did.  I didn't really see that as clearly in their

24  papers.

25           When I read their briefs opposing our motion to

1  dismiss, and their brief in support of their motion for leave

2  to amend, I didn't really see anything other than a general

3  assertion that the integrity of the Presidential election is

4  important, and so anyone, anywhere, who has registered to

5  vote, whether they have voted or not, anywhere in the country

6  can file a suit in any Federal Court against any public or

7  private entity who, in their view, did anything that may have

8  affected the administration or the result of a Presidential

9  election.

10       And in support of that, they did not cite -- and I

11  would highlight this, at least in their papers with respect

12  to CTCL, they did not cite a single case, not one, about the

13  injury in fact requirement.  Not a single case.

14       And they didn't respond to or distinguish a single

15  case that we cited, including *Lance*, including *Raffensperger*,

16  including all of those CTCL cases.  They didn't cite one.

17       They cited that case from the Supreme Court about

18  repressability, and they do have a repressability problem for

19  the reason counsel to Facebook described, but they said

20  nothing about injury.  I've never seen anything like that in

21  a Federal case when injury is squarely put at issue by

22  everybody.  And the Plaintiff says nothing.  The Plaintiff

23  says absolutely nothing about it.

24       You know, and they don't cite any authority for

25  their position, for their very broad view.  To me, you know,

1  that is irresponsible and problematic.

2          Your Honor has suggested that maybe what separates

3  their case from all of these other cases is this idea that

4  they're bringing it with a vote for registered voters.

5          As I've mentioned, there's a few difficulties with

6  that.

7          The first is that any number of cases that were

8  brought and dismissed for lack of standing involved

9  registered voters.

10          The second is that registered voters are not

11  unique in sharing an interest in the proper administration of

12  the election.

13          The third is that they suggest that a whole line

14  of cases were dismissed essentially for a pleading error, or

15  for a briefing error, because what the Plaintiff should have

16  said is that they care about the interests of voters rather

17  than the general integrity of the electoral system.

18          And it's hard for me to think that something like

19  that distinction, the distinction would open the doors to a

20  broader conception of Federal standing to challenge any

21  alleged election administration issue.

22          And then finally, and this was referenced by prior

23  counsel, *Seldon* confirms -- and this is a quote:  "When the

24  asserted harm is a generalized grievance, short in

25  substantially equal measure by all or a large class of

1  citizens, that harm alone normally does not warrant exercise

2  of jurisdiction.

3          And so that confirms the principle that I think is

4  implicit to -- or maybe explicit in many of the other cases

5  surrounding the 2020 election, which is that representing all

6  registered voters doesn't solve the problem that the

7  Plaintiffs face in pursuing a generalized interest in the

8  proper administration of an election generally.  That's an

9  interest everybody in this country has in common.

10         And, again, even if that's their argument, I have

11 to say, at least in the CTCL papers, the Plaintiffs never

12 said that, and they certainly never cited any case that they

13 thought would support that proposition.

14         And this is sort of where I started.  What's a

15 little frustrating about this case from I think CTCL's point

16 of view, is that, you know, we're a non-profit organization

17 trying to do some good in the world.  This lawsuit is

18 frivolous.  It is a waste of our time and our money and our

19 energy.

20         The Plaintiffs can't even cite a single case about

21 the injury in fact.  hey can't be bothered to respond to a

22 single case that we cite against them.  Even after the status

23 conference Your Honor asked them to do so.

24         Instead, they can be troubled to level all sorts

25 of false and outrageous accusations of criminality against us

1  and the other parties in this case.  They can be troubled to

2  engage in all sorts of litigation improprieties; the latest

3  being the judicial notice motion they filed last night, which

4  is obviously improper, and to which we object.

5         The filing of a lawsuit is pretty serious

6  business.  And Article III of the Constitution requires that

7  Plaintiffs demonstrate an actual, unique, particularized

8  injury entitling them to a Federal judicial forum.

9         Plaintiffs come no where close to making that

10  showing.  In their papers with respect to us they don't even

11  try.  They just say that Presidential elections are

12  important, so gee, everyone ought to be able to sue for

13  everything if they've registered to vote, whether or not they

14  actually voted.

15         Respectfully, Your Honor, that's nonsense.  There

16  is not a single case anywhere in the United States that

17  supports that proposition.  Every case that I am aware of

18  forecloses it.

19         And for that reason, we think there's clearly not

20  standing, but that Plaintiffs' argument is contrary or

21  frivolous.

22         And I would, of course, be happy to address any

23  other questions the Court may have.

24         One other point I would just quickly highlight is

25  that we're in a slightly different procedural posture than

1    the other Defendants because there is a split in authority

2    within the Tenth Circuit over in a multi-defendant case like

3    this one whether the Plaintiffs are entitled to amend as of

4    right in the circumstances they've found themselves in.

5            And for that reason, our view is that the safe

6    recourse, if the Court does perceive a lack of standing, is

7    to docket the amended complaint and dismiss it *sua sponte,*

8    which is essentially the same standard as it would apply to

9    denying the motion to amend the complaint on grounds of

10   futility.  I just want to flag that to avoid a sort of

11   needless procedural complication.

12           And, of course, we stand by the propositions set

13   forth elsewhere in our brief, and we'll happily address any

14   of them if the Court has any questions.

15           THE COURT:  Okay.  I had not seen this motion to

16   take judicial notice of hundreds of cases and articles, et

17   cetera.  Your view is that should be stricken and improper?

18           MR. MATZ:  Yes, Your Honor, for a few reasons,

19   just to put them on the record.

20           THE COURT:  Okay.

21           MR. MATZ:  The first is that we did not get

22   advance notice about it.  They didn't even confer with us

23   about it.  They just surprised us with it last night.

24           They say that they needed to do it because there

25   was no evidence, which is bizarre, given that the vast

1  majority of materials that they've attached pre-date the

2  filing of the papers in this case.

3          And what we don't yet know for what purpose they

4  asked the Court to take judicial notice.  I have a very

5  strong instinct that it will not adhere to Federal Rule of

6  Evidence 201(b), which limits judicial notice only to the

7  existence of such documents, and not to the truth of any

8  statements or matters contained there, which has, of course,

9  been confirmed by a long line of Tenth Circuit precedent.

10         And so I suspect we would have other objections if

11  we hear the grounds on which they want the Court to grant

12  judicial notice.  But the manner and circumstances of the

13  filing, in our view, by itself is sufficient grounds on which

14  to deny the motion.

15         THE COURT:  Okay.  Let's hear from the Plaintiffs

16  on the issue of -- first this motion to take judicial notice,

17  which does seem like sand bagging in the worst way the day

18  before.  You know, I've been reading the many briefs and

19  pages, and your complaint, your amended complaint, your

20  motion to amend.

21         To say you're relying on all of these cases, and

22  I'm supposed to take judicial notice of them, and a bunch of

23  articles, does not seem like it's consistent with the Rules.

24         So, Plaintiffs' counsel?

25    (No response)

1          THE COURT:  Is Plaintiffs' counsel there?

2      (No response)

3      (Pause)

4          THE COURT:  Is Plaintiffs' counsel there?

5      (No response)

6          MR. WALKER:  I think we lost Mr. Fielder, Your

7   Honor.  Hold on a second.

8          THE COURT:  Okay.

9      (Pause)

10          MR. GARNETT:  Your Honor, this is Stan Garnett.

11   If I may, while we're waiting?

12          THE COURT:  Yes.

13          MR. GARNETT:  We don't want to add to the argument

14   at this point, but we too would object.

15          THE COURT:  Let's wait until Mr. Fielder is on the

16   line, because I want him to hear everything.

17          MR. GARNETT:  All right.

18      (Pause)

19          THE COURT:  Was he able to ever log on, do we

20   know?  Did he ever show up?

21          THE COURT CLERK:  Your Honor, not that I'm aware

22   of.

23          THE COURT:  Okay.

24      (Pause)

25          THE COURT:  Mr. Walker, do you want to try and

 1  call Mr. Fielder and ask him to call in?

 2       (No response)

 3            MR. WALKER:  He does appear in the list of

 4  participants, albeit as muted.  I don't know --

 5            THE COURT:  Ms. Libid, can you un-mute him?

 6            THE COURT CLERK:  I've already tried.  I don't

 7  think it's working.

 8            THE COURT:  Okay.

 9            THE COURT CLERK:  We must have dropped him, but

10  he's still listed there.  I tried un-muting him, but it's not

11  working.

12            THE COURT:  Okay.  Mr. Fielder, if you can hear

13  us, now is the time for you and your Plaintiffs to talk, and

14  you can call in if you're not working -- if the computer is

15  not working.

16       (Pause)

17            THE COURT:  We'll give him about two minutes.

18  But, Mr. Walker, if he doesn't call in, you're going to be at

19  bat.

20       (Pause)

21            MR. WALKER:  Judge, he's switching computers.

22       (Pause)

23            THE COURT:  Is he communicating with you by phone

24  or otherwise?

25       (No response)

1           THE COURT:  Mr. Walker?

2       (No response)

3           THE COURT:  Mr. Walker, can you hear me?  I think

4   you're muted, sir.

5           THE COURT CLERK:  It looks like Mr. Walker also

6   dropped.

7           THE COURT:  Oh no.  So much for technology.  Could

8   you have Mr. Fielder just dial the phone number?

9           THE COURT CLERK:  He was called in.

10          THE COURT:  I know.  He  never did video?

11          THE COURT CLERK:  Mr. Fielder?

12          THE COURT:  Yes.

13          THE COURT CLERK:  No.

14      (Pause)

15          THE COURT:  Mr. Walker, I see you on the screen.

16  Can you -- or maybe I don't.  Can you hear me, Mr. Walker?

17  Are you there?  No, I guess that's Mr. Matz.  It's a small

18  picture.

19      (Pause)

20          THE COURT:  All right.  Here's what we're going to

21  do.  We're going to take a break until 3:15 Denver time.  I

22  don't know if Mr. Walker or -- Ms. Libid, if you could email

23  both Mr. Walker and Mr. Fielder and say we're coming back on

24  at 3:15.  Mr. Fielder, if he can't get his computer to work,

25  needs to dial in and we'll hear him by phone.

1        But I just can't sit here waiting for people to

2   call in.  We've been going for about an hour.  Everybody take

3   a break.  Don't hang up or disconnect.

4        But somebody communicate with Mr. Fielder, either

5   by telephone or by email, that he needs to try in the next

6   five minutes to get on the computer.  And if that's not

7   working, he should call in and we'll at least be able to hear

8   him by phone like I did for the first five minutes in this

9   process.

10        We'll be in recess until 3:15 Denver time.

11        (Recess from 3:03 p.m. until 3:13 p.m.)

12        THE COURT CLERK:  Court is in session.

13        THE COURT:  This is Magistrate Judge Reid

14   Neureiter.  We're back on the record in the case of O'Rourke

15   versus Dominion.

16        When we broke, Mr. Fielder was not with us.  Mr.

17   Fielder, are you there?

18        MR. FIELDER:  I'm here, Your Honor.  I'm going to

19   use my cell phone to speak and hear.  I don't know what

20   happened to my computer.  I could hear everything and see

21   everything, but all of the sudden I lost my ability to speak

22   and hear.

23        So I'm on the cell phone, but at least you can see

24   me, Your Honor, and I can see you.

25        THE COURT:  Okay.  I now have a pen malfunction.

 1  Ms. Libid, do we have another pen?  I have a low tech problem

 2  as opposed to a high tech problem.

 3          So, Mr. Fielder, just so that you know,

 4  unfortunately because I think the way the system works is

 5  when you speak or when a party speaks and the computer picks

 6  it up, and I can see you, because you're speaking through

 7  your phone, you're teenie-tiny in the lower right hand

 8  corner.  You're not as large as Mr. Walker, who is the person

 9  who spoke last, so I see him really large.

10          But at least we're on.  So I don't know how much

11  of the last -- oh there you are.  Okay, good.

12          Were you able to hear all of the arguments that

13  transpired over the last hour?

14          MR. FIELDER:  Yes, Your Honor.

15          THE COURT:  Okay.  So first, I'd like you to

16  address the unusual motion to take judicial notice that was

17  filed yesterday.  That is not really proper.  It sort of sand

18  bagged the Defendants.

19          I haven't read it.  I hadn't been even alerted to

20  it being filed.  The briefs were done, and we now have oral

21  argument for you to fill me in orally.

22          I'm not going to take judicial notice of anything

23  that you filed yesterday.  It just doesn't make any sense.

24          That's denied.

25          MR. FIELDER:  Okay.  Do you want me to comment on

1  that, Your Honor?

2          THE COURT:  No.  I'm just telling you.  The motion

3  to take judicial notice is denied.  It's not consistent with

4  the Rules, and briefing was closed, and there's no basis for

5  putting in a list of cases and a list of newspaper articles

6  and other things.

7          Now let's hear your argument on the standing

8  question.

9          MR. FIELDER:  Well, Your Honor, with regard to

10  standing, it is closely connected to the issue of State

11  action.  And I didn't mean to surprise anybody.  I just

12  listed the cases and their current citation because some of

13  which have been ruled upon in just the last week with regard

14  to the case out of the State of Pennsylvania, the Supreme

15  Court, on April 19th of 2021, granted the writ of certiorari

16  and vacated the lower court's judgment, but sent it back down

17  with instructions to declare that the case was moot.

18          There are also some recent filings from other

19  individuals against the parties here.  A company called My

20  Pillow, Inc. just sued last week Dominion Voting Systems,

21  Inc.

22          THE COURT:  Mr. Fielder, seriously, you're citing

23  the My Pillow guy as your defense in this case?  Come on.

24  Let's talk about standing.  Go to standing.  I've denied your

25  motion to take judicial notice.  Let's talk about standing.

1          Why didn't you cite a single case of the dozens

2    that have been issued by Federal District Courts across the

3    country dismissing the claims exactly like yours o n the

4    basis of standing.  You didn't mention any of them in either

5    your motion to amend or your opposition to the motions to

6    dismiss.  Why not?

7          Please distinguish this case from the cases in

8    Iowa, the cases in Wisconsin, the cases in Pennsylvania, that

9    were all dismissed on the basis of standing.

10          MR. FIELDER:  Because the individuals there were

11   coming to the court and suing government individuals and

12   persons in their official capacities.  Therefore, they were

13   essentially suing the states or sub-divisions of a state.

14          They were asking for extraordinary relief.  All of

15   those cases, all of them, were with regard to a request for a

16   TRO or a preliminary injunction.

17          In those cases, the standard of proof is that the

18   plaintiff must show a likelihood of success on the merits.

19   The standard here is different.

20          This is a completed Constitutional right

21   violation.  This is multiple parties committing multiple

22   violations.

23          However, in the middle of the election -- strike

24   that.  After the election, in the middle of the process

25   before the Electoral College met, many voters expressing

1   their dissatisfaction hired lawyers that went to court and

2   asked for extraordinary relief.  We didn't do that.

3          On December 10th of 2020, the United States

4   Supreme Court in the *Panzen* (ph) case, indicated that it has

5   long since recognized a plaintiff's ability to sue

6   individuals in their individual capacity.

7          THE COURT:  But, sir, let me ask you a question.

8   Standing is linked to injury.  You have to show a

9   particularized injury.  What is the -- when I read your

10   papers, whether it's the original complaint or the amended

11   complaint, or all of the affidavits that you've attached to

12   the original complaint, the injury that your clients are

13   complaining about is assumed that their vote wasn't counted,

14   that their vote was diluted, that somehow the mechanism of

15   the election was fiddled with, was interfered with, so that

16   their votes weren't counted.

17          That's the injury.  And if that's the injury,

18   explain to me how that's a particularized injury that differs

19   from injury of all other voters or all other Americans,

20   because that's what you have to have to have standing.  It

21   has to be linked to the injury that's claimed.

22          And when I read your complaint, the injury in this

23   claim is that it's perception that the vote wasn't counted,

24   or my vote was diluted.  Right?  That's what you say.

25          MR. FIELDER:  No, that's not the claim.  That's

1  not the claim.

2          The claim is that we all have one national right

3  amongst us all, and that's to vote for President and Vice-

4  President.  We've said that multiple times.  That's not a

5  state-based claim.  That's one right that we all share across

6  the country, and it's an extraordinary right.

7          THE COURT:  Okay.  So how is that right -- so

8  that's the right.  And it was that right that was interfered

9  with.  The right to vote.  Correct?

10          MR. FIELDER:  The right to vote for President.

11          THE COURT:  Okay.  And how is that -- your named

12  Plaintiff, Mr. O'Rourke, didn't vote.  So let's pick somebody

13  from Colorado.  The grandmother from Summit County who said

14  her vote was somehow not counted.

15          How was she -- how is she injured?  How is her

16  injury different from my courtroom deputy, who I assume

17  voted, or somebody else?  How is that injury different?

18          MR. FIELDER:  First of all, Mr. O'Rourke did vote,

19  and is really upset that the pleadings say that he didn't

20  vote.  In his affidavit, he said that he voted.

21          THE COURT:  Okay.

22          MR. FIELDER:  And he did vote.  However, if a

23  person votes for President, and then information is revealed

24  that certain persons, Mark Zuckerberg, his wife, they

25  confused the election.  The Presidential election was

1   hundreds of millions of dollars, and they funneled that money

2   through CTCL to impact the election, so that impacted your

3   clerk if she's registered to vote.  If she's a regular person

4   that doesn't want to vote, is not registered to vote, she

5   might have a generalized grievance about it, but it wouldn't

6   have affected her right.

7          Every person that voted doesn't want to believe

8   that their vote is counted, but demands that their vote be

9   counted.  And if there's evidence that the -- that first of

10  all from Dominion, that the votes were weighted, that one

11  vote might count to a fraction, where another counts as --

12  another vote might count four then one, 1.12, for example.

13         That's the evidence that's coming out from the

14  experts.  Not the Plaintiffs.  Not the layers.  But the

15  experts.  Evidence that the voting machines don't work.

16         Law Review articles, law professors, all cited in

17  the complaint and the pleadings, that the ballot marking

18  devices don't work, and that the voting machines are

19  connected to the internet.

20         These are not a generalized grievance.  Maybe they

21  would have been before the election.  But once all of the

22  evidence came out that there was foreign interference, that

23  the machines were connected to the internet, and that they

24  mistabulated the votes, maybe on purpose, but certainly

25  Dominion must take responsibility for being responsible for

1   those voting machines.

2          So we're in a crossroad in our country where we're

3   either going to allow these private entities to tabulate our

4   votes, run the election, set the elections up, and then when

5   something goes wrong and the voters say "hey, that's not

6   right," well, that's a generalized grievance.

7          How was your vote affected?  Well, if swing states

8   are being affected, not to a couple of thousand votes, but

9   hundreds of thousands of votes, which are being adjudicated,

10  and we outlined that in the complaint, that are being

11  adjudicated, that is judged, by either artificial

12  intelligence or by county clerks looking at their computer

13  screens, there is a high error rate on these Dominion

14  machines.

15         I'll give you one example.  There was information

16  that in Maricopa County people were given Sharpies.  Dominion

17  didn't just lead the equipment, they set up the whole

18  election in Maricopa County.  There shouldn't have been a

19  Sharpie within a mile of that place, because everybody knows

20  when you use Sharpies on a ballot, that causes an error

21  reading from the ballot scanner, such that it must be

22  adjudicated.

23         There is facts which indicate that over a hundred

24  thousand votes just in Maricopa County were adjudicated

25  without observation, by who, no one knows.  And that has a

1   substantial impact on everyone in Arizona's right to vote for
2   President, and everyone across the country.
3            And it didn't just happen in one state.  It
4   happened in multiple states.
5            So what could be called a conspiracy theory by
6   some expert who has opined that these machines are being
7   interfered with, that would certainly impact everybody's
8   right to vote.  Why would we even have an election if there's
9   an algorithm in the computer voting machine?
10           And CTCL, they were going all across the country
11   granting hundreds of millions of dollars to municipalities,
12   to cities, and interacting with those jurisdictions'
13   elections.  Not building an ice skating rink or participating
14   in a law enforcement charity.  They were dealing with
15   elections, which is a public function.
16           Any time a corporation, a private individual, or a
17   501(3)(c) --
18           THE COURT:  You're back to the state action issue.
19   I'm wondering about standing and the injury that -- the
20   injury that you've described, the dilution of your right to
21   vote, is precisely the kinds of injuries that all of the
22   cases, the case out of Iowa, the case out of -- even the case
23   out of Iowa had no other case in the Third Circuit, the
24   judgment was reversed and the matter dismissed as moot.
25           But the reasoning still stands.  Their case was

 1   dismissed on the basis of lack of standing.  And so the

 2   reasoning in that case is no different from the reasoning

 3   here.

 4          Your clients' injury all is linked to supposedly

 5   the dilution of the votes, for not counting their votes, and

 6   that is a generalized grievance shared by all 160 million

 7   registered voters.  Right?

 8          MR. FIELDER:  We've never used the word dilution

 9   of votes.  Our claim is that these private entities

10   interfered in a substantial way with the election.

11          And so that could be described as diluting one's

12   vote.  If you're fractionalizing votes or weighting votes,

13   that could be described as diluting votes.  But that's not

14   what those cases stand for in the classic term of vote

15   dilution.  That's not our general theory.

16          What our theory is, is that these private

17   companies interfered with the election in a substantial way,

18   and that affected everybody's rights.  That affected

19   Republicans and Democrats.  It certainly affected

20   Independents who vote for either Republic or Democrat.

21          Many people are disgruntled voters that don't

22   vote, but they have a right to vote, because they feel that

23   the system is corrupt by these private entities.

24          Is the next election going to involve a

25   billionaire that comes in and drops $500 million dollars on

1   elections all over the country, and no one is going to be

2   able to say anything or do anything?

3           THE COURT:  Well, --

4           MR. FIELDER:  Wonder if all of the allegations are

5   proven that these Dominion machines are easily actable,

6   connected to the internet, and are intentionally programmed

7   through this private software, this proprietary software, to

8   impact elections.

9           The only people that can stop them are the people,

10  but not the general people, but those who have the right to

11  vote.  The right to vote is the most precious thing we have,

12  and that's why everyone is so upset.  It's not just a

13  privilege that you might have to take advantage of.  It's

14  your right to vote.  We fight wars over this.

15          People are very, very upset that these elections

16  can't be held properly because of influence by private

17  actors, voting machines connected to the internet, that have

18  algorithms in them --

19          THE COURT:  So, Mr. Fielder, let me posit a

20  question:  So there are two possibilities in an election when

21  one candidate wins and one candidate loses.

22          One is, you know, before the election people see

23  to make sure that the procedures are done right, and State

24  Courts review those, and sometimes they say "okay, this

25  procedure can be implemented, this procedure can't be

1    implemented."

2            It goes up to the Supreme Court of that State, it

3    approves it or doesn't approve it, then it goes to the

4    Supreme Court of the United States.  The Supreme Court of the

5    United States might not see it.  And that happens in states

6    all across the country.

7            And the vote happens, and people file some suits

8    about whether their votes should be counted or not, or

9    recounted or not.  In Georgia, there's a hand recount.  They

10   found that the hand recount confirmed what the ballots said.

11           So, and then when the votes are certified and we

12   get a new President of the United States.

13           That's one possibility that you -- votes happened,

14   procedures get approved by courts or disapproved by courts,

15   and then you go forward with the Constitutional process.

16           The other option is:  Everybody believes, and a

17   large part of the people believe, that the system is rigged

18   by third parties, by corporations, by non-profit

19   organizations, that the votes are rigged.  All of these

20   municipalities are somehow in bed with the corporations to

21   rig the election, that the Republican and Democrat

22   Secretaries of State of Wisconsin and Michigan and Arizona

23   and Georgia, they're all in on it, because that's what you

24   alleged, and somehow this election was rigged.

25           But those two possibilities, people voted, courts

1    approved it, they counted it, got a result, versus this whole

2    thing was rigged, no, by the way, let's spread these rumors

3    and theories about conspiracy all across the country in full

4    rest and unrest, to the point where people literally storm

5    the Congress of the United States making the same points and

6    making the same mark that you're making in this courtroom,

7    arguing that this vote was rigged.

8              And your complaint cites many of the allegations

9    that this election was stolen.  And you, I think, in your

10   complaint are doing a disservice to your clients, because

11   you're saying "disregard what all the courts said, disregard

12   what all the Secretaries of States, and we're going to file

13   another lawsuit trying to challenge all of this and dump in

14   as many conspiracy theories as possible."

15             Isn't that what's going on in this lawsuit?

16   You're not genuinely trying to solve a problem.  You're using

17   this lawsuit as a political statement for some objective.

18             Because if this were a real lawsuit, you would

19   have said something about the dozens of cases that dismiss

20   these kinds of claims on the basis of lack of standing.  And

21   you don't have that here.

22             You didn't respond to a single one of the cases

23   cited by the Defendants on lack of standing.  Why didn't you

24   do that?

25             You didn't mention *Lance v. Coffman,* which is

1   clearly on point.  Four voters in Colorado brought a lawsuit

2   three days after the Colorado Supreme Court issued a

3   decision, challenging the decision as violating the Elections

4   Clause of the U.S. Constitution.

5           And the Supreme Court of the United States said

6   the only injury plaintiffs allege is that the law has not

7   been followed.  The injury is precisely the kind of

8   undifferentiated generalized grievance about the conduct of

9   government that we have refused countenance in the past.

10          How do you respond to that?  There's nothing in

11  your briefing justifying your lawsuit as having any injury

12  that's particularized to your Plaintiffs.

13          So that was a bit of a speech, and I'm going to

14  give you a chance to respond.  But I'm a little bit shocked

15  that you, even today, given this opportunity, you're not

16  responding to these cases.  Supreme Court cases, Tenth

17  Circuit cases, Eleventh Circuit cases, and dozens of District

18  Courts that dismiss cases just like this on the basis of lack

19  of standing.

20          MR. FIELDER:  I'm looking at the *Lance v. Coffman*

21  case now, and I thought that we addressed not necessarily

22  that case particularly, and I apologize for that, but we

23  addressed the issue of standing throughout our pleadings that

24  this is not a generalized grievance.

25          In that case, there was a reapportionment of the

1  districts, and certain people objected, and the court found

2  that that was a generalized grievance.

3          In our pleadings, we've articulated that this is a

4  completed Constitutional right violation.  And these aren't

5  particularized grievances, that they're separated.  They're

6  separated based upon the status of the registered voter to be

7  secure in their vote, to make sure it counts, to make sure

8  that others, particularly private entities that have been

9  made into state actors.

10         Your Honor, this isn't a conspiracy theory.  We

11 were very careful in our complaint.  This has nothing to do

12 with Trump or the Capitol.  In fact, we predicted that things

13 like that would happen in our complaint because we knew that

14 when you have elections that nobody trusts, and that the

15 population I would admit generally is damaged, but the

16 registered voter is the one that has the standing.  Not just

17 to bring a generalized grievance, but an injury.

18         The election happened.  The individuals in the

19 *Lance v. Coffman* case couldn't point to how they had been

20 injured by the redistricting.  But we articulated how our

21 clients were injured specifically by the conduct of the

22 Defendants.  We can't allow this to continue to happen in our

23 Presidential elections.

24         This is state action, and it's interwoven with the

25 issue of standing.  If they're not state actors, then

1   standing would be very difficult to prove.  But if they are

2   state actors -- and we've just mentioned the nominal damages

3   cases to establish that nominal damages are all that are

4   required.

5           However, we have now over 400 affidavits from

6   registered voters from 47 states.  How can those people be

7   frivolous?

8           We're about ready to file a motion to join where

9   we put all of the affidavits in.  We're not trying to

10  overload the Court with papers.  But all of these people feel

11  very passionate --

12          THE COURT:  Can I stop you for a second?

13          MR. FIELDER:  Their rights have been violated.

14          THE COURT:  Can I stop you for a second, Mr.

15  Fielder?

16          MR. FIELDER:  Yes.

17          THE COURT:  So when we started here, you said Mr.

18  O'Rourke did vote.  I'm looking at his affidavit, paragraph

19  11, "I have, for the previous two Presidential election

20  cycles, not voted, as it was my firmly held belief that my

21  vote would be altered, deleted, or fractionalized, based on

22  the will of some other entity or actor."

23          So he's swearing under oath that he didn't vote in

24  the previous two election cycles.  I'm assuming that he --

25  you entered this in the Court when you filed the complaint in

1  December, so that would have included the election cycle of

2  President Trump.

3            So that's why I said that.

4            But in answer to your question, how could 400

5  people --

6            MR. FIELDER:  I talked to Mr. O'Rourke, and there

7  might be some confusion.  He may be talking about the two

8  previous election cycles.  I thought that he voted.  I mean,

9  the overwhelming majority of our clients have voted.

10           THE COURT:  Okay.

11           MR. FIELDER:  And now there's over 400, and the

12  overwhelming majority voted.

13           THE COURT:  Did 400 people who have this belief,

14  that's not helpful.  It's not evidence.  It's not evidence of

15  injuries, for sure.

16           And when you say this isn't about Trump, either in

17  your original complaint or your amended complaint, you

18  included a Tweet that he sent out saying, you know, "stop the

19  steal," or "this election has been stolen."  That tends to

20  take away from the persuasiveness of your argument that this

21  isn't about some political statement to defend the

22  President's view that the election was stolen from him.

23           The other question I have is that you focused in

24  on this Time magazine article, "The Secret History of the

25  Shadow Campaign That Saved The 2020 Election."

1          I think in docket number 40, which is a response

2    to motion to dismiss, you cite that article saying "well,

3    Time magazine doesn't print conspiracy theories unless

4    they're true."  I think that's a quote from your brief.

5          What is it about this article that is

6    demonstrative or supportive of your claim?  It describes an

7    effort by -- and I read it, because you wanted me to.  It's

8    cited in your complaint and your amended complaint, so it's

9    part of the complaint.

10          It describes in great detail seemingly a

11   bipartisan effort on behalf of labor and business and non-

12   profit organizations and municipalities to try and make sure

13   that the vote happened, was secure, that COVID-19 didn't

14   prevent people from getting to the polls.

15          There's nothing in here that describes any

16   illegality at all, and yet you seem to be basing much of your

17   complaint on some kind of conspiracy, as shown by this Time

18   magazine article.

19          So you've got to educate me about why you cited

20   it, and what is it about that article that you think proves a

21   RICO claim.

22          MR. FIELDER:  Well, first of all, we are talking

23   about our precious elections, and so although the article was

24   written from the perspective of those who claimed to have

25   saved democracy, just like the counsel here on behalf of the

1   parties can make passionate arguments on behalf of their

2   Defendants, it basically established that there were a huge

3   group of people that had almost unlimited amounts of money,

4   which includes Facebook.

5           Facebook was right in the middle of this election.

6   Now, normally as a private company, that would not be of

7   concern.  But when their CEO is becoming involved in the

8   election process under the disguise of COVID, it's not a

9   conspiracy theory.  That's degrading to call our position a

10  conspiracy theory.

11          I just mentioned that because it's the magazine of

12  record.  It's not a right wing publication or a publication

13  that we don't trust, much like the New York Times is the

14  paper of record.

15          So when Time magazine outlined all of this

16  information with regard to specifically how individuals

17  interacted with the public function of elections, not just to

18  make sure that Mr. Trump didn't poison the well by his

19  misinformation, but to support their candidate.

20          That was just the admission that we needed to

21  establish that all of this really is true.  They really did.

22  That is to say that Defendants here, they really did infuse

23  all of these municipalities and cities without state

24  regulation, with money, concerning the election, and it was a

25  Presidential election.

1                And although --

2                THE COURT:  So let's accept that as true.  Money,

3     millions of dollars, was given to municipalities.  We heard

4     from the Center's lawyer that it was done without regard to

5     partisan views, but accept it as true that millions of

6     dollars was given to municipalities so that they could use it

7     for election purposes.

8                Do you think the municipal officials were in on

9     it, too, that this was all part of a plot to somehow -- I

10    mean, what is it that's illegal about any of this?

11               And part of the Defendants' motion to dismiss,

12    whether it's Facebook, saying "look, our contributions to the

13    non-profit, that's protected First Amendment activity."  The

14    Center says "nothing that we did is illegal.  It's been

15    challenged in multiple courts across the country, and no

16    court has found that what we did was improper."

17               So what is it about this -- let's call it a

18    conspiracy or an agreement, or -- what is it that's illegal

19    about that?  Yes, it had to do with the election, but if a

20    whole bunch of people want to go out and say "hey, let's rock

21    the boat, let's make sure that folks who are scared to go out

22    because of COVID, they have an opportunity to vote, too."

23               What's illegal about that?

24               MR. FIELDER:  It's illegal in a number of

25    different ways.

1        First of all, there's a lack of equal protection.

2   It's normally the government giving out grants, not the other

3   way around, where private individuals can say "well, anyone

4   who applies could have gotten grants."  But not every

5   municipality wanted to apply or county anted to apply.

6        And so they recruited -- this is all the facts of

7   the case.  CTCL recruited certain mayors and recruited

8   secretaries of state.  This is all in the record.  To get

9   others to take these loans.

10        Once they got the loans, part of the tit-for-tat,

11   part of the consideration, was for the government entities to

12   give up the data, to sharing the voting lists, and that's

13   information that was used by CTCL, by Facebook, and others,

14   to know where to target, to execute some of the very

15   problematic statistical anomalies that have arised in all of

16   these swing states, all of which has been documented by

17   dozens and dozens of expert witnesses in the cases which,

18   although they may have been dismissed over the last three or

19   for months, ours is the only case which is not coming to the

20   Court asking for extraordinary relief.

21        So it was the redressability element, Your Honor.

22   The Court didn't have -- the Federal Courts didn't have

23   within their remedial powers to go tell a sovereign state

24   what electors to send to Washington.

25        This isn't about overturning the election.  We've

1   never suggested that.  We've never attempted to say that, nor

2   have we come to you, Your Honor, asking for extraordinary

3   relief.

4           If a person like Mr. Wood, who I've never talked

5   to Len Wood, I've never talked to Sidney Powell, or any of

6   these people.  If Len Wood asked for extraordinary relief,

7   then he doesn't have the standing to tell a sovereign state,

8   that is the State of Georgia, to decertify an election or

9   send certain electors.

10          Nor does that person have standing to ask the

11  Federal Court to give that remedy.

12          However, if as a class and as individuals evidence

13  is presented that individuals in concert with other people,

14  like CTCL, Dominion, Mark Zuckerberg, and many others,

15  influenced public officials, had access to data.

16          Now there's information that members of CTCL had

17  access to ballots.  All of this is coming out.  These are

18  Constitutional rights violations.

19          And I understand counsel.  They might disagree.

20  They can call it frivolous, but it's not frivolous to us.

21  It's everything to us.

22          So we've given the Court all of this information

23  to show that we're not acting frivolously.  I understand the

24  Court's articulation of how it normally works, but this

25  election was not normal.

1          All of those other cases involved plaintiffs

2   coming to Federal Court or other courts asking for

3   extraordinary relief, meaning the burden of proof was

4   different, their claims were different, and they were against

5   different parties; that is mostly sovereign states, because

6   the actors were sued in their official capacities.

7          So all of those states are different than this

8   case.  This is a typical class action where either private

9   parties or individual government actors -- a state can't be

10  sued, but individual government actors violated the

11  Constitutional rights of others.

12          And it's a big class, but it's a class that can be

13  sub-divided.  Every person is from a state, and your right to

14  vote is a political right, so you're either a Texan

15  Republican or a New York Democrat, or an Alaskan third party,

16  or a Washington Independent, all of which are different from

17  state-to-state and/or a disgruntled voter.

18          THE COURT:  So we're going to have 50 sub-classes

19  for every state, and within each state we're going to have

20  sub-classes of Democrats, Republicans, and Independents?  So

21  that's 150-200 sub-classes?

22          MR. FIELDER:  Well, they're not that -- there are

23  a lot of sub-classes, but they're not that hard to keep track

24  of because although it is a very serious and big case, the

25  Anderson -- the Secretary of State of Ohio case indicates

1  that there is a national right, and the actions of entities

2  in one state can affect the actions of persons, voters, in

3  another state.

4          So although there may seem to be a number of

5  different classifications, there are millions of people that

6  not only believe that the election was rigged, that's not the

7  point, although books are being written about it now, Your

8  Honor.  Books are being written about it.  None of it is

9  frivolous.  It all needs to be investigated, and it's mostly

10  already out there in the terms of the affidavits, expert

11  reports, articles that are attached to those other lawsuits.

12          THE COURT:  Let me ask you a question?

13          MR. FIELDER:  So although --

14          THE COURT:  Can I ask you a question?

15          MR. FIELDER:  Yes.

16          THE COURT:  Assuming I'm not persuaded by your

17  standing argument with respect to the original complaint,

18  what is it about the amended complaint, if anything, that

19  changes your position on standing?  What cures the standing?

20  If I accept Defendants' arguments that there's no standing

21  with respect to the original complaint, is there anything

22  about the amended complaint that cures the standing problem?

23          MR. FIELDER:  Well, we didn't attach the -- hold

24  on.  I may have gotten the volume back.  But that's okay, I'm

25  going to keep talking to my phone.

1        We may have addressed the issue through the

2   inclusion of all of the affidavits, but we didn't want to

3   just attach 150 affidavits.

4        But now that we have over 400 affidavits, we feel

5   like we have to because every individual has a story as to

6   the gas mileage, or the time off work, or the time that they

7   took to vote.  All of that as a compensatory damage.

8   Everyone is feeling like -- when I say everyone, our clients

9   are feeling like their right to vote was violated.

10       And so when you have these numbers, when you have

11  these kinds of serious numbers, now 400, soon to be 4,000,

12  soon to be 40,000.  We've said this before, Your Honor.  Then

13  those people can't be denied.  You can just look at them and

14  say "get over it, your candidate lost."

15       For some of the people, they didn't vote for Mr.

16  Trump.  This is not about Mr. Trump.  This is about

17  everyone's precious right to vote.

18       And so if private entities can just target six

19  cities and win practically every Presidential election

20  without the ability of the voters to, in unison, say

21  "enough," you can't do that.  That violates all of our

22  rights.

23       You can't just put money in certain

24  municipalities.  That's a violation of equal protection.  You

25  can't fractionalize votes, or allow foreign entities to flip

1  votes, or delete votes.  You can call that vote dilution, but

2  the changing of votes through algorithms and other known risk

3  associated with these voting machines, affects everyone's

4  ability and right to vote.

5        THE COURT:  So let's vote here or there was

6  changed, whether it was intentionally or not.  It's done.

7  It's over.  The vote has been certified.

8        MR. FIELDER:  It's done.

9        THE COURT:  And so what are we talking about?  Why

10 don't you tell your clients, "you know what, let's move

11 forward.  And if you didn't like the outcome of this

12 election, let's figure out a way to either change the

13 candidate or change the message, and your party will win next

14 time.  We'll get out the vote for your guys, and move

15 forward."

16        What are we doing here?  It's over.  I'm not going

17 to be able to solve any problem.

18        MR. FIELDER:  What we're doing here is ensuring

19 the future of the country.  That's what we're doing here.

20        We can't solve everything, but to allow, for

21 example, Dominion.  I could talk about Facebook and their

22 censoring, the fact that they're a town square, they're a

23 public forum.  Even Justice Thomas said Section 230 is ripe

24 for review.

25        These are all matters that need to be brought to

1  the Court by people not with a generalized grievance, but

2  with a right to vote.  A heartfelt right to vote, outlined

3  there --

4          THE COURT:  Let me ask you a question on

5  traceability, because you mentioned Facebook is censoring,

6  Section 230, and then you went right to right to vote.

7          How in any of the complaint -- or any of the

8  affidavits of the -- that you did attach, is there a link

9  between Facebook's either pushing of certain messages or

10  censoring in others, and in interference with -- let's pick

11  Ms. -- the Colorado lady.  How did anything that Facebook do

12  affect Ms. Cutunilli's right to vote?  I think it goes to the

13  traceability issue.

14          MR. FIELDER:  Yes.  Well, Facebook had a major

15  impact on the election itself, which might ordinarily be

16  okay, as long as they're in the private realm.  But they

17  didn't stay in the private realm.

18          Their CEO, Mark Zuckerberg, took it upon himself

19  to make sure his candidate won.  We all know that Facebook is

20  being sued by the Federal Trade Commission.  They're being

21  sued by the 49 attorneys general for essentially anti-trust

22  Sherman Act, because they used their power to buy up their

23  competitors and they used their influence to exert their

24  realm.

25          Well, that's what happened here.  If they were

1  just social media, and if -- if they were just social media,

2  that would be one thing.  But when their CEO is actively

3  pouring money to a so-called non-profit to get the data from

4  these municipalities, get out the vote only in those certain

5  municipalities, and if they were carried by --

6          THE COURT:  So I'm confused.  I'm confused.

7  Facebook is different from Mark Zuckerberg.  Mark Zuckerberg

8  gave money to the Center, but you're suing Facebook, and

9  you're claiming that Facebook --

10          MR. FIELDER:  Right.

11          THE COURT:  -- based on their censorship or

12  pushing of --

13          MR. FIELDER:  Right.

14          THE COURT:  -- somehow interfered with, and I'm

15  looking at the affidavit of Lori Cutunilli, she's a Plaintiff

16  in the case, --

17          MR. FIELDER:  Right.

18          THE COURT:  How did what Facebook do, how is Ms.

19  Cutunilli's injury to her right to vote traceable to the

20  allegations against Facebook for not allowing QAnon to

21  publish something, or not allowing some anti-vaccine person

22  to publish something?  Help me understand how her vote was

23  affected by what you allege Facebook was doing.

24          MR. FIELDER:  Well, her vote is like just about

25  everyone else's vote.  When you have a huge social media

1    company that has such a broad outreach, and they are just for

2    one example a thousand suppressing the story with regard to

3    one of the candidate's son, Hunter Biden.  That was a story

4    of public interest.  It should have been publicized.  They

5    chose not to do it.  Why?  Well, because that supported their

6    position.

7              If they were a private actor, that would be okay.

8    But, they participated in concert with their CEO.  They were

9    in concert with CTCL.  They were in concert with a

10   progressive movement.

11             And it wasn't just by accident that the people

12   that they were censoring stood for not only a conservative

13   position, but every other adverse or different opinion.

14             And it's really not about QAnon or vaccines, but

15   people have a right to talk about those types of things.

16             So when these huge social media platforms, which

17   are interacting through their chief executive officer with a

18   public function, then they transform themselves into a state

19   actor.

20             And that's the side of public forum argument which

21   is already being articulated by others separate and apart

22   from state action.

23             So, of course they have an enormous impact on the

24   Presidential election.  Any time they can censor one view and

25   support another view, that has an impact.  If they were

 1  private actors, that would be okay.  But they worked in

 2  concert with others to certify the election, but really

 3  interfere with it and get their candidate to win.  That's a

 4  violation of the Constitution.  The voters have been damaged.

 5          THE COURT:  Okay, Mr. Fielder.

 6          MR. FIELDER:  Some more than others.

 7          THE COURT:  We've been going for about 45 minutes.

 8  I'm going to give the other side a chance to rebut, so I'm

 9  going to give you three minutes now, and I'm not going to

10  interrupt you, and you can say anything you want to support

11  your position.

12          One question I typically ask people when I have

13  oral argument:  What's the one case, if there's one case,

14  that supports your position that you want me to read, what

15  case would that be?  And feel free to give me a couple.

16          But on the issue of standing, what's the case

17  that's most supportive of your position?  And if I read it,

18  the light bulb will go on in my head and I'll say "oh,

19  Fielder is right.  This is the money shot here."

20          MR. FIELDER:  I would direct the Court to two

21  cases that I'm sure the Court has already read.

22          The *Terry v. Adams* case is a big case involving

23  African-Americans in the early 1950s that accused the Jaybird

24  Democratic Association of being a private -- excuse me, a

25  state actor.  They said they were only conducting a straw

1  poll.

2          Well, the Supreme Court found that they were in

3  state action.

4          I would ask the Court to review *Anderson v.*

5  *Calabrese,* the Secretary of State of Ohio, wherein the

6  Supreme Court stated that it's a national right that we have,

7  and the one election only that everybody in the nation

8  participates in, and that national right transcends the

9  actions of someone in one state which might impact a

10 plaintiff in another state.

11         This is a somewhat unusual approach, but on the

12 other hand, it's a legal approach wherein the registered

13 voters are coming to the Court as a class, not for a

14 generalized grievance, but for a completed Constitutional

15 right violation.

16         We've already mentioned the case that -- out of

17 the Supreme Court that was recently decided.  And I can't

18 pronounce the name either, but that's the case that starts

19 with a U.

20         And that case is vitally important because

21 although legislatures, which across the country are now

22 changing their laws to stop private funding, those are sort

23 of subsequent remedial measures, that clearly is evidence

24 that the private entities that did involve themselves in this

25 election should not have happened.

1          So those cases stand for the proposition that

2   individuals can come to Court and seek redress.

3          *Brown v. Board of Education,* which is decided

4   right after the *Terry v. Adams* case, I think was 17 African-

5   American families that came in a class action to stop Topeka

6   from segregating students.

7          So individuals can come to Court in a class,

8   asserting their rights individually and for those similarly

9   situated, to ask for a redress of grievances.  And that's all

10  we meant by an assembly, is that the First Amendment gives us

11  all the right to assemble and speak and petition for redress

12  of grievances.

13         THE COURT:  So you really think *Brown v. Board of*

14  *Education,* the case that did away with separate but equal and

15  allowed African-Americans to attend schools, that's similar

16  to the situation of your clients who feel aggrieved because

17  somehow their right to vote wasn't -- was discounted in some

18  way, in the same way that every other registered voter's

19  right to vote was discounted?

20         MR. FIELDER:  Not every other registered voter,

21  because some people win on elections that are weighted one

22  way or the other.

23         However, it's an important right.  And I'm not for

24  a second going to concede that the right to vote isn't as

25  most precious as any other right that exists.

1          And so in that regard, there is a serious issue

2    concerning private entities involving themselves in local

3    elections, social media companies participating in a

4    concerted effort to have one candidate or the other win.

5    Maybe it's a conservative candidate the next time.

6          There is a Constitutional concern whether private

7    individuals, such as Mark Zuckerberg, can interfere with an

8    election.

9          But more than anything, the proprietary nature of

10   this software is ruining the country's ability to have a

11   stake in their electoral process.

12         What's going on right now, Your Honor, in Maricopa

13   County can't be ignored.  I just put the case in the

14   pleadings yesterday because the case was only filed a couple

15   of days ago.  The Democratic party against one of the state

16   legislatures, trying to stop the forensic analysis of 2.1

17   million votes in Maricopa County.

18         Things like that haven't happened in our country's

19   history.  So what if the result of that audit are positive to

20   the Plaintiffs?  And, of course, it will be.  Well, then

21   where are going to be?  Well, we're going to be right back to

22   our original claims, because all of this is foreseeable.  All

23   of it.

24         THE COURT:  So let's clear that up.  Let's say

25   Arizona does do an audit and they find that there were

1   errors.  So what?  How does that change this lawsuit?  Then

2   they'll try and fix it for the next election.  It's not going

3   to remove the President.  It's not going to do anything.

4   It's going to cause -- you know, the legislature is doing an

5   investigation.  The legislature will decide what the results

6   mean.  Maybe next time they won't hire Dominion.

7          But what does that have to do with us in this

8   lawsuit and what your clients are claiming?  In theory,

9   that's how it should work.  Legislature should do an

10  investigation, the Attorney General should look at things,

11  they'll see what worked, they'll see what didn't work, then

12  they'll change it for the next one and try to do better.

13         But bringing a lawsuit and having a judge declare

14  "oh, you know," do you want -- so is it your proposal here --

15  let's say the motion to dismiss is not denied, and we go

16  forward and we do a scheduling order.  What exactly do you

17  anticipate discovery will be?  You subpoena everybody from

18  the Center, you want to do -- get the proprietary software

19  from Dominion and find out what that's about.

20         How is this lawsuit going to work exactly?  Are

21  the Defendants supposed to depose your 400 Plaintiffs?

22            MR. FIELDER:  I'm sorry, I missed that last --

23            THE COURT:  The last question is:  Are the

24  Defendants supposed to depose your 400 Plaintiffs and ask

25  them about their thoughts and feelings about why they feel

1  their vote wasn't counted?  I mean, how -- this isn't

2  something -- a problem that a Court can solve, is my sense.

3          How do you foresee this lawsuit planning out?

4          MR. FIELDER:  Well, a couple of different things.

5          First of all, there's been damage to the

6  Plaintiffs and a lot of other people.

7          For example, in the *Brown v. Board of Education*

8  case, --

9          THE COURT:  No, I don't want to hear about *Brown.*

10  Answer my question:  If we get to a scheduling order, --

11          MR. FIELDER:  I am.

12          THE COURT:  -- how many depositions are you going

13  to take?  How many interrogatories?  Who are you going to

14  depose?  How long is the discovery period going to last?

15          Tell me.  How do you foresee this lawsuit actually

16  working?

17          MR. FIELDER:  I foresee it working over time.  I

18  think that it should be declared a complex lawsuit.  But it

19  will be much like other class actions where there are

20  literally millions of clients that have been affected, and

21  there might be hundreds of depositions.

22          Certainly there are thousands and thousands of

23  emails showing the connectivity between Dominion and state

24  actors, CTCL and state actors, Facebook has integrated itself

25  in these state governments to such a way that all of that's

1   going to be issues concerning in the case.

2           For example, in Maricopa, if it's determined that

3   there was voter fraud, election fraud, in Arizona, there will

4   nothing anyone can do about it to change the presidency.

5           However, that will cause damage.  As will the

6   revelations that are being made in other cases which have not

7   been dismissed in Atrium County and other investigations in

8   New Hampshire.

9           People will be damaged.  Their faith in the system

10  will be damaged.  And $1,000.00 per person is a nominal

11  amount when it comes to your right to vote, which is

12  priceless.  That's a jury question.  I don't think the Court

13  should take it out of the jury's determination.

14          But yes, it will be a complex case like many class

15  actions involving tens of thousands of people who have been

16  harmed by either a product or a credit card company or breast

17  implant manufacturer.  There are tons of people that are

18  affected in those types of situations, and it will be very

19  complex.

20          This is very serious.  And to be called frivolous,

21  even with passion, is an insult to me and my clients.  We're

22  taking this very seriously.  It won't be easy.  And others

23  will have to be involved as the case grows.

24          But we're officers of the Court, we're coming to

25  the Court not as conspiracy theorists or any movement.  I

1  haven't talked to any of those people.  We are representing

2  clients that know their rights have been aggrieved, and we're

3  coming to the Court to --

4          THE COURT:  So hold on a second.  You say you know

5  their rights have been aggrieved.  That hasn't been proven.

6  Let's say it plays out and it turns out there hasn't been

7  anything wrong.  Are your clients going to accept that and

8  say "well, we took it to court, and the court did an

9  investigation."

10         I don't think anything that the Court determines,

11  whether you win or whether you lose, your clients aren't

12  going to change their view.  They feel that way.

13         I'm just looking at Ms. -- you know, she just

14  feels that her right to vote has been adversely affected,

15  dramatically affected by the following states, accepting

16  bribes through the Center for Tech and Civic Technology.

17  You're not going to change her mind.  She just feels that

18  way.

19         A lawsuit is not -- you don't always win lawsuits,

20  you know, Mr. Fielder.  Sometimes you lose after you get to

21  trial.

22         MR. FIELDER:  Well, sometimes you lose.  I'm sure

23  that the individuals that were harmed by tobacco companies

24  knew that they could lose, or if they were harmed by Round Up

25  by the millions of people, they knew that they could lose.

1              But those cases still went forward, and people
2    still were able to make their claims.

3              And the other cases, the *Wilderness* case in terms
4    of people believing that their view was being distorted.
5    Well, they've been damaged.  They're coming to the Court to
6    ask for redress of grievances.

7              We wouldn't have standing to ask you to stop the
8    vote or send certain electors to Washington.  But if people's
9    rights have been damaged by private companies who, in
10   concert, have performed deeds in our complaint, almost every
11   paragraph has to be admitted.  That's why I put so many
12   footnotes in there, because you could call me a plagiarist,
13   but I was citing the information from where we got the
14   source.

15             So when 19 to 20 states, sovereign states, go to
16   the Supreme Court and outline by name state actors who
17   violated the Constitution, the State of Texas didn't have
18   standing, but that doesn't mean that individual voters in a
19   class in Texas can't sue the private entities involved in
20   this situation.

21             So that was one --

22             THE COURT:  Well, why doesn't it?  If the State of
23   Texas doesn't have standing to sue Pennsylvania, why on earth
24   would individual voters who are alleging the same kind of
25   injury to their right to vote be able to sue secondary

1    participants in the election process?   That doesn't make

2    sense.

3            MR. FIELDER:   They really weren't secondary.   They

4    were in joint action together, and they created a symbiotic

5    relationship.

6            We've engaged in the intellectual exercise of the

7    standing and state action arguments where I could same the

8    same about the Defendants that they don't want to talk about

9    public function.

10            So if there's state action, and I just lost my

11    concentration a little bit there.   Oh, the State of Texas.

12    We cannot have a sovereign state coming to court and asking

13    the court to tell another sovereign state what to do with

14    regard to its election.

15            This is totally different.   These are individuals

16    as a class suing individuals.   We dismissed those claims, but

17    they were righteous.   We just didn't have, we felt, personal

18    jurisdiction to a certainty.

19            However, it's very common for individuals to sue

20    corporations or other private individuals separate and apart

21    from sovereign states.

22            Of all of those cases that named the governors and

23    secretaries of state in their official capacities were just

24    suing the state.   Suing the State of Pennsylvania.   Suing the

25    State of Michigan.   That requires enormous amounts of

1  evidence.

2          THE COURT:  You've used your five minutes.

3          MR. FIELDER:  Thank you.

4          THE COURT:  Okay.  Thank you, Mr. Fielder.  I'll

5  have a brief rebuttal, starting with Dominion.

6          MR. GARNETT:  Thank you, Your Honor.  It's Stan

7  Garnett on behalf of Dominion.  I'll be very brief.

8          Let me first simply say, however, that counsel

9  said several times that his theories are not conspiracy

10 theories.  They certainly sounded that way in the argument.

11         Regardless, I think it's important that we state,

12 given that we've had to listen to these allegations about

13 Dominion for an hour, that Dominion is an excellent company.

14 It has been vindicated by every legitimate certified audit of

15 its results that has ever been done.  They have done terrific

16 work, and they will continue to do terrific work.

17         And allegations like this in these lawsuits are

18 very damaging, continue to be damaging, to an excellent

19 company that provides great service.

20         Now, with regard to the legal argument, let me

21 simply say this, Your Honor:  Everything counsel said

22 underscores the problems with standing.  Everything is about

23 a generalized grievance.

24         In fact, he himself called it a generalized

25 grievance several times in his argument.  The Court asked

1   what case is most applicable.  Obviously, *Wood v.*

2   *Raffensperger* is an excellent case, but without any doubt the

3   Colorado case *Lance v. Coffman* is a terrific case, deals on

4   all fours with the issue of standing, the Court need go no

5   further than that case, which was, in fact, a per curiam U.S.

6   Supreme Court decision in 2007.

7           THE COURT:  Let me ask you quickly, Mr. Garnett.

8   Plaintiffs' counsel seems to emphasize "well, all of those

9   other election related standing cases were suits against

10  states or states actors, and in fact *Lance v. Coffman* was

11  against the Colorado Secretary of State."

12          Here, we're suing private entities, and that's

13  okay.  So that's a distinction that they draw there.  Private

14  entities are not state actors in -- sorry, state government

15  officials.

16          What do you say to that?

17          MR. GARNETT:  Sure.  What I say to that, Your

18  Honor, is every one of the standing cases do not recognize

19  that distinction.  That is simply not a distinction that

20  exists in any of the analyses of the United States Supreme

21  Court.

22          It may be a distinction that counsel wants to

23  make, but the reality is you still have to bring to a Federal

24  Court a case or controversy under Article III, Section 2,

25  Clause 1, of the United States Constitution.  They've failed

1   to do that in this case.

2           The mere fact that one case may be seeking one

3   kind of relief, and another this, and I would note that --

4   you know, and I think I commented previously.  Who knows what

5   their $1,000.00 in nominal damages would be tied to and how

6   they'd come up with that.

7           But it doesn't make any difference for the issue

8   of standing.  You still have to have a case or controversy

9   that meets the three clear standing requirements.

10          THE COURT:  Thank you.  I'll hear from Facebook

11  now.

12      (Poor connection issue causing distorted audio)

13          MR. LIPSHUTZ:  Thank you, Your Honor.  I only have

14  one point that I want to make, which is -- in any of this two

15  hours and change of arguing, how it has anything to do with

16  Colorado.  And that's why Defendants should be dismissed from

17  this case for lack of personal jurisdiction on their claims

18  against Facebook.

19      (Unable to understand what is being said)

20          MR. LIPSHUTZ:  From the United States Supreme

21  Court -- headquartered in California.

22          Facebook is not a Colorado company.  It's not

23  subject to general jurisdiction here.  We would ask the Court

24  to dismiss Facebook for lack of personal jurisdiction, in

25  addition to any other grounds that the Court deems necessary.

1              THE COURT:  And for the Center?

2              MR. MATZ:  Thank you, Your Honor.  Just a few

3    brief comments to add.

4         (Poor connection issue causing distorted audio)

5         (Unable to understand what is being said)

6              THE COURT:  Okay, thank you.  So the motions to

7    dismiss by Dominion, Facebook, and the Center, will be taken

8    under advisement, as will the Plaintiffs' motion to amend the

9    complaint.

10             The motion to take judicial notice has been

11   denied.  I'm only going to be consider the materials that

12   were provided in connection with the motions to dismiss and

13   the motion to amend.

14             Is there anything else, Plaintiffs' counsel, that

15   you'd -- any other housekeeping matters or any other things

16   that we -- that I need to address today?

17             MR. FIELDER:  No, Your Honor.  Thank you.

18             THE COURT:  Okay.  Defense counsel for Facebook,

19   anything further?

20             MR. LIPSHUTZ:  Nothing further, Your Honor.

21             THE COURT:  Mr. Garnett, anything further for

22   Dominion?

23             MR. GARNETT:  Nothing, Your Honor.  Thank you for

24   your time today.

25             THE COURT:  Okay.  And for the Center?

1        MR. MATZ:  No, Your Honor.  Thank you for your

2   time.

3        THE COURT:  Okay.  Thank you very much for the

4   arguments.

5        Like I said, I'll take it under advisement.  I

6   hope to get out a decision shortly.

7        We'll be in recess.

8                (Time noted:  4:22 p.m.)

9                    *  *  *  *  *

10                      CERTIFICATE

11     I, RANDEL RAISON, certify that the foregoing is a

12   correct transcript from the official electronic sound

13   recording of the proceedings in the above-entitled matter, to

14   the best of my ability.

15

16

17   _____          April 30, 2021

18   Randel Raison

19

20

21

22

23

24

25