## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH and
AMIE TRAPP,

       Plaintiffs,

v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR., individually, and
DOES 1-10,000,

       Defendants.

---

## DEFENDANTS GOVERNOR GRETCHEN WHITMER AND SECRETARY OF STATE JOCELYN BENSON'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS

## EXHIBIT LIST

A.    7/12/21 Transcript, *King, et al. v. Whitmer, et al.*, Case No. 20-13134 (E.D. Mich.) (Parker, J.)

B.    Michigan Senate Oversight Committee Report

C.    Audit of the November 3, 2020 General Election

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN SHERIDAN,
JOHN EARL HAGGARD, CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER and DAREN WADE RUBINGH,
                    Plaintiffs,


V.                                        CIVIL ACTION
                                          NO. 20-cv-13134
GRETCHEN WHITMER, in her official capacity
As Governor of the State of Michigan
JOCELYN BENSON, in her official capacity
As Michigan Secretary of State, the Michigan
BOARD OF STATE CANVASSERS,
                    Defendants,

And

THE DEMOCRATIC NATIONAL COMMITTEE and THE
MICHIGAN DEMOCRATIC PARTY, and ROBERT DAVIS
And THE CITY OF DETROIT,
                    Intervenors,

And

SCOTT HAGERSTROM, JULIA HALLER,
ROBERT JOHNSON, L. LIN WOOD, HOWARD
KLEINHENDER, SIDNEY POWELL, and GREGORY ROHL,
                    Intersted Parties,
And

MICHIGAN STATE CONFERENCE NAACP,
                    Amicus.
_____/

MOTION HEARING
BEFORE THE HONORABLE LINDA V. PARKER
United States District Judge
Detroit, Michigan
Monday, July 12, 2021

(All parties appearing via videoconference.)

APPEARANCES:

•GREGORY J. ROHL
The Law Offices of Gregory J. Rohl, P.C.
41850 W. 11 Mile Road
Suite 110
Novi, MI 48375
248-380-9404
Email: greg@rohllaw.com

            On behalf of Plaintiffs King, Sheridan, Haggard,
Ritchard, Hooper, and Rubingh.

•HEATHER MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: meingasth@michigan.gov

            On behalf of Defendant, Jocelyn Benson.

•DAVID H. FINK, NATHAN J. FINK
Fink Bressack PLLC
38500 Woodward Ave.
Suite 350
Bloomfield Hills, MI 48304
248-971-2500.
Email: dfink@finkbressack.com, nfink@finkbressack.com

            On behalf of Intervenor, City of Detroit.

•MARY ELLEN GUREWITZ
Cummings & Cummings Law PLLC
423 North Main Street
Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com.

            On behalf of the Defendant Intervenors, Democratic
National Committee and the Michigan Democratic Party.

APPEARANCES, cont'd:

•SCOTT R. ELDRIDGE
Miller, Canfield
One Michigan Avenue
Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

        On behalf of the Defendant Intervenors, Democratic
National Committee and the Michigan Democratic Party.

•ANDREW A. PATERSON , JR.
46350 Grand River Ave.
Novi, MI 48374
248 568-9712
Email: aap43@hotmail.com

        On behalf of Defendant Intervenor, Robert Davis.

•DONALD D. CAMPBELL, PATRICK K. McGLINN
Collins, Einhorn
4000 Town Center
Suite 909
Southfield, MI 48075-1473
248-355-4141
Email: donald.campbell@ceflawyers.com,
patrick.mcglinn@ceflawyers.com

        On behalf of Interested Parties, Rohl, Hagerstrom,
Haller, Johnson, Wood, Kleinhendler, Powell.

•THOMAS M. BUCHANAN
Winston & Strawn, LLP.
1901 L. Street NW.
Washington DC  20036
(202)282-5787
Email:  Tbuchana@winston.com

        On behalf of Interested Party, Emily Newman.

                    - - -
                Andrea E. Wabeke
    Certified Realtime Reporter•Federal Official Court Reporter
          Email:  federalcourttranscripts@gmail.com

# I N D E X

**Proceeding**                                                      **Page**

Discussion of drafting of the Complaint
& Amended Complaint.............................   20

Discussion of Court's authority to issue
The relief sought..............................   22

Discussion of timing of filing
Of the Complaint...............................   34

Discussion of Mootness.........................   42

Discussion of the legal obligation to review
Facts alleged in the Complaint.................   54

Discussion of Ramsland Affidavit...............   56

Discussion of Expert Merritt...................   70

Discussion of Expert Braynard..................   74

Discussion of Expert Briggs....................   75

Discussion of Expert Watkins...................   76

Discussion of Ramsland Affidavit...............   76

Discussion of Expert Merritt...................   77

Discussion of whether an attorney should be
Sanctioned for his or her failure to correct
Or withdraw allegations that an attorney comes
To know or came to know are untrue.............   85

Discussion of Expert Briggs....................   88

Discussion of Sitto Affidavit..................  108

Discussion of Carone Affidavit.................  122

Discussion of Connarn Affidavit................  135

**I N D E X (Cont'd)**

| Proceeding | Page. |
|---|---|
| Discussion of Jacob Affidvit.................... | 138 |
| Discussion of Bomer Affidavit.................. | 146 |
| Discussion of Jacob Affidvit.................... | 150 |
| Discussion of Helminen, Waskilewski Mandelbaum, Rose, Sitek, Posch Champagne & Bomer Affidvit.................... | 155 |
| Discussion of Brunell, Spalding & Sherer Affidavit............................. | 163 |
| Discussion of Larsen Affidavit.................. | 171 |
| Discussion of Gustafson Affidavit............... | 176 |
| Discussion of Meyers Affidavit.................. | 184. |

- - - - - - - -

| Closing Remarks by Mr. Campbell................. | 197 |
|---|---|
| Closing Remarks by Mr. Buchanan................. | 203 |
| Closing Remarks by Mr. Wood..................... | 206 |
| Closing Remarks by Ms. Gurewitz................. | 216 |
| Closing Remarks by Mr. Paterson................. | 217 |
| Closing Remarks by Mr. David Fink.............. | 217 |
| Closing Remarks by Ms. Meingast................. | 230 |
| Closing Remarks by Ms. Powell................... | 231 |

**E X H I B I T S**

| Exhibit No. | Offered | Received |
|---|---|---|
| | (None Offered) | |

```
Motion hrg.                                        7/12/2021
```

1               Detroit, Michigan

2               July 12, 2021

3               8:36 a.m.

4                              -   -   -   -

5        **THE CLERK:**  The United States District Court for the

6    Eastern District of Michigan is now in session, the Honorable

7    Linda V. Parker presiding.

8            Your Honor, the Court calls civil matter 20-13134,

9    Timothy King and others versus Governor Whitmer and others.

10   Today is the date and time set for a motion hearing in this

11   matter.

12       **THE COURT:**  I'd like counsel please to place their

13   names on the record, and I will start first with counsel for

14   Plaintiffs' counsel.

15       **MR. ROHL:**  Thank you, your Honor.  Good morning.  For

16   the record, may it please the court, Greg Rohl on behalf of

17   Plaintiffs.

18       **THE COURT:**  All right.  Mr. Rohl, thank you.

19       **MR. CAMPBELL:**  Thank you, your Honor.

20   Donald Campbell here on behalf of the following lawyers:

21   Sidney Powell, Howard Kleinhendler, Greg Rohl, Scott

22   Hagerstrom, Julia Haller, Brandon Johnson, and Lin Wood.  All

23   of them are here pursuant to your order.

24       **THE COURT:**  All right.  Thank you.

25           And what about Mr. McGlinn, is he here with us this

Motion hrg.                          7/12/2021

1  morning?

2          **MR. CAMPBELL:**  Yes, I'm sorry.  Mr. McGlinn is here.

3  He's co-counsel with me.  He is in the same room.  He does not

4  have a separate video feed.  He can hear things off of this

5  computer.  If necessary, he can even come and take the screen

6  from me, but he was not going to have his own screen or his own

7  sound to avoid any interference.

8          **THE COURT:**  All right.  Thank you.

9          And I understand that Mr. Buchanan is also

10  representing Ms. Newman.  Is he here?

11          **MR. BUCHANAN:**  Yes, I am here, and so is Ms. Newman.

12          **THE COURT:**  Thank you.

13          Now, I'm going to, in a sense take -- well, let me

14  have Plaintiffs' counsel state their names for the record and

15  let me -- let me start with Mr. Hagerstrom.  Are you here, sir?

16          **MR. HAGERSTROM:**  I am.

17          **THE COURT:**  State your name.

18          **MR. HAGERSTROM:**  Scott Hagerstrom.

19          **THE COURT:**  Ms. Haller?

20          **MS. HALLER:**  Yes, your Honor.

21          **THE COURT:**  State your name, please, after I've

22  called you.

23          **MS. HALLER:**  Julia Haller.

24          **THE COURT:**  All right.  Mr. Brandon Johnson?

25          **MR. JOHNSON:**  Yes, your Honor, Brandon Johnson.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1            THE COURT:  Thank you.

 2       And Ms. Stefanie Lambert.

 3            MS. LAMBERT:  Good morning, your Honor.

 4   Stefanie Lambert.

 5            THE COURT:  All right.  Your name, please, for the

 6   record.

 7            MS. LAMBERT:  Stefanie Lambert Junttila, P-71303.

 8            THE COURT:  Mr. Kleinhendler.

 9            MR. KLEINHENDLER:  Howard Kleinhendler.

10            THE COURT:  Thank, you sir.

11       And Ms. Newman.

12            MS. NEWMAN:  Good morning.  Emily Newman.

13            THE COURT:  Thank you, Ms. Newman.

14       Ms. Powell.

15            MS. POWELL:  Sidney Powell.

16            THE COURT:  Thank you.

17       And, Mr. Rohl, you've already placed your name on the

18   record.

19       Mr. Wood?

20            MR. WOOD:  Yes.  This is Lin Wood, your Honor.  Good

21   morning.

22            THE COURT:  Good morning.

23       All right.  Counsel, thank you very much.  Have I

24   missed anyone?

25       Mr. Fink, I don't recall calling your name.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                  7/12/2021

1           **MR. DAVID FINK:**  No, your Honor.  I am counsel for

2    the City of Detroit, and also with me is my partner and son.  I

3    have to mute so I don't get feedback.

4           **THE COURT:**  Thank you.  All right.

5           **MR. NATHAN FINK:**  Good morning, your Honor, Nathan

6    Fink on behalf of the Intervenor Defendant, City of Detroit.

7           **THE COURT:**  All right.  Thank you.

8           And do we have counsel on the line for the State

9    defendants?

10          **MS. MEINGAST:**  Yes, your Honor.  Assistant Attorney

11   General Heather Meingast on behalf of Governor Whitmer and

12   Secretary Benson.

13          **THE COURT:**  Thank you very much.

14          And I see -- I'm sorry, Ms. Gurewitz.

15          **MS. GUREWITZ:**  Yes.  Mary Ellen Gurewitz, on behalf

16   of the Michigan Democratic Party and the Democratic National

17   Committee.

18          **MR. ELDRIDGE:**  Good morning, your Honor.

19   Scott Eldridge, also on behalf of the DNC and the MDP.

20          **THE COURT:**  And, Mr. Davis, are you here with counsel

21   today, sir?

22          **MR. DAVIS:**  Yes, your Honor.  Mr. Paterson is on the

23   line, your Honor.

24          **THE COURT:**  All right.  Thank you.  You can -- so

25   Robert Davis is here, and your counsel is Mr. Paterson.  Okay.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   He is not -- I see that his square appears, but I don't hear

2   him.  All right.  Let me just make a note of that.

3           All right.  I think I've covered everyone -- and

4   Mr. Owen, Jason Owen.

5           **INTERNET TECHNICIAN:**  Good morning, Judge.  I'm IT

6   support.

7           **THE COURT:**  Thank you, Mr. Owen.  Thank you very

8   much.  Probably one the most critical individuals on this call,

9   would you say, counsel?  All right.  Thank you, Jason.

10          All right.  Ladies and gentlemen, thank you so much

11  for your appearance here -- your prompt appearance, and I want

12  to just make some opening remarks and underscore that the

13  purpose of today's hearing is to address three pending motions

14  for sanctions.  Those motions are as follows:  Intervening

15  Defendant Robert Davis' motion for sanctions against Plaintiffs

16  and Plaintiffs' counsel in which Mr. Davis seeks sanctions

17  pursuant to the Court's inherent authority and also under 28

18  U.S.C. 1927.

19          The second motion for sanctions has been filed by

20  intervening Defendant City of Detroit's motion for sanctions,

21  for disciplinary act, for disbarment referral, and for referral

22  to state bar disciplinary bodies, and, here, the City seeks

23  sanctions under Rule 11 of the Federal Rules of Civil

24  Procedure.

25          And, finally, the State Defendants, Secretary of

Motion hrg.                              7/12/2021

 1   State Jocelyn Benson and Governor Gretchen Whitmer, they have

 2   filed motions for sanctions under 28 U.S.C. Section 1927 in

 3   which Defendants alternatively seek sanctions under the Court's

 4   inherent authority.

 5            All right.  Now, the Court finds for this record that

 6   the referenced motions adequately put Plaintiffs and

 7   Plaintiffs' counsel on notice of the conduct alleged to be

 8   sanctionable.  Plaintiffs and their counsel have had the

 9   opportunity to respond to these allegations in their briefs.

10   However, I've called this hearing to provide them with an

11   additional opportunity to respond to those claims and to answer

12   questions that I deem relevant to deciding whether Rule 11 or

13   Section 1927 have been violated, and/or, counsel, whether the

14   Court's inherent powers to sanction should be utilized.

15            It bears mentioning that I recognize that there is

16   disagreement about whether the City of Detroit followed the

17   Safe Harbor provisions with exactitude.  Nevertheless, I want

18   to advise Plaintiffs and Plaintiffs' counsel that Rule 11

19   allows a court, on its own initiative, to require a party to

20   show cause why sanctions should not be imposed under the rule

21   and to impose Rule 11 sanctions if, after notice and a

22   reasonable opportunity to respond, which I am providing today,

23   the Court determines that Rule 11(b) has been violated if after

24   that notice.

25            I'll tell you, counsel, I do not need today to rehear

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   the arguments that have been advanced in the parties' briefs at

2   this hearing.  I have thoroughly reviewed every filing.  After

3   I ask my questions, however, I will give the parties the

4   opportunity to make a brief statement on their own to the Court

5   concerning the matter at hand.

6           Now, I ordered the personal appearance at this

7   hearing of all attorneys whose names appear on any of the

8   Plaintiffs' pleadings and briefs because I have questions that

9   I want to give you the opportunity to answer.  I ask counsel to

10  provide clear and direct answers to the Court's questions, and

11  let me be clear, that these questions are not seeking the

12  mental impressions, conclusions, opinions, or legal theories of

13  counsel.

14          Each question that I ask is directed to all of the

15  attorneys whose names appear on any of the Plaintiffs'

16  pleadings or briefs.  I will not call out any of your

17  individual names unless the question is specifically crafted

18  for a particular attorney, and there are a couple of those.

19  After I ask a question, the attorney best equipped to answer

20  the question may respond.  When I've received a complete answer

21  to a line of questioning, I will give all other attorneys the

22  opportunity to comment or add to the answers on the record.

23  Note that if no other attorneys speaks, the Court finds that --

24  will find that all other attorneys agree with the answer that

25  has been placed on the record.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          Now, that brings me, counsel, to a potential issue as

2    we now have counsel representing counsel for Plaintiffs.  The

3    Michigan Rules of Professional Responsibility, as I'm certain

4    everyone on this call should know, prohibit a lawyer from

5    representing a client if the representation will be directly

6    adverse to another client unless the lawyer reasonably believes

7    the representation will not adversely affect the relationship

8    of the other client, and, secondly, each client consents after

9    consultation.

10          Now, at this time I would like to confirm on the

11   record, through Mr. McGlinn and Mr. Campbell to determine -- I

12   would like to confirm that they have addressed this potential

13   conflict issue with their clients.

14          **MR. CAMPBELL:**  I have, your Honor, and they have

15   given me their consent to proceed.  I do also wish to make an

16   objection, so that you have it for the record, on one of the

17   statements that you made about proceeding on the possibility of

18   the Court's own power with regard to Rule 11 and the show

19   cause.

20          **THE COURT:**  Yes.

21          **MR. CAMPBELL:**  May I, briefly?

22          **THE COURT:**  Briefly, yes.

23          **MR. CAMPBELL:**  Your Honor, I believe under Rule 11(c)

24   that the court can seek a show cause on notice prior to a

25   dismissal.  I believe after the dismissal that is not part of

Motion hrg.                              7/12/2021

1    the power that the Court retains.  So I do object, on those

2    grounds, for the Court's consideration of its own show cause.

3            **THE COURT:**  Okay.  I'll make a note of that, and at

4    this moment let me ask counsel for the Defendants if they would

5    like to respond to that, any of counsel?  Let me start with

6    Mr. Fink.

7            **MR. DAVID FINK:**  Your Honor, the rule itself does not

8    include that requirement.  The rule simply says on its own the

9    court may order an attorney, law firm, or party to show cause

10   why conduct specifically described in the order has not

11   violated Rule 11(b).

12           Notwithstanding that, I do want to be clear for the

13   Court that -- and I believe the Court is aware of this -- a

14   proper Rule 11 notice was sent to all of the parties, all of

15   the attorneys.  While they make general objections to it, the

16   notice included a detailed motion, which was, with minor

17   exceptions, the same motion that was filed, and we can provide

18   that to the Court.

19           We have met all the prerequisites for a Rule 11

20   proceeding, with or without a request on the part or an order

21   to show cause from the Court.  They have had several months to

22   respond, and the issue is clearly before the Court properly

23   today.

24           **THE COURT:**  All right.  Thank you, Mr. Fink.

25           Mr. Campbell, let me go back to you, sir.  What's the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  authority for your position?

2          **MR. CAMPBELL:**  Your Honor, I believe it's Rule 11(c).

3  If you give me some time, I can probably pull it up, but I

4  wasn't prepared to address the Court's inherent or, if you

5  will, the Court's show cause powers because we hadn't gotten

6  notice of that coming into this proceeding so I apologize for

7  that so I'm going off memory.

8          **THE COURT:**  All right.  I'm going to make a note of

9  that, and, if needed, we'll come back to that.

10          **MR. CAMPBELL:**  Happy to address that for the Court if

11  need be and in writing.

12          **THE COURT:**  We'll see if I need that.  Thank you.

13          Counsel, if there are not any other comments at this

14  point, the way I intend to proceed, I'm going to go ahead and

15  move forward.

16          Any other housekeeping that we need to take care of

17  at this point?

18          **MR. BUCHANAN:**  Thank you, your Honor.  This is

19  Mr. Buchanan on behalf of Ms. Newman.

20          **THE COURT:**  Yes.

21          **MR. BUCHANAN:**  I don't believe my client was ever

22  served with the papers at the time in question.  Ultimately,

23  she became aware generally, but my client was a contract lawyer

24  working from home, who spent maybe five hours on this matter so

25  she really wasn't involved in, you know, when the motions were

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1   filed and lawyers were retained and pleadings were filed.  So I
 2   just want to note that.
 3          We're -- she's aware now.  She just recently hired
 4   me, and I thank the Court for getting my admission process so
 5   quickly.  Her role is de minimus; and so she was never, as I
 6   understand, sent the pleadings at the time in question.  They
 7   were served on local counsel, but she was never part of a law
 8   firm.  She is listed as "of counsel" on two of the pleadings,
 9   the first amended complaint and the complaint, but she was
10   never an employee of that firm.  That was something that
11   someone put on the pleadings.  She was a contract lawyer, 1099
12   employee, who spent five hours on the matter.  I just wanted to
13   note that for the Court.  Thank you.
14          **MR. CAMPBELL:**  If I may, briefly, to add to that.  I
15   know Mr. Fink will have a response.  It's my belief that he did
16   serve local counsel if he used the ECF for service.  There are
17   a number of folks who would not have received it that way.  I
18   don't know what he says is service.  There is also the factual
19   issue of what was served under the Safe Harbor provision versus
20   what was filed.  That is addressed a little bit in the briefs
21   also, your Honor, but those same circumstances and situations
22   would apply.
23          So that when he says this was properly served and
24   this is a proper Rule 11 motion on behalf of the City, we, of
25   course, have the initial issue of whether the City, as an

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   intervenor, is a proper party to bring a Rule 11, at least in

2   this matter at all, and, secondly, I'm not sure what he means

3   by service.  So I don't want my silence to be a confirmation of

4   that.  So, with that, I've made my remarks.  Thank you.

5           **THE COURT:**  Mr. Fink.

6           **MR. DAVID FINK:**  Your Honor, I have and can provide

7   to the court -- I'm not sure how to do this, but we can -- I've

8   got it -- I can provide it in a PDF.  I have letter, which was

9   sent by first class mail, and it identifies, among the

10  addressees at Sidney Powell's office, Sidney Powell,

11  Emily Newman, Julia Haller, and Brandon Johnson.  They're all

12  included on an e-mail that was sent -- and, I'm sorry, a letter

13  that was sent by first class mail to Sidney Powell, P.C., at

14  2911 Turtle Creek Boulevard, Suite 300, in Dallas, Texas.

15          The issue has never been raised before in this case.

16  We have not heard from anybody claiming that somebody or that

17  any one of these parties did not receive the Rule 11 notice.

18  This is hardly the time to suddenly say they didn't receive it.

19  We did -- and we also sent it by e-mail.

20          What I can't confirm for the Court right now, because

21  I'm not set up, but we're trying to find it, is whether the

22  e-mail was directly sent to Ms. Newman.  It was definitely sent

23  to the parties who we had e-mail addresses for, but I don't

24  believe, at the time, we may not have had an e-mail address for

25  Ms. Newman, but we definitely sent it to her first class mail.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1      **THE COURT:**  All right.  That sounds like something

2   we're obviously going to need to sort that out, and I will

3   determine, before this proceeding is over, to what extent, if

4   any, I'm going to need any briefs on it, all right, but it's a

5   flagged issue.

6           Yes, Mr. Fink.

7      **MR. DAVID FINK:**  Would the Court like us to provide a

8   PDF to the Court right now of the -- and I'm not sure how to

9   produce things on this record, but we can produce a PDF of the

10  notice.

11     **THE COURT:**  Mr. Flanigan, would that be a

12  screen-sharing issue?  Is that something -- I don't know if we

13  can do that through Mr. Fink is my question.

14     **THE CLERK:**  He should be able to screen share.

15     **THE COURT:**  Okay.  Do you know how to do that,

16  Mr. Fink?

17     **MR. DAVID FINK:**  Fortunately, the younger Mr. Fink

18  probably does.

19     **THE COURT:**  Okay.

20     **MR. DAVID FINK:**  I'm going to mute for a second so he

21  can talk to me about technology.

22     **THE COURT:**  Yeah, just a few seconds, because I think

23  I really want to move forward, and it's something -- but let's

24  just -- I'll give you a couple minutes -- just 60 seconds.  How

25  about that?  Yeah.  Honestly, it is something that can be

Motion hrg.                                    7/12/2021

1   docketed, Mr. Fink -- let me let him -- Mr. Fink.

2           **MR. DAVID FINK:**  Yes, your Honor.

3           **THE COURT:**  I think the better way to do this is go

4   ahead and docket what you have, and the Court will take a look

5   at it, and others can do the same, and I'll advise whether or

6   not there needs to be any briefing on that issue.  Okay?

7           **MR. DAVID FINK:**  Yes, your Honor, I understand.  My

8   son even knows how to docket.

9           **THE COURT:**  Duly noted.  All right.

10          **MR. BUCHANAN:**  Your Honor, one quick point.  I'm not

11  disputing Mr. Fink's representations of, you know, sending it

12  to Sidney Powell's office.  My client was working from home in

13  Washington, D.C., a fact Mr. Fink would not have been aware of.

14  Again, she was a contract lawyer.  She was listed on the

15  pleading as being at the location or at least "of counsel" at

16  Ms. Powell's office, but she really was not of counsel.  It was

17  just, you know, recorded, but so that's my point that she --

18          **THE COURT:**  Okay.  Fair enough.

19          **MR. BUCHANAN:**  She did not receive it.  Thank you.

20          **MR. DAVID FINK:**  Your Honor, may I very briefly speak

21  to that point, very briefly, because it's a theme that runs

22  through the entire case for us, and that is counsel knew that

23  she had been presented as being an attorney representing the

24  Plaintiffs.  She knew that her address was provided to the

25  court in the manner it was provided.  It was not our obligation

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   or ability to do any kind of investigation.  It was her

2   responsibility to no longer use the privilege she had as an

3   attorney to endorse this case without coming forward.

4          I know, your Honor, perhaps I'm getting carried away.

5   I apologize.  I just want to say it's a theme that's going to

6   come up all through this.

7          **THE COURT:**  Okay.  It's -- I have been duly noted,

8   counsel, and we will address that in due course.  File what

9   you -- docket what you need to docket and we'll pick it up from

10  there, all right?

11         All right.  Anything else before the Court proceeds?

12  Good.  Thank you.

13         All right.  My first question to Plaintiffs' counsel

14  is:  Who wrote the complaint or the amended complaint in this

15  matter?

16         **MR. CAMPBELL:**  Your Honor, this is Don Campbell.

17  You said "Plaintiffs' counsel."  This is counsel for

18  Plaintiffs' counsel.  I think I am in the best position to give

19  the initial answer to the Court on that, if I may?

20         **THE COURT:**  You may.

21         **MR. CAMPBELL:**  Thank you.  If you're looking for the

22  principal author, it would be Howard Kleinhendler.  If you're

23  looking for the lawyer who worked closest with him, it's

24  Sidney Powell.

25         **THE COURT:**  Okay.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                          7/12/2021

1          **MR. CAMPBELL:**  Between them, it is their work product

2    primarily, if you will.  There are others who helped, some very

3    briefly, as Mr. Buchanan mentioned, some only on the amended

4    complaint.  That's Brandon Johnson, again, only with some

5    research, but in terms of the folks who helped to draft or,

6    really, the final product that gets filed in Michigan is

7    primarily a product of Sidney Powell and of

8    Howard Kleinhendler.

9          **THE COURT:**  All right.  Does anybody else want to add

10   to that?

11         All right.  Thank you.  Let's move --

12         **MR. WOOD:**  Your Honor, may I?  Your Honor, this is

13   Lin Wood.

14         **THE COURT:**  Yes, sir.

15         **MR. WOOD:**  If I might answer.  I played absolutely no

16   role in the drafting of the complaint.

17         **THE COURT:**  Okay.

18         **MR. WOOD:**  Just to be clear.

19         **MR. CAMPBELL:**  All my clients agree on that, your

20   Honor.

21         **THE COURT:**  Okay.  Is there anybody else that feels

22   that they played no role in the drafting of the complaint?

23         **MS. NEWMAN:**  Your Honor --

24         **MR. BUCHANAN:**  Yes, your Honor.  My client,

25   Emily Newman, as I said, spent a total of five hours.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **THE COURT:**  Okay.  We're fine.  I'm clear on that.

2    I'm clear on that.  I think -- you know what?  I think I've got

3    a straight -- a good enough, clear answer from Mr. Campbell.  I

4    understand that Mr. Wood has not played any role in that, but

5    under -- the answer that I am taking is, is that

6    Mr. Howard Kleinhendler, as well as Ms. Sidney Powell, were the

7    principal drafters of the complaint.  All right.

8          **MS. NEWMAN:**  Your Honor, the Court should note -- I'm

9    sorry, your Honor.  The Court should know that I did not play a

10   role in drafting the complaint.

11         **THE COURT:**  I'm very -- yes, it's clear from the

12   record.  It's clear from the record that you have not.  So the

13   complaint or the amended complaint in this matter were drafted

14   principally by Mr. Howard Kleinhendler and Ms. Sidney Powell.

15         The Court is moving on.

16         All right.  Let's talk about -- I'd like to now talk

17   about the relief that the complaint -- the amended complaint

18   seeks, and I ask this question to counsel for Plaintiffs'

19   counsel, or Plaintiffs' counsel, and you all can decide who you

20   feel is best equipped to answer the question, and the first

21   question is:

22         What authority enabled this Court to issue any of the

23   relief sought in this case, such as decertifying the election

24   results or declaring an outcome that is different than that

25   which was declared by the State?

                    King v Whitmer, Case No. 20-cv-13134

Motion hrg.                               7/12/2021

1      **MR. CAMPBELL:**  Well, your Honor, I guess, first, you

2  start with the Constitution of the United States; secondly,

3  *Bush v Gore* decided 20 years earlier.  That was a case where

4  the court ordered the State of Florida to stop a count and

5  decided the 2000 presidential election.

6          Since that time, there have been other cases that

7  have been developed under the *Bush v Gore* doctrine.  This idea

8  that, again, was not invented in *Bush v Gore* but has existed

9  since the founding fathers put it into the Constitution, and

10  that is that the court has a role to play in challenges and

11  deciding those challenges on due process grounds, on the

12  Eleventh Amendment, looking at the electors clause and the

13  Twelfth Amendment.  So those things which came up, and which

14  there was another *Bush v The Board of Canvassers*.  I believe

15  that it was decided at the same time.  I have that cite from

16  one of the briefs that we have.  So, again, another example of

17  where the court did take into consideration.  Of course,

18  ultimately, *Bush v Gore* decided the election, and other suits

19  were no longer necessary to be held.

20          There's also the *Carson* case from the Eighth Circuit,

21  and I understand -- and I, of course, read your opinion, your

22  Honor, that this Court has adopted the dissent from *Carson*,

23  but, as you can rightly imagine, a lawyer bringing the majority

24  opinion as part of the basis for the bringing of the action is

25  not unusual, extraordinary, and certainly shouldn't expose

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   anybody to sanctions simply because they were unable to

2   determine ahead of time that this Court would choose to follow

3   the dissent.

4          Judge, I can't, obviously, distill down into a few

5   moments all of the authorities that were placed in the motion.

6   I do want to point out to the Court, because the Court

7   identified in its order, the relief that was requested, and it

8   identified relief that was in the amended complaint, but in the

9   request, the motion, actually, for the restraining order, there

10  were, as I recall -- and I hope I have this accurately -- at

11  Page 16 of what would have been, I believe, ECF 7, there were

12  three requests, decertify or stay the delivery of the vote

13  count and results, conserve the status quo, and, thirdly,

14  impound the voting machines, and that was the -- those were the

15  great relief requested within the motion.

16         I should also point out the names on the motion were

17  Sidney Powell, Greg Rohl, Scott Hagerstrom, and

18  Howard Kleinhendler.  The other lawyers do not appear on that

19  document when it was filed.  So I hope that's a response --

20  responsive to the Court's question.

21         THE COURT:  What is the authority, specifically, that

22  allows a court to decertify an election?  I mean what specific

23  case are you looking at?

24         MR. CAMPBELL:  Well, again, if you're looking at

25  cases, I would say it's *Bush v Gore*.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          Now, it is, in some respects, the obverse, right?  In

2   *Bush v Gore*, it was a direction to stop an election count.  If

3   you have the authority to stop an election count, I think it's

4   a reasonable inference to believe that the Court has the

5   authority to start a count.  And, again, if that theory is

6   wrong -- and in this case you ruled the Sixth Circuit didn't

7   disturb that.  The U.S. Supreme Court didn't disturb that.  My

8   clients are lawyers.  They understand that, and they respect

9   that.  That's the ruling in this case, but until you gave that

10  ruling, Judge, I don't think that result was as obvious as the

11  Defense has made it out to be.

12          And I have more arguments about that, but I'll

13  reserve that.  You haven't asked me that question yet.

14          **THE COURT:**  You feel that based upon basically an

15  extrapolation of a court's ruling you can conclude the direct

16  opposite?  If it's A, then it could be B.  I don't really

17  understand that.

18          Let me get the Defenses' thoughts on that.  Let me

19  hear -- I'll hear from Mr. Fink, and then I'd like to hear from

20  Ms. Meingast and Ms. Gurewitz.  Go ahead.

21          No, I'm sorry.  I'm sorry, Ms. Gurewitz.  I'm just

22  looking at those -- the State Defendants' counsel and the

23  Intervening Defendants', including Mr. Fink.

24          Go ahead, Mr. Fink.

25          **MR. DAVID FINK:**  Your Honor, in this case the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   Plaintiffs chose to ignore centuries of precedent.  They chose

2   to ignore the procedures that are in place.  They did not

3   seek -- the Trump campaign did not seek, nor did any of the

4   Plaintiffs, a recount.  Instead, they tried, somehow, to

5   collaterally attack everything that had happened.  There was no

6   basis.

7         This Court's opinion and order of December 7th, 2020,

8   extremely well and properly addressed the weakness of all of

9   the claims.  I'm happy to argue or respond to any specific one,

10  but there was no basis for what was argued here.  This was,

11  from the beginning to the end, an attempt to get a message out

12  that was extrajudicial.  They were trying to use the court to

13  get a message out.  We could not find a basis in law for what

14  they were trying to do.

15        **THE COURT:**  Ms. Meingast.

16        **MS. MEINGAST:**  Thank you, your Honor.

17        I would agree with Mr. Fink.  You know, I think we've

18  argued in the numerous briefs that were submitted here really

19  *Bush v Gore* was not even applicable to this case on a

20  substantive theory of dilution.  That wasn't even really what

21  was pled here, and to the extent *Bush v Gore* has any meaning

22  for being able to stop, you know, a vote, stop ballots being

23  counted, that's not what happened here.  Here we went all the

24  way through vote counting, all the way through canvassing, and

25  all the way through certification, and all the way of sending

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    the slate of electors to the U.S. archivist before this case

2    was even filed.

3            So I don't believe that *Bush v Gore* has any support

4    for disenfranchising millions of Michigan voters after the

5    election has already been certified through our processes, and,

6    as Mr. Fink pointed out, the proper recourse here, with respect

7    to these claims of fraud and misconduct in the election --

8    which of course we disagree with -- was to seek a recount.

9    That's the ordinary process.  You go and ask for a recount.

10   That's the remedy for mistake or fraud in the results of an

11   election.  That's the process that should have been pursued

12   here.  It was not.

13           We even have processes for filing a challenge if you

14   think that the voting equipment malfunctions, and neither of

15   those processes occurred.

16           It's our position that *Bush v Gore* isn't applicable

17   and that the relief requested here is essentially undoing an

18   election and asking this Court to choose a new winner is

19   unprecedented and unsupported by any case law extant.  Thank

20   you.

21           **THE COURT:**  Thank you -- and hang on, Mr. Campbell.

22           Mr. Davis, do you want to be heard on this issue or

23   your counsel, Mr. Paterson?

24           **MR. DAVIS:**  I'm not sure if Mr. Paterson's audio is

25   working properly.  So, your Honor, if you can try and  -- I

Motion hrg.                              7/12/2021

1  defer to my counsel.

2       THE COURT:  Well, I mean I'm here.  Mr. Paterson, can

3  you hear the Court?  All right.

4       Mr. Campbell, what -- we don't have to -- I've asked

5  the question.  You've given me the answer.  I've heard from

6  defense counsel.

7       MR. CAMPBELL:  Would the Court allow me to give two

8  quick cites, one from the Eastern District of Michigan?

9       THE COURT:  Okay.

10      MR. CAMPBELL:  -- and one from Colorado.

11      So the first from the Eastern District of Michigan is

12  *Stein versus Thomas*, 222 F.Sup.3d 539.  This was cited in the

13  briefing as well, and, there this Court said, "The fundamental

14  right of vote by plaintiffs, the right to vote," and, "To have

15  that vote conducted and counted accurately."

16      This Court began its order dismissing the request for

17  the injunction by saying, "The right to vote is sacred, and

18  it's uniquely American."  In fact, it's this aspect of having

19  the count conducted and challenged by petition to the judiciary

20  that is uniquely American.

21      Everybody -- a lot of folks vote.  Nazi Germany had

22  plebiscites.  The Soviets had regular voting.  Even Hugo Chavez

23  let you vote for him as many as times as you wanted.  That's

24  not uniquely American.  What's uniquely American is the ability

25  to challenge it, to address that and petition to this court.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    That's what *Bush v Gore* decided.  It decided that the court can

2    get involved, must get involved under the Constitution.

3              So the other -- the continuation of that quote is,

4    "And to have the vote conducted and counted accurately is the

5    bedrock of our nation.  Without elections that are conducted

6    fairly and perceived to be fairly conducted, public confidence

7    in our political institutions will swiftly erode."

8              It is the executive that did the counting, and that

9    was the issue here.  They created the issues that disrupted

10   elements of society that resulted, in this instance, in a case

11   being brought to the court, as it should be in our democracy

12   and in our republic.

13             The other case, by the way, is *Common Cause Georgia*

14   *versus Kemp*.  That's 347 F.Supp.3d 1270, from 2018.  And I

15   think I called it Georgia.  It's obviously -- I think I called

16   it Colorado.  It's obviously Georgia.  There, the court looked

17   at a combination of statistical evidence and witness

18   declarations enough to demonstrate that there -- it could take

19   some action.

20             That's what you had here.  You had the eyewitness

21   reports, which are dismissed by the Defendants as being

22   uneducated statements or statements by uneducated --

23             **THE COURT:**  Yeah, I'm going to get into those

24   statements in just a minute.

25             **MR. CAMPBELL:**  So those things all combine to show

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   that using what was available to determine a path, and then,

2   remember, Judge -- this is very important -- three of the

3   Plaintiffs -- and that would be King, Sheridan, and Haggard --

4   they are not just voters.  All six of the Plaintiffs are

5   voters, and every vote is important under the Constitution and

6   the case law, but these three are electors.  And, in order to

7   bring their claims, it was the consideration of counsel in this

8   case that certain acts had to be completed by the State.  The

9   State finally completed those on November 23rd, and this is

10  also explained and gone over in the Supreme Court filings.  The

11  last acts were done by November 23rd, and this case was filed

12  on November 23rd.

13          THE COURT:  Mr. Campbell, let me ask you something:

14  Do you agree that the state law establishes an extensive

15  procedure for challenging elections?

16          MR. CAMPBELL:  Yes.

17          THE COURT:  Did the Plaintiffs avail themselves of

18  any of these procedures?

19          MR. CAMPBELL:  No.

20          THE COURT:  And why is that?

21          MR. CAMPBELL:  Well, with regard to those procedures,

22  in part because before the claims on behalf of the electors

23  could be fully ripe that those processes had taken place.

24  Again, there are a number of different claims that were

25  pending.  You know, Judge, because it's bean cited that the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                        7/12/2021

1   U.S. Attorneys, 18 U.S. -- I'm sorry, attorneys generals, 18

2   attorneys generals had their own claim and their own approach

3   to this.  There are a number of other suits.  People took

4   different paths, all seeking to get what they thought the

5   Constitution permitted these courts to undertake on behalf of a

6   petition to address a grievance from a citizen.  In this case,

7   not just citizens, but at least, in the instance, of three

8   electors and so --

9            **THE COURT:**  But the procedures --

10           **MR. CAMPBELL:**  (Indiscernible.)

11           **THE COURT:**  The procedures --

12           **MR. CAMPBELL:**  (Indiscernible.)

13           **THE COURT:**  The procedures were there for them to

14   avail themselves of, you would not -- you disagree with that?

15           **MR. CAMPBELL:**  Oh, no --

16           **THE COURT:**  They were --

17           **MR. CAMPBELL:**  In terms of the procedures under the

18   statutes were there, and, Judge, if this is a case that my

19   clients, those are the lawyers, misjudged the timeline and got

20   it wrong, then that's -- then that's what it is, but that is a

21   long way from anything that could be sanctionable or has been

22   argued by the Defendants, and in terms of issues --

23           **THE COURT:**  Let me -- all right.  Let me -- Mr. Fink,

24   I'm going to give everybody -- I have one more question to ask

25   about the relief that's been sought here and then I'll give you

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1  | an opportunity to speak.

2  | **MR. DAVID FINK:**  Your Honor, I didn't want to speak

3  | to substance.  It wasn't substance.  It was a point of concern.

4  | That is, it appears that Sidney Powell has left the proceeding,

5  | and at least we don't see her, and I just -- I know we want all

6  | of the Plaintiffs to be present.

7  | **THE CLERK:**  It looks here as if she turned the camera

8  | off.

9  | **THE COURT:**  Okay.  All right.  There we go.  Maintain

10 | the camera, Ms. Powell, please.  I'd like to have everyone

11 | here.

12 | All right.  My question to Plaintiffs' counsel or

13 | counsel for --

14 | **MR. KLEINHENDLER:**  Your Honor, I apologize.  Before

15 | you move to your next question, I just wanted to add something

16 | to what Mr. Campbell said, if I may.

17 | **THE COURT:**  Okay.

18 | **MR. KLEINHENDLER:**  You asked what is the authority

19 | for the relief requested.

20 | **THE COURT:**  Yes.

21 | **MR. KLEINHENDLER:**  This Court, in the face of a claim

22 | of fraud, has inherent equitable authority to do as it sees

23 | fit.  Fraud vitiates everything, and that is another basis that

24 | this Court has.

25 | I also want to make another point that I think is

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                          7/12/2021

1   escaping, particularly what Ms. Meingast had mentioned.  There

2   was no way on this planet that the electors could have used the

3   State of Michigan electoral processes, because that's not what

4   they were trying to accomplish.  What they were trying to

5   accomplish was what are their rights under the Twelfth

6   Amendment and what are their rights heading into the vote of an

7   electoral college, which had not yet taken place, and that was

8   the purpose of the TRO, not to have what is typically

9   considered -- and that's what you're hearing from the Defense.

10  A candidate who loses an election, what resources does that

11  specific candidate have in order to unwind or preserve his or

12  her position?

13          **THE COURT:**  Mr. Kleinhendler, do you have any case

14  authority for the proposition of inherent equitable authority

15  to address fraud?

16          **MR. KLEINHENDLER:**  Your Honor, I haven't.  I don't

17  have it with me.  I did look it up, your Honor, just briefly

18  while we were here.  There is a -- there are many cases that --

19  I would refer you to the United States Supreme Court case,

20  *United States versus Throckmorton*.  It's old.  98 U.S. 61 in

21  1878.  I believe that case states the general equitable

22  jurisdiction that this Court has, fraud vitiates everything,

23  and this Court has the equitable power.

24          And I also just want to point out one other thing

25  that Mr. Campbell --

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1           **THE COURT:**  I can't imagine it's been over 100 years

2      since -- that this is --

3           **MR. KLEINHENDLER:**  Sorry.  It's just the quickest

4      case I could pull up.  There are more modern cases, and I'd be

5      happy to present them to you, your Honor, but that's just one

6      case that came up quickly while we are here.  And --

7           **THE COURT:**  That's fine.  Okay.  Let me stop you,

8      Mr. Kleinhendler.  I'm going to move on.  I need to move on,

9      and I want to ask, and it's relevant, too.  It's really a segue

10     to what you're saying.

11          So let me just ask -- this is a timing issue, and the

12     question from the Court is, is that why did the Plaintiffs wait

13     for almost three weeks after the election to assert challenges

14     regarding voting machines and election procedures, some of

15     which Plaintiffs themselves claim were well-known far before

16     the November 3rd election and others which were known by the

17     close of election day?

18          So, again, we're talking about State procedures that

19     are there, that were there when you -- you know, had been in

20     place for Plaintiffs, Plaintiffs' counsel to for -- counsel to

21     access.  Why -- what was -- what was the reason for the delay?

22          Let me direct that to Mr. Campbell, and then I'll

23     hear from whomever else.

24          **MR. CAMPBELL:**  Well, as we've already expressed, my

25     clients have already expressed, in the written matters both

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    before this Court and also through the United States Supreme

2    Court filings, the reasons for the delay had to do with, one,

3    the gathering of that information.  The Court says, "Well, all

4    this was well-known."  It wasn't known that the election was

5    going to go as the election did until the election; right?  In

6    fact, it's the day after the election because --

7            **THE COURT:**  Okay.

8            **MR. CAMPBELL:**  -- people went to bed.  On election

9    night there was one result anticipated, and another came out,

10   at least in Michigan, the next day.  So there is a reaction

11   time to that.

12           **THE COURT:**  Certainly, but three weeks?

13           **MR. CAMPBELL:**  Judge, if anything, and it's said

14   already in the briefing, it was filed too early.  It shows

15   you -- again, you've seen the number of lawyers who did

16   contribute.  It's not that there was a lack of effort to get it

17   done.  It's not that there was a lack of direction to get it

18   done, although this is a novel proceeding, we candidly admit.

19           Now, it's not completely novel.  It was pursued in

20   other states, but this was really the first of those states

21   that it was pursued in, but it was believed to be done in good

22   faith by everybody.  And, again, I haven't talked to

23   Emily Newman, but I talked to her counsel.  It was believed to

24   be done in good faith by everybody, and they -- they worked

25   diligently to get it done, and, as Mr. Kleinhendler has said

Motion hrg.                          7/12/2021

1   and as I will reiterate, the fact is that part of the theory

2   rested on certain processes being completed by the State so

3   that the electors could raise their particular and specialized

4   causes of action and claims.  So there is a ripeness issue

5   here, along with the clock that the Court said was running for

6   three weeks.

7          **THE COURT:**  Any response from Defense counsel?

8          You can start, Mr. Fink.

9          **MR. DAVID FINK:**  Absolutely, your Honor.  This is a

10  case about the election of the President of the United States.

11  There simply is no case that could be of greater magnitude,

12  and, in considering the extent of diligence necessary in going

13  forward, certainly, no case warranted more serious due

14  diligence and hard work on the part of the attorneys.  The

15  suggestion that it would take three weeks to file a lawsuit to

16  raise issues that became -- many of which were stale by the

17  time they were brought.  The possibility that they say they

18  were pulling together the facts, when, in fact, all they did

19  was append affidavits that were filed in other cases and, by

20  the way, rejected in those other cases.  This is a case in

21  which the most diligence received the least.

22          This Court has said in its ruling that the --

23  correctly, "That this case was stunning in its scope and

24  breathtaking in its reach," very well-worded of course.  And I

25  have to -- excuse me, your Honor, but I have to say that the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  Court summed it up:  It was "breathtaking in its reach."  In a
2  case like that, you do the hard work.  The suggestion that
3  people couldn't work long hours and put something out quickly
4  is absolutely insulting to the Court and to all of the parties.
5          We all worked on the schedule that was created by
6  this.  We filed briefs in the Supreme Court on just a couple
7  days' notice.  We filed briefs in this Court on just a couple
8  of days' notice, and our briefs were comprehensive.  What they
9  filed, in the first complaint in this case, was an
10 embarrassment to the legal profession.  It was sloppy.  It was
11 unreadable.  It was mocked publicly until they then filed
12 another version a couple of days later.  The fact is this was a
13 sloppy, careless effort, and it was long delayed.  They had
14 plenty of time, and they absolutely should have filed more
15 quickly.
16          **THE COURT:**  Thank you, Mr. Fink.
17          **MR. DAVID FINK:**  Obviously, it should never have been
18 filed.
19          **THE COURT:**  Ms. Meingast, would you like to add
20 anything to that?  You don't have to.
21          **MS. MEINGAST:**  I agree with what Mr. Fink just said,
22 your Honor.
23          **THE COURT:**  All right.  Mr. Paterson, counsel for
24 Mr. Davis, you're on a phone line.  Did you want to add
25 anything?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1           Can you hear the Court, sir?

2           All right.  We're going to move on.

3           **MR. KLEINHENDLER:**  Your Honor, I'd --

4           **THE COURT:**  Mr. Paterson?

5           **MR. PATERSON:**  I would agree with Mr. Fink and

6    Ms. Meingast, Mr. Davis, on behalf of the

7    five-and-a-half-million voters in the state of Michigan, who

8    were attempted to be misled by this complaint.  It was an

9    absolute effort on the part of the Plaintiffs not to challenge

10   the results of the election but to throw shade on the election.

11   I think it's entirely appropriate to have this proceeding and

12   to proceed and make the Court's determination.  So I would

13   agree with Mr. Fink and Ms. Meingast and urge the Court to

14   grant the relief that's being sought.

15           **THE COURT:**  Thank you, Mr. Paterson.

16           Let me just say to counsel, at the close of this

17   hearing I am going to give you -- everyone an opportunity to

18   make a statement.  Please do not feel that you need to comment

19   every opportunity given to you.  Please, if you want to add

20   something that you feel that has not yet been stated, please

21   feel free to do so.  I'm not trying to chill your right at all.

22   I want you to be able to make your record.

23           **MR. KLEINHENDLER:**  Yes, your Honor.

24           **THE COURT:**  All right.  Thank you.  All right.

25           **MR. KLEINHENDLER:**  I wanted to say --

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1           THE COURT:  Let me move --

2           MR. KLEINHENDLER:  No, your Honor, I would like to

3   make a record here, and this is not been said.  Number one,

4   we've been criticized that the attachments --

5           THE COURT:  Hang on, Mr. Kleinhendler.  Let me ask

6   you something, sir.  What -- tell me -- now, you have already

7   spoken, and I was asking -- that my specific last question was

8   "Why did Plaintiffs wait three weeks after the election?"  Are

9   you going to address that?  Without regard to what Mr. Fink or

10  others have said, did you want to address that to --

11          MR. KLEINHENDLER:  Yes, your Honor.

12          THE COURT:  -- the Court?

13          MR. KLEINHENDLER:  Yes, that's exactly what I wanted

14  to address.

15          THE COURT:  All right.  Proceed, sir.

16          MR. KLEINHENDLER:  Your Honor, yes, there was

17  suspicion about the voting machines prior to the election.

18  Yes, there was a court decision in Georgia that had called into

19  question the security of the Dominion machines, but it wasn't

20  until the voting was counted, and that took multiple days, even

21  in Michigan, until the scope of what many people perceived to

22  be irregularities was understood.  So we didn't even get a -- I

23  don't even think the networks announced the winner of the

24  election until November 7th or November 8th.

25          One second.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1        Okay.  Now, it took us time to put together the

2   Ramsland affidavit, the affidavit from Spider, the affidavit

3   from many of the other people, and what Mr. Fink said is simply

4   not accurate.  To say that every single affidavit, declaration

5   that was presented to you in this complaint was filed in other

6   cases is absolutely false.  Okay.  Look at what we filed.  Look

7   at the record.

8        Second, it took time to put together those

9   affidavits.  We did not -- we chose not to simply file a

10  speaking complaint.  We chose to file the complaint supported

11  by 960 pages, your Honor, of documents, affidavits, many of

12  which were original to this proceeding.

13       Further, your Honor, I want to make the point very

14  clear to you.  It was not possible to bring this complaint

15  before the election was certified because we are here on behalf

16  of electors.  This is a case that is heading towards the

17  electoral college.  This mantra that you're hearing over and

18  over again that we're looking to disenfranchise millions of

19  voters is not what we were trying to do.  What we are trying to

20  do is, hey, wait a second, let's take a look at these machines.

21  Let's slow the locomotive train down so a court of law can take

22  a look at the allegations raised in these 960 pages.  It takes

23  time to put that together.

24       Last point.

25            **THE COURT:**  Hang on.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                               7/12/2021

1          **MR. KLEINHENDLER:**  Last point and I'm done.

2          Mr. Fink criticized our initial complaint, says it

3    was horrible, it's garbage.  If that's the way he wants to

4    talk, I'll will leave it to the Court if that's --

5          **THE COURT:**  Please make your point.

6          **MR. KLEINHENDLER:**  The point is we had an error in

7    converting the Word document to the PDF document.  I even told

8    this to Mr. Fink.  We spoke for -- I even sent him --

9          **THE COURT:**  And what was the impact of the error as

10   relates to time?

11         **MR. KLEINHENDLER:**  The error was many paragraphs,

12   many paragraphs, the words were slammed so close together you

13   couldn't read them.  Okay.

14         **THE COURT:**  Okay.  All right.

15         **MR. KLEINHENDLER:**  So we -- one more second.  So

16   we --

17         **THE COURT:**  No, Mr. Kleinhendler, that's enough.

18   I've heard enough, and there's time reserved at the end.  If

19   you want to use your time in addressing that, you may do so.

20         The Court is prepared now to move on to the issue --

21         **MR. CAMPBELL:**  If I can, your Honor.  Very briefly,

22   your Honor, only to put dates on this.

23         I've had a chance to look this up.  The county boards

24   finished on November 17th, according to my records.  The Board

25   of Canvassers finished on November 23rd.  So this case was

                 King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   filed on November 25th.  So with respect to the Court, although

2   that's obviously three weeks from the election --

3              **THE COURT:**  Yes.

4              **MR. CAMPBELL:**  -- it's not three weeks from when the

5   case could have been filed.

6              **THE COURT:**  Yeah.  Okay.  Thank you.

7              Let's talk about mootness, counsel, a couple

8   questions about that.  This is directed, again, to Plaintiffs'

9   counsel and counsel for Plaintiffs.

10             As you acknowledged before, the U.S. Supreme Court,

11  in a filing before it, once electoral votes were cast on

12  December 14th, subsequent -- these are the words that

13  Plaintiffs' counsel inserted in a brief to the Supreme Court --

14  "Subsequent relief would be pointless and the petition would be

15  moot."

16             Is that right, Mr. Campbell?  Was that the assertion?

17             **MR. CAMPBELL:**  I believe that is accurate.  There

18  wasn't -- the first assertion, and I think this Court is aware

19  in the filing before this --

20             **THE COURT:**  No, no --

21             **MR. CAMPBELL:**  -- your Honor --

22             **THE COURT:**  I'm not asking whether that was the first

23  assertion.  I'm asking if that was the assertion that was made

24  to the Supreme Court.

25             **MR. CAMPBELL:**  At that time, and it was believed to

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   be accurate at that time, as the first assertion was believed

2   to be accurate when it was made, but things change.  This Court

3   I think is well aware of what changed actually on the 14th.  If

4   I'm correct, your Honor, that assertion was made on

5   December 11th in good faith.

6            **THE COURT:**  All right.  Given that statement -- I

7   don't know about that December 11th date.  I'm talking about

8   the statement that was made to the Supreme -- and it could have

9   been made.  I wasn't saying that it was made --

10           **MR. CAMPBELL:**  I believe that's right, your Honor.

11           **THE COURT:**  Right.  Okay.  I was just referencing the

12  date.  December 14th is the date upon which the electoral votes

13  were cast.

14           **MR. CAMPBELL:**  Correct.

15           **THE COURT:**  My question is, given the statement to

16  the Supreme Court that subsequent relief would be pointless and

17  the petition would be moot after votes were cast on the 14th,

18  why did the Plaintiffs not recognize this lawsuit as moot and

19  dismiss it voluntarily on that date, on the 14th of December?

20           Mr. Campbell.

21           **MR. CAMPBELL:**  Because my clients are lawyers, and

22  lawyers have a duty to zealously advocate for their clients.

23           Your Honor, things change.  This was a fluid

24  situation, and, if I may, by historical reference, I believe

25  when this case was filed originally before your Honor we

Motion hrg.                                        7/12/2021

1   thought -- my clients thought honestly and truly that the

2   drop-dead date was December 8th, and that's what we've said to

3   this Court.   Turns out that another judge in Wisconsin did a

4   different set of calculations and said, "Well, why are you guys

5   all hurrying for December 8th.   It should be December 14th."

6          I think Defendants agree that it's December 14th

7   because that's what they said in their briefing.   Again, we --

8   my clients thought honestly and truly it was December 8th.

9   Somebody else came along and said, "Why not December 14th?" and

10  we didn't argue with that.   That's the date that we gave to the

11  Court on December 11th because by that time the analysis was

12  made in Wisconsin, and it was adopted, basically, by all

13  parties.

14         On December 14th, your Honor, something happened that

15  nobody anticipated and nobody on my side instigated or

16  commanded happen, but three of our Plaintiffs were, in their

17  opinion, properly elected as electors.   That's not something

18  that anybody, in terms of the lawyers in this case, had

19  anticipated, expected, or, necessarily, had even wanted.

20  However, once they were in their -- you can call it, again, a

21  Trump election by the Republicans -- once they were elected as

22  electors in Lansing, they believe, according to the

23  Constitution, to be the electors.

24         That changed things, and now the Supreme Court's

25  determination did have life.   It had life it did not have

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    before, and so, in order to respect the desires, the goals that

2    are set by the client, it was decided by -- again, not

3    everybody.  Obviously, Emily Newman didn't have any role.

4    Brandon Johnson didn't have any.  Lin Wood didn't have any role

5    in this.  But, Howard Kleinhendler, Sidney Powell, they

6    decided -- and, again, I believe appropriately so given their

7    responsibilities as lawyers to their clients -- that this case

8    was not proper to be dismissed after December 14th because

9    there were still issues that existed and remain.  When those

10   were cleared, and they were cleared in early January, shortly

11   thereafter this case was dismissed.

12            **THE COURT:**  All right.  Let me hear from Ms. Meingast

13   on that issue, please.

14            **MS. MEINGAST:**  Thank you, your Honor.  I'm not even

15   sure I even know what to say.  You know, as we put forth in our

16   brief, your Honor, as you indicated, in their pleadings to the

17   U.S. Supreme Court, the highest court in our land, Plaintiffs

18   indicated this case would be moot by the time the electors

19   voted.  This whole idea or notion that this was somehow untrue

20   or their case was revitalized because some of the Plaintiffs,

21   who were purported Republican Party electors, took a vote

22   outside the Capitol electing themselves electors is

23   preposterous.  There is no mechanism for having an alternative

24   slate of electors sent anywhere, to the archivist or anything.

25            So I think the suggestion that somehow their case was

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    reinvigorated or that they were wrong, by their own pleadings

2    that December 14th was the date by which really this would be

3    moot, as far as any relief this Court could enter, I mean,

4    really at the point that December 14th, we've sent the

5    electoral slate, the college votes, our electors vote, and it

6    goes to the archivist.

7          At this point, if you want to bring a case, you want

8    some relief, you're going to have to go sue Congress.  You're

9    going to have to go to, you know, a different -- a different

10   playing field and not this Court.  So I'm flabbergasted by this

11   idea that somehow their case was newly invigorated on the 14th

12   and that this was not something simply made up here to avoid

13   the claims that we've put forth in our pleadings.

14         **THE COURT:**  To that point -- thank you, Ms. Meingast.

15         To that point, Mr. Campbell, how -- explain to me how

16   you think that electing themselves as electorates changed

17   anything.  I've never heard this as a reason, by the way, as to

18   why your clients were not willing to dismiss after

19   December 14th.  In fact, what had been said, as I understand

20   it, was that it was -- your clients believed that I didn't have

21   any jurisdiction to consider a motion to dismiss while the

22   decision on the injunction was still on appeal.  That's what I

23   heard.  So I've never heard this explanation about there being

24   some reinvigoration because of the electors having been

25   elected, air quotes.  I never have heard that.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **MR. CAMPBELL:**  I'm not sure I've heard air quotes --

2          **THE COURT:**  I'm sorry, sir?

3          **MR. CAMPBELL:**  I'm not sure I've heard air quotes in

4   a case before, but I appreciate that.

5          **THE COURT:**  All right.  Well, you see them.  Okay.

6          **MR. CAMPBELL:**  Your Honor, again, my understanding is

7   that argument is made by Defense from an e-mail exchange with

8   Stefanie Lambert, who can tell you what she was thinking about.

9          It seems to me a reasonable consideration, if I'm

10  appellate attorney, is to decide whether or not this Court has

11  jurisdiction, but I don't think there was a flat statement

12  there was no jurisdiction.  I believe it was, if I recall the

13  e-mail that was addressed in one of the pleadings, that it was

14  that there was wondering whether or not there was jurisdiction.

15  I don't think there's been any pleading ever filed in this

16  court saying that it was without jurisdiction to do something

17  or to not do something.

18          Again, the only pleadings that occur after this Court

19  rules are, basically, the Defendants and the Intervenors who

20  decided that they needed to go and file things, rather than

21  asking for an extension of time, for example.  They decided to

22  file a motion to dismiss.  That's their election.

23          I hope this Court understands why, in part, they

24  wanted to do that rather than take the courtesy of an

25  extension.  They wanted to do something that they could later

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    hang a hat on and say, "Hey, this is stuff we should be able to

2    collect on either under 1927 or Rule 11," or whatever theory

3    they were going to come up with.

4              So in terms of what our clients' clients and what my

5    clients did in this case, they let a claim pend long enough so

6    that there was a final resolution of the issues clearly and

7    absolutely.  And, again, your Honor practiced law long enough

8    to know.  You make the decision to dismiss that case, and it

9    turns out that there is some relief for your client, there's no

10   policy in the world that's going to cover the loss that

11   occurred because of that.

12             This is, again, basic lawyering.  It's done every day

13   in this country --

14        **THE COURT:**  Yeah, I haven't -- let me stop you,

15   Mr. Campbell.  Again, my question:  Are you arguing this for

16   the first time?

17        **MR. CAMPBELL:**  I'm sorry, when you say arguing?

18        **THE COURT:**  This issue that you're bringing up about,

19   you know, the claims have been reinvigorated after

20   December 14th.  Is that a new argument that you're advancing?

21        **MR. CAMPBELL:**  Well, I don't believe the issue of the

22   date of dismissal in the Supreme Court, the filing that has

23   come up in these proceedings, as a basis for anything, and,

24   again, I know you might not love the arguments about

25   jurisdiction, but I don't believe you have Rule 11

              King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   jurisdiction.  That's something that's said in the Supreme

2   Court or the Sixth Circuit.  I don't believe you have Section

3   1927 jurisdiction over -- it hasn't been a part of any of the

4   pleadings.  If I'm the first person that happens to argue it,

5   it's because it's not been raised by anybody until you asked

6   the question, Judge.

7              **MR. DAVID FINK:**  Your Honor --

8              **MR. KLEINHENDLER:**  Your Honor, if I might point

9   out --

10             **THE COURT:**  Hang on a moment.  One at a time.

11             Let me hear from Mr. Fink.

12             **MR. DAVID FINK:**  Your Honor --

13             **MR. CAMPBELL:**  Your Honor, if can intervene, and I

14   apologize --

15             **THE COURT:**  No, Mr. Campbell.  Mr. Campbell --

16             **MR. CAMPBELL:**  Yes, I just want to suggest, it

17   might --

18             **THE COURT:**  No, no --

19             **MR. CAMPBELL:**  -- be better to hear from Mister --

20             **THE COURT:**  No --

21             **MR. CAMPBELL:**  -- Kleinhendler --

22             **THE COURT:**  I'm sorry, sir.

23             **MR. CAMPBELL:**  -- before Mr. Fink.

24             **THE COURT:**  Excuse me.  Excuse me.

25             **MR. CAMPBELL:**  Apologize.  I'll mute.  Thank you.

                   King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                   7/12/2021

1          **THE COURT:**  Thank you.

2      Mr. Fink.

3          **MR. DAVID FINK:**  Your Honor, we've now heard for the

4  very first time the theory from the Plaintiffs that the

5  subjective belief of three of the Plaintiffs that they had

6  somehow been elected as electors, because that was their

7  subjective belief, the attorneys had to pursue that claim.

8          Now, there's a couple of problems with it.  One, of

9  course, the attorneys have a duty to only go forward with

10  something for which there is a valid, legitimate, legal theory

11  to present to the Court and facts to support it, but, the more

12  important issue, in terms of the question this Court poses,

13  which was mootness, was not once, until this hearing today, not

14  once did that distinction come up in this case, and on

15  December 14th, the date when they said the case would be moot,

16  on December 14th, if in fact they decided that due to a change

17  in circumstances it was not moot, they could have and should

18  have amended their complaint or otherwise filed something with

19  this Court to notify us of the new proceeding that they were

20  taking.

21          Now, counsel said something that I have to take

22  personally as outrageous, when he suggests that the reason that

23  we filed our motion to dismiss in this case at the time that we

24  did and the reason the State filed the motion at the time that

25  they did, was because we had some venal interest in collecting

Motion hrg.                                    7/12/2021

1   funds in a Rule 11 sanction.

2          The fact is in this case the basis of the election of

3   the President of the United States was under attack.  These

4   folks were putting in jeopardy the safety of our republic, and

5   we chose to step up and to say, "No, this case must be and

6   should be dismissed," and, ironically, their response at the

7   time was, "Well, it's pending on appeal so it can't be

8   dismissed yet."  Of course, that was absurd that the other

9   sanction was pend -- that the motion -- the temporary relief

10  motion was pending on appeal didn't interfere with it.

11         We moved forward with our motion to dismiss.  We're

12  being asked today why we didn't adjourn it.  We did everything

13  we could to expedite it, as we should have.

14         Now, I will say this.  After we filed that motion and

15  they saw all the grounds, they still didn't dismiss.  They also

16  still didn't dismiss after January 7th when the United States

17  Congress accepted the electors.  Certainly, by then, the case

18  would have been moot, if not on December 14th, and they still

19  didn't dismiss.  They still didn't dismiss, even though they

20  had in one of their briefs on sanctions, they've said that the

21  January 6th certification rendered their claims moot, but they

22  didn't dismiss that day.

23         Instead, they kept moving forward, and then they

24  waited until January 12th, which was the date that the response

25  to our motion to dismiss was due, and on that date what did

Motion hrg.                              7/12/2021

1   they do?  They asked for an extension.  We said, "No, we don't

2   want an extension."  We opposed it.  The Court, understandably,

3   under the circumstances granted them two days.  During those

4   two days we were compelled -- we didn't choose to do this.  We

5   were compelled to file responses to a writ of cert in the

6   Supreme Court of the United States, hardly a minor matter,

7   again, only because they wouldn't dismiss.

8          And then even when they did choose to so-call

9   voluntarily dismiss on January 14th, even when they did that,

10  they didn't dismiss the appeal.  They didn't dismiss their

11  petition for cert.  We asked them if they would.  On

12  January 18th, we asked Stefanie Junttila if they were going to

13  dismiss the appeal.  She asked us if we would consent.  Of

14  course we said we'd consent to dismissal of the appeals, but,

15  instead, after we did this, we reached out -- or my late

16  partner reached out to Ms. Junttila and said, "What's happening

17  with the dismissal of the appeals?"  And the answer she got --

18  he got was, "It's my understanding that Sidney Powell's team is

19  preparing, it and I will submit it as I receive it."

20         And then, one last point, while the Supreme Court has

21  the petition for writ pending -- and this case is clearly moot.

22  Everybody agrees today that it's moot.  They agree it was moot

23  in the pleadings they're filing now.

24         On February 4th, Sidney Powell sends out a social

25  media message on Telegram saying -- this February 4th -- "By

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1   the way, assertions that all cases were lost is false.  Our

2   Michigan case in the Supreme Court is scheduled for conference

3   soon."  Signed Sid.  They never dismissed this case.  It was

4   moot from the beginning, as this Court found in its first

5   ruling.  At every stage they'd say, "It will be moot when this

6   happens, it will be moot when that happens," but they kept it

7   going.

8          **THE COURT:**  Final response.  Thank you.

9   Mr. Campbell, I'll give you the last word on that.

10          **MR. KLEINHENDLER:**  Ma'am, I just want to point out

11  something I think is very important.

12          We've raised this precise argument in ECF 112, pages

13  27-30.  I'm just going to read you just to where you can start

14  reading.  "Opposing counsel and Defendants" -- this is page 27

15  of ECF 112 that was in response to ECF 105.

16          "Opposing counsel and Defendants also allege the case

17  was moot and vexatious over the pleadings in the case that this

18  argument based on the event of the Michigan Republican slate of

19  electors voting a dual slate of electors."  We raised this

20  issue square front and center before you.  That's number one.

21          Number two, your Honor, it's not merely that three

22  electors believed subjectively that they were still in the

23  game.  All 16 electors, Michigan electors, which we have

24  nothing to do with, appeared before the capitol.  They weren't

25  allowed in, and they decided to hold a vote.  That is based on

Motion hrg.                              7/12/2021

1   their rights under the Twelfth Amendment, and it figures into

2   what happens in Congress on January 6th when, under the Twelfth

3   Amendment, and even under the ECA, the Electoral Count Act,

4   objections to electors are permitted.  That's what the

5   Constitution says.

6           So, A, it's before you in the briefing; B, it renders

7   this thing not moot.

8           To the last point -- and this is also in the brief

9   before you, your Honor.  Again, this is ECF 112.

10          **THE COURT:**  I understand.

11          **MR. KLEINHENDLER:**  Okay.  Even after January 6th, I'm

12  going to push this, and I'm going to read you the last

13  sentence.  "There is still a nonmootness issue, because the

14  matters that were raised in this lawsuit are likely to be

15  repeated and evading review."  And we cited *Del Monte Fresh*

16  *Produce versus U.S.* 570 F.3d 316, D.C. Circuit, 2009.

17          So, yes, the election was moot.  Mr. Biden was

18  elected.  However, the issues raised in this lawsuit, because

19  they were likely to be repeated and evaded review, could have

20  still been decided by the Supreme Court.

21          Thank you, your Honor.

22          **THE COURT:**  All right.  I'm going to move on.  Thank

23  you.  I'm going to move on to that section looking at legal

24  authority.  I'm going to move on now to the actual evidence

25  that's been submitted in this case.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          The answers, counsel, to the following questions will

2     be assessed to determine whether sanctions under Rule 11,

3     Section 1927 and/or the Court's inherent sanctions authority

4     should be imposed.  Specifically, the questions are structured

5     to determine whether Plaintiffs and/or counsel for Plaintiffs

6     should be sanctioned under Rule 11 for failure to make a

7     reasonable inquiry into fact or law, knowingly asserting a

8     groundless position, or asserting a claim for an improper

9     purpose; secondly, whether counsel for Plaintiffs should be

10    sanctioned under Section 1927 for unreasonable and vexatious

11    behavior that prolonged this litigation; and, three, whether

12    Plaintiffs and/or Plaintiffs' counsel should be sanctioned

13    under the Court's inherent authority for litigation practices

14    undertaken in bad faith through the advancement of claims

15    without merit for an improper purpose.

16          So that's noticed.  Those are the various sources of

17    sanctions, and now I will proceed.

18          And this first question here is for Plaintiffs or

19    Plaintiffs' counsel -- I'm sorry, Plaintiffs' counsel or

20    counsel for Plaintiffs' counsel.

21          Do you believe that a lawyer has a legal obligation

22    to review the plausibility of the facts alleged in the pleading

23    before signing and filing it?

24          Mr. Campbell.

25          **MR. CAMPBELL:**  I believe the answer, on behalf of all

King v Whitmer, Case No. 20-cv-13134

56

Motion hrg.                          7/12/2021

1  my clients, would be yes.

2          THE COURT:  All right.  Let me then ask you as

3  relates to Mr. Russell Ramsland's affidavit.  Before -- I would

4  like to know who read Russell Ramsland's declaration before

5  attaching it to the pleadings in this case and submitting it in

6  support of the motion for TRO?  Who on the team read it?

7          MR. CAMPBELL:  I don't have that information, your

8  Honor.  I --

9          THE COURT:  Okay.  Does anybody have --

10         MR. CAMPBELL:  I know who didn't read it.

11         MR. KLEINHENDLER:  I read it, your Honor.

12         THE COURT:  Wait a minute.  Hang on one second.

13         MR. KLEINHENDLER:  Howard Kleinhendler.  I read it.

14         THE COURT:  Okay.  All right.  So all right.  Are you

15  the only person, Mr. Kleinhendler, that did?  Anyone else?

16         MR. KLEINHENDLER:  I don't know if others reviewed it

17  as well.

18         THE COURT:  Well, I need to know.  That's what this

19  hearing is for.  I need to know.  If you read it before it was

20  attached, raise your hand or speak up.

21         Okay.  Mr. Johnson read it.  When did you read it,

22  sir?  You read it?

23         MR. JOHNSON:  I don't recall when I read it.  I read

24  it before it was filed.

25         THE COURT:  Okay.  And, Mr. Kleinhendler, you read

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  it?

2           **MR. KLEINHENDLER:**  Yes.

3           **THE COURT:**  And, Mr. Rohl, you read it, sir?

4           **MR. ROHL:**  I read it prior to the -- the day of

5  filing I read the entirety of what was sent to me, including

6  that.

7           **THE COURT:**  Okay.

8           **MR. WOOD:**  Your Honor, this is Lin Wood.

9           **THE COURT:**  So the question here is read before it

10  was filed in support of -- before it was filed.

11           **MR. ROHL:**  That's correct.  That is correct, your

12  Honor, the day of.

13           **THE COURT:**  Okay.  All right.  Thank you.

14           **MR. HAGERSTROM:**  Same here.

15           **MR. WOOD:**  Your Honor --

16           **THE COURT:**  I'm sorry, Mr. Wood?

17           **MR. HAGERSTROM:**  Scott Hagerstrom.  I read through --

18  on the day it was filed, I read through --

19           **THE COURT:**  No, no, no.  I'm not asking if you looked

20  at it after it was filed.  The Court's question is --

21           **MR. HAGERSTROM:**  No --

22           **THE COURT:**  -- the Court's question is:  Was it read

23  before --

24           **MR. HAGERSTROM:**  Yes, prior to the filing.

25           **THE COURT:**  Okay.  Mr. Wood, you had your hand up,

Motion hrg.                               7/12/2021

1   sir?

2          **MR. WOOD:**  Thank you, your Honor.  I just want to

3   make a point, which I think I made earlier.  I did not review

4   any of the documents with respect to the complaint.

5          **THE COURT:**  Okay.

6          **MR. WOOD:**  My name was placed on there, but I had no

7   involvement.  So I haven't read -- didn't read the complaint,

8   wasn't aware of the affidavits.  I just had no involvement

9   whatsoever in it.

10          **THE COURT:**  Did you give your permission to have your

11   name included on the pleadings or the briefs, sir?  Mr. Wood,

12   this is directed to you.

13          **MR. WOOD:**  Yes, your Honor.  Let me answer that.  I

14   do not specifically recall being asked about the Michigan

15   complaint, but I had generally indicated to Sidney Powell that

16   if she needed a, quote/unquote, trial lawyer that I would

17   certainly be willing and available to help her.

18          In this case obviously my name was included.  My

19   experience or my skills apparently were never needed so I

20   didn't have any involvement with it.

21          Would I have objected to being included by name?  I

22   don't believe so, but I did not apply for pro hoc vice

23   admission.  I had no intentions.  It's not indicated on the --

24   if you look on the complaint and the amended complaint --

25          **THE COURT:**  All right.  You gave your permission.

Motion hrg.                              7/12/2021

1          **MR. WOOD:**  -- there's no indication.  I'm sorry.

2          **THE COURT:**  You didn't --

3          **MR. WOOD:**  I didn't object to it, but I did not

4    know -- I actually did not know at the time that my name was

5    going to be included, but I certainly told Ms. Powell in

6    discussions that I would help her if she needed me in any of

7    these cases, and in this particular matter apparently I was

8    never needed so I didn't have anything to do with it.

9          **THE COURT:**  Did you read it before it was filed,

10   Mr. Wood, or are you saying you had no knowledge?

11         **MR. WOOD:**  I had no notice.

12         **THE COURT:**  Right.

13         **MR. WOOD:**  I didn't have any involvement in the

14   filing so I did not read it before it was filed.  It was only

15   afterwards when I found out my name was even on there.

16         So I just -- you know, I haven't received a motion

17   for sanctions.  I didn't get served with anything.  I'm just --

18   I'm here because your Honor warned me to be here, but I'm here

19   subject to my defense that I just don't think there's any

20   personal jurisdiction over me because I didn't do anything in

21   Michigan.  I didn't do anything with respect to this lawsuit.

22         **THE COURT:**  But you did --

23         **MR. WOOD:**  I didn't put my name --

24         **THE COURT:**  -- but you gave a general --

25         **MR. WOOD:**  No, I didn't --

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1        **THE COURT:**  Hold on.  So that I can properly

2   characterize your testimony.  You gave general permission to

3   Ms. Powell to use your name on any pleading that -- what?

4   Finish that sentence or restate it if I'm wrong.

5        **MR. WOOD:**  I didn't give permission for my name

6   specifically to be on any pleading.  I told Sidney, when she

7   asked, if she needed my help, I would help her from a trial

8   lawyer standpoint.  That's it.

9        **THE COURT:**  Okay.  So you were not -- were you

10  surprised to see that your name was included?

11       **MR. WOOD:**  When I found out it was included, your

12  Honor --

13       **THE COURT:**  That was my next question --

14       **MR. WOOD:**  I guess I was --

15       **THE COURT:**  Yeah, when did you find out?

16       **MR. WOOD:**  I don't -- it would have been sometime

17  well after the filing.  I didn't follow the litigation.

18       I think I first became aware that my name -- I know

19  that I was away when I saw an article in the newspaper about

20  this motion for sanctions being filed, and I was trying to

21  figure out why I was named in it and I didn't receive a copy of

22  the sanctions.  I looked.  I was on the pleadings, but only on

23  the complaint and the amended complaint.  On the subsequent

24  filings that were made with respect to the injunction, my name

25  doesn't even appear.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                   7/12/2021

1           So I'm only saying that I'm assuming that

2   Sidney Powell knew that I would help her.  For whatever reason,

3   whoever was drafting the complaint put my name only there, but,

4   your Honor, I just didn't have anything to do with this so I --

5   I didn't read anything.

6           **THE COURT:**  All right.

7           **MR. WOOD:**  I wasn't asked to read anything and so I

8   didn't specifically say, "Hey, put my name on there.  I want to

9   endorse this lawsuit."  I just, in general, told Ms. Powell,

10  and I think she'll affirm this, that I was there to help her

11  from a trial lawyer standpoint.  On that matter or any other

12  matter, I don't -- I didn't have any specific involvement in

13  it.

14          **THE COURT:**  All right.  Let me --

15          **MS. HALLER:**  Your Honor --

16          **MR. DAVID FINK:**  Your Honor --

17          **THE COURT:**  Hang on.  One moment.  Hang on for one

18  moment.  Ms. Haller, can you hang on for one moment, please.

19          Mr. Fink, you may be heard.

20          **MR. DAVID FINK:**  Yes, if I may, your Honor.  Mr. Wood

21  just indicated that he did not know about the sanctions motion.

22  Mr. Wood was served with our December 15th notice and

23  opportunity to withdraw the pleadings and through the Safe

24  Harbor provision.  He was served by e-mail and he was served by

25  first class mail using the addresses provided in the pleadings,

Motion hrg.                                    7/12/2021

1 and the other representation by him is blatantly false.

2          I also would indicate that Mr. Wood in Delaware

3 Circuit Court -- in Delaware court trying to defend against a

4 claim brought there --

5          **MR. CAMPBELL:**  Your Honor, I'm going to object --

6          **THE COURT:**  Hang on.  No, no, no.  Excuse me.

7          Excuse me, Mr. Campbell.  Please.  Please.  I will

8 handle this.  I am going to give everyone who I need to hear

9 from an opportunity to speak.

10         You may proceed, Mr. Fink.

11         **MR. DAVID FINK:**  Thank you.  In Delaware, Mr. Wood,

12 attempting to burnish his credentials in some way, explicitly

13 made the representation to the superior court that he was, in

14 fact, in the words of that case, "Among those cases in which

15 Wood became involved were lawsuits in Wisconsin, Michigan, and

16 Wood's own suit in the state of Georgia."  This is the case in

17 Michigan.

18         So he's ready to tell people when it helps him that

19 he's involved in this case.  He also broadcast on social media

20 regularly his participation and his advancement and endorsement

21 of this.  That said, most importantly and most relevantly here,

22 he could at any time have withdrawn the pleading or withdrawn

23 his participation.

24         We didn't want -- we didn't choose to give them a

25 chance to back out.  We did it because the court rule required

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                  7/12/2021

1    it.  The court rule said we couldn't seek Rule 11 sanctions if

2    we didn't give them notice and an opportunity to withdraw their

3    allegations.  We did it.  He had the notice, and he didn't

4    withdraw the allegations.  Thank you.

5             **THE COURT:**  All right.  Thank you, Ms. Haller --

6             **MR. WOOD:**  Your Honor --

7             **THE COURT:**  Hang on, please.

8             **MR. WOOD:**  Your Honor, may I be permitted --

9             **MS. HALLER:**  (Indiscernible.)

10            **THE COURT:**  Mr. Wood, hang on, sir.  I'm going to let

11   you speak momentarily, and I see that Ms. Wabeke, our court

12   reporter, and we all know, is legitimately concerned.  So one

13   at a time, and I will come right back to you, but I want to go

14   to Ms. Haller because I said that I would.  So please go ahead.

15            **MS. HALLER:**  Thank you, your Honor.  I just wanted to

16   clarify that I was one the reviewers of Russ -- Russ Ramsland's

17   affidavit in the complaint that we filed.  I couldn't remember

18   if I had, but I do recall I did.

19            **THE COURT:**  Okay.  All right.  And so you -- and you

20   actually -- you reviewed it before it was filed, counselor?

21            **MS. HALLER:**  Yes, your Honor.

22            **THE COURT:**  All right.  Very well.  And let me do a

23   housekeeping piece right here because I want to hear -- but I

24   need everyone to raise your hand and I can see you, and we'll

25   take it in that order.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          Mr. Wood, you may respond to what Mr. Fink has said.

2          **MR. WOOD:**  Thank you, your Honor.  I was not afforded

3    any type of a hearing on the Delaware proceedings.  I didn't

4    take any position.  I didn't have an opportunity to.  That

5    matter is on appeal now to the Supreme Court of Delaware based

6    on the trial court's lack of authority to sua sponte issue a

7    ruling (indiscernible) with respect to disciplinary matters and

8    failure to have any type of a hearing.  So I'm not sure what

9    he's referring to there.

10         What I have said, I'm involved -- well, I'm involved.

11   My name showed up so I can't say I'm not involved generally,

12   but, again, I have to tell you, your Honor, I didn't receive

13   any notice about this until I saw something in the newspaper

14   about being sanctioned.  So I disagree with Mr. Fink.

15         **THE COURT:**  Okay.  Well, that can be fleshed out.

16   That can be fleshed out.

17         **MR. WOOD:**  Sure.

18         **THE COURT:**  I'm going to move on at this point.

19         **MR. WOOD:**  Because --

20         **THE COURT:**  Yes, sir.

21         **MR. WOOD:**  Let me say, because if I had been, I would

22   have obviously had a duty to consider whether or not to

23   withdraw, but I can't withdraw from something I've never asked

24   to be a part of.  I never moved to be admitted to this court,

25   to in any way be involved as counsel of record.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **THE COURT:** Did you feel that you had a duty --

2          **MR. WOOD:** So I just don't think that --

3          **THE COURT:** Did you feel you had a duty --

4          **MR. WOOD:** (Indiscernible.)

5          **THE COURT:** Did you feel, Mr. Wood, you needed to

6    notify this Court of that?

7          **MR. WOOD:** Notify --

8          **THE COURT:** I don't know, I mean, that, you know,

9    that your name was used and you're not really sure, you know,

10   you hadn't given full permission for that --

11         **MR. WOOD:** I --

12         **THE COURT:** -- any kind of notification to the Court

13   and saying this seems to be a --

14         **MR. WOOD:** (Indiscernible.)

15         **THE COURT:** This appears to the Court to be an

16   after-the-fact assessment.

17         **MR. WOOD:** Well, I just don't understand that at all.

18   If the Court -- if the Court knew from the Court's record that

19   I had never moved to be admitted pro hoc vice.  So you knew,

20   the Court knew that I was not of record in this case so why

21   would I have a duty to tell the Court what you already knew?

22         Now --

23         **THE COURT:** We don't even --

24         **MR. WOOD:** Listen, I don't know anything --

25         **THE COURT:** -- have pro hoc vice status.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          **MR. WOOD:**  So you have --

2          **THE COURT:**  Excuse me.  We do not even have pro hoc

3   vice status here in Michigan.  So everybody -- you know, I mean

4   there's an assumption, certainly, that I am able to make, that

5   when you come into the Eastern District of Michigan, you

6   familiarize yourself with the local rules.

7          **MR. WOOD:**  I didn't (indiscernible) --

8          **THE COURT:**  So there's no responsibility --

9          **MR. WOOD:**  I didn't --

10          **THE COURT:**  -- that the Court has to do that.

11          **MR. WOOD:**  I didn't come into the district.  My name

12   was placed on a pleading.  You seem to assume that I said,

13   "Hey, I want to be part of the Michigan case."  I've made it

14   clear that that's not what happened factually.

15          **THE COURT:**  Okay.

16          **MR. WOOD:**  And that factual presentation is

17   undisputed.

18          **THE COURT:**  Okay.  Well, I don't believe it's

19   undisputed, and, certainly when you put your name --

20          **MR. WOOD:**  Who's disputing it, your Honor?  Who's

21   disputing it?

22          **THE COURT:**  Mr. Fink has --

23          **MR. WOOD:**  Who's disputing?

24          **THE COURT:**  -- disputed it.  Have you been tracking

25   with Mr. Fink?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1        **MR. WOOD:**  He hasn't -- Mr. Fink only knows that my

2  name appeared on the pleading.  He doesn't know how it got

3  there.

4        **THE COURT:**  Okay.

5        **MR. WOOD:**  So he has no basis to dispute what I'm

6  saying about the conversation --

7        **COURT REPORTER:**  Excuse me.

8        **MR. WOOD:**  He understands --

9        **COURT REPORTER:**  Excuse me.

10        **MR. WOOD:**  -- that I have --

11        **COURT REPORTER:**  Excuse me.  I'm sorry, Judge, I'm

12  going to have to say that please stop interrupting.  It's hard

13  enough on a Zoom hearing, let alone in open court when we are

14  live, so please stop.

15        **THE COURT:**  Thank you, Ms. Wabeke.  Absolutely,

16  absolutely.  So, counsel, here are the rules again.  One at a

17  time.  Let the court recognize you to speak after you've raised

18  your hands.

19        Mr. Fink, you may speak.

20        **MR. DAVID FINK:**  Thank you, your Honor.  To be clear,

21  Mr. Wood indicates what I do and do not know.  What I do know

22  and what we put on this record is the following:  One, we

23  served him with a Rule 11 notice.  Now, he should have known

24  already before that because it was not only public, but I think

25  we have social media comments from him, but that's irrelevant.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1    That's not necessary today.

2              On December 15th we e-mailed him, and it did not come

3    back to us.   Then we sent first class mail to us [sic.] that

4    did not come back to us in which we notified him of the

5    potential Rule 11 filing.   It also ended up in the

6    Twitter-verse, if you will.   It became public, and,

7    interestingly, it became public not because of anything we did.

8    But, rather, because another attorney, Mark Elias, who saw our

9    notice, which was not filed with the court but only sent to the

10   parties, Mr. Elias Tweeted that notice out, and, after he did

11   that, Mr. Wood posted a Tweet saying something about he knew --

12   "You know you're over the target when you're in the sights of

13   David Fink," or something like that.

14             The point is, he knew.   He even commented publicly.

15   Equally importantly, today he's representing to this Court that

16   he did not participate in -- I think that's what I heard him

17   say -- that he had no chance to respond in Delaware.   In fact,

18   we offered, and, understandably, it wasn't at that point

19   something the Court felt was pertinent or relevant, but we

20   offered, as a potential supplemental brief with an attachment,

21   the opening brief of Ronald Poliquin, an attorney purporting to

22   represent Lin Wood in the Supreme Court of the State of

23   Delaware and filed on May 5th, 2021, and that is the document

24   in which his attorney said, "Among those cases in which Wood

25   became involved were lawsuits in Wisconsin, Michigan, and

              King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   Wood's own suit."  I didn't make this stuff up.

2           **THE COURT:**  Thank you, Mr. Fink, and I would -- I'm

3   going to ask a question to Ms. Powell, and my question,

4   Ms. Powell, to you is:  Did you -- did you have an opportunity

5   to speak to Mr. Wood?  Let me -- let me restate this.

6           Did you ever at any point tell Mr. Wood you were

7   going to place his name on the pleading?

8           **MS. POWELL:**  My view, your Honor, is that I did

9   specifically ask Mr. Wood for his permission.  I can't imagine

10  that I would have put his name on any pleading without

11  understanding that he had given me permission to do that.

12  Might there have been a misunderstanding?  That's certainly

13  possible.

14          **THE COURT:**  All right.  And, Mr. Kleinhendler, sir,

15  one specific question to you, yes or no:  Did you have an

16  opportunity to speak to Mr. Wood before you placed his name on

17  the pleading?

18          **MR. KLEINHENDLER:**  Honestly, your Honor, I don't

19  recall.

20          **THE COURT:**  Okay.

21          **MR. KLEINHENDLER:**  I don't recall.  Sorry.

22          **THE COURT:**  All right.

23          **MR. BUCHANAN:**  Your Honor?

24          **THE COURT:**  Yes, Mr. Buchanan.

25          **MR. BUCHANAN:**  Thank you, your Honor.  I just wanted

Motion hrg.                            7/12/2021

1    to respond to your question about who had a role in the

2    affidavit of a witness in question that you mentioned, and my

3    client doesn't recall specifically when she looked at this

4    affidavit.  She said she saw it at some point, but, again, she

5    was working at home doing basic editing, research, and so, you

6    know, she didn't have any role in terms of investigating or

7    doing due diligence on these particular affidavits.  She's not

8    saying they're accurate or inaccurate, but her role was more

9    limited.

10           **THE COURT:**  All right.  Let me move on in terms of

11   experts, those affidavits that have been submitted, and my

12   questions are going to pertain to who spoke with these

13   individuals for purposes of understanding the source of their

14   facts that they were referenced in the affidavit and basis for

15   their conclusions.  Who spoke to these experts before

16   submitting their reports as evidence?  Dealing with expert

17   reports.

18           So let me start with Joshua Merritt.  Who spoke with

19   him for purposes of determining the source of his facts and the

20   basis for his conclusions before submitting?

21           And if there is counsel here who doesn't know the

22   answer to that question because they had no involvement in it,

23   because they didn't speak, please raise your hand.  If you are

24   not -- if you were not an individual who spoke in advance to

25   Joshua Merritt about the source of his facts and the basis for

Motion hrg.                                   7/12/2021

1   his conclusion in the report that he provided, raise your hand

2   if you weren't involved with it.

3            Okay.  So I'm going -- okay.  Let me name the

4   individuals because I want to -- please keep your hand up.

5            **MR. WOOD:**  Your Honor, could you restate the

6   question, please?

7            **THE COURT:**  The question -- yes, I will.  The

8   question -- as relates to the affidavit that was submitted by

9   Joshua Merritt, my question is:  Who spoke to him in advance

10  before including his affidavit to the complaint?  You know, did

11  you speak to him for purposes of determining the source of his

12  facts around the basis of his conclusions?  Who on this call

13  had that type of conversation with Mr. Merritt?

14           **MR. JOHNSON:**  Your Honor, perhaps --

15           **THE COURT:**  No, no.  Go ahead, Mr. Johnson.  Let me

16  just do this:  Raise your hand if you had the conversation with

17  him, if anybody spoke with Joshua Merritt in advance of the

18  submission of his affidavit.

19           So right now we have Mr. Kleinhendler.

20           Mr. Johnson, did you have your hand up for that?

21           **MR. JOHNSON:**  I had my hand up that I did not speak

22  with him or, for that matter, with any of the experts.

23           **THE COURT:**  Okay.  Okay.  We'll make a note of that.

24           But, Mr. Kleinhendler, you spoke with him before the

25  affidavit was submitted, Joshua Merritt; is that true?

                    King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          **MR. KLEINHENDLER:**  Yes.

2          **THE COURT:**  All right.  And did you have an

3  opportunity to speak to him about the source of his facts?

4          **MR. KLEINHENDLER:**  Your Honor, he was recommended to

5  us.  As there are certain things I cannot disclose,

6  unfortunately, in public about his sources, about his

7  qualifications, and the reason for that is he has worked as an

8  undercover confidential informant for multiple federal law

9  enforcement and intelligence services.  It's beyond merely what

10  is stated briefly in his declaration.

11          He did -- he did tell me what those -- you know, what

12  the basis is, what type of experience he had, and, based on

13  that, looking at what he had presented, with the detail, with

14  the URLs that he had cited, with the vulnerability to the

15  Dominion pass codes that were available to be hacked on what

16  they call the dark web, it was my honest belief that what he

17  was saying was correct.

18          I will take the opportunity, your Honor, to point out

19  that the one area in his affidavit that has come into dispute

20  was his role in the 305th military intelligence.  At the time

21  it was my understanding that he had spent a reasonable amount

22  of time with that unit.  Subsequently -- subsequently I did

23  learn that he did train with them, your Honor.  He trained with

24  the unit.  I think it's called Fort Huachuca.  I can't remember

25  the exact one.  However, he subsequently was transferred out of

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1  there.

 2          However, I point out to you that that -- that one

 3  point is minor and practically irrelevant because the basis of

 4  his expert opinion and his factual opinion are based on, and

 5  I'm happy to talk to you in camera and give you more detail of

 6  his years and years of experience in cyber security as a

 7  confidential informant working for the United States

 8  Government.

 9          **THE COURT:**  Did you feel that it was -- did you make

10  that correction to the Court at any time?  I'm not aware of it.

11          **MR. KLEINHENDLER:**  I didn't have the time because

12  when I first learned of it, your Honor, when I first learned of

13  it, it was after all the cases had been decided and dismissed

14  and then we withdraw.  We never made a further representation

15  to this Court, an argument to this Court about his

16  qualification in that regard, and, technically, your Honor --

17  technically, your Honor, the statement is not false.  He

18  trained with the 305th.  Okay.  It's not technically false.

19  However, had I known in advance that he had transferred out, I

20  would have made that clear, but I didn't.  I had no reason to

21  doubt.

22          **THE COURT:**  Thank you, Mr. Kleinhendler.

23          Hang on a second.

24          Mr. Campbell, why do you have your hand up, sir?

25          **MR. CAMPBELL:**  Because I wanted to let you know,

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   Judge, if your questions tread into the area that you have

2   acknowledged you're going to avoid, which is the area of work

3   product or privilege, I will -- I'm asking the Court permission

4   to be able to interrupt then with objections that are direct

5   and express on that.  Hopefully your questions don't get there,

6   but I wanted to make sure that I was within your protocol to do

7   so.

8            **THE COURT:**  All right.  You may raise your hand.

9   Anyone who wants to address the Court, please raise your hand.

10           Mr. Fink.

11           **MR. DAVID FINK:**  Yes.  I just want to speak to the

12   comments regarding Mr. Merritt, and as most people know --

13           **THE COURT:**  Okay.  Mr. Fink, let me do this, sir.

14   I'm going to give you and Defense counsel an opportunity to --

15   after I have asked a couple of more questions about a couple of

16   additional purported experts, I'm going to give you a chance to

17   follow up on that.  If I could just understand -- get the lay

18   of the land in terms of these experts.

19           So let me proceed.

20           And I'd like to ask about Mr. Matthew Braynard, and

21   I'd like to know who reviewed his affidavit and who spoke to

22   him in relation to what was attached, in relation to the

23   statements in his affidavit.

24           Ms. Julia Haller, you have your hand up?

25           **MS. HALLER:**  Yes.  May I clarify, your Honor?

Motion hrg.                                    7/12/2021

1           THE COURT:  Yes.

2           MS. HALLER:  Matt Braynard had data that we cited to

3   through our expert, William Briggs, who is also known as Matt.

4   So William "Matt" Briggs cited to Matt Braynard.  Matt Braynard

5   had information, and we did communicate with Matt Braynard to

6   the extent that we could.  He had an agreement with a different

7   attorney so our communications were more limited, and I do not

8   feel comfortable discussing all the attorney work product

9   that's involved in my communications, but I will say there were

10  communications.

11          THE COURT:  Okay.  Anyone else speak to Mr. Braynard?

12          All right.  How about Mr. Briggs, William Briggs?

13  Who, as has been said, he did seem to be one who interpreted or

14  provided analysis about the materials that Mr. Braynard

15  submitted.

16          Yes, Ms. Haller.

17          MS. HALLER:  Yes, your Honor.

18          THE COURT:  Did you speak with Mr. Briggs?

19          MS. HALLER:  Yes, your Honor.  I communicated with

20  William Briggs -- Dr. Briggs.  Yes, I communicated with

21  Dr. Briggs.

22          THE COURT:  All right.  And you were able to speak to

23  him about the source of his facts?

24          MS. HALLER:  Your Honor, everything's documented in

25  his report, including his source and information, and we

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                           7/12/2021

1   addressed this in 112, as well as in our other oppositions,

2   that we thoroughly had vetted and gone over with the

3   information that's cited in Dr. Briggs' report, yes.

4            **THE COURT:**  All right.  I don't know that that's

5   clearly stated, but we'll revisit that.

6            **MS. HALLER:**  Thank you, your Honor.

7            **THE COURT:**  How about Mr. Watkins?  Who reviewed the

8   affidavit of Ronald Watkins and did anyone speak to him?

9   Please raise your hand.

10           **MS. HALLER:**  Your Honor, I can qualify that I have

11  spoken to Mr. Watkins.  I do not know at what point in time

12  exactly, but I have communicated with Mr. Watkins about his

13  reports.

14           **THE COURT:**  All right.  And you've spoken to him

15  about his sources as well?

16           **MS. HALLER:**  Yes, your Honor.

17           **THE COURT:**  And the basis for his conclusions?

18           **MS. HALLER:**  Yes, your Honor.

19           **THE COURT:**  All right.  And how about -- all right.

20  So we did -- we talked about Mr. James Ramsland already, and,

21  Ms. Haller, you said that you did in fact -- what did you say?

22  You said that you reviewed it, his affidavit?

23           **MS. HALLER:**  Yes, your Honor.

24           **THE COURT:**  And you spoke with him?

25           **MS. HALLER:**  No, your Honor, I did not.

Motion hrg.                              7/12/2021

1          **THE COURT:**  You did not speak with him?

2          **MS. HALLER:**  I did review the filing -- I mean the

3    report, but I have not communicated with him, no.

4          **THE COURT:**  All right.  Did anybody on the -- speak

5    with Mr. Ramsland?

6          Mr. Kleinhendler, go ahead, sir.

7          **MR. KLEINHENDLER:**  Yes, your Honor.  Not only did I

8    speak with him, about ten days or so before the complaint, I

9    met with him.

10         **THE COURT:**  Okay.

11         **MR. KLEINHENDLER:**  I spoke with him often I reviewed

12   drafts of his report.  I asked him clearly, "Are you

13   comfortable making these allegations?  Are you comfortable with

14   the language in the affidavit?  What are your sources?  Who

15   else has assisted you?"

16         Because he writes an affidavit that he lists ASOG

17   (ph.)  He spoke -- he briefly described some of the folks that

18   were working with him, and he submitted, your Honor, two

19   reports, an initial report and then a rebuttal -- the initial

20   was an affidavit sworn, his sworn testimony, and the rebuttal

21   was more of a 26(b) rebuttal report.

22         I worked with him on a rebuttal report after

23   analyzing and reviewing what the Defendants and the Intervenor

24   Defendants had placed before the Court, and I was involved with

25   that.  And, yes, I spoke with him, and I was comfortable, your

Motion hrg.                                    7/12/2021

1   Honor, that what we were putting before the Court was true and

2   correct.

3          **THE COURT:**  All right.  Thank you.

4          **MR. BUCHANAN:**  Your Honor, this is Mr. Buchanan.  I

5   just wanted to clarify something.  My client, Ms. Newman, did

6   communicate with Mr. Ramsland on a limited basis.

7          **THE COURT:**  For what purpose?

8          **MR. BUCHANAN:**  I think, you know, she was talking to

9   him about his affidavit in general, but, again, she was more of

10  a -- someone that was doing editing and, you know, trying to

11  gather the affidavits, including this particular one, but it

12  wasn't a substantive conversation where she was doing due

13  diligence on all the background.  She asked some questions, but

14  it was limited conversation.

15         **THE COURT:**  All right.  Thank you.  All right.  I

16  have concluded --

17         **MR. CAMPBELL:**  Your Honor, Ms. Powell has her hand

18  raised.

19         **THE COURT:**  Oh, thank you.  Ms. Powell.

20         **MS. POWELL:**  Yes, I just wanted to make clear that I

21  have spoken with Mr. Ramsland a number of times.

22         **THE COURT:**  Okay.

23         **MS. POWELL:**  I cannot say whether it was before the

24  filing or after, and I can't remember when I reviewed his

25  affidavit, whether it was before or after.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1        **THE COURT:**  Okay.  All right.  Let me -- as relates

2   to this section of presuit investigation and these particular

3   experts, does counsel for the Defendants or the Defendant

4   Intervenors or Plaintiffs' counsel wish to say anything related

5   to the questions or the answers that I've received with that

6   section?

7        **MR. DAVID FINK:**  I would.

8        **THE COURT:**  All right.  Raise your hand if you'd like

9   to be heard.

10       Okay.  We're going to only hear from Mr. Fink.

11       Go ahead.

12       **MR. DAVID FINK:**  Thank you, your Honor.  I will not

13  go into the detail, nor do I think I need to, of what our

14  concerns were with all of these affidavits.  That's laid out

15  pretty clearly in our briefing.  What I do want to first do is

16  respond to something quite disturbing that Mr. Kleinhendler

17  said.

18       He said that he couldn't have known while the case

19  was pending, didn't learn until later, during the sanctions

20  process, about the issues related to the Merritt affidavit.

21       And, by the way, we're calling it the Merritt

22  affidavit, but of course this is the one that's identified as

23  Spider, in what was attempted to be an anonymous presentation

24  in redacted documents, which were so poorly redacted that we

25  found out the name.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1            But here's what's important for the Court to know.

2    We attach as Exhibit 17 to our brief in support of sanctions a

3    *Washington Post* article that details all of the issues

4    regarding Mr. Merritt.  Now, the reason that's so important is

5    not the accuracy of that article, but, rather, that article put

6    the world on notice on December 11th of 2020 -- *Washington Post*

7    let the world know that this man was not a military

8    intelligence expert.  He washed out of training.  That he,

9    himself, disavowed participation in the case.

10           All of that was in that article, and if that did not

11   put counsel on some kind of inquiry notice so they should have

12   exercised some due diligence at that point and advised the

13   Court that they had, apparently unintentionally they're saying,

14   made a major misrepresentation to the Court, I don't know what

15   could have put them on notice.  They were on notice.

16           Now, the experts that we're talking about now, the

17   Court correctly asks the question, "Did you talk to those

18   experts?"  I would simply add one more thing, which is very

19   relevant, which is talking to those experts or not, just

20   reading those reports, if they were properly vetted, would have

21   immediately told any diligent attorney that the reports were

22   desperately flawed, and I'll be very specific.  For example, we

23   heard about the concerns about -- that Mr. Ramsland raised

24   about Antrim County and the Dominion machines.  What's

25   important --

Motion hrg.                                    7/12/2021

1        **THE COURT:**  Okay.  Mr. Fink, wait a minute.  Hang on.

2   I want to stop you because I am going to cover some of that,

3   and we can -- and, you know, why don't we stop there because I

4   have some additional questions.  Of course, I'm going to let

5   everyone be heard, okay?

6        **MR. KLEINHENDLER:**  Your Honor, can I respond to

7   Mr. Fink just on Mr. Merritt?

8        **THE COURT:**  Yes.

9        **MR. KLEINHENDLER:**  Okay.  Your Honor, I learned of

10  the issues when I saw the *Washington Post* article.

11       **THE COURT:**  Okay.

12       **MR. KLEINHENDLER:**  I can tell you that many of the

13  allegations in the *Washington Post* article are false, and I

14  want to make this very clear to the Court and all counsel.  I

15  spoke with Mr. Merritt Sunday.  He is prepared to appear before

16  your Honor and discuss his qualifications and discuss, in

17  detail, his findings.  That may require a closed session for

18  part of it.  We'll let you decide.  But I want to make it clear

19  to everyone that he is prepared to come here and testify and

20  put his qualifications and his opinions to the test.  We have

21  asked in our pleadings for an evidentiary hearing.

22       Mr. Fink wants to wave around a *Washington Post*

23  article.  He can do that.  Mr. Merritt is ready to come to

24  court and put to bed any issues regarding his qualifications

25  and regarding his testimony.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1        **MR. DAVID FINK:**  Your Honor, the only point I'm

2   making is, not whether this man is or isn't qualified, that

3   Mr. Kleinhendler has told us he learned that they made a

4   misrepresentation, whether intentional or otherwise, regarding

5   his qualifications, and he never advised the Court.  Yes, there

6   might be things in that article that aren't true.  I don't

7   know, but I know he was put on inquiry notice.  He apparently

8   did some investigation and did not notify the parties or the

9   Court.  That's --

10       **THE COURT:**  Your response to that, Mr. Kleinhendler?

11       **MR. KLEINHENDLER:**  My response to that, your Honor,

12  is when I learned of it, number one, it took awhile to contact

13  Mr. Merritt; number two, there was no further proceedings

14  before the Court.  Your Honor had already ruled on December 8th

15  that it had no subject matter jurisdiction, no standing, a

16  whole laundry list.  There was never -- there was never a

17  further opportunity, or, in my view, a reason to make a

18  correction in a case that had already been decided, and,

19  again --

20       **THE COURT:**  And it was on appeal?

21       **MR. KLEINHENDLER:**  Your Honor?

22       **THE COURT:**  And that was on appeal?

23       **MR. KLEINHENDLER:**  It was on appeal, but I want to

24  make the point.  What he said is technically not wrong.  He did

25  spend, from my understanding, seven months training with the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                            7/12/2021

1  305th.  Now, it may not be the full story, but I disagree with

2  the characterization that it's inaccurate, it's not true.

3          **THE COURT:**  All right.  Okay.  All right.  Thank you.

4      I have some follow-up questions about the affidavit

5  of Mr. Merritt, and the first one is:  Why was his affidavit

6  filed using a pseudonym?

7      Are you the person that can answer that question,

8  Mr. Kleinhendler?

9          **MR. KLEINHENDLER:**  Yes.  Your Honor, as we pointed

10  out -- okay, your Honor, as we pointed out, and I have it

11  here -- hold on.

12      This motion is a motion to seal.  This is ECF 50 --

13  okay, your Honor -- and this is his affidavit that he gave us

14  explaining it.  "He had worked in the areas that have made him

15  a known target, has had death threats and a price put on his

16  head by terrorist organizations.  For the safety of myself and

17  my family, I've requested to remain redacted.  I found

18  listening devices in my home and have had attempts on myself,"

19  meaning he had been tried to be killed.

20      Next paragraph, "Because of work I have done as a

21  confidential human source, confidential informant, as well as

22  work investigating spies across the globe, my identity is

23  redacted, not work which I have just done here in America, but

24  work with foreign nations."

25      Final paragraph, "I request that these extreme cases

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                      7/12/2021

1   be taken into consideration for my personal safety, my family's

2   safety, the safety of sources I have worked with.  I

3   respectfully request my persona remain redacted."

4          Those are the reasons I submitted the redaction.

5          **THE COURT:**  Thank you.  Next question:  Whose

6   decision was it to identify this individual as a former U.S.

7   military intelligence expert?

8          **MR. KLEINHENDLER:**  Your Honor, he drafted his

9   affidavit.  No one corrected that sentence.  That came directly

10  from him.

11         **THE COURT:**  Okay.  All right.  Anyone else have an

12  answer to that?

13         All right.  Let the record reflect that no one has

14  said that they do.

15         At any point, next question, during the course of

16  this litigation did anyone ask any of the attorneys or suggest

17  that Merritt was not a military intelligence expert?

18         **MS. HALLER:**  No.

19         **THE COURT:**  And that's Ms. Powell is saying no?  I'm

20  sorry who said, "No"?

21         **MS. HALLER:**  Excuse me, your Honor.  Julia Haller,

22  no.

23         **THE COURT:**  All right.  Mr. Kleinhendler, did anyone

24  ask you?

25         **MR. KLEINHENDLER:**  No, your Honor.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                   7/12/2021

1           **THE COURT:**  Okay.  Ms. Powell, I wanted to direct my

2    next question to you, and did anyone ask you if, or suggest to

3    you that, he was not a military intelligence expert?

4           **MS. POWELL:**  No, your Honor.

5           **THE COURT:**  Thank you.  And my next question for

6    Plaintiffs' counsel or counsel for Plaintiffs' counsel:  Should

7    an attorney be sanctioned for his or her failure to correct or

8    withdraw allegations that the attorney comes to know or came to

9    know are untrue?  Is this sanctionable behavior?

10          Mr. Campbell, I'll hear from you.

11          **MR. CAMPBELL:**  Again, it's going to depend on the

12   circumstances.  As the circumstances exist here, the answer

13   would be no.  One, because of the statements that you've just

14   heard.  There's an issue as to whether or not he correctly

15   identified himself.  Nobody knew that to be wrong.

16          Secondly, with the information, you've heard the

17   explanation.  It's not an inaccurate statement, although, as

18   Mr. Kleinhendler had said, he would have expanded upon that.

19   That's not the difference between being false, as Mr. Fink

20   accuses, and not.

21          So on this circumstance, with an affidavit that this

22   Court, again, did not reach the merits of, there was no *Daubert*

23   motion, there was no consideration of any of his information,

24   because this Court found that it was moot, found that there was

25   lack of standing and all these other issues, never reached the

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1   affidavits.

 2         Certainly, these lawyers, who, within I think it's

 3   four days of this Court's order in ECF number 7, I think, are

 4   in the United States Supreme Court, not just on this case but

 5   on three others, that somehow, some way this clarification or

 6   further explanation that Mr. Kleinhendler clearly says he would

 7   have provided if there was a means and a basis to do so or if

 8   he had noted originally, is that what would qualify for what

 9   the Court's asked?  The answer I think is, resoundingly, no.

10         **THE COURT:**  Did Mr. Merritt draft the affidavit on

11   his own with no assistance from counsel?

12         **MR. KLEINHENDLER:**  Yes, your Honor.  I got the

13   affidavit fully drafted.

14         **MS. HALLER:**  Your Honor, we can bring him forward to

15   testify.  We know that this is a qualification question, which

16   is appropriate on a *Daubert* motion.  We do not believe it is

17   grounds related to a sanctions motion when we have not had an

18   evidentiary hearing.  We've not had discovery.  We've not had

19   an opportunity to make this witness available.

20         So, again, as Mr. Kleinhendler pointed out, we would

21   like an evidentiary hearing.  We will bring forward our

22   witnesses.  We will have *Daubert* motions addressed because

23   Plaintiffs are capable of making them.  The same attorney made

24   motions in other courts with *Daubert* motions.  So we can

25   address the questions of qualification at that time as your

            King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1  Honor would like.

2          **THE COURT:**  Yeah.  All right.  We'll --

3          **MR. CAMPBELL:**  So the court is aware the record is

4  clear.

5          **THE COURT:**  I will make those --

6          **MR. CAMPBELL:**  If I may, briefly.

7          The request for an evidentiary hearing is not new,

8  your Honor.  It's been in the pleadings as well.  I know it's

9  in ECF 112, and it's in other places.  We have offered that to

10 the Court, my clients have, repeatedly.  There's been no

11 acceptance by the Defendants' at all.

12         **THE COURT:**  All right.  Let me ask what steps were

13 taken to investigate the expertise of Matthew Braynard, and I

14 specifically just need to know: Who reviewed his affidavit

15 prior to submission and who spoke with him?

16         **MS. HALLER:**  Your Honor, I have represented to this

17 Court, and I repeat what I stated earlier --

18         **THE COURT:**  Okay.  You did speak to Braynard.

19         **MS. HALLER:**  Indicated we communicated, including me,

20 personally communicated with Mr. Braynard.  I cannot give you

21 the times and the dates specifically at this moment, but I can

22 tell you that there were communications, more than one, with

23 Mr. Braynard.

24         **THE COURT:**  Okay.  Anyone else?  All right.

25         Now, let me move on.  I want to talk of more about

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   some of the -- the content, more about the content of the

2   reports that have been submitted.  I want to talk about,

3   specifically, about the Briggs -- Mr. Briggs' survey, which was

4   based on -- I'm sorry, looking at his analysis, which was based

5   on data provided by Matthew Braynard.

6           My question is:  What kind of survey did Mr. Braynard

7   conduct?  Who can answer that question?

8           **MS. HALLER:**  Dr. Briggs, your Honor, his name is

9   Dr. William Briggs, Ph.D., Cornell professor, made his report

10  and all the work underlying it, available to this Court for

11  free.  He was not charging for what he provided, and he can

12  also testify.  He will also make --

13          **THE COURT:**  I'm just asking.  Hang on.  Hang on.

14          I just want to know, after having reviewed the

15  various documents related to Matthew Braynard's

16  interpretation -- no, I'm sorry it's Dr. Briggs'

17  interpretation.

18          **MS. HALLER:**  Yes, your Honor.

19          **THE COURT:**  Sorry.  Of Matthew Braynard's survey.  My

20  question is -- it's not clear to me what type of survey

21  Mr. Braynard conducted.  What is it?

22          **MS. HALLER:**  Dr. Briggs is a statistician who, to a

23  reasonable degree of professional certainty, would be

24  anticipated to testify in accordance with the survey provided

25  as an exhibit to the complaint.  As this case has not yet

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   gotten to evidentiary proceedings or *Daubert* motions, we can

2   address this and make him available.  Dr. William M. Briggs,

3   Ph.D., can be available --

4           **THE COURT:**  I understand what his credentials are.

5           **MS. HALLER:**  Well, your Honor, I'm just trying to

6   make it clear that he would be anticipated to testify in

7   accordance with the report that was attached to the complaint.

8           **THE COURT:**  Okay.  Counsel for the City, question for

9   you, Mr. Fink:  What would be the basis, in your view, of

10  sanctioning counsel for the submission of this report?  And

11  this report I'm referring to would be the report that was

12  provided by Dr. Briggs.

13          **MR. DAVID FINK:**  The basis would be that the

14  slightest bit of due diligence, by any attorney knowledgeable

15  in the way the election proceeded, would have revealed that the

16  report was founded on -- based on, not just bad statistical

17  analysis, but bad legal analysis.  For example, in the record

18  there is a reference to the number of voters with indefinitely

19  confined status.  That's a status that doesn't exist in the

20  state of Michigan.  That's from another state.

21          There's a reference to the individuals who apply for

22  an absentee ballot and the State mails it out to them.  State

23  of Michigan has never mailed out absentee ballots and didn't

24  mail out absentee ballots in this case.

25          There's reference to early voters.  We've never had

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                          7/12/2021

1    what's called early voting in Michigan.

2          Apparently, apparently he believed that every time a

3    voter's residence changed that automatically that voter is

4    disenfranchised.  So people who happen to travel to Florida for

5    the winter but continue to vote absentee, he deemed them to be

6    fraudulent voters.

7          Furthermore, the actual analysis really just took the

8    simplest review to see that the numbers just didn't line up,

9    and this -- I'm not a statistician, but I play one in Court,

10   and -- but, seriously, I'm not a statistician, but I do know

11   how to look at two numbers and see if they match, and, in this

12   report, there are statistics that are just directly

13   inconsistent and stated over and over in the same report.

14         So now they also claim, for example, that -- and this

15   is fascinating because this comes up in multiple cases because

16   people rely on others.  A ballot is applied for -- an

17   application is applied for and on the same day a ballot is

18   cast, and they use that as evidence of fraud because they say

19   that's impossible because you couldn't mail it and get it back

20   that soon.  Well, the fact is that's exactly how I vote and a

21   lot of other people do.  You go into the clerk's office.  You

22   fill out the application.  The clerk gives you the ballot.  You

23   fill out your ballot.  You hand it in.  It all happens in one

24   day.  This is part of the fraud they claim.  They claim --

25         **MS. HALLER:**  Your Honor, may I respond?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **THE COURT:**  No, no, not yet, Ms. Haller.

2          Go ahead, Mr. Fink.

3          **MR. DAVID FINK:**  There's also a discussion about

4    ballots based on a survey.  They did a survey, an unscien -- I

5    think it's an unscientific survey.  Maybe it was scientific,

6    but there's no law that says you can do a survey and find out

7    the percentage of people who don't remember that they applied

8    for an absentee ballot or who applied for an absentee ballot

9    and don't remember if they received it.  Based on silly things

10   like that, they came to their conclusions.

11         **THE COURT:**  I understand, yes.

12         **MR. DAVID FINK:**  So the short answer to your

13   question -- I'm sorry.

14         **THE COURT:**  No problem.

15         **MR. DAVID FINK:**  The short answer -- I'm sorry, the

16   shorter answer to the Court's question -- I guess there's no

17   short answer.  I apologize.

18         The shorter answer to the Court's question is we

19   believe anybody who closely reviewed this study and looked at

20   the way it was prepared, and I don't mean going behind what was

21   written, the document as submitted to the Court itself on its

22   face is a clearly and desperately flawed document, and they

23   should have known that.  They had that duty.  Lawyers don't get

24   to just throw things out and see what the Court will do with

25   them.  We have a duty.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                        7/12/2021

1           THE COURT:  All right.  Let me --

2           MS. HALLER:  Your Honor, may I respond?

3           THE COURT:  Ms. Haller, briefly.

4           MS. HALLER:  Yes, your Honor.  We can make Dr. Briggs

5   available and to testify, and Mr. Fink can then cross-examine

6   him as in accordance with the Rules of Evidence and Rules of

7   Civil Procedure.  At this time, there is no *Daubert* motion

8   pending.

9           Mr. Fink is arguing as if he is both expert and

10  attorney.  He is not a statistician, but he is opining on the

11  lack of statisticianal basis for a report where he's never

12  questioned the witness.  Is that admissible in this court, in

13  this federal court?  Are we no longer applying the Rules of

14  Civil Procedure?

15          We have witnesses, and we have them examined, and

16  whether or not their testimony stands up under a motion is a

17  question that has yet to be addressed by this Court, and to

18  have it now as a basis -- suggested as a basis for sanctions,

19  when we have not had the opportunity to bring Dr. Briggs to

20  this court, when we have not had the opportunity to have an

21  expert opine or the question of whether he's an expert to be

22  qualified --

23          THE COURT:  Ms. Haller.

24          MS. HALLER:  Yes.

25          THE COURT:  Ms. Haller, let me point out to you that

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    I see a distinction between what you're saying and what

2    Mr. Fink is saying, and the distinction is, is that Mr. Fink is

3    pointing out areas which he thinks would have been obvious to

4    Plaintiffs' counsel before the material by Dr. Briggs was

5    submitted, and I have a series of questions that follow that

6    along those same lines.  I am not -- no one is, at this point,

7    purporting to be an expert who can understand the underlying

8    statistical analysis.  That's not being questioned.

9            The question is, is that on the face of these

10   submissions is there anything there that would give counsel

11   pause to say, hold on, need to know a little bit more?  I see

12   that as being a distinction, and that is the Court's response.

13           I want to move on, and you'll see from my next line

14   of questioning how that's borne out.

15           So I want to talk about Mr. Ramsland's affidavit, and

16   I want to ask specifically can anyone question the improbable

17   turnout numbers as shown in his declaration, which was attached

18   to the original compliant, numbers such as 781 percent of the

19   voting population in North Muskegon casted votes, 460 percent

20   of individuals in Zeeland Charter Township showed up.  Did

21   anyone feel that that type of a representation should be

22   questioned?

23           **MR. KLEINHENDLER:**  Your Honor.

24           **THE COURT:**  More importantly, did anybody question

25   it?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          MR. KLEINHENDLER:  I did.

2          THE COURT:  Okay.  Mr. Kleinhendler.

3          MR. KLEINHENDLER:  And "Russ, Russ, are you sure

4   about these numbers?"  And he said, "Yes, yes, I did question

5   them.  Yes, I did review, and yes, it was an error" that he

6   corrected on his reply affidavit.

7          MR. CAMPBELL:  ECF 49, I believe.

8          THE COURT:  He also goes on to talk about vote

9   switching discovered through hand counts when there have been

10  no hand recounts in Michigan as of the date that he made the

11  statement, something of which Plaintiffs, who include

12  Republican Party chairs, would have known.  What about that

13  kind of a statement, talking about the vote switching

14  discovered through hand counts when there have been no hand

15  recounts at that point?  Was that also corrected,

16  Mr. Kleinhendler?

17         MR. KLEINHENDLER:  I'm trying to find where you're

18  referring to.

19         MR. CAMPBELL:  Which paragraph, your Honor?

20         MR. KLEINHENDLER:  Do you have a -- because, offhand,

21  I don't --

22         THE COURT:  We might be able to pull that.

23         MR. KLEINHENDLER:  I don't -- I don't know what hand

24  counting looks like.  What paragraph?

25         MR. DAVID FINK:  Your Honor, that would be -- that

Motion hrg.                            7/12/2021

1   would be Paragraph 10 of his affidavit when he claims that the

2   Antrim County error, which was actually reported by the clerk

3   the night of the election, that the Antrim County error was

4   only discoverable through a hand counted manual recount.

5            **THE COURT:**  That is the paragraph.

6            **MR. KLEINHENDLER:**  I'm looking, your Honor.  I'm

7   getting into Paragraph 10.

8            **MR. DAVID FINK:**  Your Honor, if I may, what's

9   astounding to me is, after we have briefed this issue at least

10  twice, probably more than twice but twice to these lawyers,

11  explicitly addressing the fact that there were no hand recounts

12  in the state of Michigan at that point, that everybody should

13  have known, and that one of the Plaintiffs was the chair of the

14  Republican Party of Antrim County, of all things, who clearly

15  would have known there wouldn't have been a hand recount as of

16  November 29th, despite that, Mr. Kleinhendler, even as of

17  today, isn't even aware of where the claim is being made.

18           **MR. KLEINHENDLER:**  I don't see it in Paragraph 10.

19  Please read me the language --

20           **MR. CAMPBELL:**  I'll read that --

21           **THE COURT:**  Hang on.

22           **MR. CAMPBELL:**  (Indiscernible.)

23           **THE COURT:**  Hang on.  Stop, please.  Please stop.

24           Mr. Campbell, do you have the language in front of

25  you?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **MR. CAMPBELL:**  I believe I do, your Honor.

2          **THE COURT:**  Read it, please.

3          **MR. CAMPBELL:**  "One red flag has been seen in Antrim

4    County, Michigan.  In Michigan, we have seen reports, 6 of

5    6,000 votes in Antrim County that were switched from Donald

6    Trump to Joe Biden.  They were only discoverable through a hand

7    counted manual recount.  While the first reports have suggested

8    that it was due to a, quote/unquote, glitch -- my air quotes.

9    After an update, it was recanted and later attributed to a,

10   quote, clerical error, unquote.  This change is important

11   because if it were not due to clerical error but due to a,

12   quote, glitch, end quote, emanating from an update, the system

13   would be required to be recertified, according to Dominion

14   officials."

15         **THE COURT:**  All right.  Mr. Campbell, my question

16   goes specifically to the reference of there having been -- this

17   information having been discovered through a hand recount,

18   where we know now that the statement was made, there was no

19   such hand recount.  That is my question.

20         **MS. HALLER:**  Your Honor, if I may correct the record

21   for that.  It was the Michigan Secretary -- the county

22   secretary who did that hand recount, and that's reported on at

23   that time.  So there was what they called a hand recount.

24   Maybe it's not under the law that defines the definition, but

25   that is heavily reported at that time.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **MR. DAVID FINK:**  No, your Honor.  It was not.  I'm

2    sorry.

3          **MR. CAMPBELL:**  It wasn't.

4          **THE COURT:**  Hang on.

5          **MR. DAVID FINK:**  I'm sorry.  I'm sorry.

6          **MR. CAMPBELL:**  The Court is acting as if you've seen

7    proof that the statement made by that -- no statement was made

8    by the county person.  That hasn't been attached to the

9    pleadings here.

10         **THE COURT:**  Well, I mean all right.

11         **MR. KLEINHENDLER:**  Your Honor, you asked for my

12   understanding.  My understanding when I read this was that,

13   specifically with regard to these 6,000 votes in that specific

14   county, somebody did a hand recount.  It wasn't a

15   State-sanctioned full Board of Election recount.  My

16   understanding was that somebody recounted it by hand.

17         **THE COURT:**  All right.

18         **MR. KLEINHENDLER:**  And that's how they discovered.

19         **THE COURT:**  All right.

20         **MR. KLEINHENDLER:**  Again, what you're hearing -- I

21   want to make this clear here.  You're hearing a lot of factual

22   representations by Mr. Fink, and I would please ask you to

23   double check the record before you just take it because --

24         **THE COURT:**  I don't -- I don't need to be -- I don't

25   need that cautionary instruction from you.  Thank you.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          Mr. Fink, your response, please.

2          **MR. DAVID FINK:**  Only to the specific statement by

3    Ms. Haller and, apparently, Mr. Kleinhendler.

4          Nobody, nobody said there was a hand recount.  A

5    clerk said that there had been an error on the publicly

6    reported but not official results the night of the election.

7    Within a day it was clarified that there had been a

8    transposition of numbers, not a recount of any kind.  A hand

9    recount is a term of art.  It is possible to obtain a hand

10   recount in this state.

11         It turns out that the Trump campaign never requested

12   such a hand recount, but, eventually, there were audits.  As of

13   this November date, it is absolutely uncontroverted and

14   uncontrovertible that no hand recount had occurred, and anyone

15   knowing the facts in this case, anyone understanding how

16   Michigan elections work, which could have been local counsel,

17   should have flagged that and seen it in Ramsland's report.

18         **MS. HALLER:**  Ramsland's report -- excuse me, your

19   Honor -- actually said "hand counting."  He does not say "hand

20   count," which is the legal term.

21         **MR. DAVID FINK:**  It says "hand counted manual

22   recount."

23         "Hand counted manual recount" is the exact --

24         **MS. HALLER:**  Hand counted --

25         **MR. DAVID FINK:**  -- what it states --

              King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                      7/12/2021

 1              **MS. HALLER:**  -- is a different term --

 2              **THE COURT:**  Hang on.

 3              **MS. HALLER:**  -- from hand count.

 4              **MR. DAVID FINK:**  And there was no hand counting.

 5              **THE COURT:**  All right.  Mr. Campbell --

 6              **MR. CAMPBELL:**  But there's the lead, your Honor.

 7  There was a report about it.  He doesn't say that it happened.

 8  He doesn't swear that he was there to see it.  He says he got

 9  that report, and, again, it's the point to say then they said

10  there was a glitch.  Well, if there's a glitch, this has to

11  happen.

12              So, again, as lawyers, we all know there are

13  conditions precedent and conditions subsequent.  This is not a

14  material statement, and if he happens --  if the report happens

15  to be inaccurate, then Mr. Ramsdale [sic.] can tell you whether

16  that impacts his opinion if he were here to testify at the

17  evidentiary hearing that my clients have been asking for, but,

18  otherwise, again, you are letting Mr. Fink act like he's the

19  expert to tell us what hand recount means.

20              **MR. KLEINHENDLER:**  Your Honor --

21              **THE COURT:**  Excuse me.

22              **MR. KLEINHENDLER:**  This is very important.

23              **THE COURT:**  Excuse me.  I have already asked that if

24  anyone would like to speak that you raise your hand.  Please

25  honor that.  Not right now, Mr. Kleinhendler.  Just hold on a

                    King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1   minute.

 2              I just want to note for the record that Mr. Ramsland

 3   did in fact submit a subsequent filing on December 3rd, and he

 4   indicated that the original data that he provided, in terms of

 5   turnout, voter turnout, was based on unidentified state-level

 6   data that no longer exists.  However, as indicated above, these

 7   results that I have shared with you, the results in the city of

 8   Detroit deemed to have been 139.29 percent.  I said Zeeland was

 9   an astronomical number.  I believe North Muskegon, 790 percent.

10   He indicated that that information was obtained from the State

11   and that it no longer exists.

12              However, he indicated -- however, this Court will

13   take note of the fact that there were official results that

14   were available to him even before his original claims were

15   filed, and I understand that there could be some, you know,

16   parsing of words here, but that is the point that I am getting

17   at, and Mr. Ramsland did submit what one could argue was his

18   effort and attempt to correct, but he really did not go far

19   enough because he's simply saying that the data that he relied

20   upon seems to be saying that it was inaccurate, but it's no

21   longer available.

22              All right.  So my question becomes:  Should an

23   attorney be sanctioned for his failure to correct or withdraw

24   allegations that he comes to know were not true?

25              Let me hear from Mr. Campbell.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1      **MR. CAMPBELL:** Well, if you're asking me is that what

2  the rule says?  Yeah, the rule says if you have knowledge.

3  Now, knowledge is also defined, Judge.  It's defined as actual

4  knowledge of the fact in question.  Under the MRPC, the

5  Michigan Rules of Professional Conduct, that rule is defined.

6  So whether there's actual knowledge, your question is really

7  not a question; it's an answer.

8      Here, there is no evidence that any of the lawyers

9  had the statistical background or understanding.  I mean this

10  is why they have reports.  Nobody was confronted with proof,

11  knowledge that information was in error, inaccurate, or untrue,

12  for sure.  So -- and, again, it would have to be knowledge that

13  it was presented falsely and you don't have that here.

14      **THE COURT:** All right.

15      **MR. CAMPBELL:** And, again, I join the chorus.  Let's

16  have the evidentiary hearing if you have a question as to

17  whether the people who made the reports did so in good faith or

18  not.

19      **THE COURT:** And, again, as I've already indicated, I

20  am simply inquiring as to counsel's review of affidavits that,

21  on its face, raise questions.  That is what my questioning is

22  about.

23      Mr. Fink.

24      **MR. DAVID FINK:** If I may.  I want to speak simply to

25  the Detroit issue.  Certainly, when we saw the Ramsland report,

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   the very first time we saw it, we had the reaction that all

2   counsel should have had, which was that it was astounding that

3   139 percent could have voted in the city of Detroit.  We

4   immediately checked the records, and the record was clear that

5   something like 50.88 percent had actually voted in the city of

6   Detroit.  It was easy to find, it was publicly available, and

7   they had to be on notice that when they are making such an

8   extremely powerful, potent, and dangerous allegation they have

9   a duty of inquiry to at least look into it, and all it took was

10  30 seconds on the Internet for me to find out the correct

11  answer.

12          I also want to point out the danger that came from

13  this because --

14          **THE COURT:**  Mr. Fink, no.

15          **MS. HALLER:**  (Indiscernible.)

16          **THE COURT:**  Excuse me.

17          **MS. HALLER:**  -- as to this Court --

18          **THE COURT:**  Excuse me.

19          **MS. HALLER:**  -- we have to object.

20          **THE COURT:**  Ms. Haller, I will recognize you when you

21  have raised your hand.  Mr. Fink is allowed to finish, and I

22  will give you an opportunity to speak thereafter.

23          Go ahead, Mr. Fink.

24          **MR. DAVID FINK:**  Okay.  The suggestion that this was

25  some kind of harmless error because it was ultimately corrected

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   flies in the face of the reality of what actually happened.

2   These lies were put out into the world, and when they were put

3   out in the world, they were adopted and believed by some of the

4   most potent recipients of this information.

5          So that, in the infamous January 2nd, 2021 phone

6   conversation when then President Trump attempted to extort

7   Secretary of State Brad Raffensperger to try to help him win

8   his election which he'd already lost, President Trump

9   explicitly referenced the 139 percent voting statistic in

10  Detroit as though it were fact.  These are the consequences.

11  It's the consequence of what they did and how they abused this

12  system by not having made that correction, and they should

13  have.  They never should have filed this.

14         And, no, we don't want -- we're not looking for any

15  kind of *Daubert* hearings on any of these so-called experts.

16  No, we don't think they're experts.  Our issue is the slightest

17  bit of due diligence would have alerted the lawyers that they

18  were in the position of making misrepresentations to the Court

19  and to the world.

20         **THE COURT:**  All right.  Ms. Haller.

21         **MS. HALLER:**  Yes.  Thank you, your Honor.  Mr. Fink

22  just cited to an Internet source unnamed as the source to say

23  that one of our experts, designated or anticipated to be an

24  expert, in the time that discovery would allow or an

25  evidentiary hearing would allow as a basis for a lie.  Mr. Fink

Motion hrg.                              7/12/2021

1   is citing to unnamed Internet sources, and I submit he is

2   opining as an expert as well as arguing as an attorney without

3   foundation.  So he lacks foundation.  He's citing to hearsay,

4   and all his submissions are to claim that there are lies here.

5   We submit that that is done without legal foundation and basis.

6   Hearsay is not a basis.  Thank you, your Honor.

7          **MR. DAVID FINK:**  Your Honor, one second.

8          **THE COURT:**  Mr. Fink.

9          **MR. DAVID FINK:**  Just to be clear, I was not citing

10  an Internet source.  What I said was 30 seconds on the Internet

11  got you to the public record, which is not hearsay.  The public

12  record of the number of voters, the percentage of the

13  registered voters who voted, the public record is all I'm

14  referring to.  It was always available.  It was available to

15  all of these attorneys.

16         **THE COURT:**  And I wanted to just point out, it was

17  available on November 19th of 2020.

18         Let me go to Mr. Campbell, and then I'm going to move

19  on.

20         **MR. CAMPBELL:**  You know what, Judge, I think the

21  points have now been made relative to this, but, again, as to

22  what these numbers mean within the report and how they're to be

23  interpreted, Mr. Fink can't be the source for that.

24         **THE COURT:**  Yes, and that's -- I don't believe that's

25  his point.  It is just the matter of what an attorney, who had

Motion hrg.                              7/12/2021

1   reviewed the information, what they would make of that data.

2           Go ahead.

3           **MR. CAMPBELL:**  But, Judge, you just asked me can a

4   lawyer say something that's false.  So just because it's not

5   his point, he shouldn't be able to spread the falsehoods.

6           **THE COURT:**  All right.  I'm going to move on.

7           **MR. KLEINHENDLER:**  Your Honor, I have a very

8   important point that I think would help you, your Honor, and

9   that is Mr. Fink talked about the recount in Antrim County.  I

10  just want to refer you to Mr. Ramsland's rebuttal.  It's ECF

11  49, and at pages 8-9 he has a photograph, a photograph of the

12  hand recount that was done in Antrim County and to which he

13  referred to in the moving affidavit.  That's my point, your

14  Honor.

15          **THE COURT:**  I'm going to move on to some specific --

16          **MR. CAMPBELL:**  Your Honor, if I can, can we have

17  Mr. Fink explain why there's a photograph of something that

18  shows a hand recount when he's telling everybody there's been

19  no hand recount?

20          **MR. DAVID FINK:**  Absolutely, but, I'm sorry,

21  Ms. Meingast is --

22          **THE COURT:**  Go ahead, Mr. Fink, did you want to

23  respond to that?

24          **MR. DAVID FINK:**  I've got to pull up the document.  I

25  don't have it in front of me.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **THE COURT:**  Okay.

2          **MR. DAVID FINK:**  Because there was no hand recount,

3    as stated, but I think Attorney General Meingast has the

4    answer.

5          **THE COURT:**  Ms. Meingast, please.

6          **MS. MEINGAST:**  Just briefly, your Honor.  I'm the

7    attorney in the Antrim County *Bailey* case.

8          **THE COURT:**  Yes.

9          **MS. MEINGAST:**  The questions about this case, I'm

10   happy to shed some light.  There was certainly not any kind of

11   hand count recount that occurred before the Secretary of State

12   and the County actually did one later in December.  So what

13   the, you know, the clerks -- the county clerk and the local

14   clerks did during the canvass or during, you know, the election

15   night and the days that followed was simply look at tabulary

16   tapes and comparisons and look at those things.  There wasn't a

17   hand count of ballots or anything like that nature.  You

18   can't -- it's not even appropriate or allowed under election

19   law to do something like that at that time.

20         **THE COURT:**  All right.

21         **MR. CAMPBELL:**  Again, your Honor, the story isn't

22   what Mr. Fink said, that there's absolutely no hand recount.

23   There is something going on there, and nobody is -- neither of

24   the two counsel have said, "Hey, that's a false document."

25         So it turns out that they were aware of it, having

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  seen ECF 49.  It turns out they have no rebuttal to that

2  document.  It turns out that the expert, the person who made

3  the report, had a basis for making the statement, and we have

4  spent I don't know how long talking about a line from --

5          **THE COURT:**  And that may well be the case, that may

6  well be the case, but it is -- if that's how I choose to

7  proceed, that's how I will proceed.

8          Mr. Fink, last word on this, and I'm moving on.

9          **MR. DAVID FINK:**  I apologize, your Honor.  I know I

10  had my hand up.  I'm with somebody who is going to bring me the

11  document so I can look at it, and I can tell you and I can tell

12  Mr. Campbell unequivocally there was no hand recount as of the

13  date of this report.  I'm guessing whatever the photo is is of

14  something that was done later than that.

15          **THE COURT:**  All right.  I would like to move on now,

16  and I'm going to give you all -- you can make a note, and I

17  really don't even -- I don't know what the picture is that

18  you're referring to, but when you can pull that together, and I

19  will revisit that during the course of this hearing.  We're

20  going to move on right now.

21          All right.  Now, the amended complaint states that

22  Defendants violated the Equal Protection Clause by taking

23  several specific actions.  To be very clear, Plaintiffs' Equal

24  Protection claim was based on the notion that the votes of

25  those who voted for former President Trump were diluted.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                        7/12/2021

1    Plaintiff submitted many affidavits as evidence that specific

2    things happened, thereby causing vote dilution.

3            Considering this, and the fact that counsel knows it

4    could not submit affidavits to the Court with impunity, despite

5    the fact that the affidavits are executed by others, the Court

6    is concerned that these affidavits were submitted in bad faith.

7    For this reason, I have questions about specific affidavits and

8    the factual allegations they were alleged to support.

9            I would like to first look at -- Plaintiffs assert,

10   first of all, that Defendants, "Fraudulently added tens of

11   thousands of new ballots and/or new voters to the qualified

12   voter file in two separate batches on November 4th, all or

13   nearly all of which were votes for Joe Biden."

14           Now, the amended complaint cites three pieces of

15   evidentiary support for that conclusion.  One is the affidavit

16   that's been submitted by Mr. Sitto.  That's ECF number 6-4, PDF

17   40-42 -- Pages 40-42.  The amended complaint states, "Sitto

18   observed tens of thousands of new ballots being brought into

19   the counting room."

20           Did I understand that correctly, per the affidavit,

21   that is what the affidavit states?

22           Here's my question for counsel.  First of all -- and

23   this is referenced in the amended complaint.  As I read

24   Mr. Sitto's affidavit, the affidavit does not state that he

25   actually saw these ballots brought in.  Counsel seems to be

Motion hrg.                               7/12/2021

1    making an assumption that he had them brought in.

2              Who had anything to do with this affidavit?  Let's

3    start there.  Who prepared that affidavit at ECF number 6-4,

4    PDF?  Anybody?

5              No one knows about that, huh?

6         **MS. HALLER:**  Your Honor, can we have a moment to find

7    the document?  Because it's kind of hard to do when you have

8    this on the computer, as I do.

9         **THE COURT:**  Yes.  He said he observed tens of

10   thousands -- this is what the compliant says.  "He observed

11   tens of thousands of new ballots" -- here it is here on the

12   screen, the shared screen, and this is actually -- let's see.

13             So the question becomes -- that is a statement that's

14   made in the complaint, that Sitto observed tens of thousands of

15   new ballots being brought into the counting room, but, in fact,

16   the affidavit does not state that he actually saw it.  All

17   right.

18             All right.  He says he "heard other challengers say

19   that vehicles with out-of-state plates pulled up and unloaded

20   boxes of ballots, and, approximately 4:30, tens of thousands of

21   ballots were brought in and placed on eight long tables.

22   Unlike the other ballots, these boxes were brought in from the

23   rear of the room."

24        **MS. HALLER:**  Your Honor, what ECF document is this?

25   Because it doesn't show at the top of the screen showing.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1          THE COURT:  104.

 2          MR. CAMPBELL:  If I may, your Honor, up above --

 3  you've highlighted Paragraph 10.  Paragraph 5 describes a time

 4  frame in which he is standing in the room that he's describing

 5  the conduct in Paragraph 10.  I think that puts him personally.

 6          THE COURT:  Okay.  So let me -- let me move on then,

 7  and that was Mr. Campbell.  Please say your name before you

 8  speak.  I think it will be helpful.

 9          All right.  So even if the Court assumes -- even

10  assuming Mr. Sitto saw the ballots brought in, what is the

11  basis for concluding that there were tens of thousands, and

12  what steps, if any, did counsel take to investigate his basis?

13  And again --

14          MR. CAMPBELL:  This is Don Campbell.

15          THE COURT:  I'm not --

16          MR. CAMPBELL:  This is Don Campbell.

17          THE COURT:  Yes.

18          MR. CAMPBELL:  The basis for the tens of thousands is

19  I think that's what he says in the affidavit there.  I will

20  note this, that the only contrary statement that was provided

21  by the Defendants in any of its briefing up to this hearing was

22  to say that it might look like to uneducated, untrained folks.

23          THE COURT:  Sorry.  Hold on just one moment, please.

24  I'm sorry, hang on one moment, please.

25          Apologies, go ahead.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1        **MR. CAMPBELL:**  Thank you.  I haven't read all of

2   Mr. Sitto's affidavit here obviously at this moment, but I

3   can't recall whether he had training or not, and I don't know

4   whether he expressed his level of education, but, you know, the

5   City seems to concede that, yeah, it could look like this

6   stuff, it's just you don't know what's really going on.

7        Now, of course the Court has not had the opportunity

8   to hear what these people actually saw or to put those people

9   under examination in an evidentiary hearing, if that's what it

10  required, and nor has it had an opportunity to really test the

11  City's position, even though it looks like that, it didn't

12  actually happen --

13       **THE COURT:**  Mr. Campbell, let me be clear, that

14  this -- I said at the outset of these particular affidavits

15  that I'm going to be questioning counsel about is that I wanted

16  to determine whether or not -- whether counsel had done its

17  proper level of investigation before submitting an affidavit.

18  It's quite similar to what the other areas that we discussed

19  previously, in terms of was there anything in the content that

20  would trigger your duty as counsel to determine whether or not

21  these statements were based in facts.

22       And for someone to say tens of thousands, and if

23  you're telling me that it is just an eyeball view of it and

24  they pulled that out, I ask you:  Is it acceptable to place

25  into an affidavit?  Do you think it is, Mr. Campbell?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1      **MR. CAMPBELL:**  I've got to tell you, Judge, if a jury

2  believed it, it would be enough to convict somebody of a crime

3  of election fraud in a moment, yes, absolutely.

4      **THE COURT:**  Okay.

5      **MR. CAMPBELL:**  If you saw that.  I mean what other

6  proof would you have, Judge, other than your own eyes?  It's

7  outrageous --

8      **THE COURT:**  And --

9      **MR. CAMPBELL:**  I've got to get three witnesses --

10     **THE COURT:**  Excuse me.  Excuse me.  I'm asking you --

11 my question really is:  How would anyone know that that's tens

12 of thousands?

13     **MR. CAMPBELL:**  We can ask Mr. Sitto under

14 examination, but I don't think that's something he needs to put

15 into an affidavit.

16     **THE COURT:**  Question:  Did you -- that is really my

17 question.  Was that question asked?  And I don't think I got an

18 answer from any of the attorneys on this here today at the

19 hearing as to whether or not -- you know, who, who actually put

20 together this affidavit?  Did anyone on the call have anything

21 to do with it?  Anyone?

22     **MR. KLEINHENDLER:**  Your Honor, this is

23 Howard Kleinhendler.  I believe this affidavit and others were

24 filed in a companion case.  The companion case had nothing to

25 do with us, and on behalf of -- I believe it might have been

Motion hrg.                                    7/12/2021

1   the Trump campaign in connection with a challenge, a different

2   challenge that was made.  These were affidavits that were

3   submitted by counsel in that case.

4          **THE COURT:**  So there was no effort on -- even though

5   these affidavits -- this particular affidavit was submitted,

6   and if I'm not mistaken, attached to the complaint, you didn't

7   feel that you needed to review it before it was filed?

8          **MR. KLEINHENDLER:**  We reviewed it.  Of course we

9   reviewed it, and, frankly, it was not that inconsistent with

10  what our experts were saying.  If you look at our expert

11  reports, and -- your Honor, I don't know -- forgive me -- what

12  standard are you using here for filing a complaint?  We had a

13  good faith basis, no reason not to believe --

14         **THE COURT:**  I'm looking at the standards that are set

15  forth in the variety of options I have to impose sanctions.

16  That's what I'm looking at and --

17         **MR. KLEINHENDLER:**  Well, I'm looking at the

18  standard --

19         **THE COURT:**  Okay.  Thank you.

20         Mr. Fink, what is it you would like to say?

21         **MR. DAVID FINK:**  First, to be clear, it's astounding

22  that even today Mr. Kleinhendler isn't able to tell us what the

23  source of this is, just saying he thought it was a Trump

24  lawsuit.  This is from the *Constantino* and *McCall* case that was

25  filed in the Wayne County Circuit Court.  The case was heard by

Motion hrg.                              7/12/2021

1    Judge Kenney, and at the time that it was before Judge Kenney,

2    Chris Thomas, the former elections director, the elections

3    director of the State of Michigan for something like 38 years,

4    under Democratic and Republican administrations, and was

5    involved in this litigation, Chris Thomas filed a detailed

6    affidavit addressing these very issues, explaining why

7    Mr. Sitto misunderstood what he may have observed, very

8    clearly.

9           Judge Kenney reviewed that and made conclusions, none

10   of which are ever referred to by the Plaintiffs, but,

11   certainly, again, I'm not saying this Court needs to or should

12   make a finding of truth or falsity of these affidavits, but the

13   Court is appropriately asking about the duty of inquiry during

14   this three-week period.  This was filed first in Wayne County

15   the week of the election.  That's when these affidavits were

16   available to them.  There clearly was an issue of fact as to

17   whether this was true, as it was responded to so clearly by

18   Chris Thomas and by Judge Kenney.

19          They had a duty at that point to investigate.

20   Lawyers -- unfortunately this kind of case is going to make

21   people around the world believe that lawyers can say or do

22   whatever they want and it doesn't have to be true; they don't

23   have to inquire.  It isn't that way.  You can't put something

24   in a pleading that you know to be false, and I do want to say

25   one thing.

Motion hrg.                                    7/12/2021

1          Earlier today the question came up about pro hoc

2    vice, and I just want to say every lawyer in Detroit, including

3    the three local counsel who signed on here, should know that in

4    the Eastern District of Michigan it's been 40 years since we

5    had pro hoc vice admission, but what we do have, what we do

6    have is an admission process in which everybody who gets

7    admitted fills out a form or takes an oath that they must swear

8    or affirm that they will honor the civility principles of this

9    court, and as Mr. Campbell well knows, one of those civility

10   principles is we are not to make factual misrepresentations to

11   the Court.  We are not to misrepresent the law or the facts to

12   the Court, and they seem to have chosen not to be sworn into

13   our district.

14          So they didn't know -- and, by the way, if somebody

15   on this call, if one of these lawyers says they didn't know

16   because they're going -- everybody blames everybody else here,

17   apparently.  They're going to say, "Local counsel didn't tell

18   us."  Again, Google it.  Google "admission to Eastern District

19   of Michigan," and it pops up right away.  There is no pro hoc

20   vice, and there hasn't been since 1981.

21          They should tell the truth.  They have a duty to tell

22   the truth, and they have a duty to not submit an affidavit to

23   this Court, whether it's attached to a complaint or not, not to

24   submit an affidavit to this Court that they have reasonable

25   cause to believe has false statements in it and to rely on it

Motion hrg.                                7/12/2021

1   in the allegations they then make in the complaint.

2            Thank you.  I'm sorry if I went too long.

3         **THE COURT:**  All right.  Let me stop --

4         **MS. HALLER:**  Your Honor --

5         **THE COURT:**  Hang on.  I'm going to -- let me tell you

6    what my plan is.  I will hear from counsel, from Ms. Haller,

7    from Mr. Campbell, and Mr. Davis appears he wants to say

8    something.  After I have done that, we're going to take a

9    ten-minute break.  All right.  It is now 11:00.  We've been on

10   for the last two-and-a-half hours.  I have more areas of

11   questioning.

12            Ms. Haller, I'll hear from you.

13        **MS. HALLER:**  Thank you, your Honor.

14            I would just briefly say that this was the complaint

15   and we had good faith to attach exhibits, and we spoke to our

16   anticipated experts and we reviewed the materials, and I simply

17   am confused as to the standard that's being applied when it

18   comes to filing a complaint because this was not a verified

19   complaint so I'm a little confused at the standard.

20            We did not submit falsehoods, and we have not had an

21   opportunity to have our witnesses examined, which I'm sure your

22   Honor understands that we will make the witnesses available.

23   They can be cross-examined by Mr. Fink, who doesn't need to

24   opine on what constitutes the public record without citations.

25        **THE COURT:**  All right.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          **MS. HALLER:**  So citations are helpful, the standard
2   would be helpful, and thank you for your time, your Honor.
3          **THE COURT:**  All right.  Mr. Campbell.
4          **MR. CAMPBELL:**  Yeah, I just want to make sure the
5   record Mr. Fink has highlighted is understood and appreciated
6   by this Court.  Other members of the State Bar of Michigan,
7   other lawyers saw this and admitted it in a different
8   proceeding, and I've got to tell you, Judge, you've got to be
9   able to trust when something has been submitted by counsel
10  because of the oath that we take, because of the reliability on
11  everybody else within this profession that, yes, that should
12  have tremendous value.  In fact, I would say it's -- it ends
13  the discussion on whether there's good faith to submit it.
14          The counter-argument, which they want to promote,
15  they can do so at their time.  Judge Kenney did not rule that
16  that affidavit was in error.  He did not rule to any of the
17  merits in the *Constantino* case.
18          **THE COURT:**  All right.  Thank you.
19          **MR. CAMPBELL:**  So with regard to that, that is
20  further basis for the good faith to apply.
21          **THE COURT:**  Let me answer Ms. Merritt -- thank you
22  Mr. Campbell -- Ms. Merritt -- Ms. Haller's question as to
23  determining what the standard is that I'm applying here, and
24  I've said it before, but the standard is that Plaintiffs'
25  counsel submitted affidavits that the Court may believe should

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   have been obviously questionable, if not false, on their face.

2   That is what I am getting to.  There is a responsibility.

3   There's a duty that counsel has to ensure that when you're

4   submitting a sworn statement in support of your case, actually

5   as -- presenting it as evidentiary support of your claims, that

6   you have reviewed it, that you have done some minimal due

7   diligence and that is what I am getting at.  All right.  All

8   right.

9           MS. HALLER:  Thank you, your Honor.

10          THE COURT:  We're going to take a ten-minute break.

11          MR. CAMPBELL:  May I ask for a slightly longer break?

12          MR. WOOD:  Your Honor --

13          THE COURT:  Hang on a second, Mr. Wood.

14          MR. WOOD:  I just wanted to ask when we come back

15   from the break if I could have a couple of minutes to respond

16   to something that Mr. Fink had earlier said?

17          THE COURT:  Yes, you can do that briefly -- all

18   right -- when we come back from the break.

19          Mr. Campbell.

20          MR. CAMPBELL:  Your Honor, I would ask for a

21   20-minute break and we reconvene at 11:30, if that's not a

22   problem.

23          THE COURT:  That's fine.

24          MR. CAMPBELL:  Thank you.

25          THE COURT:  All right.  So hang on.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1         Mr. Flanigan, are we -- just how are we handling this

2    from a technology standpoint, and Mr. Owen, does everyone sign

3    off?

4              **THE CLERK:**  I think Mr. Owen can stop the stream and

5    everybody can stay signed into the room, and they can simply

6    mute and turn their camera off.

7              **THE COURT:**  All right.  So those who are on this

8    screen need to mute your mics and turn the camera off.

9              **THE CLERK:**  Court is in recess until 11:30.

10                  (Recess taken 11:14 a.m.)

11                  (Back on the record at 11:45 a.m.)

12             **THE COURT:**  All right.  Thank you everyone.  As

13   promised, we will begin with Mr. Wood.  What would you like to

14   say on this record, sir?

15             **MR. WOOD:**  Thank you, Judge.  If you just give me

16   just a short few minutes, I think I will be listening for the

17   rest of the day because I don't have anything to really add to

18   the questions your Honor is asking.

19        What I wanted to make it clear is, as I said at the

20   beginning, that I'm appearing subject to my Defense that I'm

21   not subject to the jurisdiction of the Court personally or by

22   having appeared in the case.  My name appears on the complaint

23   and the amended complaint.  It does not contain my e-mail

24   address, does not contain any reference to me filing for any

25   type of admission, including under Local Rule 83.20.  I did not

Motion hrg.                                    7/12/2021

1    sign this pleading.  You'll see I do not have a slash-S

2    signature line.  I did not have anything to do with submitting

3    the pleading.  I haven't advocated for the pleadings.

4              So when you talk about, well, the content of the

5    complaints or the content of these affidavits, I had nothing to

6    do with it, and I feel like before I am in any way subject to

7    sanctions that I ought to have the benefit of an evidentiary

8    hearing that will establish, and we could probably do it today,

9    any lawyer whose name appears on the pleadings for the

10   Plaintiffs I believe will affirm to you that, regardless of

11   whether there was some misunderstanding about why my name got

12   put on there, each lawyer will affirm to you that I did not

13   have any input into any one of these pleadings or affidavits

14   and I was not asked to have any input into them.

15             So I feel like I've been kind of lumped as counsel

16   for the Plaintiffs when I did not ever agree to appear,

17   particularly as it would apply to Rule 11.  I've practiced law

18   for 44 years, and I think I've covered 27 different states

19   outside of Georgia.  I have never appeared in a case without

20   having sought the local rules permission to do so, knowing that

21   I might, in federal court, be subjected to Rule 11.

22             So I did not subject myself to Rule 11 sanctions.

23   Section 1927 certainly does not apply to me in terms of

24   multiplying any type of proceedings, and I feel like I'm

25   entitled to due process or an evidentiary hearing that would

Motion hrg.                              7/12/2021

1   show that I was not asked, nor was it ever intended, that I be

2   represented as a signer or as a counsel of record to be held to

3   the standards of Rule 11.  I did not receive any e-mail notice

4   from counsel about the Safe Harbor.  I've had my office check,

5   and we've received nothing by mail.

6          So I wanted to make that position clear so that the

7   record is protected in terms of my request for the evidentiary

8   hearing, and perfected as to the record where I am taking the

9   position my appearance today is subject to my defense of lack

10  of jurisdiction either under Rule 11 or Section 1927.

11         **THE COURT:**  All right.

12         **MR. WOOD:**  So, going forward, if your Honor has

13  questions about who had involvement, I just want to go ahead

14  and in one lump sum let you know I had no involvement in any of

15  this in terms of the substantive input or with you.

16         Thank you very much, Judge.

17         **THE COURT:**  Okay, right, and let me just say -- and,

18  Mr. Fink, I'm not going to allow to you respond to that simply

19  because I am going to table that issue until the end of this

20  hearing where that is going to be the time in which I address

21  the issue of supplemental briefing, and I'm going to tell you,

22  Mr. Wood, right now, I'm going to allow you to submit a brief

23  on this issue and then allow Mr. Fink, or whomever else would

24  like to respond because I know that this issue factually is in

25  dispute.

Motion hrg.                              7/12/2021

1              All right.  Now, having said that --

2              **MR. WOOD:**  Thank you, your Honor.

3              **THE COURT:**  You're welcome, sir.

4              All right.  Let's move on now, counsel, to the issue

5    of the Carone affidavit, which is ECF number 6-5.  Ms. Carone

6    indicates that there were -- just a moment, please, and --

7    uh-oh.  We have a little technical glitch on our end, and we

8    will get that fixed.

9              Mr. Flanigan, are you aware of it?  Okay.  He may

10   have gotten kicked off --

11             **THE CLERK:**  Your Honor, I am having trouble with my

12   audio that I'm trying to work out with Jason currently.  I can

13   hear, but it's very faint.

14             **THE COURT:**  Okay.  I think that we have -- Ellen has

15   been kicked off as well.  So we need to figure it out.

16             **THE CLERK:**  Yes, she has.

17             **THE COURT:**  See if you can bring her back in.  All

18   right.

19             So, counsel, I'm going to proceed, and we're, again,

20   focusing on the Carone affidavit, wherein it stated, "There

21   were two -- "there was two vans that pulled into the garage of

22   the counting room, one on day shift and one on night shift.

23   These vans were apparently bringing food into the building.  I

24   never saw any food coming out of these vans.  Coincidentally,

25   it was announced on the news that Michigan had discovered over

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                               7/12/2021

1   100,000 more ballots not even two hours after the last van

2   left."  The amended complaint calls this an illegal dump.

3           Let me ask:  Who -- did anyone have an opportunity --

4   who had the opportunity to speak with Ms. Carone?  Raise your

5   hands if you did.

6           **MS. HALLER:**  Your Honor, may I?

7           **MR. CAMPBELL:**  Is there --

8           **THE COURT:**  Hang on, Ms. Haller.

9           **MR. CAMPBELL:**  Is there a particular paragraph you're

10  referring to?

11          **THE COURT:**  I just read it.

12          **MR. CAMPBELL:**  I didn't get the number, your Honor.

13  I apologize.

14          **THE COURT:**  Okay.  So this is going to be a bit of a

15  challenge.  I think I can pull it up.

16          **MR. CAMPBELL:**  If you have the number, I have it in

17  front of me.

18          **THE COURT:**  It's 6-5.

19          **MR. CAMPBELL:**  Thank you.  That's the Carone

20  affidavit.  You said there's an allegation in the complaint.

21          **THE COURT:**  I'm sorry?

22          **MR. CAMPBELL:**  As to an illegal dump.

23          **THE COURT:**  Okay.  I don't know what paragraph that

24  is in.

25          **MR. CAMPBELL:**  Thank you.  I don't mean to burden you

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  with that, but I was going to look at it and understand the

2  context.  Thank you.

3         **THE COURT:**  Okay.  Now, let me just say that the

4  questions that the Court has on this -- and I thought I saw

5  another hand, but I'll just give you a moment.  Oh, I asked the

6  question as to who spoke with Ms. Carone, if anyone.

7         All right.  Ms. Lambert.  Thank you.  Please unmute.

8         **MS. LAMBERT:**  Thank you, your Honor.  I have spoken

9  with Ms. Carone but not regarding the complaint.  As the Court

10 knows, I filed the notice of appeal before this Court.

11        **THE COURT:**  Right.

12        **MS. LAMBERT:**  I have spoken with her regarding her

13 information regarding election vendors and the role that she

14 participated with an election vendor.

15        **THE COURT:**  Okay.  So you did not speak to her

16 regarding her observations that she set forth in the affidavit;

17 is that true?

18        **MS. LAMBERT:**  That's true, your Honor.  I just wanted

19 to be accurate and let the Court know that I have spoken with

20 her.

21        **THE COURT:**  I appreciate that.

22        So, yes, Mr. Kleinhendler, sir.

23        **MR. KLEINHENDLER:**  Thank you, ma'am.  I refer you to

24 the Ramsland moving affidavit, yes, which is ECF 6, Exhibit 24,

25 page 4 of 8, and the bottom of paragraph 13.  He refers to the

Motion hrg.                                 7/12/2021

1    Melissa Carone affidavit.  It was my understanding that our

2    expert had in fact spoken with her.  I can't state the truth

3    because my memory is a little foggy, but I believe I had a

4    conversation with Mr. Ramsland about this Carone affidavit.

5    He, in turn, told me -- and, again, this is my belief, it's

6    awhile back -- that he in fact had spoken with her.

7              I do know, your Honor, that she had publicly

8    testified, I believe, in Michigan about her findings, okay, and

9    so while I don't have any recollection of directly speaking

10   with her, I am referring you to my expert, who refers to her

11   affidavit, vouches for her, and it should have been attached,

12   your Honor.  For some reason, I don't know, I guess when we

13   filed it, it wasn't attached.

14        **THE COURT:**  What wasn't attached, her vouching --

15   your expert --

16        **MR. KLEINHENDLER:**  No, no, the affidavit says, "See

17   Melissa Carone affidavit."

18        **THE COURT:**  Oh, okay.

19        **MR. KLEINHENDLER:**  And I think we had it.  I know we

20   had it, but for some reason I don't -- I don't know if it was

21   included.

22        **MS. HALLER:**  It was included.

23        **THE COURT:**  It was included.  I know that there was a

24   statement saying that it was not in one of the briefs, but it

25   has in fact been included.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                           7/12/2021

1          All right.  Anybody else have any contact with her?

2   All right.  Thank you.

3          So my question then -- Mr. Fink, I'm sorry, sir.  I

4   didn't acknowledge you.

5          **MR. DAVID FINK:**  Of course I'm not suggesting I had

6   contact with her, but, rather, I wanted to respond briefly to

7   that and also to something that I did not respond to yet

8   from -- regarding Mr. Sitto because we took the break.

9          **THE COURT:**  Okay.  Let me -- before you do that,

10  Mr. Fink, let me ask the question that I wanted to ask other

11  than who had spoken with Ms. Carone.

12         I wanted to ask the question:  She, again, she talks

13  about her observations seeing vans pull up and then she

14  connects what she considers to be the coincidental announcement

15  from local media having stated that -- and no reference to

16  which local media to which she's referring but stating that

17  there had been a statement made that Michigan had discovered

18  over 100,000 more ballots.

19         My question is:  Is it counsel's position that

20  coincidence -- that a coincidence can serve as an

21  evidentiary -- as the basis for evidentiary support for an

22  allegation?  Because that's what this sentence is saying.

23         Mr. Campbell, you look like you want to respond.

24         **MR. CAMPBELL:**  Yes, I -- here's what I think we can

25  safely say, and maybe this is responsive.  We have an expert

Motion hrg.                              7/12/2021

1  who has relied on that affidavit for purposes related to his

2  statistical analysis, and, again, going back to the Georgia

3  case that says if you have affidavits of witnesses and you have

4  statistical data, that's enough to, in that case it was, to

5  have the court act.

6          Here we have attached the actual affidavit, but, as

7  you know, your Honor, an expert can rely on hearsay.  So in

8  terms of, you know, the information that's there, I think it's

9  properly presented, and I have to say, if a witness says things

10 that don't turn out to be entirely accurate, that can be

11 discovered through the processes that this Court is very

12 familiar with, and that happens all the time.

13         But, you know, including what they have to say

14 because they say it is not inappropriate in any way.  In fact,

15 it may turn out that we don't believe some things that they

16 said, but to give only half the story isn't how we want to

17 plead the case.

18         So, again, I'm not sure about the context in which

19 the Court is asking this.  This is a claim by the Plaintiffs

20 drafted by the lawyers to bring their claim under the various

21 federal laws that they believe apply, and we thought we were

22 timely when we did it.

23         **THE COURT:**  All right.  Mr. Fink, this is your time

24 to respond, sir.

25         Thank you, Mr. Campbell.

Motion hrg.                                    7/12/2021

1          **MR. DAVID FINK:**  First, with respect to Ms. Carone,

2   we have another classic situation where if in fact -- and, by

3   the way, it's not just the expert.  The complaint explicitly

4   references, in Paragraph 94, explicitly references the Carone

5   affidavit.

6          Now, Carone makes the allegation -- and, to be clear,

7   she's not a trained election worker.  She was -- and there's no

8   dispute about this.  She was a subcontractor doing some work on

9   maintaining machines on the day of the election -- or the day

10  of the count.  She claimed that she witnessed batches of

11  ballots being run through the scanner multiple times, 50 at a

12  time, 8 or 10 times in a precinct.

13         Now, if any expert reviewing it -- and the expert

14  relied on that.  Any expert reviewing that affidavit with the

15  slightest knowledge of election procedures would know that it

16  was patently absurd because, if you ran 50 ballots through 8

17  times, you would have 350 more votes in that precinct than

18  there were voters, and there isn't a single precinct in the TCF

19  Center that had more than an 11-vote disparity.

20         Nonetheless, because they did no due diligence, they

21  didn't look at this.  They didn't check it.  They continue to

22  rely upon these findings, which are just blatantly factually

23  false.

24         Now, I want to briefly, if I may, say this.  This was

25  addressed and looked at very closely, as well as the other

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    allegations that she made, by Judge Kenney.  Earlier today,

2    just before the break, Mr. Campbell made a representation to

3    this Court that I assume comes, not out of intentional intent

4    to misrepresent the facts, but out of ignorance that comes from

5    his recent involvement in this case.

6            He said that Judge Kenney did not make findings.

7    That could not be further from the truth.  Judge Kenney made

8    extensive findings in his Opinion and Order dated November 13th

9    and very widely published and available at the time.  Certainly

10   counsel knew about this.  November 13th in his Opinion and

11   Order he explicitly discussed why it was that Ms. Carone was

12   mistaken in the representations in what she saw.

13           Importantly, in response to something this Court

14   raised earlier, he also very explicitly, directly contrary to

15   what Mr. Campbell told us before the break, Judge Kenney very

16   explicitly addressed Andrew Sitto's allegations.  He had three

17   paragraphs.  He pointed out that Andrew Sitto was a Republican

18   challenger who did not attend the walk-through meeting that

19   trained the challengers.

20           He explained, and I'll quote from him, "Mr. Sitto's

21   affidavit, while stating a few general facts, is rife with

22   speculation and guesswork about sinister motives.  Mr. Sitto

23   knew little about the process of the absentee vote counting" --

24   "voter county board activity.  His sinister motives attributed

25   to the city of Detroit were negated by Christopher Thomas'

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    explanation that all ballots were delivered to the back of Hall

2    E at TCF Center.  Thomas," he goes on to say, "also indicated

3    the City utilized a rental truck to deliver ballots.  There's

4    no evidentiary basis to attribute any evil activity by virtue

5    of the City using a rental truck with out-of-state licenses

6    plates."

7             He also directly addressed the tens of thousands

8    ballots allegation, explaining that "That number was

9    speculation on the part of Mr. Sitto," and, he said, "It's not

10   surprising that many of the votes being observed by Sitto were

11   cast for Mr. Biden."

12            Now, my main point here is not the facts.  My

13   point --

14            **MS. HALLER:**  Your Honor.

15            **MR. DAVID FINK:**  -- is a lack of due diligence, and

16   Mr. Campbell tells us, in representing seven of these nine

17   Plaintiffs' attorneys, including, incidentally, both Mr. Wood

18   and Mr. Rohl, who seem to have diametrically opposed views of

19   what happened, but Mr. Campbell told us that Judge Kenney had

20   not ruled.  Judge Kenney had ruled.  These folks were on

21   notice, and this was important.  This was the election of the

22   President of the United States.  They should have been extra

23   careful, not just diligent, but extra careful.

24            And I have to say, the statement by Mr. Campbell, as

25   though it's a precept of law that we should all except as black

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   letter law, that if something is in a pleading that someone

2   else has filed then it's fair game for me to repeat it and say

3   it's true with no due diligence on my part, I've never seen a

4   case like that.

5              **MS. HALLER:**  May I respond?

6              **THE COURT:**  Yes, you may.  You have your hand up.

7              **MS. HALLER:**  Thank you, your Honor.

8          I would just point out that the affidavit that's

9   attached as an exhibit, which is an exhibit to the complaint,

10  which is what you're referencing as the Carone affidavit, 6-5,

11  that's documented as a document from the court, in your state

12  of Michigan circuit court.  It is not represented to be a

13  document that was created by us.  It is not represented to be

14  anything other than what it was, which is a document from a

15  different court.

16         That court had its proceedings, as we all know, that

17  later, you know, in rulings in *Constantino* and that line of

18  cases, and we know that Justice Zahra spoke out about the

19  meaningful assessment of allegations by an evidentiary hearing

20  and that -- Plaintiffs' right to an evidentiary hearing as a

21  general matter.

22             **THE COURT:**  What was the purpose for which you

23  attached it?

24             **MS. HALLER:**  Because Russ Ramsland cited to it and

25  it's a source for his exhibit, as well as an identification of

Motion hrg.                                7/12/2021

1   a potential witness who may be anticipated to testify in

2   accordance with the exhibit at the time of a trial or an

3   evidentiary hearing or in a court process.  We had the ability

4   to cite to information making as much information as possibly

5   available to identify anticipated witnesses who would testify

6   in accordance with the statements or affidavits that were

7   included, but this particular affidavit was cited to by

8   Russ Ramsland.

9            **MR. CAMPBELL:**  If I may, your Honor?

10           **THE COURT:**  Go ahead, Mr. Fink.

11           **MR. DAVID FINK:**  I just want to say Ms. Haller is

12  simply wrong.  The affidavit is connected to the previous

13  lawsuit, but it is directly cited in their complaint, in their

14  complaint in Paragraph 94.  They directly quote from that --

15           **MS. HALLER:**  (Indiscernible.)

16           **MR. DAVID FINK:**  -- as though it is true, not just

17  the expert.

18           **MS. HALLER:**  That's right, Mr. Fink.  As you well

19  know, it's not hearsay.  It's a sworn statement in a court of

20  law, and, yet, we have citations to hearsay in other documents

21  that are similarly attached, but we are not in a *Daubert*

22  motion.  We are not on a motion for discovery as being in

23  contention.

24           The bottom line is it's a complaint where we attached

25  information to include a witness from another court, and we

Motion hrg.                                    7/12/2021

1    cited to that in a complaint as sworn testimony, and, as such,

2    it's available and relied upon by our expert.

3              **THE COURT:**  Question for you, Counselor.  So then

4    you're saying that you did not attach the Carone affidavit in

5    support of your factual assertions; is that what you're saying?

6              **MS. HALLER:**  No, your Honor.  Thank you.  I am simply

7    saying that it's information in support of the complaint.  It's

8    cited to in the complaint.  It is a document that is not

9    hearsay.  It is a simple document that is a sworn statement

10   from another court that is cited to by our expert, and we rely

11   upon it to the extent that it's cited in the complaint.

12             **THE COURT:**  Well, you cited it.  You referenced it.

13   You all are the ones that placed it in the complaint, and you

14   didn't place it in there in support of your allegation?

15             **MR. CAMPBELL:**  Judge, it's there because --

16             **MS. HALLER:**  No, it is in support --

17             **THE COURT:**  Excuse me, Mr. Campbell.

18             **MR. CAMPBELL:**  -- it's believed --

19             **THE COURT:**  Mr. Campbell, excuse me.

20             **MR. CAMPBELL:**  Yes.

21             **THE COURT:**  I'm directing my question to Ms. Haller.

22             **MS. HALLER:**  It's there as it is cited.  We stand by

23   the citation, the citation Mr. Fink is referencing.  I'm not

24   sure I understand.

25             **THE COURT:**  All right.  What -- Mr. Kleinhendler,

Motion hrg.                          7/12/2021

1  | what do you have to say?

2  |          **MR. KLEINHENDLER:**  I'd like to say something --

3  |          **THE COURT:**  Briefly.

4  |          **MR. KLEINHENDLER:**  -- that would help us here.

5  |          **THE COURT:**  Okay.

6  |          **MR. KLEINHENDLER:**  You're looking at a specific

7  | document at an isolated paragraph, but I think it's pretty

8  | clear you have to read a complaint through its four corners.

9  | We are writing a complaint with multiple inputs from various

10 | areas, experts, fact witnesses, other statisticians, and when

11 | we see that Carone affidavit, what we're seeing is this is

12 | consistent with what our experts -- with what we're hearing

13 | happened in Detroit.  And, your Honor, to try to take one

14 | document in isolation and use that document to infer what the

15 | intent was or what the due diligence of the attorneys should be

16 | without looking at the entire complaint and the entire

17 | submission as to what we're getting, I believe is not correct.

18 | I think --

19 |          **THE COURT:**  I reject your premise, that that's what

20 | I'm doing.

21 |          **MR. KLEINHENDLER:**  No, no, sorry.  Sorry.  Your

22 | Honor, I apologize.  That's what Mr. Fink --

23 |          **THE COURT:**  All right.

24 |          **MR. KLEINHENDLER:**  I apologize.  Sorry.  That is what

25 | Mr. Fink is asking of the Court, and that's the point I want to

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    make.

2          The second point I want to make, your Honor, is just

3    because in a preliminary election hearing a court found that

4    one affidavit trumped another affidavit, your Honor, that does

5    not render the allegations of Ms. Carone to be false.  Okay.

6          Until she appears before you or before a jury, a fact

7    finder, and you make a decision what she's saying is false, all

8    you have is argument, and that's the point.  Mr. Fink is

9    arguing in the form of stating facts, and I have a problem with

10   that.  I'd like to make that clear for the record.

11         **THE COURT:**  All right.  Thank you.  We're going to

12   move on.

13         Mr. Campbell, what --

14         **MR. CAMPBELL:**  Again, my name was raised earlier by

15   Mr. Fink, if I may respond?

16         **THE COURT:**  Briefly.

17         **MR. CAMPBELL:**  Thank you.  You can check the record.

18   I'll tell you what I intended to say and what I thought I said,

19   that Judge Kenney did not hold a hearing and did not make any

20   determinations of credibility with regard to the weight of the

21   affidavits based on having heard from affiants themselves.  I

22   didn't say anything as effusive as that, but that's what I

23   thought I said, and that is -- I don't think he would contest

24   that point.

25         **THE COURT:**  All right.  Okay.  Moving on.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                  7/12/2021

1          I'd like to look on the Connarn affidavit set forth

2   in ECF number 6-6, and I want to quote specifically from it.

3   Let's see, we may need to do some screen sharing, but I will

4   quote from it.

5          "I was working as the attorney acting as poll

6   challenger with the Michigan Republican Party.  When I was

7   approached by -- where I was approached by a Republican Party

8   poll challenger, who stated that a hired poll worker of the TCF

9   Center in Wayne County was nearly in tears because she was

10  being told by other hired poll workers" -- with an S -- "at her

11  table to change the date the ballot was received when entering

12  ballots into the computer."

13         Again, I want to emphasize the sequencing here.  "The

14  affiant is stating he was working as an attorney acting as a

15  poll challenger with the Republican Party in Michigan.  He was

16  therefore -- or there he was approached by a Republican Party

17  poll challenger, who stated that a hired poll worker at the TCF

18  Center was nearly in tears because she was being told by other

19  poll workers at her table to change the data" -- I'm sorry, "to

20  change the date that the ballot was received when entering

21  ballots into the computer."

22         So here it appears to the Court that Connarn is

23  saying that she was told by an initial person that a second

24  person, who was told by a third person and other additional

25  persons, that the second person should back date ballots.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1            Question for counsel:  Does counsel believe it is

2    appropriate to support allegations on such third-hand

3    knowledge, triple hearsay testimony that counsel has no hope of

4    ever introducing into evidence?

5            Who would like to answer that question for the

6    Plaintiffs or counsel for the Plaintiffs' counsel?

7            Okay.  Mr. Campbell, go ahead.

8            **MR. CAMPBELL:**  Thank you.  Judge, that's Paragraph 1,

9    and then in Paragraph 2 there is evidence of an actual note

10   being slipped.  It gives context.  It's not even hearsay.

11           **THE COURT:**  Who is JJ?  Are you talking about that

12   note JJ?

13           **MR. CAMPBELL:**  Yeah, I'm talking about -- again,

14   that's the portion of the affidavit you put on the screen, but

15   I've got to tell you, I have no encyclopedic knowledge of that

16   particular affidavit, and I'm the latest person, other than

17   maybe Mr. Buchanan, to this case, but I mean that seems pretty

18   obvious.  It's -- you're establishing a circumstance that

19   explains the rest of the information relative to the -- what's

20   going to follow.  Again, I'm -- I'm -- I'm surprised, and a

21   little troubled, that the Court would even have a problem with

22   that.

23           **THE COURT:**  Oh, really?  Okay.  Because that's just

24   layers of hearsay.  I don't know why that would be surprising

25   to you.  I'll give --

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                        7/12/2021

1          **MR. CAMPBELL:**  But it's not hearsay --

2          **THE COURT:**  -- counsel an opportunity to --

3          **MR. CAMPBELL:**  -- it's not offered for the truth of

4   the matter asserted.

5          **THE COURT:**  Excuse me.

6          **MR. CAMPBELL:**  It's not offered for the truth of the

7   matter asserted.  Again, I've got to tell you, Judge, that...

8          **THE COURT:**  Did anyone here take any steps to

9   identify the Republican Party poll challenger, the hired poll

10  worker, the other hired poll workers?  Any inquiry made into

11  that?

12         I will move on.

13         Let's go to Ms. Jessy Jacob's affidavit set forth at

14  ECF number 6-4 at PDF pages 36-38 and the amended complaint

15  states that "On November 4th, 2020, Jacob was instructed to

16  predate the absentee ballots received" -- I'm sorry, "Jacob was

17  instructed to predate the absentee ballots received date that

18  were not in -- that were not in the qualified voter's file, as

19  if they had been received on or before November 3rd."

20         So this is the predating of absentee ballots, and Ms.

21  Jacob estimates that this was done to "thousands of ballots."

22         Question to counsel:  Did anyone engage in any

23  inquiry to determine if there was an explanation for why such

24  predating would have taken place?

25         **MS. HALLER:**  Your Honor, I'm sorry, which exhibit are

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   we talking about?

2           THE COURT:  We're looking at -- certainly.  We're

3   looking at ECF number 6-4, the Jessy Jacob's affidavit, and

4   it's in PDF format pages 36 through 38.  So the allegation here

5   is that she was instructed to predate absentee ballots to the

6   date of -- to before November 3rd.

7           And the Court's question is simply:  Did counsel

8   engage in any inquiry to determine if there was an explanation

9   for why such predating may have occurred or would be happening?

10          MS. HALLER:  I don't remember, your Honor.  I just

11  don't remember.  I know that I may have, but I can't say.

12          THE COURT:  All right.  Was anyone, Ms. Haller,

13  working on the Jacob affidavit with you?  You were --

14  correct -- working on it?

15          MS. HALLER:  I mean I have a recollection of

16  reviewing, but I don't have a specific recollection as to -- I

17  need to refresh my recollection, to be honest.

18          THE COURT:  All right.  Mr. Fink.

19          MR. DAVID FINK:  The Jacob affidavit was filed in the

20  *Constantino* case.  Importantly, Miss Jacob was a City employee

21  who did not do work for the city clerk's office.  She was on

22  furlough from another department, and she was called in when

23  they needed additional people to assist on the election and on

24  the counting.

25          Chris Thomas provided an affidavit, which provided

140

Motion hrg.                          7/12/2021

1    some detail and explanation of Ms. -- of Jessy -- Ms. Jacob's

2    misunderstanding.  Most notably, she did not understand that

3    the ballots had already been checked and verified before they

4    arrived at the TCF Center, and she did not understand that

5    nobody was predating anything.  They were, on occasion, told to

6    put dates into the computer which had not yet gone into the

7    computer, but the important issue here isn't the facts.

8            What's important is Mr. Thomas had a conflicting

9    affidavit, and Judge Kenney ruled -- I won't read it.  I won't

10   bore the parties with the reading of it.  I guess it's not

11   boring, but I won't take the extra time.

12           On Page 4 of his opinion judge Kenney, in extreme

13   detail, explained why Ms. Jacob was wrong, and, nonetheless,

14   this complaint repeats what was said by Ms. Jacob as though it

15   is the gospel.

16           **MS. HALLER:**  Your Honor, what it does is not speak to

17   the gospel, but what it does is -- we briefed in 112 -- ECF 112

18   the holding of the *Constantino* court's ruling, and the three

19   dissents by the Supreme Court judges -- the justices in

20   Michigan, and how they made clear that there was in fact no

21   evidentiary hearing in that case and that they said there that

22   should be a need.

23           It was Justice Zahra who urged the circuit court to

24   meaningfully address Plaintiff's allegations by an evidentiary

25   hearing, particularly with respect to the credibility of the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1   competing affidavits, and Justice Viviano says, "A court may,

 2   and given the exigencies of time, sometimes must act on a

 3   motion for preliminary injunctive relief based on the parties'

 4   bare affidavits."

 5           So the courts may rely on, in Michigan, on bare

 6   affidavits, and, in doing so, that they point out the fact that

 7   there needed to be an evidentiary hearing, which did not

 8   actually occur, and so what happened when -- this hasn't

 9   actually been heard, and so if we do have the opportunity for

10   an evidentiary hearing, we will seek to have this witness

11   brought forward.

12           **THE COURT:**  And so, again -- Mr. Fink, hold on -- the

13   issue, again, that I have here is, is that we've got a few

14   affidavits that were filed in the *Constantino* case, and the

15   question, again, that I have for counsel on the *King versus*

16   *Whitmer* matter is:  To what extent did you review the contents

17   of those affidavits before including them?  I understand that

18   they came from another -- I understand what the Supreme Court

19   rulings were, but my question is so much more simpler in that

20   I'm asking what did counsel do?  Did you do anything for

21   purposes of reviewing the content, and did you see anything

22   that will make you say, "Wait a minute, let me understand what

23   this is."  That's my question.

24           Ms. Haller can you answer that for the Court?

25           **MS. HALLER:**  Sorry, your Honor, I'm trying to unmute.

Motion hrg.                                    7/12/2021

 1          I guess I'm confused by the standard.  We submitted

 2   the information to the Court on a good-faith basis that this is

 3   a signed and sworn statement in another court of law so I'm a

 4   little confused by the questions because we didn't put forth

 5   false documents.  We didn't act in bad faith, and that -- and

 6   my understanding is for sanctions, which is what I believe

 7   we're here -- we're supposed to be talking about bad faith, and

 8   I simply am at a loss because, yes, this information was

 9   included in our complaint as a source, which is what typically

10   defendants want.  They want your sources, and they want an

11   opportunity to investigate those sources.  That's why we have

12   this process called discovery.  So I am confused as to what

13   we're actually talking about.

14          **THE COURT:**  Oh, okay.  Let me ask Mr. Campbell what

15   he thinks about that because I just -- I don't understand --

16   you don't think that there's -- it seems to me you're

17   concluding that you don't have any obligation, as long as you

18   have an affidavit that's been, you know, that's been sworn, a

19   sworn affidavit, that relieves counsel of any obligation to go

20   further?  Is that how you feel about that Mr. Campbell?  What

21   is your --

22          **MR. CAMPBELL:**  On the bare bones of your scenario,

23   anything that is sworn, no.  But this isn't anything that was

24   sworn.  This is somebody who was there.  That's not in dispute,

25   and now it's a question of what they saw.  But, yeah, if

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                  7/12/2021

1    they're willing to swear under oath as to what they saw, that

2    makes them at least a res gestae witness --

3              THE COURT:  But this is not even an issue.

4          MR. CAMPBELL:  I'm sorry, Judge, can I finish,

5    please?

6              So what we have here, and this is not just a

7    statement from somebody who was there.  This is somebody whose

8    statement was, as noted, submitted in a different case, which

9    means other lawyers saw it.  They believed it to be appropriate

10   for submission to the Court in that circumstance.

11             THE COURT:  So that's enough?

12         MR. CAMPBELL:  If I may?

13             On top of that, you have an expert with a report who

14   expressly says he's relying in part on some of the information,

15   and, oh, by the way, it supports the statistical analysis.  So

16   this is not just a statement that somebody happened to say

17   under oath, and the Court is wrong to frame it in that manner.

18             THE COURT:  All right.  Mr. Fink.

19         MR. CAMPBELL:  That question is not really indicative

20   of anything in this case, with due respect.

21             THE COURT:  Mr. Fink.

22         MR. DAVID FINK:  Ms. Haller said it exactly right

23   when she said she doesn't understand what the question is.  I

24   think that's true.  The question is what responsibility did

25   they have to vet the facts they were presenting to the Court?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                               7/12/2021

1          They keep saying "it's an affidavit" and, therefore,

2    they can put it into evidence, but this is not an unquestioned

3    affidavit.  This is an affidavit that was already questioned in

4    another proceeding, and in that proceeding, not only did the

5    judge make a determination that the affidavit was not -- was

6    based on ignorance and a misunderstanding of the facts, but

7    also there were competing affidavits.  In fact, the judge said

8    that there were multiple affidavits that disagreed, but the

9    point -- with what she said, but here's what matters.  What

10   matters is they didn't talk to her and create a new affidavit.

11   They didn't --

12           **MS. HALLER:**  Has Mr. Fink --

13           **MR. DAVID FINK:**  -- work with her.

14           **THE COURT:**  Hang on, Ms. Haller.

15           **MS. HALLER:**  But Mr. Fink --

16           **THE COURT:**  Ms. Haller.

17           **MS. HALLER:**  -- is accusing us of --

18           **THE COURT:**  Ms. Haller.

19           **MS. HALLER:**  Yes, your Honor.

20           **THE COURT:**  Let him finish.

21           Go ahead, Mr. Fink.

22           **MR. DAVID FINK:**  I'm simply going to guess that

23   Ms. Haller is going to say that they did talk to her, and

24   perhaps they did.  The point is that the allegations she made

25   were very effectively refuted and then repeated here in the

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1  complaint, repeated in the compliant as though there was

2  nothing, no issue, no issue of concern.  I'm sorry.

3          THE COURT:  Thank you.  I understand.  All right.

4          Ms. Haller, you want anything else to add?

5          MS. HALLER:  Thank you, your Honor.  I would just ask

6  Mr. Fink if he has spoken to this witness because he is making

7  allegations related to her testimony or anticipated testimony,

8  but I'm not clear if Mr. Fink has spoken to the witness about

9  his conclusions.

10          THE COURT:  Okay.  I don't even know that that is a

11  relevant question.

12          MS. HALLER:  Because --

13          THE COURT:  What do you have to respond to that,

14  Mr. Fink?

15          MR. DAVID FINK:  I will respond, I guess.

16          MS. HALLER:  May I respond?

17          MR. DAVID FINK:  Because I don't think my due

18  diligence is before the Court.

19          MS. HALLER:  Well, in an evidentiary hearing you

20  would have an opportunity to examine any of the witnesses that

21  we would bring forward.  So I -- I -- I simply do not

22  understand how you can impugn the credibility of a witness who

23  is not before this Court and go as far as to say that we've

24  provided falsehoods or acted in bad faith in some manner, and

25  that is simply all I'm saying.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                               7/12/2021

1          **THE COURT:**  All right.  Thank you.

2          Mr. Fink, you don't need to respond to that.

3          Mr. Kleinhendler, you don't need to respond to it.

4          The Court's moving on to the Bomer affidavit, and

5     that's set forth at 6-3, ECF 6-3, page ID 1008-10.

6          Now, the Plaintiffs' pleadings allege that Defendants

7     changed votes for Trump and other Republican candidates.  The

8     Bomer affidavit is provided in support of that claim, and,

9     specifically, the affidavit states in part, "I observed a

10    station where election workers were working on scanned ballots

11    that had issues that needed to be manually corrected.  I

12    believe some of these workers had been changing votes that had

13    been cast for Donald Trump and other Republican candidates."

14         There we go.

15         The amended complaint calls this eyewitness testimony

16    of election workers manually changing votes for Trump to votes

17    for the Biden, and, again, the amended complaint calls this,

18    "eyewitness testimony of election workers merely changing votes

19    for Trump for votes to Biden."

20         Question from this Court:  Does an affiant belief

21    that something occurred constitute evidence that the thing

22    actually occurred?

23         Who would like to take that question on from counsel

24    for -- Plaintiffs' counsel or Plaintiffs' counsel.

25         **MR. CAMPBELL:**  Again, if that belief is based on

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  circumstantial or actual physical viewing of that evidence,

2  yes.

3          **THE COURT:**  And it doesn't appear to be because there

4  isn't any -- this affiant, Miss Bomer, does not say -- he says,

5  it's stated "I believe some of these workers," and I think the

6  question becomes also does counsel know what formed the basis

7  for the belief because it certainly is not apparent to this

8  court.  What's the basis of Mr. Bomer's belief that there was

9  something as significant as votes being changed from one

10  candidate to another?  What's the basis of that belief?  He

11  didn't say that he saw it.

12          **MR. CAMPBELL:**  I have to draw the line there, Judge.

13  I'm not so sure that you can say in the world of language that

14  that statement excludes seeing it.  In other words, one can

15  believe it because they saw it but not write it that way, and

16  so I think you have to allow for where language might play a

17  role here in how the thought is expressed.  Now, I'm not saying

18  that it says -- it says that she saw it, but I think this Court

19  is wrong to conclude that it means she didn't see it because,

20  if you see it, that would certainly help you to form a belief.

21          **THE COURT:**  Well, I think it's wrong for an affidavit

22  to be submitted in support -- as evidentiary support if there's

23  been no kind of minimal vetting.  I mean if you -- if you can't

24  determine from the plain language of the affidavit, what am

25  I -- how am I supposed to draw any kind of inference from it?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1              **MR. CAMPBELL:**  It's called an evidentiary hearing.

2              **THE COURT:**  And it's also called -- it's also called

3     you need to preliminarily -- every lawyer has that duty to do a

4     minimal amount of investigation before filing evidence or

5     what's purported to be evidence to this Court.

6              Mr. Kleinhendler, yes.

7              **MR. KLEINHENDLER:**  Thank you, your Honor.

8              We reviewed each one of these affidavits.  We read

9     them.  We realized they were filed in other proceedings, and,

10    as I said earlier, they purported and were consistent with the

11    findings of our experts and the other information placed before

12    you, and that's -- you cannot -- I propose to you, your Honor,

13    you cannot look at -- you can't nitpick one and one and one and

14    say this, standing alone, has no evidentiary basis.

15             We have an affidavit from Russ Ramsland, in detail,

16    saying that the machines themselves flipped votes, detailed

17    analysis from an expert sworn before this court.  It's,

18    therefore, unremarkable and, frankly, consistent, and now we

19    have an eyewitness who saw it or believes she saw it.

20             So the notion that we did no due diligence is

21    incorrect.  We did a ton of due diligence, and also keep in

22    mind that we are -- we are -- we are proffering this to the

23    Court, and the Court can give little or no weight to this

24    evidence.

25             This is not the whole case, and if we came in with a

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1  complaint and we had one exhibit, this affidavit, I get it,

2  okay, what are you doing, but we come into court with 960 pages

3  basically the same theme of what we're doing, okay, and this,

4  to us, appears consistent with the narrative, with the

5  evidence, with the expert testimony that we're getting, and

6  that's my response to your specific question on paragraph

7  whatever it was of this affidavit.

8         **THE COURT:**  Thank you.  I'm moving on to another --

9  Mr. Fink, quickly.

10        **MR. DAVID FINK:**  Just very quickly.  This support for

11 no matter what they say goes back to, well, it's consistent

12 with what the experts said, and now they say Mr. Ramsland said

13 that there was evidence that these machines flipped votes.  We

14 haven't talked about that.  I think it's worth talking about it

15 for a moment.

16        Machines cannot possibly flip votes in the state of

17 Michigan.  It is legally impossible.  Machines tabulate votes

18 in Michigan.  They don't have votes in them.  Votes in Michigan

19 are on paper ballots.  They're scanned by machines, they're

20 counted by machines, but the machines can't flip them, and the

21 recount process is the way that you address it.

22        They can't just keep saying they didn't need to do

23 due diligence on any of these affidavits just because they have

24 some subjective belief that some of the tabulating machines

25 could have made mistakes.  If they made mistakes, they'd be

Motion hrg.                              7/12/2021

 1   rejected.

 2          At a later time, at an appropriate time, I'll respond

 3   to the issue in Antrim County and why that wasn't a hand

 4   recount.

 5          **MR. KLEINHENDLER:**  Your Honor, if I may add --

 6          **THE COURT:**  No, no, no.  Let me -- I am going to ask

 7   a follow-up question, sir.

 8          Does anyone -- did anybody -- and, again, which has

 9   been my focus, did anyone inquire as to whether or not

10   Mr. Bomer actually saw someone change a vote?  Anyone?

11          Okay.  Let the record reflect that nobody made that

12   inquiry, which was central to his affidavit.

13          All right.  I'd like to move on to -- this is going

14   back to Ms. Jacob, the affidavit wherein she -- where

15   Plaintiffs allege that Defendants permitted double voting by

16   persons that had voted by absentee ballot and in person, and

17   one piece of evidentiary support that is provided is the

18   affidavit from Ms. Jessy Jacob, and she, in that, it's stated,

19   "I observed a large number of people who came to the satellite

20   location to vote in person, but they had already applied for an

21   absentee ballot."

22          And the question that I'm asking was:  Jacob, from my

23   view of this affidavit, does not state that these people voted

24   in person and through absentee ballot, correct, because I mean

25   that -- there's a conclusion here that there was double voting?

Motion hrg.                                    7/12/2021

1          The Court is asking where in this affidavit does

2    Ms. Jacob state that persons that she saw vote in person as

3    well as through absentee ballots?

4          Can anyone answer that question?

5          **MS. HALLER:**  Your Honor, I would respectfully submit

6    that we can make these witnesses available for an evidentiary

7    hearing.

8          **THE COURT:**  No, no.

9          **MS. HALLER:**  And the Court at that time can evaluate

10   the witness' testimony.

11         **THE COURT:**  Okay.  Yeah.  You know what, I understand

12   that and I appreciate that, and, again, I will state that my

13   question is going to the minimal duty that any attorney has in

14   presenting a sworn affidavit to the Court for consideration in

15   terms of anything.

16         What is the inquiry that was made in this scenario?

17         And I'm not hearing that -- I've heard nothing.

18         **MR. CAMPBELL:**  Well, Judge, your question there is

19   about the affidavit?  Because the affidavit is as you've read

20   it.  I thought your inquiry was as to the paragraph that was

21   written and not the affidavit so I don't understand how the

22   inquiry about the affidavit would have anything to do with it.

23         **THE COURT:**  Well, you understand, sir, that I am

24   referencing a quote from the affidavit?

25         **MR. CAMPBELL:**  I understand you're referencing her

                  King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

 1  quote.  Now, I don't hear you to take issue with the fact -- I

 2  mean that's certainly not an astounding moment, right, that

 3  some people would show up and ask to vote on the same day even

 4  though they had previously asked for absentee?

 5          **THE COURT:**  No, it isn't.  It is not an astounding

 6  moment, but the astounding moment here is, is that the affiant

 7  appears to conclude that this is double voting taking place.

 8          **MR. CAMPBELL:**  I didn't read that part of the -- I

 9  didn't hear you say that part of the affidavit.

10          **THE COURT:**  Oh, I'm sorry.  I did.  Well, I stated

11  that the Plaintiffs allege that --

12          **MR. CAMPBELL:**  Right.

13          **THE COURT:**  -- the Defendants permitted double voting

14  by persons that had voted by absentee ballot and in person and

15  cites, in evidentiary support of that claim, Ms. Jacob's

16  affidavit, the Jacob affidavit.

17          **MR. CAMPBELL:**  I get that, but, again, so -- but it's

18  in a complaint that makes that allegation that, again, if it's

19  not -- if that affidavit doesn't have to support that claim,

20  that claim may not be good.  There are other bases that is, as

21  you've indicated, the one that they pick for the footnote, if

22  you will, for where it's something to be done, and I think

23  there's inferences that can be drawn, and it should not shock

24  this Court that somebody could show up, after having asked for

25  an absentee ballot, and then decided to show up on game day --

Motion hrg.                                    7/12/2021

1    election day and make the vote, but it shouldn't shock this

2    Court to learn that there are some people who get an absentee

3    ballot vote and then show up and vote again.

4          **THE COURT:** I don't see any evidence of that.  I

5    haven't -- yeah, it does shock me.

6          **MR. CAMPBELL:** Again --

7          **THE COURT:** It shocks me in the sense that --

8          **MR. CAMPBELL:** What's there evidence of --

9          **THE COURT:** I haven't seen.

10         **MR. CAMPBELL:** (Indiscernible.)

11         **THE COURT:** I don't see any evidence of that.  I'm --

12   again, you can stick with what I'm presenting here.

13         Mr. Fink, you may speak.

14         **MR. DAVID FINK:** Only very briefly.

15         When this issue was raised by Ms. Jacob, it was

16   responded to.  I don't have the affidavit in front of me.  It

17   was responded to by Chris Thomas, who explained the process in

18   which voting works.

19         People could not vote twice.  If an attempt was made

20   to enter the second vote, the qualified voter file would have

21   reported the problem that somebody had already voted, and

22   there's a process.  It happens.  People forget.  People make

23   mistakes.  But there's a process, and she was no expert.  She

24   was very new to the process.  She came in.  She didn't know

25   what she was looking at, and I don't even know that she's still

Motion hrg.                              7/12/2021

1   making these allegations, but what I do know is the allegations

2   were refuted.  The judge addressed them, and when the

3   Plaintiffs came back, they did no due diligence to find out if

4   they were true or even possible.

5             I just want to say real quickly that several of the

6   things they claimed here, it isn't just somebody's observation.

7   It's physical impossibility.  They're claiming things that

8   couldn't have happened either by law or fact, and they're not

9   vetting anything in what they filed.  Thank you.

10            **MR. KLEINHENDLER:**  Your Honor, I'd like to respond to

11   that, and this is what I wanted to say before.

12            **THE COURT:**  Briefly.

13            **MR. KLEINHENDLER:**  We're consistently hearing

14   testimony from Mr. Fink as to what factually happened because

15   it's against the law.  Mr. Fink has not been sworn in as a

16   witness here.

17            **THE COURT:**  I'm aware of that.

18            **MR. KLEINHENDLER:**  He's not qualified as an expert,

19   your Honor.  That's all you're getting.

20            Now, I just want to refer to these questions you're

21   asking, and I come back to the same refrain.

22            **THE COURT:**  Hang on for a second before you go any

23   further.  Do you have direct information on the questions that

24   I'm asking?  Because that's the only reason that I would allow

25   you to speak at this point, sir.  I mean did you talk to any of

Motion hrg.                                    7/12/2021

1   these affiants?  Why are you -- why are you -- what information

2   do you have?

3                MR. KLEINHENDLER:  My point is we talked to experts.

4                THE COURT:  Okay.  I understand that.

5                MR. KLEINHENDLER:  Okay.  And what they were telling

6   us confirmed what these affiants were telling us.

7                THE COURT:  Okay.  You know --

8                MR. KLEINHENDLER:  So there's nothing surprising

9   about what these affiants were saying.

10               THE COURT:  Thank you, Mr. Kleinhendler.  I've heard

11  that answer before.  I'm taking it under consideration.  Thank

12  you.

13               All right.  I'm going now into affidavits -- we have

14  multiple affidavits that have been submitted by parties

15  pertaining to -- relating to the Plaintiffs' pleading which

16  claims that Defendants counted ineligible ballots, and, in many

17  cases, did so multiple times, and there's a group, if you will,

18  of evidentiary support set forth at ECF Number 6, Page ID 903,

19  Paragraph 94, and it indicates that these are the multiple

20  affidavits from challengers stating that batches of ballots

21  were repeatedly run through the vote tabulation machine.

22               These are affidavits referenced, and they are from

23  Helminen -- this next name I'm not even going to try.  Well, I

24  can try.  Waskilewski, Mandelbaum, the Rose affidavit, the

25  Sitek affidavit, the Posch affidavit, and the Champagne

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   affidavit, as well as the Bomer affidavit.

2          Where is our court reporter?  Andrea -- Ms. Wabeke is

3   okay.  There you are.  Thank you.

4          Okay.  Question, counsel, as relates to this claim.

5          Hang on, Ms. Haller.

6          Did counsel inquire as to why a stack of ballots may

7   be run through tabulation machines more than once?  Not

8   anything to do with experts.  You know, simple question,

9   counsel of record.  Did you make that inquiry, yes or no?

10         Who did?  Raise your hand if you made the inquiry

11  after reviewing this reference in the complaint as to why a

12  stack of ballots might be run through tabulation machines.

13  These were obviously statements that were made or observations

14  that were made, conclusions that were drawn in multiple

15  affidavits.

16         Did anyone ask the simple question as to -- make an

17  inquiry as to why would that happen?  Anyone?

18         **MS. HALLER:**  Yes, your Honor.

19         **THE COURT:**  Thank you, Ms. Haller.  Go ahead.

20         **MS. HALLER:**  Can you, just for clarification, for the

21  record --

22         **THE COURT:**  Yes.

23         **MS. HALLER:**  -- please give me the citations of what

24  we're talking about.

25         **THE COURT:**  Yes.  So I'm talking about the

Motion hrg.                              7/12/2021

1   Plaintiffs' pleading referenced at ECF Number 6 at Page ID 942,

2   Paragraph 190g.

3               **MS. HALLER:**  Okay.  ECF 6, Page 942.

4               **THE COURT:**  Right.  Page ID 942, Paragraph 190g,

5   which references Section 2b and 2c.

6               **MS. HALLER:**  Okay.  Your Honor, would it be a lot of

7   trouble to put that up on the screen?

8               **THE COURT:**  Let's see if I can do that.

9               **MS. HALLER:**  Judge, we haven't downloaded the

10  complaint --

11              **THE CLERK:**  You want to see a copy of the complaint

12  or you want to see these affidavits?

13              **MS. HALLER:**  The Court is asking questions about

14  certain exhibit numbers, which I can't track.

15              **THE COURT:**  Ms. Mandel --

16              **THE CLERK:**  You're citing to the pleadings that --

17  your citation is to the pleading itself?

18              **MS. HALLER:**  It is.

19              **THE CLERK:**  The affidavits would take us several

20  minutes to pull out since there's no indexing by Plaintiffs.

21              **MS. HALLER:**  Is it easier to post it on the screen?

22              **THE CLERK:**  It will take us a few minutes.

23              **THE COURT:**  It will take some time.

24              **MS. HALLER:**  Are you going by names?  Can you give me

25  the names again because they're not numbered --

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1         **THE COURT:**  Let me do a quick check on -- it's

2    referenced as a group of evidentiary support at ECF Number 6 at

3    Page ID 903, Paragraph 94.  Is that section the section wherein

4    these multiple affidavits are referenced, correct?

5         All right.  So those names, Ms. Haller, and that's

6    the operative section I'm referring to is the ECF Number 6

7    document at Page ID 903, Paragraph 94.

8         **MS. HALLER:**  Okay.  Earlier your Honor had said --

9         **THE COURT:**  I did.  I did, and I'm correcting myself.

10   I actually am correcting myself in saying that in Paragraph 94,

11   ECF Number 6 at Page ID 903.  This is all part of the

12   complaint.

13        **MS. HALLER:**  No, I understand, your Honor.  It's just

14   not consistent with the documents as I -- at least as I have

15   them on the ECF filing.  So I'm just trying to get the numbers

16   because I don't have them saved by page number, to be clear.  I

17   have them by ECF number like 06-18, 06-26.  So I'm just trying

18   to find where your Honor might be.

19        **THE COURT:**  Well, if you wrote -- yeah, well, the ECF

20   at Number 6 at Page ID 903.  What is this here?  Bring it down

21   just a little more so I can see the top.  Okay.

22        **THE CLERK:**  This is the paragraph you were citing

23   from, Judge, from the amended complaint.

24        **THE COURT:**  Right.  Yes, it's Paragraph 94, and it

25   references there -- as you can see, Ms. Haller, we're

Motion hrg.                              7/12/2021

1  highlighting it now -- these are affidavits that are

2  referenced.

3           **MS. HALLER:**  Okay.

4           **THE CLERK:**  It would take us several minutes to pull

5  them up if you need to see them on the screen.

6           **MS. HALLER:**  No.  Thank you for the citation.  I was

7  very confused.  Now I see you're citing to the complaint

8  itself.

9           **THE COURT:**  Oh, yes, each time.  Each time I was.

10          **MS. HALLER:**  I see.  Okay.  Thank you.

11          **THE COURT:**  Yep.  And so my question is whether

12  counsel queried as to why a stack of ballots might be run

13  through tabulation machines more than once, as is claimed in

14  those series of affidavits set forth in Paragraph 94 of the

15  complaint.

16          **MS. HALLER:**  Without disclosing too much attorney

17  work product, as I think we may be, but we certainly had

18  conversations on how the tabulation machines worked.  We

19  certainly did investigations in relation to the tabulation

20  machines.  We went through the Dominion handbook, their

21  manufacturing book.  We went through all of the information

22  posted on the Michigan government website.

23          **THE COURT:**  Okay.  So you saw other explanations as

24  to why this could -- is that true -- that it would not

25  necessarily be a fraudulent reason why this could have

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                            7/12/2021

1   occurred?

2        **MS. HALLER:**  I'm not sure I'm clear on your Honor's

3   question.

4        **THE COURT:**  My question is:  The documents that you

5   reviewed that you just kind of referenced just a moment ago,

6   did those documents provide an all -- a reason as to why

7   ballots could be run through the tabulation machines more than

8   once, an explanation --

9        **MS. HALLER:**  Your Honor, the question depends on

10  context.  So if somebody's just testing a machine and they're

11  going through the process of testing it, then you would want to

12  do it multiple times possibly, but if you're talking about

13  within the actual counting or tabulation process, those ballots

14  are never supposed to leave the subject precinct.  Those

15  ballots are not supposed to be put through more than once.

16  Absolutely not.  That would violate Michigan law.

17       So it depends on the context of the question because,

18  of course, outside of the actual election, if you're testing or

19  if you're checking to see if the machine works, that's a

20  different question.

21       **THE COURT:**  All right.  Mr. Fink, did you want to say

22  something?

23       **MR. DAVID FINK:**  Yes, your Honor.  Thank you.

24       First of all, the issue of whether they're not

25  supposed to leave the precinct had nothing to do with what was

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   being asked.  The question was is there, in the ordinary course

2   in counting, a time which ballots would be fed more than once

3   through a tabulating machine, and the answer is an unequivocal

4   yes, absolutely, happens all the time, and there was an

5   affidavit from Chris Thomas that explained the process.  That

6   was filed in -- early on in this matter.

7           Now, what we learned -- what we learned --

8       **MS. HALLER:**  Can you cite for that, Chris Thomas'

9   affidavit, just because --

10      **MR. DAVID FINK:**  There were two.  He filed one

11  affidavit.

12      **THE COURT:**  Can you give that cite?  It was attached

13  to the State Defendants' response.  I think it's Exhibit 2 of

14  the State Defendants' response.

15          Go ahead, Mr. Fink.

16      **MR. DAVID FINK:**  Thank you.  There were two

17  affidavits by Mr. Thomas, and I'm not sure which one that is,

18  but in Paragraph 20 of an affidavit that was filed in the -- I

19  apologize, I don't know which case this was filed in, but

20  Mr. Thomas explained that with these high-speed readers, after

21  they go through, sometimes there's a jam and they have to rerun

22  the ballots.  Sometimes there's one bad ballot in the stack.

23  Sometimes a problem ballot, pulls it out, they have to rescan

24  the ballots.  It happens all the time.

25          But what Ms. Carone didn't understand, and what the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   rest of these witnesses didn't understand, was when this occurs

2   the election worker cancels the previous count so it doesn't

3   get counted twice.  But if there is a mistake, as I explained

4   earlier, even if there's a mistake, it would mean that more

5   votes were counted in a precinct than voters appeared, and, in

6   the entire city of Detroit, at this TCF Center, there were only

7   111 additional votes over the number of voters.

8          In any one precinct --

9          **MS. HALLER:**  Your Honor, we object because he is

10  testifying --

11         **MR. DAVID FINK:**  I'm sorry, I can do this without it

12  being testimony.

13         The point is that anyone knowledgeable in election

14  procedures would know that a discrepancy of more than a dozen

15  votes would jump out, would stick out like a sore thumb.  The

16  so-called experts absolutely should have known that, and there

17  were no such discrepancies.

18         **THE COURT:**  Anything else, Ms. Haller?

19         **MS. HALLER:**  Yes.  We object to what counsel just

20  represented.

21         **THE COURT:**  Yeah, I understand that.  All right.  Let

22  me move on then.

23         The Plaintiffs have alleged in their pleading that

24  Defendants authorized "counting ballots without signatures or

25  without attempting to match signatures and ballots without post

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   marks."  There are three pieces of evidentiary support that has

2   been provided in support of that allegation.

3          Now, there are three affidavits stating that the

4   affiants witnessed no signature or postmark on the ballot

5   envelopes of some counted ballots.  These affidavits were from

6   Brunell, Spalding -- all right, hang on, Mr. Johnson -- and

7   Sherer.

8          Now, my question is very straightforward, and that

9   is, simply, did any of the affiants indicate that the votes in

10  question, you know, the ballots I guess in question, if they

11  were -- if the vote ultimately was for President Biden such

12  that these affidavits would constitute evidence sufficient to

13  support Plaintiffs' vote dilution equal protection claim?

14         So that means that, as relates to Brunell, Spalding

15  and Sherer, was there an inquiry made by counsel as to whether

16  or not, at bottom, the votes in question were for President

17  Biden such that this representation, if you will, these

18  allegations would constitute evidence to support the vote

19  dilution claim?

20         Who can respond to that?

21         And before Ms. Haller may perhaps have an answer to

22  that, let me ask Mr. Johnson, did you want to respond -- did

23  you -- what did you want to say, sir?

24         **MR. JOHNSON:**  I was attempting to respond to

25  Mr. Fink's prior statement.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          THE COURT:  Okay.  Let me hold you off on that, and

2    I'll give you a moment later.

3          Ms. Haller, did you want to respond to this?

4          MS. HALLER:  I'm sorry, your Honor, I had to unmute.

5          I would point to Dr. Briggs' expert report because in

6    there he explains how the absentee ballots would -- that are

7    identified as missing would actually lower the count -- the

8    counted votes, and because those are -- his report does address

9    disenfranchised voters.  So I raise that as a point that

10   relates to this, but as for additional information, maybe

11   Brandon can answer.

12         THE COURT:  Did you ever -- all right.  That's fine.

13   I'm sorry, Mr. Kleinhendler.

14         MR. KLEINHENDLER:  Your Honor, I have to make a

15   point here.  It doesn't -- we don't have to show in this

16   Paragraph 95, where I think you've only mentioned two or three

17   of I think there might be a dozen affidavits highlighted there,

18   we don't have to show that a vote flipped from Biden to Trump

19   or Trump to Biden.  It is enough under the law that the

20   integrity of the voting was compromised.  That is enough in

21   itself to call --

22         THE COURT:  Well, the reason I say -- the reason that

23   I have asked that question is, is because it pertains directly

24   to your equal protection claim.

25         MR. KLEINHENDLER:  Exactly right, and that's the

Motion hrg.                          7/12/2021

1   point I'm trying to make to you.  For the equal protection

2   claim, we don't have to show a flip.  We can show fraud in the

3   counting.  It doesn't matter who got the vote.  If we show

4   that --

5          THE COURT:  Ultimately, sir, the relief that you're

6   requesting -- that you requested of the Court was -- it was not

7   just to decertify the vote.  It was to -- it was to attribute

8   votes that Plaintiffs believe were mistakenly taken away from

9   Trump and given to Biden, so that is why I am asking that

10  question.  I think it's a legitimate question, and let me just

11  say this.  It's fine.  Your objection to the question and to

12  the causation here is noted, but -- I don't have to have -- you

13  don't have to argue that point with me.

14         I'll let you finish up your thoughts, sir.

15         MR. KLEINHENDLER:  I'm not -- I'm not trying to argue

16  with you.

17         THE COURT:  No, no, no.

18         MR. KLEINHENDLER:  Not the point I'm trying to make.

19         THE COURT:  Okay.

20         MR. KLEINHENDLER:  The point is we had multiple

21  layers of requested relief, and the question you had,

22  specifically, was where in these affidavits does it show that

23  the malfeasance we've identified flipped the vote, and my point

24  is that's not necessary.  If there's malfeasance, then the vote

25  becomes not countable, and, therefore, you can't certify one

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1  group of electors based on votes that have these type of

2  problems with them.  You don't have to reach the conclusion

3  that you have posited, which is show that it flipped from one

4  side to the other.  That's my point.

5          THE COURT:  Okay.  All right.  Thank you.

6          Let me go on and ask as a follow up to the allegation

7  about absentee ballots and, you know, that they had been

8  counted without a signature, without attempting to match

9  signatures and without postmarks.  In Michigan -- question:  In

10 Michigan, must absentee ballots be received through U.S. Mail

11 and, therefore, be postmarked to be counted?

12         MS. HALLER:  I think your Secretary of State was

13 actually admonished by a court this year because of the

14 guidance that she issued on the process related to absentee

15 ballots, and in that decision by the Court of Claims it was

16 made clear that the Secretary of State did not follow the

17 process as actually required under law, which brings all the

18 absentee ballots, I would submit, into question, as to how they

19 were counted.  You know, so, your Honor, in direct response to

20 your question about the process, we cannot rely on the

21 Secretary of State's guidance.

22         THE COURT:  Mr. Fink.

23         MR. DAVID FINK:  Your Honor, even now --

24         THE COURT:  Mr. Fink, I'm sorry, let me go to

25 Ms. Meingast, and then I'll come to you.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **MR. DAVID FINK:**  Absolutely.

2          **THE COURT:**  Counselor.

3          **MS. MEINGAST:**  Thank you, your Honor.  I guess I'm

4   not hearing it right, but there was a question.  Absentee

5   ballots this year in November were counted the same as they

6   have been in every other year.  In other words, they had to be

7   received by 8:00 p.m. at the right precinct on election day.

8   There was nothing different in the way we counted absentee

9   ballots this year.

10         There was an earlier case in which Plaintiffs moved

11  for an extension of the 8:00 p.m. deadline in order to receive

12  ballots after 8:00 p.m. and for several days thereafter.  There

13  was an injunction to that effect.  It was undone by the Court

14  of Appeals, and their reasoning was count it the same way we

15  have done for every year on absent voter ballots.  So there

16  wasn't any change in the way absent voter ballots were handled

17  or processed this year.

18         **MS. HALLER:**  And we would just object to any

19  testimony by counsel, especially without citation or evidence.

20         **MS. MEINGAST:**  That would be the published opinion

21  from the Court of Appeals that reversed the injunction.

22         **MS. HALLER:**  Okay.  And thank you.  As far as the

23  Court of Appeals decision, we also have a dissent in that case.

24         **THE COURT:**  All right.  Mr. Fink, quickly, please.

25         **MR. DAVID FINK:**  Yeah, may I speak?

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          First, the Court's direct question was:  Is a

2    postmark necessary?  Does a ballot have to be mailed?

3          And of course the answer is no.  Ballots are often

4    handed in by hand.  Some of them are handed-in boxes in front

5    of clerk's offices by hand.  Sometimes it's done right across

6    the table, right across the desk in the clerk's office, as we

7    talked earlier, but the most telling part about the answer to

8    the Court's question was that not one of the nine lawyers

9    representing the Plaintiffs interrupted or corrected Ms. Haller

10   when she repeated the misunderstanding that the Secretary of

11   State somehow handles absentee ballots.  In the state of

12   Michigan, the Secretary of State does not touch an absentee

13   ballot.

14         The absentee ballots are sent out, received, and

15   counted by local units of government, not the county, not the

16   state, but local units of government.  To the extent there

17   could have been any misunderstanding, it was corrected early on

18   in the Court of Claims by Judge Cynthia Stevens in the first

19   Trump lawsuit, but after all these months, after all this time,

20   that counsel doesn't understand -- that neither local counsel

21   nor national counsel understands that in Michigan elections are

22   run by local units of government tells the Court that there was

23   zero due diligence performed in the most important --

24   potentially important case ever filed in this state.

25         **THE COURT:**  Thank you, Mr. Fink.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          Mr. Johnson.

2          **MR. JOHNSON:**  Thank you, your Honor.

3          I just want to take this opportunity to make two

4   points.  I'll start with the most recent point.  Obviously, the

5   *Genetski V Benson* decision, which Ms. Haller referenced, it --

6   you know, it found that the Secretary of State had issued a

7   binding rule.  So whether or not the Secretary of State

8   actually physically handled ballots is irrelevant.  She issues

9   binding guidance.  That was the holding in the case, and that

10  is why it was ultimately found that she failed to apply the

11  proper rule-making process.

12         Second point goes back to Mr. Fink's testimony

13  regarding the Detroit count.  We had affidavits from

14  Commissioner Hartmann, and I forget the name of the other

15  woman, but the two Republican members of the Wayne County Board

16  of Canvassers who attempted to decertify the results of Wayne

17  County.  This goes to the fact of, you know, the discrepancies,

18  the irregularities in Wayne County in general, and the absentee

19  ballot counts in Detroit in particular, and that's where, I

20  believe the number was something like 76 percent of the

21  precincts were out of ballots.  He also discussed earlier

22  problems in the primary.

23         So we have public officials charged with

24  certification of the election, two of which attempted to

25  decertify.  They claimed they faced threats of physical

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   violence and harassment.  That explained the initial

2   certification despite their misgivings, but the public

3   officials in charge of absentee ballot counting in Detroit went

4   on record publicly, in testimony, not just with us, describing

5   the tremendous irregularities in the counts in absentee ballots

6   in Detroit.  So that is the point I wanted to make.  Thank you.

7            **THE COURT:**  All right.  Mr. Fink, last word on this,

8   and then I'm going to move on.

9            **MR. DAVID FINK:**  Very briefly.  The percentage of

10  precincts out of balance does not mean anywhere near what it's

11  suggested.  If it's 76 percent, we're talking about precincts

12  that are out of balance by one, two, or three votes, not by a

13  lot of votes.  The total out of balance would be the issue, and

14  President Trump lost the state by 154,000 votes.  It was never

15  at issue.

16           Now, regarding those commissioners.  As everybody

17  knows, they tried retroactivity to rescind the decision that

18  they made.  That's -- the courts have -- there's just no point

19  to really get into that issue.

20           The real issue here is that the question is, and to

21  get way back to where the Court was in the first place, the

22  question is these allegations were made about the way votes

23  were counted and is there a basis to say that the absence of a

24  postmark or the failure to compare a signature proves fraud,

25  and there isn't.

Motion hrg.                              7/12/2021

1          THE COURT:  Thank you.  I'm ready to move on to the

2     Larsen affidavit set forth at ECF 6-4, PDF Pages 25-34.

3               Plaintiffs state in their pleadings that Defendants

4     authorized, "systematic violations of ballot secrecy."  One

5     piece of evidentiary support that they provide is the Larsen

6     affidavit.

7               The amended complaint specifically states,

8     "Mr. Larsen observed that some ballots arriving without any --

9     observed some ballots arrive without any secrecy sleeve.  These

10    ballots were counted after visual inspection, whereas many

11    ballots without a secrecy sleeve were placed in the problem

12    ballot box.  He found this, quote, perplexing and raised

13    concerns that some ballots were being marked as, quote, problem

14    ballots based on who the person had voted for."

15              I would like to know if counsel would agree that

16    Larsen being perplexed and his stated concern do not serve as

17    evidence that ballots were placed in the problem box because of

18    who the vote was for.  I mean can anyone agree to that,

19    Mr. Campbell?

20          MR. CAMPBELL:  I can't agree to what you have said,

21    that somehow the word "perplexed," as describing his

22    circumstances, undercuts any of the evidence that's there, and

23    it should be perplexing that somebody is picking the troubled

24    ballots or the questioned ballots based on who's being voted

25    for.

Motion hrg.                                7/12/2021

1            THE COURT:  And you think being perplexed by an

2    observation is sufficient enough to get into court?  It's

3    sufficient to support an affidavit?  Do you feel that that

4    constitutes evidentiary support, sir?

5            MR. CAMPBELL:  Absolutely in this case without --

6            THE COURT:  Wow, okay.

7            MR. CAMPBELL:  Matters that are there -- I'm shocked

8    to hear a suggestion to the contrary.

9            THE COURT:  Yeah.  Okay.  And you're -- and this is

10   based on your theory that all of these affidavits need to be

11   viewed in context; right?

12           MR. CAMPBELL:  All of them need to be viewed in

13   context, of course, your Honor.  How else would you do it?

14           THE COURT:  I'm looking at the -- I'm looking at

15   them, in fact, individually.  I understand --

16           MR. CAMPBELL:  Right, not in context.  That's very

17   clear, Judge.

18           THE COURT:  Good, good, because I feel that every

19   affidavit that is going to be submitted in support of any of

20   these claims, there has to be a minimal belief on the part of

21   counsel that these allegations are rooted in fact, and --

22           MR. CAMPBELL:  And I think that's very clear.

23           THE COURT:  Excuse me, excuse me.

24           If you have language in an affidavit that is vague,

25   and it's clear that this language is -- this is based on his

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   own belief.  He sees something that looks a little different

2   for him so he's perplexed by it.  That's quite a low standard

3   for submission of an affidavit, but I will move on.

4             **MR. CAMPBELL:**  He's perplexed --

5             **THE COURT:**  My plan --

6             **MR. CAMPBELL:**  No, no, your Honor, he's perplexed

7   because there appears to be a choice on which ballots get

8   questions and which don't.  That -- again, if this is the

9   subjective nature in which this Court is going to view the

10  sanctions questions, which usually are objective, what can I

11  do?  But objectively, seriously, the word "perplexed" is what

12  you think is worth the time and effort of the -- all the

13  lawyers, your staff on this proceeding to talk about sanctions?

14            **THE COURT:**  And I asked you:  Did you really think

15  that it was worth it to file in support of your claims that

16  have taken up the time, energy, and space over these last

17  several months?  So I would caution you to do not question my

18  procedure.  I'm here to question what you've done, sir.  I'm

19  here to evaluate.  Hear me out --

20            **MR. CAMPBELL:**  And I am not a potted plant.

21            **THE COURT:**  I'm here to evaluate --

22            **MR. CAMPBELL:**  I am not a potted plant.  I will

23  represent my client --

24            **THE COURT:**  That is quite fine, but you -- don't

25  worry about what I'm doing at this point.  You are here to

Motion hrg.                                    7/12/2021

1    answer my questions.

2              Mr. Fink.

3              **MR. DAVID FINK:**  Judge, it's probably not my place to

4    say this, but I'm concerned by the disrespect for the Court

5    that Mr. Campbell is showing, particularly in light of the

6    history of this litigation and how patient the Court has been.

7    I want to make a quick comment that the reason that "perplexed"

8    is such a significant reference in this particular affidavit.

9    This is the affidavit of an individual who claims to have

10   served as an assistant attorney general, claims to have some

11   expertise in this area, claims to understand election law.  For

12   him to then just say he's perplexed by something rather than

13   actually explaining where he sees some violation of law or

14   practice.  We thought that was significant when we saw it a

15   long time ago.

16             My concern goes back to the same issue all along, and

17   I'll get out and I'll stop here, which is just some diligence

18   should have been applied.  What diligence is due might be a

19   question for the Court, but not when there's no diligence at

20   all, and, in this case, Mr. Larsen's affidavit had already been

21   reviewed by Judge Kenney, and, in many respects, rejected and

22   counsel should have been, I believe, to our case, I believe

23   that counsel should have undertaken a serious inquiry to

24   determine the facts before making all of these allegations.

25             **MS. HALLER:**  Mr. Fink, we are available for an

Motion hrg.                                7/12/2021

1   evidentiary hearing, as we stand by every affidavit and

2   document in this complaint.  We did not file false statements.

3   We made the documents clearly identified as they were.  We did

4   not alter documents, and any allegations that we have done

5   something that is improper really lacks foundation, and I would

6   just generally say that going through each affidavit or each

7   paragraph in the complaint, we'll do so as your Honor requests.

8   I would, just for clarity, for efficiency sake, ask that we --

9   if we can put it up side by side with the hearing so we can see

10   where the paragraph is that we're talking about.

11          **THE COURT:**  We'll try to do that.  I have to admit

12   that I'm a little surprised that counsel is coming to a

13   sanctions hearing and does not have the documents that they

14   themselves filed in fronts of them to be able to answer these

15   questions, but, be that as it may, we will try to do what we

16   can in terms of screen sharing.

17          Yes, Mr. Campbell.

18          **MR. CAMPBELL:**  Judge, you're aware that you began

19   this sanction hearing by saying it was your announcement of a

20   show cause here today.  These types of questions that you've

21   asked were not raised by the Defendants in their proceedings,

22   and, again, there's been a lot of opportunities for them to

23   submit things.  So I don't believe that statement about

24   surprise or suggesting in any way that we've come here

25   unprepared to look at the things that the Court wants us to be

Motion hrg.                              7/12/2021

1   directed towards, and, again, you have had all sorts of

2   opportunities to speak with the people who were responsible for

3   putting together this complaint and all of the attorneys who

4   stand behind its filing.

5         **THE COURT:**  All right.  Thank you.

6         I'm going to now go to the affidavit of

7   Mr. Gustafson.  That's set forth at ECF Number 6-4 at PDF Pages

8   48-49.

9         Now, Plaintiffs allege that unsecured ballots arrived

10  at the TCF Center loading garage, not in sealed ballot boxes,

11  without any chain of custody and without envelopes, after the

12  8:00 p.m. election day deadline.  They provide three pieces of

13  evidentiary support, and I want to look first at the Gustafson

14  affidavit.

15        That affidavit states, "Large quantities of ballots

16  were delivered to the TCF Center" -- here we go.  Here we go.

17  "Large quantities of ballots were delivered to the TCF Center

18  in what appeared to be mail bins with open tops.  These ballot

19  bins and containers did not have lids, were not sealed and did

20  not have the capability of having a metal seal.  The ballot

21  bins were not marked or identified any way to indicate their

22  source of origin."

23        My question to counsel at this point is:  What is

24  counsel's understanding of Michigan's requirements as to the

25  container ballots and how they are to be transported after

Motion hrg.                          7/12/2021

1  they've been removed from the ballot drop boxes?

2          In other words, what do you understand about the

3  requirements here for ballot bins?

4          **MS. HALLER:**  Your Honor.

5          **THE COURT:**  Yes.

6          **MS. HALLER:**  I would just say we do not purport to be

7  experts in Michigan's process, but I would point out that these

8  exhibits are -- these Larsen and Gustafson are exhibits to a

9  filing in the *Constantino* case, which is attached to the

10 complaint.  It's one of the exhibits that I believe your Honor

11 is referencing.  Note that these are exhibits for the Court and

12 information that has been found in another court of law just --

13         **THE COURT:**  As has been stated, Ms. Haller, a few

14 times, and again --

15         **MS. HALLER:**  We're going to a different document,

16 your Honor.

17         **THE COURT:**  Well, I mean yeah, but we're still

18 dealing with the same kind of scenario with affidavits having

19 been filed.  Are you saying this particular affidavit was filed

20 in the *Constantino* case?

21         **MS. HALLER:**  Yes.  I'm saying this is Exhibit 6-4B.

22 I believe it's B, as opposed to Larsen, which is A, and then

23 there's a C, in that these are exhibits to a filing by

24 *Constantino,* which the whole thing was attached.

25         **THE COURT:**  Okay.  Again, I think, again, the Court

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                          7/12/2021

1    and counsel have a different view, and that's clear throughout

2    this hearing, as to what obligations, and, again, I really just

3    want to clarify that the Court -- I know that none of us are

4    experts in election.  We're not necessarily experts in Michigan

5    election process, but the bottom line is is that if you're

6    going to file an affidavit, in this Court's view, there should

7    be some general understanding of the process such that when you

8    see a statement by an affiant that you're willing to submit as

9    evidentiary support, is that not why an affidavit is being

10   filed?

11          If you have not asked at least the minimal questions,

12   you know, I find that problematic, and I'm just trying to

13   determine the level of inquiry that has been made here, and I

14   really do think that that's a misunderstanding that counsel has

15   in terms of where the Court is going, and I -- and I won't

16   entertain, at this point, any argument as to why you would

17   think that that's an inappropriate inquiry, because I feel that

18   it is an appropriate inquiry.

19          Mr. Fink?

20          **MR. DAVID FINK:**  Yes, your Honor.  This allegation by

21   Mr. Gustafson -- as stated by Mr. Gustafson, occurred in the

22   *Constantino* case, and so, in that case, on November 11th, Chris

23   Thomas -- Christopher Thomas did file an affidavit explaining

24   that there is no requirement that ballots be transported in

25   sealed ballot boxes.  He's not aware of any jurisdiction in

179

Motion hrg.                              7/12/2021

1  Michigan sealing these ballots prior to election day and

2  employees bringing the ballots would bring the ballots to the

3  TCF Center, consistent with chain of custody.  They weren't

4  just left out someplace, but that's a factual statement.  I

5  could be wrong.  I don't think I am, but I could be wrong, but

6  what's important they certainly were on inquiry notice.

7           Once this affidavit was filed by Mr. Thomas, once

8  they'd seen this other litigation, two weeks before they filed

9  their case, all they had to do is ask and if they'd asked any

10 election official in Michigan, any clerk in Michigan would have

11 told them we don't even have sealed ballots for transferring

12 ballots around.  After the vote count, yes, you seal the

13 ballots, but before the vote count, you can't seal the ballots,

14 and they're not sealed and they're not transported that way.

15 It's them saying "we are not experts" tells us all we need to

16 know.  They didn't get experts.  They're not experts, and,

17 nonetheless, they threw this information in front of the Court,

18 hoping something would stick, in the most important litigation

19 imaginable.

20           **THE COURT:**  Thank you, Mr. Fink.  Mr. Campbell?

21           **MR. CAMPBELL:**  I hear Mr. Fink not taking any issue

22 with the facts that are described in the affidavit.  I'm not --

23           **MR. DAVID FINK:**  Right, they don't mean anything.

24 I'm sorry, I didn't mean to respond.

25           **MR. CAMPBELL:**  They mean something.  Somebody has to

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   say it, right, and all you did is produce another affidavit

2   that said, yeah, that's what was done, but until the first

3   person said it, the second person didn't comment on it, and I

4   think you can take some notice that things that are unsealed,

5   that things are unprotected, the things that are not -- that

6   are handled in the manner that even Chris Thomas says -- you

7   know, I never met Chris Thomas.  He's not here.  We don't even

8   have the chance of going over his affidavit in this kind of

9   detail.  Love to do that in an evidentiary hearing, but, again,

10  all this is is a fact of what somebody saw, and, in fact, it

11  appears that you're here to testify that it's true.  So how is

12  it -- what more diligence was needed to produce a truthful

13  affidavit from you?

14          Apologize, I should not have asked him the question.

15          **THE COURT:**  All right.  Let me --

16          **MR. DAVID FINK:**  I can speak to it, only if the Court

17  wants to.

18          **THE COURT:**  Yeah, let me say, again, I feel like I

19  have to respond again that, you know, I need to point out here

20  that my concern is is that counsel here has submitted

21  affidavits to suggest and make the public believe that there

22  was something wrong with the election.  Isn't that what this is

23  all about?  That's what these are affidavits are designed to

24  do, to show that there was something wrong in Michigan.  There

25  was something wrong in Wayne County.  These are the

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   observations of what took place at the TCF Center.

2           I am simply taking those affidavits, which counsel

3   submitted, in support of the general proposition that there was

4   fraud in the Michigan election.  I'm looking at that, looking

5   at the language of the affidavit and saying is that what this

6   even says?  What level of inquiry have you made to even know --

7   I mean, you know, what -- for a person who doesn't have a lot

8   of experience, maybe they -- some of them, of course, I know

9   the poll challengers went through a training, and so -- but the

10  bottom line is is that if you see something and you're not that

11  familiar with the process, it doesn't always mean that what

12  you're seeing is what you think you're seeing.  It doesn't

13  matter that -- it doesn't always mean that what you see as

14  being odd, that it is in fact odd if you don't know the

15  process.

16          All I'm asking, counsel, is if you took the time to

17  look at those affidavits and say, well, wait a minute, there

18  might be something here in the sense of is that part of

19  Michigan's process?  I want -- that's my question:  Were those

20  -- that type of inquiry made?  And it's a germane question,

21  because the premise of this lawsuit is is that Michigan

22  election was fraudulent.

23          All right.  So, Mr. Kleinhendler, I'm sorry, sir,

24  Mr. Kleinhendler.

25          **MR. KLEINHENDLER:**  Yes, your Honor.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **THE COURT:**  You may comment briefly, sir, and then
2    I'm going to move on.
3          **MR. KLEINHENDLER:**  I can't say -- I reviewed some of
4    these affidavits.  I had people working with me reviewed every
5    single one.  I believe we did speak to some of them.  I think
6    we did speak to some of the attorneys, at least that was my
7    understanding, and, with regard to your specific question, it's
8    just basic knowledge when you're transporting a bunch of
9    documents in an unsealed container that can be tampered with
10   from a remote location, that raises a suspicion.  Whether it's
11   required under Michigan law or not, it's completely irrelevant.
12   We're not saying here even that Michigan poll workers knew that
13   they might be doing something wrong.  We have alleged here that
14   there was things going on that maybe even some of the workers
15   themselves unknowingly let slide, and so I want to make that
16   point clear.  If you're bringing something from far away and
17   it's open, that raises an issue.  Your Honor, if I handed you a
18   can of Coke that was open and I told you don't worry I didn't
19   drink from it --
20         **THE COURT:**  These are elections that have been run in
21   the state of Michigan for years.  The analogy is certainly not
22   on point, sir; it is not.
23         **MR. KLEINHENDLER:**  The second point -- well, the
24   second point I'd like to raise is the notion that we filed this
25   lawsuit as some kind of public relations.  That is not correct.

                    King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    We filed this lawsuit on behalf of clients, who were electors,

2    who asked us to file this lawsuit.  What the public did with it

3    or didn't do it with it is beyond our control, and I reject,

4    categorically, the mantra you've heard in the papers and you're

5    hearing again now that we did this as a publicity stunt.  I

6    reject that wholeheartedly, your Honor.  We did not.  We filed

7    it on behalf of Plaintiffs who asked us to file it, and I'd

8    like to make that point clear.

9            THE COURT:  Okay.  And, you know, again, the analysis

10   will always be -- part of the analysis, in certain of the

11   sanctions that are available to the Court, is was the purpose

12   for which the lawsuit was filed, was it an improper purpose,

13   and this is also -- you know, I think that things can also be

14   drawn from the amount of effort that you put into a lawsuit in

15   terms of what are you really trying to do, you know, and I've

16   not drawn any conclusions at this point, but I am trying to,

17   again, drill down --

18           MR. KLEINHENDLER:  Your Honor, I just want to leave

19   you --

20           THE COURT:  Excuse me, Mr. Kleinhendler.

21           MR. KLEINHENDLER:  -- with --

22           THE COURT:  I have not finished.

23           I am trying to drill down as to the level of inquiry

24   that was made by counsel in these multiple affidavits, all

25   right, and there is no way that I could not do that and then

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    put myself in a position where I could accurately assess

2    whether behavior here has been sanctionable, and when I say

3    here, I'm talking about through the course of the litigation.

4              All right.  I am going to move on, counsel, to the

5    Meyers' affidavit and Meyers -- part of the amended complaint,

6    it is stated that Meyers -- I'm sorry, let me give you, it's

7    ECF 6-3.  This is the Meyers affidavit at PDF Pages 130-131.

8    Per the amended complaint, Plaintiff states, "Meyers

9    observed" -- Meyers "observed passengers in cars dropping off

10   more ballots than there were people in the car."

11             In Michigan, may people other than the voter drop off

12   a ballot?  Is that allowable in Michigan, to have someone,

13   other than the person who has voted, drop off a ballot for

14   someone?  That's my question.

15             **MR. CAMPBELL:**  The answer is that you can deliver

16   somebody else's ballot.

17             **THE COURT:**  Right.

18             **MR. CAMPBELL:**  If it's legally voted, it should be

19   legally counted.

20             **THE COURT:**  All right.  I want to point everyone's

21   attention to the next affidavit, which is the Ciantar --

22   certainly, I'm certain I botched this person's name.  I

23   apologize.  I will spell it.  It is C-i-a-n-t-a-r, set forth at

24   ECF Number 6-7 at Page ID 1312-14.  There it is right there.

25             And the amended complaint states that Mr. Ciantar,

Motion hrg.                                    7/12/2021

1    independent -- "independently witnessed," while walking his

2    dog, a young couple deliver three to four large plastic clear

3    bags that appeared to be, "express bags," as reflected in

4    photographs taken contemporaneously, to a U.S. postal vehicle

5    waiting.  The use of clear express bags is consistent with

6    the -- there's a whistleblower complaint that's been referenced

7    in the context of this lawsuit.  I have not ever seen any

8    underlying documents, but it's a whistleblower suit by a U.S.

9    Postal Service worker, Jonathan Clark.

10           Putting aside the fact that Plaintiffs have not

11   provided any evidence, as I just stated, regarding the postal

12   service whistleblower claim, here are a few excerpts from the

13   Ciantar affidavit which are now on the screen.

14           "I witnessed a young couple pull into the parking lot

15   of post office and proceed to exit their van, had no markings,

16   and open up the back hatch and proceed to take three to four

17   very large clear plastic bags out and walk them over to a

18   running postal service vehicle that appeared as if it was

19   'waiting' for them."

20           Let me go further.  "There was no interaction between

21   the couple and any postal service employee, which I felt was

22   very odd.  They did not walk inside the post office like a

23   normal customer to drop off mail.  It was as if the postal

24   worker was told to meet and stand by until these large bags

25   arrived."

                 King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          "As you can see in the pictures," the affidavit goes

2     on to say, "the bags were clear plastic with markings in black

3     on the bag, and on the inside of these clear bags was another

4     plastic bag that was not clear, could not see what was inside.

5     There were markings on the clear bag and what looked like a

6     black security zip tie on each bag, as if it were tamper

7     evident, as if it were a tamper type of device to secure the

8     bag.  This looked odd.  What I witnessed and considered that

9     what could be in those bags could be ballots going to the TCF

10    Center or coming from the TCF Center."

11         Now, this is quite a -- I don't -- I don't think I've

12    really ever seen an affidavit that has made so many leaps.

13    This is really fantastical.  So my question to counsel here is:

14    How can you, as officers of the Court, present this type of an

15    affidavit?  This is pure -- is there anything in here that's

16    not speculative, other than the fact that the individual saw

17    individuals with plastic bags?  They don't know what were in

18    them, happened to be located at the post office, and then

19    there's a leap made there.  Someone answer that question for

20    the Court.

21         Ms. Haller.  Thank you.

22         **MS. HALLER:**  Yes, your Honor.  The witness is stating

23    or setting forth exactly what he observed and his information

24    that he bases it on and he includes pictures.

25         **THE COURT:**  What --

Motion hrg.                                    7/12/2021

1          **MS. HALLER:**  He does not say more.  He does not say

2   less than what he knows to be true.  It is a true affidavit.

3   It is a person with some information, and he is setting forth

4   that information.  When we put the case together, we put forth

5   a pattern of evidence that shows fraud.  So it's a pattern of

6   evidence that comes together, and this is one piece of a

7   pattern.  He is testifying, in his sworn statement, as to what

8   he knows to be true.  He saw these plastic bags.  He's

9   explaining what he saw, and he takes pictures of them.

10          **THE COURT:**  Okay.

11          **MS. HALLER:**  I would submit, your Honor, that it's

12   not fantastical.  It's simply what he knew to be true.

13          **THE COURT:**  You think that he is actually thinking --

14   do you think, by the language in the affidavit, Ms. Haller,

15   that he is actually stating that he believes his conclusions to

16   be true when he says things like "could be, it appeared as if

17   they might have been waiting for him."  Where is the truth in

18   that?  I mean this is pure speculation.

19          All right.  Let me move on.

20          **MS. HALLER:**  It's in the --

21          **THE COURT:**  Is there any -- Ms. Haller.

22          **MS. HALLER:**  Your Honor --

23          **THE COURT:**  Let me ask you this question:  Was there

24   any information -- what information did the affiant have to

25   make any of these conclusions in his affidavit?  I mean

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   we're -- stay with me.

2          **MS. HALLER:**  He was speaking in the present tense and

3   he took photos.  So he saw what he saw and he documented it as

4   he did, and we don't typically rewrite what an affiant says.

5          **THE COURT:**  But don't we also as -- doesn't counsel

6   also have an obligation to evaluate that and say, "What is this

7   actually going to prove?"  He's -- he has made conclusions

8   based upon what he's observed, but there is clearly, within

9   this affidavit, nothing to support those conclusions.  This is

10  what he has -- what else is there?  This is anybody driving

11  down a street and seeing somebody with plastic bags.  You

12  automatically jump to the point, and, most importantly,

13  Ms. Haller, counsel, what is your duty here?  You said you

14  don't rewrite the observations --

15         **MS. HALLER:**  (Indiscernible.)

16         **THE COURT:**  Absolutely not.

17         **MS. HALLER:**  But your Honor --

18         **THE COURT:**  Ms. Haller, let me ask this final

19  question and then I'll let you speak.

20         My question to you is:  At what point do you have

21  that duty to say, you know what, there's really not enough

22  here?  You don't feel that -- I mean at what point do you say

23  that?

24         **MS. HALLER:**  May I respond, your Honor?

25         **THE COURT:**  Yes, please do.

Motion hrg.                                   7/12/2021

1           **MS. HALLER:**  I would simply submit that we identified

2    a witness as a potential source in a complaint to support

3    information that we would then hope to call that person as a

4    witness who would testify, would be anticipated to be testify

5    in accordance with what he or she had stated in a declaration

6    or affidavit.  This particular witness did not jump to any

7    conclusions and made that clear in his affidavit, and he did

8    believe -- I believe he believed that he saw ballots, but I

9    think he was hesitant to actually express that, and his

10   hesitancy comes through in his declaration, but there's nothing

11   untruthful about what he says.

12          **THE COURT:**  All right.  I saw another hand up.  All

13   right.

14          **THE CLERK:**  It was Ms. Powell, your Honor.

15          **THE COURT:**  Ms. Powell, yes, and then I'll get to

16   you.

17          Ms. Powell, yes, ma'am.

18          **MS. POWELL:**  Yes, we filed a massive and detailed

19   complaint in federal court that doesn't even require us to

20   append affidavits to.

21          **THE COURT:**  Right.

22          **MS. POWELL:**  The very fact that we filed 960 pages of

23   affidavits with the complaint shows extraordinary due diligence

24   on our part.  Virtually, every question the Court has raised

25   about these affidavits calls into question the veracity of the

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   affiants, and the only way to test that is in the crucible of a

2   trial or an evidentiary hearing, which the Court has denied at

3   every stage.

4           **THE COURT:**  All right.  Well, let me say volume,

5   certainly for this Court, doesn't equate with legitimacy or

6   veracity.  So please understand that is certainly my position.

7           Mr. Kleinhendler.

8           **MR. KLEINHENDLER:**  Yes, your Honor.

9           **THE COURT:**  Very briefly, sir.

10          **MR. KLEINHENDLER:**  Yes.

11          **THE COURT:**  Very briefly.

12          **MR. KLEINHENDLER:**  Yes, with regard to this specific

13  affidavit.

14          **THE COURT:**  Yes, sir.

15          **MR. KLEINHENDLER:**  We have amassed evidence in

16  Pennsylvania, and we've actually -- we can present it to the

17  Court, I think we have, where there was proof positive evidence

18  of United States Postal Service collusion and malfeasance in

19  connection with the delivery of ballots.

20          **THE COURT:**  Oh, so that's why you thought that was --

21          **MR. KLEINHENDLER:**  I'm giving you my impression on

22  this specific affidavit, where it seems to you to appear

23  bizarre to, you know, why -- you know what's the big deal, and

24  I'm telling you, your Honor, in good faith, that prior to

25  filing this, we have evidence that these very clear reports

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    that, in connection with Pennsylvania, there was malfeasance in

2    connection with the United States Postal Service.  So when I

3    looked at this or when I heard about it, it did not appear

4    unusual to me.

5          Now, we could have -- you know, we could have a

6    discussion of what that evidence is.  I don't want to get into

7    it now, but I want to make the point for the record, we had

8    clear, very credible evidence that the United States Postal

9    Service, believe it or not, had mishandled, had done illegal

10   acts in connection with the ballots that they delivered in the

11   2020 presidential election.

12         **THE COURT:**  Got it.  Mr. Fink.

13         Let me just ask one last question of you.  The

14   reports are based on this kind of spec -- well, I just -- let

15   me ask you this:  Did you -- is there a reason that you did not

16   submit that other evidence on the postal service, which is

17   quite, quite an inflammatory claim?  Is there a reason you did

18   not submit any evidence on that?

19         **MR. KLEINHENDLER:**  Your Honor.

20         **THE COURT:**  Yes, sir.

21         **MR. KLEINHENDLER:**  I believe at the time that we

22   filed this complaint, we just had reports.  We had one

23   whistleblower, who I believe we had interviewed.  It wasn't yet

24   hard enough, your Honor, what I would call hard evidence.

25   However, however, should there be an evidentiary hearing at

Motion hrg.                                    7/12/2021

1   this point, we have the who, what, and where of what happened

2   in Pennsylvania.

3           **THE COURT:**  All right.

4           **MR. KLEINHENDLER:**  What and where.

5           **THE COURT:**  Mr. Fink, quickly.

6           **MR. DAVID FINK:**  Your Honor, if I may.  We are in the

7   state of Michigan; we are not in Pennsylvania, and in the state

8   of Michigan, they made this allegation based on some paranoid

9   delusions of some witness, who never even gets to a punchline.

10  The fact is, if they've got evidence, and he says they've got

11  evidence, it should have been in the complaint.  If they don't

12  have evidence or if they don't have direct allegations, then

13  they shouldn't throw out these miscellaneous defamatory and,

14  frankly, phony allegations.

15          Now, this might all be true.  If you read it closely,

16  what it says is absolutely nothing, but it does fuel the fires

17  of the online conspirators and conspiracy theorists who want to

18  reprocess and use this to support their efforts, and that's

19  what happened here.  We'll get back to that later, but this was

20  not an accident.  This was not a case -- I'm sorry, let me just

21  finish this one thought.  I apologize, your Honor.

22          If they don't make out a legal theory with the facts

23  they're presenting, it's right for the Court to ask why they're

24  presenting the facts, and we'll get to that at the end.

25          **THE COURT:**  Let me -- I'm very close to counsel

Motion hrg.                                7/12/2021

1   wrapping up, and what that will mean for you is is that you'll

2   have an opportunity to, very briefly, address the Court on

3   anything that you might want to clarify, just a closing

4   statement.  Please do not rehash, but based upon what has been

5   discussed here today, but before I do that, I wanted to address

6   Ms. Lambert Junttila.  Are you still with us?

7           **MS. LAMBERT:**  Yes, your Honor, I'm here.

8           **THE COURT:**  Thank you so much.  And so in your latest

9   filing, you state that "Plaintiffs' counsel had a First

10  Amendment right to bring this election challenge and,

11  therefore, they could not be subjected to sanction."  You

12  further state, Counselor, that "The U.S. Supreme Court cases

13  that support this argument are just too numerous to mention,

14  and any attempt to string cite them here would be insulting to

15  all involved."

16          I will not be insulted.  I will not be insulted.  If

17  you can tell me whether the First Amendment prevents sanction

18  -- well, let me just start here in terms of is there a point

19  where a lawyers' conduct becomes sanctionable and is no longer

20  protected by the First Amendment?  Because you seem --

21          **MS. LAMBERT:**  Your Honor --

22          **THE COURT:**  -- to be quite --

23          **MS. LAMBERT:**  Thank you, Judge, and I appreciate the

24  opportunity.  The purpose of this lawsuit, I heard the Court

25  address it earlier, whether or not it was an improper purpose

Motion hrg.                                    7/12/2021

1    or to -- the premise of it was to show that the Michigan

2    election was fraudulent.  I think that these suits are critical

3    to our country to show that every vote counts and ensure that

4    every vote counts as it's intended to count.  It's not a

5    partisan issue to me.  Everyone should be able to bring

6    lawsuits to ensure election integrity, and the court system is

7    the appropriate place to bring those suits.

8             With regards to this particular case, the Court

9    didn't hear much about my role.  I filed the notice of appeal

10   before the Court.  Sidney Powell was lead counsel on this case.

11   I've spoken with her no more than two times for brief

12   conversations.  I've had a number of conversations with Howard

13   Kleinhendler, and all pleadings and briefs were prepared by

14   Howard and Sidney.  Even e-mail responses to opposing counsel,

15   I would check with them to see how they wanted me to respond

16   and then I would respond.

17            I viewed my role as the local attorney.  It was my

18   understanding that they would apply to be admitted to the bar

19   in the Eastern District of Michigan.  I know this case was only

20   alive for essentially seven days before this Court before it

21   was appealed.

22            So does that answer the Court's question?

23            **THE COURT:**  No, and thank you for letting me say that

24   and give you -- let me restate.  Again, pertaining to your

25   position that Plaintiffs' counsel had a First Amendment right

Motion hrg.                            7/12/2021

1   to bring this election challenge, my question to you, because I
2   find that the brief itself is extremely broad as to what you
3   consider to be an attorney's First Amendment right, in their
4   capacity as an attorney, in a courtroom, and my question to you
5   is:   Is there a point where a lawyer's conduct becomes
6   sanctionable and is no longer protected by the First Amendment,
7   or are you speaking of a right that is completely unbridled?
8   Help me.

9        **MS. LAMBERT:**  Your Honor, I think that an attorney's
10  obligation is to be an advocate for their client, and as long
11  the attorney is putting forth accurate pleadings, accurate
12  information before the Court, which I have done, that, no, it
13  is protected by the First Amendment and it would be
14  unconstitutional, and the Court is the appropriate place to
15  redress grievances.

16       **THE COURT:**  Let me just -- I want you to take some
17  time and look at -- this is a case from the Sixth Circuit.
18  It's the *Mezibob* case, which you, I'm certain are familiar
19  with, *versus Allen* at 411 Fed 3rd 712.

20            And the Supreme Court has noted that "It is
21  unquestionable that in the courtroom itself, whatever right to
22  free speech an attorney has is extremely circumscribed.
23  Furthermore, it appears that no circuit court has ever granted
24  an attorney relief under the First Amendment for this narrow
25  category of speech, because an attorney, by the very nature of

Motion hrg.                                7/12/2021

1   his job, voluntarily agrees to relinquish his right to free

2   expression in the judicial proceeding.  Our Sixth Circuit sees

3   no basis for concluding that free speech rights are violated by

4   a restriction on that expression.  In filing motions and

5   advocating for clients in court, an attorney is not engaged in

6   free expression.  She is simply doing her job."

7           And I think that is -- I was concerned, and you have

8   not done anything to put aside my concerns, Ms. Lambert, that

9   there is in fact, that is a circumscribed right that an

10  attorney has when they are acting in a capacity as a lawyer in

11  a courtroom.

12          All right.  So that is, counsel, where I'm going to

13  leave my questions here at this point, and what I would like to

14  do is to give counsel an opportunity, and I'll tell you the

15  order in which this may proceed, an opportunity to just give

16  some closing remarks and let the Court know if there's anything

17  that you would want to clarify, and I also would like to ask

18  each of you, if you feel that there is any basis upon which a

19  supplemental briefing would be helpful to this Court, based

20  upon what has been discussed today.  Please think long and hard

21  about that, because we've killed a lot of trees here, and so we

22  just -- we really want to know, you know, if you think it is

23  something that would be beneficial to the Court.  All right.

24          So let me begin with hearing from Plaintiffs'

25  counsel, and I'm going to start with Mr. Campbell.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1          **MR. CAMPBELL:**  So I understand, your Honor, this is

2    the Defendants' motion but you're asking me to go first.

3               **THE COURT:**  Yeah, I am.

4          **MR. CAMPBELL:**  I'm prepared to do so.

5               **THE COURT:**  I figured that you would.

6          **MR. CAMPBELL:**  Thank you.  The right to vote, quote,

7    the right to vote is among the most sacred rights of our

8    democracy, and, in turn, uniquely defines us as Americans.

9               Judge, I'm sure you like that, because you wrote

10   that.  That was the opening line of your 36-page opinion and

11   order denying the motion for injunctive relief, and I

12   appreciate the Court's point, but, respectfully, that statement

13   stops short of capturing what actually uniquely defines us as

14   Americans.

15              History shows us that the totalitarian regimes and

16   authoritarian rulers gladly let their subjects vote.  Nazi

17   Germany had plebiscites.  The Soviet Union held regular

18   elections, and even Hugo Chavez was happy to let folks vote for

19   him and touted himself as being popularly elected.

20              What separates our republic from the totalitarian and

21   authoritarian regimes is our system of checks and balances

22   created by the founders and preserved by generations.  That

23   guarantees each citizen a right to petition and redress

24   grievances and to challenge to the judicial branch the

25   executive's conduct of an election.

                   King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1        To ensure that each of our votes count, every vote must be

2   legally and properly counted.  It is this system of voting,

3   counting, and challenging that the public can draw confidence

4   from, and they usually do.

5        This Court has recognized and articulated the importance

6   of both capturing legal votes on a properly counting them.

7   That's the *Stein V Thomas* case cited in our briefing, and I

8   gave the cite earlier as well, where this Court said, "The

9   fundamental right invoked by the Plaintiffs the right to vote

10  and to have that vote conducted and counted accurately is the

11  bedrock of our nation.  Without elections that are conducted

12  fairly and perceived to be fairly conducted, public confidence

13  in our political institutions will swiftly erode."

14       This lawsuit was an opportunity to challenge whether it

15  was fairly conducted and to have a decision from this Court on

16  whether it was and then to move forward.

17       Twenty years ago in *Bush v Gore*, the United States Supreme

18  court, for the first time in our nation's history, exercised

19  its indispensable role in ensuring fair and accurate counts in

20  the election of a president.  The Court did not invent that

21  power for itself.  The power and authority to control the

22  outcome is firmly rooted in the Constitution.  It did, however

23  for, the first time, use its power, and it did so all because

24  one party petitioned for relief.  The relief in 2000 in *Bush v*

25  *Gore* was an order from the Court to the state of Florida to

Motion hrg.                              7/12/2021

1    stop counting votes.

2         In its most straightforward terms, this lawsuit asks, and

3    especially the injunctive relief asks that this Court order the

4    State of Michigan, the Secretary of State, to start counting

5    the votes and for the Governor to hold off announcing a winner

6    until the court-ordered count was completed.  Your order

7    labeled the request to be "stunning in scope" or "breathtaking

8    in its reach."  That came earlier.  I think Mr. Fink provided

9    us that also.

10        Respectfully, securing the promise of the cherished right

11   to vote by having your vote counted with only other legally

12   cast votes should not be considered so extraordinary.

13   Certainly, to my clients' clients, it was viewed as

14   self-evident and fair.  The suit and injunction were not

15   designed to disenfranchise a single lawful vote, rather, they

16   were filed to seek the relief promised in the Constitution,

17   given in *Bush v Gore* and premised on the good faith desire of

18   my clients and their clients.

19        This Court disagreed with the timing of the filing of this

20   case.  It was, however, filed as soon as it was capable of

21   being filed.

22        There may be some additional briefing you'd like on that.

23        It was filed after the deadline in the state statutes, but

24   it was largely filed as a federal claim and the due process

25   grounds.

Motion hrg.                                    7/12/2021

1          This Court applied laches to the request for an

2     injunction, but, as this Court knows, that is an affirmative

3     defense and does not usually diminish the quality of the claim

4     made.  This Court found no standing, but, in doing so, adopted

5     the dissent and not the majority from an Eighth Circuit Court

6     of Appeals case in denying the injunctive relief.  It cannot be

7     that this Court would hold that lawyers and litigants will be

8     sanctioned for essentially not knowing how another circuit's

9     law would be interpreted before it.

10         The claims here failed to win the injunction.  They failed

11    before you, and neither the Sixth Circuit, nor the U.S. Supreme

12    Court, disturbed your ruling.  That is the law of this case,

13    and my clients, the lawyers, all understand and respect that.

14    This Court wrote eloquently, "The Plaintiffs' alleged injuries

15    do not entitle them to seek their requested remedy, because the

16    harm of having one's vote invalidated or diluted is not

17    remedied by denying millions of others their right to vote."

18         That's Page 25 of your opinion.

19         This sentiment, and I think it's fair to describe it as

20    that, because the Court doesn't rely on stare decisis.  It

21    doesn't cite a case for this point, can be read differently in

22    the case law of the United States Supreme Court.  Good lawyers,

23    my lawyers, could easily read a different view in *Bush v Gore*,

24    when the Court there said, "The right to vote is protected in

25    more than the initial allocation of the franchise.  Equal

Motion hrg.                              7/12/2021

1    protection applies as well to the manner of its exercise.

2    Having once granted the right to vote on equal terms, the state

3    may not later arbitrarily or disparagingly in treatment value

4    one person's vote over that of another."

5        And that's 531 U.S. 98 at 104 and 105.

6        The Plaintiffs are electors and voters.  Your ruling can

7    be fairly read to say that diluting one vote might be okay or

8    even some votes.  This concept of one vote might cost others

9    theirs.  My clients and their clients read the precedent

10   differently.  That should not be sanctionable.

11       City of Detroit argues in their brief that the Plaintiffs

12   bringing the action raised doubts in minds of millions of

13   Americans about the legitimacy of the 2020 presidential

14   election.  So let's get this right, part of the executive is

15   saying that court filing somehow create doubts.  The fact is

16   that folks doubted this election.  It happened.  Folks doubted

17   the 2016 election.  We saw in *Stein versus Thomas*.  Folks

18   doubted the 2000 election, *Bush v Gore*, and I grew up, as many

19   ever us, did hearing the rumors, that were more than doubts,

20   about the 1960 election.

21       Leaving aside that the doubts come from the way that the

22   executive conducted its vote and gathered those votes for

23   counting, Defendants simply have it wrong.  This case was

24   driven by doubts arising from the eyewitness accounts and the

25   statistical evidence, and it was merely part of the necessary

Motion hrg.                                      7/12/2021

1    and proper process intended to settle such doubts.

2          They followed the precedent.  They followed *Common Cause*

3    *Georgia versus Kemp*, and they brought you statistical evidence

4    and they brought you witness declarations, but, still, doubling

5    down, the State says, in ECF 105, "The terrible byproduct of

6    Plaintiffs and their counsel's efforts is reflected in January

7    insurrection of our nation's capital."  Civil complaints do

8    not foment revolution.  Bringing claims based on affidavits

9    from those who were there and others who were able to study the

10   available information does not provoke insurrection.

11         Dismissing eyewitnesses that the Defendants label, in

12   their pleadings here, as uneducated and denying access to the

13   courts to those same citizens who seek to have their petitions

14   heard and grievances redressed is what is dangerous, and it is

15   contrary to the promise and guarantees of our republic.

16         **THE COURT:**  All right, Mr. Campbell.  Thank you.  Let

17   me ask a question, sir:  Is there anything that you think that

18   you would like to submit?  Do you think that there will be any

19   benefit to a supplemental brief on behalf of Plaintiffs'

20   counsel?

21         **MR. CAMPBELL:**  Your Honor, yes is my answer to that.

22         **THE COURT:**  What's the issue so I can see if I would

23   agree with you, sir?

24         **MR. CAMPBELL:**  Well, you have highlighted various

25   portions of affidavits and asked them for context and for an

                  King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   understanding.  You've essentially grabbed several, and, again

2   I hope you don't find this as an unfair example, but it's my

3   view, you've held us puzzle pieces, and you've asked us where

4   does this fit?  Where does this fit?  I think we ought to have

5   the opportunity to show you the cover of the box that shows

6   where those pieces fit.  I'm sure that would be helpful.

7           **THE COURT:**  Okay.  Let me say this.  Let us continue.

8   Mr. Buchanan is there anything, sir, you'd like to say on

9   behalf your client, Ms. Newman?  I understand, sir, your

10  position that she did not have a lot of involvement in this

11  matter.

12          **MR. BUCHANAN:**  That's all I would have, your Honor.

13  She didn't sign any pleadings.  She never made an appearance.

14  There was no intent for her.  She was a contract lawyer, 1099

15  employee basically, and her role was very limited, and although

16  Mr. Fink pointed out he sent the motions for sanctions to

17  Ms. Powell at that address, she never received those, and she

18  was never given the opportunity, obviously, to make any

19  decision of how to proceed or not proceed.  I got into this

20  case just recently because she just received notice of this

21  hearing.

22          **THE COURT:**  Let me ask you --

23          **MR. BUCHANAN:**  So --

24          **THE COURT:**  I'm sorry, go ahead.

25          **MR. BUCHANAN:**  That's it.  Her role was very limited.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1        **THE COURT:**  All right.  Thank you, Mr. Buchanan.

2        Mr. Fink, let me ask you a quick question:  Are you

3    disputing notice requirements as relates to Mr. Buchanan's

4    client?

5        **MR. DAVID FINK:**  Absolutely, we sent the letter --

6        **THE COURT:**  No, no, no, you don't have to.  Thank you

7    so much.

8        What I would like to do is give you, Mr. Fink, an

9    opportunity to provide a supplemental brief on this whole issue

10   of who knew -- you know, who received notice of your moving for

11   sanctions, and I would give anyone who feels that they have not

12   received the notice an opportunity to file a supplemental brief

13   on that, all right, and we can talk about time frame.  I don't

14   want to be unfair.

15       **MR. CAMPBELL:**  Your Honor, might I make a suggestion?

16       **MR. BUCHANAN:**  I have one quick comment.  I'm not

17   disputing to Mr. Fink's assertion that he sent his motion to

18   Sidney Powell's office.  The thing is my client was working

19   from home as a 1099 contract employee.  So you know, as a legal

20   matter, whether that constitutes notice, I don't know.  I'm

21   just saying that -- and I'm not questioning Mr. Fink's

22   representation at all.  I'm just saying that she never received

23   them after that.

24       So she played -- had no role in like whether to go

25   forward or not in this case, or, you know, the Safe Harbor

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                          7/12/2021

1   thing, and, most importantly, your Honor, I'm emphasizing -- I
2   don't know Mr. Fink's disputes this -- she worked five hours on
3   the matter.  She played a very limited role.  So I don't think
4   Rule 11 covers that level of involvement.  Thank you.

5            **THE COURT:**  Mr. Fink.

6            **MR. DAVID FINK:**  Your Honor, we can file a brief --
7   supplemental brief.  It will just indicate what we did do.  I
8   believe that we used the address on the pleadings.  We'll see.

9            **THE COURT:**  Okay.  So let me do this right.  So, you,
10  Mr. Fink, I am asking that you file a supplemental brief
11  identifying those individuals who you believe have received
12  notice of sanctions and then -- and the time frame in which
13  those notices were -- that notice was provided, and then
14  whoever is subject of that brief thing can also respond.

15           **MR. DAVID FINK:**  Your Honor, it would be helpful, and
16  I think probably save some paper and time for everybody, if we
17  could just find out -- no argument is necessary, but which
18  Plaintiffs' attorneys claim or believe they did not receive
19  notice so we'll only address the ones that say they didn't get
20  notice.  Mr. Wood said something.

21           **THE COURT:**  Right.  Mr. Wood.  So he's going to be
22  able to -- and Mr. Campbell is representing Mr. Wood, correct?

23           **MR. WOOD:**  Yes, your Honor.

24           **MR. CAMPBELL:**  If anybody is capable of doing that,
25  but, yes, Judge.

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1            THE COURT:  Okay.  All right.

2            MR. WOOD:  Judge, what I would say is, based on the

3  fact that I discern from today's hearing that my position may

4  be somewhat unique to the others, I'd like to have an

5  opportunity, and I will do this in conference with

6  Mr. Campbell, and I may have to get an independent counsel to

7  file formal documents and pleadings for me to seek a dismissal,

8  based on lack of jurisdiction and lack of a factual basis upon

9  which to bring a Rule 11 or a Section 1927 action against me.

10  So I'd like to be able to address that.

11            I'd also like to be able to address this issue of

12  notice.  I've already indicated I did not receive it.  So I'd

13  like to have a couple of weeks, because if I have to get

14  separate counsel, that will take sometime to get them up to

15  speed.  I would say this, that if you have all the Plaintiffs'

16  lawyers here, and if you ask them whether I asked to provide

17  substantive input into the pleadings, I think they'll tell you

18  no; whether I actually provided, they'll tell you no; whether

19  they asked me to, they'll tell you no; whether I had any

20  involvement in preparing the affidavits --

21            THE COURT:  I'm not going --

22            MR. WOOD:  -- they'll say no.

23            THE COURT:  Yeah, that's fine, Mr. Wood.  I'm not

24  going to do that.  What I am going to do, sir --

25            MR. WOOD:  If we don't have it here today, then I'm

Motion hrg.                                    7/12/2021

1   entitled to an evidentiary hearing and due process, because the

2   evidence will show that there is no factual basis upon which

3   this Court can sanction me --

4          **THE COURT:**  I'm giving you an opportunity --

5          **MR. WOOD:**  -- from an evidentiary standpoint.  I

6   haven't had an opportunity for an evidentiary hearing --

7          **THE COURT:**  And the Court --

8          **MR. WOOD:**  And I didn't have anything to do with the

9   drafting of the pleading.  I'm sorry.

10          **THE COURT:**  Before I give you an opportunity for an

11   evidentiary hearing, I don't know that I will be doing that, I

12   would allow you an opportunity to file a brief stating your

13   position, all right, and you know, because you're --

14          **MR. WOOD:**  I'm just saying --

15          **THE COURT:**  Because you are in a bit of unique

16   position in that you might need to have separate counsel, I'm

17   going to give you a little bit longer to submit, and I will

18   give you -- I can't -- you know, I'll give you -- I'll give you

19   two weeks to submit something to this Court setting forth your

20   position, and we'll take it from there, all right?

21          **MR. WOOD:**  Thank you, your Honor.

22          **THE COURT:**  You're welcome, sir.

23          Let me go on to -- so, Mr. Fink, you're clear?

24   You're going to go ahead -- yes, I would like for you to go

25   ahead and -- you wanted me to just see who you needed to

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   include in your supplemental briefing.  So who, of the

2   attorneys that are at this hearing, who, by hand show, who is

3   contesting the receipt of notice?

4           And so we have Mr. Kleinhendler.

5           **MR. KLEINHENDLER:**  Your Honor, I want to be clear,

6   your Honor.

7           **THE COURT:**  Yes, please.

8           **MR. KLEINHENDLER:**  I am contesting receipt of notice,

9   pursuant to Federal Rules of Civil Procedure 5, which is the

10  service that is required for a Rule 11 notice.  We did not

11  receive, I don't believe, Rule 5 service, and none of us, at

12  least I didn't, waive it.  So I want to preserve that, your

13  Honor, for the record.

14          **THE COURT:**  All right.  So you've heard that.  Anyone

15  else?  Mr. Wood?  Yes, Mr. Wood, we have you, sir.

16          Ms. Powell, you are also contesting notice?

17          Unmute, please.

18          **MS. POWELL:**  Yes, your Honor, on the same basis as

19  Mr. Kleinhendler.

20          **THE COURT:**  Thank you.

21          **MR. DAVID FINK:**  So --

22          **THE COURT:**  And I'll let you ask a question.  Let me

23  just get the head count.

24          Mr. Johnson, you, too sir?

25          **MR. JOHNSON:**  Yes, your Honor, and on the same

Motion hrg.                                    7/12/2021

1   grounds as Mr. Kleinhendler just asserted.

2             **THE COURT:**  Go ahead, Mr. Fink.

3             **MR. DAVID FINK:**  All I wanted to be clear about is

4   are these attorneys saying they did not receive, by first class

5   mail and/or e-mail, what we sent, or are they saying what they

6   received was inadequate notice because they were entitled to

7   some other type of service?  That's important because that

8   changes how we brief this.  Apparently, Mr. Wood and Ms. Newman

9   claim they had no idea because they didn't get actual notice,

10   but I think Mr. Kleinhendler is saying that he didn't -- he

11   wasn't satisfied with the form of the notice.

12             **THE COURT:**  Mr. Kleinhendler?

13             **MR. KLEINHENDLER:**  Yes, I received an e-mail, your

14   Honor.  I received the mailing, yes, of what they mailed, your

15   Honor.  In our opposition, we argue, and I don't want that to

16   be waived by your questioning here, we argued that the Rule 11

17   motion had other procedural defectiveness.  For example, they

18   bundled other arguments in the same motion.  They served a

19   notice without the brief that was ultimately filed --

20             **THE COURT:**  We have Safe Harbor briefing already.

21             **MR. KLEINHENDLER:**  Yes, yes.  All I'm -- the point

22   I'm trying to make here, your Honor, is I don't want to waive

23   any of that Safe Harbor briefing by your questioning.  I just

24   want to raise the point that there was no, in my view, there

25   was no Rule 5 service, which is required for a Rule 11 motion.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                            7/12/2021

1    That's it.  But I did get the e-mail.  I did get the first

2    class mailing of what they mailed.

3            THE COURT:  All right.  There's no waiver here.

4    You're not waiving anything.

5            All right.  Ms. Powell?

6            MS. POWELL:  Yes, your Honor.  I simply can't verify

7    actual notice today, but I will undertake the research and

8    advise on that later.

9            THE COURT:  All right.  Would that involve a phone

10   call to Mr. Fink or you would rather speak through your

11   submission?

12           MS. POWELL:  I'll speak through our submission.

13           THE COURT:  Okay.  All right.  And, Mr. Johnson,

14   you're taking the same position that Mr. Kleinhendler is

15   taking; is that correct, sir?

16           MR. JOHNSON:  Yes.

17           THE COURT:  That you received it but it's -- it's not

18   just the receipt of it that you're challenging, correct?

19           MR. JOHNSON:  I received an e-mail.  I can verify

20   that.  I don't know if I received the first class mail.  So I

21   guess I need to verify that as well but the -- you know, the

22   service issue that he raised, yes, I'm making the same claim

23   there.

24           THE COURT:  Okay.  All right.  Clear, Mr. Fink?

25           MR. DAVID FINK:  Yes, very.  Thank you, your Honor.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1        **THE COURT:**  Thank you.  All right.  Before we go

2   further to hear these kind of winding -- I'm sorry, closing

3   remarks, Ms. Lambert, I'm going to allow you to submit two

4   cases for me, if don't mind.

5        **MS. LAMBERT:**  Sure.

6        **THE COURT:**  That speak on the unbridled protection

7   that the First Amendment offers to an attorney.  So I'm looking

8   for that.

9        **MS. LAMBERT:**  Thank you, Judge.  I'd also like the

10   opportunity to prepare a supplemental brief regarding a number

11   of issues that were addressed by the Court today.  Today was

12   not set for an evidentiary hearing of the witnesses, and I'd

13   request one regarding these witnesses, as well as new witnesses

14   with new evidence that support the pleadings, your Honor.

15        **THE COURT:**  You can file that.

16        **MS. LAMBERT:**  Thank you, Judge.

17        **MR. WOOD:**  Judge, this is Lin Wood again.  I hate to

18   butt in again.  I appreciate the two weeks.  Could I indulge

19   the Court to allow me to have two weeks from the receipt of

20   transcript of the hearing today?  Because if I do have to

21   engage new counsel, I think, in fairness, they're going to have

22   to review the transcript from today, as well as, obviously, the

23   pleadings that have been filed --

24        **THE COURT:**  I'm going to decline --

25        **MR. WOOD:**  -- (indiscernible) from the date of the

King v Whitmer, Case No. 20-cv-13134

212

Motion hrg.                              7/12/2021

1   transcript --

2           **THE COURT:**  Sure.  Yeah, I'm going to decline that

3   request.  We need to kind -- we're going to take this step by

4   step.  I need to first see what it is that you're claiming, and

5   I do not want to delay that aspect of it, because it's going to

6   have implications for how quickly we can really just address

7   the sanction motion.  I would just ask, sir, that you work with

8   what you have.  I know -- you know, and reach out and try to

9   obtain counsel, if in fact you feel that that's what is

10  appropriate.  Because I'm not going --

11          **MR. WOOD:**  I --

12          **THE COURT:**  Go ahead.

13          **MR. WOOD:**  No, no.  I'm just saying I would feel like

14  if somebody came to me and said would you represent me in

15  connection with this matter, they would first want to know what

16  happened today, and so I'm just asking for the time to have the

17  transcript to be available to someone that might be interested

18  in looking at it, because, obviously, I don't want to jump in

19  asking a lawyer to do something without knowing, you know,

20  exactly what the status of the matter is, and, today, most of

21  this would not address the issues that I believe were pertinent

22  to my situation, but some parts of it would, and so that's the

23  reason I ask for the request.

24          I don't know how long it takes to get the transcript.

25  I certainly don't want an inordinate delay.  That's why I was

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                7/12/2021

1   hoping we might just go through the lawyers today and verify I

2   was not involved, but I'll do whatever your Honor wants to me

3   to do.  I'm just asking for a reasonable time.

4           **THE COURT:**  Yeah, I'm going to give you the 14 days.

5           Ms. Powell.

6           **MS. POWELL:**  I believe all the lawyers need time to

7   review the transcript and consult with our counsel before we

8   know what supplemental briefing might be needed and

9   appropriate.

10          **THE COURT:**  I don't know if I really agrees with

11  that.  You're working through -- you all have retained counsel

12  is that your position, Mr. Campbell?  I think 14 days -- 14

13  days for everybody, all right, and that would include -- we

14  will try to do whatever we can to expedite the provision of the

15  transcript, but I don't want that to be a delay.  So everyone

16  would have 14 days to submit supplemental briefing.

17          Now, I will tell you what I've done here is is that

18  I'm still trying to limit what you will provide a supplemental

19  briefing on.  I don't need to be, you know, supplied with

20  arguments that have already been made.

21          Ms. Powell, did you want to say something?

22          **MS. POWELL:**  Yes, your Honor.  We need to be able to

23  consult with counsel after this hearing and the record of this

24  hearing before we can properly provide supplemental briefing.

25          **THE COURT:**  Fourteen days is out the gate.  That's

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    where I am right now, 14 days.  If counsel feels that they need

2    more time because of a delay -- not even a delay, but because

3    of the amount of time it would take to prepare the transcript,

4    I will consider it, but I urge you to do as much as you can

5    without that transcript.  So there we have it.

6           Who's next?  Doesn't look like anybody.

7           All right.  So we're going to go back to the order in

8    which we were proceeding.  So Mr. Buchanan has already spoken

9    his concerns about his client.  Is there anything else that you

10   want to say?

11          **MR. BUCHANAN:**  No, your Honor.  Thank you very much.

12          **THE COURT:**  All right.  And Ms. Lambert Junttila, is

13   there anything else you would like to say?  I already asked for

14   you to submit two cases, and, Madam, just, please, keep your

15   remarks short.  You all have had ample opportunity -- and I

16   should say you have availed yourselves of the opportunities,

17   you know, through briefing, and I really don't need a wrap up

18   kind of closing remarks that rehashes your views.

19          Where is Miss Lambert Junttila?  Where are you?

20          **MS. LAMBERT:**  I'm here, your Honor.

21          **THE COURT:**  There you are.

22          **MS. LAMBERT:**  I didn't hear the Court's question.

23          **THE COURT:**  My question is:  Do you feel there's

24   anything else that you need to provide to this Court in order

25   to get me closer to making a decision, anything that you feel

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   that there's a supplemental briefing --

2         **MS. LAMBERT:**  I'm sorry, I thought the Court already

3   ruled on that, and I apologize.  I thought the Court ruled that

4   I could file a supplemental brief regarding issues that were

5   brought up today and the cases that the Court asked me about.

6         **THE COURT:**  Okay.  I'm going to limit -- I'm

7   really -- I really feel it's in everyone's best interest, you

8   know, to not go over the top, if you will, and that's really

9   not a legal term, but I don't need -- can we agree on a limit?

10        **MS. LAMBERT:**  Your Honor, would you like a page

11  limit?

12        **THE COURT:**  Yes.

13        **MS. LAMBERT:**  Okay.  What page limit would the Court

14  like me to do?

15        **THE COURT:**  Ten, no more than ten.

16        **MS. LAMBERT:**  Thank you, Judge.

17        **THE COURT:**  Okay.  Good.  For everyone.  All right.

18        **MR. WOOD:**  What if we have an affidavit, that would

19  not be over the 10-page limit, would it?

20        **THE COURT:**  You can attach an affidavit.  That would

21  not count.  That would not go toward the page limit.

22        Yes, who is speaking?  Mr. Campbell?

23        **MR. CAMPBELL:**  Don Campbell, yes.  On your proposed

24  10-page limit, your Honor.  You addressed more than 10 items

25  and 10 affidavits that, respectfully, I'd ask to at least have

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   a 25-page limit.

2          **THE COURT:**  You know what, I'm going to give you the

3   10-page limit.  You start writing and then you come back and

4   ask me if you think you need more, really.  That's my decision,

5   all right.

6          **MR. CAMPBELL:**  Thank you, your Honor.

7          **THE COURT:**  All right.  Now, let me -- is

8   Ms. Gurewitz still on the line?

9          **MS. GUREWITZ:**  Yes, your Honor, I am.

10          **THE COURT:**  Ms. Gurewitz, would you like to be heard?

11          **MS. GUREWITZ:**  Yes, I would like to say on behalf of

12   the MDP and the DNC, Democratic National Committee, that the

13   briefs filed by Mr. Fink and the arguments made by him, as well

14   as the briefs filed by the attorney general on behalf of

15   Governor Whitmer, more than demonstrate that sanctions are

16   warranted here, and we would request that you order sanctions

17   against all of the attorneys who have failed to exercise their

18   responsibility.

19          **THE COURT:**  Thank you, Miss Gurewitz.

20          Mr. Paterson, are you still on the line, sir?  It

21   seems to be that you are.  Would you like to say anything in

22   closing?

23          **MR. PATERSON:**  I am, your Honor.

24          **THE COURT:**  Would you like to say anything in

25   closing?

Motion hrg.                                    7/12/2021

1          **MR. PATERSON:**  I would, just briefly.  Mr. Campbell

2    indicated that they did not intend to foment revolution or

3    insurrection by this filing but merely foment partisan

4    advantage I presume, and I think that has been achieved by the

5    use of the 982 pages of affidavits from a federal court filing.

6          It's important, it's important that it was filed in a

7    federal court and under the judicial process.  That's how it

8    will be cherry picked.  The 982 pages will be interpreted

9    throughout as a partisan advantage and cherry picking of each

10   particular or any particular fact will be utilized for that

11   partisan advantage.  To me, that is the abuse that this filing

12   has caused.  It is the abuse of the judicial system, and it

13   seems to me that the grant of a motion for sanctions is

14   critical to reestablishing and minimizing the damage this

15   filing has done and the use of the judicial system in

16   attempting to support a partisan advantage.  So I would ask

17   that the Court grant this motion.

18          **THE COURT:**  Thank you, Mr. Paterson.

19          Mr. Fink.

20          **MR. DAVID FINK:**  Thank you, your Honor.  Before I

21   begin, I'd like to say, just broadly, a quick overview of what

22   I would like to do.  I would like to respond.  I will respond

23   to what Mr. Wood indicated, as the Court recall, we said we'll

24   save that to the end.  I will respond to what Mr. Wood

25   indicated regarding his nonparticipation.  I also do want to

Motion hrg.                                    7/12/2021

1   address Mr. Rohl's affidavit, because that's something that we

2   have never briefed or discussed, and, then, finally I'll

3   conclude, but before I do that --

4           **THE COURT:**  Before you -- before you begin, I have a

5   question for you regarding Mr. Wood's -- his position.  Is it

6   necessary, do you think, sir, to take care of that now, given

7   you're going to be the supplemental briefing on this?  Is this

8   dealing with participation in the case?

9           **MR. DAVID FINK:**  Yes, I can limit it to a very few

10  words.

11          **THE COURT:**  All right.

12          **MR. DAVID FINK:**  I'll limit it to a very few words.

13  I appreciate that, your Honor.

14          I'm not certain what our supplemental briefing will

15  involve.  Are we going to be -- will we be responding -- of

16  course I'm going to brief on the notice issue.  We'll do that

17  up front.  We'll do that quickly.  Then the question is I'm

18  assuming we respond to their supplemental briefing?

19          **THE COURT:**  If you need to, yep, you can.

20          **MR. DAVID FINK:**  Okay.  What I'm suggesting, though,

21  is maybe that's the time that I address in writing the issues

22  regarding Mr. Wood.  I'm trying to avoid creating confusion for

23  the Court.

24          **THE COURT:**  Good.  I'm going to issue an order after

25  this hearing is done, and it will be laid out in terms of time

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    frames and exactly how I want you all to proceed, but go ahead.

2            **MR. DAVID FINK:**  Thank you, your Honor.  Your Honor,

3    at the outset, before I speak on the substance that we talked

4    about, there's one personal matter that I want to address.

5            **THE COURT:**  Go ahead.

6            **MR. DAVID FINK:**  And that is with the Court's

7    indulgence -- well, this is important, your Honor, if I may.

8    With the Court's indulgence, I want to take a moment to honor

9    the memory of my late partner, our late partner, Darryl

10   Bressack.  As some parties here are aware and some are not,

11   Darryl Bressack had pulled the laboring oar on most of the

12   briefs filed in this case, and, tragically, Darryl died

13   suddenly from a heart attack on the night of January 24th,

14   right in the middle of these proceedings.  In fact, we had a

15   reply brief we filed on January 26.

16           Darryl was an attorney who took his oath very

17   seriously.  He was a brilliant, dedicated, passionate, and

18   ethical lawyer, and he cared so deeply about the work that he

19   did.  I miss him for many reasons, but today he's in all of our

20   hearts in this office and at the city, because we know how

21   deeply he felt about this matter, and I only wish that he could

22   be here today, and I appreciate the Court's indulgence so I

23   could say that.  It's been on my mind for days.

24           **THE COURT:**  Certainly.

25           **MR. DAVID FINK:**  Thank you, your Honor.  Now, I will

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   limit my response regarding Mr. Wood.  The reason I need to

2   talk about it a little bit is it ties into the Rohl affidavit,

3   and that's this, Mr. Rohl filed an affidavit, and when I say he

4   filed the affidavit, he prepared an affidavit.  He signed the

5   affidavit.  It was filed in this case on behalf of all the

6   Plaintiffs, and it was filed by Ms. Junttila.

7           Now, in that affidavit, he tells us, point blank,

8   that the litigation was in, in his words, spearheaded by Sidney

9   Powell and Lin Wood, and while those are his words -- I'm

10  sorry.

11          **THE COURT:**  I'm sorry, I was telling Mr. Campbell

12  that I would not allow him to speak until you're done.

13          **MR. DAVID FINK:**  Thank you.  Now, while those are

14  Mr. Rohl's words, his words were submitted to the Court by

15  Ms. Lambert Junttila, and none of the lawyers, whose names

16  appear on these pleadings, contested anything in his affidavit.

17  Now, Mr. Rohl, as of now, is represented by the same lawyer who

18  represents Lin Wood, who represents Sidney Powell, who

19  represents all of the Plaintiffs' counsel.  I think we have to

20  assume that when something is filed, a representation is made

21  by one of the attorneys in this case, we have a right to

22  believe that we can rely on that.

23          What's happened here is -- and just to be clear, I

24  understand Mr. Campbell is an expert in ethics.  So he

25  certainly would not represent Mr. Rohl and Ms. Powell and

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1    Mr. Wood if their positions and interests were adverse, and

2    this didn't just -- representation didn't start during this

3    hearing today.  They filed their appearance a little while ago,

4    and the responses on the motions were filed in February.  We've

5    been following this case for months.  They've been following it

6    for months, and nobody's corrected this.

7             Now, what's happened in this case is very

8    frustrating, and that is the Plaintiffs have played a very

9    strange game of passing the buck.  Mr. Rohl and Mr. Junttila

10   and Mr. Hagerstrom say they're not responsible because someone

11   else prepared the documents for filing.

12            **THE COURT:**  Now, Mr. Fink, let me stop you.  I

13   appreciate your advocacy here, but I mean you're going to have

14   an opportunity -- I'm giving you that opportunity, sir, to

15   bring it up in the brief, and the reason that I'm stopping you

16   is because it's going to be difficult for your statements to be

17   said and me not give the other attorneys an opportunity to

18   respond, and I really want to be fair, and so I would just ask

19   you to wrap that aspect of your remarks up, sir.

20            **MR. DAVID FINK:**  Okay.  We can -- regarding the Rohl

21   affidavit, without advocating, I would just point out that in

22   that affidavit, he does indicate that he was to hold the fort

23   while -- until a pro hoc vice application was accepted, and of

24   course was never filed because it doesn't apply.

25            I will move beyond that and we'll leave that for

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   briefing later, and, instead, I'd like to conclude more

2   broadly.

3            THE COURT:  Thank you.

4            MR. DAVID FINK:  And that is this:  Today, your

5   Honor, we are all grateful that the Court is holding this

6   hearing, because today is a very important day.  It's been six

7   months -- a little over six months since our nation faced what

8   threatened to be the greatest constitutional crisis since the

9   Civil War.  On January 6th, that insurrection, which occurred

10  in the Capitol, which horrified most of us, maybe not everyone

11  on this screen, but most of us when we watched it, and that

12  insurrection can be directly, directly linked to the lies that

13  were spread by the attorneys in this litigation.  Shielded --

14           MR. WOOD:  Your Honor, I object --

15           MR. DAVID FINK:  Shielded by --

16           MR. WOOD:  Your Honor, I object to that type of

17  speculation.

18           THE COURT:  Okay.

19           MR. DAVID FINK:  I since suggested --

20           THE COURT:  Hang on --

21           MR. WOOD:  -- person who doesn't want to be accused

22  unfairly.

23           THE COURT:  Hang on.

24           MR. DAVID FINK:  I haven't even stated your name yet,

25  but I will.

Motion hrg.                                    7/12/2021

1          I'm sorry, your Honor.

2                    (Indiscernible cross-talk.)

3          **THE COURT:**  Mr. Wood.

4                    (Indiscernible cross-talk.)

5          **THE COURT:**  Mr. Wood, I ask --

6                    (Indiscernible cross-talk.)

7          **THE COURT:**  I ask for silence, Mr. Wood.

8          Mr. Fink, finish up, please.

9          **MR. WOOD:**  I object (indiscernible) --

10         **THE COURT:**  Duly noted.

11         **MR. DAVID FINK:**  These attorneys, shielded by --

12         **THE CLERK:**  Judge, I'm sorry to interrupt.  The court

13    reporter is trying to get your attention.

14         **THE COURT:**  Okay.  I'm sorry, Ms. Wabeke, where are

15    you?  There you are.

16         **COURT REPORTER:**  So counsel, we've been going since

17    8:30.

18         **THE COURT:**  Oh, my goodness.

19         **COURT REPORTER:**  With a 20-minute break, and you're

20    all interrupting each other, and that's the kind of record you

21    want for a case like this, with interruptions, dashes, and

22    unintelligible?  So, please, can we finish up, or I will have

23    to get someone else to finish up this last little bit.

24         **THE COURT:**  Oh, Ms. Wabeke, let me -- let me

25    apologize and say that I certainly don't want to -- I know that

                 King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1    you're under a great deal of stress, and, please, always know

2    that you just need to tell me that you need to take a break.

3    You know that.

4              **COURT REPORTER:**  Yes, Judge.

5              **THE COURT:**  Mr. Wood, and everybody else on this

6    call, I am cautioning you, do not speak when another attorney

7    is -- another co-counsel, another brother counsel, sister

8    counsel is speaking -- you know, in the Eastern District of

9    Michigan, we have civility principles -- no, no comment,

10   Mr. Campbell.

11             Mr. Fink, you may proceed, and I'm looking for you,

12   sir, to wrap it up.

13             **MR. DAVID FINK:**  I'm sorry.

14             **THE COURT:**  Do you have water there you can drink

15   because you sound -- all right.

16             **MR. DAVID FINK:**  That's okay, but thank you very

17   much.

18             The reason we brought this proceeding, the reason

19   that we brought this motion, is that these attorneys wielded

20   the weapons afforded to them by the privilege of being admitted

21   to the bar, and they wielded these weapons in this case to

22   abuse the processes of this Court in a devastating way.

23             Earlier today, Mr. Campbell was saying -- talking

24   about what this complaint did and didn't do, what it was and

25   wasn't intended to do.  To be clear, the complaint was clear.

Motion hrg.                              7/12/2021

1    It explicitly said that it sought -- they sought in the

2    complaint and order requiring Governor Whitmer to transmit

3    certified election results that states that President Donald

4    Trump is the winner of the election.  That's what they were

5    seeking.

6              Now, that said, when we filed our Rule 11 sanctions

7    motion -- yes, we definitely talked about all the

8    misrepresentations, the failures to do due diligence, the

9    inadequacies of the expert reports, but what we focused on was

10   we filed this motion on January 5th, one day before the civil

11   insurrection in Washington.

12             In our motion, we explicitly reported to the Court,

13   not just what we said were lies being spread in the pleadings

14   in this case, but the vile and dangerous messages that were

15   being broadcast by the attorneys in this case on social media.

16   We raised the critical question.  We said, "Why was this

17   complaint not dismissed or amended by the Plaintiffs once this

18   became moot?"  And we said, "In light of the Court's decisive

19   ruling on December 7th, what purpose could this lawsuit serve?"

20             We answered that question, and with the Court's

21   indulgence, I'm going to mostly paraphrase, quickly read from

22   one part of our complaint -- our motion, because this was filed

23   on January 5th, and on January 5th we wrote, "Initially this

24   was one of several lawsuits used to support calls for state

25   legislatures to reject the will of the voters.  When the

Motion hrg.                              7/12/2021

1   Michigan legislature did not attempt to select a slate of

2   electors inconsistent with the will of the voters, this lawsuit

3   took on a different meaning."  On January 5th, we wrote this.

4        It was then used to support arguments for the United

5   States Congress to reject the Michigan electors on January 6th,

6   2021.  We then went on to say, "And most ominously, these

7   claims are referenced and repeated by L. Lin Wood and others in

8   support of a call for martial law."  That was before the

9   violence occurred.

10       Now, we went on to say, "The continued pendency of

11  this lawsuit accomplishes exactly the harm addressed by this

12  Court in its December 7th, 2021 opinion and order by

13  undermining people's faith in the democratic process and the

14  trust in our government.  This lawsuit has been used to

15  delegitimize the Presidency of Joe Biden."  One day later that

16  ominous prophecy became true.

17       To a great extent, because of the lies told in this

18  lawsuit, even today, millions of Americans believe the big lie

19  the big lie that Joe Biden didn't win this election, that

20  somehow the election was stolen, and there's no evidence to

21  support that, but they don't know that, because people think

22  the judicial process has some fairness in it.  People think if

23  lawyers say it in court, it must be true.  Even Mr. Campbell

24  said, if somebody said it in court, we should be able to repeat

25  it, again, because, after all, it was said in court.  So we can

Motion hrg.                                   7/12/2021

1   repeat it or at least present it to a court.  So we can repeat

2   it.

3        Now, nobody can undo what happened that day, but

4   because the lies spread in this courtroom, not only did people

5   die on January 6th, but many people throughout the world, many

6   governments and people throughout the world and the United

7   States came to doubt the strength of our democratic

8   institutions in this country about.  Now, we can't undo what

9   happened on January 6th, but this Court can do something to let

10  the world know that attorneys in this country are not free to

11  use our courts to tell lies.

12        So today we ask this Court to issue the strongest

13  possible sanctions, and, to be specific, we seek the following

14  meaningful relief:

15        One, the taxpayers should be reimbursed for the

16  extraordinary expense that was paid to defend this litigation

17  both by the State and by the City.

18        These lawyers should be punished for their behavior.

19  I use that word advisedly.  Their behavior was sanctionable,

20  and they should be punished.

21        Three, whatever sanction this Court imposes should be

22  strong enough and significant enough to deter future

23  misconduct, assuming the Court comes to the conclusion that we

24  believe it will, that there was misconduct;

25        And, four, these attorneys should never again be

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   allowed to appear in a court in our jurisdiction or, frankly,

2   anywhere else, and because of that, because of the way these

3   lawyers have dishonored our profession, because of the way that

4   these lawyers have taken advantage of this Court and this

5   courtroom, we believe that the most important sanction is for

6   this Court to refer all of these attorneys, first, to their own

7   state bar associations, where investigations should be

8   conducted and proper disciplinary proceedings should occur, but

9   just as important, if not more important, we ask this Court

10  refer to the Chief Judge of the Eastern District of Michigan a

11  recommendation that these attorneys be barred from practicing

12  in this district ever again, and that applies to all of the

13  attorneys here.

14          Your Honor, I may have gone a little too long on the

15  end, but I really appreciate it.  It's been a very long day and

16  we really appreciate it.

17          **THE COURT:**  It has been.  Thank you, Mr. Fink, and

18  I'm going to now hear from Ms. Meingast.

19          **MR. WOOD:**  Your Honor, may I?

20          **THE COURT:**  No, no.

21          **MR. WOOD:**  This is Mr. Wood.  He mentioned my name

22  several times.  May I respond?

23          **THE COURT:**  Excuse me, Mr. Wood.  Let me stop you.

24  Mr. Fink -- I'm not going to allow you an opportunity to

25  respond to Mr. Fink's remarks.  We're moving on to --

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                          7/12/2021

1        **MR. WOOD:**  Are you silencing me?

2        **THE COURT:**  Excuse me?

3        **MR. WOOD:**  I'm sorry.  He referred specifically to

4   me.

5        **THE COURT:**  I do understand that.

6        **MR. WOOD:**  I feel like I'm entitled to due process to

7   respond.

8        **THE COURT:**  No, you're not.  I asked.  I gave

9   everyone an opportunity --

10       **MR. WOOD:**  So I'm being denied a response?  I think

11  the record shows --

12       **THE COURT:**  Mr. Wood.

13       **MR. WOOD:**  I think the record shows --

14       **THE COURT:**  Mr. Wood.

15       **MR. WOOD:**  (Indiscernible.)

16       **THE COURT:**  Mr. Wood.

17       **MR. WOOD:**  (Indiscernible.)

18       **THE COURT:**  Mr. Wood, this is not a debate.

19       **MR. WOOD:**  I'm not debating you, I said --

20       **THE COURT:**  Listen, let me warn you right now.  I am

21  not granting your request --

22       **MR. WOOD:**  I'm not debating you --

23       **THE COURT:**  Listen, let me warn you right now.  I am

24  not granting your request to respond to what Mr. Fink said.  I

25  am moving on, and I will now hear from Ms. Meingast.

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1          Madam, proceed.

2          **MS. MEINGAST:**  Thank you, your Honor, Heather

3   Meingast, on behalf of Governor Whitmer and Secretary Benson.

4          Just briefly, your Honor, because it's clear we've

5   all had a long day.  I appreciate the Court's time and

6   attention to these motions.  I echo many of the comments that

7   Counsel Fink said.  You know, as the Court knows we moved for

8   sanctions against Ms. Powell, Mr. Rohl, Mr. Hagerstrom,

9   Ms. Junttila Lambert, here Junttila Lambert so we've done a

10  segment.

11         And, as the Court knows, our motion is brought under

12  Section 1927 and the Court's inherent authority.  You know, I

13  think we've -- nothing today that we've heard today from

14  Plaintiffs has changed the arguments that we've made in our

15  brief that we've demonstrated that sanctions are warranted

16  under Section 1927 here.

17         It's plain that Plaintiffs multiplied the case far

18  beyond that when it was moot and should have been dismissed, as

19  we've laid out in our briefing.  They had really no response

20  for that, this made-up idea that somehow their case was somehow

21  reinvigorated on December 14th, and we've also asked,

22  alternatively, for sanctions under this Court's inherent

23  authority, and part of that is showing improper purpose for

24  this litigation.  I think that's been clearly demonstrated

25  to -- our arguments, by Mr. Fink, and through our briefing,

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1  and, so with that, we would respectfully request that the Court

2  grant our motion for sanctions as we've written it.

3            **THE COURT:**  All right.  Ms. Meingast, thank you.

4            Counsel, I want to thank you all for being here

5  today.  This was very long, but it was all very necessary.

6  This Court will be issuing an opinion and order, but, in the

7  interim, I will be issuing an order that captures the tasks, if

8  you will, the opportunities, if you will, that the Court is

9  giving counsel to address the issues that we've discussed here

10 today.  I will take -- Ms. Powell, what is your question?

11 Unmute.

12           **MS. POWELL:**  Yes, your Honor.  I would like to speak

13 to all of these issues and reiterate the points of our

14 briefing.  We're not waiving anything.  We object to virtually

15 everything Mr. Fink has said.  I have practiced law for 43

16 years and never witnessed a proceeding like this, including

17 representing attorneys in sanctions proceedings themselves.  I

18 take full responsibility myself for the pleadings in this case.

19 Ms. Newman, Mr. Wood, Mr. Johnson, and local counsel had no

20 role whatsoever in the drafting and content of these

21 complaints.  It was my responsibility and Mr. Kleinhendler's,

22 not theirs.

23           The affidavits in support of the complaint are valid.

24 Were we to have an evidentiary hearing, we would produce the

25 witnesses to testify to those affidavits.  This is not the kind

                King v Whitmer, Case No. 20-cv-13134

Motion hrg.                              7/12/2021

1   of proceeding in which the affidavits can be challenged.  They

2   weren't even required to be attached to the complaint.  The

3   very fact that we attached 960 pages of affidavits reflect how

4   seriously we took this matter, how concerned we were about the

5   constitutional issues that we raised on behalf of electors, who

6   are, themselves, mentioned in the Constitution.

7        We had a legal obligation to the country and to the

8   electors to raise these issues.  It is the duty of lawyers and

9   the highest tradition of the practice of law to raise difficult

10  and even unpopular issues.  The fact that there may have been

11  even adverse precedent against us does not change that fact.

12  Were that true, there would not have been a decision called

13  *Brown versus the Board of Education.*

14       We have practiced law with the highest standards.  We

15  would file the same complaints again.  We welcome an

16  opportunity to actually prove our case.  No court has ever

17  given us that opportunity.  Instead, we are met with

18  proceedings like this brought by Mr. Fink and others, who are

19  themselves the ones who have abused the process for political

20  gamesmanship and their political purposes, and this is one of

21  the proceedings that leaves the American public with no

22  confidence either in our election system or in our judicial

23  system.

24       **THE COURT:**  All right.  Thank you for those remarks.

25       As the Court has indicated, I will be following up

King v Whitmer, Case No. 20-cv-13134

Motion hrg.                                    7/12/2021

1   with an opinion and order a little bit later and, in the

2   interim, as I said, I will issue an order referencing

3   supplemental briefings and time frames.

4           I want to thank, once again, counsel for appearing

5   today.  It has been a long day.  Again, it has been a necessary

6   day.

7           Mr. Flanigan.

8           **THE CLERK:**  Thank you all.  Court is adjourned.

9               (Proceedings concluded 2:32 p.m.)

10                         - - -

11                  **C E R T I F I C A T I O N**

12          I, Andrea E. Wabeke, official court reporter for the

13  United States District court, Eastern District of Michigan,

14  Southern Division, appointed pursuant to the provisions of

15  Title 28, United States Code, Section 753, do hereby certify

16  that the foregoing is a correct transcript of the proceedings

17  in the above-entitled cause on the date hereinbefore set forth.

18  I do further certify that the foregoing transcript has been

19  prepared by me or under my direction.

20

21  /s/Andrea E. Wabeke                    July 14, 2021

22  Official court Reporter                Date
    RMR, CRR, CSR
23                         - - -

24

25

                King v Whitmer, Case No. 20-cv-13134

EXHIBIT B



REPORT ON

# THE NOVEMBER 2020 ELECTION IN MICHIGAN

**COMMITTEE MEMBERS**

Senator Edward McBroom – Chair

Senator Lana Theis – Majority Vice Chair

Senator Jeff Irwin – Minority Vice Chair

Senator John Bizon

## TABLE OF CONTENTS

LETTER FROM THE CHAIR – SENATOR EDWARD McBROOM ....................4

I.    INTRODUCTION ...............................................................................6

II.   ACTIONS AND OBJECTIVES ........................................................6

III.  SUMMARY OF ISSUES AND ALLEGATIONS...........................6

IV.   INVESTIGATION AND FINDINGS.................................................7

V.    RECOMMENDATIONS AND CONCLUSION ..........................34

VI.   APPENDIX

# EXECUTIVE SUMMARY ON
# THE NOVEMBER 2020 ELECTION IN MICHIGAN

Without question, the increased political polarization of our nation has resulted in increasing public discontentment with the administration, and therefore results, of our elections. This discontent, which has been demonstrated on both sides of the aisle (see: Bush v. Gore 2000 and allegations of Russian interference in the 2016 election) culminated in public outcry of widespread fraud in 2020.

Indeed, a recent Gallup Survey found as much as 59% of voters no longer trust our elections. Voting and the right to vote is absolutely foundational to our democracy. Without faith in our elections process, fewer members of the public will likely choose to exercise that right. Lowered confidence in our election system, and thereby lower turnout, is a threat to our democracy we should not take lightly.

Many election administrators and officials have pointed to the fact that unprecedented turnout in 2020 stress-tested our elections system. Still, around 40% of the eligible population did not cast a vote. For a robust democracy, we must invest in and build a system that can withstand ever greater turnout in future elections.

In order to do this, this Committee undertook the foundational work of investigating the 2020 election — from both the perspective of election administrators, officials and workers and the perspective of the observing public. The Committee embarked upon hours of public testimony, the review of countless documents and presentations on the 2020 election, and careful review of the elections process itself.

This Committee found no evidence of widespread or systematic fraud in Michigan's prosecution of the 2020 election. However, we cannot and should not overlook severe weaknesses in our elections system. Whether it is lack of clarity in the tabulation of ballots, unnecessary barriers to ensuring that every lawfully cast ballot is counted, inconsistent poll worker or challenger training, or simply a system not primarily designed to handle ballots cast absentee or otherwise prior to Election Day, it is the opinion of this Committee that the Legislature has a duty to make statutory improvements to our elections system.

This Committee exhausted every resource available to it to thoroughly and faithfully examine our elections process in Michigan and drill down on claims and testimony specific to the 2020 election. However, this investigation should not be considered exhaustive. Remaining conscientious of the limitations of this Committee, every possible investigative avenue was not undertaken. Nevertheless, this Committee stands steadfastly behind the recommendation that our current elections system requires change in order to meet the future challenges presented by modern voting preferences, behaviors, and threats. There are clear weaknesses in our elections system that require legislative remedy.



# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

LETTER FROM THE CHAIR
## SENATOR EDWARD McBROOM

When I agreed to begin investigating the election, rumors and uncertainty were rampant. Allegations of markers bleeding through ballots, voter intimidation, dead voters, mystery ballot dumps, foreign interference, and ballot harvesting were just a few of the issues during the first days following the November 2020 election. Emotions and confusion were running wild across the country. Fears and hopes were had by every person, including myself.

On one hand was the hope some had to overturn the election. That hope was necessarily coupled with a dreadful reality that our elections were unsound. On the other hand was hope the election was accurate, coupled necessarily with those who feared the direction the victor would take the country.

I made it clear at the start that the investigation effort would be taken with a firm commitment to truth and a goal to reassure the citizens of this state that their votes counted. Within a few weeks, the State Board of Canvassers also unanimously requested the Legislature conduct a serious investigation into the election.

I believe the people deserve to know all the truth and to see their representatives seeking answers. People were understandably confused by new laws, practices, orders and determinations from the governor and secretary of state and it is right and proper for them to demand answers. This right and obligation was unfairly and unfortunately discounted by many on my own side of the aisle after the 2016 election when the other party lost and felt sure some illicit or improper actions must have taken place. When they did regain power, they were quick to utilize all of it to spend two years chasing every conspiracy and specious allegation. I pray my own party will not repeat this mistake for the next four years.

Digging into the mechanics of the election was labor intensive, but very revealing. We found both real vulnerabilities and resiliency to the systems. We also discovered the extent to which our elections officials go to facilitate our elections. The report goes into considerable detail on many of these issues and I hope readers will be reassured by the security and protections in place, motivated to support reforms that are needed, and grateful to our fellow citizens that do the hard work.

The greater challenge to this effort has been seeking the truth amid so much distrust and deception. Our present times are full of reasons for citizens to distrust their government, politicians, and leaders. The last year has seen so much amplification of this distrust. Perhaps it has never been more rampant and, certainly, modern communication helps to fan the flames of lies and distrust into an unquenchable conflagration.

"All politicians lie" is the popular axiom. Unfortunately, lies and deceit are not exclusive to politicians. Throughout our investigation, members have been actively following and engaged with various persons and reports. We have collectively spent innumerable hours watching and listening and reading. Some of these people and reports are true. Unfortunately, many of them are not, either because of a misunderstanding or an outright deception. As is often the case, the truth is not as attractive or as immediately desirable as the lies and the lies contain elements of truth.

Regardless of my status as a chairman, senator, politician, Christian, or human, I do not expect or desire my words in this report to be simply accepted. Instead, I ask all to simply put into

*(Continued)*

4

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

LETTER FROM THE CHAIR
## SENATOR EDWARD McBROOM

their determinations the same particular guidance all persons ought to consider when weighing evidence. We must all remember: "extraordinary claims require extraordinary proof" and "claiming to find something extraordinary requires first eliminating the ordinary." Also, sources must lose credibility when it is shown they promote falsehoods, even more when they never take accountability for those falsehoods.

At this point, I feel confident to assert the results of the Michigan election are accurately represented by the certified and audited results. While the Committee was unable to exhaust every possibility, we were able to delve thoroughly into enough to reasonably reach this conclusion. The strongest conclusion comes in regard to Antrim County. All compelling theories that sprang forth from the rumors surrounding Antrim County are diminished so significantly as for it to be a complete waste of time to consider them further.

Most of the rigorous debate over additional audits comes from fears surrounding the technology used and its vulnerabilities as allegedly demonstrated in Antrim County. Without any evidence to validate those fears, another audit, a so-called forensic audit, is not justifiable. Michigan's already completed post-election audit and risk-limiting audit are also far more substantive than Arizona's standard audit. However, I am keeping a close eye on the legislatively-initiated forensic audit in Arizona and will continue to ask questions regarding other election issues I feel are not settled. If genuine issues are shown in Arizona's audit or from continued investigation here, I will not hesitate to ask the Committee to consider recommending an audit or amending this report.

I must acknowledge and thank my staff including Jeff Wiggins and Paul Burns that spent so much of their work and personal time on this report. I also want to thank my current Committee members, along with all of those that participated and served during these hearings last term, including Sens. Lucido, MacDonald, and Santana, as well as Representative Hall and the members of the House Oversight Committee. Staff from those offices, the Senate, and the Committee's clerk all went above and beyond to facilitate these hearings in very difficult situations and deserve sincere thanks. Finally, as the report says in its conclusion, I want to thank the citizens of this state. Whether or not one agrees with the report or even the conducting of the investigation, those opinions were shared with myself and the Committee. An active and passionate public is critical to maintaining our republic and your participation is reassuring that attribute is alive and well.

Sincerely,

Sen. Ed McBroom, Chair

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## I. INTRODUCTION

Beginning on Nov. 7, 2020, the Senate Oversight Committee (the "Committee") commenced an inquiry into claims of election fraud and impropriety. Chair McBroom made clear that the purpose of this inquiry was not to change the outcome of the election for President of the United States. Rather, the goal of the Committee was to provide elected officials and Michigan residents a better understanding of where the administration of elections can be reformed and strengthened, ensuring that Michigan citizens can have confidence in our election processes. This report contains findings and suggestions developed from 28 hours of testimony from almost 90 individuals spanning nine committee hearings, the review of thousands of pages of subpoenaed documents from multiple government entities, hundreds of hours of Senate staff investigation, and countless reviews of claims and concerns from Michigan residents. A detailed examination of all evidence presented to the Committee established an undeniable conclusion; while there are glaring issues that must be addressed in current Michigan election law, election security, and certain procedures, there is no evidence presented at this time to prove either significant acts of fraud or that an organized, wide-scale effort to commit fraudulent activity was perpetrated in order to subvert the will of Michigan voters.

## II. ACTIONS AND OBJECTIVES

The Committee's primary objective was to produce an informative and actionable report by undertaking the following actions: 1) Investigate claims of impropriety, fraud, error, and mismanagement of certain election processes; 2) Determine whether any of the claims brought forward were substantiated by evidence; and 3) Identify areas of Michigan election law where reform or an updating of the statute may be required in order to ensure transparency and confidence in the election process. The Committee made it clear that first-person accounts reporting alleged improprieties were given higher value as evidence to address these claims, in addition to professional and expert testimony regarding the technical operation of state and local election procedures and vote tabulation.

## III. ISSUES AND ALLEGATIONS

1. Deceased and Non-Residents Voting
2. Unsolicited Absentee Voter Ballot and Application Mass Mailings
3. 3rd Party/Private Funds Used for Public Election Activities and Equipment
4. Rights and Duties of Poll Challengers/Watchers Improperly and Unlawfully Restricted
5. Antrim County Results
6. Operating Issues with Tabulators and Precinct Computers
7. Signature Verification Process
8. Jurisdictions Reporting More Than 100% Voter Turnout
9. Absentee Ballots Tabulated Multiple Times
10. Thousands of Ballots "Dumped" at the TCF Center on Election Night/The Next Morning
11. Vote Totals Abnormal Compared to Past Presidential Election and Other Vote Count Irregularities
12. Additional Issues
13. Audits

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## IV. INVESTIGATION AND FINDINGS

### OVERVIEW OF INVESTIGATION

The Committee received many complaints of election fraud throughout the state in the days following the 2020 election. The Committee reviewed these claims through several avenues, including but not limited to the manners outlined below:

- Engaged with local and county election officials to discuss the procedures utilized to administer the election, in addition to confirming certain vote totals where alleged misreporting occurred.

- Researched the claims of deceased individuals having a vote cast in their name by reviewing obituaries, various online databases, social media posts, as well as speaking with individuals who made the claims or were the subject of those claims.

- Called individuals who were said to have received unsolicited absentee ballots through the mail.

- Subpoenaed and reviewed documentation of communications from the secretary of state's office regarding pre-election mailings.

- Subpoenaed and reviewed documents and communications from the Livonia and Detroit city clerks related to election activities and vote tabulation.

- Received testimony from Kent County Clerk Lisa Lyons, Ingham County Clerk Barb Byrum, Lansing City Clerk Chris Swope, and Grand Rapids City Clerk Joel Hondorp, regarding the election processes in their respective municipalities and any reforms they would recommend.

- Received testimony from Antrim County Clerk Sheryl Guy, detailing the events that led to the reporting of incorrect, unofficial vote tallies which cascaded into accusations of vote switching and machine tampering in Antrim County.

- Received many hours of first-hand testimony regarding the events that transpired at the TCF Center on and around Election Day. This testimony was in addition to the more than 200 sworn affidavits submitted by first-hand and second-hand witnesses that were reviewed by the Committee.

- Received testimony from Chris Thomas, the Senior Elections Advisor for the city of Detroit at the time of the November 2020 election and former Michigan state director of elections, who was stationed at the TCF Center.

- Received testimony from Dominion Voting Systems CEO, John Poulus, on the company's role in providing voting equipment to several Michigan municipalities and whether they played a role in the reporting of incorrect results in Antrim County. Testimony was also received from officials representing Dominion competitors, Election Systems & Software (ES&S) and Hart InterCivic regarding those same issues.

- The chair and individual committee members researched additional claims of election fraud or impropriety made by individuals in Michigan and from across the country.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

- Received testimony from Republican and Democratic party officials regarding election training for volunteers and workers, and how that training, or lack of, impacted the events at the TCF Center and other polling places.

- Received testimony from Monica Palmer, Chair of the Wayne County Board of Canvassers, on what she experienced during the canvassing process in the 2020 election and how it could be improved.

- Met with other canvassers from around the state to understand their process and receive their observations.

- The chair and individual committee members met with various clerks around the state to discuss problems, allegations, and solutions.

- The chair and committee members spent countless hours watching and reading documentaries, news stories, and presentations regarding election issues.

- The chair and committee members examined the testimony provided by witnesses in front of the House Oversight Committee.

- The chair followed many allegations to specific sources and involved parties to ascertain the veracity or feasibility of such allegations.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## FINDINGS

1. **Deceased and Non-Residents Voting**

   The Committee researched these claims and concluded that most were false. There were two claims of deceased individuals casting votes that were found to be true; one was a clerical error while the other was a timing issue. The Committee concluded that none of these constituted fraudulent election activities or manipulations. The Committee also received claims of citizens who no longer live in the state of Michigan but had allegedly voted in the state's elections. These claims proved to be false upon researching each incident brought to the Committee's attention. An example of some of the claims are detailed below (the names of the individuals have been omitted to respect their privacy).

   A widow from the Grand Blanc/Burton area claimed her husband, who passed away in 2013, had voted in the 2020 election. Senate staff searched the state database with the information provided by the individual and were not able to find her husband in the database. This would indicate that he had been removed from the voter database and his identity could not have been used to vote in the 2020 election.

   A husband and wife, formerly of Jackson County and now living in Louisiana, claimed they saw documentation online that they had voted in Michigan during the 2020 general election. After researching the claim, it was discovered that they were mailed an absentee ballot application and are still registered to vote in Michigan. However, the state website shows that the local clerk did not receive returned and completed absentee ballot applications in these voters' names.

   The Committee was also provided a list of over 200 individuals in Wayne County who were believed to be deceased yet had cast a ballot. A thorough review of individuals on that list showed only two instances where an individual appeared to have voted but was deceased. The first individual was a 118-year-old man whose son has the same name and lives at the same residence. The Committee found there was no fraud in this instance but was instead a clerical error made due to the identical name. The second individual was a 92-year-old woman who died four days  before the November 2020 election. Research showed she had submitted her completed absentee ballot prior to the November 2020 election and prior to her death. Notably, research showed the secretary of state and clerks were able to discover and remove approximately 3,500 absentee ballots submitted by voters while they were alive but died before Election Day, which is a commendable accomplishment.

   **The Committee recommends county clerks be given the ability to assist in removing deceased voters from the Qualified Voter File (QVF). The Committee also recommends the secretary of state research and pursue methods, including statutory changes, that would prevent and identify those voting in multiple states.**

REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

2. **Unsolicited Absentee Voter Ballot and Application Mass Mailings**

   Citizens across the state were left confused and frustrated by the arrival of applications for long deceased family members, those who have moved to other states, or persons never present at that address. It appears the lists chosen by the secretary of state's Bureau of Elections were often older and previously purged. Local clerks were also frustrated as the applications duplicated some of their work and caused citizens to call on them for answers. Finally, the original mailing appeared to be not set up to return to the secretary of state to at least inform them of undeliverable applications.

   The Committee subpoenaed the secretary of state for communications related to pre-election mailings. While a court ruled that the Secretary of State was permitted to send these mass mailings, there were significant communications between the department and Rock the Vote, a group which tends to target young persons and those with more left ofcenter political leanings.

   During the review of these communications, the Committee was simultaneously researching claims made in testimony and in court filings related to the absentee ballot process. Many court filings and individuals highlighted a data spreadsheet by an individual who claimed to have worked with "experts" to determine whether individuals had received an unsolicited absentee ballot. The spreadsheet indicated that "289,866 illegal votes" had been cast. This figure came from the Voter Integrity Project. To arrive at this number, the group used a methodology where they called 1,500 voters and asked if they had received a ballot without requesting it, something that would be illegal although not specifically indicative of fraudulent voting. The number of affirmative answers were then extrapolated out to 289,866 voters statewide receiving these ballots which are defined as "illegal ballots." The repeated use of the terminology "illegal ballots" is misleading and causes significant confusion as it implies fraudulent votes or votes received that do not come from legitimate sources or should not be counted. However, while it may not be lawful to send ballots without first receiving an application, voting this ballot is not an illegal action by a lawful voter and it is not indicative of fraudulent or illicit behavior of the voter nor of an illegitimate vote.

   The Committee called forty individuals from this list at random. Only two individuals reported having received an absentee ballot without making a proper request. One of the two individuals is labeled as a permanent, absentee voter within the state's QVF file, indicating that they had, at some point, requested to be placed on that list. The other individual voted via an absentee ballot in the August primary election, and it is possible they checked the box to vote absentee in the subsequent election and simply forgot they had chosen this option. Throughout discussions with these individuals, as well as others who claimed they had received an unsolicited ballot, it became clear that many equated receiving an absentee ballot application with receiving an absentee ballot. These are separate steps in the absentee voting process, with receiving an absentee ballot requiring that an application be completed and submitted by the voter. **There was no evidence presented to the Committee indicating that hundreds of thousands of <u>absentee voter ballots</u> were mailed to Michigan voters without previously being requested.**

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Further inquiry conducted by the chair and committee members with county and local clerks confirmed how difficult it would be for a citizen to attempt to fraudulently utilize the ballot of another, if the stolen application addressee voted at their actual, present location in Michigan. While the act of obtaining and submitting the ballot of another individual is not impossible, committing voter fraud in this manner undetected is unlikely, as the Qualified Voter File would immediately have a notation of the vote for the voter and the second attempt to request a ballot or to vote would not be allowed without investigation and explanation. Whether the real voter or the fraudulent

**The Committee concludes this demonstrates a clear vulnerability for fraud that may be undetected, if the actual voter does not vote at all. If the actual voter does vote, it will create turmoil and draw attention from state and local officials. However, the lack of any such incidents or turmoil in the November 2020 election creates a clear probability that no such efforts were committed to any significant extent. The chance of encountering the attempted double vote scenario is so statistically unlikely as to make impossible even a small effort to do so.**

Additionally, the mailing of unsolicited applications allows for two other related vulnerabilities. Applications sent to the former Michigan addresses of those moved out of state and applications sent to the new addresses of former Michigan citizens now registered to vote in another state constitute a real and virtually undetectable potential for fraudulent activity. The Chair's research into this topic, as well as a review of testimony provided by the secretary of state's director of elections to the Senate Elections Committee in October 2020, make it clear that there is essentially no mechanism in place to prevent counting votes from those who may be also registered and vote in another state, whether done by themselves or the recipient of an application at their former Michigan address. As there are no efficient or established procedures to confirm or detect this, it is not possible for the Committee to report on any occurrences or to have confidence no such actions occurred. However, with mass mailings of absentee ballot applications being mailed across state lines to many who no longer reside or vote in Michigan and to thousands of former addresses in Michigan, the situation must be addressed to ensure that those individuals are voting only once in an election, are doing so only in the state of their residence, and that no one is impersonating them at their old address.

The serious, potential outcomes of these vulnerabilities versus the minor effort to request an application make a strong and compelling necessity to not provide such applications without a request from a voter - as was standard practice until this past year. **Therefore, the Committee recommends the Michigan secretary of state discontinue the practice of mailing out unsolicited applications. The Committee also recommends only the current QVF being utilized by the state or locals when making mailings to registered voters of any nature.**

There were several reports of nursing home bound parents or other family members with dementia having a record of voting. **While the Committee was unable to reach any conclusions regarding the extent of such claims, additional training and clear instructions to caretakers or facility staff ought to be provided in such circumstances to clarify how and when such voting assistance is appropriate. The Committee also recommends pre-filled out applications from any source be disallowed as well.**

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

3. **3rd Party/Private Funds Used for Public Election Activities and Equipment**
A summary of the work and findings on this issue is not finalized at this time and may be amended to this report at a later date.

4. **Rights and Duties of Poll Challengers/Watchers Improperly or Unlawfully Restricted**
The Committee received claims that challengers from the Republican party were discriminated against and removed from polling locations without cause. There were also claims that challengers were not allowed to return to counting rooms and were supposed to sign in and out of the room but had not received that instruction. They were frequently required to stand six feet or more away from tables and workers in the normal exercise of their duties, despite a court settlement that ensured their right to monitor election procedures, within six feet when necessary. The Committee also received testimony that contradicted some of these statements and provided a different viewpoint. Volunteers and workers from both the Republican and Democratic parties made claims of hazing, rudeness, bigotry, racism, and other offensive behavior occurring while election activities were still underway. Several of the issues, such as the management of the official record of challengers allowed in or out, may have been simply driven by the situation with COVID-19 and will not be relevant again. Reports were heard of calls to citizens, ostensibly made by Republicans, informing them to come and vote on Wednesday rather than Tuesday. While many accusations will remain just that, one thing is perfectly clear: the rights and duties of poll watchers and challengers must be better understood and reinforced in their respective training and must be protected equally by election officials. This is an area in need of much reform and greater clarification in election law.

Additionally, there is significant evidence that the recruitment of Republican poll workers for Wayne County encountered significant obstacles. Many witnesses testified to volunteering but not hearing back from the county or being told there were already enough workers. Others testified to a particular moment at the TCF Center when workers were surveyed for party affiliation and only a few there raised their hands as Republicans. The Committee understands the logistics of recruiting Republicans for Wayne County and the city of Detroit can be difficult but finds the repeated reports of volunteers not being accepted or not having their emails returned troubling. Obtaining the proper ratios of partisan workers is of critical importance, especially ones from the local area. **The Committee encourages the Wayne County Republican Party and officials in the county and city clerks' offices to work together to obtain the correct number of workers for each election. Further, the Committee asks the Bureau of Elections to investigate and provide to the Committee an evaluation of partisan poll worker recruitment in Wayne County and the city of Detroit.**

These issues were clearly reflected in the activities that occurred at the absentee counting board at the TCF Center. At one point, an audio recording was released of an apparent election training session in the city of Detroit where workers were instructed to maintain six feet between challengers and poll workers, due to COVID-19 precautions. Prior to the election, a court settlement ensured poll challengers could monitor election activities within six feet when necessary. After the settlement, clerk staff, like other election staff across the state, were to be informed of the ruling and how it would affect their activities on Election Day. Testimony was received by the Committee indicating that the settlement, which was reached after many workers completed their training, was not well known among the workers at the TCF Center. It is easy to see how

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

this led to significant confusion and conflict, particularly as many workers had genuine fear and concern over their proximity to persons during the pandemic.

Contributing to the confusion and hostility of poll watchers and challengers was the differing opinions regarding the actual rights and duties of those individuals. These conflicts were only amplified by the partisan and ideological nature of the volunteers, despite some not affiliating with a political party. Multiple days of testimony from Republicans and Democrats made it clear that Republican challengers were committed to ensuring that challenges were issued and recorded when information was presented to indicate a voter was not, or may not be, eligible. Representatives of Michigan Democrats, however, indicated in testimony before the Committee that their specific training regarding the duties and obligations of challengers is to not ever challenge any ballots. While it was clear they recognized the legal reasons for challenging, they also called the law "archaic" and affirmed they train their challengers to not issue any challenges. They believe their obligation is to assure no vote is disqualified. One Democrat official even noted their reason for being there was to keep an eye on Republicans, not to challenge ballots. This significant difference of opinion and action contributed to some of the misunderstandings and tensions that occurred at the TCF Center, as each partisan observed the other failing to comprehend their duties or felt their duty was specifically to confront the other side.

The concern of partisan volunteers cloaked as Independent challengers through non-profit or third-party entities only added to the accusations of an unfair or unbalanced election environment. The Committee heard testimony and saw evidence that independent observers and challengers were frequently operating for one of the two major parties making their labels as Independents confusing and unhelpful.

It is apparent that the environment at the TCF Center became intolerable and the reactions to it must be understood in this light. While mistakes were clearly made by officials on all sides, it must be acknowledged that many of them were attempting to simply do their job during a time of increasing confusion and distrust. It is impossible for the Committee, or any legal entity, to sort through all the events or persons at fault. However, it appears obvious and reasonable to conclude that confusion, fear, misunderstanding, and even chaos occurred at the TCF Center to varying degrees on Nov. 3 and 4. The environment and those emotions were compounded by a lack of proper recruitment and/or training of election workers on the part of the clerk, as well as a failure of the Republican party to verify recruitment and training, supply an adequate number of election attorneys, and to properly train and counsel some of their volunteers and challengers.

Republican officials, along with some ostensibly Independent challengers, furthered the crisis by putting out the call to other members and citizens to descend on the location to stop what was described and presented as a stealing of the election. The descent into disorder with so many extremely concerned citizens elicited responses from poll workers that seemed necessary to them at the time, such as covering windows, calling police, denying lawful challenges, and removing challengers. Those actions by both sides were not always lawful or wise, and increased the angst and fears of the untrained challengers and observers, as well as the many in the public who t did not understand what was shown to them by the media. **Despite these mistakes and, potentially, illegal**

REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

actions, the Committee found no evidence fraudulent activities were undertaken or that such actions led to irreparable harm to ballots or vote counting. Numerous safeguards, particularly the partisan make up of the election boards themselves, were not lost, despite these actions.

Therefore, the Committee recommends updating the requirements for challengers including the tasks and duties they are to preform, standards of conduct, and party affiliation. Additionally, clerks and parties need to be held to recruiting adequate workers, providing appropriate and uniform training including any recent law updates, and being able to instruct law enforcement in lawful responses to workers or volunteers creating a disturbance in the process of carrying out their duties. Officials need a clear chain of command in place for making decisions and being accountable, particularly if a crisis arises and if one of the leaders has left the premises. Finally, the Wayne County Republican Party and other, independent organizations, ought to issue a repudiation of the actions of certain individuals that created a panic and had untrained and unnumbered persons descend on the TCF Center. Both clerks and the parties need to take seriously their responsibilities of having properly trained and adequate personnel in place and the training ought to be uniform, regardless of party.[1]

5. <u>Antrim County</u>

Antrim County became the focal point of multiple theories and concerns surrounding the Nov. 3 election, as the unofficial results reported at the end of the tabulation for the county were later discovered to be in error. The common claim surrounding this mistake was that the votes for Donald Trump were switched with votes for Joe Biden, providing Biden with a win in heavily-Republican Antrim County. However, this claim is inaccurate and was explained before a joint hearing of the Senate and House Oversight Committees in November 2020 by the Antrim County Clerk, Sheryl Guy.

Due to a series of errors made within the county clerk's office, the unofficial votes received from polling places on election night did not transfer into their respective spreadsheet columns correctly. This shifted the vote totals over a column for several races across the ballot. These mistakes began months earlier when several late items were ordered onto the ballot in certain townships. Unfortunately, new logic and accuracy tests were not performed, as required by law. Programming at the clerk's computer was not updated to reflect these changes; however, tabulators in the precincts were updated and had no problems processing ballots on Election Day. Tally sheets printed at the close of polls never reflected the errors reported in the clerk's unofficial results. On the morning of Nov. 4, once it become clear that the unofficial results were inaccurate and did not match the official votes printed by the tabulators, efforts began to discover the cause of the errors. The clerk and her staff made several attempts to re-tabulate and resolve the problem before understanding the cause. This resulted in additional, incorrect vote counts being reported. Once the cause was isolated, ballots were re-tabulated and the correct results, which matched the original tabulator sheets from Nov. 3, were posted. Multiple checks were easily able to rectify the situation and later, **a complete hand recount validated the original, official results as accurate**.

---

[1] The Department of Attorney General informed the committee on June 15, 2021 that it has been investigating issues related to the events at the TCF Center, per an official request of former Senator and Oversight committee member, Peter Lucido. It indicated a report on findings is forthcoming.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

A prime example of a misrepresentation of facts that then mislead citizens is found on a chart on page two of Allied Security Operations Group's (ASOG) Antrim County Forensic Report. The chart, shown below, and the accompanying information, led citizens to conclude the election results were suspiciously changing for over a month after the election. It also could lead one to believe election officials and the Dominion tabulators were dishonest in their work by not representing the source of the specific numbers shown, even though the information is readily available to the authors of the report. Further, the authors also chose to present only some of the information, leaving out specific data that would evidence something besides a massive conspiracy or computer hack created the problem.

| Date | Registered Voters | Total Votes Cast | Biden | Trump | Third Party | Write-In | TOTAL VOTES for President |
|------|------|------|------|------|------|------|------|
| Nov 3 | 22,082 | 16,047 | 7,769 | 4,509 | 145 | 14 | 12,423 |
| Nov 5 | 22,082 | 18,059 | 7,289 | 9,783 | 255 | 20 | 17,327 |
| Nov 21 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 23 | 15,949 |
| Dec 17 | 22,082 | | 5,959 | 9,759 | 244 | 20 | 15,962 |

This second chart fills in relevant and critical information about the data and provides additional data points to provide greater context to the observer. This data was available to ASOG and others utilizing the previous chart, yet they chose not to provide the context nor the additional data.

| | Date | Registered Voters | Total Votes Cast | Biden | Trump | Third Party | Write-In | TOTAL VOTES for President | Note |
|------|------|------|------|------|------|------|------|------|------|
| 1. | Nov. 4 | 22,082 | 16,044 | 5,960 | 9,748 | 239 | 23 | 15,970 | Tabulator tapes-official results (Not reported on election night). |
| 2. | Nov. 4 | 22,082 | 16,047 | 7,769 | 4,509 | 145 | 14 | 12,437 | Clerk's computer-unofficial results (publicly reported). |
| 3. | Nov. 5 | 22,082 | 18,059 | 7,289 | 9,783 | 255 | 20 | 17,347 | First attempt to rectify discrepancy. |
| 4. | Nov. 6 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 20 | 15,969 | Completion of re-tabulation. |
| 5. | Nov. 16 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 20 | 15,969 | Official Vote report. |
| 6. | Nov. 21 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 20 | 15,969 | Canvass/certification |
| 7. | Dec. 17 | 22,082 | 16,044 | 5,959 | 9,759 | 244 | 20 | 15,982 | Hand Recount |

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Row one shows the vote totals shown on the tabulator tapes at the close of the election. These numbers are critical as they demonstrate, when coupled with the hand recount, that no tampering or pre-installed, illicit programing ever took place on the tabulators. It also shows that no fraudulent ballots were added to the ballot boxes to cover up such hardware/software malfunctions. The minor changes from the first tabulation to the final canvas and hand recount are well documented by election staff and result from several spoiled ballots that were not able to be processed in subsequent runs and from ballots that could not be electronically processed but could be hand counted.

Row two contains the vote count reported by the Antrim County clerk's office on election night, which was the unofficial vote count. As is detailed in this report, these results were incorrect because the programing to receive the data had not been properly updated after changes were made to the official ballots in certain townships. The result was what amounts to a spreadsheet having its fields improperly aligned with the incoming data. This would have been caught by logic and accuracy tests. The discrepancies with the tabulator tapes should have been discovered before these results were reported.

Row three shows the struggle faced by the clerk's office to determine what went wrong and how to correct it. These results show a series of urgent but mistaken attempts to address the errors that led to double counting of some precincts and absentee ballots. The contemporary poll books and worksheets are clear proof of what was happening, showing handwritten notes and commentary. The records also show who was there trying to figure out how to solve the issue.

Row four shows the vote count after the errors were properly identified and ballots were re-tabulated. Clearwater Township was still experiencing issues and had to be added in by hand. Again, contemporary documents and worksheets are clear proof of the situation and work being done.

Row five is the official vote report filed with the state before the certification.

Row six contains the certified election results. These were certified Nov. 21 by the county board of canvassers. The results are virtually the same as the tabulator slips produced on election night with the discrepancies identified and explained in the minutes of their meetings.

Row seven is the results of the complete hand recount conducted on Dec. 17. When a hand recount is done, ballots that were previously unable to be tabulated electronically are sometimes able to be added. These changes are, again, well documented by the workers' notes made during this process.

**The Committee states that the data this chart summarizes, coming from the actual election artifacts in Antrim County, clearly and concisely shows that ideas and speculation that the Antrim County election workers or outside entities manipulated the vote by hand or electronically are indefensible. Further, the Committee is appalled at what can only be deduced as a willful ignorance or avoidance of this proof perpetuated by some leading such speculation.**

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

There were many groups and persons from around the country that focused their attention on Antrim County as the most central point in their arguments and speculation. The county was mentioned by officials at the White House, in media, at rallies, and in several, substantial online documentaries. The Committee investigated the claims made by some of the more prominent groups and individuals.

The Allied Security Operations Group (ASOG) obtained access to the Antrim County voting tabulators and purported to perform a forensic audit. (ASOG and its co-founder were purveyors of the "fractional vote" and "more votes than registered voters" theories[2]). ASOG's audit described stolen computer files, machines designed to provide incorrect results, manipulated software, and cyber-attacks. Utilizing the difference between the unofficial vote count and the final, official count, ASOG claimed the machines were inaccurate 68% of the time. However, ASOG never provided an explanation for how the official vote was accurately obtained on the tabulator slips in the same physical count as the incorrect unofficial results on which they focus. ASOG did not make any attempt to invalidate the claims of the clerk by demonstration. ASOG also claimed a loss of files regarding auto-adjudication, a method of curing absentee voter ballots that Antrim County does not utilize as further evidence of fraudulent activity. ASOG claimed the machines had "ranked-choice" balloting turned on when this is not possible on Michigan machines. Other entities (CyberNinjas and Halderman) showed this claim was untrue. ASOG ignored that the simple and most effective way to verify the results is to simply count all ballots by hand. Even after a hand recount verified the results in Antrim County, ASOG refused to retract its assertions.

Attorney Matthew DePerno was retained by an Antrim County resident to pursue legal action against the county and the state regarding the results of the election. Mr. DePerno has subsequently released various reports, videos, and statements regarding the election results, presenting the ASOG report, as well as work by Dr. Douglas Frank and Jeff Lenberg, as primary pieces of evidence. The Committee closely followed Mr. DePerno's efforts and can confidently conclude they are demonstrably false and based on misleading information and illogical conclusions. In one recent video, Mr. Lenberg demonstrated how a hacked machine will incorrectly count ballots (reporting it on the official results printout) and how a hacked computer will show inaccurate results. However, neither of these demonstrations shows the explanation given by the clerk is untrue, nor do they explain how the actual official results sheet *did not* match the inaccurate unofficial results. Most critically, it does not explain how the hand recount verified the official results reported by the tabulators on election night. They simply proved hacked machinery will perform incorrectly. This is not evidence machines were hacked, and it is certainly not evidence that machines that performed correctly were hacked.

Further, the insinuations made depend on the tabulators being hacked *after* the logic and accuracy tests. Mr. DePerno, and others, insisted this was possible because the Dominion machines in Antrim County have modems or wireless chips installed. However, this is indisputably false. Antrim County did not utilize modems or any internet or wireless network to transmit voting results *ever*. This incredibly conclusive fact, along with the hand recount of the ballots, serve as the irrefutable bulwarks against all allegations. The cited proof of modems is from a quote for purchasing received by the county from Dominion, not an actual purchase receipt or physical sighting of any modems.

---

[2] The "more votes than voters" theory, repeated by President Trump's attorney, Rudolph Giuliani, was based on an affidavit from the ASOG co-founder that cites several Michigan counties where there were allegedly more votes than registered voters. However, the affidavit cited several townships in Minnesota, not Michigan. Even if the document referenced the right state, the claims regarding the Minnesota townships still were not accurate, according to data from the Minnesota Secretary of State.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Mr. DePerno's lawsuit, Exhibit 6, highlighted by former state Sen. Patrick Colbeck in a web post dated April 9, 2021 and entitled "Modem Chips Embedded in Voting System Computer Motherboards," feature a voting machine that is not used by Antrim County. Yet the suit draws the connection that the existence of such a machine, one that is not in Antrim County and not manufactured by Dominion at all, is evidence that the Dominion tabulators in Antrim County have the same technology. Committee members and others have been frequently approached by constituents who have been convinced that this is true of the Antrim County machines and all Dominion machines in general.

On June 11, internet and social media sources proclaimed the newest announcement from Mr. DePerno about Antrim County. However, the information provided appeared to be already available, but simply presented in a different light. The first allegation related to evidence of the clerk's Election Management System (EMS), a software package installed on her computer to manage the election. This is the same program that incorrectly reported the results on election night because it had not been properly updated with the late changes to ballots from certain precincts. **EMS is not connected to the tabulators**. The allegations focused on how the clerk's computer and the program were remotely accessed in the days following the election. This should not surprise anyone as the clerk, secretary of state, and the software company sought to determine what went wrong and how to fix it. At no time would this connection or activity have had an impact on the tabulators. More relevant, it could not have changed the tabulator slips, shown in the second chart, line one.

The June 11 video from Mr. DePerno also included what he concluded was dramatic evidence about specially made ballots, sent to Republican areas, that would more frequently fail in the tabulators. He then said such ballots would be sent to adjudication, where someone could determine them as Biden votes, even if they were not. This pronouncement is simply more blatherskite. Adjudication takes place with both Democrat and Republican workers, observers, and challengers present (Antrim County had no concerning or reported issues related to their challengers). Also, Antrim County did not have a high incidence of adjudicated ballots. Most important is the now repeated point of lines one and seven on the second chart above: the original tabulator slips and the hand recount match with only a few documented and easily explained ballot differences, dispelling any legitimacy to speculation of massive vote stealing by human or computer means.

**The Committee finds such actions to be misleading and irresponsible, diminishing the overall credibility of those asserting this conclusion.**

Dr. Frank has also worked independently of Mr. DePerno, appearing in various other reports and programming. He claimed his findings of patterns in voting demographics and results, along with disparities between census, registration, and ballot totals in given areas were conclusive evidence of a complex computer hack and conspiracy to manipulate vote counts around the nation. This theory, like Dr. Shiva's, alleged the installed "algorithm" switches or steals votes just enough to succeed while not being enough to raise suspicions. However, Dr. Frank's conclusions are not sound for several reasons. Census data is not recent, and people do not only move away (as he frequently contends) but others do move into an area. Coupled with same day registration,

18

REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

the notable red flags he spotted in the data are easily explained, e.g. young people do not vote as readily as older citizens, people's movements create disparities between registrations and the census, etc. The patterns he sees are not unexpected or unusual to elections or human behavior in general. His theories depend on the ability to hack into the tabulators before or during and/or at the end of the election. Many of the counties he and others identified as having been hacked do not even have modems or make any online connection to submit results. Those that do, do not connect the modem, which is physically separate from the Dominion tabulator, until *after* the polls are closed and the tabulators have printed the official results.

Events in Antrim County sparked a significant amount of concern about the technology used to count ballots. This concern led to much speculation, assumptions, misinformation, and in some cases, outright lies meant to create doubt and confusion. The many hours of testimony before the Committee showed these claims are unjustified and unfair to the people of Antrim County and the state of Michigan. It has also been unfair to people across America. The simple answer to all of this remains the most reasonable conclusion: human error and lack of training are the factors that contributed to inaccurate unofficial vote counts. These errors were quickly discovered and rectified by the protective and redundant systems our state has built to verify and protect election integrity, *including re-countable, paper ballots*. Even more significantly, the official vote count was never in doubt and was validated several times, including during a complete, hand recount.

**While extremely disappointed and frustrated with the obvious avoidable errors, the Committee commends the efforts of the Antrim County clerk, staff, and many volunteers that corrected these errors and gave their time for the canvass and hand recount. The Committee also recommends legislation strengthening the law regarding the conducting of logic and accuracy tests prior to the election, including penalties for failing to do so. The Committee recommends the attorney general consider investigating those who have been utilizing misleading and false information about Antrim County to raise money or publicity for their own ends. The Committee finds those promoting Antrim County as the prime evidence of a nationwide conspiracy to steal the election place all other statements and actions they make in a position of zero credibility.**

6. **Operating Issues with Tabulators and Precinct Computers**
Speculation and theories of fraud in the election appear most prevalent in the areas concerning voting tabulators, computers, software, hardware, and cybersecurity. In the testimony and information reviewed by the Committee, claims ranged from something as simple as "spikes" in the vote count that exceeded the physical capacity of the tabulators to machines that were simply inaccurate. However, more complex claims also emerged, claiming that tabulators were intentionally designed to manipulate the tally through fractional voting or swapping by hand, through software, or by cyber attacks that based their manipulation on the votes necessary to overcome candidate Joe Biden's early deficit to President Trump.

*Dominion Voting Systems, Election Systems & Software (ES&S), Hart InterCivic*
Michigan utilizes tabulators and election services provided through three different vendors, with the individual counties determining which vendor to use. All vendors must meet the specifications of the state's election laws which requires vendors to meet guidelines provided by the United

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

States Election Assistance Commission (EAC). The EAC has rigorous standards regarding construction, material and code sourcing, reviews, and independent auditing conducted by certified third parties.

The Committee interviewed, under oath, the CEO of Dominion Voting Systems and the vice president of systems security & chief information security officer from ES&S. Hart InterCivic submitted written testimony. Despite many public denunciations of their collective testimony as inaccurate, no individual has provided any evidence to the Committee of such perjury or has filed any action in a court of law asserting such.

Mr. John Polous, Dominion CEO, denied multiple rumors regarding the company and provided references to verify his testimony that the company was not involved in elections in Venezuela and had no connection to Hugo Chavez, Nancy Pelosi, Diane Feinstein, or George Soros. He also denied the existence of Dominion servers in Spain and Germany, emphasizing that ballots remain local, are counted locally, and are not moved over state lines, let alone overseas.

Mr. Polous explained in detail how the operations of the Dominion machines are not compatible with the various theories being promoted, and that any of the accusations regarding counting ballots multiple times or scanning surplus ballots would easily be uncovered due to the poll books being unbalanced. Further, ballots that required auto-adjudication or duplication are accounted for in the poll books and create a computer log that is checked to prevent or detect double counts. Damaged ballots that require duplication are logged and could not be accidentally tabulated due to the damage that required the duplication.

### Fractional Voting
The early allegation of fractional voting was supported by a few photographs which appeared to be screen shots from computer screens running the Dominion software. The chair specifically called for this information during public testimony as its existence would have been a profound demonstration of proof. However, despite numerous, repeated requests from the chair and assurances from those making the allegation, no proof, whether by demonstration or verifiable citation, was ever offered to or obtained by the Committee.

### Internet Connections
Many observers insisted the vote tabulators at the TCF Center were connected to the internet. Chris Thomas, who served as the senior elections advisor for the city of Detroit, has asserted that this is simply not true. Other individuals who were at the TCF Center, such as former state Sen. Patrick Colbeck, insist that they were. It is true that every tabulator was connected to a local area network (LAN), which would create the same icon on a computer screen indicating a network connection as is shown by an internet accessible network. This may be a source of some of the confusion. Computers at the central control center, which were not connected to each precinct's LAN, were connected to a network that was connected to the internet, which may have also contributed to the confusion. Regardless, no evidence has been offered that the tabulators were connected beyond each LAN, and, in fact, the results from the tabulators at the TCF Center were transmitted to the clerk's office via flash drives, not electronic or cellular connection. Furthermore,

## REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

and more importantly, there has been no evidence provided that such a purported connection led to alterations to machine programming, hardware, or the tabulated results or could have led to such changes. Finally, logic and accuracy tests are conducted on each tabulator prior to the election to confirm that pre-election procedures were followed properly. During the post-election audits, clerks verify that those tests were performed and that the machines and their programming were not tampered with during the election.

Many theories and speculation regarding tabulators not at the TCF Center also include a component that necessitate an internet connection. It is particularly important to note that Dominion voting machines that are not part of an absentee voter counting board do not have built in modems or wireless internet. Reports to the contrary are false, with some falsely labeling non-Dominion machines as Dominion machines to make it appear as if they do have wireless internet capabilities. The secure cellular modems some clerks use to transmit the unofficial results to the county clerk are not even turned on or connected to the tabulators until *after* the official results are printed by the individual machine.

### Tabulator/Software Integrity
There is no link in the election process chain more susceptible to unprovable and un-refutable speculation and suspicion than those involving the invisible lines of code and panels of circuits. These vulnerabilities can include tampering with machine code on site, via cyber attack, or by malicious programming by the proprietors of the machines.

There are many theories as to how compromising the integrity of the machines and software could have taken place, making it impossible to delineate each one separately. However, the answers and evidence against nearly all theories is generally the same. Reasonable deduction and logic stand to refute nearly all possible outcomes of a hack or attack, including the following theories: whether files including ballot images were hacked, a malicious algorithm was installed to switch votes, or a hostile, foreign force obtained a connection into a tabulator before, during, or after the election. In all of these situations, a simple recount or re-tabulation by the machine, after a logic and accuracy test, or by hand would demonstrate the theory to be consistent or inconsistent with the facts. This has been undertaken in multiple jurisdictions, both those in question and those not, all providing verification of the original, official results. Not one of these efforts demonstrated a problem with the tabulators or the software. There is no evidence to suggest the original, official results reflected anything but what was marked on the ballots.

Videos and reports of the ease of hacking current Dominion voting machines from outside of Michigan, e.g. Georgia, never demonstrated a vulnerability of the vote counting software or the tabulators. The chair contacted various officials from Georgia to understand the testimony and events in question there. Particularly, the testimony of Jovan Pulitzer, which purported to have on-the-spot access to manipulate voting files and vote counts, has been demonstrated to be untrue and a complete fabrication. He did not, at any time, have access to data or votes, let alone have the ability to manipulate the counts directly or by the introduction of malicious software to the tabulators. Nor could he spot fraudulent ballots from non-fraudulent ones. Notably, Georgia did conduct a complete, statewide, hand recount that validated the tabulators' official results.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Many of the theories surrounding cyber attacks were consolidated into the visuals and narratives included in the "Absolute Proof" video series first presented in January 2021 and continuing into June 2021 by Mike Lindell (the video relied heavily on the situation in Antrim County and the report from ASOG). In summary, Mr. Lindell claims that attacks by foreign and domestic enemies were successful in obtaining access to the computers containing results at local and county clerks' offices, as well as the secretary of state. In some cases, the supposed access included the actual tabulators.

However, this narrative is ignorant of multiple levels of the actual election process. Upon completion of the election, tabulators print the final results on paper. Clerks then connect a modem and transmit by secure, cellular connection or transfer by flash drive the unofficial results to the county clerk.[3] County clerks then report these unofficial results both locally and to the secretary of state. The secretary of state releases the unofficial results to media and their own page. Clarity, a Spanish based company, also takes in these unofficial results from the county or the state. This company, which is based in Spain and has servers in Europe, makes the unofficial results available to multiple users, especially media subscribers who utilize the unofficial results in their election night prognostications. Scytl and others are companies that provide similar services. All of these activities, especially due to media inquiries, constitute a significant explanation for much of the cyber activity across the country and the globe on election night.

Terminologies about the equipment used in elections leads to much of the confusion, particularly when used carelessly. Various documents, emails, and manuals discuss connectivity and servers. Certain persons have used these as proof that tabulators were connected during the election. However, the capabilities of the machines do not denote all of those options were operating during the election itself. Server connections and vulnerabilities, even errors, at clerk's offices are not indicative that tabulators themselves were vulnerable or hacked. The presence of IP addresses do not prove votes were altered or programming was hacked. Servers have nothing to do with regular tabulators during the election.

While the clear and constant presence of cyber criminals is real, the exchange of "packets" of information between two computers speaking to each other is not evidence of successful hacking or changing of data. Moreover, it is not possible for anyone to now determine what might have been in those packets of information unless granted specific access to one of the two computers involved in the transaction. All the while, the official results remain on a printed piece of paper at the local clerk's office and are not alterable to any reverse cyber attack. Most importantly, the paper ballots in the box are available for re-tabulation or recount at any time. Where this was done, no evidence of hacking or attack was ever shown. Nor did any official representative of the losing party call for a hand recount in any precinct so as to prove an instance of such. If the losing party had been so confident of any of these cyber attack theories or software-based vote switching, simply asking for several hand recounts or re-tabulations in the various precincts would have demonstrated a genuine hack had happened and that there was necessity for additional recounts and investigations.

---

[3] ES&S and Hart InterCivic tabulators have internal modems, but not Dominion. However, they are not turned on until the polls are closed and tabulation has concluded. It is worth noting that these machines will likely have to be recertified, depending on whether they have 4G or 5G capabilities when the technology changes.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Further, the graphics and charts in various videos claim very specific access and vote count changes in specific counties across Michigan but do not provide any references or evidence to demonstrate how that information was acquired. As mentioned above, once the data is transmitted, there is no way to know what was sent without access to a computer on either side. No clerk or election official in any of these counties was informed how these numbers were calculated or known (except the numbers shown for Antrim County, which mirror the numbers shown to have occurred by human error). While showing these numbers is compelling, there is no source provided, but the viewer is led to believe Mr. Lindell's experts have received access to each of these counties' or precincts' computers and discovered a connection and hack occurred along with exactly what data was transmitted. No such activities took place at any of these locations with which the Committee had contact.

The chair spoke with clerks in several of the counties listed by Mr. Lindell's experts. These clerks had no explanation for numbers his reports show as being flipped votes, nor had they had any interaction with any persons making these allegations. Moreover, clerks in these counties performed random hand recounts in various precincts or townships and found zero change to the official, canvass results. Other clerks did full county re-tabulations and found zero change. For these actions to not contradict Mr. Lindell's allegations would mean all the clerks surreptitiously or incidentally chose precincts or townships that were not involved with the hack his experts claim occurred or allowed their tabulators to be compromised. The Committee finds this is beyond any statistical or reasonable credulity.

### *Canvassing and Out of Balance Precincts*
The canvassing process that is conducted at the county level in each of Michigan's counties always serves as the check on most irregularities that may occur during the initial tabulation. If paper ballots are significantly unbalanced when compared with the number of votes reported in poll books, this constitutes a clear indication that something went wrong. Often, the imbalance arises when workers do not immediately account for the necessity of copying overseas ballots or damaged absentee voter ballots. It also occurs when a voter decides to leave the polling place without correcting a spoiled ballot or submitting their ballot. Other causes come from empty absentee voter ballot envelopes, or couples including both of their ballots in one envelope.

Some of the highly out-of-balance precincts at consolidated Absentee Voter Counting Boards (AVCB) were likely from mistakes made with the high-speed tabulators, something that several citizens swore to have witnessed in affidavits and other testimony. When these imbalances appear after Election Day, it is the board of canvassers, or in Wayne County, their chosen agent, the clerk, that can make the decision to perform a further review to correct any irregularities that are discovered. Re-tabulation of the paper ballots and a thorough examination of the poll books are critical parts to the canvass process, allowing the books and ballot boxes to reach balance.

Technically, the imbalances that remain after the canvass could exist due to fraudulent activity. Unbalanced precincts are unfortunate and are something that should be addressed in the future. However, the unbalanced precincts in Michigan counties were marginal and, in no way, would have impacted the outcome of the Presidential election. There were fewer precincts with an imbalance

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

in this election than in previous ones. **Developing best practices and training election workers on how to maintain balanced precincts is recommended. There is much discussion on allowing some out-of-balance precincts to be eligible for recount but testimony the Committee heard from several clerks indicated they did not support this. Therefore, the Committee makes no recommendations on this issue.**

The Committee did learn during testimony that Wayne County's Board of Canvassers operates differently than most other counties, shifting the actual canvass responsibilities to the county clerk and their staff. Once the canvass is complete, the board receives a report, that is unusually anemic in its details of how imbalances were rectified. This is unfair to those serving on the board, as well as the voters of Wayne County, despite being permitted by law. A transparent canvass, overseen by those not responsible for the actual election process, allows citizens to understand how imbalances occurred and how they were rectified while having confidence that there was not a conflict of interest for those preforming the canvass.

**Canvassers ought to be intimately involved in the process and the law should be changed to provide consistency and transparency in the canvassing process. Furthermore, it would be wise to allow for larger boards in higher population areas and to provide additional time to complete the canvass to rectify any irregularities.**

7. **Signature Verification Process**

The Committee was made aware of claims that election workers at the TCF Center in downtown Detroit were instructed to not match signatures on envelopes and furthermore were instructed to "pre-date" the received date of absentee ballots. To the contrary, these processing steps — signature matching and verification of the date received — occurred at another location and were completed by other employees prior to the time the ballots were sent to the TCF Center for counting. Workers at the AVCBs are to check for the clerk's signature and time stamp as well as making sure the voter signature is present. However, the validation of the voter signature by the clerk's office is indicated by the clerk's signature and stamp. As for the "pre-dating" allegation, Detroit Senior Election Advisor Chris Thomas explained this date field is necessary for processing the ballot. Without the voter present, there is no way to have that date, which was recorded into the QVF by the official who took the same day registration at another location. Since the poll books at the AVCB are not connected to the QVF during Election Day, there is no way to check what was entered at the site where the voter registered. Therefore, a "placeholder" date is entered, and the poll worker assumes the official accepting the registration did their due diligence.

Kent County Clerk Lisa Lyons, and Ingham County Clerk Barb Byrum, both testified regarding the possible requirement of a "real time" signature when applying for an absentee ballot, indicating it would be highly preferred rather than performing the application process online. In addition to the preferences of election officials, the Michigan Court of Claims struck down Secretary of State Benson's guidance on signature matching, which required workers to presume the validity of signatures, ruling that the required presumption of validity is found nowhere in state law and mandating such was a direct violation of the Administrative Procedures Act.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

After reviewing these facts and receiving the testimony of experts and clerks, it is abundantly clear that the signature verification process is one of significant importance. With new policies in place due to the adoption of Proposal 18-3, current election procedures do not require a new voter to, potentially, ever make face-to-face contact with an election official or staff throughout the process of registration, requesting an absentee ballot application, or completing and submitting their ballot. Therefore, requiring a voter to confirm their identity at some point during the process is imperative. Whether providing a "real time" signature, a government-issued photo identification card, or other unique personally identifying information, like a driver's license number or a state identification number, requesting that a voter provide one of these easily-accessible identifiers will go a long way to strengthen the integrity of our system, while supporting the new, more efficient way of administering our elections.

**Therefore, the Committee recommends that the secretary of state begin the process of establishing actual rules for examining and validating signatures consistent with a ruling of the Michigan Court of Claims. The Committee also recommends that statewide measures be put in place to ensure eligible voters are not unreasonably denied access to vote if there is an issue with their signature. Finally, the Committee recommends that reasonable measures be put in place to ensure voters can easily and properly identify themselves when exercising their right to vote.**

8. <u>**Jurisdictions Reporting More Than 100% Voter Turnout**</u>

The Committee received and heard claims that jurisdictions had more than 100% of registered voters voting. Here are some of the local municipalities that had claims of a higher voter turnout than there were actual registered voters:

| Municipality | Claim | Actual |
|---|---|---|
| Oneida Township | 118% | Approximately 80% |
| Zeeland Township | 460.51% | Precincts ranged from 74.46% – 84.80% |
| Spring Lake Township | 120% | Precincts ranged from 66.74% – 84.15% |
| Gladwin Township | 215.21% | 67.23% |
| Summit Township | Over 100% | 71% |
| Detroit | More Votes than Voters (Trump Claim) | 250,138 votes = Under 50% of registered voters in the city and only 37% of the total population. |

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

9. **Absentee Ballots Were Tabulated Multiple Times, Increasing Vote Total**

Some individuals claimed that many ballots were counted multiple times when they were re-submitted through the high-speed tabulation machines. The Committee heard from several persons and read many affidavits claiming to have first-hand knowledge that this issue occurred. Investigation does show it is possible to cycle a completed stack through the tabulator multiple times as long as no errors occur. Bundles of ballots go through the tabulator so quickly that a simple jam or other error necessitates the entire bundle being restarted. Workers cannot restart the stack unless they first clear the partial count and start from zero by pressing a button.

If ballots were counted multiple times, this would have created a significant disparity in the official pollbook. This was the testimony of several witnesses, including Chris Thomas and Monica Palmer, Republican chair of the Wayne County Board of Canvassers. Specifically, the pollbook would show that many more votes were cast than the number of people obtaining a ballot. This was the case at several counting boards at the completion of the original tabulation. However, the actual imbalances that remained after the canvass show this problem was rectified. Rectifying precincts where this mistake happened is usually not difficult to do and involves taking the ballots out of the box, counting the total number to see if it matches the poll book, and processing all the ballots through the tabulator again. The balanced poll books and the remaining imbalances do not indicate this problem any more, showing it was corrected. Remaining imbalances are likely connected to some of the other reasons addressed in finding number six, namely, empty envelopes, ruined ballots, etc.

**The Committee recommends that tabulator companies develop machines that place tabulated ballots into a box that has no access for poll workers while placing uncounted ballots in another tray to be checked and placed in the tabulator when ready. This would assure such an error cannot occur and that no reset and restarting of a full stack is necessary.**

10. **Thousands of Ballots Were "Dumped" at the TCF Center on Election Night/The Next Morning**

Several individuals testified and claimed that tens of thousands of ballots were "dumped" at the TCF Center on election night, when reported vote tallies showed that President Trump was still in the lead. They allege this occurred between 3 – 5 a.m. and that they were brought onto the floor to be counted. Chris Thomas, the senior elections advisor for the city of Detroit, stated he estimated 16,000 ballots were delivered to the TFC Center around that time. Some other persons and media speculated it was nearly 100,000, but most reported about 30,000-45,000. These ballots were submitted throughout Election Day at different locations, such as drop boxes, in the mail, and at the clerk's main and satellite offices. After the ballots were compiled and processed at the clerk's office, after the closing of polls at 8 p.m., they were brought to the TFC Center for counting. These ballots were not brought in a wagon as alleged, but via delivery truck and then placed on carts. A widely circulated picture in media and online reports allegedly showed ballots secretly being delivered late at night but, in reality, it was a photo of a WXYZ-TV photographer hauling his equipment.

## REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Others claimed that the TCF Center security camera footage around the same time showed some type of "ballot dump." While the video in question confirms that a number of ballots were delivered at the time alleged, it provides no evidence of fraudulent or wrongful conduct. In the video, the van arrived around 3:30 a.m. and unloaded the absentee ballots. Once unloaded, the van left around 3:55 a.m. to go back to the satellite office where the processing was occurring. The van arrived back once again around 4:30 a.m. to unload the final ballots.

This theory, like many of the other theories proposed as evidence of fraud, does not constitute actual evidence on its own. Those drawing such conclusions in their affidavits and testimony were asked to provide proof that something illegal actually occurred but no proof that ballots were fraudulent was provided or found by the Committee in testimony or in subpoenaed records. However, this situation does raise issues with the delayed and cumbersome process of obtaining absentee ballots from drop boxes on election night, when many other activities and processes are also ongoing. **The Committee recommends that drop boxes not be utilized or be closed earlier than 8 p.m. on Election Day so that the time taken to collect such ballots will not, by necessity, extend processing and tabulating of such a large volume so long into the night. At the least, appointed staff should be on-hand to immediately collect ballots from drop boxes at 8 p.m. Additionally, the process of transferring ballots from the clerk's office to other locations must be done with greater security and manifests so that there can be an accounting  for each ballot sent and received between the two locations, establishing a chain of custody.**

11. **Vote Totals Were Abnormal Compared to Past Presidential Elections and Other Vote Count Irregularities**

Several claims were made regarding the voter turnout in the November 2020 election in which the statistical data was cited as a source to show widespread election impropriety. Comparing historical results casts serious doubt over any claims of widespread impropriety in the Michigan 2020 election. In fact, turnout in 2020 increased less in Wayne county (11.4%) than in the rest of the state (15.4%) and President Trump won a greater percentage of votes there than he did in 2016 (30.27% vs 29.3%).

Additionally, the data suggests that there was no anomalous number of votes cast solely for the President, either in Wayne County or statewide:

| 2020 | 2016 |
|---|---|
| **Statewide** | **Statewide** |
| President: 5,539,302 | President: 4,799,284 |
| Senate: 5,479,720 | Congress: 4,670,905 |
| Difference: 59,582 (1.08% difference) | Difference: 128,379 (2.67% difference) |
| | |
| **Wayne** | **Wayne** |
| President: 874,018 | President: 782,719 |
| Senate: 863,946 | Congress: 754,560 |
| Difference: 10,072 (1.15% difference) | Difference: 28,159 (3.60% difference) |

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## Other Irregularities

Several published reports, particularly "Case for Michigan Decertification" presented charts of vote sub-totals and totals that were adjusted during the night and sometimes subtract votes from previous totals. The report also shows the increase in absentee votes tabulated was greater than the usual amount able to be processed in the given time frame. These reports require partial or incremental vote counts and totals. Finally, the report included final vote counts that include enormous spikes of final votes with a very high percentage for one candidate. Attempts by the chair to acquire the sources and citations of this data from the author were not able to be fulfilled. The author insisted that he cannot answer the questions about the origins of these data points, which he uses as evidence, without others investigating the issue or granting him access to a wide range of materials.

The reports containing these impossible mathematical counts rely on partial or incremental vote counts which are not available from any county or state official. Detroit does set up its own, unofficial vote reporting site. Incremental vote counts are reported during the process at the TCF Center. This additional level of complexity for reporting and handling, along with corrective actions that may be occurring onsite after an incremental data dump, can lead to multiple inaccuracies and discrepancies. There is additional confusion about counts and potential increases or decreases as the city merges actual precinct votes with AVCB votes. **Allowing Detroit to announce partial or incremental vote counts when no other community does, does not promote a uniform, statewide system. Further, not aligning each AVCB with each precinct creates an additional, complexity leading to an unnecessary vulnerability for errors in the unofficial, election night vote reports**. Finally, media outlets frequently make substantial errors or propagate the errors of others and then must adjust and retract data.

Large spikes in the vote count are not necessarily unexplainable or unusual. They do not alone constitute evidence of fraud and can be reasonably expected. Large precincts, particularly with the highest absentee voter turn out ever, took much longer to complete and then reported all their results at once. Further complicating this issue is that the absentee voter ballots counted at a consolidated counting board had to be merged with the votes submitted on Election Day at the corresponding, in- person voting precincts. This makes the spike larger than just the final count from the AVCB. No evidence has been presented to refute this as the legitimate reason for the dramatic jumps in vote counts seen in Michigan.

**Regardless, the Committee can only speculate on this because the author of the referenced report cannot provide sources that the Committee can pursue. Without provision of a source to investigate from the author, and as no confirmation of these numbers was provided nor can be ascertained, the Committee does not believe a wide-ranging, blanket allowance to search materials is justifiable or responsible, particularly in light of the extent of the post-election state audit performed and the lack of red flags from the final results in Detroit or Wayne County.**

## REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

### 12. Additional Issues

#### Ballot Box Construction
Testimony was heard from Monica Palmer regarding the roll of boards of canvassers in verifying the construction of ballot boxes. Her board made significant efforts to require repairing or replacing poorly constructed boxes. **This effort is commendable and ought to be extended to the construction of drop boxes, as well. Testimony was also shared that boxes disallowed by the Wayne County Board of Canvassers and labeled to not be used were still being used on Election Day. This is not acceptable, and the Committee asks the secretary of state or the attorney general to investigate who is responsible for this serious breach.**

#### Modem Usage on Tabulators
Testimony was given regarding the wisdom and necessity of modems for vote tabulators. There was not consensus amongst the clerks and the Committee makes no recommendation at this time. However, the external, detachable modem does provide a reassuring and genuine physical barrier to cyber attacks during the voting process.

#### Ballot Harvesting
Testimony and allegations of ballot harvesting were made, although no evidence of such was presented. Ballot harvesting has been caught at times in the past, but none was in this election. Drop boxes and prepaid postage do present a greater vulnerability to ballot harvesting. Others have made the argument that prepaid postage might also reduce the likelihood of an individual waiting for someone to collect their ballot. It is worth noting that ballot harvesting, while illegal due to its vulnerability to fraud, is not necessarily indicative of fraudulent voting.

#### Allegations of Illegal Votes
Testimony and reports of illegal votes, out of state votes, non-residents voting, and deceased voters are prolific, and the numbers included are substantial and compelling. However, no source or reliable method for determining these numbers is presented. References to "317 voters also voting in other states" do not come with explanation or source. Other numbers reported as evidence of fraudulent addresses or issues with residency fail to consider the complications and realities of same day registration (a real problem in its own right, but one voters created through adopting Proposal 3 in 2018). These same day registrations, also addressed earlier in this report, necessitate methods to enter voters into the database while also flagging them for additional checks and verifications later. This is particularly true at the AVCBs as they do not have access to the QVF and their electronic poll books are disconnected during the election. New registrants need lines filled in, but also must be flagged to be connected with the actual entry made in the QVF by the clerk's office prior to issuing the ballot. Impossible, and obviously contrived, birthdates serve as a rational and simple method for flagging these voters.

Many of the reports and allegations of illegal votes or fraudulent votes conflate issues of illegal or improper process with fraud or illegal votes. Many of these claims ignore the specific and legally required partisan makeup of the election workers and immediately assume that illegally removing watchers and challengers means fraud is occurring and that all ballots should be disqualified.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

Not only would this disenfranchise thousands of legitimate voters by no fault of their own, but it demonstrates a significant leap of logic and an unjustified mistrust of the bipartisan poll workers themselves. The outcome alleged to have occurred during these improperly supervised moments, namely the addition of tens of thousands of prepared ballots, would require a conspiracy of immense proportions: individuals at multiple levels and locations, massive resources of ballot production and pollbook manipulation, and an outcome that does not contain a final number count outside the realms of believability. All of this under the noses of hundreds of bipartisan workers and watchers (as not all were ever dismissed) and without a whisper from the huge pool of people who would know. And all of this to theoretically run up the Biden total in a precinct where he traditionally should have expected better than 90% of the vote but received 88% amidst a relatively unremarkable turnout. **The Committee finds these postulations strain credulity and are simply preposterous. The Committee also notes this theory would directly conflict with the idea the machines were tampered with to miscount the ballots.**

<u>Suspicious Communications</u>
Communications with Dominion to local clerks have been utilized to cause additional fear and mistrust of the company, its equipment, and the election results. While the Committee has not examined or received every document, a small sampling of the most often cited communications are only troubling if considered with the pretext that Dominion is part of a conspiracy to defraud voters. One email after the August primary regarding not saving images is highlighted as evidence of a cover-up. The context in the email, to make electronically transmitting the results after the election with the attachable modem function better, makes the instruction to turn off  transmitting the image a reasonable instruction when coupled with there being no law in Michigan to save the images. Emails and communications with Dominion to Antrim County after Nov. 3 are also reasonable as the clerk and others attempted to determine how the tabulators correctly counted the ballots while the clerk's computer showed them incorrectly. **(The saving of ballot images so the ballots can be publicly examined by digital means may be an issue Michigan should consider. Other states are doing this with success.)**

<u>*Chain of Custody and Election Material Security*</u>
Frequent demands to decertify all or a portion of the vote are accompanied by high sounding language regarding the "chain of custody." This verbiage evokes images of evidence utilized in trials, such as sealed envelopes and locked evidence rooms with sign-out sheets. However, investigating the claims regarding problems with the chain of custody usually finds highlights about the handling and transmission of the unofficial vote counts and the computer systems used to handle them. While concerns about these systems may be justified, it is incredibly misleading and irresponsible to imply this holds any danger to the official vote counts, the tabulators, or the ballots themselves. Similarly, unfair allegations have been leveled against the secretary of state and county and local clerks regarding the instruction to, and deletion of, e-poll book data. The letter instructing this and the action itself is a standard practice, ordered by the federal government and carried out shortly after every election. The law and the letter sent also provide specific instruction not to do so should there be an ongoing legal action regarding the data. All evidence the Committee found shows the law was followed. **The Committee finds insisting this is evidence of a cover up, "Destruction of election artifacts prior to end of 22-month archival requirement," is incredibly misleading, demeaning, and irresponsible.**

REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

**Confusing Terminology**

Many of the allegations simply utilize semantics and the confusing, technical nature of elections to drive up doubt. Claims such as "fake birthdays," "unsupervised ballot duplication," "system manuals explicitly refer to internet and ethernet connectivity," and "unsecured and illegal ballot boxes" are just a sampling of the terminologies used. However, each of these has legitimate explanation. The birthday issue is explained elsewhere in this report and involves same day registrations on Election Day. "Unsupervised ballot duplication" is referring to times challengers were unable to watch or were prevented from watching (which were not legal actions) but is misleading because the bipartisan election inspectors/workers were still watching and verifying each other's work. "System manuals" refer to connectivity because the machines are specifically designed to be connected to transmit the unofficial results and to be connected for other functions – this is not proof they were connected during tabulation. "Unsecured and illegal ballot boxes" refers to the transporting of absentee ballots to the counting board in postal trays. Sealed ballots have never been considered to need to be in a secured and approved container because the envelops are still sealed. **The Committee recommends this practice be made more secure with manifests and a record of custody**, but it is wrong to accuse anyone of violating the law that was written to address open ballots, *not* those in sealed envelopes.

**Blank Ballots and Military Ballots**

The presence of blank ballots also provides significant confusion, despite being necessary for the duplication of military ballots and damaged absentee voter ballots. It is noteworthy that attempting to utilize these ballots for any significant level of fraud would require perfectly matching precincts to voters, manipulating poll books with fake dates for requests and receipts of the ballots, voter's signatures, and the clerk's signature and time stamp.

One witness testified that none of the military ballots at her table being duplicated were for President Trump. However, upon questioning, the witness recounted she only witnessed a few dozen ballots. This is a very reasonable outcome given the overall performance of the candidates in these precincts and the amount witnessed, which is not statistically significant.

13. **Audits**

The demand for audits regarding the election began soon after the November election and has continued until now. Several entities have undertaken to conduct audits, sometimes referring to their efforts as "forensic audits." One of these is detailed earlier in this report, particularly in Finding 5. Several lawsuits regarding audits have been filed.

Proposal 18-3, which was approved by the voters of Michigan and amended the state constitution, guarantees every Michigan elector the right to request an audit, stating that each "elector qualified to vote in Michigan shall have...(t)he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections." The central clause, "in such a manner as prescribed by law," has resulted in the dismissal of demands of citizens to execute this provided right because the audit performed by the Michigan secretary of state was determined to satisfy this right. Much has been made by several persons that the hand recount in Antrim County was not truly an audit. This is, and was, admitted by the secretary

REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

of state's office as true in that it was not a precinct audit, but a risk-limiting audit with a risk limit of zero, because all of the ballots were recounted and not just a sample. Furthermore, this does not diminish the profound value of hand recounting every ballot and race in the county as evidence against fraud or other illicitness. However, the actual, mandated audit detailed below was eventually conducted in Antrim County as it was in all Michigan counties.

The audits performed by the Michigan secretary of state and facilitated by county clerks and local officials has faced significant derision by citizens, lawyers, and activist leaders. The accusation is that the secretary of state has a conflict of interest in the result as it is her role as chief election officer which is being judged. However, such allegations demonstrate a significant lack of understanding regarding the rigor and depth of the audit performed, especially its decentralized nature. Auditing of the results is undertaken and administered by the county clerks, with aid and assistance provided by the local city and township clerks, and is another step removed from the secretary of state. The clerks at each of these levels, excepting municipal, are partisans from both major parties.

The extent of the audit is also critical to understanding its dependability and credibility. There are 66 steps clerks are instructed to undertake in the process. The "Post-Election Audit Manual," available online at **www.Michigan.gov/sos/post_election_audit_manual_418482_7.pdf**, lays out several critical points as to purpose and goals. Notably, they include pre-Election Day and Election Day procedures' fidelity to law and rules. Precincts and races are selected randomly in each county across the state. The audit examines notices, appointments and training, e-Pollbook security, test deck procedures (logic and accuracy testing), military and overseas applications, poll books, and ballot containers. The audit checklist contains 66 points of examination to meet these goals and includes the hand counting of the randomly selected races in randomly selected precincts. Pictured is a completed audit for East Grand Rapids Precinct 5. Citizens can obtain these audit results across the state from their county clerks.



# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

**The Committee concludes these audits are far from the worthless exercises they have been castigated as being.** Many of those criticizing them are misleading concerned citizens to believe the only audit done is the "risk limiting audit." The risk limiting audit is also performed on top of the major, statewide county audit detailed above. Its purpose is to perform an *additional* spot check on the accuracy and function of the tabulators, but it is not the main audit done.

**The Committee recommends providing live video feed and recordings of the audit procedures. The public should have access to view the audit in person when possible and results should be posted online. The Committee also recommends that the Legislature fulfill the commitment of Proposal 2018-3 to guarantee an audit upon request of any elector.**

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## V. RECOMMENDATIONS AND CONCLUSION

**<u>Recommendations</u>**

- Place in statute the rights and duties of challengers and poll watchers, requiring they be uniformly trained and held accountable.

- Ensuring combined AVCBs can have more than one challenger per party, with the ability to replace challengers who exit the AVCB location after the sequester is lifted.

- Allow for bipartisan election inspectors for all audits and require the process be open to the public.

- Prohibit the unsolicited mailing of absentee voter ballot applications from the secretary of state to limit the potential for non-Michigan residents voting in elections.

- Establish signature verification requirements via the administrative rules process or statute in order to provide clarity and uniformity to election workers on the proper way to ensure signatures match.

- Require video security on all drop boxes and require all drop boxes be emptied and secured immediately or earlier than 8 p.m. on Election Day to help expedite the processing and tabulation of ballots.

- In order to ensure more accurate voter rolls, allow county clerks greater authority when removing deceased individuals from the Qualified Voter File.

- Allow for the continued pre-processing of absentee ballots the day before Election Day, so long as stringent security measures are kept in place. Pre-processing must occur on the site of tabulation.

- Consider allowing tabulation, which is more secure, to begin in the week preceding Election Day as long as results may not be released until polls are closed on the completion of Election Day.

- Require that best practices for maintaining a balanced precinct on Election Day be part of the necessary training for all precinct workers. Establish a public, published record of all clerks who fail to provide the appropriate training or continuing education to themselves or their employees.

- Reform the canvassing processes by requiring canvassers be present during the canvass activities, expanding certain county boards where population requires it, and provide for additional time for the process to be completed.

# REPORT ON **THE NOVEMBER 2020 ELECTION IN MICHIGAN**

## Conclusion

The Committee can confidently assert that it has been thorough in examination of numerous allegations of unlawful actions, improper procedures, fraud, vote theft, or any other description which would cause citizens to doubt the integrity of Michigan's 2020 election results. Our clear finding is that citizens should be confident the results represent the true results of the ballots cast by the people of Michigan. The Committee strongly recommends citizens use a critical eye and ear toward those who have pushed demonstrably false theories for their own personal gain. We also conclude citizens should demand reasonable updates and reforms to close real vulnerabilities and unlawful activities that caused much of the doubt and questionability to flourish and could, if unchecked, be responsible for serious and disastrous fraud or confusion in the future.

Further, we commend the innumerable clerks, canvassers, staff, workers, and volunteers across Michigan that make the enormous complexity of elections operate so smoothly, so often. The complexity of the work and the dedication we discovered are astounding and worthy of our sincerest appreciation. We also commend the diligent citizens that took time to report problems and concerns they saw because they want and value fair and free elections above party or personal gain. If all citizens remain vigilant and involved, we will emerge stronger after any challenging time.

| Total | | 2,513 | 6,267 | 41 | 11 | 31 | 14 | 5 |

**President and Vice President of the United States (Vote for 1)**

| Precinct | Joseph R. Biden / Kamala D. Harris - DEM | Donald J. Trump / Michael R. Pence - REP | Jo Jorgensen / Jeremy Cohen - LIB | Don Blankenship / William Mohr - UST | Howie Hawkins / Angela Walker - GRN | Rocky De La Fuente / Darcy Richardson - NLP | Write-in |
|---|---|---|---|---|---|---|---|
| Banks Township, Precinct 1 | 349 | 756 | 11 | 1 | 2 | 1 | 3 |
| Central Lake Township, Precinct 1 | 549 | 906 | 16 | 1 | 6 | 0 | 3 |
| Chestonia Township, Precinct 1 | 93 | 197 | 3 | 0 | 0 | 0 | 1 |
| Custer Township, Precinct 1 | 240 | 521 | 11 | 2 | 1 | 0 | 0 |
| Echo Township, Precinct 1 | 198 | 392 | 8 | 1 | 2 | 0 | 0 |
| Elk Rapids Township, Precinct 1 | 986 | 1,025 | 17 | 4 | 9 | 0 | 2 |
| Forest Home Township, Precinct 1 | 610 | 753 | 19 | 1 | 0 | 1 | 2 |
| Helena Township, Precinct 1 | 306 | 431 | 4 | 0 | 1 | 1 | 0 |
| Jordan Township, Precinct 1 | 183 | 371 | 13 | 1 | 1 | 0 | 2 |
| Kearney Township, Precinct 1 | 471 | 743 | 16 | 0 | 3 | 0 | 4 |
| Mancelona Township, Precinct 1 | 276 | 835 | 20 | 0 | 0 | 1 | 1 |
| Mancelona Township, Precinct 2 | 247 | 646 | 13 | 2 | 1 | 0 | 1 |
| Milton Township, Precinct 1 | 769 | 1,021 | 18 | 2 | 0 | 3 | 3 |
| Star Township, Precinct 1 | 161 | 462 | 10 | 0 | 0 | 0 | 0 |
| Torch Lake Township, Precinct 1 | 462 | 526 | 7 | 1 | 2 | 1 | 0 |
| Warner Township, Precinct 1 | 60 | 163 | 3 | 0 | 0 | 0 | 1 |
| Total | 5,980 | 9,748 | 189 | 16 | 28 | 8 | 23 |

**United States Senator for State (Vote for 1)**

| Precinct | Gary Peters - DEM | John James - REP | Valerie L. Willis - UST | Marcia Squier - GRN | Doug Dern - NLP | Write-in |
|---|---|---|---|---|---|---|
| Banks Township, Precinct 1 | 341 | 765 | 3 | 5 | 2 | 3 |
| Central Lake Township, Precinct 1 | 520 | 933 | 9 | 9 | 3 | 0 |

## Total
Banks Township, Precinct 1

---

### Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 134 |
| Republican Party (Republican): | 520 |
| Libertarian Party (Libertarian): | 1 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 1 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 656 |

### President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 349 |
| Donald J. Trump / Michael R. Pence (Republican): | 756 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 11 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 2 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |

Write In    3

1120
1123

### Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 278 |
| Jason Strayhorn (Democrat): | 273 |
| Tami Carlone (Republican): | 692 |
| Michelle A. Frederick (Republican): | 698 |
| Bill Hall (Libertarian): | 24 |
| Richard A. Hewer (Libertarian): | 20 |
| Karen Adams (U.S. Taxpayers): | 5 |
| Douglas Levesque (U.S. Taxpayers): | 5 |
| Mary Anne Hering (Working Class): | 31 |
| Hali McEachern (Working Class): | 23 |
| Tom Mair (Green): | 17 |
| Write-in: | 4 |
| Total Votes: | 2070 |

### Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 282 |
| Shauna Ryder Diggs (Democrat): | 269 |
| Sarah Hubbard (Republican): | 709 |
| Carl Meyers (Republican): | 684 |
| James L. Hudler (Libertarian): | 16 |

### Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 277 |
| Shirley Stancato (Democrat): | 257 |
| Don Gates (Republican): | 702 |
| Terri Lynn Land (Republican): | 704 |
| Jon Elgas (Libertarian): | 31 |
| Christine C. Schwartz (U.S. Taxpayers): | 23 |
| Susan Odgers (Green): | 31 |
| Write-in: | 5 |
| Total Votes: | 2030 |

### County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 870 |
| Write-in: | 14 |
| Total Votes: | 884 |

### County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 877 |
| Write-in: | 20 |
| Total Votes: | 897 |

### County Clerk (1)

| | |
|---|---|
| Sheryl Guy (Republican): | 875 |
| Write-in: | 8 |
| Total Votes: | 883 |

Total

Central Lake Township, Precinct
1

---------------------------------

## Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 227 |
| Republican Party (Republican): | 536 |
| Libertarian Party (Libertarian): | 3 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 3 |
| Green Party (Green): | 2 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 771 |

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 549 |
| Donald J. Trump / Michael R. Pence (Republican): | 906 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 16 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 6 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 3 |
| Total Votes: | 1481 |

## Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 457 |
| Jason Strayhorn (Democrat): | 443 |
| Tami Carlone (Republican): | 807 |
| Michelle A. Frederick (Republican): | 824 |
| Bill Hall (Libertarian): | 28 |
| Richard A. Hewer (Libertarian): | 32 |
| Karen Adams (U.S. Taxpayers): | 16 |
| Douglas Levesque (U.S. Taxpayers): | 12 |
| Mary Anne Hering (Working Class): | 34 |
| Hali McEachern (Working Class): | 27 |
| Tom Mair (Green): | 17 |
| Write-in: | 0 |
| Total Votes: | 2697 |

## Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 451 |
| Shauna Ryder Diggs (Democrat): | 438 |
| Sarah Hubbard (Republican): | 845 |
| Carl Meyers (Republican): | 807 |
| James L. Hudler (Libertarian): | 22 |
| Eric Larson (Libertarian): | 28 |
| Ronald E. Graeser (U.S. Taxpayers): | 13 |
| Crystal Van Sickle (U.S. | |

## Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 414 |
| Shirley Stancato (Democrat): | 439 |
| Don Gates (Republican): | 825 |
| Terri Lynn Land (Republican): | 851 |
| Jon Elgas (Libertarian): | 32 |
| Christine C. Schwartz (U.S. Taxpayers): | 23 |
| Susan Odgers (Green): | 33 |
| Write-in: | 1 |
| Total Votes: | 2618 |

## County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 1082 |
| Write-in: | 16 |
| Total Votes: | 1098 |

## County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 1142 |
| Write-in: | 21 |
| Total Votes: | 1163 |

## County Clerk (1)

| | |
|---|---|
| Sheryl Guy (Republican): | 1109 |
| Write-in: | 11 |
| Total Votes: | 1120 |

## County Treasurer (1)

| | |
|---|---|
| Sherry O. Comben | |

## Township S for Centra Township (

| | |
|---|---|
| Stanley A. Bean (Republican): | |
| Write-in: | |
| Total Votes: | |

## Township C Central Lak Township (

| | |
|---|---|
| Judy Kosloski (Republican): | |
| Write-in: | |
| Total Votes: | |

## Township Tr for Central Township (1

| | |
|---|---|
| Andrew Smith (Rep | |
| Write-in: | |
| Total Votes: | |

## Township Tru Central Lake Township (2)

| | |
|---|---|
| Patrick Hanlon (Republican): | |
| Pat Marshall (Repu | |
| Write-in: | |
| Total Votes: | |

## Justice of Su Court (2)

| | |
|---|---|

Total
Chestonia Township, Precinct 1
--------------------------

## Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 45 |
| Republican Party (Republican): | 134 |
| Libertarian Party (Libertarian): | 0 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 0 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 179 |

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 93 |
| Donald J. Trump / Michael R. Pence (Republican): | 197 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 3 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 1 |
| Total Votes: | 294 |

## Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 84 |
| Jason Strayhorn (Democrat): | 73 |
| Tami Carlone (Republican): | 171 |
| Michelle A. Frederick (Republican): | 170 |
| Bill Hall (Libertarian): | 8 |
| Richard A. Hewer (Libertarian): | 2 |
| Karen Adams (U.S. Taxpayers): | 4 |
| Douglas Levesque (U.S. Taxpayers): | 4 |
| Mary Anne Hering (Working Class): | 4 |
| Hali McEachern (Working Class): | 4 |
| Tom Mair (Green): | 8 |
| Write-in: | 5 |
| Total Votes: | 537 |

## Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 77 |
| Shauna Ryder Diggs (Democrat): | 81 |
| Sarah Hubbard (Republican): | 177 |
| Carl Meyers (Republican): | 174 |
| James L. Hudler (Libertarian): | 2 |
| Eric Larson (Libertarian): | 5 |
| Ronald E. Graeser (U.S. Taxpayers): | 5 |

## Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 79 |
| Shirley Stancato (Democrat): | 80 |
| Don Gates (Republican): | 175 |
| Terri Lynn Land (Republican): | 175 |
| Jon Elgas (Libertarian): | 6 |
| Christine C. Schwartz (U.S. Taxpayers): | 6 |
| Susan Odgers (Green): | 8 |
| Write-in: | 5 |
| Total Votes: | 534 |

## County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 216 |
| Write-in: | 11 |
| Total Votes: | 227 |

## County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 233 |
| Write-in: | 12 |
| Total Votes: | 245 |

## County Clerk (1)

| | |
|---|---|
| Sheryl Guy (Republican): | 219 |
| Write-in: | 12 |
| Total Votes: | 231 |

## County Treasurer (1)

| | |
|---|---|
| Sherry A. Comben (Republican): | 220 |

Co
9t
Chri
(Ref
Writ
Tota

To
fo
To
Ger
(Ref
Writ
Tota

To
Ch
(1
Nan
(Ref
Writ
Tota

To
fo
To
Deb
(Ref
Writ
Tota

To
Ch
(2
Mer

Total

Custer Township, Precinct 1
---------------------------

## Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 108 |
| Republican Party (Republican): | 354 |
| Libertarian Party (Libertarian): | 1 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 3 |
| Working Class Party (Working Class): | 2 |
| Green Party (Green): | 1 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 469 |

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 240 |
| Donald J. Trump / Michael R. Pence (Republican): | 521 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 11 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 2 |
| Howie Hawkins / Angela Walker (Green): | 1 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 0 |
| Total Votes: | 775 |

## 105th District (1)

| | |
|---|---|
| Jonathan Burke (Democrat): | 221 |
| Ken Borton (Republican): | 534 |
| Write-in: | 1 |
| Total Votes: | 756 |

## Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 201 |
| Jason Strayhorn (Democrat): | 185 |
| Tami Carlone (Republican): | 481 |
| Michelle A. Frederick (Republican): | 475 |
| Bill Hall (Libertarian): | 23 |
| Richard A. Hewer (Libertarian): | 13 |
| Karen Adams (U.S. Taxpayers): | 13 |
| Douglas Levesque (U.S. Taxpayers): | 5 |
| Mary Anne Hering (Working Class): | 15 |
| Hali McEachern (Working Class): | 8 |
| Tom Mair (Green): | 15 |
| Write-in: | 3 |
| Total Votes: | 1437 |

| | |
|---|---|
| (Democrat): | 178 |
| Pat O'Keefe (Republican): | 491 |
| Tonya Schuitmaker (Republican): | 485 |
| Will Tyler White (Libertarian): | 22 |
| Janet M. Sanger (U.S. Taxpayers): | 14 |
| John Paul Sanger (U.S. Taxpayers): | 8 |
| Brandon Hu (Green): | 10 |
| Robin Lea Laurain (Green): | 14 |
| Bridgette Abraham-Guzman (Natural Law): | 8 |
| Write-in: | 2 |
| Total Votes: | 1408 |

## Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 172 |
| Shirley Stancato (Democrat): | 181 |
| Don Gates (Republican): | 490 |
| Terri Lynn Land (Republican): | 486 |
| Jon Elgas (Libertarian): | 25 |
| Christine C. Schwartz (U.S. Taxpayers): | 16 |
| Susan Odgers (Green): | 20 |
| Write-in: | 3 |
| Total Votes: | 1393 |

## County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 618 |
| Write-in: | 12 |
| Total Votes: | 630 |

## County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 652 |
| Write-in: | 11 |
| Total Votes: | 663 |

| | |
|---|---|
| Total Votes: | |

## County Su

| | |
|---|---|
| Scott Papinea (Republican): | |
| Write-in: | |
| Total Votes: | |

## County Co 5th Distr

| | |
|---|---|
| Terry VanAlst (Republican): | |
| Write-in: | |
| Total Votes: | |

## County Co 6th Distr

| | |
|---|---|
| Brenda Ricksge (Republican): | |
| Write-in: | |
| Total Votes: | |

## Township for Custe (1)

| | |
|---|---|
| Roxann Flake ( | |
| Write-in: | |
| Total Votes: | |

## Township Custer To

| | |
|---|---|
| Stacy Simon (F | |
| Write-in: | |
| Total Votes: | |

## Township for Custe (1)

| | |
|---|---|
| Renee Elder (I | |
| Write-in: | |
| Total Votes: | |

Total Votes: 495

Total

| Justice of Supreme Court (2) | |
|---|---|
| Susan L. Hubbard: | 23 |
| Mary Kelly: | 31 |
| Bridget Mary McCormack: | 54 |
| Kerry Lee Morgan: | 7 |
| Katherine Mary Nepton: | 9 |
| Brock Swartzle: | 33 |
| Elizabeth M. Welch: | 33 |
| Write-in: | 0 |
| Total Votes: | 190 |

| Judge of Court of Appeals 4th District Incumbent Position (2) | |
|---|---|
| Michael J. Kelly: | 72 |
| Amy Ronayne Krause: | 63 |
| Write-in: | 0 |
| Total Votes: | 135 |

| Judge of Court of Appeals 4th District Non-Incumbent Position (1) | |
|---|---|
| Michelle Rick: | 80 |
| Write-in: | 0 |
| Total Votes: | 80 |

| Judge of Circuit Court 13th Circuit Incumbent Position (1) | |
|---|---|
| Kevin A. Elsenheimer: | 83 |

| Straight Party Ticket (1) | |
|---|---|
| Democratic Party (Democrat): | 100 |
| Republican Party (Republican): | 230 |
| Libertarian Party (Libertarian): | 1 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 1 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 332 |

| President and Vice President of the United States (1) | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 198 |
| Donald J. Trump / Michael R. Pence (Republican): | 392 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 8 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 2 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 0 |
| Total Votes: | 601 |

| Member of the State Board of Education (2) | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 175 |
| Jason Strayhorn (Democrat): | 169 |
| Tami Carlone (Republican): | 351 |
| Michelle A. Frederick (Republican): | 361 |
| Bill Hall (Libertarian): | 16 |
| Richard A. Hewer (Libertarian): | 13 |
| Karen Adams (U.S. Taxpayers): | 6 |
| Douglas Levesque (U.S. Taxpayers): | 4 |
| Mary Anne Hering (Working Class): | 11 |
| Hali McEachern (Working Class): | 9 |
| Tom Mair (Green): | 3 |
| Write-in: | 0 |
| Total Votes: | 1118 |

| Regent of the University of Michigan (2) | |
|---|---|
| Mark Bernstein (Democrat): | 168 |
| Shauna Ryder Diggs (Democrat): | 171 |
| Sarah Hubbard (Republican): | 361 |
| Carl Meyers (Republican): | 352 |
| James L. Hudler (Libertarian): | 11 |
| Eric Larson (Libertarian): | 13 |
| Ronald E. Graeser (U.S. Taxpayers): | 5 |

Township Trustee for Elk Rapids Township (2)

| | |
|---|---|
| Richard D. Hults (Republican): | 444 |
| Aaron Isenhart (Republican): | 466 |
| Write-in: | 16 |
| Total Votes: | 926 |

Justice of Supreme Court (2)

| | |
|---|---|
| Susan L. Hubbard: | 68 |
| Michelle Rick: | 407 |
| Write-in: | 3 |
| Total Votes: | 410 |

Judge of Circuit Court 13th Circuit Incumbent Position (1)

| | |
|---|---|
| Kevin A. Elsenheimer: | 442 |
| Write-in: | 3 |
| Total Votes: | 445 |

Village President for Village of Elk Rapids (1)

| | |
|---|---|
| James D. Janisse: | 486 |
| Write-in: | 15 |
| Total Votes: | 501 |

Village Trustee for Village of Elk Rapids (3)

Village Trustee for Village of Elk Rapids, Partial Term Ending 11/06/2022 (1)

| | |
|---|---|
| Teresa Fosdick: | 513 |
| Write-in: | 4 |
| Total Votes: | 517 |

School Board Member for Elk Rapids Schools (3)

| | |
|---|---|
| No: | 224 |
| Total Votes: | 806 |

------------------------

Total
Elk Rapids Township, Precinct 1
------------------------

Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 327 |
| Republican Party (Republican): | 414 |
| Libertarian Party (Libertarian): | 1 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 1 |
| Working Class Party (Working Class): | 2 |
| Green Party (Green): | 1 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 746 |

President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 784 |
| Donald J. Trump / Michael R. Pence (Republican): | 611 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 5 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 2 |
| Howie Hawkins / Angela Walker (Green): | 5 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 2 |
| Total Votes: | 1409 |

Representative in State Legislature 105th District (1)

| | |
|---|---|
| Jonathan Burke (Democrat): | 705 |
| Ken Borton (Republican): | 661 |
| Write-in: | 1 |
| Total Votes: | 1367 |

Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 681 |
| Jason Strayhorn (Democrat): | 636 |
| Tami Carlone (Republican): | 594 |
| Michelle A. Frederick (Republican): | 607 |
| Bill Hall (Libertarian): | 17 |
| Richard A. Hewer (Libertarian): | 20 |
| Karen Adams (U.S. Taxpayers): | 10 |

Incumbent Position (1)

| | |
|---|---|
| Kevin A. Elsenheimer: | 224 |
| Write-in: | 5 |
| Total Votes: | 229 |

Village President for Village of Elk Rapids (1)

| | |
|---|---|
| James D. Janisse: | 221 |
| Write-in: | 15 |
| Total Votes: | 236 |

Village Trustee for Village of Elk Rapids (3)

| | |
|---|---|
| Douglas Bronkema: | 148 |
| Patricia Ann Perlman: | 141 |
| Charlie Pryde: | 197 |
| Laura Shumate: | 168 |
| Write-in: | 3 |
| Total Votes: | 657 |

Village Trustee for Village of Elk Rapids, Partial Term Ending 11/06/2022 (1)

| | |
|---|---|
| Teresa Fosdick: | 234 |
| Write-in: | 6 |
| Total Votes: | 240 |

School Board Member for Elk Rapids Schools (3)

| | |
|---|---|
| Darryl Antcliff: | 166 |

Total
Elk Rapids Township, Precinct 1
_____

Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 81 |
| Republican Party (Republican): | 263 |
| Libertarian Party (Libertarian): | 5 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 1 |
| Working Class Party (Working Class): | 0 |
| Green Party (Green): | 4 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 354 |

President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 202 |
| Donald J. Trump / Michael R. Pence (Republican): | 414 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 12 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 2 |
| Howie Hawkins / Angela Walker (Green): | 4 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 0 |
| Total Votes: | 634 |

Representative in State Legislature 105th District (1)

| | |
|---|---|
| Jonathan Burke (Democrat): | 194 |
| Ken Borton (Republican): | 410 |
| Write-in: | 3 |
| Total Votes: | 607 |

Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 154 |
| Jason Strayhorn (Democrat): | 144 |
| Tami Carlone (Republican): | 361 |
| Michelle A. Frederick (Republican): | 361 |
| Bill Hall (Libertarian): | 29 |
| Richard A. Hewer (Libertarian): | 20 |
| Karen Adams (U.S. Taxpayers): | 9 |
| Douglas Levesque (U.S. Taxpayers): | 7 |
| Mary Anne Hering (Working Class): | 19 |
| Hali McEachern (Working Class): | 8 |
| Tom Mair (Green): | 12 |
| Write-in: | 0 |
| Total Votes: | 1124 |

## United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 610 |
| Donald J. Trump / Michael R. Pence (Republican): | 753 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 19 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |
| Write-in: | 2 |
| Total Votes: | 1386 |

## United States Senator for State (1)

| | |
|---|---|
| Gary Peters (Democrat): | 580 |
| John James (Republican): | 782 |
| Valerie L. Willis (U.S. Taxpayers): | 4 |
| Marcia Squier (Green): | 5 |
| Doug Dern (Natural Law): | 2 |
| Write-in: | 0 |
| Total Votes: | 1373 |

## Representative in Congress 1st District (1)

| | |
|---|---|
| Dana Ferguson (Democrat): | 532 |
| Jack Bergman (Republican): | 817 |

Forest Home Township, Precinct 1
Total

## University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 487 |
| Shauna Ryder Diggs (Democrat): | 482 |
| Sarah Hubbard (Republican): | 710 |
| Carl Meyers (Republican): | 674 |
| James L. Hudler (Libertarian): | 33 |
| Eric Larson (Libertarian): | 42 |
| Ronald E. Graeser (U.S. Taxpayers): | 8 |
| Crystal Van Sickle (U.S. Taxpayers): | 20 |
| Michael Mawilai (Green): | 23 |
| Keith Butkovich (Natural Law): | 8 |
| Write-in: | 3 |
| Total Votes: | 2490 |

## Trustee of Michigan State University (2)

| | |
|---|---|
| Brian Mosallam (Democrat): | 471 |
| Rema Ella Vassar (Democrat): | 488 |
| Pat O'Keefe (Republican): | 713 |
| Tonya Schuitmaker (Republican): | 703 |
| Will Tyler White (Libertarian): | 43 |
| Janet M. Sanger (U.S. Taxpayers): | 21 |
| John Paul Sanger (U.S. Taxpayers): | 8 |
| Bryan... H. (Green): | 13 |

Judge of Court of
Appeals 4th District
Non-Incumbent
Position (1)

| Sheryl Guy (Republican): | 1014 |
|---|---|
| Write-in: | 4 |
| Total Votes: | 1018 |

## County Treasurer (1)

| Sherry A. Comben (Republican): | 1001 |
|---|---|
| Write-in: | 4 |
| Total Votes: | 1005 |

## County Register of Deeds (1)

| Patty Niepoth (Republican): | 983 |
|---|---|
| Write-in: | 7 |
| Total Votes: | 990 |

## County Drain Commissioner (1)

| Mark Stone (Republican): | 981 |
|---|---|
| Write-in: | 6 |
| Total Votes: | 987 |

## County Surveyor (1)

| Scott Papineau (Republican): | 973 |
|---|---|
| Write-in: | 4 |
| Total Votes: | 977 |

County Commissioner

County Commissioner
5th District (1)

| Terry VanHalstine (Republican): | 222 |
|---|---|
| Write-in: | |

Helena Township, P

--- PRINTING INTERRUPTED ---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Antrim County
Antrim November 2020
Tuesday, November 3, 2020

Tabulator Name
  Helena Township, Precinct 1
  ICP

Tabulator ID
  8

Voting Location
  Helena Township

Precinct:

Helena Township, Precinct 1

- - - - -- - - - - -

Poll Opened
          Nov 03/2020 06:16:29
Poll Closed
          Nov 03/2020 20:01:52
Report Printed
          Nov 03/2020 20:11:08
- - - - -- - - - - -

Unit Model: PCOS-320C (Rev 1072)
Unit Serial:        AAFAJHX0088
Protective Counter:        3126
Software Version:     5.5.3-0002

## State Proposal 20-1 (1)

| | |
|---|---|
| Yes: | 0 |
| No: | 0 |
| Total Votes: | 0 |

## State Proposal 20-2 (1)

| | |
|---|---|
| Yes: | 0 |
| No: | 0 |
| Total Votes: | 0 |

Certification

WE, THE UNDERSIGNED, WERE
PRESENT DURING THE OPENING OF
THE POLLS AND PRINTING OF THIS
RECORD AND CAN VERIFY THAT ALL
CANDIDATE VOTE TOTALS ARE ZERO
AT THIS TIME.

*Constance K. Molby*
Signature

*V. Boyce*

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 306 |
| Donald J. Trump / Michael R. Pence (Republican): | 431 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 4 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 1 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |
| Write-in: | 0 |
| Total Votes: | 743 |

## United States Senator for State (1)

| | |
|---|---|
| Gary Peters (Democrat): | 294 |
| John James (Republican): | 436 |
| Valerie L. Willis (U.S. Taxpayers): | 2 |
| Marcia Squier (Green): | 4 |
| Doug Dern (Natural Law): | 1 |
| Write-in: | 0 |
| Total Votes: | 737 |

## Representative in Congress 1st District (1)

| | |
|---|---|
| Dana Ferguson (Democrat): | 279 |
| Jack Bergman (Republican): | 450 |

Non-Incumbent Position (1)

| | |
|---|---|
| Michelle Rick: | 267 |
| Write-in: | 4 |
| Total Votes: | 271 |

Judge of Circuit Court 13th Circuit Incumbent Position (1)

| | |
|---|---|
| Kevin A. Elsenheimer: | 270 |
| Write-in: | 1 |
| Total Votes: | 271 |

Board Member for Charlevoix-Emmet Intermediate School District 6 Year Term (3)

| | |
|---|---|
| Thelma A. Chellis: | 227 |
| Jean E. Frentz: | 199 |
| Mary P. Jason: | 221 |
| Write-in: | 1 |
| Total Votes: | 648 |

Board Member for Charlevoix-Emmet Intermediate School District Partial Term Ending 12/31/2024 (1)

| | |
|---|---|
| Larry Cassidy: | 250 |
| Write-in: | 7 |
| Total Votes: | 257 |

---

Total
Jordan Township, Precinct 1
---

Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 75 |
| Republican Party (Republican): | 252 |
| Libertarian Party (Libertarian): | 2 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 1 |
| Working Class Party (Working Class): | 2 |
| Green Party (Green): | 1 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 333 |

President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 183 |
| Donald J. Trump / Michael R. Pence (Republican): | 371 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 13 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 1 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 2 |

571

---

Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 165 |
| Jason Strayhorn (Democrat): | 154 |
| Tami Carlone (Republican): | 334 |
| Michelle A. Frederick (Republican): | 337 |
| Bill Hall (Libertarian): | 15 |
| Richard A. Hewer (Libertarian): | 12 |
| Karen Adams (U.S. Taxpayers): | 10 |
| Douglas Levesque (U.S. Taxpayers): | 5 |
| Mary Anne Hering (Working Class): | 15 |
| Hali McEachern (Working Class): | 5 |
| Tom Mair (Green): | 4 |
| Write-in: | 0 |
| Total Votes: | 1056 |

*Kearney*

## Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 187 |
| Republican Party (Republican): | 490 |
| Libertarian Party (Libertarian): | 2 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 0 |
| Green Party (Green): | 1 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 680 |

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 471 |
| Donald J. Trump / Michael R. Pence (Republican): | 743 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 16 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 3 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 4 |
| Total Votes: | 1237 |

## Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 396 |
| Jason Strayhorn (Democrat): | 391 |
| Tami Carlone (Republican): | 675 |
| Michelle A. Frederick (Republican): | 667 |
| Bill Hall (Libertarian): | 31 |
| Richard A. Hewer (Libertarian): | 21 |
| Karen Adams (U.S. Taxpayers): | 7 |
| Douglas Levesque (U.S. Taxpayers): | 5 |
| Mary Anne Hering (Working Class): | 26 |
| Hali McEachern (Working Class): | 22 |
| Tom Mair (Green): | 22 |
| Write-in: | 0 |
| Total Votes: | 2263 |

## Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 401 |
| Shauna Ryder Diggs (Democrat): | 379 |
| Sarah Hubbard (Republican): | 694 |
| Carl Meyers (Republican): | 664 |
| James L. Hudler (Libertarian): | 20 |

## Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 385 |
| Shirley Stancato (Democrat): | 390 |
| Don Gates (Republican): | 668 |
| Terri Lynn Land (Republican): | 685 |
| Jon Elgas (Libertarian): | 26 |
| Christine C. Schwartz (U.S. Taxpayers): | 17 |
| Susan Odgers (Green): | 39 |
| Write-in: | 2 |
| Total Votes: | 2212 |

## County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 893 |
| Write-in: | 14 |
| Total Votes: | 907 |

## County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 949 |
| Write-in: | 18 |
| Total Votes: | 967 |

## County Clerk (1)

| | |
|---|---|
| Sheryl Guy (Republican): | 932 |
| Write-in: | 9 |
| Total Votes: | 941 |

| Township Treasurer for Mancelona Township (1) | |
|---|---|
| Jessie Ayoub (Republican): | 449 |
| Write-in: | 5 |
| Total Votes: | 454 |

| Township Trustee for Mancelona Township (2) | |
|---|---|
| Yousef M. Jabara (Democrat): | 120 |
| Rod Vesey (Republican): | 415 |
| Donna Gundle-Krieg (Libertarian): | 167 |
| Write-in: | 9 |
| Total Votes: | 711 |

| Township Constable for Mancelona Township (1) | |
|---|---|
| Linden M. Bielecki (Republican): | 448 |
| Write-in: | 6 |
| Total Votes: | 454 |

| Justice of Supreme Court (2) | |
|---|---|
| Susan L. Hubbard: | 60 |
| Mary Kelly: | 109 |
| Bridget Mary McCormack: | 208 |
| Kerry Lee Morgan: | 79 |
| Katherine Mary Nanton: | 58 |

| Village Trustee for Village of Mancelona (2) | |
|---|---|
| Aaron Biehl: | 323 |
| Steven Elder: | 286 |
| Eugene K. Kerr: | 108 |
| Write-in: | 8 |
| Total Votes: | 725 |

| School Board Member for Mancelona Schools (3) | |
|---|---|
| Kim Musselman: | 330 |
| Tom Ross: | 274 |
| Burt Thompson: | 264 |
| Write-in: | 7 |
| Total Votes: | 875 |

| State Proposal 20-1 (1) | |
|---|---|
| Yes: | 419 |
| No: | 80 |
| Total Votes: | 499 |

| State Proposal 20-2 (1) | |
|---|---|
| Yes: | 446 |
| No: | 67 |
| Total Votes: | 513 |

----------------------

Total
Mancelona Township, Precinct 1
----------------------

| President and Vice President of the United States (1) | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 276 |
| Donald J. Trump / Michael R. Pence (Republican): | 835 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 20 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |
| Write-in: | 1 |
| Total Votes: | 1133 |

| United States Senator for State (1) | |
|---|---|
| Gary Peters (Democrat): | 294 |
| John James (Republican): | 803 |
| Valerie L. Willis (U.S. Taxpayers): | 9 |
| Marcia Squier (Green): | 6 |
| Doug Dern (Natural Law): | 7 |
| Write-in: | 2 |
| Total Votes: | 1121 |

| Representative in Congress 1st District (1) | |
|---|---|
| Dana Ferguson (Democrat): | 264 |
| Jack Bergman (Republican): | 829 |
| | |

Total

Mancelona Township, Precinct 2

---

## Justice of Supreme Court (2)

| | |
|---|---|
| Susan L. Hubbard: | 116 |
| Mary Kelly: | 215 |
| Bridget Mary McCormack: | 304 |
| Kerry Lee Morgan: | 65 |
| Katherine Mary Nepton: | 99 |
| Brock Swartzle: | 226 |
| Elizabeth M. Welch: | 165 |
| Write-in: | 9 |
| Total Votes: | 1199 |

## Judge of Court of Appeals 4th District Incumbent Position (2)

| | |
|---|---|
| Michael J. Kelly: | 524 |
| Amy Ronayne Krause: | 452 |
| Write-in: | 13 |
| Total Votes: | 989 |

## Judge of Court of Appeals 4th District Non-Incumbent Position (1)

| | |
|---|---|
| Michelle Rick: | 579 |
| Write-in: | 9 |
| Total Votes: | 588 |

## Judge of Circuit Court 13th Circuit Incumbent Position (1)

| | |
|---|---|
| Kevin A. Elsenheimer: | 601 |

## Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 107 |
| Republican Party (Republican): | 399 |
| Libertarian Party (Libertarian): | 4 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 2 |
| Working Class Party (Working Class): | 5 |
| Green Party (Green): | 1 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 518 |

## President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 247 |
| Donald J. Trump / Michael R. Pence (Republican): | 646 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 13 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 2 |
| Howie Hawkins / Angela Walker (Green): | 1 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 1 |
| Total Votes: | 910 |

## Member of the State Board of Education (2)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 214 |
| Jason Strayhorn (Democrat): | 204 |
| Tami Carlone (Republican): | 554 |
| Michelle A. Frederick (Republican): | 557 |
| Bill Hall (Libertarian): | 22 |
| Richard A. Hewer (Libertarian): | 21 |
| Karen Adams (U.S. Taxpayers): | 18 |
| Douglas Levesque (U.S. Taxpayers): | 13 |
| Mary Anne Hering (Working Class): | 29 |
| Hali McEachern (Working Class): | 18 |
| Tom Mair (Green): | 4 |
| Write-in: | 3 |
| Total Votes: | 1657 |

## Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 220 |
| Shauna Ryder Diggs (Democrat): | 203 |
| Sarah Hubbard (Republican): | 575 |
| Carl Meyers (Republican): | 544 |
| James L. Hudler (Libertarian): | 18 |
| Eric Larson (Libertarian): | 27 |
| Ronald E. Graeser (U.S. Taxpayers): | 13 |

Antrim County
Antrim November 2020
Tuesday, November 3, 2020

Tabulator Name
Milton Township, Precinct 1
AVCB

Tabulator ID
110

Voting Location
Milton Township

Precinct:

Milton Township, Precinct 1

— — — — — — — — — — —

Poll Opened
Nov 03/2020 06:45:21
Poll Closed
Nov 03/2020 20:22:15

| President and Vice President of the United States (1) | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 626 |
| Donald J. Trump / Michael R. Pence (Republican): | 543 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 6 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 2 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 2 |
| Write-in: | 0 |
| Total Votes: | 1179 |

| United States Senator for State (1) | |
|---|---|
| Gary Peters (Democrat): | 584 |
| John James (Republican): | 583 |
| Valerie L. Willis (U.S. Taxpayers): | 2 |
| Marcia Squier (Green): | 2 |
| Doug Dern (Natural Law): | 1 |
| Write-in: | 1 |
| Total Votes: | 1173 |

| Representative in Congress 1st District (1) | |
|---|---|
| Dana Ferguson (Democrat): | 540 |
| Jack Bergman (Republican): | 614 |
| Ben Boren (Libertarian): | 9 |

| Regent of the University of Michigan (2) | |
|---|---|
| Mark Bernstein (Democrat): | 496 |
| Shauna Ryder Diggs (Democrat): | 493 |
| Sarah Hubbard (Republican): | 549 |
| Carl Meyers (Republican): | 530 |
| James L. Hudler (Libertarian): | 14 |
| Eric Larson (Libertarian): | 20 |
| Ronald E. Graeser (U.S. Taxpayers): | 3 |
| Crystal Van Sickle (U.S. Taxpayers): | 13 |
| Michael Mawilai (Green): | 19 |
| Keith Butkovich (Natural Law): | 9 |
| Write-in: | 2 |
| Total Votes: | 2148 |
| Total Votes: | 2111 |

| County Prosecuting Attorney (1) | |
|---|---|
| James L. Rossiter (Republican): | 743 |
| Write-in: | 11 |
| Total Votes: | 754 |

| County Sheriff (1) | |
|---|---|
| Daniel S. Bean (Republican): | 782 |
| Write-in: | 11 |
| Total Votes: | 793 |

| Coun | |
|---|---|
| Sheryl | |
| Write-i | |
| Total V | |

| Count | |
|---|---|
| Sherry (Republ | |
| Write-ir | |
| Total Vc | |

| Count Deeds | |
|---|---|
| Patty Ni (Republi | |
| Write-in | |
| Total Vot | |

| Townshi for Mil (1) | |
|---|---|
| Liz Atkins | |
| Write-in: | |
| Total Vote: | |

--- PRINTING INTERRUPTED ---

*********************

Antrim County

Antrim November 2020
Tuesday, November 3, 2020

Tabulator Name
Milton Township, Precinct 1
ICP

Tabulator ID
13

Voting Location
Milton Township

Precinct:

Milton Township, Precinct 1

- - - - - - - - - - -

Poll Opened
Nov 03/2020 06:01:49
Poll Closed
Nov 03/2020 20:14:17
Report Printed
Nov 03/2020 20:18:29
- - - - - - - - - - -

Unit Model: PCOS-320C (Rev 1072)
Unit Serial:        AAFAJHX0066
Protective Counter:      5352
Software Version:    5.5.3-0002
- - - - - - - - - - -

Total Scanned:        640
Total Voters:         640

### President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 143 |
| Donald J. Trump / Michael R. Pence (Republican): | 478 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 12 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |
| Write-in: | 3 |
| Total Votes: | 637 |

### United States Senator for State (1)

| | |
|---|---|
| Gary Peters (Democrat): | 134 |
| John James (Republican): | 489 |
| Valerie L. Willis (U.S. Taxpayers): | 2 |
| Marcia Squier (Green): | 6 |
| Doug Dern (Natural Law): | 1 |
| Write-in: | 0 |
| Total Votes: | 632 |

### Representative in Congress 1st District (1)

| | |
|---|---|
| Dana Ferguson (Democrat): | 116 |
| Jack Bergman (Republican): | 501 |

### Regent of the University of Michigan (2)

| | |
|---|---|
| Mark Bernstein (Democrat): | 112 |
| Shauna Ryder Diggs (Democrat): | 102 |
| Sarah Hubbard (Republican): | 458 |
| Carl Meyers (Republican): | 437 |
| James L. Hudler (Libertarian): | 14 |
| Eric Larson (Libertarian): | 20 |
| Ronald E. Graeser (U.S. Taxpayers): | 1 |
| Crystal Van Sickle (U.S. Taxpayers): | 8 |
| Michael Mawilai (Green): | 7 |
| Keith Butkovich (Natural Law): | 7 |
| Write-in: | 1 |
| Total Votes: | 1167 |

### Trustee of Michigan State University (2)

| | |
|---|---|
| Brian Mosallam (Democrat): | 108 |
| Rema Ella Vassar (Democrat): | 108 |
| Pat O'Keefe (Republican): | 451 |
| Tonya Schuitmaker (Republican): | 444 |
| Will Tyler White (Libertarian): | 21 |
| Janet M. Sanger (U.S. Taxpayers): | 4 |
| John Paul Sanger (U.S. Taxpayers): | 4 |
| Brandon Hu (Green): | 5 |

### County Clerk

| | |
|---|---|
| Sheryl Guy (Repub | |
| Write-in: | |
| Total Votes: | |

### County Treas

| | |
|---|---|
| Sherry A. Comben (Republican): | |
| Write-in: | |
| Total Votes: | |

### County Regis Deeds (1)

| | |
|---|---|
| Patty Niepoth (Republican): | |
| Write-in: | |
| Total Votes: | |

### County Drain Commissioner

| | |
|---|---|
| Mark Stone (Republi | |
| Write-in: | |
| Total Votes: | |

### County Survey

| | |
|---|---|
| Scott Papineau (Republican): | |
| Write-in: | |
| Total Votes: | |

Star To…

Precinct:

Star Township, Precinct 1

Precinct:

Star Township, Precinct 1

### Straight Party Ticket (1)

| | |
|---|---|
| Democratic Party (Democrat): | 67 |
| Republican Party (Republican): | 299 |
| Libertarian Party (Libertarian): | 0 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 1 |
| Working Class Party (Working Class): | 0 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 367 |

### President and Vice President of the United States (1)

| | |
|---|---|
| Joseph R. Biden / Kamala D. Harris (Democrat): | 161 |
| Donald J. Trump / Michael R. Pence (Republican): | 462 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 10 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 0 |
| Total Votes: | 633 |

| | |
|---|---|
| Write-in: | 0 |
| Total Votes: | 632 |

### Representative in Congress 1st District (1)

| | |
|---|---|
| Ellen Cogen Lipton (Democrat): | 147 |
| Jason Strayhorn (Democrat): | 125 |
| Tami Carlone (Republican): | 390 |
| Michelle A. Frederick (Republican): | 395 |
| Bill Hall (Libertarian): | 11 |
| Richard A. Hewer (Libertarian): | 3 |
| Karen Adams (U.S. Taxpayers): | 8 |
| Douglas Levesque (U.S. Taxpayers): | 5 |
| Mary Anne Hering (Working Class): | 22 |
| Hali McEachern (Working Class): | 12 |
| Tom Mair (Green): | 8 |
| Write-in: | 3 |
| Total Votes: | 1129 |

| | |
|---|---|
| Eric Larson (Libertarian): | 9 |
| Ronald E. Graeser (U.S. Taxpayers): | 7 |
| Crystal Van Sickle (U.S. Taxpayers): | 7 |
| Michael Mawilai (Green): | 5 |
| Keith Butkovich (Natural Law): | |
| Robin Lea Laurain (Green): | 4 |
| Bridgette Abraham-Guzman (Natural Law): | 0 |
| Write-in: | 3 |
| Total Votes: | 1101 |

### Governor of Wayne State University (2)

| | |
|---|---|
| Eva Garza Dewaelsche (Democrat): | 133 |
| Shirley Stancato (Democrat): | 136 |
| Don Gates (Republican): | 391 |
| Terri Lynn Land (Republican): | 401 |
| Jon Elgas (Libertarian): | 10 |
| Christine C. Schwartz (U.S. Taxpayers): | 11 |
| Susan Odgers (Green): | 9 |
| Write-in: | 3 |
| Total Votes: | 1094 |

### County Prosecuting Attorney (1)

| | |
|---|---|
| James L. Rossiter (Republican): | 507 |
| Write-in: | 5 |
| Total Votes: | 512 |

### County Sheriff (1)

| | |
|---|---|
| Daniel S. Bean (Republican): | 525 |
| Write-in: | 7 |
| Total Votes: | 532 |

| | |
|---|---|
| Write-in: | |
| Total Votes: | |

### County R… Deeds (1…

Patty Niepot… (Dom L li…
9th Dis…

| | |
|---|---|
| Christian M… (Republican… | |
| Write-in: | |
| Total Votes | |

### Townshi… for Sta… (1)

| | |
|---|---|
| Robert Mars… | |
| Write-in: | |
| Total Votes | |

### Townshi… Star To…

| | |
|---|---|
| Phyllis Ho… (Republica… | |
| Write-in: | |
| Total Vote | |

### Townshi… for Sta… (1)

| | |
|---|---|
| Tammi Full… | |
| Write-in: | |
| Total Vote | |

| | 4 |
|---|---|
| .es: | 188 |

## y Register of (1)

| | |
|---|---|
| epoth can): | 188 |
| ı: | 4 |
| ›tes: | 192 |

## cy Drain issioner (1)

| | |
|---|---|
| one (Republican): | 182 |
| in: | 4 |
| Votes: | 186 |

## ity Surveyor (1)

| Papineau ıl ican): | 180 |
|---|---|
| ·in: | 4 |
| Votes: | 184 |

## ıty Commissioner District (1)

| Bargy (Republican): | 180 |
|---|---|
| r-in: | 6 |
| Votes: | 186 |

## ınship Supervisor · Torch Lake ınship (1)

| rt Cook (Republican): | 177 |
|---|---|
| .e-in: | 5 |
| ıl Votes: | 182 |

| Susan L. Hubbard: | 18 |
|---|---|
| Mary Kelly: | 72 |
| Bridget Mary McCormack: | 113 |
| Kerry Lee Morgan: | 13 |
| Katherine Mary Nepton: | 6 |
| Brock Swartzle: | 70 |
| Elizabeth M. Welch: | 56 |
| Write-in: | 2 |
| Total Votes: | 350 |

## Judge of Court of Appeals 4th District Incumbent Position (2)

| Michael J. Kelly: | 140 |
|---|---|
| Amy Ronayne Krause: | 135 |
| Write-in: | 4 |
| Total Votes: | 279 |

## Judge of Court of Appeals 4th District Non-Incumbent Position (1)

| Michelle Rick: | 145 |
|---|---|
| Write-in: | 2 |
| Total Votes: | 147 |

## Judge of Circuit Court 13th Circuit Incumbent Position (1)

| Kevin A. Elsenheimer: | 144 |
|---|---|
| Write-in: | 3 |
| Total Votes: | 147 |

---
## Total
Torch Lake Township, Precinct 1
---

## Straight Party Ticket (1)

| Democratic Party (Democrat): | 143 |
|---|---|
| Republican Party (Republican): | 297 |
| Libertarian Party (Libertarian): | 3 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 2 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | 445 |

## President and Vice President of the United States (1)

| Joseph R. Biden / Kamala D. Harris (Democrat): | 462 |
|---|---|
| Donald J. Trump / Michael R. Pence (Republican): | 526 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 7 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 1 |
| Howie Hawkins / Angela Walker (Green): | 2 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 1 |
| Write-in: | 0 |

999

| (1) | |
| --- | --- |
| Yes: | 122 |
| No: | 26 |
| Total Votes: | (148) |

---

Total

Warner Township, Precinct 1

---

| Straight Party Ticket (1) | |
| --- | --- |
| Democratic Party (Democrat): | 35 |
| Republican Party (Republican): | 106 |
| Libertarian Party (Libertarian): | 0 |
| U.S. Taxpayers Party (U.S. Taxpayers): | 0 |
| Working Class Party (Working Class): | 0 |
| Green Party (Green): | 0 |
| Natural Law Party (Natural Law): | 0 |
| Total Votes: | (141) |

| President and Vice President of the United States (1) | |
| --- | --- |
| Joseph R. Biden / Kamala D. Harris (Democrat): | 60 |
| Donald J. Trump / Michael R. Pence (Republican): | 163 |
| Jo Jorgensen / Jeremy Cohen (Libertarian): | 3 |
| Don Blankenship / William Mohr (U.S. Taxpayers): | 0 |
| Howie Hawkins / Angela Walker (Green): | 0 |
| Rocky De La Fuente / Darcy Richardson (Natural Law): | 0 |
| Write-in: | 1 |
| Total Votes: | 227 |

| 105th District (1) | |
| --- | --- |
| Jonathan Burke (Democrat): | 56 |
| Ken Borton (Republican): | 166 |
| Write-in: | 0 |
| Total Votes: | (222) |

| Member of the State Board of Education (2) | |
| --- | --- |
| Ellen Cogen Lipton (Democrat): | 53 |
| Jason Strayhorn (Democrat): | 49 |
| Tami Carlone (Republican): | 141 |
| Michelle A. Frederick (Republican): | 145 |
| Bill Hall (Libertarian): | 3 |
| Richard A. Hewer (Libertarian): | 4 |
| Karen Adams (U.S. Taxpayers): | 3 |
| Douglas Levesque (U.S. Taxpayers): | 3 |
| Mary Anne Hering (Working Class): | 3 |
| Hali McEachern (Working Class): | 5 |
| Tom Mair (Green): | 3 |
| Write-in: | 0 |
| Total Votes: | (412) |

| Regent of the University of Michigan (2) | |
| --- | --- |
| Mark Bernstein (Democrat): | 50 |
| Shauna Ryder Diggs (Democrat): | 49 |
| Sarah Hubbard (Republican): | 146 |
| Carl Meyers (Republican): | 142 |
| James L. Hudler (Libertarian): | 5 |
| Eric Larson (Libertarian): | 3 |
| Ronald E. Graeser (U.S. Taxpayers): | 2 |

| | |
| --- | --- |
| Brian Mosallam (Democrat): | 48 |
| Rema Ella Vassar (Democrat): | 48 |
| Pat O'Keefe (Republican): | 152 |
| Tonya Schuitmaker (Republican): | 140 |
| Will Tyler White (Libertarian): | 4 |
| Janet M. Sanger (U.S. Taxpayers): | 4 |
| John Paul Sanger (U.S. Taxpayers): | 3 |
| Brandon Hu (Green): | 2 |
| Robin Lea Laurain (Green): | 3 |
| Bridgette Abraham-Guzman (Natural Law): | 3 |
| Write-in: | 0 |
| Total Votes: | (407) |

| Governor of Wayne State University (2) | |
| --- | --- |
| Eva Garza Dewaelsche (Democrat): | 50 |
| Shirley Stancato (Democrat): | 47 |
| Don Gates (Republican): | 146 |
| Terri Lynn Land (Republican): | 147 |
| Jon Elgas (Libertarian): | 5 |
| Christine C. Schwartz (U.S. Taxpayers): | 6 |
| Susan Odgers (Green): | 3 |
| Write-in: | 1 |
| Total Votes: | (405) |

| County Prosecuting Attorney (1) | |
| --- | --- |
| James L. Rossiter (Republican): | 178 |
| Write-in: | 2 |
| Total Votes: | (180) |

| County Sheriff (1) | |
| --- | --- |
| Daniel S. Bean | |

| | |
| --- | --- |
| Mark S | |
| Write- | |
| Total | |

| Coun | |
| --- | --- |
| Scott | |
| (Repu | |
| Write- | |
| Total | |

| Coun 7th | |
| --- | --- |
| Dawn | |
| (Repu | |
| Write | |
| Total | |

| Town for (1) | |
| --- | --- |
| Marti | |
| (Repu | |
| Write | |
| Total | |

| Town War | |
| --- | --- |
| Pamel | |
| (Repu | |
| Write | |
| Total | |

| Town for (1) | |
| --- | --- |
| Lori | |
| (Repu | |
| Write | |
| Total | |

EXHIBIT C



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

# Audits of the November 3, 2020 General Election

April 21, 2021

In November 2018, Michigan's voters passed a referendum to guarantee citizens of Michigan the right to have the results of statewide election audited, in order to ensure the accuracy and integrity of elections. Michigan's system of statewide post-election audits system, which has been in place for many years, is now enshrined in Article II, Section 4 the Michigan State Constitution.

As the state's chief election officer, the Michigan Election Law provides the Secretary of State with the authority to prescribe the procedures with which audits will be conducted across the state. Statewide audits reflect the decentralized nature of Michigan's election system. Running of elections is a local responsibility held by Michigan's 1,520 city and township clerks, along with their staff, volunteers and poll workers (election inspectors) they have hired to work in polling places and perform other election functions. Auditing of elections, which includes review of the city and township clerks who ran the elections, is performed by county and state officials.

Audits occur following completion of the post-election canvass process and any requested recounts, if applicable. Audits cannot occur until these processes are complete because the materials needed for audits—voting machines, ballots, ballot containers, and other election day materials—are required by the Michigan Election Law to be secured until these processes are complete.

The majority of post-election audits are conducted by Michigan's 83 county clerks. County clerks do not administer elections directly on election day, but they do serve several critical election functions including the programming of election equipment and printing of ballots. The remainder are conducted by the Michigan Bureau of Elections on behalf of the Secretary of State.

The November 3, 2020 election in Michigan involved several competitive statewide contests, including races for U.S. President and U.S. Senate. The general election, which was conducted in the midst of the global COVID-19 pandemic, was also the first general election held following the implementation of Proposal 2018-3 in the state. In addition to the constitutional right to statewide audits described above, the proposal also amended the state constitution to introduce same-day voter registration, automatic voter registration, and no-reason absentee voting in Michigan. Despite the pandemic, 2020 shattered state records for voter turnout, with more than 5.5 million total ballots cast (the previous record was 5 million, set in 2008). Approximately 3.3

million of ballots cast were absentee ballots, also a new state record; by comparison, the 2016 election, with an overall turnout of 4.8 million, saw 1.3 million voters cast absentee ballots.

The combination of the COVID-19 pandemic, a set of new election rules, highly contested elections, record-breaking voter turnout, and a shift from majority in-person voting to majority absentee voting posed an unprecedented set of election administration challenges for local officials. Same-day registration at clerks' offices requires local election officials to ensure that these offices are adequately staffed with experienced workers. The manyfold increase in absentee ballots – more than double the number cast in the 2016 presidential election—required updates to training, procedures, equipment, and staffing allocation to allow for the processing of both absentee applications and ballots, along with tabulation of large numbers of ballots, under the strict timelines required and allowed by law.

Many experienced clerks, staff, temporary staff, and election inspectors—groups that include significant populations in age groups more at risk from COVID-19—were unable to work before and on election day because of health concerns, quarantines, or exposure. In-person and staffing of election offices and polling places was made more difficult because of the need to ensure social distancing and capacity limits on the auditorium or classroom-style settings in which training is typically offered.

In spite of these and many other challenges, Michigan's local election officials administered the November 2020 election exceptionally well. There were few reports of crowding or long lines, either at polling places or at clerk offices used for same-day voter registration. Largescale community spread of COVID-19 connected with the November election was not reported. Despite the massive increase in absentee ballots, none of which could be tabulated until 7:00 a.m. on election day, the vast majority of ballots statewide and within each jurisdiction had been tabulated and reported by Wednesday, November 4, with a small percentage of ballots in some larger jurisdictions completed on Thursday. This was well ahead of the Bureau of Elections' expectation that tabulation and reporting could continue for up to a week after Election Day, as occurred in some states.

The increased strain on the election system caused by COVID-19, high turnout, increased absentee voting, new and inexperienced workers, and the need for clerks to divide their attention among polling places, same day registration, and absent voter counting board locations did contribute to administrative and procedural errors, several of which are discussed in this report.

As has been the case in all recent elections, some election jurisdictions were unsuccessful in "balancing" all of their election precincts—determining that the number of names in the poll book (in a polling place) or list of absentee voters (in a counting board) matched the number of ballots tabulated exactly (or that an explanation could be found for the imbalance). In 2016, this issue was primarily a problem at in-person voting precincts. In 2020, a greater share of balancing problems occurred at absent voter counting boards where AV ballots are tabulated, and fewer problems occurred at in-person precincts.

There were also several instances of errors in the reporting of unofficial "election night results." Election results that are reported shortly after the polls close, or after AV ballots have been

2

counted on Election Day, are not the official results. Official results are not determined until after county and state canvass and certification (and, if applicable, recounts). In an effort to provide a rapid report of initial results to media and the public, election officials publish unofficial election results based on the election-night canvass of precinct returns. Many members of the public may regard these as the "results," they are often corrected or adjusted after being published or during the county canvass.

Unofficial results can be incorrect because of a variety of human errors that may occur. Unofficial results may fail to report or "double-report" individual precincts, or clerks may make programming errors that lead unofficial results to be incorrectly reported even though ballots were properly counted. These errors are more likely to occur late on election night or after multiple days of continuous work, when election workers are extremely fatigued. Unofficial result reporting errors were not new to 2020 but received substantial attention when they were amplified to support other false claims about election results.

Beginning on Wednesday, November 4, several inaccurate claims were made about the conduct of the 2020 Election. In general, these claims were either entirely fabricated, based upon misunderstanding of election processes, or the result of incorrect inferences that human errors were intentional misconduct. Post-election audits conducted by the Bureau of Elections and county clerks found no examples of fraud or intentional misconduct by election officials and no evidence that equipment used to tabulate or report election results did not function properly when properly programmed and tested.

Post-election audits were not conducted with the goal of disproving the entire myriad of false claims made about the election in Michigan and elsewhere, although one county audit was conducted specifically to provide additional assurance in light of misinformation in that county.[1] Instead, these audits focused on confirming that election procedures were properly followed and election equipment functioned properly, and to identify areas for focus and improvement in future elections. However, in some cases audit findings did provide further confirmation that various false claims about the administration of the 2020 election were without merit.

---

[1] Both the Michigan Secretary of State's "SOS Factcheck Page,", available at
https://www.michigan.gov/sos/0,4670,7-127-1633_100423_102534_102535---,00.html., and the federal
Cybersecurity and Infrastructure Agency's "Rumor Control" page, available at https://www.cisa.gov/rumorcontrol
are regularly updated sites that debunk false claims made about the 2020 election.

Post-election audits of the 2020 general election were the most extensive in Michigan's history.[2] Three types of audits were conducted:

- **Precinct Procedural Audits**. These audits were conducted primarily by county clerks and involved the review of more than 200 in-person voting precincts across the state. They are designed to ensure that election officials and poll workers followed the correct procedures in conducting elections in these precincts, that required pre-election requirements were fulfilled, and that required records were maintained. The audits also included a full hand count of paper ballots cast in the U.S. Senate race in each of these precincts.

- **Absent Voter Counting Board Audits**. New for 2020, the Bureau of Elections worked with city and county election officials to review records and procedures in absent voter counting boards in four large jurisdictions. The audits focused on determining how many absent voter counting boards were out of balance and could have been reconciled with additional review, and identifying the reasons why counting boards were out of balance.

- **Risk-Limiting Audits**. The state conducted a risk-limiting audit exercise of the presidential election statewide. Approximately 18,000 ballots were randomly selected from more than 1,300 local jurisdictions statewide, and the results of the randomly selected ballots were compared to the statewide tabulated total. The Bureau of Elections also conducted a full hand-count audit of all presidential election ballots in Antrim County.

---

[2] A complete list of 2020 audits is included as an appendix to this report.

## I. Precinct Procedural Audits

Procedural audits of precincts are primarily the responsibility of county clerks, although the Bureau of Elections also audits certain precincts each year. Procedural audits are conducted following the canvass and certification of election results (and any recounts, if applicable). They focus on the in-person voting precincts in polling places at which voters cast ballots on election day.

Procedural audits provide an opportunity to conduct an in-depth review of the proper procedures for preparing and using election day equipment and materials. They also include a 100 percent hand count of all the paper ballots cast in one statewide race in each audited precinct, which ensures that the tabulators used in the precinct calculated ballots accurately. Precinct procedural audits provide an additional check and verification by allowing the county or state official who conducts the audit to review the work of the city or township clerk, who conducts the election. Because they are extremely in-depth, it is not practical to conduct an audit of this nature for the entire state, but a substantial number—at least 200 are conducted including at least one in each county, covering roughly 1 in 25 precincts in the entire state.

<u>Selection</u>

Following the election, the Bureau of Elections randomly selects at least 200 precincts to be audited by county clerks in addition to precincts that the Bureau will audit, and selects the statewide contest that will be reviewed during the paper ballot hand count segment of the audit. The selection process ensures that at least one precinct in each county is selected for a procedural audit. Following the selection of precincts for audit, the county clerk or the Bureau, as appropriate, contacts selected jurisdictions to schedule the conduct of the audit.

Although audits are not meetings of public bodies, they are open to the public and jurisdictions may publish audit schedules or a livestream of the audit. For example, Kent County published their audit schedule on the County website,[3] while Ottawa County posted a livestream on the county Facebook page.[4]

<u>Audit Process</u>

Procedural audits verify that pre-election notices were published, proper steps were taken on election day, and correct documents and equipment were used and maintained before, on, and after election day. Auditors review local records and equipment to examine the following issues. More detail on the specific procedures reviewed is in the state audit manual.[5]

---

[3] https://www.accesskent.com/Departments/Elections/Results/2020/PostElection_Audits.pdf.
[4] https://www.facebook.com/OCClerkRegister.
[5] https://www.michigan.gov/documents/sos/Post_Election_Audit_Manual_418482_7.pdf.

*Posting of Pre-election Notices*

- Notice of Registration (MCL 168.498(3))
- Notice of Election (MCL 168.653a)
- Public Logic and Accuracy Test (MCL 168.798(1))
- Weekend hours on which clerk's office is open the Saturday or Sunday prior to the election (MCL 168.761b).
- Election inspectors appointment meeting/appointment/training (MCL 168.674, 677, 683).

*Security and Testing Protocols*

- Electronic pollbooks and flash drives were sufficiently encrypted and updated
- Logic and accuracy testing was completed for voting tabulators, and all required records were created and maintained securely
- Voter assist terminals were properly tested and used on election day

*Absent Voter Record Maintenance*

- Applications for military and overseas voters were retained (review of records and matching poll book)
- Affidavits of voters not in possession of picture ID were recorded
- Posting was made of number AV ballots distributed and received

*Election Day Records and Paperwork*

- Election day receiving board checklist was properly completed
- Pollbook paperwork was properly completed and maintained
- All items required to be included in the envelopes of election officials were transmitted to receiving boards

*Provisional Ballot Forms*

- Provisional ballot numbers in poll book and envelopes matched
- Proper procedures were followed in issuing envelope provisional ballots

*Ballot Container*

- Proper, certified ballot containers were used
- Containers were properly sealed
- Container certificate completed and retained

*Spoiled and Duplicated Ballots*

- Number of spoiled ballots matches poll book
- Duplicate and original ballots properly maintained
- Ballots were duplicated properly

<u>Hand Count</u>

Procedural audits also include a hand count of all votes cast in the precinct for a statewide race. In 2020, the U.S. Senate race was selected for hand count. To complete the hand count, auditors review every paper ballot in the precinct and make a hand tally of votes for the selected race (in this case, U.S. Senate). The total is compared to the number tabulated using the voting machine. After hand counts conducted in more than 200 randomly selected precincts, county clerk auditors did not report instances in which hand counts differed substantially from machine-tabulated totals.[6]

<u>Completion Status</u>

The Bureau of Elections received confirmation that all procedural audits were completed by county clerks. There were no reports of intentional misconduct of fraud by election officials. Counties are not required to publish detailed reports on their audits but may choose to do so. Ottawa County released a report detailing the audit process, findings, and recommendations for improvement.[7]

## II. Absent Voter Counting Board Audits

The 2020 General Election saw 3.3 million absent voter ballots cast, more than doubling the previous record for absentee ballots cast in an election. The increase in ballots was not accompanied by an increase in time allowed to tabulate ballots, however. Although voters begin returning absent voter ballots more than a month prior to the election, the Michigan Election Law provides that absent voter ballots, regardless of when they are received by a local election jurisdictions, cannot be tabulated until 7 a.m. on election day when the polls open.

In past general election years, the lower number of absent voter ballots meant that it was usually possible to complete tabulating absent voter ballots in roughly the same time frame as polling places were closed. With the more than two-fold increase in AV ballots, this was no longer the case. In other states, such as Florida and Ohio, election officials may begin tabulating AV ballots prior to election day, which allows for reporting election night results much earlier on election day. In August 2020, the Michigan Legislature enacted legislation (for November 2020 only) to allow election jurisdictions to undertake certain "preprocessing" activities for absentee ballots – including removing absent voter ballots from the ballot return envelope (but not secrecy sleeve), but this was allowed only for a 10-hour period on the Monday before election day and tabulation still could not begin until the polls opened on Tuesday.

The volume of absent voter ballots, coupled with the limited time to tabulate ballots and the pressure to count ballots and release totals as quickly as possible, placed considerable strain on

---

[6] As explained in more detail in the risk-limiting audit section, it is not unusual for hand count to differ from a machine-tabulated count by a small number of votes.
[7] https://www.miottawa.org/Departments/CountyClerk/Elections/pdf/Audit-Report-November-2020.pdf?utm_medium=email&utm_source=govdelivery.

7

absent voter ballot counting locations on Election Day. The vast majority of election jurisdictions—especially large cities and townships—count absent voter ballots at absent voter counting boards, which are special precincts created to count only absentee ballots. This is usually the most efficient method of counting absent voter ballots in large jurisdictions, because they must otherwise be tabulated at polling places while voters are casting ballots in person.

Clerks must establish a counting board for each in-person precinct in a jurisdiction (with the exception of Detroit, which is permitted to combine multiple precincts into a single counting board).[8] Counting boards allow shared equipment and space to be used to count AV ballots for multiple precincts. In particular, they may facilitate the use of high-speed ballot scanners, which can be used to count ballots for multiple precincts.

Absent voter ballot counting board processing differs from in person voting in some respects, but still requires the counting board to balance—the number of ballots should match the number of voters who are recorded as having returned absentee ballots for that counting board, unless there is an explanation. If an absent voter counting board does not balance at the end of election night, the board of county canvassers attempt to balance it or find an explanation for the imbalance.

In November 2020, several jurisdictions completed their elections with a substantial percentage of absent voter counting boards out of balance. Conversely, there were relatively few in-person precincts out of balance. This change corresponded with the change in voting patterns between November 2016 and November 2020, when the percentage of votes cast absentee more than doubled.

Precincts out of balance, whether in person or at absent voter counting boards, are typically the result of human error in making or retaining records on election day. They do not necessarily mean that ballots have been improperly counted or improperly tabulated. However, out-of-balance precincts have negative consequences for the ability to recount precincts if a recount is requested. Out-of-balance precincts sometimes cannot be recounted under the Michigan Election Law.[9] Often they can—an out-of-balance precinct can still be recounted if the number of ballots in the ballot container matches the number of ballots tabulated according to the voting machine's tabulator tape—but this often is not determined until the recount begins.

To gain a better understanding of why absent voter counting boards were out of balance and identify areas for improvement and focus to reduce instances of out-of-balance precincts in future elections, the Bureau of Elections examined absent voter counting boards in four cities with a large number of AV ballots and a significant number of AV counting boards out of balance.

<u>Selection</u>

In selecting absent voter counting boards for audit, the Bureau of Elections selected four large cities with a substantial number of absent voter counting boards out of balance. The Bureau also

---

[8] MCL 168.765a.
[9] MCL 168.871.

took into account the need to assess absent voter counting boards in different counties to get a better cross section of local voting practices and procedures. The four cities selected for absent voter counting boards were Sterling Heights, Livonia, Detroit, and Grand Rapids.

<u>Audit Process</u>

To attempt to identify explanations for why absent voter counting boards did not balance, Bureau of Elections auditors, with the assistance of municipal and county clerks and their staff, performed a series of reviews.

First, BOE staff reviewed county canvass reports to verify that any issues corrected during the canvass were accurately reflected on the canvass report and that canvass report tallies, from which balancing numbers were determined, were accurate.[10] Next, the auditors spoke with clerks and staff to determine if any issues or explanations for out of balance precincts had been identified by reviewing clerk records following the completion of the canvass.

If counting boards could not be balanced or explained based on review of canvassing or clerk records that were subsequently validated by the Bureau, the auditors proceeded to review ballot containers, absent voter lists, and absent voter ballot envelopes. Auditors reviewed the following records and procedures, as necessary, to determine why a counting board was reported out of balance:

- Review of the AV lists used at the AV counting board and county canvass, to determine if written remarks on the AV list explained any imbalances
- Hand count of all ballots in the ballot container, to determine if the physical count of ballots in the ballot container matched the number of names in the AV list
- Review of duplicated ballots, to determine if errors in ballot duplication or ballot duplication accounting occurred
- Comparison of AV envelopes used for the precinct, to determine if the AV envelopes matched the list of voters or the number of ballots in the ballot container, or contained the names of voters that were not entered correctly into QVF or changed address and were listed on an AV list for the wrong precinct in the jurisdiction
- Comparison of multiple AV counting boards, to determine whether ballots had been stored in the wrong ballot container
- Review of any additional records or materials that may have explained the imbalance

<u>Common Findings</u>

Overall, all four cities reviewed did an excellent job of performing the core function of absent voter counting boards—counting all AV ballots cast by, and only by, eligible voters who timely delivered ballots. In aggregate, the counting boards processed approximately 317,000 ballots

---

[10] In some cases county canvass reports contain errors. County boards of canvassers often have little time to complete reports prior to meeting for certification and sending reports to the Bureau of Elections.

with a net difference of 21 more names than ballots cast.[11] The boards also moved with impressive speed and efficiency, completing the vast majority of counting by Wednesday afternoon and all counting by Thursday morning.

This process was completed during an ongoing pandemic, and the need to preserve social distancing complicated election procedures that are typically done in close quarters. Additionally, many new staff members and election inspectors needed to be trained to work in an AV counting board for the first time because of both the increase in AV ballots and the need to replace workers unavailable because of the pandemic.

Many of the challenges identified in the audit started well before the processing of AV ballots on election day, the process of sending out and receiving AV ballots was complicated by the substantial increase in AV voting. Clerk offices needed to process and track two to three times as many AV ballots as they had in past general elections, increasing the possibility that a voter might be sent the wrong ballot, not be sent a ballot, might return a ballot that was not correctly entered into the Qualified Voter File (QVF) as received, or might submit a ballot this was not timely sorted for processing on election day.

Clerks also reported a substantial increase in AV ballots that were "spoiled" and reissued because a voter requested to change their vote or wished to receive an AV ballot at a clerk's office after having been previously mailed a ballot. This occurred at large scale due in part to widespread concerns about mail delivery. Additionally, many voters requested to have their AV ballot "rejected" and not counted so that they could vote in person at a precinct on Election Day.

In light of these challenges, without sufficient and redundant controls to ensure AV applications and ballots were tracked and sorted daily (or with even greater frequency), counting boards were already set up to be in a difficult position to balance completely on election day. Once counting began, the myriad challenges and opportunities for error facing AV counting board election inspectors left little margin for error. The limited time for county canvasses to complete their work and the difficulty in timely reviewing all records needed to balance precincts limited the ability to correct these issues before certification.

As a result, a large number of absent voter counting boards did not balance either on election night or after certification. Auditors identified several reasons that contributed to absent voter counting boards being able to completely balance on election night or during the canvass.

---

[11] Although the audit was focused on counting board procedures and balancing rather than debunking misinformation about the conduct of the counting of ballots on election day, the very close correspondence in records—between to the number of voters on each absent voter list, the number of returned AV envelopes, and the number of ballots tabulated—disproves claims that large numbers of ballots were somehow added to tabulators or improperly included in counts. If that had been the case, the number of ballots tabulated would far exceed the number of names on absent voter lists or the number of AV envelopes each jurisdiction received, which was not the case.

*AV ballots physically received, but not scanned into QVF*

Auditors identified several instances in which the number of ballots did not match the number of names on the absent voter *list* generated from the Qualified Voter File, but did match the number of absent voter *envelopes* for that counting board. When clerks receive absent voter ballot envelopes, they physically mark the envelope to indicate it was received on time and the signature matched the signature on file.[12]

When AV envelopes are hand marked as received by election day, it indicates that the AV envelopes were timely delivered by voters and received by 8 pm on election day and the ballot should be counted. In these scenarios, clerks had appropriately received, delivered, and counted all AV ballots, but had not accurately established the list of voters by entering all envelopes as received in QVF, thereby adding the name to the voter list. If the clerk staff had failed to enter the AV ballot as received in QVF, the voter's name did not appear on the AV list used on election day (which is printed from QVF) and the counting board would appear to have one more ballot than voters on the list.

This error could occur for two reasons. First, the step of entering the ballot as received in QVF could simply be missed, which may have occurred in the rush to transmit ballot envelopes to counting boards on Election Day. In other cases, clerk staff may have attempted to mark a ballot as received in QVF but failed to do so, for example by exiting the software application without clicking "SAVE".

Ensuring consistent QVF entry was complicated by the fact that many clerks received AV ballots on Election Day at multiple locations—for example, a clerk's office, a satellite office, and a drop box—resulting in multiple personnel being needed to perform intake in QVF on these ballots. Although procedures for physically receiving and hand marking the envelopes were effective at all of these locations, QVF entry was less consistent.

In some cases, these errors were corrected on election day; if an AV envelope that had been timely received but not entered into QVF was identified at the counting board, it could be sent to a QVF terminal to be properly entered. These issues were also sometimes identified and corrected during the canvass, but some were not. Those that were not corrected resulted in an apparent imbalance between the number of ballots and AV voters that was actually attributable to data entry error, when the number of ballots tabulated and ballots received actually did match.

*Ballots placed in the wrong containers after tabulation*

Auditors identified instances in which tabulated ballots were placed in the ballot container for the wrong counting board following tabulation. This can be more likely to occur at counting boards, because the same high-speed scanners are used to count ballots for multiple different counting boards. The scanners are programmed to count the ballot for the correct precinct, so ballots being

---

[12] Signatures are verified by the clerk's office before envelopes are delivered to the counting board. Counting board workers verify that the signature has been reviewed by the clerk, but they do not review the signature to determine if it matches because this has already been done by the clerk's office.

11

mixed between precincts in batches that are scanned through tabulators does not necessarily cause a tabulation error. However, the ballot being placed in the wrong container after tabulation can complicate efforts to balance or resolve the precinct if the precinct was out of balance.

Container-sorting errors were also more likely to occur because jurisdictions experienced a shortage in ballot containers when trying to order equipment for the November 2020 election. The COVID-19 pandemic and increased demand caused stresses on the supply chain, with the result that demand for ballot containers nationwide could not always be met by ballot container vendors. Auditors did find that workers at AV counting boards were diligent in using only approved ballot containers, and ballot containers were properly sealed. This indicates that attention was duly paid to ensuring ballots were securely stored in *an* approved container with a verifiable seal. Errors occurred in some cases in placing ballots in the *correct* approved container for the counting board.

Combining multiple precincts or counting boards in the same ballot container is permitted as long as the ballots are segregated within the container, but combining multiple precincts or counting boards in a container increases the risk of intermingling of ballots, particularly given the time pressure and the need to ensure ballots are stored in a secured location in an active AV counting board environment.

*Issuing incorrect ballots*

In some instances, AV voters were issued an AV ballot for the wrong precinct. This can occur because of user error in identifying a voter's correct precinct or counting board. For example, clerk staff may accidentally transpose digits and issue a ballot for precinct 23 when a voter should get a ballot for precinct 32. This can cause a mismatch between the tabulator record and the AV list, because the ballot is counted in a precinct that does not correspond with the voter's proper precinct.

*Documenting empty ballot envelopes or envelopes with multiple ballots*

Sometimes voters mistakenly mail back AV ballot envelopes while failing to include their ballot in the envelope. In other instances, voters may mail back the wrong ballot—for example, a voter may mistakenly return a ballot for an August primary (which they had never returned) for the November election. In still other cases, an AV envelope may contain two ballots—for example, a married couple might place both ballots in one envelope. It is impossible to determine whether a ballot envelope is empty or contains multiple ballots until the envelope is opened on election day. This means that it falls to a more inexperienced election inspector, rather than a clerk, to ensure proper documentation of the issue.

Sometimes, errors related to missing ballots can be identified and balanced out—for example, two envelopes from one address, one with zero ballots and one with two ballots. In other cases, the error will simply cause a mismatch between the number of names on the AV list and the number of ballots tabulated. If this is not identified and recorded in real time, it will likely be impossible to determine later on that it occurred. Once ballots are removed from envelopes and stubs are removed, a ballot can no longer be traced back to an envelope.

If an election inspector does not record on the remarks on the AV list that an envelope is missing a ballot, it cannot be found at a later time. Therefore, these scenarios likely constitute a significant number of out of balance AV counting boards that cannot caught at canvass or explained either at the canvass or during an audit.

*Ballot duplication*

AV ballots may need to be duplicated onto other ballots and tabulated for several reasons. Ballots that are sent electronically to military and overseas voters, or voters with disabilities, are printed and returned on ordinary printer paper and cannot be scanned in tabulators. In other cases ballots may need to be duplicated because the ballot has been damaged and cannot be run through the tabulator, or because election inspectors determine that the voter has made a stray mark on a ballot that is causing the tabulator to treat the ballot as "overvoted" (too many selections in one race).

When this occurs, it is critical to document both the original and duplicated ballot, store (but do not tabulate) the original ballot, tabulate the duplicate, and properly record that the duplication of that ballot occurred. Auditors identified instances in which a duplicated ballot was not tabulated, both the original and duplicate ballots were tabulated, or the original ballot was properly excluded from tabulation but improperly included in the ballot container with tabulated ballots. Although the numbers are small overall, these errors can result in improper tabulation of ballots and can interfere with proper balancing of ballots and AV lists.

Auditors also identified instances where original ballots that had been duplicated were not stored in a way that allowed them to be easily retrieved and sorted by precinct. This contributed to balancing challenges by requiring additional time to resolve imbalances associated with ballot duplication; a difficult task on election night or during the limited canvass period.

*Up to date AV lists on election day and QVF use*

An up-to-date and complete list of AV voters is an essential component of balancing the number of voters and the number of ballots. However, there are inherent challenges in maintaining a list of AV voters that is up-to-date in real time, as the list is constantly changing up to and through the end of Election Day.

The challenge of maintaining an accurate and complete list at all times contributed to difficulties in balancing AV counting boards. AV lists used in counting boards are produced at least the day before election day if not earlier, but voters may continue to return AV ballots up to 8 pm on election day. Voters may even register to vote up to 8 pm on election day and submit an AV ballot at the same time—a new election law that was implemented for the first time in a general election in November 2020.

AV counting boards have processes in place to account for AV ballots that are returned after previously printed AV lists used in counting boards have been generated. This process is necessary to ensure all voters are accounted for, but it carries the inherent risk of balancing errors

13

because the list is constantly changing, or additional lists are being introduced to the process. Either election inspectors must manually add the names of each voter who is not on the AV list but for whom a ballot has been received, or a supplemental list of AV voters must be generated and aggregated with existing lists. Handling multiple lists can also result in record reconciliation challenges.

In addition to voters being added to AV lists, in some cases it is necessary to *remove* voters from AV lists that had previously been generated. A voter may die after returning their ballot but before election day, causing their AV ballot to be rejected. An AV ballot that already been submitted may be spoiled or rejected because a voter chooses to vote through a different method. Additionally, some voters move and re-register after returning AV ballots, which causes their submitted AV ballots to be rejected. Although the QVF automatically rejects ballots when voters have moved in these situations, if AV lists are not updated or updated AV lists are not printed, then voters may still appear on AV lists even if their ballot is not included for tabulation.

Complicating the issue further, there are different rules depending on whether a voter has moved *within* the jurisdiction or *outside* the jurisdiction. If a voter moves outside the jurisdiction, they must apply for a new AV ballot, whereas voters who move within a jurisdiction are automatically issued a new AV ballot within the jurisdiction. If the voter is not reissued or does not return the reissued ballot, the original ballot submitted by the voter must be duplicated onto a new ballot for the proper precinct. If the jurisdiction instead tabulates the original ballot, it can cause both the old and new precinct to be out of balance.

These challenges can contribute to balancing errors in which there are more names on the AV lists than ballots tabulated (if the ballot is removed, but not the name). Conversely, if the name is removed but the ballot that corresponds to the removed name is not removed from the total, the precinct will be out of balance because there will be more ballots than names on the AV list.

*Adjustment to High-Speed Ballot Scanners*

Large cities used high-speed ballot scanners to count AV ballots. Overall, the use of high-speed scanners significantly improved the function and efficiency of AV counting boards. High-speed scanners count ballots approximately 10 times faster than regular-speed, precinct scanners, and their ability to process more ballots in less time also means fewer scanners must be used, which facilitates greater social distancing in limited space.

However, the widespread use of high-speed scanning equipment for the first time, at broad scale, in a major election contributed to challenges in retaining ballots in proper containers and in recording voters as having cast ballots in the correct precinct for that voter.

High-speed scanners are capable of scanning multiple styles of ballots and allocating the votes to the correct precinct, even if batches of ballots include mixes of different styles in the same batch. For example, if a batch of 50 ballots intended to be for precinct 1 includes one ballot for precinct 2, the scanner can be programmed so that it will scan all the ballots and allocate the precinct 2 ballot's votes to precinct 2.

14

This is beneficial to the proper counting of ballots, because it ensures that only ballots for the correct precinct are counted in the batch even if the batch is mixed. However, this feature can make it more difficult to identify ballots that are incorrectly issued and then scanned with the correctly issued ballots. If a voter should have been given a ballot for precinct 1 but got a ballot for precinct 2, the voter's name will appear on the precinct 1 list but her ballot will be recorded in the precinct 2 tabulator record. This error can be difficult to identify after the fact without closely examining every single ballot, since ballots in different precincts may be nearly identical aside from a single down-ballot local race.

High speed scanners also increase the importance of proper storage of ballots after tabulation because they are used to count ballots for multiple precincts or counting boards. When a single ballot scanner is used to count ballots for multiple precincts or counting boards, it is critical to ensure that ballots are always returned the proper container after scanning and that batches of ballots scanned are not intermingled after scanning. In some cases, election workers did not properly separate and store ballots into containers corresponding to each counting board following the scanning of ballots.

*Continuous updating of QVF information after election day*

During county canvasses, canvassers attempted to balance counting boards by generating lists of AV voters after election day, hoping fill in the gaps that might have been missing from the AV lists or supplemental lists that were generated in real time. However, this approach has limitations because QVF is a real-time database. It continues to be updated, even after election day, if voters' status changes.

For example, if a voter moves or dies after election day, a list of AV voters for a given jurisdiction generated after election day will no longer have that voter on the list, even if the voter was alive and eligible in that jurisdiction as of election day. This limited canvassers' ability to reconcile records after the fact because they could not easily generate a "snapshot" of what the AV list looked like on election day.

Jurisdictions Audited

*Sterling Heights, Macomb County*

The Bureau of Elections conducted an audit of the Sterling Heights on February 1 and 2, 2021. The Sterling Heights city clerk provided workspace and staff to assist in conducting the audit and delivered all requested equipment. The Macomb County clerk's office also provided staff assistance and participated in the audit.

As the first absent voter counting board audit of this type ever conducted in Michigan, the audit served as an opportunity to gain additional insights into the counting board audit process itself, in addition to reviewing issues specific to Sterling Heights.

In the Sterling Heights absent voter counting board system, each counting board corresponds to an individual polling precinct. Approximately 41,000 Absent voter ballots were cast in Sterling

15

Heights. Following the county canvass, 19 of 45 AV counting boards were out of balance. During the AV counting board audit, staff were able to identify 13 additional counting boards that were in balance, so that a total of 6 counting boards remained out of balance.[13]

Although 6 AV counting boards remained out of balance at the completion of the audit, some had more names than ballots and some had more ballots than names. The net number of ballots for the entire counting board was 4 more ballots than names, out of approximately 41,000 AV votes cast.

**Sterling Heights Absent Voter Counting Boards Out of Balance at Canvass**

| AVCB # | Audit Balanced/Explained | Over/Under* |
|--------|--------------------------|-------------|
| 10 | Y | 0 |
| 40 | Y | 0 |
| 15 | Y | 0 |
| 24 | Y | 0 |
| 34 | Y | 0 |
| 1 | Y | 0 |
| 2 | Y | -1 |
| 3 | Y | 1 |
| 33 | Y | 1 |
| 32 | Y | -1 |
| 42 | Y | 1 |
| 38 | Y | 0 |
| 43 | N | 2 |
| 7 | N | 3 |
| 5 | Y | 0 |
| 8 | N | -1 |
| 17 | N | -1 |
| 28 | N | -1 |
| 14 | N | 1 |

*Some absent voter counting board imbalances could be explained but could not be corrected after the fact, such as tabulating a ballot in the wrong precinct. In these cases, the remaining over/under imbalance for the precinct remains with the explained but uncorrected imbalance.

---

[13] In Sterling Heights and elsewhere, additional review of audit records identified adjustments from previously reported numbers of balanced precincts and net differences. For the previous totals, see https://www.michigan.gov/sos/0,4670,7-127-1640_9150-553386--,00.html.

*Livonia, Wayne County*

The Bureau of Elections conducted an audit of the Livonia absent voter counting board on February 3 and 4, 2021. The Livonia City Clerk provided workspace and staff to assist in conducting the audit and delivered all requested equipment. Clerks from neighboring local jurisdictions in Wayne County also participated at the Livonia clerk's invitation. The Wayne County Clerk's office provided requested records and participated in the audit.

In the Livonia absent voter counting board system, each counting board corresponds to an individual polling precinct. Approximately 43,000 absent voter ballots were cast in Livonia. Following the county canvass, 30 of 44 AV counting boards were out of balance. During the AV counting board audit,[14] staff were able to identify 14 additional counting boards that were in balance or explained, so that a total of 10 counting boards remained out of balance.

Although 10 AV counting boards remained out of balance at the completion of the audit, some had more names than ballots and some had more ballots than names. The net number of ballots for the entire counting board was 1 more name than ballots, out of approximately 43,000 AV votes cast.

---

[14] The Livonia clerk balanced some of these counting boards prior to the audit, but auditors verified her findings. The clerk's office believed that these records likely would have been identified on election night or during the course of the canvass, but staff absences due to COVID-19 protocols meant less experienced municipal staff and volunteers were involved in the process during the canvass review process.

**Livonia Absent Voter Counting Boards Out of Balance at Canvass**

| AVCB # | Audit Balanced/Explained | Over/Under* |
|---|---|---|
| 1B | Y | 0 |
| 2A | Y | 0 |
| 3A | Y | 0 |
| 7A | Y | 0 |
| 12A | Y | 0 |
| 14A | Y | 0 |
| 18A | Y | 0 |
| 19B | Y | 1 |
| 20A | Y | 0 |
| 21A | Y | -1 |
| 22A | Y | 0 |
| 24B | Y | 0 |
| 25A | Y | 0 |
| 34C | N | -4 |
| 35B | Y | 0 |
| 8B | Y | 0 |
| 15A | Y | 0 |
| 35A | N | 1 |
| 22B | N | 2 |
| 9A | N | -2 |
| 10A | N | -1 |
| 19A | Y | 0 |
| 34A | N | -1 |
| 34B | N | 3 |
| 3B | Y | 1 |
| 4A | Y | -1 |
| 24A | N | 4 |
| 31B | N | -6 |
| 32A | N | 3 |

*Some absent voter counting board imbalances could be explained but could not be corrected after the fact, such as tabulating a ballot in the wrong precinct. In these cases, the remaining over/under imbalance for the precinct remains with the explained but uncorrected imbalance.

*Detroit, Wayne County*

The Bureau of Elections conducted an audit of the Detroit absent voter counting boards on February 9 through 26.[15] The Detroit City clerk provided workspace and staff to assist in conducting the audit and delivered all requested equipment. The Wayne County clerk's office provided requested records.

In the Detroit absent voter counting board system, there were 134 counting boards, each corresponding to multiple precincts (there are 503 individual in-person voting precincts in the city). In assigning precincts to counting boards, the city considers geography and ballot style, so each counting board does not have a uniform number of ballots or precincts—there can be a substantial disparity in size, with counting boards varying in size from a few hundred ballots to several thousand.

Detroit's absent voter counting board presented distinct issues because of the volume of ballots and structure of the counting board. Combining multiple precincts into counting boards is a more efficient way of processing AV ballots, but it creates additional challenges in balancing counting boards for multiple reasons.

First, the total number of ballots and voters that must be accounted for in each counting board is higher; while an average precinct may have approximately 400 ballots, a combined counting board can have several thousand. Second, if a ballot is placed in the wrong ballot container or sent to the wrong counting board for tabulation, the volume of ballots in each counting board makes the ballot more difficult to retrieve or identify either on Election Day or during the canvass.

To facilitate more efficient processing and recording of AV ballot tabulation, Detroit utilized "electronic AV lists" similar to the electronic pollbooks used at precincts on election day. Like electronic pollbooks, the electronic AV list does not connect to the internet and cannot be updated in real time. However, it did allow for digital entry of remarks—for example, an AV ballot received on election day for a voter who was not on the previously generated list of AV voters—that would otherwise have to be handwritten.

Electronic AV lists proved difficult to use in cases where a large number of AV ballots were received on election day. The electronic list is based on the QVF electronic pollbook software, used for precincts with a few hundred voters. The pollbook software experienced performance issues when trying to process records for the larger number of voters contained in AV counting boards, and Detroit subsequently switched over to supplemental AV lists during the course of the AV counting board, which added a layer of complexity to record retention. Multiple sources of recordkeeping made balancing counting boards and retaining records more difficult.[16]

---

[15] The audit was not held continuously through this period as some days were lost due to holidays and weather.

[16] Nonetheless, auditors identified many instances in which remarks had been extensively documented in printed AV lists, including documentation of challenges made and their disposition. This suggests that claims, made by some, that challenges were being ignored were not accurate.

Detroit also encountered an additional risk of assigning incorrect ballots because of the inclusion of multiple precincts within AV counting boards.  For example, a voter may be in precinct 25 and AV counting board 10, because AV counting board 10 has multiple precincts (e.g. 24, 25, and 26). Clerk staff attempting to issue a ballot to the voter might mistakenly issue a ballot for *precinct* 10 when the voter should be getting a ballot for precinct 25, which happens to be in *counting board* 10 might mistakenly be issued a ballot for precinct 10. This causes a mismatch between the tabulator record and the AV list, because the ballot is counted in the precinct corresponding to the ballot, not the voter's correct precinct.

Detroit also had a substantial number of locations and which AV ballots could be delivered on election day, including dozens of satellite locations and drop boxes. This may have contributed to the issue, identified above, of ballots being properly physically received but not entered as received in QVF. The counting board received many envelopes that had been marked as received on time by clerk staff but had not yet been entered into QVF. Many of these were fixed on election night or during the canvass, but it was a challenging and time-consuming issue.

Approximately 174,000 Absent voter ballots were cast in Detroit.  Following the county canvass, 95 of 134 AV counting boards were out of balance. During the AV counting board audit, staff were able to identify 81 additional counting boards that were in balance or explained, so that a total of 14 counting boards remained out of balance.[17]

Although 14 AV counting boards remained out of balance at the completion of the audit, some had more names than ballots and some had more ballots than names. The net number of ballots for the entire counting board was 21 more names than ballots, out of approximately 174,000 AV votes cast.

---

[17] A prior version of this report listed the number of counting boards out of balance following the canvass as 98, which was inaccurate and has been corrected.

**Detroit Absent Voter Counting Boards Out of Balance at Canvass**

| AVCB # | Audit Balanced/Explained | Over/Under* |
|:---:|:---:|:---:|
| 2 | N | -5 |
| 4 | N | 3 |
| 5 | Y | 0 |
| 6 | N | -4 |
| 7 | Y | 0 |
| 8 | Y | 0 |
| 10 | N | -2 |
| 11 | Y | -1 |
| 12 | Y | -13 |
| 13 | Y | 0 |
| 14 | Y | 0 |
| 15 | Y | 0 |
| 16 | Y | 0 |
| 17 | Y | 0 |
| 18 | Y | 0 |
| 19 | Y | 0 |
| 20 | N | -1 |
| 21 | Y | 0 |
| 22 | Y | 1 |
| 23 | Y | 0 |
| 24 | N | 5 |
| 25 | N | -4 |
| 26 | Y | 0 |
| 27 | Y | 0 |
| 28 | Y | 0 |
| 30 | N | -2 |
| 31 | Y | 0 |
| 32 | Y | 0 |
| 33 | Y | 0 |
| 35 | Y | 0 |
| 36 | Y | 0 |
| 37 | N | 1 |
| 38 | N | -1 |
| 39 | Y | 0 |
| 41 | Y | 0 |
| 43 | Y | 0 |
| 44 | Y | 0 |
| 45 | N | 4 |
| 46 | Y | 0 |

| AVCB # | Audit Balanced/Explained | Over/Under* |
|---|---|---|
| 47 | Y | 0 |
| 48 | Y | 1 |
| 49 | Y | -1 |
| 50 | Y | -2 |
| 51 | Y | 0 |
| 52 | Y | 7 |
| 53 | Y | 0 |
| 55 | Y | -7 |
| 56 | Y | 0 |
| 57 | Y | 0 |
| 59 | N | 1 |
| 60 | Y | 0 |
| 61 | Y | 0 |
| 62 | Y | 0 |
| 63 | Y | 0 |
| 64 | Y | 0 |
| 65 | Y | 0 |
| 66 | Y | 0 |
| 67 | Y | 0 |
| 68 | Y | 0 |
| 41 | Y | 0 |
| 72 | Y | 0 |
| 73 | Y | 0 |
| 74 | Y | 0 |
| 77 | Y | 0 |
| 80 | Y | 0 |
| 81 | Y | 0 |
| 82 | Y | 0 |
| 83 | Y | 0 |
| 85 | Y | 0 |
| 86 | Y | 0 |
| 87 | Y | 0 |
| 88 | Y | -26 |
| 89 | Y | 26 |
| 90 | Y | 0 |
| 94 | Y | 0 |
| 95 | Y | 0 |
| 96 | N | -2 |
| 97 | Y | 0 |
| 98 | Y | 0 |

| AVCB # | Audit Balanced/Explained | Over/Under* |
|---|---|---|
| 100 | Y | 0 |
| 101 | Y | 0 |
| 107 | Y | 0 |
| 108 | Y | 0 |
| 109 | N | 1 |
| 110 | Y | 0 |
| 112 | Y | 0 |
| 114 | Y | -1 |
| 117 | Y | 0 |
| 119 | Y | 0 |
| 122 | Y | 0 |
| 123 | Y | 0 |
| 124 | Y | 1 |
| 128 | Y | 0 |
| 132 | Y | 0 |
| 133 | Y | 0 |

*Some absent voter counting board imbalances could be explained but could not be corrected after the fact, such as tabulating a ballot in the wrong precinct. In these cases, the remaining over/under imbalance for the precinct remains with the explained but uncorrected imbalance.

*Grand Rapids, Kent County*

The Bureau of Elections conducted an audit of the Grand Rapids AV counting board on February 10 and 11, 2021. The Grand Rapids city clerk provided work work space and staff to assist in conducting the audit, and delivered all requested equipment. The Kent County clerk's office also provided staff assistance and participated in the audit, as did the Ottawa County clerk's office with Grand Rapids and Kent County's permission.

In the Grand Rapids absent voter counting board system, each counting board corresponds to an individual polling precinct. A total of 59,000 absent voter ballots were cast in Grand Rapids. Following the county canvass, 29 of 77 AV counting boards were out of balance. During the AV counting board audit, staff were able to identify 36 additional counting boards that were in balance, so that a total of 12 counting boards remained out of balance.

Although 12 AV counting boards remained out of balance at the completion of the audit, some had more names than ballots and some had more ballots than names. Thus, the net number of ballots for the entire counting board was 3 more names than ballots, out of approximately 59,000 absentee votes cast.

**Grand Rapids Absent Voter Counting Board Balanced/Explained**

| AVCB # | Audit Balanced/Explained | Over/Under* |
|--------|--------------------------|-------------|
| 4 | N | 2 |
| 5 | Y | |
| 9 | N | -1 |
| 10 | Y | |
| 12 | N | 1 |
| 14 | N | -2 |
| 18 | Y | |
| 25 | Y | |
| 26 | N | -1 |
| 27 | Y | |
| 32 | Y | |
| 37 | Y | |
| 40 | Y | |
| 41 | N | -2 |
| 44 | Y | |
| 47 | N | -1 |
| 48 | Y | |
| 49 | N | 2 |
| 50 | N | -1 |
| 53 | Y | |
| 54 | Y | |
| 55 | Y | |
| 60 | N | 2 |
| 63 | Y | |
| 64 | N | -1 |
| 70 | Y | |
| 71 | N | -1 |
| 72 | Y | |
| 77 | Y | |

*Some absent voter counting board imbalances could be explained but could not be corrected after the fact, such as tabulating a ballot in the wrong precinct. In these cases, the remaining over/under imbalance for the precinct remains with the explained but uncorrected imbalance.

24

<u>Recommendations for Future Elections</u>

Based on the findings above, the Bureau of Elections recommends a number of procedural changes, training points of emphasis, and legislative changes to improve the efficiency and accuracy of AV processing and increase the likelihood counting boards will be balanced or recountable.

*Procedures*

City and township clerks operating absent voter counting boards should implement several procedures before, during, and after the counting of absent voter ballots. Clerks should have clearer processes to track and balance daily the number of AV applications, ballots sent, and ballots received, with corresponding tracking of spoiled and rejected ballots. Applications and ballots should also be stored physically in way that corresponds to the tracking of each category. Sorting records and materials on a daily basis leading up to election day will set up the counting board to be in a better position to identify and process ballots appropriately. Ballot controls are particularly important; returned ballots should be balanced and sorted to the appropriate precinct or counting board on a daily basis.

Clerk's offices should also establish a uniform method for documenting and retaining ballots that are deemed invalid, for any reason, during processing. It is critical that these ballots be documented and segregated from other ballots; intermingling them with other records makes it much more likely that counting boards will be out of balance without a readily apparent explanation.

Clerks should have more clear, obvious, and regularly used labels and indicators to demonstrate which precinct and counting board ballots are in each container; particularly when multiple precincts and counting board ballots are stored in a container. This will assist election inspectors in identifying the correct container on election day and make it easier for county canvassers to identify the ballots during the canvass.

Clerks should dedicate a sufficient number of experienced staff and election inspectors to handle all aspects of the ballot duplication process. In addition to ensuring that the original and duplicate are properly stored and remarked in the AV list or pollbook, this will also reduce errors in the actual duplication of ballots.

Clerks should take action, as soon as possible after election day, to organize records and prepare to assist county board of canvassers in efforts to balance counting boards and precincts— particularly if a city or township knows it has out of balance precincts that will need to be reconciled. This can be a difficult task for city or township staff who are exhausted in the days immediately following election day; one approach may be to have dedicated staff to organize records after election day. An initial step would be ensuring that all staff who will be handline records on or after election day have revisited receiving board instructions to assist in catching errors sooner.

County boards of canvassers should familiarize themselves with the findings in this audit report and speak with city and township clerks in their jurisdiction to understand the specific procedures those cities and townships use in running their boards. To the extent possible, canvassers should avoid using formats for tracking and receiving records during the canvass that do not correspond to the systems used on election day. As early as possible in the canvass, it is critical to identify the records that will be needed and why, so that the city and county officials can work together to identify all records quickly and in the right format.

*Training*

Building on prior training surrounding absent voter counting boards, the Bureau will emphasize ballot duplication in training efforts in the coming years. Ballot duplication was a major source of balancing errors and is challenging both in the actual duplication process and the proper retention of all records. Bureau training will also emphasize proper methods of duplicating ballots in addition to retention of original ballots, tabulation of duplicate ballots, and retention of military and overseas ballot materials.

Training will also emphasize the critical importance of identifying and documenting any AV envelopes that are missing ballots or have multiple ballots in real time. Once the opportunity to document these envelopes is lost, it is likely lost forever, and the counting board likely will not be able to be balanced and explained. Election inspectors should understand that they are the only line of defense on this process and it must be top of mind.

*Qualified Voter File User Improvements*

Based on user experiences reported in the audit, the Bureau will prioritize several improvements to QVF to help clerks more easily identify critical application or ballot records or status changes for absentee voters.

AV lists can be better standardized using report parameters QVF. Currently there are several different formats in which clerks can download and print lists of AV voters; these lists can be sorted by ballot number, name, accepted or rejected status, or other criteria. The Bureau plans to retain these preferences but emphasize the importance of uniform list format printing within jurisdictions and counties. The Bureau will evaluate report settings and reminders to help clerks download lists consistently. For clerks who choose to use an electronic AV list, the Bureau will emphasize improvements in the functionality and performance of the application.

In light of reported instances of clerk staff not properly entering AV ballot envelopes as received in QVF, the Bureau will evaluate the ballot scanning application with an eye toward user experience. The Bureau will evaluate options for warnings, hard-stops, or pop up messages that may prevent a user from inadvertently leaving the application without recording the ballot as received.

Finally, the Bureau will evaluate the messages and reports clerks see when voters with a pending AV application or ballot status move within or across jurisdictions. Improved QVF notifications

26

and reports may make it easier for clerks to track these moves in real time. In turn, this would reduce the number of election day issues associated with AV voters who move.

*Legislative Recommendations*

It is likely that the majority of Michigan voters will cast absentee ballots in major elections for the foreseeable future. Although 2020 was a unique election year because of the pandemic, the trend seen in other states is that most voters who start voting by mail continue to do so most of the time. Michigan should follow Florida, Ohio, and several other states' lead and allow clerks to begin tabulating AV ballots prior to election day. In addition to allowing election night results to be reported much earlier, this would also reduce errors in processing AV ballots because clerks could assign fewer, more experienced staff to process ballots. Additionally, ballot processing could proceed on a more orderly, less rushed timetable allowing more safeguards and internal review.

County canvassers need more time to complete canvasses. Currently canvassers have less than two weeks to review and attempt to balance all out-of-balance precincts in the county, in addition to the other work needed for certification. Counties have the same number of canvassers and number of days regardless of the population of the county or the number of local jurisdictions, and county clerks typically have limited election staffs. Particularly in large counties, canvassers need at least another week to complete the canvass. Many of the counting boards the Bureau was able to balance or explain would have been addressed by county boards of canvassers if they had been given more time.

Finally, Michigan's recountability standards are antiquated and should be reevaluated. Currently, if a counting board is out of balance and cannot be explained, precincts and counting boards often cannot be recounted. This makes little sense, particularly if a hand recount would make a difference in the outcome larger than the margin by which the precinct is out of balance. While other requirements for recountability (such as a sealed ballot containers) make good sense, the hyper-strict requirements that counting boards or precincts be perfectly balanced for a recount reduces, rather than increases, the ability to utilize post-election remedies to address election day errors.

## III. Risk-Limiting Audits

Michigan first began implementing risk-limiting audits (RLAs) in 2018, starting with pilots of local elections with relatively small turnout. RLAs were first developed in Colorado a decade ago and have come to be regarded as the gold standard of post-election audits. During an RLA, a subset of paper ballots are reviewed to determine if there are disparities between the marking on the paper ballots and the way votes were tabulated using voting tabulators.

Michigan, like most states, uses paper ballots. Voters hand-mark a paper ballot using a pen (or ballot-marking device), and the ballot is counted by tabulators that scan the paper ballot and electronically record the results. Tabulators are tested extensively before they are certified by the federal Election Assistance Commission, as well as the Michigan Board of State Canvassers, for

use in Michigan. Prior to each election clerks also test voting equipment on multiple occasions, including during public logic and accuracy testing.

If there is any reason to think tabulators did not count ballot accurately, the paper ballot allows this to be quickly determined. Losing candidates have the right to request a hand recount, although no statewide candidates chose to do so in 2020. However, counting ballots by hand is not practical at scale; to review every statewide race for accuracy, more than 5.5 million ballots would have to be counted by hand more than a dozen times (for each statewide race).

RLAs are a valuable tool because of their ability to efficiently review the results of an election in which a large number of ballots were cast *without* conducting a full hand recount of the election. Instead, RLAs review a random sample of ballots drawn statewide. RLAs review enough ballots to determine there is a sufficiently minimal risk (the risk limit) that completing a full hand recount of the entire election would not lead to a different result than the result reached in the audit. The more ballots randomly reviewed, the lower the risk limit is and the higher the confidence is in the outcome of the election.

Even prior to the development of RLAs in Michigan, auditors conducted hand counts of paper ballots as part of audits. As described above, procedural audits count all *ballots* in a subset of randomly selected *precincts*.  Conversely, RLAs using the polling method *randomly select* ballots but include *all* precincts in the sample from which ballots can randomly be drawn (although ballots will not necessarily be drawn from every precinct in the sample, every precinct is included in the ballot manifest from which ballots are selected). In this way, the ballot review process in procedural and risk-limiting audits complement each other by broadening the scope and specificity of paper ballot review processes.

| Audit Type | Procedural | Risk-Limiting (Polling) |
|---|---|---|
| Ballots Counted | All | Randomly Selected |
| Jurisdictions | Randomly Selected | All |

In addition to their value in efficiently confirming election results, statewide RLAs provide an additional transparency benefit by ensuring that a large *percentage* of election jurisdictions participate in audits. While procedural audits review a small percentage of local jurisdictions in great detail, RLAs review a large percentage of local jurisdictions in more limited detail.

As has been in the case in other states,[18] Michigan's RLA process continues to evolve. RLAs were implemented statewide in 2020 during the two presidential dates, the March 10 primary and the November 3 general elections. The Bureau of Elections, in cooperation with local and county clerks, developed pilots on increasing scale beginning in 2018 until the first statewide pilot was conducted in March 2020.[19] The Bureau further developed auditing procedures with the advice

---

[18] Colorado's RLA process took approximately a decade to develop.
[19] A fuller description of the pilots leading up to March 2020 and the March pilot is available here: https://www.michigan.gov/documents/sos/Michigan_RLA_Report_693501_7.pdf.

of a clerk advisory group and the Election Security Advisory Commission.[20] In both March and November, the statewide RLA process used a ballot polling model to randomly select ballots statewide.[21]

<u>November 2020 Election RLA Process</u>

Random selection of ballots involved a cooperative effort among state, county, and local officials. First, county clerks worked with local clerks to create a "ballot manifest," a list of all ballot containers in the state and how many ballots were in each container after election day. This step is necessary to establish the universe of ballots from which ballots will randomly be drawn. Each county clerk submitted a manifest of all ballot containers in its county.[22] The resulting statewide ballot manifest included 6,262 ballot containers for a total of 5,579,317 ballots cast.[23]

Ballot selection was made beginning on January 11 using the Arlo software program developed by VotingWorks.[24] To determine which ballots would be selected, the Bureau of Elections used a random seed generator. The Bureau first rolled 20 different 10-sided dice to generate a random 20-digit number. The dice roll was livestreamed and included participation by a Republican county clerk and a Democratic township clerk. The 20-digit number was then used as a seed number to randomly generate a list of ballots to be drawn from the universe of ballots in the ballot manifest.

Using a risk-limit target of $10\%$ as the baseline (as was used in March), 18,162 ballots were randomly selected for review in more than 1,300 of Michigan's 1,520 local election jurisdictions. Clerks were then given two weeks to review selected ballots and report the results. Because of the ongoing pandemic, clerks were given the option of either opening and reviewing ballots at a central, county-run audit location, or at individual local clerk offices. To review the selected ballot, clerks were given a precinct number and a ballot or ballots to review. For example, if a Township clerk was instructed to review precinct 3, ballot 255, the clerk would open the ballot container for precinct 3, count through the ballots until the 255th ballot in the stack was retrieved, and record the contents of the ballot.

---

[20] The Election Security Advisory Commission's report and recommendations are available here: https://www.michigan.gov/documents/sos/ESAC_Report_Recommendations_706522_7.pdf.

[21] Ballot polling involves comparing a random sample of individual ballots selected statewide with the official results statewide. In previous pilots, BOE and local clerks practiced ballot comparison audits, in which ballots are compared to how individual tabulators tabulated the ballot. Because in Michigan tabulators do not currently store a "cast vote record" for individual ballots, some pilots utilized a batch comparison method in which a large number of ballots from individual tabulators are compared to how the tabulator counted that group of pilots. This method has not yet been attempted statewide in Michigan.

[22] In some cases the state worked directly with local jurisdictions to establish the ballot manifest.

[23] The total number of ballots cast exceeds the number of votes for president because some voters did not cast a vote for any presidential candidate. Ballots without votes for president were included in the random selection.

[24] An explanation of the Arlo Software and RLAs is available here: https://voting.works/risk-limiting-audits/.

[25] For an explanation of risk limits and how they are used in audits, see *Knowing It's Right, Part One* (Morell), available at https://democracyfund.org/wp-content/uploads/2020/06/2019_DF_KnowingItsRight_Part1.pdf.

Local clerks recorded ballot contents using a tally sheet. Clerks could indicate if the ballot included a vote for Biden, Trump, another candidate, or no candidate; alternatively, clerks could indicate that the ballot could not be retrieved. Clerks then either entered the ballot contents on the Arlo software or submitted their tally sheet to a county clerk or the Bureau of Elections, who would enter the tally sheet into the Arlo software. Ballot retrieval began on XXX date. Clerks were instructed to retrieve and report ballots by January 22; clerks who needed time extensions (for example, if a clerk was out of town) were given additional time.

More than 99 percent of ballots were retrieved. [26] Out of 18,162 ballots selected for review, 18,804 were either retrieved or randomly selected for review multiple times.[27] The following 21 local jurisdictions failed to retrieve ballots after receiving multiple reminders and offers of assistance:

| Township | County |
|---|---|
| Maple Ridge | Alpena |
| Blue Lake | Kalkaska |
| Boardman | Kalkaska |
| Clearwater | Kalkaska |
| Coldsprings | Kalkaska |
| Excelsior | Kalkaska |
| Garfield | Kalkaska |
| Kalkaska | Kalkaska |
| Yates | Lake |
| Ellsworth | Lake |
| Larkin | Midland |
| Greenwood | Oscoda |
| Bridgehampton | Sanilac |
| Elmer | Sanilac |
| Flynn | Sanilac |
| Moore | Sanilac |
| Watertown | Sanilac |
| Berlin | St Clair |
| Grant | St Clair |
| Kenockee | St Clair |
| Lynn | St Clair |

---

[26] The full results are available here: http://michigan.gov/documents/sos/audit-report-November-3-2020-General-Election-2021-04-21T11_51+00_00_722796_7.csv

[27] The random selection ballot selection process involved ballots being selected one-by-one, meaning that some ballots could be selected multiple times in the random sample. The total number of distinct ballots reviewed was 18,051 ballots out of 18,129 unique ballots selected for review.

Despite the overwhelming participation of local clerks statewide, nonparticipation in the audit by these jurisdictions interfered with the ability to calculate the risk limit; therefore, the risk limit was not calculated and the RLA is considered an exercise.[28]

Although the data collected could not be used to calculate a risk limit, it nevertheless provides strong evidence that the result of the presidential election as calculated by tabulators was correct. In the sample of ballots reviewed, President Biden received 50 percent of ballots cast while former President Trump received votes in 48 percent of ballots cast, closely corresponding to their percentages of votes received in the official results calculated by voting tabulators.[29]

On a percentage point basis, the ballots reviewed in the sample were 49.7/48.0 percent in favor of Biden, compared with 50.3/47.5 percent in the tabulated total. The closer margin on a percentage point basis corresponds to the fact that the random sample included a relatively high percentage of ballots from counties that voted in favor of Trump (in other words, the random sample pulled more ballots from Trump-leaning counties, as opposed to Biden-leaning counties, than the median random sample would). On a county-by-county basis, the margins in the ballots retrieved corresponded extremely closely with the tabulated totals, especially in the largest counties which had the highest number of ballots retrieved.

| County | Ballots Sampled | Official Biden | Sample Biden | Official Trump | Sample Trump |
|--------|-----------------|----------------|--------------|----------------|--------------|
| Wayne | 2,789 | 68.0 | 67.8 | 30.1 | 30.7 |
| Oakland | 2,484 | 56.0 | 56.6 | 42.0 | 41.3 |
| Macomb | 1,601 | 45.1 | 44.1 | 53.1 | 53.7 |
| Kent | 1,230 | 51.7 | 51.5 | 45.6 | 46.3 |

Smaller counties had larger differences in percentages between sampled and tabulated results, as would be expected with a small number of ballots sampled. For example, Keweenaw County only had 5 ballots retrieved, making it impossible for percentages to be particularly close to the county's 55/43 official margin in favor of Trump (all 5 ballots retrieved happened to be for Biden). In the 20 counties with the highest number of 2020 voters, none saw substantial differences in the margins between the sampled and official ballots given the number of ballots retrieved. Ballot retrieval in these counties ranged from 212 to 721 ballots, with no county having a percentage difference of greater than 5 percent and most with 2 percent or less.

---

[28] Under the RLA process, is necessary to have a complete sample to accurately calculate the risk limit. Non-retrieved ballots can be treated as a vote for the "losing" candidate, but this distorts the sample. Depending on the result of the initial review of ballots, it may be necessary to retrieve additional ballots to get a larger sample as necessary to reach the risk limit. However, without 100 percent participation, this number could not be accurately calculated; treating missing ballots as votes for the "losing" candidate would artificially inflate the number of additional ballots needed for retrieval and the Bureau decided not to pursue this approach.

[29] Biden received 2,804,040 votes (50.3 percent) and Trump received 2,649,852 votes (47.5 percent), respectively, out of 5,579,317 total ballots cast. When calculated as percentage of ballots cast with a valid voter for president (5,539,302), Biden received 50.6 percent and Trump 47.8 percent, respectively.

Antrim County Full Ballot Tally

The Bureau of Elections also worked with the Antrim County clerk and local clerks to conduct a full hand tally of all ballots cast for president in the County. The Bureau decided to count all ballots in Antrim County to help safeguard public confidence following false information that was circulating regarding presidential results in the county. Because of human errors in programming election equipment, Antrim County initially *reported* erroneous unofficial results with incorrect results for the presidential race, even though ballot tabulators had *counted* the votes for President accurately. Although this could be explained, and was explained, at a technical level,[30] the Bureau took the additional step of demonstrating that ballots had been counted properly by conducting a full hand count.

The full hand count was structured as a risk-limiting audit with a risk limit of zero.[31] Bureau of Elections staff travelled to Antrim County to conduct the audit. The county clerk arranged for city and township clerks to deliver their ballot containers and reserved space at the Kearney Township Hall. The event was open to the public and livestreamed.

The hand count audit used some procedures similar to those used in hand recounts. The process, however, was an audit rather than a recount because it did not impact official results. Teams of two individuals for each precinct counted the number of votes cast for president in each of the precincts in Antrim County. The hand-counted numbers showed a total of 9,759 votes for Donald Trump and 5,959 for Joe Biden—a net change of 12 votes from the tabulated results.[32] Slight differences between hand counts and tabulator counts are not unusual and can be explained by different interpretations of stray marks on ballots by tabulators and individuals; closer review of write-in votes; and human error in hand counting.[33]

RLA Process and Future Elections

The RLA process included overwhelming participation and provided strong evidence that the outcome of the presidential election was correct. Given the extremely high percentage of ballots that were retrieved and the high number of jurisdictions that participated, the Bureau of Elections will consider future adjustments to audit procedures to allow the risk limit to be more efficiently calculated when there is a small amount of nonparticipation. Overall, the RLA exercise successfully provided visible affirmation, based on a large random sample of ballots, that the outcome of the Presidential election was correct. The willingness of the vast majority of

---

[30] The initial source of the unofficial reporting error was quickly identified. It was more fully explained in a subsequent expert review by University of Michigan Computer Science & engineering Professor J. Alex Halderman: https://www.michigan.gov/documents/sos/Antrim_720623_7.pdf.

[31] At statewide scale, setting the risk limit at zero is often impractical and undermines the efficiency value of an RLA because of the large number of ballots that have to be counted. To review one county with a relatively smaller number of voters, however, this could be accomplished in one day.

[32] The full results are available here: https://www.michigan.gov/documents/sos/AntrimCounty_Presidential_Race_Full_Hand_Count_November2020_711027_7.pdf.

[33] One precinct (Star Township, precinct 1) accounted for a net gain of 5 votes for Biden and 6 votes for Trump, larger differences than were seen in other precincts. This may have been a result of human error in counting ballots.

jurisdictions to open ballot containers and review ballots demonstrates that clerks are transparent and open to having their elections reviewed. Between the RLA exercise and other audits, more than 1,300 of Michigan's 1,520 local clerks participated in at least one type of post-election audit.

The Bureau will explore additional methods of both ensuring 100 percent compliance or adjusting auditing methodologies to account for the small minority of clerks that did not participate. In the absence of a pandemic and the need for social distancing, it may be easier to enforce 100 percent participation at a county-by-county level. The complete hand count of all ballots in Antrim County provides additional confidence in the presidential election, even if the process is not easily replicable statewide; for Antrim County alone, a full hand count took a full day.[34]

Additional options that will be explored in future RLAs include:

- Sampling a larger number of ballots in initial rounds of ballot polling audits.
- Reevaluating ballot comparison or batch comparison methods that are more likely to result in a complete sample even if a small number of jurisdictions do not participate.
- Incorporating risk-limiting audits into other audit procedures or county canvass processes (the latter would require a legislative change), to allow ballots to be retrieved more efficiently when containers are already open and unsealed.
- Additional consequences for nonparticipation.

Ultimately, the RLA exercise provided strong evidence that the outcome of the presidential election was correct and that claims that tabulators did count ballots properly were without basis. If any widespread issues involving ballot tabulators existed (despite the extensive pre-election testing tabulators undergo), a random sample of 18,000 ballots would likely have differed significantly from the tabulated total, and it did not.

**Conclusion**

Election officials successfully conducted the November 2020 election, a remarkable achievement given the many challenges officials across the state faced in conducting the election. After the most extensive audits in state history, no evidence of intentional misconduct of fraud by election officials was discovered. Election officials should improve training and procedures to ensure better documentation of ballots received and tabulated, particularly in absent voter counting boards to reduce the number of precincts out of balance. Improvements in training, as well as use of the Qualified Voter File applications, requires a joint effort with local, county, and state officials, and will be a point of emphasis in training and application design for the Bureau of Elections in the current election cycle.

---

[34] Conducting a full hand recount or full hand count audit statewide would require thousands of staff members. The fee for requesting a statewide recount (more than 5,000 precincts) of the presidential or U.S. Senate elections would have exceeded $600,000. MCL 168.827(2).

Several statutory requirements hinder the ability of election officials to conduct elections efficiently and in a way that allows full documentation and review of election conduct, particularly with regard to absent voter ballots. Strict "recountability" requirements hinder the ability of out-of-balance precincts to be reviewed during recounts, and should be reconsidered. Elections would be run more efficiently and smoothly, with more opportunity to review, if clerks were given more time to tabulate absent voter ballots and boards of county canvassers were given more time to complete the canvass.

34

**Appendix: List of Jurisdictions and Precincts Audited (November 2020 Election)**

| COUNTY | JURISDICTION | PRECINCT | STATUS |
|---|---|---|---|
| ALCONA COUNTY | HAWES TOWNSHIP | 1 | Complete |
| ALGER COUNTY | MUNISING CITY | 1 | Complete |
| ALLEGAN COUNTY | LEIGHTON TOWNSHIP | 2 | Complete |
| ALLEGAN COUNTY | SALEM TOWNSHIP | 2 | Complete |
| ALLEGAN COUNTY | OTSEGO TOWNSHIP | 1 | Complete |
| ALPENA COUNTY | LONG RAPIDS TOWNSHIP | 1 | Complete |
| ANTRIM COUNTY | CUSTER TOWNSHIP | 1 | Complete |
| ANTRIM COUNTY | ALL JURISDICTIONS | All (Ballot Audit) | Complete |
| ARENAC COUNTY | ARENAC TOWNSHIP | 1 | Complete |
| BARAGA COUNTY | LANSE TOWNSHIP | 1 | Complete |
| BARRY COUNTY | CASTLETON TOWNSHIP | 1 | Complete |
| BARRY COUNTY | HASTINGS CITY | 3 | Complete |
| BARRY COUNTY | WOODLAND TOWNSHIP | 1 | Complete |
| BAY COUNTY | BAY CITY CITY | 4-1 | Complete |
| BAY COUNTY | MONITOR TOWNSHIP | 6 | Complete |
| BAY COUNTY | PINCONNING TOWNSHIP | 1 | Complete |
| BENZIE COUNTY | JOYFIELD TOWNSHIP | 1 | Complete |
| BERRIEN COUNTY | BENTON CHARTER TOWNSHIP | 1 | Complete |
| BERRIEN COUNTY | BRIDGMAN CITY | 1 | Complete |
| BERRIEN COUNTY | BUCHANAN CITY | 1 | Complete |
| BERRIEN COUNTY | PIPESTONE TOWNSHIP | 1 | Complete |
| BERRIEN COUNTY | ST JOSEPH CHARTER TOWNSHIP | 4 | Complete |
| BRANCH COUNTY | BRONSON TOWNSHIP | 1 | Complete |
| BRANCH COUNTY | CALIFORNIA TOWNSHIP | 1 | Complete |
| BRANCH COUNTY | COLDWATER CITY | 4-1 | Complete |
| CALHOUN COUNTY | BATTLE CREEK CITY | 4-8 | Complete |
| CALHOUN COUNTY | CLARENDON TOWNSHIP | 1 | Complete |
| CALHOUN COUNTY | BURLINGTON TOWNSHIP | 1 | Complete |
| CALHOUN COUNTY | EMMETT TOWNSHIP | 3 | Complete |
| CALHOUN COUNTY | MARSHALL CITY | 1 | Complete |
| CASS COUNTY | CALVIN TOWNSHIP | 1 | Complete |
| CASS COUNTY | DOWAGIAC CITY | 2 | Complete |
| CASS COUNTY | LA GRANGE TOWNSHIP | 1 | Complete |
| CHARLEVOIX COUNTY | EVANGELINE TOWNSHIP | 5 | Complete |
| CHEBOYGAN COUNTY | BEAUGRAND TOWNSHIP | 1 | Complete |

| | | | |
|---|---|---|---|
| CHEBOYGAN COUNTY | NUNDA TOWNSHIP | 1 | Complete |
| CHEBOYGAN COUNTY | WILMOT TOWNSHIP | 1 | Complete |
| CHIPPEWA COUNTY | RUDYARD TOWNSHIP | 1 | Complete |
| CLARE COUNTY | WINTERFIELD TOWNSHIP | 1 | Complete |
| CLINTON COUNTY | EAGLE TOWNSHIP | 1 | Complete |
| CLINTON COUNTY | GREENBUSH TOWNSHIP | 1 | Complete |
| CLINTON COUNTY | ST JOHNS CITY | 2 | Complete |
| CRAWFORD COUNTY | GRAYLING CITY | 1 | Complete |
| DELTA COUNTY | BRAMPTON TOWNSHIP | 1 | Complete |
| DELTA COUNTY | ESCANABA TOWNSHIP | 1 | Complete |
| DELTA COUNTY | FORD RIVER TOWNSHIP | 1 | Complete |
| DICKINSON COUNTY | BREITUNG TOWNSHIP | 1 | Complete |
| EATON COUNTY | CHARLOTTE CITY | 1-1 | Complete |
| EATON COUNTY | CHESTER TOWNSHIP | 1 | Complete |
| EATON COUNTY | DELTA CHARTER TOWNSHIP | 6 | Complete |
| EATON COUNTY | GRAND LEDGE CITY | 3 | Complete |
| EATON COUNTY | ROXAND TOWNSHIP | 1 | Complete |
| EMMET COUNTY | HARBOR SPRINGS CITY | 1 | Complete |
| EMMET COUNTY | PETOSKEY CITY | 1-1 | Complete |
| EMMET COUNTY | WEST TRAVERSE TOWNSHIP | 1 | Complete |
| GENESEE COUNTY | CLAYTON TOWNSHIP | 2 | Complete |
| GENESEE COUNTY | CLIO CITY | 1 | Complete |
| GENESEE COUNTY | DAVISON TOWNSHIP | 1 | Complete |
| GENESEE COUNTY | FENTON CITY | 5 | Complete |
| GENESEE COUNTY | FLINT CITY | 1-3 (State Precinct Audit) | Complete |
| GENESEE COUNTY | FLINT TOWNSHIP | 5 | Complete |
| GENESEE COUNTY | GAINES TOWNSHIP | 1 | Complete |
| GENESEE COUNTY | GENESEE TOWNSHIP | 6 | Complete |
| GENESEE COUNTY | GRAND BLANC TOWNSHIP | 6 | Complete |
| GENESEE COUNTY | MOUNT MORRIS TOWNSHIP | 9 | Complete |
| GENESEE COUNTY | THETFORD TOWNSHIP | 1 (State Precinct Audit) | Complete |
| GENESEE COUNTY | VIENNA TOWNSHIP | 4 | Complete |
| GLADWIN COUNTY | GRIM TOWNSHIP | 1 | Complete |
| GOGEBIC COUNTY | BESSEMER TOWNSHIP | 1 | Complete |
| GRAND TRAVERSE COUNTY | BLAIR TOWNSHIP | 3 | Complete |
| GRAND TRAVERSE COUNTY | GARFIELD TOWNSHIP | 4 | Complete |
| GRAND TRAVERSE COUNTY | GREEN LAKE TOWNSHIP | 1 | Complete |
| GRATIOT COUNTY | ARCADA TOWNSHIP | 1 | Complete |
| GRATIOT COUNTY | HAMILTON TOWNSHIP | 1 | Complete |

| | | | |
|---|---|---|---|
| GRATIOT COUNTY | NORTH STAR TOWNSHIP | 1 | Complete |
| HILLSDALE COUNTY | AMBOY TOWNSHIP | 1 | Complete |
| HILLSDALE COUNTY | LITCHFIELD TOWNSHIP | 1 | Complete |
| HILLSDALE COUNTY | READING CITY | 1 | Complete |
| HOUGHTON COUNTY | CALUMET TOWNSHIP | 9 | Complete |
| HOUGHTON COUNTY | HANCOCK CITY | 1 | Complete |
| HOUGHTON COUNTY | HANCOCK TOWNSHIP | 1 | Complete |
| HURON COUNTY | HURON TOWNSHIP | 1 | Complete |
| HURON COUNTY | SHERIDAN TOWNSHIP | 1 | Complete |
| HURON COUNTY | SHERMAN TOWNSHIP | 1 | Complete |
| INGHAM COUNTY | ALAIEDON TOWNSHIP | 1 | Complete |
| INGHAM COUNTY | AURELIUS TOWNSHIP | 1 | Complete |
| INGHAM COUNTY | DELHI CHARTER TOWNSHIP | 3 | Complete |
| INGHAM COUNTY | EAST LANSING CITY | 12 | Complete |
| INGHAM COUNTY | LANSING CITY | 4-33 | Complete |
| INGHAM COUNTY | LANSING TOWNSHIP | 2 | Complete |
| INGHAM COUNTY | LESLIE CITY | 1 | Complete |
| INGHAM COUNTY | MERIDIAN TOWNSHIP | 6 | Complete |
| INGHAM COUNTY | VEVAY TOWNSHIP | 1 | Complete |
| INGHAM COUNTY | WILLIAMSTON CITY | 1 | Complete |
| IONIA COUNTY | EASTON TOWNSHIP | 1 | Complete |
| IONIA COUNTY | KEENE TOWNSHIP | 1 | Complete |
| IONIA COUNTY | ODESSA TOWNSHIP | 1 | Complete |
| IOSCO COUNTY | TAWAS TOWNSHIP | 1 | Complete |
| IRON COUNTY | CRYSTAL FALLS CITY | 1 | Complete |
| ISABELLA COUNTY | BROOMFIELD TOWNSHIP | 1 | Complete |
| ISABELLA COUNTY | ROLLAND TOWNSHIP | 1 | Complete |
| ISABELLA COUNTY | UNION TOWNSHIP | 1 | Complete |
| JACKSON COUNTY | LEONI TOWNSHIP | 1 | Complete |
| JACKSON COUNTY | RIVES TOWNSHIP | 2 | Complete |
| JACKSON COUNTY | SANDSTONE TOWNSHIP | 3 | Complete |
| JACKSON COUNTY | SPRING ARBOR TOWNSHIP | 1 | Complete |
| JACKSON COUNTY | SUMMIT TOWNSHIP | 8 | Complete |
| KALAMAZOO COUNTY | BRADY TOWNSHIP | 2 | Complete |
| KALAMAZOO COUNTY | CHARLESTON TOWNSHIP | 1 | Complete |
| KALAMAZOO COUNTY | COOPER TOWNSHIP | 4 | Complete |
| KALAMAZOO COUNTY | GALESBURG CITY | 1 | Complete |
| KALAMAZOO COUNTY | KALAMAZOO CITY | 14 | Complete |
| KALAMAZOO COUNTY | OSHTEMO TOWNSHIP | 8 | Complete |
| KALAMAZOO COUNTY | PAVILION TOWNSHIP | 3 | Complete |

| KALAMAZOO COUNTY | PORTAGE CITY | 4 | Complete |
|---|---|---|---|
| KALAMAZOO COUNTY | RICHLAND TOWNSHIP | 3 | Complete |
| KALAMAZOO COUNTY | TEXAS TOWNSHIP | 4 | Complete |
| KALKASKA COUNTY | OLIVER TOWNSHIP | 1 | Complete |
| KENT COUNTY | BYRON TOWNSHIP | 1 | Complete |
| KENT COUNTY | CALEDONIA TOWNSHIP | 6 | Complete |
| KENT COUNTY | CANNON TOWNSHIP | 6 | Complete |
| KENT COUNTY | CASCADE TOWNSHIP | 10 | Complete |
| KENT COUNTY | EAST GRAND RAPIDS CITY | 3-5 | Complete |
| KENT COUNTY | GRAND RAPIDS CHARTER TOWNSHIP | 1 | Complete |
| KENT COUNTY | GRAND RAPIDS CITY | AVCB | Complete |
| KENT COUNTY | GRANDVILLE CITY | 5 | Complete |
| KENT COUNTY | OAKFIELD TOWNSHIP | 3 | Complete |
| KENT COUNTY | PLAINFIELD TOWNSHIP | 4 | Complete |
| KENT COUNTY | WYOMING CITY | 3-26 | Complete |
| KEWEENAW COUNTY | HOUGHTON TOWNSHIP | 1 | Complete |
| LAKE COUNTY | PEACOCK TOWNSHIP | 10 | Complete |
| LAKE COUNTY | YATES TOWNSHIP | 19 (State Precinct Audit) | Complete |
| LAPEER COUNTY | LAPEER CITY | 1-2 | Complete |
| LAPEER COUNTY | MAYFIELD TOWNSHIP | 2 | Complete |
| LAPEER COUNTY | NORTH BRANCH TOWNSHIP | 1 | Complete |
| LEELANAU COUNTY | SUTTONS BAY TOWNSHIP | 1 | Complete |
| LENAWEE COUNTY | ADRIAN CITY | 3 | Complete |
| LENAWEE COUNTY | BLISSFIELD TOWNSHIP | 1 | Complete |
| LENAWEE COUNTY | TECUMSEH CITY | 1-4 | Complete |
| LIVINGSTON COUNTY | BRIGHTON CHARTER TOWNSHIP | 3 | Complete |
| LIVINGSTON COUNTY | MARION TOWNSHIP | 2 | Complete |
| LIVINGSTON COUNTY | OCEOLA TOWNSHIP | 5 | Complete |
| LIVINGSTON COUNTY | PUTNAM TOWNSHIP | 3 | Complete |
| LIVINGSTON COUNTY | TYRONE TOWNSHIP | 2 | Complete |
| LUCE COUNTY | LAKEFIELD TOWNSHIP | 1 | Complete |
| MACKINAC COUNTY | HENDRICKS TOWNSHIP | 1 | Complete |
| MACOMB COUNTY | CENTER LINE CITY | 5 | Complete |
| MACOMB COUNTY | CHESTERFIELD TOWNSHIP | 7 | Complete |
| MACOMB COUNTY | CLINTON TOWNSHIP | 11 | Complete |
| MACOMB COUNTY | HARRISON TOWNSHIP | 2 | Complete |
| MACOMB COUNTY | MACOMB TOWNSHIP | 23 | Complete |
| MACOMB COUNTY | NEW BALTIMORE CITY | 5 | Complete |

| | | | |
|---|---|---|---|
| MACOMB COUNTY | ROSEVILLE CITY | 12 | Complete |
| MACOMB COUNTY | ST CLAIR SHORES CITY | 4 | Complete |
| MACOMB COUNTY | SHELBY CHARTER TOWNSHIP | 24 | Complete |
| MACOMB COUNTY | STERLING HEIGHTS CITY | 20 | Complete |
| MACOMB COUNTY | STERLING HEIGHTS CITY | AVCB | Complete |
| MANISTEE COUNTY | ONEKAMA TOWNSHIP | 1 | Complete |
| MARQUETTE COUNTY | MARQUETTE CITY | 1 | Complete |
| MARQUETTE COUNTY | REPUBLIC TOWNSHIP | 1 | Complete |
| MARQUETTE COUNTY | SANDS TOWNSHIP | 1 | Complete |
| MASON COUNTY | BRANCH TOWNSHIP | 1 | Complete |
| MASON COUNTY | RIVERTON TOWNSHIP | 1 | Complete |
| MASON COUNTY | VICTORY TOWNSHIP | 1 | Complete |
| MECOSTA COUNTY | MECOSTA TOWNSHIP | 1 | Complete |
| MENOMINEE COUNTY | HOLMES TOWNSHIP | 1 | Complete |
| MIDLAND COUNTY | HOPE TOWNSHIP | 1 | Complete |
| MIDLAND COUNTY | JEROME TOWNSHIP | 4 | Complete |
| MIDLAND COUNTY | LEE TOWNSHIP | 2 | Complete |
| MISSAUKEE COUNTY | MCBAIN CITY | 1 | Complete |
| MONROE COUNTY | BEDFORD TOWNSHIP | 1 | Complete |
| MONROE COUNTY | FRENCHTOWN TOWNSHIP | 1 | Complete |
| MONROE COUNTY | MILAN CITY | 1 | Complete |
| MONROE COUNTY | PETERSBURG CITY | 1 | Complete |
| MONROE COUNTY | RAISINVILLE TOWNSHIP | 1 | Complete |
| MONTCALM COUNTY | CRYSTAL TOWNSHIP | 1 | Complete |
| MONTCALM COUNTY | FAIRPLAIN TOWNSHIP | 1 | Complete |
| MONTCALM COUNTY | MONTCALM TOWNSHIP | 1 | Complete |
| MONTMORENCY COUNTY | ALBERT TOWNSHIP | 1 | Complete |
| MUSKEGON COUNTY | FRUITPORT TOWNSHIP | 1 | Complete |
| MUSKEGON COUNTY | MONTAGUE TOWNSHIP | 1 | Complete |
| MUSKEGON COUNTY | MUSKEGON TOWNSHIP | 4 | Complete |
| MUSKEGON COUNTY | NORTON SHORES CITY | 1-1 | Complete |
| MUSKEGON COUNTY | WHITEHALL TOWNSHIP | 1 | Complete |
| NEWAYGO COUNTY | BIG PRAIRIE TOWNSHIP | 1 | Complete |
| NEWAYGO COUNTY | CROTON TOWNSHIP | 1 | Complete |
| NEWAYGO COUNTY | GRANT TOWNSHIP | 1 | Complete |
| OAKLAND COUNTY | BLOOMFIELD TOWNSHIP | 8 | Complete |
| OAKLAND COUNTY | CLAWSON CITY | 1 | Complete |
| OAKLAND COUNTY | FARMINGTON HILLS CITY | 20 | Complete |
| OAKLAND COUNTY | FERNDALE CITY | 4 | Complete |

| OAKLAND COUNTY | NOVI CITY | 2 | Complete |
|---|---|---|---|
| OAKLAND COUNTY | OAKLAND CHARTER TOWNSHIP | 3 | Complete |
| OAKLAND COUNTY | OAK PARK CITY | 15 | Complete |
| OAKLAND COUNTY | OXFORD TOWNSHIP | 2 | Complete |
| OAKLAND COUNTY | PONTIAC CITY | 5-13 | Complete |
| OAKLAND COUNTY | TROY CITY | 5 | Complete |
| OCEANA COUNTY | WEARE TOWNSHIP | 1 | Complete |
| OGEMAW COUNTY | LOGAN TOWNSHIP | 1 | Complete |
| ONTONAGON COUNTY | HAIGHT TOWNSHIP | 1 | Complete |
| OSCEOLA COUNTY | BURDELL TOWNSHIP | 1 | Complete |
| OSCODA COUNTY | ELMER TOWNSHIP | 1 | Complete |
| OTSEGO COUNTY | HAYES TOWNSHIP | 1 | Complete |
| OTTAWA COUNTY | ALLENDALE TOWNSHIP | 4 | Complete |
| OTTAWA COUNTY | CROCKERY TOWNSHIP | 1 | Complete |
| OTTAWA COUNTY | FERRYSBURG CITY | 1 | Complete |
| OTTAWA COUNTY | GEORGETOWN TOWNSHIP | 3 | Complete |
| OTTAWA COUNTY | GRAND HAVEN TOWNSHIP | 4 | Complete |
| OTTAWA COUNTY | HOLLAND CITY | 4-10 | Complete |
| OTTAWA COUNTY | HOLLAND TOWNSHIP | 11 | Complete |
| OTTAWA COUNTY | HUDSONVILLE CITY | 3-1 | Complete |
| OTTAWA COUNTY | PARK TOWNSHIP | 6 | Complete |
| OTTAWA COUNTY | TALLMADGE TOWNSHIP | 3 | Complete |
| PRESQUE ISLE COUNTY | BEARINGER TOWNSHIP | 1 | Complete |
| ROSCOMMON COUNTY | NESTER TOWNSHIP | 1 | Complete |
| SAGINAW COUNTY | BIRCH RUN TOWNSHIP | 2 | Complete |
| SAGINAW COUNTY | FRANKENMUTH TOWNSHIP | 1 | Complete |
| SAGINAW COUNTY | JAMES TOWNSHIP | 1 | Complete |
| SAGINAW COUNTY | RICHLAND TOWNSHIP | 1 | Complete |
| SAGINAW COUNTY | SAGINAW CITY | 10 | Complete |
| ST CLAIR COUNTY | BURTCHVILLE TOWNSHIP | 3 | Complete |
| ST CLAIR COUNTY | FORT GRATIOT TOWNSHIP | 2 | Complete |
| ST CLAIR COUNTY | GREENWOOD TOWNSHIP | 1 | Complete |
| ST CLAIR COUNTY | KENOCKEE TOWNSHIP | 1 | Complete |
| ST CLAIR COUNTY | ST CLAIR CITY | 2 | Complete |
| ST JOSEPH COUNTY | COLON TOWNSHIP | 1 | Complete |
| ST JOSEPH COUNTY | MENDON TOWNSHIP | 1 | Complete |
| ST JOSEPH COUNTY | STURGIS CITY | 1 | Complete |
| SANILAC COUNTY | DELAWARE TOWNSHIP | 1 | Complete |
| SANILAC COUNTY | LEXINGTON TOWNSHIP | 1 | Complete |

| | | | |
|---|---|---|---|
| SANILAC COUNTY | WASHINGTON TOWNSHIP | 1 | Complete |
| SCHOOLCRAFT COUNTY | GERMFASK TOWNSHIP | 1 | Complete |
| SHIAWASSEE COUNTY | DURAND CITY | 1 | Complete |
| SHIAWASSEE COUNTY | NEW HAVEN TOWNSHIP | 1 | Complete |
| SHIAWASSEE COUNTY | PERRY TOWNSHIP | 2 | Complete |
| SHIAWASSEE COUNTY | VERNON TOWNSHIP | 1 (State Precinct Audit) | Complete |
| TUSCOLA COUNTY | AKRON TOWNSHIP | 1 | Complete |
| TUSCOLA COUNTY | VASSAR TOWNSHIP | 1 | Complete |
| TUSCOLA COUNTY | WISNER TOWNSHIP | 1 | Complete |
| VAN BUREN COUNTY | ANTWERP TOWNSHIP | 3 | Complete |
| VAN BUREN COUNTY | PAW PAW TOWNSHIP | 1 | Complete |
| VAN BUREN COUNTY | SOUTH HAVEN TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | ANN ARBOR CITY | 2-8 | Complete |
| WASHTENAW COUNTY | LYNDON TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | MANCHESTER TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | NORTHFIELD TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | PITTSFIELD CHARTER TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | SCIO TOWNSHIP | 8 | Complete |
| WASHTENAW COUNTY | SUPERIOR TOWNSHIP | 5 | Complete |
| WASHTENAW COUNTY | YORK TOWNSHIP | 1 | Complete |
| WASHTENAW COUNTY | YPSILANTI CITY | 1-3 | Complete |
| WASHTENAW COUNTY | YPSILANTI TOWNSHIP | 1 | Complete |
| WAYNE COUNTY | CANTON TOWNSHIP | 10 | Complete |
| WAYNE COUNTY | DEARBORN CITY | 43 | Complete |
| WAYNE COUNTY | DETROIT CITY | 3-177 | Complete |
| WAYNE COUNTY | DETROIT CITY | AVCB | Complete |
| WAYNE COUNTY | GROSSE POINTE FARMS CITY | 3 | Complete |
| WAYNE COUNTY | GROSSE POINTE PARK CITY | 7 | Complete |
| WAYNE COUNTY | LINCOLN PARK CITY | 6 | Complete |
| WAYNE COUNTY | LIVONIA CITY | AVCB | Complete |
| WAYNE COUNTY | MELVINDALE CITY | 3 | Complete |
| WAYNE COUNTY | NORTHVILLE TOWNSHIP | 6 | Complete |
| WAYNE COUNTY | PLYMOUTH TOWNSHIP | 6 | Complete |
| WAYNE COUNTY | REDFORD TOWNSHIP | 19 (State Precinct Audit) | Complete |
| WAYNE COUNTY | ROMULUS | 11 | Complete |
| WEXFORD COUNTY | CADILLAC CITY | 3 | Complete |
| WEXFORD COUNTY | CHERRY GROVE TOWNSHIP | 1 | Complete |
| WEXFORD COUNTY | LIBERTY TOWNSHIP | 1 | Complete |
| STATEWIDE | STATEWIDE | RISK-LIMITING AUDIT | Complete |