1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF COLORADO

2

3    KEVIN O'ROURKE, NATHANIEL L.   .  Case No. 20-cv-03747-NRN
     CARTER, LORI CUTUNILLI,        .
4    LARRY D. COOK, ALVIN           .
     CRISWELL, KESHA CRENSHAW,      .
5    NEIL YARBROUGH, and AMIE       .
     TRAPP, on their own behalf     .
6    and of a class of similarly    .
     situated persons,             .
7                                   .
              Plaintiffs,           .
8                                   .
     vs.                            .
9                                   .
     DOMINION VOTING SYSTEMS,       .
10   INC., a Delaware               .
     corporation, FACEBOOK,         .
11   INC., a Delaware               .
     corporation, CENTER FOR        .
12   TECH AND CIVIC LIFE, an        .  United States District Court
     Illinois non-profit           .  1929 Stout Street
13   corporation, MARK E.           .  Denver, CO  80294
     ZUCKERBERG, Individually,      .
14   PRISCILLA CHAN,                .
     Individually, BRIAN KEMP,      .
15   Individually, BRAD             .
     RAFFENSPERGER, Individually,   .
16   GRETCHEN WHITMER,              .
     Individually, JOCELYN          .
17   BENSON, Individually, TOM      .
     WOLF, Individually, KATHY      .
18   BROCKVAR, Individually,        .
     TONY EVERS, Individually,      .
19   ANN S. JACOBS, Individually,   .
     MARK L. THOMSEN,               .
20   Individually, MARGE            .
     BOSTELMAN, Individually,       .
21   JULIE M. GLANCEY,              .
     Individually, DEAN KNUDSON,    .
22   Individually, ROBERT F.        .
     SPINDELL, JR., Individually,   .
23   and DOES 1-10,000,             .
                                    .
24            Defendants.           .
                                    .  July 16, 2021
25   . . . . . . . . . . . . . . .  .  10:43 a.m.

```
 1              TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
                N. REID NEUREITER, UNITED STATES MAGISTRATE JUDGE
 2
        APPEARANCES:
 3
        For the Plaintiff:              Ernest J. Walker Law Offices
 4                                      By:  Ernest J. Walker*
                                        3368 Riverside Road
 5                                      Benton Harbor, MI  49022
                                        (303) 995-4835
 6
        For the Plaintiff:              Gary D. Fielder Law Offices
 7                                      By:  Gary D. Fielder
                                        2325 West 72nd Avenue
 8                                      Denver, CO  80221
                                        (303) 650-1505
 9
        For the Defendant, Dominion     Brownstein Hyatt Farber
10      Voting Systems, Inc.:             Schreck, LLP
                                        By:  Stanley L. Garnett
11                                      By:  David Meschke
                                        By:  Bridget C. DuPey
12                                      410 17th Street
                                        Suite 2200
13                                      Denver, CO  80202
                                        (303) 223-1100
14
        For Defendant, Facebook,        Gibson Dunn & Crutcher, LLP
15      Inc.:                           By:  Joshua S. Lipshutz*
                                        1050 Connecticut Avenue N.W.
16                                      Third Floor
                                        Washington, DC  20036
17                                      (202) 955-8217

18      For the Center for Tech and     Kaplan Hecker & Fink, LLP
        Civic Life:                     By:  Joshua A. Matz*
19                                      By:  Marcella E. Coburn*
                                        By:  Michael Skocpol*
20                                      350 Fifth Avenue, Suite 7110
                                        New York, NY  10118
21                                      (646) 761-3270

22      For Defendant Gretchen          Michigan Attorney General
        Whitmer and Jocelyn Benson:     By:  Heather S. Meingast*
23                                      P. O. Box 30736
                                        Lansing, MI  48909
24                                      (517) 335-7659

25
```

```
 1   Appearances continued:

 2   For Defendant Tom Wolf          Pennsylvania Attorney General
     and Kathleen Boockvar:          By:  Jacob B. Boyer*
 3                                   1600 Arch Street
                                     Suite 300
 4                                   Philadelphia, PA  19103
                                     (267) 768-3968
 5
     Also Present:                   Mike Frontera
 6
     Court Recorder:                 Clerk's Office
 7                                   U.S. District Court
                                     1929 Stout Street
 8                                   Denver, CO  80294

 9   Transcription Service:          AB Litigation Services
                                     216 16th Street, Suite 600
10                                   Denver, CO  80202
                                     (303) 296-0017
11
     *Appearance via video/telephone.
12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1                  (Time noted:  10:43 a.m.)

 2            THE COURT CLERK:  All rise.  Court is in session.

 3            THE COURT:  Good morning.  You may be seated.

 4            This is Magistrate Judge Reid Neureiter from the

 5  Rogers Courthouse in downtown Denver.

 6            I'm calling the case of Kevin O'Rourke versus

 7  Dominion Voting Systems, 20-cv-03747.

 8            Before I do that, though, I do want to remind

 9  everybody, because we have people dialing in both remotely by

10  phone listening in, we have people on video, and we have

11  people live here in the courtroom.

12            Under Local Rule 83.1 and the General Order of the

13  Court, there should be no tape recording or videotaping of

14  these proceedings.

15            The transcript will be made available to anybody

16  who asks, and pays the court reporter who gets the tape of

17  these proceedings, but there should be no taping.  That's an

18  order of the Court, and it is subject to contempt if we find

19  out that somebody has violated that order.

20            So we've made it available for the public to call

21  in and listen in, and for lawyers to participate remotely via

22  video tele-conference, but there should be no taping.

23            With that, appearances for the Plaintiff, please.

24            MR. FIELDER:  Thank you very much, Your Honor.

25  Gary Fielder.  And on the Zoom call is Ernie Walker.
```

1              THE COURT:  Okay.  And what -- just so that

2    everybody -- go ahead and, number one, you don't have to

3    stand, in part because -- but I appreciate you doing that.

4    But you don't have to.  But just make sure you're speaking

5    into the microphone.

6              MR. FIELDER:  Yes, Your Honor.

7              THE COURT:  And when folks make their formal

8    presentations, I'll ask you to go to the podium and speak

9    into the microphone, because I want to make sure that

10   everybody on the phone and on VTC is able to hear us.

11             So your colleague appearing by video is Mr.?

12             MR. FIELDER:  Ernest Walker.

13             THE COURT:  And, Mr. Walker, can you hear us?

14             MR. WALKER:  Yes, Your Honor, I can hear you.

15             THE COURT:  Okay, good.

16             MR. WALKER:  Thank you.

17             THE COURT:  All right.  For the Defendant Dominion

18   Voting Systems?

19             MR. GARNETT:  Good morning, Your Honor.  Stan

20   Garnett, Dave Meschke, and Bridget DuPey, appearing on behalf

21   of Dominion Voting Systems.

22             And we also have present in court with us Mike

23   Frontera, who is the executive vice-president and general

24   counsel with Dominion Voting Systems.

25             THE COURT:  Okay.  Thank you, Mr. Garnett.

1                   For Facebook, Inc.?

2                   MR. LIPSHUTZ:  Good morning, Your Honor.  Joshua

3    Lipshutz from Gibson Dunn, appearing for Facebook by video.

4                   THE COURT:  All right.  Anybody else for Facebook?

5                   MR. LIPSHUTZ:  No, Your Honor.

6                   THE COURT:  All right.  For the Center for Tech

7    and Civic Life?

8                   MR. MATZ:  Your Honor, this is Joshua Matz from

9    Kaplan Hecker & Fink.  I'm joined by my associates, Michael

10   Skocpol and Marcy Coburn.

11                  THE COURT:  All right, thank you.  Mr. Zuckerberg

12   and Ms. Chan were not served.

13                  Representing Brian Kemp and Brad Raffensperger?

14   These are the folks from Georgia.  Anybody on the line?

15        (No response)

16                  THE COURT:  No one.  Okay.  Folks from Michigan?

17                  MS. MEINGAST:  Good afternoon, Your Honor.  This

18   is Heather Meingast, Assistant Attorney General from

19   Michigan, on behalf of Governor Whitmer and Secretary Benson.

20                  THE COURT:  Okay.  Anybody from Wisconsin on the

21   line?

22        (No response)

23                  THE COURT:  No.  And then from the Commonwealth of

24   Pennsylvania?

25                  MR. BOYER:  Good morning, Your Honor.  This is

1   Jacob Boyer from the Pennsylvania Office of the Attorney

2   General, appearing on behalf of Governor Wolf and former

3   Secretary Boockvar.

4           THE COURT:  Okay.  Mr. Boyer, you're a little

5   faint, so I'll ask you to just -- when you -- if there comes

6   a time for you to speak, just talk a little louder.  Okay?

7           MR. BOYER:  Certainly, Your Honor.

8           THE COURT:  Thank you.  Okay.  So we are here on

9   docket number 98, motion by Dominion for sanctions, docket

10  number 101, motion by Kathleen Boockvar and Tom Wolf,

11  Governor and former Secretary of State of the State of

12  Pennsylvania for sanctions, docket number 102, CTCL's motions

13  for sanctions, docket number 103, Facebook's motion for

14  sanctions, and docket number 109, Jocelyn Benson and Gretchen

15  Whitmer, officials of the State of Michigan, for sanctions.

16          The Plaintiffs filed responses, and replies were

17  also filed.

18          I had also issued a minute order a couple of days

19  ago, outlining some of the questions as I reviewed the

20  briefing that I had for the parties.  I trust everybody

21  received that order and is prepared to discuss some of those

22  issues.

23          And I have read the briefs.  And so what I think

24  makes the most sense in terms of proceeding, is rather than

25  have the Defendants go through their arguments on the five

 1  separate motions, I think it makes the most sense,

 2  Plaintiffs' counsel, if you went ahead and articulated your

 3  position, taking the opportunity to answer some of the

 4  questions that I have, starting with the first one that I had

 5  listed, which is:  The appropriate legal standard for

 6  reasonable pre-filing inquiry, and whether reliance on press

 7  media reports or factual allegations made in other lawsuits,

 8  most of those lawsuits having been dismissed, was enough to

 9  satisfy the requirement of a reasonable pre-filing factual

10  inquiry.

11          And in responding to that question, I would ask

12  you to enlighten me, because I didn't see it in the briefs or

13  an affidavit, other than reading media reports and other

14  lawsuits, did you or your co-counsel actually conduct any

15  investigation?  Did you speak to, when you attached an

16  affidavit by an expert or reference an affidavit by an expert

17  in the complaint, did you talk to those experts?

18          Did you analyze any of the information that, you

19  know, pick up the phone, call them, ask difficult questions?

20          So that's one of the -- so I'd like to know about

21  the standard for reasonable pre-filing inquiry, and I'd like

22  to know what you actually did.

23          So please go to the podium.

24          MR. FIELDER:  Yes.

25          THE COURT:  And as you all remember from prior

1    hearings, I tend to interrupt a lot and ask questions.

2           So after you get through that, feel free to

3    proceed with your argument.  And I'm likely to have -- be

4    prompted with more questions as we go ahead.

5           MR. FIELDER:  And, Your Honor, I don't want to

6    duplicate the process, but there are two attorneys, myself

7    and Mr. Walker, and the request is to sanction both of us.

8           So I don't want to say something that is not

9    something that Mr. Walker would agree to, so I would ask that

10   we both have at least some opportunity to address the Court,

11   generally speaking.

12          THE COURT:  Absolutely.  And just so everybody

13   knows, in terms of timing, we're limited by the hunger pains

14   that will hit me at probably 1:00 o'clock.  And if we need to

15   go further than that, we'll take a short lunch break and then

16   we can keep going, because I've got nothing else scheduled

17   today.

18          And I don't want to impose additional costs

19   unnecessarily, but I want to make sure everybody -- this is a

20   serious matter, it's serious for your professional

21   reputations, it's serious in terms of the amount of money the

22   Defendants have had to spend to defend the case, and so I

23   want to make sure everybody has a fair opportunity to say

24   their piece.

25          MR. FIELDER:  Yes.  And thank you very much.

1           Your Honor, I'll just go first.

2           And let me just give you just a brief background

3   about myself.

4           I did graduate from the University of Texas at

5   Austin in 1987, and I majored in government and minored in

6   history.  So I've been following presidential politics my

7   whole adult life.

8           I passed the bar the first time in 1990.  I

9   started in the District Attorney's Office of Adams County,

10  and after about 18 months I've been in private practice.

11          And having tried over 400 jury trials, 2 of which

12  in the District of Colorado, I've developed a keen sense of

13  reason and connecting the dots.

14          Of course, before the election, I was following it

15  closely.  And then after the election, I couldn't help but

16  follow what was happening.

17          And reading the cases that had been filed before

18  the election, and then leading the cases afterward.

19          And, no, I didn't speak to any of the experts, but

20  I reached out and I tried to email people and get a hold of

21  them.  But no one ever really responded.

22          However, when I'm going through the process of

23  approximately November 15th up to December 22nd, that there

24  were a number of different cases filed.  And most of them had

25  affidavits attached.

1              So it just wasn't the experts, and it certainly

2     wasn't media reports.  Sometimes in the initial complaint I

3     tried to give a quick reference as to where something might

4     be found.

5              But in today's internet world, I was able to

6     really highly focus without having to make a lot of movement.

7     I could find the source documents, I could research who the

8     individuals were, I could read the complaints about the

9     individuals, so on and so forth.

10             And there did appear to be some factual anomalies

11    that had even happened on the night and the morning of the

12    election as I watched it myself.

13             And, you know, the swing states of Georgia,

14    Pennsylvania, Michigan, Wisconsin, they all seemed to stop

15    counting at the same time.  And a lot of the expert witnesses

16    were talking about anomalies which took place in those early

17    morning hours during which this counting was allegedly

18    stopped, and that caused concern.

19             Now, as I was reviewing the cases, I was keeping

20    up with all of the cases.  And I've never spoke to Sidney

21    Powell, I've never spoke to Lynn Wood.  I'm not a part of

22    their club or their group, or anything like that.  And I

23    approached the case completely different because I was

24    obviously concerned about what was happening.

25             So I've had no part in trying to convince a

1  District Court to intervene in the election, to try to get a

2  state to send certain representatives to Washington as the

3  electors.  I didn't vote for Donald Trump.  I'm not a Trump

4  supporter.  I'm not a part of a Q-movement or conspiracy

5  theory.

6           I was reading all of these complaints, which were

7  filed by reputable lawyers, some of whose reputations have

8  been probably rightfully sullied over the last six or seven

9  months participating in rallies and obviously partisan

10 attempts.

11          But I wasn't really focused on them, although they

12 were lawyers and they did outline many different parts, it

13 really did appear that Mark Zuckerberg and his wife had put

14 in hundreds of millions of dollars, maybe over $300 million

15 through the Center for Technology and Civic Life, which I

16 refer to as CTCL, that it really was true.

17          It really was true because I could look at the

18 contracts that I found between CTCL and certain

19 municipalities all over the country that as part of the

20 grant, if you will, part of the safety of trying to do the

21 right thing, I think CTCL said at the motion to dismiss was

22 the placement of ballot boxes.

23          And so it was clear that that was a dangerous

24 situation which has foreseeable consequences, all of which

25 have seemed to have panned out over the last six or seven

1   months.

2            THE COURT:  Well, so you say all of which have

3   panned out over the last six or seven months, dangerous

4   consequences.

5            Now, at the same time that you're seeing in these

6   reports and lawsuits making all of these allegations, there

7   are other people, including, you know, the -- not only

8   William Barr, but the election coordinating counsel, saying

9   that this was the most secure, and there's no evidence of

10  fraud.

11           So in light of maybe media reports and lawsuits

12  suggesting there's something fishy about the election, and

13  high government officials and organizations saying, you know,

14  somebody may be saying there's something fishy about the

15  election, but there wasn't, and the American people should

16  have confidence in it.

17           Shouldn't that have been a red light for you, or

18  at least a flashing yellow light, that hey, before I make

19  these allegations -- before I cut and paste from these other

20  lawsuits and these media reports, in a Federal lawsuit class

21  action on behalf of 160 million registered voters seeking

22  $160 billion dollars in damages, shouldn't I actually talk to

23  a human being and try and verify whether this is true or not?

24           Wouldn't that be, in light of the circumstances,

25  the seriousness of the allegations, isn't that the obligation

1   on a lawyer before you file a lawsuit, not just to rely on

2   other things, but do some investigation on your own?

3   Something other than sitting by your computer and going

4   through the media reports.

5           MR. FIELDER:  Thank you.  Many of the reports were

6   under oath.  So, for example, Joel Oldman, he lives in

7   Colorado, I've never talked to Mr. Oldman, but he signed

8   several affidavits under oath and spoke about it publicly

9   about his interactions with a Dominion executive that

10  expressed some bias toward then President Trump.  So.

11          THE COURT:  But there are crazy people out there.

12  I mean, somebody could put under oath the Earth is flat.

13  That doesn't mean that you as a lawyer say "well, I'm going

14  to file a lawsuit suggesting the Earth is flat because

15  somebody somewhere else wrote about it under oath."

16          MR. FIELDER:  I understand.  I'm just advising the

17  Court that I was reviewing all of these affidavits, which

18  were under oath.  It wasn't just someone saying on a media

19  report or on a talk show or something like that.

20          These were affidavits.  And these affidavits were

21  filed in other Federal Court cases.

22          THE COURT:  And people are being sanctioned for

23  filing those other lawsuits -- those other affidavits.

24          MR. FIELDER:  Well, that's the distinction that

25  I've held on to throughout the case, because I'm reading all

1   of this and I'm thinking "well, the people really don't have

2   standing, even voters don't have standing, to come to a

3   Federal Court and ask for this extraordinary relief."  It's

4   not redressable.  There's no District Court or Circuit Court,

5   or even the Supreme Court, that's going to tell a sovereign

6   state what to do.

7          But the standard of -- and, of course, I wouldn't

8   have endorsed these experts without talking to them,

9   retaining them, you know, as a part of the process, as a part

10  of the disclosure process, and the like.

11         I think my standard was a reasonable investigation

12  to determine whether or not the allegations were, in my own

13  mind, probable, but plausible being the legal standard,

14  because there were some great concerns that were outlined.

15         My focus was a little different.  My focus and my

16  investigation was on the voters.  Those were the people that

17  I spoke to.  Voters, and their damage, and what they were

18  sensing, and their confidence.

19         So, and I know that if I mention another lawyer's

20  name it might cause some reaction.  But I just use these as

21  examples because you can't research this without coming

22  across -- Matt Deprino, he's a lawyer in Michigan.  His case,

23  one client, asking under Michigan law for an audit.  And he

24  lost that case.  The Judge said "no, there's already been an

25  audit."

1          But you can read all of the expert affidavits, and

2    you'll realize there was a substantial likelihood, at least

3    in my mind, and certainly in the research that I was actively

4    doing with regard to the minds of the voters, that the voting

5    machines, not just Dominion Voting Systems, but other voting

6    machines were hacked.

7          THE COURT:  So let me --

8          MR. FIELDER:  They were vulnerable to hack.

9          THE COURT:  Let me ask you this question about --

10   you were focused on the voters, the Plaintiffs, and their

11   sense of what had happened.

12         People have senses about lots of things.  And many

13   people have been influenced by the out going office holder

14   saying that the election was stolen, and they sincerely

15   believe everything that is stated by the out going office

16   holder.

17         And so of course they're going to feel and think

18   and have genuine emotions about this.  But as a lawyer, what

19   -- I mean, I read all of the affidavits in the original

20   complaint.  The eight that were attached.  And none of them

21   had any -- not one iota of personal knowledge of anything.

22   They were reading the same press reports that you and I and

23   everybody saw that generated 30,000 people going to

24   Washington, DC, on January 6th.

25         But they have no personal knowledge whatsoever.

1    Instead, they feel this general sense of being aggrieved by

2    the outcome of the election because their candidate lost, and

3    the candidate says "the election was stolen from me."

4            How does that a Federal lawsuit make?  The fact

5    that these people felt aggrieved somehow.  I recognize and

6    appreciate that there are probably millions of people in

7    America who feel aggrieved, but that doesn't mean that I, as

8    a lawyer, sworn to -- you know, as an officer of the Court,

9    can go up and round up these people and bring a lawsuit.

10           That is troubling to me that that's what you were

11   focused on.

12           MR. FIELDER:  Well, it wasn't just their feelings.

13   It was the evidence.  It was the affidavits.  It was the

14   experts that were coming out in these other cases where maybe

15   the request for relief was not granted.  Maybe they were moot

16   after the Electoral College.  A lot of cases were dismissed

17   because of mootness.

18           You know, there were attorneys and parties trying

19   to essentially stop the course of the Constitution.  So it

20   wasn't just that they felt aggrieved.  After every election

21   people feel aggrieved, and they feel like maybe something

22   happened.

23           But it seemed like from reviewing all of the

24   evidence that was readily accessible, and these affidavits,

25   that there was substance to it.  That there was a real issue

1  with regard to whether or not the tabulations were correct,

2  whether or not the chain of custody with these ballot boxes,

3  which were unprecedented in American history.

4          THE COURT:  So I'm not sure I got an answer to my

5  prior question, though.  In light of undisputed published

6  reports, and some lawsuits with attached affidavits saying

7  that there were problems with the election, and then high

8  government officials, including Attorney General Barr, saying

9  there's no basis for thinking this election was thrown, no

10 basis for believing there was fraud, most secure election in

11 the history of the United States.

12         In light of that, why did you accept one of those

13 and file your lawsuit, rather than doing more individualized

14 research and talking to somebody, hiring some experts to

15 confirm it, as opposed to just relying on one side of this?

16 Why didn't you view that as a big caution flag that "hey, the

17 Attorney General of the United States, loyal to the out going

18 President, says there is nothing there, maybe I ought to

19 think twice before starting a massive lawsuit against

20 enormous corporations and government officials in four

21 states?"

22         MR. FIELDER:  I appreciate that, but I dispute the

23 findings of the United States Cybersecurity and

24 Infrastructure Security Agency.  And I disagreed with then

25 U.S. Attorney Barr's statements that there was no evidence of

1    fraud.

2              When I said before that a lot of information is

3    coming out just last month, a U.S. Attorney from the Eastern

4    District of Pennsylvania just recently published a letter

5    that he had written on June 9th, William McSwain indicating

6    that he had received a lot of complaints and he was told to

7    not follow up on them.

8              So I think that William Barr was placed in a very

9    difficult situation where it was going to look like he was

10   just being a partisan if he looked into the allegations of

11   fraud, which were plentiful.

12             So as an officer of the Court, I looked at it.

13   That's when I started with my ability to reason and look at

14   this.  It just seemed to me that it was pretty obvious, and

15   that the media, Facebook, was sensoring this information.

16   Why didn't we just have a open dialogue about it?

17             And other lawyers were choosing different paths in

18   a partisan way.  Rudy Guiliani is going on a tour around the

19   states.  I didn't go on a tour around the states.

20             I filed a lawsuit so that we could get to the

21   bottom of it, because I am an officer of the Court, and I was

22   convinced.

23             Now, it wasn't totally about me.  My clients are

24   very smart people, too, and they were being affected by

25   Facebook.  Many of them were being banned.

1          THE COURT:  Well, let me ask you about that,

2     because at the suggestion of defense counsel I did look at

3     your website, DominionClassAction.com, and in there is a

4     video where you essentially say this was a lawsuit generated

5     by you.  It was not client generated.  You thought of the

6     idea, and then you went out and you collected the affidavits.

7          Is that correct?  I'm asking you whether that's

8     the origin of the lawsuit, whether it was your idea or

9     whether this was generated by the eight named Plaintiffs.

10          MR. FIELDER:  Well, it was certainly my idea,

11     because I just saw it happening.  But I was talking to people

12     that were concerned about it, and so people come to me and

13     they ask "well, what should we do?"  Well, you know, one

14     option is to file a Federal lawsuit civil rights case.  It

15     should be a class action.  This is affecting everybody.

16          So, you know, I'm -- the people looked to me to

17     come up with legal answers.  You know, you could read a

18     report about what a complaint said or what a lawyer said, but

19     then I'm the one that had the ability to go and actually read

20     these lengthy motions, affidavits.  People looked to me, you

21     know, for those types of answers.

22          But this wasn't just my brain child that I just

23     came up with.  This was all based upon what was transpiring,

24     and no one seemed to be filing it in a proper way.  So I just

25     tried to stay in honor, Your Honor.  I tried to be respectful

1  and on time, and not to get extensions, and try to be

2  professional to counsel.  I never made any disparaging

3  remarks or anything like that.

4          But I, along with my clients, and as -- again, I

5  have powers of reasoning.  I just knew that I was somewhat

6  responsible to at least make a website.  I never publicized

7  that it was on mainstream television or pumped it up through

8  YouTube.  You just have to be able to make these public

9  statements, and then I knew, because everybody was upset

10 about the election that people would respond.

11         But just by getting someone's affidavit, and the

12 Plaintiffs were required to submit under oath affidavits, I

13 would review them, we checked the notary, we checked the

14 person, their ID to see if they're really registered.

15         So we really spent a lot of time focused on the

16 damage.

17         And one of the competitions, and you can even see

18 it in the motions for sanctions, I think CTCL said something

19 like I didn't file it until December 22nd.  Well, I mean,

20 maybe you're right, Your Honor.  Maybe I should have filed it

21 next year when it was all clear.

22         But to me, it was important to file it early to

23 establish a standing so that we could get into it.  And we

24 would be into it now, but I understand Your Honor's order.  I

25 understand it.

1          I'm just saying that I did it in good faith.  I

2   wasn't trying to make money.  I haven't profited on this at

3   all.  I did what you said, and looked into the contributions

4   and all of that.  Mr. Walker and I have not profited by this.

5          THE COURT:  Just to pin that down.  How many

6   people have contributed to your request for funding, and how

7   much money has it generated?

8          MR. FIELDER:  Approximately 2,100 people.  We have

9   a precise number, but approximately 2,100 people.  And we've

10  raised approximately $95,000.00, of which we still have

11  $7,000.00, all of which was spent on expenses and paralegals

12  and office space, and other expenses, Your Honor.

13         THE COURT:  Okay.  Thank you.

14         MR. FIELDER:  So there were other entities raising

15  millions and millions of dollars.  But I wasn't out there

16  trying to do that or profit.

17         Part of it really was I saw the anger of the

18  people.  I saw the potential for an insurrection.  And it

19  happened, even after we filed the complaint.  It happened.

20  We're mitigating our damages.  We're peaceful people.  We

21  wanted to come to the Court and resolve it in a peaceful way

22  and still be always peaceful.

23         But then what happened on January 6th was exactly

24  what we predicted in the complaint, that when you have an

25  election that was sort of a perfect storm, you had a

1  pandemic, you had rule changes, you had all of this

2  unprecedented private money flooding in to the actual

3  municipalities, you had ballot boxes.  Maybe they were there

4  for safety, but they were used in such a way that -- again,

5  the information is coming out that there's a lack of chain of

6  custody.

7           If you were going to stuff the ballot box, well,

8  you do it through these ballot boxes that were placed all

9  over the place in these only certain areas.

10          So everyone from across the country was rightfully

11  upset at the process and the censorship and the interaction

12  of billionaires into a government function of electoral

13  process.

14          And it wasn't the down ballot.  It could be in

15  every state, but I've stressed this:  We only have this one

16  election nationally.  Even the U.S. Senators and Congress

17  people, persons, are elected by each individual states.

18          But for this one election every four years, we had

19  this national right.  Now, the state doesn't even have to

20  give the registered voters the right, but they all have it.

21  All 50 states.

22          THE COURT:  So let me interrupt you for a second,

23  because I think we're getting a little off track.

24          MR. FIELDER:  Yes.  Okay.

25          THE COURT:  You've answered my question about what

1    reasonable pre-filing inquiry you did.  You didn't talk to

2    anybody.  You sent emails, nobody responded, so you were

3    relying exclusively on media reports, affidavits, and public

4    reports in other lawsuits.  Is that correct?

5             MR. FIELDER:  I don't know about exclusively.  I

6    was relying on my own experience, my own research.  I've been

7    researching these voting machines for years and years.

8             I brought a lot to the table.  Mr. Walker brings a

9    lot to the table in terms of his knowledge.

10             But in terms of the facts that we -- that could

11   easily be confirmed, that this money was really being spent,

12   I researched the contracts themselves between Dominion and

13   the different municipalities and the states.  All of that was

14   available.

15             I researched the -- I attached one of the many

16   plans in Fresno.  That was sort of a common thing that

17   Dominion would outline a plan with the municipalities, and

18   they really ran the election.

19             So I listened to hours and hours of these sort of

20   quasi-public hearings.  I was just interested in the

21   information.  And all of it confirmed what was not just

22   plausible, but to me and my clients highly probable and

23   foreseeable.

24             THE COURT:  All right.  Let me stop you for a

25   second.

1           MR. FIELDER:  Okay.

2           THE COURT:  So just looking at your complaint, you

3    cite the ASOG report in your complaint, and you quote it:

4    "Dominion Voting Systems is intentionally and purposefully

5    designed with inherent errors to create systemic fraud and

6    influence election results.  The system intentionally

7    generates an enormously high number of ballot errors."

8           Now, on what basis do you, as a lawyer, have to

9    confirm that Dominion Voting Systems intentionally did

10   anything to change -- you quote it in your complaint.  What

11   did you do to verify that that was a true statement?

12          MR. FIELDER:  Well, that statement is made by a

13   group.  I think the spokesman of which is Russell Ramslin.

14   So I watched all of his interviews.  You could just see his

15   interviews.  I watched hours of interviews on other shows and

16   listened to him, and researched his background.

17          And then knowing what I knew about these voting

18   machines for years and years, and I had watched documentaries

19   that were even on HBO about the vulnerability, and read

20   letters that were written from U.S. Senators to Dominion.

21          THE COURT:  Okay.  Vulnerability is different from

22   an allegation that a company intentionally and purposefully

23   created systemic fraud to influence election results.  That's

24   a huge allegation.

25          MR. FIELDER:  Right.

1          THE COURT:  You copied it, cut it and pasted it,

2     into --

3          FEMALE:  It is.

4          THE COURT:  Ms. Libid, can we mute the public

5     phone line?

6          THE COURT CLERK:  Yes.  It is muted.

7          THE COURT:  Okay.  All right.  I'm asking what

8     good faith basis you have for believing that anything about

9     Dominion's intent or purpose.  Vulnerability is one thing,

10    but you put in your complaint that they created systemic

11    fraud intended to influence election results, and that they

12    had that in mind when they designed the system.

13         That's a huge allegation.  I'm curious.  Other

14    than this ASOG report, if you did anything to verify that

15    before you put it in your complaint.

16         MR. FIELDER:  Well, by listening to the testimony

17    which was being given in some official hearings, including I

18    think the president of Dominion, that was an issue as to

19    whether or not the equipment was connected to the internet.

20         And there was, to this very day, statements by

21    Dominion that their equipment is not connected to the

22    internet.

23         But I dispute that.

24         THE COURT:  Okay.  That's different from whether

25    somebody intentionally designed a system to intentionally

1   generate enormously high number of ballot errors,

2   intentionally and purposefully designed inherent errors to

3   create systemic fraud.

4           Would you agree that being connected to the

5   internet is something different from intentionally designed

6   to create systemic fraud and influence election results?

7           MR. FIELDER:  Well, that was just one element of

8   it.  And I know that Mr. Walker can speak in greater detail

9   with regard to some of the hardware and software, which has

10  ultimately been located in these voting systems, which were

11  placed in there.  Placed in there, and Dominion took

12  responsibility for the cybersecurity.

13          So if they had these portals and they are

14  connected to the internet, well, they must have known that.

15  They must have known that.

16          And, again, I'm trying to be respectful, Your

17  Honor, but I don't have any faith in Dominion Voting Systems.

18  That's one statement out of a report that I put in the

19  complaint, and they can admit or deny it.  But it's based

20  upon my good faith belief, based upon expert -- not just

21  testimony, but they looked at the instruments in Antrim

22  County.  They did their forensic analysis.

23          THE COURT:  And you saw the report from the

24  Michigan Senate Oversight Committee?  I saw in your reply

25  that you don't put any credence in that.

1            But the bipartisan Michigan Senate Oversight

2   Committee, chaired by a Republican, saying the allegations

3   regarding -- I mean, I don't have the exact quote, but just

4   the allegations are not founded in truth.  They are false,

5   fraudulent, and they discourage people from believing

6   anything was done wrong in Antrim County because -- you know,

7   I put it in my order, but it seemed -- but you dispute the

8   conclusions of the Michigan Oversight Committee, as well.

9            MR. FIELDER:  Yes, Your Honor.

10            THE COURT:  It doesn't give you pause?

11            MR. FIELDER:  No.

12            THE COURT:  In light of the things that have come

13   out, like the Michigan Oversight Committee, Rudy Guiliani

14   being held in losing his law license, would you file the same

15   complaint today with all of these same allegations?

16            MR. FIELDER:  Absolutely.  Absolutely.  And I

17   would have had more evidence.  But it was all foreseeable.

18   It was just all so foreseeable that ultimately there was

19   going to be a close election.  Ultimately there was going to

20   be a populous candidate that people wanted to get rid of.

21            I'm not a Trump supporter, but that's just a fact

22   of history that there was a populous candidate, and many

23   people wanted to get rid of him.

24            So the voting machines were likely -- likely.

25   That's to a preponderance, hacked by foreign entities.  And

1   whether they knew about it or didn't, --

2           THE COURT:  Which foreign entities, out of

3   curiosity, who hacked them?

4           MR. FIELDER:  Well, the information now is coming

5   out that China was involved in the interaction, that

6   individuals from Italy, that a lot of the adjudicated votes,

7   because if you have a high error rate the computer kicks it

8   into an adjudication process that -- and this is all part of

9   the Runslin reports and other -- I know just mentioning Mike

10  Lindell's name, I've never talked to Mr. Lindell, but I can

11  read all of his complaints and read all of his expert reports

12  that this information was sent out of the country,

13  adjudicated out of the country, and sent back into the

14  country.

15          Those are serious allegations, but they are made

16  by serious people that have Ph.D.s and are all committed to

17  disclosing the truth.

18          And relying on a government report or a Senate

19  report, when there's a real political desire to just put the

20  election behind us and move on.  Never tried to --

21          THE COURT:  Let me -- just to follow up on the due

22  diligence question, let me ask.  Also in your complaint,

23  paragraph 44, you cite the Declaration of Doctor Navid

24  Keshavaresnea (ph), and you quoted again his conclusion with

25  high confidence that the election 2020 data were altered in

 1   all battleground states, resulting in hundreds of thousands

 2   of votes that were cast for President Trump to be transferred

 3   to Vice-President Biden.

 4           What did you do to verify either that affiant's

 5   bona fides or the truth of that affidavit before you included

 6   it in your complaint?

 7           MR. FIELDER:  He testified in -- I think it was --

 8   and, again, I'm not trying to support Rudy Guiliani.  I can

 9   talk about that.

10           But I listened to his testimony, and I read his

11   reports, and they were attached to other complaints.  It

12   wasn't just his report floating out there.

13           THE COURT:  It was in the King v. Whitmer case.

14           MR. FIELDER:  Right.

15           THE COURT:  Where the lawyers were just facing

16   sanctions hearings.

17           What did you do, other than reading his affidavit

18   in the other lawsuit, and listening to his testimony, what

19   did you do to verify that this guy isn't a charlatan?  Did

20   you -- again, did you do any research?  Did you confer with

21   any other experts?  "Hey, is this guy just making this up, or

22   is this true?"  Or did you just take it at face value and

23   include it in the complaint?

24           MR. FIELDER:  Well, I mean, a little bit at face

25   value because I did include it in the complaint.  But I filed

 1   it on December 26th -- excuse me, 22nd.  I was just amassing

 2   all of this data, and it all seemed to be connected.  I was

 3   just connecting dots, and I put it in the complaint to

 4   establish what I was looking at.  I wasn't trying to hide

 5   anything.  I put it in there.

 6            But then I put in another report, and another

 7   report, and another report.  And I cited --

 8            THE COURT:  And including President Trump's Tweet

 9   that was repeated on the One American News Network that 22

10   million votes were shifted from me to President Biden, or

11   something to that effect.

12            Why did you include that?

13            MR. FIELDER:  He was the President of the United

14   States at the time.  I mean, whether you disagree with him or

15   just don't like him or love him, it doesn't really matter.

16   He was the President.

17            THE COURT:  So you're parroting what the guy who

18   lost the -- now seems to have lost the election was saying

19   about you wanted to retain.  Did you do anything to verify

20   that?

21            MR. FIELDER:  It seemed to be connecting all of

22   the other dots that were out there, that there was hacking,

23   that these systems were vulnerable to hacking, and that they

24   were hacked, and that through the adjudication process and

25   other means, which are now coming to light with regard to

1  getting ballots in to the system so that the ballot numbers

2  match the votes, all of this is coming out.

3           THE COURT:  Did it ever occur to you that you

4  might be being used, wittingly or unwittingly, as a

5  propaganda tool for the ex-President to file this lawsuit and

6  repeat his statements, and other people who are repeating

7  statements in his favor?  Did that ever occur to you that

8  possibly I'm just repeating stuff that the President is lying

9  about?

10          MR. FIELDER:  Of course it occurred to me.  I

11 tried to analyze it.  I looked at it.  I was engrossed in it

12 at all times.

13          And that's when I just tried to stay in honor.  I

14 never tried to over-publicize myself or grand stand in any

15 way.  I never tried to come to Court -- and I never sued a

16 government.  I never sued a government entity or a person in

17 their official capacity.

18          THE COURT:  But you sued the governors of four

19 states.  The election officials of certain states.  And the

20 secretaries of state of every state.

21          Just saying that you're suing them in their

22 individual capacity and not their official capacity doesn't

23 mean that you didn't sue government officials for work that

24 they did while they were working for the state.

25          MR. FIELDER:  Right.

1        THE COURT:  And you want injunctions to keep them

2   from doing it in the future.  How is that not suing

3   government officials?

4        MR. FIELDER:  Because I wasn't suing the State of

5   Georgia or trying to stop the state from doing anything.

6   When I'm reviewing a case, a civil case or a criminal case,

7   the issue is who is responsible.  If there's this kind of

8   activity going on, they had to know, or should have known,

9   that a billionaire was pumping millions and millions of

10  dollars through CTCL in their state.  They had to know,

11  either through their own signature or through the cooperation

12  of their political subdivisions, that a company out of

13  Denver, Colorado, was now essentially running all or a good

14  portion or some of their elections.

15        They had to know that.  They were responsible for

16  that.

17        Now, even if their certifications are set aside,

18  it doesn't change anything.  The Electoral College has been

19  convened, and President Biden has been selected by the

20  Electoral College.

21        However, if the facts are true, then those

22  individuals are the responsible party.  And if they are the

23  responsible party, they weren't acting as the governor.  They

24  were acting in their individual capacity.

25        THE COURT:  So let me -- I think I've asked you,

1   and I think you've answered, the factual due diligence you

2   did before filing this suit.  I want to give your co-counsel

3   -- and I'm not going to turn it over to defense counsel yet.

4           I'm going to ask your co-counsel if he had

5   anything to say about the factual investigation that he did.

6           But then I want to ask you the next question as

7   sort of the follow-up, which is the legal standard.

8           MR. FIELDER:  Yes.

9           THE COURT:  Why you feel that the factual

10  investigation that you did was sufficient to constitute the

11  reasonable pre-suit inquiry that's required under Rule 11 and

12  the other sanctions.

13          So let's hear from Mr. Walker.

14          MR. WALKER:  Yes, Your Honor.

15          THE COURT:  So, Mr. Walker, you've heard the

16  questions I've directed to your co-counsel.  I want to give

17  you the opportunity to say whether you did any -- other than

18  looking at media reports and affidavits and allegations in

19  other lawsuits, whether you did any reasonable factual

20  inquiry such as by actually contacting or hiring an expert,

21  or talking to any of these people to verify the bona fides of

22  the affiants in these other lawsuits.

23          MR. WALKER:  I did notspeak with any of the

24  affiants personally.

25          However, I did do considerable investigation

1    myself.  I started with the contracts between the states and

2    Dominion.  And if anybody cares to read those contracts,

3    they'll see that the environment of Dominion was extensive,

4    and covered essentially the entire administration of the

5    election, and specifically the cybersecurity and security

6    aspects of it.

7           And so my purpose in those responsibilities, it

8    was easy to see who was ultimately responsible for these

9    activities.

10          So then by reviewing the totality of the

11   affidavits that were filed, it was easy, as Mr. Fielder said,

12   to connect the dots.

13          And at this stage, we are still even at the

14   beginning stage of this case.  We haven't even gotten into

15   discovery.  Some of the statements that we have raised by

16   government officials and so forth, none of that has been made

17   under oath.  Nobody has been subjected to cross-examination

18   yet.  That is all stuff that was planning to come out.

19          So Mr. Fielder and myself amassed considerable

20   evidence to support our claims, although Mr. Fielder and I

21   agree that it's probable.  And so we believe we had a

22   righteous case to go forward.

23          And I've done considerable research myself into

24   the inner workings of Dominion's issues and how they work.

25          THE COURT:  Let me interrupt you, Mr. Walker, and

1  ask you the same question I asked your co-counsel.

2          You put this in your complaint, "Dominion Voting

3  Systems is intentionally and purposefully designed with

4  inherent errors to create systemic fraud in the influence of

5  election results, you quoted the ASOG report, and you put

6  that in.

7          What investigation, if any, did you do to justify

8  saying that Dominion Voting System intentionally and

9  purposefully designs errors to create systemic fraud?

10          MR. WALKER:  I reviewed the inner workings of the

11  Dominion machines and the information that was available on

12  multiple sources on how the machines working, including

13  direct video -- not testimony, but presentations by Dominion

14  employees to municipalities about how the machines work, and

15  concluded that the totality of the circumstances agreed with

16  the conclusion that was reached by that expert that said that

17  only an intentional corpus could have concluded that these

18  vulnerabilities in place was a purposeful intent to allow

19  these machines to be vulnerable.

20          And so the external resource, in addition to the

21  research that that expert continued to parse out for

22  conclusion and references to the evidence that it alludes to,

23  and other experts.  I mean, we've had multiple experts and

24  Dominion staff all parroting the same message.  It's pretty

25  easy to agree, certainly to a level of probability, that

1   Dominion intentionally set up their machines to be

2   vulnerable.

3            A prosecutor alleges intent, he's got evidence

4   that doesn't necessarily prove it right then and there.  But

5   we have evidence, and I think once we go through the

6   discovery process and are able to subject certainly --

7   subject them to cross-examination, we will have even further

8   evidence to support or claims and our allegations.

9            But, again, we're at the pleading stage.  And so

10  our allegation is that yes they intentionally set up their

11  machines to be vulnerable, because that's the only logical

12  reason for them leaving all of the vulnerabilities in place

13  for the election.

14            THE COURT:  Mr. Walker, would you file the same

15  complaint today?

16            MR. WALKER:  Yes.

17            THE COURT:  All right.  Is there anything else

18  you'd like to add?  You've answered my question about whether

19  you actually spoke to anybody or -- other than reading

20  reports and affidavits.

21            Anything else you'd like to add in terms of the

22  reasonable pre-filing investigation that you did?

23            MR. WALKER:  I don't know that I've got anything

24  to add, other than I think that we're entitled to rely on

25  statements that are under oath.  That's evidence that had

1  been submitted to court, and we're entitled to rely on it

2  just like anybody else would.

3          THE COURT:  Okay.  So that is a good segway back

4  to Mr. Fielder, unless you want to field this one, Mr.

5  Walker, on the legal standard for the reasonable pre-filing

6  investigation.

7          I've tried to pin this down, and the cases seem to

8  say under the circumstances.  So it seems to be case specific

9  what's appropriate.  If it's a TRO where you've got to get in

10 the next day, you can -- you're limited in your pre-filing

11 investigation.  I think there's a Supreme Court or Federal

12 Circuit case that says if you're filing a patent dispute in

13 patent litigation, somebody was sanctions because they didn't

14 have a good faith basis and they just relied on the

15 representations of their client.  He was an inventor, there

16 was an infringement.

17         And the Court said "no, you've got to go out and

18 hire an actual expert and show that before you file a lawsuit

19 that you've confirmed that these allegations have some basis

20 in fact."

21         So help me understand the legal structure within

22 whether it's Rule 11 or the other authorities on which the

23 Defendants rely, and why your pre-suit investigation met that

24 standard.

25         MR. FIELDER:  Thank you, Your Honor.  Well, as it

1   was all happening, I was realizing -- and Mr. Walker and I

2   were in consultation constantly about it, what was happening

3   in terms of the parties, the Plaintiffs that were filing the

4   different lawsuits, and we weren't in disagreement or

5   agreement.  We were just observing.

6          And I know I've said this before, but it was

7   obvious.  It was just one hundred percent obvious that the

8   parties in these other lawsuits were suing individuals in

9   their official capacity because they had to.  If you sue the

10  State of Georgia --

11         THE COURT:  So that's not my question.  I want to

12  know the standard for imposing sanctions, and the

13  reasonableness -- the legal standard for how do I assess

14  whether -- what you and Mr. Walker just described you did

15  before filing this lawsuit, whether that constitutes a

16  reasonable pre-suit investigation.

17         If there are any cases you can direct me to, or

18  actual articulation of the standard.

19         MR. FIELDER:  Well, in terms of the standard, I'm

20  just relying on the Rule itself in terms of a reasonable

21  inquiry.

22         And I was just describing our thought process as

23  we were going through, because if the facts were true, and it

24  certainly seemed to be plausible, if not probable, then

25  really the voters have been damaged.

1          If you have a system where it's not really about

2    vote dilution, but if a vote is worthless you could go down

3    and vote and your vote is counted, but really it's sort of a

4    pre-determined outcome, well then you have no voting.  There

5    is no vote.

6          And it was important when this unprecedented

7    private involvement with a presidential election took place,

8    that those responsible, the private entities, be held

9    responsible.

10          THE COURT:  I hear you.  What I'm actually asking

11    for is if you can direct me to -- and if you can't, that's

12    fine, but if you can direct me to any case that says this

13    lawsuit was brought, you know, so-and-so sued Six Flags

14    because they read in the newspaper that the ride potentially

15    injured people, and they found a plaintiff who said that they

16    were injured on this ride, and they were relying on the

17    newspaper report.

18          Case was dismissed, defendant moved for sanctions.

19    Court says "no, it was reasonable to rely on those reports.

20    They weren't required to do additional."

21          That's what I'm looking for, is some guidance,

22    some precedent, saying that your pre-suit investigation

23    doesn't justify sanctions.

24          And if there isn't a case, then there isn't a

25    case, and I'll just look at the Rule.  Maybe defense counsel

1   has some.  But that's what I'm really looking for, whether

2   you have any precedent to direct me to.

3           MR. FIELDER:  And, I'm sorry, Your Honor, I'm a

4   little nervous.  But it is in my response to, I believe the

5   CTCL motion for sanctions, a Tenth Circuit case involving a

6   group of bail bondsmen down in New Mexico that had sued

7   essentially the government.  And it was about the passage of

8   a law which was going to affect their business.

9           And it was pretty clear that those associations

10  and sort of bonding companies could not stand up for the

11  rights of third parties; that it had to be an actual person

12  hurt.

13          And sure enough at the bottom of the decision, the

14  Court indicated that one of the actual -- I'll just use the

15  word criminal, because I think that was the word.  It was in

16  reference to a person that had been charged criminally.

17          Well, she had standing, but her claim was lost in

18  the mirage of all of these other sort of frivolous and

19  sanctionable -- and the sanctions were supported in that case

20  because there was a Supreme Court case right on point that

21  you can't stand up for the Constitutional rights of third

22  parties, particularly if you're just motivated by your own

23  profit margin.

24          But it was interesting to note that the actual

25  individual, the person who actually had to post bond, or

1   whatever the case may have been, had standing.  But that was

2   an interesting fact.

3            And so in that regard, I don't know of a case that

4   really hits on this particular point.  But we certainly did

5   do a lot of legal research to determine what rights, if any,

6   were affected by these -- by the conduct of these remaining

7   Defendants.

8            And could I just make one caveat, Your Honor?

9            THE COURT:  Yes.

10           MR. FIELDER:  We did dismiss the State, you know,

11  the State officials, even though we sued them in their

12  individual capacity.  We did dismiss them.

13           And I'm quite positive Mr. Walker would agree.

14  When you asked would we re-file it, we would re-file it

15  without their inclusion, of course, because we now know that

16  they object to personal jurisdiction and they don't want to

17  come here.  And they never really responded in their

18  individual capacity as it were.

19           But I would not re-file against them.  It would

20  just be against --

21           THE COURT:  Well, but let's jump to that point.

22  Why shouldn't you be required to pay the fees of the lawyers

23  for the State officials who had to file motions to dismiss?

24           As far as I could tell, there's no justification

25  whatsoever.  There is no case cited anywhere where someone in

1  Colorado could sue the Governor of Pennsylvania, or could sue

2  the Governor of Michigan, for something that those Governors

3  did to affect the election in Michigan or Pennsylvania, and

4  sue them in Colorado.  It's like personal jurisdiction 101.

5  There's no way that was going to work.

6          And they had to file motions to dismiss.  You

7  didn't dismiss when they called you up and said "we shouldn't

8  be in this lawsuit."  You served them, they had to respond.

9          Why shouldn't sanction be awarded for that?  Why

10  wasn't that just a downright frivolous effort on your part?

11          And I recognize that you dismissed it eventually,

12  but -- before I issued my order, but you did include it in

13  the amended complaint, strangely, although you said, when I

14  asked you at oral argument "are you still suing those

15  officials?" and you said "no, they are not in the amended

16  complaint."

17          But why shouldn't sanctions be awarded for forcing

18  the tax payers of those states, four states:  Michigan,

19  Georgia, Pennsylvania, to respond to what's clearly a

20  pointless lawsuit, to sue their government officials in

21  Colorado?

22          MR. FIELDER:  Well, I've mentioned this before.

23  But when we were looking at the cases, it seemed like they

24  were responsible.  And they knew, or should have known, that

25  a company out of Colorado was involved in their state's

1  election process.  They knew, or should have known, that

2  Dominion Voting Systems --

3          THE COURT:  But that's not personal jurisdiction.

4  So you sue them in their home state.

5          Assuming this theory is at all viable, you sue

6  them in their home state.  Why should the Governor of

7  Pennsylvania have to come and answer in a Federal Court in

8  Colorado for -- he never came here.  He or -- he never did

9  anything in Colorado.  His action was only in Pennsylvania.

10         So I don't know if he came to the All Star game or

11 something, but he's not here in Colorado.  Why would you

12 think that there's any possibility that there could be

13 personal jurisdiction over the Governors or Secretaries of

14 State, or election officials, of other states?

15         MR. FIELDER:  Because they took an oath to the

16 Constitution, which is the United States Constitution.  Their

17 negligence, if you will, affected everybody in the country.

18 They must have known that the certification of their

19 elections that that was going to have a national impact, and

20 that it affected everyone.

21         So through their --

22         THE COURT:  Can you cite me any case in American

23 judicial history where a citizen of Colorado has sued a

24 Governor of another state, not in that person's -- not in the

25 Governor's state, but in their own home state, and forced

1   them to answer to a lawsuit?

2              I'm not talking about a car wreck, but for

3   something that was done while they were Governor.  And you

4   say it wasn't in their official capacity.  These were actions

5   of the Governor and the Secretary of State when they

6   certified the votes, when they -- you know, allowed ballots

7   to be placed.

8              That's what you're complaining about.  You're not

9   complaining about a car wreck.  You're complaining about

10  things that were done as Governor, as Secretary of State, as

11  election officials.  I think Wisconsin was the other state.

12             Any case in American history where some lawsuit

13  like that has been allowed?

14             MR. FIELDER:  I can't think of one.  However, our

15  allegations were that by engaging in this un-Constitutional

16  conduct, they stepped out of their office and that they were

17  not -- they were acting under color of official authority,

18  that a Governor would not act un-Constitutionally, and by

19  acting in that manner, they affected everybody in the

20  country.

21             And they obviously knew that a company in Colorado

22  was either controlling all or a portion of the elections that

23  they were responsible for.

24             THE COURT:  And that justifies suing them in

25  Colorado rather than their own home state?

1              MR. FIELDER:  Well, when they filed the motions,

2    we researched it, we looked into it, we could not feel with

3    certainty that we could establish personal jurisdiction.

4              THE COURT:  Why did it take a motion for you to

5    research that?  If I'm a lawyer here in Colorado and I'm

6    thinking of suing the Governor of Alaska for something, I

7    pretty much ought to research that before I ever file the

8    lawsuit.  Don't you think?

9              MR. FIELDER:  Well, if his conduct was affecting

10   people in Colorado, and there was business relationships

11   between Alaska or its subdivisions with corporations in

12   Colorado, that were all affecting a substantial right, then

13   that might subject that Governor to jurisdiction in another

14   state.

15             This is an unprecedented situation.  It's

16   unprecedented, Your Honor.

17             THE COURT:  You then filed a motion to strike the

18   appearance of the Attorney Generals of the various states,

19   claiming that they couldn't represent their respective

20   Governors, Secretaries of State, and election officials.

21             Now, I stepped in and denied that *sua sponte.*

22             But what was the -- has there ever been a

23   situation that you're aware of where a sitting Governor or

24   Secretary of State couldn't be represented by their Attorney

25   General in the defense of a lawsuit where they are claimed to

1  have acted un-Constitutionally?

2          MR. FIELDER:  The substance of the motion to

3  strike was because the entries of appearance were

4  specifically with regard to those individuals in their

5  official capacity.  And so that was really the substance of

6  the motions to strike, that we hadn't sued them in their

7  official capacity.

8          And so we were just reading their own entries and

9  their own motions that they were filing on behalf of the

10  Governor or Secretary of State, not on behalf of them

11  individually.

12          So that's why we filed the motion, and we outlined

13  it in the motion precisely why we did that.

14          THE COURT:  And you didn't answer my question.  Is

15  there any case anywhere where a court has ever said "sorry,

16  the Attorney General's Office of a particular state is not

17  allowed to represent a Governor or a Secretary of State who

18  has been sued for un-Constitutional conduct?"

19          MR. FIELDER:  I'm not aware of any case, but this

20  is an unprecedented situation.  And had they entered their

21  appearance for the person in their individual capacity, then

22  I would have said "yeah, they can represent that person in

23  their individual capacity."

24          But they didn't enter their appearance in that

25  regard, and they didn't file motions in that regard.  I mean,

1    we were tempted to concede the motions.  Yeah, we haven't

2    filed any claims against the Governor or these individuals in

3    their official capacity, which would essentially mean the

4    states that they were representing.

5           And part of Mr. O'Rourke's affidavit was that when

6    we are a person, we're just this one person, and another

7    person is violating our rights, well then that person steps

8    out of their official capacity and they are no longer

9    protected by their office.

10          So we were commenting on who the Attorneys General

11   actually entered their appearance on behalf of, which was in

12   a different capacity, and who they were filing motions on

13   behalf of, which you would expect to be protective of their

14   Governor or Secretary of State.  But we didn't sue them in

15   that capacity.

16          THE COURT:  Okay.  Mr. Fielder, we've been going

17   about an hour, and we've -- and really the main focus,

18   although we touched on the personal jurisdiction issue, the

19   main focus has been the pre-suit factual investigation and

20   the legal standard for whether that was sufficient.

21          I think it might make sense now for me to hear

22   from the Defendants in response to that.

23          But I want to make it clear that I'm cutting you

24   off, but it's only temporary.

25          MR. FIELDER:  I understand.

1          THE COURT:  I want to make sure you're able to say

2    your piece on the other issues.

3          So, Mr. Garnett, I assume you're going to go

4    first?

5          MR. GARNETT:  I'm happy to go in whatever order

6    the Court would like.

7          THE COURT:  Yes.

8          MR. GARNETT:  Thank you.  Your Honor, again, Stan

9    Garnett on behalf of Dominion Voting Systems.

10          And I want to get right to the question, one that

11    you asked in the minute order.

12          But given the nature of the argument from

13    Plaintiffs' counsel, there's a few other things I want to

14    quickly note before we get there, because I think it will put

15    in context the issues that the Court has to decide in

16    connection with this pre-filing inquiry issue.

17          First of all, Your Honor, I have to tell you that

18    it concerns me greatly that after all that this has gone

19    through here, and elsewhere in the country, that we continue

20    to hear the same -- and this is a strong word, and I

21    apologize if it's too strong, but I think it's appropriate,

22    nonsense about the election and about my client Dominion

23    Voting Systems.

24          Dominion Voting Systems is an excellent company.

25    A Colorado company.  It has roughly 250 employees, and

1  they've been providing the highest quality service for

2  elections across the country for a long time.

3         And to have to be in these cases, and I know about

4  this, Your Honor, because Mr. Meschke and Ms. DuPey and I are

5  coordinating the defense of Dominion in other states across

6  the country, and we hear the same thing in these cases.  And

7  all of the cases end up in the same situation:  Dismissal,

8  and then what is the Court going to do with sanctions.

9         It is very troubling because it's simply not true.

10  Dominion did a terrific job in this election, has done

11  terrific jobs for jurisdictions across the country for a long

12  period of time, and they are an excellent company that takes

13  very seriously its obligation to provide excellent voting

14  services.

15         THE COURT:  So let me -- I mean, I appreciate the

16  difficult position your client is in, because lawsuits are

17  filed procedurally and properly.  They include all of these

18  allegations suggesting your client is somehow malicious or

19  incompetent, and then the case is dismissed on procedural

20  grounds.

21         And then counsel can get up and say "well, nobody

22  has ever -- no court has ever said that these are not true."

23  Instead, it was dismissed on procedure.

24         How do you suggest, without having an evidentiary

25  hearing and hearing from your client, and, you know, deciding

1  whether this ASOG report, I mean, it's difficult for me on a

2  hearing for sanctions where we don't have any evidentiary

3  presentation to definitively say one way or another whether

4  your client is good or malicious, as these allegations

5  suggest.

6          So what's the solution to that, other than just

7  allowing you to make your statement and then letting the

8  people decide?

9          MR. GARNETT:  Well, no, Your Honor, it's a

10  critical question, and it's important, because I know that

11  we've got a hundred or so members of the public listening in

12  to the hearing today, and these are issues of great public

13  import.

14          And I think a couple of different things are

15  critical.

16          First of all, Dominion has taken a comprehensive

17  legal strategy to approaching these issues.  And as the Court

18  probably knows from press reports, there have been defamation

19  and libel cases filed in other jurisdictions on behalf of

20  Dominion, cases that will eventually work their way through

21  the court system, and will result in a definitive binding

22  resolution of the veracity of the factual allegations.

23          In other words, the case against Sydney Powell,

24  the case against Fox News, et cetera, which are in various

25  courts across the country, in the District of Columbia,

1   Delaware, and New York, will do exactly what the Court just

2   suggested, because Dominion is the Plaintiff and Dominion

3   will have the opportunity to establish the falsity of those

4   allegations.

5           But I think what's particularly important here is

6   to focus on the issues that arose between Dominion and these

7   parties, and that were the basis for the Court's ruling.

8           The primary issue that we raised from the very

9   beginning of this case, Your Honor, was the concern about

10  justiciability, and particularly standing.

11          And we went out of our way to talk to Mr. Walker

12  and Mr. Fielder from the very beginning.  And, of course, our

13  Rule 11 letter is dated February 3rd, which is pretty early

14  in this process, to talk about the problems with standing.

15          And let me talk about that for a minute, Your

16  Honor, because I think it puts in context the Court asked,

17  and of course, observers of these proceedings will have.

18          One of the wonderful things about the United

19  States is that for all of our problems, polls continually

20  show that Americans have a lot of confidence in the court

21  system.  They see the court system as capable of coming in

22  and resolving issues that should be resolved, and doing it in

23  a way that is fair, even when an observer doesn't agree with

24  a particular solution or decision of a court.

25          And that is especially true, Your Honor, about the

1  Federal Courts.  And, in fact, the polling shows that our

2  system is in a much higher regard in the United States and in

3  many other democracies across the world, and we should be

4  very proud of that.

5          Part of that is because our courts have always

6  been very careful and very clear that issues that are brought

7  to them need to be issues that are supported by a cogent

8  legal theory, as required under Rule 11(a) and (b), and by

9  evidence.

10         And you can't just dump on the court a vast amount

11 of unrelated allegations or conspiracies or various

12 possibilities that might have happened.  Dump that in a

13 courtroom and expect a court to sort it out and come up with

14 a comprehensive resolution of what particular person on the

15 internet was telling the truth, what some affidavit from an

16 expert was true or not, unless those issues are tied to

17 something that a court and should under the Constitution

18 resolve.

19         And that's why, Your Honor, from the very

20 beginning of this case, our primary focus with the Plaintiffs

21 was to say "you don't have standing to raise these issues."

22         And there are people, of course, who somehow think

23 standing is not an important consideration, or not a

24 substantive consideration.  But I think it's a point I made

25 at the motion to dismiss hearing back in April.

1          In fact, standing is so fundamental that it goes

2    to the question of why it is that a case continues in the

3    courts and can be resolved.

4          And, again, one of the reasons that our courts are

5    held in high regard by the American people, particularly the

6    Federal Courts, is because the American public understands

7    that the courts hear what they should hear, and they base it

8    on evidence and on the law.

9          And that's an essential component of what this

10   Court has had to wrestle with from the very beginning, and

11   why from our first letter and attempted conversations with

12   Mr. Walker and Mr. Fielder, we were gently, at least

13   initially, trying to say "how can you possibly bring this

14   case," which as an experienced lawyer, I suggested a first

15   year law student who has had civil procedure can't read the

16   complaint in this case and seriously believe -- either

17   complaint, that this case belongs in the court system.

18         And that is, Your Honor, why it is very

19   appropriate at this time that the Court be having a hearing

20   to determine whether Rule 11 sanctions are appropriate.  Not

21   to make Dominion whole, or any other Defendant whole, but to

22   discourage this kind of litigation.

23         And because the Courts have no way of resolving

24   these issues the way this was presented, it's not an issue

25   that could be -- the Court could issue a meaningful

1  determination on, and it's not an issue that the Court should

2  be forced to wrestle with.

3        And, Your Honor, again, I would simply note, and

4  then I'll talk quickly about the standard, all we're asking,

5  what we're here asking for sanctions on behalf of Dominion,

6  is that the Court fashion and issue an appropriate and

7  proportional response.  Not one that makes Dominion whole.

8  There's no order this Court could issue that would make

9  Dominion whole for what it has been through since the 2020

10 election.

11       But simply an appropriate and proportional

12 response that discourages the kind of litigation that was

13 filed in the two complaints.

14       And to be honest, the same kind of arguments that

15 were made here this morning by Mr. Walker and Mr. Fielder,

16 talking about this, that, or the other thing.

17       And I will say one last point in connection with

18 this, Your Honor.  I can tell you from representing Dominion

19 across the country that these folks who bring these cases

20 always said "we believe this.  Our clients believe this.  We

21 believe there was a problem.  We believe something happened."

22 Or this nonsense about, you know, possibly something happened

23 with foreign countries.

24       And, of course, one of the great things about the

25 courts is that you can't do anything about what people

1   believe.  I can't do anything about what people believe.  Who

2   knows why people believe what they believe.  And you can

3   certainly come up with some theories about why there is so

4   many conspiracy beliefs about the election.

5            But what the Court can do is say "beliefs don't

6   matter.  What matters is evidence, inquiry, and the law,

7   under this standard."

8            So to answer your question, Your Honor, --

9            THE COURT:  Well, before you do that, you said you

10  want a proportionate response.  Nobody articulated what they

11  actually want the sanction to be.  What is your request for

12  sanction?  Is it attorneys' fees associated with opposing or

13  filing the motion to dismiss?

14           MR. GARNETT:  Yes, it is, Your Honor.

15           THE COURT:  Okay.

16           MR. GARNETT:  And, Your Honor, finally, to answer

17  your question, and I apologize for --

18           THE COURT:  No, that's okay.

19           MR. GARNETT:  -- spending 20 minutes to get there.

20  The question, of course, which is a critical question, is:

21  What is the appropriate pre-filing inquiry?

22           And, again, I just wanted to stress that before we

23  get to the merits, you've got to deal with the pre-filing

24  inquiry that what makes somebody think this is justiciable.

25           But the law is clear.  The U.S. Supreme Court,

1  Tenth Circuit, and the law of this District, that Rule 11

2  imposes an affirmative duty on the lawyers to conduct a

3  reasonable inquiry into the facts and the law before filing,

4  and the applicable standard is one of reasonableness under

5  the circumstances.

6         And, Your Honor, on that I'm quoting from the

7  *Croc's* case, which we refer to in our brief, which is a

8  District of Colorado opinion from 2017.

9         And, of course, the U.S. Supreme Court case

10 *Business Guides v. Chromatic.*

11        And, Your Honor, the cases there, there's one in

12 particular we didn't cite because we didn't find it until we

13 got your question.  I'm going to get to this in a minute.

14        But the cases all make clear it's a reasonableness

15 standard.  It's an objective standard.  And it is non-

16 delegable.  In other words, the attorneys themselves have the

17 obligation to look into the case and to make a determination,

18 factually, about whether these issues can be filed and

19 pursued in good faith.

20        And I would note it's not simply about this

21 silliness about foreign interference or whatever somebody

22 thinks might have happened on the internet about this event,

23 but it's also about standing, about whether or not you're

24 going to be able through your reasonable inquiry, to come up

25 with a theory by which the 160 million Americans when

1    purported to represent Mr. Walker and Mr. Fielder did here,

2    whether through doing that they had a cogent theory that

3    could be presented to the Court.

4            Let me mention, Your Honor, one case that I think

5    is helpful to the Court.  And we didn't find it until

6    yesterday when we were researching the Court's questions.

7    And that's a Third Circuit opinion, Your Honor, *Garr v. U.S.*

8    *Health Care, Inc.,* and the citation, since it's not in the

9    briefs, is 22 F. 3d 1274.  And that's a Third Circuit opinion

10   from 1994.

11           And, Your Honor, that case is very interesting and

12   very applicable to this case, because in that case the Third

13   Circuit upheld an award of sanctions against plaintiff's

14   counsel who had filed a case that was based almost verbatim

15   on another case that had been filed, plus information that

16   counsel had read about in the Wall Street Journal.

17           And the Third Circuit had no difficulty in that

18   very interesting opinion upholding the trial court, which had

19   sanctioned that counsel, finding that that reliance upon the

20   press, reliance upon a pleading from another jurisdiction,

21   was not sufficient to be able to meet the independent

22   standard that applies to each lawyer who files a case in the

23   Federal Courts in the United States.

24           THE COURT:  Mr. Garnett, tell me about this

25   reasonable under the circumstances.  I mean, am I right that

 1   like if it's a TRO, the house is going to be bulldozed,

 2   there's less inquiry that's required, and the statute of

 3   limitations is running, client just came to you.

 4           What would you suggest are the circumstances here

 5   that would lead to the conclusion that Plaintiffs, either

 6   factual or legal inquiry, wasn't reasonable so as to justify

 7   an award of sanctions?

 8           MR. GARNETT:  Certainly, Your Honor.  First of

 9   all, that is the standard reasonable under the circumstances,

10   and clearly the Courts, both State and Federal Courts,

11   because most state courts have similar standards, will make

12   allowances for emergency cases.  The life support may be

13   taken off, the person is in the hospital, bulldozing the

14   house, that kind of thing.

15           This was definitely not that case, Your Honor.

16   And, in fact, what it requires is thoughtfulness, review,

17   deliberation, and investigation.

18           This is a case, of course, that was not filed

19   until late December.  And we noted in our briefs, and I

20   noticed that the Court highlighted some of it in its

21   questions, not from our briefs, but just because it's clear

22   from the history, that there had been all kinds of credible,

23   thoughtful statements by frankly people with no partisan

24   connection to the winner of the election, like Bill Barr, who

25   is the Trump Attorney General, that there was no evidence

1  supporting any of the wild theories that the Plaintiffs are

2  spewing about here today.

3          Long before this case was filed, beginning as

4  early as the November 12th press release of the Cybersecurity

5  and Infrastructure Security Agency determination, the

6  statements of Attorney General Barr, what was happening in

7  Georgia, and what was happening in Michigan in Antrim County,

8  which I've been very involved in, as well, which is

9  absolutely worked out to confirm the integrity of what

10 Dominion has done.

11         So my answer is really two fold.

12         First of all, based on the actual facts, there is

13 no inquiry these folks could have done that would have

14 justified filing this case, because there are no facts that

15 support that.  I want to be very clear about that.

16         However, there was no reason to rush into Court

17 with this lawsuit right before Christmas, only roughly six

18 weeks after the election.  There was no statute of

19 limitations that was running.  There was no need to --

20 frankly, the Electoral College had already met.

21         There was nothing that required these folks to

22 file this case when they filed it.  They easily could have

23 waited another two months, which they did to file their

24 amended complaint, which we've always maintained made things

25 worse.  They could have waited six months, they could have

1  waited a year.

2          All of that time, they could have taken some of

3  the money they were raising over the internet, or how ever

4  that was all working, to hire experts, to do investigations,

5  and if there was evidence, to come in with a narrowly

6  tailored suit that would be justiciable that the Court could

7  proceed with.

8          So the answer is:  They would have had to take

9  more time and actually look into it, and there was no reason

10 that they did not.

11         THE COURT:  Let me ask on the issue of standing.

12 If I understand Mr. Fielder's argument about why the other

13 cases that were dismissed, and I don't want to misquote Mr.

14 Fielder, he'll have an opportunity to correct me if I get it

15 wrong, but he said those are distinguishable because (1) in

16 this case it was an effort to seek damages for a prior

17 Constitutional wrong that was done to these people, and those

18 other dismissed cases were trying to affect the election

19 somehow by not certifying things, or requiring electors to be

20 designated.

21         And so this didn't seek injunctive relief to

22 change the election, it just sought damages.

23         Now, there is a request for an injunction at the

24 end, asking that un-Constitutional conduct not be allowed in

25 the future, but I see Mr. Fielder's point that there doesn't

1  seem to have been an effort to change the election results

2  which those other ones were.  So that was one distinction.

3         And then there was one other distinction that I

4  can't remember exactly.  But explain to me why those aren't

5  at least a good faith basis for asserting that his clients

6  have standing?

7         I think the other one was this isn't a generalized

8  complaint, that these are individual voters, these individual

9  voters have been personally damaged, the fact that a lot of

10 people have suffered the same damage doesn't make it a

11 generalized complaint.

12        I think those were a couple of the arguments that

13 he raised.

14        MR. GARNETT:  Sure.  And let me just admit

15 straight up, Your Honor.  I've read these complaints over and

16 over, and both the first and the second, and to be totally

17 frank with the Court, it's never been entirely clear to me

18 what they want in terms of relief.

19        Let's talk about the damages issue.  The damages

20 issue, as I understand it, is somehow we're going to have a

21 class.  The class is going to be somewhere between 140 and

22 200 million American voters.  And those members of the class

23 have had some kind of damage which totals in the billions.

24        As I think I said before, and if I didn't, I'll be

25 clear, this complaint -- I'm tempted to call it silly, except

1    in Federal Court, in any court, using the word "silly" is not

2    appropriate to talk about another side's position.  But it's

3    fancible.  It's totally fancible.  It's a complaint that is

4    based on bits and pieces of nonsense from the internet that

5    comes in and asks for something, whatever it is, but it's not

6    anything a court is going to be able to determine or award.

7              And in this case, damages in the billions of

8    dollars.  So there's nothing about that, Your Honor, that

9    solves the fundamental issue of individual particularized

10   injury required for Article III standing in the United States

11   under the Constitution and in the Tenth Circuit.

12             And, secondly, yeah, again, I was never clear if

13   they were seeking an injunction.  And, if so, what they were

14   seeking it for.  But there' nothing about those, Your Honor,

15   that makes these cases any more justiciable than other cases

16   in jurisdictions that were seeking to prevent the Electoral

17   College from meeting, et cetera.

18             The fundamental issue for standing, as the Court

19   went through in great detail, as we've been attempting to

20   educate Mr. Walker and Mr. Fielder from the beginning, is

21   that the Plaintiffs have to come to the Court with a

22   particularized Constitutionally recognized harm that they can

23   ask the Court for a meaningful sanction -- or a meaningful

24   remedy on.  And they failed to do that.

25             THE COURT:  Okay.  Anything else on these issues?

1          MR. GARNETT:  No, Your Honor.  I could go on for

2   quite a while, but I know you've got a lot of folks to hear

3   from.

4          THE COURT:  Yeah.

5          MR. GARNETT:  And I know other Defendants have

6   much they'd like to say, as well.

7          THE COURT:  Thank you.  What I would like to hear

8   from, in terms of the other Defendants, because I did raise

9   with Mr. Fielder the issue of personal jurisdiction over the

10  State -- the State officials.

11         And so I'd like to hear from the folks in

12  Pennsylvania and Michigan on that issue.  And I will give the

13  Center for Technology and Facebook their ability to add on to

14  what Mr. Garnett has just said.

15         But first I'd like to hear from the State

16  Defendants, please.  So we can take them in alphabetical

17  order, and M comes before P.

18         MS. MEINGAST:  Thank you, Your Honor.  Heather

19  Meingast from the State of Michigan.

20         THE COURT:  Let me interrupt you for a second.

21         MS. MEINGAST:  Sure.

22         THE COURT:  On the screen, it looks like I'm not

23  looking at you because the camera is up there and my screen

24  is down here.  So I'm actually looking at you.  It just looks

25  bad on TV.  So there used to be a screen over the shoulder of

1   defense counsel, and then I could look there.

2            But anyway, I'm actually looking at you even

3   though it looks like I'm playing with my phone or something.

4            Go ahead.

5            MS. MEINGAST:  That's all right.  Thank you, Your

6   Honor.

7            The Court has read the briefs and footnotes, the

8   motion to dismiss, their response to the motion to amend

9   complaint, and the sanctions motion and reply.  The principal

10  argument is personal jurisdiction, and the fact that in

11  neither the original complaint nor the proposed amended

12  complaint were there any allegations at all that seem to

13  establish either the type of minimum contacts or the

14  connection required to establish personal jurisdiction over

15  my clients in the State of Colorado.

16           And there just simply was not one allegation that

17  I could discern that, you know, alleged, you know, some -- in

18  some fashion how the Governor and how the Secretary

19  certifying the election, or overseeing an election, as the

20  Secretary does, somehow reached out and directed any action

21  or contact to the residents of Colorado, State of Colorado.

22           And I think that is plainly supported by the fact

23  that they voluntarily dismissed us on that basis, as well.

24  In the email that we attached, they cannot overcome the

25  defects of personal jurisdiction.

1          And also, it was really just never very clear in
2   response to that.  They couldn't really articulate a response
3   back to our motions to know what the basis for personal
4   jurisdiction was, other than this sort of nebulous argument
5   that these Plaintiffs felt aggrieved or felt that there was
6   some harm to their votes as a result of the alleged conduct
7   on behalf of our State clients.

8          So I think the Court hit the nail on the head
9   earlier in dialogue with Mr. Walker -- excuse me, Mr.
10  Fielder, that there just simply wasn't any basis for personal
11  jurisdiction.

12         THE COURT:  Well, let me ask you about the
13  dismissal.  They did eventually dismiss after reading your
14  briefs.  Why wasn't that good enough?  Why do you still think
15  that you're entitled to sanctions if they voluntarily
16  dismissed?

17         MS. MEINGAST:  First of all, Your Honor, we can
18  still ask for sanctions after voluntary dismissal.  The
19  Courts allow that.

20         And it shouldn't have had to come to a motion to
21  dismiss in the motion to amend the response, and all of that.

22         As the Court indicated, a matter of personal
23  jurisdiction -- I mean, the complaint should have never been
24  filed in the State of Colorado against my clients.  To come
25  into Court with some credible, non-frivolous allegations, to

1  haul the Governor and Secretary into Court in Colorado,

2  wasn't even present at the outset.  There shouldn't have been

3  a complaint.  I shouldn't have had to file the motion to

4  dismiss or a response to their motion to amend, which added

5  nothing.

6            And, frankly, Your Honor, you know, this is a

7  significant case.  The allegations here are important.

8  Calling into question the results of Michigan's elections,

9  continuing to perpetuate the deceptions and

10  misrepresentations as to what happened, it's important to the

11  State of Michigan that we ask for sanctions.

12            Just as we did in the King case, Your Honor, on

13  Monday.  I just had that hearing on Monday where we had that

14  same -- not personal jurisdiction arguments, but the same

15  types of perpetuation, you know, lies and falsehoods about

16  Michigan's election.

17            It is important to -- it was important to follow

18  up on this hearing.  And I'm not sure that we're out of this

19  yet, Your Honor.  I'm not sure that there won't be cases

20  again.  There needs to be some holding of counsel's feet to

21  the fire.

22            I'm being sued in Texas.  Same kinds of arguments.

23  That one just got voluntarily dismissed, too.  So I think

24  there is some concern on our part that we need to be

25  aggressive and take action.  It is fully warranted to hear

1    this motion for sanctions.

2            THE COURT:  What about the argument -- before you

3    go, you know, personal jurisdiction can be waived.  Sometimes

4    people do that.

5            MS. MEINGAST:  Uh-huh.

6            THE COURT:  I sensed in Mr. Fielder's response,

7    like "well, we didn't know that they weren't going to waive,

8    so we filed the suit.  And then when it becomes clear that

9    they can't waive, we do a little more research, we decide

10   there's not a good faith basis for going forward."

11           Is that a defense, in your view?  A legitimate

12   defense to having filed the suit in the first place?

13   Personal jurisdiction can be waived sometimes, so why not

14   file the suit and see what they do.

15           MS. MEINGAST:  No, Your Honor, I don't believe

16   that's a credible defense at all.  The concept that you would

17   file a case in Federal Court against state officials in other

18   states, I mean, on the hope that we would waive personal

19   jurisdiction, objection to personal jurisdiction, is rather

20   astonishing, Your Honor.

21           I mean, literally the first defense that came to

22   my mind when I read this complaint that somehow it's a

23   legitimate defense?  The Court pointed it out in the motion

24   to strike that this was a normal argument that we made.

25           So, no, I disagree that somehow it's a defense

1    that they thought "oh, well maybe Michigan might waive any

2    objection to personal jurisdiction."  I find that astonishing

3    that it somehow undercuts or supports their defense against

4    our motion for sanctions, Your Honor.

5             THE COURT:  Okay.  Thank you, Ms. Meingast.  Let's

6    hear from Pennsylvania.

7             MR. BOYER:  Thank you, Your Honor.  Can I confirm

8    that you can hear me all right?  We're having a little -- I

9    was not speaking loudly earlier.

10            THE COURT:  We can hear you.

11            MR. BOYER:  Thank you.  I'd like to address a

12   couple of questions that Your Honor posed, and I think I have

13   an answer that can sort of connect a number of the different

14   problems here.

15            Much of Your Honor's questioning has focused on

16   the issues of reasonable inquiry, and also jurisdiction,

17   whether personal or subject matter jurisdiction.

18            The Plaintiffs have basically, as far as the

19   allegations against Pennsylvania are concerned, lifted almost

20   all of their allegations from a complaint that Texas

21   attempted to file in the Supreme Court challenging the

22   election certification in Pennsylvania, and a number of other

23   states.

24            Now, my answer as far as the reasonable inquiry, I

25   think we have not moved under Rule 11 because the Plaintiffs

1  did dismiss their complaint against us within the safe harbor

2  period.  So the answer I'm going to give about any reasonable

3  inquiry is in the context of just exhibiting the bad faith

4  efforts of this litigation, because it was incredibly easy

5  for the Plaintiffs to have learned that their factual

6  allegations against Pennsylvania, that their legal theories,

7  were all completely frivolous, utterly false, and recently

8  rejected.

9          The Plaintiffs' theory of jurisdiction, both for

10  personal jurisdiction and subject matter jurisdiction, is

11  that their complaints relate to the Presidential election,

12  and, therefore, anyone anywhere may sue any state official

13  anywhere.

14          They have an astonishing argument, and one in fact

15  that Texas had made just days before the Plaintiffs did in

16  this case.  And I'd like to read two portions of Texas'

17  complaint.  This is the very complaint that Plaintiffs have

18  relied so heavily on in their allegations against

19  Pennsylvania, so certainly they're aware of both this

20  complaint and how the Supreme Court resolved it.

21          On page 13 of Texas' complaint, they say:  "While

22  Americans likely care more about who is elected president is

23  based on a distinct interest in who is elected vice-

24  president, and, thus, can cast a tie breaking vote in the

25  Senate through that interest," meaning the interest in the

1  results of the national election, "states suffer an Article

2  III injury when another state violates Federal law to affect

3  the outcome of a Presidential election."

4              On page 14 of the same bill, Texas goes on to say:

5              "If Defendant States un-Constitutionally appointed

6  electors, votes for a Presidential candidate opposed by the

7  Plaintiff States' electors, that operates to defeat

8  Plaintiffs' stated interests."

9              That argument for injury is indistinguishable from

10 the one that the Plaintiffs have articulated.  If you'll look

11 at page 10, for example, of their response to our motion for

12 sanctions, the paragraph that begins at the very bottom and

13 continues on to page 11, that is still the argument they

14 assert for both personal and subject matter jurisdiction.

15             Of course, as we all know, about 10 days or so

16 before Plaintiffs filed this complaint, the Supreme Court

17 said that that basis for asserting an injury was not

18 judicially recognizable under Article III.

19             Days later, the Plaintiffs made the identical

20 argument as to why the Pennsylvania Defendants can be sued in

21 Colorado for their administration of the Pennsylvania

22 election.

23             Plaintiffs were clearly aware of this pleading.

24 As I mentioned, it is relied on extensively in their

25 complaint.  They are certainly aware of its resolution.

1   Despite the fact that it is fatal to their arguments against

2   the Pennsylvania Defendants, they went ahead with this case

3   days after the Supreme Court's resolution of Texas' attempts

4   to file a bill of complaint in the Supreme Court.

5           No matter the standard for reasonable inquiry,

6   Plaintiffs have failed to meet it.  They were aware of this

7   case.  They ignored it.

8           And although our motion is not under Rule 11, I

9   would also like to point Your Honor to some useful authority

10  as to what factors matter for the reasonableness of the

11  inquiry.

12          In the notes to the 1983 amendment to Rule 11, the

13  Rules Committee does set out some factors for the Court to

14  consider.  Reading from that note, it says what constitutes a

15  reasonable inquiry may depend on such factors as how much

16  time for investigation was available to the signer, whether

17  he had to rely on a client for information as to the facts

18  underlying the pleading, motion, or other paper, whether the

19  pleading, motion, or other paper, was based on a plausible

20  view of the law, or whether he depended on forwarding counsel

21  or another member of the bar.

22          So I think those are some of the factors.  But no

23  matter how you look at it, the Plaintiffs here relied very

24  heavily on a case that was entirely fatal to both their

25  factual allegations and the legal allegations.

1        And I'll say one more piece about that.  Had the

2   Plaintiffs read Pennsylvania's response to Texas' complaint,

3   they would have been directed to all of the Pennsylvania

4   Supreme Court authority that refutes every factual allegation

5   they had made against Pennsylvania, including that

6   Pennsylvania law requires some sort of signature

7   verification, including any poll watcher in Pennsylvania who

8   was denied the access to which Pennsylvania law requires.

9        These are the factual allegations that underlie

10  their accusation that either former Secretary Boockvar or

11  Governor Wolf had somehow modified or disregarded

12  Pennsylvania law in their administration of the 2020

13  election.

14        Of course, the Supreme Court of Pennsylvania has

15  interpreted Pennsylvania law entirely consistently with how

16  the Defendants in the states acted.  Those decisions were

17  issued and rendered well before Plaintiffs filed its

18  complaint.  They were referenced in our answer to Texas'

19  complaint.  They are easily available in WestLaw to anyone

20  who is looking for the allegations.  It's the first thing you

21  would find.

22        So it is implausible that the Plaintiffs conducted

23  any reasonable investigation.  And to bring this complaint in

24  light of all of that can be explained only by their bad

25  faith.

1          THE COURT:  Thank you.  Why don't I hear now from

2    CTCL and from Facebook, in that order.  But please only add

3    what you think is important beyond what Mr. Garnett has

4    already touched on.  I think I've gotten the arguments from

5    the States.

6          So, CTCL, please.

7          MR. MATZ:  Thank you, Your Honor.  So one of my

8    agreements with the argument from Dominion, and I expect

9    Facebook, I'd like to focus on the question of standing and

10   related issues, and to address the important questions that

11   you asked Mr. Garnett.

12         So just to step back briefly, Rule 11 and 28

13   U.S.C. 1927 impose duties on counsel, whose validation can be

14   identified on the very face of their pleadings in a District

15   Court.

16         And so with respect to these duties, the inquiry

17   is straightforward.  One, you need to look at the docket and

18   the filings, and you don't need to look at anything outside

19   that, you know, any extrinsic evidence about their motives or

20   their --

21         THE COURT:  Can I interrupt you for a second?  I

22   know I'm interrupting you.

23         MR. MATZ:  Of course.

24         THE COURT:  But in your response, could you touch

25   on whether there is a different standard?  I understand under

1  Rule 11 you have to send a copy of the motion, and then

2  there's a safe harbor provision, but is the standard for

3  reasonable inquiry or unduly increasing the proceedings under

4  1927, are those different or is it sort of the same inquiry?

5           So if you could touch on that, please?

6           MR. MATZ:  With respect to this question, our

7  understanding is that the standards are largely similar.

8           THE COURT:  Okay.

9           MR. MATZ:  And that with respect to inherent

10 sanctions, there's a requirement of a finding of bad faith.

11 And, of course, the remedies can defer.  But with respect to

12 assessing, you know, whether arguments are objectively

13 frivolous or unreasonably multiplied at the proceedings

14 because they lack any basis, my understanding of precedent is

15 that they track.

16          THE COURT:  Thank you.

17          MR. MATZ:  And I would emphasize that, you know,

18 again, this dimension of the case is in some ways more

19 straightforward.  You don't have to look at anything outside

20 the docket.  It doesn't matter what their motives were.  They

21 could have the purest motives in the world for filing the

22 case.  If they don't do the diligence required of lawyers to

23 assess whether there's objective merit to their claim, or at

24 least the claims are not objectively frivolous, then they

25 have violated the Rules.  And that's *Collins v. Daniels,*

1  which held that there is "no empty head, pure heart

2  justification for patently frivolous arguments."

3          Here, for the reasons in our brief, we think

4  that's exactly what happened.  Let me lay that out very

5  quickly, and then turn to the questions that Your Honor asked

6  Mr. Garnett, because I'd just like to add a bit to his

7  answer.

8          So the theory of Article III standing in this case

9  appears to be that any registered voter, anywhere in the

10  country, regardless of whether they voted, can file suit in

11  any Federal District Court anywhere against anyone who they

12  believe did anything improperly affecting the Presidential

13  election.

14          Their case collapses if don't accept every single

15  part of that theory.  Every single court to have faced the

16  theory of that kind, including courts that, unlike this one,

17  actually sit in jurisdictions with some connection to the

18  claims at issue here, has rejected it.  That includes the

19  Supreme Court in *Lance v. Kaufman,* multiple Federal Courts of

20  Appeals, and many District Courts in cases resulting from the

21  election.

22          Among them, District Courts that rejected

23  challenges to CTCL's program that Plaintiffs' counsel just

24  copied and pasted and recycled here.

25          And confronted with that unbroken wall of directly

1  on-point authority, any reasonable lawyer would recognize

2  that the theory of standing on which this complaint depends

3  is frivolous.

4          Indeed, in their briefing, Plaintiffs' counsel

5  referred to their claims as generalized grievances.  If you

6  do that on the bar exam, you fail the bar exam.

7          Now, they have attempted to distinguish themselves

8  from those cases in a couple of ways, as the Court noted.

9          But here, I would emphasize that in *Collins v.*

10  *Daniels,* the case I just mentioned, the Tenth Circuit upheld

11  the imposition of sanctions where plaintiffs, and I quote:

12  "Unreasonably attempted to distinguish themselves" from prior

13  precedence.

14          And I think that's the rule that governs here.

15  And so let me just zero quickly in on the distinctions they

16  draw.

17          First, they say we're seeking individual damages,

18  we're not seeking an injunction.  And there's three basic

19  problems with that theory.

20          The first is that they do seek an injunction.  A

21  prayer for relief in the original complaint asks for an

22  injunction that would declare Defendants' acts a nullity, and

23  it seeks prospective injunctive relief to prevent any such

24  action in the future.

25          They include another request for declaratory and

 1   injunctive relief in the proposed amended complaint.

 2              So that distinction isn't doing anything for them.

 3              Then, if you look at the prior cases, and I've

 4   litigated a number of those prior cases personally, nothing

 5   in those cases had anything to do with whether the request

 6   for relief had to do with an injunction they say arose in the

 7   posture of requests for a TRO for a preliminary injunction.

 8   Sure.

 9              But the courts in those cases that said there was

10   no standing did link that to, you know, anything having to do

11   with the form of relief sought.  The result was that an

12   injunction was denied, but they looked at the claims and

13   simply said "you have no standing."

14              None of those cases, and I've read all of them,

15   I've litigated a number of them, nothing in those cases

16   suggests any reason to think this would be a distinction.

17              And this is the third point, which is the Supreme

18   Court of the United States has rejected the viability of that

19   distinction.

20              And here, I would point the Court to the case

21   decided this past year at the Supreme Court, whose name I

22   think we all struggled with at the last hearing.  In that

23   case, the Supreme Court expressly said that even if you can

24   satisfy, for example, a request for damages, you still have a

25   -- even if you're seeking nominal damages, even if you

1   satisfy redreassability, injury in fact is a different

2   requirement.

3          I am unaware of any Supreme Court or any other

4   appellate authority in this area holding that you would have

5   standing if you seek damages, but you wouldn't have standing

6   if you seek an injunction, on the theory they've described.

7          And so I think with respect to that distinction,

8   it's a matter of bill of pleadings, it's a matter of the

9   cases they're trying to distinguish, and it's foreclosed by

10  Supreme Court precedent.

11         THE COURT:  And just let me ask you a question

12  about this.  An injunction is a remedy.  Damage is a remedy.

13  Injury is different.  You can get different remedies.

14         But what you're saying is the particularized

15  injury, not the remedy sought to solve that injury, is that

16  correct?

17         MR. MATZ:  That's right.  That's right.  So if you

18  want to come to court and say "Your Honor, the Government is

19  violating my rights under the Equal Protection Clause," you

20  have to show that you've been injured by some improper

21  governing classification, regardless of whether you're

22  seeking damages or an injunction.

23         Now, it's true that if you want an injunction you

24  may have to show something else, like an entitlement to

25  prospective relief, but the basic ability to get into court

1 to show a concrete and particularized injury doesn't depend

2 on the kind of relief you seek.

3          And so here they do seek an injunction, and so

4 right off the bat this is a non-starter for them.  And even

5 if it got them somewhere, the cases that they're saying they

6 are different from, none of those cases in any way depend on

7 the injury and fact conclusion in those cases doesn't depend

8 on the fact that an injunction was sought.  They depend on

9 the conclusion that people positions, like the Plaintiffs

10 here, have only identified a generalized grievance, and not a

11 concrete and particularized injury.

12          And again, that all flows from *Lance v. Kaufman,*

13 and a host of subsequent authority.

14          The second distinction that the Plaintiffs have

15 tried to draw is they say "oh well, you know, in those cases,

16 people were suing governments, and here we're suing private

17 companies, and so we're not in the same claims as those

18 Plaintiffs."

19          First of all, they were suing Government entities

20 in this case.  So again, I'm not sure this distinction gets

21 them anywhere.

22          But their theory for why they could sue the

23 private parties here is that the private parties were state

24 actors.  Literally the whole basis of their cases is that we

25 should be treated as though we were the Government.

1          And so it seems like in making that argument, they

2     are completely contradicting themselves.

3          And again, there's another problem, as if two

4     weren't enough, which is that the Supreme Court has expressly

5     rejected the argument.

6          In *Steel Company v. Citizens for a Better

7     Environment,* in 1998, the Supreme Court said that in

8     assessing injury in fact sufficient for Article III standing,

9     the test "does not depend on the defendant's status as a

10    governmental entity.  There is no conceivable reason why it

11    should."

12         Now, when I think about what it means to

13    unreasonably distinguish a prior case, the fact that the

14    distinction we're drawing is inconsistent with your own

15    filings, is inconsistent with your own theory of liability,

16    and is foreclosed by a binding Supreme Court precedent, sure

17    strikes me as an unreasonable distinction.

18         And then it sort of gets worse from there.  And

19    this is why -- I mean, this is why we think it's objectively

20    perverse in a way that meets distinctions.  They don't cite

21    any injury in fact cases to support their theory.

22         As Your Honor recalls, they cited a jungle of

23    criminal and habeas and merits rulings, including *Brown v.

24    Board of Education,* and, as we emphasized in our briefs at

25    the motion to dismiss stage, they materially objectively

1   misrepresented the facts and holdings of the cases they did

2   cite.

3           So it's the theory on its face, and then their

4   litigation conduct.

5           And what's kind of shocking about this is that

6   when this was pointed out to them in the motion to dismiss

7   briefs, they didn't drop the suit.  They didn't offer a

8   response.  They didn't cite a single case that in their view

9   would affirmatively say there was an injury in fact here.

10  They just cited these other random cases that have nothing to

11  do with standing.

12          And then they lied about those precedents.  They

13  lied about the relief sought in their pleadings.  They filed

14  what turned out to be a false sworn affidavit from their own

15  client.  They sandbagged the Defendants with a frivolous

16  judicial notice motion the day before the hearing.  They

17  filed a proposed amended complaint that didn't respond to any

18  of the arguments that had been put before them.

19          And then just before the hearing, they gave the

20  Defendants notice of their intent to add several hundred more

21  Plaintiffs to the case.

22          And while doing this, I would emphasize, on the

23  theory that they were going to get $160 billion dollars of

24  nominal damages.  Of nominal damages.  On the basis of claims

25  that were so lacking the basic elements of any known cause of

1   action.  That they frankly struggled to know where to start

2   in even explaining their error.  And, of course, that too was

3   objectively frivolous.

4          And so, Your Honor, all of that - that conduct -

5   you don't need to look outside the complaint, although we

6   think if you do look at the pre-suit investigation -- but

7   just on its face, the objective frivolity of their claims,

8   their total apparent lack of legal research, the fact that

9   any effort to distinguish the tsunami of precedent against

10  them is objectively unreasonable, and then frankly bad faith

11  and improper conduct at every single stage of the litigation,

12  even after they were put on notice of the objective frivolity

13  of their claims, all of that offends Rule 11.  It offends

14  Section 1927 by revealing an objective indifference to well

15  established law.  And it evidences bad faith.

16         Which leads me to, Your Honor, I promise my very

17  final point.

18         Sanctions are not really appropriate here, but we

19  think they are necessary for two reasons:

20         The first is to deter Plaintiffs' counsel

21  themselves, who have already filed a frivolous appeal from

22  Your Honor's decision, who have told you that they see

23  nothing wrong with anything they did, and who may well file

24  copy cat suits again, if given a chance, and even now are

25  duping members of the public with fraudulent fund raising

1  appeals related to this case.

2          These are lawyers who have learned nothing from

3  their conduct, and will do it again unless the Court

4  sanctions them.

5          And, of course, sanctions are also necessary to

6  protect the Constitutional system.  And this is the broader

7  context, and I'd feel negligent if I didn't highlight this.

8          Plaintiffs' counsel have used this Court, whether

9  they subjectively believe it or not, as a soap box to spread

10 despicable and dangerous lies.  Lies that have imperiled

11 election officials, that turned for a period of time my home

12 city into an armed encampment, that not only destroyed the

13 Capitol, and that still undermine our democracy.

14         And this isn't just a mere difference of political

15 opinion.  This is the line between liberty and tyranny.  It's

16 the line between order and insurrection.

17         And a law license does not confer unbounded

18 prerogative to file objectively legally frivolous lawsuits

19 built on a copy and paste conspiracy theory derived largely

20 from a pillow salesman, and at undermining a legitimate

21 Presidential election.

22         Officers of this Court and members of the bar are

23 held to higher standard when they come to court.  Because

24 here, truth matters.  The law matters.  Ethical standards

25 matter.

1            And so whatever political opinions they hold

2    elsewhere in their private lives, here they are subject to

3    standards that they did not comply with.

4            And for that reason, we respectfully request that

5    the Court make no doubt that this conduct is beyond the pale.

6            THE COURT:  Mr. Matz, I'll ask you the same

7    question I asked Mr. Garnett, because you're -- with respect

8    to your last point, about it's necessary to protect the

9    Constitutional system and they're using a soap box to spread

10   lies that undermine a legitimate Presidential election.

11           How do I even make a comment about something like

12   that in a sanction order where there's been nobody who has

13   sat in my -- this is a new courtroom -- in my witness box,

14   and nobody made any findings.

15           I mean, am I allowed to look at news reports and

16   Attorney General Barr's statement, and the Michigan Oversight

17   Committee and the Cybersecurity Infrastructure Security

18   Agency, and make a definitive statement that this -- that

19   President Biden was legitimately elected?  Or is that

20   something I should just be quiet about?

21           MR. MATZ:  Your Honor, I have three very short and

22   specific reactions to that.

23           The first is that with respect to our argument

24   that their claims are objectively frivolous for lack of

25   standing, and all of that, --

1          THE COURT:  I get that.  That one I understand.

2          MR. MATZ:  That's all relevant.  Yes, that's

3    relevant.  You don't need to say anything about that, you

4    know, for that.

5          With respect to the pre-suit investigation claims,

6    I think the way Your Honor put it was exactly right, which is

7    in assessing what's reasonable under the circumstances, the

8    combination of those authoritative statements from every

9    reputable Governmental entity, and the severity of the

10   allegation being made, are reasons to think that what is

11   reasonable under the circumstances is heightened.  That it's

12   a yellow light.

13         And that was how Judge Grossberg in his order in

14   the D.C. District Court, you know, he emphasized that, you

15   know, claims this serious going to the heart of our

16   democratic process, you need more than copy and paste jobs

17   from other complaints and some stuff you saw on line, and

18   things that my colleagues said.

19         But the third point I would quickly make is that

20   in assessing whether sanctions are necessary here, again, you

21   don't need to consider this for the objective material.  I

22   think it's at most a yellow light with respect to the pre-

23   suit investigation issue, both of which are independent

24   grounds for sanctions.

25         But I do think the Court can consider the broader

1    context without having to weigh in on one side of it or the

2    other, and simply acknowledge the gravity of the allegations

3    and the importance of Federal Courts not allowing themselves

4    to be used in ways that don't comply with the ethical issues

5    -- with the ethical standards that apply to all lawyers, for

6    purposes of articulating theories that we have all seen can

7    lead in such dangerous directions if allowed to run rampant

8    in our society.

9         THE COURT:  Thank you.  Let's hear from Facebook

10   now.  And your co-defendants may have stolen your thunder a

11   little bit, but if you could just limit your comments to

12   something different and new.  If you do feel the need to

13   defend your client on the facts, feel free to make a short

14   statement.  Certainly Mr. Garnett did that on behalf of

15   Dominion.

16        But you don't need to repeat some of the other

17   arguments that have been made.

18        MR. LIPSHUTZ:  Thank you, Your Honor.  Joshua

19   Lipshutz for Facebook.

20        I am not going to waste this Court's time by

21   repeating anything that has already been said.  It has all

22   been eloquently said by my co-defendants.

23        I just want to make really just one point, which

24   is that every argument we heard today in this courtroom, from

25   both of Plaintiffs' lawyers, evidences the need for sanctions

1    here.

2              And the Court asked specifically about the legal

3    standard that determines whether they made a reasonable

4    investigation.

5              I would just point this Court to a couple of

6    additional cases on point.

7              One.  Mr. Fielder said that he had a good faith

8    belief in the allegations that were in the complaint.  And I

9    don't doubt that that's the case.  But the Tenth Circuit, in

10   *Wright v. General Motors Corp.,* 908 F. 2d 675, at page 680,

11   said --

12             THE COURT:  Wait.  So hold on.  The citation

13   again, please?  Slowly.

14             MR. LIPSHUTZ:  Yes, Your Honor.  908 F. 2d 675, at

15   page 680.  That Court said that in considering whether an

16   attorney's actions are objectively reasonable for avoiding

17   Rule 11 sanctions, says specifically that a "good faith

18   belief," the same words that we just heard Mr. Fielder use

19   today, a "good faith belief" is "not sufficient."  And that's

20   binding precedent from the Tenth Circuit.

21             We heard Mr. Walker comment that he was "just

22   amassing data" as he put together the complaint.  And we have

23   a case from the United States Supreme Court that we have

24   cited to Your Honor, *Marvel Entertainment Group,* at page 126

25   of that decision, where the Supreme Court said that "the

 1  purpose of Rule 11 as a whole is to bring home to the

 2  individual his personal non-delegable responsibility for his

 3  pleadings."  And that is exactly the opposite of what Mr.

 4  Walker said he did when he was "just amassing data."

 5            And the *Garr* case --

 6            MR. WALKER:  That's not what I said,.

 7            THE COURT:  Mr. Walker, you'll have an opportunity

 8  to respond, but I can't have people jumping in when we're

 9  online like this, okay?  So let --

10            MR. WALKER:  I'm sorry, Your Honor.

11            THE COURT:  Let Mr. Lipshutz respond, and you'll

12  have an opportunity.  I promise.

13            MR. LIPSHUTZ:  And I would point out simply that

14  the *Garr* decision from the Third Circuit said the same thing.

15            We cite a number of other decisions that lay out

16  the standard for Rule 11 sanctions.  They are cited in our

17  reply at page four and footnote four.  I don't need to go

18  through them all here, Your Honor.

19            But there is a Ninth Circuit decision there, as

20  well, the *Security Farms* case, 124 F. 3d 999, at page 1016,

21  said in no uncertain terms that we would agree with the

22  District Court that by blindly relying on -- in that case it

23  was an investigator, to determine that the declarations were

24  well grounded in fact, counsel had failed their duty of

25  reasonable inquiry.

1          And that was a case where the attorney was relying

2   on sworn declarations, and said "well, these people swore

3   under oath."  And the Ninth Circuit said "that's not

4   sufficient."

5          Your Honor also asked whether the test reasonable

6   under the circumstances has been interpreted and what that --

7   we would only point the Court to the *Garr* case once again

8   from the Third Circuit.

9          There, the Court said that in its view it turns

10  often on the amount of time that a plaintiff has to bring

11  their case.  For example, and this is the example that the

12  Court used in that case, if the statute of limitations is

13  about to run, it's one day away from running, perhaps in

14  those circumstances you would be justified in running into

15  court with a complaint that you have not fully vetted

16  personally in a non-delegable way.

17         But that is obviously not the situation we have

18  here.

19         And if the Plaintiffs are correct that all they

20  are seeking is damages, which I don't think they are correct

21  for the reasons stated by Mr. Matz, but if they were only

22  seeking damages, then certainly there was no urgency to run

23  into court.  Damages, by their very nature, are not urgent.

24  It's the definitive of reparable harm that can be repaired at

25  any point before the statute of limitations runs.

1              That's all I would add, Your Honor, to the

2    excellent arguments of my co-counsel.

3              THE COURT:  Okay.  Thank you very much.  So, my

4    plan was to then have Mr. Fielder and Mr. Walker respond.

5              Mr. Garnett, I sort of -- I don't intend to give

6    you another opportunity to speak, so I will now after counsel

7    for the Plaintiffs speaks.  That's going to be the end.

8              So, Mr. Garnett, if you have anything else you

9    want to add, and I know you said you could go on for a long

10   time, if there are any particular points that we haven't

11   covered that you want to emphasize, now is your chance.

12             MR. GARNETT:  Your Honor, thanks for that offer.

13   I think counsel has covered -- the issues have been covered.

14   Unless the Court has specific issues or questions for

15   Dominion, I'm happy to field those.

16             THE COURT:  I don't think so.  So, Mr. Fielder,

17   we're 15 minutes away from what I suggest would be our

18   stopping time.  How long do you think you need to be able to

19   articulate your position?  And I'll ask your co-counsel the

20   same question.

21             MR. FIELDER:  I think both of us can finish within

22   15 minutes easily.

23             THE COURT:  Okay.  All right.  And you need -- you

24   know, if we need to go until 1:05, 1:10, that's fine, too.

25             MR. FIELDER:  Thank you.

1          THE COURT:  All right.  Go ahead.

2          MR. FIELDER:  Well, Your Honor, I just completely

3    disagree with counsel for CTCL's assessment of the situation

4    in terms of --

5          THE COURT:  Mr. Fielder, just go ahead and point

6    -- you don't have to get close to it, just make sure it's

7    pointed towards your mouth.

8          MR. FIELDER:  Thank you.  In terms of materially

9    misrepresenting any previous court orders, I remember in part

10   of their motion for sanctions there was some allegation that

11   we didn't -- we didn't indicate to the Court the holding in a

12   particular case.

13         And I went back on our motion, our response to

14   their motion to dismiss, and I found a big quote right out of

15   the case that we had put in.  And so, of course, we advised

16   the Court of the ultimate resolution on that matter.

17         The complaints were not copied and pasted.  I

18   didn't copy and paste.  I looked at certain averments which

19   were made in other cases.  I independently researched those.

20   They were averments.  You could admit or you could deny them.

21         But, and again, I know how -- maybe emotional is

22   not the right word, but just vigilant in their response to

23   our complaint in terms of just calling us all of these names.

24   We can just be blunt.

25         If an individual is a billionaire and has hundreds

1   of millions of dollars to infuse into an election, and

2   chooses to use a non-profit organization to infuse those

3   hundreds of millions of dollars through so that grants are

4   given out to municipalities across the country, which include

5   the installation of ballot boxes, which is a public function,

6   that is state action.  That's not a generalized grievance

7   against government.  That's what the other complaints were.

8          The other complaints were citizens suing cities,

9   suing individuals in their official capacity because they

10   were trying to get these governments to stop taking the

11   grants.  Well, those were generalized grievances.

12          But after the completed Constitutional right

13   violation, which is interaction with ballots, I couldn't

14   imagine a grosser situation where a non-profit goes around

15   and drops millions and millions of dollars - hundreds of

16   millions of dollars, and it just so happens one of the safety

17   considerations is to erect ballot boxes all over the country

18   for the collection of ballots, which then aren't collected by

19   the Post Office, but don't have proper chain of custody, and

20   now are causing all of these problems.

21          THE COURT:  Okay, but --

22          MR. FIELDER:  They take no responsibility.

23          THE COURT:  Mr. Fielder, weren't lawsuits filed in

24   these states to try and stop this, and they were all

25   rejected?  Some of them on the substance, not procedurally.

1  But it's like "sorry, Pennsylvania, that's okay, you can do

2  that."  And I can't think of the cases, but weren't these

3  brought -- suits brought and rejected in certain states?

4       MR. FIELDER:  They weren't against CTCL after the

5  completed Constitutional right violation.  They were

6  otherwise just general grievances that they shouldn't be

7  taking this private money, and the courts were saying "what's

8  wrong with that?"

9       Well, there are problems in that.  "Well, there's

10  no damage."  But then after the election, well, the damage

11  was obvious.  There was no chain of custody.  That all of

12  these ballot boxes -- and in Wisconsin it was specifically

13  illegal, that caused -- and still to this day in Georgia

14  causing major problems with the chain of custody.

15       And as we get into it, because CTCL was here in

16  Colorado, so they are subject to the jurisdiction of this

17  Court.  Dominion is here in Colorado.  They are subject to

18  the jurisdiction of this Court.  Facebook operates in

19  Colorado.

20       THE COURT:  Let me interrupt you for a second, Mr.

21  Fielder, because I want to make sure that you have an

22  opportunity to address what was raised by the Attorney

23  General's Office from Pennsylvania.

24       Much of your complaint did take allegations from

25  the Texas lawsuit that was dismissed before your case was

1    filed.  So both on the standing issue and on the substance of

2    the allegations of why what happened in Pennsylvania was

3    allegedly wrong, why didn't -- why did you continue with the

4    allegations against Pennsylvania after that Supreme Court

5    case was dismissed, and in light of the many Pennsylvania

6    State Court decisions that, based on what was just

7    represented, affirmed the propriety of the conduct in

8    Pennsylvania?

9         MR. FIELDER:  Well, in Pennsylvania, it's still

10   ongoing in terms of the issues that surrounded the legitimacy

11   of the election.

12        And the State of Texas, as a sovereign state,

13   approached the Supreme Court to enjoin another state.  And we

14   didn't do that.  We were seeking damages against the

15   individuals who allowed this to happen.  And there are many

16   other grounds for the assertion that the election in

17   Pennsylvania was fraught with problems, and now there appears

18   to be, again, reasonable and foreseeable interactions between

19   what will be the Senate of Pennsylvania, and against, even as

20   we speak, the Attorney General.  They are battling back and

21   forth.

22        So these are ongoing issues.  But we never sued

23   the State of Pennsylvania, and we never tried to enjoin the

24   State of Pennsylvania.  So our suit was different with regard

25   to that particular issue.

1              THE COURT:  Well, when you seek a declaration that
2   the actions of the State of Pennsylvania were a legal
3   nullity, what is that?  That's not a claim for damages.
4   That's one of your requests for relief in the complaint.
5              MR. FIELDER:  Well, not really.  What we were
6   suggesting --
7              THE COURT:  I think I read it this morning.  That
8   was one of the --
9              MR. FIELDER:  Well, I understand.  No, that was an
10  allegation because if it's determined that these issues in
11  Pennsylvania, which have been alleged in -- you know, not
12  just cases, but in affidavits and expert reports, and in a
13  multitude of different sources, then the certification just
14  is void.  It doesn't require that I say it is or you say it
15  is.  It just is void.
16             It may not have any impact on the election,
17  because the Electoral College has spoken, but that's what
18  happens with anything which is subject to question, that it's
19  void *ab initio.*
20             So that was an averment.  That was an allegation.
21  It wasn't a request for declaratory judgment.  And the only
22  reason we put the injunctive relief was just to hold that
23  open as a possible need from this Court later down the line
24  if injunctive relief was necessary.
25             So the whole point about nominal damages --

1            THE COURT:  Hold on.  Hold on.  I'm looking at

2    page 83 of your complaint, "ask that the Court grant the

3    following."

4            Paragraph D, declare the actions of the Defendants

5    as herein described as un-Constitutional and ultra-virus,

6    thereby making them legal nullities; declare the un-

7    Constitutional actions of the Defendants have stripped them

8    of their official character.

9            MR. FIELDER:  Right.

10            THE COURT:  I mean, that's your request for

11    relief.  That's not an averment.

12            MR. FIELDER:  No, that was the request for relief,

13    but that would be more of the request for relief which would

14    be up to this Court and a jury.  I mean, we were asking for a

15    jury trial.

16            So if there was Constitutional rights violations,

17    if the rights of the voters of Pennsylvania and elsewhere

18    across the country were violated, then that would require

19    some analysis as to whether or not their actions were ultra-

20    virus and if their certifications were ultimately void.  That

21    was in the request for relief, not the averment.  You're

22    right.

23            THE COURT:  Okay.

24            MR. FIELDER:  So, the whole point about nominal

25    damages is when there is a Constitutional right violation,

1  that infers an injury in fact.

2          Now, I understand, Your Honor, you said that the

3  Plaintiffs here have no standing.  But our approach to that

4  is that if there's a Constitutional right violation, and that

5  there is thus the concept of nominal damages, well, who were

6  damaged?  Well, the voters were damaged.  That's been our

7  whole claim is that if there is a violation of the

8  Constitution, that infers a damage.

9          Well, who is damaged?  All the voters depend upon

10  fundamental fairness.  We all depend upon it.  And it gets

11  skewed because of our political positions and our support for

12  one candidate or another.  But everybody would agree that one

13  person, one vote, count the votes, the winner wins.  Our

14  whole system is based upon that, not ballot boxes out of the

15  control of the state, not infusion of hundreds of millions of

16  dollars from private companies.

17          Frankly, not the tabulation of votes by voting

18  machine companies, which is now all foreseeable, got us to

19  here, we're -- talk about polls, 51 percent of the people.

20  How could that be that 51 percent of the people in a

21  Rasmussen Poll believes that --

22          THE COURT:  Could you hold on one second?  It

23  looks like we've lost the --

24          THE COURT CLERK:  They are still on, but I don't

25  know why they're not showing.

1          THE COURT:  Okay.

2      (Pause)

3          THE COURT:  Mr. Walker, can you hear us?

4          MR. WALKER:  I can hear you, but I just don't have

5  visual.

6          THE COURT:  Okay.  As long as you can hear.  We've

7  lost -- okay.  Houston, we have re-contact.

8          All right, I think we're back on.  I'm sorry, Mr.

9  Fielder.  I apologize.

10         MR. FIELDER:  It's okay, Your Honor.  Thank you.

11         And if I say I had a good faith belief, or Mr.

12  Walker says that he believed the suit was righteous, we're

13  just expressing to the Court that we had a good faith belief.

14         In the end, of course, it's an objective standard.

15  So we think we've met that standard, we're standing up for

16  the rights of the people and the voters, and we're sorry that

17  it offends these Defendants, and we're certain that they're

18  going to defend their clients, but we haven't made any

19  misrepresentations.  This idea that it's all a lie and that

20  it's bad for democracy, this is healthy for democracy.

21         This will get it right in the future if we could

22  come to a resolution on this.  But for us, the place to make

23  that resolution is in Court, not in the media, not at the

24  Capitol, not -- there's this constant reference to stuff on

25  the internet.  Well, I can review an affidavit on the

1   internet, but that's not stuff on the internet.  Those are

2   affidavits filed in court.

3           And it wasn't just a series of them by one

4   investigator.  It was affidavits filed all over the country

5   by numerous experts.

6           I want to give Mr. Walker a sufficient opportunity

7   for the last five minutes, Your Honor.  Thank you.

8           THE COURT:  Thank you, Mr. Fielder.  Mr. Walker,

9   if you need more than five minutes, you certainly can take as

10  much time as you need.

11          MR. WALKER:  Thank you, Your Honor.  I don't think

12  I'll take more than five minutes.

13          I really just wanted to echo Mr. Fielder's

14  comments, but also defy the rest of this idea of what was a

15  reasonable inquiry, and did we engage in a reasonable

16  inquiry.

17          And I would say most definitely we engaged in a

18  reasonable inquiry.  We spent several weeks immersed in the

19  facts of this case.  Probably spent more time than all of

20  defense counsel in those six weeks examining the issues of

21  the election.

22          And so to say that we just looked at the internet,

23  or cut and pasted from other components, is ludicrous.  It's

24  offensive to me and my co-counsel that we -- to say that

25  that's all we did.

1        We took this case seriously.  Again, I'm sorry

2   that defense counsel can't follow our legal theory, but it's

3   pretty clear that *Terry v. Adams* says these private companies

4   who administer elections are responsible for Constitutional

5   right violations.  I'm sorry, but the case that none of us

6   can pronounce says that a Constitutional right violation

7   infers an injury, and that that injury can be redressed by

8   nominal damages.

9        So just connecting those three cases, combined

10  with the *Calabrese* case that does say people from across the

11  country can go to the jurisdiction and sue for a

12  Constitutional violations that they've been subjected to, all

13  connect the dots.

14        I think getting back to Mr. Garnett's explanation,

15  where he said for us to have standing we needed to have a

16  cogent legal theory.  I think we've presented a cogent legal

17  theory, and I think we've explained it to the masses, and

18  people agree that this legal theory does appear applicable.

19        And then the second thing Mr. Garnett said was we

20  need evidence.  And we've stockpiled evidence, and they've

21  objected, but they don't submit anything under oath that

22  suggests what we have said is wrong.  They have never

23  submitted any denials to any specific allegations that we've

24  had.  We've never received any affidavits from any member of

25  Facebook or CTCL or Dominion that asserts that our processes

1    or what they did was clean and pure, like counsel suggests.

2              And to address the redressability issue, the

3    Constitutional violation infers an injury in fact, and that

4    the injury can be redressed with nominal damages.

5              So that's what it amounts to, Judge.  Thank you.

6              THE COURT:  All right.  Thank you.  The motions

7    will stand submitted.  I'm going to take it under advisement.

8    I probably won't get a decision out in a day this time.

9              Thank you all very much for your presentations.

10             If there are law clerks from my fellow judges who

11   come over and watch this, if you want to come back to

12   Chambers, I'll be happy to talk about any questions you have

13   about the proceedings.

14             But with that, we'll be in recess.

15             MR. FIELDER:  Thank you very much, Your Honor.

16             THE COURT CLERK:  All rise.

17                     (Time noted:  1:00 p.m.)

18                         *  *  *  *  *

19

20

21

22

23

24

25

103

1                              CERTIFICATE

2          I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____          July 21, 2021

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25