No. 21-1161

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

_____

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

_____

## APPELLANTS' OPENING BRIEF
_____

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1505
gary@fielderlaw.net

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………….. i

TABLE OF AUTHORITIES …………………………………………………… i

INTRODUCTION……………………………………………………………1

STATEMENT OF JURISDICTION…………………………………………… 1

ISSUES PRESENTED……………………………………………………….. 1

STATEMENT OF THE CASE

    I.     Historical Background……………………………………………….. 2

    II.    Statement of Facts……………………………………...............7

    III.    Procedural History…………………………………………….. 20

SUMMARY OF ARGUMENT………………………………………………...23

ARGUMENT…………………………………………………………… 24

    I.     The Plaintiffs have Article III standing …………………………… 24

        A.    Standard of Review...................................................................24

        B.    Standing…………………………………………………… 24

        C.    Injury in Fact……………………………………………….25

        D.    A Constitutional Infringement is an Injury in Fact………….. 30

        E.    Causation…………………………………………………… 33

        F.    Redressability……………………………………………… 34

G.  Plaintiffs Are Only in the Pleading Stage……………………. 34

II.  The District Court Erred by Dismissing the Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction………………… 37

A.  Standard of Review.................................................................37

B.  Lack of Subject Matter Jurisdiction………………………….37

C.  Accepting Well Plead Facts as True…………………………39

D.  The Cases Relied Upon By the District Court Are Not Determinative Regarding the Standing of the Plaintiffs……...41

III.  The District Court Erred by Denying the Plaintiffs' Motion To Amend Their Complaint as Futile ……………………………… 50

A.  Standard of Review.................................................................50

B.  The District Court Abused Its Discretion…………………… 50

CONCLUSION………………………………………………………….. 53

ORAL ARGUMENT STATEMENT………………………………………..54

CERTIFICATE OF COMPLIANCE………………………………………...55

CERTIFICATE OF SERVICE…………………………………………...........56

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)…………………………………… 5, 26

*Bailey v. Antrim County*, Case No. 20-9238-CZ (13th Cir. Ct. Mich)……………17

*Baker v. Carr*, 369 U. S. 186 (1962)…………………………………………….....25

*Bauchman v. West High School*, 132 F.3d 542 (10th Cir. 1987)…………………..50

*Bell v.* Hood, 327 U.S. 678 (1946)……………………………………………….. 38

*Bognet v. Secretary Commonwealth of Pennsylvania,*
     980 F. 3d 336, 348 (3rd Cir. 2021), *cert granted and judgment vacated with*
     *instructions to dismiss as moot.* ___S.Ct.___(2021)………………………30

*Bowyer v. Ducey*, Civ. No. 20-cv-2321, 2020 WL 7238261 (D. Ariz. 2020)…….44

*Bush v. Gore*, 531 U.S. 98 (2000)…………………………………………….......28

*Butler v. Kempthorne*, 532 F.3d 1108 (10th Cir. 2008) …………………………...37

*Castaneda v. INS,* 23 F.3d 1576 (10th Cir. 1994) ………………………………...37

*Carey v. Piphus*, 435 U.S. 247 (1978)…………………………………………….32

*Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571 (10th Cir.1993)……… 51

*Com'rs of County of Arapahoe, Colorado*, 633 F.3d 1022 (10th Cir. 2011)……... 36

*Curling, et al., v. Raffensperger, et al.,*
     Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.)……………………….15

*Donald J. Trump for President, Inc. v. Boockvar,*
     493 F. Supp.3d 331(2020)……………………………………………….. 34-36

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991)............................ 39

*Ex parte Siebold*, 100 U.S. 371 (1879)...............................................27

*Ex Parte Yarbrough*, 110 U.S. 651 (1884)...........................................27

*Ex Parte Young*, 209 U.S. 123 (1908)......................................... 44, 45

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 (1978) ...................................... 5

*Fairchild v. Hughes*, 258 U.S. 126 (1922).............................................43

*Feehan v. Wisconsin Elections Commissions*,
    506 F.Supp.3d 596 (E.D. Wis. 2020) ...........................................44

*First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*,
    820 F.2d 1127 (10th Cir. 1987) ...................................................50

*Foman v. Davis,* 371 U.S. 436  (1962) ...................................................51

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995)......4, 39

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ....................................... .29

*Gray v. Sanders*, 372 U.S. 368 (1963) ...................................................29

*Grossman v. Novell, Inc.*, 120 F. 3d 1112 (10th  Cir. 1997) ......................... 52

*Guinn v. United States*, 238 U. S. 347 (1915)......................................27

*Hafer v. Melo*, 52 U.S. 21 (1991) ...............................................45

*Hennigh v. City of Shawnee*, 155 F.3d 1249 (10th Cir. 1998) .........................12

*Holt v. United States*, 46 F.3d 1000 (10th Cir. 1995) ...................................37

*Iowa Voter Alliance v. Black Hawk County*,
    C20-2078-LTS. 2021 WL 276700 (N.D. Iowa 2021) ..........................49

*Jackson v. Metropolitan Edison,* 419 U.S. 345 (1974) ………………………….. 40

*Kentucky v. Graham*, 473 U.S. 159 (1985) ……………………………………… 45

*King v. Whitmer*, Civ. No. 20-cv-13134, 2020
    WL 7134198 (E.D. Mich. 2020)......................................................45, 46, 47

*King v. Whitmer*, 141 S.Ct. 1449 (2021) ……………………………………… 47

*Klebanow v. New York Produce Exch.*, 344 F.2d 294 (2d Cir. 1965)……………51

*Kusper v. Pontikes*, 414 U.S. 51 (1973)…………………………………………... 28

*Lance v. Coffman*, 549 U.S. 437 (2007)…………………………………………..42

*Lane v. Wilson*, 307 U. S. 268 (1939) ……………………………………………… 27

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) …………………………...33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ……………….. 25, 26, 33, 36

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ……………………………………..47

*McPherson v. Blacker*, 146 U.S. 1 (1892) …………………………………………..28

*Mountain View Pharmacy v. Laboratories*, 630 F.2d 1383 (10th Cir. 1980)…….. 51

*Muscogee (Creek) Nation v. Pruitt*, 669 F. 3d 1159, 1166  (10th Cir. 2012)……...44

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*,
    8 F.3d 1285 (10th Cir. 2005) ………………………………………………….38

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)………………...45

*Reynolds v. Sims*, 377 U.S. 533 (1964) ……………………………………… 27, 28

*Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26 (1976)……….. 33

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001) …………………………………37

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)…………………………………...26

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ………………………..25

*Terry v. Adams*, 345 U.S. 461 (1953) ……………………………… 5, 12, 40

*Texas Voters Alliance v. Dallas County*,
    495 F. Supp.3d 441 (E.D. Tex. 2020)…………………………………... 48

*Trackwell v. United States*, 472 F.3d 1242 (10th Cir. 2007)………………… 37

*TV Communications Network v. Turner Network*,
    964 F. 2d 1022 (10th Cir. 1992)……………………………………………51

*Texas v. Pennsylvania*, 141 S.Ct. 1230 (2020) ……………………… 14, 43

*Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013) …………………………..47

*Transunion v. Ramirez*,  141 S.Ct. 2109  (2021) ……………………… 25, 26

*United States v. Classic*, 313 U. S. 299 (1941)…………………………….. 27

*United States v. Mosley*, 238 U. S. 383 (1915)……………………………27

*United States v. Saylor*, 322 U. S. 385 (1944)…………………………………27

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792  (2021) ……………………… 32,  34, 52

*Ward v. Utah*, 321 F.3d 1263 (10th Cir. 2003) …………………………………24

*Warth v. Seldin*, 422 U.S. 490 (1975) …………………………………………24

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ……………………………………... 27

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) ………………… 41

*Winsness v. Yocom*, 433 F. 3d 727 (10th Cir. 2006) ……………………………….. 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)………………………...46

**Statutes**

18 U.S.C. § 1962(c) ……………………………………………………… 52

28 U.S.C. § 1331(a) ……………………………………………………..2

28 U.S.C. § 1332………………………………………………………... 2

28 U.S.C. § 1343……………………………………………………….2, 7

28 U.S.C. § 1291……………………………………………………….. 2

42 U.S.C. § 1983……………………………………………….5, 7, 26, 33

42 U.S.C. § 1988……………………………………………………..6

47 U.S.C. § 230(c)………………………………………………… 10,20

**Federal Rules of Civil Procedure**

Fed.R.Civ.P 12(b)(1) ……………………………………………20, 37

Fed.R.Civ.P 12(b)(6) ……………………………………………….. 20

Fed.R.Civ.P. 15(a) ………………………………………………….50

Fed.R.Civ.P 56……………………………………………………… 38

**Other Authorities**

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3, September 17, 2020………………………….. 17

Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A*, State of Texas, January 24, 2020………………………17

Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)………………………………… 25

**Constitutional Provisions**

U.S. Const. Art III, § 2……………………………….................................. 24

U.S. Const. Art II, § 1 …………………………………................................30

U.S. Const. Amend. 11………………………………….................................44

## INTRODUCTION

The issue on appeal is the standing of the Plaintiffs to pursue their civil rights claims. The district court ruled it lacked subject matter jurisdiction for want of a case and controversy, and that the Plaintiffs' claims were a generalized grievance. The district court dismissed the case and found any further amendment would be futile.

The Plaintiffs' amended complaint included the addition of over one hundred fifty plaintiffs from a total of thirty-eight States, all of whom signed under oath affidavits concerning their damage and status as registered voters from their respective States.

The Defendants' conduct was specifically described in the Complaint and Amended Complaint (complaints). As such, one issue is whether registered voters, in their capacity as citizens of the United States and of their States, have standing in federal court to sue these Defendants for *any* conduct they engaged in regarding the 2020 Presidential election that violated the rights of the Plaintiffs, and other persons similarly situated.[1]

---

[1] In the complaints, Plaintiffs reference damage to "all registered voters," which the Plaintiffs estimated to be 160 million citizens of the United States. Although the vast conduct of the Defendants as described in the complaints affects every registered voter, many may not claim that they are damaged. Plaintiffs would have been better served to have used the phrase "any registered voter."

## JURISDICTION

The district court has jurisdiction pursuant to 28 U.S.C. §§1331(a), (federal question), 1332 (diversity), and 1343(a) (civil rights). On April 26, 2021, the district court dismissed the case without prejudice for lack of standing. This Court has jurisdiction pursuant to 28 U.S.C. 1291. The district court's *Order on Defendant's Motion to Dismiss (Dkt. ##22, 23, & 41) & Plaintiffs' Motion to Amend (Dkt. #48)* is a final order Ap. 1505-1533.

## ISSUES PRESENTED

I.   Whether the conduct of the Defendants as state actors concerning the 2020 Presidential election caused an injury in fact to the Plaintiffs sufficient to establish standing in the pleading stage of a complaint filed in federal district court.

II.  Whether the district court erred by dismissing the case pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction after finding the Plaintiffs had not suffered an injury and determining the complaints to be a generalized grievance.

III. Whether the district court erred by denying the Plaintiffs' motion to amend their complaint and finding that any amendment would be futile because neither the Plaintiffs, nor those seeking to join the suit, could establish that they suffered an injury in fact.

## STATEMENT OF THE CASE

### I.     Historical Background

When the Constitution was ratified, the people had already constituted themselves into the original thirteen States. The people expressed their sovereignty through those States. The new federal government created by those people, through their States, was granted certain powers. Those not so enumerated were reserved to the people and the States.

Currently, all the States choose their Electors for President and Vice-President based upon the respective States' popular vote for those offices. The right to vote is not guaranteed by the Constitution. However, once granted, the right to vote becomes one of the fundamental rights of a citizen of the United States.

Congress enacted the Civil Rights Act (Act). The Act protects citizens of the United States from the usurpation of their respective rights, which includes the right to vote. The Act gives citizens of the United States an avenue to vindicate their rights through the filing of a complaint in federal court. The Act grants district courts the jurisdiction to hear cases and controversies between citizens and other persons, the latter of whom is alleged to have violated any of the complaining citizen's rights—including the right to vote.

District courts have historically exercised jurisdiction to hear claims under the Act to vindicate the voting rights of citizens of the United States. Accordingly, a vast body of case law exists that allows attorneys, scholars and citizens to analyze these rights to determine their scope and breath.

Of course, only state actors can violate a citizen's rights. A private person owes no duty, in that regard. Nonetheless, the law has evolved over time to allow citizens to sue private entities that engage in state action. Courts have developed several, well know tests to determine whether a person is a state actor, under the Act. This Court has addressed that issue and employs four tests to determine whether a person is engaged in state action. As the 10th Circuit has observed:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' The Court has also inquired whether the State has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them. In addition, the Court has held that if a private party is a 'willful participant in joint activity with the State or its agents,' then state action is present. Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995).

The Public Function Test is the most stringent, because a created State government has very few exclusive responsibilities:

> While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State. One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158 (1978). *See also Terry v. Adams*, 345 U.S. 461 (1953).

Each State holds a Presidential election every four years, which is the *only* election in which the registered voters of the United States collectively participate. Every other election held by States concern their own laws, and the choice of their respective representatives at the state, local and federal levels.

Consequently, every registered voter has one shared right to vote for President and Vice-President. Any persons engaged in state action that substantially burdens that right is liable under the Act. Thus, a registered voter in one State has the right to sue persons for acts concerning a Presidential election committed in another State. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). The district court may be limited by want of personal jurisdiction over a defendant, but if the voter chooses to travel to the district in which the perpetrator may be found, jurisdiction is satisfied.

A citizen claimant must have standing, which requires a case and controversy. Generalized grievances cannot form the entire basis of a claim. Nevertheless, when a citizen has evidence that certain persons violated her right to vote, a lawsuit for damages has historically been an acceptable manner through which she may vindicate her rights. Further, if a defendant has violated the rights of other citizens similarly situated, plaintiffs may bring a class action lawsuit.

Understandably, the district court provides a gatekeeping function. Nonetheless, standing is not bestowed. It either exists, or it does not.

Accordingly, if a citizen files a claim under the Act, and sufficiently claims a violation of rights, traceable to the conduct of a defendant, the district court must accept subject matter jurisdiction over the case.

Also, in cases wherein the plaintiffs are represented by counsel, those attorneys become private attorney generals.[2] Far from being frivolous, the Plaintiffs, through counsel, here, have outlined their claims, and the facts upon which they have relied, with specificity in their complaints and in their several responses to the Defendants' motions to dismiss.

---

[2] *See Civil Rights Attorney's Fees Award Act of 1976.* 42 U.S.C. 1988.

## II.      Statement of Facts

28 U. S. C. § 1343, which provides in pertinent part:

The district courts shall have original jurisdiction of any civil action
authorized by law to be commenced by any person:

* * *

(3) To redress the deprivation, under color of any State law, statute,
ordinance, regulation, custom or usage, of any right, privilege or
immunity secured by the Constitution of the United States or by any Act
of Congress providing for equal rights of citizens or of all persons within
the jurisdiction of the United States.

This statute conferring jurisdiction is related to 42 U.S.C. §1983, under

which the Plaintiffs brought this action.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage of any State or Territory, subjects, or causes to be
subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be liable to the
party injured in an action at law, suit in equity, or other proper
proceeding for redress.

Appellants, Kevin O'Rourke, Nathaniel Carter, Lori Cutunilli, Larry Cook,

Alvin Criswell, Neil Yarbrough and Amie Trapp (Plaintiffs), are all citizens of the

United States and of their respective States Ap. 104-142. Three of the Plaintiffs are

African-American. All the Plaintiffs were registered to vote at the time of 2020

Presidential election. When the Plaintiffs attempted to amend their complaint, an

additional 152 Plaintiffs were joined to the suit, all of whom were also citizens of the United States and their State, which totaled 38. Ap. 860-975.

Each of the additional Plaintiffs also signed under oath affidavits with regard to their citizenship, status as a registered voter, personal knowledge and experience, and the affect and damages, if any, traceable to the Defendants. Ap. 1127-1135. Although not required at that stage of the case, the original Plaintiffs attached their affidavits to the Complaint. They are natural persons. Each Plaintiff had a stake in the 2020 Presidential election.

The right to vote for the President of the United States is sacrosanct. As stated by counsel at the hearing on the motions to dismiss, "we fight wars over this." Ap. 1651, l. 14. Such is the sentiment in all the affidavits—but that's not the end. Plaintiffs alleged "nominal damages" as compensation for the violation of their rights as a minimum basis for recovery. Plus, a jury determines the value of a constitutional right violation, which, in and of itself, is an injury resulting in damage of at least one dollar.

Defendants/Appellees, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and the Center for Technology and Civic Life (CTCL), all substantially participated in the 2020 Presidential election.

Facebook is a global tech-giant with approximately three billion online users. Facebook is owned and controlled by Defendant, Mark Zuckerberg (Zuckerberg), one of the wealthiest persons in the world. Prior to the 2020 Presidential election, Zuckerberg and his wife, Defendant, Priscilla Chan (Chan), funneled $350 million, along with other funding and the technical know-how of Facebook, through a small, Illinois charity, CTCL, which prior to 2020 had annual revenues of approximately $1 million. Ap. 29, 77, 865, 1293.

Despite only being registered as a charitable organization in Illinois, CTCL distributed this money through conditional grants across the country, primarily to known, historically Democrat strongholds. Ap. 1291.

Municipalities and other State sub-divisions used the money to, among others, establish alternate drop-off locations for the collection of mail-in ballots. Ap. 33, 46, 72. Ballots deposited in these "drop boxes" where not collected by the U.S. Post Office, which scans every parcel. Ap. 33, 46, 907, 958.

Instead, guidelines were created in numerous States (in cooperation with local and state election officials) which, in many instances, effectively changed election laws to allow for the collection of ballots through these so-called drop boxes. E.g., Ap. 72.

This resulted in a foreseeable disaster. Plaintiff would allege that these drop boxes were used to deposit ballots which were not cast by actual, live, registered voters in the States they were tabulated. This has led to enormous, foreseeable problems with the chain of custody of these deposited ballots (in certain swing states and elsewhere), which has resulted in substantial questions concerning the voter rolls, phantom voters, and other numerous anomalies, many of which are noted in the complaints and the Plaintiffs' responses to the Defendants motions to dismiss. *See* Ap. 1419. All the swing States listed in the complaints cooperated with CTCL to allow for the placement of these drop boxes. Ap. 45-46, 57-58, 65-66, 70-74.

This is state action. As such, CTCL cannot hide behind the private nature of its non-profit status. A 501(C)(3) must be non-political. CTCL claims to be non-partisan, but the facts on that issue, like so many others, are in dispute. Ap. 30-31. Thus, the issue of standing is linked directly to the issue of whether these, otherwise, private entities became state actors through their actions connected to the 2020 Presidential election. *See* Ap. 81, 943.

The Plaintiffs allege that CTCL and Facebook, as alter-egos of Zuckerberg and Chan, participated in a scheme to benefit the latter's candidate of choice, then former Vice-President, Joseph Biden (Biden). Ap. 864-865, 954-959. Facebook

was actively censoring conservative ideology on its platform, while supporting the progressive ideology of Zuckerberg. Ap. 866, 902-903. This conduct violated the First Amendment rights of the Plaintiffs. Ap. 89-93, 951-954.

Facebook is a private corporation, protected by 47 U.S.C. § 230. Ap. 27, 90-93. However, as applied by Facebook to shield its conduct from liability, Section 230 is unconstitutional as violative of the Plaintiffs' rights to due process, freedom of expression and association, all of which are irrevocably connected to the Plaintiffs' right to meaningfully participate in the 2020 Presidential election. Ap. 93-95, 960-963. The Plaintiffs' claims are more than just about "being on Facebook." The act of voting for the Presidency, itself, is an expression of national will, and of utmost importance to each Plaintiff, personally.

Zuckerberg and Chan's injection of enormous amounts of money, influence, organization, and governmental cooperation, specifically with regard to the 2020 Presidential election, converted him, personally, into a state actor. Ap. 943. Zuckerberg, like the government, became a funding source for state jurisdictions to perform their public function. CTCL, as an alter ego of Zuckerberg, conditioned the grants on specific, required conduct of the municipality, or other sub-division of a State that accepted the money. Ap. 865, 906, 1293-1295. This conduct shocks the conscious of a reasonable person, and forms the basis of the Plaintiffs' claims

against these Defendants for violation of substantive due process. Ap. 88-89, 949-950. Substantive due process claims "are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (internal quotations and citation omitted).

Therefore, Plaintiffs filed their lawsuit alleging damages associated with completed constitutional right violations. Ap. 945, 949, 950, 954. States cannot be sued for damages. However, a line of cases establishes a citizen's right to sue private entities that have engaged in state action. *See Terry v. Adams*, 345 U. S. 461 (1953).

In the 2020 Presidential election, President Donald J. Trump (Trump) ran for reelection. Trump was a populist figure that many despised and accused of spreading "misinformation" throughout the campaign.[3] In an attempt to "fortify" the 2020 Presidential election, pressure was applied to Facebook and other social media companies to regulate information that a cadre of progressives thought was

---

[3] Molly Ball, TIME, *The Secret History of the Shadow Campaign That Saved the 2020 Election* (February 4, 2021) establishes through investigative journalism that there was a *de facto* cabal of progressives that used their influence and money to "fortify" the 2020 Presidential election against Trump's "lies and misinformation," as if the allegations against the incumbent President were objective truth.

misleading to the public.[4] Extraordinary lengths were taken to ensure Trump's defeat. The Plaintiffs' Amended Complaint describes in detail these instituted plans. Ap. 860-975. As described, these Defendants brought to bear a highly coordinated effort to elect the candidate of their choice. Such is the case in practically every presidential election—but this one involves state action.

Lawsuits were filed to stop this funding from being used by the municipalities, and other jurisdictions. However, those cases where against the government entities that accepted the grant funding. There, as discussed below, the courts often found the evidence too general and speculative at the time, and denied these extraordinary requests for prospective relief based upon the lack of concrete injury.

After the election, other plaintiffs filed ill-fated cases, many of which requested federal district court to issue injunctions against States from certifying its election, or from sending certain Electors to Washington, D.C., for the electoral college vote. Those cases saw plaintiffs suing persons in their official capacity,

---

[4] The Plaintiffs take no political position, except to adhere to and defend the Constitution, and their own rights to vote for their candidate of choice for President and have that vote count in a fundamentally fair process. and express themselves, accordingly, while enjoying the rights and privileges of all citizens of the United States, which include the right to counsel, due process, equal protection, to petition government for a redress of grievances, and have a jury decide the issues of material fact that are in dispute.

which is tantamount to suing a State. Because damages cannot be sought against a

State, the only requests were for prospective relief. In those settings, the parties

and standards of proof required are different than those here.

Other cases, however, such as *Texas v. Pennsylvania*, filed in the United

States Supreme Court, were serious ventures. There, the Petitioners stated:

> Lawful elections are at the heart of our constitutional democracy. The
> public, and indeed the candidates themselves, have a compelling interest
> in ensuring that the selection of a President—any President—is
> legitimate. If that trust is lost, the American Experiment will founder. A
> dark cloud hangs over the 2020 Presidential election.

Bill of Complaint, *Texas v. Pennsylvania*, case 22O155 (U.S. filed Dec. 7,
2020), p. 1.

Regardless of how these cases were resolved, the affidavits and information

contained in the multiple complaints filed across the country established the

conduct of these Defendants—none of whom were sued in these other cases.

Concurrently, Dominion has managed to divide the country in half. Of

course, that was a foreseeable result of any vote counting system that uses

proprietary software that is not shared with the governmental bodies in charge of

election integrity. The company CEO is not an American citizen. Ap. 895. The

corporation is owned by a private equity firm largely consisting of foreign

investment. Ap. 895.

In the years leading up to the 2020 Presidential election, courts, elected officials, government agencies, academics and experts expressed concerns about the security, accuracy and reliability of Dominion voting systems. For example, in their Complaint, the Plaintiffs cite *Curling, et al., v. Raffensperger, et al.,* Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.). Ap. 51-52. There, before the election, the *Curling* court found:

> [T]he evidence shows that the Dominion BMD [Ballot Marking Device] does not produce a voter verifiable paper ballot ...Thus...voters must cast a BMD-generated ballot that...has the potential to contain information regarding the voter's choices that does not match what they enter on the BMD...or could cause a precinct scanner to improperly tabulate their votes.

2020 WL 5994029 at *35 (N.D. Ga. Oct. 11, 2020).

The *Curling* court's concluding statement regarding Dominion's obstruction tactics in discovery and verifiable vulnerabilities proved prophetic:

> The Court's Order has delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted...

*Id*. at *58

Before that, in December 2019, U.S. Senator Elizabeth Warren and other members of the Senate Banking and Urban Affairs Committee launched an investigation into Dominion and two other election technology firms responsible for developing, manufacturing and maintaining the vast majority voting machines and software in the United States. The Senators' letter to Dominion expressed grave concerns about the security of electronic voting machines, including the role private equity investment in Dominion has played in the creation and perpetuation of concerns regarding "vulnerabilities and a lack of transparency in the election technology industry." Ap. 25.

Scholars and industry experts have concluded that ballot-marking devices, generally, including the voting machines used by Dominion:

a.   produce ballots that do not necessarily record the vote expressed by the voter when they enter their selections on the touchscreen;

b.   are associated with known risks, which include hacking, bugs and configuration errors that can cause the voting machine to print votes that differ from what the voter entered and verified electronically;

c.   are not defensible, because there is no way to generate convincing public evidence that reported outcomes are correct despite any malfunctions that might have occurred;

d.   are not software independent, and can mark a ballot after the voter has inspected it;

> e.   the original transaction, i.e., the voter's expression of the votes, is not documented in a verifiable way; and,
>
> f.   cannot ensure through an audit that the reported outcome is correct.

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3, September 17, 2020. (*Dkt. 1, ¶ 42*). Ap. 26.

In early 2020, the Dominion voting system was rejected by the Texas Board of Elections, after the "examiner reports raise concerns about whether the Democracy Suite 5.5A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation." Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A*, State of Texas, January 24, 2020. (*Dkt. 1, ¶43, fn. 5*). Ap. 27.

After the election, Dominion machines underwent a third-party review as part of a Michigan case following reports of voting irregularities in Antrim County, Michigan.[5] Ap. 48, That case was brought by one citizen that paid for his own experts to request that a Michigan court order an audit of Michigan's 2020 General Election. In that litigation, a forensic report was generated that corroborated similar expert reports discussing known historical issues with Dominion voting machines.

---

[5] *Bailey v. Antrim County*, Case No. 20-9238-CZ (13th Cir. Ct. Mich).

There, Allied Security Operations Group released its report of an audit of the

Dominion voting machines and software used in the Antrim County, Michigan,

2020 Presidential election. Ap. A. The ASOG Report concludes:

> Dominion Voting System is intentionally and purposefully designed
> with inherent errors to create systemic fraud and influence election
> results. The system intentionally generates an enormously high number
> of ballot errors. The electronic ballots are then transferred for
> adjudication. The intentional errors lead to bulk adjudication of ballots
> with no oversight, no transparency, and no audit trail. This leads to voter
> or election fraud. Based on our study, we conclude that The Dominion
> Voting System should not be used in Michigan. We further conclude
> that the results of Antrim County should not have been certified.

Ap. 48, 921.

However, this report is only a part of a mosaic of evidence averred in the

Plaintiffs' complaints. As are the other Defendants, Dominion is a state actor. Ap.

81, 943, 308-309. It counts the ballots of over half the votes casts across America

in 28 states and more than 1300 jurisdictions. Ap. 24, 895. Additionally, Dominion

performs services in the execution of what is exclusively a public function, i.e.,

here, a Presidential election. As a part of those services, as intricately plead in the

Plaintiffs' Amended Complaint, Dominion's voting machines classify ballots as

either normal, or adjudicated. Ap. 897. Adjudicated ballots are the digital scans of

physical ballots that are flagged by the system's artificial intelligence, separated

for later adjudication to determine the voter's intent. Ap. 897. Ballots sent to

adjudication can be altered by administrators. Ap. 898. Adjudication files can be moved between different Results Tally and Reporting terminals with no audit trial of which administrator actually adjudicated the ballot batch, designated for adjudication. Ap. 898. Dominion's election management system provides no meaningful observation of the adjudication process, or audit trial concerning which administrator actually adjudicates the ballots, or the choice of which ballots required adjudication. Ap. 898. This patented adjudication process allows an administrator, or other person with access to a particular Dominion election management system to manually manipulate votes. Ap. 898.

Additionally, Dominion's retaliation lawfare to silence the media, lawyers, researchers, independent broadcasters, witnesses and others, indicate a clear intent to retaliate against those who question the integrity of not just their vote count and the security of its machines, but the responsibility it bears for the general administration of a substantial part of the 2020 Presidential election, as well. Ap. 302.

This case also concerns the rights of the Plaintiffs to have meaningful access to federal courts. The class has not been certified. Nonetheless, by the time of oral arguments on the motions to dismiss, Plaintiffs' counsel had received over 400 affidavits, from voters in 48 States. Ap. 1656, ll. 5-7.

### III.   Procedural History

On December 22, 2020, the Plaintiffs filed their suit in the U.S. District Court of Colorado (district court) for violations of the Act by the Defendants and, among other things, a constitutional challenge to 47 U.S.C. §230(c), as applied to the conduct of Facebook. Ap. 18-101.

After service, on February 16, 2021, Dominion and Facebook filed their motions to dismiss, pursuant to Fed.R.Civ.P 12(b)(1) and (6). Ap. 241-268 & 269-286. Plaintiffs timely responded to those motions. Ap. 300-709 & 710-735. On March 23, 2021, Dominion and Facebook filed their replies. Ap. 1156-1172 & 1173-1190.

On March 9, 2021, the Attorney General of the Commonwealth of Pennsylvania filed his entry of appearance of behalf of Tom Wolf, in his official capacity as the Governor of Pennsylvania, and Veronica Degraffenreid, in her official capacity as the Acting Secretary of the Commonwealth. Ap. 297-299.

Similarly, on March 9, 2021, the Attorney General of Georgia filed his entry of appearance of behalf of Brian Kemp, in his official capacity as the Governor of Georgia, and Brad Raffensperger, in his official capacity as the Secretary of State of Georgia. Ap. 293-296.

The Michigan Attorney General also entered her appearance on behalf of Gretchen Whitmer, in her official capacity as the Governor of Michigan, and Jocelyn Benson, in her official capacity as the Secretary of State of Michigan. Ap. 289-290.

These persons were not named as defendants in their official capacity. Defendants, Tom Wolf, Kathy Boockvar, Brian Kemp, Brad Raffensperger, Gretchen Whitmer and Jocelyn Benson, never entered their appearance in their named, individual capacity.

Thereafter, on March 10, 2021, Plaintiffs filed their motion to amend the complaint, with their attached Amended Complaint. Ap. 845-1135. On that same day, CTCL filed its motion to dismiss the original Complaint. Ap. 736-756.

At this time, Defendants, Zuckerberg and Chan, had not been served. Before the expiration of the previously issued summons, Plaintiffs filed a motion to extend the time necessary to serve those Defendants. Ap. 1306-1310. That motion which was granted to allow Plaintiffs up to May 21, 2021, to serve Zuckerberg and Chan. Ap. 1311-1312. The case was dismissed before that date.

All the parties filed timely responses and replies to the various motions to dismiss and the motion for leave to amend, all of which are in the Appendix.

On April 19 and 20, 2021, the Plaintiffs voluntarily dismissed all the individual persons from Wisconsin, Michigan, Georgia and Pennsylvania, without prejudice. Ap. 1460-1491.

In the interim, the district court set the matter for oral arguments on the motions to dismiss, to proceed on April 27, 2021. *See Transcript of Hearing*, 4/27/21, Ap. 1594-1684. The day after the hearing, the district court granted the served Defendants' motions to dismiss. Ap. 1505-1533. In its order of dismissal, the district court found that the "Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America." Ap. 1524. For that reason, the district court ruled that the Plaintiffs had no standing, and thus dismissed the Complaint "for lack of federal jurisdiction." Ap. 1524.

Additionally, the district court denied the Plaintiffs' motion for leave to amend their complaint. In finding that amendment would be futile, the district court stated, "Plaintiffs allege no particularized injury traceable to the conduct of the Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted." Ap. 1530.

Thereafter, the Plaintiffs filed a timely notice of appeal.

## SUMMARY OF ARGUMENT

Plaintiffs have standing to pursue their claims for civil rights violations, as each has suffered a particularized injury from one or more completed violations of their fundamental rights caused by the conduct of Defendants. The Plaintiffs referenced causes of actions for declaratory and injunctive relief are non-specific, and only plead as a means of reserving that portion of the district court's power to enter such orders, as may be necessary throughout the litigation.

The damages were caused by the conduct of the named Defendants, and the remedy requested, here, is retrospective. Thus, their claims are redressable by the district court, at a minimum, for nominal damages—which must be awarded upon a finding of a completed constitutional right violation.

The Defendants are state actors through their voluntary participation in the administration of the 2020 Presidential election, which is exclusively a public function. Plaintiffs do not simply allege a generalized grievance against government conduct, as none of these Defendants are government. At all times material, the Defendants were acting under color of law.

As such, the damages suffered by the Plaintiffs are traceable to the Defendants, despite the fact that a large portion of the general population was harmed. Importantly, not every member of the general public has the right to vote.

Only similarly situated, registered voters would have a right to claim injury for the conduct, described herein. Accordingly, the district court erred by dismissing the Plaintiffs complaint, denying the Plaintiffs' motion to amend, and finding that any amendment thereto would be futile. The district court never accepted the allegations contained in the complaints as true, and essentially foreclosed any citizen of the United States from filing a complaint against these Defendants.

## ARGUMENT

### I.     Plaintiffs have Article III Standing

### A.     Standard of Review

This Court reviews issues of standing de novo. *Winsness v. Yocom*, 433 F. 3d 727, 732 (10th Cir. 2006). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (*quoting Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### B.     Standing

The Constitution limits federal judicial power to the resolution of cases and controversies. U.S. Const. art. III, § 2. "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role

of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. (citations and internal quotation marks omitted). Second, there must be a causal connection between the injury and the conduct complained of, hence, the injury alleged must be fairly traceable to the challenged action of the defendant. *Id*. Third, it must be likely that the injury will be redressed by a favorable decision. *Id*. at 561.

### C.    Injury in Fact

Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr*, 369 U.S. 186, 204 (1962). "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *Transunion v. Ramirez*, 141 S.Ct. 2109, 2203 (2021) (*citing* Scalia, *The Doctrine of Standing as an*

*Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).

Assessing concreteness includes "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts…'" *Id.* at 2204 (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-341 (2016)). In delivering the opinion of the Court in *Transunion*, Justice Kavanaugh stated:

> To appreciate how the Article III 'concrete harm' principle operates in practice, consider two different hypothetical plaintiffs. Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.

*Id.* at 2205.

Here, the Plaintiffs bear the burden of demonstrating that they have standing. *Lujan*, 504 U.S. at 561. All of them are citizens of the United States and of their respective State. The Plaintiffs are registered voters, and each has an individual right to vote for the President and Vice-President of the United States, the latter of whom "are the only elected officials who represent all the voters in the Nation." *Anderson v. Celebreeze*, 460 U.S. 780, 794-795 (1983). As such, "in the context of

a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Id*.

In their complaints, the Plaintiffs outlined with specificity how the Defendants substantially burdened their respective right to vote in the 2020 Presidential election. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote," and "to have their votes counted." *Id*. (*citing Ex Parte Yarbrough*, 110 U.S. 651 (1884), and *United States v. Mosley*, 238 U.S. 383 (1915)).

As "equally unquestionable that the right to have one's vote counted is as open to protection. . .as the right to put a ballot in a box." *Mosley*, 238 U.S. at 386.

> The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347, *Lane v. Wilson*, 307 U.S. 268, nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315, nor diluted by ballot-box stuffing, *Ex Parte Siebold*, 100 U. S. 371, *United States v. Saylor*, 322 U.S. 385. As the Court stated in *Classic*, 'Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . .' 313 U. S., at 315.

*Reynolds*, 377 U.S. at 554-555.

"Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). This is particularly true

in the context of a Presidential election. "To be sure, administration of the electoral process is a matter that the Constitution largely entrusts to the States." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). Nonetheless, a Presidential election is a national expression of choice. "And history has seen a continuing expansion of the scope of the right of suffrage in this country." *Reynolds*, 377 U.S. at 555.

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Id*.

"The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." *Bush v. Gore*, 531 U.S. 98, 104 (2000). A state legislature's power to select the manner for appointing electors is plenary, as it may select the electors itself, which was indeed the manner used by state legislatures in several States for many years after the framing of our Constitution. *Id.* (*citing McPherson v. Blacker*, 146 U.S. 1, 35 (1892)).

Currently, every State has chosen the means of a statewide election to appoint its respective members of the electoral college. As stated by the Supreme Court:

> History now favors the voter, and in each of the several States the citizens themselves vote for Presidential electors. When the state legislatures vest the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity of each voter.

*Id*.

The Supreme Court has also instructed:

> When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

*Gomillion v. Lightfoot*, 364 US 339 (1960).

The examination continues with the concept that a voter must be real, have the right to vote, and only be allowed to cast *one* ballot that is counted *one* time.[6] The right to meaningfully vote for the President is priceless. As stated by Plaintiffs' counsel at the hearing on the motion to dismiss, "We fight wars over

---

[6] "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963).

this." Ap. 1651, l. 14. A pandemic does not set aside the Constitution and the laws of the United States to allow private persons to fund and substantially impact the administration of a Presidential election in 28 States.

As described by the Plaintiffs in their complaints, the conduct of the Defendants had a direct impact on the result of the 2020 Presidential election, which likely does not reflect the actual will of the American people.[7]

## D.    A Constitutional Infringement is an Injury in Fact

In its order of dismissal, the district court cited *Bognet v. Secretary Commonwealth of Pennsylvania*, wherein the 3rd Circuit stated:

> To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts you own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing.

980 F. 3d 336, 348 (3rd Cir. 2021), *cert granted and judgment vacated with instructions to dismiss as moot.* ___S.Ct.___(2021).

---

[7] The President of the United States is ultimately chosen by the Electors of each State. U.S. Const., Art. II, §1. These facts, however, are unprecedented in the history of the United States. Nonetheless, the Plaintiffs take no position, and have never made any requests regarding the legitimacy of the Presidential election. The Plaintiffs are powerless, in that regard. Nonetheless, the damages suffered by the Defendants are the foreseeable result of the Defendants' conduct. The power of persons like Zuckerberg and Chan, Facebook and Dominion to affect the outcome of any election is tremendous and fearsome. To deny it, is to deny reality.

Here, every original Plaintiff expressed their personal injuries in their respective affidavits—not to mention those referenced in the complaints—regarding their damages associated with the violations of their rights by the Defendants. Recently, the Supreme Court discussed the history of a completed constitutional violation as a legal injury, noting:

> Early courts required the plaintiff to prove actual monetary damages in every case. (Citation omitted). Later courts, however, reasoned that *every* legal injury necessarily causes damage, so they awarded nominal damages absent evidence of other damages (such as compensatory, statutory, or punitive damages), and they did so where there was no apparent continuing or threatened injury for nominal damages to redress. *See, e.g., Barker* v. *Green,* 2 Bing. 317, 130 Eng. Rep. 327 (C. P. 1824) (nominal damages awarded for 1-day delay in arrest because "if there was a breach of duty the law would presume some damage");[citations omitted]; *Marzetti* v. *Williams,* 1 B. & Ad. 415, 417-418, 423-428, 109 Eng. Rep. 842, 843, 845-847 (K. B. 1830) (bank's 1-day delay in paying on a check); *id.,* at 424, 109 Eng. Rep., at 845 (recognizing that breach of contract could create a continuing injury but determining that the fact of breach of contract by itself justified nominal damages).

> The latter approach was followed both before and after ratification of the Constitution. *An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote, the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. Ashby v. White, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K. B. 1703).* Dissenting, Lord Holt argued that *the common law inferred damages whenever a legal right was violated.* Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the

[violation]." Id., at 955, 92 Eng. Rep., at 137. Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, 3 Salk. 17, 91 Eng. Rep. 665 (K. B. 1703), and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases," *Embrey v. Owen,* 6 Exch. 353, 368, 155 Eng. Rep. 579,585 (1851).

The dissent correctly notes that English courts differed in some respects from courts under our system, but Lord Holt's position also prevailed in courts on this side of the Atlantic. Applying what he called Lord Holt's "incontrovertible" reasoning, Justice Story explained that a prevailing plaintiff "is entitled to a verdict for nominal damages" whenever "no other [kind of damages] be proved." *Webb* v. *Portland Mfg. Co.,* 29 F.Cas. 506, 508-509 (No. 17,322) (CC Me. 1838). *Because the common law recognized that "every violation imports damage," Justice Story reasoned that "[t]he law tolerates no farther inquiry than whether there has been the violation of a right." Ibid.* Justice Story also made clear that this logic applied to both retrospective and prospective relief. *Id.,* at 507 (stating that nominal damages are available "wherever there is a wrong" and that, "[a] fortiori, this doctrine applies where there is not only a violation of a right of the plaintiff, but the act of the defendant, if continued, may become the foundation, by lapse of time, of an adverse right." [Emphasis added].

*Uzuegbunam v. Preczewski*, 141 S. Ct. at 798-799.

Delivering the opinion of the Court, Justice Thomas went on to state:

That this rule developed at common law is unsurprising in the light of the noneconomic rights that individuals had at that time. *A contrary rule would have meant, in many cases, that there was no remedy at all for those rights, such as due process or voting rights, that were not readily reducible to monetary valuation. See* D. Dobbs, Law of Remedies § 3.3(2) (3d ed. 2018) (nominal damages are often awarded for a right "not economic in character and for which no substantial non-pecuniary award is available"); *see also Carey* v. *Piphus,* 435 U. S. 247, 266-267 (1978) (awarding nominal damages for a violation of

procedural due process). By permitting plaintiffs to pursue nominal damages whenever they suffered a personal legal injury, the common law avoided the oddity of privileging small-dollar economic rights over important, but not easily quantifiable, nonpecuniary rights. [Emphasis added].

*Id*. at 800.

## E.    Causation

In its order of dismissal, the district court did not address this issue, having found that the allegations contained in the Plaintiffs' complaints fell short of establishing an injury in fact. A §1983 claim requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). With regard to this second element of standing to make such a claim:

[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."

*Lujan*, 504 U.S at 560 (*quoting Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42 (1976)).

Suffice it say, Plaintiffs damages are directly traceable to the conduct of the Defendants and, although, different parties may have also been involved, the

causal connection is established through the averments, exhibits, reports and affidavits contained in the complaints, and other materials referenced therein.

## F.    Redressability

The Plaintiffs have requested that damages be assessed against the Defendants. A jury decides the amount of money to award upon a finding of a constitutional right violation, which must be at least one dollar. That does not mean that the jury is limited to one dollar—but only that some damage must be awarded if the elements of the claims are satisfied by a preponderance of evidence. Plaintiffs request nominal damages as the minimum liability of the Defendants.

Even then, a "request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 141 S.Ct. at 801-802.

## G.    Plaintiffs Are Only in the Pleading Stage

The district court cited President Trump's pre-election, legal challenge in the Western District of Pennsylvania concerning election guidance given by the Secretary of the Commonwealth regarding manned security near absentee drop boxes, performing signature comparisons for mail-in ballots, and a county-residency requirement for poll watchers. *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp.3d 331 (2020). There, then President Trump's campaign

argued that "drop boxes allow for an unacceptable risk of voter fraud and 'illegal delivery or ballot harvesting' that, when it occurs, will 'dilute' the votes of all lawful voters who comply with the Election Code." *Id*. at 359. The campaign also claimed that it would suffer an injury through the non-equal treatment or dilution of their legitimately cast votes by improperly verified absentee or mail-in ballots. In granting summary judgment on behalf of the defendants, the court stated:

> Defendants argue that the claimed injury of vote dilution caused by possible voter fraud *here is too speculative to be concrete*. The Court agrees. To establish a 'concrete' injury, Plaintiffs rely on a chain of theoretical events…The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is 'certainly impending.' To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is 'certainly impending,' and not just a 'possible future injury.' [Emphasis added].

*Id*. at 377.

"This case is well past the pleading stage," the *Boockvar* court noted, "Extensive fact and expert discovery are complete…and unlike on a motion to dismiss, on summary judgment, [plaintiffs] must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact." *Id*. at 377.

This case does not involve the risk of harm, but a completed constitutional violation. Further, this case was in the pleading stage at the time of the district

court's dismissal. At the pleading stage, general factual allegations of injury

resulting from the defendant's conduct may suffice. *Lujan*, 504 U.S. at 561.

The *Boockvar* court went on to state:

> [A] plaintiff can have standing to bring a voter-fraud claim, but the proof
> of injury there is *evidence of actual fraud in the election and thus the
> suit will be brought after the election has occurred*. [Emphasis added].

*Id*.

Further, as it is with every case cited by the district court, the *Boockvar*

matter was *not* a request for damages against private persons engaged in state

action. The case involved a constitutional challenge to Pennsylvania election laws,

and requests for injunctive relief against the State:

> Indeed, '[c]ommon sense, as well as constitutional law, compels the
> conclusion' that states must be free to engage in 'substantial regulation
> of elections' if 'some sort of order, rather than chaos, is to accompany
> the democratic processes. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

*Id*. at 383.

In response to a summary judgment motion, a plaintiff can no longer rest

on such mere allegations, but must set forth by affidavit or other evidence

specific facts. *Com'rs of County of Arapahoe, Colorado*, 633 F.3d 1022, 1025

(10th Cir. 2011). This case, however, has yet to progress that far.

## II. The District Court Erred by Dismissing the Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction

### A. Standard of Review

A dismissal for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) is reviewed de novo. *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007).

### B. Lack of Subject Matter Jurisdiction

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir. 1994).

A Rule 12(b)(1) motion to dismiss must be determined from the allegations of facts in the complaint, without regard to mere conclusory allegations of jurisdiction. *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008).

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack

on the complaint, a district court must accept the allegations in the complaint as true. *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).

Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion. *Id.* at 1002-03 (citations omitted).

Different standards apply, however, to a dismissal based on lack of subject matter jurisdiction under Rule 12(b)(1), and a motion to dismiss for failure to state a claim under Rule 12(b)(6). As the Supreme Court explained in *Bell v. Hood*:

> Jurisdiction...is not defeated...by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law[,] and just as issues of fact[,] it must be decided after[,] and not before[,] the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state

a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

327 U.S. 678, 682 (1946).

### C.     Accepting Well Plead Facts as True

In its order of dismissal, the district court stated:

The decisive argument is that the *Plaintiffs* have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. [Emphasis added].

Ap. 1512.

With that, the district court entertained only a facial challenge to the complaints, and did not consider evidence outside of the Plaintiffs' complaints and pleadings. As clear, the district court applied an improper standard in evaluating the Plaintiffs' claims, in that, it did not actually accept as true all of Plaintiffs' plausible allegations and draw all reasonable inferences in their favor.

For example, the district court described Dominion as "a private supplier of election and voting technology," Facebook as a "social media company," and CTCL as "a non-profit organization dedicated to making elections more secure and inclusive." Ap. 1506. In that regard, the district court refused to assess the Plaintiffs' claims under a recognition that the Defendants are state actors. A §1983 claim is only applicable to conduct occurring under color of law. *Gallagher,* 49 F. 3d at 1447.

> If the state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor.

*Id.* at 1456 (*quoting Jackson v. Metropolitan Edison,* 419 U.S. 345, 352 (1974)) (*citing Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991)).

Notably, election administration is one of the few required functions of a State:

> This test is difficult to satisfy. 'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'[Citation]. Nevertheless, the Supreme Court has found some functions to satisfy this test. *These traditional state functions include administering elections of public officials.* [Emphasis added].

*Id.* (*citing Terry v. Adams,* 345 U.S. 461, 468-70 (1953)).

With that, the status of the Plaintiffs as citizens of the United States that claim damage under the Act, as averred by their well pleaded facts, establish their standing. In the order of dismissal, the district court states:

> Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury… Here, by their own admission, Plaintiffs claimed injuries are no different than the supposed injuries experienced by all registered voters.

Ap. 1528.

Nowhere in the record do the Plaintiffs request that the district court bestow standing. The Plaintiff have standing, on their own. Further, Plaintiffs never

admitted that their injuries are no different than those suffered by all registered voters, except to express that others may be similarly situated across the country for purposes of establishing the class.

### D. The Cases Relied Upon By the District Court Are Not Determinative Regarding the Standing of the Plaintiffs

Citizens are prohibited from suing States for damages. U.S. Const., Art. XI. However, plaintiffs may sue government officials in their official capacity for prospective relief. In the line of cases cited by the district court, each one involved plaintiffs suing States, or their sub-divisions, for such relief.

For example, in *Wood v. Raffensperger*, the 3rd Circuit affirmed the lower courts finding that plaintiff's request for emergency injunctive relief was not justiciable. 981 F.3d 1307, 1313 (11th Cir. 2020). There, the plaintiff based his standing on his interest in ensuring that "only lawful ballots are counted." *Id*. at 1314. As the Court stated:

> Wood asserts only a generalized grievance. A particularized injury is one that effects the plaintiff in a personal and individual way…A generalized grievance is undifferentiated and common to all members of the public. (Citations and internal quotation marks omitted).

*Id*. at 1314.

The Court further noted:

> Wood moved for extraordinary relief. He asked that the district court take one of three steps: prohibit Georgia from certifying the results of

> the November election; prevent it from certifying results that include 'defective absentee ballots, regardless of whether said ballots were cured;' or declare the entire election defective and order the state to fix the problems caused by the settlement agreement.

*Id*. at 1312.

The 3rd Circuit also found that that even "if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness." *Id*. at 1316. Georgia had "already certified its results." *Id*. at 1317. "Based upon the posture of this appeal," concluded the Court, "the challenged action is the denial of an emergency injunction against the certification of election results." *Id*. at 1317.

The district court's reliance on *Lance v. Coffman*, 549 U.S. 437 (2007), is also misplaced. In *Lance*, the plaintiffs sued the Colorado Secretary of State, in his official capacity, challenging the state supreme court's interpretation of a section of the Colorado Constitution. In finding the plaintiffs failed to establish standing, the United States Supreme Court, per curiam, held:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law — specifically the Elections Clause — has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing.

*Id*. at 1198.

There, Supreme Court identified a generalized grievance as "only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted." *Id*. at 439 (*quoting Fairchild v. Hughes*, 258 U.S. 126, 129 (1922)).

The district court misapplied this standard in finding, here, that the Plaintiffs "allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted." Ap. 1530. However, this does not accurately reflect the Plaintiffs' claims, nor their request for retrospective damages.

Similarly, the recent Supreme Court's denial of the State of Texas' attempt to file a bill of complaint challenging the election procedures of several States is not a justification for finding the Plaintiffs, here, have not suffered a particularized, personal injury. *Texas v. Pennsylvania*, 141 S.Ct. 1230 (2020) (finding that "Texas ha[d] not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections.") There, again, the Supreme Court was not asked to examine the claims of natural persons against state actors for damages. The State of Texas was requesting that the Supreme Court, among other things, declare that the Defendant States administered the 2020 Presidential election in violation of the Electors Clause and the Fourteenth Amendment, and that any

electoral college votes casts by electors appointed by these States are similarly in violation of the Constitution. Texas further requested that the Supreme Court enjoin the Defendant States' use of the 2020 election results to appoint presidential electors, authorize a special election, and enjoin those States certifying presidential electors, pending further order of the Court.

In its order of dismissal, the district court also referenced the dismissal of several cases brought by former Assistant U.S. Attorney General, Sidney Powell, Esq., and others, *some of* the contents of which were referenced in the Plaintiffs' complaints. *See Bowyer v. Ducey*, Civ. No. 20-cv-2321, 2020 WL 7238261 (D. Ariz. December 9, 2020); *King v. Whitmer*, Civ. No. 20-cv-13134, 2020 WL 7134198 (E.D. Mich. December 7, 2020); and *Feehan v. Wisconsin Elections Commissions*, 506 F.Supp.3d 596 (E.D. Wis. December 9, 2020).

In those cases, the plaintiffs filed complaints against government officials in their official capacity. Generally, "States enjoy sovereign immunity from suits under the Eleventh Amendment." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). However, "a plaintiff may bring suit against individual state officers acting in their official capacity if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Id*. *See also Ex Parte Young*, 209 U.S. 123, 155-56 (1908).

As such, courts treat those cases as suits against the States themselves. *See Hafer v. Melo*, 52 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity…should be treated as suits against the State."). *See also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Accordingly, the above referenced cases were suits against sovereign States, and the requested prospective relief proves that point.

As the *King* court noted in its order denying the plaintiffs' request for emergency declaratory judgment and injunctive relief:

> The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act. [*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, n.11 (1984)] (*quoting Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

*King*, *supra*, ECF No. 62, Pg ID 3302.

The *King* court found *Ex Parte Young* did not apply to state law claims against state officials. *Id*. at Pg ID 3304 (*citing Pennhurst*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.”))

Further, the *King* court correctly noted that a preliminary injunction is “an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.” *Id.* at Pg ID 3300 (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). In *King*, the plaintiffs lacked standing, the defendants were immune, the matter was moot, laches and abstention applied, and the plaintiffs did not establish a likelihood of success on the merits.

There, the plaintiffs were requesting a federal district court to, inter alia, decertify the election results of that particular State and order Defendants “to transmit certified election results that state that President Donald Trump is the winner of the election.” *King*, *supra*, ECF No. 6 at pg ID 955; ECF No. 7 at pg ID 1847. The *King* court described the relief sought as “stunning in its scope and breathtaking in its reach.” *King*, *supra*, at p. 2.

Although those cases may have been doomed from the start, the information contained in those matters, in the form of affidavits and expert reports, formed the

basis for *some* of the averments in this case.[8] Discernibly, the dismissal of those cases did not render that evidence incredible as a matter of law.

Plus, a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). A plaintiff who seeks a preliminary injunctive relief must make a clear showing of irreparable injury, and a clear showing of likely of success on the merits. *See Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) ("At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing.").

In ruling upon a motion to dismiss for lack of subject matter jurisdiction, the district court must accept as true all material allegations of the complaint related to Article III standing. *Warth*, 422 U.S. at 501. When a plaintiff is seeking a preliminary injunction, much more is needed. In that context, a plaintiff cannot simply make allegations in his complaint and demand that the courts accept them as true.

---

[8] The Plaintiffs fared no better in the Supreme Court, which denied their writ of certiorari before judgment to the U.S. Court of Appeals for the Sixth Circuit. *King v. Whitmer*, 141 S.Ct. 1449 (2021).

In *Texas Voters Alliance v. Dallas County*, before the 2020 Presidential election, a voters' group and other citizens, again, filed for prospective relief to enjoin four Texas counties from receiving grants from CTCL. 495 F. Supp.3d 441, 449 (E.D. Tex. Oct 10, 2020). As in the cases noted above, the *Texas Voters Alliance* court was faced with a request for preliminary injunction. In relying upon the decision, however, the district court, here, stated that the allegations made in *Texas Voters Alliance* were "similar to the allegations made in this case [in] that by accepting or using CTCL private federal election grants, Texas counties acted ultra vires." Ap. 1519. Plaintiffs in this case made no such accusation. Their complaint is against CTCL, directly, for its conduct across the country, which ultimately did result in the Plaintiffs' rights being substantially burdened by the foreseeable result of its conduct, as outlined in the complaints—not another complaint regarding completely different parties, dissimilar issues and different standards of proof during the pleading stage.

There, as in many of the cases above, the *Texas Voters Alliance* court found the injury claimed was an "undifferentiated, generalized grievance about the conduct of government," and that "merely alleging that the grants *may* influence the election result and lead to *possible* disenfranchisement is not an injury-in-fact." [Emphasis added]. *Id*. at 552.

Specifically, the *Texas Voters Alliance* court found that the plaintiffs were "not claiming their right to vote is being disadvantaged." *Id.* at 452-453. "Plaintiffs are merely alleging that this wider access *may* lead to a result with which they disagree." *Id*. at 453.

In *Iowa Voter Alliance v. Black Hawk County*, the Northern District of Iowa dismissed a similar lawsuit also brought by a local voter's group and other citizens, seeking to "prevent the named counties from using the CTCL grants to help fund the election." C20-2078-LTS. 2021 WL 276700 (N.D. Iowa January 27, 2021). After the plaintiffs were denied a temporary restraining order before the election, the plaintiffs amended their complaint for a declaratory judgment that the named counties' use of the grants violated federal and state law, and for an injunction preventing them from using CTCL, or other private grants, in the future.

Predictably, the *Iowa Voter Alliance* court likewise determined that the plaintiffs did not have standing, as the plaintiffs, there, "failed to allege facts showing that the counties actions resulted in a concrete and particularized injury to their right to vote or to their rights under the Fourteenth and Ninth Amendments." *Id*. at *7. "Instead, they have done no more than assert generalized grievances against government conduct of which they do not approve." *Id*.

Here, CTCL is the state actor, under the circumstances of *this* case. Yet, none of the Defendants are government. The Defendants don't govern the Plaintiffs, nor do they have any legislative, judicial or executive power. Because of that, they don't have immunity from suit under the Eleventh Amendment. Under the Act, they are persons acting under color of official authority.

### III.   The District Court Erred by Denying the Plaintiffs' Motion to Amend Their Complaint as Futile

### A.   Standard of Review

The district court has discretion when considering whether to allow a plaintiff to amend her complaint. *First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*, 820 F.2d 1127, 1132 (10th Cir. 1987). Thus, the district court's denial of the Plaintiffs' motion to amend their complaint as futile is reviewed for abuse of discretion. *Bauchman v. West High School*, 132 F.3d 542, 559 (10th Cir. 1987). Courts will not overturn a decision absent such abuse. *Id.*

### B.   The District Court Abused Its Discretion

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or

futility of amendment. *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir.1993) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The test is whether the proposed amendments, as supported by the affidavits or other evidence, cure the deficiencies in the original complaint. *See, e.g.*, *Mountain View Pharmacy v. Laboratories*, 630 F.2d 1383 (10th Cir. 1980)(court of appeals gave plaintiffs benefit of any supporting allegations contained in sworn factual certificate submitted with the amended complaint when evaluating motion for leave to amend).

Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant language to state a claim for relief. *Mountain View Pharmacy*, 630 F.2d at 1387. A plaintiff must allege sufficient facts to support a cause of action under the law. Conclusory allegations that the defendant violated those laws are insufficient. *Id.* (*citing Klebanow v. New York Produce Exch.*, 344 F.2d 294, 299 (2d Cir. 1965)). *See also TV Communications Network v. Turner Network*, 964 F. 2d 1022, 1028 (10th Cir. 1992).

Plaintiffs sought to amend their complaint primarily to add additional factual allegations, as significantly more was known at the time of the amendment, than when Plaintiffs filed their initial Complaint—not to mention the addition of 152 Plaintiffs.

Noting the district court's ruling that, "if the amendment was allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing," the same issues as argued above apply to this issue, as well. Except, the Amended Complaint was filed by 160 Plaintiffs from 38 States, and additionally included claims against Zuckerberg, Facebook, CTCL and others for violations of 18 U.S.C. §1962(c)—enterprise racketeering (RICO).

As before, the district court never accepted the factual allegations in the Amended Complaint as true. Instead, the district court misread the recently decided *Uzuegbunam* decision as only instructive with regard to the "redressability" element of standing. Ap. 1512. As the Plaintiffs have argued throughout, however, "every violation of a right imports damage." *Uzuegbunam*, 141 S.Ct. at 802. Here, the rights of all the Plaintiffs were violated by the state action of the Defendants. Those completed violations imported damage.

The district court ruled, "Nothing in the proposed Amended Complaint changes the standing analysis." Accordingly, the district abused its discretion by denying the Plaintiffs' motion to amend on the grounds of futility. If the stated reasons for a denial of a request to amend "are incorrect as a matter of law, the district court will be found to have abused its discretion" in dismissing a claim. *Grossman v. Novell, Inc*., 120 F. 3d 1112, 1126 (10th Cir. 1997).

## CONCLUSION

For the reasons stated herein, the Plaintiffs requests that this Court reverse the district court's order granting dismissal of their case, and further requests that this matter be reinstated with instructions to the district court to allow the Plaintiffs to amend their complaint, pursuant to Rule 15, and, considering the dismissal of certain parties and claims since the filing of the Amended Complaint, to grant reasonable leave to allow the Plaintiff's to amend their complaint, again, if necessary, consistent with this Court's ruling.

Respectfully submitted on September, 18, 2021, by:

*s/ Gary D. Fielder*
Gary D. Fielder, #19757
LAW OFFICE OF GARY D. FIELDER
1444 Stuart St.
Denver, CO 80204
(303) 650-1505 Fax: (303) 650-1705
e-mail: gary@fielderlaw.net

Attorney for the Plaintiffs

## ORAL ARGUMENT STATEMENT

Per 10th Cir. R. 28.2(C)(4), Plaintiff - Appellee requests oral argument to permit the Court to explore the important factual and legal issues in the case.

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. Ap. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 12,063 words. I relied on my word processor and its Word software to obtain this count. I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

_s/ Gary D. Fielder_
Gary D. Fielder, #19757

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 18th day of September, 2021, I electronically filed the foregoing **APPELLANT'S OPENING BRIEF** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

*s/ Gary D. Fielder*
Gary D. Fielder, #19757