No. 21-1161

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

_____

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

_____

## APPELLANTS' APPENDIX A

## 1 of 6 – Pages 1 to 299

_____

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1515
gary@fielderlaw.net

*Counsel for Plaintiffs-Appellants*

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:20-cv-03747-NRN

| | |
|---|---|
| O'Rourke et al v. Dominion Voting Systems, Inc. et al<br>Assigned to: Magistrate Judge N. Reid Neureiter<br>Case in other court: USCA-10th Circuit, 21-01161<br>Cause: 42:1983 Civil Rights Act | Date Filed: 12/22/2020<br>Date Terminated: 04/28/2021<br>Jury Demand: Plaintiff<br>Nature of Suit: 441 Civil Rights:<br>Voting<br>Jurisdiction: Federal Question |

| Date Filed | # | Docket Text |
|---|---|---|
| **12/22/2020** | 1 | COMPLAINT *and Jury Demand* against All Plaintiffs (Filing fee $ 402,Receipt Number 1082-7642517)Attorney Gary D. Fielder added to party Kevin O'Rourke(pty:pla), filed by Kevin O'Rourke. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Exhibit Ex. 1 O'Rourke Affidavit, # 3 Exhibit Ex. 2 Carter Affidavit, # 4 Exhibit Ex. 3 Cutunilli Affidavit, # 5 Exhibit Ex. 4 Criswell Affidavit, # 6 Exhibit Ex. 5 Cook Affidavit, # 7 Exhibit Ex. 6 Crenshaw Affidavit, # 8 Exhibit Ex. 7 Yarbrough Statement, # 9 Exhibit Ex. 8 Trapp Statement, # 10 Exhibit Ex. 9 ASOG Report, # 11 Exhibit Ex. 10 Navarro Report, # 12 Exhibit Ex. 11 Amistad Project Report)(Fielder, Gary) (Entered: 12/22/2020) |
| 12/22/2020 | 2 | Case assigned to Magistrate Judge N. Reid Neureiter. Text Only Entry. (trvo, ) (Entered: 12/22/2020) |
| 12/22/2020 | 3 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. NO SUMMONS ISSUED. (trvo, ) (Entered: 12/22/2020) |
| 12/23/2020 | 4 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE AND SETTING DEADLINE FOR FILING OF CONSENT/NON-CONSENT FORM by Magistrate Judge N. Reid Neureiter on 23 December 2020. Consent Form due by 2/25/2021. Proposed Scheduling Order due 3/4/2021. Scheduling Conference set for 3/11/2021 11:00 AM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. (cmadr, ) (Entered: 12/23/2020) |
| 12/23/2020 | 5 | SUMMONS REQUEST as to DOMINION VOTING SYSTEMS INC., FACEBOOK, INC., CENTER FOR TECH AND CIVIC LIFE, MARK E. ZUCKERBERG, PRISCILLA CHAN, BRIAN KEMP, BRAD RAFFENSPERGER, GRETCHEN WHITMER, JOCELYN BENSON, |

TOM WOLF, KATHY BOOCKVAR, TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, ROBERT F. SPINDELL, JR re 1 Complaint,, by Plaintiff Kevin O'Rourke. (Attachments: # 1 Summons Summons in one pdf file)(Fielder, Gary) (Entered: 12/23/2020)

| | | |
|---|---|---|
| 12/24/2020 | 6 | Administrative Notice: The Summonses submitted contain an incomplete caption and will not be issued. All parties to the action must be listed in the caption of the summons. (Text Only Entry) (cmadr, ) (Entered: 12/24/2020) |
| 12/24/2020 | 7 | SUMMONS REQUEST as to DOMINION VOTING SYSTEMS INC., FACEBOOK, INC., CENTER FOR TECH AND CIVIC LIFE, MARK E. ZUCKERBERG, PRISCILLA CHAN, BRIAN KEMP, BRAD RAFFENSPERGER, GRETCHEN WHITMER, JOCELYN BENSON, TOM WOLF, KATHY BOOCKVAR, TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, ROBERT F. SPINDELL, JR. re 1 Complaint,, by Plaintiff Kevin O'Rourke. (Attachments: # 1 Summons Summonses on one PDF file)(Fielder, Gary) (Entered: 12/24/2020) |
| 12/28/2020 | 8 | SUMMONSES issued by Clerk. (cmadr, ) (Entered: 12/28/2020) |
| 01/05/2021 | 9 | NOTICE of Entry of Appearance by Ernest John Walker on behalf of All Plaintiffs Attorney Ernest John Walker added to party Nathaniel L Carter(pty:pla), Attorney Ernest John Walker added to party Larry D Cook(pty:pla), Attorney Ernest John Walker added to party Kesha Crenshaw(pty:pla), Attorney Ernest John Walker added to party Alvin Criswell(pty:pla), Attorney Ernest John Walker added to party Lori Cutunilli(pty:pla), Attorney Ernest John Walker added to party Kevin O'Rourke(pty:pla), Attorney Ernest John Walker added to party Amie Trapp(pty:pla), Attorney Ernest John Walker added to party Neil Yarbrough(pty:pla) (Walker, Ernest) (Entered: 01/05/2021) |
| 01/06/2021 | 10 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:re: 9 filed by attorney Ernest John Walker. Attorney has used an incorrect signature format in violation of D.C.COLO.LCivR 5.1(a) and 4.3(a) of the Electronic Case Filing Procedures (Civil cases). **DO NOT REFILE THE DOCUMENT.** In the future, the filer must affix an electronic s/signature followed by a typed, not an inked, signature to all future documents.(Text Only Entry) (cmadr, ) (Entered: 01/06/2021) |
| 01/20/2021 | 11 | NOTICE of Entry of Appearance by Stanley L. Garnett on behalf of Dominion Voting Systems, Inc.Attorney Stanley L. Garnett added to party Dominion Voting Systems, Inc.(pty:dft) (Garnett, Stanley) (Entered: 01/20/2021) |

| 01/20/2021 | 12 | NOTICE of Entry of Appearance by Amanda Kristine Houseal on behalf of Dominion Voting Systems, Inc.Attorney Amanda Kristine Houseal added to party Dominion Voting Systems, Inc.(pty:dft) (Houseal, Amanda) (Entered: 01/20/2021) |
|---|---|---|
| 01/20/2021 | 13 | NOTICE of Entry of Appearance by David Meschke on behalf of Dominion Voting Systems, Inc.Attorney David Meschke added to party Dominion Voting Systems, Inc.(pty:dft) (Meschke, David) (Entered: 01/20/2021) |
| 01/20/2021 | 14 | NOTICE of Entry of Appearance by Bridget C. DuPey on behalf of Dominion Voting Systems, Inc.Attorney Bridget C. DuPey added to party Dominion Voting Systems, Inc.(pty:dft) (DuPey, Bridget) (Entered: 01/20/2021) |
| 01/25/2021 | 15 | NOTICE of Entry of Appearance by Ryan Thomas Bergsieker on behalf of Facebook, Inc.Attorney Ryan Thomas Bergsieker added to party Facebook, Inc.(pty:dft) (Bergsieker, Ryan) (Entered: 01/25/2021) |
| 01/25/2021 | 16 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint,, by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 01/25/2021) |
| 01/25/2021 | 17 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Facebook, Inc.. Facebook, Inc. answer due 2/16/2021. (Bergsieker, Ryan) (Entered: 01/25/2021) |
| 01/25/2021 | 18 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 25 January 2021. It is hereby ORDERED that Dominion Voting Systems, Inc.'s Unopposed Motionfor Extension of Time to File Answer or Response to Complaint (Dkt. # 16 ) is GRANTED. Dominion Voting Systems, Inc. shall answer or otherwise respond toPlaintiffs' Complaint (Dkt. # 1 ) on or before February 16, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 01/25/2021) |
| 01/26/2021 | 19 | NOTICE of Entry of Appearance by Joshua Seth Lipshutz on behalf of Facebook, Inc.Attorney Joshua Seth Lipshutz added to party Facebook, Inc.(pty:dft) (Lipshutz, Joshua) (Entered: 01/26/2021) |
| 01/26/2021 | 20 | NOTICE of Entry of Appearance by Craig Brian Streit on behalf of Facebook, Inc.Attorney Craig Brian Streit added to party Facebook, Inc.(pty:dft) (Streit, Craig) (Entered: 01/26/2021) |
| 01/26/2021 | 21 | NOTICE of Entry of Appearance by Natalie Jean Hausknecht on behalf of Facebook, Inc.Attorney Natalie Jean Hausknecht added to party Facebook, Inc.(pty:dft) (Hausknecht, Natalie) (Entered: 01/26/2021) |
| 02/16/2021 | 22 | MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO* |

| | | |
|---|---|---|
| | | *STRIKE PURSUANT TO F.R.C.P. 23* by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 02/16/2021) |
| 02/16/2021 | 23 | MOTION to Dismiss by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 02/16/2021) |
| 02/16/2021 | 24 | MOTION to Stay *Disclosures and Discovery Pending Ruling on Motion to Dismiss* by Defendant Facebook, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Lipshutz, Joshua) (Entered: 02/16/2021) |
| 02/19/2021 | 25 | Unopposed MOTION to Stay *DISCLOSURES AND DISCOVERY PENDING RULING ON MOTIONS TO DISMISS* by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 02/19/2021) |
| 02/19/2021 | 26 | NOTICE *of Plaintiffs' Withdrawal of Opposition to Facebook's Motion for Stay of Disclosures and Discovery Pending Ruling on Motions to Dismiss* by Defendant Facebook, Inc. (Lipshutz, Joshua) (Entered: 02/19/2021) |
| 02/25/2021 | 27 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Nathaniel L Carter, Larry D Cook, Kesha Crenshaw, Alvin Criswell, Lori Cutunilli, Kevin O'Rourke, Amie Trapp, Neil Yarbrough All parties consent.. (Walker, Ernest) (Entered: 02/25/2021) |
| 02/26/2021 | 28 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 26 February 2021. It is hereby ORDERED that Dominion Voting Systems, Inc.'s Unopposed Motion for Stay of Disclosures and Discovery Pending Ruling on Motions to Dismiss (Dkt. # 25 ) is GRANTED. Accordingly, it is further ORDERED that this case is STAYED pending resolution of the two motions to dismiss (Dkt. ## 22 & 23 ). It is further ORDERED that the Motion to Stay Disclosures and Discovery Pending Ruling on Motion to Dismiss by Defendant Facebook, Inc. (Dkt. # 24 ) is DENIED as moot. It is further ORDERED that the Scheduling Conference set for March 11, 2021 at 11:00 a.m. is CONVERTED to a Status Conference. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 02/26/2021) |
| 03/03/2021 | 29 | NOTICE of Entry of Appearance by Heather Stuht Meingast on behalf of Gretchen WhitmerAttorney Heather Stuht Meingast added to party Gretchen Whitmer(pty:dft) (Meingast, Heather) (Entered: 03/03/2021) |
| 03/04/2021 | 30 | NOTICE of Entry of Appearance by Heather Stuht Meingast on behalf of Jocelyn BensonAttorney Heather Stuht Meingast added to party Jocelyn Benson(pty:dft) (Meingast, Heather) (Entered: 03/04/2021) |
| 03/04/2021 | 31 | NOTICE of Change of Address/Contact Information by Gary D. Fielder (Fielder, Gary) (Entered: 03/04/2021) |

| | | |
|---|---|---|
| 03/04/2021 | 32 | NOTICE of Change of Address/Contact Information by Ernest John Walker (Walker, Ernest) (Entered: 03/04/2021) |
| 03/08/2021 | 33 | NOTICE of Entry of Appearance by Joshua Adam Matz on behalf of Center for Tech and Civic LifeAttorney Joshua Adam Matz added to party Center for Tech and Civic Life(pty:dft) (Matz, Joshua) (Entered: 03/08/2021) |
| 03/08/2021 | 34 | NOTICE of Entry of Appearance by Michael Skocpol on behalf of Center for Tech and Civic LifeAttorney Michael Skocpol added to party Center for Tech and Civic Life(pty:dft) (Skocpol, Michael) (Entered: 03/08/2021) |
| 03/08/2021 | 35 | NOTICE of Entry of Appearance by Marcella E. Coburn on behalf of Center for Tech and Civic LifeAttorney Marcella E. Coburn added to party Center for Tech and Civic Life(pty:dft) (Coburn, Marcella) (Entered: 03/08/2021) |
| 03/08/2021 | 36 | NOTICE of Entry of Appearance by Louis William Fisher on behalf of Center for Tech and Civic LifeAttorney Louis William Fisher added to party Center for Tech and Civic Life(pty:dft) (Fisher, Louis) (Entered: 03/08/2021) |
| 03/09/2021 | 37 | NOTICE of Entry of Appearance by Charlene Swartz McGowan on behalf of Brian Kemp, Brad RaffenspergerAttorney Charlene Swartz McGowan added to party Brian Kemp(pty:dft), Attorney Charlene Swartz McGowan added to party Brad Raffensperger(pty:dft) (McGowan, Charlene) (Entered: 03/09/2021) |
| 03/09/2021 | 38 | NOTICE of Entry of Appearance by Jacob Biehl Boyer on behalf of Kathy Boockvar, Tom WolfAttorney Jacob Biehl Boyer added to party Kathy Boockvar(pty:dft), Attorney Jacob Biehl Boyer added to party Tom Wolf(pty:dft) (Boyer, Jacob) (Entered: 03/09/2021) |
| 03/09/2021 | 39 | BRIEF in Opposition to 22 MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE PURSUANT TO F.R.C.P. 23* filed by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Fresno County Election Worker Training Guide, # 2 Exhibit Software Lic Agreement, # 3 Exhibit Contract Between Dominion and Michigan, # 4 Exhibit Contract Between Dominion and Georgia)(Fielder, Gary) (Entered: 03/09/2021) |
| 03/09/2021 | 40 | BRIEF in Opposition to 23 MOTION to Dismiss filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 03/10/2021) |
| 03/10/2021 | 41 | MOTION to Dismiss by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 03/10/2021) |

| | | |
|---|---|---|
| 03/10/2021 | 42 | MOTION to Strike 40 Brief in Opposition to Motion *to Dismiss* by Defendant Facebook, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Lipshutz, Joshua) (Entered: 03/10/2021) |
| 03/11/2021 | 43 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Status Conference held on 3/11/2021. ORDER denying 42 Motion to Strike. FTR: Courtroom C204. (slibi, ) (Entered: 03/11/2021) |
| 03/11/2021 | 44 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 11 March 2021. As discussed at the March 11, 2021 Status Conference (see Dkt. # 43 ) It is hereby ORDERED that the deadline for all the parties to complete and file the Consent/Non-Consent Form (see Dkt. # 3 ), indicating either unanimous consent of the parties or that consent has been declined, is extended up to and including March 19, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 03/11/2021) |
| 03/15/2021 | 45 | TRANSCRIPT of TELEPHONIC STATUS CONFERENCE held on 03/11/2021 before Magistrate Judge Neureiter. Pages: 1-30. Prepared by: AB Litigation Services. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 03/15/2021) |
| 03/15/2021 | 46 | MOTION to Dismiss for Failure to State a Claim *Pursuant to FRCP 12(b)(2) and 12(b)(6)*, MOTION to Dismiss for Lack of Jurisdiction *Pursuant to FRCP 12(b)(2) and 12(b)(6)* by Defendants Jocelyn Benson, Gretchen Whitmer. (Meingast, Heather) (Entered: 03/15/2021) |
| 03/15/2021 | 47 | MOTION to Dismiss *and Brief in Support* by Defendants Brian Kemp, Brad Raffensperger. (Attachments: # 1 Exhibit Pearson Transcript, # 2 Exhibit Wood Final Order)(McGowan, Charlene) (Entered: 03/15/2021) |
| 03/15/2021 | 48 | MOTION for Leave to *File Amended Complaint* by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Amended Complaint, # 2 Exhibit Redline Amended Complaint, # 3 Exhibit Declaration of Counsel)(Fielder, Gary) (Entered: 03/15/2021) |

| 03/18/2021 | 49 | MOTION to Dismiss by Defendants Kathy Boockvar, Tom Wolf. (Boyer, Jacob) (Entered: 03/18/2021) |
| 03/19/2021 | 50 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Jocelyn Benson, Gretchen Whitmer All parties consent.. (Meingast, Heather) (Entered: 03/19/2021) |
| 03/19/2021 | 51 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Kathy Boockvar, Tom Wolf All parties consent.. (Boyer, Jacob) (Entered: 03/19/2021) |
| 03/19/2021 | 52 | CONSENT to Jurisdiction of Magistrate Judge by Defendant Center for Tech and Civic Life All parties consent.. (Matz, Joshua) (Entered: 03/19/2021) |
| 03/19/2021 | 53 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Brian Kemp, Brad Raffensperger All parties consent.. (McGowan, Charlene) (Entered: 03/19/2021) |
| 03/22/2021 | 54 | ORDER OF REFERENCE. Pursuant to the consent of the parties to the jurisdiction of the magistrate judge 27 , 50 , 51 , 52 , and 53 , this case is referred to Magistrate Judge N. Reid Neureiter for all purposes pursuant to 28 U.S.C. § 636(c), by Chief Judge Philip A. Brimmer on 3/22/2021. Text Only Entry (pabsec2) (Entered: 03/22/2021) |
| 03/23/2021 | 55 | REPLY to Response to 22 MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE PURSUANT TO F.R.C.P. 23* filed by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 03/23/2021) |
| 03/23/2021 | 56 | REPLY to Response to 23 MOTION to Dismiss filed by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 03/23/2021) |
| 03/28/2021 | 57 | NOTICE of Entry of Appearance by Michael John Fischer on behalf of Kathy Boockvar, Tom WolfAttorney Michael John Fischer added to party Kathy Boockvar(pty:dft), Attorney Michael John Fischer added to party Tom Wolf(pty:dft) (Fischer, Michael) (Entered: 03/28/2021) |
| 03/29/2021 | 58 | RESPONSE to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Brian Kemp, Brad Raffensperger. (McGowan, Charlene) (Entered: 03/29/2021) |
| 03/29/2021 | 59 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Kathy Boockvar, Tom Wolf. (Boyer, Jacob) (Entered: 03/29/2021) |
| 03/29/2021 | 60 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Jocelyn Benson, Gretchen Whitmer. (Meingast, Heather) (Entered: 03/29/2021) |

| | | |
|---|---|---|
| 03/29/2021 | 61 | RESPONSE to 48 MOTION for Leave to *File Amended Complaint RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO FILE AMENDED COMPLAINT PURSUANT TO FRCP 15* filed by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 03/29/2021) |
| 03/29/2021 | 62 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 03/29/2021) |
| 03/29/2021 | 63 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 03/29/2021) |
| 03/31/2021 | 64 | RESPONSE to 41 MOTION to Dismiss *filed By Center For Technology and Civic Life* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 03/31/2021) |
| 04/01/2021 | 65 | First MOTION for Extension of Time to *Serve Defendants* by Plaintiff Kevin O'Rourke. (Attachments: # 1 Proposed Order (PDF Only))(Fielder, Gary) (Entered: 04/01/2021) |
| 04/02/2021 | 66 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 2 April 2021. It is hereby Plaintiffs' Motion to Extend Time for Service and for Alternate Service Via U.S. Marshall (Dkt. # 65 ) is GRANTED IN PART and DENIED IN PART as follows.Plaintiffs are granted a 60-day extension to effectuate service on all remaining identified Defendants, up to and including May 21, 2021. But Plaintiffs are not authorized to conduct service through the U.S. Marshals Service. Plaintiffs are not proceeding in forma pauperis, and the Court is not persuaded by Plaintiffs' explanation why private process servers cannot serve the remaining Defendants, rather than unnecessarily burdening our federal marshals. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 04/02/2021) |
| 04/02/2021 | 67 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 2 April 2021. It is hereby ORDERED that a Motion Hearing is set on Defendants' various motions to dismiss (Dkt. ## 22 , 23 , 41 , 46 , 47 , & 49 ) and Plaintiffs' motion to amend (Dkt. # 48 ) for April 27, 2021 at 2:00 p.m. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 04/02/2021) |
| 04/05/2021 | 68 | MOTION to Strike *Michigan's Motion to Dismiss* by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/05/2021) |
| 04/05/2021 | 69 | MOTION to Strike *Georgia's Motion to Dismiss* by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/05/2021) |

| 04/07/2021 | 70 | ORDER DENYING PLAINTIFFS' MOTIONS TO STRIKE MOTIONS TO DISMISS OF MICHIGAN AND GEORGIA (Dkt. ## 68 & 69 ) by Magistrate Judge N. Reid Neureiter on 7 April 2021.(cmadr, ) (Entered: 04/07/2021) |
|---|---|---|
| 04/08/2021 | 71 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 72 | RESPONSE to 49 MOTION to Dismiss filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 73 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 74 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/09/2021 | 75 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/09/2021) |
| 04/09/2021 | 76 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/09/2021 | 77 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/09/2021 | 78 | MOTION for Leave to *File Reply Brief One Day Out Of Time* 76 Reply to Response to Motion, 75 Reply to Response to Motion, 77 Reply to Response to Motion by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/12/2021 | 79 | RESPONSE to 47 MOTION to Dismiss *and Brief in Support* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/12/2021) |
| 04/12/2021 | 80 | RESPONSE to 46 MOTION to Dismiss for Failure to State a Claim *Pursuant to FRCP 12(b)(2) and 12(b)(6)* MOTION to Dismiss for Lack of Jurisdiction *Pursuant to FRCP 12(b)(2) and 12(b)(6)* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/12/2021) |
| 04/14/2021 | 81 | REPLY to Response to 41 MOTION to Dismiss filed by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 04/14/2021) |
| 04/19/2021 | 82 | NOTICE of Voluntary Dismissal of Party *TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M.* |

|  |  |  |
|---|---|---|
|  |  | *GLANCEY, DEAN KNUDSON, and ROBERT F. SPINDELL, JR.* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 83 | NOTICE of Voluntary Dismissal of Party *GRETCHEN WHITMER and JOCELYN BENSON* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 84 | NOTICE of Voluntary Dismissal of Party *BRIAN KEMP and BRAD RAFFENSPERGER* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 85 | NOTICE of Voluntary Dismissal of Party *TOM WOLF and KATHY BOOCKVAR* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/20/2021 | 86 | NOTICE by Defendants Kathy Boockvar, Tom Wolf (Attachments: # 1 Exhibit 1)(Boyer, Jacob) (Entered: 04/20/2021) |
| 04/20/2021 | 87 | MOTION for Leave to *Voluntary Dismiss Defendants TOM WOLF and KATHY BOOCKVAR* 85 Notice of Dismissal of Party by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Email, # 2 Exhibit Email, # 3 Exhibit Email, # 4 Exhibit Email, # 5 Exhibit Email, # 6 Exhibit Email, # 7 Exhibit Email, # 8 Exhibit Email, # 9 Exhibit Email)(Walker, Ernest) (Entered: 04/20/2021) |
| 04/21/2021 | 88 | MINUTE ORDER The Motion Hearing set on April 27, 2021 at 2:00 PM shall be conducted via video conference, by Magistrate Judge N. Reid Neureiter on 4/21/2021. Attached are the video conference instructions and helpful tips. Please contact Stacy Libid at stacy_libid@cod.uscourts.gov if you have any questions regarding video conference. Text Only Entry (Attachments: # 1 Video Conference Tips) (slibi, ) (Entered: 04/21/2021) |
| 04/25/2021 | 89 | NOTICE of Voluntary Dismissal of Party by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/25/2021) |
| 04/26/2021 | 90 | MOTION for Order to *take Judicial Notice* by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/26/2021) |
| 04/27/2021 | 91 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Motion Hearing via video conference held on 4/27/2021. ORDER taking under advisement 22 23 41 46 47 and 49 Motions to Dismiss. ORDER taking under advisement 48 Plaintiffs Motion for Leave to File Amended Complaint Pursuant to FRCP 15 and Memorandum of Points and Authorities in Support. ORDER denying 90 Plaintiffs Motion for Judicial Notice. FTR: Courtroom C203. (slibi, ) (Entered: 04/28/2021) |
| 04/28/2021 | 92 | ORDER ON DEFENDANTS' MOTIONS TO DISMISS (Dkt. ## 22 , 23 , & 41 ) & PLAINTIFFS' MOTION TO AMEND (Dkt. # 48 ) |

by Magistrate Judge N. Reid Neureiter on 28 April 2021. It is hereby ORDERED that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are GRANTED. It is further ORDERED that Plaintiffs' Complaint (Dkt. # 1 ) is DISMISSED WITHOUT PREJUDICE for lack of standing. Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further ORDERED that the Motions to Dismiss filed by those state official defendants (Dkt. ## 46 , 47 , & 49 ) are DENIED as moot.It is further ORDERED that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. # 48 ) is DENIED on the grounds of futility.(cmadr, ) (Entered: 04/28/2021)

| | | |
|---|---|---|
| 04/29/2021 | 93 | NOTICE re 1 Complaint,, *Correction Of Plaintiff Kevin O'Rourke's Affidavit By Interlineation* by Plaintiff Kevin O'Rourke (Attachments: # 1 Affidavit)(Walker, Ernest) (Entered: 04/29/2021) |
| 04/29/2021 | 94 | NOTICE OF APPEAL as to 92 Order on Motion to Dismiss,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,,,,, Order on Motion for Leave,,,,,,,,,,,,,,,, by Plaintiff Kevin O'Rourke (Filing fee $ 505, Receipt Number 1082-7842647) (Walker, Ernest) (Entered: 04/29/2021) |
| 04/30/2021 | 95 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 94 Notice of Appeal, filed by Kevin O'Rourke to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record, # 2 Docket Sheet)(cmadr, ) (Entered: 04/30/2021) |
| 04/30/2021 | 96 | USCA Case Number 21-1161 for 94 Notice of Appeal, filed by Kevin O'Rourke. (cmadr, ) (Entered: 04/30/2021) |
| 04/30/2021 | 97 | TRANSCRIPT of MOTION HEARING held on 04/27/2021 before Magistrate Judge Neureiter. Pages: 1-91. Prepared by: AB Litigation Services. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for |

electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 04/30/2021)

| 05/13/2021 | 98 | MOTION for Sanctions *PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927* by Defendant Dominion Voting Systems, Inc.. (Attachments: # 1 Exhibit Ex. A. Rule 11 Letter)(Garnett, Stanley) (Entered: 05/13/2021) |
| 05/13/2021 | 99 | TRANSCRIPT ORDER FORM by Plaintiff Kevin O'Rourke. Necessary transcript is already on file re 94 Notice of Appeal. (cmadr, ) (Entered: 05/14/2021) |
| 05/14/2021 | 100 | LETTER TO USCA and all counsel certifying the record is complete as to 94 Notice of Appeal, filed by Kevin O'Rourke. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 21-1161) Text Only Entry. (cmadr, ) (Entered: 05/14/2021) |
| 05/17/2021 | 101 | MOTION for Sanctions by Defendants Kathy Boockvar, Tom Wolf. (Boyer, Jacob) (Entered: 05/17/2021) |
| 05/21/2021 | 102 | MOTION for Sanctions by Defendant Center for Tech and Civic Life. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Matz, Joshua) (Entered: 05/21/2021) |
| 05/21/2021 | 103 | MOTION for Sanctions by Defendant Facebook, Inc.. (Attachments: # 1 Memorandum in Support of Facebook's Motion for Sanctions, # 2 Declaration of Joshua S. Lipshutz, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6)(Lipshutz, Joshua) (Entered: 05/21/2021) |
| 06/01/2021 | 104 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 1 June 2021. This matter is before the Court on Defendants' Motions for Sanctions (Dkt. ## 98 , 101 103 ). It is hereby ORDERED that a Motion Hearing is set for July 16, 2021 at 10:30 a.m. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/01/2021) |
| 06/03/2021 | 105 | MOTION for Extension of Time to File Response/Reply as to 98 MOTION for Sanctions *PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927* by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/03/2021) |
| 06/04/2021 | 106 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 4 June 2021. It is hereby ORDERED that Plaintiffs' Unopposed Motion for Extension of Time for Plaintiffs to File Response to Motion for Sanctions filed by Dominion Voting Systems, Inc. (Dkt. # 105 ) is GRANTED finding good cause shown. Plaintiffs shall respond to Dominion Voting Systems, Inc.'s Motion for Sanctions Pursuant to Fed. R. Civ P. 11 and 28 U.S.C. § 1927 (Dkt. # 98 ) on or before June 10, 2021. It is further ORDERED that |

counsel who have been vaccinated may, if they are comfortable doing so, appear in person at the Motion Hearing set for July 16, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/04/2021)

06/08/2021   107   MOTION for Extension of Time to File Response/Reply as to 101 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/08/2021)

06/08/2021   108   Minute ORDER by Magistrate Judge N. Reid Neureiter on 8 June 2021. It is hereby ORDERED that Plaintiffs' Unopposed Motion for Extension of Time for Plaintiffs to File Response to Motion for Sanctions filed by Governor Tom Wolf and former Secretary Kathy Boockvar (Dkt. # 107 ) is GRANTED finding good cause shown. Plaintiffs shall respond to Governor Tom Wolf and former Secretary Kathy Boockvar's Motion for Sanctions (Dkt. # 101 ) on or before June 14, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/08/2021)

06/09/2021   109   MOTION for Sanctions by Defendants Jocelyn Benson, Gretchen Whitmer. (Attachments: # 1 Exhibit Index and A) Email from Plaintiffs' Counsel)(Meingast, Heather) (Entered: 06/09/2021)

06/10/2021   110   RESPONSE to 98 MOTION for Sanctions *PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927* filed by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit)(Walker, Ernest) (Entered: 06/10/2021)

06/12/2021   111   MOTION for Extension of Time to File Response/Reply as to 103 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/12/2021)

06/12/2021   112   MOTION for Extension of Time to File Response/Reply as to 102 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/12/2021)

06/14/2021   113   Minute ORDER by Magistrate Judge N. Reid Neureiter on 14 June 2021. It is hereby ORDERED that Plaintiffs' Unopposed Motions for Extension of Time (Dkt. ## 111 & 112 ) are GRANTED finding good cause shown. Plaintiffs shall respond to Center for Tech and Civil Life Motion for Sanctions (Dkt. # 102 ) on or before June 21, 2021, and Facebook, Inc.'s Motion for Sanctions (Dkt. # 103 ) on or before June 18, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/14/2021)

06/14/2021   114   RESPONSE to 101 MOTION for Sanctions filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/14/2021)

06/19/2021   115   MOTION for Extension of Time to File Response/Reply as to 103 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/19/2021)

06/21/2021   116   Minute ORDER by Magistrate Judge N. Reid Neureiter on 21 June 2021. It is hereby ORDERED that Plaintiffs' Unopposed Motion for Extension

of Time (Dkt. # 115 ) are GRANTED finding good cause shown. Plaintiffs shall respond to Facebook, Inc.'s Motion for Sanctions (Dkt. # 103 ) on or before June 21, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/21/2021)

| 06/21/2021 | 117 | MOTION for Leave to *file combined response and exceed page limit* 116 Order on Motion for Extension of Time to File Response/Reply, by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/21/2021) |
|---|---|---|
| 06/21/2021 | 118 | RESPONSE to 102 MOTION for Sanctions filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/21/2021) |
| 06/22/2021 | 119 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 22 June 2021. It is hereby ORDERED that Plaintiffs' Motion to File Combined Response to Motion for Sanctions Filed by Defendant CTCL and Facebook and to Exceed the Page Limits Requirement (Dkt. # 117 ) is GRANTED. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 06/22/2021) |
| 06/22/2021 | 120 | MOTION to Amend/Correct/Modify 117 MOTION for Leave to *file combined response and exceed page limit* 116 Order on Motion for Extension of Time to File Response/Reply, *to correct the communication record among counsel* by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/22/2021) |
| 06/24/2021 | 121 | REPLY to Response to 98 MOTION for Sanctions *PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927* filed by Defendant Dominion Voting Systems, Inc.. (Attachments: # 1 Exhibit B- Declaration of S. Garnett, # 2 Exhibit 1- To Declaration of S. Garnett, # 3 Exhibit 2- To Declaration of S. Garnett, # 4 Exhibit 3- To Declaration of S. Garnett)(Garnett, Stanley) (Entered: 06/24/2021) |
| 06/28/2021 | 122 | REPLY to Response to 101 MOTION for Sanctions filed by Defendants Kathy Boockvar, Tom Wolf. (Attachments: # 1 Exhibit)(Boyer, Jacob) (Entered: 06/28/2021) |
| 06/30/2021 | 123 | MOTION for Extension of Time to File Response/Reply as to 109 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 06/30/2021) |
| 07/01/2021 | 124 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 1 July 2021. It is hereby ORDERED that Plaintiffs' Unopposed Motion for Extension of Time for Plaintiffs to File Response to Motion for Sanctions Filed by Defendants Whitmer and Benson (Dkt. # 123 ). Plaintiffs' response Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Bensons Motion for Sanctions (Dkt. # 109 ) is due on or before July 8, 2021. It is further ORDERED that Plaintiffs' Amended Motion to File Combined Response to Motion for Sanctions Filed by Defendant CTCL and Facebook and to Exceed the Page Limits Requirement (Dkt. # 120 ) |

is DENIED as moot in light of the Minute Order at Dkt. # 119 . PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 07/01/2021)

07/06/2021   125   REPLY to Response to 102 MOTION for Sanctions filed by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 07/06/2021)

07/06/2021   126   REPLY to Response to 103 MOTION for Sanctions filed by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 07/06/2021)

07/08/2021   127   RESPONSE to 109 MOTION for Sanctions filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 07/08/2021)

07/09/2021   128   Minute ORDER by Magistrate Judge N. Reid Neureiter on 9 July 2021. This matter is before the Court on review of the docket. It is hereby ORDERED that the Court will hear argument on all pending motions for sanctions (Dkt. ## 98 , 101 103 , & 109 ) at the Motion Hearing set for July 16, 2021 at 10:30 a.m. Any outstanding reply briefs shall be filed before the Motion Hearing.It is further ORDERED that counsel who are not appearing in person at the Motion Hearing shall appear via VTC. Please see Dkt. # 88 for VTC instructions. Although the Court is permitting counsel to appear via video conference, it is the Court's preference that counsel appear in person. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 07/09/2021)

07/14/2021   129   MINUTE ORDER by Magistrate Judge N. Reid Neureiter on 7/14/2021.

MEMBERS OF THE PUBLIC ARE DIRECTED TO CALL IN TO:

Toll Free: 888-398-2342
Access Code: 5755390#

for the Motion Hearing set on 7/16/2021 at 10:30 a.m. Text Only Entry (slibi, ) (Entered: 07/14/2021)

07/14/2021   130   Minute ORDER by Magistrate Judge N. Reid Neureiter on 14 July 2021. In anticipation of the hearing set for Friday July 16, 2021 at 10:30 a.m., the Court asks that the parties be prepared to discuss, in connection to the matters raised in the briefs, the following contained herein. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 07/14/2021)

07/15/2021   131   REPLY to Response to 109 MOTION for Sanctions filed by Defendant Gretchen Whitmer. (Attachments: # 1 Exhibit Index and Exhibits A-C)(Meingast, Heather) (Entered: 07/15/2021)

07/16/2021   132   COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Motion Hearing held on 7/16/2021. ORDER taking under advisement 98 101 102 103 and 109 Motions for Sanctions. FTR: Courtroom C203. (slibi, ) (Entered: 07/16/2021)

07/21/2021   133   TRANSCRIPT of MOTION HEARING held on 07/16/2021 before Magistrate Judge Neureiter. Pages: 1-103. Prepared by: AB Litigation Services.
**NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**
Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 07/21/2021)

07/21/2021   134   MOTION for Leave to *for Evidentiary Hearing* 109 MOTION for Sanctions , 98 MOTION for Sanctions *PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927*, 102 MOTION for Sanctions , 101 MOTION for Sanctions , 103 MOTION for Sanctions by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 07/21/2021)

07/21/2021   135   Minute ORDER by Magistrate Judge N. Reid Neureiter on 21 July 2021. It is hereby ORDERED that Plaintiffs' Counsels' Motion for an Evidentiary Hearing (Dkt. # 134 ), filed on July 21, 2021, is DENIED. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 07/21/2021)

08/03/2021   136   ORDER GRANTING DEFENDANTS' MOTIONS FOR SANCTIONS (Dkt. ## 98 , 101 , 102 , 103 , & 109 ) by Magistrate Judge N. Reid Neureiter on 3 August 2021. For the foregoing reasons, it is HEREBY ORDERED that Plaintiffs' counsel shall jointly and severally pay the moving Defendants reasonable attorneys for (1) having to prepare and argue the motions to dismiss, and (2) having to prepare and argue the oppositions to the Motion for Leave to Amend. Accordingly, it is FURTHER ORDERED that within 14 days from the date of this Order, the moving Defendants are directed to submit to Plaintiffs' counsel detailed billing records of each lawyer, reflecting the time spent on which tasks, with accompanying hourly rates, so that the Parties may attempt to confer and stipulate to a reasonable figure that would establish an appropriate sanction award for each moving Defendant.(cmadr, ) (Entered: 08/04/2021)

08/05/2021   137   MOTION to Withdraw as Attorney by Defendant Center for Tech and Civic Life. (Skocpol, Michael) (Entered: 08/05/2021)

08/09/2021   138   Minute ORDER by Magistrate Judge N. Reid Neureiter on 9 August 2021. It is hereby ORDERED that the Motion to Withdraw (Dkt. # 137 )

|            |     | is GRANTED. Michael Skocpol shall be permitted with withdraw as counsel for Defendant Center for Tech and Civic Life. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 08/09/2021) |
| 08/17/2021 | 139 | MOTION for Protective Order by Defendant Facebook, Inc.. (Attachments: # 1 Proposed Document Protective Order)(Lipshutz, Joshua) (Entered: 08/17/2021) |
| 08/17/2021 | 140 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 17 August 2021. It is hereby ORDERED that Defendants Dominion Voting Systems Inc., Facebook, Inc., and the Center for Tech and Civic Life's Motion for Entry of Protective Order (Dkt. # 139 ) is GRANTED finding good cause shown. The proposed Protective Order (Dkt. #139-1) is APPROVED subject to the modifications at paragraph 3 and made an Order of Court. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 08/17/2021) |
| 08/17/2021 | 141 | PROTECTIVE ORDER by Magistrate Judge N. Reid Neureiter on 17 August 2021. (cmadr, ) (Entered: 08/17/2021) |

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

   Plaintiffs, on their own behalf
   and of a class of similarly
   situated persons,

vs.

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, and DOES 1-10,000,

   Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

  COME NOW the Plaintiffs, through counsel, on behalf of themselves and of a class of

similarly situated persons, and bring this Complaint for damages, injunctive and declaratory

relief against the Defendants, and each of them, and, in support thereof, hereby state as follows:

## I. NATURE OF THE CASE

1.      This is a civil rights case brought by citizens of the United States of America, from different states across the Union, against the Defendants for, among other things, burdening the voting rights of 160 million people.

2.      The Plaintiffs allege the following on behalf of themselves and others similarly situated against Defendants for damages, declaratory relief, and to enjoin them from further unconstitutional and unlawful acts, omissions, orders, agreements and certifications concerning the Plaintiffs' rights of due process, equal protection, and to vote and speak freely.

3.      Plaintiffs, as citizens of the United States of America (American Citizen(s)), bring this action to halt, and seek redress from the unconstitutional acts and omissions of the Defendants enforced pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986 & 1988 (Civil Rights Act), and the Constitution of the United States of America.

4.      At all material times, the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other things, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution.

5.      The Plaintiffs have been damaged and, unless the Defendants are enjoined, will continue to suffer the loss of their individual right to vote, freedom of speech, due process and equal protection under the laws and Constitution of the United States of America (Constitution).

## II. PARTIES

## PLAINTIFFS

6.     Plaintiff, Kevin O'Rourke, is a natural person, Virginian, American citizen, certified public accountant and independent auditor, having a place of abode and registered to vote in Virginia. The *Affidavit of Kevin Patrick O'Rourke* is attached hereto as Exh. 1, as though fully contained herein.

7.     Plaintiff, Nathaniel L. Carter, is a natural person, Michigander, African-American citizen, married, having a place of abode and registered to vote in Michigan. The *Affidavit of Nathaniel L. Carter* is attached hereto as Exh. 2, as though fully contained herein.

8.     Plaintiff, Lori Cutunilli, is a natural person, Coloradan, American citizen, business owner, having a place of abode and registered to vote in Colorado. The *Affidavit of Lori Cutunilli* is attached hereto as Exh. 3 is, as though fully contained herein.

9.     Plaintiff, Alvin Criswell, is a natural person, Alaskan, American citizen, retired, having a place of abode and registered to vote in Alaska. The *Affidavit of Alvin Criswell* is attached hereto as Exh. 4, as though fully contained herein.

10.     Plaintiff, Larry D. Cook, is a natural person, Californian, American citizen, author, having a place of abode and registered to vote in California. The *Affidavit of Larry Cook* is attached hereto as Plaintiffs' Exh. 5, as though fully contained herein.

11.     Plaintiff, Kesha Crenshaw, is a natural person, Michigander, African-American citizen, having a place of abode and registered to vote in Michigan. The *Affidavit of Kesha Crenshaw* is attached hereto as Exh. 6, as though fully contained herein.

3

12.     Plaintiff, Neil Yarbrough, is a natural person, Coloradan, African-American citizen, licensed real estate agent, having a place of abode and registered to vote in Colorado. The *Statement of Neil Yarbrough* is attached hereto as Exh. 7, as though fully contained herein.

13.     Plaintiff, Amie Trapp, is a natural person, Alabamian, American citizen, mother of nine, having a place of abode in the state of Alabama, after having recently moved from the state of Missouri, where the Plaintiff voted as a registered voter in Missouri. The *Statement of Amie Trapp* is attached hereto as Exh. 8, as though fully contained herein.

## DEFENDANTS

14.     Defendant, DOMINION VOTING SYSTEMS, INC. (Dominion), is a corporation organized under the laws of the State of Delaware, doing business at 1201 18th Street, Suite 210, Denver, CO 80202-1421.

15.     Defendant, FACEBOOK, INC. (Facebook), is a corporation organized under the laws of the State of Delaware, a publicly traded company, doing business at 1601 Willow Road, Menlo Park, CA 94025. Facebook's businesses are in technologies that facilitate digital communications, including Facebook Blue, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and, WhatsApp, which provides mobile messaging services.

16.     Defendant, MARK E. ZUCKERBERG (Mr. Zuckerberg), is a resident of California and the chief executive officer of Facebook.

17.     Defendant, PRISCILLA CHAN (Ms. Chan), is a resident of California.

18.     Defendant, CENTER FOR TECH AND CIVIC LIFE (CTCL), is a non-profit organization, organized under the laws of the State of Illinois, with its principle offices at 233 North Michigan Ave, No. 1800, Chicago, IL 60601.

19.     Defendant, BRIAN KEMP (Mr. Kemp), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Governor of the State of Georgia.

20.     Defendant, BRAD RAFFENSPERGER (Mr. Raffensperger), is a resident of Georgia, personally liable for his individual conduct, acting under color of his official authority as Secretary of State of the State of Georgia.

21.     Defendant, GRETCHEN WHITMER (Ms. Whitmer), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Governor of the State of Michigan.

22.     Defendant, JOCELYN BENSON (Ms. Benson), is a resident of Michigan, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the State of Michigan.

23.     Defendant, TOM WOLF (Mr. Wolf), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of his official authority as Governor of the Commonwealth of Pennsylvania.

24.     Defendant, KATHY BOOCKVAR (Ms. Boockvar), is a resident of Pennsylvania, personally liable for her individual conduct, acting under color of her official authority as Secretary of State of the Commonwealth of Pennsylvania.

5

25.     Defendant, TONY EVERS (Mr. Evers), is a resident of Wisconsin, personally liable for his individual conduct, acting under color of his official authority as Governor of the State of Wisconsin.

26.     Defendants, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY,  DEAN KNUDSON, and ROBERT F. SPINDELL, JR., are all residents of Wisconsin, personally liable for their individual conduct, acting under color of their official authority as members of the Wisconsin Elections Commission (WEC Defendants).

27.     DOES 1 – 10,000 are herein named as co-conspirators, agents, employees or contractors, as their involvement is discovered though the course of this action.

### III. JURISDICTION

28.     Jurisdiction of the Court is invoked under from Article III, Section 2 of The Constitution of the United States of America (Constitution). U.S. Const., Art. III, § 2.

29.     Plaintiffs, as representatives of the people, have standing to exercise all rights reserved thereto under the Constitution. U.S. Const., amend IV, X.

30.     The Court has subject matter jurisdiction pursuant to the Supremacy Clause of the Constitution, wherein state laws or actions violating federal rights are invalid and subject to declaratory judgment. U.S. Const., Art. VI, cl. 2.

31.     Jurisdiction over the Defendants arises pursuant to 28 U.S.C. §§ 1331(a) (federal question), 1332 (diversity), 1343(a) (civil rights), and 2201-02 (declaratory judgment); and, under the Constitution.

32.     This Court also has jurisdiction over any common law claims pursuant to this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

Appendix Page 23

33.     This Court is authorized to issue permanent injunctive relief requested under Rule 65 of the Federal Rules of Civil Procedure.

34.     Jurisdiction of this Court in vindication of rights arises under 42 U.S.C § 1983, 1985, 1986 and 1988, which also authorizes the Court to issue injunctive relief.

35.      Venue is proper pursuant to 28 U.S.C. §1391(a) & (b), because a substantial part of the acts and omissions occurred within the District of Colorado.

## IV. GENERAL ALLEGATIONS

### DOMINION

36.     Dominion is one of three election technology vendors that currently make up more than 80 percent of the voting machines in the United States.[1]

37.     Dominion's technology, in various forms, reached 71 Million Voters, and is involved in 1635 jurisdictions in the United States as of 2016. [2]



Figure 2b: **Vendor Marketplace Coverage by Number of Eligible Voters**

Note: Only vendors that reach more than 500,000 registrants are included.

---

[1] Ben Popken, *Voting Machine Makes Face Questions from House Lawmakers—But More Remain*, NBCNews.com, Jan. 9, 2020.

[2] Penn Wharton Public Policy Initiative, *The Business of Voting, Market Structure and Innovation in the Election Technology Industry*, University of Pennsylvania, 2017.

38.     Dominion is owned by DOMINION VOTING SYSTEMS CORP. (Dominion

Corp), a Canadian corporation, established in 2003.

39.     In 2018, Dominion Corp was acquired by its senior management team and

STAPLE STREET CAPITAL GROUP, L.L.C. (Staple Street).

40.     On December 6, 2019, U.S. Senator Elizabeth Warren, and other members of the

Senate Banking, Housing, and Urban Affairs Committee, sent a letter to Staple Street requesting

information about the role private equity investment in Dominion has played in the creation and

perpetuation of concerns regarding "vulnerabilities and a lack of transparency in the election

technology industry."[3]

41.     In an April 2020 letter in response to the request made by the House Committee

Administration, CEO of Dominion Corp, John Poulos, confirmed that the corporation is 75.2%

owned by Staple Street, and that he, a Canadian citizen, holds a 12% stake, with no other

investor owning more than a 5% stake in the corporation.[4]

---

[3] In the letter, the Senators expressed concern about the "secretive and 'trouble-plagued companies,' owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, 'having long skimped on security in favor of convenience,' leaving voting systems across the country 'prone to security problems.'" *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, December 10, 2019. https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf  *See* Jessica Huseman, *The Market for Voting Machines Is Broken. This Company Has Thrived in It*, ProPublica, October 28, 2019. *See also* Frank Bajak, *US Election Integrity Depends on Security-Challenged Firms*, Associated Press, October 28, 2019.

[4] Ali Swenson, *Family of Hugh Chavez Does Not Own Dominion Voting System*, Associated Press, December 1, 2020.

42.      Scholars and industry experts have concluded that ballot-marking devices,

generally, including the voting machines used by Dominion:

   a.   produce ballots that do not necessarily record the vote expressed by the voter
        when they enter their selections on the touchscreen;

   b.   are associated with known risks, which include hacking, bugs and configuration
        errors that can cause the voting machine to print votes that differ from what the
        voter entered and verified electronically;

   c.   are not defensible, because there is no way to generate convincing public
        evidence that reported outcomes are correct despite any malfunctions that might
        have occurred;

   d.   are not software independent, and can mark a ballot after the voter has inspected
        it;

   e.   the original transaction, i.e., the voter's expression of the votes, is not
        documented in a verifiable way; and,

   f.   cannot ensure through an audit that the reported outcome is correct.

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs)
Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy,
Vol. 19, No. 3, September 17, 2020.

43.      In early 2020, the Dominion voting system was rejected by the Texas Board of

Elections, after the "examiner reports raise concerns about whether the Democracy Suite 5.5A

system is suitable for its intended purpose; operates efficiently and accurately; and is safe from

fraudulent or unauthorized manipulation."[5]

44.      Other experts have opined that Dominion's software is vulnerable to data

manipulation by unauthorized means, and permits data to be altered in states across the country:

---

[5] Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy
Suite 5.5-A*, State of Texas, January 24, 2020.

I conclude with high confidence that the election 2020 data were altered in all battleground states resulting in hundreds of thousands of votes that were cast for President Trump to be transferred to Vice President Biden. These alterations were the result of systemic and widespread exploitable vulnerabilities in DVS, Scytl/SOE Software and Smartmatic systems that enabled operators to achieve the desired results. In my view, the evidence is overwhelming and incontrovertible.[6]

## FACEBOOK

45.     Facebook is the largest social media platform for real-time interaction and dissemination of information across the internet.

46.     According to the Federal Trade Commission (FTC), Facebook is the world's dominant online social network with more than three billion people regularly using Facebook's services to connect to friends and family.[7]

47.     According to the FTC, Facebook and its Chief Executive Officer, Mr. Zuckerberg, have maintained a monopoly position through anti-competitive means reflecting Mr. Zuckerberg's view that "it is better to buy the competition than to compete."[8]

48.     Additionally, Facebook has come under scrutiny by the scheduled October 28, 2020, Congressional Hearing related to its status as a neutral media platform under Section 230 of the Communications Decency Act.[9]

---

[6] *See Declaration of Dr. Navid Keshavarez-Nia* (Doc. No. 1, Exh. 19), *King, et al., v. Whitmer*, *et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), p. 9.

[7] *See Federal Trade Comm., v. Facebook, Inc.*, Case 1:20-cv-03590 (D.D.C. 2020).

[8] *Id*. at ¶ 5.

[9] Press Release, *Committee to Hold Hearing with Big Tech CEOs on Section 230*, U.S. Senate Committee on Commerce, Science & Transportation, Oct. 16, 2020.

49.     Facebook asserts protection from civil liability for its "Good Samaritan" blocking of content *it* considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected. 47 U.S.C. § 230(c)(2)(A).

50.     Although Mr. Zuckerberg appeared supportive of changes to Section 230, Facebook continues to censor conservative voices and coverage related to election irregularities.

51.     At all material times, Facebook has burdened the Plaintiffs' rights to free speech, free press, and online assembly, based upon the favored political and health related preferences of Defendants, Mr. Zuckerberg and Ms. Chan.

52.     At all material times, Facebook has actively disseminated political and health related content that supports the narrow cultural views of the Defendants, Mr. Zuckerberg and Ms. Chan, and the executives and employees of Facebook.

53.     Facebook employs algorithms to automatically censor posts based upon words that Defendant, Mr. Zuckerberg, and his employees find offensive to their political agenda, which create pop-up notifications that allegedly fact-check the post, with a warning label.

54.     The conduct of Facebook precludes protection under the "publisher" exclusion set forth in 47 U.S.C. § 230(c)(1).

### MARK ZUCKERBERG

55.     Defendant, Mr. Zuckerberg, is only the third person on Earth to exceed a net worth of $100 Billion.[10]

---

[10] Tanza Loudenback, Liz Knueven and Taylor Niclole Rogers, *Mark Zuckerberg just became the third person on Earth worth over $100 billion. Here's how the Facebook CEO makes and spends his fortune*, Business Insider, Aug. 6, 2020.

11

56.     Defendants, Mr. Zuckerberg and Ms. Chan, have used their alter-ego, Facebook, to dominate the competition in business, and now in politics, by funding their political ideology through alleged philanthropic charities, and other civic minded entities, such as CTCL[11].

57.     Defendants, Mr. Zuckerberg and Ms. Chan, have pledged 99 percent of their shares and profits from Facebook to their philanthropic efforts, which include extraordinary donations to non-profit organization that share their political ideologies.[12]



**The New York Times**

## How Would You Give Away Your Fortune?

By THE NEW YORK TIMES   UPDATED December 2, 2015

---

[11] Nicholas Riccardi, *Mark Zuckerberg Donates $100M More to Help Election Offices*, Assoc. Press, October 13, 2020 ("The contribution brings the total funding for the election from Zuckerberg and Chan to $400 million — the same amount that Congress allocated in March to help fund election offices as they dealt with the difficulties of adapting to new voting behavior during the coronavirus pandemic.")

[12] Reuters Staff, *Facebook's Zuckerberg to give 99 percent of shares to charity*, Reuters, Dec. 1, 2015.

12

58.     In 2020, Mr. Zuckerberg and Ms. Chan donated over $400 million to Defendant, CTCL, and the other organization, such as, the Center for Election Innovation and Research and the Chan and Zuckerberg Initiative.

59.     Here, after receiving the funds from Mr. Zuckerberg and Ms. Chan, CTCL in turn granted millions of dollars to select cities and counties, across the country.[13]

60.     As a non-profit, CTCL represents to the public that it is "bi-partisan."

61.     CTCL's executive directors and board members are progressives, and primarily register Democrat.[14]

62.     As a reporter for the New York Times observed:

The prospect of election administrators tapping large pools of private money has raised new legal and political questions. That is partly because it is unusual for elections to be subsidized by nongovernment funding at this level, but also because most of the cash is coming from nonprofit groups that have liberal ties, and the biggest source of the cash, Mr. Zuckerberg, has drawn fire from across the political spectrum.

Kenneth P. Vogel, *Short of Money to Run Elections, Local Authorities Turn to Private Funds*, New York Times, September 25, 2020.

63.     Through their donations to CTCL, and other entities, Mr. Zuckerberg and Ms. Chan have created a scheme and an organized device to provide funding to pursue their political ideology, which is used as a part of the governmental function of holding an election—while stifling the speech of the political opposition on Facebook.

---

[13] Scott Walter, *What is Mark Zuckerberg's Election Money Doing in Georgia?* The Federalist, December 7, 2020.

[14] The founders of CTCL, Ms. Tiana Epps-Johnson, Donny Bridges and Whitney May, were co-workers at the New Organizing Institute, dissolved in 2015, and described as "the Democratic Party's Hogwarts for digital wizardry." Brian Fung, *Inside the Democratic Party's Hogwarts for Digital Wizardry*, Washington Post, April 24, 2019.

64.     The founder and Executive Director of CTCL, Ms. Tiana Epps-Johnson, holds a Fellowship with the Obama Foundation, was a director of the progressive New Organizing Institute, a Democratic grassroots election training group, and sits on the Board of Directors for the Center for Civic Design.[15]

65.     The actions of Defendants, Mr. Zuckerberg and Ms. Chan, have been coordinated to use private donations to the CTCL, and other alter-egos, to fund public functions in a scheme that deprives the people in unfunded areas of equal protection under law.

66.     Senior Facebook Engineer, Brian Amerige, posted to an internal employee message board, "We are a political monoculture that's intolerant of different views."[16]

67.     Other employees have been pressured to leave Facebook for contributing to political organization that are in opposition to the ideals of Mr. Zuckerberg and the senior leadership of Facebook.[17]

68.     The funds received from Facebook, Zuckerberg and Chan, and funneled through CTCL, and others, were administered and directed to the most effective counties, as determined by certain secretaries of state, with knowledge of their agenda and the impact it would have on the 2020 presidential election.

---

[15] *See* Scott Walter, *Georgia Election Officials, a Billionaire, and the "Nonpartisan" Center for Tech & Civic Life*, Capital Research Center, November 27, 2020.

[16] Kate Conger and Sheera Frenkel, *Dozens at Facebook Unite to Challenge Its 'Intolerant' Liberal Culture*, New York Times, Aug. 28, 2018 ("We claim to welcome all perspectives, but are quick to attack-often in mobs- anyone who presents a view that appears to be in opposition to left-leaning ideology."

[17] Nick Wingfield, *Oculus Founder Plots a Comeback With a Virtual Border Wall*, New York Times, June 4, 2017.

14

69.     The unconstitutional acts and omissions of the other Defendants would not have been possible without the funding provided by Mr. Zuckerberg and Ms. Chan,  which was funneled through their alter-ego, CTCL, and others, for the intended purpose of influencing the 2020 presidential election to benefit themselves, and others supportive of their political ideology.

70.     Through the combination of the censorship by Mr. Zuckerberg and Facebook, and the use of alter-egos to fund Mr. Zuckerberg and Ms. Chan's political ideology through extraordinary donations to local counties and election administrators,  Mr. Zuckerberg and Ms. Chan have directly funded a scheme to unlawfully and unconstitutionally interfere with a presidential election, in violation of the Constitution and multiple state election laws.[18]

71.     At all relevant times, Defendants, Mr. Zuckerberg, Ms. Chan and CTCL, inextricably wove themselves into the presidential election, which effected all the states in the Union, qualifying their concerted conduct as actionable under the Civil Rights Act.

72.     CTCL was instrumental in providing vote-by-mail funding, from donations received from Mr. Zuckerberg and Ms. Chan, their alter-ego, Facebook, and others in the technology industry, under the false excuse of COVID-19 pandemic relief.

73.      These grants were also considered additional "support" to city and county election offices, who were primarily involved in the unlawful conduct asserted by the State of Texas in their *Motion for Leave to File Bill of Complaint*, filed with the Supreme Court.[19]

---

[18] The Director of CTCL also serves as the Executive Director of the Colorado County Clerks Association with direct access to the Colorado County Voting apparatus, and sits on the board of another of Mr. Zuckerberg and Ms. Chan's donee's, Center for Election Innovation and Research. The Executive Director and President of CTCL leads a "team that is doing groundbreaking work to make US elections more inclusive and secure."

[19] *Texas v. Pennsylvania*, case 22O155 (U.S. filed Dec. 7, 2020).

74.     A general break down of the grants awarded in the relevant states, herein, include:

a.      **Georgia Counties**: Cobb ($5.6M), Fulton (6M), Gwinnett (4.2M),
        Dougherty (300K), Macon-Bibb (557K);

b.      **Michigan Counties**: Wayne (3.5M), Ann Arbor (417K), Flint (467K),
        Lansing (443K), Muskegon (433K), Pontiac (405K), and Saginaw (402K)*;*

c.      **Pennsylvania Counties**: Alleghany (2.02M), Berks (471K), Centre (863K),
        Delaware (2.2M), and the City of Philadelphia (10M);

d.      **Wisconsin Counties**：Cities Milwaukie (2.15M), Madison (1.27M), Green
        Bay (1.09M), Kenosha (862K), Racine (942K), and Janesville (183K).[20]

75.     The unconstitutional conduct of these Defendants includes, but is not limited to:

a.      funding unmanned ballot boxes in violation of state and federal law to
        bypass and intercept the United States Mail;

b.      unequally funding wage increases and bonuses for poll workers and
        canvassers;

c.      facilitating the purchase of voting machines, software, high speed vote
        tabulators, and voting booths;

d.      the training and recruitment of poll workers, many of whom participated in a
        conspiracy to influence the presidential election, but all of whom owed a
        duty to perform a governmental function of providing a free and fair
        election for the people of the United States—not the political favorite of Mr.
        Zuckerberg, Ms. Chan and others; and,

e.      actively suppressing the speech of others who disagree with the views held
        by the monoculture of Facebook, its chief executive officer and others, both
        before and after the 2020 presidential election.

76.     This conduct in furtherance of a conspiracy, scheme, and device, that burdens the

rights of every registered voter in America, was implemented in municipalities and counties

where documented election fraud and irregularities have occurred.

---

[20] https://ballotpedia.org/Non-profits_providing_vote_by_mail_support_to_
city_and_county_election_offices.

Appendix Page 33

77.     Prior to the election, Defendants, Facebook and Mr. Zuckerberg, censored important information that would have exposed misdeeds, scandal, and possible involvement of their preferred candidate, which violated the Plaintiffs' First Amendment rights.[21]

78.     This pre-election censorship is now under federal investigation.[22]

79.     The Media Research Center conducted a poll of voters related to eight specific issues involving Facebook and Mr. Zuckerberg's preferred candidates, and determined that 17% of said voters would have changed their vote had they been aware of the censored information.[23]

80.     Facebook and Zuckerberg continue to censor election information including, any post related to President Trump, and any user on Facebook that uses the phrase "voter fraud" or "election fraud" is similarly censored.

81.     Facebook and Zuckerberg have engaged in such conduct as part of a larger scheme and device to interfere with a federal election—which continued after election night, and presently continues as an unconstitutional effort to sway the electorate in a presidential election.

82.     A private corporation can be fairly be said to be a state actor for purposes of the Civil Rights Act, if there is a sufficiently close nexus between the state and the challenged action of the private entity, so that the action of the latter may fairly be treated as that of the state itself. *Blum v. Yaretshy*, 457 U.S. 991, 1004 (1982).

---

[21] Marl Moore, *Post's Expose on Hunter Biden Soars Online Despite Social Media Censorship*, N.Y. Post, October 20, 2020.

[22] Evan Perez and Pamela Brown, *Federal Criminal Investigation into Hunter Biden Focuses on His Business Dealing in China*, CNN Politics, December 10, 2020.

[23] Jordan Davidson, *Poll: One in Six Would Have Changed Their Vote if They Had Known About Scandals Suppressed By Media*, The Federalist, November 24, 2020.

## CENTER FOR TECH AND CIVIC LIFE

83.     Defendant, CTCL, is a non-profit organization providing federal election grants to local governments.

84.     On its website, CTCL's mission includes training public election officials in communication and technology and to inform and mobilize voters.

85.     CTCL states it is "a team of civic technologists, trainers, researchers, election administration and data experts working to foster a more informed and engaged democracy, and helping to modernize elections."

86.     The founders of CTCL all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democrat campaigns in digital campaigning strategies.

87.     NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012.

88.     Funders of CTCL include groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

89.     CTCL is associated with Rock the Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections.

90.     Along with Rock the Vote and The Skoll Foundation, CTCL also lists Facebook as a partner in their efforts.

91.     CTCL is a progressive organization that targets urban cities for its private federal election grants to turn out the progressive vote in those urban cities.

Appendix Page 35

92.     On or after September 1, 2020, CTCL received approximately $250 million from Defendants, Mr. Zuckerberg and Ms. Chan.

93.     CTCL used that money for federal election grants to local election offices as "COVID- 19 response grants."

94.     On its website, CTCL stated:

(CTCL) is excited to expand our COVID- 19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants to local election jurisdictions across the country to help ensure you have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

95.     In 2020, Defendant, CTCL provided private federal election grants to cities and counties in Pennsylvania, Wisconsin, Michigan and Georgia.

96.     Said states do not accept CTCL's private elections grants.

97.     To accomplish its objectives, Defendant, CTCL, circumvented these state's legislatures, and recruited local governments to apply and agree to accept CTCL's private federal election grants.

98.     CTCL's private federal election grants to counties and cities in Michigan, Wisconsin, Pennsylvania and Georgia were not approved by Congress, nor by the respective state legislatures of the states, herein listed.

99.     In the *Help America Vote Act* (HAVA), Congress left discretion to the states on how to implement federal elections.[24]

100.    HAVA preempts CTCL's private federal election grants to the cities and counties.

---

[24] *See* 52 USC §§ 20901-21145.

101.    Under HAVA, and the Supremacy Clause of the Constitution, CTCL's private federal election grants are not legally authorized by federal law, nor the laws of the states, herein.

102.    Public-private partnerships are constitutionally impermissible in federal elections.

103.    CTCL private federal elections grants are a constitutionally impermissible public-private partnership.

104.    The entanglement of public and private interests involved with cities and counties accepting and using CTCL's private federal election grant are unconstitutionally impermissible.

105.    Federal and state governments exclusively fund federal elections to eliminate undue influence and the appearance of undue influence by private parties.

106.    CTCL's private funding of federal elections appeared to and, in fact, did unduly influence the 2020 presidential election.

107.    Congress enacted the *National Voter Registration Act* (NVRA)[25] to create "national procedures for voter registration for elections for Federal office." 52 U.S.C. § 20503.

108.    NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for, or renew a driver's license, and requires states to forward the completed application to the appropriate state or local election official. 52 U.S.C. § 20504.

109.    NVRA provides that citizens can register to vote by mail using mail-in forms developed by each state and the Election Assistance Commission (EAC). 52 U.S.C. § 20505.

110.    The purpose of the NVRA was to coordinate federal and state administration of voter registration for federal elections, and to create legally authorized, nationwide, and uniform standards for voter registration.

---

[25] *See* 52 U.S.C. §§ 20501-20511.

Appendix Page 37

111.    NVRA does not legally authorize local governments to accept private federal election grants for voter registration.

112.    NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration.

113.    Under NVRA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way on voter registration for federal elections.

114.    The CTCL's private federal election grants circumvent the EAC and the states, and thus conflicts with NVRA.

115.    CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

116.    The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration.

117.    Local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration, which is not approved by the EAC, or the states.

118.    States are not allowed to deviate from the NVRA.

Appendix Page 38

## THE ELECTION

119.     On November 3, 2020, a presidential election was held in every state of the Union (Election).

120.     Leading up to the Election, the Defendants conspired to change election laws, without consent of the people acting through their respective state legislatures.

121.     At all relevant times prior to and after the Election, in violation of the Constitution, Facebook, at the direction of Mr. Zuckerberg, censored certain media, press releases, articles, opinions and posts concerning the Election.

122.     During the late evening of November 3, 2020, many of the so-called "swing states," where reporting election results in favor of the incumbent presidential candidate.

123.     Thereafter, a number of states prematurely stopped counting ballots.

124.     During the early morning hours of November 4, 2020, the Defendants' preferred presidential candidate received a statistically impossible spike in votes.

125.     Dominion voting machines were used in over 1600 counties across the United States, many of which were set to flag a high rate of ballots for adjudication, which could then be used to alter or delete votes in favor of one candidate.

126.     The combination of unconstitutional acts and omission by the Defendants, as described herein, has created a constitutional crisis, destroyed the people's faith in elections, violated the rights of millions of people, weakened national security, triggered financial uncertainty and mental anguish, and increased the possibility of civil and world war, all of which has proximately caused damage to the Plaintiffs, and every registered voter similarly situated.

## MICHIGAN

127.    In 2018, the Michigan constitution was amended to allow all registered voters the right to request and vote by absentee ballot without giving a reason. Mich. Const. art. 2, § 4.

128.    On May 19, 2020, Defendant, Ms. Benson, announced that the secretary of state would send unsolicited absentee-voter ballot applications by mail to all 7.7 million registered Michigan voters, prior to the primary and general elections.

129.    Ms. Benson's acts and omissions failed to ensure that Michigan's election systems and procedures were adequate to ensure the accuracy and legality of the historic flood of mail-in votes.[26]

130.    In fact, Ms. Benson's acts and omissions "did away with protections designed to deter voter fraud." *Texas v. Pennsylvania*, ¶ 81.

131.    As alleged by the State of Texas, joined by 20 other states in the Union, Ms. Benson's "flooding of Michigan with millions of absentee ballot applications prior to the 2020 general election violated" Michigan law. *Id.*

132.    M.C.L. § 168.759(3), states:

An application for an absent voter ballot under this section may be made in any of the following ways:

a.  By a written request signed by the voter;

b.  On an absent voter ballot application form provided for that purpose by the clerk of the city or township; and,

c.  On a federal postcard application.

---

[26] *See* Motion for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, case 22O155, (U.S. filed Dec. 7, 2020) (*Texas v. Pennsylvania*), ¶ 81.

133.     The Michigan Legislature did not include the secretary of state as a means for distributing unsolicited absentee ballots without application by a voter. *Id.* at § 168.759(3)(b).

134.     Under the statute's plain language, the Legislature explicitly gave only local clerks the power to distribute absentee voter ballots, upon application. *Id.*

135.     Because the Legislature declined to explicitly include the secretary of state as a vehicle for distributing absentee ballots applications, Defendant, Ms. Benson, "lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan." *Texas v. Pennsylvania*, ¶ 84.

136.     In June 2020, Defendant, Ms. Benson, also violated Michigan law when she launched a program allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. *Id.* at ¶ 85.

137.     The Michigan Legislature did not approve or authorize Ms. Benson's unilateral actions. *Id.*

138.     MCL § 168.759(4) states in relevant part:

An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application.

139.     Further, MCL § 168.761(2) states in relevant part:

The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot, and if the signatures do not agree sufficiently or [if] the signature is missing the ballot must be rejected.

140.     Ms. Benson's "unconstitutional modifications of Michigan's election rules resulted in the distribution of millions of absentee ballot applications without verifying voter signatures as required by MCL §§ 168.759(4) and 168.761(2)." *Texas v. Pennsylvania*, ¶ 89.

141.     Democrats in Michigan voted by mail at a ratio of approximately two to one compared to Republican voters.

142.     Defendant, Ms. Benson, "without legislative approval, unilaterally abrogated Michigan election statutes related to absentee ballot applications and signature verification." *Id*. at ¶ 79.

143.      Michigan's Legislature has not ratified these changes, and Michigan's election laws do not include a severability clause." *Id*.

144.     Michigan also requires that poll watchers and inspectors have access to vote counting and canvassing. M.C.L. §§ 168.674-.675. *Id*. at ¶ 90.

145.     Local election officials in Wayne County made a conscious and express policy decision not to follow M.C.L. §§ 168.674-.675 for the opening, counting, and recording of absentee ballots. *Id*. at ¶ 91.

146.     Michigan also has strict signature verification requirements for absentee ballots, including that the Elections Department place a written statement or stamp on each ballot envelope where the voter signature is placed, indicating that the voter signature was in fact checked and verified with the signature on file with the State. *See* MCL § 168.765a(6).

147.     However, Wayne County made the policy decision to ignore Michigan's statutory signature verification requirements for absentee ballots. *Id*. at ¶ 93.

148.     Thus, one presidential candidate, over the rest, materially benefited from those unconstitutional changes to Michigan's election law, who happens to be the choice of those involved in the scheme and device to interfere with the federal election process.

149.     As is outlined in *Texas v. Pennsylvania*, numerous poll challengers and an Election Department employee whistleblower have testified that the signature verification requirement was ignored in Wayne County. *Id.* at ¶ 94.[27]

150.     In *Johnson v. Benson*, Jesse Jacob, a decades-long City of Detroit employee assigned to work in the Elections Department for the 2020 election testified that:

    a.     absentee ballots that were received in the mail would have the voter's signature on the envelope;

    b.     while I was at the TCF Center, he was instructed not to look at any of the signatures on the absentee ballots; and that,

    c.     he was instructed not to compare the signature on the absentee ballot with the signature on file.[28]

151.     The TCF was the only facility within Wayne County authorized to count ballots for the City of Detroit. *Texas v. Pennsylvania,* ¶ 95.

152.     These non-legislative modifications to Michigan's election statutes resulted in a number of constitutionally tainted votes that far exceeds the margin of voters separating the presidential candidates in Michigan. *Id*. at ¶ 96.

---

[27] *See Johnson v. Benson*, Petition for Extraordinary Writs & Declaratory Relief, Case No. 162286, (Mich. 2020), ¶ 71, 138-39, App. 25a-51a.

[28] *Id*., Affidavit of Jessy Jacob, App. 14 at ¶ 15.

153. Additional, public information confirms the material adverse impact on the integrity of the vote in Wayne County, caused by these unconstitutional changes to Michigan's election law. *Id*. at ¶ 97.

154. For example, the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit. *Id.*, Cicchetti Decl. at ¶ 27, App. 8a.

155. The number of votes not tied to a registered voter by itself exceeds the margin of victory of the announced winner of the presidential election by more than 28,377 votes. *Id.* at ¶ 97.

156. The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations. *Id.* at ¶ 97, and App. 25a-51a.

157. After the election, "County Board of Canvassers ("Canvassers Board"), William Hartman, determined that 71% of Detroit's Absent Voter Counting Boards ("AVCBs") were unbalanced—*i.e.*, the number of people who checked in did not match the number of ballots cast—without explanation." *Id*. at ¶ 99, and App. 25a-51a, at ¶ 29.

158. On November 17, 2020, the Canvassers Board deadlocked 2-2 over whether to certify the results of the presidential election based on numerous reports of fraud and unanswered material discrepancies in the county-wide election results. *Id*. at ¶ 100.

159. A few hours later, the Republican Board members reversed their decision and voted to certify the results after severe harassment, including threats of violence. *Id.*

160.     The following day, the two Republican members of the Board *rescinded their votes* to certify the vote and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious irregularities in Detroit votes are resolved. *Id.* at ¶ 100, Cicchetti Decl. at ¶ 27, App. 8a.

161.     As determined by the State of Texas and many other states in support thereof, "[r]egardless of the number of votes that were affected by the unconstitutional modification of Michigan's election rules, the non-legislative changes to the election rules violates the Electors Clause." *Id.* at ¶ 100.

162.     "There exists sufficient evidence to place in doubt [Michigan's] presidential election results in identified key counties, including issues with transparency, fraudulent changing of dates, a software glitch, clerical errors, illegal votes, and many other issues and irregularities."[29]

163.     Additionally, Defendants, Mr. Zuckerberg, Ms. Chan and their alter-egos, Facebook and CTCL, funneled approximately $9.8 million to ten different, predominately Democrat, counties across the state of Michigan.

164.     This infusion of private money created an unfair, two-tier election system, which caused disparate treatment of voters and thus violated the civil and constitutional rights of millions of Michiganders and American citizens.[30]

---

[29] Verified Complaint for Declaratory and Injunctive Relief (Doc. 1), *Bally v. Whitmer*, case 1:20-cv-1088 (W.D. Mich. filed Nov. 11, 2020), ¶ 44.

[30] *See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson*, case MSC No. 162286 (Mich. filed Nov. 26, 2020).

165.     The money paid by Mr. Zuckerberg and Ms. Chan, through CTCL, was used to:

a.     Pay ballot harvesters;

b.     Fund mobile ballot pick-up units;

c.     Deputize and pay political activists to manage ballots;

d.     Pay poll workers, election judges, i.e., inspectors and adjudicators;

e.     Establish drop-boxes to bypass and intercept the United States Mail.

f.     Establish other satellite offices;

g.     Pay local election officials and agents "hazard pay" to recruit cities recognized as Democrat Party strongholds to apply for the non-profit grants;

h.     Consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots, without legally required observation;

i.     Implement a two-tiered ballot curing plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

j.     Subsidize and design a scheme to remove poll watchers from one political party so that the critical responsibility of counting the ballots could be done without oversight.[31]

166.     After an election, the secretary of state "on the receipt of the certified copies of the statements of votes given in the several counties," lays "before the board the statements received by [her] of the votes given at such election in the several counties." Mich. Code § 168.843.

167.     Thereafter, the Board of State Canvassers examines the statements received by the secretary of state of the votes cast in the several counties, and prepares a statement showing the total number of votes cast for all candidates. Mich. Code §§ 168.841-845.

---

[31] *Id., Expert Report of James Carlson*, App. 245-276.

168.    According to a Republican board member, the Board of State Canvassers duty is

"ministerial," and there's "nothing in the law that gives me the authority to request an audit or

block certification."[32]

169.    On November 23, 2020, the board-certified Michigan's election.

170.    The members of the board are executive officers under the supervision of the

Governor, the latter of which is elected and sworn to uphold the Constitution.

171.    On November 23, 2020, Defendant, Ms. Whitmer, with knowledge of the

numerous election irregularities and unconstitutional behavior of officers in her administration,

released the following statement after the Michigan State Board of Canvassers voted to certify

the results of the November 2020 election:

> I commend the three members of the State Board of Canvassers who voted to follow the
> law and certify the 2020 election results today. The people of Michigan have spoken.
> President-elect Biden won the State of Michigan by more than 154,000 votes, and he will
> be our next president on January 20th. I also want to thank Secretary of State Jocelyn
> Benson and the local clerks across Michigan who made sure this year's election was free,
> fair and secure, and the voters who turned out in record numbers to make their voices
> heard. Now, it's time to put this election behind us and come together as a state to
> defeat our common enemy: COVID-19.

172.    Thereafter, on December 14, 2020, Michigan's 16 electoral college delegates

unanimously voted in support of the Democrat candidates for president and vice-president.[33]

---

[32] Ari Beerman, *In a Blow to Trump, Michigan's Canvassing Board Certifies Election Results*,
Mother Jones, Nov. 23, 2020.

[33] Dave Boucher, *Michigan's Electoral College delegates cast all 16 votes for Joe Biden,
Kamala Harris*, Detroit Free Press, Dec. 14, 2020. *See also* Pat Droney, *Governor Whitmer Has
Police, 200 Troops Block Republican Electors From Michigan State Capital*, Law Enforcement
Today, December 14, 2020.

173.     On that same day, Allied Security Operations Group "(ASOG"), released a report
of an audit of the Dominion voting machines and software used in Antrim County, Michigan, in
the 2020 election ("ASOG Report").[34] A copy of the *Revised Preliminary Summary V2* is
attached hereto as Plaintiff's Exh. 9, as though fully contained herein.

174.     The ASOG Report concludes:

> Dominion Voting System is intentionally and purposefully designed with inherent
> errors to create systemic fraud and influence election results. The system
> intentionally generates an enormously high number of ballot errors. The electronic
> ballots are then transferred for adjudication. The intentional errors lead to bulk
> adjudication of ballots with no oversight, no transparency, and no audit trail. This
> leads to voter or election fraud. Based on our study, we conclude that The
> Dominion Voting System should not be used in Michigan. We further conclude that
> the results of Antrim County should not have been certified.

175.     Said report was generated after a Michigan voter petitioned the court for a
temporary restraining order requiring Antrim County to preserve the Dominion machines and
electronic data in the county, and to allow expert auditors to inspect the sequestered machines.

176.     On December 1, 2020, a memo from the Michigan Bureau of Elections, an agency
overseen by Ms. Benson, ordered Michigan county clerks to "'delete Electronic Poll Book
software and associated' even as calls to audit the election persist."[35]

177.     On December 4, 2020, said Michigan court granted the petitioning voter the right to
have his experts inspect the Dominion Voting Machines and contributing date.

---

[34] *William Bailey v. Antrim County*, case 2020-CZ-9238 (13th Cir.Ct. Mich. filed Dec. 13, 2020).

[35] Frank Salvato, *Michigan Secretary of State Issues Order to Delete Election Data Amid Audit
Calls,* National File, December 4, 2020.

178.    On December 9, 2020, Defendant, Ms. Benson, moved for a protective order to

conceal the results of the examination—which was initially granted, but later removed by the court.

179.    On December 13, 2020, the Michigan Attorney General, Dana Nessel, tweeted:

 

**Dana Nessel** ✔
@danannessel

Fun fact: Lawyers who practice in Michigan are required to take an oath to support the MI and US Constitutions, not to file unjust and/or frivolous actions or mislead the court. The spate of Trump lawsuits in our state violates each of these tenets. It demeans our profession.

180.    Due to the unconstitutional acts of Defendant, Ms. Benson, and others, said

statements from the several counties were constitutionally tainted and, thus, all of Ms. Benson's

conduct involving the certification of Michigan's federal election is unconstitutional.

181.    As the United States Supreme Court has held many times:

[T]he Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law… when a state officer acts under a state law in a manner violative of the Federal Constitution, he 'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'

*Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (quoting *ex parte Young*, 209 U.S. 123, 159-160 (1908).

182.    In acting in said unconstitutional manner, as described herein, Defendant, Ms.

Benson, was stripped of her official capacity as Secretary of State of the State of Michigan.

32

Appendix Page 49

183.    As such, Defendant, Ms. Benson, was acting outside the scope of her official capacity when she certified said results of the presidential election.

184.    Defendant, Ms. Whitmer, as the state's chief executive officer, is responsible for the constitutional execution of the state's laws.

185.    The governor of Michigan is responsible for transmitting the state's results of an election to the United States for transmission to Congress and, by state law, to the United States secretary of state. *See* 3 U.S.C. § 6. Mich. Code § 168.46.

186.    This ministerial task has been unconstitutionally corrupted by her subordinate executive officers and other election officials, and Ms. Whitmer's "failure to meaningfully investigate and determine the proper lawful vote counts when the general election was marked with inaccuracy and loss of integrity over absentee ballots and other serious statutory violations such as failure to require bipartisan oversight at absent voting counting boards."[36]

187.    In allowing the board and secretary of state to certify an unconstitutional presidential election, as described herein, Ms. Whitmer was stripped of her official capacity as Governor of the State of Michigan.

188.    As such, Ms. Whitmer was acting outside the scope of her official capacity, when the results of the Election were certified, as above.

189.    Said certification of the Election is *ultra vires* and unconstitutional.

190.    Said certification of the Election is void *ab initio*.

---

[36] *See* Petition for Extraordinary Writs & Declaratory Relief, *Johnson v. Benson*, filed Nov. 26, 2020, MSC No. 162286 (Mich. filed Nov. 26, 2020), ¶ 38.

## GEORGIA

191.     In 2017, Georgia voters and a voting rights organization brought separate § 1983 actions, later consolidated, against Georgia state officials alleging that the state's reliance on a direct recording electronic ("DRE") voting system burdened their 14th Amendment rights to due process and equal protection.[37]

192.     Thereafter, on or about April 4, 2019, behind closed doors, Mr. Kemp signed a bill that, among other things, granted Dominion an estimated $150 million contract to replace Georgia's voting machines.[38]

193.     An expert witness in the *Curling* case in Georgia, Harri Hursti, observed Georgia's June 9, 2020, statewide primary, and August 11 runoff, and participated in a Rule 34 inspection of the ongoing updating of Dominion software in Fulton County, Georgia.[39]

194.     In a 48-page affidavit, Mr. Hursti noted "a wide range of well-known and publicly disclosed vulnerabilities."[40]

---

[37] *Curling, et al., v. Raffensperger, et al.,* Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.) ("*Curling* case"). *See also* Johnny Kaufman, *Federal Court Asked to Scrap Georgia's 27,000 Electronic Voting Machines*, NPR, September 12, 2018.

[38] Ben Nadler, *Georgia Gov. Kemp Signs New Touchscreen Voting Machines Bill*, Associated Press, April 4, 2019. *See also*, Greg Bluestein and Mark Niesse, *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal- Constitution, June 14, 2019("In a statement by [Fair Fight, a voting rights organization started by Stacey Abrams], the group called it "corruption at its worst.").

[39] *See Declaration of Harri Hursti*, October 4, 2020, *Curling* case, Doc. 942, Exh. A. *See also Id.*, Docs. 680-1, 800-2, 809-3, 860-1, 877, and 923-2 (prior declarations of Mr. Hursti).

[40] *See Declaration of Harri Hursti* (Doc. 809-3, Exh. 2), *Curling* case, August 24, 2020, ¶ 36.

195.    The security risks outlined in Mr. Hursti's affidavit, including, the "operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* at ¶ 49.

196.    On October 4, 2020, Mr. Hursti signed a supplemental affidavit concerning his observation and inspection "to review the ongoing software updating of the Dominion software for Fulton County ballot marking device ('BMD') touchscreen units to ICX software version 5.5.10.32."[41]

197.     Based upon Mr. Hursti expert opinion, the "methods and processes of adopting and installing this software change is completely unacceptable." *Id.* at ¶ 20.

198.    The "methods and processes adopted by Dominion in Fulton County do not meet national standards for managing voting system technical problems and remedies, and should not be accepted for use in a public election under any circumstances." *Id.*

199.    As is outlined in *Texas v. Pennsylvania*:

a.      Georgia law prohibited the opening of absentee ballots until after the polls open on Election Day. O.C.G.A. § 21-2-386(a)(2).

b.      Georgia law authorized and required a single registrar or clerk—after reviewing the outer envelope—to reject an absentee ballot if the voter: failed to sign the required oath or to provide the required information; the signature appears invalid; the required information does not conform with the information on file; or, if the voter is otherwise found ineligible to vote. O.C.G.A. § 21-2-386(a)(1)(B)-(C).

---

[41]    *Declaration of Harri Hursti* (Doc. 942, ¶ 3), *Curling* case, Oct 2, 2020.

c.    Georgia law provided absentee voters the chance to "cure a failure to sign the oath, an invalid signature, or missing information" on a ballot's outer envelope by the deadline for verifying provisional ballots (i.e., three days after the election). O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c)(2).

d.    To facilitate cures, Georgia law required the relevant election official to notify the voter in writing: "The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, a copy of which notification shall be retained in the files of the board of registrars or absentee ballot clerk for at least two years." O.C.G.A. § 21-2-386(a)(1)(B).

e.    On March 6, 2020, Georgia's Secretary of State entered a Compromise Settlement Agreement and Release with the Democratic Party of Georgia (the "Settlement") to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the express mandatory procedures set forth at O.C.G.A. § 21-2-386(a)(1)(B).[42]

f.    Among other things, before a ballot could be rejected, the Settlement required a registrar who found a defective signature to now seek a review by two other registrars, and only if a majority of the registrars agreed that the signature was defective could the ballot be rejected but not before all three registrars' names were written on the ballot envelope along with the reason for the rejection. *Texas v. Pennsylvania*, ¶ 71.

g.    These cumbersome procedures are in direct conflict with Georgia's statutory requirements, as is the Settlement's requirement that notice be provided by telephone (i.e., not in writing) if a telephone number is available. Finally, the Settlement purports to require State election officials to consider issuing guidance and training materials drafted by an expert retained by the Democratic Party of Georgia. *Id.*

h.    Georgia's legislature has not ratified these material changes to statutory law mandated by the Compromise Settlement Agreement and Release, including altered signature verification requirements and early opening of ballots. *Id.* at ¶ 72.

i.    This unconstitutional change in Georgia law materially benefitted one presidential candidate, over another. *Id.* at ¶ 74.

---

[42] *See Democratic Party of Georgia, Inc. v. Raffensperger,* case 1:19-cv-05028-WMR (N.D. Ga.).

j.   According to the Georgia Secretary of State's Office, the Democrat's nominee for president had almost double the number of absentee votes (65.32%) as the incumbent candidate. (34.68%). *Id.*, Cicchetti Decl. at ¶ 25, App. 7a-8a.

k.   The effect of this unconstitutional change in Georgia election law, which made it more likely that ballots without matching signatures would be counted, had a material impact on the outcome of the election. *Id.* at ¶ 65.

l.   Specifically, there were 1,305,659 absentee mail-in ballots submitted in Georgia in 2020. There were 4,786 absentee ballots rejected in 2020. This is a rejection rate of .37%. In contrast, in 2016, the 2016 rejection rate was 6.42% with 13,677 absentee mail-in ballots being rejected out of 213,033 submitted, which more than seventeen times greater than in 2020. *Id.*, Cicchetti Decl. at ¶ 24, App. 7a.

m.   If the rejection rate of mailed-in absentee ballots remained the same in 2020 as it was in 2016, there would be 83,517 less tabulated ballots in 2020. *Id.* at ¶ 76.

n.   The statewide split of absentee ballots was 34.68% for Trump and 65.2% for Biden. *Id.*

o.   Rejecting at the higher 2016 rate with the 2020 split between Trump and Biden would decrease Trump votes by 28,965 and Biden votes by 54,552, which would be a net gain for Trump of 25,587 votes. *Id.*

p.   This would be more than needed to overcome the Biden advantage of 12,670 votes, and Trump would win by 12,917 votes. *Id.*

q.   Regardless of the number of ballots affected, the non-legislative changes to the election rules violated the Electors Clause. *Id.*

200.   After the Election, local attorney, L. Lin Wood, Jr., Esq., filed a verified

complaint against Georgia's Secretary of State, Defendant, Mr. Raffensperger.

Appendix Page 54

201.    The complaint sued the secretary of state in his official capacity, wherein
Attorney Wood accused Mr. Raffensperger of unilaterally abrogating Georgia law
governing the signature verification process for absentee ballots.[43]

202.    On November 25, 2020, former U.S. Attorney, Sidney Powell, Esq.
(Attorney Powell), on behalf of a group of Georgia voters, filed a complaint in federal court
for emergency relief to "de-certify the results of the General Election for the Office of
President." (Pearson Complaint).[44]

203.    In the Pearson Complaint, the Plaintiff's alleged that Georgia's certification
of the Election was unconstitutional, based upon:

a.      the conduct of Defendant, Mr. Raffensperger, acting in his official authority
        as the chairman of the State Election Board, wherein said board adopted
        Secretary of State Rule 183-1-14-0.9-.15, *Processing Ballots Prior to
        Election Day*, in direct conflict with O.C.G.A. § 21-2-386(a)(2);

b.      the unconstitutional conduct of certain Georgia county election officials,
        who, after Defendant, Mr. Raffensperger, instructed Georgia counties to
        conduct an audit of said federal election in a manner consistent with
        O.C.G.A. § 21-2-498, did not provide certain political parties and candidates
        meaningful access and an opportunity to review the validity of mail-in
        ballots during the pre-canvassing meetings and, specifically, mishandled
        many other ballots—which established a pattern showing the absence of
        mistake. *Id*. at ¶¶ 64-91.

c.      specific acts of fraud, including the counting of certain absentee ballots in
        Fulton County, Georgia, without observers, due to a false claim of a "pipe
        burst," which resulted in the tabulation center "shutting down" for 2 ½
        hours, while said ballots were unlawfully counted, without observers
        present. *Id*. at ¶¶ 111-114.

---

[43] *See* Verified Amended Complaint, *Woods v. Raffensperger* (Doc. No. 5)*, Case 1:19-cv-05028-WMR (N.D. Ga. Nov. 15, 2020).

[44] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1), *Pearson, et al., v. Kemp.*, Case 1:20-cv-04809-TCM (N.D. Ga. Nov. 25, 2020).

d.     specific acts of fraud, including the identification of the Voting Systems
       Officer of Strategy and Security of the company that manufactured said
       voting machines, Dominion Voting Systems Corporation, who publicly
       made derogatory remarks about the incumbent, Presidential candidate, and
       has documented ties to a domestic terrorist organization. *Id.* at ¶ 120.

e.     numerous public records, expert reports and witness statements evidencing
       the Defendants' "egregious misconduct, including ignored legislative
       mandates concerning mail-in and ordinary ballots [that] led to
       disenfranchisement of an enormous number of Georgia voters." *Id.* at ¶ 122.

f.     statistical analysis performed by experts established: "lost votes;" "a pattern
       of widespread fraud;" votes casts by persons who have moved out of
       Georgia or had "fraudulent residence addresses;" analysis that established a
       "platykurtic distribution;" thousands of "missing and unlawful ballots;" and
       "data breaches in the Dominion software permitting rogue actors to
       penetrate and manipulate the software during the recent general election."
       *Id.* at ¶¶ 122-131.[45]

g.     the software used by the voting machines in Georgia, which allowed
       operators of the machines to: accept or discard batches of votes; mark
       certain ballots as "problem ballots" for *discretionary determination*; and,
       view and delete individual ballot scans—without "guarantee that electronic
       ballots accurately reflect the choices of voters because there's no paper
       backup to verify results," contrary to 50 U.S.C. § 20701. *Id.* at ¶¶ 92-102.

h.     evidence that said software used by the voting machines in Georgia was
       created to rig elections, facilitate vulnerability and to "allow a select few to
       determine which votes will be counted in any election." *Id.* at ¶ 103.

i.     evidence of a common scheme, plan and *modus operandi*, concerning the
       creation of said software to manipulate elections, worldwide, e.g. in
       Venezuela. *Id.* at ¶103.

j.     the foreign connections and ownership of said software and voting
       machines, used throughout Georgia. *Id.* at ¶104-105.

---

[45] *See*, An Analysis of Surveys Regarding Absentee Ballots Across Several States by William M
Biggs (Doc. No. 1-1), *Pearson Complaint*, Nov. 25, 2020. *See also* Declaration of Eric Quinnell
(Doc. No. 1-27), *Pearson Complaint*, Nov. 25, 2020.

k.   the numerous reports, articles and statements made by prominent political figures, newspaper articles, television news shows, and multiple interviews over the last fifteen years indicating the unreliability of said software and voting machines, many of which included warnings that the software and voting machines, herein used, created a treat to the national security of the United States. *Id.* at ¶¶ 104-115.

l.   analysis concluding that said system and software "have been accessible and were certainly compromised by rogue actors, such as Iran and China." *Id.* at ¶¶ 111-114.

204.   Also, within "the State of Georgia, private non-profits, state officials and local elected officials acted to systematically eviscerate Georgia's Election Law contrary to Title 21 of the Official Code of Georgia—failing to protect election integrity."[46]

205.   For example, as a part of the scheme herein described, Defendant, CTCL, using money given to it by Defendants, Mr. Zuckerberg and Ms. Chan, granted $6.3 million dollars to Fulton County, Georgia, which was primarily used to:

a.   pay ballot harvesters;

b.   fund mobile ballot pick-up units;

c.   deputize and pay political activists to manage ballots;

d.   pay election judges and poll workers;

e.   establish satellite offices, and fund drop-boxes to bypass and intercept United States Mail;

f.   pay local election officials and agents to recruit cities recognized as democratic strongholds to recruit other cities to apply for the grants from non-profits;

---

[46] Petition for Election Contest, *Wood v. Raffensperger*, case 2020CV342959 (Ga. Super. Ct. filed November 25, 2020), pp. 1-2.

Appendix Page 57

g.    consolidate counting centers to facilitate the movement of hundreds of thousands of questionable ballots, without legally required observation;

h.    initiate and implement a two-tiered ballot "curing" plan that unlawfully counts ballots in Democrat Party strongholds, while spoiling similar ballots in Republican areas; and,

i.    pay for and help design the plan to remove the poll watchers from one political party so that the critical responsibility of determining the validity of the ballot and the validity of the count could be conducted without oversight.[47]

206.    On November 20, 2020, Defendant, Mr. Raffensperger, unconstitutionally certified the Election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

207.    In acting in said unconstitutional manner, as described herein, Defendant, Mr. Raffensperger, was stripped of his official capacity as Secretary of State of the State of Georgia.

208.    As such, Mr. Raffensperger was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

209.    On November 20, 2020, Defendant, Mr. Kemp, unconstitutionally certified the election, under color of O.C.G.A. §§ 21-2-502, and his official authority.

210.    In acting in said unconstitutional manner, as described herein, Mr. Kemp was stripped of his official capacity as Governor of the State of Georgia.

211.    As such, Mr. Kemp was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

212.    Said certifications of the Election are *ultra vires* and unconstitutional.

213.    Said certifications of the Election are void *ab initio*.

---

[47] *Id*., Harding Decl., Exh. A, B, C and F, to the original petition, ¶ 25, App. 7a-8a.

# PENNSYLVANIA

214.    In 2019, Pennsylvania enacted bipartisan election reforms that, among other things, set a deadline of 8:00 p.m. on election day for a county board of elections to receive a mail-in ballot. 25 Pa. Stat. §§ 3146.6(c), 3150.16(c).

215.    Later, the Pennsylvania's Supreme Court extended that deadline to three days after Election Day, and adopted a presumption that even non-postmarked ballots were presumptively timely.[48]

216.    On August 7, 2020, the League of Women Voters of Pennsylvania, and others, filed a complaint against Defendant, Ms. Boockvar, in her official capacity, and other local election officials, seeking "a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting" were unlawful for a number of reasons.[49]

217.    The Pennsylvania Department of State quickly settled with the plaintiffs, issuing revised guidance on September 11, 2020, stating in relevant part:

> The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

218.    This guidance is contrary to Pennsylvania law, and unconstitutional.[50]

---

[48] *Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020).

[49] *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT (E.D. Pa. filed Aug. 7, 2020).

[50] *Texas v. Pennsylvania*, ¶¶ 41-63.

Appendix Page 59

219. In *Texas* v. *Pennsylvania*, filed after the election in the U.S. Supreme Court, the

Attorney General of the State of Texas averred:

> Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these changes, and the legislation did not include a severability clause.

*Texas v. Pennsylvania*, ¶ 43.

220. As outlined in *Motion for Leave to File Bill of Complaint*:

a. Prior to the election, Secretary Boockvar sent an email to local election officials urging them to provide opportunities for various persons—including political parties—to contact voters to "cure" defective mail-in ballots. This process clearly violated several provisions of the state election code;

b. Section 3146.8(a) requires: "The county boards of election, upon receipt of official absentee ballots in sealed official absentee ballot envelopes as provided under this article and mail-in ballots as in sealed official mail-in ballot envelopes as provided under Article XIII-D,1 shall safely keep the ballots in sealed or locked containers until they are to be canvassed by the county board of elections;"

c. Section 3146.8(g)(1)(ii) provides that mail-in ballots shall be canvassed (if they are received by eight o'clock p.m. on election day) in the manner prescribed by this subsection.

d. Section 3146.8(g)(1.1) provides that the first look at the ballots shall be "no earlier than seven o'clock a.m. on election day." And the hour for this "pre-canvas" must be publicly announced at least 48 hours in advance. Then the votes are counted on election day.

e. By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security. This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely.

*Id*. at ¶¶ 50-51.

221.    As a result of Ms. Boockvar's unconstitutional acts, state and local election

officials in Philadelphia and Allegheny Counties violated Pennsylvania's election law by

adopting different standards for voters in Philadelphia and Allegheny Counties, with the intent to

favor one presidential candidate, over another. *Id.* at ¶ 52.[51]

222.    As a result of said unconstitutional acts by Ms. Boockvar, absentee and mail-in

ballots in Pennsylvania were evaluated under an illegal standard regarding signature verification.

*Texas v. Pennsylvania*, ¶ 53.

223.    As stated by Texas, "It is now impossible to determine which ballots were

properly cast and which ballots were not." *Id.*

224.    The changed process allowing the curing of absentee and mail-in ballots in

Allegheny and Philadelphia counties is a separate basis resulting in an unknown number of

ballots being treated in an unconstitutional manner, inconsistent with Pennsylvania statute. *Id.* at

¶ 54.

225.    In addition, a great number of ballots were received after the statutory deadline,

and yet were counted by virtue of the fact that Pennsylvania did not segregate all ballots received

after 8:00 pm on November 3, 2020. *Id.* at ¶ 55.

226.    As stated by Texas:

> Boockvar's claim that only about 10,000 ballots were received after this deadline
> has no way of being proven since Pennsylvania broke its promise to the Court to
> segregate ballots and co-mingled perhaps tens, or even hundreds of thousands, of
> illegal late ballots.

*Id.*

---

[51]  *See also* Verified Complaint (Doc. 1), *Donald J. Trump for President, Inc. v. Boockvar*, case
4:20-cv-02078-MWB (M.D. Pa. filed Nov. 18, 2020), ¶¶ 3-6, 9, 11, 100-143.

227.    On December 4, 2020, fifteen members of the Pennsylvania House of

Representatives, led by Rep. Francis X. Ryan, issued a report to U.S. Congressman Scott Perry

(Ryan Report).[52]

228.    The Ryan Report states:

The general election of 2020 in Pennsylvania was fraught with inconsistencies,
documented irregularities and improprieties associated with mail-in balloting, pre-
canvassing, and canvassing that the reliability of the mail-in votes in the
Commonwealth of Pennsylvania is impossible to rely upon.

Ryan Report, *Texas v. Pennsylvania*, App. 139a-144a.

229.    The Ryan Report's findings include:

a.       Ballots with NO MAILED date total is 9,005;

b.       Ballots Returned on or BEFORE the Mailed Date total is 58,221; and,

c.       Ballots Returned one day after Mailed Date. That total is 51,200.

*Id*. at App. 143a.

230.    The State of Texas plead to the U.S. Supreme Court that these "nonsensical

numbers alone total 118,426 ballots and exceed" the margin of votes that determined

Pennsylvania's presidential election. *Id.* at ¶ 58.

231.    The Ryan Report also states:

[I]n a data file received on November 4, 2020, the Commonwealth's PA Open Data
sites reported over 3.1 million mail in ballots sent out. The CSV file from the state
on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the
information was provided that only 2.7 million ballots had been sent out. This
discrepancy of approximately 400,000 ballots from November 2 to November 4 has
not been explained.

*Id*. at 143a-44a.

---

[52] *Texas v. Pennsylvania*, App. 139a-144a.

232.     In its *Motion for Leave to File Bill of Complaint*, the State of Texas stated:

a.     Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these changes, and the legislation did not include a severability clause;

b.     These non-legislative modifications to Pennsylvania's election rules appear to have generated an outcome-determinative number of unlawful ballots that were cast in Pennsylvania;

c.     In 2020, Pennsylvania received more than 10 times the number of mail-in ballots compared to 2016, which were "treated in an unconstitutionally modified manner that included: (1) doing away with the Pennsylvania's signature verification requirements; (2) extending that deadline to three days after Election Day and adopting a presumption that even *non-postmarked ballots* were presumptively timely; and (3) blocking poll watchers in Philadelphia and Allegheny Counties in violation of State law;"

d.     Local election officials in Philadelphia and Allegheny Counties decided not to follow Pennsylvania law, which requires that poll-watchers be granted access to the opening, counting, and recording of absentee ballots;

e.     By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security;

f.     This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely;

g.     The number of votes affected by the various constitutional violations exceeds the margin of votes separating the candidates; and that,

h.     The blatant disregard of statutory law renders all mail-in ballots constitutionally tainted and cannot form the basis for appointing or certifying Pennsylvania's presidential electors to the Electoral College.

*Texas v. Pennsylvania*, ¶¶ 43-61.

233.    On October 31, 2019, Defendant, Mr. Wolf, signed Act 77,[53] which implemented sweeping reforms to the elections process in Pennsylvania.[54]

234.    As outlined in *Kelly v. Commonwealth*, Act 77:

a.    created a new option to vote by mail without providing an excuse;

b.    allowed voters to request and submit mail-in or absentee ballots up to 50 days before an election; and,

c.    established a semi-permanent mail-in and absentee ballot voter list.

*Kelly v. Commonwealth*, ¶ 55.

235.    The Election was administered by Pennsylvania election officials pursuant to Act 77, which included allowing for universal, no-excuse mail-in ballots to be counted in violation of the Pennsylvania constitution. *Id*. at ¶ 62.

236.    The Plaintiffs in *Kelly v. Commonwealth* argued that Act 77 was unconstitutional, because it expanded the scope of absentee voting to all voters, which, in effect:

a.    created an entire class of electors who are shown to have received a mail-in ballot, despite never actually receiving a mail-in ballot; and,

b.    similarly produced a whole class of voters who received unsolicited or unrequested mail-in ballots that never voted via mail-in ballot and never intended to vote by mail.

*Id*. at ¶ 56-57.

---

[53] Act of October 31, 2019, P.L. 552, No. 77 ("Act 77"). *See also* 25 Pa.Stat. §§ 3146.6(c), 3150.16(c).

[54] *See* Complaint for Declaratory and Injunctive Relief, *The Honorable Mick Kelley v. Commonwealth of Pennsylvania*, Case 620 MD 2020 ("*Kelly v. Commonwealth*"), (Commonwealth Ct. of Penn. filed November 21, 2020), ¶ 54.

237.    Act 77 does not provide Pennsylvania voters any meaningful method of disputing a mail-in or absentee ballot that has been submitted in their name, even where a ballot is improperly submitted by another individual. *Id.* at ¶ 58.

238.    Even under circumstances wherein the voter insists that he or she did not submit a mail-in ballot, "if the voting records suggest that such a ballot has purportedly been received from that voter, the voter is effectively deprived of their right to cast a vote as a direct and proximate result of the enactment of Act 77." *Id.* at ¶ 58.

239.    Based upon these facts, as alleged by bar members, state representatives, experts and states of the Union, no reasonable person could disagree that, in the light most favorable the Plaintiffs, the actions of Defendants, Ms. Boockvar, Mr. Wolf, and others, herein described, was unconstitutional.

240.    Governors and secretaries of state do not act unconstitutionally.

241.    All acts performed by a governor or secretary of state, in their official capacity, are performed on behalf of the state.

242.    States do not act unconstitutionally—unless they are in rebellion or insurrection.

243.    Unconstitutional acts and omissions of state actors strip those persons of their official and representative character and, thus, subjects them to the consequences of their individual conduct. *See ex parte Young*, 209 U.S. 123, 159-160 (1908).

244.    As in the other states, Defendants, Mr. Zuckerberg and Ms. Chan, engaged in a scheme in Pennsylvania with Defendant, CTCL, and others, to use their enormous wealth to unconstitutionally favor one presidential candidate, over the others, by, among other things:

Appendix Page 65

a.      privately contracting with municipalities to accept grants that require the recipient to expend the grant money for the express purposes set forth in the grants;

b.      unlawfully paying the salaries of election officials;

c.      Employing the use of illegal drop boxes to intercept and bypass the United States Mail; and,

d.      Utilizing unauthorized mobile voting vehicles.[55]

245.    The State of Pennsylvania also contracts with Dominion to provide voting services for approximately 1.3 million voters whose ballots were tabulated by Dominion.[56]

246.    On November 20, 2020, Dominion cancelled a scheduled appearance to discuss voting irregularities with a state government committee.

247.    After the cancelation, Pennsylvania House Republicans tweeted:

Transparency is key for our election security. Dominion Voting Software is asking us to give them only blind trust. We're very disappointed in Dominion's last-minute cancelation in today's hearing.

248.    After the Election, the President of the United States tweeted:



**Donald J. Trump** ✓ @realDonaldTrump · Nov 12

"REPORT: DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN." @ChanelRion @OANN

---

[55] *See* Complaint for Declaratory and Injunctive Relief (Doc. 1), *Pennsylvania Voters Alliance, v. Centre County*, case 4:20-cv-01761 (M.D. Penn. filed Sept. 25, 2020).

[56] Hank Berrien, *Pennsylvania GOP Slams Dominion Systems For Canceling On Giving Testimony*, Dailywire, Nov. 20, 2020.

249.    On November 24, 2020, Defendant, Ms. Boockvar, unconstitutionally certified said election, under color of law and her official authority.

250.    In acting in said unconstitutional manner, as described herein, Ms. Boockvar was stripped of her official capacity as Secretary of State of the State of Pennsylvania.

251.    As such, Ms. Boockvar was acting individually, outside the scope of her official capacity, when she certified said results of the Election.

252.    On November 20, 2020, Defendant, Mr. Wolf, unconstitutionally certified said election, under color of law and his official authority.

253.    In acting in said unconstitutional manner, as described herein, Mr. Wolf was stripped of his official capacity as Governor of the State of Pennsylvania.

254.    As such, Mr. Wolf was acting individually, outside the scope of his official capacity, when he certified said results of the Election, as described herein.

255.    An "unconstitutional state enactment is void and…any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such is a nullity." *Pasasin v. Allain*, 478 U.S. 265, 276 (1986).

256.    Said certification of the Election in Pennsylvania is unconstitutional.

257.    Said certification of the Election in Pennsylvania is void *ab initio*.

Appendix Page 67

# WISCONSIN

258.     On December 14, 2020, the Wisconsin Supreme Court determined that certain county clerks had erroneously interpreted Wisconsin election law.[57]

259.     Wisconsin allows voters to declare themselves indefinitely confined, provided they meet the statutory requirements. *See also* Wis. Stat. § 6.86(2)(a).

260.     On March 25, 2020, the Dane and Milwaukee County Clerks issued guidance *on Facebook* suggesting all voters could declare themselves confined because of the pandemic and the governor's then-existing Safer-at-Home Order.[58]

261.     Wisconsin's highest court concluded that the emergency order issued by the county clerks did not render Wisconsin electors "indefinitely confined," which obviated the legal requirement of valid photo identification to obtain absentee ballots.

262.     On March 31, 2020, the Wisconsin Supreme Court unanimously deemed that advice incorrect, and the "county clerks immediately updated their advice in accordance with our decision." *Trump v. Biden*, 2020 WI 90, ¶ 7.

263.     A blanket invalidation of votes casts by Wisconsin citizens receiving a ballot after claiming indefinitely confined status, "without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit." *Id.* at ¶8.

264.     Nonetheless, the number of indefinitely confined voters surged from just under 70,000 voters in 2019 to over 200,000 in 2020.

---

[57] *Jefferson v. Dade County*, 2020 WI 90 (Wis. 2020).

[58] *Trump v. Biden*, 2020 WI 91 (Wis. 2020).

265.     According to a report prepared by Director of the Office of Trade and Manufacturing Policy and Assistant to the President, Peter Navarro, the "130,000 vote increment of new indefinitely confined voters is more than five times" the margin of victory in Wisconsin. The Navarro Report, *The Immaculate Deception: Six Key Dimensions of Election Irregularities*, Dec. 17, 2020, p. 10, a copy of which is attached hereto as Plaintiff's Exh. 10, as though fully contained herein.

266.     During this same time period, Mr. Zuckerberg and Ms. Chan, funneled millions of dollars in private money, through CTCL, and others, to unlawfully and unconstitutionally circumvent Wisconsin's absentee ballot laws—using the COVID-19 pandemic as a pretext to create an exception to Wisconsin's photo identification requirements.

267.     Mr. Zuckerberg and Ms. Chan, through CTCL, and others, granted over six million dollars to the cities of Racine, Kenosha, Green Bay, Madison and Milwaukie.

268.     The use of private funding from Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and many others, undermines the existing *Help America Vote Act* (HAVA),[59] which requires state election plans be submitted for approval by federal officials to, among other things, preserve the equal protection and due process rights of registered voters across the country.[60]

269.      The National Voter's Registration Act (NVRA) also preempted CCTCL' private federal election grants.[61]

---

[59] *See* 52 USC §§ 20901-21145.

[60] *See* Complaint for Declaratory and Injunctive Relief, *Wisconsin Voters Alliance v. City of Racine*, case 1:20-cv-01487 (E.D. Wis), ¶¶ 127-149.

[61] *Id*. at ¶¶ 150-173. *See* 52 USC §§ 20501-20511.

270. The private funding from Mr. Zuckerberg, Ms. Chan, Facebook and CTCL was utilized to place illegal ballot drop boxes in disparate proportion based upon Democrat concentrations, encouraging targeted demographics as a method of increasing voter turnout, and the suppression of political opposition.

271. In Wisconsin, the margin of victory in the Election was slightly over 20,000 votes.

272. In Wisconsin, the reported results of the Election are in invalid based upon the following facts:[62]

    a.    In the 2020 general election, 1,275,019 mail-in ballots were returned, nearly a 900 percent increase over 2016

    b.    Leading up to the 2020 general election, in contravention of Wisconsin law, the Wisconsin Elections Commission ("WEC"), and other local officials unconstitutionally modified Wisconsin election laws that weakened, or did away with, established security procedures and photo ID requirements put in place by the Wisconsin legislature to ensure absentee ballot integrity.

    c.    For example, the WEC undertook a campaign to position hundreds of drop boxes to collect absentee ballots—including the use of unmanned drop boxes.

    d.    The mayors of Wisconsin's five largest cities—Green Bay, Kenosha, Madison, Milwaukee, and Racine, which all have Democrat majorities—joined in this effort, and together, developed a plan use purportedly "secure drop-boxes to facilitate return of absentee ballots."[63]

---

[62] *Texas v. Pennsylvania*, ¶¶ 104-108.

[63] *See* Wisconsin Safe Voting Plan 2020, Submitted to CTCL, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf

e.  In a summary of resources needed, the plan outlined a need for $6,324,567;[64]

**Table 3: Summary of Resources Needed to Robustly Implement All Four Recommendations**

| Recommendation | Green Bay | Kenosha | Madison | Milwaukee | Racine | Totals |
|---|---|---|---|---|---|---|
| Encourage and Increase Absentee Voting By Mail and Early, In-Person | $277,000 | $455,239 | $548,500 | $998,500 | $293,600 | $2,572,839 |
| Dramatically Expand Strategic Voter Education & Outreach Efforts | $215,000 | $58,000 | $175,000 | $280,000 | $337,000 | $1,065,000 |
| Launch Poll Worker Recruitment, Training & Safety Efforts | $174,900 | $145,840 | $507,788 | $800,000 | $181,500 | $1,810,028 |
| Ensure Safe & Efficient Election Day Administration | $426,500 | $203,700 | $40,500 | $76,000 | $130,000 | $876,700 |
| Totals: | $1,093,400 | $862,779 | $1,271,788 | $2,154,500 | $942,100 | $6,324,567 |

f.  In August 2020, CTCL announced that it had donated $6.3 million dollars to five cities in Wisconsin, meant to ensure that Wisconsin has a "safe, inclusive, and secure election."[65]

g.  Over five hundred unmanned, illegal absentee ballot drop boxes were used in the Election in Wisconsin.[66]

---

[64] *Id*. at p. 5.

[65] *CTCL Announces COVID-19 Response Rural Grants Program*, Center for Tech and Civic Life, August 7, 2020, *available at:* https://www.techandciviclife.org/covid-19-rural-grants/.

[66] *See* Complaint (Doc. No. 1), *Donald J. Trump, Candidate for President of the United States of America v. The Wisconsin Election Commission*, Case 2:20-cv-01785-BHL (E.D. Wisc. filed Dec. 2, 2020), ¶¶ 188-89.

Appendix Page 71

h.      The use of *any* drop box, manned or unmanned, is directly prohibited by Wisconsin statute.[67]

i.      Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. 6.855(3);

j.      "In a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed." Wis. Stat. 7.15(2m).

k.      Unmanned absentee ballot drop-off sites are prohibited by the Wisconsin Legislature as they do not comply with Wisconsin law expressly defining "[a]lternate absentee ballot site[s]". Wis. Stat. 6.855(1), (3);

l.      The use of drop boxes for the collection of absentee ballots, positioned predominantly in Wisconsin's largest cities, is directly contrary to Wisconsin law providing that absentee ballots may only be "mailed by the elector, or delivered in person to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b);

m.      The fact that other methods of delivering absentee ballots, such as through unmanned drop boxes, is not permitted by Wisconsin law, which mandates that "[a]ny ballot not mailed or delivered as provided in this subsection may not be counted." Wis. Stat. § 6.87(6).

n.      "Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election." Wis. Stat. § 6.84(2);

o.      Through Facebook, WEC and local election officials encouraged voters to unlawfully declare themselves "indefinitely confined"—which under Wisconsin law allows the voter to avoid security measures like signature verification and photo ID requirements;

---

[67] The Wisconsin legislature specifically described in their Election Code "Alternate absentee ballot site[s]," and detailed the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1).

p.      Specifically, registering to vote by absentee ballot requires photo
        identification, except for those who register as "indefinitely confined" or
        "hospitalized." Wis. Stat. § 6.86(2)(a), (3)(a);

q.      Registering for indefinite confinement requires certifying confinement
        "because of age, physical illness or infirmity or [because the voter] is
        disabled for an indefinite period." Id. § 6.86(2)(a).

r.      Should indefinite confinement cease, the voter must notify the county clerk,
        id., who must remove the voter from indefinite-confinement status. Id. §
        6.86(2)(b);

s.      On May 13, 2020, the Administrator of WEC issued a directive to the
        Wisconsin clerks prohibiting removal of voters from the registry for
        indefinite-confinement status if the voter is no longer "indefinitely
        confined;"

t.      Said directive violates Wisconsin law, which provides that "any
        [indefinitely confined] elector [who] is no longer indefinitely confined ...
        shall so notify the municipal clerk" who "shall remove the name of any
        other elector from the list upon request of the elector or upon receipt of
        reliable information that an elector no longer qualifies for the service." Wis.
        Stat. § 6.86(2)(a)&(b);

u.      According to statistics kept by the WEC, nearly 216,000 voters said they
        were indefinitely confined in the 2020 election, nearly a fourfold increase
        from nearly 57,000 voters in 2016;

v.      In Dane and Milwaukee counties, more than 68,000 voters said they were
        indefinitely confined in 2020, a fourfold increase from the roughly 17,000
        indefinitely confined voters in those counties in 2016;

w.      The fourfold increase in absentee ballots under the "indefinitely confined"
        interpretation creates sufficient illegal ballots to exceed the Wisconsin final
        ballot margin.

x.      Under Wisconsin law, voting by absentee ballot requires voters to complete
        a certification, including their address, and have the envelope witnessed by
        an adult who also must sign and indicate their address on the envelope. Wis.
        Stat. § 6.87;

Appendix Page 73

y.      The sole remedy to cure an "improperly completed certificate or [ballot] with no certificate" is for "the clerk [to] return the ballot to the elector[.]" Wis. Stat. § 6.87(9);

z.      "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(9);

aa.     However, in a training video issued April 1, 2020, the Administrator of the City of Milwaukee Elections Commission unilaterally declared that a "witness address may be written in red and that is because we were able to locate the witnesses' address for the voter" to add an address missing from the certifications on absentee ballots. The Administrator's instruction violated Wisc. Stat. § 6.87(6d);

bb.     The WEC issued similar guidance on October 19, 2020, in violation of this statute as well.

cc.     In the Wisconsin *Trump Campaign Complaint*, it is alleged, supported by the sworn affidavits of poll watchers, that canvas workers carried out this unlawful policy, and acting pursuant to this guidance, in Milwaukee used red-ink pens to alter the certificates on the absentee envelope and then cast and count the absentee ballot, in violation of Wis. Stat. § 6.87(6d);

dd.     Wisconsin's legislature has not ratified these changes, and its election laws do not include a severability clause.

ee.     In addition, a box truck delivery driver subcontracted to the U.S. Postal Service (USPS) to deliver truckloads of mail-in ballots to the sorting center in Madison, WI, testified that USPS employees were backdating ballots received after November 3, 2020.[68]

ff.     This same USPS subcontractor testified how a senior USPS employee told him on November 4, 2020 that "[a]n order came down from the Wisconsin/Illinois Chapter of the Postal Service that 100,000 ballots were missing" and how the USPS dispatched employees to "find…the ballots." *Id.* ¶¶ 8-10.

---

[68] *See* Motion for Expedited Consideration*, Texas v. Pennsylvania*, Decl. of Ethan J. Pease, App. 149a-151a, ¶¶ 3-13.

Appendix Page 74

273.     On November 20, 2020, the WEC Defendants unconstitutionally certified the Election, under color of Wis. Stat 7.70(5), and their official authority.

274.     In acting in said unconstitutional manner, as described herein, said WEC Defendants were stripped of their official capacity as members of the Wisconsin Elections Commission.

275.     As such, Defendants, WEC Defendants were acting individually, outside the scope of their official capacity, when they participated in certifying said results of the Election, as described herein.

276.     On November 20, 2020, Defendant, Mr. Evers, unconstitutionally certified said election under color of Wis. Stat. § 7.70(5)(b), and his official authority.

277.     In acting in said unconstitutional manner, as described herein, Mr. Evers was stripped of his official capacity as Governor of the State of Wisconsin.

278.     As such, Mr. Evers was acting individually, outside the scope of his official capacity, when he certified said results of the Election.

279.     The "theory of [*ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States." *Pennhurst State School and Hospital v. Halderman*, 475 U.S. 89, 102 (1984) (quoting *ex parte Young*, 209 U.S. 123, 160 (1908)("Since the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct.' *Ibid.*")

280.     Said certification of the Election in Wisconsin is *ultra vires* and unconstitutional.

281.     Said certification of the Election in Wisconsin is void *ab initio*.

282.     As in Georgia, on December 1, 2020, Attorney Powell, on behalf of two

Wisconsin voters, filed a complaint in federal court for declaratory, emergency and

permanent injunctive, naming Defendants, herein, WEC Defendants and Mr. Evers, in their

official capacity (Feehan Complaint).[69]

283.     The Feehan Complaint "brings to light a massive election fraud" and

"multiple violations of the Wisconsin Election Code." Feehan Complaint, p. 1.

284.     In attached affidavits, experts on statistical and data analysis, opined, among other

things, that:

    a.     Wisconsin's database for the Election showed 96,711 voters whom the state
marked as having requested and been sent an absentee ballot, who did not return
it;

    b.     of those 96,711, at least 16,316 people did not request an absentee ballot;

    c.     of those 96,711, at least 13,991 of those did in fact mail back an absentee ballot
to the clerk's office; and, accordingly,

    d.     there are 29,594 "troublesome ballots in Wisconsin."[70]

285.     The Feehan Complaint includes the affidavit of Seth Keshel, who noted:

New York Times live vote reporting shows a dump of 168,541 votes at 3:42:20 (a.m.)
on November 4, 2020. Of those votes, 143,378 (85.07%) went to Biden, and just
25,163 (14.93%) went for Trump. This dump was enough to flip the race with almost
no transparency to the viewing public. The live graph showing this vote dump
(circled) is attached as Exhibit D to this document.

---

[69] Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (Doc. No. 1),
*Feehan., v. Wisconsin Elections* Commission, Case 2:20-cv-1771 (E.D. Wis. Nov. 25, 2020).

[70] See William M. Briggs, PhD, *An Analysis of Surveys Regarding Absentee Ballots In
Wisconsin,* Feehan Complaint, Exh. 4.  *See also* Matthew Braynard, *Expert Report of Matthew
Braynard*, Feehan Complaint, Exh. 9 (as filed in *Wisconsin Voters Alliance v. Wisconsin
Elections Commission*, case 2020PA1930 (Wis. filed Nov. 24, 2020).



Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

286.    The Feehan Complaint further contained evidence that senior management of Dominion had public expressed hostility to the incumbent president, and opposition to his election.[71]

287.    Dr. Eric Coomer is listed as the co-inventor of several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion. *See* Feehan Complaint, ¶ 93, fn. 10.

288.    In an affidavit, Dr. Coomer is documented as: having admitted that Dominion Voting machines can be manipulated; making previous public statements that are "highly partisan;" and, assuring a group that, "Trump is not going to win. I made f---ing sure of that."[72]

---

[71] Feehan Complaint (Doc. 1-16), *Declaration of Seth Keshel*, ¶ 7.

[72] Feehan Complaint (Doc. 1-13), *Affidavit of Joseph T. Oltmann*, p. 2.

289.     On  December 14, 2020, Phill Kline of the Amistad Project of the non-partisan Thomas More Society released a report that "alleged Facebook founder Mark Zuckerberg and his wife made $419.5 million in contributions to non-profits organizations during the 2020 election cycle--$350 million to the 'Safe Election' Project of the Center for Technology and Civic Life and another 69.5 million to the Center for Election Innovation and Research—that, 'improperly influence[d] the 2020 presidential election on behalf of one particular candidate and party.'"[73] A copy of J.P. Carlson's, The Legitimacy and Effect of Private Funding in Federal and State Electoral Processes, is attached hereto as Plaintiff's Exhibit 11, as though fully contained herein.

290.     Based upon the foregoing, the Plaintiffs and all those similarly situated as registered voters have suffered individualized, concrete injuries and damage, caused by the unlawful and unconstitutional acts and omission of the Defendants, which has damaged the reputation of the country, violated the civil rights of hundreds of millions of people, includes incalculable financial loss due to lack of productivity and mental anguish, destroyed the people's faith in their government and elected officials, caused massive internal strife inside the United States and, among many other things, has increased the risks of civil war, and other violent and uncivil behavior.

291.     Judgement in favor of the Plaintiffs and those similarly situated will redress the Plaintiffs' injuries and allow them to enjoy their rights to legally authorized, uniform and fair presidential elections guaranteed under federal law and the Constitution.

---

[73] Michael Patrick Leahy, *Report: Mark Zuckerberg's $419 Million Non-Profit Contributions 'Improperly Influenced 2020 Presidential Election,'* Brietbart, Dec. 18, 2020.

# V. CLAIMS FOR RELIEF

## COUNT I

### U.S. Const. art. II § 1, cl. 2, & Amend. XIV, § 2
### As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
### Violation of Electors Clause
### Unconstitutional Burden on the Fundamental Right
### to Vote for the President and Vice-President of the United States of America
(All Defendants)

292.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

293.    The Civil Rights Act specifically prohibits any person who, under color of any statute, ordinance, regulation, custom, or usage of a State, subjects any citizen of the United States to the deprivation of any rights, privileges or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.

294.    Every person who subjects, or causes to subject, any citizen of the United States to said deprivation "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *Id.*

295.    The Electors Clause mandates that each state appoint, in such manner as the legislature thereof may direct, a number of Electors, equal to the whole number of Senators and Representatives to which a state may be entitled in the Congress. U.S. Const. art. II, § 1, cl. 2.

296.    None of the Defendants, herein named, are part of any state legislature, nor do any have legislative power.

297.    The Supremacy Clause ensures that local governments do not act contrary to federal and state law regarding federal elections. U.S. Const. art. I, § 4, cl. 1.

Appendix Page 79

298.     The historic events that shaped America include the unanimous Declaration of

Independence of the original thirteen states that enshrined the rights to life, liberty and the

pursuit of happiness, which thereafter instituted a government among those who pledged their

lives, fortunes and sacred honor to the United States of America.

299.     Later, under the Constitution, all rights not granted to the United States, in trust,

were reserved to the states and the people.

300.     The most fundamental right in creation of a representative government is the

people's right to choose their representatives.

301.     The continuing method of preserving the will of the people necessarily includes

the right of assembly, free speech, free press, and to the redress of grievances.

302.     No right is more precious in a free country than that of having a voice in the

election of those who make the laws under which, as good citizens, we must live.

303.     Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)

("Though not regarded strictly as a natural right, [voting is a] privilege…regarded as a

fundamental political right, because preservative of all rights").

304.     A person's right to vote is individual and personal in nature, thus voters who

allege facts showing disadvantage to themselves as individuals have standing to sue to remedy

that disadvantage. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).

305.     This Complaint involves the protection of a right to vote for the President,

Commander-in-Chief, and Vice President, under a process enumerated by the Constitution.

306.    This right is further supported through Public Laws, federal election laws, and by the legal administration of elections by the states, for as long as the latter is not administered in contravention with federal law or the Constitution.

307.    In that regard, the conduct and actions of the Defendants, acting under color of law and official capacity, violated the rights of the Plaintiffs and others similarly situated, individually, as every registered voter has an interest in selecting the president and vice-president.

308.    Governors, secretaries and election officials of Georgia, Wisconsin, Michigan and Pennsylvania, do not legislate, nor do they engage in unconstitutional behavior.

309.    Accordingly, the state actors herein named stepped out of their official capacity and are personally liable for violating the voting rights of the Plaintiffs and others similarly situated.

310.    Defendants, Facebook, Dominion, CTCL, Mr. Zuckerberg and Ms. Chan, having so inextricably woven their interests into the presidential election process and said state actors, they are thus defined as persons subject to 42 U.S.C. § 1983, 1985, and 1988.

311.    The Defendants, and each of them, acted in concert with each other, and other persons, to unconstitutionally legislate rules, change procedures, and implement a scheme and device to interfere and manipulate the Election, with their common goal to remove the incumbent, by any means necessary.

312.    The Supreme Court has "found state action present in the exercise of a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352 (1974).

313.     Defendant, CTCL, acting under the influence of Mr. Zuckerberg and Ms. Chan, induced other Defendants to use grant funding from CTCL, and to solicit other municipalities to apply for and use the same—creating a symbiotic relationship between and among the parties sufficient to make them state actors. *Luger v. Edmonson Oil Co.*, 457 U.S. 922, 941 (1982).

314.     Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the Civil Rights Act.

315.     To act under color of law does not require that the accused be an officer of the State," as it "is enough that he is a willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966).

316.     Even assuming the private defendants did not take specific action to qualify them as state actors, the conspired actions between the parties to achieve the desired result holds them within the context of parties conspiring against rights under 42 U.S.C. § 1985, and 18 U.S.C. § 241.[74]

317.     This claim is not a generalized grievance.

318.     As established by the facts averred, and with forthcoming evidence, the Plaintiffs and those similarly situated were personally harmed, and continue to suffer financial damages required to protect their rights through this lawsuit.

319.     The evidence establishes that the Defendants have engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country, no matter whose side the voter is on. Other than the nefarious, the honest American voter wants every vote counted to legally determine the president and vice-president.

---

[74] https://www.justice.gov/crt/conspiracy-against-rights.

320.     Because illegal votes and unconstitutional procedures dilute the votes of the legally registered voter, persons that create policies and procedures that authorize, encourage, and cover-up unconstitutional behavior are liable for the damages they cause to Plaintiffs with proper standing.

321.     The criminal laws of the United States make it illegal for administrative employees of the United States, the States, their political subdivisions and municipalities, to use their official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner. *See* 18 U.S.C. § 595.

322.     Additional penalties under federal criminal law support and restrict actions taken under color of law and conspiracy against rights, pursuant to 18 U.S.C. § 241 & 242.

323.     Recently, the Supreme Court confirmed that appropriate relief includes claims for money damages against Government officials in their individual capacities. *Tanzin v. Tanvir*, 140 S. Ct 861, (2020).

324.     The principle of the "Private Attorney General" was codified into law with the enactment of the *Civil Rights Attorney's Fees Award Act of 1976.* 42 U.S.C. § 1988.

325.     The actions of the Defendants were and are the direct and proximate cause of the violations of Plaintiffs' rights, injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT II

### U.S. Const. Amend. XIV, § 1 & Amend. XV, § 1
### As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
### Violation of Equal Protection
(All Defendants)

326.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

327.     At all times relevant herein, Plaintiffs and those similarly situated have certain inalienable and civil rights protected by the Constitution, federal and state statutes.

328.     The Defendants listed herein are persons, subject to 42 U.S.C. § 1983, 1985, 1986 and 1988.

329.     The Defendants, and each of them, are responsible for the actions of their employees, agents, or attorneys under the legal doctrine of *Respondeat Superior*.

330.     The Equal Protection Clause of the Fourteenth Amendment prohibits persons acting under color of law from abridging or burdening the rights or immunities of citizens of the United States. U.S. Const. amend. XIV.

331.     The Equal Protection Clause prohibits the use of differential standards in the treatment and tabulation of ballots within a State. *Bush v. Gore*, 531 U.S. 98, 107 (2000).

332.     One-person, one-vote jurisprudence arises when persons acting under color of authority influence arbitrary and disparate treatment among voters of different jurisdictions.

333.     Acting under the color of law and authority, Defendants violated Plaintiffs' rights, privileges and immunities secured by the Constitution, and guaranteed by the Fourteenth Amendment.

334.     The Defendants, and each of them, have participated in conduct and actions resulting in, among other things, unconstitutional agreements, illegal modifications of election law, illegal administration of the federal election process, the unconstitutional certification of the Election, all of which has damaged the Plaintiffs, but, more broadly, every registered voter in America, all of whom have an interest in free and fair elections to determine the President of the United States of America.

335.     Among other things, the Defendants have funded, influenced, and participated in acts of subterfuge and other manipulations aimed directly at the election machinery including the unequal distribution of unsecured ballot boxes with the intent to bypass the United States Post Office, and to otherwise intercept ballots that should have been mailed, or dropped off at polling stations, primarily in certain demographic areas—which, when inevitably discovered, was designed to defend any challenge thereto as "racist."

336.     The Fifteenth Amendment forbids the denial or abridgment of the right to vote on account of race or ethnicity. U.S. Const. amend. XV.

337.     Because a discriminatory motive may hide behind legislation that appears neutral on its face, the U.S. Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent: 1) evidence that defendants' decision bears more heavily on one race than another; 2) the historical background of the decision; 3) the specific sequence of events leading up to the decision; 4) departures from the normal procedural sequence; 5) substantive departures; and, 6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–28 (1977).

Appendix Page 85

338.    Both constitutional protections guard against any deprivation of the right to vote that is motivated by race. *Rogers v. Lodge*, 458 U.S. 613, 621–25 (1982).

339.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the U.S. Constitution. *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 378–79 (1975).

340.    Defendants acts and omissions contribute to a scheme or device aimed at camouflaging their election interference behind certain areas of concentrated demographic and racial groups, under the deception, as here, to promote a belief that to challenge the scheme would be tantamount to disparaging the racial group.

341.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights v. Metropolitan Housing and Development Corp.*, 429 U.S. 252, 265 (1977).

342.    Instead, the plaintiff's burden is to show that the discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

343.    By the shared enterprise of the entire nation electing the President and Vice President, equal protection violations in one state can and do adversely affect and diminish the weight of votes cast by citizens of other states that lawfully abide by the election structure set forth in the Constitution.

344.    The Defendants, and each of them, have conspired together, and with other persons known and unknown, to carry out their actions with concerted and orchestrated effort, the effect of which is actionable under the Civil Rights Act.

345.     The Defendants, and each of them, have used electronic communication and mail to send and receive documents to and from each other, and to the separate election officials across the states of the Union, and others, beyond the borders of their respective states.

346.     At all relevant times herein, the Defendants, and each of them, engaged in a pattern of unconstitutional behavior and obfuscation, which Plaintiffs have recently discovered through public reports, news articles, complaints and affidavits filed by other persons, regarding the Election.

347.     Defendants, and unknown DOES 1-10,000, had knowledge of the wrongs done or about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglected and failed to do so. 42 U.S.C. § 1986.

348.     Defendants, and each of them, have conspired and acted in concert to injure, oppress, threaten, or intimidate the Plaintiffs and all similarly situated in the free exercise or enjoyment of their rights and privileges secured to them by the Constitution, and the laws of the United States, or because of having so exercised the same. 18 U.S.C. § 241

349.     Plaintiffs and all others similarly situated have been injured by the actions of the Defendants, as related to rights secured to them by Constitution, herein described.

350.     Plaintiffs and others similarly situated have suffered concrete and particularized damages, injuries and losses, as a direct and proximate cause of the Defendants' unconstitutional conduct, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

Appendix Page 87

# COUNT III

## U.S. Const. Amend. XIV, § 1
## As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
## Violation of Due Process
(All Defendants)

351.    Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

352.    Voting is a fundamental right, protected by the Fourteenth Amendment to the United States Constitution.

353.    A state, having once granted the right to vote on equal terms, may not later by arbitrary and disparate treatment, value one person's vote over that of another.

354.    The Constitution protects the right of all qualified citizens to vote in a federal election. *Reynolds v. Simms*, 377 U.S. 533, 554 (1964).

355.    The right to vote can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise thereof. *Id*. at 555.

356.    All qualified voters have a constitutionally protected right to vote, and to have his or her vote count. *ex parte Yarbrough*, 110 U.S. 651, 665 (1884). *See also United States v. Mosley*, 238 U.S. 383, 386 (1915).

357.    The conduct of the Defendants violated the rights of the Plaintiffs and all registered voters in the United States, protected by the Fourteenth Amendment to the Constitution. U.S. Const., Amend XIV.

358.    As a result of the Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs and those similarly situated are deprived of their right to substantive due process of law, in violation of the Fifth and Fourteenth Amendments of the Constitution.

359.     When election practices reach "the point of patent and fundamental unfairness," the integrity of the election itself violates substantive due process. *Griffen v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978).

360.     Under Supreme Court precedents on procedural due process, not only intentional failure to follow election law as enacted by a state's legislature, but also unauthorized acts and omissions by persons acting under color of official law and capacity, and their designees in local government can violate the Due Process Clause.

361.     The Defendants, and each of them, acted unconstitutionally to lower election standards and miscalculate votes with the express intent to not only favor one candidate, but, more obviously, to defeat an incumbent, with who they so vehemently oppose.

362.     As a direct and proximate result of Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their right to procedural due process of law, in violation of the Fifth and Fourteenth Amendments of the Constitution, and have and continue to suffer damages, mental distress, anguish, humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT IV

### U.S. Const. Amend. I & Amend. XIV, § 1
### As enforced by 42 U.S.C. § 1983, 1985, 1986 & 1988
### Burden on Political Speech, Right to Associate and Freedom of Press
(Defendants Facebook and Mr. Zuckerberg)

363.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

364.     Plaintiffs and all others similarly situated have a right to speak, associate, assemble, and act independently and collectively with others, whether said speech is politically motivated, or not.

365.     Plaintiffs and all others similarly situated have a right to a free press, with access to information, which includes print, radio, television and all related journalistic media.

366.     The named Defendants, herein, provide interactive computer services to the internet by various platforms for real-time public input.

367.     Defendants, Facebook and Mr. Zuckerberg, deny that they are publishers or content providers, and assert that they are immune from civil liability for the content posted by others, pursuant to 47 U.S.C. § 230(c)(2) (Section 230).

368.     Section 230 allows the Defendants to block and screen offensive material, through the use of enabling tools and means to filter, screen, allow and disallow content, pick, choose, analyze or digest content for the purpose of transmission, receipt, display, forwarding, cache, search, subset, organize, reorganize or translate such content.

369.     However, at all times material hereto, Facebook, under the direction and control of Mr. Zuckerberg, intentionally censored non-offensive, politically relevant, journalistic articles and opinion, posted by users for other users, with the intention to limit the exposure thereof.

370.     The Congressional intent of Section 230 was to promote and expand the dissemination of educational, informative, cultural and entertainment material to stimulate diversity of political discourse and other intellectual activity.

Appendix Page 90

371.     In pursuance thereof, Section 230 also sought to limit exposure of illegal content for the purpose of ensuring "vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." Section 230(b)(5).

372.     Here, Facebook, under the control and direction of Mr. Zuckerberg, unconstitutionally relied upon Section 230 to suppress the 1st Amendment rights of others having a different political and cultural ideology than Mr. Zuckerberg, and monoculture of the left-leaning agents and employees of Facebook.

373.     At all relevant times, Defendants, Facebook and Mr. Zuckerberg, through his agents, third party contractors, fact checkers, and employees, censored news articles, opinions, editorials, and other content by setting specific parameters, algorithms and other methods to suppress content related to the Election, including threats or actions to ban or terminate individual users or groups or Pages who did not comply with the censorship rules.

374.     The named Defendants, and each of them, and others identified as DOES 1-10,000, intended to censor, block, delete, screen, disallow, qualify or otherwise interfere with the content posted to Facebook and its affiliates by unilaterally determining that such content was "offensive" to the Defendants' political ideology.

375.     The named Defendants specifically and intentionally acted in direct contravention of the Congressional intent of Section 230 by censoring, filtering, blocking and deleting content that was contrary to their political ideology.

376.     The named Defendants have intentionally determined that all statements related to the ongoing investigations into election misconduct would be filtered and censored.

377.    The Defendants have participated in conduct and actions resulting in, among other things, unconstitutional suppression of Plaintiffs' right to a free press, right to assemble, speak *and* hear the legitimate thoughts and ideas of others.

378.    Defendants knowingly and intentionally, created, utilized, and conspired to implement policies, procedures, algorithms and other means to suppress the 1st Amendment rights of its users, with knowledge that this would impact the Plaintiffs and all others similarly situated, whether the voter is a user of Facebook, or not.

379.    Defendants, Facebook and Mr. Zuckerberg, conspired with others, herein identified as DOES 1-10,000, to cooperate in the censorship and join in the labeling and banning of certain political ideology in opposition to that shared by Mr. Zuckerberg, in which he had invested so much.

380.    By becoming intricately involved in the funding of the non-profit organizations that worked closely with targeted cities and counties, against state law and with federal regulation, which involved the machinery of the elections, themselves, Mr. Zuckerberg and Ms. Chan, may fairly be treated as the state itself.

381.    Private persons "jointly engaged with state officials in the challenged action, are acting `under color' of law for purposes of § 1983." *Dennis v. Spark*, 449 U.S. 24, 28 (1980).

382.    Ordinarily, a state pays for the costs of an election.

383.    Defendant, Mr. Zuckerberg, voluntarily became part of a state mechanism, while he used his personal control over the largest social media platform in the world to suppress the speech of those, with whom *he* disagreed.

384.     Said behavior, coupled with the clearly documented and overwhelming evidence of unconstitutional behavior, called out, by name, by 20 Attorneys General across the country, amounts to probable evidence of concerted action between the Defendants, and many others.

385.      The suppression by Defendants, Facebook and Mr. Zuckerberg of the First Amendment rights of the Plaintiffs and all others similarly situated was part of a greater plan to influence the Election.

386.     The Defendants knowingly and intentionally engaged in this unconstitutional conduct with malice aforethought, believing that no one would do anything about it.

387.     As a direct and proximate result of Defendants' collusive, concerted, unlawful and unconstitutional conduct, Plaintiffs were and are being deprived of their rights, in violation of the First and Fourteenth Amendments of the Constitution, and have and continue to suffer damages, mental distress, anguish, humiliation, loss of liberty and legal expenses.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiffs' Prayer for Relief, below.

## COUNT V

### Constitutional Challenge
### 47 U.S.C.  230(c), as applied
### (Defendants Facebook and Mr. Zuckerberg)

388.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

389.     The unlawful and unconstitutional actions of Defendants, Facebook, and Mr. Zuckerberg, their agents and employees, in violation of, among other things, Plaintiffs' protected

right of free speech, free press, and right to assemble has caused an ongoing and imminent threat of the loss of Plaintiffs' rights, and of all others similarly situated.

390.     This ongoing contravention of rights has burdened the Plaintiffs' right to vote, as well.

391.     The Supreme Court has held that if a private party is "a willful participant in joint activity with the State or its agents," then state action is present. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

392.     As has been demonstrated, Defendants, Mr. Zuckerberg and Ms. Chan, utilized Defendant, CTCL, as the conduit to interact with, and fund select municipalities and counties.

393.     Defendants, Mr. Zuckerberg and Ms. Chan, derived the money to fund their political agenda from their alter-ego, Defendant, Facebook.

394.     Defendant, Facebook, at the direction of Mr. Zuckerberg, uses the exemption from civil liability, provided under Section 230, to label and censor content that opposes their preferred cultural and political ideology, as offensive, harassing, and violent.

395.     Additionally, Defendant Facebook, at the direction of Mr. Zuckerberg, publishes their own content to support their political ideology and, thus, preserve their investment in the Election.

396.     Defendants, Facebook and Mr. Zuckerberg, have participated in overt and covert acts to block and restrict access and availability of material in a politically motivated and biased manner.

397.     Defendants, Facebook and Mr. Zuckerberg, by publishing and providing their own politically charged content, lost their immunity and protection as a "Good Samaritan" in contravention of Section 230.

398.     Plaintiffs seek review of the constitutionality of Section 230, as applied to Defendants, Facebook and Mr. Zuckerberg.

399.     Plaintiffs' claims are supported by ongoing congressional review of Facebook's censorship and blocking conduct, especially as it relates to the intentional manipulation and interference in the public election process, nationwide.

400.     Plaintiff's claims are supported by substantial evidence being disclosed that Facebook, Mr. Zuckerberg, and others herein identified as DOES 1-10,000, interfered in the public election process, by blocking and censoring content in opposition to, and by actively publishing content in support of one political ideology—which disparately impacted the incumbent candidate, and his supporters.

401.     Therefore, good cause exists for this Court to determine the constitutionality of 47 U.S.C. § 230(c), as applied to the Defendants, Facebook and Mr. Zuckerberg.

402.     Plaintiffs and all others similarly situated will continue to suffer irreparable harm without legal remedy from the civil liability shield created by said "Good Samaritan" protection.

403.     Plaintiffs are informed and aware of the notice requirements of F.R.C.P. 5.1, and shall provide all notices required by law, and hereby seek certification by the Court, pursuant to F.R.C.P. 5.1(b) and 28 U.S.C. § 2403(a), of the following question:

> Whether the "Good Samaritan" protection, pursuant to 47 U.S.C. § 230(c), applies to the acts and omissions of Facebook.

## COUNT VI

### REQUEST FOR DECLARATORY JUDGEMENT
### 42 U.S.C. § 1988
### 28 U.S.C. § 2201, 2202
### Federal Rule of Civil Procedure 65
(Against all Defendants)

404.     Plaintiffs incorporate herein by reference all of the allegations contained in the foregoing paragraphs, as though fully contained herein.

405.     Defendants, each of them, acted in contravention to the limitations imposed by the Constitution and the laws related to a federal presidential election to the injury of Plaintiffs.

406.     Plaintiffs seek declaratory judgment for all unconstitutional acts, which shall be evidenced and established by these proceedings.

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## COUNT VII

### PERMANENT INJUNCTIVE RELIEF
(Against all Defendants)

407.     Plaintiffs incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint, as though fully contained herein.

408.     Plaintiffs seek permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters.

409.     Federal courts have broad discretion for an award of equitable relief. *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980).

Wherefore, Plaintiffs requests that the Court grant the relief as described in the Plaintiff's Prayer for Relief, below.

## VI. PRAYER FOR RELIEF

The people created the Constitution to protect themselves from the loss of liberty. In that manner, certain rights were delegated to the states and federal government, the latter of which has the exclusive power to declare war, create money and interpret the laws of the land.

Corporations are creations of a state, and often hold enormous power and wealth. The Constitution protects the people from the states and their corporate creations. The Constitution guarantees a republican form of government and prohibits Congress, and the states, from unduly burdening free speech and the right of assembly. No state shall violate the constitutional rights of the people, which include rights to due process, equal protection and, for some, to vote. These are fundamental rights, which must be protected by the people, federal government and the states—in that order.

Here, a multi-billionaire, his corporation and many others, infused hundreds of millions of dollars into a presidential election. These persons became personally and voluntarily involved in the most important function of government, granted to the states through the Constitution. Having done so, even through alter-egos and non-profits, Mr. Zuckerberg, and others, became inextricably woven into the functioning of government, and thus owed a duty to the people to conduct themselves within the boundaries of public law and the Constitution.

It is not satire to suggest that Mr. Zuckerberg and Ms. Chan are not the Masters of the Universe. They are U.S. Citizens and are no more important than any other person in the United States. No one is above the law. How many times have the people heard that? Yet, it is true. No matter how much money certain persons have, and no matter who is cooperating with those persons, free and fair elections are the most scared right of the people.

Appendix Page 97

Everyone has a right to free speech, but not everyone can vote. That right is bestowed upon a citizen as a civil right, granted by the authority of the created state. Once granted, that right becomes a fundamental right of the individual.

Collectively, the people have been voting since before the Revolution. Only through a right to vote can the people elect those who will honestly protect their liberties. Without fair elections, inevitably, tyranny will prevail. In such an event, all of the people's rights are at risk.

The Defendants acting under color of their official authority are personally liable for the damages caused to the Plaintiffs. Suffice it to say, the violation of a person's constitutional rights carry a monetary value, to be determined by the jury. More importantly, however, those persons must be enjoined from any further unconstitutional behavior that, if not enjoined, they will commit in future presidential elections, conducted in their respective states.

On the other hand, Defendants, Dominion, Mr. Zuckerberg, Ms. Chan, Facebook, CTCL, and others herein listed as DOES 1-10,000, collectively, have enormous wealth. Just the contracts between Dominion and the several states, herein, are in excess of one hundred million dollars in public funds. Mr. Zuckerberg, Ms. Chan, Facebook, CTCL and others, are sued herein precisely because these Defendants used their almost unlimited financial resources to unlawfully interfere with the Election.

Their conduct has negatively affected the entire World. However, the Plaintiffs represent a designated class of persons that have standing to sue, i.e., the registered voter. The Plaintiffs and those similarly situated have birth certificates, driver licenses, social security cards and are on the jury rolls. These registered voters have an interest in choosing the President of the United States, as the chief executive officer, and Commander in Chief of the armed forces.

Although a voter may cast a ballot in a state holding a lawful and fair election, when other actors operate an unconstitutional presidential election in another state, every registered voter has an interstate interest in that matter, and is potentially harmed by the unlawful conduct.

Here, the damages are continuing. The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty. Those who support the challenger need only suffer a loss in the House of Representatives, pursuant to the Twelfth Amendment, to feel the anguish being endured by those who support the incumbent. Unfair elections have a way of devolving in that manner. Thus, this lawsuit is being filed to give the people a civil mechanism to redress their grievances.

In a products liability case where, say, a ladder was defectively designed and thousands were hurt, the manufacturer and others would likely be sued, and the rest would learn from it. The Plaintiffs have fallen off the ladder, and the damage is done. Now, their goal is to ensure that ladders manufactured in the future don't have the same defects—or at least have a warning label on the top step.

With that, there must be a substantial monetary judgment imposed upon certain Defendants liable for the damages caused to the Plaintiffs and those similarly situated.

A nominal amount of $1,000 per registered voter equals damages in the approximate amount of $160 billion dollars. The Defendants, and others likely to be added, referenced herein as DOES 1-10,000 (some of which are foreign countries), can easily pay such a judgment, and would serve to discourage this behavior in the future.

Accordingly, a judgment of such an amount, or more, is the price of doing business.

WHEREFORE, Plaintiffs request that judgment be entered against the Defendants, and

that the Court grant the following:

a. Certification of the constitutional question, pursuant to F.R.C.P. 5.1 and 28 U.S.C.§ 2403;

b. Declare Defendant, Facebook, is not protected by the "Good Samaritan" provision in 47 U.S.C. § 230(c);

c. Declare that 47 U.S.C. § 230(c) is unconstitutional, as applied, to the actions of Defendants, Facebook and Mr. Zuckerberg;

d. Declare the actions of the Defendants, as herein described, as unconstitutional and ultra vires, thereby making them legal nullities;

e. Declare the unconstitutional actions of the Defendants have stripped them of their official character;

f. Permanently restrain the Defendants from any further unconstitutional behavior, as herein described;

g. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class; Assume jurisdiction over the action;

h. Enter judgment against Defendants in favor of Plaintiffs and the Class;

i. Award the Class damages, that is, three times their damages, in an amount to be determined at trial;

j. Award actual, compensatory, statutory, and consequential damages;

k. Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's ill-gotten gains, to ensure a remedy;

l. Grant permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct;

m.  Award pre-judgment and post-judgment interest at the highest rate allowed by law;

n.  Award Plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and,

o.  Award such other relief as is just and proper, and any other equitable relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims so triable as a matter of right.

Dated: December 22, 2020                    Respectfully submitted,


*/s/ Gary D. Fielder*
**Gary D. Fielder**  (CO 19757)
LAW OFFICE OF GARY FIELDER
2325 W. 72nd Ave.
Denver, CO 80221
(303) 650-1505
criminaldefense@fielderlaw.net


*/s/ Ernest J. Walker*
**Ernest J. Walker** (MI P58635)*
ERNEST J. WALKER LAW OFFICE
3368 Riverside Road
Benton Harbor, Michigan
(*pro hac vice* forthcoming)*

Appendix Page 101

JS 44 (Rev. 10/20)  District of Colorado

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KEVIN O'ROURKE, et al. | DOMINION VOTING SYSTEMS, INC. , et al. |

**(b)** County of Residence of First Listed Plaintiff  Roanoke, VA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Denver, CO
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gary D. Fielder, LAW OFFICE OF GARY FIELDER
2325 W. 72nd Ave., Denver, CO  80221 (303) 650-1505

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983, 1985, 1986, 1988; U.S. Const. Art. 2, Section 1; Amdts. 1, 5, 14, 15
Brief description of cause:
Civil rights action seeking monetary, declaratory and injunctive relief arising from unconstitutional acts regarding presidential election

- [ ] AP Docket

## VII. REQUESTED IN COMPLAINT:

- [x] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$160,000,000,000.

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  December 22, 2020

SIGNATURE OF ATTORNEY OF RECORD  Gary D. Fielder

Digitally signed by Gary D. Fielder
Date: 2020.12.22 11:16:27 -07'00'

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT  _____  APPLYING IFP  _____  JUDGE  _____  MAG. JUDGE  _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Exhibit 1

**Affidavit of Kevin Patrick O'Rourke**

| | |
|---|---|
| Commonwealth of Virginia | ) |
| | )sa |
| County of Roanoke | ) |

Comes Now, Kevin Patrick O'Rourke, a natural person, being first duly affirmed and hereby states the following facts in support of his Bill of Claim:

1) My name is Kevin Patrick O'Rourke and I am a natural person with a place of abode in Virginia.

2) I am a free man, born of a free woman and free man, both Marylanders, on March 25, 1974 having reached the age of majority and competent to handle all of my own affairs.

3) I am a citizen of Virginia and the United States of America, *one of the people*, my inalienable rights are my property, and I have never knowingly waived any of my rights or ceded them or any interest therein to any party.

4) My rights, expressly enumerated in the organic documents, created by universal and unanimous declaration of the thirteen original united States of America, include my right to life, liberty and pursuit of my happiness.

5) The Constitution guarantees to the people the right to a *republican* form of government, as enshrined in Article 4, Section 4.

6) Through the Declaration of Independence, the people agreed that if the government becomes destructive to these rights, as one people, we have the right to abolish that form of government, and to create our own.

7) It is my belief that the "one people" expressed in the Declaration of Independence means me, one of the people, as my independent sovereignty and granted to me by my Creator can never be controlled under the dominion of another.

8) These inalienable rights, and other civil rights protected under the charter of the Constitution and enshrined by the "constitutional" open and notorious government laws and treaties, are mine and cannot be encroached.

9) I am informed, educated, competent and can affirm that I am under no legal disability.

10) I have registered to vote in Virginia and maintain my professional license there as well.

11) I have, for the previous two presidential election cycles, not voted, as it was my firmly held belief that my vote will be altered, deleted, or fractionalize based upon the will of some other entity or actor.

12) Additionally, I have researched the political nuances and differences between a "republic" and a "democracy"; the first of which is a state in which equality and sovereignty is held by the people, limited by constitutional charter and from whom the supreme power is vested while granting limited authority to their elected officials in Trust and Confidence to preserve and protect life, property and national sovereignty, the latter is ruled by laws written by the voting majority which largely fails to protect the interests of the minority.

13) Typically, the government has layers of checks and balances to maintain order under the laws, including state legislators, state executive offices, House Representatives, Senate Representatives, a President Commander in Chief, and a Vice President.

14) Historically, the independent and unbiased journalists would provide an additional layer to the aforementioned checks and balances to validate and investigate corruption.

15) However, what had worked for hundreds of years is now clearly broken or on the verge of destruction or collapse at the hand of foreign and domestic enemies to this guaranteed republican form of government.

16) The guarantees reserved to me as one of the people, establish that if the democratic form of government encroaches upon my liberty interests or inalienable rights to my republican form of government, redress may be petitioned for, and ultimately I can severe the ties that bind me to the political apparatus.

17) This guarantee does not allow the governed or the government to _Ever_ encroach upon my inalienable rights, and I deny that I am a subject or a slave to the governed or government, equality and independence reigns supreme in America.

18) The Thirteenth Amendment abolishes slavery and "involuntary" slavery to any party including the dominion exercised by the government over the people from which it derives its power, in Trust.

19) The federal Constitution acts as a permanent injunction against government encroachment on all such rights, and all parties sworn to uphold the Same are forever bound to its limitations.

20) It is by and through these expressed beliefs, and the free exercise of my spiritual beliefs, that I petition for redress to the Honorable Court for restoration, at a minimum, of the "civil" rights preserved by law in Title 42 of the United States Code.

21) It is also through the same beliefs that I petition the Honorable Court, that if these encroachments and direct and proximate violations as outlined in the Complaint are not fully and adequately addressed, that the Court issue declaratory judgment in my favor against the government in all its forms recognizing my right not to participate and to my right of self-governance.

22) It is my firmly held belief that my right to vote in a free, fair, equal, and lawfully administered election process is the least of my rights that should be protected by the Courts under the Article 4, Section 4 guarantee.

23) To wit, I raise these objections to the 2020 Presidential and Vice-Presidential Election and direct my bill of claim to the named defendants and all those in conspiracy therewith:

a) That Dominion Voting Systems, Incorporated, ("Dominion") through the political leanings and ideology of its corporate executives, and with an interest in achieving profit by selling its "proprietary" voting machines, software, and servicing contracts has created an inequitable scheme in favor of one political party that effects my vote in a negative manner.

b) That Facebook, Inc. and its Chief Executive Officer, has encroached upon the free speech and right to assemble on its platform to express our free ideas and political positions by censoring the conservative voices, by concealing information related to criminal investigations and act of the democratic party candidate's family members and how those acts may be providing aid and comfort to foreign enemies of the republican form of government.

c) That the Center for Tech and Civic Life, through donations from Mr. Zuckerberg, Ms. Chan and Facebook, have interfered with the free, fair and honest electorate process in America, for which no remedy appears to be forthcoming.

d) That Brian Kemp, a peer equal to me, has abandoned his position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and his official character.

e) That Brad Raffensberger, a peer equal to me, has abandoned his position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and his official character.

f) That Gretchen Whitmer, a peer equal to me, has abandoned her position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and her official character.

Appendix Page 106

g) That Jocelyn Benson, a peer equal to me, has abandoned her position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and her official character.

h) That Tony Evers, a peer equal to me, has abandoned his position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and his official character.

i) That Doug J. LaFollette, a peer equal to me, has abandoned his position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and his official character.

j) That Tom Wolf, a peer equal to me, has abandoned his position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and his official character.

k) That Kathy Boockvar, a peer equal to me, has abandoned her position of public trust by acting in an unconstitutional manner and has acted in a manner detrimental to the rule of law and her official character.

24) The aforementioned state actor defendants have allowed Dominion to exercise inequitable influence over the voting results in Georgia, Pennsylvania, Michigan, Wisconsin and other states and counties nationwide, which have affected the entire balance of the political election for President Commander in Chief and Vice President.

25) The actions of the aforementioned defendants still threaten the balance of power of the US Senate race in the upcoming January 5, 2020 run-off election.

26) The actions of Facebook, Mr. Zuckerberg, Ms. Chan and other co-conspirators continue to censor, block, conceal and propagandize the entirety of the issues related to the election fraud, the legal challenges and the fundamental rights of the people.

27) I am a Certified Public Accountant ("CPA"), who is qualified and licensed to conduct financial audits, including audits conducted with government auditing standards.

28) I have investigated numerical and statistical anomalies related to the Dominion Voting machines and software and have reviewed the research and information being advanced by my peers.

29) I am uniquely qualified to audit and investigate the matters related to Dominion and the numerous anomalies, which I feel compelled to do as one of the people.

30) I have devoted considerable time to a comprehensive review of the national real time election results, have compared all available information and am convinced the election was manipulated through various means and methods.

31) Based upon empirical data and other analyses that shall be introduced at trial, I am positive that my vote and those of my peers have been negatively affected by the named defendants, to which there is no efficient remedy unless immediately enjoined from their unlawful and unconstitutional conduct.

32) My review leads me to a conclusion that the election process and results in the states in question are defective due to fraud, interference, and other nefarious methods utilized by Dominion that result in fractional portions of votes, repetitive vote ratios based upon the fractions of votes, spikes in voting results, and other falsified data that drastically skew statistical norms never seen in any election in the history of America.

33) Through my own experiences with Facebook, I have witnessed free speech curtailment, censorship, propaganda of a liberal nature, bias and harassment of my opinions, those of my peers, and have witnessed Facebook block the ability of my peers and I from freedom of assembly, free exercise of spiritual beliefs and ideals, all to the detriment of my rights and those of the people.

34) That due to the bias and harassment, mod mentality and other violative actions of the parties, I have canceled and deleted my Facebook profile.

35) That Facebook fails to constitute a neutral platform and is not entitled to Section 230 immunity and I challenge the constitutionality of 47 U.S.C. § 230(c) as applied to the actions of Facebook and seek redress for its violations of civil rights for myself and the people similarly suffering under its technocracy.

36) That due to the actions of the defendants, each and every one of them, I have lost any faith in the existing form of government and technology monopolies; I am angry; I am frustrated; I cannot sleep at night; I suffer from anxiety as a result of this uncertainty; I have lost my desire to communicate with most people openly and remain guarded as to my interactions and communication with every day people; I feel that I have no voice, no rights, and I have been 100% abandoned by the government in all its forms; and I believe that the incoming administration intends, through admissions of certain senators, to target conservatives that voted for Trump and will weaponize the entirety of the IRS, DOJ, DHS, CIA and other agencies against the people; I live in daily fear that I will be targeted and harassed for exposing or trying to expose fraud, waste and abuse by government actors, who are acting outside of their official character.

37) That unless and until these unlawful acts are enjoined, I maintain and preserve my objections to the 2020 Presidential and Vice Presidential Election results, and if not remedied by the Court or the American political apparatus, I seek declaratory judgment that I am entitled to invoke my right to abolish this form of government over me.

Appendix Page 108

38) The requested remedy is enshrined in the Declaration of Independence and the limitations placed upon government by its Constitutional Charter, which establishes the right to abolish as absolute, not as a conditional or "take it or leave it principal."

39) These rights, much like the supreme court's decision of Hale v. Henkle, allow me to structure my affairs to my own benefit, allowing that I may self-govern with immunity from the political apparatus while remaining on the soil of my country without being encroached, on the condition that I do not cause a bona fide injury to another of my peers.

40) The declaratory judgment of this Court in my favor shall entitle me to recognition of the free exercise of these rights in preservation of my life, liberty and to restore my happiness.

41) Without the relief requested in the Complaint, and without declaratory judgment of the matters outlined herein, I remain in a perpetual state of injury to my person.

I hereby state and affirm that the foregoing is true, correct, complete, and based upon first-hand knowledge under the laws of the United States of America.

_____

Kevin Patrick O'Rourke

## VIRGINIA NOTARY ACKNOWLEDGMENT

Commonwealth of Virginia

County of _Roanoke_

The foregoing instrument was acknowledged before me this 17th day of December, 2020 by Kevin Patrick O'Rourke, who provided me sufficient evidence of identity.

_____     (Seal)

Signature of Notarial Officer

Notary Registration Number: _346468_

My Commission Expires _October 31, 2021_

AMANDA N GILBERT
NOTARY PUBLIC
REGISTRATION # 346468
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
_10/31/21_

Appendix Page 109

# Exhibit 2

### AFFIDAVIT OF NATHANIEL L. CARTER

I, Nathaniel L. Carter, being duly sworn, do hereby state, under oath, as follows:

1.      My name is Nathaniel L. Carter, and I was born on October 25, 1965, in Berrien Springs, Michigan.

2.      I currently live at 386 Linden St. Benton Harbor, Michigan, and have lived and worked in this area all of my life.

3.      I am a resident of the State of Michigan.

4.      I am a registered voter in the State of Michigan.

5.      I am a married African-American male.

6.      I participated as a voter in the November 3, 2020, federal election for President and Vice President of the United States of America.

7.      I understand a contract exists between Dominion Voting Systems, Inc., 1201 18th Street, Suite 210, Denver, Colorado 80202 ("DOMINION"), which is identified in the public records of Michigan as Contract Number 071B7700117 (the "ELECTION CONTRACT").

8.      I understand that DOMINION has warranted to the State of Michigan that "[i]t is duly organized, validly existing, and in good standing as a corporation or other entity as represented under this Contract under the laws and regulations of its jurisdiction of incorporation, organization, or chartering."

9.      I understand that the ELECTION CONTRACT defined the "Deliverables" as "the voting system tabulators and all related components, and the accessible voting system components, and all other materials that Contractor is required to or otherwise does provide to the State or Authorized Users under this Contract and otherwise in connection with any Services, including all items specifically identified as Deliverables in the Statement of Work.  Notwithstanding the foregoing, the term Deliverable shall not include the EMS Software or System Software."

10.     I understand that the ELECTION CONTRACT also defined "Harmful Code" as "any: (a) virus, trojan horse, worm, backdoor or other software or hardware devices the effect of which is to permit unauthorized access to, or to disable, erase, or otherwise harm, any computer, systems or software; or (b) time bomb, drop dead device, or other software or hardware device designed to disable a computer program automatically with the passage of time or under the positive control of any Person, or otherwise prevent, restrict or impede the State's or any Authorized User's use of such software."

11.     The ELECTION CONTRACT required DOMINION to "provide all Services and Deliverables in a timely, professional and workmanlike manner and in accordance with the terms, conditions, and specifications set forth in this Contract and the Statement of Work."

12.     I understand that the ELECTION CONTRACT also required DOMINION to maintain "a data privacy and information security program, including physical, technical, administrative, and organizational safeguards, that is designed to: (a) ensure the security and confidentiality of State Data; (b) protect against any anticipated threats or hazards to the security or integrity of State Data; (c) protect against unauthorized disclosure, access to, or use of State Data; (d) ensure the proper disposal of State Data; and (e) ensure that all employees, agents, and subcontractors of Contractor, if any, comply with all of the foregoing.

13.     I also understand that DOMINION warranted to the State of Michigan that it "uses industry standard software and tools designed to ensure that the EMS Software or any System Software does not or will not at any time during the license term contain any Harmful Code."

14.     Based on information and news reports that I have seen, I believe DOMINION has similar contracts with the States of Georgia, Pennsylvania, and Wisconsin.

15.     Based on public records, 527 jurisdictions within the State of Michigan received money from the Center for Tech and Civic Life based on a $350 million donation from Mark Zuckerberg and Priscilla Chan for the purpose of conducting the November 3, 2020, election.

16.     I believe that the actions or inactions of DOMINION, Mark Zuckerberg, Priscilla Chan, and cooperating state officials have resulted in the States of Michigan, Georgia, Pennsylvania, and Wisconsin (and elsewhere) conducting tainted elections due to providing faulty election hardware, software and/or direct operational assistance.

16.     I am aware of reports and lawsuits regarding voting conducted in Antrim County, Michigan, in which "significant errors" were discovered following forensic investigation of twenty-two DOMINION voting machines.

17.     I am aware of similar DOMINION voting machine "irregularities" and "glitches" that occurred in several other states, which has cast significant doubt on election results Nationwide.

18.     From my understanding, DOMINION voting machines can interface with the internet, are generally unsecure, and use software that can be deployed to change votes, and affect election results.

19.     DOMINION and others were aware or should have been aware that machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside DOMINION.

20.     I believe that as a result, my vote during the 2020 Presidential Election was effectively not counted, and the results of the election were predetermined.

21.     I believe my right to vote is one of the most sacred rights recognized in the Constitution, and as a minority, I understand that my vote is the only real voice I have.

22.     I believe my vote has be discounted or eliminated all-together from consideration regarding the choice for the country's highest office.

23.     While I once had faith in the fairness of elections, the actions or inactions of DOMINION, Zuckerburg, Chan and cooperating State officials have effectively stripped my vote, causing me to lose all faith that our governing bodies can conduct a fair election.

23.     Moreover, my desire to vote in future elections has been effectively suppressed because I believe elections run by current DOMINION systems are untrustworthy, and there is no reason to participate in future elections as results are predetermined.

24.     Therefore, I hereby demand for myself, and all Americans, a fair and equitable resolution of this case, on its merits, for damages and injunctive relief, all for the benefit of the injured and to ensure our freedom, which life, liberty, the pursuit of happiness, and, for many, to vote.

        Further, affiant sayth not.


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF BERRIEN          )


        The foregoing **AFFIDAVIT OF NATHANIEL L. CARTER** was subscribed and sworn before

me on this_____day of December, 2020, by Nathaniel L. Carter, personally.


                                        _____
                                        Nathaniel L. Carter

My Commission Expires:


_____                         _____
                                        Notary Public

12/22/2020                                    3556366086004233469.jpg

23.    While I once had faith in the fairness of elections, the actions or inactions of DOMINION, Zuckerburg, Chan and cooperating State officials have effectively stripped my vote, causing me to lose all faith that our governing bodies can conduct a fair election.

23.    Moreover, my desire to vote in future elections has been effectively suppressed because I believe elections run by current DOMINION systems are untrustworthy, and there is no reason to participate in future elections as results are predetermined.

24.    Therefore, I hereby demand for myself, and all Americans, a fair and equitable resolution of this case, on its merits, for damages and injunctive relief, all for the benefit of the injured and to ensure our freedom, which life, liberty, the pursuit of happiness, and, for many, to vote.

Further, affiant sayth not.

STATE OF MICHIGAN        )
                         ) ss.
COUNTY OF BERRIEN        )

The foregoing **AFFIDAVIT OF NATHANIEL L. CARTER** was subscribed and sworn before me on this    day of December, 2020, by Nathaniel L. Carter, personally.

_____
Nathaniel L. Carter

Kenya Lynn Fields
Notary Public   Kenya Lynn Fields

Exhibit 3

# AFFIDAVIT OF LORI ANN CUTUNILLI

I, Lori Ann Cutunilli, have personal knowledge of the matters set forth in this declaration and will be able to testify competently to these facts if called as a witness:

1.      My name is Lori Ann Cutunilli, I was born on January 12, 1957, in Denver, Colorado.  I have lived my entire life in Colorado, and currently live in Breckenridge, Summit County, Colorado.

2.      I am a citizen of the United States of America, registered to vote in Colorado, having voted every election since age 18.

3.      I am a small independent business owner, a mother and grandmother.  I believe the governors, secretary of states, Facebook and its founder and billionaire, Mark Zuckerberg, and his wife, Priscilla Chan, are directly responsible for unconstitutionally interfering in the United States Presidential Election on November 3, 2020,  resulting in the American people's loss of liberty—which has created the uncertainty that people posing as elected officials were legally voted into office.

4.      I participated as a Colorado registered voter in the November 3, 2020, presidential election and clearly see the election was tampered with not only by Colorado's secretary of state and attorney general insistence on using Dominion Voting System, but also, nationwide, by the $400 million Mark Zuckerberg and his wife Priscilla Chan funneled through their Chicago based non-profit Center for Tech and Civic Life (CTCL) to unconstitutionally interfere with election results—especially in swing states—ultimately affecting the outcome of the presidential election as well as Senate and Legislative seats across the country, which directly impact my right to vote and our lives in Colorado.

5.      Facebook's billionaire founder Mark Zuckerberg and Priscilla Chan's thinly veiled involvement in privatizing the United States election process through the guise of a left-of-center non-profit organization intent on influencing state, county and election officials by providing election funding to towns, cities and counties via contributions to their general funds interfered with fair and honest elections.  These bribes were categorized as funds to help jurisdictions across the country hire more staff, purchase mail-in ballot processing machinery, unsecured drop boxes, expansions to mail in voting, etc. to deal with voting during the "Pandemic" especially in swing states.

6.      Not only do I and my fellow Coloradans question if our votes even counted as cast, life in Colorado will be dramatically affected by the following states accepting bribes

through the Center for Tech and Civic Life organization to alter the United States election process and outcome:

    A.     HARTFORD, CT:  $350,000  Governor: Ned Lamont  Secretary of State: Denise Merrill

    B.  GEORGIA:  $5.6 million Cobb County - $300,000 Dougherty County - $6 million Fulton    County - $557,000 to Macon-Bibb County  Governor: Brian Kemp  Secretary of State: Brad Raffensperger

    C.  ILLINOIS: $855,000 to Lake County  Governor: J.B. Pritzker  Secretary of State: Jesse White

    D.  IOWA:  $267,500 to Blackhawk County - $286,870 to Scott County - $155,000 to Woodbury County  Governor: Kim Reynolds    Secretary of State: Paul Pate

    E.  KANSAS:  $856,000 to Johnson County - $816,458 to Sedgewick County  Governor: Laura Kelly    Secretary of State: Scott Schwab

    F.  MAINE:  $210,000 to City of Augusta - $272,000 to City of Bangor - $211,000 to Town of Brunswick - $274,000 to City of Lewiston  Governor: Janet Mills    Secretary of State: Matthew Dunlap

    G.  MARYLAND:  $688,000 to Howard County  Governor: Larry Hogan  Secretary of State: John Wobensmith

    H.  MICHIGAN:  $417,000 to City of Ann Arbor - $467,625  City of City of Flint - $443,000 to City of Lansing - $433,580 to City of Muskegon - $405,564 to City of Pontiac - $402,000 to City of Saginaw - $3.5 million to Wayne County  Governor: Gretchen Whitmer  Secretary of State: Jocelyn Benson

    I.  MISSISSIPPI: $1.5 million to Hinds County  Governor: Tate Reeves  Secretary of State: Michael Watson

    J.  MONTANA:  $294,000 to Cascade County - $263,000 to Glacier County - $215,000 to Lewis & Clark County  Governor: Steve Bullock  Secretary of State: Corey Stapleton

    K.  NEW JERSEY:  $300,000 to Atlantic County - $2.9 million to Burlington County  Governor: Phil Murphy    Secretary of State: Tahesha Way

L. NEW MEXICO: $206,000 to Dona Ana County    Governor: Michelle Grisham    Secretary of State: Maggie Oliver

M. NEW YORK: $280,000 to Onondaga County  Governor: Andrew Cuomo    Secretary of State: Rossana Rosado;

N. OHIO: $435,000 to Lorain County - $544,624 to Lucas County - $580,000 rejected by Summit County   Governor: Mike DeWine Secretary of State: Frank LaRose;

O. PENNSYLANIA: $10 million to City of Philadelphia ($12.3 million annual budget) - $2.05 million to Alleghany County - $471,000 to Berks County - $863,000 to Centre County - $2.2 million to Delaware County - $148,000 to Erie County - $474,202 to Lancaster County  Governor: Tom Wolf Secretary of Commonwealth: Kathy Boockvar;

P. SOUTH CAROLINA: $695,000 to City of Charleston - $102,373 to Clarendon County - $660,000 to City of Greenville - $730,000 to City of Richland    Governor: Henry McMaster  Secretary of State: Mark Hammond;

Q. TEXAS: $1.9 million to Bexar County - $1.8 million to Cameron County - $15.1 million to Dallas County - $86,424 to Ellis County - $289,075 to Hays County - $ 263,644 to Williamson County  Governor: Greg Abbott Secretary of State: Ruth Ruggero;

R. WISCONSIN: $6.3 million - Mayors of five specific Wisconsin cities: Green Bay, Kenosha, Madison, Milwaukee, Racine City of Jansesville Governor: Tony Evers    Secretary of State: Doug La Follette.

7.      Due to the use of the Dominion Voting System being used in Colorado and around the country in the 2018 Midterm elections, I have serious doubts as a member of the Class that Jared Polis was legitimately elected as governor in Colorado.

8.      As a result of Polis and other elected officials across the country being elected through dishonest means 160 million people have been damaged by the loss of liberties at the hands of corrupt politicians.

9.      As the tool for conducting dishonest elections in the United States, I understand the following is true about Dominion Voting Systems:

a.)      Dominion Voting Systems Corporation is headquartered in Toronto, Ontario, and Denver, Colorado, selling electronic voting hardware and software, including voting machines and vote tabulators in Canada and the United States.

b.)      In the United States, Dominion Voting Systems headquarter's are located in Denver, Colorado; and,

c.)      Dominion Voting Systems Corporation develops their software in-house in offices located in Canada, Serbia and the United States.

10.      From my research, Dominion Voting Systems Corporation owns the following subsidiaries:

a)   Premier Election Solutions with headquarters in North Canton, Ohio in the United States providing electronic voting hardware and consulting via the following products:  AccuVote-TSX, AccuVote-OS, Accuview Printer Module, Global Election Management System (GEMS). DIMS-Net, ExpressPoll-2000, ExpressPoll-4000 and VoteRemote Suite.

b)   Sequoia Voting Systems, one of the largest providers of electronic voting systems in the United States, headquartered in California with offices in Denver, Oakland and New York City.  Dominion Voting Systems Corporation purchased "certain assets" of Sequoia Voting Systems in 2010 as it was a major competitor to Premier Election Solutions in providing the following systems in 16 states and 300 jurisdictions:  BPS, WinEDS, Edge, Edge2, Advantage, Insight, InsightPlus and 400C.

c)   Smartmatic, based in London, UK sold to Sequoia Voting Systems in 2005 which triggered a request for investigation as to whether the Committee on Foreign Investment in the United States (CFIUS) had followed correct processes in allowing the sale of Smartmatic to Sequoia.  The United States Department of State has stated that Smartmatic's Venezuelan owners "remain hidden behind a web of holding companies in the Netherlands and Barbados."

11. Colorado's then Secretary of State Wayne Williams ordered counties in Colorado to adopt use of Dominion Voting Systems Corporation's electronic voting hardware and software in 2015 with it in use in 61 of Colorado's 64 counties during the United States Presidential election on November 3, 2020. Douglas County currently uses the Clear Ballot Group Voting System after bringing a lawsuit against the Colorado Secretary of State to have the choice of alternate voting systems other than Dominion, resulting in Douglas and Garfield counties choosing Clear Ballot Group Voting System and one small county hand counting ballots. It is my understanding the Clear Ballot system has audit capabilities which can be used to verify ballots/votes cast in counties using Dominion Voting System and should be used to do so.

12. The State of Colorado continued to certify use of the Dominion Voting System despite the system being rejected by data communications experts from the Texas Secretary of State and Attorney General's Office for failing to meet basic security standards in three separate instances for use in Texas as well as Dominion Voting Systems subsidiaries being involved in several instances of alleged fraud including Smartmatic.

13. Smartmatic's "glitches" have been proven to have changed thousands of votes from Republican Donald Trump to Democrat Joe Biden in the United States Presidential Election on November 3, 2020 in Georgia and Michigan.

14. Per an article published by thecentersquare.com I understand litigation over Smartmatic's "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud with an independent review of the source codes used in the machines identifying multiple problems, which concluded "The software inventory provided by Smartmatic is inadequate...which brings into question the software credibility," ABS-CBN reported.

15. Mark Malloch Brown, Smartmatic's chairman, is a member of the British House of Lords, former vice-chairman of George Soros' Investment Funds; lead international partner at Sawyer Miller, a political consulting firm; former vice-president at the World Bank and former vice-chairman of the World Economic Forum who "remains deeply involved in international affairs" causing government officials to raise questions about involvement in the United States electoral process.

16. Due to all of the above I believe my constitutional right to participate in fair and honest elections has been violated with my vote suppressed. While I once trusted in the fairness of the United States electoral system I no longer do, with the Dominion Voting System

being utilized in Colorado and around the country as well as private "donations" being unconstitutionally distributed and accepted to interfere with the legitimacy of our elections.

17. In summary, I hereby request on behalf of myself and the 160 million citizens of the United States of American a fair and equitable resolution to this situation, on its merits which includes damages for the voters and people whose votes have been discounted and cast aside in violation of our constitutional freedoms and rights, including Life, Liberty and the Pursuit of Happiness by having our voices heard.

Under penalty of perjury I do hereby the above statement of facts are true and correct.

## NOTARY ACKNOWLEDGMENT

State of Colorado )

) (Seal)

County of Larimer )

JORDAN HARRIS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20204032907
MY COMMISSION EXPIRES 09/21/2024

The foregoing instrument was acknowledged before me this 14th day of December 20 20, by the undersigned, Lori Cutunilli , who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

Lori A Cutunilli
Signature

Jordan Harris
Notary Public

My Commission Expires: 9-21-2024

Appendix Page 119

Exhibit 4

## AFFIDAVIT OF ALVIN CRISWELL

I, Alvin Criswell, being first duly sworn, do hereby state, under oath, as follows:

1.      My name is Alvin Criswell, and I was born on March 27, 1962, in Hutchinson County, Texas.

2.      In 1980, I went to work in the Alaska oilfields, and spent 38 years of my life, there.

3.      In 2017, I was diagnosed with multiple sclerosis, and took an early retirement to go on disability. I have paid my taxes, as all good Americans do. I have a driver's license, and am a citizen of the United States of America, registered to vote in Alaska.

4.      I spent a year with my son, after he sustained a serious Traumatic Brain Injury, and helped him the best I could. Over the years, I've donated to many charities and food banks.

5.      I have voted in almost every election since I was 18 years old, unless I was working remote, and did not have access to a polling place. Since 2009, I have been politically active, working on election campaigns and donating to many political candidates. Through all of this, I have earned a right to vote in fair elections.

6.      After much research and contemplation, it has come to my attention that the 2020 general election, and probably many more, have been compromised by a number of persons, including a corporation in the United States called Dominion Voting Machines, Inc., and others, such as, Mark Zuckerberg and his wife, Priscilla Chan; and other individuals acting as governors and secretaries of state, including, Brian Kemp and Brad Raffensperger of Georgia, and Gretchen Whitmer and Jocelyn Bensen from Michigan.

7.      From my understanding, these Dominion voting machines can interface with the internet, are generally unsecure, and use software that can be deployed to change votes, and affect election results.

8.      The individuals listed above, and apparently many others, knew or should have known that these machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors of Dominion Voting Machines, Inc.

1

9.     I went to school in the 1970s, and attended Chugiak High School in Eagle River, Alaska. When I was in the 9th grade, we watched movies about the Holocaust, and we all said, "That would never happen, here." I now fear that we are very close to something similar actually happening "here" in the United States.

10.     Also, when I was a junior in high school, the Iranian Hostage Crisis happened in 1979. I remember that many of the young men, including myself, where ready to go to war, at that very moment. Everyone, as I recall, was literally enraged.

11.     Even after 911, the anger I felt wasn't necessarily against one enemy, or country. I remember feeling confused and empathic to the victims of the tragedy.  The thought of reaction didn't really sink-in until, of course, the rest of the country and I were misled into a war with Iraq.

12.     All I know is that I have never felt like I did during the Iranian Hostage Crisis, until after this recent national election. Similar to 911, though, my feelings of anger were mixed with confusion and, frankly, wild speculation. Should I feel mad at my fellow citizens, just because they voted for another candidate? No, that doesn't seem right.

13.     Should my focus be on those States that obviously violated the Constitution and, thus, are also responsible for this mess, like Georgia, Michigan, Pennsylvania and Wisconsin? Well, yes, but I felt that my sense of loss of liberty and fear or tyranny should be not directed against another State, or the people that live there.

14.     Instead, after much research and thought, it is obvious now that the primary culprit in this fraudulent election is Dominion Voting Systems, Inc., and all the people that were helping that company delete, transfer, and add votes from one candidate to another, all over the country—and are now all helping to cover it up.

15.     I don't know a lot about the law, but I do know that when a person uses an official office to violate my rights, and others, those people are not acting in their "official capacity," but are acting as themselves, individually, "under color of their official authority." That's against the law and I, and millions of others have been harmed.

16.     Over my adult life, I have observed a lot of people spending a lot of time and money on an election for one candidate, or another. Now, it seems like all that time and money spent is just worthless, considering that other people and corporations can just decide an election, however and for whomever, they want.

17.     Of course, Alaska was going to vote for the President, and no one would be that brazen enough to try and change that outcome. However, I'm questioning other elections that have taken place in Alaska, and I am certainly convinced that the Defendants here tampered with the election in other States, in a manner that affected the outcome of our recent federal election.

18.     Also, there are many others that worked with States and counties, like Mark Zuckerberg and his wife, that used their money and big tech companies as a front to express their political beliefs, while not only censoring others, but actively interfering with our elections, all over America.

19.     How can we have a free country if companies like that are allowed to operate and effect everyone's right to vote? When Dominion, and these other persons, affect an outcome that involves a substantial number of votes in another state, that affects my right to vote to elect the President. As I understand it, if one state's electors are fraudulently chosen, that affects us all.

20.     Obviously, the governments are not going to do anything to stop Dominion, and these other persons. The U.S. Attorney hasn't done anything, and it seems unlikely that any other state attorney general is going to do anything, either. Because of that, it's up to the people to do something, and that's what we are doing, here.

21.     As far as I can tell, Georgia is going to use the same Dominion voting machines in the upcoming senatorial runoff, and the national media hasn't said a word about Dominion, or these other state actors. All of this is so incredible to me, and almost all the people around me. It's outrageous that a corporation can have this much power to affect our elections across the country, and nobody does anything.

22.     Well, I'm doing something, and this lawsuit is the way to hold Dominion, and these other persons, liable for all the damages that they have caused to ever registered voter in America.

23.     Unless we have elections without the use of these Dominion voting machines and software, and without all the unlawful and unconstitutional acts by these other listed individuals, we will never know the true results of any election, from here on out.

24.     Every citizen's right to vote is now being compromised. We cannot and must not allow this to happen. I demand recourse and a remedy, through a lawful court procedure, which must be swift and decisive.

3

25.     As registered voters, we have a right to fair and free elections, without election tampering. Without a fair election process, my right to vote as a citizen of the United States of America is illegally stripped from me, and every other legally registered voter in the country.

26.     We all have rights in this republic that we call the United States of America, and every citizen who is a legally registered to vote has a voice be heard in a free and fair election. All of those rights have been compromised, now, and we are all living under a threat of losing our other rights, as well. We cannot, and must not allow this to happen.

27.     Lastly, we must not forget those who have sacrificed their lives, and others who have worked so hard, over the years, to help secure free elections and the American way of life. Those sacrifices cannot have been made in vain.

28.     Therefore, I hereby demand for myself, my sons, and all Americans, a fair and equitable resolution of this case, on its merits, for damages and injunctive relief, all for the benefit of the injured and to ensure our freedom and rights, which include, life, liberty, the pursuit of happiness, and, for many, to vote.

Further, affiant sayth not.

STATE OF ALASKA                      )
                                     ) ss.
MATANUSKA-SUSITNA BOROUGH  )

The foregoing **AFFIDAVIT OF ALVIN CRISWELL** was subscribed and sworn

before me on this __11th__ day of December, 2020, by Alvin Criswell, personally.

_____
Alvin Criswell

My Commission Expires:

__04/26/22__

_____
Notary Public

OFFICIAL SEAL
J. Mengel
Notary Public State of Alaska
My Comm. Expires 04/26/2022

4

# Affidavit of Larry D. Cook

<span style="color:gray">Exhibit 5</span>

**State of California**
**Los Angeles County**

  **I, Larry D Cook, being first duly sworn, do herby state, under oath, as follows:**

1. My name is Larry D. Cook and I was born on November 23, 1964 in Bremerton, Washington.

2. I have lived in Los Angeles, Los Angeles County, CA for over 15 years.

3. I am a registered voter in Los Angeles County and have voted in most elections, including the 2020 Presidential election held on November 3rd, 2020.

4. During early 2015 California Senator Richard Pan and California Senator Ben Allen introduced SB 277, a vaccine mandate bill that would eliminate religious vaccine exemptions for children who attend public and private schools in California.[1]

5. I vehemently oppose any and all governmental medical mandates on moral, scientific and health grounds and absolutely believe that the rights of the Individual – especially regarding legally forced medical intervention - outweigh any perceived or real "disease threat" to the Community at Large.

6. I believe that every Person has the unalienable right to refuse any and all medical treatment and the right to remain unmolested by Government, Business, and other entities; that our bodies are Sovereign; that the sole responsibility for medical treatment and procedures rests within the autonomy of the Individual, or legal guardians when minors are involved.

7. In early 2015, and in response to the potential egregious violation of Personal Sovereignty as outlined in CA SB277 – the CA vaccine mandate bill – I created a brand, STOP MANDATORY VACCINATION, to express my views and the views of experts, scientists, parents, medical professionals, activists and others to the Public at Large why we oppose mandatory vaccination (in all its iterations).

---

[1] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB277

[2] https://www.politico.com/story/2019/04/16/republican-reject-democrat-

8.  My brand, Stop Mandatory Vaccination, included numerous properties including a website (www.StopMandatoryVaccination.com), a Facebook PAGE and a Facebook GROUP, as well as an email list, which were my primary properties. Facebook Pages "broadcast" to "followers" while Facebook Groups allow "members" to easily interact with each other based on shared or common interests.

9.  Through unique messaging, video interviews, vaccine injury and death stories, public health arguments against vaccine mandates, expert testimony, medical opinion and numerous other communications through my Stop Mandatory Vaccination website, Facebook PAGE, Facebook GROUP and email list, by the end of 2018 I had grown a formidable INFLUENCE which included over 125,000 followers and an average of 2 million reach on my Facebook Page per month, well over 150,000 members in my Facebook Group with a 1 million engagement per month, over 50,000 visits per month to my website and an email list of over 45,000 subscribers. I had also paid Facebook over $35,000 for advertising and had paid to "boost" posts to reach targeted audiences through my Facebook Page. For the most part, up to this point, my messaging was not censored.

10. In 2016 I voted for Donald J Trump to be President for two primary reasons: 1) He was on the Republican ticket and Republicans have by and large voted AGAINST vaccine mandates (while Democrats have primarily voted FOR vaccine mandates),[2] and 2) Donald J Trump has stated publicly that he has concerns about vaccination and that vaccines are linked to autism (and they are).[3] [4]

11. On February 14, 2019 Rep. Congressman Adam Schiff  (D-CA), "sent a letter to Sundar Pichai and Mark Zuckerberg, the Chief Executive Officers of Google and Facebook, respectively, to express concern that the company's platforms including YouTube, Facebook and Instagram, are surfacing and recommending information that discourages parents from vaccinating their children, contributing to declining vaccination rates which could reverse progress made in tackling vaccine-preventable diseases," [5] which was a blatant call for CENSORSHIP and certainly a violation of the First Amendment.[6] The "science" on vaccination is NOT settled.[7]

---

[2] https://www.politico.com/story/2019/04/16/republican-reject-democrat-vaccines-1361277

[3] https://twitter.com/realdonaldtrump/status/449525268529815552?lang=en

[4] https://twitter.com/realdonaldtrump/status/260415099452416000?lang=en

[5] https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation

[6] https://constitutioncenter.org/interactive-constitution/amendment/amendment-i

[7] https://thetruthaboutvaccines.com/be-brave-pt1-vaccine-science-settled/

12. Additionally, numerous, numerous mainstream media outlets began running hostile, defamatory "hit pieces" on me with demands that Facebook and other platforms shut me down entirely, including my Personal Profile, Page and Group, along with others who may challenge vaccine safety, efficacy and the "need" for mandatory vaccination. Headlines included: "Anti-Vaxxer Larry Cook Has Weaponized Facebook Ads in War Against Science,"[8] "Here's How One Of Facebook's Biggest Anti-Vax Communities Built Its Massive Network,"[9] and "Half of new parents shown anti-vaccine misinformation on social media – report."[10] Hundreds of defamatory mainstream news "hit" pieces would follow, including my all time favorite (sarcasm), "Meet Larry Cook, the Villain Behind the Facebook Anti-Vaxx Scandal."[11]

13. Within several months of the all-out mainstream media AND GOVERNMENT (e.g., Congressman Schiff, but also CA Senator Pan, etc.) attack on medical freedom activists sharing why they oppose vaccine mandates, multiple platforms decided to deplatform or ban anyone who challenged vaccine mandates or who challenged vaccine safety and efficacy, including Mailchimp[12] (an email subscription provider), GoFundMe[13] (crowd funding platform), Vimeo[14] (video hosting), Pinterest[15] (visual social media) while Facebook began to REDUCE DISTRIBUTION of medical freedom Pages and Groups[16] such as my Stop Mandatory Vaccination Page and Group.

14. In real world terms, reduced distribution[17] for my Stop Mandatory Vaccination Facebook Page meant that I went from an average of 2 million reach per month down to just 100,000 reach per month (5%) while my Facebook Group saw a

---

[8] https://www.thedailybeast.com/anti-vaxxer-larry-cook-has-weaponized-facebook-ads-in-war-against-science

[9] https://www.buzzfeednews.com/article/ryanhatesthis/facebook-anti-vaccination-vaxxer-communities-promotions-ads

[10] https://www.theguardian.com/society/2019/jan/24/anti-vaxxers-spread-misinformation-on-social-media-report

[11] https://www.fatherly.com/news/meet-larry-cook-the-villain-behind-the-facebook-anti-vaxx-scandal/

[12] https://www.nbcnews.com/tech/tech-news/email-marketer-mailchimp-bans-anti-vaccination-content-n1017221

[13] https://www.independent.co.uk/news/health/antivax-gofundme-ban-donation-crowdfunding-vaccines-conspiracy-a8870716.html

[14] https://vimeo.com/terms

[15] https://help.pinterest.com/en/article/health-misinformation

[16] https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/

[17] https://www.nytimes.com/2019/03/07/technology/facebook-anti-vaccine-misinformation.html

Larry D Cook Affidavit

3

dramatic drop in member engagement and member requests (from 300 per day to 50 per day requests).

15. Additionally, Facebook turned off my ability to run advertising on their platform,[18] while YouTube demonetized my YouTube Channel[19] because I questioned vaccine safety, efficacy and the "need" for vaccine mandates.

16. In 2019 the World Health Organization (WHO) declared "Vaccine Hesitancy" as a top ten threat to humanity,[20] an assertion that I personally reject, and an assertion that millions upon millions of parents, researchers, medical professionals, scientists and others wholeheartedly reject.

17. My work, as Larry Cook, and as Stop Mandatory Vaccination, on Facebook and other platforms, on my website and in emails to my subscribers, among other avenues of information dissemination, included interviews with or messaging from thousands of parents, scientists, medical doctors, health professionals, researchers, elected officials and more that included (but was not limited to) discussions of:

- Death following vaccination
- Severe injury following vaccination
- Chronic ailments following vaccination
- Vaccine failure
- Herd immunity failure
- Scientific vaccine fraud
- Lack of vaccine efficacy
- Rebuttal of contemporary vaccine history
- Vaccinated vs unvaccinated health outcomes
- Cover-up of vaccine induced death by medical examiners
- Homeopathy as disease treatment and prevention
- Natural medicine
- Natural immunity
- And other relevant topics

---

[18] https://www.theguardian.com/technology/2019/nov/13/majority-antivaxx-vaccine-ads-facebook-funded-by-two-organizations-study
[19] https://www.buzzfeednews.com/article/carolineodonovan/youtube-just-demonetized-anti-vax-channels
[20] https://www.who.int/news-room/spotlight/ten-threats-to-global-health-in-2019

18. Is it the role of Social Media Companies, Elected Officials and Big Tech to be the final **ARBITRATOR OF TRUTH**[21] for the liability-free vaccine industry and its continuous push to force-vaccinate every living human on the planet? Or, should Social Media Companies, Elected Officials and Big Tech follow the tenants of the **FIRST AMENDMENT** and allow **Freedom of Speech** whereby citizens can engage in unrestricted dialogue about topics that may have lifelong consequences based on decisions made? Wouldn't MORE INFORMATION from BOTH SIDES of a topic be beneficial for all involved? Or, are Social Media Companies, Elected Officials and Big Tech working on an AGENDA - together - to quash opposition to mandatory vaccination? **Is this a conspiracy?**

19. The United States Government has paid out nearly 5 billion dollars for vaccine injury and death related claims through the National Vaccine Injury Compensation Program[22] and yet HHS claims that only an estimated 1% of vaccine injuries are even reported to the Vaccine Adverse Events Reporting System (VAERS).[23] What if ALL vaccine injuries and deaths were actually reported and the claims were properly settled? Would the payout be in the TRILLIONS OF TAXPAYER DOLLARS? The topics of VACCINE SAFETY and VACCINE EFFICACY (effectiveness) should **NOT be censored** to conform to a CONSPIRACY[24] to force vaccinate every human without question when serious harm and death can and does result from vaccination!

20. Although there are many, many reasons why I voted for President Donald J Trump in the 2020 election, one of those reasons is that he stated publicly that he would not mandate the COVID vaccine once it is available.[25] He has also rejected national mask mandates[26] and national COVID testing mandates, which means he respects medical freedom. Medical freedom should be able to be discussed without censorship!

---

[21] https://www.cnbc.com/2020/05/28/facebook-has-been-an-arbiter-of-truth-here-are-examples.html
[22] https://www.hrsa.gov/vaccine-compensation/data/index.html
[23] https://childrenshealthdefense.org/news/vaccine-injury-payouts-taxpayers-on-the-hook-for-over-3-8-billion-as-vaccine-makers-rake-in-profits/
[24] https://www.dictionary.com/browse/conspiracy
[25] https://www.dailymail.co.uk/news/article-8844153/Donald-Trump-says-WONT-make-COVID-vaccines-mandatory.html
[26] https://www.rollingstone.com/politics/politics-news/trump-covid-positive-test-hospital-plane-train-mask-mandate-transportation-1070629/

21. Facebook not only censors vaccine related topics, but Facebook also censors COVID related topics, including proven alternative treatments for COVID,[27] disputed COVID death statistics, and many other COVID related topics that do not align with the official mainstream narrative. My posts were censored with "fact checks" and/or outright deletions and/or bans on my account use (e.g., 24 hour ban, 3 day ban, 7 day ban, etc.).

22. On November 17, 2020, Facebook permanently terminated my Personal Facebook account of over twelve years with 50,000 plus followers and deleted my Stop Mandatory Vaccination Page with over 167,000 followers, without explanation. However, an Internet search produced a Newsweek article entitled, "Facebook Bans One of the Anti-Vaccine Movement's Biggest Groups for Violating QAnon Rules,"[28] and that's where I learned that Facebook removed me because I discussed Qanon. What's interesting to note here is that Facebook has stated[29] that only those who "represent" Qanon will be removed, not those who discuss Qanon.

23. <u>Two hours later</u> Twitter banned me from their platform, supposedly for "election interference." Coordinated?

24. Two days later Facebook removed my popular Stop Mandatory Vaccination Group with over 201,000 members.

25. It is worth noting that Facebook not only deleted my personal account, but Facebook also deleted four other personal accounts who were admins and editors on my Facebook Group and Page. Disgraceful.

26. **Q** of Qanon is believed to be a US Military Intelligence Operation that offers detailed information about Government Corruption and other topics through a sophisticated anonymous chat board that is then aggregated and disseminated though a number of channels, with www.qanon.pub being one of the many channels. Facebook has stated that "we've removed about 1,700 Pages, 5,600 Groups and about 18,700 Instagram accounts representing QAnon" and that the

---

[27] https://formerfedsgroup.com/wp-content/uploads/2020/12/20201212-Filed-complaint.pdf

[28] https://www.newsweek.com/facebook-bans-anti-vaccine-group-violating-qanon-rules-1548408

[29] https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to-violence/

Larry D Cook Affidavit

6

purported reason for doing so is that Qanon is a "violence-inducing conspiracy network."[30]

27. **OF PARTICULAR IMPORTANCE** is that Facebook (and other Qanon censors) NEVER mention **any** of the nearly 5,000 **Q** posts (since 2017) as justification for censoring Facebook Users, Pages and Groups! That's right, not EVEN ONE POST by **Q** is used as an example that **Q** "incites violence," "advocates for violence" or is "tied to violence." NOT ONE POST. Surely, if **Q** was posting dangerous information that would influence researchers to violent acts then there must be at least one post – ONE POST – that Facebook could point to that would prove their assertion that Qanon is a "Dangerous Organization." But they cannot, and do not, because it simply is not true.

28. ELECTION INTERFERENCE. Facebook routinely and aggressively blocked, censored and/or removed content that challenged mainstream media COVID death tallies, alternative treatment options, hospitalization numbers and other disputed facts and figures to help ensure Democrat controlled states would remain "locked down" so as to push the need for mail in voting while discouraging in-person voting. Users who did so could be punished with bans. Mail in voting creates a scenario ripe for ballot harvesting and election fraud.[31]

29. I believe that there was widespread vote fraud and manipulation during the 2020 Presidential Election and as such, this topic, along with the vaccination topic, along with the Qanon topic, as well as other "controversial topics," should not be censored, "fact checked," deleted and/or result in a ban or permanent account deletion just because the topic at hand challenges the official narrative as presented in mainstream media, the Democrat Party, the liability-free vaccine industry and other domestic and foreign controlling interests.

30. INFLUENCE DEMOLISHED. Facebook, the largest modern day public square in the world that connects over 1.5 billion people in real time communication each day,[32] was my PRIMARY outreach and communication tool that allowed me to communicate with parents, medical professionals, politicians, lawyers, health enthusiasts, Patriots, and more all over America as well as the world, including Australia, United Kingdom, Brazil, France, Spain, Poland, Germany, Canada, and people of all walks of life in all countries. My vast network of 5,000 friends, 50,000 plus followers, 167,000 followers on my Page and over 201,000

---

[30] https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to-violence/

[31] https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-voterfraudcases.pdf

[32] https://sproutsocial.com/insights/facebook-stats-for-marketers/

members in my Group - that I spent years and years building - has been obliterated by Facebook censorship.

31. REVENUE DEMOLISHED. Through Facebook I also shared online summits, donation requests, supplement recommendations and other revenue generating opportunities. Without my Facebook account because of censorship, my ability to secure ongoing revenue for my full time activist work has been demolished.

32. Social Media - including Facebook, Twitter, YouTube, Instagram – along with other Big Tech platforms (e.g., Vimeo, GoFundMe, Mailchimp, etc.) should not be in the business of censoring its users in an effort to control the "official" narrative. This is UNAMERICAN and literally goes against the very principal of the US CONSTITUTION which guarantees Freedom of Speech, which INCLUDES the FREEDOM TO DISAGREE and the FREEDOM TO CHALLENGE and the FREEDOM TO OFFER ALTERNATIVES, WITHOUT REPRECUSSION!!! If social media titans are going to editorialize content on their platforms then Section 230 protections must be repealed, as advocated by President Trump.[33]

**Continued...**

---

[33] https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/

33. THERFORE, I hereby demand and request an equitable remedy to this situation, which includes but is not limited to, the full restoration of my Facebook account and Page and Group WITHOUT restriction or reduced distribution, the restoration of any and all Facebook deleted "Qanon accounts" and users, the restoration of any and all Facebook medical freedom accounts, Pages and Groups (e.g., Del Bigtree's Highwire Page[34]), as well as damages for the people who had their accounts CENSORED or DELETED (including their Pages and Groups), and I seek immediate injunctive relief for myself and everyone affected by Facebook's vaccine, 2020 election, COVID and Qanon censorship and "fact-checking" policies.

The foregoing statement is true to the best of my knowledge and belief.

Larry D Cook, December 21, 2020

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ____LOS Angeles_____
Subscribed and sworn to (or affirmed) before me this ___21___ day
of __December__, 20_20_, by __Larry D Cook__, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.
Signature __Blanca M Vivas__ (Seal)

BLANCA M. VIVAS
Notary Public - California
Los Angeles County
Commission # 2250527
My Comm. Expires Aug 16, 2022

Comission expires Aug 16, 2022

---

[34] https://www.nbcnews.com/tech/tech-news/covid-19-vaccines-face-varied-powerful-misinformation-movement-online-n1249378

Larry D Cook Affidavit

9

Exhibit 6

**AFFIDAVIT OF KESHA CHARMAINE CRENSHAW**

I, Kesha Charmaine Crenshaw, being duly sworn, do hereby state, under oath and penalty of perjury, as follows:

1.      My name is Kesha Charmaine Crenshaw, and I was born on March 2, 1983, in Saint Joseph, Michigan.

2.      I currently live at 1133 Blossom Lane, Benton Harbor, Michigan, and have lived and worked in this area all of my life.

3.      I am a resident of the State of Michigan.

4.      I am a registered voter in the State of Michigan.

5.      I am a married African-American female.

6.      I participated as a voter in the November 3, 2020, federal election for President and Vice President of the United States of America.

7.      I take may vote seriously, because I know it is my voice to the government.

8.      I am routinely told by people, even my husband, that my vote didn't matter, and that voting is just wasting my time. But I know it is an important right that I possess, and an important responsibility for me to vote.

9.      I have watched what happened on Election Day and since, and now realize that the people who warned me that my vote didn't count were right.

10.     I know that I did cast a ballot and voted in the election, but based on reports that I have seen, I have no faith that the outcomes reported are actually the votes that were cast, or that my vote was counted at all.

11.     I think all Americans deserve a fair election, and must be able to rely on the outcome of elections.

12.     I can see with my own eyes the "irregularities" that have been reported, and know what I see is not right, has not been explained, and calls into doubt the legitimacy of the election.

13.     I understand that Dominion voting machine tabulators were used in Michigan that were supposed to maintain the integrity of the election but did not do that.

1

14.     I have seen the news reports of Mark Zuckerburg and his wife bragging about millions of dollars he paid Michigan so the election could be run "safely," and resulting in the outcome promoted by Zuckerburg and Chan.

15.     I have heard my Governor and Secretary of State tell me that Michigan held a valid election and certify results, but independent audits showed that in Michigan, "Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results," and that machines were set to produce an error rate over 68%.

16.     I believe my vote was effectively not counted, because the results of the vote count reported does not reflect the actual votes cast for this election.

17.     My faith in fair elections has been shattered.  Where I once defended the importance of voting, I must now concede that our elections are only a sham.

18.     Whitmer and Benson certified the election results even with all the reported "irregularities."  Benson tried to blame voting machine errors on the local clerk.

19.     The audit of voting machines showed that election records from this year were suspiciously missing even though records from prior elections still existed, so I don't know if a complete audit can ever be done.

20.     We can't do the election again, and I don't know if we'll be able to figure out what the true numbers were.

21.     But my rights, and the rights of everyone who voted, have been violated because outside parties including Dominion, Zuckerburg, and Chan, worked their way into the Michigan elections, and manipulated the results of the election with cover provided by Whitmer and Benson.

22.     Dominion, Zuckerburg, Chan, Whitmer, and Benson effectively stole my vote and the vote of every American and used it for their purposes by manipulating the vote numbers to get the outcome that was programmed into the machines provided by Dominion and paid for by Zuckerburg and Chan.

23.     Dominion, Zuckerburg, Chan, Whitmer, and Benson effectively suppress my vote and the votes of others by showing the American people that their votes don't matter because they pay for and control the machines to get predetermined results.  Whoever pays the most gets to program the machines?

24.     Dominion, Zuckerburg, Chan, Whitmer, Benson, and all those who assisted their efforts, cannot undo the damage they have done.  The election is over.

2

25.     Neither Dominion, Zuckerburg, Chan, Whitmer, nor Benson, can give back my vote, it was wrongfully taken.

26.     But neither can these people be allowed to conduct an election in this manner again, and I and all other Americans who have been effectively denied our right to vote must be fairly compensated for our loss.

27.     Therefore, I hereby demand for myself, and all Americans, a fair and equitable resolution of this case, on its merits, for damages and injunctive relief, all for the benefit of the injured and to ensure our freedom, which life, liberty, the pursuit of happiness, and, for many, to vote.

Further, affiant sayth not.

STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF BERRIEN          )

The foregoing **AFFIDAVIT OF KESHA CHARMAINE CRENSHAW** was subscribed and sworn before me on this 18th day of December, 2020, by Kesha Charmaine Crenshaw, personally.

_Kesha Charmaine Crenshaw_
Kesha Charmaine Crenshaw

My Commission Expires:

Kenya Lynn Fields
Notary Public of Michigan
Berrien County
Expires 02/11/2025
Acting in the County of Berrien

_Kenya Lynn Fields_
Kenya Lynn Fields
Notary Public

Appendix Page 135

Exhibit 7

## STATEMENT OF NEIL YARBROUGH

STATE OF COLORADO          )
                           ) ss.
COUNTY OF ARAPAHOE         )

I, Neil Yarbrough, being duly sworn, do hereby state, under oath, as follows:

1.      My name is Neil Yarbrough, and I am an African-American male, born on May 7, 1995, in Houston, Texas.

2.      I currently live in Aurora, Colorado, and am a registered voter in Colorado.

3.      I am a licensed Realtor in Colorado. Lately, because of the down economy, I've been moving pianos for a friend's non-profit organization.

4.      In early 2020, I became personally compelled to become actively involved with civic issues facing my community and my country more than at any time prior in my life.

5.      For the past nine months, I have been involved in the protests against injustice. Several times, I have put my life on the line, out there to keep things peaceful. Despite being threatened on numerous occasions, I will keep fighting for our country.

6.      I did so because I was under the impression that this country had hope. I wasn't the only one.

7.      There were thousands of people just like me in Denver, and millions of people around our country who still had faith in our institution, The United States of America.

8.      Part of that faith being our right to vote, for that vote to be recorded properly, and to make a difference.

9.      I'm sorry and embarrassed to say that I have no faith in our elections, and did not even vote in this last election.

10.     I feel that my vote has been made worthless by Dominion, their voting machines and software.

11.     For a lot of people, voting is the only way they feel they can contribute, and be heard in this country.

1

12.     Any violation of our right to vote is a direct assault on our rights, liberties, freedoms and the intelligence of the American people.

13.     When I was out there on the streets of Denver, we broke down barriers. Bringing people together, from the Mayor, to the Police Chief, to the Denver Broncos, and to the homeless guy that slept on 14th street.

14.     We organized in good faith, preserving the peace, protecting our infrastructure from rioters and looters, encouraging people to keep the faith, and inspiring people to do the right thing.

15.     Every day for 6 months straight, people were encouraging each other to vote. But for what? So that my vote can be made into a fraction of a vote for someone else?

16.     For Dominion to put a damper on the voices of the American people in which I risk my life to amplify? For them to unconstitutionally influence the election, directly or indirectly? It's all so mind boggling.

17.     I feel that Dominion has violated the rights of the American people by creating a system that is unsatisfactory, and susceptible to tampering, whether it be knowingly or unknowingly. That goes against our standards and everything that we stand for as Americans.

18.     We deserve better, and I want to help protect this country from any government affiliated foreign interest corporations who act only out of self-interest, in spite of the American people.

19.     Dominion, as a whole, should be held accountable, as well as anyone who aided or assisted Dominion. Dominion has failed the American people by producing unsatisfactory hardware especially susceptibility to tampering.

20.     Dominion has been compromised and should never be allowed to participate in an American election ever again.

21.     I feel that Dominion should be disbanded, and their machines never allowed to be used.

22.     I am aware that Dominion has been working with a majority of states, and particularly in the States of Michigan, Wisconsin, Pennsylvania, and Georgia, where reported "irregularities" with Dominion machines could have affected the voting process.

2

23.    I am also a user of Facebook, and have personally witnessed that company censor the voices of many Americans. I may not like what everyone says, but everyone has a right to free speech.

24.    I also understand that Facebook has certain protections under federal law, but if you as a company are going to get to start getting involved in elections, then you have to do it by the constitution.

25.    Based on public records, many cities and counties across the nation received money from the Center for Tech and Civic Life. I believed in their ideas like "Rock the Vote" and other methods of increasing voter participation. I totally agree with all of that.

26.    But recently, I have come to understand that it was Mark Zuckerberg and his wife, Priscilla Chan, that gave hundreds of millions of dollars in donations to those non-profit companies to influence the outcome of the presidential election to help the candidate they wanted to win.

27.    That's not rocking the vote, that's sinking the boat.

28.    Just yesterday, the Amistad Project issued a report titled, "The Legitimacy and effect of Private Funding in Federal and State Electoral Processes."

29.    This report stated that "[f]unded by hundreds of millions of dollars from Facebook founder Mark Zuckerberg and other high-tech interests, activist organizations created a two-tiered election system that treated voters differently depending on whether they lived in Democrat or Republican strongholds."

30.    The report also said that "executive officials in swing states facilitated, through unique and novel contracts, the sharing of private and sensitive information about citizens within those states with private interests."

31.    The report concluded that "[t]his public-private partnership in these swing states effectively placed government's thumb on the scale to help these private interests achieve their objectives and to benefit the candidates of one political party."

32.    I believe that the actions of Dominion, Zuckerberg, Chan, and cooperating state officials have tainted the results of the elections in Michigan, Georgia, Pennsylvania, and Wisconsin (and elsewhere). That effects the whole country and all of us living in it.

3

33.     I am aware of reports and lawsuits regarding voting conducted in Antrim County, Michigan, in which "significant errors" were discovered following the investigation of 22 Dominion voting machines.

34.     The examination of these machines revealed that Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter and election fraud."

35.     I am aware of similar Dominion voting machine "irregularities" and "glitches" that occurred in several other states, which has cast doubt on election results nationwide.

36.     From my understanding, the Dominion voting machines can connect to the Internet, which means that anybody can get into them, especially if you are an enemy country that doesn't like America.

37.     Dominion and others were aware or should have been aware that their machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside Dominion.

38.     I believe that as a result, my vote wouldn't have been meaningfully counted, and that the results of the elections were predetermined.

39.     In the future, will Zuckerberg and Chan buy the next election, or will it be another one of the billionaires who have only increased their wealth while Americans are economically crushed by the same cooperating government officials charged with running a fair election?

40.     This last election has it made clear that as long as Dominion is in use, and billionaires like Zuckerberg and Chan can just drop money on the most important places, elections will continue to be for sale, and no one votes will actually matter.

41.     If things don't change, my desire to vote in future elections will continue to be suppressed.

42.     This whole situation has opened my eyes, however, and I will try and vote in every election from now on.

4

43.    I feel like I can say that now that the people are rising up to demand that we have honest elections.

44.    I do believe our right to vote is one of the most sacred rights recognized in the constitution, and as a minority, I understand that my vote is the only real voice I have.

45.    Honestly, though, if we don't fix this, there may not be any more elections.

46.    Your honor, and the rest of the country, please help us fix this problem and grant us a jury trial so that we can address our grievances.  Please grant us a fair and equitable solution to this case, and my God bless America.

I, hereby, state and affirm that the statements made herein are true, correct and complete to the best of my knowledge and belief, under penalty of perjury, under the laws of the United States of America.

_Neil Yarbrough_                12-20-2020

Neil Yarbrough                DATE

5

Statement of Amie D. Trapp

Exhibit 8

STATE OF ALABAMA          )
                          ) ss.
COUNTY OF DALE            )


  1.  My name is Amie D Trapp, I was born in Springfield, MO on July 8th,

1981.

  2.  I was widowed in November, 2015, with 6 children.

  3.  I remarried in July, 2017, and am now the wife of an active duty soldier and mother to 9 children. I am almost 7 months pregnant and we just moved to Fort Rucker, Dale County, Alabama.

  4.  I lived, and am currently registered to vote in the state of Missouri.

  5.  I voted early in Missouri, and will become a registered voter of the state of Alabama, as soon as practicable.

  6.  I voted in the November 3, 2020, federal election for President and Vice President of the United States of America.

  7.  It is obvious our federal election has been tampered with and compromised by Dominion Voting Systems Inc, along with the founder of Facebook, Mark Zuckerberg, his wife Priscilla Chan, and many others acting as governors/secretaries of state across the country.

  8.  Every day, we, as a country, find out more information about this corrupt system, Dominion, and the government officials who allow it.

  9.  I am also seeing and hearing Dominion officials deny any wrongdoing, and other government officials threatening lawyers and others who dare challenge their unlawful behavior.

  10.  It has been shown beyond any doubt that the voting machines installed by Dominion Voting Systems can be accessed over the internet.

  11.  That cannot be allowed by law, because that obviously allows votes to be changed, and is NOT secure in any way from foreign interference.

12.    All of this has affected the vote for President, all across the country.

13.    I speak on behalf of every legal registered voter who has been stomped on and had their vote compromised by demanding action on behalf of our constitutional rights.

14.    We have not been given a free and fair election and demand this right be given transparently immediately.

15.    My husband is former combat arms, served 3 combat tours and after multiple injuries and TBI's is a Staff SGT for the US Army Human Recourses department.

16.    My husband, and many others (some of whom are not with us anymore) have made the sacrifice to keep our elections free, fair and transparent.

17.    Our family makes sacrifices in a way that the politicians compromising our elections will never understand.

18.    I have been damaged, and am now spending my time, money and resources having to stand up for my rights and the rights of all voters in America.

19.    We Therefore demand, on behalf of ourselves, our children and our posterity, that this case be resolved by a jury trial and that the federal court facilitate this process in the most fair and equitable way, including an award for the people and an injunction against the Defendants.

20.    We have given all we can.

I, hereby, state and affirm that the statements made herein are true, correct and complete to the best of my knowledge and belief, under penalty of perjury, under the laws of the United States of America.

_____
Amie D. Trapp              date

Exhibit 9

# Allied Security Operations Group

### Antrim Michigan Forensics Report

### REVISED PRELIMINARY SUMMARY, v2

### Report Date 12/13/2020

**Client:**      **Bill Bailey**

**Attorney:**    **Matthew DePerno**

## A.      WHO WE ARE

1.      My name is Russell James Ramsland, Jr., and I am a resident of Dallas County, Texas.  I hold an MBA from Harvard University, and a political science degree from Duke University.  I have worked with the National Aeronautics and Space Administration (NASA) and the Massachusetts Institute of Technology (MIT), among other organizations, and have run businesses all over the world, many of which are highly technical in nature.  I have served on technical government panels.

2.      I am part of the management team of Allied Security Operations Group, LLC, (ASOG).  ASOG is a group of globally engaged professionals who come from various disciplines to include Department of Defense, Secret Service, Department of Homeland Security, and the Central Intelligence Agency.  It provides a range of security services, but has a particular emphasis on cybersecurity, open source investigation and penetration testing of networks.  We employ a wide variety of cyber and cyber forensic analysts.  We have patents pending in a variety of applications from novel network security applications to SCADA (Supervisory Control and Data Acquisition) protection and safe browsing solutions for the dark and deep web. For this report, I have relied on these experts and resources.

## B.      PURPOSE AND PRELIMINARY CONCLUSIONS

1.      The purpose of this forensic audit is to test the integrity of Dominion Voting System in how it performed in Antrim County, Michigan for the 2020 election.

2.      We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan. We further conclude that the results of Antrim County should not have been certified.

1

3. The following is a breakdown of the votes tabulated for the 2020 election in Antrim County, showing different dates for the tabulation of the same votes.

| Date | Registered Voters | Total Votes Cast | Biden | Trump | Third Party | Write-In | TOTAL VOTES for President |
|------|-------------------|------------------|-------|-------|-------------|----------|---------------------------|
| Nov 3 | 22,082 | 16,047 | 7,769 | 4,509 | 145 | 14 | 12,423 |
| Nov 5 | 22,082 | 18,059 | 7,289 | 9,783 | 255 | 20 | 17,327 |
| Nov 21 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 23 | 15,949 |

4. The Antrim County Clerk and Secretary of State Jocelyn Benson have stated that the election night error (detailed above by the vote "flip" from Trump to Biden, was the result of human error caused by the failure to update the Mancelona Township tabulator prior to election night for a down ballot race. We disagree and conclude that the vote flip occurred because of machine error built into the voting software designed to create error.

5. Secretary of State Jocelyn Benson's statement on November 6, 2020 that "[t]the correct results always were and continue to be reflected on the tabulator totals tape . . . ." was false.

6. The allowable election error rate established by the Federal Election Commission guidelines is of 1 in 250,000 ballots (.0008%). We observed an error rate of 68.05%. This demonstrated a significant and fatal error in security and election integrity.

7. The results of the Antrim County 2020 election are not certifiable. This is a result of machine and/or software error, not human error.

8. The tabulation log for the forensic examination of the server for Antrim County from December 6, 2020consists of 15,676 individual events, of which 10,667 or 68.05% of the events were recorded errors. These errors resulted in overall tabulation errors or ballots being sent to adjudication. This high error rates proves the Dominion Voting System is flawed and does not meet state or federal election laws.

9. These errors occurred after The Antrim County Clerk provided a re-provisioned CF card with uploaded software for the Central Lake Precinct on November 6, 2020. This means the statement by Secretary Benson was false. The Dominion Voting System produced systemic errors and high error rates both prior to the update and after the update; meaning the update (or lack of update) is not the cause of errors.

10. In Central Lake Township there were 1,222 ballots **reversed** out of 1,491 total ballots cast, resulting in an 81.96% rejection rate. All reversed ballots are sent to adjudication for a decision by election personnel.

11. It is critical to understand that the Dominion system classifies ballots into two categories, 1) normal ballots and 2) adjudicated ballots. Ballots sent to adjudication can be altered by administrators, and adjudication files can be moved between different Results Tally and Reporting (RTR) terminals with no audit trail of which administrator actually adjudicates (i.e. votes) the ballot batch. This demonstrated a significant and fatal error in security and election integrity because it provides no meaningful observation of the adjudication process or audit trail of which administrator actually adjudicated the ballots.

12. A staggering number of votes required adjudication. This was a 2020 issue not seen in previous election cycles still stored on the server. This is caused by intentional errors in the system. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency or audit trail. Our examination of the server logs indicates that this high error rate was incongruent with patterns from previous years. The statement attributing these issues to human error is not consistent with the forensic evaluation, which points more correctly to systemic machine and/or software errors. The systemic errors are intentionally designed to create errors in order to push a high volume of ballots to bulk adjudication.

13. The linked video demonstrates how to cheat at adjudication:

    https://mobile.twitter.com/KanekoaTheGreat/status/1336888454538428418

14. Antrim County failed to properly update its system. A purposeful lack of providing basic computer security updates in the system software and hardware demonstrates incompetence, gross negligence, bad faith, and/or willful non-compliance in providing the fundamental system security required by federal and state law. There is no way this election management system could have passed tests or have been legally certified to conduct the 2020 elections in Michigan under the current laws. According to the National Conference of State Legislatures – Michigan requires full compliance with federal standards as determined by a federally accredited voting system laboratory.

15. Significantly, the computer system shows vote adjudication logs for prior years; but all adjudication log entries for the 2020 election cycle are missing. The adjudication process is the simplest way to manually manipulate votes. The lack of records prevents any form of audit accountability, and their conspicuous absence is extremely suspicious since the files exist for previous years using the same software. Removal of these files violates state law and prevents a meaningful audit, even if the Secretary wanted to conduct an audit. We must conclude that the 2020 election cycle records have been manually removed.

16.   Likewise, all server security logs prior to 11:03 pm on November 4, 2020 are missing. This means that all security logs for the day after the election, on election day, and prior to election day are gone. Security logs are very important to an audit trail, forensics, and for detecting advanced persistent threats and outside attacks, especially on systems with outdated system files. These logs would contain domain controls, authentication failures, error codes, times users logged on and off, network connections to file servers between file accesses, internet connections, times, and data transfers. Other server logs before November 4, 2020 are present; therefore, there is no reasonable explanation for the security logs to be missing.

17.   On November 21, 2020, an unauthorized user unsuccessfully attempted to zero out election results. This demonstrates additional tampering with data.

18.   The Election Event Designer Log shows that Dominion ImageCast Precinct Cards were programmed with new ballot programming on 10/23/2020 and then again after the election on 11/05/2020. These system changes affect how ballots are read and tabulated, and our examination demonstrated a significant change in voter results using the two different programs. In accordance with the Help America Vote Act, this violates the 90-day Safe Harbor Period which prohibits changes to election systems, registries, hardware/software updates without undergoing re-certification. According to the National Conference of State Legislatures – Michigan requires full compliance with federal standards as determined by a federally accredited voting system laboratory.

19.   The only reason to change software after the election would be to obfuscate evidence of fraud and/or to correct program errors that would de-certify the election. Our findings show that the Central Lake Township tabulator tape totals were significantly altered by utilizing two different program versions (10/23/2020 and 11/05/2020), both of which were software changes during an election which violates election law, and not just human error associated with the **Dominion Election Management System.** This is clear evidence of software generated movement of votes. The claims made on the **Office of the Secretary of State** website are false.

20.   The Dominion ImageCast Precinct (ICP) machines have the ability to be connected to the internet (see Image 11). By connecting a network scanner to the ethernet port on the ICP machine and creating Packet Capture logs from the machines we examined show the ability to connect to the network, Application Programming Interface (API) (a data exchange between two different systems) calls and web (http) connections to the Election Management System server. Best practice is to disable the network interface card to avoid connection to the internet. This demonstrated a significant and fatal error in security and election integrity. Because certain files have been deleted, we have not yet found origin or destination; but our research continues.

4

21. Because the intentional high error rate generates large numbers of ballots to be adjudicated by election personnel, we must deduce that bulk adjudication occurred. However, because files and adjudication logs are missing, we have not yet determined where the bulk adjudication occurred or who was responsible for it. Our research continues.

22. Research is ongoing. However, based on the preliminary results, we conclude that the errors are so significant that they call into question the integrity and legitimacy of the results in the Antrim County 2020 election to the point that the results are not certifiable. Because the same machines and software are used in 48 other counties in Michigan, this casts doubt on the integrity of the entire election in the state of Michigan.

23. DNI Responsibilities: President Obama signed Executive Order on National Critical Infrastructure on 6 January 2017, stating in Section 1. Cybersecurity of Federal Networks, "The Executive Branch operates its information technology (IT) on behalf of the American people. The President will hold heads of executive departments and agencies (agency heads) accountable for managing cybersecurity risk to their enterprises. In addition, because risk management decisions made by agency heads can affect the risk to the executive branch as a whole, and to national security, it is also the policy of the United States to manage cybersecurity risk as an executive branch enterprise." President Obama's EO further stated, effective immediately, each agency head shall use The Framework for Improving Critical Infrastructure Cybersecurity (the Framework) developed by the National Institute of Standards and Technology." Support to Critical Infrastructure at Greatest Risk. The Secretary of Homeland Security, in coordination with the Secretary of Defense, the Attorney General, the Director of National Intelligence, the Director of the Federal Bureau of Investigation, the heads of appropriate sector-specific agencies, as defined in Presidential Policy Directive 21 of February 12, 2013 (Critical Infrastructure Security and Resilience) (sector-specific agencies), and all other appropriate agency heads, as identified by the Secretary of Homeland Security, shall: (i) identify authorities and capabilities that agencies could employ to support the cybersecurity efforts of critical infrastructure entities identified pursuant to section 9 of Executive Order 13636 of February 12, 2013 (Improving Critical Infrastructure Cybersecurity), to be at greatest risk of attacks that could reasonably result in catastrophic regional or national effects on public health or safety, economic security, or national security (section 9 entities);

This is a national security imperative. **In July 2018, President Trump strengthened President Obama's Executive Order to include requirements to ensure US election systems, processes, and its people were not manipulated by foreign meddling, either through electronic or systemic manipulation, social media, or physical changes made in hardware, software, or supporting systems.** The 2018 Executive Order. Accordingly, I hereby order:

Section 1. (a) Not later than 45 days after the conclusion of a United States election, the Director of National Intelligence, in consultation with the heads of any other appropriate executive departments and agencies (agencies), shall conduct an assessment of any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in that election. The assessment shall identify, to the maximum extent ascertainable, the nature of any foreign interference and any methods employed to execute it, the persons involved, and the foreign government or governments that authorized, directed, sponsored, or supported it. The Director of National Intelligence shall deliver this assessment and appropriate supporting information to the President, the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security.

We recommend that an independent group should be empaneled to determine the extent of the adjudication errors throughout the State of Michigan. This is a national security issue.

24. Michigan resident Gustavo Delfino, a former professor of mathematics in Venezuela and alumni of University of Michigan, offered a compelling affidavit [Exhibit 2] recognizing the inherent vulnerabilities in the SmartMatic electronic voting machines (software which was since incorporated into Dominion Voting Systems) during the 2004 national referendum in Venezuela (see attached declaration). After 4 years of research and 3 years of undergoing intensive peer review, Professor Delfino's paper was published in the highly respected "Statistical Science" journal, November 2011 issue (Volume 26, Number 4) with title "Analysis of the 2004 Venezuela Referendum: The Official Results Versus the Petition Signatures." The intensive study used multiple mathematical approaches to ascertain the voting results found in the 2004 Venezuelan referendum. Delfino and his research partners discovered not only the algorithm used to manipulate the results, but also the precise location in the election processing sequence where vulnerability in machine processing would provide such an opportunity. According to Prof Delfino, the magnitude of the difference between the official and the true result in Venezuela estimated at 1,370,000 votes. Our investigation into the error rates and results of the Antrim County voting tally reflect the same tactics, which have also been reported in other Michigan counties as well. This demonstrates a national security issue.

## C.   PROCESS

We visited Antrim County twice: November 27, 2020 and December 6, 2020.

On November 27, 2020, we visited Central Lake Township, Star Township, and Mancelona Township. We examined the Dominion Voting Systems tabulators and tabulator roles.

On December 6, 2020, we visited the Antrim County Clerk's office. We inspected and performed forensic duplication of the following:

1.   **Antrim County Election Management Server** running **Dominion Democracy Suite** 5.5.3-002;

2.   **Compact Flash** cards used by the local precincts in their **Dominion ImageCast Precinct;**

3.   **USB memory sticks** used by the **Dominion VAT** (Voter Assist Terminals); and

4.   **USB memory sticks** used for the Poll Book.

**Dominion** voting system is a Canadian owned company with global subsidiaries. It is owned by Staple Street Capital which is in turn owned by UBS Securities LLC, of which 3 out of their 7 board members are Chinese nationals. The Dominion software is licensed from Smartmatic which is a Venezuelan owned and controlled company. Dominion Server locations have been determined to be in Serbia, Canada, the US, Spain and Germany.

## D.   CENTRAL LAKE TOWNSHIP

1.   On November 27, 2020, part of our forensics team visited the Central Lake Township in Michigan to inspect the **Dominion ImageCast Precint** for possible hardware issues on behalf of a local lawsuit filed by Michigan attorney Matthew DePerno on behalf of William Bailey. In our conversations with the clerk of **Central Lake Township** Ms. Judith L. Kosloski, she presented to us "two separate paper totals tape" from Tabulator ID 2.

   •   One dated "Poll Opened Nov. 03/2020 06:38:48" (Roll 1);

   •   Another dated "Poll Opened Nov. 06/2020 09:21:58" (Roll 2).

2.   We were then told by Ms. Kosloski that on November 5, 2020, Ms. Kosloski was notified by Connie Wing of the County Clerk's Office and asked to bring the tabulator and ballots for the County Clerk's office for re-tabulation. They ran the ballots and printed "Roll 2". She noticed a difference in the votes and brought it up to the clerk, but canvasing still occurred, and her objections were not addressed.

3.   Our team analyzed both rolls and compared the results. Roll 1 had **1,494** total votes and Roll 2 had **1,491** votes (Roll 2 had 3 less ballots because 3 ballots were damaged in the process.)

4.   "Statement of Votes Cast from Antrim" shows that only **1,491** votes were counted, and the **3** ballots that were damaged were not entered into final results.

7

5. Ms. Kosloski stated that she and her assistant manually refilled out the three ballots, curing them, and ran them through the ballot counting system - but the final numbers do not reflect the inclusion of those **3** damaged ballots.

6. This is the most preliminary report of serious election fraud indicators. In comparing the numbers on both rolls, *we estimate 1,474 votes changed* across the two rolls, between the first and the second time the exact same ballots were run through the County Clerk's vote counting machine - *which is almost the same number of voters that voted in total.*

- *742 votes were added to* **School Board Member for Central Lake Schools (3)**

- *657 votes were removed from* **School Board Member for Ellsworth Schools (2)**

- **7** votes were added to the total for **State Proposal 20-1 (1)** and out of those there were **611** votes moved between the Yes and No Categories.

7. There were incremental changes throughout the rolls with some significant adjustments between the 2 rolls that were reviewed. This demonstrates conclusively that votes can be and were changed during the second machine count after the software update. That should be impossible especially at such a high percentage to total votes cast.

8. For the **School Board Member for Central Lake Schools (3)** [Image 1] there were **742 votes** added to this vote total. Since multiple people were elected, this did not change the result of both candidates being elected, but one does see a change in who had most votes. If it were a single-person election this would have changed the outcome and demonstrates conclusively that votes can be and were changed during the second machine counting. That should be impossible.

[Image 1]:



8

9.　For the **School Board Member for Ellsworth Schools (2)** [Image 2]

- Shows *657 votes being removed* from this election.

- In this case, only **3** people who were eligible to vote actually voted. Since there were **2** votes allowed for each voter to cast.

- The recount correctly shows **6** votes.

But on election night, there was a major calculation issue:

[Image 2]:



10.　In **State Proposal 20-1 (1)**, [Image 3] there is a major change in votes in this category.

- There were **774 votes for YES** during the election, to **1,083 votes for YES** on the recount a change of **309 votes**.

- **7** votes were added to the total for **State Proposal 20-1 (1)** out of those there were **611** votes moved between the Yes and No Categories.

[Image 3]:

9



11. **State Proposal 20-1 (1)** is a fairly technical and complicated proposed amendment to the Michigan Constitution to change the disposition and allowable uses of future revenue generated from oil and gas bonuses, rentals and royalties from state-owned land. Information about the proposal: https://crcmich.org/publications/statewide-ballot- proposal-20-1-michigan-natural-resources-trust-fund

12. A Proposed Initiated **Ordinance to Authorize One (1) Marihuana (sic) Retailer Establishment Within the Village of Central Lake (1)**. [Image 4]

   - On election night, it was a tie vote.

   - Then, on the rerun of ballots 3 ballots were destroyed, but only one vote changed on the totals to allow the proposal to pass.

   When **3 ballots were not counted** and **programming change on the tabulator was installed** the proposal **passed with 1 vote being removed from the No** vote.

   [Image 4]:



Recount 11/6      Election 11/3

13.      On Sunday December 6, 2020, our forensics team visited the Antrim County Clerk. There were two USB memory sticks used, one contained the software package used to tabulate election results on November 3, 2020, and the other was programmed on November 6, 2020 with a different software package which yielded significantly different voting outcomes. The election data package is used by the **Dominion Democracy Suite** software & election management system software to upload programming information onto the Compact Flash Cards for the **Dominion ImageCast Precinct** to enable it to calculate ballot totals.

14.      This software programming should be standard across all voting machines systems for the duration of the entire election if accurate tabulation is the expected outcome as required by US Election Law. This intentional difference in software programming is a design feature to alter election outcomes.

15.      The election day outcomes were calculated using the original software programming on November 3, 2020. On November 5, 2020 the township clerk was asked to re-run the Central Lake Township ballots and was given no explanation for this unusual request. On November 6, 2020 the Antrim County Clerk, Sheryl Guy issued the second version of software to re-run the same Central Lake Township ballots and oversaw the process. This resulted in greater than a 60% change in voting results, inexplicably impacting every single election contest in a township with less than 1500 voters. These errors far exceed the ballot error rate standard of 1 in 250,000 ballots (.0008%) as required by federal election law.

- The original election programming files are last dated 09/25/2020 1:24pm

- The updated election data package files are last dated 10/22/2020 10:27 am.

16.    As the tabulator tape totals prove, there were large numbers of votes switched from the November 3, 2020 tape to the November 6, 2020 tape. This was solely based on using different software versions of the operating program to calculate votes, not tabulate votes. This is evidenced by using same the Dominion System with two different software program versions contained on the two different USB Memory Devices.

17.    The Help America Vote Act, Safe Harbor provides a 90-day period prior to elections where no changes can be made to election systems. To make changes would require recertification of the entire system for use in the election. The Dominion User Guide prescribes the proper procedure to test machines with test ballots to compare the results to validate machine functionality to determine if the **Dominion ImageCast Precinct** was programmed correctly. If this occurred a ballot misconfiguration would have been identified. Once the software was updated to the 10/22/2020 software the test ballots should have been re-run to validate the vote totals to confirm the machine was configured correctly.

18.    The November 6, 2020 note from **The Office of the Secretary of State Jocelyn Benson** states: "The correct results always were and continue to be reflected on the tabulator totals tape and on the ballots themselves. Even if the error in the reported unofficial results had not been quickly noticed, it would have been identified during the county canvass. Boards of County Canvassers, which are composed of 2 Democrats and 2 Republicans, review the printed totals tape from each tabulator during the canvass to verify the reported vote totals are correct."

- Source: https://www.michigan.gov/sos/0,4670,7-127-1640_9150-544676--,00.html

19.    The **Secretary of State Jocelyn Benson's** statement is false. Our findings show that the tabulator tape totals were significantly altered by utilization of two different program versions, and not just the **Dominion Election Management System.** This is the opposite of the claim that the **Office of the Secretary of State** made on its website. The fact that these significant errors were not caught in ballot testing and not caught by the local county clerk shows that there are major inherent built-in vulnerabilities and process flaws in the **Dominion Election Management System**, and that other townships/precincts and the entire election have been affected.

20.    On Sunday December 6, 2020, our forensics team visited the Antrim County Clerk office to perform forensic duplication of the **Antrim County Election Management Server** running **Dominion Democracy Suite** 5.5.3-002.

21.    Forensic copies of the **Compact Flash** cards used by the local precincts in their **Dominion ImageCast Precinct** were inspected, **USB memory sticks** used by the **Dominion VAT** (Voter Assist Terminals) and the **USB memory sticks** used for the Poll Book were forensically duplicated.

22. We have been told that the ballot design and configuration for the **Dominion ImageCast Precinct** and VAT were provided by **ElectionSource.com** which is which is owned by MC&E, Inc of Grand Rapids, MI.

## E. MANCELONA TOWNSHIP

1. In Mancelona township, problems with software versions were also known to have been present. Mancelona elections officials understood that ballot processing issued were not accurate and used the second version of software to process votes on 4 November, again an election de-certifying event, as no changes to the election system are authorized by law in the 90 days preceding elections without re-certification.

2. Once the 10/22/2020 software update was performed on the Dominion ImageCast Precinct the test ballot process should have been performed to validate the programming. There is no indication that this procedure was performed.

## F. ANTRIM COUNTY CLERK'S OFFICE

1. Pursuant to a court ordered inspection, we participated in an onsite collection effort at the Antrim County Clerk's office on December 6, 2020. [Image 5]:



Among other items forensically collected, the Antrim County Election Management Server (EMS) with Democracy Suite was forensically collected. [Images 6 and 7].

13

 

The EMS (Election Management Server) was a:

Dell Precision Tower 3420.

Service Tag: 6NB0KH2

The EMS contained 2 hard drives in a RAID-1 configuration. That is the 2 drives redundantly stored the same information and the server could continue to operate if either of the 2 hard drives failed. The EMS was booted via the Linux Boot USB memory sticks and both hard drives were forensically imaged.

At the onset of the collection process we observed that the initial program thumb drive was not secured in the vault with the CF cards and other thumbdrives. We watched as the County employees, including Clerk Sheryl Guy searched throughout the office for the missing thumb drive. Eventually they found the missing thumb drive in an unsecured and unlocked desk drawer along with multiple other random thumb drives. This demonstrated a significant and fatal error in security and election integrity.

## G. FORENSIC COLLECTION

We used a built for purpose Linux Boot USB memory stick to boot the EMS in a forensically sound mode. We then used Ewfacquire to make a forensic image of the 2 independent internal hard drives.

Ewfacquire created an E01 file format forensic image with built-in integrity verification via MD5 hash.

We used Ewfverify to verify the forensic image acquired was a true and accurate copy of the original disk. That was done for both forensic images.

## H. ANALYSIS TOOLS

14

**X-Ways Forensics:** We used X-Ways Forensics, a commercial Computer Forensic tool, to verify the image was useable and full disk encryption was not in use. In particular we confirmed that Bit locker was not in use on the EMS.

**Other tools used:** PassMark – OSForensics, Truxton - Forensics, Cellebrite – Physical Analyzer, Blackbag-Blacklight Forensic Software, Microsoft SQL Server Management Studio, Virtual Box, and miscellaneous other tools and scripts.

## I.    SERVER OVERVIEW AND SUMMARY

1.    Our initial audit on the computer running the Democracy Suite Software showed that standard computer security best practices were not applied. These minimum-security standards are outlined the 2002 HAVA, and FEC Voting System Standards – it did not even meet the minimum standards required of a government desktop computer.

2.    The election data software package USB drives (November 2020 election, and November 2020 election updated) are secured with bitlocker encryption software, but they were not stored securely on-site. At the time of our forensic examination, the election data package files were already moved to an unsecure desktop computer and were residing on an unencrypted hard drive. This demonstrated a significant and fatal error in security and election integrity. Key Findings on Desktop and Server Configuration: - There were multiple Microsoft security updates as well as Microsoft SQL Server updates which should have been deployed, however there is no evidence that these security patches were ever installed. As described below, many of the software packages were out of date and vulnerable to various methods of attack.

a)    Computer initial configuration on 10/03/2018 13:08:11:911

b)    Computer final configuration of server software on 4/10/2019

c)    Hard Drive not Encrypted at Rest

d)    Microsoft SQL Server Database not protected with password.

e)    Democracy Suite Admin Passwords are reused and share passwords.

f)    Antivirus is 4.5 years outdated

g)    Windows updates are 3.86 years out of date.

h)    When computer was last configured on 04/10/2019 the windows updates were 2.11 years out of date.

i)    User of computer uses a Super User Account.

3. The hard drive was not encrypted at rest – which means that if hard drives are removed or initially booted off an external USB drive the files are susceptible to manipulation directly. An attacker is able to mount the hard drive because it is unencrypted, allowing for the manipulation and replacement of any file on the system.

4. The Microsoft SQL Server database files were not properly secured to allow modifications of the database files.

5. The Democracy Suite Software user account logins and passwords are stored in the unsecured database tables and the multiple Election System Administrator accounts share the same password, which means that there are no audit trails for vote changes, deletions, blank ballot voting, or batch vote alterations or adjudication.

6. Antivirus definition is 1666 days old on 12/11/2020. Antrim County updates its system with USB drives. USB drives are the most common vectors for injecting malware into computer systems. The failure to properly update the antivirus definition drastically increases the harm cause by malware from other machines being transmitted to the voting system.

7. Windows Server Update Services (WSUS) Offline Update is used to enable updates the computer – which is a package of files normally downloaded from the internet but compiled into a program to put on a USB drive to manually update server systems.

8. Failure to properly update the voting system demonstrates a significant and fatal error in security and election integrity.

9. There are 15 additional updates that should have been installed on the server to adhere to Microsoft Standards to fix known vulnerabilities. For the 4/10/2019 install, the most updated version of the update files would have been 03/13/2019 which is 11.6.1 which is 15 updates newer than 10.9.1

   **This means the updates installed were 2 years, 1 month, 13 days behind the most current update at the time. This includes security updates and fixes. This demonstrated a significant and fatal error in security and election integrity.**

   • Wed 04/10/2019 10:34:33.14 - Info: Starting WSUS Offline Update (v. 10.9.1)

   • Wed 04/10/2019 10:34:33.14 - Info: Used path "D:\WSUSOFFLINE1091_2012R2_W10\cmd\" on EMSSERVER (user: EMSADMIN)

   • Wed 04/10/2019 10:34:35.55 - Info: Medium build date: 03/10/2019

16

- Found on c:\Windows\wsusofflineupdate.txt

- *WSUS Offline Update (v.10.9.1) was created on 01/29/2017

*WSUS information found here https://download.wsusoffline.net/

10. Super User Administrator account is the primary account used to operate the **Dominion Election Management System** which is a major security risk. The user logged in has the ability to make major changes to the system and install software which means that there is no oversight to ensure appropriate management controls – i.e. anyone who has access to the shared administrator user names and passwords can make significant changes to the entire voting system.  The shared usernames and passwords mean that these changes can be made in an anonymous fashion with no tracking or attribution.

## J.   ERROR RATES

1. We reviewed the Tabulation logs in their entirety for 11/6/2020. The election logs for Antrim County consist of 15,676 total lines or events.

- Of the 15,676 there were a total of 10,667 critical errors/warnings or a 68.05% error rate.

- Most of the errors were related to configuration errors that could result in overall tabulation errors or adjudication. These 11/6/2020 tabulation totals were used as the official results.

2. For examples, there were 1,222 ballots **reversed** out of 1,491 total ballots cast, thus resulting in an 81.96% rejection rate. Some of which were reversed due to "Ballot's size exceeds maximum expected ballot size".

- According to the NCSL, Michigan requires testing by a federally accredited laboratory for voting systems. In section 4.1.1 of the Voluntary Voting Systems Guidelines (VVSG) Accuracy Requirements a. **All systems shall achieve a report total error rate of no more than one in 125,000**.

- https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf

- In section 4.1.3.2 Memory Stability of the VVSG it states that **Memory devices used to retain election management data shall have demonstrated error free data retention for a period of 22 months**.

- In section 4.1.6.1 Paper-based System Processing Requirements sub-section a. of the VVSG it states "The ability of the system to produce and receive electronic signals from the scanning of the ballot, perform logical and numerical operations upon these data, and reproduce the contents of memory when required **shall** be sufficiently free of **error** to enable

17

satisfaction of the system-level accuracy requirement indicated in Subsection 4.1.1."

- These are not human errors; this is definitively related to the software and software configurations resulting in error rates far beyond the thresholds listed in the guidelines.

3. A high "error rate" in the election software (in this case 68.05%) reflects an algorithm used that will weight one candidate greater than another (for instance, weight a specific candidate at a 2/3 to approximately 1/3 ratio). In the logs we identified that the RCV or Ranked Choice Voting Algorithm was enabled (see image below from the Dominion manual). This allows the user to apply a weighted numerical value to candidates and change the overall result. The declaration of winners can be done on a basis of points, not votes. [Image 8]:



choice voting results are evaluated on a district per district basis and each district has a set number of points (100). Elimination and declaration of winners is done on basis of points, not votes.

Figure 11-3: RCV Profile screen

4. The Dominion software configuration logs in the Divert Options, shows that all write-in ballots were flagged to be diverted automatically for adjudication. This means that all write-in ballots were sent for "adjudication" by a poll worker or election official to process the ballot based on voter "intent". Adjudication files allow a computer operator to decide to whom to award those votes (or to trash them).

5. In the logs all but two of the Override Options were enabled on these machines, thus allowing any operator to change those votes. [Image 9]:

6. In the logs all but two of the Override Options were enabled on these machines, thus allowing any operator to change those votes. This gives the system operators carte blanche to adjudicate ballots, in this case 81.96% of the total cast ballots with no audit trail or oversight. [Image 10]:

7. On 12/8/2020 Microsoft issued 58 security patches across 10+ products, some of which were used for the election software machine, server and programs. Of the 58 security fixes 22, were patches to remote code execution (RCE) vulnerabilities. [Image 11]:

19



8.  We reviewed the Election Management System logs (EmsLogger) in their entirety from 9/19/2020 through 11/21/2020 for the Project: Antrim November 2020. There were configuration errors throughout the set-up, election and tabulation of results. The last error for Central Lake Township, Precinct 1 occurred on 11/21/2020 at 14:35:11 System.Xml.XmlException System.Xml.XmlException: The ' ' character, hexadecimal value 0x20, cannot be included in a name. Bottom line is that this is a calibration that rejects the vote (see picture below). [Image 12]:



20

**Notably 42 minutes earlier on Nov 21 2020 at 13:53:09 a user attempted to zero out election results. Id:3168 EmsLogger - There is no permission to {0} - Project: User: Thread: 189. This is direct proof of an attempt to tamper with evidence.**

9. The Election Event Designer Log shows that Dominion ImageCast Precinct Cards were programmed with updated new programming on 10/23/2020 and again after the election on 11/05/2020. As previously mentioned, this violates the HAVA safe harbor period.

Source: C:\Program Files\Dominion Voting Systems\Election Event Designer\Log\Info.txt

- Dominion Imagecast Precinct Cards Programmed with 9/25/2020 programming on 09/29/2020, 09/30/2020, and 10/12/2020.

- Dominion Imagecast Precinct Cards Programmed with New Ballot Programming dated 10/22/2020 on 10/23/2020 and after the election on 11/05/2020

Excerpt from 2020-11-05 showing "ProgramMemoryCard" commands.



21



10.     Analysis is ongoing and updated findings will be submitted as soon as possible. A summary of the information collected is provided below.

    10|12/07/20 18:52:30| Indexing completed at Mon Dec 7 18:52:30 2020
    12|12/07/20 18:52:30| INDEX SUMMARY
    12|12/07/20 18:52:30| Files indexed: 159312

```
12|12/07/20 18:52:30| Files skipped: 64799
12|12/07/20 18:52:30| Files filtered: 0
12|12/07/20 18:52:30| Emails indexed: 0
12|12/07/20 18:52:30| Unique words found: 5325413
12|12/07/20 18:52:30| Variant words found: 3597634
12|12/07/20 18:52:30| Total words found: 239446085
12|12/07/20 18:52:30| Avg. unique words per page: 33.43
12|12/07/20 18:52:30| Avg. words per page: 1503
12|12/07/20 18:52:30| Peak physical memory used: 2949 MB
12|12/07/20 18:52:30| Peak virtual memory used: 8784 MB
12|12/07/20 18:52:30| Errors: 10149
12|12/07/20 18:52:30| Total bytes scanned/downloaded: 1919289906
```

Dated: December 13, 2020

_____

Russell Ramsland

23



Exhibit 10

# THE IMMACULATE DECEPTION:

## Six Key Dimensions of Election Irregularities

The Navarro Report

## Executive Summary

This report assesses the fairness and integrity of the 2020 Presidential Election by examining six dimensions of alleged election irregularities across six key battleground states. Evidence used to conduct this assessment includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations,[1] testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.

The matrix below indicates that significant irregularities occurred across all six battleground states and across all six dimensions of election irregularities. This finding lends credence to the claim that the election may well have been stolen from President Donald J. Trump.

|  | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Outright Voter Fraud** | ✓ | ✓ | * | ✓ | * | ✓ |
| **Ballot Mishandling** |  | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Contestable Process Fouls** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Equal Protection Clause Violations** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Voting Machine Irregularities** | ✓ | ✓ | ✓ | ✓ | ✓ | * |
| **Significant Statistical Anomalies** | ✓ | ✓ | ✓ | ✓ |  | ✓ |

✓ = Wide-Spread Evidence   * = Some Evidence

From the findings of this report, it is possible to infer what may well have been a coordinated strategy to effectively stack the election deck against the Trump-Pence ticket. Indeed, the observed patterns of election irregularities are so consistent across the six battleground states that they suggest a coordinated strategy to, if not steal the election outright, strategically game the election process in such a way as to "stuff the ballot box" and unfairly tilt the playing field in favor of the Biden-Harris ticket. Topline findings of this report include:

- The weight of evidence and patterns of irregularities are such that it is irresponsible for anyone – especially the mainstream media – to claim there is "no evidence" of fraud or irregularities.

- The ballots in question because of the identified election irregularities are more than sufficient to swing the outcome in favor of President Trump should even a relatively small portion of these ballots be ruled illegal.

2

- All six battleground states exhibit most, or all, six dimensions of election irregularities. However, each state has a unique mix of issues that might be considered "most important." To put this another way, all battleground states are characterized by the same or similar election irregularities; but, like Tolstoy's unhappy families, each battleground state is different in its own election irregularity way.

- This was theft by a thousand cuts across six dimensions and six battleground states rather than any one single "silver bullet" election irregularity.

- In refusing to investigate a growing number of legitimate grievances, the anti-Trump media and censoring social media are complicit in shielding the American public from the truth. This is a dangerous game that simultaneously undermines the credibility of the media and the stability of our political system and Republic.

- Those journalists, pundits, and political leaders now participating in what has become a Biden Whitewash should acknowledge the six dimensions of election irregularities and conduct the appropriate investigations to determine the truth about the 2020 election. If this is not done before Inauguration Day, we risk putting into power an illegitimate and illegal president lacking the support of a large segment of the American people.

- The failure to aggressively and fully investigate the six dimensions of election irregularities assessed in this report is a signal failure not just of our anti-Trump mainstream media and censoring social media but also of both our legislative and judicial branches.

  o Republican governors in Arizona and Georgia together with Republican majorities in both chambers of the State Legislatures of five of the six battleground states – Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin[2] – have had both the power and the opportunity to investigate the six dimensions of election irregularities presented in this report. Yet, wilting under intense political pressure, these politicians have failed in their Constitutional duties and responsibilities to do so – and thereby failed both their states and this nation as well as their party.

  o Both State courts and Federal courts, including the Supreme Court, have failed the American people in refusing to appropriately adjudicate the election irregularities that have come before them. Their failures pose a great risk to the American Republic.

- If these election irregularities are not fully investigated prior to Inauguration Day and thereby effectively allowed to stand, this nation runs the very real risk of never being able to have a fair presidential election again – with the down-ballot Senate races scheduled for January 5 in Georgia an initial test case of this looming risk.

3

## I. Introduction

At the stroke of midnight on Election Day, President Donald J. Trump appeared well on his way to winning a second term. He was already a lock to win both Florida and Ohio; and no Republican has ever won a presidential election without winning Ohio while only two Democrats have won the presidency without winning Florida.[3]

At the same time, the Trump-Pence ticket had substantial and seemingly insurmountable leads in Georgia, Pennsylvania, Michigan, and Wisconsin. If these leads held, these four key battleground states would propel President Trump to a decisive 294 to 244 victory in the Electoral College.

Shortly after midnight, however, as a flood of mail-in and absentee ballots began entering the count, the Trump red tide of victory began turning Joe Biden blue. As these mail-in and absentee ballots were tabulated, the President's large leads in Georgia, Pennsylvania, Michigan, and Wisconsin simply vanished into thin Biden leads.

At midnight on the evening of November 3, and as illustrated in Table 1, President Trump was ahead by more than 110,000 votes in Wisconsin and more than 290,000 votes in Michigan. In Georgia, his lead was a whopping 356,945; and he led in Pennsylvania by more than half a million votes. By December 7, however, these wide Trump leads would turn into razor thin Biden leads – 11,779 votes in Georgia, 20,682 votes in Wisconsin, 81,660 votes in Pennsylvania, and 154,188 votes in Michigan.

**Table 1: A Trump Red Tide Turns Biden Blue**

|  | GEORGIA | PENNSYLVANIA | MICHIGAN | WISCONSIN |
|---|---|---|---|---|
| Trump Lead Midnight 11/3 | 356,945 | 555,189 | 293,052 | 112,022 |
| Biden "Lead" 12/15 | 11,779 | 81,660 | 154,188 | 20,682 |

Sources: Associated Press & Edison/Decision Desk HQ
*Midnight based on state's time zone

There was an equally interesting story unfolding in Arizona and Nevada. While Joe Biden was ahead in these two additional battleground states on election night – by just over 30,000 votes in Nevada and less than 150,000 votes in Arizona – internal Trump Campaign polls predicted the President would close these gaps once all the votes were counted. Of course, this never happened.

In the wake of this astonishing reversal of Trump fortune, a national firestorm has erupted over the fairness and integrity of one of the most sacrosanct institutions in America – our presidential election system.  Critics on the Right and within the Republican Party – including President Trump himself – have charged that the election was stolen. They have backed up these damning charges with more than 50 lawsuits,[4] thousands of supporting affidavits and declarations, and seemingly incriminating videos, photos, and first-hand accounts of all manner of chicanery.[5]

4

Critics on the Left and within the Democrat Party have, on the other hand, dismissed these charges as the sour grapes of a whining loser. Some of these critics have completely denied any fraud, misconduct or malfeasance altogether. Others have acknowledged that while some election irregularities may have existed, they strenuously insist that these irregularities are not significant enough to overturn the election.

There is a similar Battle Royale raging between large anti-Trump segments of the so-called "mainstream" media and alternative conservative news outlets. Across the anti-Trump mainstream media diaspora – which includes most prominently print publications like the New York Times and Washington Post and cable TV networks like CNN and MSNBC – a loud chorus of voices has been demanding that President Trump concede the election.

These same anti-Trump voices have been equally quick to denounce or discredit anyone – especially anyone within their own circle – that dares to investigate what may well turn out to be THE biggest political scandal in American history. Social media outlets like Facebook, Twitter, and YouTube likewise have been actively and relentlessly censoring anyone who dares to call the results of the election into question.

In contrast, alternative news outlets, primarily associated with the American conservative movement, have provided extensive, in-depth coverage of the many issues of fraud, misconduct, and other irregularities that are coming to light. From Steve Bannon's War Room Pandemic[6] and John Solomon's Just the News[7] to Raheem Kassam's National Pulse,[8] to Newsmax,[9] and One America News Network,[10] Americans hungry for facts and breaking developments have been able to find such critical information only by following this alternative coverage.

That the American public is not buying what the Democrat Party and the anti-Trump media and social media are selling is evident in public opinion polls. For example, according to a recent Rasmussen poll: "Sixty-two percent (62%) of Republicans say it is 'Very Likely the Democrats stole the election'" while 28% of Independents and 17% of Democrats share that view.[11]

If, in fact, compelling evidence comes to light proving the election was indeed stolen after a *fait accompli* Biden inauguration, we as a country run the very real risk that the very center of our great American union will not hold.

To put this another way, if the greatest democracy in world history cannot conduct a free and fair election, and if much of the mainstream media of this country won't even fully investigate what is becoming a growing mountain of evidence calling into question the election result, there is little chance that our democracy and this Republic will survive as we know it. It is therefore critical that we get to the bottom of this matter. That is the purpose of this report.

5

## II. Six Dimensions of Election Irregularities across Six Battleground States

This report assesses the fairness and integrity of the 2020 presidential election across six key battleground states where the Democrat candidate Joe Biden holds a slim lead, and the results continue to be hotly contested.  As documented in the extensive endnotes, the evidence used to conduct this assessment includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony presented in a variety of state venues, published reports and analyses by think tanks and legal centers, videos and photos, public comments and first-hand accounts, and extensive press coverage.

From a review and analysis of this evidence, six major dimensions of alleged election irregularities have been identified and assessed on a state-by-state basis across six key battleground states: Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These six dimensions include outright voter fraud, ballot mishandling, contestable process fouls, Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.

The matrix in Table 2 provides an overview of the presence or absence of each of the six dimensions of alleged election irregularities in each of the six battleground states.  Column 1 lists each of the six dimensions along with the alleged Biden victory margin and the possible illegal ballots due to election irregularities.  Columns 2 through 7 in the matrix then indicate the presence or absence of the election irregularities in any given state.

Note that a checkmark in matrix cell indicates there is *widespread* evidence in a given state for a particular dimension of election irregularity while a star indicates there is at least *some* evidence.

### Table 2: 2020 Alleged Election Irregularities across the Six Battleground States

|  | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Outright Voter Fraud** | ✓ | ✓ | * | ✓ | * | ✓ |
| **Ballot Mishandling** |  | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Contestable Process Fouls** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Equal Protection Clause Violations** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Voting Machine Irregularities** | ✓ | ✓ | ✓ | ✓ | ✓ | * |
| **Significant Statistical Anomalies** | ✓ | ✓ | ✓ | ✓ |  | ✓ |
| **Biden "Victory" Margin** | 10,457 | 11,779 | 154,188 | 33,596 | 81,660 | 20,682 |
| **Possible Illegal Ballots** | >100,000 | >400,000 | Unknown | >100,000 | >600,000 | >200,000 |

✓ = Wide-Spread Evidence     * = Some Evidence

6

Two key points stand out immediately from the matrix. First, significant irregularities appear to be ubiquitous across the six battleground states. Only Arizona is free of any apparent widespread ballot mishandling while only Pennsylvania lacks significant statistical anomalies. The rest of the matrix in Table 2 is a sea of checkmarks and occasional stars.

Second, if one compares the alleged Biden victory margin in Column 7 of the figure with the possible illegal ballots in Column 8, it should be clear that the number of possible illegal ballots dwarfs the alleged Biden victory margin in five of the six states.

For example, the alleged Biden victory margin in Nevada is 33,596 votes yet the number of ballots in question is more than three times that.  In Arizona, which has the narrowest alleged Biden victory margin at 10,457 votes, there are nearly 10 times that number of possible illegal ballots; and the ratio of the alleged Biden vote lead to possible illegal ballots is even higher for Georgia.

Only Michigan is the exception to the rule. This is not because it is likely to be a true exception but simply because there remains insufficient estimates of how the various types of irregularities in Michigan translate into possible illegal votes.

Clearly, based on this matrix, the American people deserve a definitive answer as to whether this election was stolen from Donald J. Trump. Absent a thorough investigation prior to Inauguration Day, a cloud and a stain will hang over what will be perceived by many Americans as an illegitimate Biden administration.

The next six sections of this report examine in more detail each of the six dimensions of alleged election irregularities.

7

## III. Outright Voter Fraud

*Outright voter fraud* ranges from the large-scale manufacturing of fake ballots, bribery, and dead voters to ballots cast by ineligible voters such as felons and illegal aliens, ballots counted multiple times, and illegal out-of-state voters. Table 3 provides an overview across the six battleground states of the various types of outright voter fraud that have been alleged to be present.

### Table 3: Outright Voter Fraud in the 2020 Presidential Election

| | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Bribery** | ✓ | | | ✓ | | |
| **Fake Ballot Manufacturing & Destruction of Legally Cast Real Ballots** | ✓ | ✓ | | * | * | |
| **Indefinitely Confined Voter Abuses** | | * | | | * | ✓ |
| **Ineligible Voters & Voters Who Voted in Multiple States** | ✓ | ✓ | | ✓ | | |
| **Dead Voters & Ghost Voters** | ✓ | ✓ | * | ✓ | * | |
| **Counting Ballots Multiple Times** | | | * | * | * | ✓ |
| **Illegal Out-of-State Voters** | ✓ | ✓ | | ✓ | * | |

✓ = Wide-Spread Evidence    * = Some Evidence

From the figure, we see that different types of fraud may be present in all six states. Let's more precisely define each of these different types of fraud using examples that are designed to be illustrative rather than exhaustive.

Bribery

In a voter fraud context, *bribery* refers to the corrupt solicitation, acceptance, or transfer of value in exchange for official action, such as voter registration or voting for a preferred candidate.[12] At least in Nevada, there is a slam dunk case that such bribery occurred.

What is so stunning about the Nevada case is the brazen disregard for our federal bribery laws. In the Silver State, in an effort orchestrated by the Biden campaign, Native Americans appear to have traded their votes not for pieces of silver but rather for Visa gift cards, jewelry, and other "swag."[13] According to the Epoch Times, such vote buying schemes also may have occurred in eight other states, including Arizona and Wisconsin.[14]

8

Fake Ballot Manufacturing and Destruction of Legally Cast Real Ballots

*Fake ballot manufacturing* involves the fraudulent production of ballots on behalf of a candidate; and one of the most disturbing examples of possible fake ballot manufacturing involves a truck driver who has alleged in a sworn affidavit that he picked up large crates of ballots in New York and delivered them to a polling location in Pennsylvania.[15] There may be well over 100,000 ballots involved, enough fake ballots alone to have swung the election to Biden in the Keystone State.

Likewise in Pennsylvania, there is both a Declaration and a photo that suggests a poll worker used an unsecured USB flash drive to dump an unusually large cache of votes onto vote tabulation machines. The resultant tabulations did not correlate with the mail-in ballots scanned into the machines.[16]

Arguably the most flagrant example of possible fake ballot manufacturing on behalf of Joe Biden may have occurred at the State Farm Arena in Atlanta, Georgia. The possible perpetrators were caught *in flagrante delicto* on surveillance video.

In one version of this story, poll watchers and observers as well as the media were asked to leave in the middle of the night after a suspicious water leak. Once the room was cleared, several election officials pulled out large boxes of ballots from underneath a draped table. They then proceeded to tabulate a quantity of fake manufactured ballots estimated to be in the range of tens of thousands.[17] Note that a large surge in Biden votes following the tabulation of these ballots can be clearly observed after these votes were processed.[18]

Despite what appears to be damning evidence of a possible crime, a spate of stories appeared across the anti-Trump media diaspora dismissing any concerns. According to these whitewash stories, these were regular and authorized ballot boxes, observers in the media were not asked to leave but simply left on their own, and it is perfectly acceptable to count ballots in the absence of observers.[19] Or so the spin goes.

Of course, this is precisely the kind of incident that should be fully investigated both by Georgia's Attorney General as well as by the Federal Department of Justice. Yet it remains unclear as to whether such investigations are underway. Meanwhile, the videotape itself, absent an adequate explanation, has contributed to the current climate of skepticism surrounding the fairness and integrity of the election.

Finally, as an example of the possible *destruction of legally cast real ballots* there is this allegation from a court case filed in the United States District Court for the District of Arizona: Plaintiffs claim that over 75,000 absentee ballots were reported as unreturned when they were actually returned. These absentee ballots were then either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled out by election workers or other third parties.[20]

9

Indefinitely Confined Voter Abuses

*Indefinitely confined voters* are those voters unable to vote in person because of old age or some disability. There are two types of possible abuses associated with such indefinitely confined voters.

The first kind of abuse involves exploiting the elderly or the infirm by effectively hijacking their identities and votes. For example, in Georgia, the family of an elderly man in a nursing home facility discovered that a mail-in ballot had been requested and submitted under his voter registration identity, yet it was done without his consent.[21]  In a similar situation in Pennsylvania, two parents and their daughter who has Downs Syndrome went to vote in person and discovered that a mail-in ballot had both been requested and submitted for the daughter without her consent.[22]

The second kind of indefinitely confined voter abuse is far more consequential, at least in the state of Wisconsin.  The key allegation here in several court filings is that "bad-faith voters" registering as "indefinitely confined" intentionally broke "Wisconsin election law to circumvent election integrity photo identification requirements." In a nutshell, they were able to vote without showing a voter identification photo and therefore underwent a far less rigorous I.D. check than would otherwise have been conducted.

This abuse happened, according to one press account, after "clerks in Dane and Milwaukee counties offered illegal advice that encouraged individuals to use indefinite confinement as a way to ignore the state's photo I.D. requirement."[23] The Trump side has called this correctly an open invitation to fraud; and stories and pictures abound of Wisconsin voters who registered as indefinitely confined but were seen also attending weddings, riding their bikes, going on vacation, and otherwise be anything but confined.[24]

Here is what is most important about this particular type of election fraud: In the wake of the expanded definition of indefinitely confined voters – a definition ruled legally *incorrect* by the Wisconsin Supreme Court[25] – the number of indefinitely confined voters surged from just under 70,000 voters in 2019 to over 200,000 in 2020.[26] This 130,000 vote increment of new indefinitely confined voters is more than five times the Biden victory margin in Wisconsin.

Ineligible Voters and Voters Who Voted in Multiple States

*Ineligible voters* include felons deemed ineligible, underage citizens, nonregistered voters, illegal aliens, illegal out-of-state voters, and voters illegally using a post office box as an address.[27]

In a court filing by the Trump campaign legal team, lead counsel Ray Smith provided a list of more than 70,000 allegedly ineligible voters casting ballots in Georgia in the 2020 election.[28] Also in Georgia, over 20,000 people appear to have filed a Notice of Changed Address form to the Georgia state government or had other indications of moving out of state. Yet, these clearly ineligible out-of-state voters appeared to have remained on the voter rolls and voted in the 2020 election.[29]

As additional data points regarding ineligible out-of-state voters, there are these: Between 80 and 100 self-proclaimed Black Lives Matter-affiliated members from other states have admitted to having voted in Pennsylvania.[30]

10

As for those *voters who vote in multiple states*, one lawsuit claims that roughly 15,000 mail-in or absentee ballots were received in Nevada from voters who were known to have voted in other states.[31] It is useful to note here that in Nevada, poll workers allegedly were not consistent in their procedures when checking voters in to vote about whether they accepted California or Nevada Voter Identification as proof of eligibility to register to vote.[32]

Dead Voters and Ghost Voters

According to widespread evidence, there was a surprising number of ballots cast across several key battleground states by deceased voters, sparking one wag to quip, in reference to a classic Bruce Willis movie, this was the "Sixth Sense" election – I see dead people voting.

In Pennsylvania, for example, a statistical analysis conducted by the Trump Campaign matching voter rolls to public obituaries found what appears to be over 8,000 confirmed dead voters successfully casting mail-in ballots.[33]    In Georgia – underscoring the critical role any given category of election irregularities might play in determining the outcome – the estimated number of alleged deceased individuals casting votes almost exactly equals the Biden victory margin.

In Michigan, according to one first-hand account offered in a declaration, computer operators at a polling location in Detroit were manually adding the names and addresses of thousands of ballots to vote tabulation systems with voters who had birth dates in 1900.[34] And in Nevada, a widower since 2017 saw that his deceased wife had successfully cast a mail-in ballot on November 2, 2020, three and a half years after her death.[35]

It may be useful to note here that dead voters played a critical role in stealing the election from Richard Nixon, a theft orchestrated by Mayor Richard Daley and his Chicago political machine. According to one report "more than 3,000 votes [were] cast in the names of individuals who were dead, and more than 31,000 individuals voted twice in different locations in the city." President Kennedy's victory margin in Illinois was less than 9,000 votes.

On the Ghost Voter front, a "Ghost Voter" is a voter who requests and submits a ballot under the name of a voter who no longer resides at the address where that voter was registered.  In Georgia for example, it is alleged that over 20,000 absentee or early voters – almost twice the Biden victory margin – cast their ballots after having moved out of state.[36] In Nevada, a poll worker reported that there were as many as 50 ballots per day being delivered to homes vacated by their former residents.[37]

Counting Ballots Multiple Times

*Counting ballots multiple times* occurs most egregiously when batches of ballots are repeatedly rescanned and re-tabulated in electronic voting machines. It can also happen when the same person votes multiple times within the same day. Evidence of these particular kinds of "ballot stuffing" are present across all six battleground states.

11

For example, in Wisconsin, poll workers were observed running ballots through tabulation machines more than once.[38]  In Wayne County, Michigan, Republican poll watchers observed canvassers re-scanning batches of ballots through vote tabulation machines up to 3 to 4 times.[39]

In Pennsylvania, a poll worker observed a woman vote twice in the same day by changing her appearance.[40] Another poll worker observed people in voting lines in one corner of a polling location voting, and then coming to another polling location at the other side of the building to vote.[41] Still another poll worker witnessed a woman voting twice at voting machines on Election Day.[42]

## IV. Ballot Mishandling

*Ballot mishandling* represents the second major dimension of alleged election irregularities in the 2020 presidential election. As Table 4 illustrates, this is a multifaceted problem across the battleground states.   Let's work our way through this figure starting with the failure to properly check the identification of voters.

**Table 4: Ballot Mishandling in the Battleground States**

|  | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **No Voter I.D. Check** |  |  | * | * |  | ✓ |
| **Signature Match Check Abuses** |  | ✓ |  | ✓ | ✓ |  |
| **"Naked Ballots" Lacking Outer Envelope** |  |  | * |  | ✓ |  |
| **Broken Chain of Custody & Unauthorized Ballot Handling or Movements** |  | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Ballots Accepted Without Postmarks & Backdating of Ballots** |  |  | * |  |  | * |

✓ = Wide-Spread Evidence    * = Some Evidence

No Voter I.D. Check

It is critical for the integrity of any election for poll workers to properly verify a voter's identity and registration when that voter comes in to cast an in-person ballot. However, there is at least some evidence of a lack of adequate voter ID check across several of the battleground states.

For example, in Michigan, the chairperson of a polling location permitted an individual to vote without presenting voter identification and another with only a photocopy of a driver's license.[43]

12

In Nevada, poll workers were instructed to advise people who wanted to register to vote and did not have proper Nevada IDs or Driver's Licenses to do the following: These unregistered voters could go outside into the parking lot and make an appointment with the Department of Motor Vehicles as late as January 2021 to obtain a Nevada Driver's License as proof of their identity. They could then bring in confirmation of their DMV appointment in either paper or digital form; and that would be sufficient to allow them to be registered.[44]

## Signature Matching Abuses

It is equally critical that ballot counters legally verify mail-in and absentee ballots by checking if the signatures on the outer envelopes match the voters' registration records.[45] Note, however, that a variety of signature matching abuses represent a major issue in Nevada, Pennsylvania, and especially in Georgia.

In Georgia, contrary to state law, the Secretary of State entered into a Consent Decree with the Democrat Party that weakened signature matching to just one verification instead of two. This illegal weakening of the signature match test has called into question more than 1.2 million mail-in ballots cast in Georgia.[46]

Georgia is not the only state where signature match check abuses have surfaced. Nevada law requires that *persons* – not machines – review all signatures and ballots. Yet the Clark County Registrar of Voters used a defective signature matching computer system called Agilis to conduct such checks.[47] As will be discussed further below, this problem of machines replacing humans contrary to Nevada state law was compounded by the fact that the Agilis system has an unacceptably low accuracy rate, making it easier for illegal ballots to slip through its screen.[48]

Signature match abuses also surfaced in Wisconsin where mandatory voter information certifications for mail-in ballots were reduced and/or eliminated, again contrary to state law. As noted in one lawsuit, this change "undermined the authority of the state legislature, reduced the security and integrity of the election by making it easier to engage in mail-in ballot fraud and created another standard-less rule in conflict with the clear terms of the Wisconsin Election Code, preventing uniform treatment of absentee ballots throughout the State."[49]

## "Naked Ballots" Lacking Outer Envelope

A *naked ballot* is a mail-in or absentee ballot lacking an outer envelope with the voter's signature on it. It is illegal to accept the naked ballot as the outer envelope provides the only way to verify a voter's identity.

The illegal acceptance of naked ballots appears to be particularly acute in Pennsylvania as a result of ill-advised "guidance" issued by the Secretary of State – a registered Democrat[50] – that such naked ballots be counted.

13

This issuance of such guidance, in violation of state law,[51] appears to be a blatant attempt by a Democrat politician to boost the count for Joe Biden as it was clear that Democrats would be voting disproportionately higher through mail-in ballots.  This incident is especially egregious because when the Pennsylvania Supreme Court rejected this guidance, the Secretary of State refused to issue new guidance directing election officials to NOT count non-compliant mail-in or absentee ballots.[52]

Broken Chain of Custody & Unauthorized Ballot Handling or Movements

The maintenance of a proper chain of custody for ballots cast is the linchpin of fair elections. Chain of custody is broken when a ballot is fraudulently transferred, controlled, or moved without adequate supervision or oversight.[53]

While chain of custody issues can apply to all ballots, the risk of a broken chain of custody is obviously higher for mail-in and absentee ballots. This is because the ballots have to go through more hands.

In the 2020 presidential election, the increased use – often illegal use – of unsupervised drop boxes arguably has enhanced the risk of a broken chain of custody. So, too, has the increased practice of so-called "ballot harvesting" whereby third parties pick up ballots from voters and deliver them to drop boxes or directly to election officials.

Both drop boxes and ballot harvesting provide opportunities for bad actors to insert fraudulent ballots into the election process.  That this is a very serious matter is evident in this observation by BlackBoxVoting.org: "In court cases, chain of custody violations can result in refusal to admit evidence or even throwing a case out. In elections, chain of custody violations can result in 'incurable uncertainty' and court orders to redo elections."[54] (emphasis added)

As an example of the drop box problem, in Pennsylvania, ballots were illegally dumped into drop boxes at the Nazareth ballot drop center in violation of state law.[55] Likewise in Pennsylvania, a man caught on videotape and photos came out of an unmarked Jeep extracting ballots from an unsupervised ballot drop-box to bring them into a ballot counting center. That same man was observed to come back with an empty ballot container to place in the unsupervised drop box.[56]

In Wisconsin, the state's Election Committee illegally positioned five hundred drop boxes for collection of absentee ballots across the state. However, these drop boxes were disproportionately located in urban areas which tend to have much higher Democrat registration, thereby favoring the candidacy of Joe Biden.  Note: Any use of a drop box in Wisconsin is illegal by statute. Therefore, the votes cast through them cannot be legally counted in any certified election result.[57]

As an example of ballot harvesting – in this case at the front end of the process – 25,000 ballots were requested from nursing home residents in Pennsylvania at the same time.[58]

14

As additional examples of a possible broken chain of custody, there are these: Large bins of absentee ballots arrived at the Central Counting Location in Wisconsin with already opened envelopes, meaning that ballots could have been tampered with.[59] They were nonetheless counted.

Also in Wisconsin, an election worker was observed moving bags of blank ballots into a vehicle and then driving off without supervision.[60] There is also the previously referenced case whereby a truck driver has offered a firsthand account of moving large quantities of fake manufactured ballots from New York to Pennsylvania.

As a final note on the unauthorized handling or movement of ballots, there is the problem of *illegal ballot counters*. These are persons *w*ho not legally permitted and/or certified to be counting ballots.

In one curious case, an individual who worked as an official photographer for Kamala Harris' campaign in 2019[61] was alleged to be involved in scanning ballots in Floyd County, Georgia. Ballot counters cannot have any ties to candidates in a presidential election.

Ballots Accepted Without Postmarks and Backdating of Ballots

Across all of the battleground states, it is against state law for poll workers to count either mail-in or absentee ballots that lack postmarks. It is also illegal to backdate ballots so that they may be considered as having met the election deadline for the receipt and counting of such ballots. There is some evidence of these irregularities in several of the battleground states.

For example, in Wisconsin, according to one Declaration, employees of the United States Postal Service (USPS) in Milwaukee were repeatedly instructed by two managers to backdate late-arriving ballots so they could still be counted.[62] In addition, the USPS was alleged to have backdated as many as 100,000 ballots in Wisconsin.[63]

Similarly, in Detroit, Michigan, as noted in a court case, poll workers were instructing ballot counters to backdate absentee ballots so they could be counted.[64] One poll watcher also observed ballots in Michigan being run through vote tabulation machines without postmarks on them.[65]

15

## V. Contestable Process Fouls

Contestable process fouls represent the third dimension of election irregularities in the 2020 presidential election. The various forms such process fouls can take are illustrated in Table 5 across the six battleground states.

**Table 5: Contestable Process Fouls in the Battleground States**

| | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Abuses of Poll Watchers & Observers** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Mail-In & Absentee Ballot Rules Violated Contrary to State Law** | | ✓ | | | ✓ | ✓ |
| **Voters Not Properly Registered Allowed to Vote** | | ✓ | * | ✓ | * | ✓ |
| **Illegal Campaigning at Poll Locations** | | | * | | * | * |
| **Ballots Cured by Poll Workers or Voters Contrary to Law** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

✓ = Wide-Spread Evidence    * = Some Evidence

Abuses of Poll Watchers and Observers

Central to the fairness and integrity of any election is the processes by which observers monitor the receipt, opening, and counting of the ballots. You can see in the Table 5 that poll watcher and observer abuses were present across all six battleground states.

In Georgia,[66] Michigan,[67] and Pennsylvania,[68] poll watchers and observers were denied entry to ballot counting centers by Judges of Elections and other poll workers. This was despite presenting proper certification and identification.

In Georgia,[69] Michigan,[70] Nevada,[71] and Pennsylvania,[72] Republican poll watchers were also forced inside confined areas, thereby limiting their view. In some cases, this confinement was enforced by local law enforcement.

Across these four battleground states, Republican poll watchers were also directed to stand at unreasonably lengthy distances from ballot counters. In Michigan – arguably the "first among equals" when it comes to observer abuses – poll workers put up poster boards on the windows of the room where ballots were being processed and counted so as to block the view.[73] In Pennsylvania, tens of thousands of ballots were processed in back rooms where poll observers were prohibited from being able to observe at all.[74]

This is an extremely serious matter because it is these poll watchers and observers who represent the frontline defenders of a fair election process. Their job is to make sure all ballots are handled properly and tabulated accordingly. They seek to answer questions like: Is there a signature match process being conducted? Does each ballot have an outer envelope or is it a naked ballot? Are ballots being run more than once through the tabulation machines?

When poll watchers or observers are barred from viewing or forced to view from unacceptably large distances, these watchdogs cannot accurately answer these questions. They, therefore, cannot fulfill their critical watchdog function.

Mail-In Ballot and Absentee Ballot Rules Violated Contrary to State Law

In Georgia, more than 300,000 individuals were permitted to vote who had applied for an absentee ballot more than 180 days prior to the Election Day. This is a clear violation of state law.[75]

In both Pennsylvania and Wisconsin, Democrat election officials acted unilaterally to accept both mail-in and absentee ballots after Election Day. State Republicans have argued this is contrary to state law.

In Pennsylvania, absentee and mail-in ballots were accepted up to three days after Election Day.[76] On November 7th, in anticipation of a legal challenge, the United States Supreme Court ordered that the approximately 10,000 absentee and mail-in ballots that had arrived past November 3rd be separated from ballots that had arrived on Election Day.[77] This direction notwithstanding, a poll watcher reported on November 7th that, in Delaware County, ballots received the previous night were not being separated from ballots received on Election Day, contrary to state law.[78]

Wisconsin state law does not permit early voting. Nonetheless, city officials in the Democrat stronghold of Madison, Wisconsin assisted in the creation of more than 200 "Democracy in the Park" illegal polling places.

These *faux* polling places were promoted and supported by the Biden campaign. They provided witnesses for absentee ballots and acted in every way like legal polling places. Moreover, they received ballots outside of the limited 14-day period preceding an election that is authorized by statute for in-person or absentee balloting. These were clear violations of state law.[79]

17

### Voters Not Properly Registered Allowed to Vote

One of the jobs of poll workers is to ensure that in-person voters are legally registered and are who they say they are. Across at least three of the six battleground states – Georgia, Nevada, and Wisconsin – this job may not have been effectively done.

In Wisconsin, for example, officials refused to allow poll watchers to challenge the qualifications of people applying to vote or require proof of such persons' qualifications.[80] In Georgia, more than 2,000 individuals appear to have voted who were not listed in the State's records as having been registered to vote.[81]

In Pennsylvania, a poll watcher observed poll workers taking individuals whose names did not appear in voter registration books back into a separate area that was unobserved by any poll watchers. There, these apparently unregistered voters met with a Judge of Elections who allegedly told them: "you go back in, tell them this is your name, and you can vote."[82]

### Illegal Campaigning at Poll Locations

Poll workers are supposed to remain politically neutral. When a poll worker displays bias for one political candidate over another at a polling location, this is contrary to state law. Unfortunately, this law appears to have been repeatedly violated in Michigan, Pennsylvania, and Wisconsin.

For example, in Pennsylvania, poll workers were wearing paraphernalia from a group called "Voter Protection." This is a 100% Democrat-funded Political Action Committee dedicated to Democrat redistricting in Pennsylvania; and the wearing of its paraphernalia constitutes illegal campaigning at the polls.[83]

In a similar type of illegal campaigning in Michigan, poll workers were allowed to wear Black Lives Matter shirts and were seen carrying tote bags of President Obama paraphernalia.[84] In addition, poll workers with Biden and Obama campaign shirts on were allowed on the ballot counting floor.[85]

In Wisconsin, representatives from the Biden campaign were outside with clipboards talking to voters on their way in to vote. They were clearly inside the prohibited perimeter for electioneering. Poll workers did nothing to address this illegal campaigning despite the objections of observers.[86]

### Ballots Cured by Poll Workers or Voters Contrary to Law

Under prescribed circumstances, both poll workers and voters may fix ballots with mistakes or discrepancies. This process is known as "ballot curing."

In nineteen states, poll workers must notify voters if there are errors or discrepancies on their ballots and allow them to "cure" or correct any errors so their votes will count.[87] However, in states that do not allow curing, ballots with discrepancies such as missing or mismatched signatures <u>must be discarded</u>.[88]

18

In Pennsylvania, and contrary to state law, poll workers were trained to allow voters to cure or "correct" their ballots.[89] According to one court filing, Democrat-controlled counties in Pennsylvania participated in pre-canvass activities prior to Election Day "by reviewing received mail-in ballots for deficiencies."[90] Such discrepancies included "lacking the inner secrecy envelope or lacking a signature of the elector on the outer declaration envelope." Voters were then notified so that they could cure their ballots – a clear violation of state law.[91]

Numerous other examples of illegally cured ballots abound. For example, in Wisconsin, tens of thousands of ballots were observed to be corrected or cured despite election observer objections.[92]

In Pennsylvania, poll workers sorted approximately 4,500 ballots with various errors into bins. Poll workers then re-filled out the 4,500 ballots so that they could be read by tabulation machines, an action contrary to state law.[93]

In Michigan, poll workers altered the dates on the outer envelopes of the ballots so that they would be able to count them.[94] Michigan poll workers also filled out blank ballots to "correct" mail-in and absentee ballots according to what they believed the "voter had intended."[95]

## VI. Equal Protection Clause Violations

The Equal Protection Clause is part of the 14th Amendment of the U.S. Constitution and a fundamental pillar of the American Republic. This Equal Protection Clause mandates that no State may deny its citizens equal protection of its governing laws.[96]

Table 6 illustrates three major alleged violations of the Equal Protection Clause in the 2020 presidential election. As the table illustrates, each violation was observed to occur across all six battleground states.

**Table 6: Equal Protection Clause Violations in the Six Battleground States**

| | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Higher Standards of Certification & I.D. Verification Applied to In-Person Voters** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Different Standards of Ballot Curing** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Differential & Partisan Poll Watcher Treatment** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

✓ = Wide-Spread Evidence   * = Some Evidence

19

Higher Standards of Certification & I.D. Verification Applied to In-Person Voters

The first alleged violation focuses on the application of higher standards of certification and voter identification for in-person voters than mail-in and absentee ballot voters. In effect, these higher standards disproportionately benefited the candidacy of Joe Biden because President Trump had a much higher percentage of in-person voters than mail-in and absentee voters. Indeed, mail-in and absentee ballots were largely skewed for Joe Biden across the country by ratios as high as 3 out of 4 votes in some states.[97]

Note here that much of the alleged fraud and ballot mishandling focused on mail-in voters and absentee ballots. Therefore, the lower the level of scrutiny of these voters, the more illegal votes for Joe Biden relative to Donald Trump could slip in. It should likewise be noted here that this particular violation of the Equal Protection Clause was further enabled by poll watchers being denied meaningful observation.

Perhaps the most egregious examples of this particular violation of the Equal Protection clause occurred in Georgia and Michigan. Georgia, for example, requires ID for voting in-person and Michigan will only allow provisional voting without an ID. However, in both Georgia and Michigan, a valid ID is not required to vote by mail so long as the person has already registered in a previous election.

These procedures are ripe for fraud. In fact, there is evidence that election fraudsters targeted voters who had voted in past elections but not voted in more recent ones. These fraudsters could then cast ballots on behalf of these infrequent voters with little likelihood they would be caught. Numerous affidavits, however, detail persons arriving to vote at polls only to be informed that records indicate they had already voted. At least fourteen such affidavits have been made by Georgians.

As a further example, in Wisconsin, mail-in ballots were accepted without witness signatures placed properly in the allocated envelope location.[98] A comparable process for in-person voting would have resulted in the invalidation of the vote.

Different Standards of Ballot Curing

As a second major violation of the Equal Protection Clause, likewise observed across all six battleground states, different standards for correcting mistakes on ballots (ballot curing) were applied across different jurisdictions within the states. Often, jurisdictions with predominantly Democrat registration were more expansive about allowing the curing of ballots than jurisdictions with predominantly Republican registration.

In Pennsylvania, there was a clear difference between how ballots were – or were not – cured in Republican counties versus Democrat counties. When Pennsylvania's Secretary of State Kathy Boockvar issued <u>illegal</u> guidance authorizing counties to cure ballots, this illegal guidance was <u>not</u> followed in at least eight different Republican counties.[99] Meanwhile, ballots <u>were</u> cured in Democrat counties under this illegal guidance.[100]

20

In Arizona, there likewise was a clear difference between how in-person voters were treated versus mail-in ballots. On the one hand, mail-in voters had up to 5 days to "cure" or "fix" invalid mail-in ballots sent prior to Election Day.[101]  On the other hand, in-person voters in Maricopa County, for example, had to deal with poll workers who did not know how to work electronic voting machines properly. This resulted in thousands of in-person votes being marked incorrectly and disregarded rather than cured.[102]

### Differential and Partisan Poll Watcher Treatment

In most states, political party candidates and ballot issue committees are able to appoint poll watchers and observers to oversee the ballot counting process.[103] Such poll watchers and observers must be registered voters and present certification to the Judge of Elections in order to be able to fulfill their duties at a polling location.[104]

Such certified poll watchers should be free to observe at appropriate distances regardless of their party affiliation. Yet in key Democrat strongholds, e.g., Dane County in Wisconsin and Wayne County in Michigan, which yielded high Biden vote counts, Republican poll watchers and observers were frequently subject to different treatment ranging from denial of entry to polling places to harassment and intimidation.

For example, in Georgia, a certified poll watcher witnessed other poll workers at a polling location discussing how they should not speak to her due to her party affiliation.[105] In Pennsylvania, a Republican poll watcher was harassed and removed from the polling location due to his party affiliation.[106] In Wisconsin, a Republican poll watcher was prevented from observing due to the fact that polling locations were not allowing Republicans in.[107]

Note the synergy here between the problem of the process foul involved with denying access to certified poll watchers (discussed in the previous section) and the violation of the Equal Protection Clause such conduct entails when such denial, harassment, and intimidation differs by party affiliation.

21

## VII. 2020 Election Voting Machine Irregularities

Perhaps no device illustrates that technology is a double-edged sword than the machines and associated software that have come to be used to tabulate votes across all 50 states.[108] Types of voting equipment include optical scanners used to process paper ballots, direct recording electronic systems which voters can use to directly input their choices, and various marking devices to produce human-readable ballots.[109]

Two main types of voting machine irregularities have been alleged in the 2020 presidential election. As Table 7 illustrates, these types of irregularities include large-scale voting machine inaccuracies together with inexplicable vote switching and vote surges, often in favor Joe Biden.

### Table 7: 2020 Voting Machine Irregularities

| | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Large-Scale Voting Machine Inaccuracies** | √ | | √ | √ | | |
| **Inexplicable Vote Switching and Vote Surges In Favor of Biden** | √ | √ | √ | | | |

√ = Wide-Spread Evidence   * = Some Evidence

Large-Scale Voting Machine Inaccuracies

Much has been made about the shadowy genesis of a company called Dominion which provides voting machines and equipment to 28 states.[110] According to critics, Dominion's roots may be traced to an effort by the Venezuelan dictator Hugo Chavez to rig his sham elections.[111] Dominion is also alleged to have ties to the Clinton Foundation,[112] while the Smartmatic software used in the Dominion machines is alleged to have links to the shadowy anti-Trump globalist financier George Soros.[113]

The controversy swirling over Dominion and Smartmatic notwithstanding, one of the biggest problems with machine inaccuracies may be traced to a company called Agilis.  Nevada election officials in Clark County, a Democrat stronghold in Nevada, used Agilis signature verification machines to check over 130,000 mail-in ballot signatures.

According to a court case filed in the First Judicial District Court in Carson City, the Agilis machines used a "lower image quality than suggested by the manufacturer."  Clark County Election Department officials also lowered the accuracy rate below the manufacturer's recommendations, making the whole verification process unreliable. [114]

22

In a test run, it was proven that, at the manufacturer's setting, the Agilis machine already had a high tolerance for inaccuracies—as high as 50% non-matching. In other words, half of the ballots that might be moved through the machine would be impossible to verify; and Clark County officials lowered that threshold even further.[115]

As a final comment on this case, there is also the broader legal matter that the Agilis machines were used to "entirely replace signature verification by election personnel." This is contrary to Nevada state law.

As noted in a court case: "In violation of Nevada law, the Clark County Election Department allows the Agilis machine to solely verify 30% of the signatures accompanying the mail-in ballots without ever having humans inspect those signatures."[116]

A similar problem has been alleged in a court filing in Arizona with a software known as the Novus 6.0.0.0. In cases where ballots were too damaged or illegible to be read by vote tabulation machines, Novus was used in an attempt to cure or restore the ballots. The system would do so by trying to read the applicable scans of the original rejected ballots. However, as noted in a court case filed by Kelli Ward, Chairwoman of the Arizona Republican Party: "the software was highly inaccurate, and it often flipped the vote." [117]

Inexplicable Vote Switching and Vote Surges In Favor of Biden

As a further complication to the Novus software problem in Arizona referenced above, the software was not only highly inaccurate. According to observers, and as an example of inexplicable vote switching, "the software would erroneously prefill 'Biden' twice as often as it did 'Trump.'"[118]

At least one instance of a large and inexplicable vote switching and vote surge in favor of Joe Biden took place in Antrim County, Michigan – and it is associated with the controversial aforementioned Dominion-Smartmatic voting machine hardware-software combo.[119] In this Republican stronghold, 6,000 votes were initially, and incorrectly, counted for Joe Biden. The resulting vote totals were contrary to voter registration and historical patterns and therefore raised eyebrows. When a check was done, it was discovered that the 6,000 votes were actually for Donald J. Trump.

A subsequent forensic audit of the Antrim County vote tabulation found that the Dominion system had an astonishing error rate of 68 percent.[120] By way of comparison, the Federal Election Committee requires that election systems must have an error rate no larger than 0.0008 percent.[121]

Perhaps even more troubling given concerns over hackers and Dominion's alleged ties to bad foreign actors, the records that would have allowed the deletion of remote internet access went missing from the Antrim County system. This was in direct violation of Michigan state law,[122] which requires retention of voting records for 22 months -- such information was in place for previous election years, but not this election. At the very least, the results of this audit indicates the need for further investigation of the Dominion system across other states in the country.

23

In Georgia, there were numerous "glitches" with the Dominion machines where the results would change. The most notable of these changes was a 20,000 vote surge for Biden and 1,000 vote decrease for Trump.[123]

## VIII. Statistical Anomalies in the Six Battleground States

The 2020 presidential election appears to feature at least four types of statistical anomalies that raise troubling questions. Table 8 illustrates the incidence of these statistical anomalies across the six battleground states.  As you can see from the table, Wisconsin and Georgia are characterized by the highest degree of statistical anomalies, with three of the four anomalies present.   Nevada and Arizona show two anomalies present while Michigan has at least one.  Let's take a more granular look now at each of these types of statistical anomalies.

**Table 8**: **Statistical Anomalies in the Battleground States**

| | ARIZONA | GEORGIA | MICHIGAN | NEVADA | PENNSYLVANIA | WISCONSIN |
|---|---|---|---|---|---|---|
| **Significant Changes In Absentee Ballot Rejection Rates From Previous Elections** | | ✓ | | ✓ | ✓ | |
| **Excessively High Voter Turnout (at times exceeding 100%)** | ✓ | ✓ | ✓ | ✓ | | ✓ |
| **Statistically Improbable Vote Totals Based on Party Registration & Historical Patterns** | ✓ | | | | | ✓ |
| **Unusual Vote Surges** | | ✓ | * | | | ✓ |

✓ = Wide-Spread Evidence      * = Some Evidence

Dramatic Changes in Mail-in and Absentee Ballot Rejection Rates from Previous Elections

It is routine across the 50 states for mail-in-and absentee ballots to be rejected for any number of reasons. These reasons may include: the lack of a signature or adequate signature match, a late arrival past a deadline,[124] the lack of an external envelope that verifies voter-identification (a naked ballot),[125] or if voters provide inaccurate or incomplete information on the ballots.[126]

In the 2020 presidential race, Joe Biden received a disproportionately high percentage of the mail-in and absentee ballots. Perhaps not coincidentally, we saw a dramatic fall in rejection rates in Pennsylvania, Nevada, and especially Georgia.

24

For example, in Nevada, the overall rejection rate dropped from 1.6%[127] in 2016 to 0.58% in 2020.[128] In Pennsylvania, the 2016 rejection rate of 1.0%[129] dropped to virtually nothing at 0.28%.[130]  The biggest fall in the overall absentee ballot rejection rate came, however, in Georgia. Its rejection rate fell from 6.8%[131] in 2016 to a mere 0.34%[132] in 2020.

These dramatically lower rejection rates point to a conscious effort by Democrat election officials across these key battleground states to subject mail-in and absentee ballots to a lower level of scrutiny. That this kind of government conduct and gaming of our election system may have contributed to tipping the scales in favor of Joe Biden can be illustrated in this simple calculation:

In the 2020 race, Georgia election officials received 1,320,154 mail-in and absentee ballots. If these ballots had been rejected at the 2016 rate of 6.8% instead of the 2020 rate of 0.34%, there would have been 81,321 ballots rejected instead of the 4,489 ballots that were actually rejected.

Under the conservative assumption that 60% of these mail-in and absentee ballots went to Joe Biden,[133] this dramatic fall in the rejection rate provided Joe Biden with an additional 16,264 votes. That's more than the margin of the alleged Biden victory in Georgia.

Excessively High Voter Turnout (at times exceeding 100%)

When there are more ballots cast than registered or eligible voters, fraud has likely taken place. During the 2020 presidential election, excessively high voter turnout occurred across all six swing states.

In analyzing this problem, it is important to distinguish between states that have same-day registration and those that don't. States with same-day registration can plausibly have voter turnout that is higher than 100%. However, is impossible for that to happen in states without same-day registration without fraud having taken place.

Consider, then, Arizona which does not allow same-day voter registration. According to testimony from an MIT-trained mathematician, Candidate Biden may have received a weighted 130% total of Democrat votes in Maricopa County to help him win the state due to an algorithm programmed into the Dominion voting machines used there.[134]

Although Michigan does allow same-voter registration, voter turnout was still abnormally high.  Here again, the Dominion voting system has been implicated. To wit:

Cybersecurity executive and former NASA analyst, Russ Ramsland, testified that in Wayne County, Michigan, where Dominion Voting Systems equipment was used, 46 out of 47 precincts in the county displayed greater than a 96% voter turnout. 25 out of those precincts showed a 100% voter turnout.[135]

25

Wisconsin, which also allows same-day voter registration, also reported abnormally high voter turnout when compared to 2016 numbers. For example, Milwaukee reported a record 84% voter turnout during the 2020 presidential election versus 75% in 2016.[136] Of the city's 327 voting wards, 90 reported a turnout of greater than 90%.[137]

Statistically Improbable Vote Totals Based on Party Registration and Historical Patterns

The 2020 presidential election was characterized by strong partisan voting patterns consistent with historical patterns. As a rule, heavily Republican jurisdictions voted heavily for President Trump and heavily Democrat jurisdictions voted heavily for Joe Biden.

In some cases, however, there were instances where these partisan and historical patterns were violated. It is precisely in such instances where either outright fraud or machine inaccuracies or manipulations are most likely to be operative.

As one example of such statistically improbable vote totals, there are the results in Arizona's Fifth Congressional District. In one precinct in the suburb of Queen Creek, the vote percent for President Trump dropped dramatically relative to 2016, from 67.4 to 58.5 percent.[138] This was attributed to an "unusually high" number of duplicate ballots.[139]

Unusual Vote Surges

Several unusual vote surges took place in the very early hours of the morning of November 4th in Georgia, Michigan, and Wisconsin. An analysis conducted by the Voter Integrity Project of *The New York Times* publicly reported data on Election Day that showed several vote "spikes" that were unusually large in size with unusually high Biden-to-Trump ratios. Such spikes or surges could well indicate that fraudulent ballots had been counted.

In Georgia, for example, an update at 1:34 AM on November 4th showed 136,155 additional ballots cast for Joe Biden, and 29,115 additional votes cast for President Trump.[140] An update in Michigan at 3:50 AM on November 4th showed an update of 54,497 additional votes cast for Joe Biden, and 4,718 votes cast for President Trump.[141] And an update in Wisconsin at 3:42 AM on November 4th showed 143,379 additional ballots cast for Joe Biden, and 25,163 votes cast for President Trump.[142]

26

## IX. A State-By-State Analysis and Signal Failure of Our Legislative and Judicial Branches

*All happy families are alike; each unhappy family is unhappy in its own way.*

– *Anna Karenina, by Leo Tolstoy*

It should be clear at this point that all six battleground states suffer from most or all of the six dimensions of election irregularities documented in this report. However, like Tolstoy's unhappy families, it is also true that each battleground state is different in its own election irregularity way. That is, each battleground state may be characterized by a unique mix of issues that, impressionistically, might be considered "most important" in swinging that state for Joe Biden.

Consider Arizona, a state with the lowest alleged Biden victory margin at 10,457 votes. This is a state with statistically improbable high voter turnouts in Maricopa and Pima counties; widespread ballot mishandling; and 1.6 million mail-in ballots (which tended towards Biden) subjected to much lower standards of certification and ID verification than in-person voters (who tended towards Trump).

In Georgia, the alleged Biden victory margin was just 11,779 votes. What perhaps jumps out most in the Peach State is the illegal Consent Decree that effectively gutted the signature match requirements for millions of mail-in ballots. There is also the quite unresolved fake ballot manufacturing matter of the roughly 100,000 ballots that were mysteriously pulled, in the dead of night, out from underneath tables and expeditiously tabulated. Of course, we saw that Georgia's electoral version of a Three-card Monte sleight-of-hand led to a strong Biden vote surge.

Of all of the six battleground states which suffered from numerous observer and poll watcher abuses, Michigan must rank as "first among equals." With its "board up the windows" and "rough up the observers" tactics, Detroit in Wayne County was the center of this "see no evil" universe. When two local Republican officials tried to withhold certification of the votes in this county for practices such as these and demanded an audit, they were subject to extreme intimidation and "doxing" and quickly capitulated.[143]

As for Nevada, this is a state likewise with a very narrow alleged victory margin for Joe Biden – 33,596 votes. Here, voting machine irregularities associated with the Agilis machine have called into question as many as 130,000 votes. There may also be an unusually large number of ballots cast by out-of-state voters and others who did not meet residency requirements. Of course, the brazen bribery of Native Americans to vote for Joe Biden is a dark stain on the state and the Democrat Party.[144]

In Pennsylvania, an equally brazen Democrat Secretary of State issued illegal guidance for the acceptance of naked ballots and ignored direction from the Pennsylvania Supreme Court to fix the matter. She allowed ballots to be illegally cured in contravention of state law and pushed the legal envelope for accepting ballots after Election Day.

27

In the Keystone State, and as with Georgia's Three-card Monte, shuffle fake ballots out from underneath a table scandal, there is also the equally unresolved matter of possible fake ballot manufacturing. Recall, here, the testimony of a truck driver who swears he picked up as many as 100,000 fake manufactured ballots in New York and delivered them to Pennsylvania. Both the tractor-trailer and the ballots involved remain unaccounted for – and what might have been in this tractor-trailer were enough ballots alone to swing the election to Joe Biden.

Finally, in Wisconsin, the mother of all contestable process fouls is arguably that of the roughly 170,000 mail-in ballots entering the tabulation process under the guise of absentee ballots in clear violation of state law. That's more than eight times the number of ballots of the alleged Biden victory margin of 20,682 votes.

In Wisconsin, there is likewise the large-scale abuse associated with an overly expansive definition of "indefinitely confined voters." Recall here that the increment of new indefinitely confined voters in the 2020 election in Wisconsin was more than five times the alleged Biden victory margin.

****

While Democrat Party government officials cheated and gamed the electoral process across all six battleground states, many Republican government officials – from governors and state legislators to judges – did little or nothing to stand in their way.

Consider that the Republican Party controls *both* chambers of the State Legislatures in five of the six battleground states – Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin.[145] These State Legislatures clearly have both the power and the opportunity to investigate the six dimensions of election irregularities presented in this report. Yet, wilting under intense political pressure, these politicians have failed in their Constitutional duties and responsibilities to do so – and thereby failed both their states and this nation as well as their party.

The same can be said for the Republican governors in two of the six battleground states – Arizona and Georgia. Both Arizona's Doug Ducey and Georgia's Brian Kemp have cowered in their Governor's mansions and effectively sat on their hands while their states have wallowed in election irregularities.

The judicial branch of the American government should be the final backstop for the kind of issues examined in this report. Yet both our State courts and Federal courts, including the Supreme Court, have failed the American people in refusing to properly adjudicate the election irregularities that have come before them. Their failures likewise pose a great risk to the American Republic.

28

## Concluding Observations

From the findings of this report, it is possible to infer what may well have been a coordinated strategy to effectively stack the election deck against the Trump-Pence ticket. Indeed, the patterns of election irregularities observed in this report are so consistent across the six battleground states that they suggest a coordinated strategy to, if not steal the election, then to strategically game the election process in such a way as to unfairly tilt the playing field in favor of the Biden-Harris ticket.

A major part of this "stuff the ballot box" strategy has been aptly summarized in a complaint filed before the US Supreme Court by the State of Texas:

> *Using the COVID-19 pandemic as a justification, [Democrat] government officials [in Georgia, Michigan, Pennsylvania, and Wisconsin] usurped their legislatures' authority and unconstitutionally revised their state's election statutes. They accomplished these statutory revisions through executive fiat or friendly lawsuits, thereby weakening ballot integrity.[146]*

According to the Texas complaint – which the Supreme Court sadly refused to hear – the goal of this strategy was to flood the battleground states "with millions of ballots to be sent through the mails, or placed in drop boxes, with little or no chain of custody." At the same time, Democrat government officials also sought to "weaken the strongest security measures protecting the integrity of the vote signature verification and witness requirements."[147]

The findings of the assessment conducted in this report are consistent with the Texas complaint. Key takeaways include:

- The weight of evidence and patterns of irregularities uncovered in this report are such that it is irresponsible for anyone – especially the mainstream media – to claim that there is "no evidence" of fraud or irregularities.

- The ballots that have come into question because of the identified election irregularities are more than sufficient to swing the outcome in favor of President Trump should even a relatively small portion of these ballots be ruled illegal.

- While all six battleground states exhibit most, or all, six dimensions of election irregularities, each state has a unique mix of issues that might be considered "most important." To put this another way, all battleground states are characterized by the same or similar election irregularities; but, like Tolstoy's unhappy families, each battleground state is different in its own election irregularity way.

- This was theft by a thousand cuts across six dimensions and six battleground states rather than any one single "silver bullet" election irregularity.

29

- In refusing to investigate a growing number of legitimate grievances, the anti-Trump media and censoring social media are complicit in shielding the American public from the truth. This is a dangerous game that simultaneously undermines the credibility of the media and the stability of our political system and Republic.

- Those journalists, pundits, and political leaders now participating in what has become a Biden Whitewash should acknowledge the six dimensions of election irregularities and conduct the appropriate investigations to determine the truth about the 2020 election. If this is not done before Inauguration Day, we risk putting into power an illegitimate and illegal president lacking the support of a large segment of the American people.

- The failure to aggressively and fully investigate the six dimensions of election irregularities assessed in this report is a signal failure not just of our anti-Trump mainstream media and censoring social media but also of both our legislative and judicial branches.

  o Republican governors in Arizona and Georgia together with Republican majorities in both chambers of the State Legislatures of five of the six battleground states – Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin[148] – have had both the power and the opportunity to investigate the six dimensions of election irregularities presented in this report. Yet, wilting under intense political pressure, these politicians have failed in their Constitutional duties and responsibilities to do so – and thereby failed both their states and this nation as well as their party.

  o Both State courts and Federal courts, including the Supreme Court, have failed the American people in refusing to appropriately adjudicate the election irregularities that have come before them. Their failures pose a great risk to the American Republic.

- If these election irregularities are not fully investigated prior to Inauguration Day and thereby effectively allowed to stand, this nation runs the very real risk of never being able to have a fair presidential election again – with the down-ballot Senate races scheduled for January 5 in Georgia an initial test case of this looming risk.

30

## ENDNOTES

[1] All witnesses who have signed sworn affidavits or declarations who are referenced in this report but whose names are not referenced in the public record, e.g., a court case, are referred to as "Jane Doe" or "John Doe" based on gender. This has been done to ensure their safety and security.

[2] Ballotpedia, "Partisan composition of state legislatures," December 4, 2020. https://ballotpedia.org/Partisan_composition_of_state_legislatures

[3] Bump, Philip. "The two states that almost always predict which candidate is headed for defeat," *The Washington Post*, 7 September 2016. https://www.washingtonpost.com/news/the-fix/wp/2016/09/07/the-two-states-that-almost-always-predict-which-candidate-is-headed-for-defeat/

*The two Democrat candidate exceptions were John F. Kennedy in 1960 and Bill Clinton in 1992.

[4] Williams, Pete. "Trump's election fight includes over 50 lawsuits. It's not going well." *NBC News*, November 23, 2020. https://www.nbcnews.com/politics/2020-election/trump-s-election-fight-includes-over-30-lawsuits-it-s-n1248289

[5] All witnesses who have signed sworn affidavits and declarations referenced in this report are referred to as "Jane Doe" and "John Doe" based on gender, in order to ensure their safety and security.

[6] Bannon, Steve, *War Room Pandemic*, https://pandemic.warroom.org/

[7] Solomon, John, *Just the News*, https://justthenews.com/john-solomon

[8] Kassam, Raheem, *National Pulse*, https://americasvoice.news/the-national-pulse/

[9] *Newsmax*, https://www.newsmax.com/

[10] *One America News Network*, https://www.oann.com/

[11] "Most Say Mail-In Voting Worked, But 47% Say Fraud Likely." *Rasmussen Reports*, December 7, 2020. https://www.rasmussenreports.com/public_content/politics/elections/election_2020/most_say_mail_in_voting_worked_but_47_say_fraud_likely

[12] Legal Information Institute, "Bribery," *Cornell University*, https://www.law.cornell.edu/wex/bribery

[13] Bedard, Paul, "Pro-Biden effort offered Native Americans $25-$500 Visa gift cards and jewelry to vote," *Washington Examiner*, December 14, 2020. https://www.washingtonexaminer.com/washington-secrets/pro-biden-effort-offered-native-americans-25-500-visa-gift-cards-jewelry-to-vote

[14] Pentochoukov, Ivan, "Illegal Money-for-Votes Raffles Conducted in Several States in 2020 Election," *Epoch Times*, December 2, 2020. https://www.theepochtimes.com/illegal-money-for-votes-raffles-conducted-in-several-states-in-2020-election_3598915.html

[15] Morgan, Jessy. Testimony. "A truck driver with USPS says he was suspicious of his cargo load of 288,000 completed ballots." December 1, 2020. https://www.youtube.com/watch?v=R0xaA4dYsbQ

[16] Declaration of John Doe, Delaware County Pennsylvania, November 9, 2020.

[17] Bedard, Paul, "20 House Republicans demand Barr investigate 'suitcases' of ballots in Georgia," *The Washington Examiner*, December 4, 2020. https://www.washingtonexaminer.com/washington-secrets/20-house-gop-demand-ag-barr-investigate-suitcases-of-ballots-in-georgia

[18] "Trump Campaign lawyers present video 'evidence' of ballot fraud," *Senate Judiciary Subcommittee*, December 4, 2020. https://www.youtube.com/watch?v=LJ0xDWhWUxk

*Real American Politics,* December 4, 2020. https://twitter.com/RealAPolitics/status/1334754269052997635?s=20

[19] See, for example: Weber, Peter, "Georgia's top election investigator debunks a vote fraud conspiracy involving 'suitcases' of ballots, a urinal," December 7, 2020. https://news.yahoo.com/georgias-top-election-investigator-debunks-115236191.html

[20] In the United States District Court for the District of Arizona, *Tyler Bowyer et al v.. Doug Ducey*, December 2, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Bower-Complaint-AZ.pdf

[21] Affidavit of Jane Doe, Cobb County, Georgia, November 12, 2020.

[22] Declaration of Jane Doe, Bucks County, Pennsylvania, Nov 7, 2020

[23] *WisGOP*, "WisGOP: Trump lawsuit highlights indefinitely confined voter increase," https://www.wispolitics.com/2020/wisgop-trump-lawsuit-highlights-indefinitely-confined-voter-increase/

[24] *WisGOP*, "WisGOP: Some indefinitely confined voters are not indefinitely confined," https://www.wispolitics.com/2020/wisgop-some-indefinitely-confined-voters-are-not-indefinitely-confined/

[25] *WisGOP*, "WisGOP: Some indefinitely confined voters are not indefinitely confined," https://www.wispolitics.com/2020/wisgop-some-indefinitely-confined-voters-are-not-indefinitely-confined/

31

[26]   *WisGOP*,   "WisGOP:   Trump   lawsuit   highlights   indefinitely   confined   voter   increase,"
https://www.wispolitics.com/2020/wisgop-trump-lawsuit-highlights-indefinitely-confined-voter-increase/
[27]   Legal   Information   Institute,   "18   U.S.   Code   § 611.Voting   by   aliens,"
https://www.law.cornell.edu/uscode/text/18/611
[28]   The Superior Court Of Fulton County State Of Georgia,   *Trump v. Raffensperger,* December 4, 2020.
https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Trump-v.-Raffensperger.pdf
[29]   In   the   Superior   Court   of   Fulton   County   State   of   Georgia,   November   30,   2020.
https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/2020-11-30-Verified-Complaint.pdf
[30] Declaration of Jane Doe, Philadelphia County, Pennsylvania,  November 8, 2020.
[31] In the First Judicial District Court Carson City, Nevada *Jesse Law v. Judith Whitmer*,  November 17, 2020.
https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/nov-17-doc-2.pdf
[32] Declaration of John Doe, Las Vegas, Nevada, November 22, 2020.
[33]   "Rudy Giuliani claims 8,000 dead people voted in election in Pennsylvania," November 25, 2020.
https://www.youtube.com/watch?v=2_VUkB2jAcg
*See Also*
"Pennsylvania Senate Republican Lawmaker Hearing Transcript on 2020 Election," *Rev*, November 26, 2020.
https://www.rev.com/blog/transcripts/pennsylvania-senate-republican-lawmaker-hearing-transcript-on-2020-election
[34] Affidavit of Jane Doe, Oakland County, Michigan, November 11, 2020.
[35] Declaration of John Doe, Clark County, Nevada, November 7, 2020.
[36] In the Superior Court of Fulton County State of Georgia, *Paul Andrew Boland v Brad Raffensperger*, November
29,   2020.   https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/2020-11-30-Verified-
Complaint.pdf
[37] Statement of John Doe, Las Vegas, Nevada, November 20, 2020.
[38] Declaration of Jane Doe, Wisconsin, November 12, 2020.
[39] Affidavit of Jane Doe, Washtenaw County, Michigan, November 9, 2020.
[40] Declaration of Jane Doe, Northampton County, November 8, 2020.
[41] Declaration of John Doe, Philadelphia County, November 14, 2020.
[42] Declaration of Jane Doe, Northhampton County, Pennsylvania,  November 7, 2020.
[43] Affidavit of John Doe, Michigan, November 10, 2020.
[44] Declaration of Jane Doe, Clark County, November 8, 2020.
[45]   *Ballotpedia*,   "How   do   election   workers   match   signatures?   (2020),"
https://ballotpedia.org/How_do_election_workers_match_signatures%3F_(2020)
[46]Democratic Party of Georgia, Inc. ("DPG"), the DSCC, and the DCCC, Compromise Settlement and Release, March
6, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/07/GA-Settlement-1.pdf
[47]Petition for Writ of Madamus and Complaint for Declaratory and Injunctive Relief, "*Daniel Rodimer v. Joseph
Gloria,* November 19, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/Rodimer-v-
Gloria_A-20-825130-W_Writ-of-Mandamus.pdf
[48]  In the First Judicial District Court Carson City, Nevada *Jesse Law v. Judith Whitmer*, November 17, 2020.
https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/nov-17-doc-2.pdf
[49]  In the United States District Court Eastern District of Wisconsin Milwaukee Division, *Donald J. Trump v. the
Wisconsin   Elections   Commission*,   December   2,   2020.   https://www.democracydocket.com/wp-
content/uploads/sites/45/2020/12/Trump-v-WEC-EDWI.pdf
[50] *Ballotpedia,* "Pennsylvania Secretary of State," https://ballotpedia.org/Pennsylvania_Secretary_of_State
[51] The United States District Court for the Middle District of Pennsylvania, *Donald J. Trump for President et al v.
Kathy   Boockvar   et   al,*   November,   18   2020.
https://www.courtlistener.com/recap/gov.uscourts.pamd.127057/gov.uscourts.pamd.127057.169.0.pdf
[52] The United States District Court for the Middle District of Pennsylvania, *Donald J. Trump for President et al v.
Kathy   Boockvar   et   al,*   November,   18   2020.
https://www.courtlistener.com/recap/gov.uscourts.pamd.127057/gov.uscourts.pamd.127057.169.0.pdf
[53]   The   Elections   Assistance   Commission,   "Ballot   Building,"
https://www.eac.gov/sites/default/files/eac_assets/1/6/Chapter_5_Ballot_Building.pdf
[54] Harris, Bev, "About Chain of Custody," *Election Watch*, February 16, 2016. https://blackboxvoting.org/about-
chain-of-custody/
[55] Declaration of Jane Doe, Pennsylvania,  November 7, 2020. Northhampton County.
[56] Declaration of John Doe, Delaware County, Pennsylvania,  November 7, 2020. (3 Pictures, 2 Videos)

32

[57] In the Supreme Court of the United States, *The State of Texas v. Commonwealth of Pennsylvania, State of Georgia, State of Michigan, State of Wisconsin*, December 7, 2020. https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2020/Press/SCOTUSFiling.pdf

[58] Chaitin, Daniel, "Lindsey Graham: Possible ballot harvesting in Pennsylvania involving 25,000 nursing home residents," *Microsoft News*, November 10, 2020. https://www.msn.com/en-us/news/politics/lindsey-graham-possible-ballot-harvesting-in-pennsylvania-involving-25-000-nursing-home-residents/ar-BB1aR3R4

[59] Affidavit of Jane Doe, Brookfield, Wisconsin, November 10, 2020.

[60] Declaration of John Doe, Brown County, November 11, 2020.

[61] Greenberg, Jay, "Dominion Technician Exposed as Anti-Trump Ex-Kamala Harris Worker," December 1, 2020. https://neonnettle.com/news/13425-dominion-technician-exposed-as-anti-trump-ex-kamala-harris-worker

[62] Declaration of Jane Doe, Waukesha County, Wisconsin, November 11, 2020.

[63] " 'USPS contractor: "Something profoundly wrong occurred in Wisconsin during the presidential election' " December 1, 2020. https://www.youtube.com/watch?v=hRUvP6cbtZk&feature=youtu.be&t=69

*See also*

Van Brugen, Isabel, "Wisconsin USPS Subcontractor Alleges Backdating of Tens of Thousands of Mail-In Ballots," December 2, 2020. https://www.theepochtimes.com/wisconsin-usps-subcontractor-alleges-backdating-of-tens-of-thousands-of-mail-in-ballots_3601580.html

[64] State of Michigan Judicial District, *Cheryl A. Constantino and David A. Kallman v. City of Detroit,* November 8, 2020. https://assets.documentcloud.org/documents/20403147/wayne-county-michigan-election-fraud-lawsuit.pdf

[65] Affidavit of Jane Doe, Oakland County, Michigan November 10, 2020.

[66] Declaration of John Doe, Cobb County, Georgia, November 5, 2020.

[67] Affidavit John Doe, Eagle County, Colorado November 12, 2020.

[68] The Declaration of John McBlain, Esquire. *See*, The Supreme Court of the United States, *State of Texas v. Commonwealth of Pennsylvania, State of Georgia, State of Michigan, and State of Wisconsin,* December 7, 2020. https://www.supremecourt.gov/DocketPDF/22/22O155/163048/20201208132827887_TX-v-State-ExpedMot%202020-12-07%20FINAL.pdf

[69] Affidavit of Jane Doe, Gwinnett County, Georgia, November 12, 2020.

[70] Affidavit John Doe, Waukesha County, Wisconsin, November 10, 2020.

[71] Affidavit of Jane Doe, Clark County, Nevada, November 10, 2020.

[72] The Declaration of John McBlain, Esquire. *See*, The Supreme Court of the United States, *State of Texas v. Commonwealth of Pennsylvania, State of Georgia, State of Michigan, and State of Wisconsin,* December 7, 2020. https://www.supremecourt.gov/DocketPDF/22/22O155/163048/20201208132827887_TX-v-State-ExpedMot%202020-12-07%20FINAL.pdf

[73] Affidavit of John Doe, November 10, 2020, Waukesha County, Wisconsin.

[74] The Declaration of John McBlain, Esquire. *See*, The Supreme Court of the United States, *State of Texas v. Commonwealth of Pennsylvania, State of Georgia, State of Michigan, and State of Wisconsin,* December 7, 2020. https://www.supremecourt.gov/DocketPDF/22/22O155/163048/20201208132827887_TX-v-State-ExpedMot%202020-12-07%20FINAL.pdf

[75] The Superior Court Of Fulton County State Of Georgia, *Trump v. Raffensperger,* December 4, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Trump-v.-Raffensperger.pdf

[76] Liptak, Adam, "Supreme Court Allows Longer Deadline for Absentee Ballots in Pennsylvania and North Carolina," *New York Times*, October 28, 2020. https://www.nytimes.com/2020/10/28/us/supreme-court-pennsylvania-north-carolina-absentee-ballots.html

[77] Southwick, Ron, "Pa. received 10,000 ballots after polls closed on Election Day," *PennLive*, Nov 10, 2020. https://www.pennlive.com/elections/2020/11/pa-received-10000-late-ballots-that-arrived-after-polls-closed-on-election-day.html

[78] Declaration of Jane Doe, Delaware County, Pennsylvania, November 7, 2020.

[79] The Supreme Court of Wisconsin, "Donald J. Trump et al v. Anthony Evers et al" December 1, 2020. https://cdn.donaldjtrump.com/public-files/press_assets/wisconsin-filing-12-1-20_compressed.pdf

[80] Declaration of Jane Doe, Oak Creek, Wisconsin, November 11, 2020.

[81] The Superior Court Of Fulton County State Of Georgia, *Trump v. Raffensperger,* December 4, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Trump-v.-Raffensperger.pdf

[82] Declaration of John Doe, Montgomery County, Pennsylvania, November 7, 2020.

[83] Declaration of John Doe, Allegheny County, Pennsylvania, November 9, 2020.

[84] Declaration of John Doe, Ingham County, Michigan, November 11, 2020.

[85] Declaration of Jane Doe, Ingham County, Michigan, November 11, 2020.

33

86 Declaration of Jane Doe, Wheaton, Illinois, November 9, 2020.
87 "Cure period of absentee and mail-in ballots," *Ballotpedia*, Accessed on December 14, 20. https://ballotpedia.org/Cure_period_for_absentee_and_mail_in_ballots
88 "Cure period of absentee and mail-in ballots," *Ballotpedia*, Accessed on December 14, 20. https://ballotpedia.org/Cure_period_for_absentee_and_mail_in_ballots
89 Declaration of Jane Doe, Centre County, Pennsylvania, November 11, 2020.
90 The United States District Court for the Middle District of Pennsylvania, *Donald J. Trump for President et al v. Kathy Boockvar et al,* November 18, 2020. https://www.courtlistener.com/recap/gov.uscourts.pamd.127057/gov.uscourts.pamd.127057.169.0.pdf
91 The United States District Court for the Middle District of Pennsylvania, *Donald J. Trump for President et al v. Kathy Boockvar et al,* November 18, 2020. https://www.courtlistener.com/recap/gov.uscourts.pamd.127057/gov.uscourts.pamd.127057.169.0.pdf
92 Declaration of Bartholomew W. and Jean B. W., Milwaukee County, Wisconsin, November 16, 2020. *See Also* https://www.jsonline.com/story/news/2020/11/11/fact-check-republicans-claim-wisconsin-clerks-illegally-altered-ballots/6234023002/
93 Declaration of John Doe, Delaware County Pennsylvania, November 9, 2020.
94 State of Michigan Court of Appeals, "*Donald J. Trump for President et. al v. Jocelyn Benson,*" November 30, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/Trump-brief-FINAL.pdf
95 Affidavit of Jane Doe, Washtenaw County, Michigan, November 9, 2020.
96 Cornell University, "Equal Protection," *Legal Information Institute*, https://www.law.cornell.edu/wex/equal_protection
97 Lai, Jonathan et al, " Joe Biden won 3 of every 4 mail ballots in Pennsylvania. Trump won 2 of 3 votes cast in person. What does that mean for the future?" *The Philadelphia Inquirer*, https://www.inquirer.com/politics/election/mail-ballots-pennsylvania-election-trump-biden-20201119.html
98 Declaration of John Doe, County of Milwaukee, Wisconsin, November 11, 2020
99 Blair County, Berks County, Lancaster County, Carbon County, Clinton County, Lycoming County, Dauphin County, and Perry County.
100 *Joseph D. Hamm v. Kathy Boockvar*, Commonwealth Court of Pennsylvania, November 3, 2020. http://www.pacourts.us/assets/files/setting-7723/file-10362.pdf?cb=f327ff
101 Secretary of State of Arizona, "Voters have a limited amount of time to correct certain ballot issues," November 9, 2020. https://azsos.gov/about-office/media-center/press-releases/1248
102 In the United States District Court for the District of Arizona, *Tyler Bowyer et al v.. Doug Ducey*, December 2, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Bower-Complaint-AZ.pdf
103 *National Conference of State Legislatures*, "Poll Watchers and Challengers," October 1, 2020. https://www.ncsl.org/research/elections-and-campaigns/poll-watcher-qualifications.aspx
104 *National Conference of State Legislatures*, "Poll Watchers and Challengers," October 1, 2020. https://www.ncsl.org/research/elections-and-campaigns/poll-watcher-qualifications.aspx
105 Affidavit of Jane Doe, Rockdale County, Georgia, November 2020.
106 Declaration of John Doe, Philadelphia, Pennsylvania, November 8, 2020.
107 Affidavit of Jane Doe, Brookfield, Wisconsin, November 10, 2020.
108 *Ballotpedia*, "Voting Equipment and Methods by State," https://ballotpedia.org/Voting_methods_and_equipment_by_state
109 *Ballotpedia*, "Voting Equipment and Methods by State," https://ballotpedia.org/Voting_methods_and_equipment_by_state
110 *Dominion Voting Systems*, "About," https://www.dominionvoting.com/about/
111 Varrona, Frank "2020 Stolen Election by Dominion Voter Systems – Hammer & Scorecard," Conservative Business Journal, https://www.conservativebusinessjournal.com/2020-stolen-election-hammer-and-scorecard/
112 *Clinton Foundation*, "The Delian Project," https://www.clintonfoundation.org/clinton-global-initiative/commitments/delian-project-democracy-through-technology
113 For example, the Chairman of Smartmatic, Mark Malloch-Brown, is on the board of George Soros' Open Society Foundation. *Open Society Foundation*, "Leadership," https://www.opensocietyfoundations.org/who-we-are/leadership/mark-malloch-brown
114 The First Judicial Court in Carson City, Nevada, "*Jesse Law et al v. Judith Whitmer et al,*" November 17, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/nov-17-doc-2.pdf
115 The First Judicial Court in Carson City, Nevada, "*Jesse Law et al v. Judith Whitmer et al,*" November 17, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/nov-17-doc-2.pdf

34

[116] "In violation of Nevada law, the Clark County Election Department allows the Agilis machine to solely verify 30% of the signatures accompanying the mail-in ballots without ever having humanize inspect those signatures."

[117] In the Superior Court of Arizona in and For the County of Maricopa, "*Kelli Ward v. Constance Jackson et al*," November 24, 2020. https://assets.documentcloud.org/documents/20417265/ward-v-jackson-complaint-and-petition-for-discovery.pdf

[118] In the Superior Court of Arizona in and For the County of Maricopa, "*Kelli Ward v. Constance Jackson et al*," November 24, 2020. https://assets.documentcloud.org/documents/20417265/ward-v-jackson-complaint-and-petition-for-discovery.pdf

[119]    Affidavit    of    John    Doe,    Dallas    County,    Texas.    November    17,    2020. https://www.courtlistener.com/recap/gov.uscourts.gand.283580/gov.uscourts.gand.283580.7.1_2.pdf

[120] Ramsland Jr., Russell. "Antrim Michigan Forensics Report." *William Bailey v. Antrim County, Michigan*, December    13,    2020. https://depernolaw.com/uploads/2/7/0/2/27029178/antrim_michigan_forensics_report_[121320]_v2_[redacted].pdf

[121] "Excerpts from the 2002 FEC Voting System Standards – 3.2.1 Accuracy Requirements." *Michigan Secretary of State*. https://www.michigan.gov/sos/0,4670,7-127-1583-130621--,00.html

[122]    "Document    Retention    Schedule."    *Michigan    Bureau    of    Elections*,    May    2019. https://www.michigan.gov/documents/sos/Document_Retention_Schedule_412493_7.pdf

[123] Sperry, Paul. "Georgia voting irregularities: The curious case of Biden's 20,000-vote surge." *The Citizen*, November    15,2020.    https://thecitizen.com/2020/11/15/georgia-voting-irregularities-the-curious-case-of-bidens-20000-vote-surge/

[124] Parks, Miles, "Why Some Mail-In Ballots Are Rejected As Invalid," *NPR*, October 4, 2020. https://www.npr.org/2020/10/04/920175418/why-some-mail-in-ballots-are-rejected-as-invalid

[125] Livingston, Doug, "Why absentee ballots get rejected, and how to make yours count," *USA Today*, September 21, 2020. https://www.beaconjournal.com/story/news/2020/09/21/why-absentee-ballots-rejected-presidential-and-other-elections/3486553001/

[126] Livingston, Doug, "Why absentee ballots get rejected, and how to make yours count," *USA Today*, September 21, 2020. https://www.beaconjournal.com/story/news/2020/09/21/why-absentee-ballots-rejected-presidential-and-other-elections/3486553001/

[127] Election Assistance Commission, "The Election Administration and Voting Survey; A Report to the United States Congress," 2016. https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

[128]    *Ballotpedia,*    "Election    results,    2020:    Analysis    of    rejected    ballots,"    December    11,    2020. https://ballotpedia.org/Election_results,_2020:_Analysis_of_rejected_ballots

*See Also*

*Office of Nevada Secretary of State Barbara K. Cegavske*, "2020 General Election Turnout Mail Ballot Information," https://www.nvsos.gov/sos/home/showdocument?id=9058

[129] Election Assistance Commission, "The Election Administration and Voting Survey; A Report to the United States Congress," 2016. https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

[130]    *Ballotpedia*,    "Election    results,    2020:    Analysis    of    rejected    ballots,"    December    11,    2020. https://ballotpedia.org/Election_results,_2020:_Analysis_of_rejected_ballots

*See Also*

*U.S.    Elections    Project*,    "Pennsylvania    Early    Voting    Statistics,"    November    20,    2020. https://electproject.github.io/Early-Vote-2020G/PA.html

[131] Election Assistance Commission, "The Election Administration and Voting Survey; A Report to the United States Congress," 2016. https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

[132] The Superior Court Of Fulton County State Of Georgia,    *Trump v. Raffensperger*, December 4, 2020. https://www.democracydocket.com/wp-content/uploads/sites/45/2020/12/Trump-v.-Raffensperger.pdf

[133]    For    example,    in    Pennsylvania,    3    out    of    every    4    absentee/mail-in    ballots    went    to    Joe    Biden https://www.inquirer.com/politics/election/mail-ballots-pennsylvania-election-trump-biden-20201119.html

And in Milwaukee, Wisconsin, 84% of absentee/mail-in ballots went to Joe Biden https://www.tmj4.com/news/election-2020/no-joe-biden-did-not-get-100-percent-of-all-milwaukee-absentee-ballots

[134] Heine, Debra,"Mathematician Says Biden May Have Received 130 Percent of the Democrat Vote in Maricopa County, Arizona," December 2, 2020. https://themichiganstar.com/2020/12/02/mathematician-says-biden-may-have-received-130-percent-of-the-democrat-vote-in-maricopa-county-arizona/

[135]    Affidavit    of    Russel    R.,    Dallas    County,    Texas.    November    17,    2020. https://www.courtlistener.com/recap/gov.uscourts.gand.283580/gov.uscourts.gand.283580.7.1_2.pdf

35

136 *Milwaukee City Wire News Service*,"Analysis: Five Milwaukee wards report 89% turnout in 2020 presidential vote; Biden nets 146K votes in city," November 4, 2020. https://mkecitywire.com/stories/564495243-analysis-seven-milwaukee-wards-report-more-2020-presidential-votes-than-registered-voters-biden-nets-146k-votes-in-city

137 *Milwaukee City Wire News Service*,"Analysis: Five Milwaukee wards report 89% turnout in 2020 presidential vote; Biden nets 146K votes in city," November 4, 2020. https://mkecitywire.com/stories/564495243-analysis-seven-milwaukee-wards-report-more-2020-presidential-votes-than-registered-voters-biden-nets-146k-votes-in-city

138 Duda, Jeremy. "GOP lawsuit questions 'duplicate' ballots in Queen Creek," *San Tan Valley Sentinel*, November 27, 2020. https://www.pinalcentral.com/san_tan_valley_sentinel/local_news/gop-lawsuit-questions-duplicate-ballots-in-queen-creek/article_ee9557d0-97e4-53e9-a269-5beb4b64370a.html

139 In the Superior Court of Arizona in and For the County of Maricopa, *Kelli Ward v. Constance Jackson et al*, November 24, 2020. https://assets.documentcloud.org/documents/20417265/ward-v-jackson-complaint-and-petition-for-discovery.pdf

140 *Voter Integrity Project*, "Anomalies in Vote Counts and Their Effects on Election 2020," November 24, 2020. https://votepatternanalysis.substack.com/p/voting-anomalies-2020

141 *Voter Integrity Project*, "Anomalies in Vote Counts and Their Effects on Election 2020," November 24, 2020. https://votepatternanalysis.substack.com/p/voting-anomalies-2020

142 *Voter Integrity Project*, "Anomalies in Vote Counts and Their Effects on Election 2020," November 24, 2020. https://votepatternanalysis.substack.com/p/voting-anomalies-2020

143 *News Now*, "Michigan Republican Electors Harassed And Forced To Change Vote," November 18, 2020. https://www.youtube.com/watch?v=YW1YzQY_1Ro

Dowling, M. "Michigan's largest county refuses to certify the election – Update, evil wins," *Independent Sentinel*, November 17, 2020. https://www.independentsentinel.com/michigans-largest-county-refuses-to-certify-the-election/ *See Also*

*Institute for Political Economy,* "Wayne County Michigan Withdraws Election Certification, Security Expert Concludes Michigan Was Stolen." https://www.newsbreak.com/news/2105758771365/wayne-county-michigan-withdraws-election-certification-security-expert-concludes-michigan-was-stolen

144 Pentchoukov, Ivan, "Illegal Money-For-Votes Raffles Conducted in Several States in 2020 Election," December 1, 2020. https://www.theepochtimes.com/illegal-money-for-votes-raffles-conducted-in-several-states-in-2020-election_3598915.html

145 Ballotpedia, "Partisan composition of state legislatures," December 4, 2020. https://ballotpedia.org/Partisan_composition_of_state_legislatures

146 *State of Texas v. The Commonwealth of Pennsylvania, State of Georgia, State of Michigan, State of Wisconsin*, "Motion for Leave to File Bill of Complaint," December 7, 2020. https://www.supremecourt.gov/DocketPDF/22/22O155/162953/20201207234611533_TX-v-State-Motion-2020-12-07%20FINAL.pdf pg. 1

147 *State of Texas v. The Commonwealth of Pennsylvania, State of Georgia, State of Michigan, State of Wisconsin*, "Motion for Leave to File Bill of Complaint," December 7, 2020. https://www.supremecourt.gov/DocketPDF/22/22O155/162953/20201207234611533_TX-v-State-Motion-2020-12-07%20FINAL.pdf pg. 1

148 Ballotpedia, "Partisan composition of state legislatures," December 4, 2020. https://ballotpedia.org/Partisan_composition_of_state_legislatures

36




Exhibit 11

# The Legitimacy and Effect
## of
## Private Funding
## in
## Federal and State Electoral Processes

Prepared for:

Phill Kline
Thomas More Society
309 West Washington Street,
Suite 1250
Chicago, IL 60606



*"Complex Problems Solved Well"*

Principal Author:

J.R. Carlson

Stillwater Technical Solutions
PO Box 93
Garden City, KS 67846
jcarlson@stillwateroffice.net

December 14, 2020

# Executive Summary

The 2020 presidential election witnessed an unprecedented and coordinated public-private partnership to improperly influence the 2020 presidential election on behalf of one particular candidate and party.

Funded by hundreds of millions of dollars from Facebook founder Mark Zuckerberg and other high-tech interests, activist organizations created a two-tiered election system that treated voters differently depending on whether they lived in Democrat or Republican strongholds.

Private monies dictated city and county election management contrary to both federal law and state election plans endorsed and developed by state legislatures with authority granted by the United States Constitution.

Moreover, executive officials in swing states facilitated, through unique and novel contracts, the sharing of private and sensitive information about citizens within those states with private interests, some whom actively promote leftist candidates and agendas.

This data sharing allowed direct access to data of unique political value to leftist causes, and created new vulnerabilities for digital manipulation of state electronic poll books and counting systems and machines.

This public-private partnership in these swing states effectively placed government's thumb on the scale to help these private interests achieve their objectives and to benefit the candidates of one political party.

The Amistad Project began monitoring these activities beginning in the spring of 2019, originally focusing on the digital vulnerabilities of state election systems.

Amistad became aware that states and local election officials failed to maintain the legal right to access computer logs on the machines

counting ballots. The first step to engage any computer forensic examination is to gain access to machine logs, yet scores of election officials failed to maintain the right to even review such information, much less establish a method for bipartisan review.

In effect, America purchased a complex ballot box (computer) into which its votes would be deposited, but didn't have the right to open the box and review the count.

As COVID escalated in March of 2020, The Amistad Project began witnessing troubling efforts to undermine the integrity of the 2020 by assaulting laws designed to protect the integrity of the absentee ballot.

The use of absentee ballots is uniquely vulnerable to fraud, as detailed in a special bipartisan congressional report authored by former President Jimmy Carter and James Baker.

In-person voting occurs with trained election officials present. These officials deter voter intimidation and coercion and are trained to educate, not mislead, the voter when completing the ballot. Moreover, in-person voting allows for voter identification. When the ballot leaves government controls, new challenges are present. There are few identity checks and no assurance the ballot was completed without intimidation, coercion, inducement, or by a person other than the voter.

Accordingly, states have basic, common-sense laws protecting the integrity of the absentee, advance, or mailed ballot.

Beginning in the spring of 2020, left-leaning organizations filed a massive number of lawsuits to challenge these integrity laws. Lawsuits sought to set aside witness requirements, identification requirements, deadlines, delivery requirements, ballot deadlines, signature requirements, application requirements, and even argued that the Constitution required all returned ballot envelopes be postage prepaid due to COVID.

Swing state governors also started issuing emergency executive orders shutting down in-person voting while pouring new state resources into encouraging persons to vote in advance.

Polling data revealed this coordinated assault on in-person voting generally favored Democrat Party voters who preferred to vote in advance, while placing Republicans, who preferred to vote in person, at a disadvantage.

These actions represent the beginning of the formation of a two-tier election system favoring one demographic while disadvantaging another demographic.

Also in March 2020, David Plouffe, former campaign manager for President Barak Obama, published his book entitled *A Citizen's Guide to Defeating Donald Trump.* At the time, Plouffe was working for the charitable initiative of Mark Zuckerberg and his wife Priscilla Chan.

On page 81 of his book, Plouffe correctly identifies that the 2020 general election will come down to a "block by block street fight" to turn out the vote in the urban core, a key stronghold of Democrat Party votes. Plouffe specifically highlighted high turnouts in Milwaukee, Detroit, and Philadelphia as the key to a Democrat victory.

Soon after, we witnessed the rumblings of a previously sleepy 501(c)(3) organization entitled the Center for Tech and Civic Life (CTCL) whose previous annual revenues never exceeded $1.2 million.

CTCL began sending agents into states to recruit certain Democrat strongholds to prepare grants requesting monies from CTCL.

For example, CTCL inked a $100,000 grant to the Mayor of Racine, WI in May of 2020 directing the Mayor to recruit four other cities (Green Bay, Kenosha, Madison, and Milwaukee) to develop a joint grant request of CTCL. This effort results in these cities submitting a "Wisconsin Safe Election Plan" on June 15, 2020 to CTCL and, in turn,

receiving $6.3 million to implement the plan. This privatization of elections undermines the Help America Vote Act (HAVA), which requires state election plans to be submitted to federal officials and approved and requires respect for equal protection by making all resources available equally to all voters.

The provision of Zuckerberg-CTCL funds allowed these Democrat strongholds to spend roughly $47 per voter, compared to $4 to $7 per voter in traditionally Republican areas of the state.

Moreover, this recruiting of targeted jurisdictions for specific government action and funding runs contrary to legislative election plans and invites government to play favorites in the election process.

The "Wisconsin Safe Election Plan" was not authored by the state, and considered state election integrity laws as obstacles and nuisances to be ignored or circumvented. Moreover, CTCL retained the right, in the grant document, to, in its sole discretion, order all funds returned if the grantee cities did not conduct the election consistent with CTCL dictates.

Effectively, CTCL managed the election in these five cities. And this plan violated state law in, at least, the following fashion:

1) The plan circumvented voter identification requirements for absentee ballots by attempting to classify all voters as "indefinitely confined" due to COVID and later, after Wisconsin Supreme Court criticism, by ordering election clerks to not question such claims.
2) The plan initiated the use of drop boxes for ballot collection, significantly breaching the chain of custody of the ballot and failing to maintain proper logs and reviews to ensure all properly cast ballots were counted and all improperly cast ballots were not counted.
3) Initiated the consolidation of counting centers, justifying the flow of hundreds of thousands of ballots to one location and the marginalization of Republican poll watchers such that bipartisan

participation in the management, handling, and counting of the ballots was compromised.

These are but examples of radical changes in election processes that opened the door for significant fraud.

The disparate impact of Zuckerberg funding is also present in the analysis of CTCL funding in Pennsylvania. Documents obtained through court order revealed communication between the City of Philadelphia and CTCL emphasizing that CTCL paid election judges in Philadelphia and other election officials. CTCL mandated Philadelphia to increase its polling locations and to use drop boxes and eventually mobile pick-up units. Moreover, Zuckerberg monies allowed Philadelphia to "cure" absentee ballots in a manner not provided for in Republican areas of the state.

In Democrat Delaware County, Pennsylvania, one drop box was placed every four square miles and for every 4,000 voters. In the 59 counties carried by Trump in 2016, there was one drop box for every 1,100 square miles and every 72,000 voters. Government encouraging a targeted demographic to turn out the vote is the opposite side of the same coin as government targeting a demographic to suppress the vote.

This two-tiered election system allowed voters in Democrat strongholds to stroll down the street to vote while voters in Republican strongholds had to go on the equivalent of a "where's Waldo" hunt.

These irregularities existed wherever Zuckerberg's money was granted to local election officials. In effect, Mark Zuckerberg was invited into the counting room, and the American people were kicked out.

Additionally, Amistad became alarmed at the new vulnerabilities created in our election system with "data sharing agreements" that gave left-leaning third-party organizations front door access to electronic poll books.

Rock the Vote and other organizations inked agreements with blue state election officials to enter new registrations into state poll books. Such agreements are unprecedented and unwise.

Previously, voter registrations were entered solely by election clerks, who have three important checks on their authority. These checks are: 1) they must be transparent subject to FOIA and open records laws; 2) they are geographically limited rendering audits manageable; and 3) they are politically accountable. No such checks apply to Rock the Vote.

Allowing such access creates new digital vulnerabilities easily allowing nefarious actors to access poll books and alter entries.

The Amistad Project's concerns were amplified by the nature of a contract offered by Michigan's health director to a subsidiary of NGP VAN, a Democrat fundraiser and data services company.

Michigan granted the COVID tracing contract to Michigan VAN as a subsidiary of NGP VAN.  The contract allowed this leftist organization to demand sensitive information from Michigan citizens at the threat of arrest. Citizens could be ordered to turn over medical records, travel information, the names of associates and friends, and other information with a significant privacy interest and of significant monetary value to a political fundraiser.

Emails later obtained through FOIA requests demonstrate Governor Whitmer's political director was involved in suggesting to the health department that they not directly contract with NGP VAN because of possible political fallout.  Governor Whitmer's staffer recommended NGP VAN create a Michigan subsidiary and that the subsidiary become a subcontractor so as to conceal NGP VAN's involvement. When this information became public, Whitmer claimed she was unaware of the agreement and faced with public pressure, she rescinded the contract.

At this time, The Amistad Project decided to retain the services of Stillwater and Mr. Carlson to develop this report. Stillwater has and will

continue to play a critical role in The Amistad Project's understanding of the privatization of the 2020 election.

Stillwater has engaged in extensive research of law, procedures, city documents, and public documents to reveal the workings of these private interests directing the 2020 election.

This report reveals those relationships and the method in which public officials partnered with private interests to improperly influence the 2020 election.

Managing elections is a core government function that cannot be trusted to private interests. We must not privatize our elections. Such privatization threatens democracy, silences the voice of the electorate, and undermines election integrity. These concerns should transcend party affiliation and this threat requires a bipartisan response. We will continue to expose these issues so our nation may adequately respond to this threat to the election process.


-- Phill Kline, Director of the Amistad Project of the Thomas More Society

# AUTHORS PREFACE

Using the COVID-19 flu pandemic as justification and the excuse that local elections lacked funding to facilitate safe elections, a well-funded network of foundations and non-profit organizations gave hundreds of millions of dollars of private funding directly to counties and municipalities across Michigan, Wisconsin, and Pennsylvania for electoral purposes.

The illegitimate infusion of private funding and third-party promotion of training, equipment, security, staffing and reporting programs by a network of private nonprofits at the local level bypassed state administrative processes, violated legislative prerogatives codified in state Help America Vote Plans (HAVA), and resulted in questions about the integrity of the US electoral system.

This report places in context and raises substantive questions about last minute gifting of private funding by five progressive, non-profit foundations and ten non-profit organizations into the local elections of swing states.

We begin by documenting longstanding federal and state authorities through which elections are to be funded and administered, factually demonstrating the adequacy and availability of public funding for the 2020 general election.

Because the availability of adequate public funding severely contrasted the narrative by the Center for Technology and Civic Life (CTCL) that private monies were needed for safe administration of public elections, we explored the background of CTCL and discovered a deep and integrated apparatus of progressive foundations and affiliated non-profits whose mission is to transition the bottom-up, electoral system of the United States to a top down, electronic system that centralizes voter information, interfaces with state registration databases, and promotes advocacy, all of which could, over time, have the capacity to exert strong local influence on the electoral processes of the United States.

It is not difficult for even the most casual of observers to conclude that the presence of private funding in public elections simply is not a good idea. In fact, the use of public/private partnerships for elections is neither wise nor legal, and if allowed to continue unchecked will create a dependency of local governments on funding from a select group of people who can afford to promote their own causes.

Our particular concern lies not with the influence of foundations and their cooperating non-profits, but instead with the elected officials who accessed the funding and Secretaries of State who understood - even enabled - the influence of non-profits to take place within their states.

We leave it to the readers of this report and those in authority to investigate our findings, buttress the existing electoral system, or take the necessary actions to ensure electoral processes are truly safe and secure.

# Table of Contents

**1.0 BACKGROUND** ........................................................................1

    1.1 *Introduction; Situation Appraisal* ................................... 1

    1.2 *State Electoral Authority; The Help America Vote Act* ................................. 1

    1.3 *Supplementary Funding for Administration of 2020 General Election*......... 2

    1.4 *The Structure and Role of Non-Profits in Affecting Elections* .....................3

**2.0 STATEMENT OF ISSUES** .......................................................4

    2.1 *Focus Topics* ................................................................4

**3.0 CONFLICT ANALYSIS** ...........................................................7

**4.0 CONCLUDING REMARKS** ...................................................16

## Tables

Table of Private Non-profit Associations in Elections - Policy......................................... 5

Table of Private Non-profit Associations in Elections - Advocacy.................................... 6

HAVA and CARES Funding Plus State Matching Funds for 2020 Elections .................. 9

Estimated CARES Act Expenditures 20 Days Post Primary Election .............................. 9

Government Funding and CTCL Grant Funding................................................................. 9

## ATTACHMENTS

ATTACHMENT A:   Flowchart: The Relationship of Foundations and Non-profit Organizations Involved in US Electoral Policy

ATTACHMENT B:   Charts, Graphs, and Tables

# 1.0 BACKGROUND

*1.1 Situation Appraisal -*

Disruption of the 2020 US general election can be traced to infusion of private funding from non-profit foundations and organizations to local counties and municipalities of swing states. The injection of **hundreds of millions of dollars** in early summer of 2020 violated legislatively adopted regulatory plans, bypassed adequately funded state electoral programs, and resulted in an unbalanced distribution of funding among precincts.

The early infusion of funding and non-profit advisory services, when combined with errant directives from senior state electoral officials, confused and encouraged county officials into appointing untrained personal, installing unapproved ballot processing equipment, illegitimately relocating precincts or ballot boxes, or otherwise making decisions that had a disparate influence on specific voting blocs of swing states. Ultimately, infusion of private funding brought about a nationwide level of confusion that has resulted in lawsuits that has led to a loss of confidence in the US electoral system.

This report explores the legitimacy, legality, and wisdom of blending the governmental administration of elections with the influence brought about by embracing private/public partnership through grants into elections. Historically, public officials have been skeptical of lowering the bright line distinction between the public and private sectors - and the example of disruption caused by private funding into Michigan, Wisconsin, and Pennsylvania during the 2020 elections demonstrates why.

Having demonstrated the adequacy of existing federal appropriations and the soundness of the existing electoral framework, we then explore the background, structure, and mission of a foundation/non-profit apparatus whose mission is to erode confidence in US electoral processes, blend government and private sector functions, and gain access to state-by-state voter information.

Following a review of the adequacy of public funding and the structure and intent of non-profits and foundations to access state databases and influence elections, we then present data to demonstrate that the infusion of private funding in the 2020 election cycle had a disparate and political end – to increase the total number of votes in select Democrat leaning precincts.

*1.2 State Electoral Authority; The Help America Vote Act -*

The authority to administer state and federal elections is the sole prerogative of the Michigan, Wisconsin, Pennsylvania, and other state legislatures.[1] These state legislatures maintain authority to enact statutes, make fiscal appropriations, and delegate responsibility to executive electoral commissions - who in turn are responsible for the integrity, security, and administration of elections throughout the state.

---

[1]   U.S. Const. Art. I, § 4

State electoral commissions who receive Help America Vote Act HAVA funding enact policies, support county and municipal officials in their individual precincts, and have a responsibility to administer policy in accordance with the HAVA and Elections Assistance Commission (EAC) mandates and standards. The mechanism for ensuring electoral policy administration at the state and county level is the legislatively appointed state HAVA implementation plan. The states of Michigan,[2] Wisconsin,[3] and Pennsylvania[4] all have a longstanding regulatory system based upon certified HAVA Plans that govern elections and implement electoral policies.  For their part, counties and municipalities who receive HAVA funding are required to maintain HAVA compliance agreements with their respective state.

The state HAVA implementation plans contain specific requirements and protocols for: 1) ensuring the security and integrity of voter information systems; 2) effecting voter communication; 3) recruiting and training poll workers; 4) enacting plans to improve voter access; and 5) auditing and reporting under HAVA funding programs.[5,6]

Preparation and revision of State HAVA implementation plans are subject to the Administrative Procedure Act (APA) of the individual states. State APA procedures impose public notification, opportunities for public comment, and other protective, procedural constraints on electoral commissions before HAVA implementation plans may legitimately be enacted or substantively modified. Promoting or undertaking activities outside the HAVA system bypasses state APA procedures and violates state APA requirements.

### 1.3 Supplementary Funding for Administration of 2020 General Election -

On March 27, 2020, the Congress enacted the Coronavirus Aid Relief and Economic Security (CARES) Act[7,8] which appropriated an additional $400 million dollars to the EAC for dissemination to the states:

> "*to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle.*"

The CARES Act requires state agencies to coordinate with the Pandemic Response Accountability Committee, and funding from the CARES Act was to be disseminated to counties through the HAVA state implementation system. In response to mounting election-related costs from COVID-19, some states appropriated even more funding for administration of county and municipal elections. In Wisconsin, the state legislature

---

[2]   Certified Michigan HAVA State Plan of 2003.  Terri Lynn Land Secretary.  FR Vol. 69 No. 57 March 24 2004

[3]   Certified Wisconsin HAVA State Plan of 2003.  WI Elections Board.  FR Vol. 69 No. 57 March 24 2004

[4]   Certified Pennsylvania HAVA State Plan of 2003. Edward Rendell Governor, P.A. Cortes Secretary FR Vol. 69 No. 57 March 24 2004

[5]   41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments*

[6]   OMB Circular A 133 Audits of States, Local Governments and Non Profit Organizations, June, 2003

[7]   Elections Assistance Commission. Plans for Use of CARES Act Funds. Report to Pandemic Response Committee.

[8]   Federal Election Assistance Commission.  *Post Primary CARES Act Expenditure Report, September 22, 2020*

funded an aid program called *Wisconsin Routes to Recovery.*[9] The *Routes to Recovery* program was enacted to reimburse local governments for unbudgeted expenditures due to the COVID-19 pandemic.

In late November 2020, Wisconsin reported that of its 1,850 municipalities, only 1,265 had applied for CARES election funding. After the November general election, Wisconsin reported a CARES funding surplus of $1,198,511.[10] As of November 23, 2020, Pennsylvania reported surplus CARES funds of $953,839.[11] As of this report, Michigan had not submitted a November report to the EAC as required; however, following the primary election Michigan CARES had a fund surplus of $4,663,819.[12]

During the same timeframe, the Wisconsin municipalities of Racine, Madison, Milwaukee, Green Bay, and Kenosha actively pursued private grant funding from the Center for Technology and Civic Life (CTCL) for funding of elections expenses that included equipment, salary, training, and even a $250,000 motor home.[13] The grant applications, governmental approval documents, and other information was previously reported by STS.[14]

Because adequate funding for elections administration was available in Michigan, Wisconsin, and Pennsylvania, the CTCL narrative that it needed to provide funding for safe and secure elections was at best naïve, and at worst, an outright falsehood. The presence of ample sources of public funding rendered the infusion of any private funding unjustified, unnecessary, and disruptive to electoral processes.

### 1.4 The Structure and Role of Non-profits in Affecting Elections -

Shortly following the inauguration of President Obama in 2009, a network of special-use non-profit organizations was created to collect, aggregate, and analyze information collected from third party users, such as Turbo Vote, who have access to state databases for the purpose of influencing US elections and electoral policy. These well-funded non-profits share leadership, are centrally coordinated, and have the common mission of amassing and analyzing voter information to influence campaigns, promote activism, and affect elections. Attachment A presents an organizational chart of foundations and non-profits involved in US electoral policy.

The multiple layered, special-use non-profit model also provides an outward appearance of strength, assures political cover for donors, and affords a convenient conduit to quickly channel funding to loosely knit street activists. This special-use non-profit apparatus is not unique to elections, as progressive activists have been using similar networks to influence public lands policy, for expansion of the environmental movement, and in influence of administrative government policy.[15]

---

[9]   Guidance. Wisconsin Routes to Recovery Reimbursement Program. September 25 2020

[10]  Wisconsin Cares Nov 23 Report

[11]  Pennsylvania Cares Nov 23 Report

[12]  Michigan Cares Aug 24 Report

[13]  Wisconsin Safe Voting Plan

[14]  STS Timeline of Electoral Activities FINAL12/14/20

[15]  *The Chain of Command. How Billionaires and Foundations Control Environmental Movement. US Senate Report July 30 2014*

3

The multi-level non-profit structure also affords a convenient way to shield donors, because non-profits can shift resources among themselves, making tracing and discovery more difficult and time consuming. Specialization also gives a perception of separation and impartiality, traits which are particularly important for those non-profits who seek to influence electoral policy, promote academic standards, or influence cyber security policy.

## 2.0 STATEMENT OF ISSUES

*2.1 Focus Topics -*

1) Whether state certified HAVA implementation plans or state legislative prerogatives were compromised through the infusion of private grants from the Center for Technology and Civic Life (CTCL) into local elections;

2) If appropriations from federal, state, or local sources were sufficient to completely fund the 2020 general election, rendering funding from public/private partnerships unnecessary;

3) Whether the reporting and claw back provisions in private grant agreements between CTCL and local governments presents a future audit, bonding, or pension liability to counties who received the CTCL grants.[16]

---

[16] 41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments*

**Private Non-profit Associations Involved in Elections - Policy**

| Organization | Function | Key People | Funders |
|---|---|---|---|
| **Electronic Registration Information Center (ERIC)** | ▪ Governmental Association of State Secretaries<br>▪ Access to motor vehicle information<br>▪ Promotes centralized access and sharing of state registration and motor vehicle databases<br>▪ Funded by states; subject to IRS Instrumentalities rules and FOIA | ▪ David Decker - CEO<br>▪ Pam Anderson - EO of Colorado County Clerks<br>▪ Kevin Kennedy - Former Wisconsin Chief Election official | ▪ Democracy Works |
| **National Vote at Home Institute (NVHI)** | ▪ Promotes comprehensive at-home voting and mail-in balloting<br>▪ Bypasses HAVA State Plans and commissions by providing privately generated " tool kits" and " calculators" to educate local officials in elections administration | ▪ Co-Chair Jocelyn Benson, Michigan<br>▪ Tiana Epps-Johnson - CTCL<br>▪ Carolyn De Witt - Rock the Vote<br>▪ Dana Chisnel - Center for Civic Design<br>▪ Jake Matlisky - Center for Secure & Modern Elections<br>▪ Jennifer Morrell - Democracy Fund<br>▪ Seth Flaxman - Democracy Works | ▪ Democracy Fund<br>▪ Center for Civic Design<br>▪ Rock the Vote |
| **Center for Technology and Civic Life (CTCL)** | ▪ Founded by Tiana Epps-Johnson<br>▪ CTCL promotes national API interface agreements between federal, state, and local systems<br>▪ Bypasses state HAVA training requirements by providing tool kits and education<br>▪ Circumvents state appropriations by providing grant funding to local counties<br>▪ Collects and analyzes voter information from local county clerks<br>▪ Grants contain future liabilities for counties and present audit issues<br>▪ Data sharing with Big Tech, Face Book, and Google | ▪ Tiana Epps-Johnson - Executive Director and Founder*<br>▪ Whitney May - Government Services Department*<br>▪ Donny Bridges - Civic Data Department*<br><br>*previously employed by *New Organizing Institute* | ▪ Knight Foundation<br>▪ Skoll Foundation<br>▪ The Democracy Fund<br>▪ Rockefeller Brothers Fund<br>▪ Mark Zuckerberg and Priscilla Chan |
| **Center for Civic Design** | ▪ Research arm of electoral non-profits<br>▪ Drives government policy through white papers, security standards, and science<br>▪ Promotes intergovernmental data sharing and automatic voter registration | ▪ Dana Chisnel - Director<br>▪ Whitney Quesenbery - CTCL<br>▪ Tiana Epps Johnson - CTCL<br>▪ Katy Peterson - Democracy Works<br>▪ Jennifer Morrell - Democracy Fund | ▪ Democracy Fund<br>▪ MacArthur Foundation<br>▪ Center for Secure and Modern Elections<br>▪ Mark Zuckerberg and Priscilla Chan |
| **Center for Secure and Modern Elections** | ▪ Election policy at state and local level<br>▪ Promotes voter registration at state and federal government offices and during social program enrollment | ▪ Jake Matlisky - Director | ▪ New Venture Fund |

POLICY

5

Appendix Page 216

Private Non-profit Associations Involved in Elections -Advocacy

| | Organization | Function | Key People | Funders |
|---|---|---|---|---|
| ADVOCACY | **US Vote Foundation** | ▪ Created in 2005; rebranded in 2012<br>▪ Third party aggregation of voter information<br>▪ Maintains database of public officials for advocacy<br>▪ Advocates for federal absentee voting<br>▪ Data aggregator for other non-profits | ▪ Dana Chisnel | ▪ Democracy Fund<br>▪ Knight Foundation<br>▪ Pew Trust<br>▪ Carnegie<br>▪ JEHI Foundation |
| | **Democracy Works; dba Turbo Vote** | ▪ Promotes mail in and absentee voting for all 50 states<br>▪ Targets and recruits college students<br>▪ Collects and aggregates information from users accessing websites<br>▪ Model integrated and replicated throughout several states (with name changes) | ▪ Seth Flaxman - Also sits on NVHI Board<br>▪ Trey Grayson | |
| | **Rock the Vote (RTV)** | ▪ " Rocky" actively recruits college students and inner-city youth for activism<br>▪ Affiliated with 300 academic institutions and colleges<br>▪ Collector and aggregator of information<br>▪ Has third party access to Pennsylvania voter registration system<br>▪ Promotes " full integration" of state API registration databases<br>▪ Remote access for batch loading of voter information | ▪ Carolyn DeWitt - Director<br>▪ Jeff Ayeroff - Founder<br>*Board Members:*<br>▪ Wayne Jordan<br>▪ Michael Skolnick<br>▪ DeRay Mckesson - National BLM Leader and Co-Founder of Campaign Zero and Our States.org.<br>▪ Jesse Moore - Founder Common Thread Strategies | |

### 3.0 CONFLICT ANALYSIS -

I.   **Injection of private funding into county and municipal elections circumvents State and Federal appropriations processes, violates protocols in HAVA state implementation plans, and results in inaccurate reporting under HAVA 254(a)(5):**

   a.   The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the U.S. Election Assistance Commission (EAC), state legislatures, and delegated state commissions.

   b.   The authority for administration of HAVA mandates and for HAVA and CARES Act appropriation funding is prescribed in the Michigan, Wisconsin, and Pennsylvania state certified HAVA plans.

   c.   The individual state HAVA implementation plans incorporate detailed requirements for the 13 HAVA categories, including election security protocols; standards for voter systems; equipment procurement requirements; voter and electoral official training procedures; provisional voting and balloting processes; provisions to improve voting access; mail-in voter registration requirements; voter complaint resolution protocols; and appropriations monitoring, auditing and reporting protocols. The state HAVA implementation plans provide measures to upgrade voter systems, standards for database integrity, methods of voter communication, requirements for recruitment and training of poll workers, and many other policies to be implemented by elected officials at the local level.

   d.   The claw back and reporting provisions in contracts between CTCL and local counties and municipalities, if exercised, will result in inaccurate recordkeeping and state reporting under *HAVA 254(a)(5)* and the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments at 41 CFR Part 105-71.*

   e.   The claw back language in the CTCL agreements represents a long-term, contingent liability for counties and municipalities who received the CTCL grants. These liabilities pose long-term audit, bonding, or pension risks to those counties who received CTCL grants.

   f.   Scaled up across the 15 states of known CTCL grant funding activity, the inaccuracies in state/federal HAVA Title II reporting and auditing resulting from unreported funding or claw back provisions is substantial.

   g.   The appropriate mechanism for charitable donations for electoral purposes is through donations earmarked into the general fund of the individual state legislatures. There is no state or federal statutory authority for counties, municipalities, or other local electoral jurisdictions to solicit, receive, or appropriate private funding outside of state HAVA implementation plans.

## II. HAVA, CARES, and state appropriations for local elections in Michigan, Wisconsin and Pennsylvania were sufficient to fund administration of the entire 2020 election cycle, rendering CTCL funding unnecessary:

a. Public appropriations for federal elections through the U.S. Election Assistance Commission (EAC) and state matching funds are the only legitimate funding sources for administration of U.S. elections. State-level funding formulas provide for proportional and equitable allocation of funds across electoral precincts, ensuring resources are evenly distributed so as not to result in funding disparities.

b. For the 2020 general election, federal and state appropriations for administration of local elections were substantially augmented to account for the COVID-19 pandemic.

c. Additional COVID-19 pandemic response funding for election administration was made available through state appropriations and similar allocations of public funding. As example, the State of Wisconsin used CARES Act funding and state matches for its *Routes to Recovery Program.*

d. The combination of the HAVA and CARES Act funding, along with any state matches, was more than adequate for electoral operations, upgrade of election-specific hardware and software, cybersecurity, training for voter and elections officials, and COVID-19 specific needs. The infusion of private funding was unnecessary. (Tables 1, 2, and 3)

e. Local electoral officials in Michigan who performed due diligence on CTCL grants observed the sufficiency of CARES Act funding and remarked as to the non-necessity of CTCL grants. As example, Michigan's Oakland County Clerk Lisa Brown decided not to seek CTCL funding stating: "*We already had an opportunity through the CARES Act to get extra equipment and things we would need at the county level. It seemed to me that they were offering up the same sort of thing.*" [17]

f. The December 2019 HAVA Title II 251 Report to the EAC from Michigan Secretary Jocelyn Benson documented an unexpended HAVA surplus for administration of statewide elections of $1,285,975.[18] The public record also indicates that Secretary Benson was aware of the availability of adequate public funding for dissemination to Ann Arbor, Flint, Lansing, East Lansing, Muskegon, Pontiac, Romulus, Kalamazoo, and Saginaw – jurisdictions that received CTCL grants.

g. On April 13, 2020 Michigan Secretary Benson corresponded with the EAC and certified the use of $11,299,561 CARES funding for COVID-19 electoral administration. This stands in stark contrast to Secretary Bensons public advocacy for CTCL and its funding, and ultimately the CARES funding solicited by Secretary Benson was unspent and supplanted by CTCL grants.[19]

---

[17] *Benson accused of letting 'partisan operatives' influence election.* Detroit News. October 6, 2020.

[18] Michigan HAVA 251 Funds Report. December 2019.

[19] Bureau of Elections  Audit Report Michigan Auditor

h.  The 2016 IRS Form 990 for the Southern Law and Poverty Center
    lists Michigan Secretary Jocelyn Benson as the Director of that non-
    profit corporation.

i.  Concerns with CTCL funding include lack of public accountability,
    no state legislative or EAC oversight, and agreements that require
    reporting of voter information from county clerks back to a non-
    governmental organization.

| Table 1 - HAVA and CARES Funding Plus State Matching Funds for 2020 Elections[20] | | | | | | |
|---|---|---|---|---|---|---|
| | **2019 HAVA Carryover** | **Election Security** | **Match** | **CARES** | **Match** | **Total** |
| **MI** | $6,635,744 | $12,053,705 | $2,410,741 | $11,299,561 | $2,259,912 | $34,689,663 |
| **MN** | $6,548,440 | $7,418,672 | $1,483,734 | $6,958,233 | $1,391,647 | $23,800,726 |
| **PA** | $3,531,998 | $15,175,567 | $3,035,113 | $14,233,603 | $2,844,721 | $38,821,002 |
| **WI** | $4,316,403 | $7,850,124 | $1,570,025 | $7,362,345 | $1,472,469 | $22,531,366 |

| Table 2 - Estimated CARES Act Expenditures 20 Days Post Primary Election[21] | | | | | |
|---|---|---|---|---|---|
| | **Amount Appropriated** | **State Match** | **Initial Total Available** | **Estimated Expenditure** | **Available Funds** |
| **MI** | $11,299,561 | $2,249,551 | $13,549,112 | $6,821,392 | $6,727,720 49% |
| **MN** | $6,958,233 | $1,386,122 | $8,344,355 | $363,867 | $7,980,488 92% |
| **PA** | $14,233,603 | $2,831,101 | $17,064,704 | $3,511,525 | $13,553,179 79% |
| **WI** | $7,362,345 | $1,472,469 | $8,834,814 | $3,228,484 | $5,303,330 60% |

| Table 3 – Government Funding and CTCL Grant Funding | | |
|---|---|---|
| | **2020 HAVA + CARES Funding[22]** | **2020 CTCL Grants[23, 24]** |
| **MI** | $28,023,919 | $6,369,753   (22.7%) |
| **MN** | $17,252,286 | $2,297,342   (13.3%) |
| **PA** | $35,289,004 | $15,824,895   (44.8%) |
| **WI** | $18,254,963 | $6,946,767   (38.1%) |

---

[20]  *Election Assistance Commission—Election Security Grant Funding Chart July 16, 2020* and *Election Assistance Commission—CARES Grant Funding Chart July 22, 2020*

[21]  *ESTIMATED CARES Act Expenditures As Reported in 20 Day Post Primary Reports (September 22, 2020 Update)*

[22]  Includes federal funding + state matching funds; does not include 2019 carryover.

[23]  CTCL grant dollar amount accompanied with size as a percentage of total government funding for the state.

[24]  CTCL grant values must be viewed as approximate because the numbers reported by news sources and local governments vary, and grant awards continue.

III. **When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate clear partisanship in grant funding awards:**

a. A review of data for the 2020 CTCL grant-making actions in Michigan, Wisconsin, and Pennsylvania, along with 2016 presidential election voting records for recipients of CTCL grants reveals a distinct pattern of greater funding to jurisdictions where candidate Hillary Clinton won versus grant-receiving jurisdictions where candidate Donald Trump won. While CTCL maintains that it is a non-partisan organization and its grants are available to all local jurisdictions, the grant pattern is understood to have a distinct color of partisanship. Attachment B contains charts, graphs, and a table supporting this conclusion.

b. **Michigan -** CTCL awarded eleven grants in Michigan. Recipient cities were Detroit ($3,512,000); Lansing ($443,742); East Lansing ($43,850); Flint ($475,625); Ann Arbor ($417,000); Muskegon ($433,580); Pontiac ($405,564); Romulus ($16,645); Kalamazoo ($218,869); and Saginaw ($402,878). In the 2016 election, only Saginaw was won by candidate Donald Trump; the remainder were won by candidate Hillary Clinton. In total, **$5,939,235** was awarded to the ten jurisdictions where candidate Clinton won and only **$402,878** where candidate Trump won.[25]

c. **Pennsylvania -** CTCL awarded seven grants in Pennsylvania. Three of these grants were awarded to the cities of Philadelphia ($10,016,074); Erie ($148,729); and Lancaster ($474,202). Five grants were awarded to counties: Wayne County ($25,000); Northumberland County ($44,811); Center County ($863,828); Delaware County ($2,200,000); and Allegheny County ($2,052,251). A total of **$13,063,828** (94.7%) went to jurisdictions where candidate Hillary Clinton won in the 2016 presidential election; only **$692,742** (5.3%) went to jurisdictions where candidate Donald Trump won in 2016.[26]

d. **Wisconsin -** CTCL awarded multiple grants to five Wisconsin cities: Milwaukee - two for a total of $2,164,500; Madison - two for a total of $1,281,788; Green Bay - two for a total of $1,625,600; Racine - two for a total of $1,002,100; and Kenosha - two for a total of $872,779. The $60,000 grant to Racine is what remained of a $100,000 CTCL grant to that municipality which included a stipulation that Racine would distribute a $10,000 sub-grant to each of the other four cities. This placed Racine in the position of being an agent for CTCL with the purpose of distributing grant moneys.[27,28]

---

[25] CTCL Grant Charts
[26] CTCL Grant Chart
[27] Wisconsin Safe Voting Plan. June 15, 2020
[28] CTCL Grant Chart

## IV. Systemic mismanagement of voter registration databases and verification processes in Michigan and Pennsylvania deprived voters in the 2020 general election of a free and fair election:

a. Registration is the first essential step in verifying legitimate voters, and protection of the state registration database is necessary to ensure the accuracy of voter rolls. The secretaries of Michigan and Pennsylvania allowed flawed administrative procedures that gave third party access to state voter information in the QVF and SURE systems. The voter registration databases of both Michigan and Pennsylvania fail to fully comply with the Help America Vote Act (HAVA) standards required by National Institutes of Standards (NIST) for certified technologic security.

b. HAVA established the U.S. Election Assistance Commission (EAC) which provides funding to states, sets requirements for administration of elections, and identifies NIST as the agency charged with setting performance standards for:

   1. Systems maintaining Personally Identifiable Information (PII) in voter registration databases, and;

   2. Voting systems allowing votes to be cast, tabulated, and reported.

   3. Requires states to ensure data exchanges between state drivers' registration and licensing databases and the Social Security Administration databases.

c. HAVA Section 303, "*Computerized statewide voter registration list requirements and requirements for voters who register by mail*" requires those states receiving HAVA funding to **secure** their state-wide voter registration databases.

d. HAVA Section 303(a)(5)(F) requires states receiving federal funds to **ensure protection of voter Social Security information**. This Section explicitly requires that protection protocols extend to all state employees and state contractors who have access to the Michigan QVF and Pennsylvania SURE systems.

   1. Michigan has entered into an API contract with the third-party, non-profit Rock the Vote (RTV) granting RTV remote access to the QVF database. As of 2020, the public record is silent on Michigan's certification that RTV has adhered to Michigan or NIST standards to protect information or assure compliance with Michigan technologic security standards. A review of the RTV contract indicates the last RTV audit was conducted in 2018. The absence a certification of compliance for RTVs access to QVF could pose a security risk to the state voter information system. There is no assurance that the voter rolls are only populated with legal, Michigan voters nor is there assurance that voter data has not been exfiltrated or misused.

2. A comprehensive review of Michigan's use of third-party contractors accessing the registration databases is needed, along with an Organizational Conflict of Interest (OCI) risk review of Michigan election staff who have access to the registration database. The OCI review is a central component of NIST standards.

3. In 2005, the Pennsylvania Legislature certified a state HAVA plan that enabled access to federal funds. Pennsylvania then used federal funding to establish its Statewide Uniform Registry of Electors (SURE) system, the repository for sensitive voter information. The Pennsylvania state HAVA plan is silent regarding whether their SURE system is secure and correctly manages Social Security Administration (SSA) information as required by HAVA. In a press release dated September 2016, the non-profit Rock the Vote is documented to have an application linked to 25,000 "partners." The public record is silent as to how the Pennsylvania Secretary ensures certification of its registration system for RTV's 25,000 partners. Without public review, it is not possible to ascertain the security of the Pennsylvania SURE system under HAVA and NIST.

4. In an audit cover letter of the Pennsylvania SURE system performed between January 2016 and April, 2019 Pennsylvania Auditor General Eugene DePasquale issued a **scathing** letter to Governor Wolf of noncompliance of the SURE system with HAVA and federal auditing standards, excessive redactions by Pennsylvania Secretary of State, and impediments to the auditing process by the Pennsylvania Department of Transportation. The public record is silent as to whether in 2020 Secretary Boockvar remedied any of noncompliance issues prior to the 2020 election. Pennsylvania Secretary of State Boockvar has deep affiliations with far left voting related advocacy groups.[29]

## V. Michigan's 2020 electoral administration and tabulation of election results is fatally flawed and involves potentially fraudulent use of federal funds to implement and maintain their HAVA state Plan:[30]

a. The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the US election assistance Commission (EAC), state legislators and delegated state commissions. HAVA establishes the EAC, provides funding to states, sets requirements for election administration, and identifies the National Institute of Standards (NIST) as the agency charged was setting performance standards for voting systems.

---

[29]  Performance Audit Report Pennsylvania Auditor General 121919

[30]  FR Vol. 69, No 57. Wednesday, March 24, 2004; HAVA 101 (d), 301, 302, and 303.

b. Based on the Michigan HAVA implementation plan the state obtained an excess of $71 million in federal funding for fiscal years 2004 - 2006 to establish voter training, voting systems, and a statewide voter registration database.

c. Section 101 (d) of HAVA specifies that funds are to be used to train election officials and poll workers. In section 905 (a) **HAVA describes criminal penalties for individuals who conspire to deprive voters of a fair election**. HAVA also cites the 42 USC 1973i (c), which defines coercion, blocking of poll locations, and other forms of **voter intimidation or denial of access or voting monitoring as being potential criminal violations**. Based on observed behavior captured on video and news reporting, Michigan poll workers, election officials, and election staff demonstrated a lack of training in conflict with the HAVA law and the 1965 Voting Rights Act of 1965.

d. Registration is the first critical step in determining who in this state can vote in an election. Protecting the registration rolls of voters is the first critical step in assuring a legal, accurate, election result. HAVA section 303 (a)(3) requires a state to provide technological security of state-wide Social Security information of voters. **This section specifically requires these protections extend to all state employees and state contractors** who work with voter data. The State of Michigan, in its HAVA plan, states that the Department of Technology, Management, and Budget (DTMB) governs technology contracts in Michigan. **Michigan has entered into a state contract with Rock the Vote (RTV) granting that third party non-profit organization access to the QVF database**.[31] As of mid-2020, there is no record that RTV has adhered to Michigan standards to protect voter information in the QVF, complied with Michigan technological security standards, or other standards that assures HAVA compliance. A comprehensive review of Michigan's use of third-party contractors assessing the registration is needed to assess the risk.

## VI. Infusion of private funding into electoral processes has altered the times, manner and places established by HAVA Plans and longstanding electoral practices in which elections were conducted.

a. In Wisconsin, an elector who is Indefinitely Confined due to age, physical illness, or infirmity - or is disabled for an indefinite period - may by signing a statement to that effect that an absentee ballot be sent to the elector automatically for every election. The application form and instructions are prescribed by the Wisconsin Elections Commission and must furnished upon request to any elector by each municipality.[32]

---

[31]   Michigan RTV Contract
[32]   Indefinitely Confined Report

b.  High Speed Tabulators, Scanners, High Speed Industrial Printers, and Electronic Poll Books funded by CTCL raise questions of certification, training, or disparate access due to their installment of some but not other locations.[33]

c.  Election regulations in Michigan and the state HAVA implementation Plan detail training requirements for officers overseeing elections. Despite adequate funding from multiple public sources, poll workers in Detroit lacked adequate training, became frustrated, and walked off in response to training problems.[34]

d.  In Michigan, the process used for acquisition of electoral equipment on a statewide basis violated state funding, procurement, and legislative budget committee approval processes, as legislators were left out of the process.[35]

e.  CTCL funded **mobile** precincts used by election officials to collect ballots and register people to vote, resulted in a disparate, statewide access from precinct to precinct, favoring specific demographics.[36]

f.  The establishment of satellite polling places on several college campus using CTCL funding occurred at multiple locations. These offices were not mapped, favored a specific age and demographic group of citizens, and were established outside of HAVA plans and protocols.

g.  CTCL funds created and funded an official position of election workers called "**Voter Navigators.**" The Voter Navigators were not approved positions according to the state electoral process.[37]

h.  Unlike the HAVA Title I (303) requirement to maintain an electronic voter database in Michigan, *not one* **of the CTCL contracts - including those reviewed from swing and other states - included provisions for updating or purging of voter rolls**. A December 2019 Bureau of Elections report indicated more control was needed over the Qualified Voter File (QVF) system.

i.  In Detroit, poll watchers were instructed not to compare signatures on ballots, to back date the ballots, and to not require ID for people who were voting in person.[38]

j.  A 2019 Michigan lawsuit filed by Pacific Interest Legal foundation found noncompliance with the National Voter Registration Act of 1993.  Detroit had 2,503 dead people on its voter rolls, and 4,788 voters that were flagged for duplicate or triplicate concern.  Detroit had 511,786 registered voters but only 479,267 adults designated as eligible to vote.[39]  None of these items was addressed by Secretary Benson in a December 2019 Audit by the State of Michigan Auditors office.[40]

---

[33]  Wisconsin Safe Voting Plan
[34]  Detroit Training Issues
[35]  Michigan Law Election Supplies
[36]  Wisconsin Safe Voting Plan
[37]  Wisconsin Safe Voting Plan
[38]  Detroit Workers Did not Check Signatures
[39]  Dead People on Voter Files
[40]  Office of the Auditor General State of Michigan December 2019

k. Wisconsin, Green Bay, Kenosha, Madison, Milwaukee, and Racine **all added ballot drop boxes to facilitate the return of absentee ballots throughout their cities**.[41] The locations and placement of ballot drop boxes raises questions of disparate access from precinct to precinct and across the state.

l. In Detroit, Michigan, poll workers were restrained in their ability to verify signatures or handle ballots. The Michigan Election Law outlines the rules which were not adhered to in this process.[42,43]

---

[41] Wisconsin Safe Voting Plan

[42] Poll Watchers Denied Access

[43] Poll Watchers in Detroit Kicked Out

## 4.0 CONCLUDING REMARKS -

The confusion and negative effect from illegitimate infusion of private funding in Michigan, Wisconsin, Pennsylvania, and several other states during the 2020 election can be shown to have had a disparate and inequitable impact on the electorate.

Although history is replete with examples of elite groups attempting to gain influence, the current incidence of CTCL and other private donors purposefully injecting hundreds of millions of dollars into swing states is troubling because county officials who should know better actually ***accepted*** **the grants, to the exclusion of abundantly available public funding**. Even the most casual of observers can understand that acceptance of *any* private funding for administration of public elections creates inequity, dependency, and the potential for collusion, or even fraud.

It seems odd that while CTCL promotes having nationwide expertise in elections and electoral policy, its funding of local counties and municipalities in the 2020 general election blatantly circumvented well-funded and legislatively adopted state and federal HAVA plans.

Perhaps even more troubling is the collaboration of the Michigan and Pennsylvania Secretaries of State and representatives who sit on the election commission of Wisconsin in promoting CTCL grants, granting access to databases, or otherwise promoting non-profit activities while subordinating CARES funding and HAVA state implementation plans. Several of these officials have longstanding affiliations with progressive non-profits and foundations who actively endeavor to collect voting information for purposes of affecting elections or altering electoral policies.

The presence of vast quantities of public funds for administration of the 2020 elections in Michigan, Wisconsin, and Pennsylvania raises questions as to whether CTCL and its supporting foundations understood that there **was no resource deficit** for administration of elections, including extra expenses due to COVID-19.

This warrants investigation.

Based upon the information in this report and related research, STS offers the following actions and activities for consideration:

1. The secretaries, attorneys general, and/or legislatures of states whose county governments received CTCL funds should commission a comprehensive, third-party audit of the consistency of private/public transactions with the HAVA implementation plans of their state. This should include compliance with NIST standards, and state procurement requirements.

2. State secretaries, attorneys general and/or legislatures who have membership in the non-profit **Electronic Registration Information Center** (ERIC) should audit the information access, collection, storage, security and/or potential voter information sharing practices of ERIC with other states or third-party non-profit associations.

3. In the fall of 2020, the Center for Election Innovation (CEIR) issued grants to state secretaries, local governments, and non-profit associations for election-related purposes. Secretaries, attorneys general, and/or legislators of states receiving CEIR grants should request and evaluate CEIR contracts for HAVA compliance and the fiscal and procurement requirements of their individual states.

4. CTCL is a non-profit organization chartered in Illinois but who has negotiated grant contracts with county and municipal governments in multiple jurisdictions across many states. The public record is silent as to whether CTCL is licensed in all the states in which it continues to conduct contractual business.

5. The claw back language in CTCL agreements with counties and municipalities who received grants represents a long-term, contingent liability and is subject to federal audit, bonding, or pension risks. County commissioners should coordinate with their respective attorneys general or legislatures to understand and mitigate potential future liabilities.

**Attachment A**

Flowchart:
The Relationship of Foundations
and
Non-profit Organizations Involved in US Electoral Policy



KNIGHT FOUNDATION
$4,251,666
MARK ZUCKERBERG PRICILLA CHAN
$500,000,000
SKOLL FOUNDATION
$1,300,000
DEMOCRACY FUND ( Pierre Omidyer )
$3,065,000
TIDES FOUNDATION SIXTEEN THIRTY FUND
ARABELLA INVESTORS NEW VENTURE FUND
2017
ERIC
Electronic Registration Information Center
2012
PEW Trust
Purpose:
• Association of State Secretaries.
• Inter and multistate API data access.
• Integrated Voter DL, USPS, and SS numbers.
• Promotes national and international cyber security standards.
Funding:
• Membership Dues: States
People:
• David Becker - DOJ > PEW > ERIC> CEIR
• Meghan Wolf - Wisconsin WEC
• John Lindback - PEW
CSME
Center for Secure and Modern Elections
2010
New Venture
Purpose:
• Policy at State level.
• Automatic update of voter information at USPS during change of address.
• Promotes voter registration at state and Federal government offices during enrollment in government programs.
Funding:
• New Venture Fund
People:
• Jake Matelsky
CEIR
Center for Electronic Innovation Research
2012
Purpose:
• Voter Registration / Policy at the Senior Administrative level.
• Field level electronic applications:
○ Field batching load to SURE System and SOS offices
○ Registrations w/Tablets
• Promotes interface with System for exchange of drivers license information.
○ Has access to Pennsylvania SOS SURE system
Funding:
• Democracy Works
People:
• David Becker - PEW/ERIC/CEIR
• Pam Anderson - ED of Colorado County Clerks
• Kevin Kennedy - Former Wisconsin Chief Election Officer
CTCL
Center for Technology and Civic Life
2017
Purpose:
• Centralized data collection, aggregation dissemination.
• Promotes national API interface agreements between federal, state, and local information systems.
• Confuses administration of state HAVA plans through toolkits, training and advice.
• Promotes and provides funding for tabulators and election equipment.
• Supplements poll labor funding in excess of appropriated HAVA funds.
• Provides lists and location recommdations for ballot drop boxes.
Funding:
• Knight Foundation
• New Venture Fund
• Google
• Facebook
• CCD
People:
• Tiana Epps Johnson - [CTCL]
• Whitney May
• Donny Bridges
• Pam Anderson
• Tammy Patrick [Democracy Fund]
CCD
Center for Civic Design
2013
Purpose:
• Academic arm of electoral nonprofits.
• White papers & Federal Policy making:
○ NIST security interface
○ Drives policy through guidelines, technical documents, and "science" for election administration.
• Toolkits:
○ Ballot printing/design
○ Electronic poll books
○ Motor Voter
○ Opt-In to Opt-Out
• Promotes intergovernmental and automatic voter registration.
Funding:
• Democracy Fund
• MacArthur Foundation
• Center for Secure and Modern Elections
• Knight Foundation
People:
• Tiana Epps Johnson - [CTCL]
• Whitney Quesenbery
• Katy Peterson: [Democracy works; Turbo Vote]
• Jennifer Morrell - [Democracy Fund]
NVHI
National Vote at Home Institute
2017
Centralized Organization
Purpose:
• Promotes "comprehensive" at home voting:
○ Policy advocacy at state/local level
○ Legislation and lobbying
○ Public education
○ Advocates Intergovernmental relationships- USPS
○ "Flooding the Zone" Initiative
• Toolkits:
○ Vote-By-Mail calculators
○ Electorial resource estimators
○ Polling place wait time calculators
○ Worker and supply needs
Funding:
• Democracy Fund
• Center for Civic Design
• Rock the Vote
People:
• Centralized leadership from other nonprofits:
• Jocelyn Bensen - MI Secratary of State
• Tiana Epps Johnson - [CTCL]
• Dana Chisnell - [CCD]
• Jake Matilsky - [CSME]
• Carolyn DeWit -[Rock the Vote]
• Stephen Silberstien - [Democracy Alliance]
• Tammy Patrick - [Democracy Fund]
Policy
Advocacy
GOVERNMENT
PRIVATE SECTOR
US VOTE FOUNDATION (USVF)
2007
Purpose:
• Grassroots advocacy and organization.
• Advocates federal absentee voting.
• State directories and mailing lists; customized advocacy reports.
• Promotes voter enrollment at all government offices, and during participation in government programs.
Funding:
• Democracy Fund
• Knight Foundation
• Pew Trust
• Carnegie
• JEHI Foundation
PA. VOICE (PV)
Purpose:
• Grassroots advocacy of college students and inner-city youth.
• Messaging promotes progressive ideology, "modernization" of elections and promotion of left wing political causes.
• Initiatives include engagement for 2020 Census and redistricting.
• Partners with Rock the Vote and PA SOS in online voter registration with remote 3rd party access to Penn. SURE system.
Funding:
• States Voices Network
• Rock the Vote
• Pennsylvania Secretary Bookvar
People:
• Erin Casey
• Marian Schneider
ROCK THE VOTE (RTV)
1992
Purpose:
• Grassroots advocacy and indoctination aimed at young progressives.
• Promotes online digital registration verification, and update of voter information.
• 3rd party OVR registration access with Pennsylvanian SURE System through user Apps and ROV Website.
• Full integration of online Voter Registration platform with PA SURE.
• Partners with PA DOS to develop digital technology for batch loading to SURE system.
Funding:
• $2,515,819
People:
• Carolyn DeWitt - DNC PM
• DeRay Mckesson - Black Lives Matter
TURBO VOTE (TV)
2012
Purpose:
• Democracy Works DBA as Turbo Vote
• "Partners have 3rd party access to Rocks the Vote through API agreements".
• Collects VR data from registrants for political messaging.
• Promotes voter registrations, absentee balloting.
• Tracks voting rules for all 50 states.
Funding:
• Rock the Vote
• Democracy Works
• Colleges and Universities
• Pew Charitable Trust
• JEHI Foundation
People:
• Trey Grayson [ERIC]
• Seth Flaxman
• Kathryn Peters
THE RELATIONSHIP OF FOUNDATIONS AND NON-PROFIT ORGANIZATIONS INVOLVED IN U.S. ELECTORAL POLICY
FUNDING PATHWAYS
POLITICAL CONNECTIONS
THE AMISTAD Journey
Stillwater Technical Solutions
"Complex Problems Solved Well"

# Attachment B

## Charts, Graphs and Tables

**Note:** Variations in grant amounts were reported by editors, the press and in meeting minutes from local governments. These variations might result in perceived inaccuracies in the dollar amounts of some CTCL grants. Because CTCL continues to make grants, source information in these calculations will outdate. The data presented is sufficient and reliable to conclude clear political trends in CTCL grant awarding patterns.

# Center for Tech and Civic Life's Grants to Democratic Strongholds in Battleground States

### State of Wisconsin

| City | CTCL Grant | Dem. Vote | Rep. Vote | Trump's 2016 WI Win | Trump's 2016 WI Win in Votes |
|------|-----------|-----------|-----------|---------------------|------------------------------|
| Milwaukee | $2,164,500 | 85% | 14% | 0.77% | 22,748 |
| Madison | $1,281,788 | 70% | 23% | 0.77% | 22,748 |
| Green Bay | $1,625,600 | 58% | 42% | 0.77% | 22,748 |
| Racine | $1,002,100 | 72% | 28% | 0.77% | 22,748 |
| Kenosha | $872,779 | 69% | 31% | 0.77% | 22,748 |
| Total CTCL WI Grant | $6,946,767 | | | | |

The five Wisconsin cities above accounted for 82% of Hillary Clinton's vote in 2016. CTCL's $6.32 million grant to increase voter participation in only five of Wisconsin's 190 cities will produce a lopsided vote for Joe Biden in Wisconsin's five largest Democrat strongholds. If CTCl's $6.3 million Wisconsin voter participation grant increases the Biden vote in just the five Democratic strongholds by 2%, then Democrat Joe Biden will win Wisconsin. CTCL's $6.3 million Wisconsin grant deliberately increases Joe Biden's chances of winning Wisconsin's popular vote and 10 electoral votes.

### State of Pennsylvania

| City/County | CTCL Grant | Clinton | Trump | Trump's 2016 Pa Win | Trump's 2016 PA Win in Votes |
|---|---|---|---|---|---|
| Delaware County | $2,200,000 | 65% | 35% | 0.72% | 44,292 |
| Philadelphia | $10,000,000 | 92.1% | 7.9% | 0.72% | 44,292 |
| Centre County | $863,828 | 48.71% | 46.32% | | |
| Wayne County | $25,000 | 67.63% | 29.18% | | |
| Erie | $148,729 | 48.57% | 46.99% | | |
| Total CTCL PA Grant | $13,237,557 | | | | |

CTCL's $10 million grant to Philadelphia is three times higher than CTCL's second largest grant. CTCL granted Philadelphia more money than anywhere else because President Trump can't win his reelection if he doesn't win Pennsylvania's electoral votes. If CTCL's $10 million voter participation grant increases just the Philadelphia Democratic voter turnout by 7.5%, then CTCL has flipped Pennsylvania for Democrat Joe Biden.

Hillary Clinton had her second largest winning percentage in Delaware County behind the City of Philadelphia. CTCL's Pennsylvania grants to Democratic strongholds in Philadelphia and Delaware County will play a significant role in determining whether Biden or Trump wins Pennsylvania.

### State of Michigan

| City County | CTCL Grant | Clinton Vote | Trump Vote | + Clinton Votes | + Trump Votes |
|---|---|---|---|---|---|
| Detroit | $3,512,000 | 234,871 | 7,682 | 227,189 | 0 |
| Lansing | $443,742 | 65,272 | 22,390 | 42,882 | 0 |

| City County | CTCL Grant | Clinton Vote | Trump Vote | + Clinton Votes | + Trump Votes |
|---|---|---|---|---|---|
| East Lansing | $43,850 | 26,146 | 8,294 | 17,852 | 0 |
| Flint | $475,625 | 16,163 | 4,677 | 11,486 | 0 |
| Ann Arbor | $417,000 | 128,025 | 50,335 | 77,690 | 0 |
| Muskegon | $433,580 | 8,933 | 3,372 | 5,561 | 0 |
| Saginaw | | 10,263 | 11,077 | 0 | 814 |
| Pontiac | $405,564 | 14,351 | 2,735 | 11,616 | 0 |
| Romulus | $16,645 | 7,573 | 3,078 | 4,495 | 0 |
| Kalamazoo | $218,869 | 18,644 | 5,456 | 13,188 | 0 |
| | | | | | |
| Total CTCL MI | $5,966,875 | 530,241 | 119,096 | 411,959 | 814 |

If CTCL's $3.5 million Detroit grant increases Democrat Joe Biden's vote by 4.5% in just Detroit, CTCL's grant will have flipped Michigan from Red to Blue. CTCL's $3.96 million in Michigan grants to Democratic strongholds in Detroit, Flint, Lansing and East Lansing increase Democrat Joe Biden's chance of winning Michigan's statewide and 16 electoral votes.

### State of South Carolina

| County | CTCL Grant | Clinton Vote | Trump Vote | Trump's 2016 SC Win | Trump's 2016 SC Win in Votes |
|---|---|---|---|---|---|
| Richland County | $730,000 | 108,000 | 52,469 | 14.1% | 300,016 |
| Charleston County | $695,000 | 89,299 | 75,443 | 14.1% | 300,016 |

| County | CTCL Grant | Clinton Vote | Trump Vote | Trump's 2016 SC Win | Trump's 2016 SC Win in Votes |
|---|---|---|---|---|---|
| Clarendon County | $102,373 | 7,732 | 7,386 | | |
| Greenville | $660,000 | 74,483 | 127,832 | | |
| Total CTCL SC Grant | $2,187,373 | | | | |

Republican Senator Lindsey Graham represents South Carolina and is on the November 3, 2020 ballot. CTCL's grants to South Carolina Democratic strongholds improperly increases Democratic votes in Richland and Charleston counties and makes President Trump and Senator Graham's reelection more difficult. State of Georgia

**Georgia**

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Fulton | $6,000,000 | 297,051 | 117,783 |
| Cobb | $5,600,000 | 160,121 | 152,912 |
| Dougherty | $295,235 | 23,311 | 10,232 |
| Dekalb | $4,800,000 | 251,370 | 51,468 |
| Total GA Grant | $16,695,235 | 731,853 | 332,395 |

Fulton County is one of the most reliable Democratic Counties in the country. Since 1876 Fulton County has voted Democratic in every presidential election, except in 1928 and 1973. Of the State of Georgia's 159 counties, Hillary Clinton received more votes in Fulton County than any other Georgia county. Clinton beat Donald Trump by 180,000 votes in Fulton County.

**Iowa**

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Black Hawk | $267,500 | 50.6% | 43.3% |
| Scott County | $286,870 | 47.5% | 46% |
| Woodbury | $156,000 | 57.4% | 37.5% |
| Cerro Gordo | $20,325 | 43.5% | 51.2% |
| Floyd | $7,302 | 39.8% | 54.7% |
| Louisa | $6,324 | 32.91% | 61.28% |
| Total IA Grant | $744,321 | | |

**Minnesota**

| City | CTCL Grant | | |
|---|---|---|---|
| Minneapolis | $3,000,000 | | |
| | | | |
| Total MN Grant | $3,000,000 | | |
| | | | |

**New Jersey**

| County | CTCL Grant | | |
|---|---|---|---|
| Atlantic County | $150,000 | | |
| | | | |
| Total NJ Grant | $150,000 | | |
| | | | |

**New York**

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Onondaga County | $286,960 | 53.89% | 40.13% |
| Warren County | $31,000 | 41.68% | 50.15% |
| Tompkins County | $69,000 | 67.69% | 24.3% |
| Total NY Grant | $386,960 | | |

Warren County which voted for Trump in 2016 received the smallest CTCL grant.

## Texas

| County | CTCL Grant | Clinton Vote | Trump Vote |
|---|---|---|---|
| Dallas County | $15,130,433 | 461,080 | 262,945 |
| Bowie County | $62,095 | 8,838 | 24,924 |
| Hays County | $289,000 | 33,224 | 33,826 |
| Hopkins County | $19,952 | 2,510 | 10,707 |
| Cameroon County | $1,800,000 | 59,402 | 29,472 |
| Colorado | $14,990 | 1,987 | 6,325 |
| Bexar | $1,900,000 | 319,550 | 240,333 |
| Ellis | $86,424 | 16,253 | 44,941 |
| Williamson | $263,644 | 84,468 | 104,175 |
| Total Texas Grant | $19,566,538 | 987,312 | 757,648 |

In 2016 Clinton won Dallas County by 137,284 votes. In 2016 Bowie County only had 33,4470 votes. Trump won Bowie County by 16,082 votes over Clinton. Trump won Hays County by 602 votes over Clinton. Trump won Hopkins County by 5,412 votes over Clinton.

## Maine

| Town | CTCL Grant | | |
|------|------------|---|---|
| Town of Union | $5,000 | | |
| | | | |
| Total Maine Grant | $5,000 | | |
| | | | |

## Maryland

| County | CTCL Grant | Clinton | Trump |
|--------|------------|---------|-------|
| Washington | $90,512 | | |
| | | | |
| Total Maryland Grant | $90,512 | | |
| | | | |

## Arkansas

| County | CTCL Grant | Clinton | Trump |
|--------|------------|---------|-------|
| Craighead | $59,856 | | |
| | | | |
| Total Arkansas Grant | $59,856 | | |
| | | | |

## Mississippi

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Hinds | $1,500,000 | 71.39% | 26.69% |
| | | | |
| Total MS Grant | $1,500,000 | | |
| | | | |

### Ohio

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Lucas | $544,624 | 56.10% | 38.32% |
| Lorain | $435,248 | 47.63% | 47.54% |
| Franklin | $975,188 | 60.43% | 34.30% |
| Ashtabula | $65,000 | 23,318 | 15,577 |
| Total Ohio Grant | $2,020,060 | | |
| | | | |

### Kansas

| County | CTCL Grant | Clinton | Trump |
|---|---|---|---|
| Sedgwick | $816,458 | 36.88% | 55.28% |
| | | | |
| Total KS Grant | $816,458 | | |

### Total CTCL Grants

| State | Number of Grants | CTCL Grant Amount |
|---|---|---|
| Wisconsin | 6 | $7,324,567 |

| State | Number of Grants | CTCL Grant Amount |
|---|---|---|
| Pennsylvania | 5 | $13,237,557 |
| Michigan | 8 | $6,106,599 |
| South Carolina | 3 | $1,527,373 |
| Georgia | 2 | $11,600,000 |
| Iowa | 6 | $744,321 |
| Minnesota | 1 | $3,000,000 |
| New Jersey | 1 | $150,000 |
| Texas | 7 | $19,216,470 |
| New York | 3 | $386,960 |
| Maine | 1 | $5,000 |
| Maryland | 1 | $90,512 |
| Arkansas | 1 | $59,856 |
| Mississippi | 1 | $1,500,000 |
| Ohio | 1 | $544,624 |
| Total CTCL Grants | 47 | $65,493,839 |

The first 26 CTCL grants went only to Democratic strongholds in swing states. CTCL claim that its grants are for the purpose of protecting voters from the COVID-19 pandemic is a blatant lie. CTCL hidden COVID-19 grant agenda is to increase the votes for Democratic presidential candidate Joe Biden, Democratic U.S. Senate candidates and Democratic House of Representative candidates.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

Plaintiffs, on their own behalf
and of a class of similarly
situated persons,

v.

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, and DOES 1-10,000,

Defendants.

---

## MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT
## TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE,
## TO STRIKE PURSUANT TO F.R.C.P. 23

---

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

STANDARDS OF REVIEW .............................................................................................. 4

ARGUMENT ...................................................................................................................... 5

I.     This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Implausible Claims ................................................................................................................... 5

II.    Plaintiffs Lack Standing ................................................................................... 7

      a.       No cognizable injury-in-fact ................................................................... 7

      b.       No traceability ...................................................................................... 10

      c.       Lack of redressability and mootness ................................................... 10

III.   Plaintiffs Fail to State a Plausible Claim for Relief ......................................... 12

      a.       Plaintiffs fail to state a claim under Section 1983 ............................... 12

           i.       Dominion did not act under color of law ...................................... 12

           ii.      Plaintiffs fail to plausibly allege claims that their constitutional or federal rights were violated ............................. 14

      b.       Plaintiffs fail to state a claim under Sections 1985, 1986, and 1988 ....... 17

      c.       Plaintiffs fail to plead a claim for declaratory judgment ...................... 18

      d.       Permanent injunctive relief is not a valid claim for relief ..................... 19

CONCLUSION ................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Addisu v. Fred Meyer, Inc.*,
    198 F.3d 1130 (9th Cir. 2000) ...............................................................................17

*Alabama v. U.S. Army Corps of Eng'rs*,
    424 F.3d 1117 (11th Cir. 2005) .............................................................................19

*Allen v. Wright*,
    468 U.S. 737 (1984).................................................................................................10

*Already, LLC v. Nike, Inc*.,
    568 U.S. 85 (2013)...................................................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................4

*Bally v. Whitmer*,
    No. 1:20-cv-1088 (W.D. Mich.) ...........................................................................6

*Bauge v. Jernigan*,
    669 F. Supp. 348 (D. Colo. 1987)..........................................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................4

*Bognet v. Sec'y Commonwealth of Pa.*,
    980 F.3d 336 (3d Cir. 2020)...........................................................................9, 10, 15

*Brooks v. Gaenzle*,
    614 F.3d 1213 (10th Cir. 2010) .......................................................................13, 17

*Brown v. Reardon*,
    770 F.2d 896 (10th Cir. 1985) ...............................................................................17

*Bldg. & Constr. Dep't v. Rockwell Int'l Corp*.,
    7 F.3d 1487 (10th Cir. 1993) .................................................................................11

*Byers v. City of Albuquerque*,
    150 F.3d 1271 (10th Cir. 1998) .............................................................................7

*Chiles v. Thornburgh*,
    865 F.2d 1197 (11th Cir. 1989) .............................................................................8

-i-

**TABLE OF AUTHORITIES**
(continued)

*Coomer v. Donald J. Trump for President, Inc.*,
    No. 2020CV034319 (Denver Dist. Ct.) ...................................................................................4

*Corman v. Torres*,
    287 F. Supp. 3d 558 (M.D. Pa. 2018) (per curiam) .............................................................10

*Curry v. Baker*,
    802 F.2d 1302 (11th Cir. 1986) ............................................................................................16

*Donald J. Trump for President, Inc. v. Boockvar*,
    No. 2:20-cv-966, 2020 WL 5997680 (W.D. Penn. Oct. 10, 2020)..................................6, 8, 15

*Duggins v. Hunt*,
    323 F.2d 746 (10th Cir. 1963) ..............................................................................................18

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006).............................................................................................................19

*Edwards v. Zenimax Media Inc.*,
    No. 12-cv-00411-WYD-KLM, 2012 WL 4378219 (D. Colo. Sept. 25, 2012) ........................5

*Faustin v. City, Cnty. of Denver, Colo.*,
    268 F.3d 942 (10th Cir. 2001) ................................................................................................7

*Feehan v. Wis. Elections Comm'n*,
    No. 20-cv-1771-pp, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)....................................6, 11

*Gallagher v. Neil Young Freedom Concert*,
    49 F.3d 1442 (10th Cir. 1995) ..............................................................................................13

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978)...............................................................................................16

*Grove v. Groome*,
    817 Fed. App'x 551 (10th Cir. 2020) ...................................................................................17

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013)...............................................................................................................7

*Johnson v. Benson*,
    No. 1:20-cv-00948-PLM-PLG (W.D. Mich.)..........................................................................6

*Kan. Penn Gaming, LLC v. Collins*,
    656 F.3d 1210 (10th Cir. 2011) ..............................................................................................5

## TABLE OF AUTHORITIES
(continued)

*King v. Whitmer*,
    No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)....................................11, 14

*Lance v. Coffman*,
    549 U.S. 437 (2007)....................................................................................................7, 8, 10

*Ex parte Levitt*,
    302 U.S. 633 (1962)..................................................................................................................8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................................4, 7, 10

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)................................................................................................................18

*Morman v. Campbell Cnty. Mem'l Hosp.*,
    632 F. App'x 927 (10th Cir. 2015) ..........................................................................................4

*Pearson v. Kemp*,
    831 Fed. App'x 467 (11th Cir. 2020) ......................................................................................6

*Reynolds v. Sims*,
    377 U.S. 533 (1964)................................................................................................................9

*Richardson v. Tex. Sec'y of State*,
    978 F.3d 220 (5th Cir. 2020) ................................................................................................16

*Romstad v. City of Colo. Springs*,
    650 F. App'x 576 (10th Cir. 2016) ........................................................................................19

*S. Disposal, Inc. v. Tex. Waste Mgmt.*,
    161 F.3d 1259 (10th Cir. 1998) ............................................................................................16

*Schneller v. Phila. Newspapers, Inc.*,
    No. 11-5071, 2012 WL 3704758 (E.D. Pa. Aug. 28, 2012) ..................................................13

*Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*,
    327 F.3d 1019 (10th Cir. 2003) ............................................................................................11

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..............................................................................................................5, 8

*Surefoot LC v. Sure Foot Corp.*,
    531 F.3d 1236 (10th Cir. 2008) ......................................................................................18, 19

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page

*Texas v. Pennsylvania*,
No. 155, 2020 WL 7296814 (Dec. 11, 2020) .............................................................6

*The Wilderness Soc. v. Kane Cnty., Utah*,
632 F.3d 1162 (10th Cir. 2011) ..............................................................................10

*United States v. Price*,
383 U.S. 787 (1966)...................................................................................................12

*United States v. Richardson*,
418 U.S. 166 (1974)....................................................................................................7

*US Dominion, Inc. v. Giuliani*,
No. 1:21-cv-00213 (CJN) (D.D.C. Jan. 25, 2020) .....................................................4

*US Dominion Inc. v. Powell*,
No. 1:21-cv-00040-CJN (D.D.C. Jan. 8, 2020) ..........................................................4

*West v. Atkins*,
487 U.S. 42 (1988)....................................................................................................12

*Wittner v. Banner Health*,
720 F.3d 770 (10th Cir. 2013) ............................................................................12, 13

*Wolotsky v. Huhn*,
960 F.2d 1331 (6th Cir. 1992) ..................................................................................13

*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020) ...............................................................................6, 9

**Statutes**

3 U.S.C., ch. 1 ................................................................................................................10

28 U.S.C. § 2201 .............................................................................................................18

28 U.S.C. § 2202 .............................................................................................................18

42 U.S.C. § 1986 .............................................................................................................18

42 U.S.C. § 1988 .............................................................................................................18

U.S. CONST. art. I, § 4, cl. 1 ...........................................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page

### Other Authorities

Fed. R. Civ. P. 5 .................................................................................................................... 20

Fed. R. Civ. P. 11(c) ............................................................................................................. 20

Fed. R. Civ. P. 12(b)(1) ....................................................................................................... 4, 5

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 4, 5

Fed. R. Civ. P. 23(d)(1)(D) ................................................................................................... 5

Fed. R. Civ. P. 23(c)(1)(A) ................................................................................................... 5

Defendant Dominion Voting Systems, Inc. ("Dominion"), by and through its counsel,

hereby moves this Court to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the

Federal Rules of Civil Procedure. Consistent with its conferral obligation, Dominion has

conferred with Plaintiffs' counsel on multiple occasions regarding the bases for this motion,

including Dominion's positions that Plaintiffs lack standing and that amending the Complaint

would not resolve the Complaint's flaws. Plaintiffs oppose this motion. In support of this motion,

Dominion states as follows:

## INTRODUCTION

The 2020 election was the "most secure in American history."[1] The U.S. Justice

Department has uncovered no evidence of widespread voter fraud that could change the outcome

of the 2020 election.[2] Since Election Day, former President Trump's campaign and others have

filed at least 42 legal challenges to the results of the presidential election. They have not been

successful.[3] The lies, misinformation, and defamatory statements have sparked insurrection but

have fallen well short of overturning the will of the voters.

---

[1] *Joint statement from the Election Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees*, Cybersecurity & Infrastructure Security Agency (Nov. 12, 2020), *available at* https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (concluding that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised"). The Joint Statement was signed and endorsed by, among others, the National Association of State Election Directors, the National Association of Secretaries of State, and the U.S. Cybersecurity & Infrastructure Security Agency—then led Chris Krebs, an appointee of former President Trump.

[2] *See, e.g.*, Katie Benner & Michael S. Schmidt, *Barr Acknowledges Justice Dept. Has Found No Widespread Voter Fraud*, N.Y. Times (Dec. 14, 2020), *available at* https://www.nytimes.com/2020/12/01/us/politics/william-barr-voter-fraud.html.

[3] Jacob Shamsian & Sonam Smith, *Trump and Republican officials have won zero out of at least 42 lawsuits they've filed since election day*, Business Insider (Jan. 5, 2021), *available at* https://www.businessinsider.com/trump-campaign-lawsuits-election-results-2020-11.

Plaintiffs' lawsuit must join the list. Plaintiffs seek to overturn the 2020 presidential

election results in at least four states—Michigan, Georgia, Pennsylvania, and Wisconsin—and to

receive $160 billion in damages by filing implausible claims in federal court in Colorado against

Dominion, Facebook, several elected officials, and others. Plaintiffs rely upon as "evidence,"

their feelings (as expressed in affidavits), debunked conspiracy theories, dismissed lawsuits, and

accusations in a tweet from then-President Trump. They specifically allege without support that

Dominion participated in a conspiracy to alter the results of the presidential election, and that

Dominion intentionally designed its voting systems to create errors that allowed votes to be

changed from Mr. Trump to President Biden. These allegations are not based on evidence; the

only connection alleged between Dominion and any of the other Defendants is that Dominion

contracts with states and local governments to provide voting systems that count paper ballots.

The Complaint's flaws are many. Plaintiffs lack standing, are seeking relief that is not

redressable or has been rendered moot, fail to adequately state claims for relief against Dominion

(and the other Defendants), and fail to adequately plead a class action. Plaintiffs' recycled,

rejected claims are frivolous and may justify sanctions and attorneys' fees. Like the plethora of

other lawsuits alleging fraud in the 2020 election, this case must be dismissed.

## **BACKGROUND**

Dominion is a company headquartered in Denver, Colorado, that provides local election

officials with tools they can use to run elections, such as voting machines that count paper

ballots. Compl., ¶¶ 14, 36–37.[4] Its voting systems are certified under standards promulgated by

the U.S. Election Assistance Commission ("EAC") and reviewed and tested by independent

---

[4] Dominion accepts as true—for the purposes of this motion only—the allegations in the
Complaint cited in this motion.

testing laboratories accredited by the EAC. Dominion provided voting systems used across the

country for the November 4, 2020 election. *See* Compl., ¶ 125.

Despite Plaintiff's insinuations (but not specific allegations), Dominion's voting systems

were not subject to widespread manipulation during the 2020 election. The accuracy of these

voting systems can be verified by matching machine counts with the number of paper ballots.

Indeed, hand and machine recounts in states such as Georgia and Michigan, as well as audits in

states such as Colorado, have universally reaffirmed the accuracy of Dominion's voting systems

used in the election. *See infra* III.a.ii (referencing recount results in various states).[5]

Plaintiffs, some of whom did not even vote, nevertheless have asserted five claims

against Dominion—violation of the Electors Clause for burdening the right to vote (Count I),

violation of equal protection (Count II), violation of due process (Count III), declaratory

judgment (Count VI), and permanent injunctive relief (Count VII). Despite the fact that

Dominion is a private company and not a state actor, Plaintiffs allege that Dominion acted in

concert with the other Defendants to dilute votes to ensure that Mr. Trump lost the 2020

presidential election and to damage all registered voters in the amount of $160 billion for

"mental anguish," fear, and other emotional harm. *See* Compl., ¶ 290. Tellingly, Plaintiffs allege

no facts connecting Dominion to this fictional narrative. None exist. The Complaint simply states

---

[5] *See also* Final Audit Reports and Affirmations, Colo. Sec'y of State, *available at*
https://www.sos.state.co.us/pubs/elections/RLA/files/2020/general/finalReports.html (last visited
Feb. 12, 2021) (providing links to Risk Limiting Audits from Colorado counties that give a
statistical level of confidence that the outcome of the 2020 election was correct); Casey Van
Divier, *Wayne Williams Stands by Dominion Voting Systems Results . . . in Colorado*,
WESTWORD, Nov. 20, 2020, https://www.westword.com/news/former-secretary-of-state-defends-
dominion-voting-systems-resultsin-colorado-11847518 (quoting former Colorado Secretary of
State Wayne Williams, a Republican, stating: "Since its adoption, Dominion machines have been
tested in 62 Colorado counties at least 807 times. They have passed every test.").

the benign allegation that Dominion contracted with Pennsylvania and Georgia to provide voting

systems for the 2020 election. *See* Compl., ¶¶ 192, 246. Dominion does not have any role in

creating or modifying election laws and procedures; rather, it simply follows the law and its

contracts with each state in which it operates.[6]

### STANDARDS OF REVIEW

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction."

*See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears

the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1).

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough

facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and

conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient."

*Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court

should disregard all conclusory statements of law and consider whether the remaining specific

factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn

Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

---

[6] Allegations in the Complaint regarding statements made by Dominion employees are the
subject of ongoing defamation lawsuits. *See , e.g.*, *Coomer v. Donald J. Trump for President,
Inc.*, No. 2020CV034319 (Denver Dist. Ct.); *US Dominion Inc. v. Powell*, No. 1:21-cv-00040-
CJN (D.D.C. Jan. 8, 2020); *US Dominion, Inc. v. Giuliani*, No. 1:21-cv-00213 (CJN) (D.D.C.
Jan. 25, 2020). Many of the media outlets that helped spread this false information in the wake of
the 2020 election have since retracted their coverage about Dominion voting systems and its
employees. Joey Bunch, *American Thinker joins conservative outlets walking back voter fraud
claims*, COLO. POLITICS (Jan. 15, 2021), *available at* https://www.coloradopolitics.com/2020-
election/american-thinker-joins-conservative-outlets-walking-back-voter-fraud-
claims/article_29bcd852-5782-11eb-96fe-0f94e3dae8d0.html.

4

## **ARGUMENT**

All five of Plaintiffs' claims for relief against Dominion—Counts I, II, III, VI, and VII—must be dismissed because this Court lacks subject-matter jurisdiction under Rule 12(b)(1) and Plaintiffs fail to state a claim for relief that survives Rule 12(b)(6).[7]

### **I.  This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Implausible Claims.**

As an initial matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims against Dominion because they are substantially similar to other claims that have been consistently dismissed and are based on implausible allegations. Federal courts lack subject-matter jurisdiction "when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quotation omitted)).

Here, Plaintiffs' allegations and claims are recycled from previous lawsuits. As described in greater detail below, the Complaint cites as support complaints and affidavits from a plethora of recent cases with nearly identical claims that have been consistently dismissed for lack of

---

[7] Although not addressed in this motion, even if this Court had subject-matter jurisdiction and Plaintiffs could state a claim, the class allegations should be stricken under Rules 23(c)(1)(A) and 23(d)(1)(D) because the Complaint fails to adequately plead a class action, Plaintiffs' proposed class is overbroad, and common issues do not predominate. Specifically, Plaintiffs' class definition in Paragraph 81 of the Complaint—"the registered voter"— is too broad because it improperly includes registered voters like Plaintiffs O'Rourke and Yarbrough, who admit in their affidavits that they did not vote and thus could not have had their votes diluted, *see* Compl., Ex. 1, ¶ 11; Ex. 7, ¶ 8, and voters for President Biden, who could not have been injured by the results of the election because their preferred candidate won. *See Edwards v. Zenimax Media Inc.*, No. 12-cv-00411-WYD-KLM, 2012 WL 4378219, at *5 (D. Colo. Sept. 25, 2012) (granting motion to strike pursuant to Rule 23(d)(1)(D) where the overbroad class included persons who purchased product "regardless of whether he or she was ever injured"). Indeed, Plaintiffs allege misconduct in only a few states—Michigan, Georgia, Pennsylvania, and Wisconsin—and thus only voters in those states could possibly have had their votes diluted based on the specific allegations in the Complaint. Dominion reserves the right to move to strike the class allegations in a separate motion.

standing and failure to state a claim. None of these lawsuits have been successful.[8]

Moreover, Plaintiffs' claims against Dominion are specifically based on allegations that it played a role in the manipulation of votes and also changed votes from Mr. Trump to President Biden. *See* Compl., ¶¶ 173–74, 196–98, 245–48 (allegations of ballot manipulation in Atrium County, Michigan, Fulton County, Georgia, and Pennsylvania). These allegations, however, have been consistently disproven. An audit conducted by bipartisan election officials using paper ballots recounted by hand has disproved allegations that Dominion voting systems erroneously tabulated 68 percent of the votes in Antrim County.[9] A different audit also confirmed that its systems accurately tabulated votes in Georgia.[10] And there is no evidence supporting Mr. Trump's tweet that Dominion deleted or switched votes in Pennsylvania or elsewhere.[11]

---

[8] *See, e.g.*, *Texas v. Pennsylvania*, No. 155, 2020 WL 7296814 (Dec. 11, 2020) (dismissed for lack of Article III standing); *Bally v. Whitmer*, No. 1:20-cv-1088 (W.D. Mich.) (voluntarily dismissed); *Johnson v. Benson*, No. 1:20-cv-00948-PLM-PLG (W.D. Mich.) (voluntarily dismissed); *Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) (dismissed for lack of standing and mootness); *Pearson v. Kemp*, 831 Fed. App'x 467 (11th Cir. 2020) (dismissed for lack of jurisdiction); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680 (W.D. Penn. Oct. 10, 2020) (dismissed for lack of Article III standing and for failure to state a claim); *Feehan v. Wis. Elections Comm'n*, No. 20-cv-1771-pp, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020) (dismissed for lack of standing, mootness, and failure to state a claim).

[9] *Trump still wins small Michigan county after hand recount*, ASSOCIATED PRESS (Dec. 17, 2020), *available at* https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387 (explaining that the audit found that the small number of additional votes for Mr. Trump was attributable to human error and not the product of any issues with the Dominion voting systems).

[10] *Georgia Secretary of State, Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, *available at* https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race#:~:text=2020%20Qualifying%20Packet,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result%20of,machine%20tally%20of%20votes%20cast.

[11] Ali Swenson & Amanda Seitz, *AP FACT CHECK: Trump tweets a tall tale of 'deleted' votes*, ASSOCIATED PRESS (Nov. 12, 2020), *available at* https://apnews.com/article/fact-check-trump-tweets-tall-tale-votes-13c104367924b8192b4fcecf334f7806.

Plaintiffs' claims are frivolous and facially implausible, and thus have no place in federal court.

## II. Plaintiffs Lack Standing.

The claims asserted against Dominion must be dismissed for lack of Article III standing. Plaintiffs assert that they have standing pursuant to the Fourth and Tenth Amendments. Compl., ¶ 29. But to avoid dismissal on standing grounds, a plaintiff "must show injury in fact, a causal relationship between the injury and the challenged action of the defendant, and a likelihood that the injury will be redressed by a favorable decision." *Faustin v. City, Cnty. of Denver, Colo.*, 268 F.3d 942, 947 (10th Cir. 2001). Plaintiffs' claims fail on all three prongs, and thus the Complaint must be dismissed. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) ("Standing is 'an essential and unchanging part' of the Article III case-or-controversy." (quoting *Lujan*, 504 U.S. at 560)).

### a. No cognizable injury-in-fact.

Plaintiffs cannot establish that they have suffered an injury-in-fact sufficient to maintain any of their claims against Dominion because their alleged injuries are non-cognizable generalized grievances—the kind of injury "that is 'plainly undifferentiated and common to all members of the public.'" *Lance v. Coffman*, 549 U.S. 437, 440–41 (2007) (quoting *United States v. Richardson*, 418 U.S. 166, 176–77 (1974)); *see also Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (explaining that "a 'generalized grievance,' no matter how sincere," cannot support standing). Specifically, Plaintiffs' first three claims against Dominion—violations of the Electors Clause, equal protection, and due process—are based on allegations that their votes were "diluted" by Defendants' actions to manipulate the results of the 2020 president election in violation of election laws (and Plaintiffs' claims for declaratory judgment and injunctive relief

stem from those alleged constitutional violations).[12] *See* Compl., ¶¶ 319–320, 334, 343, 353, 355. Not only did Plaintiffs O'Rourke and Yarbrough not vote in the 2020 president election and thus by definition cannot have had their vote diluted, *see* Compl., Ex. 1, ¶ 11; Ex. 7, ¶ 8, but Plaintiffs do not (and cannot) explain how their interests in compliance with election laws are different from that of any other voter. *Cf. Lance*, 549 U.S. at 440 ("To have standing . . . a plaintiff must have more than 'a general interest common to all members of the public.'" (quoting *Ex parte Levitt*, 302 U.S. 633, 633 (1962))); *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance). In fact, by Plaintiffs' own admission, any voter in any state could bring the same claims. *See* Compl., ¶ 319 ("The evidence establishes that the Defendants have engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country, no matter whose side the voter is on."). Accordingly, vote dilution cannot be a basis that confers Plaintiffs standing. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) (holding that plaintiff's injury of vote dilution based on his interest in compliance with state election laws "is a 'paradigmatic generalized grievance that cannot support standing'" because it lacks a point of comparison) (quoting *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 354, 356 (3d Cir. 2020) (dismissing similar equal protection and Elections Clause claims for lack of standing and

---

[12] If Plaintiffs are alleging that they have been injured by Defendants' actions as to future elections, such injury is speculative and not concrete, and thus does not constitute an injury-in-fact. *See, e.g.*, *Boockvar*, 2020 WL 5997680, at *31–33 (holding that the risk of vote dilution from the risk of potential voter fraud from mail-in voting was too speculative to give rise to a concrete injury because it was based on evidence of past injury and a series of events that may not ever occur). Any such claims based on future injury, such as Plaintiffs' "claim" for permanent injunctive relief, are not ripe. *Texas*, 523 U.S. at 300.

8

specifically holding that "state actors counting ballots in violation of state election law . . . is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment")).[13]

Plaintiffs' allegation that they have standing to sue because a person's right to vote is individual and personal in nature similarly fails. *See* Compl., ¶ 304. The Third Circuit recently rejected this very argument because "it does not follow from the labeling of the right to vote as 'personal' . . . that *any* alleged illegality affecting voting rights rises to the level of an injury in fact." *Bognet*, 980 F.3d at 358. Rather, "[t]he key inquiry for standing is whether the alleged violation of the right to vote arises from an invidious classification" where "'the favored group has full voting strength and the groups not in favor have their votes discounted.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964)). Here, however, no voter's vote counted for less because Plaintiffs allege that all voters were affected.[14]

Plaintiffs also lack prudential standing to bring their Electors Clause claim (Count I). Prudential standing "encompasses various limitations, including 'the general prohibition on a litigant's raising another person's legal rights.'" *The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). An Electors Clause claim belongs to a state's legislature, not individual citizens such as Plaintiffs. *See Lance*, 549 U.S. at 442 (rejecting notion that "private citizens acting on their own behalf" can bring an Elections Clause claim); *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa.

---

[13] Particularly as to Dominion, which provided voting systems used to tabulate votes, "irregularities in the tabulation of election results do not affect [a plaintiff] differently from any other person" and thus does not confer standing. *See Wood*, 981 F.3d at 1315.

[14] Although Plaintiffs attempt to allege some form of racial discrimination in Count II on the basis that Defendants allegedly aimed their election interference behind certain areas of concentrated demographic and racial groups, there is no allegation in the Complaint that Plaintiffs are part of one demographic or racial group that allegedly had its votes diluted.

9

2018) (per curiam) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly."); *Bognet*, 980 F.3d at 349–50 (same). No exception to this rule applies.

### b. No traceability.

As it pertains to the Electors Clause claim, Plaintiffs' allegations that Defendants "acted in concert with each other, and other persons, to unconstitutionally legislate rules, change procedures, and implement a scheme and device to interfere and manipulate the Election," *see* Compl., ¶ 311, are not traceable to Dominion. *See Lujan*, 504 U.S. at 561–61 (requiring causal connection between injury and defendant's conduct). Dominion can neither legislate nor change procedures governing elections. Administering elections is a state matter. *See* U.S. CONST. art. I, § 4, cl. 1; 3 U.S.C., ch. 1. Dominion has no authority over the manner in which the election was held or the certification of results; Dominion simply provides the machinery.

### c. Lack of redressability and mootness.

Plaintiffs' alleged injury in Counts I through III related to the certification of election results also is not redressable. Even if Plaintiffs could establish that their meritless claims asserted more than generalized grievances, they have not established that the Court can redress their claims. Rather, the relief Plaintiffs seek, such as de-certifying the results of the 2020 presidential election, would disenfranchise not only Plaintiffs' votes (or at least the votes of the named Plaintiffs that actually voted), but also the nearly 160 million others who voted in the 2020 presidential election. *See King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198, at *9 (E.D. Mich. Dec. 7, 2020) ("Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied

10

by denying millions of others *their* right to vote."); *Feehan v. Wis. Elections Comm'n*, No. 20-cv-1771-pp, 2020 WL 7250219, at *10 (E.D. Wis. Dec. 9, 2020).

Moreover, since the filing of this lawsuit, the electors have cast their votes, Congress confirmed those votes, and President Biden was sworn into office. To the extent there was ever any possibility that this Court could grant Plaintiffs' requested relief, there no longer is, and thus mootness strips this Court of subject-matter jurisdiction. *See Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (explaining that a case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome'" (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curium))). There is simply no "actual, ongoing case or controversy" pertaining to vote dilution in the 2020 presidential election or the certification of results for this Court to decide. *See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1028 (10th Cir. 2003) ("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts may only decide actual, ongoing cases or controvers[ies]." (quoting *Blgd. & Constr. Dep't v. Rockwell Int'l Corp*., 7 F.3d 1487, 1491 (10th Cir. 1993))).

Plaintiffs' declaratory judgment claim and prayer for relief similarly asks this Court to declare Defendants' actions in connection with the 2020 presidential election as unconstitutional and *ultra vires*, such that the certifications of the presidential election in Michigan, Georgia, Pennsylvania, and Wisconsin are legal nullities. *See* Compl., ¶¶ 404–06. This issue likewise is not redressable and/or has been rendered moot by the casting of votes by the electors, the counting of those votes by Congress, and President Biden's subsequent inauguration.

11

### III. Plaintiffs Fail to State a Plausible Claim for Relief.

#### a. Plaintiffs fail to state a claim under Section 1983.

Counts I, II and III are brought under Sections 1983, 1985, 1986, and 1988 of Title 42 of

the United State Code. To survive, a claim brought under Section 1983 must include plausible

allegations: (1) that a right secured by the Constitution or laws of the United States was violated;

and (2) that the alleged violation was committed by a person or entity acting under the color of

law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs fail to do either.

##### i. Dominion did not act under color of law.

As a threshold matter, Plaintiffs fail to allege sufficient facts that plausibly show

Dominion was acting under color of law with regard to the 2020 presidential election.

For claims brought under Section 1983, "'under color' of law has consistently been

treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United

States v. Price*, 383 U.S. 787, 794 n.7 (1966). The four ways a private actor can become a state

actor are: (1) if "the state exercises sufficient 'coercive power' over the challenged action"; (2) if

"the challenged action is a traditional and exclusive function of the state"; (3) if the "state

officials and private parties have acted in concert in effecting a particular deprivation of

constitutional rights"; and (4) if "the state has so far insinuated itself into a position of

interdependence with a private party [that] it must be recognized as a joint participant in the

challenged action" (*i.e.*, through a conspiracy or "symbiotic relationship" with the state). *Wittner

v. Banner Health*, 720 F.3d 770, 775, 776–77 (10th Cir. 2013) (internal quotations and citations

omitted).

Here, Plaintiffs only allege conclusory allegations that Dominion acted under color of

law. *See* Compl., ¶¶ 314, 344. The only factual support alleged is that Dominion entered into contracts with several states to provide voting systems for the 2020 election. Compl., ¶¶ 192, 245. In other words, Dominion was a vendor to various states, and then the states used the machines to count votes. *Id.* But the existence of a government contract alone is simply insufficient to establish that Dominion acted under color of law. *See, e.g.*, *Wittner*, 720 F.3d at 778 ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity" (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995))); *Wolotsky v. Huhn*, 960 F.2d 1331, 1336 (6th Cir. 1992) ("Acts of private contractors do not become the acts of the government by reason of their significant or even total engagement in performing public contracts."); *Schneller v. Phila. Newspapers, Inc.*, No. 11-5071, 2012 WL 3704758, at \*4 (E.D. Pa. Aug. 28, 2012) ("Simply having to adhere to the statutory directive of the Constitution of the United States of America and acts of Congress and the [state] does not create a sufficient nexus with the state." (internal quotations omitted)). Moreover, Plaintiffs do not provide even a single fact to support their allegation that Dominion willfully participated in a conspiracy with government actors. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1228 (10th Cir. 2010) (noting that "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants because conclusory allegations of a conspiracy are insufficient to state a valid [section] 1983 claim" (internal quotations omitted)). At best, Plaintiffs point to alleged "vulnerabilities" in Dominion's voting systems, but do not allege any facts that Dominion took specific *action* to manipulate or change votes. *See* Compl., ¶¶ 42, 43, 162, 173, 196, 197. Accordingly, Plaintiffs' Section 1983 claims must fail because

13

Plaintiffs have not put forth sufficient facts establishing that Dominion acted under color of law.

### ii. Plaintiffs fail to plausibly allege claims that their constitutional or federal rights were violated.

Equally fatal is Plaintiffs' failure to sufficiently allege that Dominion violated their rights under the Electors, Equal Protection, or Due Process Clauses.

As to Count I, Plaintiffs allege that Dominion, acting in concert with the other Defendants, violated the Electors Clause by "unconstitutionally legislat[ing] rules, chang[ing] procedures, and implement[ing] a scheme and device to interfere with and manipulate the Election" by "dilute[ing] the votes of some, and count[ing] illegal ballots to the benefit of another." Compl., ¶¶ 311, 319. However, Plaintiffs do not—and indeed, cannot—set forth even a single factual allegation explaining how Dominion was involved in any of the allegations that Defendants altered voting laws without legislative approval. *See* Compl., ¶¶ 4, 120, 272(b), 272(dd), 311. Dominion had no hand in determining election laws and procedure. And even if it did, Plaintiffs' Electors Clause claim is not based on federal law, as is required under Section 1983. *See King*, 2020 WL 7134198, at *11 (explaining, after analyzing previous cases interpreting the clauses, that raising Electors and Election Clause claims under Section 1983 based on violations of state election laws was inappropriate as they were "state law claims disguised as federal claims"). Plaintiffs' claim is based on allegations that Defendants likewise altered election laws and procedures and thus also presents state law claims in federal clothing. And even if Plaintiffs could assert a constitutional claim on the basis that Dominion interfered in the counting of votes during the 2020 presidential election, the supporting allegations are not only implausible but have been proven false. *See supra* I.

As to Count II, although the Equal Protection Clause "protects the People from arbitrary

14

discrimination at the hands of the state," it certainly "does not forbid classifications." *Boockvar*,

2020 WL 5997680, at *10. While less than clear, Plaintiffs' equal protection claim appears to

center on allegations of vote dilution through manipulation of voting laws, illegal administration

of the federal election process, unequal distribution of ballot boxes, and other conclusory

allegations. *See* Compl., ¶¶ 331–32, 334–35. As described above, this is not an equal protection

injury that can support standing. Vote dilution is a viable basis for federal law claims only in

particular contexts that are not present here. *See, e.g.*, *Bognet*, 980 F.3d at 355 ("[V]ote dilution

under the Equal Protection Clause is concerned with votes being weighed differently."). And

even if Plaintiffs had standing to assert an equal protection claim on the basis that "equal

protection violations in one state can and do adversely affect and diminish the weight of votes

cast by citizens of other states that lawfully abide by the election structure set forth in the

Constitution," Compl., ¶ 343, they do not allege how these votes were purportedly diluted or

how Dominion took part in such purported dilution. Plaintiffs' attempt to fashion an argument

that there was racial discrimination also has no merit. Although Plaintiffs contend that

Defendants took certain steps, such as unequally distributing ballot boxes, that were "designed to

defend any challenge thereto as 'racist,'" Compl., ¶ 335, they make no allegations tying

Dominion to these purported actions. Regardless, Plaintiffs' allegations of racial discrimination

do not fit within the paradigm of equal protection—Plaintiffs' claim is that all votes were diluted,

not that a certain class of people's votes were diluted. *See* Compl., ¶ 334 (alleging that

Defendants' actions damaged "every registered voter in America"). Thus, Plaintiffs' attempt to

use Section 1983 as a sword to assert a frivolous equal protection claim, rather than as shield to

protect against racial discrimination, fails.

As to Count III, Plaintiffs appear to raise both procedural and substantive due process challenges. As to the procedural due process challenge, Plaintiffs cannot show that they were deprived of some "definite liberty or property interest . . . without appropriate process." *S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998). First, the right to vote is neither a property nor liberty interest. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 230–33 (5th Cir. 2020) (noting that it could not identify any courts treating the right to vote as a property interest, and holding that the right also is not a liberty interest). Second, Plaintiffs have not set forth any allegations regarding constitutionally insufficient *procedures*. *See* Compl., ¶¶ 351–61. It is entirely unclear what procedures Plaintiffs take issue with beyond the alleged failure to follow state election laws. *See* Compl., ¶ 360. Nevertheless, as explained above, Plaintiffs have alleged no facts that Dominion participated in altering state election laws.

Plaintiffs' substantive due process claim, which is premised upon Plaintiffs' right to vote, fares no better. There is no dispute that the right to vote is fundamental. However, "[c]ircuit courts have uniformly declined to endorse actions under [section] 1983 with respect to garden variety election irregularities." *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978). In fact, to implicate substantive due process, the situation "must go well beyond the ordinary dispute over the counting and marking of ballots." *Curry v. Baker*, 802 F.2d 1302, 1314, 1315 (11th Cir. 1986) (noting that "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation"). Plaintiffs attempt to allege election irregularities of epic proportions, utilizing debunked and misconstrued expert reports and alleged "evidence" that has been disproven. These speculative allegations are simply insufficient to state a plausible claim for relief. In fact, it is entirely unclear from the Complaint how Dominion itself had any

16

role in causing these alleged irregularities beyond merely serving as a vendor to various states.

### b. Plaintiffs fail to state a claim under Sections 1985, 1986, and 1988.

Counts I through III also fail to state a claim under Sections 1985, 1986, and 1988. Section 1985(3) creates a civil action for damages caused by two or more persons who "conspire . . . for the purpose of depriving" the injured person of "the equal protection of the laws or of equal privileges or immunities under the laws." *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000) (explaining that the elements of a 1985 claim are: (1) the existence of a conspiracy to deprive the plaintiff of equal protection of the laws; (2) an act in furtherance of the conspiracy; and (3) a resulting injury). Critically, plaintiffs bringing a claim under Section 1985 must "show that the conspiracy was targeting [them] based on class-wide or racial discrimination." *Grove v. Groome*, 817 Fed. App'x 551, 557 (10th Cir. 2020).

Here, not only do Plaintiffs fail to plausibly allege the existence of a conspiracy, *see supra*,[15] but their grievances also do not fall within the class-wide or race-based animus required under Section 1985. The Complaint principally relies on political affiliations as a means of establishing class-based animus, alleging that Defendants acted "to defeat an incumbent, with who [sic] they so vehemently oppose." Compl., ¶ 361. Political-based animus, however, does not fall within the ambit of Section 1985. *See, e.g.*, *Brown v. Reardon*, 770 F.2d 896, 905 (10th Cir. 1985); *Bauge v. Jernigan*, 669 F. Supp. 348, 354 (D. Colo. 1987). Plaintiffs' attempt to fashion a race-based argument in relation to their equal protection claim, *see* Compl., ¶¶ 326–50, likewise fails because they do not allege any race-based animus, as required under section 1985. Because

---

[15] For example, there are no factual allegations that there was an agreement between Dominion and the other Defendants or any sort of meeting of the minds. *See Brooks*, 614 F.3d at 1227–28 (explaining that to bring a Section 1985 action, there must be "an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective").

17

Plaintiffs fail to state a claim under Sections 1983 or 1985, their Section 1986 and 1988 claims

must be dismissed as well. *See* 42 U.S.C. § 1986; 42 U.S.C. § 1988; *Bauge*, 669 F. Supp. at 353

(explaining that the existence of a claim under Section 1986 is dependent upon the survival of a

Section 1985 claim).

### c. Plaintiffs fail to plead a claim for declaratory judgment.

Plaintiffs' sixth claim for relief, as it pertains to Dominion, appears to be a vague request

for a declaratory judgment that Defendants' actions in connection with the 2020 presidential

election were unconstitutional and *ultra vires*. To assert a claim under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201, 2202, a "plaintiff must present the court with a suit based on an 'actual

controversy,' a requirement the Supreme Court has repeatedly equated to the Constitution's case-

or-controversy requirement." *Surefoot LC v. Sure Foot Corp*., 531 F.3d 1236, 1240 (10th Cir.

2008) (citing 28 U.S.C. § 2201(a)). Plaintiffs cannot meet this requirement because, as explained

above, their theory lacks redressability and has been rendered moot, and Plaintiffs' other

allegations fail to state a claim for relief that Dominion has acted unconstitutionally. *See Duggins*

*v. Hunt*, 323 F.2d 746, 748 (10th Cir. 1963) (explaining that the purpose of the Declaratory

Judgment Act "is to provide an immediate forum for the adjudication of rights and obligations in

actual controversy where such controversy may be settled in its entirety and with expediency and

economy"). Moreover, to the extent that Plaintiffs are seeking a declaratory judgment as to future

elections, this claim is speculative and unripe. *See MedImmune, Inc. v. Genentech, Inc*., 549 U.S.

118, 126–27 (2007) (explaining that a declaratory judgment suit must "admi[t] of specific relief

through a decree of a conclusive character, as distinguished from an opinion advising what the

law would be upon a hypothetical state of facts" (internal quotations omitted)). Therefore, this

claim must be dismissed for lack of an actual controversy.[16]

### d. Permanent injunctive relief is not a valid claim for relief.

Plaintiffs' seventh claim for relief—permanent injunctive relief—must be dismissed not only because it is not ripe but also because "[a]n injunction is not an independent cause of action; it is a 'remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.'" *Romstad v. City of Colo. Springs*, 650 F. App'x 576, 585 n.7 (10th Cir. 2016) (quoting *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005)). Regardless, Plaintiffs' lack of standing and failure to state a plausible claim against Dominion is fatal to their request for permanent injunctive relief.[17]

### CONCLUSION

For the foregoing reasons, the claims against Dominion in the Complaint must be dismissed with prejudice. No amendment could cure its deficiencies. Due to the frivolous nature of the Complaint, Dominion reserves the right to seek attorneys' fees and costs pursuant to Rules 5 and 11(c) of the Federal Rules of Civil Procedure.

---

[16] Even if Plaintiffs had pleaded an actual controversy, this Court is under no duty to address it. *See Surefoot*, 531 F.3d at 1240 (explaining that the Act stipulates that federal district courts "may"—not "must"—make a declaration and setting forth factors under which to make that determination). A declaration here fails under the relevant factors because it would not settle any controversy and would increase friction between federal and state courts.

[17] Plaintiffs also cannot meet the standard for injunctive relief because irreparable injury is speculative at best as to future elections, and Plaintiffs nevertheless allege that they are entitled to monetary damages. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (elements of permanent injunctive relief include irreparable damage and that remedies at law, such as monetary damages, are inadequate).

Dated February 16, 2021

s/ *Stanley L. Garnett*_____
Stanley L. Garnett
David B. Meschke
Amanda K. Houseal
Bridget C. DuPey
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202-4432
Phone: 303.223.1100
Email: sgarnett@bhfs.com
        dmeschke@bhfs.com
        ahouseal@bhfs.com
        bdupey@bhfs.com

Attorneys for Defendant Dominion Voting
Systems, Inc.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 16th day of February 2021, a true and correct copy of the foregoing Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(1) And 12(b)(6) or, in the Alternative, to Strike Pursuant to F.R.C.P. 23 was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Stanley L. Garnett*
Stanley L. Garnett

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L.
CARTER, LORI CUTUNILLI, LARRY D.
COOK, ALVIN CRISWELL, KESHA
CRENSHAW, NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs, on their own behalf and of a class of
similarly situated persons,

v.

DOMINION VOTING SYSTEMS INC., a
Delaware corporation, FACEBOOK, INC., a
Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit
organization, MARK E. ZUCKERBERG,
individually, PRISCILLA CHAN,
individually, BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually, TOM
WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L.
THOMSEN, individually, MARGE
BOSTELMAN, individually, JULIE M.
GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

## DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS

---

Defendant Facebook, Inc. respectfully submits this Motion to Dismiss.  Following efforts

to confer pursuant to D.C.Colo.LCivR 7.1, Plaintiffs oppose the motion.

## I.    INTRODUCTION

This case is the latest in a series of failed attempts to overturn the 2020 Presidential

election.  Plaintiffs bring suit against a wide array of individuals and companies, alleging that the

Defendants' lawful and constitutionally protected activities "burden[ed] the voting rights of 160

million people."   Compl. ¶ 1.   Each Defendant supposedly "created a constitutional crisis,

destroyed the people's faith in elections, violated the [voting] rights of millions of people,

weakened national security, triggered financial uncertainty and mental anguish, and increased the

possibility of civil and world war."  *Id.* ¶ 126.

Courts around the country, including the U.S. Supreme Court, have already dismissed

identical claims about the recent election—many of which are simply copied into Plaintiffs'

Complaint.  *See, e.g.*, *Texas v. Pennsylvania, et al.*, 592 U.S. 155 (2020) (denying petition to

challenge election results for lack of a judicially cognizable interest); *Feehan v. Wisc. Elections

Comm.*, 2020 WL 7250219, at *8 (E.D. Wisc. Dec. 9, 2020) (dismissing case as voter has no

judicially cognizable interest in challenging acts to assist others' voting); *King v. Whitmer*, 2020

WL 7134198 (E.D. Mich. Dec. 7, 2020) (same); *Bowyer v. Ducey*, 2020 WL 7238261 (D. Ariz.

Dec. 9, 2020) (same).  This action should be dismissed for all of the same reasons.

Plaintiffs' allegations are facially insufficient either to assert personal jurisdiction over

Facebook in Colorado or to establish Plaintiffs' standing to bring any constitutional claim.  In none

of the 84 pages and more than 400 paragraphs of their Complaint do Plaintiffs explain what their

concrete, personalized injury is with any reasonable specificity, how any judicially sanctioned

remedy could redress it, or how Facebook's conduct in Colorado resulted in this unspecified injury such that the jurisdiction of this Court could be invoked.

The Complaint suffers from numerous other deficiencies that require it to be dismissed. Plaintiffs never explain how Facebook's alleged actions could be treated as those of a state actor— a preliminary requirement for their constitutional claims under 42 U.S.C. § 1983. Moreover, Facebook's alleged conduct, which includes fact-checking and removing user posts perpetuating misinformation, *see* Compl. ¶¶ 51–52, is the precise kind of editorial function protected by Communications Decency Act ("CDA") Section 230 immunity, which bars liability. Any purported donations that Facebook could have made to non-profit organizations are protected First Amendment activities. And the list of defects goes on.

For all of these reasons, Facebook should be dismissed from this case for lack of personal jurisdiction, or Plaintiffs' Complaint should be dismissed with prejudice.

## II.    LEGAL STANDARD

The facts in Plaintiffs' Complaint, taken as true, must contain sufficiently plausible "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Plaintiffs fail to meet this standard.

## III.   ARGUMENT

The Complaint fails for a host of threshold jurisdictional reasons. Plaintiffs have alleged no facts to support personal jurisdiction over Facebook in Colorado, and Plaintiffs have failed to plead any injury or remedy that could meet the minimum necessary to establish Article III standing.

Plaintiffs also cannot establish that Facebook is a state actor subject to Section 1983 merely

because Facebook has performed editorial functions over its private social media platform or based on allegations of donations to causes or organizations that Plaintiffs disfavor. And, even if Plaintiffs had met any of these burdens, Section 230 of the CDA still would bar liability on their claims—none of which are cognizable as pleaded in any event, for a host of other reasons.

## A. This Court Does Not Have Personal Jurisdiction Over Facebook

A complaint must be dismissed where the Court lacks jurisdiction over the defendant. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 126–28 (2014). Personal jurisdiction cannot be established over a non-resident corporation like Facebook unless an "applicable statute authorizes the service of process on defendants" *and* "the exercise of such statutory jurisdiction comports with constitutional due process demands." *Anzures v. Flagship Restaurant Group*, 819 F.3d 1277, 1279 (10th Cir. 2016). In evaluating whether a plaintiff has met its burden of establishing personal jurisdiction, "mere conclusory allegations" are not accepted as true. *BASF Corp. v. Willowood, LLC*, 359 F. Supp. 3d 1018, 1025 (D. Colo. 2019).

There are two forms of personal jurisdiction—general and specific—neither of which exists here. There is no general jurisdiction over Facebook in Colorado because Facebook is not "at home" in the state. *Daimler*, 571 U.S. at 127 (quotation omitted). Plaintiffs acknowledge that neither Facebook's "place of incorporation" nor its "principal place of business" are in Colorado. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011); Compl. ¶ 15.

Plaintiffs therefore must show that this Court has specific jurisdiction over Facebook arising from its "minimum contacts" with Colorado, such that "the in-state activities of the corporate defendant had not only been continuous and systematic, but also gave rise to the liabilities sued on." *Daimler*, 571 U.S. at 126 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S.

3

310, 317 (1945) (alterations omitted)).  Plaintiffs fail to make any allegation that Facebook's

allegedly unlawful conduct took place in Colorado, was "continuous or systematic" in the state, or

that any conduct in Colorado "gave rise to the liabilities sued on."  *Id.*  In fact, Plaintiffs do not

allege Facebook engaged in any relevant conduct at all in Colorado.  Plaintiffs therefore have failed

to establish any basis for this Court to exercise personal jurisdiction over Facebook here.

### B.      Plaintiffs Do Not Have Standing to Sue

The Article III standing requirements "ensure that the Federal Judiciary respects the

proper—and properly limited—role of courts in a democratic society" by preventing an individual

from "invok[ing] federal-court jurisdiction unless he can show a personal stake in the outcome of

the controversy."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (citation omitted).  The

"irreducible constitutional minimum of standing," requires Plaintiffs establish an injury that is: (1)

concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) causally

connected to the defendant's alleged wrongdoing; and (3) redressable.  *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560–61 (1992).  Plaintiffs fail to meet any of these standing requirements.

### 1.      Plaintiffs Do Not Allege a Concrete Injury Traceable to Facebook

Plaintiffs must allege an "injury in fact" that is "concrete," "real," and "particularized,"

such that it "affect[s] the plaintiff in a personal and individual way"—and it cannot be merely

"abstract."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  "A plaintiff [thus] cannot show

a particularized or concrete injury by claiming 'that he has merely a general interest common to

all members of the public.'"  *Feehan.*, 2020 WL 7250219, at *7 (quoting *Ex parte Levitt*, 302 U.S.

633, 634 (1937)).  To the contrary, a plaintiff cannot "use a 'federal court as a forum in which to

air his generalized grievances about the conduct of government.'"  *Id.* (quoting *United States v.*

4

*Richardson*, 418 U.S. 166, 174 (1974)); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam)
(injury cannot be "generally available grievance about government") (citation omitted).

Plaintiffs allege no specific or concrete injury they have suffered as a result of Facebook's
purported editorial conduct and fail to draw any plausible, traceable connection between
Facebook's alleged role in running its social media platform and any supposed constitutional injury
they may have suffered.  They summarily assert that Facebook "has burdened the Plaintiffs' rights
to free speech, free press, and online assembly, based upon the favored political and health related
preferences of Defendants, Mr. Zuckerberg and Ms. Chan" because it removes misleading posts,
allows a third party to fact-check election content, and "disseminate[s] political and health related
content."  Compl. ¶¶ 51–52.  But nowhere do Plaintiffs allege that their individualized
constitutional rights were harmed in any concrete or specific way by Facebook's conduct.

They allege instead, only in the abstract, that Facebook's alleged removal or flagging of
posts about the election hurt "160 million" citizens writ large by diluting their votes or decreasing
their faith in the results.  This is the type of alleged abstract injury that cannot satisfy Article III
standing.  *See Spokeo*, 136 S. Ct. at 1548; *Lujan*, 504 U.S. at 573–74 (a "generally available
grievance about government—claiming only harm to his and every citizen's interest in proper
application of the Constitution and laws . . . does not state an Article III case or controversy").
Indeed, numerous courts have rejected standing based on similar allegations that plaintiffs—as
voters—were discouraged to vote, concerned about the election results, or felt their votes were
diluted or diminished by the fact that others were allowed to vote or engage in election-related
speech. *E.g., Feehan*, 2020 WL 7250219, at *9; *Bognet v. Secretary Commonwealth of Penn.*, 980
F.3d 336, 354–55 (3d Cir. 2020) ("conceptualization of vote dilution" meaning "state actors

<center>5</center>

counted other ballots … is not a concrete harm"); *Wood v. Raffensperger*, 981 F.3d 1307, 1314–

15 (11th Cir. 2020) (rejecting "vote dilution" theory based on counting of others' votes or

"arbitrary and disparate treatment" theory based on alleged "preferred class" of voters); *Bowyer*,

2020 WL 7238261, at *5 (voter dilution "allegations are nothing more than generalized grievances

that any . . . who voted could make if they were so allowed" and collecting cases); *King*, 2020 WL

7134198, at *9–11 (same); *Trump v. Kemp*, 2021 WL 49935, at *4–6 (N.D. Ga. Jan. 5, 2021)

(same); *Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020)

(similar).[1] Many of the allegations in these failed cases are parroted in Plaintiffs' Complaint. *See,

e.g.*, Compl. ¶¶ 282–87 (copying *Feehan* allegations).

Moreover, nowhere do Plaintiffs allege how these generalized injuries over the election

results are "fairly traceable to" Facebook's "challenged action" of removing or failing to remove

certain content from its platform. *Lujan*, 504 U.S. at 560. Article III requires a dismissal in this

action for the same reason other courts have unanimously rejected nearly identical suits.

### 2.     Plaintiffs Do Not Allege Facts to Support Redressability

"An injury is redressable if it is likely to be redressed by a favorable decision." *Citizen

Ctr. v. Gessler*, 770 F.3d 900, 914 (10th Cir. 2014). "Relief that does not remedy the injury

suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability

---

[1] *See also Minnesota Voters All. v. City of Minneapolis*, 2020 WL 6119937, at *1 (D. Minn. Oct.
16, 2020) (denying TRO challenging CTCL grants because "Plaintiffs allege no injury to their
right to vote"); *Texas Voters All. v. Dallas Cty.*, 2020 WL 6146248, at *1 (E.D. Tex. Oct. 20, 2020)
(denying TRO challenging CTCL grants because plaintiffs failed to allege injury in fact, causation,
or redressability and unreasonably delayed); *Wisconsin Voters All. v. City of Racine*, 2021 WL
179166, at *1 (E.D. Wis. Jan. 19, 2021) (dismissing complaint); *Georgia Voter All. v. Fulton Cty.*,
2020 WL 6589655, at *5 (N.D. Ga. Oct. 28, 2020) (similar); *Iowa Voter All. v. Black Hawk Cty.*,
2021 WL 276700, at *8 (N.D. Iowa Jan. 27, 2021) (dismissing voting case for lack of standing).

requirement." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998). Plaintiffs must show that it is "likely," not merely "speculative," that the injury they allege will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561. And any requested relief must be "tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934; *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Nowhere do Plaintiffs define the specific relief they seek, even assuming they obtain a favorable decision. For example, Plaintiffs do not explain what an injunction against Facebook would address other than to request "permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct." Compl. at 83.

Plaintiffs' generalized grievance with the election results is not redressable. The election is over. A new President has been inaugurated. Plaintiffs do not explain how an injunction or declaration against Facebook would redress their dissatisfaction with those facts—or how any such relief would "directly and tangibly benefit [them more] than it does the public at large." *Bowyer*, 2020 WL 7238261, at *6 (quoting *Lance*, 549 U.S 437 at 439). Nor do they explain how any relief could avoid either "destroying" or "disenfranchis[ing] the … million[s] . . . that voted in the 2020 General Election" for the inaugurated President. *Id.*; *see also King*, 2020 WL 7134198, at *9 ("Plaintiffs' alleged injury does not entitle them to seek [relief] because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote.").

Moreover, Plaintiffs purport to seek "equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's [sic] ill-gotten gains." Compl. at 83. But Plaintiffs do not allege that Facebook made any money from enforcing its platform rules or that any money was

taken from them.  Rather, at most, they seem to allege that Facebook may have *donated* money to unspecified organizations (or allowed its employees or their spouses to do so).  *E.g.*, Compl. ¶¶ 70–71.  They offer no explanation for why or how this Court could order Facebook to gift money to them or others—a patently unconstitutional ask that, as alleged and requested in the Complaint, would violate Facebook's First Amendment rights.  *Infra* Section III.C.

The same is true for Plaintiffs' claims for declaratory relief, "because it fails to seek more than a retrospective opinion that [Plaintiffs were] wrongly harmed by the defendant."  *Prison Legal News v. Federal Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (internal citations and quotations omitted).  Again, numerous courts have rejected these sorts of remedies as redressing any purported injury to voters writ large from alleged electoral influence.  *E.g.*, *Feehan*, 2020 WL 7250219, at *10.  At any rate, the state official defendants "already ha[ve] certified and transmitted the election[] results."  *Id.* at *13.  As the court observed in *Feehan*, "most of the relief [Plaintiffs] seek[] is beyond this court's ability to redress absent the mythical time machine."  *Id.*  at *14.  So too, here, the Court can offer no relief to "restore" Plaintiffs' purported loss of faith in the election or democracy, or to lessen the chance of future civil strife.[2]

### C.    Plaintiffs Fail to State a Claim Because Facebook Is Not a State Actor

To state a claim for relief under 42 U.S.C. § 1983, Plaintiffs must establish a "deprivation

---

[2]  The deficiencies that cause Plaintiffs' claims to be non-redressable also render the claims moot.  *E.g.*, *Bowyer*, 2020 WL 7238261, at *12 ("Because this Court cannot" change the election results, "it would be meaningless to grant Plaintiffs any of the remaining relief they seek"); *Wood*, 981 F.3d at 1316–18 (same); *King*, 2020 WL 7134198, at *5–6 (same).  Laches also bars their belated election claims, including the alleged election-related donation activities.  *See, e.g.*, *King*, 2020 WL 7134198, at *6–7 (denying claims related to alleged electoral interference and influence on laches ground where filed 21 days after the election and collecting cases); *Trump v. Wisc. Elections Comm'n*, 983 F.3d 919, 925–26 (7th Cir. 2020) (affirming dismissal of suit brought after election seeking to challenge rules' impact on election based on the doctrine of laches and collecting cases).

of a right secured by the Constitution or laws of the United States" "committed under color of state law." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1143 (10th Cir. 2014) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). "[S]tate, not private, action is an irreducible minimum in a § 1983 action." *Id.* But federal courts have affirmed that Facebook is not a state actor and therefore cannot be sued under 42 U.S.C. § 1983 for actions taken on its platform. *See, e.g.*, *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. Oct. 2, 2020) ("To the extent that the constitutional claims are free speech claims premised on the blocking of the plaintiffs' accounts, they fail because Facebook is not a state actor."); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) (dismissing § 1983 claims because Facebook was not a state actor); *Nyabwa v. Facebook*, 2018 WL 585467, at *1–2 (S.D. Tex. Jan. 26, 2017) (same); *see also Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor.").

Nor can Plaintiffs show that "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). While a private party can be treated as a state actor if "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights," Plaintiffs make no plausible allegations of such a conspiracy or agreement here. *Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013) (finding no state action where "Plaintiffs have not alleged that any state officials conspired with or acted jointly in making the decision to medicate [Plaintiff]").

The Tenth Circuit applies a stringent pleading requirement to Section 1983 claims alleging

9

a conspiracy between private individuals and state officials. *Scott v. Hern*, 216 F.3d 897, 907 (10th Cir. 2000); *see also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) ("a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants" to state a valid § 1983 claim). Conclusory allegations "with no supporting factual" allegations are insufficient. *Raiser v. Kono*, 245 F. App'x 732, 736 (10th Cir. 2007). Plaintiffs never even allege Facebook *interacted* with any state actor here pursuant to its alleged efforts to prevent misinformation on its platform, and Plaintiffs make no allegations whatsoever of any actual conspiracy or agreement between state actors and Facebook to deny their constitutional rights. *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52 ("[M]ere approval or acquiescence of the State[,]" does not transform a private party's actions into state action.). Nor do they allege that Facebook "reached an understanding" with a particular state official to violate Plaintiffs' rights in concert. *Harvey v. Harvey*, 949 F.2d 1127, 1130, 1133 (11th Cir. 1992) ("Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes.").[3]

Finally, Plaintiffs allege that Facebook became a state actor "[b]y becoming intricately involved in the funding of the non-profit organizations that worked closely with targeted cities and counties, against state law and with federal regulation, which involved the machinery of the elections." Compl. ¶ 380. This allegation is frivolous. As an initial matter, Plaintiffs never allege that *Facebook itself* donated money—their allegations focus on alleged donations by two other

---

[3] Even if Plaintiffs could show that Facebook might be treated as a state actor (which they cannot), Plaintiffs' claims are not cognizable because Plaintiffs do not allege that any violation of their constitutional rights occurred through the adoption of some "official policy or practice" as required for *Monell* liability, or that there was a violation of a well-established constitutional right to overcome qualified immunity. *See, e.g.*, *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *see also Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) ("private corporation … is subject to at least the same rules that apply to public entities").

Defendants.  More fundamentally, mere allegations regarding the donation of money are not sufficient to allege concerted activity between a private individual and a state actor for purposes of Section 1983.  Multiple federal courts have already concluded that allegations regarding donations of Defendant Center for Tech and Civic Life like those set forth in the Complaint are insufficient to adequately plead a constitutional violation.  *See, e.g.*, *Texas Voters Alliance*, 2020 WL 6146248, at *5 (rejecting Plaintiffs' argument "that the grants create a public-private partnership between the Counties and the CTCL that is constitutionally impermissible"); *Iowa Voter Alliance*, 2021 WL 276700, at *5 n.3 (N.D. Iowa Jan. 27, 2021) (observing Court was "thoroughly unconvinced that the counties violated any particular law by accepting the CTCL grants"); *Wisc. Voters All.*, 2021 WL 179166 at *3 (same).  No federal court has ever held that donating money to non-profits that work with local agencies transforms a financial donor into a state actor or creates a conspiracy based on how that money is then used.  *Cf.  Poel v. Webber*, 899 F. Supp. 2d 1155, 1161 (D.N.M. 2012) (allegations of innocuous communications between lawyers and judges through pleadings and motions insufficient to allege Section 1983 claim); *Harvey*, 949 F.2d at 1133 (activities like resort to judicial process are not "state actions" for Section 1983 purposes simply because they implicate later state action).

Nor could the rule be any different.  Imposing liability on an entity simply by virtue of its charitable donations would impermissibly burden core First Amendment rights.  *Cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (recognizing right to donate to non-profits implicates First Amendment rights); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) ("freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States"); *Citizens*

11

*United v. FEC*, 558 U.S. 310 (2010) (corporations have First Amendment speech rights).[4]  Indeed,

the very objective of a suit like this one is to chill Defendants' conduct.

### D.       Section 230 of the Communications Decency Act Bars Plaintiffs' Claims

Plaintiffs' claims also fail under Section 230 of the CDA, which "facilitate[s] the use and

development of the Internet by providing certain services an immunity from civil liability arising

from content provided by others."  *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

"The prototypical service qualifying for this statutory immunity is an online messaging board (or

bulletin board) on which Internet subscribers post comments and respond to comments posted by

others."  *Id.*  Under 47 U.S.C. § 230(c)(1), immunity from liability thus attaches 1) to a "provider

of an interactive computer services" ("ICS"),[5] where 2) the purported liability is "based on the

defendant's having acted as a publisher or speaker," and 3) the immunity is "claimed only with

respect to information provided by another information content provider."  *Accusearch*, 510 F.3d

at 1195.  Thus, "Section 230 protects a publisher from liability for exercising its editorial and self-

regulatory functions."  *Silver v. Quora, Inc.*, 666 F. App'x 727, 729 (10th Cir. 2016).  Facebook's

conduct alleged in the Complaint falls well within the scope of this immunity from liability.

*First*, it is well-established that Facebook is a provider of interactive computer services.

*E.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *see also Klayman v. Zuckerberg*,

753 F.3d 1354, 1357 (D.C. Cir. 2014).

*Second*, Plaintiffs' claims seek to hold Facebook liable as a publisher of third-party content,

which Section 230 bars.  *See* Compl. ¶ 400 ("Facebook . . . interfered in the public election process,

---

[4]   Facebook reserves the right to file an anti-SLAPP motion.  *See* C.R.S. § 13-20-1101.

[5]   47 U.S.C. § 230(f)(2) defines an ICS as "any information service, system, or access software
provider that provides or enables computer access by multiple users to a computer server.".

by blocking and censoring content in opposition to, and by actively publishing content in support

of one political ideology.").  For purposes of Section 230, Facebook allegedly would have been

"acting as a publisher" when it removed misinformation from its online platform or flagged posts

to alert users to their potential falsity.  In *Barnes v. Yahoo!, Inc.*, the Ninth Circuit explained that

"publication involves reviewing, editing, and deciding whether to publish or to withdraw from

publication third-party content."  570 F.3d 1096, 1102 (9th Cir. 2009); *see Klayman*, 753 F.3d at

1359 (publisher is "reproducer of a work intended for public consumption" and "very essence of

publishing is making the decision whether to print or retract a given piece of content").  Section

230 was specifically enacted to "forbid the imposition of publisher liability on a service provider

for the exercise of its editorial and self-regulatory functions," including the removal of misleading

or harmful user posts.  *Ben Ezra, Weinstein & Company, Inc. v. America Online, Inc.*, 206 F.3d

980, 986 (10th Cir. 2000); *see Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) ("so long

as a third party willingly provides the essential published content, the interactive service provider

receives full immunity, regardless of the specific editing or selection process").  As the D.C.

Circuit observed in *Klayman*, "[i]t would make nonsense of [Section 230] to say that interactive

computer services must lack the capacity to police content when the Act expressly provides them

with immunity for doing just that."  753 F.3d at 1358.

  *Third*, Plaintiffs' allegations relate to "information provided by another information

content provider."  Plaintiffs' Complaint faults Facebook for publishing or removing certain

information, all of which was provided by third-party Facebook users.  Plaintiffs do not and cannot

allege that Facebook had any role in creating or publishing the content on which their Complaint

is based.  The CDA therefore applies.  *See, e.g.*, *Klayman*, 753 F.3d at 1358 ("Indeed, the complaint

13

nowhere alleges or even suggests that Facebook provided, created, or developed any portion of the content that Klayman alleges harmed him.").  Nor do Plaintiffs accurately describe the *third party* fact-checking of content published by others on Facebook's platform, but regardless, such conduct alone does not transform the content into material *provided by Facebook.  See, e.g.*, *Force*, 934 F.3d at 68 ("consistent with broadly construing 'publisher' under Section 230(c)(1), … a defendant will not be considered to have developed third-party content unless the defendant directly and 'materially' contributed to what made the content itself unlawful"); *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014) (The CDA expressly bars "lawsuits seeking to hold a service provider liable for … deciding whether to publish, withdraw, postpone or alter content.")  And there can be no argument that Facebook's *removal* of content provided by a third-party user somehow makes Facebook a material contributor to the alleged illegality of that content.  Accordingly, Plaintiffs' claims fail under Section 230.  *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) ("The 'development of information' therefore means something more substantial than merely . . . selecting material for publication."); *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1120 (N.D. Cal. 2020) (similar).

### E.      Plaintiffs Fail to State Any Cognizable Claim

None of Plaintiffs' constitutional claims are cognizable for a litany of other reasons.

Count I fails to explain how Facebook's conduct violated any right Plaintiffs hold.  "The [Electors] clause confers on the *state* the right to appoint electors, and confers on the *legislature* the right to decide the way those electors will be appointed," but does not confer any "right on the *electors* themselves"—much less citizens.  *Feehan*, 2020 WL 7250219, at *12.  Nor do Plaintiffs explain how they were barred from voting by Facebook; in fact, some attest they chose not to vote.

14

Counts II–III similarly fail to allege how Facebook discriminated against Plaintiffs on the basis of race or denied their right to vote. They appear to allege that the ability of *others* to vote somehow discriminated against them, which is not cognizable. Compl. ¶¶ 326–62; *Bowyer*, 2020 WL 7238261, at *5–6 (allegations that other votes were counted, even in opposition to rules or laws, does not state a viable due process or equal protection claim).

Count V fails because, to the extent that Plaintiffs allege an as-applied constitutional challenge to Section 230, Plaintiffs never allege how Section 230 has been applied to deny their protected speech or any other constitutional right. Moreover, they cannot rest a challenge on Facebook's purported violation of their First Amendment rights because, as shown *supra* in Section III.C, Facebook is not a state actor. *Prager University v. Google*, 951 F.3d 991, 999 (9th Cir. 2020) ("state action doctrine precludes constitutional scrutiny of YouTube's content moderation"); *Green v. America Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) (same).[6]

## IV.    CONCLUSION

The Court should dismiss Facebook for lack of jurisdiction, or dismiss the Complaint with prejudice as amendment would be futile. *E.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997). Plaintiffs cannot cure the standing defects given the nature of their claims, nor can they allege any facts that would make Facebook a state actor.

---

[6] To the extent Plaintiffs assert a claim under the Help America Vote Act or CDA, neither provides a private right of action. *See, e.g.*, *Cain v. Christine Valmy Int'l Sch. of Esthetics, Skin Care, & Makeup*, 216 F. Supp. 3d 328, 334–35 (S.D.N.Y. 2016) ("Case law is unanimous that a private right of action is not available under the [CDA]"); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) ("HAVA does not itself create a private right of action.").

15

Dated: February 16, 2021

Respectfully submitted,

_/s/ Joshua S. Lipshutz_

Joshua S. Lipshutz
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: 202.955.8217
Facsimile: 202.530.9614
Email: jlipshutz@gibsondunn.com

Ryan T. Bergsieker
Natalie J. Hausknecht
**GIBSON, DUNN & CRUTCHER LLP**
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: 303.298.5700
Facsimile: 303.298.5907
Email: rbergsieker@gibsondunn.com
nhausknecht@gibsondunn.com

Craig B. Streit
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: 415.393.8225
Facsimile: 415.374.8487
Email: cstreit@gibsondunn.com

_Attorneys for Facebook, Inc._

16

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2021, I electronically filed a copy of the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing

to the e-mail addresses denoted on the Court's Electronic Mail Notice List.


*/s/ Joshua S. Lipshutz*
Joshua S. Lipshutz

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et at.,
Plaintiff(s),

v.

DOMINION VOTING SYSTEMS INC., et al.
Defendant(s).

---

**ELECTION CONCERNING CONSENT/NON-CONSENT TO
UNITED STATES MAGISTRATE JUDGE JURISDICTION**

---

Under 28 U.S.C. § 636(c) and

(1) D.C.COLO.LCivR 40.1(c) (Assignment of Cases/Direct Assignment to Magistrate Judges);

or

(2) Fed. R. Civ. P. 73 and D.C.COLO.LCivR 72.2 (Consent Jurisdiction of a Magistrate Judge);

or

(3) D.C.COLO.LAPR 72.2 (Consent Jurisdiction of a Magistrate Judge).

**CHECK ONE**

___X___ all parties in this civil action CONSENT to have a United States magistrate judge conduct all proceedings in this civil action, including trial, and to order the entry of a final judgment;

**OR**

_____ at least one party in this civil action DOES NOT CONSENT to have a United States magistrate judge conduct all proceedings in this civil action, including trial, and to order the entry of a final judgment.

| Signatures | Party Represented | Date |
|---|---|---|

s/ David B. Meschke_____  Dominion Voting Systems Inc.  February 25, 2021
Print name:  David B. Meschke


s/ Ryan T. Bergsieker_____  Facebook, Inc.  February 25, 2021
Print name:  Ryan T. Bergsieker


s/ Ernest J. Walker_____  Plaintiffs  February 25, 2021
Print name:  Ernest J. Walker


**NOTE:**  You are directed to confer with all parties in this action and execute and file with the Court this Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction, indicating either the unanimous consent of the parties or that at least one party has declined to consent, at the earlier of (1) no later than seven days before the scheduling conference, if any; or (2) 45 days after the filing of the first response, other than an answer, to the operative complaint. All parties must either consent to the exercise of magistrate judge jurisdiction, or any party may decline to consent. In either event, **filing of the Election Concerning Consent/Non-Consent to United States Magistrate Judge Jurisdiction is mandatory**, indicating either the unanimous consent of the parties or that at least one party has declined to consent.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH and
AMIE TRAPP,

       Plaintiffs,

v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR., individually, and
DOES 1-10,000,

       Defendants.

---

**APPEARANCE OF HEATHER S. MEINGAST**

---

       Please enter the appearance of Michigan Assistant Attorney General Heather S.

Meingast, for and on behalf of Michigan Governor Gretchen Whitmer, in the above matter.

Dated: March 3, 2021

Respectfully submitted,

Dana Nessel
Michigan Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendant Whitmer
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 3, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendant Whitmer
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH and
AMIE TRAPP,

       Plaintiffs,

v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR., individually, and
DOES1-10,000,

       Defendants.

---

## APPEARANCE OF HEATHER S. MEINGAST

---

Please enter the appearance of Michigan Assistant Attorney General Heather S.

Meingast, for and on behalf of Michigan Secretary of State Jocelyn Benson, in the above matter.

Dated: March 4, 2021

Respectfully submitted,

Dana Nessel
Michigan Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 4, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action NO. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, AND
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually, PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR, individually,
TONY EVERS, individually, ANN S. JACOBS, individually,
MARK L. THOMSEN, individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**NOTICE OF APPEARANCE OF COUNSEL**

---

COMES NOW Charlene S. McGowan, Assistant Attorney General, and hereby makes an

entry of appearance in the above-styled action on behalf of Defendants Governor Brian Kemp,

Secretary of State Brad Raffensperger.

Respectfully submitted, this 9th day of March, 2021.

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Georgia Bar No. 697316
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)

*Attorney for Brian Kemp and Brad Raffensperger*

2

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been formatted in compliance with Local Rule 10.1.

*/s/Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **NOTICE OF APPEARANCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record via electronic notification.

Dated: March 9, 2021.

<div align="right">

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
VERONICA DEGRAFFENREID, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ENTRY OF APPEARANCE OF JACOB BOYER FOR DEFENDANTS GOVERNOR
TOM WOLF AND ACTING SECRETARY VERONICA DEGRAFFENREID**

To the clerk of this court and all parties of record:

I hereby enter my appearance in this case as counsel for Governor Tom Wolf and Acting Secretary of the Commonwealth Veronica Degraffenreid.[1] I certify that I am a member in good standing of the bar of this court. Governor Wolf and Secretary Degraffenreid reserve all rights to raise any jurisdictional or other arguments, through a motion pursuant to Federal Rule of Civil Procedure 12, or otherwise.

Dated: March 9, 2021

Respectfully submitted,

/s/ *Jacob Boyer*
Jacob Boyer (PA Bar No. 324396)
Pennsylvania Office of Attorney General
Deputy Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov

Attorney for Governor Tom Wolf and
Acting Secretary of the Commonwealth
Veronica Degraffenreid

---

[1] Since plaintiffs filed the complaint, Veronica Degraffenreid has succeeded Kathy Boockvar as Secretary of the Commonwealth. Secretary Degraffenreid has been substituted as a defendant. *See* Fed. R. Civ. P. 25(d).

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of March 2021 I electronically filed the foregoing

ENTRY OF APPEARANCE with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to all counsel of record.

/s/ Jacob Boyer
Jacob Boyer