No. 21-1161

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

_____

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

_____

**APPELLANTS' APPENDIX C**

**3 of 6 – Pages 598 to 844**

_____

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1515
gary@fielderlaw.net

_Counsel for Plaintiffs-Appellants_



Ex. 4

**MASTER SOLUTION PURCHASE AND SERVICES AGREEMENT**

**BY AND BETWEEN**

**DOMINION VOTING SYSTEMS, INC.**
**as Contractor,**

**and**

**SECRETARY OF STATE OF THE STATE OF GEORGIA**
**as State**

Dated as of July 29, 2019

Contract No. [●]

# Master Solution Purchase and Services Agreement

THIS MASTER SOLUTION PURCHASE AND SERVICES AGREEMENT (this "**Agreement**") is entered into this _____ day of _____, 2019 (the "**Effective Date**"), by and between the Secretary of State of the State of Georgia, with its principal executive offices at 2 Martin Luther King Jr. Drive, West Tower, Atlanta, Georgia 30334 ("**State**"), and Dominion Voting Systems, Inc., with an office at 1201 18th Street, Suite 210, Denver, Colorado 80202 ("**Contractor**"). All capitalized terms used in this Agreement are defined, or the location of such definitions indexed, in Section 18.

## 1. BACKGROUND AND SCOPE.

1.1    Background.  State desires to acquire, and enable other State Entities to acquire, from Contractor certain Services, Software, Equipment and/or any Licensed Programs or any combination of the foregoing (collectively, the "**Solution**") capable of providing a new Statewide Voting System (a "**SVS**") with a verifiable paper record which is sufficient to support all primaries and general elections, as more fully described in State's request for proposal for the Solution (event number 47800-SOS0000037) released March 15, 2019 and all documents attached thereto or links contained therein (as amended, the "**eRFP**").  Based on Contractor's experience, State has selected Contractor to supply such Solution and, if selected by State, to perform (through itself or one or more Contractor Solution Partners) Services to customize, install, implement and/or maintain a Solution, as further described herein.

1.2    Guaranteed Functionality & Guaranteed Performance.  Before the selection of Contractor, State issued the eRFP whereby Contractor was required to make an initial, written response to such eRFP and to engage in meetings and discussions with State regarding the suitability of the Solution and Services for identified needs of the State Entities as set forth in the eRFP. As part of the eRFP process, State required Contractor to perform certain professional services and demonstrations to validate and confirm that the Solution and Services fulfill the needs of the State as described in the eRFP, including the delivery and implementation of a SVS that can be used by all State Entities throughout the State of Georgia for the 2020 Presidential Preference Primary on March 24, 2020 (the "**Presidential Preference Primary**"). Such requirements, together with Contractor's eRFP Response, Contractor's Request for Supplemental Technical Response dated June 24, 2019, shall be considered the "**Mandatory Requirements**" for purposes of this Agreement, which shall be incorporated in writing into this Agreement. Contractor expressly represents that the Solution will meet all Mandatory Requirements, and, when implemented, will accurately function in accordance with those requirements and this Agreement. State selected Contractor and the Solution and enters into this Agreement based on the features, functions and attributes of the Solution described in (a) the Documentation, (b) the Mandatory Requirements as being capable of enabling State and all other State Entities to accurately and securely administer elections throughout the State of Georgia in accordance with Applicable Laws of the State of Georgia (the "**Guaranteed Functionality**"), and (c) Contractor's guarantee that Contractor will have timely and completely implemented the Solution prior to the date of the Presidential Preference Primary (March 24, 2020), including delivery of all Equipment and training on the use of such Equipment in the registration of voters and administration of an election, such that the SVS is in place and the Solution fully operational and available for use by all State Entities in such Primary and in all subsequent primary and general elections throughout the Term (the **"Guaranteed Performance"**).

1.3    Solution Partners.  Contractor may provide certain of the Services and/or components of the Solution (including certain Third Party Licensed Programs) through one or more Contractor Affiliates, suppliers, resellers, or service providers (each, a "**Contractor Solution Partner**"), provided, each is expressly identified by Contractor to State and State agrees to its inclusion on Exhibit D hereto.  As between Contractor and each Contractor Solution Partner on the one hand, and State on the other hand, Contractor shall be the prime contractor to State hereunder and in such capacity shall have full responsibility and liability for the performance of the Solution (including each of its Contractor Solution Partner components) and all Services hereunder (including all Services provided by Contractor Solution Partners).  Unless the context otherwise requires, all references to **"Contractor"** throughout this Agreement shall refer to both Contractor and each Contractor Solution Partner. If any Services or any portion or component of the Solution is subject to a warranty claim or otherwise suffers a malfunction or defect and Contractor and a

Contractor Solution Partner dispute the cause of and/or fault for such malfunction or defect, then until such time as Contractor and the Contractor Solution Partner resolve their dispute, Contractor shall, without delay or cost to State continue to provide the Maintenance Services and complete all repairs, replacements or other applicable remedy obligations hereunder as necessary to full remedy the warranty claim.

1.4     Purchasing by State and other State Entities. State may use the Solution and/or Services purchased under this Agreement on its own behalf and for the benefit of all other State Entities, in accordance with the terms and conditions hereof. Contractor acknowledges and agrees that this Agreement is intended to be subject to an intergovernmental agreement between State and the other State Entities, and, therefore, that State or any other State Entity may purchase the Solution and/or any of the Services directly under this Agreement by issuing a valid purchase order and entering into a Solution Order or Services Order, as applicable. Any State Entity directly purchasing a Solution and/or Services under this Agreement (i) shall be solely responsible for payment of the Solution or Services purchased by such State Entity, (ii) shall be entitled to all of the rights and benefits afforded to State under this Agreement, and (iii) may enforce this Agreement in its own name with respect to such Solution and/or Services as if this Agreement, in its entirety, had been executed by Contractor and the applicable State Entity, and (iv) subject to Section 17.6.1, shall only be held responsible by Contractor for the performance of its obligations (including payment obligations) with respect to the specific Solution and/or Services purchased by such State Entity as set forth in the applicable Solution Order or Services Order.

1.5     Non-Exclusive Rights.  This Agreement is not exclusive.  State and each other State Entity reserve the right to select other contractors to provide the same or other products, licenses and services.

1.6     No Minimums Guaranteed.  Except as provided in an executed Solution Order, this Agreement does not guarantee any minimum level of purchases.

## 2.     SOLUTION AND DELIVERABLES.

2.1     Solution Order and Delivery.  During the Term, and subject to all of the terms and conditions contained herein, Contractor agrees to deliver to State the Solutions ordered pursuant to a Solution Order, as hereinafter described.

2.1.1     Solution Order.  For the ordering of a Solution from Contractor, any State Entity and Contractor will, subject to mutual agreement by both parties, execute a written order (each an "**Solution Order**").  Each Solution Order shall: (a) be substantially in the form of Exhibit B hereto; (b) be consecutively numbered with respect to all prior Solution Orders; and (c) include, where applicable and available at that time, the following information:

(i)     the services described in this Agreement, including the Configuration Services, services required to complete Installation Events, Maintenance Services, Training Services and other services provided by Contractor under this Agreement (the "**Services**"), which are being purchased by the applicable State Entity;

(ii)     licenses and/or sublicenses to the application software (the "**Application Programs**"), and to the custom programming application software (the "**Special Programs**") required in connection with the Services;

(iii)     the software support services to be provided by Contractor for the Application Programs and the Special Programs (collectively, the "**Support Services**");

(iv)     the hardware and equipment Deliverables to be provided by Contractor hereunder, including any computer systems, accessories, supplies, parts, related Documentation, and Revisions thereto to be provided by Contractor required for the operation of the Solution (the "**Equipment**") and the licenses and/or sublicenses to the operating software for such Equipment granted by Contractor (the "**Operating Programs**");

(v)     the maintenance services for the Equipment (collectively, the "**Maintenance Services**");

(vi)     the date by which the Solution must be fully delivered;

(vii)     the particular State Site to which such Solution must be delivered; and

(viii)     the price applicable to the items set forth on such Solution Order**.**

The terms "Application Programs," "Special Programs," and "Operating Programs" are collectively referred to as the "**Software**."  In the event of a conflict between the terms of this Agreement and the terms of any Solution Order, except with respect to any provision of this Agreement which explicitly states that it may be modified or superseded by an analogous provision in a Solution Order, the terms of this Agreement shall control.  The terms and conditions of each Solution Order will apply solely with respect to the Solution purchased under such Solution Order and shall not be deemed to modify this Agreement.

2.1.2     Implied Products and Services. Subject to Section 2.3.2 if any Services, Application Programs, customizations, Operating Programs, Support Services, Maintenance Services which are reasonably required for, and incidental to or inherent in, the proper delivery and use of the Solution or the performance and provision of the Services (regardless of whether they are specifically described in this Agreement), they will be deemed to be implied by and included within the scope of the Solution and Services to be provided by Contractor to the same extent and in the same manner as if specifically described in this Agreement.

2.1.3     Installation Plan. Attached as Attachment 4 to each Solution Order shall be an installation plan, developed by Contractor and approved by State (the "**Installation Plan**") which describes in detail with respect to such Solution Order: (i) each element of the delivery, installation, and training of State Personnel in the operation and use of, the Solution, each in a manner that meets the Mandatory Requirements (each a "**Installation Event**"); (ii) the specific dates set by which each of the Installation Events are to be completed (the "**Installation Deadlines**"); and (iii) the applicable Site Specifications, if any. Installation Plans may be replaced and superseded from time to time upon agreement of the parties in order to reflect mutually agreed changes in the Installation Events or Installation Deadlines by using the change control procedures set forth in Section 5.2. For the avoidance of doubt, State Entities will only be responsible for those fees related to Installation Events that are reflected in the applicable Solution Order.

2.1.4     Delivery.  Contractor shall deliver the Solution ordered, including all Equipment and Documentation, to the State Site specified in the Solution Order, by the date(s) specified in the Installation Plan and otherwise in strict compliance with the terms and conditions of this Agreement and Installation Plan. Contractor shall not make any substitutions for the Solution of any other version, model, capacity or manufacturer without the prior written consent of State.  Contractor represents and warrants that the Solution shall be new (not remanufactured or refurbished), free of defects, and in good operating condition at all times prior to the expiration of the Warranty Period. Solutions which consist solely of Licensed Programs may also be delivered electronically upon mutual agreement of the parties.

2.1.5     Shipment, Title and Risk of Loss.  For each piece of Equipment or other Solution hardware component, Contractor shall pass title and ownership of such Solution component to State upon State's payment in full for such Solution component.  Upon State's payment in full for each Solution, Contractor will deliver a bill of sale for each Solution component to State, as applicable.  Contractor guarantees that State shall acquire good and clear title to the Equipment and other Solution hardware components being purchased hereunder, free and clear of all liens and encumbrances.  Contractor shall arrange for shipment, at Contractor's expense, of Equipment by a mutually acceptable common carrier F.O.B. to the applicable State Site, or other delivery location specified in the Solution Order, at a mutually agreeable time.  Risk of loss for such Equipment shall pass to State upon proper delivery at the designated destination.  There shall be no additional charge to State for shipping, delivery or insurance beyond the prices set forth in the Solution Order.  In the event of damage to any Equipment or hardware during transit or if Contractor or its designee delivers Equipment or hardware that does not pass Acceptance Testing, then Contractor will replace such

Equipment or hardware at Contractor's expense, including covering all shipping costs associated with returning such items to Contractor.

2.1.6 <u>Inspection</u>. In accordance with the Installation Plan and the requirements for the Acceptance Testing Plan, all Equipment shall be inspected as follows: (i) following arrival of the initial deliveries at the central warehouse designated by State and (ii) for the same deliveries, when forwarded to the State Site (or any subsequent delivery made directly to the State Site(s)). Prior payments shall not be considered as waiving any right of testing or inspection of the State Entities under this Agreement. Determination by a State Entity that Equipment or component has passed Acceptance Testing is without prejudice to any other rights or remedies that such State Entity may have with respect to any subsequently uncovered non-compliance, defect, or non-conformity. Any State Entity may return any Equipment or component of the Solution to Contractor that it determines not to have passed Initial Testing or Acceptance Testing for replacement, and such returns shall be at Contractor's expense including as relates to transportation charges. Any return made by a State Entity for failure of the Equipment or any component of the Solution to pass the Acceptance Testing shall not be affected by any determination by State that such Equipment or component passed Initial Acceptance Testing. If Contractor fails to repair or arrange shipment and pickup of such rejected Equipment by a mutually acceptable common carrier (F.O.B. the State Site from which such rejected items will be dispatched) and redeliver appropriate replacement Equipment or components sufficient to cure the defect prompting the rejection and otherwise fully functional in accordance with the requirements of this Agreement, within thirty (30) days of the applicable State Entity's notification of such rejection, the State Entity shall be entitled to, at its option: (a) rescind the applicable Solution Order as to the rejected Equipment; (b) accept the rejected Equipment or component at an equitable price reduction agreed by the parties; or (c) demand specific performance.

2.1.7 <u>Cancellation of Solution Order for Convenience</u>. A State Entity may cancel a Solution Order or any part thereof at any time without charge or cancellation fee. If State cancels any Solution Order, other than pursuant to Section 2.1.6, then the applicable State Entity will bear the cost of shipping any Equipment already delivered pursuant to such Solution Order back to location designated by Contractor (F.O.B. the State Site from which such rejected items will be dispatched). The remedy set forth in this Section 2.1.7 shall be Contractor's sole and exclusive remedy and State's entire liability for claims related to any such cancelled Solution Order. Where a Solution Order is terminated by a State Entity pursuant to this Section 2.1.7, State or the other State Entity, as applicable, shall pay to Contractor for the Equipment actually delivered and used by the applicable State Entity and the Services satisfactorily performed by Contractor, in each instance, prior to the date of such termination. If a State Entity has prepaid Contractor any amounts under a Solution Order terminated pursuant to this Section 2.1.7, Contractor will refund to the applicable State Entity that portion of such prepaid expense which is attributable to month(s) of and after the termination of the applicable Solution Order.

2.2 <u>Documentation</u>. Contractor shall deliver to State in such form as State shall request the number of copies requested by State of Documentation relating to the Solution and any updates thereto at no additional charge to State. State Entities may duplicate the Documentation provided that the State Entities reproduce the copyright that appears on such Documentation being duplicated. In no event will any provision of this Agreement, or any right or benefit of State or the other State Entities provided for under this Agreement, be reduced, limited or otherwise adversely affected (including through any increase in cost, charge or expense, including taxes) as a consequence of the terms of the Documentation.

2.3 <u>Revisions; Upgraded Solution</u>.

2.3.1 If Contractor makes any revision, modification, enhancement, improvement or otherwise updates the Software, any component thereof, or code used therein to include any patches, upgrades, updates, new versions, substitutions, replacements, and other modifications, improvements and enhancements, including through the introduction of new products that have comparable purpose and functionality as the Software used by the State Entities (collectively the "**Revisions**"), such Revisions will be made available to the State Entities, and, if approved by State, provided by Contractor, on a no-charge basis (with a corresponding credit for the amortized cost of the component being replaced by the accepted Revision) and will be deemed to be part of the Solution. Contractor shall keep State informed of any

potential Revisions being considered by Contractor, Revisions which may be necessary to keep the Solution relevant, and any developments in the industry or election practices generally that could adversely affect the Solution or render it obsolete including by: (i) meeting with State quarterly throughout the twenty-four (24) months immediately following the Effective Date and then twice in each of the successive twelve (12) month period remaining during the Term to discuss the same and (ii) providing State with a detailed comparison of the Solution currently in use by the State Entities as of the date of the Proposed Revisions as would exist after any proposed Revisions (the "**Upgraded Solution**"). The Upgraded Solution and the Revisions contained therein shall be subject to State's prior review and approval and State may conduct such testing and evaluations of the same as it determines to be necessary. If State declines to use the Revisions or the Upgraded Solution, Contractor will remain obligated to support the existing version of the Solution during the Term. For the avoidance of doubt, except as otherwise specified in Section 2.3.2, Contractor shall provide all Revisions occurring at any time during the Term at no additional cost to, and without increases to any existing fees payable hereunder by, any State Entity.

2.3.2    If a State Entity requests that Contractor make Revisions to the Software that are major in nature and are required because of a change to Applicable Laws of the State of Georgia governing elections as in effect as of the date of this Agreement (e.g. a change to a ranked-choice voting system) ("**Major Revisions**") such Major Revisions may be accompanied by additional or increased fees as mutually agreed upon by the parties in accordance with the Change Request procedure described in Section 5.4. Notwithstanding the foregoing, Contractor acknowledges and agrees that any Revisions or other changes to the Solution that are required due to changes in federal law, regulation, or standard shall not be accompanied by an increased fee.

2.3.3    Throughout the Term and subject to any restrictions on implementing changes or adding services under this Agreement, Contractor will seek to improve the quality, efficiency and effectiveness of the Solution to keep pace with technological advances and support State's evolving needs as related to election administration.  Without limiting the generality of the foregoing, Contractor will: (a) identify and apply 'best practice' techniques and methodologies in performing and delivering the Solution and Services consistent with then-current industry standards and Contractor's normal course of business; (b) train Contractor Personnel in new techniques and technologies used generally within the industry; and (c) maintain the currency of the Contractor's tools, infrastructure, software and other resources. Notwithstanding anything contained herein to the contrary, Contractor shall not, without the prior written consent of State, (i) make any Revision or otherwise add to or alter the Solution or any component part thereof in any way that could remove Guaranteed Functionality or materially degrade Guaranteed Performance (or any portion thereof) or (ii) fail to make any Revisions necessary to ensure the Solution used by the State Entities remains current and at the forefront of voting technology throughout the Term, provided that such Revisions have been certified under the applicable provisions of the election laws and regulations of the State of Georgia, to the extent such certification is required.

2.4    <u>Additional Requirements and Dependencies</u>.  Items or services which are included in or required for a Solution but not provided directly by Contractor must be identified as such in the Schedule for the corresponding Solution.  Items or services which are required but are not available without further development or engineering must be identified as such in the Schedule for the corresponding Solution.  If for any Solution Contractor sells or licenses to State Contractor's own or a Contractor Solution Partner's software, hardware, network communications, or interfaces, including project tools that Contractor regards as proprietary, Contractor will provide State, in addition to descriptions contained in a Schedule, a separate purchase order, contract, or license agreement describing the terms of such transaction.  State will not be subject to extraneous royalties or other extended payment terms or usage restrictions of any kind arising from the purchase or license of such items unless shown in such purchase order, contract, or license agreement and unless such purchase order, contract, or license agreement is approved in writing by an authorized representative of State.

2.5    Within industry standards, State reserves the right to select the features, tools, accessories and companion applications to be used with the Solution to the extent reasonably necessary for the administration of elections. Contractor agrees to work with the other contractors who offer such products

and solutions. State reserves the right to approve system configuration, architecture, or functionality that affects the choice or use of the third-party products.

**3.    LICENSE AND AUTHORIZED USE.**

3.1    Grant of License.

   3.1.1    Grant of License.  Except as provided elsewhere in this Agreement or an applicable Solution Order, Contractor hereby grants to State a non-exclusive, irrevocable (during the Term), and worldwide license for State and other State Entities to use, install, execute, store, and display the object version of all Contractor Licensed Programs in connection with State's use, operation, or support of the Solution and in accordance with all the terms and conditions of this Agreement.  In addition, State, the other State Entities, and/or State Contractors, subject to the restrictions and processes set forth herein, shall be permitted, in connection with the use, operation, or support of the Solution, to: (a) use the Contractor Licensed Programs at any State Site; (b) make and use copies of the Contractor Licensed Programs at each State Site; (c) use the Contractor Licensed Programs for to fulfill the Mandatory Requirements including by providing access at all applicable State Sites to the Contractor Licensed Programs, other than by remote connection; and (d) use and/or copy of the Contractor Licensed Programs for the purpose of creating and using training materials relating to the Contractor Licensed Programs for internal purposes, which training materials may include flow diagrams, system operation schematics, or screen prints from operation of the Contractor Licensed Programs.

   3.1.2    License to Source Code Version. The License also includes the right to receive from Contractor and use the source code version of the Contractor Licensed Programs to the extent so provided in Section 3.1.4 and Section 3.2.

   3.1.3    Deactivation at State's Request. From time to time, a State Entity may elect to uninstall one or more Contractor Licensed Programs for some period of time.  If a State Entity elects to uninstall any Contractor Licensed Program such State Entity shall not be responsible for payment of any further fee applicable to such uninstalled Contractor Licensed Program(s). If a State Entity elects to reinstall any such Contractor Licensed Program(s) (i) the Extended Warranty applicable to such Contractor Licensed Program(s) will recommence as of the date such Contractor Licensed Program(s) is reinstalled and (ii) any such reinstallation by a State Entity will be at no cost to any State Entity other than as provided above.

   3.1.4    Rights Upon Contractor Insolvency.  All rights and licenses granted under or pursuant to this Agreement by Contractor to State and any State Entities are, and shall otherwise be deemed to be, for purposes of Section 365 (n) of the United States Bankruptcy Code ("**Bankruptcy Code**"), licenses to rights to "intellectual property" as defined under the Bankruptcy Code.  Contractor acknowledges that if it, as a debtor in possession or a trustee in bankruptcy in a case under the Bankruptcy Code, rejects this Agreement, then State or a State Entity may elect to retain its rights under this Agreement as provided in Section 365(n) of the Bankruptcy Code.  The parties further agree that, in the event of the commencement of any bankruptcy proceeding by or against Contractor under the Bankruptcy Code, State and each State Entity shall be entitled to retain all of such rights under this Agreement.  Contractor agrees and acknowledges that enforcement by State or any State Entity of any rights under Section 365(n) of the Bankruptcy Code in connection with this Agreement shall not violate the automatic stay of Section 362 of the Bankruptcy Code and waives any right to object on such basis.  Upon rejection of this Agreement by Contractor or the bankruptcy trustee in a bankruptcy case under the Bankruptcy Code and written request of State or a State Entity to Contractor or the bankruptcy trustee pursuant to Section 365(n) of the Bankruptcy Code, Contractor or such bankruptcy trustee shall:  (a) provide State or such State Entity the materials that are the subject of the rights and licenses described in this Section 3.1.4 and any Intellectual Property Rights otherwise required to be provided to State or such State Entity under this Agreement, or any agreement supplementary to this Agreement, held by Contractor or such bankruptcy trustee; and (b) not interfere with the rights of State or such State Entity provided in this Agreement or any other agreement supplementary to this Agreement, to the materials that are the subject of the rights and licenses described in this Section 3.1.4, and any Intellectual Property Rights provided under such agreements, including any

right to obtain the materials that are the subject of the rights and licenses described in this Section 3.1.4 and any such Intellectual Property Rights from another party.

3.2     Delivery and Use of Source Code.  No later than thirty calendar days from State of Georgia certification, Contractor shall, at its sole expense, (i) place in escrow with NCC Group, Inc., a Virginia corporation (the "**Escrow Agent**"), pursuant to the NCC Group Sourceone Escrow Agreement (Agreement# 46286) by and between Escrow Agent and Contractor dated November 4, 2010 (the "**Escrow Agreement**"), a copy of the Source Code incorporated within the Solution provided to the State Entities under this Agreement and (ii) cause the State to be enrolled as a "Licensee" under the Escrow Agreement.  Delivery of such Contractor Licensed Programs under this Agreement will be deemed to include and require delivery of a copy of the Source Code to the Escrow Agent under the Escrow Agreement, together with any updates thereto.  State shall be entitled to receive a copy of such Source Code and to use such Source Code to support and maintain the State Entities' authorized use of the Contractor Licensed Programs, upon the occurrence of a "Release Event" set forth in the Escrow Agreement.  If Contractor makes any update to any escrowed Contractor Licensed Program, Contractor shall furnish the Escrow Agent with a corrected or revised copy of the Source Code for such Contractor Licensed Program within the timeframe required by Section 1.2 of the Escrow Agreement.

3.3     Third Party Source Code.  Contractor shall identify to State in writing prior to the Effective Date and from time to time thereafter as often as required, any source code for Third Party Licensed Programs that Contractor is not authorized to deliver as part of the Source Code hereunder and for all such source code.

**4.     Services.**

4.1     Configuration Services.

4.1.1     State Solution and Functional Requirements.  Contractor acknowledges that State has relied, and will rely on, Contractor's experience and expertise in installing, implementing, and servicing the Solution purchased under this Agreement.  The Solution will, when installed and implemented, meet State's technology and business requirements including all Functional Requirements. For purposes of this Agreement "**Functional Requirements**" means the technical requirements of State including, where applicable: (a) an identification of all software applications to be run on such Solution (including Licensed Programs provided by Contractor under this Agreement) (collectively, the "**Designated Licensed Programs**"); (b) any performance requirements of the Solution, as applicable (the "**Performance Requirements**"); (c) the anticipated number of users of the Solution and/or Designated Licensed Programs; and (d) details relating to any State systems with which the Solution and Designated Licensed Programs are to interface. Any Functional Requirements described in the Installation Plan, Solution Order, or Services Order shall be incorporated herein.

4.1.2     Contractor System Proposal.  If State provides Contractor with Functional Requirements, Contractor shall, at no additional cost to State, analyze such Functional Requirements to determine the minimal amount and type of Solution that Contractor believes State needs to purchase in order to meet the Functional Requirements.  Within ten (10) business days of its receipt of the Functional Requirements, Contractor shall deliver to State a written proposal (each a "**Contractor System Proposal**") which shall thereupon become part of the Guaranteed Functionality and be attached to the applicable Solution Order. The Contractor System Proposal shall detail at a minimum (as applicable): (a) the Solution components required to meet the applicable Functional Requirements; (b) the minimal operating system, network, and third-party software necessary to run the Designated Licensed Programs in conformity with the Functional Requirements; and (c) the estimated cost for such Solution determined in accordance with this Agreement. Nothing contained in the Contractor System Proposal shall obligate State to purchase any Solution or portion thereof.

4.1.3     Attachments to Solution.  Subject to the other terms of this Section, in the event State provides Contractor with Functional Requirements for a certain Solution (and obtains confirmation of approval thereof as required below), State shall be entitled to install any attachment, feature, or device to, or install any Licensed Programs, on such Solution without affecting Contractor's representations and

warranties hereunder, if within a reasonable period of time not to exceed thirty (30) business days after receipt from State of notice of its intent to do so (such notice to be addressed to the Contractor Relationship Manager and delivered via return receipt mail), Contractor provides written notice to State either confirming compatibility with the Solution of the such items or stating reasonable grounds upon which it concludes such attachment, feature, device, modification, change, enhancement, upgrade, or addition will adversely affect its obligations, including any warranty or representation hereunder.  Contractor shall use reasonable efforts to respond to any such request.  Any request for such confirmation from State as provided under this Section that is not responded to by Contractor shall be deemed an acceptance by Contractor of the compatibility of such items with the Solution.  If after receipt of the Contractor notice advising State of Contractor's conclusion that such attachments, features, or devices will adversely affect its obligations State employs such attachment, feature, device, modification, change, enhancement, upgrade, or addition, Contractor shall not be liable for those representations and warranties that it notified State it reasonably concluded would be adversely affected as identified in the detailed notice.

4.2     Extended Warranty. Contractor shall provide from the Effective Date until December 31, 2021 and thereafter for so long as requested by each State Entity, a "total care solution" for the Solution, which, in addition to basic commitments contained in this Agreement, will include service guarantees sufficient to keep the Solution in good operating order in accordance with the Mandatory Requirements at all times (the "**Extended Warranty**"). The Extended Warranty will include all Maintenance Services, telephone and online support, installation assistance, troubleshooting, "break-and-fix," replacement or repair of Equipment and components. Contractor will, at its own expense, upon receipt of written notice from a State Entity of an Extended Warranty claim make all adjustments and modifications necessary to cure any defect or nonconformity affecting the Solution such that it is fully functional in conformity with the specifications and requirement set forth herein. Contractor shall immediately commence correction of all Extended Warranty claims made pursuant to this Section 4.2. For the avoidance of doubt, the parties acknowledge and agree that no fees, charge, or other costs associated with maintenance, repair, modification, adjustment, replacement, or other remediation of the Solution will be owed by any State Entity in connection with the Extended Warranty. The Extended Warranty shall be "all inclusive." If the parties agree that State or any of its personnel shall perform any services relating to an Extended Warranty claim on behalf of Contractor, State shall receive a credit against the next Milestone Payment to the extent of the services so performed by State. Notwithstanding the administration of any services by a State Entity on behalf of Contractor in connection with the maintenance or support of the Solution, Contractor shall at all times be responsible the integrity and quality of all Services and the Solution. Without limiting the foregoing, the following conditions apply to the Extended Warranty:

> 4.2.1     State Entity shall bear the shipping costs to return the malfunctioning item of Hardware to Contractor, and Contractor shall bear the costs for ground shipping the repaired or replaced item of hardware to State Entity.  Shipping costs are based on ground service rates. If faster shipping service is required, the shipping cost shall be at the State Entity's expense.

> 4.2.2     Repairs will be conducted and parts replaced at the Contractor repair depot, followed by an inspection.

> 4.2.3     The following services are among those not covered by this Warranty, but will be made available to the State Entities at Contractor's time and material rates specified on the Fee Schedule:

> (a)     Replacement of the following consumable items required for operation of the Equipment: batteries, paper rolls, ribbons, seals, smart cards, and removable memory devices and disks;

> (b)     Replacement of Equipment that has been irreparably damaged by abuse by acts of the State or its employees;

> (c)     Replacement of Equipment that is lost due to theft;

> (d)     Repair or replacement of hardware damaged by of accident, disaster, theft, vandalism, neglect, or abuse;

(e)    Repair or replacement of hardware Equipment that has modified by any Person other than those expressly authorized in writing by Contractor; and

(f)    Repair or replacement of Equipment from which the serial numbers have been removed.

4.3    Training Services. Contractor shall provide training services ("**Training Services**"), for the fees set forth in the Solution Order, on such dates and locations mutually agreed upon, and shall make available any additional training requested by State which will be for the fees set forth in an additional Services Order Attachment (defined below).  In addition and at no cost to State, upon request by State, Contractor shall (a) prior to the date of the Presidential Preference Primary provide (March 24, 2020) to up to ten (10) business days (consecutive but for intervening weekend) of training to up to four (4) State designated personnel covering basic level 1 support issues relating to the maintenance of such initial Solution, and (b) up to three (3) business days (consecutive) of training for to up to four (4) State designated personnel on similar issues during each subsequent period.  All such training shall occur at the Contractor designated Contractor location within Georgia, and State shall be responsible for all travel, living and other out-of-pocket expenses incurred by such State designated personnel to attend such training.  State shall have the right, at its expense, to copy and distribute any and all training materials within State and its other State Entities, and to distribute such materials to train its personnel in the use of the Solution without additional charge by Contractor, provided all proprietary notices of Contractor are duplicated and no modifications to such materials are made without Contractor's prior written consent.  Contractor represents that the Training Services described in the Training Plan attached to the Solution Order as Attachment 6 are designed to enable State personnel to productively use and operate the Solution.  All Training Services shall be conducted by qualified instructors.

4.4    Other Services.  In the event State wishes Contractor to provide software development or software customization, and/or consulting services, such Services shall be provided pursuant to written Services Orders detailing the Services to be performed.  Each such Services Order shall have attached to and incorporated into it all delivery, Milestone Schedules, Specifications, Performance Levels (or other Service Level Agreements), disaster recovery plans or other mutually agreed project requirements or documents related to the Services to be provided (each a "**Services Order Attachment**").  All Services Orders and Services Order Attachments shall be mutually agreed by the parties and executed by their authorized representatives but shall take substantially the form contained in Exhibit C to this Agreement.  All Services Orders require a validly issued State purchase order. Notwithstanding anything contained in this Agreement to the contrary, all Services ordered by a State Entity, and provided by Contractor, pursuant to a Services Order shall be included with the annual License Fee set forth on the Fee Schedule payable by the State Entities, except where such Services are required because of a Major Revision, in which case additional fees may be agreed upon by State and the Contractor in accordance with Section 2.3.2.

**5.    CHANGE CONTROL.**

5.1    No Deviation. Contractor shall not deviate from the terms and conditions of a Solution Order or Services Order by substitution, deletion, or additions to the Solution, Services or other Deliverables without prior written approval or consent to waiver signed by a duly authorized representative of State or the applicable State Entity. Either party may request or recommend changes by following the change control procedures set forth in this Section 5.

5.2    Change Order.  Either party may request or recommend changes to the Solution, Services or the scope or nature of Deliverables being developed, by having its Project Manager provide the other party with a written request or recommendation for changes in writing, signed by such requesting party (each a "**Change Request**").  The party receiving the Change Request shall provide a written response to the Change Request, signed by such receiving party, on the same form (a "**Change Response**") in the manner specified below.  Each Change Request and associated Change Response (if any) expressly accepted by the non-requesting party as evidenced by its signature on the applicable Change Control Form shall be deemed a "**Change Order**," unless the non-requesting party has proposed changes to the original Change Request from the requesting party that require the non-requesting party's acceptance by execution of the revised Change Request, which, upon execution by the initially requesting party without change, shall be

deemed a "Change Order." Change Requests, Change Responses and all resulting Change Orders shall be in the form attached to this Agreement as <u>Exhibit E</u> (the "**Change Control Form**"). Any Change Request that is not responded to by the receiving party shall be deemed rejected. Any Change Request not responded to by the non-requesting party as provided below shall be deemed rejected.

5.3 <u>Contractor Requested Change</u>. If the Change Request is submitted by Contractor to State, the Change Request shall, to the extent known at the time of the request, indicate schedule changes and any other items Contractor believes the Change Request is likely to impact (each an "**Impact Analysis**"). If a complete and final Impact Analysis cannot be specified, or if aspects of the Impact Analysis cannot be determined at the time of the request, Contractor shall so indicate on the applicable Change Control Form, including a detailed explanation of the basis of such inability of Contractor to so determine. State shall indicate its acceptance or rejection of the Change Request and/or provide a counter-proposal to the Impact Analysis stated thereon via a Change Response. In no event shall any Contractor-submitted Change Request include any additional charges or purport to increase any of the fees set forth on the Fee Schedule payable by a State Entity hereunder. A Contractor submitted Change Request shall not become a Change Order unless such Change Request (and its related Impact Analysis) are expressly accepted by State as evidenced by its signature on the applicable Change Control Form.

5.4 <u>State Requested Change</u>. If the Change Request is submitted by State to Contractor, then Contractor shall provide an initial response to the Change Request within three (3) business days of the receipt of the Change Request or such other time specified by State that is reasonable and appropriate to the scope of such requested change. Contractor shall provide in its initial Change Response a detailed Impact Analysis, or a date by which such detailed Impact Analysis will be provided in a later Change Response. If a complete and final Impact Analysis cannot be specified, or if aspects of the Impact Analysis cannot be determined, at the time of the Change Response, Contractor shall so indicate in its Change Response, including a detailed explanation of the basis of such inability of Contractor to so determine. In no event shall any State-submitted Change Response become a Change Order unless such Change Response (and its related Impact Analysis) are expressly accepted by Contractor as evidenced by its signature on the applicable Change Control Form.

5.5 <u>Limits on Discretion</u>. Notwithstanding any contrary term in this Section, Contractor may not decline to accept any Change Request that: (a) State reasonably believes would reduce the cost of performance, provided that an equitable adjustment in compensation is made for the reasonable out-of-pocket costs of any performance or preparation already undertaken for the original, pre-change Solution, Services, or other Deliverables; or (b) increases Contractor's internal cost or magnitude of required performance, provided that the requested changes are reasonable in scope and the parties agree upon a commensurate increase in compensation to the extent otherwise permitted by this Agreement.

5.6 <u>Status of Change Orders</u>. Each Change Order shall become a part of the Solution Order or Services Order to which it relates as if initially entered into as part of that Services Order, and, together with such Solution Order or Services Order, shall be governed by this Agreement. The parties may mutually agree to supersede, modify, or amend these change control procedures in writing under a Solution Order or Services Order, provided they make express reference to this Section or portion thereof being superseded, modified or amended. If there are conflicts between (or ambiguities within) any Solution Order or Services Order and a subsequent Change Order proposing the delivery of specific Solution, Services, or other Deliverables, the Change Order shall control. If there are conflicts between Change Orders, the most recent Change Order shall control.

## 6. PERSONNEL.

6.1 <u>Relationship Manager</u>. Contractor shall appoint a qualified member of its staff to act as a dedicated manager of Contractor's relationship with State (the "**Contractor Relationship Manager**"), whose duties shall be to act as primary liaison between Contractor and State for all matters relating to Contractor's performance, and the performance of all Contractor Solution Partners, under this Agreement, who shall have sufficient authority to grant or communicate the granting of all necessary approvals and who shall: (a) have overall managerial responsibility for the responsibilities of Contractor and all Contractor Solution

Partners under this Agreement; (b) have direct access to the key decision makers of Contractor and all Contractor Solution Partners; and (c) be able to call upon the experience, expertise and resources of Contractor and each Contractor Solution Partner as needed to properly, efficiently and timely perform their duties under this Agreement. The Contractor Relationship Manager shall be a resource in addition to any Project Manager or project management established under any Solution Order or Services Order. State may, at its option, designate one or more individuals who shall use reasonable efforts to facilitate Contractor in carrying out an efficient delivery of Services ("**State Relationship Managers**"). Both parties shall notify the other party of a change in the identity of their respective Relationship Managers.

6.2     Contractor Personnel. The individuals who perform Services, whether employees or independent contractors of Contractor (or of a Contractor Solution Partner) are hereinafter referred to as "**Contractor Personnel**" and at all times meet the requirements set forth below. If Services are to be performed outside of the United States all Contractor Personnel shall meet these requirements to the maximum extent applicable, and shall further meet, to the maximum extent applicable, equivalent requirements under local law. The Contractor Personnel assignment requirements are as follows:

(a)     Unless specifically agreed otherwise by State in each instance, Contractor shall only assign as Contractor Personnel employees of Contractor and those limited non-employees of Contractor who qualify as "independent contractors" or "temp employees" by meeting the following respective criteria: (i) they are consultants who provide services to Contractor or its entities in the ordinary course of business under independent contractor relationships of a type commonly referred to in the United States as "1099" relationships, or (ii) they are individuals who provide services to Contractor or its entities on a leased employee or so-called staffed- or temp-employee basis pursuant to contracts between Contractor and the third-party staff augmentation companies or staffing companies, and (iii) they are, in all cases, subject, in their individual capacities, to written duties of confidentiality and obligations to protect State's Intellectual Property Rights that are at least as protective of State as those contained in this Agreement;

(b)     Prior to assigning any individual to perform the Services in the United States (which may have been completed at the time of hire), Contractor shall perform a background check, such check shall include the (i) United States Department of Motor Vehicles; (ii) credit check; (iii) national criminal check; (iv) government excluded parties list; (v) the United States Department of Health excluded parties list; (vi) (vi) a determination that the individual's employment complies with relevant immigration law; and (vii) Contractor shall obtain finger prints for all Contractor Personnel reasonably expected to have access to Confidential Information of any State Entity in connection with such individuals performance of Services hereunder. All information obtained by Contractor pursuant to this Section shall remain in Contractor's possession and Contractor shall not be obligated to disclose such information to State; and

(c)     Contractor shall not assign any person to perform Services who (i) refuses to submit to such checks; (ii) has in the last seven (7) years been convicted of a financial-related crime or a felony (excluding motor vehicle-related offenses); (iii) does not meet the requirements under immigration law to be employed. Contractor shall not be responsible for information not disclosed pursuant to the foregoing background check requirements.

6.3     State Review and Acceptance. If any Contractor Personnel performing Services is found to be unacceptable to State for cause, including demonstration that he or she is not qualified to perform the Services assigned, State shall notify Contractor of such fact and Contractor shall immediately remove said Contractor Personnel and, if requested by State, provide a qualified replacement. If any Contractor Personnel is found to be unacceptable to State for any other reason, State shall notify Contractor of such fact in writing, and Contractor shall promptly take reasonable and appropriate action.

6.4     Project Managers. Contractor shall designate a project manager ("**Project Manager**") who shall be principally responsible for owning and ensuring timely delivery of the Solution or provision of the Services, as applicable.

6.5     Continuity. If Contractor reassigns any Contractor Personnel, Contractor shall promptly provide a qualified replacement acceptable to State, and State shall not be charged for any training or transition time

for such replacement. Without limiting the generality of the foregoing, because the progress of a project specified in a Solution Order or Services Order may be dependent on such continuity, certain individual Contractor Personnel may be identified in a Solution Order or Services Order as key personnel ("**Key Personnel**"). Except as directed by State under Section 6.3 or for the reasons provided in this Section 6.5, Contractor shall not remove or reassign any Key Personnel at any time for any reason during the term of such individual's obligations of performance of Services under the applicable Solution Order or Services Order without State's prior written consent, such consent not to be unreasonably withheld. Contractor shall have the right to re-assign any Key Personnel in case of: (a) death, (b) disability, (c) bona fide termination of employment, (d) changes in Applicable Law, (e) changes in immigration status not caused by the negligence of Contractor or the applicable individual and which could not have otherwise been reasonably foreseen, or (f) upon the occurrence of events having a significant personal impact on the affected Key Personnel (such as death of next of kin). Any re-assignment shall be so permitted only to the limited extent and for such limited duration as required to reasonably accommodate the circumstances of the adversely affected Contractor Personnel.

6.6     Resource Prioritization.  If there is any conflict in the resource demands between State and the other State Entities (or among the other State Entities), Contractor shall escalate such conflict to the Contractor Relationship Manager and State Relationship Manager immediately upon becoming aware of its existence, and the respective Relationship Managers shall work with the applicable Project Managers to determine appropriate prioritization and allocation of Contractor Personnel.

6.7     Subcontractors; Ineligible Status.  The unique abilities, knowledge, and skills of Contractor and Contractor Personnel constitute a material inducement for State entering into this Agreement. Contractor agrees that it shall not employ any agent or subcontractor in connection with the performance of any Services without the prior written consent of State, which consent may not be unreasonably withheld.  If State does consent, Contractor shall provide State with written evidence (acceptable to State) of said agent's or subcontractor's compliance with the confidentiality and intellectual property provisions of this Agreement prior to the disclosure of any State Confidential Information to, or the performance by, any such agent or subcontractor in connection with or pursuant to this Agreement. Contractor certifies that the Contractor and/or any of its subcontractors have not been debarred, suspended, or declared ineligible by any agency of the State of Georgia or as defined in the Federal Acquisition Regulation (FAR) 48 C.F.R. Ch.1 Subpart 9.4. Contractor will immediately notify State if Contractor is debarred by State or placed on the Consolidated List of Debarred, Suspended, and Ineligible Contractors by a federal entity. Contractor's use of any subcontractors does not relieve Contractor of its representations, warranties or obligations under this Agreement. Without limiting the foregoing, Contractor will: (i) be responsible and liable for the acts and omissions of each of its subcontractors (including Contractor Personnel and Contractor Solution Partners) to the same extent as if such acts or omissions were by Contractor or its employees; and (ii) be responsible for all fees and expenses payable to, by or on behalf of each subcontractor in connection with this Agreement, including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes, unemployment insurance, workers' compensation insurance payments and disability benefits.

6.8     Site Visits.  Upon the giving of at least five (5) business days' notice to Contractor, State Entity personnel shall have the right to visit the offices of Contractor and/or the Contractor Solution Partners in order to observe the performance of any Services at the sole cost of the applicable State Entity. The State Entities shall cooperate with Contractor to ensure that such site visits do not unreasonably interfere with Contractor's normal business operations.

6.9     Timely and Quality Performance.  The Contractor Personnel shall perform the Services with promptness and diligence, and in all events by the times specified therefor in the applicable Solution Order or Services Order, if any.  At all times during the Term Contractor shall retain sufficient number of Contractor Personnel, with the required skills, to meet the ongoing needs of State and ensure that Contractor achieves the timely implementation of the Solution, including the Guaranteed Functionality and Guaranteed Performance. Contractor shall be responsible for the management of all Contractor Personnel in the performance of Services, the integrity and quality of all Services and Deliverables, and the required periodic reporting of the status of all Services and Deliverables to State.  In response to any feedback or

performance assessment provided by State to Contractor Personnel, Contractor shall provide State written acknowledgement within three (3) business days of receipt of the assessment and a comprehensive response including a formal mitigation action plan within ten (10) business days of receipt of the assessment addressing each of the identified areas requiring Contractor improvement.

## 7.    **COMPLIANCE.**

7.1    <u>State Policies and Directives</u>.  Contractor shall ensure that all Contractor Personnel, while at a State Site, will abide by all reasonable policies and directives issued by State, including those relating to its Code of Business Conduct, all on-site rules of behavior, work schedules, security procedures, and other standards and procedures as may be established by State from time to time, provided such policies or directives are published (or otherwise made know) to Contractor prior to such visit and are limited to administrative and security-based issues. Accordingly, Contractor hereby agrees that prior to sending any Contractor Personnel to work at any State facility, Contractor will provide such Contractor Personnel with a copy of all written State policies and procedures provided by State to Contractor and will have Contractor Personnel review and acknowledge same.  In addition, Contractor will cause all Contractor Personnel to comply, when at a State Site, with such standard safety policies applicable to such site and such additional policies as State may, from time to time, communicate to Contractor or Contractor Personnel.

7.2    <u>Cyber Security Audits and Reporting</u>.

7.2.1    Contractor has an established information security program containing appropriate administrative, technical and physical measures to prevent data (including Regulated Information (as defined in Section 11.5 below) that Contractor may have access to or be processed by the Solution) against accidental, unauthorized, or unlawful loss, destruction, alteration, disclosure or access consistent with applicable laws.  Contractor, on at least an annual basis, shall, at Contractor's expense, participate in a risk assessment relating to Contractor's controls that ensure data security and reduce cybersecurity threats from being realized conducted by an independent third-party agreed upon by State.  During the Term Contractor will promptly provide to State a summary of each such assessment that is performed by or on behalf of Contractor, which summary may be redacted to exclude information unrelated to the Solution or Services provided under this Agreement. More specifically, Contractor or its auditor will provide to State at least one (1) hard copy and one (1) electronic copy of the summary from each such assessment at no charge. Contractor, at its own expense, will undertake such actions, and implement such changes, as reasonably necessary to remedy any material deficiencies, concerns or recommendations identified through any audits, examinations, or tests described in this Section 7.2.1 and ensure Contractor's continued compliance with Contractor's obligations as relate data security under this Agreement.

7.2.2    Contractor further agrees that it shall:

(a)    Provide the State Entity with the name and contact information for the Contractor's primary information security contact.

(b)    Notify the State Entity's primary security contact of an actual or security breach or the suspicion of the occurrence of a security breach (hereinafter a "**Breach Incident**") as soon as practical but no later than forty-eight hours after Contractor becomes aware of a Breach Incident by contacting the primary business and security contact at the State Entity by both telephone and email as agreed upon.

(c)    Upon the State Entity's written request and no less than 10 business days following such written request, Contractor shall permit State Entity's information security office to conduct or oversee an audit of the Contractors facilities and/or practices to confirm compliance with this Agreement as well as any applicable laws. Contractor is not required to permit the State Entity to conduct or oversee more than one audit per calendar year unless the process, technology, or services change prior to the next audit or there has been a Breach Incident. All costs associated with such audits shall be the responsibility of the State Entity.

(d)     At any time during the term of this Agreement at the State Entity's written request, or upon termination of the expiration of this Agreement for any reason, Contractor shall instruct all authorized persons to promptly and securely return or destroy any and all State Entity data, whether in written, electronic, or other form of media.

7.3     Applicable Law – Contractor.  Contractor shall obey and abide by all Applicable Laws, regulations, ordinances and other rules of the United States of America, and any other jurisdiction where Services are, or may likely be, performed in connection with this Agreement (including respective states, territories or subdivisions thereof or any other duly constituted public authority in any such jurisdiction). Without limiting the generality of the foregoing:

7.3.1     Contractor will ensure that no labor will be used in the performance of this Agreement that violates the child labor laws of any country in which State or any State Entity is located or any country in which Contractor is located or performs Services hereunder. If State believes that Contractor is using such labor, then State may immediately terminate this Agreement in which event State shall have no liability whatsoever to pay compensation to Contractor, including for Services already performed.

7.3.2     Contractor represents and warrants that: (i) Contractor, Contractor Affiliates, and any and all of their respective parents, subsidiaries, officers, directors, employees (including all Contractor Personnel), and all of their agents and business partners (collectively, "**Contractor Parties**") are in compliance with, in good standing under, and have not violated, any United States laws or the laws of any other country or countries relating to the transfer of technology, including the Export Administration Regulations, the International Traffic in Arms Regulations and the regulations administered by the Office of Foreign Assets Control of the United States Department of the Treasury or other similar laws or any foreign country (collectively, the "**Transfer Control Laws**"); (ii) Contractor Parties are not, and never have been, named as a "debarred" party, "denied person or entity", "embargoed entity" or otherwise sanctioned under, or prohibited from engaging in activities subject to, the Transfer Control Laws; and (iii) Contractor will immediately notify State in the event that any of the Contractor Parties are named as a "debarred" party, "denied person or entity," or "embargoed entity," or otherwise sanctioned under, or prohibited from engaging in activities subject to, the Transfer Control Laws; and (iv) Contractor Parties will comply with all applicable Transfer Control Laws.

7.3.3     Contractor acknowledges and understands that improper use of material non-public information may be a violation of the law, including the laws concerning insider trading, and may subject it and its employees to prosecution, civil liability, fines and criminal penalties, and, where applicable, may also be grounds for termination of this Agreement.

7.3.4     The Contractor Parties shall comply with all applicable federal, state, and local laws, rules, ordinances, regulations and orders now or hereafter in effect when performing under this Agreement, including without limitation, all laws applicable to the prevention of discrimination in employment and the use of targeted small businesses as subcontractors or contractors.

7.3.5     Certain equipment, software, and technical data which may be provided hereunder may be subject to export and re-export controls under the U.S. Export Administration Regulations and/or similar regulations of the United States or any other country.  Contractor shall be responsible for complying with all export and re-export laws and regulations, including: (i) local license or permit requirements, (ii) export, import, and customs laws and regulations, which may apply to certain equipment, software, and technical data provided hereunder; and (iii) all applicable foreign corrupt practices acts.

7.3.6     The Contractor Parties shall comply with all federal, state, and local laws regarding business permits and licenses that may be required to carry out the work performed under this Agreement. The Contractor Parties shall also comply with all policies and standards of the State Entities in effect during the performance of this Agreement, including but not limited to the State Entity's policies and standards relating to personnel conduct, security, safety, confidentiality, and ethics.  Further, the provisions of O.C.G.A. Section 45-10-20 et seq. have not and must not be violated under the terms of this Agreement.

7.3.7    Contractor shall obtain and maintain, and shall cause its subcontractors to obtain and maintain, all approvals, permissions, permits, licenses, and other documentation required to comply with all Applicable Laws, rules, or regulations. Contractor certifies that Contractor is not currently engaged in, and agrees for the duration of this Agreement not to engage in, a boycott of Israel, as defined in O.C.G.A. § 50-5-85. Contractor agrees that any failure by Contractor or Contractor's employees to comply with any of the obligations of this section may be treated by the State Entity as a material breach of this Agreement by the Contractor.

7.3.8    Contractor hereby certifies as follows:

(a)    Contractor will not engage in the unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana during the performance of this Agreement.

(b)    If Contractor has more than one employee, including Contractor, Contractor shall provide for such employee(s) a drug-free workplace, in accordance with the Georgia Drug-free Workplace Act as provided in O.C.G.A. Section 50-24-1 et seq. throughout the duration of this Agreement.

(c)    Contractor will secure from any subcontractor hired to work on any job assigned under this Agreement the following written certification:  "As part of the subcontracting agreement with (Contractor's Name), (Subcontractor's Name) certifies to the contractor that a drug-free workplace will be provided for the subcontractor's employees during the performance of this Agreement pursuant to paragraph 7 of subsection (b) of Code Section 50-24-3."

7.3.9    Contractor may be suspended, terminated, or debarred if it is determined that any of Contractor's certifications in Section 7.3.8 is false or Contractor has violated any such certification by failure to carry out the requirements of O.C.G.A. Section 50-24-3(b).

7.4    <u>Permits and Licenses</u>.  Contractor acknowledges and agrees that it is solely responsible for procuring and maintaining all necessary permits and licenses required in connection with Contractor's performance, and the performance of all Contractor Solution Partners, under this Agreement, including obtaining all necessary shipping and/or delivery permits and processing and procuring all necessary visas and passport documents for all Contractor Personnel in advance of their assignment in connection with Services.  Contractor will obtain, at Contractor's sole cost and expense, all such permits, licenses and visas in a timely manner to avoid any unnecessary delay.

## 8.    **PERFORMANCE STANDARDS, MONITORING AND MEASUREMENT**.

8.1    <u>Performance Levels</u>. Contractor shall provide the Solution and perform the Services with promptness and diligence, and in all events by the times specified therefor in the applicable project documentation, Solutions Order, or Services Order as applicable.  Contractor shall be responsible for the management of all Contractor Personnel in the performance of Services, the integrity and quality of all Services and all applications and Deliverables, and the required periodic reporting of the status of all Services and such applications and Deliverables to State.  In fulfilling its obligations under this Agreement, Contractor shall perform, and shall cause each Contractor Solution Partner to perform, all Services and all Deliverables to perform, in accordance with the response, resolution, and other support standards and timelines and such other systems availability and processing requirements as are set forth in the applicable Services Order (the "**Performance Levels**").  If State management, including the State Relationship Manager or Project Manager, provides feedback or performance assessments that identify areas requiring Contractor improvements, Contractor shall provide State written acknowledgement within three (3) business days of receipt of the assessment and a comprehensive response, including a formal mitigation action plan, within ten (10) business days of receipt of the assessment addressing each of the identified areas requiring Contractor improvement.

8.2    <u>Non-Conformance</u>.

**8.2.1** <u>Generally</u>. If Contractor or any Contractor Solution Partner fails to meet any Performance Level or fails to perform its other obligations hereunder, Contractor shall immediately: (a) investigate and report to State on the causes of the failure; (b) prepare an action plan for State's approval to correct the failure; (c) advise State, as and to the extent requested by State, of the status of remedial efforts being undertaken with respect to such failure; (d) correct the failure and begin meeting the Performance Levels; and (e) take appropriate preventive measures so that the failure does not recur. In addition, failures to meet a Performance Level shall entitle State to receive liquidated damages and/or credits (as applicable) from Contractor, as provided in the applicable Services Order.

**8.2.2** <u>Reserved.</u>

8.3 <u>Measurement Tools</u>. Contractor shall utilize, and shall cause the Contractor Solution Partners to utilize, the necessary measurement and monitoring tools and procedures required to measure and report its performance against all Performance Levels. Such measurement and monitoring shall permit reporting at a level of detail sufficient to verify compliance with the Performance Levels. Contractor shall provide State with information and access to such tools and procedures, upon request, for purposes of verification. State also shall monitor and measure certain Performance Levels, and any discrepancy between Contractor and State measurements of the Performance Levels shall be resolved by reference to State's measurement and monitoring tools and procedures.

8.4 <u>Proactive Monitoring</u>. Contractor acknowledges and agrees that the performance of Services in accordance with this Agreement is critical to State's business and that State requires metrics to monitor such performance. Accordingly, at no cost to State, Contractor shall, and, if requested by State shall cause each Contractor Solution Partner to: (a) provide to State, on a quarterly basis, data (or metrics) regarding its progress in improving the quality and productivity of Contractor Personnel providing services pursuant to or in connection with this Agreement, including data on the number of Contractor Personnel, average experience, and turnover (on a project basis); (b) provide to State, on a quarterly basis, data on each project covering such matters as productivity, quality and timeliness, new development productivity measures (function points per person/day, error rates per function point, etc.) and maintenance project measures (requests serviced weekly etc.); and (c) provide to State a log reflecting State open issues that is to be updated on a monthly basis. In addition to the periodic delivery described above, Contractor agrees to provide State with the foregoing information within fifteen (15) days of a request made by State for the same.

8.5 <u>Coding Standards</u>. If Contractor or a Contractor Solution Partner will be performing development, programming or other coding services under a Services Order and the Deliverables thereunder will be owned exclusively by State (pursuant to Section 12 below), Contractor or the applicable Contractor Solution Partner shall, with respect to such Services Order, be responsible for such specific coding and naming standards and conventions as may be provided by State in connection with certain of its and/or its third-party licensors' requirements, as well as such quality performance and productivity provisions and documentation requirements, if any, set forth in the applicable Services Order. Contractor shall, in addition, be responsible for imposing the applicable quality assurance requirements on Contractor Personnel. State shall have the right to conduct quality audits and to perform or witness inspections or tests of the Deliverables furnished hereunder at Contractor's facility, at sole cost of State, at any time during development and prior to delivery. Notwithstanding anything contained in this Agreement to the contrary, State for itself, and on behalf of the other State Entities, acknowledges and agrees that the Solution shall not constitute "works made for hire", and shall remain the exclusive property of Contractor.

8.6 <u>Quality Assurance</u>. State may, at its option, employ consultants, including quality assurance consultants, for periodic review of any work or project, including evaluation of Change Orders and monitoring of compliance with Service Level Agreements and Performance Levels. References to State in this Agreement shall include such consultant to the extent State so indicates for that purpose. If so requested by State, State shall have the right to receive and review quality assurance reports produced by Contractor. Contractor shall accommodate reasonable State requests to expand or modify Contractor's quality assurance procedures for Projects in progress.

8.7 <u>Material Defects</u>.  Contractor shall give State prompt notice if Contractor becomes aware of a material defect in any Deliverables or the performance of any Services or any issue that may affect Contractor's ability to implement the Solution, including all Guaranteed Functionality and Guaranteed Performance, in accordance with the timeline required by this Agreement.

## 9.    **DELIVERY AND ACCEPTANCE.**

Each delivery and implementation of the Solution and Services or any additional applications at a State Site shall be subject to acceptance by State in accordance with acceptance testing procedures, as provided in the Solutions Order. An "**Acceptance Testing Plan**" for the Solution and Services shall be prepared by Contractor and submitted to State prior to execution of this Agreement, which agreement, as approved by State shall be incorporated into this Agreement. The Acceptance Testing Plan shall be based on full implementation of the Solution and Services and shall include testing procedures sufficient to demonstrate that (a) all functionality has been provided and performs in the applicable State Entity's environment, in all material respects, in accordance with the Guaranteed Functionality; (b) the applications and deliverables meet the warranty requirements specified in this Agreement and the applicable Solution Order; (c) the applications and Deliverables will perform at acceptable levels required to support State's implementation of the SVS and the operation of general and primary elections using such SVS; and (d) the applications and Deliverables will successfully complete an "election voting and processing" simulation. Testing procedures will include testing before, at, and after "go-live" as appropriate before the Solution "goes-live", but the testing will continue after "go-live" as appropriate to verify that the applications and services meet applicable requirements in a full production mode.  State representatives will have the right to be present during the Acceptance Test and review all test results.  When the applications and Deliverables meet the requirements of the Acceptance Test, State will provide a written sign-off that Acceptance has occurred.  If the applications and Deliverables fail to meet all material requirements of the Acceptance Test, Contractor will, at its sole expense, correct the deficiencies and the Acceptance Test will then be repeated.  Acceptance will not relieve Contractor of responsibility for its warranties, support and maintenance obligations, or achieving the Performance Levels.

## 10.    **CHARGES, PAYMENT, AND TAXES.**

10.1 <u>Payments</u>. As further provided in Contractor's fee proposal delivered by Contractor, accepted by State prior to execution of this Agreement, and attached hereto as <u>Exhibit G</u> (the "**Fee Schedule**"), and subject to the other terms and conditions of this Agreement, in consideration of Contractor's agreement to provide the Solution to State, deliver necessary documentation, train State Personnel, and render related services in accordance with this Agreement, Contractor shall be entitled to be paid as follows (each a "**Milestone Payment**" unless otherwise noted):

10.1.1   $44,967,752.40 on the Effective Date, inclusive of initial implementation/training and initial Equipment costs.

10.1.2   $1,500,000.00 for training and implementation upon Certification of the November 2019 Election.

10.1.3   $4,386,020.40 for remaining costs for training and implementation upon Certification of the March 2020 Presidential Preference Primary Election.

10.1.4   $1,500,000.00 for final training and implementation and hold back upon Certification of the November 2020 Election.

10.1.5   $834,673.35 upon Final Acceptance of election management system hardware and software to the State.

10.1.6   $816,768.00 upon Final Acceptance of ImageCast Precinct scanners (without ballot box) and ImageCast Central scanners hardware and software for absentee/mail ballot voting.

10.1.7   The following items will be invoiced on a monthly basis upon unit Final Acceptance by the State:

(a)   Electronic Pollbook hardware and software at a $708.93/unit for a total cost of $5,671,440.00.

(b)   ImageCast Precinct scanners hardware and software at $2,330.36/unit for a total cost of $8,156,260.00.

(c)   ImageCast X BMD hardware and software at the remaining unit cost* of $753.53 for a total cost of $22,102,676.50.

\* Remaining Cost reflects an overall reduction resulting from the initial milestone payment equaling $44,967,752.40 for initial implementation and ImageCast X BMD costs.

10.1.8   <u>Equipment Charges</u>. The price for the Equipment ordered by a State Entity, as contemplated by the Fee Schedule, shall be set out in each  applicable Solution Order (the "**Equipment Charges**"). Contractor shall deliver an invoice for the relevant Equipment Charges to the applicable State Entity in accordance with the following: (a) fifty percent (50%) of the Equipment Charges following State's completion of initial Acceptance Testing and (b) the remaining fifty percent (50%) of the Equipment charged upon the applicable State Entity's confirmation that testing of the same has been satisfactorily completed at the State Site at which such Solution is to be implemented and administered as designated by the applicable State Entity. Notwithstanding anything contained herein to the contrary the parties acknowledge and agree (i) that purchases of new models of Equipment released by Contractor shall be made available to the State Entities at the same price as the Equipment purchased as part of the Solution Order dated as of even date herewith, provided, if the State Entities shall not be obligated to upgrade to such new models and if any State Entities do not elect to purchase such new models, Contractor shall continue to support the version of the Equipment then in use by the State Entities, including ensuring that such Equipment is supported by the Software.

10.1.9   <u>T&M Rates</u>. Except as otherwise set forth in the Fee Schedule, this Agreement does not contemplate, and Contractor shall not be entitled to, payment for any of its work, overhead, or expenses on a time and materials basis.

10.2   <u>Events Affecting Critical Milestones - Liquidated Damages</u>. By entering into this Agreement, Contractor acknowledges and agrees that in the event that State determines in good faith that Contractor has not meet a Critical Milestone by the applicable Milestone Deadline, the State will suffer actual damages that will be impractical or extremely difficult to determine and the State shall be entitled to recover agreed upon liquidated damages in an amount equal to  $1,000 for each calendar day after the applicable Milestone Deadline until the Critical Milestone in question has been satisfactorily completed by Contractor. Contractor further acknowledges and agrees that the amounts to which State may become entitled under this Section 10.1 are not penalties but a fair and reasonable estimate of the anticipated harm that may be caused to the State Entities by delays that result in Contractor failing to meet the Milestone Deadlines for Critical Milestones provided that such liquidated damages be deemed to be constitute State's sole remedy, exclusive or otherwise, for any damages caused by such a failure and shall be in addition to any other monetary and non-monetary remedies available to State under this Agreement, at law or in equity. Notwithstanding anything contained in this Agreement to the contrary, in the event that the State becomes entitled to any amount under this Section 10.1, State may, in its sole discretion, set off the sum owed it against any sum owed to Contractor under this Agreement or any other contract between the State and Contractor.

10.3   <u>Invoices</u>. Contractor shall submit invoices to the applicable State Entity (a) thirty (30) days prior to the anticipated completion of the applicable Installation Event to which a Milestone Payment relates; and (b) with respect to Equipment Charges, in accordance with Section 10.1.8.  The applicable State Entity shall pay all undisputed correct invoices, which are timely submitted to it, within thirty (30) days of receipt.

*Master Solution Purchase and Services Agreement*

10.4 <u>Disputed Charges</u>. In the event State reasonably believes that any invoice submitted by Contractor contains any discrepancies or errors, State shall notify Contractor of such discrepancy(ies) or error(s). The parties agree to cooperate in good faith to resolve any dispute in a timely manner. Upon receipt of State's notification of dispute, Contractor will investigate such dispute and will either (a) correct such invoice if a correction is so required and provide a corrected invoice or other such notice in writing, or (b) if no correction is required, send State written notice that Contractor has investigated such dispute and that Contractor considers the amounts due and payable and no longer in dispute. State shall not be required to make payment on any disputed portion of an invoice until such time as the dispute has been finally resolved by the parties. For the avoidance of doubt, a dispute regarding an invoice and State withholding payment of disputed charges as permitted under this Agreement will not permit Contractor to suspend or cease performance of the Services and Contractor shall continue to provide such Services.

10.5 <u>Currency; Settlement Method</u>. State shall settle payments with Contractor by wire transfer or such other payment method as mutually agreed by the parties.

10.6 <u>State Status as Most Favored Customer</u>. During the Term, Contractor shall offer to State and the other State Entities the Solution and any other Services which Contractor offers on a general basis to its other customers, at prices at least as favorable as Contractor offers or provides to any Person that orders similar products and quantities as ordered by State pursuant to Solution Order No. 1. In comparing the prices offered by Contractor to other customers with the prices offered to State under this Agreement the fees paid by State hereunder for the applicable Solution shall be reduced by an appropriate amount to compensate for any installation, training, migration and other services provided by Contractor hereunder at no charge and to account for any credits provided by Contractor to State hereunder. The Contractor shall give prompt written notice to the State of each such instance in which more favorable fees as described above are extended to another State. On each anniversary of the Effective Date and at such other time as the State may request (based on the State's reasonable belief that the Contractor has an obligation under this Section), the Contractor shall deliver to the State a certificate duly executed by an appropriate executive of the Contractor, certifying that, as of the date of such certificate, and at all times since the date of the last certification pursuant to this Section (or since the Effective Date if there has been no prior certification), stating that the Contractor is and has been in compliance with this Section. If the Parties are unable to agree as to the Contractor's compliance with the requirements of this Section or, as to the appropriate means to effectuate this Section, then such issue shall be determined pursuant to Section 17.5.

10.7 <u>No Other Charges; Expenses</u>. Contractor acknowledges and agrees that the charges and fees described in this Section 10 shall be "all-inclusive" and represent the total cost for the Solution including all costs associated with all goods, software, and services to be provided Contractor pursuant to this Agreement, including (i) the SVS components described on each Solution Order, (ii) all Equipment described in the applicable Solution Order, (iii) the Training Services described in such Solution Order, and (iv) the Extended Warranty and all maintenance, support, and remedial action thereunder required to ensure the Solution and all components thereof are available to the ordering State Entity and function in accordance with the requirements of this Agreement. In no event shall State be liable for any amounts not described in this Section 10 or any other charges, fees, expenses, or costs incurred by Contractor, which Contractor failed to consider in its eRFP Response. Accordingly, no such expenses of any Contractor Party will be separately reimbursable by any State Entity.

10.8 <u>Taxes</u>.

10.8.1 State is exempt from Federal Excise Taxes, and no payment will be made for any taxes levied on Contractor's employee's wages. State is exempt from state and local sales and use taxes on the Services. Tax exemption certificates will be furnished upon request. Contractor or an authorized subcontractor has provided State with a sworn verification regarding the filing of unemployment taxes or persons assigned by Contractor to perform Services required in this Agreement, which verification is incorporated herein by reference.

10.8.2 By executing this Agreement the Contractor certifies it is either (a) registered with State Department of Revenue and collects and remits State sales and use taxes as required by Georgia law,

including Chapter 8 of Title 48 of the O.C.G.A. or (b) not a "retailer" as defined in O.C.G.A. Section 48-8-2. The Contractor also acknowledges that State may declare this Agreement void if the above certification is false. The Contractor also understands that fraudulent certification may result in State or its representative filing for damages for breach of contract.

10.9    Books and Records.

    10.9.1    GAAP Standards; Record Retention. Contractor shall maintain books and records in accordance with Generally Accepted Accounting Principles to substantiate Contractor's prices and other charges billed to State under this Agreement and each Solution Order and Services Order.  Contractor will maintain such books and records for a period of at least five (5) years following the date of final payment or completion of any required audit, whichever is later. Records to be maintained include both financial records and service records.

    10.9.2    Information Regarding Billing Questions.  Contractor shall answer billing questions and provide State with such documentation as State may request pertaining to billing.  Once per year and at the sole cost of State, Contractor shall provide State and State's representatives with reasonable accept access to such books and records for purposes of auditing the fees under this Agreement and/or any Schedule or Services Order.

10.10    Audit.  The Contractor shall permit the Auditor of State of Georgia or any authorized representative of State, and where federal funds are involved, the Comptroller General of the United States, or any other authorized representative of the United States government, to audit Contractor to achieve one or more of the following additional objectives: (a) verify the security and integrity of State's and each other State Entity's data and examine the systems that process, store, support, and transmit that data or (b) examine Contractor's performance of, and conformance to the terms of, this Agreement, including, to the extent applicable to the applications and services provided by Contractor and to the charges therefor, performing audits of (i) Contractor's practices and procedures, including its conformance with State policies with which it is obligated to comply under this Agreement and otherwise as reasonably necessary to enable State to confirm that Contractor is meeting applicable regulatory and other legal requirements for which it is obligated to comply under this Agreement; (ii) supporting information and calculations regarding compliance with Performance Levels, security standards for which Contractor is responsible hereunder or other required standards or levels of performance; and (iii) Contractor's disaster recovery and back-up procedures.  State agrees to the following conditions in connection with such audits: (i) State will not unreasonably interfere with Contractor's normal business operations, (ii) Contractor is not entitled to review or see and other Confidential Information of other Contractor States except in an anonymized or redacted format, (iii) all information disclosed during such site visit shall be considered Contractor's Confidential Information (unless the information Contractor possesses is already Confidential Information of State or State Data), and (iv) State will comply with Contractor's reasonable security policies and procedures delivered in writing to State in advance of the applicable audit.  If as a result of any such audit State determines that Contractor has overcharged State, State will notify Contractor of the amount of such overcharge and provide Contractor with a report setting forth the determination of such overcharge.  Upon such notice, Contractor shall promptly pay to State the amount of such overcharge, together with interest thereon at the Interest Rate calculated from the date of such overcharge until the date Contractor reimburses State.  In addition, if such audit reveals an overcharge to State in any fee, cost, or charge billed by Contractor, Contractor shall reimburse State for the actual costs of such audit.  In the case of a performance-related audit, Contractor and State shall meet to review each audit report promptly after the issuance thereof and to mutually agree upon the appropriate manner, if any, in which to respond to the changes suggested by the audit report.  State and Contractor agree to develop operating procedures for the sharing of audit and regulatory findings and reports related to Contractor's operating practices and procedures produced by auditors or regulators of either party. Evidence of criminal conduct uncovered by State during an audit will be turned over to the proper authorities.

10.11    Delay of Payment Due to Contractor's Failure.  If the State Entity in good faith determines that the Contractor has failed to perform or deliver any component of the Solution for which the State Entity is charged as required by the Agreement, the Contractor shall not be entitled to the compensation under this

Agreement corresponding to such components until such components are delivered and/or conform to the requirements of this Agreement.  To the extent that the Contractor's failure to perform or deliver in a timely manner causes the State Entity to incur costs, the State Entity may deduct the amount of such incurred costs from any amounts payable to Contractor. State's right to deduct such incurred costs shall not in any way affect State's right to terminate this Agreement or any Solution Order or Services Order.

10.12   Set-Off Against Sums Owed by the Contractor.  In the event that the Contractor owes the State Entity and/or the State any sum under the terms of this Agreement, pursuant to any judgment, or pursuant to any law, the State Entity and/or the State may set off the sum owed to the State Entity and/or the State against any sum owed by the State Entity and/or the State to the Contractor in the State Entity's sole discretion.

## 11.   CONFIDENTIALITY, PRIVACY, AND DATA SECURITY.

11.1   Disclosure of Confidential Information.  Contractor and State acknowledge that, in the course of performance under this Agreement, one party (the "**Disclosing Party**") may intentionally or inadvertently disclose, deliver, or permit access by the other party (the "**Receiving Party**") to information, data, or materials which are, to the Disclosing Party, secret, proprietary, and/or confidential, including as may be so designated by statute, regulation, or common law, including, among others, by the form of the Uniform Trade Secrets Act adopted under Applicable Law (if any) and various applicable privacy laws.  All of the foregoing information, data, and materials are referred to collectively in this Agreement as the "**Confidential Information**" as that term is further defined and described in Section 11.2.

11.2   Confidential Information.  Without in any way limiting the generality of the definition of Confidential Information contained in Section 11.1, the term Confidential Information shall also expressly include all data, information, materials, and subject matter, works of authorship, methods, processes, techniques, systems, and know-how containing, recording, expressing, or embodying the Disclosing Party's (a) products, both existing and under development during the Term, and all related documentation algorithms, source code, object code, workflows, models, formulae, structures, schematics, designs, drawings, specifications, and flow charts containing, comprised by or embodied in such products and (b) current or prospective businesses, business plans, states, finances, contracts, contractual arrangements, employees, contractors, partners, investors and suppliers.  All of the foregoing shall be Confidential Information hereunder irrespective of its field of use and whether it is (i) owned by the Disclosing Party, leased or licensed from third parties or held for the benefit of or in connection with its clients, states, business partners, or investors; (ii) intangible or tangible, but if tangible, regardless of form, medium or physical format including paper documents or graphic or machine readable media; and (iii) actually disclosed to a party, but if actually disclosed, whether in whole or in part or orally or in writing. Notwithstanding anything contained in this Agreement to the contrary, the parties acknowledges and agree that where Contractor is the Disclosing Party, "Confidential Information" shall include only such information that Contractor has marked as "confidential", "proprietary", "trade secret", or otherwise redacted in accordance with eRFP Section 2.1.12.2.1 et seq. the terms of which are incorporated herein by reference, provided, however State reserves the right to determine if such information has been properly designated as such and whether it may or may not be disclosed by State.

11.3   Non-Disclosure and Non-Use.  Except as otherwise permitted by eRFP, the Receiving Party shall hold all Confidential Information actually received in strictest confidence and shall not disclose or provide the Confidential Information to any individual or entity without the express written consent of the Disclosing Party in each instance, except to the Authorized Recipients.  In all events the Receiving Party shall handle, store, and maintain all Confidential Information actually received with a degree of care that is reasonable for the circumstances of disclosure and the nature of each component of Confidential Information.  The Receiving Party shall not make any use of the Confidential Information whatsoever except such limited uses as are required under the Agreement. To the limited extent reasonably necessary for such permitted purposes, the foregoing right of use shall include the right to make a reasonable number of copies of the Confidential Information each of which shall be subject to Section 11.8. The use rights hereunder do not permit, and the Receiving Party is expressly prohibited from (a) performing any benchmarking or other comparative or competitive analysis of any Confidential Information for any purpose other than as required

under this Agreement and (b) using, distributing, delivering, or disclosing the Confidential Information or any portion to any Person in violation of U.S. export regulations.

11.4    Confidentiality Exclusions.  The Receiving Party shall have no obligation under Section 11.3 with respect to any Confidential Information which the Receiving Party can demonstrate by reasonable written evidence contemporaneous with the event of the exclusion sought to be used hereunder: (a) was already known to it at the time of its receipt hereunder; (b) is or becomes generally available to the public other than by means of breach of this Agreement; (c) is independently obtained from a third party (other than any Authorized Recipient) whose disclosure to the Receiving Party does not violate a duty of confidentiality; or (d) is independently developed by or on behalf of the Receiving Party without use of, reference to, or reliance on any Confidential Information. Furthermore State, as Receiving Party shall have no obligation under Section 11.3 with respect to any information that State determines is required to be disclosed by Applicable Law including the provisions of the Georgia Procurement Manual, State Purchasing Act, or Georgia Open Records Act as provided in O.C.G.A. Section 50-18-70 et seq. If the Receiving Party is required by a court or other body of competent jurisdiction to disclose the Confidential Information, the Receiving Party may disclose only so much Confidential Information as is legally required, provided that the Receiving Party has given notice of such compelled disclosure to the Disclosing Party and has given the Disclosing Party a reasonable opportunity to object to such disclosure and has provided reasonable assistance, at the cost of the Disclosing Party, in obtaining and enforcing a protective order or other appropriate means of safeguarding any Confidential Information so required to be disclosed.

11.5    Privacy Regulations and Guidelines.  This Agreement, the Solutions Orders, Services Orders, and the parties hereunder, may be governed by one or more privacy laws, regulations or guidelines including O.C.G.A. 21-2-379.24(g) and such others as may be designated by State from time to time (collectively, the "**Privacy Regulations**"). If so governed, then to the extent not captured already by the definition of Confidential Information hereunder, or required already by the Receiving Party's obligations under Section 11.3: (a) the term "Confidential Information" shall further include all Nonpublic Personal Information, Personal Information, material nonpublic information and Personal Data as each of those terms is defined in or by application of each respective Privacy Regulation (collectively, the "**Regulated Information**"); and (b) the Receiving Party shall comply with all requirements of the Privacy Regulations reasonably known to be applicable to the Regulated Information portions of the Confidential Information actually received by the Receiving Party including all reporting, audit, access, third-party disclosure and onward transfer obligations and restrictions therefor, if any are so applicable. If a Privacy Regulation applicable to the Receiving Party under this Agreement is amended, and/or if any other state or federal law, regulation or treaty is effected such that a more restrictive standard of confidentiality or obligation of privacy or security is imposed with respect to an applicable component of the Regulated Information portions of the Confidential Information, then such more restrictive standard shall prevail over the provisions of this Agreement with respect to those portions.  By signing below the Receiving Party acknowledges that the Privacy Regulations may prohibit or render ineffective some or all of the exclusions otherwise available under Section 11.3.  Notwithstanding anything to the contrary contained in this Agreement, Contractor agrees (i) it shall maintain, and shall require all Authorized Recipients to maintain, effective information security measures to protect Regulated Information from unauthorized disclosure or use, and (ii) it shall provide with information regarding such security measures upon the reasonable request of State and promptly provide State with information regarding any failure of such security measures or any security breach related to Regulated Information.

11.6    No Transfer of Rights.  Nothing in this Agreement is, nor shall be deemed to be, any transfer, conveyance, assignment or waiver (by express license, implied license or otherwise) by the Disclosing Party of any Intellectual Property Rights it has or claims to have in the Confidential Information.

11.7    Data and Network Security.

      11.7.1    Contractor is responsible for providing network security and security for such of its facilities where its servers or other network equipment are located. Contractor shall also comply with its own  then-current security policies and procedures, and its security policies and procedures shall comply with laws and regulations applicable to Contractor.

11.7.2  If, during the course of this Agreement, Contractor is creating, hosting, maintaining, processing or transmitting any State Confidential Information on or through any Contractor computer networks, data centers, labs, supporting environments, Web servers or other information technology resources (collectively "**Contractor Computer Systems**"), or is otherwise using any Contractor Computer Systems in connection with this Agreement, then with respect to all such Contractor Computer Systems, Contractor will, in accordance with industry best practices or higher standards that are in all cases no less than reasonable:

(a)     Limit physical and electronic access to Contractor's employees and essential third-party contractors, on a need-to-access basis, who have signed a written agreement that is at least as protective of the confidentiality and security of State Confidential Information as those provided in this Agreement;

(b)     Implement and maintain technical access controls that, at a minimum, require unique identification and authentication of all users, restrict access to all data, software, or other file-system objects exclusively to those users who need such access to perform their job responsibilities, and limit administrator-level control to only authorized IT personnel;

(c)     Implement and maintain transmission controls that, at a minimum, allow only the data protocols required for the function and management of each solution to be used or transmitted and insure the confidentiality, availability, and integrity of all transmissions;

(d)     Implement and maintain firewall technology and intrusion detection software configured to minimize or eliminate hacking and other threats;

(e)     Implement and maintain protection against viruses, worms, Trojan horses, spyware, and other malicious code;

(f)     Perform routine reviews of logs files and system records for suspicious activity;

(g)     Perform regular reviews of relevant security notifications and alerts (e.g., notifications of bugs, attacks, and patches), and apply such patches and fixes as appropriate;

(h)     Implement and maintain disaster recovery, backup, and other contingency plans; and

(i)     Conduct regular security audits, reviews, and tests and systematically retain log files, system records, test plans, and other security documentation.

11.7.3  Contractor shall notify State immediately upon discovery or notification of any actual, potential or threatened Security Breach.  Contractor agrees to take action immediately, at its own expense, to identify and eradicate (or to equip State to identify and eradicate) any further Security Breach and carry out any recovery necessary to remedy any impact of such Security Breach. Contractor's actions will include at a minimum:

(a)     Confirming the attack;

(b)     Denying access from the source of the attack;

(c)     Investigating and evaluating the extent of the damage, if any;

(d)     Backing-up the affected systems and those suspected to be affected;

(e)     Strengthening defenses everywhere, not just the suspected path that the attacker used, if possible;

*Master Solution Purchase and Services Agreement*

(f)  Contacting Contractor's internet service provider and, subject to State's prior written approval, any law enforcement agency to work with Contractor's security team; and

(g)  Producing an incident report within twenty-four (24) hours detailing Contractor's findings and distributing the report to State.

11.8  Disaster Recovery – Requirements and Audit Procedure.  Contractor shall provide a disaster recovery plan and data backup procedures (the "**Disaster Recovery Plan**") attached hereto as Exhibit J.

11.9  Loss of Information; Equitable Relief.  The remedy at law for any breach or threatened breach of this Section 11 shall be inadequate, and in addition to any other remedy available at law, in equity, or under this Agreement, the non-breaching party shall be entitled to seek to obtain injunctive relief without proof of irreparable injury and without posting bond.  If there is any unauthorized disclosure or loss of, or inability to account for, any Confidential Information of the Disclosing Party, the Receiving Party shall promptly: (a) notify the Disclosing Party upon becoming aware thereof; (b) take such actions as may be necessary or reasonably requested by the Disclosing Party to minimize the disclosure, losses or violation; and (c) cooperate in all reasonable respects with the Disclosing Party to minimize the violation and any damage resulting therefrom.

11.10  Compliance by Contractor Solution Partners.  Without limiting Contractor's obligations above, Contractor shall cause each Contractor Solution Partner to comply with the provisions of this Section 11 to the same extent that Contractor is required to comply with such provisions.

## 12.  **OWNERSHIP OF CONTRACTOR PRODUCTS; STATE DATA; THIRD-PARTY PRODUCTS.**

12.1  Ownership of Contractor Products.  State acknowledges that the Software, the Contractor data bases which are part of the Services, and all copyrights, patents, trade secrets, and other intellectual and proprietary rights therein and thereto (collectively the "**Contractor Products**") are and shall remain the exclusive and confidential property of Contractor or the third parties for whom Contractor is acting as agent or from whom Contractor has obtained the right to use the Contractor Products.  For this purpose, the Contractor Products do not include the State Data, including any extract, database, output, reports or derivative works that include or are based on the State Data, or any business or transaction information produced by or for State using the Services or Software (the "**Output**").

12.2  State's Rights in Output.  State may use the Output in conjunction with any services, software or equipment that State or State may choose.  State or any contractor chosen by State may copy, use, and modify such data as Contractor provides State and the Output for purposes of meeting its internal business requirements.  State may make an appropriate number of copies of the Contractor Products provided to State at its premises for back-up purposes only.

12.3  Confidentiality of State Data; File Security.  Contractor acknowledges and agrees that any file or other information provided by any State Entity to Contractor, including any extract, database, output, reports or derivative works that include or are based on the State Data, or any business or transaction information produced by or for a State Entity using the Services or Software (collectively the "**State Data**") shall be and remain the exclusive and confidential property of State. Except to the limited extent set forth in Section 12.4 below, Contractor shall treat as confidential and will not disclose or otherwise make available any State Data to any person other than employees of Contractor with a need-to-know.  Contractor will instruct its employees who have access to the State Data to keep the same confidential by using the same care and discretion that Contractor uses with respect to its own confidential property and trade secrets.  Contractor will provide reasonable security provisions to ensure that access to the State Data is available only to State. Contractor will hold and process the State Data of State and State's other vendors in systems that are physically and logically separated from other data of other States.

12.4  Contractor Use of State Data.  Notwithstanding the foregoing, but subject to State's consent on a case-by-case basis, State will consider Contractor's request that Contractor be given the right to use such

*Master Solution Purchase and Services Agreement*

State Data as it ordinarily receives, and to distribute such State Data to third parties, in an anonymized and cleansed statistical and/or compilation forms in connection with other Contractor services. If so approved by State in writing on a case-by-case basis, State acknowledges that such statistics and/or compilations (which are not identifiable to State or State's location and do not include information otherwise subject to privacy or confidentiality requirements) may be used or resold by Contractor outside the scope of this Agreement.

12.5    Turnover of State Data. If so requested by State at any time before or after termination of this Agreement, Contractor shall provide copies of the State Data in Contractor's possession to State in such form as State may reasonably request together with such tables and instructions as State may require to extract or convert the information. Unless otherwise approved by State or necessary to carry out the transition/termination provisions of this Agreement, Contractor may not retain copies of the State Data following termination of this Agreement.

12.6    Unlimited Use of State Data and Output by State. State and its designees are free to extract, aggregate, use, store, modify, compile, retransmit, and distribute the State Data, including all Output, in any manner and for any purpose that State may desire, without being subject to any restriction on doing so that may be associated with the Contractor applications or any other Contractor Products. State may install and use its own or third-party providers' equipment and software to do so, and State and State may create and install its own or third-party providers' APIs to access and collect any of the State Data or applicable files at State's premises in such manner as State or State chooses.

12.7    Deliverables. The deliverables that Contractor actually provides to the State Entities under this Agreement may take the form of any Solution, the Services themselves or individual items of State-Specific Enhancements, Third Party Materials or Derivative Works & Improvements, or one or more of them. More likely, however, such deliverables, shall be composed of some combination of such Solution, State-Specific Enhancements, Contractor Products, Third Party Materials or Derivative Works & Improvements, or one or more of them created by linking, embedding, bundling or incorporating them with or into one-another. Such combination shall be referred to as **"Deliverables**." Each party shall at all times its respective ownership rights of the Intellectual Property Rights in and to such party's respective Proprietary Materials components of the Deliverables under the terms of this Section 12 and neither party shall own the Intellectual Property Rights in and to the Deliverables as a whole. Notwithstanding anything contained in this Agreement to the contrary, State for itself, and on behalf of the other State Entities, acknowledges and agrees that the Solution shall not constitute "works made for hire", and shall remain the exclusive property of Contractor.

12.8    Third Party Materials. Neither Contractor nor any Contractor Personnel shall use any Third Party Materials in the performance of the Services nor introduce, embed, bundle, link, or incorporate Third Party Materials into or with any State Data or Output unless: (a) expressly requested by State or (b) disclosed to State by Contractor in writing in the applicable Solution Order or Services Order in connection with which Contractor desires to use them. If use of Third Party Materials is so permitted, Contractor shall supply them by either providing State: (i) with the applicable shrink-wrap license agreement governing the use of such Third Party Materials or (ii) with the applicable license agreement submitted by the owner or provider of such Third Party Materials generally to its states; or (iii) with all necessary use and/or license rights via pass-through or assignment to State, as well as all warranties and maintenance and support rights (if any) as provided by either the manufacturer of the applicable provider of such Third Party Materials or by Contractor on such manufacturers' behalf pursuant to a reseller or similar agreement therefor.

12.9    Open Source Software. The Solution may contain Third Party Materials subject to or governed by an open source license. Use by State, as part of the Solution, in accordance with this Agreement and normal operating instructions, of such open source license (in object code) procured by Contractor under a license commonly referred to as "open source," "free software," "copyleft," or "community source code license," including, without limitation, the GNU General Public License or Lesser General Public License (collectively, "**OSS**") is and will be in compliance with the terms of such OSS licenses. The use by State of the System in accordance with this Agreement does not require that the OSS included by Contractor in the System will be combined or merged with any proprietary software provided or separately operated by State.

12.10    Residuals.  Subject to Section 11 (Confidentiality, Privacy and Data Security), Contractor, State or the applicable State Entities shall have the right to use for any purpose Residuals arising from this Agreement.  For the avoidance of doubt, the foregoing shall not be deemed to grant to the receiving party a license to use the other party's copyright, patents, trademarks, source code, or other Intellectual Property.

## 13.    BONDS & INSURANCE.

13.1    Bonds. Within ten (10) days of the Effective Date, Contractor shall obtain all bonds required by the eRFP and described on Exhibit H attached hereto and deliver a true, correct, and complete copy of the same to State.

13.2    Required Coverage.  Contractor, at its sole expense, shall obtain and keep in force at all times during the Term insurance coverage for the benefit of Contractor and State, issued by insurance carriers licensed to do business in the State of Georgia with a minimum A.M. Best rating of A- as set forth in Exhibit H as that Exhibit may be updated and modified from time to time by State (provided Contractor is given a reasonable amount of time to review and meet such updated and modified insurance requirements).

13.3    Primary Policies.  All insurance maintained by Contractor in compliance with this Agreement, shall be primary to any other insurance owned, secured, or placed on behalf of State, which insurance shall not be called upon by Contractor's insurer to contribute in any way.  Contractor shall secure endorsements to this effect from all insurers of such policies.

13.4    Certificates.  Within ten (10) days of the Effective Date, Contractor shall furnish State with certificates of insurance and necessary endorsements affecting coverage required by this Section 13.  To the maximum extent permitted for each coverage type, the certificates and endorsements shall identify the contract number of this Agreement (as shown on the cover page), the State of Georgia, State, and the other State Entities as additional insureds and shall be signed by a person authorized by that insurer to bind coverage on its behalf.  State reserves the right to require complete, certified copies of all required insurance policies, at any time.

13.5    No Cancellation.  All policies herein shall expressly provide that such policies shall not be cancelled, allowed to lapse, terminated or materially altered (resulting in failure to comply with requirements set forth herein) without at least thirty (30) days prior written notice to State.

13.6    Waiver.  To the extent permitted by its respective policies of insurance, Contractor hereby waives any right of recovery against State for any loss or damage that is covered by any insurance policy maintained or required to be maintained with respect to this Agreement.  The parties do not intend to shift all risk of loss to insurance. The Contractor's obligation to maintain insurance coverage in specified amounts will not act as a limitation on any other liability or obligation which the Contractor may otherwise have under this Agreement.  Similarly, the inclusion of the State of Georgia and the State Entities as additional insured is not intended to be a limitation of the Contractor's liability under this Agreement and will in no event be deemed to, or serve to, limit the Contractor's liability to the State or any State Entity to required insurance coverage, nor to limit State's rights to exercise any and all remedies available to the State Entities under this Agreement, at law or in equity.

## 14.    REPRESENTATIONS AND WARRANTIES.

14.1    Warranties.  Contractor hereby expressly represents, warrants, and covenants to State that:

14.1.1    Organization. It is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, and it is duly qualified to conduct business, and is in good standing, in the State of Georgia and every other jurisdiction in which the nature of its assets or its business would require it to so qualify.

14.1.2   Authority.  (a) It has full power and authority to enter into this Agreement, to grant the rights granted hereunder and to perform its obligations under this Agreement; (b) execution and performance of this Agreement shall not violate any law or breach any other agreement known to Contractor; and (c) Contractor will not assume any obligation or restriction that does or would in any way interfere or conflict with, or would prevent, limit, or impair in any way the performance by Contractor of any of the terms of this Agreement or of the Services.

14.1.3   Liens and Encumbrances.  Contractor has good and valid title to the Solution and all Equipment or hardware components provided to the State Entities pursuant to the terms of this Agreement free and clear of any and all liens and encumbrances. All such items will be delivered, and title will transfer, to the applicable State Entity pursuant to Section 2.1.5 free and clear of all liens and encumbrances and State will be entitled to use the Solution and all other Deliverables in accordance with the terms of this Agreement without disturbance.

14.1.4   eRFP Bring Down. Each of the representations, warranties, guarantees, certifications, and similar assurances contained in Contractor's eRFP Response were true and correct in all respects as of the date of submission of Contractor's eRFP Response and shall be true and correct in all respects on and as of the Effective Date with the same force and effect as if made at and as of the Effective Date.

14.1.5   Non-Infringement.  As of the Effective Date and throughout the Term:

(a)      None of the Solution, Services, or other Deliverables, nor any portion or component thereof, nor State's use or possession of any of the foregoing as permitted under this Agreement, shall infringe or violate any right, title, or interest (including any Intellectual Property Right) of any third party.

(b)      Contractor and/or all Contractor Personnel shall be the sole authors of the Solution and any Revisions thereto and Contractor has and shall have full and sufficient right, title and interest (including all Intellectual Property Rights) in and to the Solution.

(c)      No claim of infringement has been threatened or asserted, or is pending against Contractor (or insofar as Contractor is aware, against any entity from which Contractor has obtained such rights) (the warranties set forth in clauses "(a)", "(b)", and "(c)" collectively the "**Non-Infringement Warranty**").

14.1.6   Disabling Procedures.  The Solution, State-Specific Enhancements and other Deliverables and each module or component and function thereof, and to the maximum extent applicable, the Services performed hereunder, do not contain any "back door," "time bomb," "Trojan horse," "drop dead device," or other similar software routines or components designed to permit access or use of any State Entities' computer systems by Contractor or a third party or to disable or delete any Solution or any data, computer hardware, or software operated or maintained by any State Entity;

14.1.7   Viruses.  The Licensed Programs, State-Specific Enhancements and other Deliverables and each module or component and function thereof, and to the maximum extent applicable, the Services performed hereunder, do not contain any Virus and prior to delivery to the State Entities, Contractor shall have used up-to-date, industry-accepted, corporate-enterprise, quality virus detection products to scan for and ensure the absence of Viruses.  Contractor shall take all commercially reasonable steps to ensure that no Viruses are coded or introduced into any other State Entities' systems or into the systems used to provide the Services or operate the Solution;

14.1.8   EAC Certification. All relevant components of the Solution, any Upgraded Solution, and all Software, Equipment, and other components forming a part thereof for which certification by the U.S. Election Assistance Commission ("**EAC**") is available have been certified by the EAC as of delivery of the Solution to the State. Without limiting the foregoing, if at any time during the Term, the Solution or any component (including Software and Equipment) forming a part thereof for which EAC certification is available ceases to be certified by the EAC, Contractor shall immediately notify State and, if Contractor has, or has made available a non-infringing, EAC certified, version of the offending component to its

customers generally, then Contractor will make that version of the Solution available to the State under the same or better economic terms as it offers to its other customers.  If no EAC certified version of the offending component is available, the parties will cooperate in good faith to attempt to resolve the issue.

14.1.9   <u>Documentation</u>.   The Documentation meets industry standards, accurately reflects the operations features and functioning of the Solution, Services and Deliverables and shall in all events be written in the English language as well as such other languages as are required under the applicable Solution Order or Services Order.

14.1.10  <u>Services</u>.  Contractor has all of the resources (financial or otherwise), personnel, experience, and know-how necessary for the successful and timely implementation of the Solution and performance of its obligations under this Agreement. All Services performed by Contractor (or its permitted subcontractors, if any) shall be so performed in accordance with all Applicable Laws and in a professional and workmanlike manner by adequate staff having the skills training and background requisite to perform them in accordance with the highest prevailing standards and best practices in the industry.

14.1.11  <u>Operations Conducted Lawfully</u>.  Contractor has conducted, and at all times during Term will conduct, its business in compliance with all Applicable Laws including with the provisions of O.C.G.A. Title 21, as amended and the State of Georgia Election Board and Secretary of State Rules contained in Sections 183 and Sections 590 of the Georgia Administrative Code respectively. Contractor has not been charged with, nor is Contractor in receipt of any notice or warning of, or to the knowledge of Contractor, under investigation with respect to, any failure or alleged failure to comply with any provision of any Applicable Law with respect to its business, the Solution, or the Services to be provided pursuant to this Agreement. Contractor has all licenses, permits, approvals, authorizations, registrations, certificates, variances or similar rights issued by any governmental authority required with respect to the operation of its business and the delivery of the Solution and the Services. All such permits are in full force and effect and Contractor is in compliance with the same.

14.1.12  <u>Solution and other Deliverables</u>.  During the Term the Solution and all  Deliverables and each module or component and function thereof, and to the maximum extent applicable, all Services performed hereunder, shall:

(a)      be free from defects in material and workmanship and under normal use shall remain in good working order;

(b)      function in all material respects in accordance with the specifications and criteria stated in the applicable Solution Order or Services Order, including the Functional Requirements, and in accordance with all other warranties set forth herein and in the applicable Solution Order or Services Order (the "**Specifications Warranty**"); and

(c)      perform the Guaranteed Functionality in accordance with the Guaranteed Performance,

14.1.13  <u>Compliance with Regulations</u>. The Guaranteed Functionality and Guaranteed Performance of the Solution, either by itself or in conjunction with such Third Party Materials as may be identified by Contractor, contain features and functionality that permit State, or the applicable State Entity, to comply either through use of the Solution as delivered or via no more than *de minimis* parameterization and/or configuration, with those industry and/or governmental regulations (and the data formats, records, reporting or communications standards required to be utilized to comply with such regulations) affecting State at each State Site as of the Effective Date ("**Regulation Compliant**").

14.1.14  <u>Third Party Materials</u>. If the warranties to Third Party Materials passed-through and assigned to State under Sections 12.7 and 14.2 are not substantially similar to the warranties received by State from Contractor hereunder with respect to the Solution and other Deliverables, or if Contractor is not permitted to pass-through and assign such warranties, then Contractor shall obtain comparable warranties from the owner, licensor, or other providers of the applicable Third Party Materials or Contractor shall take

appropriate action to ensure that such Third Party Materials are otherwise compliant with the warranties in this Section 14.1 including that they are free of Viruses, preventative routines, and disabling procedures.

14.1.15 <u>Independent Contractors</u>.  Contractor represents and warrants that it has complied with, and covenants that during the Term, it shall continue to comply with all laws, rules, and regulations required by appropriate government authorities of independent contractors, including the appropriate withholding, reporting, and payment of all required taxes.

14.1.16 <u>Conflicts of Interest</u>. Contractor has not violated, and shall not violate during the Term, the provisions of O.C.G.A. Section 45-10-20 et seq. Without limiting the foregoing, neither Contractor nor any of its Affiliates or any of their respective Representatives has made any bribe, rebate, payoff, influence payment, kickback or other payment unlawful under any Applicable Law.

14.2   <u>Construction of Warranties; Disclaimer</u>.  Contractor shall assign and pass through to the State Entities all applicable Software publishers' warranties, covenants and indemnification provisions. The representations, warranties, and covenant of Section 14.1 apply at all times during the Term. EXCEPT FOR THE WARRANTIES SPECIFICALLY PROVIDED IN THIS AGREEMENT (INCLUDING ALL EXHIBITS, SCHEDULES, APPENDICES, EXECUTED SOLUTION ORDERS AND SERVICES ORDERS, AND ANY ATTACHMENTS THERETO) AND AS OTHERWISE SET FORTH ABOVE, CONTRACTOR DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

14.3   <u>Remedies</u>.

14.3.1   <u>Remedies</u>.  In the event that any of the Software is found by the Contractor, State, any other State Entity or governmental agency, or any court having jurisdiction to to breach the warranties set forth in this Agreement, or not to be otherwise in compliance with any standard or requirement so as to require or make advisable that such Software be reworked or recalled, the Contractor will promptly communicate all relevant facts to the State Entity and undertake all corrective actions authorized by the State, including those required to meet all obligations imposed by laws, regulations, or orders, provided that nothing contained in this section shall preclude State from taking such action as may be required of it under any such law or regulation.  If the Contractor is the Software publisher, the Contractor shall perform all necessary repairs or modifications at its sole expense, provided the State determines the performance of such repairs and modifications is in the State's best interest. Payment for the Software shall not constitute acceptance.  Acceptance by a State Entity shall not relieve the Contractor of its warranty or any other obligation under this Agreement.

14.3.2   In the event State or any other State Entity asserts any claim, demand, dispute relating to the subject of this Agreement Contractor shall continue to perform its obligations hereunder, and any such dispute, whether as to a claim for breach of any representation, warranty, or covenant contained in this Agreement, shall not affect Contractor's obligation to fulfill its remedy obligations to the State Entities hereunder. If any such dispute is finally resolved in State's favor, State shall be reimbursed for the cost of all reasonable remediation services performed by Contractor, subject to State substantiating the same.

14.3.3   <u>Disabling Procedures, Preventative Routines and Viruses</u>.  In addition to all other remedies at law and under this Agreement, Contractor agrees to notify State immediately upon discovery of any actual, potential or threatened breach of the warranties in Sections 14.1.6 or 14.1.7, and, if State discovers or reasonably suspects any Viruses to be present in any component of any Solution, State-Specific Enhancements or other Deliverables, Contractor agrees to take action immediately, at its own expense, to identify and eradicate (or to equip State to identify and eradicate) such Viruses and carry out any recovery necessary to remedy any impact of such Viruses.

14.3.4   <u>Interference with Services</u>. Contractor is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with, or would

prevent, limit, or impair in any way the performance by Contractor of any of the terms of this Agreement or of the Services.

## 15.   **INDEMNIFICATION.**

15.1     Contractor Indemnification.   Contractor agrees to defend, indemnify, and hold harmless State, the other State Entities, and all parties making authorized use of the Deliverables, and each of their respective directors, officers, employees, and representatives (the "**Indemnified Parties**") from and against any and all liabilities, claims, damages, suits, judgments, losses, costs, and expenses (including reasonable attorneys' fees) to the extent incurred in connection with or arising out of: (a) any inaccuracy or breach of a representation or warranty of Contractor set forth in this Agreement or any agreement, instrument, or certificate, or document delivered in connection herewith (including Contractor's eRFP Response); (b) any breach or failure to comply with any covenant or agreement made by Contractor in this Agreement or any agreement or instrument delivered in connection herewith; (c) any negligent, intentional or wrongful act or omission of the Contractor or any Contractor Personnel; (d) any breach of contract; (e) any third-party claims of infringement or other violations of Intellectual Property Rights; (f) any failure of the Solution or the Services to comply with applicable specifications, warranties, and certifications under this Agreement or Contractor's eRFP Response; (g) any failure by Contractor or Contractor Personnel to comply with Applicable Law; or (h) any failure by the Contractor to make all reports, payments and withholdings required by federal and state law with respect to social security, employee income and other taxes, fees or costs required by the Contractor to conduct business in the State of Georgia or the United States. Contractor acknowledges and agrees that no delay in notifying Contractor shall relieve Contractor of its obligations under this Section 15.1. Contractor may not agree to any settlement that could have an adverse impact on any State Entity, as applicable, without State's prior written consent. Notwithstanding the foregoing State, and not Contractor, will be responsible and therefore solely liable for its own acts and omissions constituting gross negligence, willful misconduct or fraud.

15.2     Assumption of Defense.   State shall be entitled to participate in the defense of any such action, with its counsel and at its own expense.  If Contractor does not promptly commence fulfillment of its defense obligations for any indemnified claim or litigation resulting therefrom, State may defend against such claim or litigation in such manner as it may deem appropriate, including settling such claim or litigation, after giving notice of the same to Contractor, on such terms as State may deem appropriate but after prior written consent from Contractor signed by the designated person  signing this Agreement, and no action taken by State in accordance with such defense and settlement shall relieve Contractor of its indemnification obligations herein with respect to any loss, liability, or damages resulting therefrom.

15.3     Infringement Related Remedies.   In addition to and without in any way limiting or excluding Contractor's indemnification obligations, if any party makes any claim or allegation of infringement against State or State Entity based on State's or a State Entity's use of a Deliverable in accordance with the terms of this Agreement and  State or any State Entity is actually enjoined from using any Deliverables (or, if Contractor earlier believes that such claim may arise), Contractor shall, at its own cost and expense, and at its option: (a) procure for State a license to continue using the allegedly or potentially infringing materials of nature and scope identical to that contained in this Agreement and without loss, diminution or degradation in the manner of performance or functionality or (b) modify the allegedly or potentially infringing materials so as to make them non-infringing without loss, diminution or degradation in the manner of performance or functionality. If Contractor cannot complete "(a)" or "(b)" above after good faith efforts undertaken for a reasonable period of time, then Contractor shall, at its own cost and expense: (c) procure for State and the State Entities a license to a third-party product (including, if required, engaging a third-party to develop such product on commercially reasonable terms) that will serve as a replacement for the allegedly or potentially infringing materials without loss, diminution or degradation in the manner of performance or functionality. If Contractor cannot complete "(a)," "(b)" or "(c)" above after good faith efforts undertaken for a reasonable period of time, on commercially reasonable terms, Contractor promptly shall refund to State all amounts paid by State under the Services Order (including any expenses and fees for Third Party Materials) pursuant to which the applicable materials were created.

15.4    Duty to Reimburse State Tort Claims Fund.  To the extent any damage or loss as covered by this indemnification is covered by the State of Georgia Tort Claims Fund ("the **Fund**"), the Contractor (and its insurers) agrees to fully reimburse the Fund. To the full extent permitted by the Constitution and the laws of State and the terms of the Fund, the Contractor and its insurers waive any right of subrogation against State, the Indemnified Parties, and the Fund and insurers participating thereunder, to the full extent of this indemnification.

15.5    Limitation of Liability.

15.5.1   EACH PARTY'S TOTAL AGGREGATE LIABILITY FOR ANY LOSS, DAMAGE, COSTS OR EXPENSES UNDER OR IN CONNECTION WITH THIS AGREEMENT, HOWSOEVER ARISING, INCLUDING WITHOUT LIMITATION, LOSS, DAMAGE, COSTS OR EXPENSES CAUSED BY BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, BREACH OF STATUTORY OR ANY OTHER DUTY SHALL IN NO CIRCUMSTANCES EXCEED THE TOTAL DOLLAR AMOUNT OF THE AGREEMENT, INCLUDING ALL SOLUTION ORDERS AND SERVICES ORDERS IN EFFECT AS OF THE DATE OF THE APPLICABLE CLAIM.

15.5.2   NEITHER PARTY SHALL BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF USE OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER, HOWSOEVER ARISING, INCURRED BY THE OTHER PARTY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT, NEGLIGENCE OR OTHER TORT, EVEN IF THE PARTIES OR THEIR REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

15.5.3   Notwithstanding anything contained in this Agreement to the contrary the limitations and exclusions in Sections 15.5.1 and 15.5.2 shall not apply to (1) Contractor's obligation to pay any liquidated damages pursuant to Section 10.1, (2) Contractor's failure to honor any pricing commitments made in this Agreement, (3) claims arising out of the willful misconduct or gross negligence of a Party or any of their respective employees, agents, contractors or subcontractors, (4) claims and losses that are the subject of indemnification under this Agreement, including pursuant to Section 15, (5) damages and costs associated with the Contractor's breach of its data security or data privacy obligations hereunder; (6) damages attributable to a Party's breach of its obligations with respect to Confidential Information of the other Party; or (7) damages attributable to the abandonment of this Agreement by the Contractor, including Termination Assistance, where "abandonment" has the meaning provided in Section 16.8 below.

## 16.    TERM AND TERMINATION.

16.1    Term.  This initial term of this Agreement shall commence upon the Effective Date and shall remain in effect for a period of ten (10) years (the "**Initial Term**"). State shall have the option to extend this Agreement for a period of up to ten (10) successive periods of one (1) year each (each a "**Renewal Period**") under the same terms and conditions of this Agreement as in effect during the Initial Term, which options may be exercised by the issuance of a "Notice of Award Amendment" by State no later than thirty (30) days prior to the end of the Initial Term or then-current Renewal Period. As used throughout this Agreement, all references to the "**Term**" shall be construed to include the Initial Term, all Renewal Periods, and any Transition Assistance Period.

16.2    Immediate Termination.  Pursuant to O.C.G.A. Section 50-5-64, this Agreement will terminate immediately and absolutely if State determines that adequate funds are de-appropriated such that State cannot fulfill its obligations under the Agreement, which determination is at the State's sole discretion and shall be conclusive.

16.3    Termination for Cause.  Subject to Section 16.3.133.13, the State may terminate any Solution Order, Services Order or this Agreement, in each instance in whole or in part, if State reasonably determines that any one or more of the following events has occurred:

16.3.1   The actions, or failure to act, of the Contractor, its agents, employees, or subcontractors have caused, or reasonably could cause, life, health, or safety to be jeopardized;

16.3.2   Contractor fails to comply with confidentiality laws or provisions, including the Privacy Regulations;

16.3.3   Contractor furnished any statement, representation, or certification in connection with this Agreement or the bidding process which is materially false, deceptive, incorrect, or incomplete;

16.3.4   Contractor fails to deliver or has delivered nonconforming goods or services or fails to perform, to State's satisfaction, any material requirement of this Agreement, individually, in each case in whole or in part or is in violation of a material provision of this Agreement, including, but without limitation, the express warranties made by the Contractor;

16.3.5   Satisfactory performance of this Agreement is substantially endangered or that a default is likely to occur, including in connection with Contractor's inability or unwillingness to meet the milestones or timelines described in any Solution Order or Services Order;

16.3.6   Contractor fails to make substantial and timely progress toward performance of this Agreement;

16.3.7   Contractor becomes subject to any bankruptcy or insolvency proceeding under federal or state law to the extent allowed by applicable federal or state law including bankruptcy laws; the Contractor terminates or suspends its business; or State reasonably believes that the Contractor has become insolvent or unable to pay its obligations as they accrue consistent with applicable federal or state law;

16.3.8   Contractor has failed to comply with applicable federal, state and local laws, rules, ordinances, regulations, and orders when performing within the scope of this Agreement;

16.3.9   Contractor has engaged in conduct that has or may expose the State or any State Entity to liability, as determined in State's sole discretion;

16.3.10 Contractor endangers the value, integrity, or security of any State Site or the data or personnel of any State Entity;

16.3.11 Contractor breaches any of its material duties or obligations under this Contractor, including but not limited to obtaining and maintaining, throughout the Term, federal and State voting system certification; or

16.3.12 Contractor has infringed any patent, trademark, copyright, trade dress or any other intellectual property right of State, a State Entity, or any other Person.

16.3.13 <u>Notice of Default</u>.  Contractor shall be afforded thirty (30) calendar days to cure any breach that could give rise to a termination for cause by State pursuant to Section 16.3, with such thirty (30) day period commencing as of the date Contractor receives written notice of such breach from the State. If the breach or noncompliance is not remedied within such thirty (30) day period, State may (i) immediately terminate this Agreement without additional written notice; and/or, (ii) procure substitute Software, Licensed Programs or Services from another source and charge the difference between this Agreement and the substitute contract to the defaulting Contractor; and/or (iii) enforce the terms and conditions of this Agreement and seek any legal or equitable remedies. For the avoidance of doubt the parties acknowledge and agree that the items listed in Section 16.3 shall each constitute a material breach, provided, however any reference to specific breaches being material breaches within this Agreement will not be construed to mean that other breaches are not material. If termination occurs prior to the date of Final Acceptance or the Presidential Preference Primary, whichever is later, and such termination is for cause pursuant to Section

16.3, then State may elect to terminate this Agreement and Contractor shall immediately refund all applicable Milestone Payments paid by State.

16.4    <u>Convenience</u>.  State may at any time for any reason or no reason, terminate this Agreement or any Solution Order or Services Order individually, in each case in whole or in part, for its sole convenience for any reason whatsoever.

16.5    <u>Effect</u>.  Termination of a Solution Order, a Services Order or this Agreement shall not limit either party from pursuing any other remedies available to it, including injunctive relief. Subject to Section 16.6 and Section 16.7 upon termination or expiration of this Agreement and request of the State Entity, the Contractor shall:

16.5.1   Cease work under this Agreement or the applicable Solution Order or Services Order and take all necessary or appropriate steps to limit disbursements and minimize costs, and furnish a report within thirty (30) days of the date of notice of termination, describing the status of all work under the this Agreement, including, without limitation, results accomplished, conclusions resulting therefrom, and any other matters State may require;

16.5.2   Immediately cease using and return to the State Entity any personal property or materials, whether tangible or intangible, provided by the State Entity to the Contractor;

16.5.3   Comply with State's instructions for the timely transfer of any active files and work product produced by the Contractor under this Agreement;

16.5.4   Cooperate in good faith with the State Entity, its employees, agents, and contractors during the transition period between the notification of termination and the substitution of any replacement contractor; and

16.5.5   Immediately return to the State Entity any payments made by the State Entity for goods and services that were not delivered or rendered by the Contractor.

16.5.6   <u>Payment Limitation in Event of Termination</u>. In the event of termination of this Agreement, a Solution Order, or any Service Order, for any reason by State, State shall pay only those amounts, if any, due and owing to the Contractor for goods and services actually delivered and satisfactorily performed up to and including the date of such termination. Payment will be made only upon submission of invoices and proper proof of the Contractor's claim. This provision in no way limits the remedies available to the State Entity under the Agreement in the event of termination. State shall not be liable for any costs incurred by the Contractor in its performance of this Agreement, including, but not limited to, startup costs, overhead, or other costs associated with the performance of this Agreement or the bidding process.

16.5.7   In such case, State shall pay for all Services Orders and Solution Orders and Deliverables to the extent delivered and satisfactorily performed by Contractor until the date of such termination. If this Agreement is terminated, Contractor will complete all Services in process under all then-outstanding Solution Orders and Services Orders and adhere to all terms and conditions outlined in this Agreement, including all credits and discounts set forth on the applicable Solution Order or Service Order.

16.6    <u>Transition and Termination Assistance</u>.  If State decides to discontinue use of any applications or services, Contractor will, at State's option, provided that State agrees to pay Contractor's reasonable fees and expenses, assist to cause the orderly transition and migration with regard to State's requirements so that State or third-party contractors contractor(s) selected by State are properly equipped to meet those requirements (the **"Termination Assistance"**).  As part of the Termination Assistance, (a) Contractor and State will work together to develop a transition plan (the **"Transition Plan"**) setting forth the respective tasks to be accomplished by each party in connection with the orderly transition and a schedule pursuant to which the tasks are to be completed and (b) Contractor will provide State with tables and instructions for extraction of data and reports and conducting testing procedures incident to such migration.

16.7   <u>Continuance of Services</u>.  Notwithstanding anything contained in this Agreement to the contrary, upon any termination or expiration of this Agreement or any Schedule relating to the provision of applications or services by Contractor, Contractor shall, if requested by State, continue to provide the applications or services and accept additional Solutions Orders and/or Services Orders for up to two (2) years or such longer period as the parties may mutually agree (the "**Transition Assistance Period**") in the manner described herein and in the applicable Schedule and provide such additional assistance as mutually agreed upon between the parties and as reasonably necessary for State to effect an orderly transition of operational responsibilities for the terminated applications or services.  Such termination assistance may include: (a) providing reasonable assistance to State in establishing or transferring all processes; (b) assisting State with the execution of parallel processing and testing; (c) doing all things and providing all information reasonably necessary for an orderly transition with reasonable continuity of operations; and (d) carrying out such other activities as the parties may agree is necessary.

16.8   <u>No Abandonment</u>.  Contractor represents, warrants and covenants that, during the Term, it shall not "Abandon" this Agreement (or any Schedule) or application or service obtained by State thereunder. For purposes hereof, "Abandon" or "Abandonment" means the threatened or actual intentional refusal by Contractor to provide or support any of the solutions or perform any of the services in breach of its obligations under this Agreement (or any Schedule).  If Contractor breaches or threatens to breach this Section, Contractor agrees that State will be irreparably harmed, and, without any additional findings of irreparable injury or harm or other considerations of public policy, State shall be entitled to apply to a court or tribunal of competent jurisdiction for and, provided State follows the appropriate procedural requirements (e.g., notice), Contractor shall not oppose the granting of an injunction compelling specific performance by Contractor of its obligations under the Agreement without the necessity of posting any bond or other security.  Contractor further agrees not to oppose any such application for injunctive relief by State except to require that State establish that Contractor has committed an Abandonment.

**17.   <u>MISCELLANEOUS</u>.**

17.1   <u>Notice</u>.  All notices to be given to the parties hereunder shall be in writing and shall be deemed to have been given and be effective when delivered personally or if sent by certified mail, return receipt requested, postage prepaid addressed to the parties at the addresses set forth below.

|  |  |
|---|---|
| If to State: | with copies to: |
| Georgia Secretary of State<br>2 Martin Luther King Jr. Drive,<br>West Tower, Atlanta, Georgia 30334<br>Attention: Chief Operating Officer | Attention: General Counsel |

If to Contractor:

Dominion Voting Systems, Inc.
1201 18th Street, Suite 210
Denver, CO 80220

Attention: General Counsel

17.2   <u>No Exclusivity</u>.  Unless expressly provide in a Solutions or Services Order, State has the right, at any time and without any notice or duty to account to Contractor, to have services performed by State's own employees or those of other State Entities or, subject to the terms and conditions of this Agreement, to purchase any equipment or services from any other individual or entity, subject at all times to its compliance with this Agreement. Nothing contained in this Agreement shall constitute a minimum purchase commitment by State, and Contractor has not relied on any representation, verbal or written, to the contrary.

17.3    Language.  The headings as to the contents of particular sections of this Agreement are inserted for convenience of reference only and shall in no way define, limit, expand, or otherwise affect the construction or interpretation of any provision of this Agreement. The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either of the parties. Those terms, acronyms, and phrases used but not otherwise defined in this Agreement, which are utilized in the information technology outsourcing industry or in State's contracting processes will be interpreted in accordance with their generally understood meaning in such industry or context.

17.4    Governing Law.  This Agreement shall be interpreted and construed under the laws of the State of Georgia, USA, without regard to its conflicts of law principles. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement or any services or products provided hereunder. Any judicial action or proceeding between the parties relating to this Agreement must be brought in the courts of Fulton County, Georgia or the United States District Court for the Northern District of Georgia.  Each party consents to the jurisdiction of such courts, agrees to accept service of process by mail to the addresses outlined in Section 17.1 (Notice) above, and hereby waives all jurisdictional and venue defenses otherwise available to it.

17.5    Parties' Duty to Provide Notice of Intent to Litigate and Right to Demand Mediation.  In addition to any dispute resolution procedures otherwise required under this Agreement or any informal negotiations which may occur between State and the Contractor, no civil action with respect to any dispute, claim or controversy arising out of or relating to this Agreement may be commenced without first giving fourteen (14) calendar days written notice to State of the claim and the intent to initiate a civil action.  At any time prior to the commencement of a civil action, either the State or the Contractor may elect to submit the matter for mediation.  Either State or the Contractor may exercise the right to submit the matter for mediation by providing the other party with a written demand for mediation setting forth the subject of the dispute.  The parties will cooperate with one another in selecting a mediator and in scheduling the mediation proceedings. Venue for the mediation will be in Atlanta, Georgia; provided, however, that any or all mediation proceedings may be conducted by teleconference with the consent of the mediator.  The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs; provided, however, that the cost to State shall not exceed five thousand dollars ($5,000.00).  All offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts, and attorneys, and by the mediator or employees of any mediation service, are inadmissible for any purpose (including but not limited to impeachment) in any litigation or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.  Inadmissibility notwithstanding, all written documents shall nevertheless be subject to the Georgia Open Records Act O.C.G.A. Section 50-18-70 et seq.  No party may commence a civil action with respect to the matters submitted to mediation until after the completion of the initial mediation session, forty-five (45) calendar days after the date of filing the written request for mediation with the mediator or mediation service, or sixty (60) calendar days after the delivery of the written demand for mediation, whichever occurs first.  Mediation may continue after the commencement of a civil action, if the parties so desire.

17.6    Assignment.

17.6.1    This Agreement shall not be assignable by either party  without the prior written consent of the other party.  Notwithstanding anything contained herein to the contrary, State may assign to any other State Entity, in whole or in part, State's right, title, interest and obligations under this Agreement or any Solutions Order or Services Order which relate to items purchased by State on behalf of such State Entity, without Contractor's consent. State's assignment pursuant to this Section 18.6.1of any payment obligations to another State Entity shall be limited to the extent of that State Entity's interest or use of the subject matter hereof and shall constitute a full and complete novation of State's liabilities and obligations with respect thereto and Contractor shall recognize the State Entity to which such obligations were assigned as State's successor-in-interest with respect to such obligations and will exclusively look to such State Entity for the discharge of all such liabilities and obligations, provided, however State will continue to be Contractor's sole point of contact with respect to this Agreement in accordance with Section 17.234.

17.6.2   This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective permitted successors and assigns, provided that no assignment, except as described in Section 17.6.1, shall relieve any party of such party's obligations hereunder without the consent of the other party hereto.

17.7   <u>Covenant Against Pledging</u>. Contractor agrees that, without the prior written consent of State, it will not assign, transfer, pledge, hypothecate or otherwise encumber its rights to receive payments from any State Entity under this Agreement for any reason whatsoever. To the extent State permits Contractor to assign, transfer, pledge, hypothecate or otherwise encumber its rights to receive payments from State under this Agreement, Contractor will continue to be State's sole point of contact with respect to this Agreement, including with respect to payment.  The Person to which such rights are assigned, transferred, pledged, hypothecated or otherwise encumbered will not be considered a third party beneficiary under this Agreement and will not have any rights or causes of action against any State Entity.

17.8   <u>No Liens</u>. Contractor will not file, or by its action or inaction permit, any liens to be filed on or against property or realty of State or any other State Entity. In the event that any such liens arise as a result of the Contractor's action or inaction, Contractor will obtain a bond to fully satisfy such liens or otherwise remove such liens at its sole cost and expense within ten (10) Business Days. If Contractor fails to do so, State may, in its sole discretion, pay the amount of such lien, or deduct such amounts from payments due to Contractor.

17.9   <u>Non-Delegation</u>. Nothing herein will be deemed or construed as delegating the discretionary powers or authority of State or any of the other State Entities to Contractor.  Further, nothing herein will be deemed or construed as delegating the discretionary powers or authority of the other State Entities to State or the discretionary powers or authority of State to the other State Entities.

17.10   <u>No Waiver</u>.  The failure of either party at any time or times to enforce or require performance of any provision contained in this Agreement shall in no way operate as a waiver or affect the right of such party at a later time to enforce such provision.

17.11   <u>Entire Agreement</u>.  This Agreement (together with its Exhibits, all executed Solution Orders and Services Orders, and all attachments thereto) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior written agreements and contemporaneous oral agreements with respect to the subject matter hereof; provided, if the parties have entered into a Confidentiality and Non-Disclosure Agreement, the terms of such agreement shall survive and govern the parties' obligations as set forth in such agreement between the execution date thereof and the Effective Date.  Although State may utilize its own purchase order or confirmation form for its own convenience, the provisions of this Agreement shall control as to all issues relating to the subject matter hereof.  Typewritten or handwritten additions, initialed by both parties, shall supersede any pre-printed provisions of this Agreement. Subject to the foregoing, each Solution Orders and Services Orders hereto, whether executed concurrently herewith or subsequent hereto, shall be deemed to be incorporated herein and shall be governed by the terms of this Agreement.

17.12   <u>Amendment</u>**.**  This Agreement may be amended in writing from time to time by mutual consent of the parties.  If the contract award exceeds the delegated purchasing authority of State, then State must obtain approval of the amendment from the Department of Administrative Services (DOAS). All amendments to this Agreement must be in writing and fully executed by duly authorized representatives of State and the Contractor.

17.13   <u>Severability</u>.  Each provision herein shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses of the Agreement.  Moreover, if any provision contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity, subject, or otherwise unenforceable, such provision shall be construed by the appropriate judicial body by limiting or reducing it or them so as to be enforceable to the maximum extent compatible with the Applicable Law.

*State of Georgia/Dominion Confidential*

17.14   Time is of the Essence.  Time is of the essence with respect to Contractor's performance of the terms of this Agreement. Contractor shall ensure that all personnel providing Software, Licenses and Services to State are responsive to State's requirements and requests in all respects.

17.15   Independent Contractor.  Contractor and all Contractor Personnel are independent contractors and neither Contractor nor any Contractor Personnel shall be deemed an employee of State.  Contractor is and shall remain the employer of all Contractor Personnel and shall be solely responsible for the employment, training, and payment of salaries, wages, bonuses, benefits (including health insurance, retirement and other similar benefits, if any) and other compensation, of all Contractor Personnel. Contractor shall be responsible for the payment of all federal, state, and local withholding taxes and workers compensation, and, at the reasonable request of State, Contractor shall provide to State evidence that all of such payments have been made.  Nothing in this Agreement shall be construed to create a partnership, joint venture, or agency relationship between the parties.  Neither Contractor nor any Contractor Personnel shall have the right to bind State to any contract, agreement, or obligation.

17.16   Joint/Several Liability.  If the Contractor is a joint entity, consisting of more than one Person, all such Persons shall be jointly and severally liable for carrying out the activities and obligations of this Agreement, and for any default of activities and obligations. Contractor acknowledges and agrees that that the liability of each State Entity shall be several and not joint.

17.17   No Third-Party Beneficiaries. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person other than Contractor and State any rights or remedies under or by reason of this Agreement.

17.18   Survival. All provisions of this Agreement that, by their terms, are intended to survive shall expressly survive any termination or expiration of this Agreement, including Section 3, Section 11, Section 12, Section 14 and Section 15.

17.19   Publicity. The laws of the State of Georgia, including the Georgia Open Records Act, as provided in O.C.G.A. Section 50-18-70 et seq., require procurement records and other records to be made public unless otherwise provided by law. Notwithstanding the foregoing, the Contractor Parties each agree that no acknowledgment or other information concerning the Agreement or the Services and/or Deliverables provided hereunder will be made public by the Contractor Parties without the prior written agreement of State. Further, the Contractor Parties shall not use State's, any other State Entities' name, photographs, logo, trademark, or other identifying characteristics without the applicable State Entity's prior written approval.

17.20   Solicitation.  The Contractor warrants that no person or selling agency (except bona fide employees or selling agents maintained for the purpose of securing business) has been employed or retained to solicit and secure this Agreement upon an agreement or understanding for commission, percentage, brokerage or contingency.

17.21   Interpretation; Intent of References to Bid Documents. Whenever any provision of this Agreement uses the term "including" (or "includes"), such term shall be deemed to mean "including without limitation" and "including but not limited to" (or "includes without limitations" and "includes but is not limited to") regardless of whether the words "without limitation" or "but not limited to" actually follow the term "including" (or "includes").  The words "herein," "hereby," "hereunder," "hereof," and other equivalent words shall refer to this Agreement in its entirety and not solely to the particular portion of this Agreement in which any such word is used. All definitions set forth herein shall be deemed applicable whether the words defined are used herein in the singular or the plural. Wherever used herein, any pronoun or pronouns shall be deemed to include both the singular and plural and to cover all genders. The references to the parties' obligations, which are contained in this Agreement, are intended to supplement or clarify the obligations as stated in the eRFP and Contractor's eRFP Response.  The failure of the parties to make reference to the terms of the eRFP or Contractor's eRFP Response in this Agreement shall not be construed as creating a conflict and will not relieve the Contractor of the contractual obligations imposed by the terms of the eRFP and the

Contractor's eRFP Response. The contractual obligations of any State Entity cannot be implied from Contractor's eRFP Response.

17.22   Force Majeure.  Neither party shall be liable for, or be in breach of this Agreement because of, any delay or failure to perform its obligations under this Agreement or thereunder resulting from any acts of God, war, insurrection, terrorism or the public enemy (collectively, "**FM Events**").  A party that experiences a FM Event shall give the other party prompt written notice of the FM Event.  The affected party shall use reasonable efforts to work around or to overcome the FM Event and to resume full performance under this Agreement as soon as practicable.  Occurrence of FM Events will not excuse the backup and disaster recovery obligations of Contractor.  Contractor will follow normal procedures for classification, resolution, resolution and escalation of incidents, even if the incident is caused by an FM Event.  If an FM Event causes a material failure or delay in the performance of any applications or services for more than five (5) consecutive days, State may, at its option, and in addition to any other rights State may have, procure such applications or services from an alternate source until Contractor is again able to provide them, and Contractor shall be liable for all payments made and costs incurred by State required to obtain such applications and services from such alternate source during such period.  If an FM Event causes a material failure or delay in the performance of any application or services for more than thirty (30) consecutive days, State may, at its option, and in addition to any other rights they may have, immediately terminate each affected Schedule and Services Order without liability to Contractor. State shall not be required to pay the fees that may have otherwise been payable for any period of time in which any substantial part of the Solution and Services are not provided as a result of an FM Event.

17.23   Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one Agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

17.24   State Entity Representative.  Notwithstanding anything contained in this Agreement to the contrary, each of the State Entities other than State hereby appoint State to serve as their representative and State accepts such appointment, to act for and on behalf of such State Entities with respect to this Agreement. Each of the State Entities acknowledges and agrees that any decision, act, consent, or instruction taken or given by State pursuant to this Agreement shall be and constitute a decision, act, consent or instruction of all State Entities and shall be final, binding, and conclusive upon the State Entities, and Contractor and its Affiliates may rely upon any such decision, act, consent or instruction of State on behalf of the other State Entities.  The State Entities hereby agree to release State from and waive any and all claims and liabilities based on any claim that an action authorized hereunder to be taken by the State on behalf of the other State Entities is not binding on, or enforceable against, any such State Entity.

17.25    Order of Precedence.  In the case of any inconsistency or conflict among the specific provisions of this Agreement (as amended), the Exhibits attached hereto, the eRFP (including any subsequent addenda), Contractor's eRFP Response, and the Documentation, the order of precedence shall be, notwithstanding any terms that may be contained in the eRFP, Contractor's eRFP Response, or the Documentation (including any statement that purports to change the order of precedence described herein, incorporate additional or inconsistent terms, or amend documents having precedence), as follows:

     17.25.1 First, by giving precedence to the specific provisions of this Agreement.

     17.25.2 Second, by giving precedence to the specific provisions of the Exhibits attached hereto.

     17.25.3 Third, by giving precedence to the specific provisions of the eRFP.

     17.25.4 Fourth, by giving precedence to the specific provisions of the Contractor's eRFP Response, except that objections or amendments by a Contractor contained in Contractor's eRFP Response that have not been expressly accepted by State in writing shall not be included in this Agreement and shall be given no weight or consideration.

18.    **DEFINITIONS AND INDEX OF PREVIOUSLY DEFINED TERMS.**

This Section 18 provides definitions for capitalized terms used but not previously defined in this Agreement and indexes capitalized terms used and previously defined in the Section in which they first appear as indicated by bold type. The definitions in this Section apply to such capitalized terms in both their singular and plural forms. This Section 18 does not apply to those terms capitalized only to comply with grammatical conventions.

18.1    **"Abandon"** and **"Abandonment"** have the meanings set forth in Section 16.8.

18.2    **"Acceptance Test"** is defined in Section 9.

18.3    **"Acceptance Test Plan"** is defined in Section 9.

18.4    **"Agreement"** is defined in the Initial Paragraph of this Agreement.

18.5    "**Applicable Law**" means all applicable provisions of any constitution, statute, common law, ordinance, code, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted or issued by any Governmental Authority or arbitrator or arbitration panel.

18.6    **"Application Programs"** is defined in Section 2.1.1(ii).

18.7    **"Authorized Recipients"** means those employees, consultants or agents of the Receiving Party to whom disclosure is required to carry out this Agreement and any Order hereunder and who have executed a confidentiality agreement or are otherwise bound to duties of non-disclosure and restrictions on use of the Confidential Information at least as restrictive as those set forth in this Agreement (including, but not limited to an undertaking to implement and maintain appropriate administrative, technical and physical safeguards to protect the confidentiality, integrity and availability of Regulated Information) but shall expressly exclude such individuals or entities as may, at the election of the parties, be identified on a list bearing the signatures of the parties and attached to and incorporated into this Agreement.

18.8    **"Bankruptcy Code"** is defined in Section 3.1.4.

18.9    **"Breach Incident"** is defined in Section 7.2.2(b).

18.10    "**Change Control Form**" is defined in Section 5.2.

18.11    "**Change Order**" is defined in Section 5.2.

18.12    "**Change Request**" is defined in Section 5.2.

18.13    "**Change Response**" is defined in Section 5.2.

18.14    **"Confidential Information"** is defined in Section 11.1.

18.15    "**Configuration Services**" means the services described in Section 4.1.

18.16    **"Contractor"** is defined in the initial paragraph of this Agreement.

18.17    **"Contractor Affiliates"** means those entities that are: (a) directly or indirectly, through one or more intermediaries, controlled by Contractor, whether such control is effective by ownership of equity interests, contract or otherwise; and (b) expressly identified by Contractor to State and State agrees to their inclusion on Exhibit D.

18.18  **"Contractor Computer Systems"** is defined in Section 11.7.1.

18.19  "**Contractor's eRFP Response**" means Contractor's submission in response to the eRFP including all materials submitted in connection therewith and, for the avoidance of doubt, all responses to the Mandatory Response Worksheet, questionnaires, and other attachments or links released with the eRFP, a copy of which is attached hereto as <u>Exhibit A</u>.

18.20  **"Contractor Licensed Programs"** means those Licensed Programs identified on the applicable Solution Order as being licensed by Contractor.

18.21  **"Contractor Parties"** is defined in Section 7.3.2.

18.22  **"Contractor Personnel"** is defined in Section 6.2.

18.23  **"Contractor Products"** is defined in Section 12.1.

18.24  **"Contractor Relationship Manager"** is defined in Section 6.1.

18.25  **"Contractor Solution Partner"** is defined in Section 1.3.

18.26  **"Contractor System Proposal"** is defined in Section 4.1.2.

18.27  **"County"** means the 159 counties of the State of Georgia.

18.28  **"Crisis"** means an extraordinary event affecting Contractor that requires emergency response measures to be taken, including any event that may result in the Solution or Services and any additional applications provided by Contractor to State becoming unavailable for a significant amount of time

18.29  **"Critical Milestone"** means those critical delivery and implementation milestones specifically identified in Table A of Appendix A to Attachment 4 of Solution Order No. 1 (Milestones).

18.30  "**Deliverables**" is defined in Section 12.7.

18.31  **"Delivery & Acceptance Notice"** means a written notice substantially in the form of <u>Exhibit I</u>.

18.32  **"Derivative Works & Improvements"** has, collectively, the meaning ascribed to the term "derivative work" in Title 17 U.S.C., and "improvement" in Title 35 U.S.C., but in all events shall apply to additions, changes, or other statutorily specified new material appearing for the first time in the applicable item or work hereunder.

18.33  **"Designated Licensed Programs"** is defined in Section 4.1.1.

18.34  **"Disabling Procedures"** means any program routine, device, code or instructions (including any code or instructions provided by third parties) or other undisclosed feature, including a time bomb, virus, software lock, drop-dead device, malicious logic, worm, Trojan horse, bug, error, defect or trap door, that is capable of accessing, modifying, deleting, damaging, disabling, deactivating, interfering with, or otherwise harming the Services and Deliverables, any hardware, data or other electronically stored information, or computer programs or systems.

18.35  **"Disaster Recovery Plan"** is defined in Section 11.8.

18.36  **"Disclosing Party"** is defined in Section 11.1.

18.37  **"Discounts"** shall mean the discounts set forth in the Fee Schedule.

18.38 **"Documentation"** means all written materials related to any Services or Deliverables (including any component of any Solution) that are supplied by Contractor to State hereunder, including any and all installer's, operator's and user's manuals, training materials, guides, functional and/or technical specifications, commentary, listings and other materials, (including all materials describing interoperability with other hardware or software), in any or all media, for use in conjunction with the applicable Services or Deliverables (including any component of any Solution), in all cases in sufficient form and content to allow for first and frontline personnel comprehension thereof. If such Deliverables are discrete computer software applications, Documentation shall include such reasonable descriptions as would allow a third party of reasonable skill and experience in information technology to operate, maintain, customize and parameterize such Deliverables and their related Source Code.

18.39 **"Effective Date"** is defined in the initial paragraph of this Agreement.

18.40 **"Equipment"** is defined in Section 2.1.1(iv).

18.41 "**Equipment Charge**" is defined in Section 10.1.8.

18.42 "**Extended Warranty**" is defined in Section 4.2.

18.43 **"eRFP"** is defined in Section 1.1.

18.44 **"Fee Schedule"** is defined in Section 10.1.

18.45 **"Final Acceptance"** means the receipt by Contractor of written notification from State that all Services and Deliverables under a given Services Order have been reviewed and tested by State as a whole and found to: (a) substantially conform to the Specifications and descriptions set forth in such Services Order and any exhibits thereto, as such Specifications and descriptions may be specifically amended by subsequent mutual written agreements between the parties; and (b) conform to Contractor's representations and warranties in this Agreement.

18.46 **"FM Events"** is defined in Section 17.22.

18.47 **"Functional Requirements"** is defined in Section 4.1.1.

18.48 "**Fund**" is defined in Section 15.3.

18.49 "**Generally Accepted Accounting Principles**" means United States generally accepted accounting principles.

18.50 "**Governmental Authority**" means any federal, state, local or foreign legislative, executive, judicial, quasi-judicial or other public authority, agency, department, bureau, division, unit, court or other public body.

18.51 **"Guaranteed Functionality"** is defined in Section 1.2.

18.52 **"Guaranteed Performance"** is defined in Section 1.2.

18.53 **"Impact Analysis"** is defined in Section 5.3.

18.54 "**Indemnified Parties**" is defined in Section 15.1.

18.55 **"Initial Acceptance"** means the receipt by Contractor of written notification from State that any particular Services or Deliverables under a given Services Order have been reviewed and/or tested by State and found to: (i) substantially conform to the Specifications and descriptions set forth in such Services Order and any exhibits thereto, as such Specifications and descriptions may be specifically amended by

subsequent mutual written agreements between the parties and (ii) conform to Contractor's representations and warranties in this Agreement.

18.56    "**Initial Term**" is defined in Section 16.1.

18.57    "**Installation Deadline**" is defined in Section 2.1.3.

18.58    "**Installation Event**" is defined in Section 2.1.3.

18.59    "**Installation Plan"** is defined in Section 2.1.3.

18.60     "**Intellectual Property Rights"** means all right, title and interest, including all copyright rights, patent rights (including rights under all patent applications, patents, letters patent, supplementary patent certificates, inventor's certificates, continued prosecution applications, requests for continued examination, and other similar filings or stages thereof) and trademark rights as well as all proprietary rights (including Trade Secrets) and moral rights (including the rights of authorship and attribution and subsequent modification) throughout the world whether under the laws of the United States, any of its several states or any foreign jurisdiction and whether or not evidenced by certificates, applications or registrations therefor and whether granted permanently, on initial issuance or granted upon reissue, re-examination, division, extension, provisionally, in continuation or in continuation-in-part and at all times further including all goodwill associated with all such rights.

18.61    "**Interest Rate"** means the lesser of eighteen percent (18%) or the maximum rate permitted by Applicable Law.

18.62    "**Interruption"** means any material, or continuing, or repeated suspension or interruption in the supply of the Solution or Services by or on behalf of Contractor to State, or any other material, or continuing, or repeated failure of Contractor to meet its obligations under this Agreement in regard to the Solution or Services, whether resulting from breach, termination, partial or complete cessation of business, disruption of business, bankruptcy or other insolvency proceedings, or otherwise, or termination of this Agreement.

18.63    "**Key Personnel"** is defined in Section 6.5.

18.64    "**Licensed Programs"** means all operating system software and other software programs (including all Contractor Licensed Programs and Third Party Licensed Programs) provided by Contractor hereunder.

18.65    "**Major Revisions**" is defined in Section 2.3.

18.66    "**Maintenance Services"** is defined in Sections 2.1.1(v)**.**

18.67    "**Mandatory Requirements"** is defined in Section 1.2.

18.68    "**Milestone Payment"** is defined in Section **Error! Reference source not found.**.

18.69    "**Milestone Deadline**" means each of the dates listed in the "Milestone Deadline" column of the tables set forth on Appendix A to Attachment 4 of Solution Order No. 1 (Milestones).

18.70    "**Non-Infringement Warranty"** is defined in Section 14.1.5(c).

18.71    "**Operating Program"** is defined in Section 2.1.1(iv).

18.72    "**OSS"** is defined in Section 12.9.

18.73    "**Output"** is defined in Section 12.1.

18.74    **"Performance Levels"** is defined in Section 8.1.

18.75    **"Performance Requirements"** is defined in Section 4.1.1.

18.76    **"Person"** means any individual, corporation, limited liability company, partnership, limited partnership, business trust, or other entity of any nature.

18.77    **"Pilot Election**" means the pilot election to be administered on November 5, 2019 in up to 6 Counties (exact Counties to be determined by mutual agreement), including the coding of election database (and additional training needed in connection therewith), training of personnel including poll-workers of the Counties hosting the Pilot Election, logic and accuracy testing at each of the participating State Sites, election day support at the participating State Sites, and post-Pilot Election auditing and validation of results.

18.78    **"Privacy Regulations"** is defined in Section 11.5.

18.79    **"Project Manager"** is defined in Section 6.4.

18.80    **"Proprietary Materials"** means: (a) all runtime and non-runtime machine-readable, executable object code, human readable source code, in any language whatsoever (including HTML, CGI, XML, Java, Visual Basic and C) and on any operating or database platform, system or environment whatsoever (including Windows, Unix, Linux, DB2, J2EE, Oracle, SQL or any mainframe) as well as all  computer system designs, user interfaces, commented source code, explanations, flow charts, schematics, algorithms, subroutine descriptions, class and object descriptions, memory and overlay maps, statements of principles of operations, architecture standards, data flow descriptions, class, base-class and sub-class descriptions, data structures, control logic and other computer formatting, programming or scripting code; (b) all inventions and discoveries, whether or not patentable, reduced to practice or recorded in a medium; (c) all published and unpublished works of authorship including audio-visual works, "look and feel," artwork, illustrations, images, photographs and printed or graphic matter; (d) all tangible materials, including all prototypes, models, designs, files, templates libraries (.dll or otherwise), tools, graphics, screen displays and/or their other user interface components or "look and feel" (as that phrase is understood and applied under Title 17 U.S.C.), creative content, algorithms, formulae data, information, reports and technologies; (e) business and technical requirements and system designs and architectures in any form or medium.

18.81    **"Receiving Party"** is defined in Section 11.1.

18.82    **"Regulated Information"** is defined in Section 11.5.

18.83    **"Regulation Compliant"** is defined in Section 14.1.13.

18.84    **"**Renewal Period**"** is defined in Section 16.1.

18.85    **"Residuals"** means any information in intangible form that is not protectable under copyright or patent law, or protected as a trade secret or other intellectual property right including any ideas, concepts, know-how or techniques contained therein.

18.86    **"Revision"** is defined in Section 2.3.

18.87    **"Security Breach"** means (i) unauthorized physical or technical access to any Contractor Computer System; (ii) any circumstance that may constitute or result in, any unlawful or unauthorized acquisition, access, loss, theft, use or disclosure of  any Confidential Information, Regulated Information, or State Data in the possession of any of the Contractor Parties; (iii) any breach or attempted breach of the security of any Confidential Information, Regulated Information, or State Data, or of any of the controls of any of the Contractor Parties intended to protect the same; or (iv) any other circumstances or events that

could compromise the privacy or security of any of the Confidential Information, Regulated Information, or State Data in the possession of any of the Contractor Parties.

18.88    "**Service Level Agreements**" means the service levels to be maintained by Contractor throughout the Term as more fully described in a Services Order or Services Order Attachment.

18.89    "**Services**" is defined in Section 2.1.1.

18.90    "**Services Order**" means a written instrument signed by an authorized signatory of a State Entity and an authorized representative of Contractor substantially in the form of Exhibit C. Such Services Order will include any requirements, considerations, or objectives which differ from the general provisions of this Agreement and not otherwise address in a Solution Order; for example, the intent of the parties with respect to any rights to particular developments (intellectual property), specific Milestone Events and/or Milestone Dates and/or quality and warranty considerations, special fees, and all such other particular objectives, considerations, or requirements in conjunction with the delivery of Services by Contractor. Except as otherwise specifically provided in such Services Order, each Services Order shall be governed by the terms of this Agreement.

18.91    "**Services Order Attachment**" is defined in Section 4.4.

18.92    "**Site Specifications**" means the reasonable environmental specifications as relate to utilities, temperature, and humidity conditions, which Contractor suggests are maintained at the State Sites for efficient operation and use of the Solution at those State Sites.

18.93    "**Software**" is defined in Section 2.1.1.

18.94    "**Solution**" is defined in Section 1.1.

18.95    "**Solution Order**" is defined in Section 2.1.1.

18.96    "**Source Code**" means a copy of the complete source code corresponding to the object code of a given Deliverable, as applicable, plus any pertinent commentary or explanation (including any and all explanations, flow charts, schematics, algorithms, subroutine descriptions, class and object descriptions, memory and overlay maps, statements of principles of operations, architecture standards, data flow descriptions, class, base-class and sub-class descriptions, data structures, and control logic) that may be necessary to render such source code understandable and useable by a reasonably trained computer-programming expert who is generally familiar with information technology systems in the financial and banking sectors. The source code shall include all Documentation, statements of principles of operation, and schematics, all as necessary or useful for the effective understanding and use of such source code. Insofar as the development environment employed for the development, maintenance, and implementation of any source code includes any device, programming, or Documentation not commercially available to State on reasonable terms through readily known sources other than Contractor, the source code shall include all such devices, programming, or Documentation. The foregoing reference to "development environment" is intended to apply to any programs, including compilers, "workbenches," tools, and higher-level (or "proprietary") languages, used by Contractor for the development, maintenance, and implementation of the applicable source code.

18.97    "**Special Programs**" is defined in Section 2.1.1(ii).

18.98    "**Specifications**" means the technical and business requirements of State described in a given Solution Order or Services Order, including all technical detail and design specifications, functionality matrices, requirements definition, request for proposals, proposals, gap analysis, requirements for project management, relevant project considerations, objectives, Milestone Events and/or Milestone Dates, and Performance Levels set forth therein.

18.99   **"Specifications Warranty"** is defined in Section 14.1.12(b).

18.100   **"State"** is defined in the initial paragraph of this Agreement.

18.101   **"State Contractor"** means any individual, corporation, limited liability company, partnership, limited partnership, business trust or other business organization duly recognized under the laws of its applicable jurisdiction that provides services to State or any other State Entity.

18.102   **"State Data"** is defined in Section 12.3.

18.103   **"State Entity"** means the State and the Counties.

18.104   **"State Relationship Managers"** is defined in Section 6.1.

18.105   **"State Site"** means the 159 locations of the State Entities at which the Solution is to be implemented and such other locations as may be designated by State from time to time.

18.106   **"Support Services"** is defined in Section 2.1.1(iii).

18.107   "**SVS**" is defined in Section 1.1.

18.108   [Reserved].

18.109   "**Term**" is defined in Section 16.1.

18.110   **"Termination Assistance"** is defined in Section 16.6.

18.111   **"Termination Assistance Period"** is defined in Section 16.7.

18.112   **"Third Party Licensed Programs"** means those Licensed Programs identified on the applicable Solution Order as being licensed by a Contractor Solution Partner.

18.113   **"Third Party Materials"** means all Proprietary Materials the Intellectual Property Rights for which are owned, by an individual or entity other than State Entities) and Contractor (including Contractor Affiliates).

18.114   **"Trade Secrets"** means any business, scientific or technical data, information, design, process, procedure, formula, or improvement that is commercially valuable to either party and is not generally known in the industry.  Each party acknowledges that the Trade Secrets of the other party have been developed by that party at great expense and with the considerable effort of skilled professionals.  Each party also acknowledges that the Services and Deliverables under this Agreement may of necessity incorporate Trade Secrets.

18.115   **"Training Services"** is defined in Section 4.2.

18.116   **"Transfer Control Laws"** is defined in Section 7.3.2.

18.117   "**Transition Plan**" is defined in Section 16.6.

18.118   **"Upgraded Solution"** is defined in Section 2.3.

[This space intentionally left blank; signatures appear on following pages.]

**IN WITNESS WHEREOF,** the parties have caused this Master Solution Purchase and Services Agreement to be executed by their duly authorized representatives as of the date first written above.

| STATE OF GEORGIA OFFICE OF THE SECRETARY OF STATE | Dominion Voting Systems, Inc. |
|---|---|
| By:_____ | By:_____ |
| Name: _____ | Name:__John Poulos_____ |
| Title: _____ | Title:___President & CEO____ |
| Date:_____ | Date:__7/29/2019_____ |
| By:_____ | |
| Name: _____ | |
| Title: _____ | |
| Date:_____ | |

## EXHIBIT A
To Master Solution Purchase and Services Agreement

### CONTRACTOR'S ERFP RESPONSE

**EXHIBIT B**
To Master Solution Purchase and Services Agreement

**SOLUTION ORDER**

THIS SOLUTION ORDER is dated this _____ day of _____, 20__ ("**Solution Order Effective Date**") and is subject to the terms of the Master Solution Purchase and Services Agreement (the "**Agreement**") dated as of _____, 20109 by and between _____ ("State") and _____ ("**Contractor**").  Unless otherwise defined herein, all capitalized terms used herein have the same meanings as is set forth in the Agreement, which is hereby incorporated by reference.  The undersigned State Entity hereby orders delivery for the following pieces of Solution from Contractor. Contractor agrees to deliver the items ordered herein in accordance with the Agreement and in compliance with all Applicable Laws including with the provisions of O.C.G.A. Title 21, as amended and the State of Georgia Election Board and Secretary of State Rules contained in Sections 183 and Sections 590 of the Georgia Administrative Code respectively.

**EQUIPMENT, SOFTWARE, DELIVERY DATES AND PURCHASE PRICE(S)**

1.      **Democracy Suite (EMS) Software description**

Democracy Suite is an Election Management System (EMS) that supports all ImageCast voting channels: early votes, vote by mail votes, Election Day votes from touchscreen ballot marking devices (ICX) and Scanner, and Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) votes, from a single comprehensive database.

The structure of the election files, as well as the content of the iButton security keys, is bit-level sensitive with regards to accuracy and precision. This means that a single bit change can influence system behavior. The structure of these interfacing entities is dependent on the election domain business logic implemented within the system. Therefore, within the EMS EED application, election files and iButton security keys can only be created when the election project is in the "ballot generated" state.

From an accuracy point of view, CRC checks are implemented. From a security point of view, election files utilize SHA256 (keyed hash HMAC) or digital certificates and AES encryption for data integrity and confidentiality.  The figure below presents an overview of the EMS interfaces, focusing on the Democracy Suite internal and external entities.

*Master Solution Purchase and Services Agreement*



*The Democracy Suite system includes the following Third Party Software:*

<u>EMS Standard Server Prerequisites</u>
- Microsoft Visual J#
- Microsoft Visual C++ 2013 Redistributable Package
- Microsoft Visual C++ 2013 Redistributable Package (64bit)
- Microsoft Visual C++ 2015 Redistributable Package (32bit)
- Microsoft Visual C++ 2015 Redistributable Package (64bit)
- Java Runtime Environment
- Microsoft SQL Server 2016 Standard -(Microsoft SQL Server Management Tools)
- Cepstral Voices
- Arial Narrow Fonts

<u>EMS Client Workstation Prerequisites</u>
- Microsoft Visual J#
- Microsoft Visual C++ 2013 Redistributable Package
- Microsoft Visual C++ 2015 Redistributable Package 64bit
- Java Runtime Environment
- Maxim iButton Driver
- Adobe Reader
- Microsoft Access Database Engine
- Open XML SDK 2.0 for Microsoft Office
- Arial Narrow Fonts

*Master Solution Purchase and Services Agreement*

<u>Adjudication Workstation Prerequisites</u>
- Dell Latitude T3420 Laptop
- Microsoft Visual J#
- Microsoft Visual C++ 2013 Redistributable Package
- Microsoft Visual C++ 2015 Redistributable Package 64bit
- Java Runtime Environment
- Adobe Reader





The Democracy Suite EMS consists of the following Dominion Software modules:

1.1 <u>Election Event Designer (EED).</u> EED application is used for the definition and management of election event.  EED contains all ballot content utilized to define election projects. Each election project is represented as an instance of the election domain database with associated set of election project file.  The definition of the election project can be initiated by importing the election data through the Election Data Translator (EDT) module from external systems that contain the necessary relational data to build a ballot or by defining election project entities without importing external data.  It is important to note that an election project initiated through EDT can be further modified within the EED Client Application.  The EED module can generate two types of paper ballots:

- Proofing ballots – ballots produced to allow election project stakeholders to proof ballot content and styling. These ballots cannot be processed by the ImageCast as they don't have proper ballot barcodes. These ballots are overprinted with the text "Proofing Ballots – date/time".

- Official ballots – represent production ready, press ready ballots in PDF format with barcodes and without any overprinting.

1.2 <u>Results Tally and Reporting (RTR).</u>  RTR application is used for the tally, reporting and publishing of election results.  For the RTR module, inputs represent encrypted and signed election result files, log files and scanned ballot images with Dominion's patented AuditMark, produced by the ImageCast Precinct and Central tabulators (PNG and TIFF images). Outputs represent a variety of election result reports, as well as auditing information (XML, HTML, CSV, MS Excel and PDF formats).

The program uploads the result files into the results tally module, and consolidated results are verified, tabulated, and published. Once the vote data is uploaded into the result tally module, the flow of results to the public and media can be controlled.

RTR allows election officials to review the results before releasing them, and the system provides a number of reporting methods, including but not limited to summary and precinct-level (Statement of Votes Cast) result reports. In addition to the static, pre-defined reports found in most reporting systems, RTR summary and precinct-level reports use the Microsoft SQL Server reporting services engine to offer maximum flexibility to user. These reports feature a variety of configurable options and filters, including detailed breakdowns of provisional ballots cast, ballots cast during early voting, on Election Day, and by mail.

1.3 <u>Adjudication.</u>  The adjudication module is used to review and adjudicate ImageCast ballot images. The application uses tabulator results files and scanned images to allow election administrators to electronically adjudicate ballots requiring review based on exception criteria. Exceptions include overvotes, undervotes, blank contests, blank ballots, write-in selections, and marginal marks.  After a ballot is adjudicated, the ballot image is appended with a record of that decision including the user's name, action taken by the user, and date and time of the action.  This adjudication AuditMark is appended to the ballot image under the original AuditMark, which was manifested during tabulation.

1.4 <u>Audio Studio (AS).</u>  Audio studio uses Cepstral, a third-party text-to-audio synthesizer, to automatically generate audio ballots for the ImageCast X Ballot Marking Device. The State also has the option to import human-recorded audio, with or without the use of Audio Studio.  Pronunciation may be modified using the Cepstral's Swifttalker application. The system outputs audio ballots (PNG images, SPX audio files and XML definition files), definition reports (XML, Excel or HTML files), and election definition files required to program the ImageCast X.

1.5 <u>Automated Test Deck (ATD).</u>  ATD is an application used to create test decks for running Pre-Logic and Accuracy Test with marking pattern requirements. The application can be used to access the election database and produce a set of print-ready PDFs and results tables for testing.

2. **EMS Hardware description, including third-party software components.**[1]

| Description |
|---|
| **EMS STANDARD SERVER**<br>DELL POWEREDGE R640 RACK SERVER - 16GB RAM, 6 X 1.2TB HDD, WINDOWS SERVER 2012 R2, MICROSOFT SQL SERVER 2016 STANDARD |
| SQL SERVER 2016 LICENSE W/5 CALs |
| VOICE SYNTHESIS SOFTWARE LICENSE, ALLISON - ENG - CEPSTRAL 6.2 |

---

[1] All equipment is subject to change dependent upon product availability.  An equivalent model, certified by the State of Georgia, may replace products that are end of life.

| Description |
| --- |
| VOICE SYNTHESIS SOFTWARE LICENSE, ALEJANDRA SPA - CEPSTRAL 6.2 |
| VOICE SYNTHESIS SOFTWARE LICENSE - SAVE TO FILE FOR WINDOWS |
| VOICE SYNTHESIS SOFTWARE LICENSE - AUDIO DISTRIBUTION LICENSE |
| VOICE SYNTHESIS SOFTWARE LICENSE - CONCURRENT PORT FOR WINDOWS |
| ANTI-VIRUS - AVAST! ENDPOINT PROTECTION SUITE, 5-PACK LICENSE |
| POWERCONNECT X1026 24 PORT ETHERNET SWITCH |
| SERVER UPS: UPS 1500VA - 2U |
| SERVER RACK: 12U |
| 24" SWIVEL CAPABLE MONTIOR |
| VGA CABLE – MALE TO MALE, 6 FT |
| PATCH CABLE, CAT6, 25 FT., BLUE |
| **EMS EXPRESS SERVER**<br>DELL PRECISION T3420/3430 WORKSTATION - 16GB RAM, 2X 500GB HDD, RAID 1, WIN 10 PRO, KB & MOUSE |
| 8 PORT SWITCH X1008 |
| 24" SWIVEL CAPABLE MONITOR |
| IBUTTON PROGRAMMER KIT |
| COMPACT FLASH CARD READER - KINGSTON |
| VOICE SYNTHESIS SOFTWARE LICENSE, ALLISON - ENG - CEPSTRAL 6.2 |
| VOICE SYNTHESIS SOFTWARE LICENSE, ALEJANDRA SPA - CEPSTRAL 6.2 |
| VOICE SYNTHESIS SOFTWARE LICENSE - SAVE TO FILE FOR WINDOWS |
| VOICE SYNTHESIS SOFTWARE LICENSE - AUDIO DISTRIBUTION LICENSE |
| VOICE SYNTHESIS SOFTWARE LICENSE - CONCURRENT PORT FOR WINDOWS |
| **EED/RTR/ADJ - CLIENT**<br>DELL PRECISION T3420/3430 (INTEL I5-6500, 8GB RAM, 500GB HDD, W10X64PRO) W/24" MONITOR, KB & MOUSE |
| SINGLE IBUTTON PROGRAMMER WITH USB ADAPTER, IBRW-100A |
| USB TO 1-WIRE/IBUTTON ADAPTER |
| PATCH CABLE, CAT6, 25 FT. , BLUE |
| SMART CARD READER / WRITER |
| COMPACT FLASH CARD READER - KINGSTON |
| SQL 2016 USER USER CALs |

3.    **ImageCast X -Prime Touchscreen Ballot Marking Device (ICX-BMD)**

3.1    <u>Application</u>:  ImageCast X-Prime BMD is a touchscreen in-person voting device and ballot marking device. Voting sessions are initiated on the tablet by either a smart card or the entry of a numeric code based on activation. The ballot is loaded directly onto the standalone device.  All voting activity is performed at the tablet, including accessible voting. Accessible voting interfaces connect to the tablet via an Audio Tactile Interface or ATI.  For all modes of voting, after the voter reviews the ballot selections, a paper ballot is created for the voter from a printer in the voting booth.  The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct or Central tabulator. No votes are stored on the ImageCast X-BMD unit. All votes can be tabulated and stored both the ImageCast Central and Precinct Tabulators.

3.2    <u>Components</u>: ImageCast X-Prime BMD is composed of a 21.5" Avalue touchscreen, Android OS 5.1, DC 19V input, HP LaserJet Pro M402dne laser printer.

3.3    <u>Additional included items</u>:  Three (3) ICX smartcards (to be used for activation, pollworker or technician), battery, 6' cable and 8GB flash drive.

4.    **ImageCast Precinct Tabulator (ICP)**

ImageCast Precinct Scanner and Tabulator is an optical scan ballot tabulator used to scan marked paper ballots, interpret voter marks on the paper ballot, communicate these interpretations back to the voter and upon voter acceptance, deposits the ballot in the ballot box. The ImageCast consists of the following:

4.1.    Two (2) optical imaging scanners for creating a duplex scanned image of each side of the ballot.  Ballots can be fed in all four (4) orientations.

4.2.    Linux Operating System.

4.3.    Two memory cards ports for storage capabilities.  Two (2) 8GB memory cards are provided and located behind two securable doors (Administrator Door and Pollworker Door).

4.4.    An integrated interactive electronic display in the form of an ultra-high contrast graphical color 5.7" LCD screen, and a built-in touch screen for administration purposes.

4.5.    An internal 3" thermal printer and one (1) 3" paper roll for generating reports.

4.6.    Two (2) administrative security key (iButton) used with an integrated receptacle (physically attached to the top of the unit and electrically connected to the motherboard) used for a variety of verification and security tasks such control, data confidentiality and integrity functions.

4.7.    A motorized paper feed mechanism for detecting and moving the ballot within the scanner.  Ballots used with the ImageCast must be 8.5" wide by a variable length (11", 14", 17" and 22"). The paper feed mechanism is physically capable of moving the ballot forward into the machine, across image sensors, enabling complete image capture of both sides of the ballot.

4.8.    Power supply module uses 120 Vac, 60 Hz, one phase power. It has a power consumption of 0.07 Amps at 120 Volts AC.

4.9.    An internal battery which is rated to provide two-and-a-half (2.5) hours of normal use in the absence of AC power. In addition to internal 2.5 hours battery an internal 6 hours battery option is also available. There is also a connection for an external 12VDC SLA battery.

4.10. Patented functionality known as the AuditMark. For each ballot scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.

- The bottom portion consists of a machine-generated text showing each mark that the unit interpreted for that particular ballot. This is referred to as the AuditMark.

## 5. ImageCast Central Scanner (ICC)

The ImageCast Central Scanner consists of a commercial off-the-shelf digital scanners configured to work with the ImageCast Central Software for high speed ballot tabulation. Each ImageCast Central Scanner includes the following components:

5.1. Canon DR-G1130 high speed document scanner

5.2. ImageCast Central Software including third party Twain software

5.3. DELL 7450 Computer 24" Touchscreen DELL Optiplex AIO 3050 Touchscreen

5.4. iButton Security Key

5.5. iButton Programmer and iButton Key Switch & Cat5 RJ 45 Cables used with Democracy Suite to transfer security and election information to the iButtons for use with the ICC.

5.6. Patented functionality known as the AuditMark. For each ballot scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.

- The bottom portion consists of a machine-generated text showing each mark that the unit interpreted for that particular ballot, known as the AuditMark.

## 6. ImageCast Molded Plastic Ballot Box

A textured molded plastic ballot box per ImageCast Precinct unit. The ballot box is made of a three (3) compartments, custom designed for use with the ImageCast Precinct.

## 7. Voting Supply Carriers. Design and manufacture mobile Voting Supply Carrier that will store, secure and transport voting equipment and will act as a mobile vote center.

## 8. System Security Description

Dominion implements security protocols that meet or exceed EAC VVSG 2005 requirements. All of Dominion's security protocols are designed and implemented to stay current with the rapidly evolving EAC security requirements set forth by various iterations of the VVSG. Dominion's security technology is unprecedented insofar as it takes into account every aspect and every component of the Democracy Suite platform. This includes – but is not limited to – the full encryption of election projects, iButton security keys, memory cards, election data, software applications, and elections results files. In addition, Dominion developed a custom ballot authentication system built around an secure ballot paper stock and in-tabulator authenticators.

Democracy Suite integrates a role-based access control system for all software and hardware components. Each user accessing the system is the member of one of the predefined or custom-made roles. Each role has its own set of permissions, or actions that users of that role are allowed to perform. This access control approach provides authentication and authorization services and can be granular according to the jurisdiction's needs and organization. Complete

user and role membership management is integrated within the Democracy Suite EMS Election Event Designer client module.

The Democracy Suite EMS platform implements role-based user management for provisioning access control mechanisms on each election project. Managing access control policies is integrated within the User Management activity of the EMS EED module. This activity is permitted only for users with administrative privileges.

Democracy Suite utilizes hardware- based security tokens (iButton security keys) in the process of access control for ImageCast Precinct tabulators. These password paired hardware tokens contain data encryption information used in the voting process (encryption and signing keys). Without a valid security token, and paired access password, the administrative functions of election tabulators are effectively locked.

All of these activities and controls, and more described below in response to specific section requirements, are integrated within the Democracy Suite platform. Dominion utilizes authentication and authorization protocols that meet EAC VVSG 2005 standards. In addition, Dominion's solution relies on industry-standard security features to ensure that the correct users based on a user role or group are granted the correct privileges.

8.1     <u>Password configurations</u>

Proper password management relies on multiple activities and controls, namely:
- Input data validation
- Data quality
- Utilization of one-way (hash) cryptography
- Computer generated passwords for greater entropy and protection from dictionary attacks
- Different password strength profiles for different user levels
- Utilization of hardware tokens for storing user credentials (two-level authentication security: something you know and something you have)
- User state machine (initial, active, inactive)

The system does not enforce aging or complexity, but Dominion recommends establishing best practices that meet State's requirements.

8.2     <u>Authentication configuration</u>

To protect any modification of software by malicious users, the Democracy Suite Election Management System integrates the Microsoft .NET Framework code signing process, within which, Dominion digitally signs every executable and library (DLL) during the software build procedure. After the installation of Election Management software, only successfully verified EMS software components will be available for use. Digital signature verification is performed by the .NET Framework runtime binaries. If a malicious user tries to replace or modify any EMS executables or library files, the digital signature verification will fail and the user will not be able to start the EMS application.

8.3     <u>Encryption configurations for both data at rest and data in motion</u>

Data generated by the Democracy Suite platform is protected by the deployment of FIPS-approved symmetric AES and asymmetric RSA encryption. The Democracy Suite Election Management System uses these techniques to encrypt election files prior to their use on ImageCast tabulators. Once the polls have been closed, the ImageCast tabulators encrypt all of the results files prior to transmitting them back to EMS.

SHA-256 hashes are used for all data integrity and verification. Should an intrusive process or altering of any file occur, hash values will be, in turn, altered as well. Any presence of an intrusive process will be detected, as the hashes of any altered data will not match the value initially determined.

For communication channels (as well as data storage) a combination of security techniques for data integrity, authenticity and confidentiality is implemented. Democracy Suite integrates AES or RSA encryption algorithms for data confidentiality, along with SHA-256 and HMAC digital signatures for data signing (data authenticity and integrity).

| File Type | Storage Place | Mode 1- Symmetric Crypto | |
|---|---|---|---|
| | | Confidentiality | Integrity |
| Election files (ICP) and election database (ICE), DCF (ICP) and MBS (ICE), result files (ICP/ICE) | NAS and Compact Flash | AES-128/256 | HMAC (SHA-256) |
| Reports and Logs | NAS and Compact Flash | AES-128/256 | HMAC (SHA-256) |
| Ballot Images | NAS and Compact Flash | - | HMAC (SHA-256) |
| Ballot Layout Definition (XML) | NAS and Compact Flash | - | HMAC (SHA-256) |
| Official Ballots | NAS | X.509 Digital Certificate | |
| User Credentials | iButton | HMAC (SHA-256) | HMAC (SHA-256) |

File Type to Security Algorithmic Mappings

8.4    Logging/Auditing capabilities

From the initial state of the election project, until the deactivation state, the EMS system maintains an activity log within the EMS Database. This activity log contains every action that any of the users have performed within the system and represents a detailed audit log that can be analyzed and printed in the form of an audit report. The audit record information cannot be modified or permanently deleted using the EMS client applications. It can, however, be exported for archiving purposes as part of the record retention policy. During the voting, ImageCast devices keep an activity audit log which tracks events happening on the device itself.  Logs are exportable in text format.

8.9    Secure Development Process

All software programs satisfy recommended coding standards, as well as code styling guidelines as required by EAC VVSG standards. Automated code review processes are in place, that verifies compliance with industry accepted coding standards for programming languages used. In addition, proper system and software hardening procedures are clearly defined and regularly tested. Data integrity and confidentiality is also implemented according to NIST defined and FIPS validate procedures and algorithms.

9. **KNOWiNK Electronic Pollbook**

The KNOWiNK Poll Pad solution provides a seamless electronic voter check-in and verification process for election authorities across North America. Poll Pad is a secure Apple iPad application requiring no appendages for operation.

- Process voters in approximately 30 to 45 seconds; mitigate long lines with fast and secure voter look-up.

- Built-in election management and reporting tools; elections can be finalized and submitted within hours of election close.

- Customizable workflow presents required steps according to each jurisdiction's requirements and preferences.

- Improved accuracy and reduced preparation time and storage requirements with the elimination of paper logs.

- Poll workers or voters cannot leave the application without a password, preventing user error, a line slow-down, or creating a potential security issue.

The Poll Pad components include the following:

- iPad tablet - The iPad has a touchscreen/keyboard and a shockproof clear case. The iPad has a battery life of approx. 10 hours. Make: Apple | Model: MP2FLL/A

- Encoder/iOS Reader - The Mfi certified lightning port contact card reader connects securely to the iPad lightning port and include a micro USB cable.  Make: FEITAN Technologies | Model: iR301

- iSync Drive - KNOWiNK's secure proprietary removable memory device, the iSync flash drives. Make: KNOWiNK | Model: iSD-110

- Stand for iPad - The iPad stand is durable and user friendly. Make: AI Data | Model: i360

- Scanning tray - KNOWINK'S patented scanning trade scans barcodes on voter ID cards or state identification cards. Make: KNOWiNK | Model: ISP103b-KN2-1

- Styluses - Poll workers and voters may use the styluses or their finger for the iPad's capacitive touch screen. Make: AI Daata | Model: ISP-1010-KNO

- Carrying case - Shockproof weatherproof foam-fitted case. Make: Nanuk | Model: 910

10. **Implementation Services**

10.1 **Implementation Phase Periods**

The implementation period will consist of a sixteen-month implementation; Phase One includes a pilot of 6 counties and the GA Secretary of State office for the November 2019 General elections.  Phase Two includes the 2020 Presidential Preference Primary and all Primary, General, Runoff and Special elections for all 159 counties in Georgia as well as the state in the 2020 Election cycle.

## 10.2    Implementation Plan and Schedule

Dominion's Project Manager and the State's Project Manager shall provide an Implementation Plan specifying the details for all tasks necessary to successfully complete the project, working cooperatively to set hard and soft deadlines.  Each task identified will include a start and end date and the responsible parties involved.  The Implementation Plan will include, but will not be limited to, a detailed Implementation Project Plan, which includes product delivery with implementation, delivery and training dates; Acceptance Testing Plan; System Readiness Plan; a Training Plan specifying training dates and curriculum to parties requiring training; as well as a Communication Plan.  Please see a draft Project Plan attached hereto.

The draft Project Plan developed for this Agreement represents the sample based upon discussions with the State.  Upon execution of the Agreement, the Parties shall finalize the project plan including the training and delivery schedule.  The Parties agree that during the course of the implementation, changes to the project schedule may be required.  Any changes to the project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

## 10.3    Project Team

Dominion's project team includes key experienced staff, with extensive expertise in system implementation, project management and customer service obtained through years of dedicated work for our customers. The personnel selected for the State of Georgia's implementation are among Dominion's most experienced team members, ensuring that Georgia has the best people to meet their needs and requirements. The team will receive executive oversight from the Executive Vice President of Sales and Executive Vice President of Operations throughout the project.

Project Manager.  The Dominion Project Manager will be appointed and dedicated entirely to this project and will be on-site, full-time (consistent to the departments work hours) and available commencing shortly after the contract is signed through completion of the first year.  Dominion's Project Manager will be responsible for arranging all meetings, visits and consultations between the Parties and for all administrative matters such as invoicing, payments and amendments.  The Dominion Project Manager shall have the requisite skills and experience to provide the services required for the implementation including without limitation: elections support, project management, excellent verbal and written communications skills, strong organizational skills to include multi-tasking and time management skills, and ability to manage detail-oriented projects with fixed deadlines.  Dominion shall make commercially reasonable efforts to provide a Project Manager familiar with the election operations, and the election rules and regulations of Georgia.

The Dominion Project Manager shall communicate with the State as to the status of information, milestones, procedures and progress on the tasks as set out in this Agreement and to advise the State forthwith upon the occurrence of any event requiring a material change in such plans, and request Customer's written consent to any such material change.  In addition, the following Project management resources will be dedicated on an as need basis through the 2020 general election.

After the 2020 general election, Project Management will continue through the remainder of the Agreement.  After the completion of the implementation, a Customer Relations Manager will work directly with the State (both on and off site), but will have other responsibilities outside of the Agreement.  In addition, account management and technical phone support shall be available through the contract Term at no additional costs.

Product Specialist.    Dominion Voting shall provide technical support throughout the implementation.    This resource is responsible for the installation, operation, repair, and maintenance of all Dominion Voting Systems hardware and software, scheduling and supervising resources for all hardware and software related matters.  The Product Specialist will provide election support services and customer training, and interfacing directly with customers, co-workers and election officials.

<u>System Technical Manager</u>.  Shall work with the State's elections staff, as well the State's IT staff, to install the certified EMS and adjudication system hardware.  As part of this role, the systems configuration manager will evaluate the current environment at the County and provide recommendations for any changes required for configuration.

<u>Training and Documentation Manager</u>.  Will coordinate with Dominion and County project managers to develop and customize all training documentation and supervise all training related activity.

<u>Election Programmers</u>.  Responsible for all aspects of election event definition, including without limitation to following components: Importing of data files into the EMS system, defining election project parameters and assigning templates, assigning tabulators (ICC, tablet, mobile ballot printing), defining ballot structures, creating proofing ballot, creating official ballots, and creating election files and the security keys for the ImageCast®.

<u>Ballot Printer Certification Manager</u>.  Shall conduct activities required to qualify the County certified printer as described in [section six] of this Agreement.

<u>Other</u>. Additional Acceptance and Readiness Testing, Pre-Logic and Accuracy, Election Day rover personnel, and Post-Election activity (recount and canvass).

## 10.4    System Transition Review

This meeting is a key meeting with the objective of: reviewing the project plan; confirming major milestones, key dates and deliverables; and developing the Implementation Plan.

Discussion items will include: Confirming ImageCast quantities, ImageCast delivery plan and schedule, consumables, election programming, ballot definition and required resources.  Demonstration of the ImageCast units, training, testing, simulation services and managed election services are also discussed for a successful delivery.

*Gap Analysis* - After an initial gap analysis, a simulation event further uncovers implementation, deployment, usability, and customization requirements. All of these details are funneled into Dominion's implementation process, which includes (as realistically as possible) the customer in scheduled development iterations.

In order to ensure that the system meets the State of Georgia's business and technical requirements, Dominion will work closely with State elections staff to identify, prioritize and enable the roll-out of these requirements through each phase of the implementation.

At the end of each stage, a report will be created to summarize the shared understanding of the requirements, and the State will have a chance to provide feedback and formal sign-off as acceptance.

## 10.5    System Installation and Configuration

Dominion's Project Manager will manage the shipment process through an authorized shipper to ensure delivery is successful. The State's staff is also responsible for the removal of all legacy equipment. Dominion's Project Manager will require a written confirmation ensuring that all packages were delivered successfully.

## 10.6    Acceptance Testing

Dominion shall provide an Acceptance Test Plan (ATP). The ATP shall identify all tests necessary to demonstrate compliance with the requirements of the State of Georgia. Dominion shall be responsible for

providing all training and training materials required to support the acceptance testing. Dominion and the State shall finalize the development of the test plan and procedures prior to the acceptance-testing phase.

A Dominion hardware technician will provide guidelines to the team responsible for the State warehouse for inbound acceptance testing. This includes assessing suitability and identifying any modifications required, identifying areas for each process including a secure area for inventory control, preparing necessary acceptance documentation, and ensuring all necessary supplies are available for work.

A checklist template will be provided to the State for printing and distribution during the acceptance test process. For each piece of ballot marking equipment, State staff, under the supervision of a Dominion technician, will complete the acceptance test for each unit received. Each form will be signed and stored by the State with copies made or scanned for Dominion in order to ensure that each component is in proper working order upon receipt and unpacking.

## 10.7    Printer Certification

Ballot qualification is an educational and testing process designed to assist ballot printers on how to properly print ImageCast ballots and maintain an ongoing level of quality assurance needed to ensure the ballots they provide their customers will tabulate correctly. ImageCast printing qualification is also meant to be an ongoing support vehicle providing qualified printers with an ongoing resource to continually assist printers if questions were to arise.  The printer certification process consists of 5 stages: Administrative; Discovery; Training; Testing; and Qualification.

## 10.8    <u>Election Setup</u>

### Election Definition

Dominion's Democracy Suite Election Management System shall have the capability of importing election data from the State of Georgia's current database to generate ballot layout used to conduct an election. Dominion shall provide election definition services for the 2019 pilot and 2020 elections.  In the event the State requests additional election definition services from Dominion, Dominion shall provide those services according to the prices identified in the pricing Schedule.

The State shall review and approve or identify issues to all Dominion deliverables related, with particular attention to ballot proofs and audio files, to such service within two (2) business days of discovery of an issue by the State.  In the event the State discovers an issue, it shall provide written notice to Dominion following the discovery of any issue and Dominion shall rectify the issue at no additional cost to the State. In the event the State approves the final ballot proofs and audio files and subsequent to such approval, requests that a change be made to the deliverable, the Dominion may provide the change according to the service pricing identified in pricing schedule.

### Ballot Layout

Dominion's Ballot Layout/Generation System supports both English and Spanish both in written and audio format; and, have the ability to add new languages. Dominion's System has the ability to import data in all languages via direct importation to appropriate files or cut and paste.  The State will be able to edit all ballot layout files in all languages.

Dominion's System creates all ballots, (precinct, vote center, absentee, and audio) from a single Election Management System.  Dominion's Ballot Layout/Generation System has audio capability utilizing human voice recordings as well as voice simulation program.

Dominion's Democracy Suite election management system can support a single input of customer profile data such as voting locations, precincts, political subdivisions, offices, parties and machines; and use this data to simultaneously manage multiple elections by multiple users.

Dominion shall work with the State and the certified printer used by the State and Counties to create a simple method of transferring ballot information to the printer for production.

Dominion will work with the State to develop the appropriate workflow to import the candidate/contest information directly from the State of Georgia's current Election Information Management System and create the absentee ballot, BMD ballot, and sample ballot from the same imported file.

**Logic and Accuracy Test**

On completion of election definition and ballot layout, the ballots are generated. Ballot proofs and electronic ballot image files are generated and provided to the State. The State and Counties carefully reviews each ballot. When the State is satisfied that the ballots are correct, they initial each ballot, and when they are satisfied that all ballots, audio and reports are correct, they sign-off on their accuracy, and the image files are provided to the printer.

Ballot printing and distribution are the responsibility of the certified printer and the State/Counties. Dominion will provide a recommended ballot inspection process that should be followed to ensure that all ballots produced are of sufficient quality. The receipt of test ballots from the certified ballot printer is the milestone that triggers the beginning of Pre-Election Logic and Accuracy Testing ("Pre-LAT"), a simulation of the voting process under which the System will operate.

Election files are transferred from the EMS to memory cards which are created for each ICX ballot marking device, ICP tabulator and the ICC system. The State is responsible for delivering the election files to the Counties. The State, Counties, or Dominion will then load the election files onto the units. After loading the election files onto the units, Pre-LAT must be performed on all System components before deployment.

With a paper-based tabulation system, Pre-LAT is performed on the ImageCast X, ImageCast Precinct and ImageCast Central tabulators though the use of ballot test decks, rather than simulation scripts. Generally, the Pre-LAT procedure involves programming all voting machines with the final election definition and scanning hand-marked or pre-marked (computer generated) test decks through each tabulator. This provides verification of both the quality of the printed ballots as well as the correctness of each tabulator's programming. After test decks have been scanned and the results report tapes have been verified, test results may be uploaded directly to the EMS Server using EMS Results Tally and Reporting. This result transfer test verifies that all parameters for each tabulator have been correctly configured.

**10.9    Election Support**

The Dominion project team will develop a customized support plan to meet the needs of the GASOS and counties for the November 2019 Pilot elections through the 2020 election cycle. This plan will include technical support for GASOS and counties on election night including the day before to the day after the election.  This support plan defines the number of Dominion staff required in the field on election day as well.  Dominion's on-site support resources have the necessary skills to assist the State to ensure the polling location opens in a timely fashion and that the equipment functions properly. In addition, a key role for the on-site support resource is to assist the State and counties with polling place closing, tabulation and results reporting. Dominion's active voting support strategy will be customized to meet the State's and counties specific needs.

**10.10    Post-Election**

<u>Canvass</u> - Dominion will assist the State/Counties in creating procedures for the conduct of the canvass and any necessary recounts.  The system shall provide canvass reports including, but not limited to Interim, Semi-Final Official, Final Official, and the Statement of Vote reports.  Dominion will be available to assist the State's or County's staff in the conduct of the canvass and for any recounts through the 2019 – 2020 Election Cycle.  Dominion shall provide sample procedures and recommendations for the canvass process.

<u>Recount</u> - The system must be able to provide for a manual recount process that would utilize either the physical ballot or ballot image with AuditMark, Cast Vote Record and EMS SOV reports. Dominion will assist the State/County in creating procedures for a recount.

## ATTACHMENT 1 TO SOLUTION ORDER

### Installation Site Specifications

**ICX**

For best lifetime, follow the storage recommendations described below for the ImageCast X:

- Operating Temperature min/max: 0ºC~40ºC
- Storage Temperature min/max: -20ºC~60ºC
- Operating and/Storage Conditions (Relative Humidity): From 0%~90% RH non-condensing
- Pack the ImageCast X tablet into its provided packaging box with foam inserts to provide vibration and impact protection.

The ImageCast X units should not be stacked on top of one another for storage unless they are in their respective carrying cases or packaging boxes (Maximum Stack = 5 Boxes High).

Standard power / electrical outlets.

**ICC**

For optimal product of the ImageCast Central, storage limitations should adhere to the following specifications:

- Storage Temperature min/max: -40ºC~65ºC
- Operating and/Storage Conditions (Relative Humidity): From 20%~80% (non-condensing)
- Place the CPU and Scanner in packaging boxes with foam inserts to provide vibration and impact protection
- Store the packaged CPU and Scanner boxes under conditions specified
- Store the CPU and Scanner boxes in a dust-free, clean environment
- The CPU and scanner units should not be stacked on top of one another for storage unless they are in their respective carrying cases or packaging boxes (Suggested Maximum Stack = 5 boxes high for CPU and 4 boxes high for the G1130 scanner)

Standard power / electrical outlets.

**ICP**

For optimal ImageCast Precinct product life, storage limitations should adhere to the following specifications:

- Storage Temperature min/max: From -25°C - 60°C
- Operating and/Storage Conditions (Relative Humidity): From 20% - 80% RH non-condensing
- Place the tabulator inside the re-sealable bag into the provided packaging box with foam inserts to provide vibration and impact protection.
- Store the packaged tabulator box under conditions specified.
- Alternatively, leave the tabulator on the ballot box but place the ballot box dust cover over it to keep it free from environmental elements.
- Store the tabulator (and ballot box, if applicable) in a dust-free, clean environment.
- Perform periodic charging of the back-up battery module for 12 hours every 9 months.

- The tabulators should not be stacked on top of one another for storage unless they are in their respective carrying cases or packaging boxes (Suggested Maximum Stack = 4 Boxes High).

Standard power / electrical outlets.

**Server Dell PowerEdge R630**

Temperature     Specifications

Storage −40°C to 65°C (−40°F to 149°F)

Continuous operation (for altitude less than 950 m or 3117 ft)      10°C to 35°C (50°F to 95°F) with no direct sunlight on the equipment.

NOTE: Maximum of 145 W 22 core processor is supported in systems with eight 2.5-inches drives, two PCI slot chassis, and 75 W single wide active GPU.

Maximum temperature gradient (operating and storage)  20°C/h (36°F/h)

Standard power / electrical outlets.

**ATTACHMENT 2 TO SOLUTION ORDER**

**Functional Requirements**

|  | **System Capacity** |  |
|---|---|---|
| 1 | System accommodates for a minimum of three (3) different languages | Comply |
|  | **Ballot Secrecy** |  |
| 2 | System must not allow ballot to be traced to voter | Comply |
|  | **Special ballot voting circumstances** |  |
| 3 | System must allow for write-in candidate for all offices with post-election review of write-in votes readily available | Comply |
| 4 | System must prevent voter from casting an overvote (voting for more candidates than allowed for an office) | Comply |
| 5 | System must notify/alert voter if they failed to vote for one or more offices or propositions | Comply |
| 6 | System must allow a voter to change a vote during the process prior to casting | Comply |
| 7 | System must have secure mechanisms for insuring that all ballots cast are authorized by the pollworkers in that precinct | Comply |
|  | **Ballot Types** |  |
| 8 | Accommodate for no fewer than six (6) political parties in a primary election | Comply |
| 9 | System must accommodate for hundreds of ballot styles to account for split precincts which may have several unique voting districts | Comply |
| 10 | System must allow all voters to be capable of casting a ballot independently, without assistance or without the intervention of pollworkers, in all elections | Comply |
| 11 | System capabilities for mobility-restricted voters | Comply |
| 12 | System capabilities for visually-impaired voters with audio component | Comply |
| 13 | System capabilities for voters with limited or no manual dexterity | Comply |
| 14 | System must accommodate last-minute ballot changes due to court orders quickly and effectively | Comply |
| 15 | System must be capable of performing self-test to identify equipment errors | Comply |
| 16 | System must be able to produce a paper "zero tape" evidencing the fact that the System has no votes recorded on it at the opening of the polls | Comply |
|  | **Results tabulation** |  |
| 17 | System must produce a paper record once the voter has finished voting of each voter's choices | Comply |

| 18 | System must have the capacity to maintain internal back-ups of the votes that have been cast on the System | Comply |
|---|---|---|
| 19 | System must include a software component that produces a final, unified tabulation of the votes cast in the precincts, and any centrally cast or tallied ballots (such as votes-by-mail and early votes), including provisional votes | Comply |
| | **Storage** | |
| 20 | System includes all necessary equipment to optimally store its components | Comply |
| 21 | System requires only standard electrical outlets to keep components charged and use-ready | Comply |
| 22 | System components do not require temperature of humidity conditions outside of industry standard storage facilities | Comply |
| | **Maintenance** | |
| 23 | After the period of vendor-supplied maintenance expires, the system is capable of being maintained by the County staff. | Comply |
| 24 | Vendor guarantees the availability of replacement parts for a period of 10 years after system acquisition. | Comply |
| | **Touchscreen Display** | |
| 25 | Touchscreen component includes variable screen fonts | Comply |
| 26 | Touchscreen allows voter to vary screen font size | Comply |
| 27 | Touchscreen allows contrast of screens to be varied | Comply |
| 28 | Touchscreen Allows voter to vary screen contrast | Comply |
| 29 | Touchscreen component includes variable screen contrast | Comply |
| 30 | Touchscreen component allows voter to freely move from screen to screen | Comply |
| 31 | Touchscreen component includes review function after voter has viewed all ballot pages | Comply |
| 32 | Touchscreen component allows voter to go directly from review page to page where a change in vote can be made | Comply |
| 33 | Touchscreen component prevents offices from being split onto multiple screens | Comply |
| 34 | Touchscreen component prevents overvoting for an office or proposition | Comply |
| 35 | Touchscreen component includes messages relating to successfully ballot casting | Comply |
| | **Ballot Printer** | |
| 36 | Printer is easily refilled with paper | Comply |
| 37 | Printer uses industry standard connectors and ports | Comply |
| 38 | System can produce a flat file of the summary report to be posted on the web sites of the State | Comply |

**ATTACHMENT 3 TO SOLUTION ORDER**

**RESERVED**

*Master Solution Purchase and Services Agreement*

## ATTACHMENT 4 TO SOLUTION ORDER

### Implementation Schedule including standard Milestones

| Task Name | Duration | Start | Finish |
|---|---|---|---|
| **GA Draft Project Plan** | | | |
| **Installation Key Dates** | **123 days** | **Thu 8/1/19** | **Mon 1/20/20** |
| Phase 1 Installations | 69 days | Thu 8/1/19 | Tue 11/5/19 |
| Phase 2 Part 1 Installations | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| Phase 2 part 2 Installations | 14 days | Wed 1/1/20 | Mon 1/20/20 |
| **Election Key Dates** | **261 days** | **Tue 11/5/19** | **Tue 11/3/20** |
| 2019 General Election | 1 day | Tue 11/5/19 | Tue 11/5/19 |
| PPP | 1 day | Tue 3/24/20 | Tue 3/24/20 |
| Primary Election | 1 day | Tue 5/26/20 | Tue 5/26/20 |
| Primary Election Runoff | 1 day | Tue 7/28/20 | Tue 7/28/20 |
| General Election | 1 day | Tue 11/3/20 | Tue 11/3/20 |
| **Project Management** | **383 days** | **Tue 7/16/19** | **Thu 12/31/20** |
| **Project Initiation** | **14 days** | **Tue 7/16/19** | **Fri 8/2/19** |
| Review Project Structure, roles and responsibilities | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Review and update project plan | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Manufacturing and Deliveries Schedule | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Issues Tracking and Escalation Plan | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Risk Mitigation Plan | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Communication Plan | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Conflict Resolution Plan | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Training Plan Finalization | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Review and Adjust Training Schedules | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| **Requirements Gathering, Gap Analysis and Application Configuration** | **11 days** | **Tue 7/16/19** | **Tue 7/30/19** |
| Requirements Review | 11 days | Tue 7/16/19 | Tue 7/30/19 |
| Requirements Signoff | 1 day | Tue 7/30/19 | Tue 7/30/19 |
| Create Election Data Import Bridge | 12 days | Tue 7/16/19 | Wed 7/31/19 |
| Customer kick-off meeting | 1 day | Thu 8/1/19 | Thu 8/1/19 |
| **Poll Pad Build, Testing and Documentation** | **54 days** | **Tue 7/16/19** | **Fri 9/27/19** |
| **Receipt and Acceptance Testing in DVS facility** | **25 days** | **Tue 7/16/19** | **Mon 8/19/19** |
| Development | 25 days | Tue 7/16/19 | Mon 8/19/19 |
| Migrate App Changes | 1 day | Fri 8/9/19 | Fri 8/9/19 |
| **Test** | **14 days** | **Mon 8/12/19** | **Thu 8/29/19** |
| Create test cases | 5 days | Mon 8/12/19 | Fri 8/16/19 |
| Acceptance Testing | 5 days | Thu 8/22/19 | Wed 8/28/19 |
| Testing Signoff | 1 day | Thu 8/29/19 | Thu 8/29/19 |
| **Documentation** | **5 days** | **Mon 9/23/19** | **Fri 9/27/19** |
| Create administrator and user guides | 5 days | Mon 9/23/19 | Fri 9/27/19 |
| **Project Meetings** | **371 days** | **Thu 8/1/19** | **Thu 12/31/20** |
| **Weekly Project Status Meetings** | **371 days** | **Thu 8/1/19** | **Thu 12/31/20** |

*Master Solution Purchase and Services Agreement*

| | | | |
|---|---|---|---|
| **Receipt and Acceptance Testing in DVS facility** | **125 days** | **Mon 7/29/19** | **Fri 1/17/20** |
| **July Shipment** | **20 days** | **Mon 7/29/19** | **Fri 8/23/19** |
| Receive Shipment | 3 days | Mon 7/29/19 | Wed 7/31/19 |
| Initial Acceptance Test | 18 days | Tue 7/30/19 | Thu 8/22/19 |
| Preparation and Delivery of Equipment | 17 days | Thu 8/1/19 | Fri 8/23/19 |
| **August Shipment** | **21 days** | **Mon 8/26/19** | **Mon 9/23/19** |
| Receive Shipment | 5 days | Mon 8/26/19 | Fri 8/30/19 |
| Initial Acceptance Test | 22 days | Thu 8/22/19 | Fri 9/20/19 |
| Preparation and Delivery of Equipment | 10 days | Tue 9/10/19 | Mon 9/23/19 |
| Ship 334 Poll Pads | 15 days | Tue 9/3/19 | Mon 9/23/19 |
| **September Shipment** | **23 days** | **Tue 9/24/19** | **Thu 10/24/19** |
| Receive Shipment | 5 days | Tue 9/24/19 | Mon 9/30/19 |
| Initial Acceptance Test | 23 days | Mon 9/23/19 | Wed 10/23/19 |
| Preparation and Delivery of Equipment | 10 days | Thu 10/10/19 | Wed 10/23/19 |
| Ship 369 Poll Pads | 14 days | Mon 10/7/19 | Thu 10/24/19 |
| **October Shipment** | **25 days** | **Fri 10/25/19** | **Thu 11/28/19** |
| Receive Shipment | 5 days | Fri 10/25/19 | Thu 10/31/19 |
| Initial Acceptance Test | 24 days | Mon 10/28/19 | Thu 11/28/19 |
| Preparation and Delivery of Equipment | 10 days | Fri 11/15/19 | Thu 11/28/19 |
| **November Shipment** | **19 days** | **Mon 11/25/19** | **Thu 12/19/19** |
| Receive Shipment | 5 days | Mon 11/25/19 | Fri 11/29/19 |
| Initial Acceptance Test | 18 days | Tue 11/26/19 | Thu 12/19/19 |
| Preparation and Delivery of Equipment | 10 days | Fri 12/6/19 | Thu 12/19/19 |
| Ship 7047 Poll Pads | 75 days | Mon 11/18/19 | Fri 2/28/20 |
| **December Shipment - Any additional balance needed** | **25 days** | **Mon 12/16/19** | **Fri 1/17/20** |
| Receive Shipment | 5 days | Mon 12/16/19 | Fri 12/20/19 |
| Initial Acceptance Test | 24 days | Mon 12/16/19 | Thu 1/16/20 |
| Preparation and Delivery of Equipment | 10 days | Mon 1/6/20 | Fri 1/17/20 |
| **Phase 1 Installations** | **69 days** | **Thu 8/1/19** | **Tue 11/5/19** |
| November 2019 Election Day | 1 day | Tue 11/5/19 | Tue 11/5/19 |
| **Counties receiving equipment during Phase 1** | **32 days** | **Thu 8/1/19** | **Fri 9/13/19** |
| GASOS | | | |
| County 1 | | | |
| County 2 | | | |
| County 3 | | | |
| County 4 | | | |
| County 5 | | | |
| County 6 | | | |
| **Procurement and Delivery** | **32 days** | **Thu 8/1/19** | **Fri 9/13/19** |
| **Election Management System** | **32 days** | **Thu 8/1/19** | **Fri 9/13/19** |
| **Documentation Delivery** | **1 day** | **Thu 8/1/19** | **Thu 8/1/19** |
| Installation guides | 1 day | Thu 8/1/19 | Thu 8/1/19 |
| User guides | 1 day | Thu 8/1/19 | Thu 8/1/19 |
| **Equipment** | **30 days** | **Mon 8/5/19** | **Fri 9/13/19** |
| Procurement and Delivery | 30 days | Mon 8/5/19 | Fri 9/13/19 |
| Installation | 30 days | Mon 8/5/19 | Fri 9/13/19 |
| County Level Acceptance Testing and Training | 30 days | Mon 8/5/19 | Fri 9/13/19 |

| Tabulator and Accessible Voting System | 30 days | Mon 8/5/19 | Fri 9/13/19 |
|---|---|---|---|
| **Documentation Delivery** | **1 day** | **Thu 8/1/19** | **Thu 8/1/19** |
| User Manuals | 0.25 days | Thu 8/1/19 | Thu 8/1/19 |
| Quick reference guides | 0.25 days | Thu 8/1/19 | Thu 8/1/19 |
| Maintenance manuals | 0.25 days | Thu 8/1/19 | Thu 8/1/19 |
| Training manuals | 0.25 days | Thu 8/1/19 | Thu 8/1/19 |
| **Supplies and Consumables** | **30 days** | **Mon 8/5/19** | **Fri 9/13/19** |
| Procurement and Delivery | 30 days | Mon 8/5/19 | Fri 9/13/19 |
| County Level Acceptance Testing and Training | 30 days | Mon 8/5/19 | Fri 9/13/19 |
| **Training** | | | |
| **GASOS Training** | **22 days** | **Thu 8/1/19** | **Fri 8/30/19** |
| D-Suite Election Management System Election Event Designer Training | 10 days | | |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Train the Trainer | 1 day | | |
| Pollworker Training - Pilot | | | |
| **Regional Training 1** | **67 days** | **Thu 8/1/19** | **Fri 11/1/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Train the Trainer | 5 days | | |
| Pollworker Training - Pilot | | | |
| **Regional Training 2** | **67 days** | **Thu 8/1/19** | **Fri 11/1/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Train the Trainer | 5 days | | |
| Pollworker Training - Pilot | | | |

*Master Solution Purchase and Services Agreement*

| | | | |
|---|---|---|---|
| Refresh Training | 67 days | Thu 8/1/19 | Fri 11/1/19 |
| **Election Programming - November 2019 General Election** | | | |
| November 2019 General Election | 1 day | Tue 11/5/19 | Tue 11/5/19 |
| **Ballot Definition and Programming** | | | |
| Data entry and import | 5 days | Wed 8/7/19 | Tue 8/13/19 |
| Ballot Styling | 1 day? | Wed 8/7/19 | Wed 8/7/19 |
| Review and modifications | 1 day | Fri 9/6/19 | Fri 9/6/19 |
| Generate official ballots | 15 days | Fri 9/6/19 | Thu 9/26/19 |
| Generate audio ballots | 3 wks | Fri 9/6/19 | Thu 9/26/19 |
| Generate election files | 3 wks | Fri 9/6/19 | Thu 9/26/19 |
| Generate test decks | 2 wks | Fri 9/6/19 | Thu 9/19/19 |
| **Ballot Production and L&A Testing** | | | |
| UOCAVA Ballots Ready | 1 day? | Sat 9/21/19 | Sat 9/21/19 |
| Official ballot printing | 15 days | Sat 9/21/19 | Thu 10/10/19 |
| Logic and accuracy testing | 15 days | Sat 9/21/19 | Thu 10/10/19 |
| **Election Readiness** | | | |
| Voter Outreach | | | |
| Pollworker Training | 21 days | Mon 10/7/19 | Mon 11/4/19 |
| Equipment Delivery to Polls | 6 days | Mon 10/28/19 | Mon 11/4/19 |
| **Poll Pad Pilot Readiness** | | | |
| Confirm iOS and application updates | 5 days | Mon 9/30/19 | Fri 10/4/19 |
| Deploy application updates | 10 days | Mon 10/7/19 | Fri 10/18/19 |
| Confirm ePulse settings | 5 days | Mon 10/14/19 | Fri 10/18/19 |
| Load election data | 5 days | Mon 10/21/19 | Fri 10/25/19 |
| Verify election data | 1 day | Fri 10/25/19 | Fri 10/25/19 |
| **Poll Pad Post Pilot Support** | | | |
| Data Reconciliation | 3 days | Wed 11/6/19 | Fri 11/8/19 |
| Export Data | 1 day | Mon 11/11/19 | Mon 11/11/19 |
| Auditing the election | 1 day | Tue 11/12/19 | Tue 11/12/19 |
| Archiving the elections | 1 day | Wed 11/13/19 | Wed 11/13/19 |
| **Phase 1 complete** | **0 days** | **Tue 11/12/19** | **Tue 11/12/19** |
| Phase 1 Lessons Learned Meeting | 1 day | Tue 11/12/19 | Tue 11/12/19 |
| **Phase 2 Installations** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| **Counties Receiving Equipment Phase 2 Part 1** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| **Election Management System** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| **Documentation Delivery** | **1 day** | **Wed 11/6/19** | **Wed 11/6/19** |
| Installation guides | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |
| User guides | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |
| **Equipment** | **15 days** | **Wed 12/11/19** | **Tue 12/31/19** |
| Procurement and Delivery | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| Installation | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| County Level Acceptance Testing and Training | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| **Tabulator and Accessible Voting System** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| **Documentation Delivery** | **1 day** | **Wed 11/6/19** | **Wed 11/6/19** |
| User Manuals | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |
| Quick reference guides | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |
| Maintenance manuals | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |

*Master Solution Purchase and Services Agreement*

| | | | |
|---|---|---|---|
| Training manuals | 0.25 days | Wed 11/6/19 | Wed 11/6/19 |
| **Equipment** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| Procurement and Delivery | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| County Level Acceptance Testing and Training | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| **Supplies and Consumables** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| Procurement and Delivery | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| **Training** | | | |
| **Regional Training 1** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 2** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 3** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 4** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |

Appendix Page 670

| | | | |
|---|---|---|---|
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 5** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 6** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 7** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 8** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |

| | | | |
|---|---|---|---|
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 9** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 10** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 11** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 12** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 13** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |

| | | | |
|---|---|---|---|
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| **Regional Training 14** | **40 days** | **Wed 11/6/19** | **Tue 12/31/19** |
| D-Suite Accumulation only EMS Training | 2 days | | |
| D-Suite Results Tally & Reporting | 1 day | | |
| D-Suite ICP Training | 1 day | | |
| D-Suite ICX Training | 1 day | | |
| D-Suite ICC & Adjudication Training | 1 day | | |
| D-Suite UOCAVA Training | 1 day | | |
| D-Suite Mobile Ballot Printing Training | 1 day | | |
| Pollworker Train the Trainer | 1 day | | |
| Election Day Rover Training | 0.5 days | | |
| Poll Pad Pollworker Training | 1 day | | |
| Refresh Training | 40 days | Wed 11/6/19 | Tue 12/31/19 |
| **Phase 2 Part 1 Complete** | **0 days** | **Tue 12/31/19** | **Tue 12/31/19** |
| Phase 2 Part 1 Wrap up Meeting | | | |
| **Phase 2 Part 2 Installations** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| **Counties Receiving Equipment Phase 2 Part 2** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| **Election Management System** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| **Documentation Delivery** | **1 day** | **Wed 1/1/20** | **Wed 1/1/20** |
| Installation guides | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| User guides | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| **Equipment** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| Procurement and Delivery | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| Installation | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| County Level Acceptance Testing and Training | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| **Tabulator and Accessible Voting System** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| **Documentation Delivery** | **1 day** | **Wed 1/1/20** | **Wed 1/1/20** |
| User Manuals | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| Quick reference guides | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| Maintenance manuals | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| Training manuals | 0.25 days | Wed 1/1/20 | Wed 1/1/20 |
| **Equipment** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| Procurement and Delivery | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| County Level Acceptance Testing and Training | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| **Supplies and Consumables** | **13 days** | **Wed 1/1/20** | **Fri 1/17/20** |
| Procurement and Delivery | 13 days | Wed 1/1/20 | Fri 1/17/20 |
| **Presidential Preference Primary Election** | | | **Tue 3/24/20** |
| Presidential Preference Primary Election | 1 day | Tue 3/24/20 | Tue 3/24/20 |
| Presidential Preference Primary Lessons Learned | 0 days | Wed 3/25/20 | Wed 3/25/20 |

| Election Programming | | | |
|---|---|---|---|
| Data entry and import | 3 days | Wed 12/4/19 | Fri 12/6/19 |
| Ballot Styling | 2 days | Wed 12/4/19 | Thu 12/5/19 |
| Review and modifications | 2 days | Fri 1/3/20 | Mon 1/6/20 |
| Generate official ballots | 2 days | Fri 1/3/20 | Mon 1/6/20 |
| Generate audio ballots | 2 days | Fri 1/3/20 | Mon 1/6/20 |
| Generate election files | 2 days | Fri 1/3/20 | Mon 1/6/20 |
| Generate test decks | 2 days | Fri 1/3/20 | Mon 1/6/20 |
| **Ballot Production and L&A Testing** | | | |
| UOCAVA Ballots Ready | 1 day? | Sat 1/18/20 | Sat 1/18/20 |
| Official ballot printing | 15 days | Sat 1/18/20 | Thu 2/6/20 |
| Logic and accuracy testing | 15 days | Sat 1/18/20 | Thu 2/6/20 |
| **Election Readiness** | | | |
| Voter Outreach | | | |
| Pollworker Training | 21 days | Mon 2/3/20 | Sat 2/29/20 |
| Transport to polling | 6 days | Mon 2/24/20 | Mon 3/2/20 |
| **Poll Pad Election Readiness** | | | |
| Confirm iOS and application updates | 5 days | Mon 2/3/20 | Fri 2/7/20 |
| Deploy application updates | 14 days | Mon 2/10/20 | Thu 2/27/20 |
| Confirm ePulse settings | 5 days | Mon 2/17/20 | Fri 2/21/20 |
| Load election data | 5 days | Mon 2/24/20 | Fri 2/28/20 |
| Verify election data | 1 day | Fri 2/28/20 | Fri 2/28/20 |
| **Poll Pad Post Election Support** | **7 days** | **Wed 3/25/20** | **Thu 4/2/20** |
| Data Reconciliation | 3 days | Thu 3/26/20 | Mon 3/30/20 |
| Export Data | 1 day | Tue 3/31/20 | Tue 3/31/20 |
| Auditing the election | 1 day | Wed 4/1/20 | Wed 4/1/20 |
| Archiving the elections | 1 day | Thu 4/2/20 | Thu 4/2/20 |
| **May Primary Election** | | | **Tue 5/26/20** |
| May Primary Election | 1 day | Tue 5/26/20 | Tue 5/26/20 |
| May Primary Election Lessons Learned | 1 day | Wed 5/27/20 | Wed 5/27/20 |
| **Election Programming** | | | |
| Data entry and import | 3 days | Wed 2/26/20 | Fri 2/28/20 |
| Ballot Styling | 2 days | Wed 2/26/20 | Thu 2/27/20 |
| Review and modifications | 2 days | Fri 3/27/20 | Mon 3/30/20 |
| Generate official ballots | 1 day | Fri 3/27/20 | Fri 3/27/20 |
| Generate audio ballots | 1 day | Fri 3/27/20 | Fri 3/27/20 |
| Generate election files | 1 day | Fri 3/27/20 | Fri 3/27/20 |
| Generate test decks | 1 day | Fri 3/27/20 | Fri 3/27/20 |
| **Ballot Production and L&A Testing** | | | |
| UOCAVA Ballots Ready | 1 day? | Sat 4/11/20 | Sat 4/11/20 |
| Official ballot printing | 15 days | Sat 4/11/20 | Thu 4/30/20 |
| Logic and accuracy testing | 15 days | Sat 4/11/20 | Thu 4/30/20 |
| **Election Readiness** | | | |
| Voter Outreach | | | |
| Pollworker Training | 21 days | Mon 4/27/20 | Mon 5/25/20 |
| Transport to polling | 6 days | Mon 5/18/20 | Mon 5/25/20 |
| **July Primary Election Runoff** | | | **Tue 7/28/20** |

| | | | |
|---|---|---|---|
| June Primary Election | 0 days | Tue 7/28/20 | Tue 7/28/20 |
| June Primary Runoff Lessons Learned | 1 day | Wed 7/29/20 | Wed 7/29/20 |
| **Election Programming** | | | |
| Data entry and import | 3 days | Wed 4/29/20 | Fri 5/1/20 |
| Ballot Styling | 2 days | Wed 4/29/20 | Thu 4/30/20 |
| Review and modifications | 2 days | Fri 5/29/20 | Mon 6/1/20 |
| Generate official ballots | 1 day | Fri 5/29/20 | Fri 5/29/20 |
| Generate audio ballots | 1 day | Fri 5/29/20 | Fri 5/29/20 |
| Generate election files | 1 day | Fri 5/29/20 | Fri 5/29/20 |
| Generate test decks | 1 day | Sat 6/13/20 | Sat 6/13/20 |
| **Ballot Production and L&A Testing** | | | |
| UOCAVA Ballots Ready | 1 day? | Sat 6/13/20 | Sat 6/13/20 |
| Official ballot printing | 15 days | Sat 6/13/20 | Thu 7/2/20 |
| Logic and accuracy testing | 15 days | Sat 6/13/20 | Thu 7/2/20 |
| **Election Readiness** | | | |
| Voter Outreach | | | |
| Pollworker Training | 21 days | Tue 6/30/20 | Tue 7/28/20 |
| Transport to polling | 6 days | Mon 7/20/20 | Mon 7/27/20 |
| **November 2020 General Election** | | | **Tue 11/3/20** |
| November 2020 General Election | 0 days | Tue 11/3/20 | Tue 11/3/20 |
| November 2020 General Election Lessons Learned | 1 day | Wed 11/4/20 | Wed 11/4/20 |
| **Election Programming** | | | |
| Data entry and import | 3 days | Wed 8/5/20 | Fri 8/7/20 |
| Ballot Styling | 2 days | Wed 8/5/20 | Thu 8/6/20 |
| Review and modifications | 2 days | Fri 9/4/20 | Mon 9/7/20 |
| Generate official ballots | 1 day | Fri 9/4/20 | Fri 9/4/20 |
| Generate audio ballots | 1 day | Fri 9/4/20 | Fri 9/4/20 |
| Generate election files | 1 day | Fri 9/4/20 | Fri 9/4/20 |
| Generate test decks | 1 day | Fri 9/4/20 | Fri 9/4/20 |
| **Ballot Production and L&A Testing** | | | |
| UOCAVA Ballots Ready | 1 day? | Sat 9/19/20 | Sat 9/19/20 |
| Official ballot printing | 15 days | Sat 9/19/20 | Thu 10/8/20 |
| Logic and accuracy testing | 15 days | Sat 9/19/20 | Thu 10/8/20 |
| **Election Readiness** | | | |
| Voter Outreach | | | |
| Pollworker Training | 21 days | Mon 10/5/20 | Mon 11/2/20 |
| Transport to polling | 6 days | Mon 10/26/20 | Mon 11/2/20 |
| Project Closeout Meeting(s) | 4 days | Tue 12/15/20 | Fri 12/18/20 |

### APPENDIX A TO ATTACHMENT 4 TO SOLUTION ORDER

### Critical Milestones

| Table A - Critical Milestones: | Milestone Deadline |
|---|---|
| 1.  Delivery and Acceptance of 2 ICX BMD units and 2 ICP scanners for public demonstrations and initial training | 5 days after Agreement Effective Date |
| 2.  Delivery and Acceptance of Equipment and Software required to conduct the Pilot Election via the Solution, as mutually agreed to by the Parties | 30 days after Agreement Effective Date |
| 3.  Delivery and Acceptance preliminary 10 ICX BMD units and 10 ICP scanners for public demonstrations and training | September 15, 2019 |
| 4.  Delivery and Acceptance of all Democracy Suite Election management system hardware and software | October 15, 2019 |
| 5.  Certification of the November 2019 Pilot Election conducted via the Solution. | November 22, 2019 |
| 6.  Delivery and Acceptance of all remaining ImageCast Precinct Scanner Kits | December 31, 2019 |
| 7.  Delivery and Acceptance of all remaining ImageCast Central Scanner Kits | December 31, 2019 |
| 8.  Delivery and Acceptance of all electronic pollbook Kits | December 31, 2019 |
| 9.  Delivery and Acceptance of all remaining ImageCast X BMD Kits | January 15, 2020 |
| 10. Delivery and Acceptance of all remaining ancillary items | January 31, 2020 |
| 11. Certification of the March 24, 2020 Presidential Preference Primary conducted via the Solution. | April 10, 2020 |
| 12. Certification of the November 3, 2020 General Election conducted via the Solution | November 20, 2020 |

# ATTACHMENT 5 TO SOLUTION ORDER

## RESERVED

*Master Solution Purchase and Services Agreement*

**ATTACHMENT 6 TO SOLUTION ORDER**

**Training Plan**

**Georgia Implementation Training Plan**

The following is an in-depth training plan as requested and is submitted with the understanding that training dates and training content are subject to change pending award of the contract and the outcome of collaboration with the GASOS/County Election Officials.

**Pre-Training Tasks**

2 Days: 7/30 to 7/31 - Meeting with GASOS and GASOS-selected County Election Officials to customize training documentation, syllabi, demonstration project and ballots to reflect GA election procedures and terminology.
11 Days: 8/1 to 8/11 - Customized training documentation, syllabi, demonstration project and ballot development.

**Phase 1 Training Plan**

GASOS – 8/12 to 8/23 – 11 1/2 Days.  During this period, GASOS review and approval of final training documentation, syllibi, demonstration project and ballot and set/confirm the training schedule.

- Election Programming – 4 1/2 Days
- DSuite Administrator and User – 2 Days
- ICX-BMD/ICP Operator – 1 Day
- ICC/ADJ Administration – 1 Day
- ICC/ADJ Operator – ½ Day
- UOCAVA – 1 Day
- Election day Rover Training – ½ day
- Pollpad Train the Trainer Training – 1 day

Counties – Administrative/User – 8/26 to 9/9 – 2 Regional Trainings - 4 Days Each

- DSuite Administrator and User – 2 Days
- ICC/ADJ Administration – 1 Day
- UOCAVA – 1 Day

Counties – Operator/Pollworker – 9/10 to 9/13 – 2 Regional Trainings - 3 Days Each

- ICX-BMD/ICP Operator – 1 Day
- ICC/ADJ Operator – ½ Day
- Pollworker Train the Trainer – ½ Day
- Pollpad Training – 1 day

**Phase 2 Training Plan**

**Counties not holding December Runoff Election**

Counties – Administrative/User – 11/11 to 12/13 – Regional Trainings - 4 Days Each

- DSuite Administrator and User – 2 Days
- ICC/ADJ Administration – 1 Day
- UOCAVA – 1 Day

Counties – Operator/Pollworker – 11/11 to 12/13 – Regional Trainings - 3 Days Each

- ICX-BMD/ICP Operator – 1 Day
- ICC/ADJ Operator – ½ Day
- Pollworker Train the Trainer – ½ Day
- Pollpad Training – 1 day

**Counties holding December Runoff Election**

Counties – Administrative/User – 12/9/2019 to 1/17/2020 – Regional Trainings - 4 Days Each

- DSuite Administrator and User – 2 Days
- ICC/ADJ Administration – 1 Day
- UOCAVA – 1 Day

Counties – Operator/Pollworker – 12/9/2019 to 1/17/2020 – Regional Trainings - 3 Days Each

- ICX-BMD/ICP Operator – 1 Day
- ICC/ADJ Operator – ½ Day
- Pollworker Train the Trainer – ½ Day
- Pollpad Training – 1 day

**Courses**

**DSuite Election Programming – 4.5 Days**

- Democracy Suite Election Programming Software Overview
- Template (Master) Election Project Concepts
- Election Programming Phases
- Introduction to Election Event Designer
- Election Project Definition – Primary and General Elections
- Divisioning – Districts, Precincts, and Elector and Ballot Groups
- Election Event – Contests and Candidates
- User Management
- Advancing to Election Project Styling
- Ballot Styling and Templates
- Translations – Single and Multiple Language
- Creating the Ballots and Audio Ballot Files
- Previewing Audio Ballot Files
- Creating Electronic Ballot Headers
- Tabulation Setup

Appendix Page 679

- Preparing Proofing Packages
- Create Election (Tabulator) Files
- Create Final Project Backup for Transfer to County
- Advanced Functions – Creating Template (Master) Projects and Using Election Data Translator for Import/Export of Election Definition Data

**DSuite Administrator and User – 2 ½ Days**

- Introduction to Democracy Suite
  - o Democracy Suite Software Component Overview
  - o Tabulator Systems Overview
    - ▪ ImageCast Precinct Ballot Scanner – ICP
    - ▪ ImageCast X-Ballot Marking Device – ICX-BMD
    - ▪ ImageCast Central – ICC
  - o Review of Quick Reference Guides
  - o Additional System Components
  - o Consumable Items
  - o Voting System Process Overview
  - o Generic Election Timeline and Workflow Responsibilities Review
- The Election Proofing Process
  - o Overview of the County Proofing Process
  - o The Election Proofing Package
  - o Proofing Ballots
  - o Proofing Reports
  - o Proofing Audio Ballot Files
- Election Preparation
  - o Election Event Designer – EED – Programming the Tabulators
  - o Setting Up ImageCast Central – ICC
  - o Setting Up Adjudication
- Logic and Accuracy Testing
  - o Testing Steps Overview
  - o Test Deck Overview
  - o Logic and Accuracy Test Procedures
    - ▪ ICX-BMD/ICP
    - ▪ ICC with Adjudication
    - ▪ RTR
- Results Talley and Reporting - RTR
  - o Overview of RTR
  - o Opening an Election in RTR
  - o RTR Settings
  - o Loading Election Results
  - o Managing Results Files and Tabulators in RTR
  - o Manual Entry of Results
  - o Results Reporting and Exporting
  - o Exporting Results Manually
- Backing up the Final Results
- Purging Test Results

**ICX-BMD/ICP Operator – 1 Day**

- ICP Operations
  - Hardware Overview
  - Loading/Changing Paper Tape
  - Loading the Memory Cards
  - Acceptance Testing
  - Maintenance and Troubleshooting
- ICX-BMD Operations
  - Hardware Overview
  - Loading Paper and Toner in the BMD Printer
  - Loading Election Files
  - Acceptance Testing
  - Maintenance and Troubleshooting
- Logic and Accuracy Testing
  - Test Decks and Vote Sims
- Voting Equipment in the Polling Place
  - Setting up the Equipment
  - Opening the Polls
  - Activating Voter Cards
  - Voting on the ICX-BMD/ICP
  - Closing the polling place

**ICC/ADJ Administration – 1 Day**

- Overview of ICC and ADJ Functionality
- Setting Up the ICC – Loading the Tabulator Files and Scanner Configuration
- Setting Up RTR to Manage, Monitor and Automatically Upload Results From ICC/ADJ
- Setting Up Adjudication – Loading the Election and Setting Conditions
- Logic and Accuracy Testing
- Ballot Handling
  - Scanning Ballots and Common problems
  - Batch Handling
    - Rejecting and Resetting batches
    - Deleting Batches
- Adjudicating Ballots
  - Standard User Vs. Administrative User
  - Ballot Overlays
  - Ballot Review and AuditMark
  - Write-in Resolution
  - Submitting Batches
  - Managing Quarantined Ballots
  - Configuring and Managing Report Profiles

**ICC/ADJ Operator – ½ Day**

- Ballot Handling
  - Scanning Ballots and Common problems
  - Batch Handling
    - Rejecting, Resetting, and Deleting Batches
- Adjudicating Ballots
  - Ballot Overlays

- o   Ballot Review and AuditMark
- o   Write-in Resolution
- o   Quarantining Ballots

### UOCAVA – 1 Day

- Configuring UOCAVA
  - o   Display
  - o   Language Management
  - o   Voter ID and PIN Options
- Tabulator Management
  - o   Importing Election Files
  - o   Configuring Parameters
- Download Administration
  - o   Editing the Ballot Package
  - o   Cover Sheet, Affidavit, and Return Envelope Settings
  - o   Security Question Administration
- User Management
- Customization
  - o   Logos
  - o   Color Schemes
- Voter List Management
- Accessibility
- Testing
- Reporting

### Election Day Rover Training – 1 Day

- Preparing for Election Day
- Opening and Closing the polls
- Processing Voters
- Assisting Voters with Special Needs
- Troubleshooting Election Day Problems

### Pollpad Train the Trainer Training – 1 Day

- ePulse training
  - o   Create elections
  - o   Administer elections
  - o   Closing out elections
  - o   Monitoring pollpads
  - o   Generating reports
- Train the trainer
  - o   Set up of pollpad solution
  - o   Familiarizations of screens, statuses, and functionality
  - o   Configuration
- Meraki Mobile Device Management System training
  - o   Enrolling pollpad
  - o   Updating pollpad applications
  - o   Ensuring proper restriction settings
  - o   Monitoring/remote wipe devices

**Pollworker Train the Trainer – ½ Day**

- Training Techniques
- Learning Styles
- Presentation Skills
- Voting Equipment in the Polling Place
    - Setting up the Equipment
    - Opening the Polls
    - Activating Voter Cards
    - Voting on the ICX-BMD/ICP
    - Troubleshooting
    - Closing the Polls

## Exhibit C
To Master Solution Purchase and Services Agreement

### FORM OF SERVICES ORDER

THIS SERVICES ORDER ("**Services Order**") is dated this _____ day of _____, 20__ ("**Services Order Effective Date**") and is subject to the terms of the Master Solution Purchase and Services Agreement (the "**Agreement**") dated as of _____, 20109 by and between _____ ("**State**") and _____ ("**Contractor**"). Unless otherwise defined herein, all capitalized terms used herein have the same meanings as is set forth in the Agreement, which is hereby incorporated by reference. The undersigned State Entity hereby orders delivery for the following pieces of Solution from Contractor. Contractor agrees to deliver the items ordered herein in accordance with the Agreement and in compliance with all Applicable Laws including with the provisions of O.C.G.A. Title 21, as amended and the State of Georgia Election Board and Secretary of State Rules contained in Sections 183 and Sections 590 of the Georgia Administrative Code respectively.

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions contained herein, State and Contractor hereby agree as follows:

In performing Services under this Services Order, Contractor shall communicate to _____ of State or his/her designee

DESCRIPTION OF THE SERVICES.

Project Overview. The <insert project name here> project ("**Project**") is <insert descriptive summary of the project associated with these services>.

Services Order Purpose. The purpose of this Services Order is for Contractor to provide the following services <insert a short general descriptive summary> to State related to the Project.

Services Scope. Contractor is responsible for the following Services and scope, as further described and detailed below, in the context of the overall Project:

<Please provide a list of services to be performed by Contractor here. If the services are subject to any specific specifications, requirements or acceptance criteria, please list them here.>

SCHEDULE.

Contractor shall complete the Services and provide any Deliverables on or before _____. The parties agree that time is of the essence in this Agreement.

<Please provide a schedule here, including a commencement date, a completion date, and any interim milestone dates.>

DESCRIPTION OF DELIVERABLES.

<Please provide a list of deliverables here, including a delivery date for each of the deliverables. If the deliverables are subject to any requirements or acceptance criteria, please list them.>

MILESTONES

Contractor shall deliver to Company the Deliverables listed in the table below during the period of performance of this Services Order.

| Item Number | Deliverables / Milestone | Due Date | Final Acceptance Criteria |
|---|---|---|---|
| **1.** | <Identify all "items" (including interim deliverables) that will be developed or provided as a result of contractor performing the tasks detailed in Section **Error! Reference source not found.** above (*i.e.*, products, plans, status reports, documentation, etc.)> | XX/XX/XX | <Describe the precise conditions / criteria that will be applied to determine that the Deliverable is accepted for payment issuance to the Contractor>. |
| **2.** | | | |

FEES AND EXPENSES.

The Fees for the Services shall not exceed _____, and **[***Expenses associated with performing the Services shall not exceed*** _____**.]**

Any additional services shall be set forth in an additional Statement of Work executed by STATE and Contractor under the Agreement or in a purchase order issued by STATE and accepted by Contractor under the Agreement.  Contractor shall be reimbursed for additional reasonable expenses if pre-approved by STATE in writing.

DEVIATIONS FROM TERMS OF AGREEMENT

[Insert any deviations from the Master Agreement]

This Services Order is approved by:

STATE OF GEORGIA

OFFICE OF THE SECRETARY OF STATE                    DOMINION VOTING SYSTEMS, INC.

By: _____                    By: _____

Name: _____                    Name: _____

Title: _____                    Title: _____

**Exhibit D**
To Master Solution Purchase and Services Agreement

**LIST OF PERMITTED CONTRACTOR SOLUTION PARTNERS**

1.  KNOWiNK, LLC having its principal place of business at 2111 Olive Street, Saint Louis, MO 63103.

2.  Diversified Technologies, LLC having its principal place of business at 100 Peachtree St, Atlanta, GA 30303.

*Master Solution Purchase and Services Agreement*

**Exhibit E**
To Master Solution Purchase and Services Agreement

**CHANGE CONTROL FORM**

**1. Contract Information.** This change control form is provided pursuant to and governed by Section 6.2 of the Master Solution Purchase and Services Agreement entered into between State and Contractor as of _____ ("Agreement"). Any term used but not defined in this Change Control Form will have the meaning given to it in the Agreement.  Once this Change Control Form is signed by both parties below it shall be deemed a Change Order.

| Contract Control No. | Change Order No. | For Solution Order or Services Order No. |
|---|---|---|
| | | |

**2. Party Information.**

| Name Of Requesting Party: | Name of Party to whom Submitted: | Date Submitted: |
|---|---|---|
| | | |

**3. Change Request.** (Attach additional pages referencing this Section as required.)

| Change to: (identify one only) | Description of Requested Change |
|---|---|
| ☐  Deliverable<br><br>☐  Services Task | |

**4. Impact Analysis.**   (Required to be filled-out with all Change Requests submitted by Contractor and as part of all Change Responses returned to State by Contractor as part of a State submitted Change Requests. Attach additional pages referencing this Section as required.)

| Resource Impact: | |
|---|---|
| Cost Impact: | |
| Timing Impact: | |
| Date Response Delivered | |

**5.  Change Response -** Acceptance or Rejection of Change Request.

HAVING RECEIVED, UNDERSTOOD AND AGREED with this Change Control Form, (check only one)  ☐ STATE ☐ Contractor hereby (initial one):

_____  accepts the Change Request and desires to proceed with the change requested hereon.

_____  rejects the Change Request and does not desire to proceed with the change requested hereon and hereby terminates such request.

**6. Change Order.** If this Change Control Form is signed by both parties below it shall be deemed a Change Order and shall become a part of the Solution Order or Services Order to which it relates, shall be governed by this Agreement and shall be attached thereto as if initially entered into as part of a Solution Order or Services Order.

| State ENTITY | CONTRACTOR |
|---|---|
| <br>_____<br>AUTHORIZED SIGNATURE & DATE SIGNED | <br>_____<br>AUTHORIZED SIGNATURE & DATE SIGNED |

*Master Solution Purchase and Services Agreement*

| | |
|---|---|
| _____ | _____ |
| PRINTED NAME & TITLE | PRINTED NAME & TITLE |

## **Exhibit F**
To Master Solution Purchase and Services Agreement

**RESERVED**

*Master Solution Purchase and Services Agreement*

**Exhibit G**
To Master Solution Purchase and Services Agreement

**FEE SCHEDULE**

**First Year Purchase Summary** - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing. All pricing in U.S. Dollars.

| DESCRIPTION | QTY | TOTAL GROUP COST |
|---|---|---|
| **Central Scanning Solution: Absentee / Central Count** | | |
| ImageCast Central Kit - G1130 | 14 | |
| ImageCast Precinct Tabulator (Absentee Only without ballot box) | 153 | |
| Sub-Total: | | $816,768.00 |
| **In-Person Voting Solution: Ballot Marking Device** | | |
| ImageCast X Kit - Prime | 30050 | |
| ImageCast X BMD Polling Place Metal Cart | 30050 | |
| ATI Kit - ICX - USB | 2754 | |
| Polling Place UPS | 2750 | |
| Sub-Total: | | $59,684,408.50 |
| **In-Person Voting Solution: Precinct Scanner/Tabulator** | | |
| ImageCast Precinct Tabulator | 3500 | |
| ImageCast Precinct Ballot Box - Plastic | 3500 | |
| ICP Paper Roll (98') | 14000 | |
| Seals - Pull Up / Pull Tight - Plastic - Red (25/pkg) | 1120 | |
| Seals - Pull Quick (25/pack) | 560 | |
| Seals - Tamper Evident Security Label (25/pkg) | 5368 | |
| Sub-Total: | | $8,156,260.00 |
| **In-Person Voting Solution: Electronic Pollbook Hardware and Software** | | |
| EPB Unit (Apple IPAD) | 8,000 | |
| Carrying Case (without printer) | 8,000 | |
| Stand | 8,000 | |
| Stylus | 16,000 | |
| Encoders | 8,000 | |
| Isync Drives | 2,800 | |
| EPB Software Initial License | 8,000 | |
| Administrative Dashboard/Command Center and Reporting | 1 | |
| Sub-Total: | | $5,671,440.00 |
| **Election Management Hardware and Software** | | |
| EMS Standard Server Kit | 14 | |
| EMS Client Workstation Kit | 151 | |
| EED/RTR/ Adjudication Workstation Kit | 28 | |
| Smart UPS 1500 (rack mountable for Standard Server) | 14 | |
| Smart UPS 1500 (non-rack mountable for Express Server) | 151 | |
| Democracy Suite Standard Initial License (through 12/31/2021) | 1 | |
| Adjudication Module Initial License (through 12/31/2021) | 1 | |

| | | |
|---|---|---|
| **Automated Test Deck Module Initial License (through 12/31/2021)** | 1 | |
| **Remote UOCAVA Module Initial License (through 12/31/2021)** | 1 | |
| Sub-Total: | | $834,673.35 |
| **Support Services** | **Days** | |
| **Implementation and Training** | | |
| **Product Implementation & Support** | 510 | |
| **Project Management & Implementation** | 1716 | |
| **Logic & Accuracy Testing** | 640 | |
| **Training (/day)** | 320 | |
| **Train The Trainer: Poll worker** | 28 | |
| **Democracy Suite Full System Training** | 20 | |
| **Democracy Suite Result, Tally and Reporting** | 80 | |
| **ImageCast Central Operator Training** | 80 | |
| **ImageCast Central Adjudication Training (reserved)** | 80 | |
| **ImageCast Precinct Training** | 80 | |
| **Election Setup / Ballot Setup** | 1045 | |
| **On-site Services - Election Day** | 1280 | |
| **On-Site Services - Non-Election Day (/day)** | 200 | |
| Sub-Total: | | $14,772,040.80 |
| **Purchase - Year 1 Total:** | | **$89,935,590.65** |
| **BMD security paper ballots** | $0.13/ballot | TBD |

**Annual Purchase Summary** - Dominion shall provide invoices for Annual Licenses and Warranties on January 1 of each Term year. Dominion shall provide invoices for BMD ballot security paper upon delivery to the State for each Election during the Term. The State shall pay invoices in a timely manner in accordance with the terms of the Agreement. All pricing in U.S. Dollars.

| **Ballot Marking Device Security Paper** | | |
|---|---|---|
| **BMD security paper ballots** | $0.13/ballot | TBD |

| **Annual Software Licenses: 2022** | | |
|---|---|---|
| **Democracy Suite Standard Annual License Fee** | 1 | $190,500.00 |
| **Adjudication Annual License Fee** | 1 | Included |
| **Automated Test Deck Annual License Fee** | 1 | Included |
| **Remote UOCAVA Module Annual License Fee** | 1 | Included |
| **Electronic Poll Bool Management System Annual License Fee** | 1 | Included |
| **Electronic Poll Book (EPoll) Annual License Fee** | 8000 | Included |
| **ImageCast X Annual License Fee** | 30050 | $2,319,108.00 |
| **ImageCast Precinct Annual License Fee** | 3653 | $410,571.00 |
| **ImageCast Central Annual License Fee** | 14 | $287,605.50 |
| TOTAL: | | **$3,207,784.50** |

| Annual Software Licenses: Years 2023 - 2029 | | |
|---|---|---|
| **Democracy Suite Standard Annual License Fee** | 1 | $190,500.00 |
| **Adjudication Annual License Fee** | 1 | Included |
| **Automated Test Deck Annual License Fee** | 1 | Included |
| **Remote UOCAVA Module Annual License Fee** | 1 | Included |
| **Electronic Poll Bool Management System Annual License Fee** | 1 | Included |
| **Electronic Poll Book (EPoll) Annual License Fee** | 8000 | Included |
| **ImageCast X Annual License Fee** | 30050 | $1,660,342.00 |
| **ImageCast Precinct Annual License Fee** | 3653 | $293,637.00 |
| **ImageCast Central Annual License Fee** | 14 | $205,114.00 |
| **TOTAL:** | | **$2,349,593.00** |

| Annual Warranty: 2022 (optional to county) | | |
|---|---|---|
| **Electronic Poll Book (EPoll) Annual License Fee** | 8000 | $890,000.00 |
| **ImageCast X Annual License Fee** | 30050 | $2,396,412.38 |
| **ImageCast Precinct Annual License Fee** | 3653 | $1,498,522.62 |
| **ImageCast Central Annual License Fee** | 14 | $67,656.75 |
| **TOTAL:** | | **$4,852,591.75** |

| Annual Warranty: Years 2023 – 2029 (optional to county) | | |
|---|---|---|
| **Electronic Poll Book (EPoll) Annual License Fee** | 8000 | $890,000.00 |
| **ImageCast X Annual License Fee** | 30050 | $1,593,886.00 |
| **ImageCast Precinct Annual License Fee** | 3653 | $997,483.00 |
| **ImageCast Central Annual License Fee** | 14 | $47,515.00 |
| **TOTAL:** | | **$3,528,884.00** |

**Price List** – Standard Price List without volume discounts for future purchases by counties.

| | |
|---|---|
| **ImageCast Central Kit - G1130** | $25,000.00 |
| **ImageCast Central Kit - M160ii** | $7,500.00 |
| **ImageCast X Kit - Prime** | $3,500.00 |
| **ImageCast X Prime Voter Smart Card - Generic** | $8.10 |
| **ImageCast X Prime Poll Worker Smart Card - Generic** | $8.10 |
| **ImageCast X Prime Technician Smart Card - Generic** | $8.10 |
| **ImageCast Precinct Tabulator - 320C** | $3,900.00 |
| **Mobil Ballot Printing Kit #2 Portable High Volume** | $5,800.00 |
| **EMS Standard Server Kit (R630/WS2012/SS2016)** | $17,000.00 |
| **EMS Client Workstation Kit** | $1,700.00 |
| **EMS Adjudication Workstation Kit** | $1,700.00 |
| **Smart UPS 1500 (rack mountable)** | $800.00 |
| **ATI Kit - ICX - USB** | $375.00 |
| **ImageCast X Voting Booth - Standard** | $295.00 |

| | |
|---|---|
| **ImageCast X Prime Transport Bag - Single** | $60.00 |
| **ImageCast X BMD Printer Transport Bag** | $63.00 |
| **ImageCast Precinct Ballot Box - Plastic** | $1,000.00 |
| **ICP Paper Roll (98')** | $4.00 |
| **Seals - Pull Up / Pull Tight - Plastic - Red (25/pkg)** | $14.00 |
| **Seals - Pull Quick (25/pack)** | $6.75 |
| **Seals - Tamper Evident Security Label (25/pkg)** | $16.75 |

**Exhibit H**
To Master Solution Purchase and Services Agreement

**INSURANCE**

**A. PERFORMANCE BOND**

Contractor shall furnish a performance bond or an irrevocable letter of credit to the State for the faithful performance of the Agreement in an amount equal to 100% of the value of the Agreement as determined by the State. The bond shall be issued by a Corporate Surety authorized to do business with the State of Georgia. The performance bond/letter of credit must be submitted to the State within ten (10) calendar days of the date the Agreement is awarded, but in any event, prior to the beginning of any contract performance by the Contractor.  The Performance Bond requirement shall expire on December 31, 2020.

**B. MINIMUM INSURANCE COVERAGE**

1.1    Workers' Compensation and Employer's Liability - Statutory Workers Compensation as required by the laws of all jurisdictions (other than the State of Georgia) in which Contractor Personnel are physically present to perform the Services and/or the premises at which such Services were performed, and Employers' Liability with a minimum limit of not less than $1 Million per occurrence. In the State of Georgia, Contractor shall maintain Workers Compensation Insurance (Occurrence) in the amounts of the statutory limits established by the General Assembly of the State of Georgia. Any self-insurer must submit a certificate from the Georgia Board of Workers Compensation stating that the supplier qualifies to pay its own workers compensation claims.  In addition, Contractor shall require all subcontractors occupying the premises or performing work under the Agreement to obtain an insurance certificate showing proof of Workers Compensation Coverage with the following minimum coverage:

- Bodily injury by accident - per employee $100,000;
- Bodily injury by disease - per employee $100,000; and
- Bodily injury by disease – policy limit $500,000.

1.2    Commercial General Liability (CGL) - On a per occurrence basis, including (a) products / completed operations coverage; (b) independent contractors protective coverage; and (c) contractual liability coverage, which coverage must specifically cover Contractor's indemnification provisions contained herein (but net of intellectual property indemnification which shall be covered by the policies required in Section 1.5 below).  The CGL policy must be maintained in effect for ten (10) years following the date of expiration or termination of the Agreement. The CGL policy shall provide for the following minimum coverage.

- Each Occurrence Limit - $1,000,000;
  Personal & Advertising Injury Limit - $1,000,000;
- General Aggregate Limit - $2,000,000; and
- Products/Completed Ops. Aggregate Limit - $2,000,000.

1.3    Automobile Liability - Covering all non-owned and hired vehicles utilized in the performance of the Agreement with a combined single limit of not less than $1 Million per occurrence (inclusive of amounts under Contractor's umbrella policy).

1.4    Professional Errors & Omissions – Coverage, which shall include, but not be limited to, loss or damage resulting from errors and omissions, advertising injury, personal injury (including invasion of privacy), intellectual property offenses related to software, internet, network and e-business activities, claims of code misappropriation, code theft, copyright and/or trademark infringement with an aggregate limit of no less than $3 Million per claim. If the policy is issued on a claims-made basis, either an extended reporting period of not less than ten (10) years following the expiration or

termination of the Agreement shall be provided; or such coverage must be maintained in effect for ten (10) years following the date of expiration or termination of the Agreement. The retroactive date shall not precede the (signature) date of the Agreement.

1.5     <u>Commercial Fidelity and Crime Insurance</u> – Coverage with a limit of not less than $1,000,000 per occurrence, including coverage for or the benefit of State in the event of loss of money, securities or property third party legal liability, or fraud arising out of or in connection with the acts or omissions of Contractor Personnel in an amount not less than $1 Million per loss.

1.6     <u>Cyber-Liability Insurance</u> - Coverage $1,500,000 per occurrence covering liability for transmission of a virus, hacker damage, theft or unauthorized disclosure of private information, theft of digital ID, cyber business interruption, cyber extortion, and consumer and client coverage.

1.7     <u>Excess or Umbrella Liability Insurance</u> - Coverage on a follow-form basis, with a minimum limit of $5,000,000 per occurrence and $5,000,000 as an annual aggregate, in excess of the following insurance coverages described above: Worker's Compensation Insurance and Employer's Liability Insurance coverage; Commercial General Liability Insurance; and Automobile Liability Insurance coverage.

**Exhibit I**
To Master Solution Purchase and Services Agreement

**FORM OF DELIVERY & ACCEPTANCE NOTICE**

| | | | | COUNTY: _____ |
|---|---|---|---|---|
| | | **On-Site Acceptance Test Checklist** | | DATE: _____ |
| | DOMINION VOTING | **ICX Prime – ImageCast X®** | | MODEL: _____ |
| | Our customers come first | | | SW VERSION: _____ |
| | | | | SERIAL NUMBER: _____ |

| STEP NO. | STAGE DESCRIPTION | DETAILS | P A S S ✓ | COMMENTS *Please list any anomalies or issues and resolution* |
|---|---|---|---|---|
| | | **Unpacking & Inspection Stage** | | |
| 1 | | Ensure the system is properly packed. | | |
| 2 | Physical Inspection | Ensure that the following items are present in the packaging box: 1. Inspect the machine for any external damage. 2. Inspect the screen 3. Inspect the stand 4. Inspect the card reader slot 5. Open the four external doors and check for damage to ports. 6. Verify the presence of the power cord(10') and the external battery | | |
| 3 | Hardware Setup | Place ICX and HP Printer on flat surface | | |
| 4 | | Connect AC Power Supply to ICX ( bottom-right corner) | | |
| 5 | | Connect Power Cable to rear of HP Printer | | |
| | | **Power Up and System Status Verification (with Test CF cards)** | | |
| | Maintenance Diagnostic | Turn on Printer ( Front of Unit) | | |
| | | Turn on ICX Prime( bottom-right door) | | |
| | | ICX unit launches the ICX application by default | | |
| | | Check battery charging status ( top right tool bar) | | |
| | | **Verify Android Version/Kernel Version** | | |
| | Maintenance Diagnostic (Continue) | Insert Technician Card: 1. Enter Technician Pin and Select Login 2. Confirm and modify the date and time 3. Select Android Settings 4. Select About Tablet 5. Verify Android Version 6. Verify Kernel Version Date 7. Select home | | |
| | | Check functionality of all USB ports: A. Unplug ATI cable from USB port and plug into each USB port not being use. B. There are a total of 6 ports: 4 ports inside top left door, 2 ports inside top right door. C. Light blinks when plugged in. Repeat for each USB port. D. When finished, plug ATI cable back into original USB port | | |
| | Functional Testing | Load Elections Files On USB ( PG_ICX.dat file) | | |
| | | Load Election file to ICX: 1. Insert Technician card 2. Enter Technician Pin and Select Login 3. Select Load Election Data 4. Select the PG_ICX.dat file 5. Select the select option 6. Select Copy 7. Select OK 8. Select Result Location to Prime (Drop down menu) 9. Select Apply 10. Select OK 11. Remove Technician Card | | |
| | Functional Testing (Continue) | Open Election Polls: 1. Insert Pollworker Card 2. Enter Pollworker Pin and Select Login 3. Select the appropriate tabulator (Drop down menu) 4. Select OK 5. Check the box to enable AVS Controller 6. Check the box to enable Manual Session Activation 7. Select Yes 8. Select OK 9. Remove Pollworker Card | | |

| | | Activate a Manual Voter Session: 1. Insert Pollworker card 2. Select the Activation Ballot tab 3. Enter Activation Code 4. Select Next 5. Select Regular 6. Voting Session will start 7. Remove Pollworker card | | |
|---|---|---|---|---|
| | | Activate a Manual Voting Session with Audio: 1. Insert pollworker Card 2. Select the Activation Ballot tab 3. Select Enable AVS controller check box 4. Select Next 5. Select Regular 6. Voting Session will start, LED will turn yellow 7. Remove Pollworker Card | | |
| | | Vote and cast Audio ballot: 1. Select Vote in English 2. Select ATI 3. Make Voting selections with ATI and cast ballot 4. Confirm selections are heard on headphone 5. Select more (top right corner) 6. Cancel Activation | | |
| | | Vote and Cast Ballot: 1. Select Vote in English 2. Make voting selections and cast ballot 3. Print ballot, confirm printed selections 4. Insert ICX ballot into ICP2 Tabulator 5. Confirm ICP2 has accepted ICX Ballot | | |
| | | Close polls: 1. Insert Pollworker card 2. Enter Pollworker Pin and select Login 3. Select Close poll and select yes 4. Report Prints 5. Select OK 6. Remove Pollworker card | | |
| | | Re-zero results: 1. Insert Technician card 2. Enter Technician pin and select Login 3. Select Re-zero 4. Select Yes 5. Re-enter Technician pin 6. Confirm all results are deleted 7. Select OK | | |
| | | Reset Machine: 1. Select Clear All Election Data 2. Select Yes 3. Enter Technician pin 4. Confirm selections are heard on headphone 5. Confirm all election data, results and audit logs are deleted 6. Select OK | | |
| | | Power off Unit (bottom right corner) | | |



**Acceptance Test Checklist**
**ImageCast® Precinct**

County: _____

DATE: _____

PCOS MODEL: _____

FW VERSION: _____

PCOS SERIAL NUMBER: _____

| STEP NO. | STAGE DESCRIPTION | DETAILS | P A S S ✓ | COMMENTS *Please list any anomalies or issues and resolution.* |
|---|---|---|---|---|
| | | **Unpacking & Inspection Stage** | | |
| 1 | Unpacking | Ensure the system is properly packed in a large plastic zip-tight bag. | | |
| 2 | | Ensure that the following items are present in the packaging box: 1. Power supply unit 2. Power Cord. 3. Two (2) Memory Cards 4. Two (2) Security Keys (iButtons) | | |
| 3 | Inspection | Verify that the ICP is secured to the ballot box correctly. | | |
| 4 | | Verify unit has external doors installed and function correctly. | | |
| 5 | | Ensure that there are no obvious scratch marks, dents or spots. | | |
| | | **Power Up and System Status Verification (with Test cards)** | | |
| 6 | System Power Up Status Verification | Insert two (2) cards programmed with a Test Election Project into the memory card slots of the tabulator. **Note:** The Test Election Project must be compatible with the SW installed on the tabulator. | | |
| 7 | | Power up the system and verify that the appropriate audio-visual indications are seen and heard and that the correct F/W version successfully installed. | | |
| 8 | | When prompted by the operator screen (accompanied by an audible beep), place the security token on the tabulator. Hold the token in place until the operator screen displays "Key Accepted, Validating Election Files" | | |
| | | **Functional Testing (with Test Election cards)** (Note: This section is to be performed based on the ImageCast® L1 Tech Guide v0-02 20100310 Level 1 Maintenance Manual) | | |
| 9 | Election Project Testing | Select "Utilities" from the Admin menu. Select "Diagnostic" from the Utilities menu and select "Complete" and verify that all diagnostic functions complete successfully | | |
| 10 | | Verify that the printed tape has the same serial number that is on the tabulator and also has the correct software version listed | | |
| 11 | | Select the "open Poll" option from the Administrator menu. The Operator Screen will display that the totals are zero. Press the "Zero" button to print the zero proof. | | |
| 12 | | Inspect the printed tape to verify that the serial number on the tape matches the tabulator. | | |
| 13 | | Unplug the A/C power from the rear of the unit to verify that the unit is running on battery. | | |
| 14 | | Preform standard voting using the supplied test deck. **Note:** This is not a conclusive battery capacity test but only verification of the battery's ability to hold charge. Re-Connect to AC power source upon completion. | | |
| 15 | | Close the polls and print the results tape. Verify that the results on the report match the expected results as per the **Master Results Report Tape**. | | |
| 16 | | Re-zero the memory cards. | | |
| 17 | | Follow the standard procedure to power down the tabulator. | | |
| 18 | Power Down & Sign | Unplug AC power cord and any peripheral devices attached to the tabulator. | | |
| 19 | | Record the machine **Serial Number** in the Inventory Database. | | |
| 20 | | Place the completed and signed Checklist with the tabulator. | | |
| 21 | | Store the system away or set aside for dispatch, whichever required. | | |
| 22 | | | | |

Appendix Page 700

| | | | | COUNTY: _____ |
|---|---|---|---|---|
| | **DOMINION VOTING** *Our customers come first* | **On-Site Acceptance Test Checklist** **ICC – Canon ImageCast Central®** | | DATE: _____ |
| | | | | MODEL: _____ |
| | | | | SW VERSION: _____ |
| | | | | SERIAL NUMBER: _____ |

| STEP NO. | STAGE DESCRIPTION | DETAILS | P A S S ✓ | COMMENTS *Please list any anomalies or issues and resolution.* |
|---|---|---|---|---|
| | | **Unpacking & Inspection Stage** | | |
| 1 | | Ensure the system is properly packed. | | |
| 2 | Unpacking | Ensure that the following items are present in the packaging box: 5. Power cord 6. USB Data cable 7. Dell all in one workstation 8. Keyboard, mouse, power cord, dell driver disk 9. CF card reader, iButton reader and adaptor | | |
| 3 | | Ensure there are no loose screws or parts. | | |
| 4 | Inspection | Remove all tape and foam packaging from scanner and workstation. | | |
| 5 | | Ensure that there are no obvious scratch marks, dents or spots. | | |
| 6 | | Verify that the Scanner, keyboard, mouse, iButton reader and CF card reader are all plugged into the workstation properly. | | |
| | | **Power Up and System Status Verification (with Test CF cards)** | | |
| 7 | System Power Up | Insert one (1) CF card programmed with a Test Election Project into the CF reader and attach the iButton to the 1wire adaptor. | | |
| 8 | | Power up the system, Enter the login credentials and verify that the operating system powers up correctly and no hardware error messages occur. | | |
| | | **Functional Testing (with Test Election CF cards)** | | |
| 9 | | Load the election files to the proper location as specified in the ICC user guide. | | |
| 10 | | Verify the following: 10. Open the ICC Application and enter the administrator code"12345678" 11. Ensure that the scanner initializes and no error messages occur. 12. Verify the Software version of the application under the "Status" tab. | | |
| 11 | Election Project Testing | Under Configuration: 1. Enter supervisor mode and verify that the scan options are set to maximum paper length and that the driver options are set to user guide saved profile. 2. Set the server path if applicable 3. Change stop options if applicable | | |
| 12 | | Print or save a zero proof report from the status menu. | | |
| 13 | | Scan the pre marked test deck and verify that the scanner is stopping on all exception ballots that were pre-determined. | | |
| 14 | | Close the tabulator and print or save the results report. | | |
| 15 | | Compare Results to the master report for accuracy. | | |
| 16 | Power Down & Sign | Zero the tabulator and close the application. | | |
| 17 | | Reset the DVS folder to a new election state by deleting the all election files from the DVS and config folders and power down the scanner. | | |

**Exhibit J**
To Master Solution Purchase and Services Agreement

**DISASTER RECOVERY PLAN**

Overview

The Disaster Recovery & Business Continuity Plan ("DRCP") described herein details the coordinated mitigation strategies employed by Dominion Voting Systems, Inc. (Dominion) during project implementation in conjunction with the State of Georgia in the event of a disaster leading to business interruptions

This Plan remains valid until superseded by a revised DRCP mutually endorsed by the partners. This DRCP outlines the parameters of all strategies offered as the primary partners mutually understand them. This DRCP does not supersede current processes and procedures unless explicitly stated herein.

Dominion will from time to time review its procedures with respect to security safeguards through risk assessments, benchmarking or other means, to determine whether they are still consistent with applicable Privacy Laws, appropriate to the risks, and consistent with best practices, and if not, Dominion will revise the same as required.

Scope and Objectives

The scope of this Disaster Recovery & Business Continuity Plan is to document the coordination and support strategies set by the State of Georgia in conjunction with Dominion in the event of a disaster or major business interruption. Dominion shall implement the recovery strategies as set forth in this document in line with the State of Georgia processes.

The objectives of the Disaster Recovery & Continuity Plan include the following:

- To minimize interruptions of normal operations.
- To limit the extent of disruption and damage.
- To minimize the economic impact of the interruption.
- To establish alternative means of operation in advance.
- To train personnel with emergency procedures.
- To provide smooth and rapid restoration of service.

The Disaster Recovery & Continuity Plan accounts for a variety of disruption types. The first step is to identify the potential disaster and issue types and assess the risk associated with each one. After identifying the potential risks, it is necessary to grade them based on likelihood and seriousness. Preventative measures are then identified for risk prevention and recovery strategies are outlined in cases where disruption occurs.

Team Members & Responsibilities by Phase

This disaster recovery plan focuses on the primary Crisis Team and departmental/management leadership responsibilities related to incidents or situations outside normal business operations. The Crisis Team will include both senior GASOS and Dominion management (President, Executive Vice Presidents and local Project Manager) and specific corporate department heads (Accounting, Administration/Facilities, Human Resources, Information Technology, and Marketing and Sales). The Dominion Executive Vice President and GASOS designated executive (or other senior GASOS assigned staff) may designate additional staff from their areas of responsibility to assist the Crisis Team. This may be particularly important if a location other than the main corporate headquarters in Denver, CO or our Atlanta metro

area facility is impacted by a disaster situation. In a situation of this nature, the local Project Manager and his/her department heads will assist the Crisis Team with any additional support required provided by wither Dominion or GASOS corporate offices.

<u>At Imminent Declaration of a Disaster</u>

*Crisis Team*

- All Crisis Team members must work to ensure the immediate safety and well-being of all GASOS, Dominion staff, and electors present.
- Implement the Disaster Recovery & Business Continuity Plan (DRCP).
- Adjust the task list and timelines of the DRCP as necessary.
- The GASOS Crisis Team members in collaboration with Dominion Crisis Team members will communicate with all staff, insurance and service providers customers, news media as necessary (via telephone, email, fax, or through local cable or radio channels – employees should follow local guidelines regarding radio or cable channels to monitor in case of a disaster situation in their area.)
- The President of Dominion, with informational assistance from both GASOS and Dominion staff, will make the decision regarding "Stay and Repair", "Repair and Temporarily Relocate", or "Permanently Relocate" operations.
- Monitors DRCP progress.
- Assists each employee/department as required
- The President of Dominion in partnership with the designated executive from GA SOS is responsible for making the decision regarding when to transition from the crisis phase to the recovery phase of the plan.
- Implement Recovery Phase tasks.
- GASOS in partnership with Dominion will communication with staff, insurance and service providers, customers, news media as necessary.
- The President of Dominion and the designated executive from GASOS are responsible for making the decision regarding when the recovery phase has been completed and the corporation can return to "business as usual."
- Critique and review DRCP and processes and update and enhance the DRCP as needed.
- Dissemination of updated DRCP/destruction of previous version of DRCP.

*Senior Management*

- Remain visible to employees, customers, and stakeholders.
- Delegate recovery roles.
- Establish the Disaster Recovery as a partnership between GASOS and Dominion
- Direct, manage and monitor the recovery.
- Ensure all business and operational units receive normal ongoing support (offices and business units in other locations not impacted by the disaster).
- Avoid the temptation to participate "hands on."
- Publicly praise success.
- Rationally amend business plans/projections as necessary.
- Closely control media and analyst communications to ensure accuracy of information dissemination.

*Human Resources*

- Monitor employee morale
- Monitor productivity of personnel
- Prioritize reallocation of resources
- Provide appropriate retraining
- Provide counseling and support resources

*Technology Management*

- Identify/prioritize mission critical applications
- Prepare business impact analysis by unit
- Re-assess original recovery plans as necessary
- Continuously assess recovery site stability
- Recover/reconstruct all critical data ASAP in the agreed order (department, function, site, etc.)
- Ensure all business and operational units receive normal ongoing support (offices and business units in other locations not impacted by the disaster)
- Information systems security during the disaster and recovery, including opportunistic fraud

<u>Within the Recovery Environment</u>

*Crisis Team*
- Assesses the adequacy of information security
- Assesses the adequacy of system security
- Re-assesses recovery tolerance/timeframes
- Evaluates recovery contingencies
- Develops and tests recovery plans semi-annually
- Develops emergency plans for recovery staff
- Evaluates Information systems security

*Customers Clients and Suppliers*

- Re-establishes customer and vendor contacts ASAP
- Recover/reconstructs customer data and contracts
- Continues full customer support/assistance services
- Reconsider product and service cost/delivery projections

<u>In the Post-Disaster Environment</u>

*Crisis Team*

- Assists in responses to any changed customer requirements
- Assesses ability to respond to customer requests/inquiries
- Assesses Customer/Counterparty stability
- Assesses Supplier/Vendor reliability
- Statuses existing orders and contracts
- Assists in fulfillment of Customer support needs

*Finance Department, General Counsel and Compliance*

- Protect facilities from further damage
- Site security
- Formally notify insurers of any claims
- Ensure all business and operational units receive normal ongoing support (offices and business units in other locations not impacted by the disaster)

*Process Re-Establishment*

- Key reconciliations
- Other financial controls
- Meaningful key performance indicators

*Dominion Operations*
- Assess ability to deliver customer orders
- Identify outsourcing options/opportunities
- Refresh supply chain management
- Analyze lease options/requirements
- Establish new risk Dominion controls
- Amend policies and procedures
- Monitors DRCP progress assists each employee/department as required
- Implement Recovery Phase tasks continue communication with staff, insurance and service providers, customers, and other items
- Critique and review DRCP and processes and update and enhance the DRCP as needed
- Dissemination of updated DRCP/destruction of previous version of DRCP

Identification of Disaster Scenarios

The types of disasters that we must prepare for include the following:
- Environmental disasters
- Criminal disasters
- Hardware failures
- Programming and Generation Failures
- Service and Shipping Failures
- Network and Power Failures

*Environmental and Criminal Disasters*

Environmental disasters can range from events such as fires and floods. To account for these types of potential disasters, Dominion incorporates preventative measures into the initial project plan. Although the likelihood of these types of disasters is low, the seriousness is quite high. Dominion maintains inventories of spare voting equipment (both vote counters and accessible voting devices) in case of such disasters. In addition to spare equipment and systems, Dominion also maintains an inventory of spare parts that can be used to repair systems with minor damage.

In the event of an Environmental Disaster, the recovery strategy includes deployment of spare units to the affected voting locations. This additional equipment may be used to supplement the project, if the scope of the disaster is far worse than the spare units are capable of rectifying. The recovery strategy for a criminal disaster would also include deploying spare units and replacing the units through investigative and insurance claims.

Security systems and/or secure storage facilities are used to store spare inventory and Dominion requires that the customer implement similar security measures when responsible for voting equipment and hardware.  Dominion equipment also incorporates built-in security features on each other their voting unit through the use of redundant memory media locks, and seal hasps.

All edges, upon which a tabulator is connected to the ballot box, are pre-sealed in manufacturing to prevent ballots from being dropped within the ballot box without passing through the vote center.  These edges can further be sealed with the use of sticker seals.

*Hardware Failures*

Although there is a higher likelihood of hardware failures, than environmental or criminal disasters, these types of failures are commonly less serious or severe.  Hardware failures encompass any type of issue that may prevent the use of the vote counting equipment or accessible voting equipment.

Preventative measures are employed on all equipment in order to minimize the potential for hardware failures.  These measures include diagnostic testing and maintenance prior to deployment.  The maintenance and diagnostic testing examines the condition of the equipment and its components and tests the systems hardware and configuration.  Diagnostic testing examines the functionality of the equipment and ensures all aspects are in proper working order.

Dominion maintains inventories of spare voting equipment (both vote counters and accessible voting devices) in case of such disasters.  In addition to spare equipment and systems, Dominion also maintains an inventory of spare parts that can be used to repair systems with minor damage.  Supplementary units are deployed in the event of a major hardware failure, and their initial inclusion in the project plan is another preventative measure for this type of failure.

Prior to an election event, pre-election logic and accuracy testing is performed.  Similar to the preventative testing implemented by Dominion, logic and accuracy testing ensures accurate functioning of the equipment.  Any malfunctions or deficiencies found during L&A testing can be repaired in advance of the election event.  If a hardware failure of any type occurs, the recovery strategy would include troubleshooting, and diagnosis.  If the failure is deemed non-repairable, a spare unit will be deployed in its place.  Spare units should be included in the stock purchased by the GASOS so they are available for immediate deployment in regional deployment centers.  This rapid deployment provides a solution to a hardware failure.

| ID | Description of Risk | Preventative Measures | Recovery Strategy |
|---|---|---|---|
| 1 | Vote Counting Equipment: Malfunctions during tabulation/scanning | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting units |
| 2 | Vote Counting Equipment: Malfunction during ballot review, prior to ballot being cast | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |
| 3 | Accessible Voting Equipment: Malfunctions during accessible session (technical or user error) | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |
| 4 | Accessible Voting Equipment: Malfunctions during review of voting session, prior to paper ballot printing | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |

| | | | |
|---|---|---|---|
| 5 | Accessible Voting Equipment: Malfunction during ballot printing | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |
| 6 | Voting Equipment: Malfunctions during opening or closing of polls | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |
| 7 | Voting Equipment: Malfunctions during advance or special voting days | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |
| 8 | Voting Equipment: Malfunctions during pre-election Logic and Accuracy testing | Diagnostic testing | Deploy spare voting equipment |
| 9 | Voting Equipment: Malfunctions during post-election Logic and Accuracy testing | Diagnostic testing Pre-election Logic and Accuracy testing | Deploy spare voting equipment |

*Programming and Configuration Failures*

Programming and configuration failures are most likely to occur during the configuration phase (pre-election). Preventative measures include testing configurations and programming prior to delivery to the customer. For example, ballots are tested after printing to ensure that the voting equipment is able to gather the appropriate information from the ballot. These testing steps are implemented so if an error is discovered they can be corrected as part of the recovery strategy. The recovery strategy for this type of failure, involves determining the error and rectifying it immediately. The preventative steps are put in place, so errors can be detected and the recovery strategy may be implemented in a timely manner.

| ID | Description of Risk | Preventative Measures | Recovery Strategy |
|---|---|---|---|
| 10 | Error during memory card and security key programming | Tested prior to being sent to {client name} | Determine error and correct; reprogram cards |
| 11 | Unable to collect pronunciation of candidate and party names through normal process | Software/Process already been used in the past to collect this info | Determine error and correct |
| 12 | Ballots generated incorrectly | Tested prior to printing | Determine error and correct |
| 13 | Ballots printed incorrectly | Tested after being printed | Determine error and correct; reprint ballots |

*Service and Shipping Failures*

Please refer to the Service Level Agreement for detailed preventative measures and recovery strategies regarding the services provided by Dominion. Additional resources are available and factored in to the project plan for every Dominion project. In the event of a resource or delivery issue, for example, an employee taking leave during a project, additional resources are available

Appendix Page 707

to supplement the project and in turn to prevent or recover from a resource issue. All Dominion employees utilize the same standardized procedures and collaboration techniques to ensure a seamless transition in case of accident or other business continuity threat.

| ID | Description of Risk | Preventative Measures | Recovery Strategy |
|---|---|---|---|
| 14 | Model and Demonstration Units unavailable by requested Dates | Voting Equipment already manufactured and in-stock | Use Allotted Additional Resources |
| 15 | System equipment not shipped by time set out in the Project Plans | Voting Equipment already manufactured and in-stock. Have used same shipping company for past elections; | Use Allotted Additional Resources |
| 16 | Supplies not delivered to correct location/by time set out in the Project Plans/ contract agreement | Most Supplies already manufactured and in-stock. Have used same shipping company for past elections; | Use Allotted Additional Resources |
| 17 | Error in shipping results in system equipment not arriving at appropriate location | Have used same shipping company for past elections; never encountered this issue | Send another shipment with different shipping company |
| 18 | Shipment handling resulting in damage to system equipment | Have used same shipping company for past elections; never encountered this issue | Send another shipment with different shipping company |
| 19 | Unable to supply personnel for on-site support | Always schedule back-up personnel for on-site support | Use Allotted Additional Resources |
| 20 | Unable to perform training on date set out in Election Calendar | Always schedule back-up personnel for on-site training | Use Allotted Additional Resources |
| 21 | Issue in travel resulting in trainer unable to make training date/location | Never encountered this issue in past elections; always schedule travel ahead of training session to prevent these issues | Use Allotted Additional Resources |

*Power Failures*

In the event of a power failure, the voting equipment is configured to maintain the integrity of Election Day results.  The battery power supplied to the vote tabulator provides sufficient time to properly power-down the unit and protect the integrity of the results.  If the battery discharges prior to a proper power-down, the results will remain stored in the memory cards, unchanged by the improper power down.

| ID | Description of Risk | Preventative Measures | Recovery Strategy |
|---|---|---|---|
| 24 | Power failure resulting in call center being unreachable | Ensure other support locations are available | Route all calls and communications to alternate support location |
| 25 | Call center overloaded/network failure resulting in delay in return of calls/unreachable | Ensure other support locations are available | Route calls and communications to alternate support location |
| 26 | Network Failure during Ballot Generation | Generate Copies | Deploy Copy |
| 27 | Power Failure  during Ballot Generation | Generate Copies | Deploy Copy |
| 28 | Power Failure  on Election Day | Backup Battery in Voting Equipment | Shut down voting equipment.  Use auxiliary port on ballot box. |

Escalation Process

*Contact Details*

In the event of any type of disaster, the Vendor Delivery Manager will be the primary point of contact.  The primary contact will have access to key resources on the Dominion Project teams as well as product and technical specialists and will be responsible for coordination of all recovery strategies.

*Escalation Chain of Command*

If during the recovery period the primary contact is not available, the following Dominion representatives should be contacted in the listed order below:

**Primary Contact:**  Project Manager
**Secondary Contact:**  Executive Sponsor
**Tertiary Contact:**  President of Dominion Voting

Appendix Page 709

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et at.,
Plaintiff(s),

v.

DOMINION VOTING SYSTEMS INC., et al.
Defendants.

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT FACEBOOK'S MOTION TO DISMISS

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Response and Brief in Opposition to Facebook, Inc.'s Motion to Dismiss [Doc. 23], and hereby respectfully requests that the motions be denied or, in the alternative, determined to be moot, for the reasons set forth below.

### INTRODUCTION

This case seeks redress for violations of the Civil Rights of all registered voters in America, resulting from the actions of key players who participated in the administration of the 2020 Presidential election. The actions of Defendants, including Facebook, have left the American people still questioning the integrity of the recent Presidential, even several months after the transition to a new executive administration.

The damages to the Plaintiffs, and to those similarly situated, were caused by the immense power of Facebook, its Chief Executive Officer (CEO), Defendant, Mark Zuckerberg (Zuckerberg), and the influence their unchallenged monopoly brought to bear on the entire Presidential election process—which continues, and is not going away.

1

Facebook wrongly casts Plaintiffs' claims as "the latest in a series of failed attempts to overturn the 2020 Presidential election." The Plaintiffs have made no such request, and have not asked for such extraordinary relief. The Plaintiff's filed their complaint on December 22, 2020. At no time during the electoral process have the Plaintiffs moved the Court for a restraining order, nor have they requested an order to have a State to do this, or that. Nonetheless, States, like Texas, have put together lengthy and well researched pleadings for filing in the Supreme Court of the United States, which have outlined with specificity a long list of constitutional right violations, listing the individual actors, by name. Most of them are Defendants in this lawsuit.

Instead, Plaintiffs individually, and collectively as the people, claim violations of their civil rights, and seek damages to be determined at trial—even if nominal—for the injuries caused by the Defendants. These Defendants have a right to engage in discovery, and investigate, with their counsel as a private attorney general, the conduct and actions directed at the election machinery in the United States.

An obvious conspiracy existed among Defendants, Zuckerberg, Facebook and the Center for Tech and Civic Life (CTCL). The Plaintiffs complaint lays out in detail, the when, where, who, how and why of the whole operation. It started when the pandemic struck (or before). Zuckerberg donated close to $400 million dollars to certain non-profits organizations, the bulk of which went to CTCL. Millions of dollars in grants were given to counties and municipalities, in many states, much of which for the increased costs of running a safe, local election. No one objects to that. No one objects to voter registration drives. Everybody loves the Rock the Vote campaign. However, when private organizations work with local governments to place ballot drop boxes in primarily urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail—the philanthropy quickly turns into state action.

2

How many ballots do these drop boxes hold? Are they monitored? What stops a person from just stuffing that drop box full of fake ballots. If a person did that through the U.S. Mail, it would be scanned and detected. These programs promoted, paid, planned and encouraged voters to use these illegal drop boxes. Most importantly, who picks up and handles the ballots? A city worker? That's not the Post Office, or a sworn election official. This activity goes to the heart of our democratic process. Further, a finding of state action infers no wrongdoing, but at least the conduct of a party can be legally decided within the proper constitutional framework.

The Constitution guarantees a republican form of government. U.S. Constitution, Art. IV. As averred in the Complaint, the people thus have the power to enforce the Constitution, when necessary, and appropriate. Here, an action lies against *any* two parties that conspire to injure, oppress, threaten or intimidate any person in the free exercise or enjoyment of *any* right secured to him/her by the Constitution or laws of the United States, enforceable through the Civil Rights Act, codified by Title 42, §§ 1981 through 1986; and, through the Civil RICO laws, codified at Title 18, §§ 1961, 1962 and 1964.

Notably, Facebook and its CEO, Zuckerberg, played a vital role in a secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media information censorship, propaganda, media manipulation, and lawsuit suppression through the use of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.[1]

---

[1] *See* Molly Ball, *The Secret History of the Shadow Campaign that Saved the 2020 Election*, TIME, Feb. 4, 2021 https://time.com/5936036/secret-2020-election-campaign/.

3

Facebook's actions were directly and indirectly intertwined with several aspects of the plot, allowing it to exercise control and influence at a level equivalent to state action. All of this worked to the detriment of the Plaintiffs' right to vote in a free and fair Presidential election, along with every other voter in America. The right to vote for the President and Vice President, once granted, is individualized and protected by the Constitution. TIME Magazine doesn't print conspiracy theories, unless they're true.

Essential to the overall strategy was the dedication by Zuckerberg of 99% of his compensation received from his Facebook, alter-ego monopoly. He then directed money to non-profit, alter-egos, created and/or funded for the purpose of carrying out the implementation of the enterprise's master plan—all under cover of the COVID-19 crisis, yet directed at the election.

Facebook, Zuckerberg, and a large number of co-conspirators, funded and set into motion a dramatic increase in the number of absentee and mail-in ballots, and decreased the level of scrutiny the ballots received.[2]  The scheme and device, directed at the election machinery, needed a coordinated message and media subterfuge, Hundreds of Millions of Dollars (equal to or in excess of what the federal government allocated to all the States under its COVID-19 funding), and a network of progressives to make it work.[3]  Facebook is structured for that role, as a part of  Zuckerberg's anti-competitive[4] monopoly, which has the social-media horsepower to achieve the successful implementation of the enterprise's agenda.

Facebook is liable for violation of Plaintiffs' constitutional rights as a state actor, *and* as the administrator of a Public Forum exercising control and impairment by non-governmental

---

[2] *See* Peter Navarro, *The Art of the Steal, Volume Two of the Navarro Report* (Jan. 5, 2021).
[3] *See* Molly Ball, *The Secret History of the Shadow Campaign that Saved the 2020 Election*, TIME, Feb. 4, 202, *supra*.
[4] *See FTC v. Facebook Inc*, 1:20-cv-03590, Doc. 51, p. 3, ¶ 9.

discrimination, under color of state law.  *See* 42 U.S.C. § 1981(c) — Protection against

Impairment. Facebook, acting through and with Defendants, Zuckerberg, Priscilla Chan and

CTCL, established a sufficiently close nexus with an essential and exclusive function of

government, i.e., election administration. Under the shroud of "COVID" related grants, directed

exclusively at the election machinery, specifically to cloak Facebook, Zuckerberg, Chan and

CTCL from State election funding laws, and its role as a state actor.

Regardless, Facebook is liable as a participant in the enterprise, that engaged in

racketeering activity, designed to unconstitutionally impact the outcome of the 2020 Presidential

election. To do this, the enterprise needed to disseminate a public narrative, through exclusive

partnerships with fact-checking and other censorship enterprise participants. This conduct is

subject to regulation under the commerce clause, and does not require state action to trigger this

Court's subject matter jurisdiction.

Facebook argues that it should not be accountable for its mass censorship because it is

protected by 47 U.S.C. § 230. However, the Plaintiffs have challenged the constitutionality of

Section 230, as applied to Facebook.  Section 230 does not permit the Facebook monopoly to

publish its own progressive political ideology and content, through its enterprise partnerships—

while blocking, fact-checking, and labeling dissenting political speech under a false

determination as "misinformation," or as "lewd, lascivious, filthy, and obscene."

These designations were adopted by Congress in 1996 to control pornographic content,

not constitutionally protected political speech.  Even if Section 230 is constitutional as applied,

Facebook must be denied any safe-harbor protections, as its censorship was not done in *good

faith*, as mandated by Section 230, when directed at political opponents of the enterprise.

5

Facebook also claims various pleadings flaws by Plaintiffs. However, Facebook chose to proceed with its motion, despite Plaintiffs' offer to amend their Complaint to clarify their claims and add more specific evidence to rectify any alleged deficiencies. In that regard, the Plaintiffs are close to filing their first amended complaint, as soon as these necessary responses have been filed. Certainly, any ambiguity in the record, and all factual inferences should be construed in Plaintiffs' favor, until discovery has been completed. Fed. R. Civ. Pro. 12(b)(6) and 12(f).

Plaintiffs have invoked the constitutional authority of this Court to vindicate their rights, under the provisions of the Civil Rights Act, which preserves the right to sue and to give evidence, to the full and equal benefit of all laws and proceedings for the security of persons and property. 42 U.S.C. § 1981(a).

## BACKGROUND

Facebook has dominated the social media universe, and the Federal Trade Commission (FTC), and 46 States, all of whom have sued Facebook, agree:

> Facebook is the world's dominant personal social networking service and has monopoly power in a market for personal social networking services.  This unmatched position has provided Facebook with staggering profits. Last year alone, Facebook generated revenues of more than $70 billion and profits of more than $18.5 billion.[5]

Facebooks dominance has virtual full control over America's online interactivity:

> If those who don't like a particular platforms censorship rules could go elsewhere to express their views . . . , they can't.  YouTube dominates video platforms, Facebook dominates social platforms, Amazon dominates online book sales, etc. Thanks to network effects, *if you want to spread your views by book, by video, or by social media post, you have to use their platforms and live with their censorship regimes.*[6] [Emphasis added].

---

[5] *See FTC Sues Facebook for Illegal Monopolization*, FTC Press Release (Dec. 9, 2020) https://www.ftc.gov/news-events/press-releases/2020/12/ftc-sues-facebook-illegal-monopolization. *See also* Kelly Anne Smith, *What You Need to Know About the Facebook Antitrust Lawsuit*, Forbes Advisor (Jan. 28, 2021) https://www.forbes.com/advisor/investing/facebook-antitrust-lawsuit/.
[6] *See* Stewart Baker, *What Should We Do About Section 230?*, Reason (Feb. 20, 2020) https://reason.com/volokh/2020/02/20/what-should-we-do-about-section-230/.

The anti-competitive monopoly, as outlined by the FTC, allows Facebook to eliminate any other competitive social media platforms, allowing it to monetize Section 230 on behalf of the government, and has developed a "censorship industry" focusing its control over the Public Forum[7], and in support of the progressive enterprise which it partakes.

Speech in public forums in the purely physical, not cyberspace, was typically subject to time, place, and manner regulations that take into account control, traffic and scheduling of two meetings or demonstrations at the same time and place, the preventing of blockages of building entrances, and the like.[8] Such regulations are closely scrutinized in order to protect free expression, and, to be valid, must be justified without reference to the content or subject matter of speech,[9] must serve a significant governmental interest, and *must leave open ample alternative channels for communication of the information. ISKCON*, 452 U.S. at 650, 654-55. *See also Consolidated Edison Co. v. PSC*, 447 U.S. 530, 535 (1980).

Facebook's anti-competitive ideology leaves no alternative channels for communication of the social media platform finding that it is "better to buy than compete."[10] Facebook and other tech titans and business leaders, Amazon, Google, and Apple, have used their influence, control and monopoly to destroy other platforms that tried to take the overflow of censored conservative political voices.[11] They did so by attempting to label all conservative viewpoints as "conspiracy-theories," describing practically anyone who objects as a "right-wing activist."

---

[7] *See* A Comprehensive Review of the "Public Forum", Cornell Law, U.S. Constitution Annotated at: https://www.law.cornell.edu/constitution-conan/amendment-1/the-public-forum#fn1465amd1.

[8] *See, e.g.*, Heffron v. ISKCON, 452 U.S. 640, 647–50 (1981).

[9] *See Niemotko v. Maryland*, 340 U.S. 268 (1951). *See also Police Dep't of Chicago v. Mosle* 408 U.S. 92 (1972).

[10] *FTC v. Facebook*, 1:20-cv-03590 (Doc. 51), p. 2, ¶ 5.

[11] Chris Smith, Conservative Social Network Parler Taken Offline By Amazon Ban, MSN, Jan. 11, 2021 https://www.msn.com/en-us/news/technology/conservative-social-network-parler-taken-offline-by-amazon-ban/ar-BB1cEvH2.

Facebook's monopoly of the Public Social Media Forum has created enormous wealth

that it wields against any business, *or political* foe. Facebook has been censoring conservative

political viewpoints for years, governed only by complex, self-serving and self-written "rules."

Over a year ago, *The New York Times* reported:

> *The Times* described a global network with more than 15,000 employees assessing
> content based on rulebooks more than 1,400 pages long.  The rules secretly
> designate groups as hate organizations and are so specific they even ban certain
> emoji use.  Hate speech mandates alone run "200 jargon-filled, head-spinning
> pages," wrote *The Times*.  *The result is chaos.  There's no consistency in what
> Facebook bans or doesn't ban — except that conservatives suffer*. Pro-life, pro-
> gun and pro-Trump content all run afoul of Facebook's eager hate speech censors.
> Just days before the annual March for Life, Facebook blocked advertising for the
> new pro-life movie "*Roe v. Wade*."[12] [Emphasis added].

In April 2018, Facebook's secret rules were finally revealed.[13]  But in advance of the

2020 election, Facebook began a systematic plan to increase censorship to stifle opposing

viewpoints, and shape election information to align with its preferred narrative.[14] Leading up to the

2020 Presidential election, Facebook exercised its dominance and increased its control over the

flow of information across its platforms.

---

[12] L. Brent Bozell III, *Facebook Doesn't Really Believe in Free Speech.  What They Believe in
(and Actively Practice) is censorship*, FoxNews (Jan. 22, 2019)
https://www.foxnews.com/opinion/facebook-doesnt-really-believe-in-free-speech-what-they-
believe-in-and-actively-practice-is-censorship.
[13] Todd Haselton, *Here's Facebook's Once-Secret List of Content That Can Get You Banned*,
CNBC (Apr. 24, 2018) https://www.cnbc.com/2018/04/24/facebook-content-that-gets-you-
banned-according-to-community-standards.html.
[14] *See* M. Dowling, *Facebook Prepares for 2020 with Pathetic New Censorship Rules*,
Independent Sentinel (July 3, 2019) (https://www.independentsentinel.com/facebook-prepares-
for-2020-with-pathetic-new-censorship-rules/.

In January 2020, Facebook began censoring information it believed would "delegitimize the US election"[15] Facebook's political ideology and monoculture were weaponized against their political opponents, all under the alleged safe harbor of Section 230.

In June 2020, Facebook accelerated its crackdown on opposing viewpoints:

'We're going to start labeling content that we find newsworthy that might otherwise violate our policies,' [Zuckerberg] said. 'There's no newsworthy exemption to content that incites violence or suppresses voting . . . even if a politician or government official says it. If we determine the content may lead to violence or deprive people of their right to vote, were going to take that content down no matter who says it.'[16]

By September 2020, Facebook had implemented even more drastic censorship rules "to help secure the integrity of the US elections" before, during, and after the election.[17] Defendant Zuckerberg announced he was concerned about "the challenges people could face when voting," and was "worried that with our nation so divided and election results potentially taking days or even weeks to be finalized, there could be an increased risk of civil unrest across the country."[18]

Zuckerberg asserted that Facebook's censorship regime was needed to protect "our democracy" by "*helping people register and vote,*" "clearing up confusion" about the elections, and "taking steps to reduce the chances of violence and unrest."[19] The agenda of the enterprise was not to help all voters, just the voters in support of the enterprise's preferred candidates.

---

[15] Aditya Sharma, *Facebook Bans US Ads that Claim Widespread Voting Fraud Ahead of Election*, DW (Jan. 10, 2020) https://www.dw.com/en/facebook-bans-us-ads-that-claim-widespread-voting-fraud-ahead-of-election/a-55113285.
[16] Andrea Morris, *Facebook Launches New Censorship Plan, Employees Reveal Anti-Conservative, Anti-Trump Agenda*, CBN News (Jun. 27, 2020) https://www1.cbn.com/cbnnews/us/2020/june/facebook-announces-new-censorship-plan-as-employees-reveal-their-anti-conservative-anti-trump-agenda.
[17] Kevin Reed, *Facebook Announces Political Censorship Plan in Advance of US Presidential Election*, World Socialist Web Site (Sept. 7, 2020) https://www.wsws.org/en/articles/2020/09/07/face-s07.html.
[18] *Id*.
[19] *Id*.

Within weeks, Facebook announced additional bans on actual evidence of election fraud:

Rob Leathern, Facebook director of product management, said the policy applies to any ads that make false claims *about voting by mail or other methods of voting.* It also *bans the use of isolated incidents of voter fraud* to discredit the result of an election.[20] [Emphasis added].

Facebook's censorship also extended to significant news stories appearing in advance of the Presidential election that were negative towards Facebook and Zuckerberg's preferred candidate.[21] Internal whistleblowers within Facebook have revealed their own "shame" for censoring negative news, and exclaimed, "Facebook is almost an arm of the Democratic Party—an arm of the far-left wing of the Democratic Party."[22] Importantly, post-election polling revealed that 82% of President Biden supporters in battleground states being unaware of at least one of eight significant election-related news stories—with 17% of them stating that they would have changed their vote if they had been aware of one of these stories.[23]

Facebook increased censorship after the 2020 Presidential election, as well, announcing within days that it would demote content "our systems predict may be misinformation" relating to election fraud.[24]

---

[20] Jessica Guynn, *Facebook Bans Ads That Seek to Delegitimize the Election or Make False Claims About Voting*, USA Today (Sep. 30, 2020)

[21] *See* Noah Manskar, *Facebook Limits Spread of The Post's Hunter Biden Expose*, New York Post (October 14, 2020) https://nypost.com/2020/10/14/facebook-limits-spread-of-the-posts-hunter-biden-expose/.

[22] Sohrab Ahmari, *Facebook Workers 'Ashamed' By Tech Giant's Censorship of Post's Hunter Files Reporting*, New York Post (October 19, 2020) https://nypost.com/2020/10/19/facebook-workers-ashamed-by-tech-giants-censorship-of-posts-reporting/.

[23] *See* Alexander Watson, *Poll Shows Media Censorship Cheated Voters of Vital Info, Robbed Trump of Second Term*, CNS News (Nov. 24, 2020) https://www.cnsnews.com/article/national/alexander-watson/poll-shows-media-censorship-cheated-voters-vital-info-robbed. *See also* Frank Salvato, *Facebook Engaged 'Emergency' Conservative Censorship Post-Election*, National File (Nov. 26, 2020).

[24] Lucas Nolan, *Facebook Censorship: Platform Will 'Temporarily Demote' Posts that Share 'Election Misinformation,'* Breitbart (Nov. 6, 2020). https://www.breitbart.com/tech/2020/11/06/facebook-censorship-platform-will-temporarily-demote-posts-that-share-election-misinformation/.

For example, *American Thinker* detailed being censored and "fact checked" by Facebook
for a video posted to Rumble titled "*Smoking Gun: ES&S Transferring Vote Ratios Between
Precincts in PA.*"[25]  Further, Facebook routinely censored the President of the United States.[26]

Even more insidious:

> [Facebook] made an 'emergency change' to its algorithm to suppress news
> sources that were spreading what the company believed to be 'election
> misinformation' [using] a 'secret internal ranking' of publishers that Facebook
> created based on 'signals about the quality of their journalism.'[27]

Facebook expanded its censorship to include all content that even mentioned certain
words or phrases.[28]  This wove Facebook's electronic tentacles deeper into the election. All this,
while Zuckerberg used his enormous wealth to fund his alter ego, non-profit organizations,
namely, CTCL. Through cooperation with numerous municipalities and counties, all outlined in
the Complaint, CTCL funded and participated in specific precincts in key swing states. Although
CTCL's contribution to local communities was proposed as COVID relief funding, a substantial
portion of the funding was directed at the election machinery. The Complaint outlines the time
frame, locations, actions, identity of other state actors, and specific conduct of Facebook,
Zuckerberg and CTCL. All of it is supported by the public record and none of it is in dispute.

---

[25] *See* Andrea Widburg, *Facebook is Censoring Information About the Election*, American
Thinker (Dec. 1, 2020)
https://www.americanthinker.com/blog/2020/12/facebook_is_censoring_information_about_the_
election.html.
[26] *See* Ella Kietlinska, *Twitter, Facebook Censor Trump's Post About Election*, The Epoch Times
(Nov. 8, 2020).
[27] Phil Shiver, *Report: Facebook Hatched 'Emergency' Plan Using 'Secret Internal Ranking' to
Suppress 'Right-Wing' News Sources Post-Election*, Blaze Media (Nov. 25, 2020)
https://www.theblaze.com/news/facebook-post-election-censorship-plan.
[28] *See, e.g.*, Janita Kan, *Facebook to Remove All Content That Mentions 'Stop the Steal' Ahead
of Inauguration*, The Epoch Times (Jan. 11, 2021).

## STANDARD OF REVIEW

A sufficiently stated claim need only present sufficient facts that, when accepted as true,

plausibly state a valid claim:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable* for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, ____ (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, _____ (2007)) (emphasis added).

The Federal Rules embody "notice pleading" and require only a concise statement of

claim. Thus, dismissal under Rule 12(b)(6) is proper only when the complaint lacks a cognizable

legal theory or does not allege facts that, when taken as a whole, raise the claim for relief above

mere speculation. *Id.* at 555-556.

As the 10th Circuit explained, "the complaint must give the court reason to believe that

*this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at

Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis in original).

## ARGUMENT

## I.      PLAINTIFFS PROPERLY ALLEGE CLAIMS AGAINST FACEBOOK

### A.      Section 230 Does Not Shield Facebook from Liability

Facebook believes that they possess a "license to censor with impunity,"[29] and hides

behind  Section 230 to shield its unlawful censorship. The level of censorship has dramatically

increased since the start of the 2020 Presidential election, and the damage being done is

compounding:

---

[29] Philip Hamburber, *The Constitution Can Crack Section 230*, Wall Street Journal (Jan. 29, 2021).

Relying on [Section 230], tech companies including Google and Twitter increasingly pull the plug on disfavored posts, websites and even people. Online moderation can be valuable, *but this censorship is different. It harms Americans' livelihoods, muzzles them in the increasingly electronic public square, distorts political and cultural conversations, influences elections, and limits our freedom to sort out the truth for ourselves.*[30][Emphasis added].

Section 230 shields an interactive computer service, "Good Samaritan." from liability:

[For] any action voluntarily *taken in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*, whether or not such material is *constitutionally protected*.

47 U.S.C §230(c)(2)(A).

Section 230 is unconstitutional, on its face and as applied by Facebook, and cannot survive the strict scrutiny that must be applied. Further, even if determined constitutional, Facebook cannot utilize Section 230 protection under these facts, because Facebook's censorship of politically dissenting speech was not done in good faith, and was directed at political opponents of the progressive enterprise.

### B. Section 230 Is Unconstitutional

Section 230 should be declared unconstitutional as it violates protections afforded under the First Amendment of the Constitution. However, the First Amendment severely limits the government's abilities to regulate political speech:

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation]. Although First Amendment protections are not confined to 'the exposition of ideas,' [Citation]. 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates. . . .' [Citation]. This no more than reflects our "profound national commitment to the principle that debate on public

---

[30] *Id.*

issues should be uninhibited, robust, and wide-open.' [Citation].  In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.  As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'

*Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976).

The Supreme Court in *Buckley* concluded that campaign expenditure limits were

unconstitutional, stating:

It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates.  The restrictions, while neutral as to the ideas expressed, limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'

*Id*. at 39 (*quoting Williams v. Rhodes*, 393 U. S. 23, 32 (1968)).

*Buckley* further clarified that speech should not be defined by the listener:

For the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application.  Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions.  Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.  In an analogous context, this Court…observed:

[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect.  No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation.  In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation *puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning*. Such a distinction offers no security for free discussion.  In these conditions it blankets with uncertainty whatever may be said.  *It compels the speaker to hedge and trim*.' [Emphasis added].

*Id*. at 42-43 (quoting *Thomas v. Collins,* 323 U.S. at 535).

As written, Section 230 encompasses an unconstitutionally broad swath of political speech because of the vagueness of its limits, specifically its applicability to whatever Facebook may deem "otherwise objectionable." "The use of so indefinite a phrase . . . fails to clearly mark the boundary between permissible and impermissible speech." *Id*. at 41.

Considering Section 230's enumeration of objectionable' material, the "vagueness of this term would be enough to make restrictions unconstitutional if Congress directly imposed it."[31] Clearly, Section 230 covers otherwise protected free speech, and states as much in the statute, which was primarily intended to limit pornography and lewd content.

Effectively, the Congress has privatized the regulation of free speech on social media platforms—a function the government could not do itself. This immunizes Facebook, and allows it to censor anything it deems objectionable. While this may not be as severe if applied to ordinary websites, because of Facebook's effective monopoly status, the potential for unconstitutional abuse is far greater:

> [T]he danger lies in the statutory protection for massive companies that are akin to common carriers and that function as public forums [like Facebook]. *The First Amendment protects Americans even in privately owned public forums*, such as company towns, and the law ordinarily obliges common carriers to *serve all customers* on terms that are *fair, reasonable and nondiscriminatory*.[32]

In *Marsh v. Alabama*, the Supreme Court held that residents of a company owned town possessed the same rights as those of a municipal town, even if the company:

> [o]wned all the homes, and all the stores, and all the streets, and all the sidewalks, all those owners together could not together have set up a municipal government with power to pass an ordinance completely barring the distribution of religious literature. [So then, *o]wnership does not always mean absolute dominion*. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Thus, the owners of privately held

---

[31] Philip Hamburger, *The Constitution Can Crack Section 230*, Wall Street Journal
[32] *Id*. [Emphasis added].

bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. *Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function*, it is subject to state regulation. [Emphasis added].

*Marsh v. Alabama*, 326 U.S. 501, 505-506 (1946) (citing *Republic Aviation Corp.* v. *Labor Board,* 324 U.S. 793, 798, 802, n. 8. (1945)).

In the United States, Facebook has become a virtual town square. Even though Facebook owns its platform, it was built for public use. Further, Facebook is more closely connected to the public as its users must interface with other Facebook users through end devices (i.e., computers or smartphones) not owned by Facebook. Facebook's platform is more analogous to phone use, where Facebook primarily allows connectivity to other users to permit communication and the exchange of information between users. No one could imagine a telephone carrier interrupting a phone call between users because it believed the content of the call was "otherwise objectionable" to it. Yet, Facebook's apps permit phone-like discussions and chat messaging. Facebook's extreme position would permit censorship of these activities as well.

Moreover, Section 230 unconstitutionally grants Facebook the power to regulate other businesses:

> The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental function, since, *in the very nature of things, one person may not be entrusted with the power to regulate the business of another, and especially of a competitor*. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. [Emphasis added].

*Carter v. Carter Coal Co.*, 298 US 238, 311-312 (1936)(citing *Schechter Corp. v. United States*, 295 U.S. 495, 537(1935)).

16

Section 230 cannot survive strict constitutional scrutiny afforded fundamental rights, particularly as applied here to Facebook, a de facto monopoly and online town square. Congress cannot grant to Facebook what it cannot do itself. As such, Section 230 must be declared unconstitutional.

### C.     Facebook Censorship Lacks Good Faith

Even if determined to be constitutional, Facebook should still be denied liability protection under Section 230 because Facebook's mass censorship of material on its platform was not done in good faith and as here was used in an unlawful manner in support of a RICO enterprise and the agenda of politically motivated participants. Examples of duplicity in application of standards by Facebook are too numerous to cite, but one of the more outrageous:

> Facebook flagged as 'hate speech' the Declaration of Independence on July 4th and pulled it down, until the backlash hit. The very document that gave birth to our nation---which then gave us free speech, which the big tech companies thrive on---was pulled as 'hate speech.' This example says it all.[33]

But, leading up to and following the 2020 election, Facebook censorship became totally arbitrary and capricious by censoring every opposing narrative and completely suspending user accounts, including the President of the United States.[34]

Importantly, questions of good faith are measured by the objective reasonableness of the official's conduct:

> The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. *Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be*

---

[33] Jerry Newcombe, *Social Media Censorship Is Out of Control*, The Christian Post (Aug. 30, 2018) https://www.christianpost.com/voices/social-media-facebook-google-censorship-out-of-control.html.

[34] *See* James Murphy, *Twitter and Facebook Censor President Trump by Suspending his Account*, The New American (Jan. 7, 2021) https://thenewamerican.com/twitter-and-facebook-censor-president-trump-by-suspending-his-accounts/.

*made to hesitate*; and a person who suffers injury caused by such conduct may
have a cause of action. [Emphasis added].

*Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982).

Here, the wholesale barring of information and entire accounts that *Facebook* deems

objectionable is a clear infringement of First Amendment rights. No reasonable official would

believe he could permanently silence a citizen, and certainly not the present leader of the United

States and Commander-in-Chief. Facebook's partisan censorship must be declared outside the

protections of Section 230 as lacking good faith, and in violation of Plaintiffs' First Amendment

rights.

### D. Facebook Became A State Actor Through Its Own Conduct

A § 1983 claim is only applicable to conduct occurring "under color of law." *Gallagher

v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1447 (10th Cir. 1995). The Supreme Court

developed several approaches to determine whether a private party engaged in State action:

> The Court has taken a flexible approach to the state action doctrine, applying a
> variety of tests to the facts of each case. In some instances, the Court has
> considered 'whether there is a sufficiently close nexus between the State and the
> challenged action of the regulated entity so that the action of the latter may be
> fairly treated as that of the State itself.' The Court has also inquired whether the
> State has "so far insinuated itself into a position of interdependence' with the
> private party that there is a 'symbiotic relationship' between them. In addition,
> the Court has held that if a private party is a "willful participant in joint activity
> with the State or its agents,' then state action is present. Finally, the Court has
> ruled that a private entity that exercises 'powers traditionally exclusively reserved
> to the State' is engaged in state action.

*Id*. at 1447.

A private party becomes a State actor if it assumes a traditionally State function:

> If the state delegates to a private party a function 'traditionally exclusively
> reserved to the State,' then the private party is necessarily a state actor.

*Id*. at 1456 (quoting *Jackson,* 419 U.S. at 352) (citing *Edmonson v. Leesville Concrete Co.,* 500
U.S. 614 (1991).

> Notably, election administration is one of the 'very few' such recognized State functions: This test is difficult to satisfy. 'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'[Citation]. Nevertheless, the Supreme Court has found some functions to satisfy this test. *These traditional state functions include administering elections of public officials.*[35]

*Id.*

Here, Facebook, together with Zuckerberg, Chan, and CTCL, established privatized election operations in key Democrat strongholds designed specifically to influence the 2020 Presidential election. The sinister approach of using the COVID-19 health crisis as the basis of the non-profit grant funding, while directing the use of the funding at the election machinery, was unlawful, as described in the Complaint. This effort was far more than basic assistance with funding for PPE and election office supplies. Zuckerberg and Chan funneled Hundreds of Millions of Dollars of their personal wealth, obtained from their alter ego Facebook, to fund and equip CTCL to direct local governments through grant funding contracts. These grants were used to make specific purchases of voting machines, placement of private ballot collection boxes, printing and mailing extra ballots, developing voting propaganda, recruiting potential voters, and hiring and training staff in select communities.[36] Some communities received more private grant funding than their entire 2020 budget.[37]

Through funding agreements other state actors, CTCL used Zuckerberg's money, and Facebook's technical know-how, to assume a primary role in the administration of select elections in key precincts around the county, a function exclusively reserved to the State.

---

[35] *Id.* (citing *Terry v. Adams,* 345 U.S. 461, 468-70 (1953)) (emphasis added)
[36] *See* Geoff Hing, Sabby Robinson, Tom Scheck, and Gracie Stockton, *How Private Money Helped Save the Election*, APM Reports (December 7, 2020) https://www.apmreports.org/story/2020/12/07/private-grant-money-chan-zuckerburg-election.
[37] *Id.*

### E.     Enterprise Racketeering Activity Requires No State Action

The Plaintiffs have added claims for racketeering in their amended complaint. As a core

funding participant in Defendants' racketeering activity through the enterprise, Facebook is not

required to be a state actor.  Defendant Facebook played, and continues to play an integral role in

certain Defendants' racketeering activities to influence to 2020 Presidential election. Through

censorship, Facebook is a part of the enterprise, able to control the narrative available for public

consumption on its platform—before and after the election.  Through cash and in-kind

contributions, Facebook further enabled the effective privatization of election precincts in

Democrat strongholds.  As such, Facebook's liability under 18 U.S.C §1962 remains, whether or

not it is considered a state actor.

### F.     Facebook Is The Alter-Ego of Zuckerberg and Chan

Facebook operates globally from its headquarters in California, and is the alter ego of its

CEO Zuckerberg, and the latter's ideology and political agenda.  Zuckerberg and Chan have

pledged 99% of all their value received to their charitable alter egos, from and through which

they execute their agenda and that of the enterprise.

The fact the FTC recognizes that Facebook operates under the anti-competitive and

ideological control of its CEO, Zuckerberg, leaves little doubt that Zuckerberg and Facebook are

united. Defendant Zuckerberg is in complete control of the technology and direction of

Facebook.  As one of the wealthiest individuals in America, Zuckerberg has no need for the

money generated from his ownership. It is the control of how Facebook is used by Zuckerberg

that continues to drive the corporation's actions, both in the business sector and political realms.

As well documented by the FTC, Facebook and its monopoly wields so much enormous power

and influence that it must be dismantled.

The same applies to its political influence and Zuckerberg's use to Facebook to implement the racketeering activities that spawn from its enormous platform. The participation of Facebook in the activities of the enterprise confirms Zuckerberg's use of the media giant for a wrongful purpose, injurious to the Plaintiffs, and all others similarly situated.

### G. Facebook Fundamentally Mischaracterizes Plaintiffs' Claims

Facebook erroneously believes this case is "the latest in a series of failed attempts to overturn the 2020 Presidential election." Although the evidence presented in these election challenge lawsuits is certainly relevant to Plaintiffs' claims, Plaintiffs do not present the same claims as these election challenge lawsuits, nor do Plaintiffs seek to overturn the Presidential election. More importantly, none of the election challenge lawsuits noted by Facebook have made sufficient findings of fact and law, concerning the issues, herein.

### H. The Plaintiffs Have Standing to Bring Claims Under the Civil Rights Act

A § 1983 claim requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

All qualified voters have a constitutionally protected right to vote. *ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the

Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

The national interest in this election outweighs that of any one State. There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975).

Moreover, the Plaintiffs have suffered a particularized injury-in-fact. Every constitutional right violation infers a damage. "Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Carey v. Piphus*, 435 U.S. 247, 255 (1978). The legislative history of § 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

### I.    The Civil Rights Of All Members Of The Class Have Been Violated

While all Americans have been deprived of the appearance of a fair election, the "general interest of the members of the public" differs considerably, as only registered voters have had their rights infringed.  Only registered voters were qualified and could legally participate in the election.  Those who were registered exercised their right to cast a ballot for one candidate or the other (or neither), while members of public were mere observers.  As such, it is not simply a "generalized grievance." Here, every registered voter was deprived of a fair and legitimate process administered by the relevant state actors.  Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes

22

do not matter, thereby diminishing the perceived present value of the right to vote in future

elections and suppressing subsequent voter turnout.  Registered voters have been subjected to

tumult, mental anguish and division for months. These injuries are bipartisan, and have been

suffered by all registered voters regardless of whom their vote was cast.  Although some

registered voters may be content that the candidate of their choice was certified as the winner,

questionable election integrity impacts all registered voters.

These injuries are not speculative.  Although the outcome of the election cannot be

changed, the appearance of a fair election is in serious question.  Fair elections are open and

transparent, not driven by private, billionaires and their gigantic, multi-media companies. When

a nation, founded upon equal station and a one person, one vote guarantee as a republican form

of government can fall prey to a "cabal" of well-funded actors seeking to use technology to

change the outcome of an election, oversight and transparency must prevail.

### J.       Plaintiffs' Claims Are Redressable

Plaintiffs have alleged claims of violations of their Civil Rights, and are seeking nominal

damages for these infringements.  Just yesterday, the Supreme Court reaffirmed the sufficiency

of pleading nominal damages for Civil Rights violations. "A request for nominal damages

satisfies the redressability element necessary for Article III standing where a plaintiff's claim is

based on a completed violation of a legal right.". *Uzuegbunam v. Preczewski*, 592 U.S._____

(Mar. 8, 2021)(slip op. at 2).

### II.      VENUE IS PROPER AND THIS COURT HAS PERSONAL
###          JURISDICTION OVER FACEBOOK

### A.       Minimal Contacts

It is inconceivable to assert that Facebook fails to satisfy the minimum contacts standard

within the forum. Certain Plaintiffs are located within the District of Colorado, and most of the

Plaintiffs and class members currently use Facebook services, have been targeted as users, have been shadow banned by Facebook or other members of the enterprise, or have been injured through the bad faith censorship of important content. Facebook undoubtedly services millions of users in the District of Colorado, has significant contacts, and has taken affirmative action to register to do business in the State.

Facebook's newly established "censorship industry" created as another arm and division of the enterprise, acting through its partnership with fact-checking entities such as LEAD STORIES, LLC, a Colorado Limited Liability Company (Lead Stories). This creates layers of integrated censorship agents, and contacts relevant to its actions taking place in Colorado. Facebook defines Lead Stories as a "Facebook Third Party Fact-Checking Partner."

Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional conceptions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945).

Where a defendant deliberately engages in significant activities within a state, purposely availing itself of the privilege of conducting business there, it is presumptively reasonable to require that defendant "submit to the burdens of litigation in that forum as well." *Burger King v. Rudzewicz*, 471 U.S. 462, 475-476 (1985).

In such instances, "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being hauled into court there." *Id.* at 474 (*citing World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Applying the "minimum contacts" analysis, a court may obtain either general or specific jurisdiction over a defendant. If the defendant's activities in the forum are substantial, continuous and systematic, general jurisdiction

24

is available; in other words, the foreign defendant is subject to suit even on matters unrelated to

his or her contacts to the forum. *Perkins v. Benguet Consolidated Mining Co*., 342 U.S. 437, 446

(1952).

A court may exercise specific jurisdiction over a foreign defendant if his or her less

substantial contacts with the forum give rise to the cause of action before the court. The question

is "whether the cause of action arises out of or has a substantial connection with that activity."

*Hanson v. Denckla*, 357 U.S. 235, 250-253 (1958)

Facebook maintains a registered agent for service of process listed as Corporation Service

Company. Additionally, Facebook has filed a Statement of Foreign Entity Authority under

registration number 20171961374, in anticipation of doing substantial business in or having

minimal contacts with users in Colorado.

## CONCLUSION

For the reasons above, the Plaintiffs respectfully requests that this Court deny Defendant

Facebook's motion to dismiss, or, in the alternative deny the Defendant's motion as moot, in

light of the Plaintiff's filing of their Amended Complaint.


Respectfully submitted this 9th day of March, 2021.


By:     *s/ Gary D. Fielder*
        Gary D. Fielder  (CO 19757)
        LAW OFFICE OF GARY FIELDER
        1444 Stuart St.
        Denver, CO 80204
        (720) 306-0007
        gary@fielderlaw.net

By:      *s/Ernest J. Walker*
         Ernest J. Walker (MI P58635)
         ERNEST J. WALKER LAW OFFICE
         1444 Stuart St.
         Denver, CO 80204
         (720) 306-0007
         ernestjwalker@gmail.com


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 10th, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747-NRN

KEVIN O'ROURKE, NATHANIEL L. CARTER, LORI CUTUNILLI, LARRY D. COOK, ALVIN CRISWELL, KESHA CRENSHAW, NEIL YARBROUGH, and AMIE TRAPP,

        Plaintiffs, on their own behalf and of a class of similarly situated persons,

   v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation, FACEBOOK, INC., a Delaware corporation, CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization, MARK E. ZUCKERBERG, individually, PRISCILLA CHAN, individually, BRIAN KEMP, individually, BRAD RAFFENSPERGER, individually, GRETCHEN WHITMER, individually, JOCELYN BENSON, individually, TOM WOLF, individually, KATHY BOOCKVAR, individually, TONY EVERS, individually, ANN S. JACOBS, individually, MARK L. THOMSEN, individually, MARGE BOSTELMAN, individually, JULIE M. GLANCEY, DEAN KNUDSON, individually, ROBERT F. SPINDELL, Jr., individually, and DOES 1-10,000,

        Defendants.

---

## DEFENDANT CENTER FOR TECH AND CIVIC LIFE'S MOTION TO DISMISS

---

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT ........................................................................................................................ 3

I.      Plaintiffs lack Article III standing.......................................................................... 4

        A.      Plaintiffs do not allege an injury-in-fact. ................................................. 4

        B.      Any asserted injury-in-fact is not fairly traceable to CTCL's
                actions. ...................................................................................................... 7

        C.      Plaintiffs fail to allege redressability. ...................................................... 7

II.     The Complaint fails to state a claim. ...................................................................... 8

        A.      The Complaint fails to state a claim under § 1983. .................................. 8

                1.      Plaintiffs do not allege state action. .............................................. 8

                2.      Plaintiffs do not allege a constitutional violation. ...................... 10

        B.      The Complaint fails to state a claim under any of the other statutes
                cited........................................................................................................... 13

CONCLUSION.................................................................................................................... 14

CERTIFICATE OF SERVICE ........................................................................................... 15

Appendix Page 737

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of New Mexico v. Santillanes*,
    546 F.3d 1313 (10th Cir. 2008) ............................................................. 11

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ................................................................................ 7

*Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1,*
    859 F.3d 1243 (10th Cir. 2017) ........................................................... 4

*Bognet v. Sec'y of Commonwealth of Pa.*,
    980 F.3d 336 (3d Cir. 2020) .................................................. 5, 6, 7, 11

*Bowyer v. Ducey*,
    No. 20 Civ. 2321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020) .......................... 6, 12

*Brereton v. Bountiful City Corp.*,
    434 F.3d 1213 (10th Cir. 2006) ........................................................... 14

*Brown v. Reardon*,
    770 F.2d 896 (10th Cir. 1985) ............................................................. 13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................. 8

*Crissman v. Dover Downs Entm't Inc.*,
    289 F.3d 231 (3d Cir. 2002) ................................................................. 9

*Donald J. Trump for President, Inc. v. Boockvar*,
    No. 20 Civ. 966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) .............................. 12

*Election Integrity Fund v. City of Lansing*,
    No. 20 Civ. 950, 2020 WL 6605987 (W.D. Mich. Oct. 19, 2020) ........................ 1, 6

*Election Integrity Fund v. City of Lansing*,
    No. 20-2048 (6th Cir. Oct. 30, 2020) ......................................................... 1

*Feehan v. Wis. Elections Comm'n.*,
    No. 20 Civ. 1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020) .......................... 6, 11

*Ga. Voter All. v. Fulton Cty.*,
    No. 20 Civ. 4198, 2020 WL 6589655 (N.D. Ga. Oct. 28, 2020) .................... 1, 11, 14

*Gallagher v. Neil Young Freedom Concert*,
 49 F.3d 1442 (10th Cir. 1995) ................................................. 9

*Griffin v. Breckenridge*,
 403 U.S. 88 (1971) ................................................................ 13

*Iowa Voter All. v. Black Hawk Cty*,
 No. 20 Civ. 2078, 2020 WL 6151559 (N.D. Iowa Oct. 20, 2020) ..................................... 1, 11

*Iowa Voter All. v. Black Hawk Cty.*,
 No. 20 Civ. 2078, 2021 WL 276700 (N.D. Iowa Jan. 27, 2021).................................... 2, 6, 13

*Johnson ex rel. Johnson v. Columbia Univ.*,
 No. 99 Civ. 3415, 2003 WL 22743675 (S.D.N.Y. Nov. 19, 2003) ......................................... 9

*King v. Whitmer*, 20 Civ. 13134,
 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020) ................................ 6, 10

*Kinnell v. Graves*,
 265 F.3d 1125 (10th Cir. 2001) ................................................ 12

*Lance v. Coffman*,
 549 U.S. 437 (2007)............................................................. 4, 6

*Lansing v. City of Memphis*,
 202 F.3d 821 (6th Cir. 2000) .................................................... 9

*Logan v. Pub. Employees Ret. Ass'n*,
 163 F. Supp. 3d 1007 (D.N.M. 2016) ........................................... 12

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)............................................................... 4

*Minn. Voters All. v. City of Minneapolis*,
 No. 20 Civ. 2049, 2020 WL 6119937 (D. Minn. Oct. 16, 2020)..................................... 1, 6, 13

*Moore v. Bd. of Cty. Comm'rs*,
 507 F.3d 1257 (10th Cir. 2007) ................................................ 12

*Pa. Voters All. v. Centre Cty.*,
 No. 20 Civ. 01761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020)........................................ 1, 6

*Pa. Voters All. v. Centre Cty.*,
 No. 20A82 (U.S. Nov. 3, 2020) ................................................. 2

*Pa. Voters All. v. Centre Cty.*,
 No. 20-3175 (3d Cir. 2020)....................................................... 1

*Reynolds v. Sims*,
   377 U.S. 533 (1964)..............................................................................................5

*S.C. Voter's All. v. Charleston Cty.*,
   No. 20 Civ. 3710 (D.S.C. Oct. 26, 2020)............................................................ 1, 11

*Safe Streets All. v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ...............................................................................3

*Schroder v. Volcker*,
   864 F.2d 97 (10th Cir. 1988) ..............................................................................13

*Scott v. Hern*,
   216 F.3d 897 (10th Cir. 2000) ...............................................................................9

*SECSYS, LLC v. Vigil*,
   666 F.3d 678 (10th Cir. 2012) .............................................................................11

*Shipley v. Chi. Bd. of Election Comm'rs*,
   947 F.3d 1056 (7th Cir. 2020) .............................................................................10

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)...........................................................................................4

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)...........................................................................................4, 8

*Tex. Voters All. v. Dallas Cty.*,
   No. 20 Civ. 775, 2020 WL 6146248 (E.D. Tex. Oct. 20, 2020)................... 1, 6, 11, 14

*Texas v. Pennsylvania*,
   No. 155, 2020 WL 7296814 (U.S. Dec. 11, 2020) ...................................................6

*Tilton v. Richardson*,
   6 F.3d 683 (10th Cir. 1993) ................................................................................13

*Warth v. Seldin*,
   422 U.S. 490 (1975)...............................................................................................5

*West v. Atkins*,
   487 U.S. 42 (1988).................................................................................................8

*Wis. Voters All. v. City of Racine*,
   No. 20 Civ. 1487, 2020 WL 6129510 (E.D. Wis. Oct. 14, 2020) .................. 1, 11, 13

*Wis. Voters All. v. City of Racine*,
   No. 20-3002 (7th Cir. Oct. 23, 2020)......................................................................1

iv

*Wis. Voters All. v. City of Racine*,
  No. 20A75 (U.S. Oct. 29, 2020) .......................................................................................... 1

*Wis. Voters All. v. City of Racine*,
  No. 20 Civ. 1487, 2021 WL 179166 (E.D. Wis. Jan. 19, 2021)............................................ 2, 6

*Wittner v. Banner Health*,
  720 F.3d 770 (10th Cir. 2013) ............................................................................................. 8, 9

*Wood v. Raffensperger*,
  981 F.3d 1307 (11th Cir. 2020) .............................................................................................. 5

**Statutes**

Const. Art. I, § 4............................................................................................................................ 11

Const. Art. II, § 1 .......................................................................................................................... 10

42 U.S.C. § 1983................................................................................................................ 3, 8, 10, 13

42 U.S.C. § 1985 ........................................................................................................................... 13

42 U.S.C. § 1986 ........................................................................................................................... 13

42 U.S.C. § 1988 ........................................................................................................................... 13

52 U.S.C. § 20510 ......................................................................................................................... 13

**Rules**

Federal Rule of Civil Procedure 12 .............................................................................................. 3

v

# INTRODUCTION

This is the latest (and hopefully the last) case in which plaintiffs without any concrete or particularized injury seek to raise outlandish, disreputable, and discredited conspiracy theories about the 2020 election. Like every other similar case to precede it, this one should be dismissed.

Plaintiffs here assert that a vast cabal of government officials, private organizations, and private citizens somehow conspired to massively manipulate the 2020 presidential election. As damages for this alleged plot, Plaintiffs seek $160 billion. But Plaintiffs' case against Defendant Center for Tech and Civic Life (CTCL)—a non-profit organization that offered grants to support local election administrators during the COVID-19 pandemic—fails on every level. Plaintiffs lack Article III standing because they assert only generalized grievances, fail to connect their supposed harms to anything that CTCL allegedly did, and fail to demonstrate redressability. And Plaintiffs also fail to state a claim upon which relief can be granted: the constitutional violations that Plaintiffs allege are not cognizable against a private entity like CTCL, and they lack merit regardless.

Over the past several months, eight federal district courts, three unanimous appellate panels, and two Supreme Court Justices have rejected attacks on the legality of CTCL's COVID-19 response grant program.[1] This challenge fares no better. It should be dismissed.

---

[1] *See Wis. Voters All. v. City of Racine*, No. 20 Civ. 1487, 2020 WL 6129510 (E.D. Wis. Oct. 14, 2020); *Minn. Voters All. v. City of Minneapolis*, No. 20 Civ. 2049, 2020 WL 6119937 (D. Minn. Oct. 16, 2020); *Election Integrity Fund v. City of Lansing*, No. 20 Civ. 950, 2020 WL 6605987 (W.D. Mich. Oct. 19, 2020); *Iowa Voter All. v. Black Hawk Cty.*, No. 20 Civ. 2078, 2020 WL 6151559 (N.D. Iowa Oct. 20, 2020); *Tex. Voters All. v. Dallas Cty.*, No. 20 Civ. 775, 2020 WL 6146248 (E.D. Tex. Oct. 20, 2020); *Pa. Voters All. v. Centre Cty.*, No. 20 Civ. 1761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020); ECF 5, *S.C. Voter's All. v. Charleston Cty.*, No. 20 Civ. 3710 (D.S.C. Oct. 26, 2020); *Ga. Voter All. v. Fulton Cty.*, No. 20 Civ. 4198, 2020 WL 6589655 (N.D. Ga. Oct. 28, 2020); ECF 5, *Wis. Voters All. v. City of Racine*, No. 20-3002 (7th Cir. Oct. 23, 2020); ECF 20 & 28, *Pa. Voters All. v. Centre Cty.*, No. 20-3175 (3d Cir. 2020); ECF 10-2, *Election Integrity Fund v. City of Lansing*, No. 20-2048 (6th Cir. Oct. 30, 2020); *Wis. Voters All. v. City of*

## BACKGROUND

CTCL is a non-profit organization that provides training and logistical support to election administrators around the country "to make U.S. elections more inclusive and secure." Compl. ¶ 70 n.18; *see* Compl. ¶¶ 83-85. In preparation for the 2020 election, CTCL made "COVID-19 response grants" available to election administrators and encouraged "all U.S. local election jurisdictions" to apply. Compl. ¶¶ 94, 97. Many local governments participated (over 2500 in total), including the cities and counties in Michigan, Georgia, Pennsylvania, and Wisconsin singled out by the Complaint. Compl. ¶ 95; *see also* ECF. No. 1-4 at 2-3. Indeed, the grants identified by Plaintiffs here are just a small fraction of the thousands of grants that CTCL awarded to jurisdictions of all political and demographic stripes around the country.[2] *See* CTCL, *CTCL Program Awards Over 2,500 COVID-19 Response Grants* (Oct. 29, 2020), https://www.techandciviclife.org/grant-awards.

This lawsuit was filed on December 22, 2020 by registered voters from six states. Compl. ¶¶ 6-13. It asserts that CTCL and the other Defendants—an election technology vendor, a social media platform, two private individuals, a bi-partisan group of state officials from four "swing" states, and up to 10,000 unnamed co-conspirators—"engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other things, change voting laws without legislative approval, use unreliable voting machines, alter votes through an

---

*Racine*, No. 20A75 (U.S. Oct. 29, 2020) (Kavanaugh, J.) (application for injunction denied); *Pa. Voters All. v. Centre Cty.*, No. 20A82 (U.S. Nov. 3, 2020) (Alito, J.) (same); *see also Wis. Voters All. v. City of Racine*, No. 20 Civ. 1487, 2021 WL 179166 (E.D. Wis. Jan. 19, 2021) (granting motion to dismiss); *Iowa Voter All. v. Black Hawk Cty.*, No. 20 Civ. 2078, 2021 WL 276700 (N.D. Iowa Jan. 27, 2021) (same).

[2] While dismissal is warranted on the face of the Complaint alone, and without reference to any facts outside the pleadings, CTCL highlights this context to underscore that the Complaint does not (and cannot) allege that the cherry-picked grants highlighted in the Complaint are the *only* grants CTCL made during the 2020 election.

illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionately and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Compl. ¶ 4. Plaintiffs claim that CTCL and the other Defendants violated the Constitution's Electors Clause, the Equal Protection Clause, and the Due Process Clause—all "as enforced by" federal civil rights statutes, including 42 U.S.C. § 1983. Compl. ¶¶ 292-362. Plaintiffs allege that these violations harmed them and "millions" of other voters. Compl. ¶ 126. They seek unspecified declaratory and injunctive relief and $160 billion in damages. Compl. ¶¶ 404-09 & Prayer for Relief.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Plaintiffs must allege non-conclusory facts that, if true, establish this Court's subject-matter jurisdiction and state a claim for relief that is "plausible on its face." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017).

## ARGUMENT

The Complaint fails to establish standing and fails to state a claim. It should therefore be dismissed.[3]

---

[3] Pursuant to this Court's Practice Standards for Civil Cases, counsel for CTCL proposed on March 5, 2021 to meet and confer with counsel for Plaintiffs. On March 8, 2021, Plaintiffs' counsel responded to state that they "object to [CTCL's] request to dismiss at this point." Plaintiffs' counsel added that "we have an amended complaint that we plan to file tomorrow with our responses to motions to dismiss from Dominion and Facebook." However, notwithstanding references to an amended complaint in the briefs that they filed in opposition to the pending motions to dismiss, Plaintiffs did not actually file any amended complaint. Because they have missed the window in which to file an amended complaint as of right, CTCL has proceeded with filing this motion to dismiss the operative complaint, which is due today under the applicable rules.

Appendix Page 744

## I.      Plaintiffs lack Article III standing.

Federal courts may decide only "actual cases or controversies" brought by litigants with a justiciable stake in the outcome. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Article III requires (1) a concrete and particularized injury-in-fact, (2) a causal connection between that injury and the challenged conduct, and (3) redressability. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). Because Plaintiffs cannot establish any of these required elements, their Complaint must be dismissed for lack of Article III standing.

### A.      Plaintiffs do not allege an injury-in-fact.

Plaintiffs fail to allege a "concrete and particularized" injury-in-fact. *See Susan B. Anthony List*, 573 U.S. at 158. To be particularized, an injury-in-fact must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1547. A mere generalized grievance—"undifferentiated and common to all members of the public"—is insufficient to confer standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992); *see Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1247 (10th Cir. 2017).

Plaintiffs assert only a generalized grievance. At bottom, they assert that "illegal votes and unconstitutional procedures dilute[d] the votes of the legally registered voter" in the 2020 presidential election. Compl. ¶ 320. But that alleged harm is too amorphous and too broadly shared to support jurisdiction. Plaintiffs' essential contention is simply that "the law . . . has not been followed," which is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past." *See Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Indeed, Plaintiffs admit that their grievances can be generalized to all registered voters in the United States—and even specifically allege in several places that the conduct they challenge "hurts every registered voter in the country." Compl. ¶ 319; *accord* Compl. ¶¶ 1, 76, 334, 357. "[W]hen the asserted harm is . . . shared in substantially

4

equal measure by . . . a large class of citizens," it is not a particularized injury that can support Article III standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

To be sure, Plaintiffs articulate their generalized harm in varied ways throughout the Complaint—for example, they complain that the election was administered unconstitutionally in certain "swing" states (*see* Compl. ¶¶ 127-291), that their votes were somehow diluted (*see* Compl. ¶¶ 319, 320, 355), or that unspecified voters were treated unequally (*see* Compl. ¶ 331-32). But every single one of these complaints amounts to a general grievance about the totality of the 2020 presidential election. Nowhere do Plaintiffs identify any concrete and particularized harm that affected them in a personal, individualized way. While Plaintiffs assert that this case concerns their "individual and personal" right to vote (*see* Compl. ¶ 304), it obviously "does not follow from the labeling of the right to vote as 'personal' . . . that *any* alleged illegality affecting voting rights rises to the level of an injury in fact." *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 358 (3d Cir. 2020). "The key inquiry for standing is whether the alleged violation of the right to vote arises from an invidious classification . . . to which the plaintiff[s] [are] subject" and which causes their votes to be actually "discounted" when the votes of others are not. *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964)). No such harm is alleged here. *See infra*, Part II.A.2.[4]

For that reason, this case is just like many others in which federal courts dismissed challenges to the 2020 election for lack of any alleged concrete and particularized injury. In *Wood v. Raffensperger*, for instance, the Eleventh Circuit concluded that a plaintiff had no standing to challenge alleged unlawful processing of ballots under the Electors Clause, Equal Protection Clause, and Due Process Clause. The *Wood* court explained that "no single voter is specifically

---

[4] Plaintiffs' allegation that "[t]his claim is not a generalized grievance" is a conclusory recitation of the legal standard that merits no weight under *Iqbal* and *Twombly*. Compl. ¶ 317.

disadvantaged if a vote is counted improperly" and that therefore "[v]ote dilution in this context is a paradigmatic generalized grievance." 981 F.3d 1307, 1314-15 (11th Cir. 2020). The Third Circuit has likewise explained that "an alleged 'dilution' is suffered equally by all voters and is not 'particularized' for standing purposes," *Bognet*, 980 F.3d at 356-57, while further clarifying that an alleged "right to have government administered in compliance with the . . . Electors Clause" is a generalized grievance that cannot support standing. *Id.* at 349.[5]

In fact, courts have repeatedly invoked these principles to reject (for lack of standing) constitutional challenges to the receipt of CTCL grants—including challenges where the alleged harms involved vote dilution, partisan favoritism, the use of improper election procedures, and/or denial of individual rights to vote. *See, e.g.*, *Minn. Voters All.*, 2020 WL 6119937, at *7-8; *Election Integrity Fund*, 2020 WL 6605987, at *2; *Tex. Voters All.*, 2020 WL 6146248, at *4-5; *Pa. Voters All.*, 2020 WL 6158309, at *4-5, *appeal dismissed*, ECF 28, No. 20-3175 (3d Cir. Nov. 23, 2020) ("The appeal is summarily dismissed for lack of standing, as there is no injury-in-fact."); *Wis. Voters All.*, 2021 WL 179166, at *2-3; *Iowa Voter All.*, 2021 WL 276700, at *4-8. Because all of those theories of injury amounted to claims that "the law has not been followed," courts repeatedly rejected them as "precisely the kind of undifferentiated, generalized grievance" that cannot confer Article III standing. *Lance*, 549 U.S. at 442.

---

[5] *See also Feehan v. Wis. Elections Comm'n*, No. 20 Civ. 1771, 2020 WL 7250219, at *9 (E.D. Wis. Dec. 9, 2020) (finding no "particularized, concrete injury sufficient to confer standing" where plaintiff alleged "injuries that any . . . voter suffers if the [state's] election process were, as the plaintiff alleges, 'so riddled with fraud, illegality, and statistical impossibility'"); *Bowyer v. Ducey*, No. 20 Civ. 2321, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020) (voter dilution "allegations are nothing more than generalized grievances that any[one] . . . who voted could make if they were so allowed" and collecting cases); *King v. Whitmer*, 20 Civ. 13134, 2020 WL 7134198, at *9-11 (E.D. Mich. Dec. 7, 2020) (same); *cf. Texas v. Pennsylvania*, No. 155, 2020 WL 7296814, at *1 (U.S. Dec. 11, 2020) ("Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections.").

## B. Any asserted injury-in-fact is not fairly traceable to CTCL's actions.

An independent basis for dismissal is that the injuries Plaintiffs allege are not "fairly traceable" to CTCL's challenged actions. The Complaint is devoid of any allegations connecting CTCL's grant program to any cognizable harm to any specific plaintiff—be it alleged vote dilution, denial, or discrimination. *Cf. Bognet*, 980 F.3d at 352 (candidate lacked standing because his "expenditures" were not "'fairly traceable' . . . to the actions that [he] challenges"). To the contrary, the Complaint alleges that CTCL offered "grants to local election jurisdictions . . . to help ensure [they] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted." Compl. ¶ 94. No Plaintiffs allege that CTCL's grants stopped them from voting or having their votes counted, much less harmed them based on membership in a protected class. Nor do Plaintiffs allege that CTCL's grants themselves changed states' rules for selecting Electors. In other words, Plaintiffs do not allege that CTCL's provision of election administration grants to make voting easier and to improve election efficiency actually caused them any concrete injury.

## C. Plaintiffs fail to allege redressability.

Finally, Plaintiffs' requests for declaratory and injunctive relief cannot redress their alleged harms. Much of their requested relief is moot. Plaintiffs seek a declaratory judgment that "the actions of the Defendants" are "unconstitutional and ultra vires, thereby making them legal nullities." Compl., Prayer for Relief; *accord* Compl. ¶¶ 404-06. They also seek "permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct." Compl., Prayer for Relief; *accord* Compl. ¶ 408. None of that relief is available. The election is over and a new President has been inaugurated. Those facts strip this Court of subject-matter jurisdiction to declare Michigan, Georgia, Pennsylvania, and Wisconsin's certifications of the presidential election "legal nullities." *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (case becomes

7

moot when the issues before the Court are "no longer 'live'"). And it obviously prohibits "permanent injunctive relief" to "remedy the ongoing effects" of Defendants' alleged misconduct—which would presumably be an injunction requiring a do-over of the election.[6]

## II.     The Complaint fails to state a claim.

### A.     The Complaint fails to state a claim under § 1983.

The Complaint asserts various constitutional claims against CTCL, principally under 42 U.S.C. § 1983. To succeed on their § 1983 claims, Plaintiffs must allege (1) "the violation of a [constitutional] right" and (2) that those violations were attributable to a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Plaintiffs' claims satisfy neither requirement. We first address the state actor requirement and then turn to the merits of their legal allegations.

### 1.     Plaintiffs do not allege state action.

Because CTCL is a private non-profit organization, not a government entity, Plaintiffs' allegations must be dismissed unless they can satisfy one of the four recognized bases for treating a private actor's conduct as state action under § 1983. *See Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013). But Plaintiffs meet none of these tests.

*First*, Plaintiffs do not allege that CTCL acted under the "coercive power" of a governmental entity. *See id. Second*, Plaintiffs' claims that CTCL provided monetary grants to

---

[6] In their opposition to Facebook's motion to dismiss, Plaintiffs disclaim any attempt to nullify the 2020 presidential election and implicitly concede that any request "for such extraordinary relief" would be moot. ECF 40 at 2. It is thus unclear what equitable relief (if any) Plaintiffs seek in this case. To the extent Plaintiffs' claims for declaratory and injunctive relief instead seek to challenge the conduct of *future* elections, Plaintiffs would still lack Article III standing because they cannot allege prospective injury that is "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List*, 573 U.S. at 158. Any such claim would improperly rest on speculative inferences about how various actors might behave and what collective impact those myriad decisions might have on election results. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (no standing where plaintiffs relied on "a highly attenuated chain of possibilities").

local governments to support their administration of the 2020 election do not indicate that CTCL itself assumed "a traditional and exclusive function of the state." *Id.* at 777. *Third*, Plaintiffs' threadbare assertions of a conspiracy among Defendants are "conclusory allegations with no supporting factual averments." *Scott v. Hern*, 216 F.3d 897, 907 (10th Cir. 2000). They are therefore insufficient to show that public and private actors "share[d] a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1455 (10th Cir. 1995). *Finally*, Plaintiffs' allegations that CTCL offered (and some local governments accepted) COVID-19 response grants do not establish that CTCL and state actors have "commingled their responsibilities" to the point where they are so "interdependen[t]" and "entwine[d]" as to form a "symbiotic relationship." *Wittner*, 720 F.3d at 777-78. *Cf. Gallagher*, 49 F.3d at 1453 ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity.").

It is no surprise that Plaintiffs' claims fail any version of the test for state action. The only alleged interaction between CTCL and any government actor is CTCL's provision of funds to various local government entities to support ongoing election administration efforts. That is not a sufficient basis for treating a private actor as though they are the government. *See Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 244 (3d Cir. 2002) ("[I]t would be a radical concept if the state's receipt of funds from private actors were to convert them into state actors."); *Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000) (explaining that the fact that a defendant "confers an economic benefit" on the government is "insufficient to establish that the [defendant] is a state actor"); *Johnson ex rel. Johnson v. Columbia Univ.*, No. 99 Civ. 3415, 2003 WL 22743675, at *6 (S.D.N.Y. Nov. 19, 2003) (holding that the "mere allegation that [a defendant]

9

provided funding" for an allegedly unconstitutional program did not make the defendant a state
actor).

Because CTCL was not a state actor when it created and administered the grant program
described in the Complaint, all of Plaintiffs' § 1983 claims against CTCL must be dismissed.

### 2. Plaintiffs do not allege a constitutional violation.

Alternatively, Plaintiffs' § 1983 claims against CTCL must be dismissed because they fail
to allege any cognizable constitutional violation.

In Count I, Plaintiffs assert that Defendants (including CTCL) violated their rights under
the Electors Clause, which provides for each state to appoint presidential electors "in such Manner
as the Legislature thereof may direct." Const. Art. II, § 1, cl. 2. While the nature of this claim is
hard to discern, Plaintiffs appear to contend that the Electors Clause forbids any state or local entity
from adopting any rule or taking any action while administering a Presidential election that the
state's legislature has not expressly authorized. Plaintiffs also appear to contend that any registered
voter anywhere in the country has a private cause of action to vindicate the Clause as they
understand it. These theories suffer from several fundamental defects.

*First*, the Electors Clause cannot plausibly be understood to mean "that *any* alleged
deviation from state election law . . . opens the door to federal review." *King*, 2020 WL 7134198,
at *12 (emphasis added); *see also id.* ("Plaintiffs cite to no case—and this Court found none—
supporting such an expansive approach."); *Shipley v. Chi. Bd. of Election Comm'rs,* 947 F.3d 1056,
1062 (7th Cir. 2020) ("[A] deliberate violation of state election laws by state election officials does
not transgress against the Constitution."). *Second*, regardless, Plaintiffs have not alleged any
specific action taken by CTCL or any CTCL grant recipient that plausibly violated any particular
state law. *Third*, Plaintiffs have failed to articulate any coherent theory of the Electors Clause that
would apply to the conduct of private entities, rather than the state or local officials who actually

implemented the challenged policies. *Finally*, even if the Complaint cleared all those hurdles, any federal cause of action under the Electors Clause would belong to the relevant state and its legislature, not to individual voters. *See, e.g.*, *Feehan*, 2020 WL 7250219, at *12. For these and related reasons, federal courts across the country repeatedly and uniformly ruled against analogous challenges to the legality of CTCL's grant program under the Elections Clause, Const. Art. I, § 4, c1. 1, in litigation surrounding the election.[7] *See Bognet*, 980 F.3d at 349 (applying the "same logic" to analysis of Elections Clause and Electors Clause claims due to their "considerable similarity"). In short, Plaintiffs fail to allege that CTCL violated the Electors Clause of the Constitution.

In Count II, Plaintiffs allege that Defendants (including CTCL) violated the Equal Protection Clause of the Fourteenth Amendment. Specifically, they assert that Defendants engaged in "arbitrary and disparate treatment" of voters in different jurisdictions. *See* Compl. ¶¶ 331-32. But the Complaint does not establish any of the familiar predicates of a cognizable equal protection claim. There is no allegation of invidious discriminatory intent. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012). There is no allegation that Plaintiffs' personal rights to vote or any other fundamental rights were burdened. *See ACLU of New Mexico v. Santillanes*, 546 F.3d 1313,

---

[7] *See Iowa Voter All.*, 2020 WL 6151559, at *3 ("Plaintiffs have not provided any authority, nor have I found any, suggesting that the Elections Clause imposes specific limits or restrictions as to how a federal election must be funded."); ECF 5 at 3, *S.C. Voter's All.*, No. 20 Civ. 3710 (D.S.C. Oct. 26, 2020) (denying TRO on Elections Clause and other claims because "Plaintiffs appear to lack a private right of action for any of their causes of action and their underlying legal premises are dubious, at best"); *Ga. Voter All.*, 2020 WL 6589655, at *3 ("Fulton County's acceptance of private funds, standing alone, does not impede Georgia's duty to prescribe the time, place, and manner of elections, and Plaintiffs cite no authority to the contrary."); *Tex. Voters All.*, 2020 WL 6146248, at *12 ("Supreme Court precedent directly precludes Plaintiffs' Election Clause claim."); *Wis. Voters All.*, 2020 WL 6129510, at *2 (plaintiffs failed to establish likelihood that "defendant Cities are prohibited from accepting and using 'private federal election grants' by the Elections and Supremacy Clauses of the United States Constitutions").

1321-22 (10th Cir. 2008). At most, the Complaint alleges that some of the challenged conduct reduced barriers to voting for *other* people. But it is not clear what classification CTCL itself, or any other Defendant, may have adopted that allegedly resulted in the arbitrary and irrational differential treatment of plaintiffs. *See Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001) ("The threshold requirement of an Equal Protection claim is a showing that the government discriminated among groups. Unless a legislative classification either burdens a fundamental right or *targets a suspect class*, it need only bear a rational relation to some legitimate end . . . ."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20 Civ. 966, 2020 WL 5997680, at *41 (W.D. Pa. Oct. 10, 2020) (differential treatment is "a necessary predicate for an equal-protection claim"); *Bowyer*, 2020 WL 7238261, at *5 (alleged deviations from state election law or other irregularities do not make out an Equal Protection claim).[8]

Finally, in Count III, Plaintiffs allege that Defendants (including CTCL) violated the Due Process Clause. But they do not identify any process they believe they were owed or denied, which forecloses any procedural due process claim. *See Moore v. Bd. of Cty. Comm'rs*, 507 F.3d 1257, 1259 (10th Cir. 2007). And because they have not alleged any burden on their right to vote, they cannot have alleged that any such burden gave rise to the "exceptional case where a state's voting system is [so] fundamentally unfair" as to constitute a substantive due process violation. *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1034 (D.N.M. 2016).[9]

---

[8] Plaintiffs' attempt to invoke the Fifteenth Amendment's prohibition on denial of the right to vote on account of race fails for the same reasons. *See* Compl. ¶ 336.

[9] Counts IV and V do not concern CTCL. Counts VI and VII purport to state separate causes of action for declaratory and injunctive relief based on the alleged violations discussed above. These fail with the substantive claims. The relief sought by these claims is also improper for the reasons discussed above and in Defendant Facebook's and Defendant Dominion Voting Systems' Motions to Dismiss: These claims were filed after the 2020 election concluded, and well before there is any nonspeculative basis to conclude that the alleged conduct will recur in future elections. *See supra* Part I.C; ECF No. 22 at 18-19; ECF No. 23 at 7-8 n.2.

**B.     The Complaint fails to state a claim under any of the other statutes cited.**

In addition to § 1983, Plaintiffs also invoke 42 U.S.C. §§ 1985, 1986, and 1988. To the extent Plaintiffs allege claims under these statutes, they fail for the reasons just given—and for additional, independent reasons. Any claim under § 1985 fails because the Complaint's allegations of conspiracy are conclusory and implausible, and because Plaintiffs have not alleged that CTCL or any other Defendant was motivated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Tilton v. Richardson*, 6 F.3d 683, 684 (10th Cir. 1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Any claims under § 1986 are "dependent upon the validity of a § 1985 claim." *Brown v. Reardon*, 770 F.2d 896, 905 (10th Cir. 1985). And § 1988 is a procedural provision that does not create any independent cause of action. *Id.* at 907; *Schroder v. Volcker*, 864 F.2d 97, 99 (10th Cir. 1988).

Plaintiffs also mention the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA) while discussing CTCL. *See* Compl. ¶¶ 99-118, 268-69. To the extent the Complaint is construed as alleging claims under these statutes, any such claims would be meritless. HAVA does not confer any private right of action, and the NVRA confers a private right of action only for voters "aggrieved" by its violation. *See* 52 U.S.C. § 20510(b) (NVRA). Individual plaintiffs whose own rights to register and vote have not been impeded are not "aggrieved" under the NVRA, for essentially the same reasons Plaintiffs lack Article III standing. For these and other reasons, every court to consider the legality of the CTCL grant program under these statutes has upheld it. *See, e.g.*, *Wis. Voters All.*, 2020 WL 6129510, at *2 ("[T]he Court finds nothing in the statutes Plaintiffs cite, either directly or indirectly, that can be fairly construed as prohibiting the defendant Cities from accepting funds from CTCL."); *Iowa Voter All.*, 2021 WL 276700, at *5 n.3 (Strand, C.J.) ("I remain thoroughly unconvinced that the counties violated any particular law by accepting the CTCL grants."); *see also Minn. Voters All.*, 2020 WL 6119937, at

13

*5-6 (no private cause of action under HAVA and no private cause of action under the NVRA in part because plaintiffs were not "aggrieved"); *Tex. Voters All.*, 2020 WL 6146248, at *10-12 (no private cause of action under HAVA); *Ga. Voter All.*, 2020 WL 6589655, at *4 (same).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims against CTCL for lack of jurisdiction, or in the alternative for failure to state a claim. Because the Complaint's many fundamental deficiencies render amendment futile, the dismissal should be without leave to replead. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

Respectfully submitted,

Joshua Matz
Michael Skocpol
Marcella Coburn
Louis W. Fisher
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: 212.763.0883
Facsimile: 212.564.0883
Email: jmatz@kaplanhecker.com
        mskocpol@kaplanhecker.com
        mcoburn@kaplanhecker.com
        lfisher@kaplanhecker.com

*Attorneys for Defendant Center for Tech and Civic Life*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 10, 2021, a true and correct copy of the

foregoing Motion to Dismiss was electronically filed with the Court using the CM/ECF system

which will send notifications of such filing to all counsel of record.

Joshua Matz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge N. Reid Neureiter**

| | |
|---|---|
| Civil Action No: 20-cv-03747-NRN | Date: March 11, 2021 |
| Courtroom Deputy: Stacy Libid | FTR: Courtroom C204 |

| _Parties:_ | _Counsel:_ |
|---|---|
| KEVIN O'ROURKE, | Ernest Walker |
| NATHANIEL L. CARTER, | |
| LORI CUTUNILLI, | |
| LARRY D. COOK, | |
| ALVIN CRISWELL, | |
| KESHA CRENSHAW, | |
| NEIL YARBROUGH, and | |
| AMIE TRAPP, | |
| | |
| Plaintiffs, | |
| | |
| v. | |
| | |
| DOMINION VOTING SYSTEMS INC., a Delaware | Bridget DuPey |
| corporation, | David Meschke |
| FACEBOOK, INC., a Delaware corporation, | Stanley Garnett |
| CENTER FOR TECH AND CIVIC LIFE, an Illinois | Craig Streit |
| non-profit organization, | Joshua Lipshutz |
| MARK E. ZUCKERBERG, individually, | Ryan Bergsieker |
| PRISCILLA CHAN, individually, | Heather Meingast |
| BRIAN KEMP, individually, | Louis Fisher |
| BRAD RAFFENSPERGER, individually, | Charlene McGowan |
| GRETCHEN WHITMER, individually, | Marcella Coburn |
| JOCELYN BENSON, individually, | |
| TOM WOLF, individually, | |
| KATHY BOOCKVAR, individually, | |
| TONY EVERS, individually, | |
| ANN S. JACOBS, individually, | |
| MARK L. THOMSEN, individually, | |
| MARGE BOSTELMAN, individually, | |
| JULIE M. GLANCEY, | |
| DEAN KNUDSON, individually, | |
| ROBERT F. SPINDELL, JR, individually, and | |
| DOES 1-10,000, | |

Defendants.

---

## COURTROOM MINUTES

---

**TELEPHONIC STATUS CONFERENCE**

**11:00 a.m.    Court in session.**

Court calls case. Appearance of counsel.

Discussion regarding consent/non-consent.

This matter is before the Court regarding Facebook, Inc.'s Motion to Strike Plaintiffs' Response and Brief in Opposition to Facebook's Motion to Dismiss [Docket No. 42] and Plaintiff's oral request for leave to file an Amended Complaint.

Arguments by counsel.

For the reasons set forth on the record, it is

**ORDERED:**   Defendant Facebook, Inc.'s Motion to Strike Plaintiffs' Response and Brief in Opposition to Facebook's Motion to Dismiss [Docket No. 42] is **DENIED**. The Court will allow a 15-page limit on any replies filed by Defendants in support of motions to dismiss.

**ORDERED:**   Plaintiff shall file a written Motion for Leave to File an Amended Complaint, with the proposed Amended Complaint attached in redline, on or **before March 15, 2021.** Defendants' shall file any oppositions to the response on or before **March 29, 2021.** Plaintiff shall file a reply on or before **April 8, 2021**. The Court will issue a written ruling.

**11:38 a.m.    Court in recess.**

Hearing concluded.
Total in-court time:   00:38

*To order transcripts of hearings, please contact either Patterson Transcription Company at (303) 755-4536 or AB Litigation Services at (303) 629-8534.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH and
AMIE TRAPP,

       Plaintiffs,

v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR., individually, and
DOES1-10,000,

       Defendants.

---

# DEFENDANTS GOVERNOR GRETCHEN WHITMER'S AND SECRETARY OF STATE JOCELYN BENSON'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO F.R.C.P. 12(b)(2) AND 12(b)(6)

# TABLE OF CONTENTS

Page

Table of Contents ...................................................................................... i

Index of Authorities .................................................................................. ii

Introduction .............................................................................................. 1

Statement of Facts .................................................................................... 2

Argument ................................................................................................... 5

I.     The Michigan Defendants' motion to dismiss must be granted where this Court lacks personal jurisdiction over Defendants. ................................. 5

     A.    Legal standard ........................................................................... 5

     B.    Plaintiffs cannot satisfy their burden of demonstrating personal jurisdiction. ................................................................................ 5

II.    The Michigan Defendants' motion to dismiss must be granted where Plaintiffs have failed to state a claim against Defendants. ............................. 7

     A.    Legal standard ........................................................................... 7

     B.    Plaintiffs fail to state a claim as to Governor Whitmer and Secretary Benson ...................................................................... 8

Conclusion and Relief Requested ........................................................... 13

i

# INDEX OF AUTHORITIES

Page

**Cases**

*Albright v. Oliver*, 510 U.S. 266 (1994) ........................................................ 11

*Arizona State Legislature v. Arizona Independent Redistricting Comm.*, 576 U.S. 787 (2015) ............................................................................................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................... 7

*AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054 (10th Cir. 2008) ........ 5

*Bailey v Antrim County, et al.*, Antrim Circuit Court No. 20-9238 ............................ 3

*Bally, et al. v. Whitmer, et al.*, Case No. 1:20-cv-1088 (W.D. Mich, 2020) .................. 2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 7

*Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998) ........................................... 11

*Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. 2020) ........................................................................................... 8, 10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..................................... 6, 7

*Bush v. Gore*, 531 U.S. 98 (2000) ................................................................. 9

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) .............................................. 9

*Cook v. Gralike*, 531 U.S. 510 (2001) ............................................................ 8

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................................... 6, 7

*Davis v. Secretary of State*, 2020 WL 5552822  (Mich. Ct. App., Sept. 16, 2020) ........ 4

*Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) ..................................................... 10

*Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974 (D. Nev. Sept. 18, 2020) .................................... 9

*Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) ............................................................................................ 5

*Gamza v. Aguirre*, 619 F.2d 449 (5th Cir. 1980) ............................................. 11

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ........................................................ 9

*Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408 (1984) ............................ 6

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................... 5

*Johnson, et al. v. Benson, et al.*, 951 N.W.2d 310 (Mich. 2020) ................................ 2

*Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332 (7th Cir. 1987) ............................. 11

*King, et al. v. Whitmer, et al.*, 2020 WL 7134198 (E.D. Mich., Dec. 7, 2020) ........ 8, 10

*Lance v. Coffman*, 549 U.S. 437 (2007) ........................................................ 8

*Minn. Voters All. v. Ritchie*, 720 F.3d 1029 (8th Cir. 2013) ..................................... 11

*Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580 (6th Cir. 2012) ...................................................................................................... 12

*Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415 (10th Cir. 1988) ...................................... 5

*Romstad v. City of Colorado Springs*, 650 F. App'x 576 (10th Cir. 2016) ................ 12

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) .......................................... 9

*Ryan, et al. v. Benson,* Michigan Court of Claims, 20-00198 ..................................... 4

*Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056 (7th Cir. 2020) .................. 11

*Surefoot LC v. Sure Foot Corp.,* 531 F.3d 1236 (10th Cir. 2008) .............................. 12

*Texas v. Pennsylvania, et al.*, 592 U.S. ___ (2020) ......................................... 2

*Wood v. Raffensperger*, No. 1:20-CV-04651-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ................................................................................................ 9

**Rules**

D.C. Colo. L. Civ. R. 7.1 ...................................................................... 1

Fed. R. Civ. P. 8(a)(2) ........................................................................ 7

Michigan Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Benson respectfully submit this Motion to Dismiss.  Defendants sought concurrence in their motion pursuant to D.C. Colo. L. Civ. R. 7.1.

## INTRODUCTION

This case is one of the last of a series of lawsuits filed since Michigan held its general election on November 3, 2020, and it alleges a similar litany of far-fetched claims of fraud and irregularity in the conducting of the November election.  Many of these made-up and misrepresented "fraud" claims have already been rejected by multiple courts.  Indeed, the U.S. Supreme Court was twice presented with the same or similar claims of irregularities in Michigan's election, and declined both times to hear the case.  *See Texas v. Pennsylvania, et al.*, 20-220155 and *King, et al. v. Whitmer, et al.,* 20-815.  And a post-election audit conducted in numerous jurisdictions in Michigan, including the City of Detroit, confirmed the accuracy and integrity of the November 2020 general election.[1]

Plaintiffs' complaint offers nothing other than conspiracy theories fed by misunderstandings of Michigan law and unaccompanied by any actual evidence of fraud.  The only thing new about this case is its forum—Colorado—a state with which Michigan Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Benson have had no contact supporting personal jurisdiction.  Accordingly, the complaint must be dismissed as to these Defendants, and there are numerous

---

[1] *See* More than 250 audits confirm accuracy and integrity of Michigan's election, March 2, 20201, available at https://www.michigan.gov/sos/0,4670,7-127-93094-553386--,00.html, (accessed March 15.)

1

other grounds supporting dismissal as well. This case must join the rest of the failed lawsuits seeking to overturn the will of the people.

## STATEMENT OF FACTS

Plaintiffs' fundamental allegations regarding Governor Whitmer and Secretary Benson raise the same alleged errors in the conducting of Michigan's November 3, 2020, general election that were rejected by other state and federal courts. (Compl., ¶¶ 127-190.)[2] Indeed, Plaintiffs' complaint incorporates numerous allegations from complaints in these defunct cases. (*Id.*).

For example, Plaintiffs' borrow heavily from the pleadings filed in *Texas v. Pennsylvania, et al.*, a case brought by Texas in the U.S. Supreme Court to challenge how other states conducted their elections, including Michigan's. The Supreme Court denied the petition determining that "Texas ha[d] not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections."[3] Plaintiffs also incorporate and quote from the pleadings and affidavits filed in *Johnson, et al. v. Benson, et al.*, 951 N.W.2d 310 (Mich. 2020), an original action in Michigan's highest court. But the Michigan Supreme Court denied that petition because it was "not persuaded that it [could] or should grant the requested relief." *Id.* Similarly, Plaintiffs quote from the complaint filed in *Bally, et al. v. Whitmer, et al.*, Case No. 1:20-cv-1088 (W.D. Mich, 2020), but that case was voluntarily dismissed shortly after it was filed.

---

[2] Plaintiffs Nathaniel L. Carter and Kesha Crenshaw are allegedly registered voters in the State of Michigan. (Compl., ¶¶ 7, 11.)
[3] See December 11, 2020, order in *Texas v. Pennsylvania, et al.*, 592 U.S. ___ (2020), No. 20-155, available at 121120zr_p860.pdf (supremecourt.gov).

Plaintiffs also discuss and attach a "preliminary report" of a purported forensic exam of a single Dominion Voting Systems tabulator used in Antrim County, Michigan, and generated in connection with pending state-court litigation in that county. *See Bailey v Antrim County, et al.*, Antrim Circuit Court No. 20-9238. As Plaintiffs note, the report concludes that Dominion software is designed to perpetuate errors and fraudulent results. (Compl., ¶ 174.) This report, however, has largely been repudiated and a post-election audit revealed no irregularities in vote totals.[4] Moreover, Michigan legislators have stated that there is no evidence of fraud perpetuated by Dominion Voting Systems.[5] In any event, this litigation is ongoing and a Michigan judge will determine, after discovery and the exchange of expert reports, whether there is any merit to the claims in that case that the election-night reporting error was due to fraudulently designed software, rather than human error.

As far as specific conduct by the Defendants, Plaintiffs allege that Secretary Benson acted contrary to Michigan law by mailing applications for absent voter ballots to registered voters in May 2020. Plaintiffs' argue that this action resulted in a "flood" of mail-in ballots. (Compl., ¶¶ 129-135.) But the Michigan courts held that the Secretary's mailing did not violate Michigan election law. *See Davis v.*

---

[4] *See* Antrim County audit shows 12-vote gain for Trump, 12/17/20, The Detroit News, available at https://www.detroitnews.com/story/news/local/michigan/2020/12/17/antrim-county-audit-shows-12-vote-gain-trump/3938988001/ (accessed March 15).

[5] *See* statement by State Senator Ed McBroom, available at https://www.detroitnews.com/story/news/local/michigan/2020/12/17/antrim-county-audit-shows-12-vote-gain-trump/3938988001/ (accessed March 15).

*Secretary of State*, 2020 WL 5552822 at *1 (Mich. Ct. App., Sept. 16, 2020), leave

denied 951 N.W.2d 911 (Mich., Dec. 28, 2020.)  Plaintiffs also complain that in June

2020 the Secretary created a platform for requesting an absent voter ballot

application online that did not require signature verification.  (Compl., ¶ 136.)

However, the online program was only available to registered voters who possessed

a Michigan driver's license or state identification card and had electronically stored

signatures on file that could be verified.[6]  Moreover, a Michigan court declined to

enjoin operation of the platform.  *See Election Integrity Fund, et al. v. Secretary of

State*, Case No. 20-00169, Michigan Court of Claims.[7]

With respect to Governor Whitmer, Plaintiffs complain that she should not

have certified Michigan's election results on November 23, 2020 and should not

have certified the vote of Michigan's electors on December 14, 2020, because of the

allegations of election irregularities.  (Compl., ¶¶ 184-188.)  But these were

ministerial acts by the Governor under the relevant statutes, *see* Mich. Comp. Laws

§§ 168.46, 47, 3 U.S.C. §§ 5-7, and no court had enjoined any part of the process.

And of course, on January 6, 2021, Congress convened in a joint session as required

by 3 U.S.C. § 15 to count the electoral votes of the fifty states and the District of

Columbia.  Congress counted Michigan's 16 electoral votes for President-elect

---

[6] *See Michigan Department of State launches online absentee voter application*,
6/12/20, available at https://www.michigan.gov/sos/0,4670,7-127--531796--,00.html,
(accessed March 15).
[7] Also still pending in Michigan is a state-court lawsuit challenging the legality of
grants to jurisdictions provided by the Center for Tech and Civic Life in connection
with the 2020 election cycle.  *See Ryan, et al. v. Benson,* Michigan Court of Claims,
20-00198.

Biden. And at the end of the joint session, President Biden was certified the winner.

With that declaration, the November 3, 2020, presidential election concluded.

## ARGUMENT

I.  **The Michigan Defendants' motion to dismiss must be granted where this Court lacks personal jurisdiction over Defendants.**

A.  **Legal standard**

The purpose of a motion to dismiss under Rule 12(b)(2) is to determine whether the Court has personal jurisdiction over a defendant. The plaintiff bears the burden of establishing personal jurisdiction. *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988). A plaintiff can satisfy its burden by making a prima facie showing. *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). The Court will accept the well-pleaded allegations of the complaint as true in determining whether plaintiff has made a prima facie showing that personal jurisdiction exists. *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). If the presence or absence of personal jurisdiction can be established by reference to the complaint, the Court need not look further. *Id.*

B.  **Plaintiffs cannot satisfy their burden of demonstrating personal jurisdiction.**

The Due Process Clause permits the exercise of personal jurisdiction over nonresident defendants when two conditions are met. First, a defendant must have "minimum contacts" with the forum state. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). Second, if sufficient minimum contacts are shown, due process

requires that the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *Id*.

The "minimum contacts" standard can be met in two ways. First, a court may, consistent with due process, exercise *specific* jurisdiction over a nonresident defendant "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (internal quotations omitted). Where a court's exercise of jurisdiction does not directly arise from or relate to a defendant's forum-related activities, the court may nevertheless maintain *general* personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 415-16 (1984). But to be subject to general jurisdiction in a forum state, a defendant's affiliations with that state must be "so 'continuous and systematic' as to render [it] essentially at home" there. *Daimler AG v. Bauman,* 571 U.S. 117, 127 (2014) (internal quotation marks and citation omitted).

Here, Plaintiffs' allegations fail to establish personal jurisdiction under the traditional "minimum contacts" test. They devote 63 paragraphs in their complaint to describing perceived irregularities in the conducting of the November 3, 2020 general election *in* the State of Michigan. (Compl., ¶¶ 127-190.) But none of these paragraphs describe any actions by Governor Whitmer or Secretary Benson that were "purposefully directed at residents" of the State of Colorado. *Burger King*

6

*Corp.,* 471 U.S. at 472.  Nor have Plaintiffs alleged that Governor Whitmer or

Secretary Benson engage in continuous and systematic contacts with Colorado that

would render Defendants at home in the State.  *Daimler*, 571 U.S. at 127.  As a

result, this Court should dismiss Plaintiffs' claims against Governor Whitmer and

Secretary Benson for lack of personal jurisdiction.

## II.   The Michigan Defendants' motion to dismiss must be granted where Plaintiffs have failed to state a claim against Defendants.

The Michigan Defendants observe that Dominion Voting Systems and

Facebook have filed motions to dismiss as well.  Governor Whitmer and Secretary

Benson concur in the able arguments made by counsel in those briefs and have

endeavored to keep similar arguments limited in the instant filing.

### A.   Legal standard

Defendant also moves to dismiss under Federal Rule of Civil Procedure

12(b)(6). Under modern federal pleading standards, a complaint must contain "a

short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a)(2).  A complaint will survive a motion to dismiss if the

plaintiff alleges facts that "state a claim to relief that is plausible on its face" and

that, if accepted as true, are sufficient to "raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see

also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs must "nudge[ ] [their]

claims across the line from conceivable to plausible." *Id.* at 555.  "[L]abels and

conclusions" and "a formulaic recitation of the elements of a cause of action" are

insufficient. *Id.* at 555.

**B.      Plaintiffs fail to state a claim as to Governor Whitmer and Secretary Benson.**

In Count I Plaintiffs allege a violation of the Electors Clause of the U.S. Constitution based on the theory that Defendants violated state law mandating the manner in which electors are chosen.  (Compl., ¶¶ 292-325.)

However, a federal court in Michigan rejected a similar, if not the same exact argument, as to these Defendants in *King, et al. v. Whitmer, et al.*, 2020 WL 7134198 (E.D. Mich., Dec. 7, 2020).  There, the court concluded that the plaintiff voters and electors did not have standing to bring their claim because claims that laws have not been followed are generalized grievances insufficient to support standing, particularly where any claim belonged to the Michigan Legislature, and not the plaintiffs.  (*Id*. at *10) (citing *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (rejecting idea that "private citizens acting on their own behalf" can bring an Election Clause claim); *Arizona State Legislature v. Arizona Independent Redistricting Comm.,* 576 U.S. 787 (2015); *Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. 2020)).

The court further concluded that the plaintiffs' claims were without merit because case law did not support interpreting the Electors and Elections Clauses to be violated any time a state may violate its own election laws.  (*Id*. at *11) (citing *Cook v. Gralike*, 531 U.S. 510 (2001); *Arizona State Legislature,* 575 U.S. 787.)  *See also Bognet*, 980 F.3d at 343-344, 349; *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020); *Wood v. Raffensperger*, No. 1:20-CV-04651-SDG, 2020 WL 6817513, at *5

(N.D. Ga. Nov. 20, 2020), aff'd, 981 F.3d 1307 (11th Cir. 2020) (December 5, 2020, decision); Cf. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (holding that Republican presidential electors had standing to bring Electors Clause claim under Minnesota law) (October 29, 2020 decision).

This Court should likewise conclude that Plaintiffs' lack standing to bring their Electors Clause claim, and that the claim is otherwise without merit.

In Count II, Plaintiffs allege a violation of the Equal Protection Clause based on the administration of the November 2020 election. (Compl., ¶¶ 326-350.) Plaintiffs' theory is rather unclear, but they cite *Bush v. Gore*, 531 U.S. 98, 107 (2000) as prohibiting differential standards in the treatment or tabulating of ballots. (*Id.*, ¶¶ 331-332.) Plaintiffs allege that "every registered voter in America" has been damaged, and that "equal protection violations in one state can and do . . . *dimmish the weight* of votes cast by citizens of other states that lawfully abide by the election structure set forth in the Constitution." (*Id.*, ¶¶, 334, 343) (emphasis added.) It thus appears that Plaintiffs are alleging a vote-dilution, equal protection claim on behalf of themselves and all registered voters. But such a claim would be meritless.

A vote-dilution claim is generally only viable, and a party only has standing to assert such a claim, where the law devalues certain voters' votes over another group of voters' votes. *See, e.g., Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019); *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018); *Bush,* 531 U.S. at 104-05, and the cases cited therein. But here, Plaintiffs' claims of harm in counting

9

supposedly invalid ballots allegedly affected *all* voters, not just Plaintiffs.  And, as above, other federal courts have rejected similar claims regarding the November 2020 election.  *See, e.g., Bognet*, 980 F.3d at 354-55 ("Put another way, '[a] vote cast by fraud or mailed in by the wrong person through mistake,' or otherwise counted illegally, 'has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.' ") (citations omitted); *Wood*, 2020 WL 6817513, at *8–10 (concluding that vote-dilution injury is not "cognizable in the equal protection framework"); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680 at *45-46 (W.D. Pa. Oct. 10, 2020)).  This includes the court in *King*, which rejected similar claims against Governor Whitmer and Secretary Benson based on some of the same allegations of election irregularities presented here.  *See King*, 2020 WL 7134198 at *9, 12-13 ("Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court," and "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.").[8]

---

[8] Plaintiffs make several allegations regarding racial discrimination in their Equal Protection Clause claim.  (Compl., ¶¶ 335-342.)  But these appear to be included only to avoid any claim by Defendants that the purported unlawful actions were necessary to avoid racial discrimination.

Because Plaintiffs' lack standing to bring their Equal Protection Clause claim, and where they otherwise fail to state a claim, this Court should dismiss Count II.

In Count III, Plaintiffs allege a violation of the Due Process Clause based on the theory that the election was administered in a manner that was fundamentally unfair thereby diluting Plaintiffs' votes.  (Compl., ¶¶ 351-362.)  To the extent this claim is pled as a vote-dilution claim, such claims are analyzed under equal protection, not due process, and fail for the reasons stated above.  *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (specific amendment applies over generalized concept of substantive due process).  But even if Plaintiffs' allegations were construed as a "fundamental fairness" due process claim, their claim still fails. "The Constitution is not an election fraud statute," *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013), and it "d[oes] not authorize federal courts to be state election monitors."  *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980).  Even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution."  *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) (quoting *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987)).

The kind of unconstitutional irregularities that courts have entertained under the Due Process Clause consist of widespread disenfranchisement through system-wide process failures.  *See Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580, 597

11

(6th Cir. 2012). But here, Plaintiffs complain instead of widespread
*enfranchisement*, and essentially seek to *disenfranchise* voters. And in that case,
they fail to state a claim under the Due Process Clause.

Counts IV and V do not pertain to Defendants Whitmer and Benson. In
Count VI Plaintiffs request declaratory relief. (Compl., ¶¶ 404-406.) But to obtain
declaratory relief Plaintiffs' must present the Court with an "actual controversy"
similar to the "case or controversy" requirement of standing. *See Surefoot LC v.
Sure Foot Corp.,* 531 F.3d 1236, 1240 (10th Cir. 2008). But for the reasons
discussed above, Plaintiffs have not and cannot do so where they lack standing to
bring their claims. Finally, in Count VII Plaintiffs request permanent injunctive
relief based on the other alleged violations. (Compl., ¶¶ 407-409.) This claim must
be dismissed because an "injunction" "is not an independent cause of action," but
rather a "remedy" if a plaintiff can show his or her legal rights have been violated.
*Romstad v. City of Colorado Springs*, 650 F. App'x 576, 585 n.7 (10th Cir. 2016)
(citation omitted). Where there is no violation, there is no right to an injunction.
*Id.* Because Plaintiffs' substantive claims fail, their request for injunctive relief
fails as well.[9]

---

[9] To the extent Defendants might have been sued in their individual capacity, they
would be entitled to assert the defense of qualified immunity should this case not be
dismissed outright.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendants Governor Gretchen Whitmer and

Secretary of State Jocelyn Benson request that this Court grant their motion to

dismiss.

Dated: March 15, 2021

Respectfully submitted,

Dana Nessel
Michigan Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 15, 2021, a copy of the
foregoing document was electronically filed with the Court using the CM/ECF
system which will send notification of such filing to all counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action NO. 1:20-cv-3747-NRN

KEVIN O'ROURKE, *et al.*,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., *et al.*,

Defendants.

---

## MOTION TO DISMISS OF DEFENDANTS BRIAN KEMP AND BRAD RAFFENSPERGER AND BRIEF IN SUPPORT

---

Brian Kemp, Governor of Georgia, and Brad Raffensperger, the Georgia Secretary of

State (collectively, the "Georgia Defendants"), move to dismiss Plaintiffs' Complaint (Doc. 1)

for lack of subject matter and personal jurisdiction, pursuant to Federal Rule of Civil Procedure

12(b)(1) and (b)(2), for the reasons shown in the following brief in support.

## INTRODUCTION

This action is the latest in a long line of baseless lawsuits challenging the results of 2020

Presidential Election in Georgia, none of which have been successful.[1] Plaintiffs' allegations are

---

[1] Numerous litigants, including former President Donald J. Trump, filed state election contests seeking to re-do the 2020 Presidential Election, in addition to federal lawsuits seeking stop or undo certification of the general election results. In all of these cases, injunctive relief was denied and/or the case was dismissed. *See, e.g., Trump v. Kemp*, No. 1:20-cv-05310-MHC, 2021 U.S. Dist. LEXIS 4185 (N.D. Ga. Jan. 5, 2021) (motion for injunction denied); *Trump v. Raffensperger*, No. 2020cv343255 (Fulton Superior Court) (election contest voluntarily dismissed by plaintiff on the day before trial); *Texas. v. Pennsylvania*, No. 155 (Orig.) 2020 WL 7296814 (U.S. Dec. 11, 2020) (denying petition to file original action challenging Georgia's general election results); *Wood v.*

not new—they rely on the same debunked myths, conspiracy theories, and outright lies regarding the election that have been repeatedly rejected by courts. The only difference between this action and the prior cases is that Plaintiffs are not asking the Court to undo the election results. Instead, Plaintiffs are asking to be paid $160 billion dollars because they are disappointed in Georgia's election results, even though none of the Plaintiffs are actually Georgia voters. There is no reason for this Court to seriously entertain Plaintiffs' claims and re-litigate the accuracy of Georgia's election results, which have been upheld over and over again under enormous scrutiny.

As a threshold issue, this Court lacks jurisdiction to consider Plaintiffs' claims against the Georgia Defendants. First, this Court lacks personal jurisdiction over the Georgia Defendants, who have no ties to the forum state of Colorado. It would certainly violate due process and "offend 'traditional notions of fair play and substantial justice" for this Court to exercise personal jurisdiction over the Georgia Governor and Secretary of State for actions they took in their capacity as elected officials of another state.

Second, Plaintiffs lack Article III standing. Plaintiffs have alleged no set of facts that establishes that they have suffered an injury in fact that is traceable to the Georgia Defendants, or

---

*Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) (affirming denial of motion to enjoin certification of general election results); *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga.) (dismissed); *Wisconsin Voters Alliance, et al. v. Pence*, No. 20-3791, 2021 U.S. Dist. LEXIS 127 (D.D.C. Jan. 4, 2021) (*sua sponte* dismissal of a challenge to Georgia's general election results, in which the district court referred plaintiffs' counsel to the court's grievance commission for discipline for filing a frivolous action); *Wood v. Raffensperger*, No. 2020cv342959 (Fulton County Superior Court) (dismissed); *Della Polla v. Raffensperger*, No. 20-1-7490-46 (Cobb County Superior Court) (dismissed); *Boland v. Raffensperger*, No. 2020cv34018 (Fulton County Superior Court) (dismissed).

Appendix Page 777

that this Court can redress any perceived injury caused by the Georgia Defendants. Accordingly, Plaintiffs' claims against the Georgia Defendants must be dismissed.

## **FACTUAL BACKGROUND**

I.      **Plaintiffs' Allegations against the Georgia Defendants have been Raised and Rejected by Federal and State Courts in Georgia**

The Plaintiffs, none of whom reside in Georgia or voted in Georgia, believe many things about the presidential election in Georgia that simply are not true. The truth is that the 2020 presidential election in Georgia was secure and the results are accurate. Cybersecurity experts at the federal agency charged with ensuring the security of elections determined that there is "*no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.*" [2] The accuracy of the presidential election results in Georgia was confirmed through: (1) a statewide risk-limiting audit; [3] (2) a hand recount; and (3) independent testing that confirmed that the security of the state's electronic voting equipment was not compromised. [4]

Despite these demonstrable facts, Plaintiffs perpetuate disinformation and conspiracy theories regarding the election that have been disseminated by unreliable, fringe internet media

---

[2] *See* Cybersecurity & Infrastructure Security Agency's Joint Statement, November 12, 2020. A copy of this statement is available at https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

[3] *See* Statement of Secretary Raffensperger, "Historic First Statewide Audit of Paper Ballots Upholds Results of Presidential Race," available at https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race.

[4] *See* Statement of Secretary Raffensperger, "Secretary Raffensperger Announces Completion of Voting Machine Audit Using Forensic Techniques: No Sign of Foul Play," available at https://sos.ga.gov/index.php/elections/secretary_raffensperger_announces_completion_of_voting_machine_audit_using_forensic_techniques_no_sign_of_foul_play.

sources.[5] Plaintiffs have not alleged any independently verified facts in their Complaint; instead,

they merely copied and pasted the same allegations levied against the Georgia Defendants by

plaintiffs in other cases. Specifically, Plaintiffs allege that the Georgia Defendants violated their

constitutional rights and the rights of "all Americans" by (1) using Dominion voting machines;

(2) altering Georgia's election laws regarding the verification and counting of absentee ballots;

and (3) allowing counties to accept money from private non-profit companies. (*See* Doc. 1 at ¶¶

191-213).

 None of these allegations are new, and Plaintiffs readily acknowledge that these

allegations were lifted from prior lawsuits against the Georgia Defendants challenging the

presidential election.  (*See* Complaint at ¶ 199 (citing *Texas v. Pennsylvania, et al.*, S.C. Docket

No. 22O155; ¶¶ 200 & 201 n. 43 (citing *Wood v. Raffensperger*, Civil Action File No. 1:19-cv-

05028-WMR (N.D.Ga.)); ¶¶ 202 n. 44 & 203 (citing *Pearson v. Kemp*, Civil Action File NO.

1:20-cv-04809-TCM (N.D. Ga.); ¶ 204 (citing *Wood v. Raffensperger*, Ga. Superior Ct. Case No.

2020CV342959)). However, Plaintiffs fail to candidly disclose to the Court that all of these

lawsuits have been dismissed, and no court has found any of the cited allegations to be supported

by evidence or granted any type of relief.

 For example, Plaintiffs recite the allegations raised in *Pearson v. Kemp* in support of their

allegations that Georgia's election results are fraudulent because the software used by Dominion

Voting Systems, one of Georgia's elections vendors, was "created to rig elections" as part of a

---

[5] Plaintiffs' Response to Dominion's Motion to Dismiss (Doc. 39) cites to fringe sources such as internet blogs World Net Daily and Gateway Pundit, and a video produced by My Pillow CEO Mike Lindell posted on the video sharing site Rumble. Citation to these types of sources, along with copying allegations from other failed lawsuits, hardly satisfies the requirement of Fed. R. Civ. P. 11 that factual contentions in a pleading have evidentiary support.

4

"common scheme, plan and *modus operandi*, concerning the creation of said software to manipulate elections, worldwide, e.g., in Venezuela." (Doc. 1 at ¶ 203). U.S. District Court Judge Timothy Batten stated how he viewed the plausibility of the claims before him in *Pearson*:

> In this case, the Plaintiffs are a group of disappointed Republican presidential electors. They assert that the 2020 presidential election in Georgia was stolen, and that the results, Joe Biden winning, occurred only because of massive fraud. Plaintiffs contend that this massive fraud was manifest primarily, but not exclusively, through the use of ballot stuffing. And they allege that this ballot stuffing has been rendered virtually invisible by computer software created and run by foreign oligarchs and dictators from Venezuela to China to Iran. The defendants deny all of Plaintiffs' accusations. They begin in their motions to dismiss by rhetorically asking what a lot of people are thinking, why would Georgia's Republican Governor and Republican Secretary of State, who were avowed supporters of President Trump, conspire to throw the election in favor of the Democratic candidate for President.

*See* **Exhibit A** at 2-3 (Transcript of Dec. 7, 2020 hearing). Judge Batten denied the *Pearson* plaintiffs' request that the presidential election results be de-certified and granted the State's motion to dismiss, holding that the court lacked jurisdiction to hear plaintiffs' claims and that the plaintiffs lacked standing. *See id.* at 42-43. Although the *Pearson* plaintiffs appealed the decision to the Eleventh Circuit Court of Appeals and sought emergency review with the U.S. Supreme Court, those appeals have been dismissed by the plaintiffs and the case has been terminated.

Plaintiffs' allegations regarding Georgia's procedures for verifying absentee ballots, *see* Doc. 1 at ¶¶ 200, 201, were rejected on the merits in *Wood v. Raffensperger*, No. 1:20-cv-04651-SDG, 2020 U.S. Dist. LEXIS 218058 (N.D. Ga. Nov. 20, 2020), *aff'd* 981 F.3d 1307 (11th Cir. 2020). In that case, attorney L. Lin Wood argued that the Georgia Secretary of State abrogated Georgia election law by agreeing in a settlement agreement to issue guidance to county elections officials that clarified the process for verifying voter signatures on absentee ballot envelopes. *Id.* at *8-9. U.S. District Court Judge Steven Grimberg rejected Wood's argument, finding that "the

Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law." *Id.* at *31.[6] Judge Grimberg also held that Wood lacked Article III standing to assert his constitutional claims because his alleged injury was a generalized grievance that any Georgia voter could have asserted. *Id.* *13-15. The Eleventh Circuit Court of Appeals affirmed the decision that Wood lacked standing because he failed to allege a concrete and particularized injury, rather than a generalized grievance. 981 F.3d at 1314-15. Wood's petition for certiorari to the U.S. Supreme Court was denied, and that case has been terminated.

Finally, Plaintiffs' allegation that the Georgia Defendants impermissibly allowed counties to accept money from private non-profit company CTCL was rejected by a Georgia Superior Court in *John Wood v. Raffensperger*, Civil Action No. 2020CV342959 (Fulton Cty. Sup. Ct.). The court held that these claims against the Georgia Governor and Georgia Secretary of State were barred by sovereign immunity and were not the proper basis for an election contest under state law. *See* Order of Dec. 8, 2020, attached as **Exhibit B**.

In sum, all of Plaintiffs' allegations against the Georgia Defendants have been raised in prior cases by Georgia plaintiffs and have been rejected by numerous federal and state courts. That Plaintiffs cited these cases but failed to disclose to the Court the unsuccessful outcomes underscores the speciousness of their claims.

---

[6] Another federal judge reached the same conclusion in an action filed by former President Trump, which raised similar allegations with respect to the settlement agreement. *Trump v. Kemp*, No. 1:20-cv-05310-MHC, 2021 U.S. Dist. LEXIS 4185 at *25-26 (N.D. Ga. Jan. 5, 2021) ("State legislatures 'possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses' like the Georgia General Assembly did in giving the Georgia Secretary of State authority to enter into the settlement agreement….").

6

## II.  Plaintiffs Fail to Allege any Facts Supporting Jurisdiction in this Judicial Forum

Notably absent from Plaintiffs' Complaint are any allegations that the Georgia

Defendants' actions were purposefully directed at residents of Colorado—or voters in any other

state for that matter—and that this litigation results from alleged injuries that arise out of or

relate to those actions, or that the Georgia Defendants have general business contacts with

Colorado, so as to provide this Court with personal jurisdiction over the Georgia Defendants.

Also absent from Plaintiffs' complaint are any facts supporting their standing to sue the Georgia

Defendants.  Specifically, the Plaintiffs have not alleged that the Georgia Defendants injured any

of the Plaintiffs in an individual particular way, and that any perceived injury is both traceable to

the Georgia Defendants and redressable.  Instead, Plaintiffs merely assert that they have

standing, which is insufficient, as discussed below. (*See* Complaint at ¶¶ 304, 320).

## ARGUMENT AND CITATION OF AUTHORITIES

## I.  This Court Lacks Personal Jurisdiction Over the Georgia Defendants

This Court lacks personal jurisdiction over the Georgia Defendants, as haling the Georgia

Defendants into Colorado courts for official actions conducted in Georgia to run a state election

would offend traditional notions of fair play and substantial justice. "Federal courts ordinarily

follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*,

571 U.S. 277, 283 (2014) (quotations omitted). "This is because a federal district court's

authority to assert personal jurisdiction in most cases is linked to service of process on a

defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where

the district court is located.'" *Id*. (quoting Fed. Rule Civ. Proc. 4(k)(1)(A)). This is only part of

the inquiry, however. Due process also "constrains a State's authority to bind a nonresident

7

defendant to a judgment of its courts," and thus, a federal court's exercise of personal jurisdiction through a state's long arm statue must also "comport with the limits imposed by federal due process." *Id.*

Due process requires a nonresident to have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This inquiry "focuses on the relationship among 'the defendant, the forum, and the litigation.'" *Id.* at 284 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). Thus, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* Furthermore, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, *not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State*." *Id.* at 286 (quotation omitted) (emphasis added).

In regards to the "minimum contacts" standard, the Tenth Circuit has explained:

> The "minimum contacts" standard may be met in two ways. First, a court may, consistent with due process, assert *specific* jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state.

*Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090-91 (10th Cir. 1998)) (internal citations and quotations omitted). According to the Tenth Circuit, "[t]he Colorado Supreme Court has interpreted Colorado's long-arm statute to extend jurisdiction to the fullest extent permitted by

8

the Due Process Clause of the Fourteenth Amendment," which "obviates the need for a long-arm

statutory analysis separate from the due process inquiry required by *International Shoe Co*. [. . .]

and its progeny."  *Ast Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir.

2008).

The Georgia Defendants lack sufficient minimum contacts with Colorado for the exercise

of personal jurisdiction over them in this forum to comport with due process. Plaintiffs have pled

no facts to explain why a federal court in Colorado would have personal jurisdiction over the

Governor and the Secretary of State of Georgia for official actions taken in Georgia pertaining to

a Georgia election. Plaintiffs have failed to allege any facts that would support this Court's

exercise of specific or general personal jurisdiction over the Georgia Defendants, as they have

not even alleged that the Georgia Defendants' actions were purposefully directed at residents of

Colorado and that the litigation results from alleged injuries that arise out of or relate to those

activities alleged, or that the Georgia Defendants have general business contacts with Colorado.

*See Wisconsin Voters Alliance, et al. v. Pence*, No. 20-3791, 2021 U.S. Dist. LEXIS 127, at *4

(D.D.C. Jan. 4, 2021) (dismissing challenge to Georgia's election results brought against the

Georgia Governor and Georgia Secretary of State in part because of a lack of personal

jurisdiction over the Georgia Defendants in the District of Columbia).

The Supreme Court has repeatedly said that "[f]or a State to exercise jurisdiction

consistent with due process, the defendant's suit-related conduct must create a substantial

connection with the forum State." *Walden*, 571 U.S. at 284. This is certainly not the case here.

The Georgia Defendants did not create contacts with Colorado by overseeing and certifying an

election in Georgia.  And to the extent that Plaintiffs allege that the Georgia Defendants'

9

certification of the results of the Georgia election had an effect on the election nationwide, such conduct and any resultant harm would merely be "a random, fortuitous, or attenuated contact," which is not sufficient to bring them within the jurisdiction of Colorado courts. *Id.* at 286 (quotation omitted). Because there is no purposeful availment of the privilege of conducting activities within Colorado by the Georgia Defendants, exercising personal jurisdiction over them would violate their due process rights and "offend 'traditional notions of fair play and substantial justice.'" *Id.* at 283 (quoting *International Shoe Co.*, 326 U.S. at 316). Therefore, this Court must dismiss the Georgia Defendants from this action.

## II.   Plaintiffs Lack Standing.

Plaintiffs' claims suffer from another fatal jurisdictional defect: lack of standing. Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an irreducible constitutional minimum, Plaintiffs must demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also Lujan*, 504 U.S. at 561.  As the party invoking federal jurisdiction, Plaintiffs bear the burden at the pleadings phase of "clearly alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

### A.   Plaintiffs have not clearly alleged an injury in fact.

Injury in fact is the "first and foremost" of the standing elements. *Id.* "[T]he requirement of an 'injury in fact,' requires 'an invasion of a legally protected interest which is (a) concrete

10

and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1181 (10th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs cannot show, and have not alleged, that the Georgia Defendants' actions relating to the presidential election conducted in Georgia, even if unconstitutional as Plaintiffs posit, which they are not, harmed them at all. Plaintiffs' alleged injury, to put it simply, is that the Georgia Defendants' actions of not following the Constitution and Georgia law diluted their votes. (*See* Doc. 1 at ¶¶ 292-362). Plaintiffs' alleged injury is not an injury particularized to Plaintiffs that is "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). This is because none of the Plaintiffs voted in Georgia, or even reside in Georgia. The Supreme Court has stated that, in vote dilution and gerrymandering cases, the injury is district specific and not state-wide in nature, and thus, a voter only has standing to bring claims concerning their own district. *See id*. at 1930. Otherwise, the Supreme Court has stated, that person is asserting "only a generalized grievance against governmental conduct of which he or she does not approve." *Id*.; *see also Lance v. Coffman*, 549 U.S. 437, 440– 41 (2007) (holding that "a generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

Here, Plaintiffs are not only raising claims against the Georgia Defendants that do not involve their own district, but also do not involve their own state. Accordingly, it is not possible for the actions of the Georgia Defendants to have affected or harmed the Plaintiffs in any concrete or particularized way. Plaintiffs only raise a generalized grievance against government

conduct in another state that they do not approve of, which is insufficient to meeting the harm requirement of Article III standing. *Id*. at 1930.

Furthermore, federal courts in Georgia have held that even *Georgia voters* do not have standing to raise the *same exact claims* as Plaintiffs here. The Eleventh Circuit rejected the same vote dilution argument made by Plaintiffs in *Wood*, holding that Wood's claimed injury was merely a generalized grievance because any other voter could have raised it. 981 F. 3d 1307, 1314 (11th Cir. 2020) ("Wood cannot explain how his interest in compliance with state election laws is different from that of any other person."). Similarly, in *Pearson*, the court held that the plaintiffs, who were Georgia Republican presidential electors, lacked standing to bring their claims "because anyone could have brought this suit and raised the exact same arguments and made the exact same allegations that the Plaintiffs have made in their complaint." *See* **Ex. A** at 42.

By Plaintiffs' own admission, any voter in any state could bring the same claims they raise here. (*See* Doc. 1 at ¶ 319) ("The evidence establishes that the Defendants have engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country, no matter whose side the voter is on."). Accordingly, Plaintiffs only assert a generalized grievance, rather a concrete and particularized injury sufficient to satisfy Article III standing.

**B.      Any perceived injury Plaintiffs allege they have suffered is not traceable to the Georgia Defendants or redressable by this Court.**

Not only have Plaintiffs failed to demonstrate an injury in fact, they cannot satisfy the causation requirement of standing, which requires "a plaintiff's injury to be fairly traceable to the challenged *action of the defendant*, and not the result of the independent action of some third

party not before the court." *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007)

(quotations omitted); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir.

2020) (same). Plaintiffs offer no explanation whatsoever as to how any injury they claim to have

suffered is traceable to any action of the Georgia Defendants, especially considering that none of

the Plaintiffs voted or resided in Georgia during the presidential election. *See Trump v. Kemp*,

No. 1:20-cv-05310-MHC, 2021 U.S. Dist. LEXIS 4185, at *14-15 (N.D. Ga. Jan. 5, 2021)

("because Defendants [the Georgia Governor and Secretary of State] did not have any role in the

counting of any allegedly illegal votes, Plaintiff is unable to show that any injury he suffered was

fairly traceable to any action on the part of Defendants or redressable by any judgment against

Defendants").

      Plaintiffs' sweeping assertion that any citizen has standing to challenge the election laws

and processes of another state in a presidential election because presidents are elected nationally

is not supported by any legal precedent. (*See* Doc. 39 at 17-18). Plaintiffs' reliance on *Anderson

v. Celebrezze*, 460 U.S. 780 (1983) in support of this argument is misplaced and overstates the

Supreme Court's holding in that case. The *Anderson* decision, which sets forth the standard for

determining whether a state election law is unconstitutionally burdensome in violation of the

Fourteenth Amendment, involved a challenge to Ohio's ballot access laws for president. *Id.* at

783. There, the Supreme Court held that the state's interest in regulating ballot access for

candidates in a presidential election was not sufficiently important to prevent Ohio voters from

voting for a candidate who would be on the ballot in other states. *Id.* at 795. While, as Plaintiffs

state, the Supreme Court recognized the "uniquely important national interest" of a presidential

election, *see id.* at 794-95, it did so in the context of balancing the state's interest with that of the

rights of voters to vote for their preferred candidate. The Supreme Court certainly did *not* hold in *Anderson* that voters outside of Ohio had standing to challenge the Ohio ballot access law at issue in that case. Indeed, the issue of standing was not even before the Court. And the Supreme Court has since been very clear that a plaintiff must still assert a concrete and particularized injury sufficient to satisfy Article III standing when challenging state election laws. *See Gill*, 138 S. Ct. at 1931.

In sum, Plaintiffs allege only a vague injury to the right to vote that is common to all voters. This is not a cognizable injury traceable to the Georgia Defendants that is sufficient to support Article III standing. Accordingly, the Court lacks subject matter jurisdiction over this action and it should be dismissed.

## CONCLUSION

Because the Court lacks subject matter jurisdiction over the action and personal jurisdiction over the Georgia Defendants, Plaintiffs' claims against the Georgia Defendants must be dismissed.

Respectfully submitted, this 15th day of March, 2021.

Christopher M. Carr
Attorney General

Bryan K. Webb
Deputy Attorney General

Russell D. Willard
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)
Georgia Bar No. 697316*

*Admitted to practice in this Court on Mar. 8, 2021

*Attorneys for the Georgia Defendants*

15

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing **MOTION TO DISMISS OF BRIAN KEMP AND BRAD RAFFENSPERGER** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record via electronic notification.

Dated: March 15, 2021.

/s/ Charlene S. McGowan
Charlene S. McGowan
Assistant Attorney General

16

# EXHIBIT A

```
 1                 United States District Court
                   Northern District Of Georgia
 2                       Atlanta Division

 3

 4   Coreco Jaqan Pearson,    )
     et al.,                  )
 5                            )
                 Plaintiff,   )
 6                            )      Civil Action
              vs.             )      File No. 1:20-CV-4809-TCB
 7                            )
                              )      Atlanta, Georgia
 8   Brian Kemp, et al.,      )      Monday December 7, 2020
                              )      10:00 a.m.
 9               Defendant.   )
     _____)
10

11

12                 Transcript of Motions Hearing
             Before The Honorable Timothy C. Batten, Sr.
13                 United States District Judge

14

15   APPEARANCES:

16       FOR THE PLAINTIFFS:           Sidney Powell
                                        Harry MacDougald
17                                      Attorneys at Law

18       FOR THE DEFENDANTS:           Carey Allen Miller
                                        Joshua Barret Belinfante
19                                      Charlene Swartz McGowan
                                        Melanie Leigh Johnson
20                                      Attorneys at Law

21

22

23   Lori Burgess, Official Court Reporter
     (404) 215-1528
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
```

```
1              THE COURT:  Good morning.  I would like to point out
2     that this hearing is being audio streamed nationally, so
3     whatever you say near your microphones will be picked up for
4     the world to hear, so you might want to be discreet in what
5     you have to say this morning with the microphones.  Also, I
6     would ask that -- each of y'all should have some plastic bags.
7     As you leave the lectern, take the bag with you, and the next
8     person who comes up should put a new bag.  You all have bags,
9     right?  Okay.  So that is what we are going to do.  All right.
10             In this case, the Plaintiffs are a group of
11    disappointed Republican presidential electors.  They assert
12    that the 2020 presidential election in Georgia was stolen, and
13    that the results, Joe Biden winning, occurred only because of
14    massive fraud.  Plaintiffs contend that this massive fraud was
15    manifest primarily, but not exclusively, through the use of
16    ballot stuffing.  And they allege that this ballot stuffing
17    has been rendered virtually invisible by computer software
18    created and run by foreign oligarchs and dictators from
19    Venezuela to China to Iran.
20             The defendants deny all of Plaintiffs' accusations.
21    They begin in their motions to dismiss by rhetorically asking
22    what a lot of people are thinking, why would Georgia's
23    Republican Governor and Republican Secretary of State, who
24    were avowed supporters of President Trump, conspire to throw
25    the election in favor of the Democratic candidate for
```

```
 1    President.
 2              We are going to turn now to the legal arguments.  We
 3    have several motions today, but primarily they are grouped
 4    into two.  First we have a motion to dismiss that has been
 5    filed by the State Defendants, the original defendants in the
 6    case, and then we have another motion to dismiss filed by the
 7    Intervening Defendants in the case.  The Plaintiffs of course
 8    oppose both of these motions.  They've been fully briefed, and
 9    I have read everything that has been filed in this case by the
10    Plaintiffs and everything pertaining to these motions.  If the
11    Defendants are not successful on those motions to dismiss, we
12    will proceed to hear argument on the substantive merits of the
13    complaint and the claims in the complaint.  The way that time
14    is going to be -- well let me begin it this way.  In their
15    legal arguments the Defendants contend that Plaintiffs lack
16    standing to bring this suit, which is pretty much what the
17    11th Circuit just held in Mr. Woods's own separate suit
18    against the State on Saturday.  The Defendants further argue
19    that under Georgia law this kind of suit, one for election
20    fraud, should be filed in State Court, not Federal Court.
21    This too is what the 11th Circuit held in a separate but
22    similar case recently.  And next, Defendants assert that
23    Plaintiffs waited too long to file this suit which seeks an
24    order decertifying the election results.  The Secretary of
25    State has already certified the election result, and there is
```

1    no mechanism that the Court is aware of of decertifying it,

2    but that is that the Plaintiffs seek.

3          And finally, the law is pretty clear that a party

4    cannot obtain the extraordinary remedy of injunctive relief

5    unless he acts quickly.  And Defendants contend that the

6    Plaintiffs have failed to do that, pointing out that all of

7    Plaintiffs' claims about the Dominion voting machines, the

8    ballot marking devices, could have been raised months ago, and

9    certainly prior to the November 3 election, and certainly

10   before Plaintiffs filed this suit over three weeks after the

11   election took place.

12         So these are the procedural arguments that the

13   Defendants are making today, or at least the main ones, I

14   believe.  And then the question is, assuming the Plaintiffs

15   can survive these procedural hurdles, what is the relief that

16   they want?  They want me to agree with their allegations of

17   massive fraud.  And what do they want me to do about it?  They

18   want me to enter injunctive relief, specifically the

19   extraordinary remedy of declaring that the winner of the

20   election in Georgia was Donald Trump and not Joe Biden.  They

21   ask me to order the Governor and the Secretary of State to

22   undo what they have done, which is certify Joe Biden as the

23   election winner.  We will get to those merits if the

24   Plaintiffs survive the motion to dismiss.

25         At this time we're going to begin with the motion to

```
 1    dismiss, and the time allotment will be as follows:  The State
 2    Defendants have 20 minutes -- let me back up.  Each side gets
 3    30 minutes.  The Plaintiffs get all 30 of their minutes, and
 4    the Defendants' 30 minutes are divided among the two sets of
 5    Defendants.  The State Defendants -- the State Defendants get
 6    20 minutes, and then the Intervening Defendants get 10
 7    minutes, following which we will hear the Plaintiffs'
 8    response.  They have up to 30 minutes.  And then whatever time
 9    was saved in -- reserved for rebuttal, the State Defendants
10    and Intervening Defendants will then have.
11            But before we go forward, is there any way we can
12    stop this fuzzy sound that is coming through up here?  I don't
13    know if it is coming through in the whole courtroom.  I don't
14    think has anything to do with my microphone.  (pause).  All
15    right, is that better?  I think it was the speaker, one of the
16    two speakers up here on the bench.  I talk loud enough and I
17    think the lawyers talk loud enough that I can hear what they
18    are going to say.  I don't need a microphone.  So at this time
19    I will turn the matter over to the State Defendants.
20            MR. MILLER:  Good morning, Your Honor.  Carey Miller
21    on behalf of the State Defendants.  I am joined today by Josh
22    Belinfante, Charlene McGowan, and Melanie Johnson.  Mr.
23    Belinfante will be handling the motion to dismiss.  I do want
24    to raise with the Court, to the extent that we get there,
25    State Defendants would like to renew their motion to alter the
```

1     TRO that is in place at this point.  I understand that we can

2     address that in that section.

3               THE COURT:  All right.  Thank you, sir.

4               MR. BELINFANTE:  I am not checking email, I am

5     trying to keep my time.

6               THE COURT:  Okay.

7               MR. BELINFANTE:  I would ask this.  Would the Court

8     allow me to speak without the mask?  Or do you prefer I keep

9     the mask on to speak?

10              THE COURT:  I think I need to have everybody keep

11    the mask on.

12              MR. BELINFANTE:  I'll be happy to do it.  Good

13    morning, Your Honor.  I think you have hit the nail on the

14    head in terms of what the issues are.  This case simply does

15    not belong in this Court.  The relief that Plaintiffs seek is,

16    as the Court described, extraordinary.  It is to substitute by

17    judicial fiat the wishes of the Plaintiffs over presidential

18    election results that have been certified, that have been

19    audited, that have been looked over with a hand-marked count.

20    There is zero authority under the Federal law, under the

21    Constitution of the United States, or even under Georgia law

22    for such a remedy.

23              If the Plaintiffs wanted the relief they seek, they

24    are not without remedies.  They could do what the campaign of

25    the President has done, which is file a challenge in Georgia

1    court under Georgia law challenging election irregularities.

2    There are three currently pending.  I have with me two Rule

3    Nisi orders.  One will proceed today at 3:30 in the Cobb

4    Superior Court sitting by designation.  Another I believe is

5    Wednesday.  And the President's, as I understand it, is to

6    proceed on Friday.  That is where these claims should be

7    brought.

8            To the extent that the claims are about something

9    else, the Court need only look at what has happened in Georgia

10   since roughly 2019 and the passage of House Bill 316.  It was

11   at that time that the Georgia legislature completely redid

12   Georgia election law.  And there had been suit after suit

13   after suit, many of which brought by the Defendant

14   interveners, their allies, and others who question election

15   outcomes.  And in every suit no relief has been ordered that

16   has been upheld by the 11th Circuit.  In fact, no court has

17   ordered relief.  And to the extent that two have, the *Curling*

18   case and the *New Georgia Project* case on discrete issues, the

19   11th Circuit stayed those because it concluded that there was

20   a strong likelihood of reversible error.

21           So what does this tell you?  It tells you that

22   Georgia laws are constitutional, Georgia elections are

23   constitutional, and Georgia machines are constitutional.  The

24   constitutional that the legislature has set forward is

25   constitutional.  Now, that's where the Plaintiffs have backed

1    themselves into a corner from which they cannot escape.   In

2    their reply brief, the claims, from the State's perspective,

3    got significantly crystallized.   It became much clearer.   And

4    they're relying heavily on *Bush v. Gore*.   The problem is that

5    they are turning *Bush v. Gore* on its head.

6            In *Bush v. Gore* the challenge was that a Florida

7    Supreme Court decision was going to, as the Plaintiffs repeat

8    often, substitute its will for the legislative scheme for

9    appointing presidential elections.   That is exactly what they

10   are asking this Court to do, substitute this Court for the

11   Florida Supreme Court, and you have *Bush v. Gore* all over

12   again.   And that manifests itself in various different forms

13   that the Court has seen in our brief and the Court has already

14   identified.   I will not go through all of them.   I will try to

15   hit the high notes on some, but we will rely on our briefs.

16   We're not dropping or conceding arguments, but we will rely on

17   our briefs for those that I don't address expressly.

18           Let's talk briefly about what the complaint is,

19   because that has been I think significantly clarified with the

20   reply brief.   One, the parties are presidential electors.   And

21   they argue that that makes a significant difference.   But what

22   are the acts of the State?   Not Fulton County, not mullahs in

23   Iran, not dictators in Venezuela.   What are the acts of the

24   State that are at issue?   And it's in the discussion about

25   traceability and the *Jacobson* decision in the 11th Circuit

1    where that gets fleshed out really for the first time in the

2    reply brief, and there are three.  And they tell you, and I

3    will keep coming back to it, on Page 20 of their reply brief.

4              The Plaintiffs, describing the State, say they

5    picked the Dominion system.  Their policies led to de facto

6    abolition of the signature match requirement, their

7    regulations to permit early processing of absentee ballots is

8    unlawful and unconstitutional.  Those are the three acts of

9    the State.  Everything else is happening at a county level,

10   period.  And from that they raise what appears to now be four

11   claims.  One is the Elections and Electors Clause citing the

12   absentee ballot opening rule, I will refer to it as, the

13   settlement agreement.  They raise equal protection claims

14   saying that the violation of the Election Clause has led to a

15   vote dilution and discrimination against Republican voters.

16   They argue that due process is violated because they have a

17   property interest in lawful elections, again, under the

18   Elections and Electors Clause.  And finally, they raise a pure

19   State claim in Federal Court under a voter election challenge.

20             What is the relief they seek?  The Court has

21   identified it.  Why do they seek it?  The Court is informed of

22   this on Page 25 of the reply brief.  And it is -- if the Court

23   will not order a different result than what a certified

24   election has, they seek it through another means.  They say on

25   Page 25 that allowing the electors to be chosen by the

1    legislature under the plenary power granted to them for this

2    purpose by the elections and election laws.  One way or the

3    another, the relief they seek is judicial fiat, changing

4    certified election results.  And to evaluate these claims the

5    Court does need to consider aspects of State law.  And this is

6    where the problem lies.  I am going to keep going until you

7    tell me to stop.

8               (noise from courtroom audio system).

9               THE COURT:  I am sorry, Mr. Belinfante.  I don't

10   know what the issue is.  We just have to bear through it

11   unless or until somebody fixes it.  I've got six kids.  It

12   doesn't bother me.

13              MR. BELINFANTE:  I have three, I understand.  I also

14   have the loudest dog in America.  In any case, to evaluate the

15   claims, you have to look at State law.  And because the

16   Plaintiffs raise Code Section 21-2-522 and the statutes that

17   surround it, it's those cases that are important.  It allows a

18   challenge based on these grounds - in fact some are pending

19   now - misconduct, fraud, irregularity, illegal votes, and

20   error are all grounds to challenge an election in Georgia.

21   All of these issues can be brought in in those cases.  Those

22   election challenges have to be decided promptly under

23   21-2-525.  And, and this is critical, the relief sought is not

24   to declare someone else a winner, it is to have another

25   election.  This goes to the point that there is simply no

1    authority for the relief that they seek.

2           Turning first, with that factual predicate in mind,

3    to standing.  There has been a fair amount of briefing on

4    whether the status as a presidential elector guarantees

5    standing.  The 8th Circuit said yes, the 3rd Circuit said no.

6    And I think the 3rd Circuit's analysis is more persuasive.

7    And to the extent that the Plaintiffs say the 3rd Circuit did

8    not consider their status as an electorate, that is true, but

9    the electorate is not what gives you unique status, it's if

10   the electorate is a candidate.  And that is expressly what the

11   3rd Circuit considered in the *Bognet* decision, and we would

12   suggest that that is the more persuasive one that we rely on

13   in our briefs.

14          But I do want to address two other aspects of

15   standing that are more particularized.  One is that when they

16   are seeking to invalidate a State rule or a consent decree

17   that the State has entered into, or anything truly under the

18   Elections Clause, the *Bognet* case speaks to this as well.  And

19   it says that because Plaintiffs are not the General Assembly,

20   nor do they bear any conceivable relationship to the State

21   law-making process, they lack standing to sue over the alleged

22   usurpation of the General Assembly's rights under the

23   Elections and Electors Clauses.  That is absolutely true here.

24   The *Wood* court, the 11th Circuit *Wood* opinion, says the same,

25   citing *Walker,* because Federal Courts are not constituted as

1    freewheeling enforcers of the Constitution and laws.  And that

2    is the injury that underlies all of their claims, which is why

3    they lack standing.

4            I am not going to get into traceability as much

5    because I think the most useful aspect of the traceability

6    issue is the crystallizing of Plaintiffs' complaints, and as

7    I've indicated, the isolating of the State acts in particular.

8            On sovereign immunity, I only want to highlight that

9    a decision just came out in Michigan seeking very similar

10   relief.  We will get you the cite.  It is Michigan -- it is

11   against Whitmer, *King versus Whitmer*, in the Eastern District

12   of Michigan.  Walks through all of the issues in this case and

13   rejects the claims, denies the relief.  On sovereign immunity

14   they raise the point that under *Young*, you can only get

15   prospective injunctive relief.  That is not decertification,

16   that is a retrospective.  And so sovereign immunity would bar

17   that.  They do seek to prevent the Governor from mailing the

18   results; that can be prospective, but there is just no relief

19   for it.  So that is all I will says on sovereign immunity.

20           On laches, the Michigan Court also joined in with

21   Judge Grimberg on laches in the *Wood* case and said that there

22   is time that is inexcusable.  The Court is well-aware of the

23   elements, was there a delay, was it not excusable, and did the

24   delay cause undue prejudice.  Judge Grimberg has already

25   looked at this argument in the context of the *Wood* case and

1    the challenge to the consent order and said laches applied.

2    And it does here for all of the Plaintiffs' arguments, and all

3    you need to do, again, is go back to that Page 20 and see why.

4    They say that their policies, the State's policies, led to a

5    de facto abolition of the signature requirement.  The

6    complaint at Paragraph 58 acknowledges in Exhibit A that that

7    happened in March of this year.  There has been plenty of time

8    that they thought the Secretary overstepped his bounds to

9    bring a challenge in that case or to bring a challenge even

10   afterwards, challenge the OEB.  They did not.

11          They say on Page 20 that they, the State, picked the

12   Dominion system.  They tell you on Paragraph 12 that happened

13   in 2019.  There has been significant litigation over the

14   Dominion system.  Nothing has been held in order that the

15   Dominion system is unconstitutional, is flawed, or anything

16   else that has stuck.

17          Third, they said that their regulation, the absentee

18   ballot regulation, permitted absentee ballots as unlawful and

19   unconstitutional.  They tell you in Paragraph 60 that happened

20   in April of 2020.  Georgia law, in the Administrative

21   Procedures Act, specifically allows you to challenge rules,

22   50-13-10.  That wasn't done.  They certainly could have.  And

23   you don't need the fraud, as they allege, to happen first,

24   because their argument is not based on the fraud, it is based

25   on usurpation of power by the Executive Branch.  That can be

1    challenged when the rule has been promulgated, when the order

2    is out, and when the Dominion machines were selected.

3              We raise in our brief several forms of abstention.

4    And truly, Your Honor, they all kind of get to the same place

5    under different theories.  And again, the reply brief made

6    this point to the clearest.  I think at the end of the day,

7    while we will rely on our briefs in terms of why those matter,

8    and the Michigan court found that *Colorado River* abstention

9    should apply, there are parallel proceedings in State Court --

10             THE COURT:  Did they even argue why it shouldn't?

11             MR. BELINFANTE:  They argued that in voting rights

12   cases the 11th Circuit does not typically abstain.  And those

13   cases are slightly different.  They are challenging an

14   underlying statute, for the most part.  *Siegel* is a slightly

15   -- it's a different case.  But they are mostly challenging

16   underlying statutes.  And there is not a pending election

17   challenge on the same thing in State Court.  It's like the

18   other cases that we have seen that we've defended since the

19   gubernatorial election in 2018.  So no, I don't think so.  But

20   I think the *Bush v. Gore* analysis is the one that is most

21   critical, and it is that simply the Secretary -- the

22   legislative scheme for electing presidential electors is set

23   forth in the Code in Title 21, it has a means of challenging

24   fraudulent illegal votes, it has a means of allowing the

25   Secretary to address various issues, the State Election Board

1    to pass regulations.  All of that authority has been delegated
2    by, first, Congress to the Georgia Legislature, and then to
3    the Executive Branch.  That is the scheme that is put in
4    place, and that is exactly what they seek to turn on its head.
5    And what the three justice concurrence on which they rely
6    says, makes that impossible.  Because the Supreme Court said
7    at Page 120, for the Court, in that case the Florida Court, to
8    step away from this established practice prescribed by the
9    Secretary, the State official charged by the Legislature with
10   the responsibility to obtain and maintain uniformity in the
11   application, operation, and interpretation of election laws
12   was to depart from the legislative scheme.
13           Read the proposed order.  That is exactly what the
14   Plaintiffs seek here, and that is exactly what their own
15   authority says the Court cannot issue in terms of relief, and
16   that would actually trump the remaining claims because it
17   would violate the Elections Clause in order to arguably save
18   some other vague right in terms of due process.
19           Turning to that, let me talk briefly about the
20   absentee ballot regulation, the return of the ballots.  There
21   is nothing that is inconsistent with that, number one, because
22   if you look in the Election Code, there are five times that
23   the General Assembly said something cannot occur earlier than
24   X date.  This doesn't say that.  This says beginning on this
25   date they can do this, but it doesn't say it can only happen.

1    And the five times elsewhere in the Code would suggest that

2    the legislature knew how to change it if they wanted.  That is

3    121-2-132, 133, 153, 187, and 384.  They are simply reading

4    the regulation to create the conflict, when every piece of

5    Federal and State law says you should read it to avoid the

6    conflict.  In terms of the settlement agreement itself, I

7    think Judge Grimberg has sufficiently analyzed that.  And it

8    fills the gap.  There is no conflict.  They can't point to any

9    language that it does.  And at the end of the day it is an

10   OEB, an Official Election Bulletin, not a statute and not a

11   regulation of the State Election Board anyway.

12            On the Dominion machines, I think we will rely on --

13   Mr. Miller is going to talk about that a good deal, but also

14   they argue that the audit somehow doesn't save it because of

15   *Prohm* and that we are estopped from raising *Prohm.*  There are

16   two problems with that.  One, estoppel doesn't apply.  There

17   has been no final order.  They're not estopped from doing

18   anything.  That's the *Community State Bank vs. Strong* decision

19   from the 11th Circuit applying Georgia law 2011.  And two,

20   there has not been an order in *Curling* saying that the

21   machines are unconstitutional.  There have been nine

22   preliminary injunctions filed, no standard relief, and it

23   ignores -- the entire premise of the argument ignores that

24   when a voter gets a ballot from the machine they can read who

25   they voted for.  And when the hand count took place, they

```
 1    didn't scan it back in, they looked at what the ballot said
 2    and who they voted for and that is why things were put in
 3    different boxes.  Their own affidavits talk about that
 4    provision of separating the boxes by hand.  It resolves the
 5    issue.
 6              The remaining theories fail -- again, I want to be
 7    cognizant of time and save some time for rebuttal.  We rely on
 8    our briefs in terms of the merits of those, but the equal
 9    protection and due process allegations I think are addressed
10    in Wood from the 11th Circuit.  On procedural due process, to
11    the extent that that is the due process claim, they don't
12    challenge the Georgia election means of correcting as somehow
13    invalid or insufficient.  In fact, they raised it.  And so you
14    can't have a procedural due process claim if you have a
15    remedy.  You can't have a substantive due process claim if it
16    doesn't shock the conscience, which having to use the remedy
17    here, they can do.  Your Honor, with that, unless there are
18    questions, I would will reserve the rest of my time for
19    rebuttal.
20              THE COURT:  Thank you, sir.
21              MS. CALLAIS:  Good morning, Your Honor.  I am Amanda
22    Callais on behalf of Intervenor Defendants, the Democratic
23    Party of Georgia, the DSCC and the DCCC, and I am mindful of
24    many of the points Mr. Belinfante just made, and I will not
25    repeat them, but for the record, Your Honor, I would just like
```

1   to say that for the statements that we've made in our motion

2   to dismiss, this case should be dismissed.  The Plaintiffs in

3   this case lack standing.  They bring their claims and assert

4   only generalized grievances.  This Court also lacks

5   jurisdiction to hear their claims because this case is moot

6   now that the election has been certified, which is what the

7   11th Circuit found just this past Saturday in the *Wood v.*

8   *Raffensperger* case.  And then Plaintiffs have also failed to

9   state any cognizable claim under the Election and Elections

10  Clause, Equal Protection Clause, and Due Process Clause.

11          Where I would like to begin though is where

12  Mr. Belinfante started, and I would like to bring us back to

13  this point about where we are in terms of Georgia elections

14  and with the remedy asked for in this case.  Over a month ago

15  five million Georgians cast their ballots in the 2020

16  presidential election with the majority of them choosing

17  Joseph R. Biden, Jr. as their next President.  Those votes,

18  both the ballots that were cast on Dominion machines and the

19  ballots that were cast by absentee were counted.  Almost

20  immediately after that count took place, those votes were

21  counted again by hand, and then almost immediately after that

22  count finished, the recount began again, a third time, by

23  machine.  Each and every one of those counts has confirmed

24  Georgia voters' choice.  Joe Biden should be the next

25  President of The United States.  At this point there is simply

```
1    no question that Joe Biden won Georgia's presidential election
2    and with it all of Georgia's 16 electoral votes.  Despite
3    that, Plaintiffs have come to this Court eight months after a
4    settlement agreement they challenged was entered, three weeks
5    after the election is over, and days after certification took
6    place, and they asked this Court to take back that choice, to
7    set aside the choice that Georgia voters have made, and to
8    choose the next president by decertifying the 2020
9    presidential election results and ordering the governor to
10   appoint a new slate of electors.
11            THE COURT:  Speaking of taking back, how do the
12   Intervening Defendants respond to the Plaintiffs' point in
13   their complaint that many people, including Stacey Abrams,
14   affiliated with the Democratic Party, opposed these machines
15   from the beginning and said that they are rife with the
16   possibility of fraud?
17            MS. CALLAIS:  I think, Your Honor, that the key
18   there is that when we talk about a possibility of fraud, that
19   does not mean that fraud has actually occurred.  And here
20   Plaintiffs come after an election has taken place and they say
21   on very -- as we will talk about if we get to the TRO
22   portion -- on very limited specious evidence that there is a
23   possibility of fraud.  A possibility of fraud does not mean
24   that fraud has actually occurred.  And truthfully, Your Honor,
25   that is what the Plaintiffs would need to show to get some
```

1    sort of -- the relief that they are requesting here, that

2    there has been actual fraud.  And that is just not in their

3    complaint, it is not in their evidence.  It makes no

4    difference whether there has been a possibility of fraud or

5    issues with the machines.  That is a case that is in front of

6    Judge Totenberg and that she is deciding.  But that is not the

7    evidence that they have presented here, and it certainly does

8    not support their claims.

9            So with that, Your Honor, as the 3rd Circuit

10   explained just a little over a week ago when denying an

11   emergency motion to stop certification in a case similar to

12   this one brought by Donald J. Trump's campaign, voters not

13   lawyers choose the President.  Ballots not briefs decide

14   elections.  Plaintiffs' request for sweeping relief in this

15   case is unprecedented.  It is unprecedented anywhere, and it

16   is particularly unprecedented in Georgia where the ballots

17   have been counted not once, not twice, but three times, and

18   the vote has been confirmed.  Their request for relief is not

19   just unprecedented, but also provides a separate and

20   independent grounds for this Court to dismiss this case.

21           As we explained in our motion to dismiss, granting

22   Plaintiffs' remedy in and of itself would require the Court to

23   disenfranchise over 5 million Georgia voters, violating their

24   constitutional right to vote.  Post-election

25   disenfranchisement has consistently been found to be a

1    violation of the Due Process Clause throughout the courts.

2    For example, in *Griffin v. Burns* the 1st Circuit found that

3    throwing out absentee votes post election that voters believed

4    has been lawfully cast would violate the Due Process Clause.

5    Similarly, in *Marks v. Stinson*, a number of years later, the

6    3rd Circuit found the same thing in their finding where they

7    found even if there is actual evidence of fraud, discarding

8    ballots that were legally cast or that voters believed to be

9    legally cast violates the Due Process Clause and is a drastic

10   remedy.  This is precisely what would happen here if this

11   Court were to order the requested relief.  That order would

12   violate the Due Process Clause.  And because of that, this

13   Court cannot grant the remedy that Plaintiffs seek and the

14   Court should dismiss this suit.

15        In finding that the Court can't grant this relief,

16   this Court would not be alone, it would be in actually quite

17   good company, not just from the 1st Circuit and the 3rd

18   Circuit in *Griffin* and *Stinson,* but also from more recent

19   cases.  In 2016 in *Stein v. Cortes*, the District Court

20   declined to grant Jill Stein's request to a recount because,

21   quote, it would well insure that no Pennsylvania vote counts,

22   which would be outrageous and unnecessary.  Just this cycle,

23   in *Donald J. Trump for President v. Boockvar* the Plaintiffs

24   sought to invalidate 7 million mail ballots under the Equal

25   Protection Clause, and the Court explained that it has been

1    unable to find any case in which a plaintiff has sought such
2    drastic remedy in the contest of an election in terms or the
3    sheer volume of votes asked to be invalidated.  The Court also
4    promptly dismissed there.

5            Just this last Friday in *Law v. Whitmer* in Nevada
6    State Court, which actually would have the ability to hear a
7    contest, found that it would not decertify the election in
8    Nevada.  And the list goes on, Your Honor.  We could talk
9    about findings in State Court in Arizona on Friday.  There
10   have been over 30 challenges to this election that have been
11   repeatedly dismissed since -- basically since election day.
12   Since election day.

13           So the Court is in good company, and it's not just
14   in company good company nationwide, but it is in good company
15   with the judge right down the hall from here who, just two
16   weeks ago, in a case nearly identical to this one, found a
17   request to disenfranchise nearly 1 million absentee voters in
18   Georgia to be extraordinary.  Judge Grimberg explained that to
19   prevent Georgia certification of the votes cast in the general
20   election after millions of people have lawfully cast their
21   ballots, to interfere with the results of an election that has
22   already concluded would be unprecedented and harm the public
23   and in countless ways.  Granting injunctive relief here would
24   breed confusion, undermine the public's trust in the election,
25   and potentially disenfranchise over 1 million Georgia voters.

1    Viewed in comparison to the lack of any demonstrable harm,
2    this Court finds no basis in fact or law to grant Plaintiff
3    the relief he seeks.
4            That same reasoning applies here.  And in fact, it
5    applies here even more because most of the claims that were
6    brought in front of Judge Grimberg are the same, but the
7    amount of votes that Plaintiffs here seek to decertify are far
8    greater in scope.
9            On this last point, Your Honor, about the inability
10   of the Court to order the remedy, I wanted to respond to
11   something that Plaintiffs raised in their brief last night.
12   In their brief last night they react to the briefing on
13   mootness that we included in our TRO and note that this
14   Court -- this case would not be moot because the Court can
15   decertify an election.  And that *Wood v. Raffensperger* that
16   came out by the 11th Circuit didn't discuss decertification of
17   the election, only halting certification.
18           And I would just like to point out that if this
19   Court were to decertify the election and specifically to point
20   a new slate of electors, which is what is asked, that in and
21   of itself would also violate the law.  The U.S. Constitution
22   empowers State Legislatures to choose the manner of appointing
23   presidential electors, and that is the Electors Clause that
24   Plaintiffs actually challenge.  And pursuant to that clause,
25   the Georgia General Assembly has chosen to appoint electors

1   according to popular vote.  Those are certified by the

2   governor through certificate of ascertainment.  That popular

3   vote has already taken place, Your Honor, and if this Court

4   were to order a new slate of electors to be appointed, that

5   would -- that would violate the Electors Clause.

6           In addition, Congress has also provided that

7   electors shall be appointed in each and every state on the

8   Tuesday next after the first Monday in November in every 4th

9   year as also known as Election Day, which this year took place

10  on November 3rd.  Georgia has held that election on Election

11  Day, and if this Court were to now, months after the -- over a

12  month after the election, to go and order that a new slate be

13  appointed, it would be violating that statute as well.  So for

14  the very reasons that the Plaintiffs -- the very relief that

15  Plaintiffs ask is actually what prevents this Court from

16  issuing any relief in this case, and precisely why it should

17  be dismissed.

18          THE COURT:  All right.  Thank you.  All right, I

19  will hear from the Plaintiffs.

20          MS. POWELL:  May it please the Court.  Sidney Powell

21  and Harry MacDougald for the Plaintiffs.  We are here on a

22  motion to dismiss which requires the Court to view the

23  pleadings and all the facts alleged in the light most

24  favorable to the Plaintiff.  In my multiple decades of

25  practice I have never seen a more specifically pled complaint

1    of fraud, and replete with evidence of it, both mathematical,

2    statistical, computer, expert, testimonial, video, and

3    multiple other means that show abject fraud committed

4    throughout the State of Georgia.

5              Forget that this machine and its systems originated

6    in Venezuela to ensure the election of Hugo Chavez and that it

7    was designed for that purpose.  Look just at what happened in

8    Georgia.  Let's start, for example, with the language, "the

9    insularity of the Defendants' and Dominion's stance here in

10   evaluation and management of the security and vulnerability of

11   the system does not benefit the public or citizens' confident

12   exercise of the franchise.  The stealth vote alteration or

13   operational interference risk posed by malware that can be

14   effectively invisible to detection, whether intentionally

15   seeded or not, are high once implanted, if equipment and

16   software systems are not properly protected, implemented, and

17   audited.  The modality of the system's capacity to deprive

18   voters of their cast votes without burden, long wait times,

19   and insecurity regarding how their votes are actually cast and

20   recorded in the unverified QR code makes the potential

21   constitutional deprivation less transparently visible as well;

22   at least until any portions of the system implode because of

23   system breach, breakdown, or crashes" -- all of which the

24   State of Georgia experienced -- "the operational shortcuts now

25   in setting up or running election equipment or software

1    creates other risks that can adversely impact the voting
2    process."
3            THE COURT:  You don't have to get into any of the
4    evidence or any of the statements or averments of the
5    complaint because I have read it.  And all these statements, I
6    am assuming that every word of it is true.  My question -- the
7    first question I have for you, for the Plaintiffs in the case,
8    is why -- first of all, whether you can or cannot pursue these
9    claims in State Court, specifically in Georgia Superior
10   Courts.  Just the question is, can you?
11           MS. POWELL:  No, Your Honor, we can't.  These are
12   exclusively Federal claims with the exception of the election
13   contest allegation.  They are predominantly Federal claims,
14   they are brought in Federal Court for that purpose.  We have a
15   constitutional right to be here under the Election and
16   Electors Clause.  I was not reading evidence.  What I was
17   reading to the Court was the opinion of Judge Totenberg that
18   was just issued on 10-11-20 which defeats any allegation of
19   laches or lack of concern over the voting machines.  This has
20   been apparent to everyone who has looked at these machines or
21   discussed them in any meaningful way or examined them in any
22   meaningful way, beginning with Carolyn Maloney, a Democratic
23   Representative to Congress back in 2006 who objected to them
24   being approved by CFIUS.  Judge Totenberg went on to say that
25   "the Plaintiffs' national cybersecurity experts convincingly

1    present evidence that it's not a question of might this
2    actually ever happen but, quote, when will it happen,
3    especially if further protective measures are not taken.
4    Given the masking nature of malware in the current systems
5    described here, if the State and Dominion simply stand by and
6    say we have never seen it, the future does not bode well."
7    And sure enough, exactly the fears articulated in her 147 page
8    opinion, and all the means and mechanisms and problems
9    discussed in that three day hearing she held have now
10   manifested themselves within the State of Georgia in the most
11   extreme way possible.
12          THE COURT:  She did not address the question before
13   the Court today though as to the propriety of bringing this
14   suit in this Court, did she?
15          MS. POWELL:  There is no other place to bring this
16   suit of Federal Equal Protection claims and the electors.
17          THE COURT:  You couldn't bring all of these claims
18   in State Court?  Is that your position?
19          MS. POWELL:  We are entitled to bring these claims
20   in Federal Court, Your Honor.  They are Federal constitutional
21   claims.
22          THE COURT:  What do you do with the 11th Circuit's
23   holding in *Wood* on Saturday that we cannot turn back the clock
24   and create a world in which the 2020 election results are not
25   certified?

```
 1          MS. POWELL:  Actually we can, but we don't need to

 2   because we are asking the Court to decertify.

 3          THE COURT:  Where does that exist?

 4          MS. POWELL:  Bush v. Gore.  Bush v. Gore was a

 5   decertification case.  There are other cases we've cited in

 6   our brief that allow the Court the decertify.  And at the very

 7   minimum this Court should order a preliminary injunction to

 8   allow discovery and allow us to examine the forensics of the

 9   machines.  For example, we know that already in Ware County,

10   which is a very small precinct, there were 37 votes that were

11   admittedly flipped by the machines from Mr. Trump to

12   Mr. Biden.  That is a 74 vote swing.  That equates to

13   approximately the algorithm, our experts also believe, was run

14   across the State that weighed Biden votes more heavily than it

15   did Trump votes.  That is a systemic indication of fraud that

16   Judge Totenberg was expressing concern about in her decision

17   just weeks before the election.  We have witness after witness

18   who have explained how the fraud can occur within the

19   machines.  We know for example that there were crashes, just

20   like she feared in the decision, and everybody expressed

21   concern about.  We know machines were connected to the

22   internet which is a violation of their certification

23   requirements and Federal law itself.  We could not have acted

24   more quickly.  In fact, the certification issue wasn't even

25   ripe until it was actually certified.
```

```
1        THE COURT:  But you weren't limited in your remedies
2   to attacking the certification, you could have attacked the
3   machines months ago.
4        MS. POWELL:  That is what happened in the Totenberg
5   decision, and that is why I read it to the Court.  The
6   machines were attacked by parties, and the election was
7   allowed to go forward.  And we have come forward with our
8   claims as fast as is humanly possible.  This is a massive
9   case, and of great concern not just to the nation and to
10  Georgia, but to the entire world, because it is imperative
11  that we have a voting system that people can trust.
12       They talk about disenfranchising voters, well there
13  are over a million voters here in Georgia that will be
14  disenfranchised by the counting of illegal ballots that render
15  theirs useless.  It's every legal vote that must be counted.
16  Here we have scads of evidence.  And the vote count here is
17  narrow.  I mean, the disparity now is just a little over
18  10,000 votes.  Just any one of our categories of that we have
19  identified require decertification.  For example, 20,311
20  nonresidents voted illegally.  Between 16,000 and 22,000
21  unrequested absentee ballots were sent in in violation of the
22  legislative scheme.  Between 21,000 and 38,000 absentee
23  ballots were returned by voters but never counted.  32,347
24  votes in Fulton County were identified to be statistically
25  anomalous.  And the vote spike for Mr. Biden, that is
```

```
 1    completely a mathematical impossibility, according to multiple
 2    expert affidavits we provided, shows that it was like 120,000
 3    Biden votes all of a sudden magically appear after midnight on
 4    election night.  That happens to coincide with the time we
 5    have video of the Fulton County election workers running the
 6    same stack of rather pristine-looking ballots through the
 7    machine multiple times.  And as for the recounts, that makes
 8    no difference because if you recount the same fake ballots,
 9    you achieve -- in the same machines, you achieve the same
10    results.  That is why the hand count in Ware County that
11    revealed the 74 swing is so important and indicative of the
12    systemic machine fraud that our experts have identified, and
13    why it is so important that we at least get access for the
14    Department of Defense even, or our own experts, or jointly, to
15    examine the machines in Fulton County and the ten counties
16    that we requested in our protective order, or our motion
17    for --
18               THE COURT:  How is this whole case not moot from the
19    standpoint of even if you were to win, and win Georgia, could
20    Mr. Trump win the election?
21               MS. POWELL:  Well fraud, Your Honor, can't be
22    allowed by a Court of Law to stand --
23               THE COURT:  That is not what I am asking.  I am not
24    saying that there may not be other issues that need to be
25    addressed, and that there might not be questions that need to
```

1  be investigated, I am asking, as a practical matter, in this
2  particular election, can Mr. Trump even win the election even
3  if he wins Georgia?
4  　　　　MS. POWELL:  Yes, he can win the election.
5  　　　　THE COURT:  How would that happen?
6  　　　　MS. POWELL:  Because there are other states that are
7  still in litigation that have even more serious fraud than we
8  have in Georgia.  It is nowhere near over.  And it doesn't
9  affect just the presidential election.  This fraud affects
10  senate seats, congressional seats, gubernatorial seats, it
11  affects even local elections.  Another huge statistic that is
12  enough by itself to change the result is the at least 96,000
13  absentee ballots that were voted but are not reflected as
14  being returned.  All of these instances are violations of
15  Federal law, as well as Georgia law.  And in addition,
16  Mr. Ramsland's report finds that the ballot marking machine
17  appears to have abnormally influenced election results and
18  fraudulently and erroneously attributed between thirteen
19  thousand seven hundred and twenty-five thousand and the
20  136,908 votes to Mr. Biden just in Georgia.  We have multiple
21  witnesses who just saw masses of pristine ballots appearing to
22  be computer marked, not hand marked, and those were repeatedly
23  run through machines until votes were injected in the system
24  that night without being observed by lawfully required
25  observers in violation of Georgia and Federal law that

1     resulted in the mass shoot-up spike of votes for Mr. Biden.
2     Mr. Favorito's affidavit is particularly important.  He talks
3     about the Ware County Waycross City Commission candidate who
4     reported that the Ware County hand audit is flipped those 74
5     votes.  That is a statistically significant swing for a
6     precinct that small, and there is no explaining for it other
7     than the machine did it.  We have testimony of witnesses who
8     saw that their vote did not come out the same way it was.
9     Mr. Favorito is a computer tech expert.  He said that the vote
10    flipping malware was resident on the county election
11    management system of possibly one or more precinct or
12    scanners.  There was also an instance where it came out of the
13    Arlo system changed, and there was no way to verify the votes
14    coming out of the individual precincts versus coming out of
15    Arlo because apparently they didn't keep the individual
16    results so that they can be compared.  So there was a vote
17    swapping incident through the Arlo process also.
18            There was a misalignment of results, according to
19    Mr. Favorito, among all three presidential candidates.  Rather
20    than just a swapping of the results for two candidates, in
21    other words, they would sometimes put votes into a third-party
22    candidate and take those out and put them in Mr. Biden's pile.
23    The system itself according to its own technological handbook
24    explains that it allows for votes to be put in, it can scan to
25    set or overlook anything it wants to overlook, put those in an

1    adjudication pile, and then in the adjudication process, which

2    apparently was conducted in top secret at the English Street

3    warehouse, where all kinds of strange things were going on,

4    were just thrown out.  They could just literally drag and drop

5    thousands of votes and throw them out.  That is why it is so

6    important that we at least get temporary relief to examine the

7    systems and to hold off the certification or decertify or ask

8    the Court to halt the proceedings continuing right now until

9    we can have a few days to examine the machines and get the

10   actual evidence off the machines and look at the ballots

11   themselves, because we know there were a number of counterfeit

12   ballots that were used in the Fulton County count that night.

13   It would be a simple matter to examine 100,000 or so ballots

14   and look at which ones are fake.  It is possible to determine

15   that with relative ease.

16          This is not about who or which government officials

17   knew anything was wrong with the machine.  It's entirely

18   possible that many people did not know anything was wrong with

19   them.  But it is about ensuring the integrity of the vote and

20   the confidence of the people that the will they expressed in

21   their vote is what actually determines the election.  Very few

22   people in this country have any confidence in that level right

23   now.  Very few.

24          The standard is only preponderance of the evidence.

25   We have shown more than enough for a prima facie case to get

1    to -- meet the standard required -- this Court is required to

2    apply.  It is crucial that we decertify and stop the vote.  We

3    need to have discovery.  It's so important to the American

4    people, particularly in a country that is built on the rule of

5    law, to know that their election system is fair and honest.

6              THE COURT:  But that rule of law limits where these

7    suits can be filed and who can bring them.  Specifically on

8    the standing issue, how does your -- how do your clients

9    survive the motion to dismiss with respect to the standing

10   issue if I don't follow the 8th Circuit's case opinion in

11   *Carson*?

12             MS. POWELL:  Even the Court's decision in *Wood* is so

13   distinguishable it should make clear electors have standing.

14   In that case, for example, the State could not even say who

15   did have standing.  But under the Constitution, electors

16   clearly do.

17             THE COURT:  But Georgia, unlike Minnesota,

18   differentiates between candidates and Presidential electors.

19   Right?

20             MS. POWELL:  I am not sure about that.  But we also

21   have the Cobb County Republican Party official who is suing,

22   and the electors themselves are part of the Constitutional

23   Clause that entitles them to standing.

24             THE COURT:  I just think you have a pretty glib

25   response to what the 11th Circuit has held regarding these

1    cases.  I mean, the 11th Circuit has basically said, you know,

2    we are not -- the Federal Courts are courts of limited

3    jurisdiction and we are not open 24/7 to remedy every

4    freewheeling constitutional issue that comes up.  They have

5    made it clear, the Appellate Courts have made it clear, they

6    don't want District Courts handling this matter, they want

7    State Courts handling State election disputes, even regarding

8    in Federal elections.  The Federal Government has nothing to

9    do with the State election and how it is conducted.  As you

10   said, it is the Secretary of State who is the chief election

11   officer, and decides it.  Why shouldn't the State of Georgia

12   investigate this?  Why should it be a Federal judge?

13          MS. POWELL:  Because we raise Federal constitutional

14   issues that are paramount to --

15          THE COURT:  They raised Federal constitutional

16   issues in *Wood*.

17          MS. POWELL:  -- to equal protection.  He did not

18   request decertification.  That is one of the things that

19   distinguished that case.  He was not an elector or

20   representative of a county.  He was simply an individual.  And

21   I am not sure that decision is correct because, in that case,

22   they were also wondering who could challenge it.  Well

23   obviously the Federal Equal Protection Clause and the

24   constitutional issues we have raised here give this Court

25   Federal question jurisdiction.  This Court's one of the

1   primary checks and balances on the level of fraud that we are

2   experiencing here.  It is extremely important that this Court

3   exercise its jurisdiction as a gatekeeper on these issues.

4   There were numerous departures from the State statute,

5   including the early processing of votes, and the de facto

6   abolition of signature matches that give rise to Federal Equal

7   Protection claims.

8           THE COURT:  Well, back to the standing question.

9   You know, the Plaintiffs allege that their interests are the

10  same, basically one in the same, as any Georgia voters.  In

11  Paragraph 156 of the complaint they aver that Defendants

12  diluted the lawful ballots of Plaintiffs and of other Georgia

13  voters and electors.  Further, Defendants allege that -- the

14  Plaintiffs allege that Defendants further violated Georgia

15  voters's rights, and they allege, the Plaintiffs, that quote,

16  all candidates, political parties, voters, including without

17  limitation Plaintiffs, have a vested interest.  It doesn't

18  sound like your clients are special, that they have some

19  unique status that they enjoy that allows them to bring this

20  suit instead of anyone else.  How do they have standing?

21          MS. POWELL:  They have the unique status of being

22  the Presidential electors selected to vote for Donald Trump at

23  the electoral college.  They were not certified as -- and

24  decertification is required to make sure they can do their

25  jobs that they were selected to do.

1          THE COURT:  Under the 3rd Circuit case, does your
2    theory survive?
3          MS. POWELL:  Our theory is -- I think the 3rd
4    Circuit decision is wrong, the 8th Circuit decision is
5    correct.  There is no circumstance in which a Federal elector
6    should not be able to seek relief in Federal Court, thanks to
7    our Constitution.  It is one of our most important principles.
8          There were multiple means of fraud committed here.
9    We have also the military intelligence proof of interference
10   in the election, the Ware County 37 votes being flipped, the
11   video of the Fulton City vote count, they lied about the water
12   leak, they ran off observers, they brought in unusually
13   packaged ballots from underneath a table.  One person is seen
14   scanning the same QR code three different times in the machine
15   and big batch of ballots which would explain why the same
16   number of ballots gets injected repeated into the system.
17   That corresponds with the math and the algorithms showing a
18   spike of 26,000 Biden votes at that time.  After Trump's lead
19   of 103,997 votes there were mysteriously 4800 votes injected
20   into the system here in Georgia multiple times, the same
21   number, 4800 repeatedly.  That simply doesn't happen in the
22   absence of fraud.  All of the facts we have laid out in our
23   well-pleaded complaint require that this Court decertify the
24   election results or at least, at the very least, stop the
25   process now in a timely fashion and give us an opportunity to

1   examine the machines in ten counties and get further

2   discovery, particularly of what happened in Fulton County.

3   Those things need to be resolved before any citizen of Georgia

4   can have any confidence in the results of this election.

5           Allowing voters to cast ballots that are solely

6   counted based on their voting designations and not on an

7   unencrypted humanly unverifiable QR code that can be subject

8   to external manipulation and does not allow proper voter

9   verification and ballot vote auditing cannot withstand the

10  scrutiny of a Federal Court and cannot pass muster as a

11  legitimate voting system in the United States of America.  For

12  those reasons, we request the Court to deny the motion to

13  dismiss, allow us a few days, perhaps even just five, to

14  conduct an examination of the machines that we have requested

15  from the beginning, and find out exactly what went on and give

16  the Court further evidence it might want to rule in our favor,

17  because the fraud that has happened here has destroyed any

18  public confidence that the will of the people is reflected in

19  their vote, and just simply cannot stand.

20          THE COURT:  Thank you, ma'am.  All right, rebuttal?

21  This is Josh Belinfante.

22          MR. BELINFANTE:  Just briefly, Your Honor.  Your

23  Honor, just a few points.  One, I want the get back to

24  *Colorado River* abstention.  There was a means and a process to

25  do that.  You had asked earlier about their response.  I did

1    go back and check.  The *Siegel* case they rely on cites to only
2    *Burford* and *Pullman* abstention, not *Colorado River*.  It is
3    appropriate in this case, and as the Michigan Court concluded,
4    the *Moses Cone* case which establishes it says that there is
5    really not a reason not to do so when you have concurrent
6    jurisdiction.
7              And that is one of the problems with the Plaintiffs'
8    argument.  They keep telling you that they can't go to State
9    Court because they have Federal constitutional claims.  Those
10   can be litigated in State Court pursuant to 1983.  They also
11   say on laches that -- it is interesting, they have cited to
12   you and read to you numerous aspects of the *Curling* case, and
13   they say that going back to 2006 somebody thought that there
14   was something wrong with these machines.  Well if that's the
15   case, then it makes the laches argument even stronger.  These
16   are the arguments that they are about the machines.  They
17   certainly could have been litigated prior to after the
18   certification of the election.
19             The other big problem that they raise is that the
20   *Curling* case, everything that was read was stayed by the 11th
21   Circuit, presuming that it is reading the part of the opinion
22   that I think it is.  If it is going back to a prior opinion,
23   that is about old machines which aren't even used anymore.
24   And then in Ware County, that was provided in an affidavit
25   that was new as part of the reply brief, it should not be

1    counted.  There is authority for that, *Sharpe v. Global*
2    *Security International* from the Southern District of Alabama,
3    from 2011.  But even still, that can be brought in the State
4    Court under the challenge mechanisms set.

5         You asked what is the authority for decertifying the
6    election.  The citation was *Bush v. Gore*.  *Bush v. Gore* stayed
7    a Florida recount, it did not decertify the election.  But
8    most importantly, what *Bush v. Gore* said is, when there is a
9    State process, the Elections Clause says that has to continue.
10   And they have not shown you that the State process is
11   insufficient, invalid, whatsoever.  On standing, they find
12   themselves in a bind.  If they are candidates as electors, the
13   State election code says you can bring a challenge under
14   21-2-522.  If they are not candidates and the 3rd Circuit
15   reasoning applies, then the 11th Circuit in *Wood* would apply
16   too, and say that when you are not a candidate you don't have
17   standing.  So either way, they find themselves out of Federal
18   jurisdiction on these arguments.

19        Just a few points on closing.  They tell you that
20   the voters lack confidence in the election system.  Well,
21   since 2018 candidates that were not successful have tried to
22   overturn the rule of voters in the Courts.  Since 2018 courts
23   have stayed with the State of Georgia and upheld Georgia's
24   election laws and Georgia's election machines.  This Court
25   should do the same.  The State is doing what it can to enhance

1    public confidence.  That is why we went the extra step of a

2    hand count, not that pushes ballots through a machine, but

3    that looks at what the ballot says, and when the voter had

4    access to that ballot they could see too.  And if they voted

5    for Donald Trump it will show it on the ballot; if they voted

6    for Joe Biden it will show it on the ballot.  And if not, they

7    can correct it right there.  That is the actions that instill

8    confidence, not this.  And if they want to challenge those

9    election results, the State Courts are open for them to do it,

10   there are hearings scheduled now, and those hearings should

11   proceed and not this one.  Thank you.

12              THE COURT:  Thank you, sir.  Ms. Callais, did you

13   have anything else?

14              MS. CALLAIS:  No, Your Honor.

15              THE COURT:  All right.  Thank you very much.  I have

16   considered the entire record in the case and I find that, even

17   accepting as true every averment of the complaint, I find that

18   this Court must grant the Defendants' motions to dismiss, both

19   of the motions to dismiss, beginning with the proposition that

20   Federal Courts are courts of limited jurisdiction; they are

21   not the legal equivalent to medical hospitals which have

22   emergency rooms that are open 24/7 to all comers.  On the

23   contrary, the 11th Circuit has specifically held that Federal

24   Courts don't entertain post election contests about vote

25   counting and misconduct that may properly be filed in the

1    State courts.  So whether the Defendants have been subjected

2    to a Federal claim, which is Equal Protection, Due Process,

3    Elections Clause and Electors Clause, it does not matter.  The

4    11th Circuit has said these claims in this circuit must be

5    brought in State court.  There is no question that Georgia has

6    a statute that explicitly directs that election contests be

7    filed in Georgia Superior Courts, and that is what our Federal

8    Courts have said in this circuit, it is that is exactly right.

9         Sometimes Federal judges are criticized for

10   committing the sin of judicial activism.  The appellate courts

11   have responded to that and said enough is enough is right.  In

12   fact, enough is too much.  And the courts have convincingly

13   held that these types of cases are not properly before Federal

14   Courts, that they are State elections, State courts should

15   evaluate these proceedings from start to finish.

16        Moreover, the Plaintiffs simply do not have standing

17   to bring these claims.  This Court rejects the 8th Circuit's

18   nonbinding persuasive-value-only holding in *Carson vs Simon*

19   and I find that the Defendants -- excuse me -- the Plaintiffs

20   don't have standing, because anyone could have brought this

21   suit and raised the exact same arguments and made the exact

22   same allegations that the Plaintiffs have made in their

23   complaint.  The Plaintiffs have essentially alleged in their

24   pleading that their interests are one and the same as any

25   Georgia voter.  I do not believe that the 11th Circuit would

1    follow the reasoning of the 8th circuit in *Carson*.

2            Additionally, I find that the Plaintiffs waited too

3    late to file this suit.  Their primary complaint involves the

4    Dominion ballot marking devices.  They say that those machines

5    are susceptible to fraud.  There is no reason they could not

6    have followed the Administrative Procedure Act and objected to

7    the rule-making authority that had been exercised by the

8    Secretary of State.  This suit could have been filed months

9    ago at the time the machines were adopted.  Instead, the

10   Plaintiffs waited until over three weeks after the election to

11   file the suit.  There is no question in my mind that if I were

12   to deny the motions to dismiss, the matter would be brought

13   before the 11th Circuit and the 11th Circuit would reverse me.

14   The relief that the Plaintiffs seek, this Court cannot grant.

15   They ask the Court to order the Secretary of State to

16   decertify the election results as if such a mechanism even

17   exists, and I find that it does not.  The 11th Circuit said as

18   much in the *Wood* case on Saturday.

19           Finally, in their complaint, the Plaintiffs

20   essentially ask the Court for perhaps the most extraordinary

21   relief ever sought in any Federal Court in connection with an

22   election.  They want this Court to substitute its judgment for

23   that of two-and-a-half million Georgia voters who voted for

24   Joe Biden, and this I am unwilling to do.

25           The motion for temporary restraining order that was

```
 1    entered on November 29 is dissolved.  The motions to dismiss

 2    are granted.  And we are adjourned.

 3                    (end of hearing at 11:07 a.m.)

 4                         * * * * *

 5                    REPORTER'S CERTIFICATION

 6

 7        I certify that the foregoing is a correct transcript from

 8    the record of proceedings in the above-entitled matter.

 9

10                              _____

11                              Lori Burgess
                                Official Court Reporter
12                              United States District Court
                                Northern District of Georgia

13                              Date:  December 8, 2020

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT B

Fulton County Superior Court
***EFILED***QW
Date: 12/8/2020 2:34 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

JOHN WOOD

        Petitioner,

    V.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of
State of the State of Georgia, and
BRIAN KEMP, in his official
capacity as Governor of the State
of Georgia

        Respondents.

Civil Action No.:
2020-CV-342959

## FINAL ORDER.

John Wood filed this action on November 25, 2020, to contest the

November 3, 2020, election for President of the United States. Wood

named as defendants Brad Raffensperger, the Georgia Secretary of

State, and Brian Kemp, the Georgia Governor ("State Defendants").

The Court held a hearing on December 7, 2020. In attendance were

counsel representing the Petitioner, counsel representing the State

Defendants, and counsel representing the parties attempting to

intervene in the election as Defendant-Intervenors ("Attempted

Intervenors").  The court heard argument from the parties on the oral
motion to dismiss raised by the State Defendants, the motion to
intervene and motion to dismiss filed by the Attempted Intervenors,
and the propriety of and scope of relief sought by the Petitioner.
Georgia law does not countenance naming as a defendant either the
Governor or the Secretary of State to an election contest filed pursuant
to Article 13 of Chapter 2 of Title 21.[1] To the extent that Petitioner
seeks equitable relief against the State Defendants, those claims are
barred by sovereign immunity.  As a result, the petition must be
dismissed against the only named defendants.  As a result of that
dismissal, all other motions before this Court are moot.

In O.C.G.A. § 21-2-520(2), the General Assembly delineated only
four categories of persons subject to suit in an election contest under
Article 13 of the Election Code:

(A)   the person whose nomination or election is contested;

(B)   the person or persons whose eligibility to seek any
      nomination or office in a run-off primary or election is
      contested;

---

[1] Of course, if the election contest concerned the re-election efforts of
either the sitting Governor or Secretary of State, they would be a proper
defendant under O.C.G.A. § 21-2-520(2)(A).

2

      (C)    the election superintendent or superintendents who conducted the contested primary or election; or

      (D)    the public officer who formally declared the number of votes for and against any question submitted to electors at an election.

The State Defendants are not candidates for the office that is the subject of the contest, nor are they eligible for a runoff for the office that is the subject of the contest, so neither (A) nor (B) are applicable. Petitioner has made no argument and brought no contest against either of the two constitutional amendments or the taxation issue put to the voters statewide, which were the only questions submitted to the voters statewide in the November 3, 2020, general election, so (D) is not applicable.

      Neither of the State Defendants is an "election superintendent … who conducted the contested primary or election."  For purposes of Chapter 2 of Title 21, a "superintendent" is defined at O.C.G.A. § 21-2-2(35) as:

    (35) "Superintendent" means:

      (A) Either *the judge of the probate court* of a county or *the county board of elections*, *the county board of elections and registration*, the *joint city-county board of elections*, or the *joint city-county board of elections and registrations*, if a county has such.

3

O.C.G.A. § 21-2-2(35)(A) (emphasis added). The Code defines "superintendent" as one of five possible *city* or *county* officials/entities: 1) the judge of the probate court of a county; 2) the county board of elections; 3) the county board of elections and registrations; 4) the joint city-county board of elections; and 5) the joint city-county board of elections and registration.

To the extent that Petitioner has, as his counsel claimed at the hearing, asserted claims for equitable relief[2] against the State Defendants beyond the Petition which was brought pursuant to Article 13 of Chapter 2 of Title 21, those claims are barred by sovereign immunity. The "sweep of sovereign immunity" under the Georgia Constitution is "broad." *Olvera v. Univ. Sys. of Ga.'s Bd. of Regents*, 298 Ga. 425, 426 (2016). The Georgia Supreme Court has held that sovereign immunity applies to public officials sued in their official capacities because these "are in reality suits against the state." *See Ga.*

---

[2] Counsel for Petitioner, under questioning by the Court, asserted only equitable claims for relief under the Court's plenary authority. Such claims do not overcome the sovereign immunity bar adopted by the people of Georgia in the state constitution when claims are brought against the state or its officials.

4

*Dep't of Natural Resources v. Ctr. for a Sustainable Coast*, 294 Ga. 593,

599 n. 4 (2014) (citing *Cameron v. Lang*, 274 Ga. 122, 126 (2001)).

Petitioner sought only relief here against the State Defendants in their

official capacities, seeking to prohibit official acts already completed,

compel by way of injunction future official acts, and cause declaratory

relief to issue against these officials.

Suits against public officials are permitted only where there is an

explicit waiver of sovereign immunity by the legislature, as stated in

the Georgia Constitution:

> Except as specifically provided in this Paragraph, sovereign
> immunity extends to the state and all of its departments and
> agencies.  The sovereign immunity of the state and its
> departments and agencies can *only be waived by an Act of the
> General Assembly which specifically provides that sovereign
> immunity is thereby waived and the extent of such waiver.*

Ga. Const. Art. I, Sec. II, Par. IX(e) (emphasis added). "Where the

sovereign has sovereign immunity from a cause of action, and has not

waived that immunity, the immunity rises to a constitutional right and

cannot be abrogated by any court." *Ga. Dep't of County Health v. Neal*,

334 Ga. App. 851, 854 (2015); s*ee also Sustainable Coast*, 294 Ga. at 597

("The history of sovereign immunity in our State shows that the 1991

amendment intended to expressly reserve the power to waive sovereign immunity exclusively to the legislature.").

Georgia courts have also made clear that it is the plaintiff's (or Petitioner's) burden to demonstrate the existence of an explicit waiver of sovereign immunity to authorize the suit. *See, e.g., Neal,* 334 Ga. App. at 855 ("It is axiomatic that the party seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver."). Thus, in an election contest the petitioner must show the existence of a statute that specifically waives sovereign immunity by authorizing suits against the State Defendants in election contests under Article 13 of the Georgia Election Code. Petitioner cannot make such a showing here because the Georgia Election Code does not contain a waiver of sovereign immunity against the State Defendants within Article 13.

The plain language of the Georgia Election Code thus makes clear that the State Defendants are not proper defendants in an election contest. Additionally, the General Assembly has not waived sovereign immunity to either authorize election contest claims to be brought against the State Defendants or to cause relief to issue against them in

6

an action of this type.  Therefore, the claims against the State

Defendants must be dismissed.  With the dismissal of the State

Defendants, there remains no cause of action remaining against any

party for the Court to grant intervention into, nor is there a party

remaining against whom Petitioner can gain relief.

Accordingly, for the forgoing reasons the motion to dismiss by the

State Defendants is **GRANTED** and Petitioner's election contest is

**DISMISSED**.  In light of this, all other motions are moot, and therefore,

**DENIED**.

This 8th day of December, 2020.

_____
Judge Jane C. Barwick
Fulton County Superior Court
Atlanta Judicial Circuit

Prepared by:
/s/ Russell D. Willard
Russell D. Willard
40 Capitol Square, SW
Atlanta, Georgia 30334
Telephone: (404) 656-3300
Facsimile: (404) 657-9932
Email: rwillard@law.ga.gov

7

Appendix Page 844