No. 21-1161

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

_____

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

_____

**APPELLANTS' APPENDIX E**

**5 of 6 – Pages 1136 to 1427**

_____

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1515
gary@fielderlaw.net

*Counsel for Plaintiffs-Appellants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
VERONICA DEGRAFFENREID, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

## GOVERNOR TOM WOLF'S AND ACTING SECRETARY VERONICA DEGRAFFENREID'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

LEGAL STANDARD...................................................................................................... 4

ARGUMENT .................................................................................................................. 4

    I.    This Court Lacks Personal Jurisdiction over Governor Wolf and Secretary Acting
    Degraffenreid ......................................................................................................... 5

    II.    The Eleventh Amendment Divests This Court of Jurisdiction ....................................... 7

    III.    This Court Lacks Jurisdiction Because No Plaintiff Has Standing.................................. 8

    IV.    Plaintiffs Fail to State Any Claim that Could Allow Relief.......................................... 10

CONCLUSION................................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Cases**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) .......... 11

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070 (D. Colo. 2018) ................................................................................................................................... 15

*Bognet v. Sec'y Commonwealth of Pa.,* 980 F.3d 336 (3d Cir. 2020) ................................ 9, 10, 11

*Brown v. Reardon*, 770 F.2d 896 (10th Cir. 1985) ........................................................................ 10

*C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319 (10th Cir. 2019) ................................. 5

*Cohen v. Waxman*, No. 08-cv-2188, 2009 WL 3390487 (D. Colo. Oct. 21, 2009) ....................... 6

*Curtis v. Oliver*, 479 F. Supp. 3d 1039 (D.N.M. 2020) ............................................................... 13

*Defs. of Wildlife v. Everson*, 984 F.3d 918 (10th Cir. 2020) ........................................................ 8

*Dermansky v. Univ. of Colorado*, 445 F. Supp. 3d 1218 (D. Colo. 2020) ..................................... 4

*Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020) ..................................................................................................................... 3, 12

*Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020) 3, 10, 12

*Edelman v. Jordan*, 415 U.S. 651 (1974) ....................................................................................... 8

*Green v. Mansour*, 474 U.S. 64 (1985) .......................................................................................... 8

*In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) .................................................................................................................................. 3, 10, 13

*In re Canvassing Observation*, 241 A.3d 339 (Pa. 2020) ................................................... 3, 10, 13

*In re Nov. 3, 2020 Election*, 240 A.3d 591 (Pa. 2020) ........................................................ 2, 10, 13

*Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020) ...................................................................... 2

*Kentucky v. Graham*, 473 U.S. 159 (1985) .................................................................................... 7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................... 8

*McPherson v. Blacker*, 146 U.S. 1 (1892) ................................................................................... 11

ii

*Metcalfe v. Wolf*, No. 636 M.D. 2020, 2020 WL 7241120 (Pa. Commw. Ct. Dec. 9, 2020) ......... 2

*Mullaney v. Wilbur*, 421 U.S. 684 (1975) ....................................................................................... 7

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895 (10th Cir. 2017) ............................... 5

*Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) .................................................. 3, 10

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) ................................................................. 7

*Republican Party of Pennsylvania v. Degraffenreid*, No. 20-542, 2021 WL 666401 (Feb. 22, 2021) ........................................................................................................................................ 11

*Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244 (10th Cir. 2009) ........................ 7

*Taylor v. Casper City Council Corp. Members*, No. 10-cv-127, 2010 WL 1904541 (D. Colo. Apr. 14, 2010) .............................................................................................................................. 6

*Texas v. Pennsylvania*, No. 22O155, 2020 WL 7296814 (U.S. Dec. 11, 2020) ........................... 9

*Trump v. Degraffenreid*, No. 20-845, 2021 WL 666798 (Feb. 22, 2021) .................................. 13

*Williams v. Utah Dep't of Corr.*, 928 F.3d 1209 (10th Cir. 2019) ................................................ 7

*Wilson v. Pauling*, 457 F. Supp. 3d 965 (D. Colo. 2020) ............................................................. 4

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) ............................................................. 9

*Zvelo, Inc. v. Check Point Software Techs., Ltd.*, 418 F. Supp. 3d 664 (D. Colo. 2019) .............. 4

**Constitution and Statutes**

25 Pa. Stat. § 3146.5 .................................................................................................................... 14

25 Pa. Stat. § 3146.6 .................................................................................................................... 13

25 Pa. Stat. § 3150.16 .................................................................................................................. 13

U.S. CONST. amend XIV, § 1 ........................................................................................................ 11

U.S. CONST. amend XV, § 1 .......................................................................................................... 12

**Other Authorities**

Department of State, Official Returns ............................................................................................ 4

Letter from Rep. Ryan to Rep. Perry (Dec. 15, 2020) ................................................................. 14

Pennsylvania Governor Tom Wolf and Pennsylvania Acting Secretary of the Commonwealth Veronica Degraffenreid[1] file this motion, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), to dismiss plaintiffs' complaint. As required under Local Civil Rule 7.1(a), counsel for Governor Wolf and Acting Secretary Degraffenreid has conferred with counsel for plaintiffs. Plaintiffs oppose this motion.

## INTRODUCTION

The 2020 election cycle generated a torrent of frivolous litigation, much of it seeking to overturn the results of free and fair elections. As much as any other state, Pennsylvania bore the brunt of that abusive use of courts. A range of parties—from the former president's campaign, to federal and state representatives, to other states, to private individuals—brought meritless lawsuits, premised on far-fetched allegations and misrepresentations about Pennsylvania's 2020 election. This case is no different. Plaintiffs without standing to sue have recycled dubious allegations and legal claims already considered and dismissed across the country. They name as defendants two Pennsylvania officials beyond this Court's jurisdiction, and who are immunized under the Eleventh Amendment. For all of these reasons, this case must be dismissed.

## BACKGROUND

Last year, Pennsylvania held a free, fair, and lawful election in which more than 6.9 million Pennsylvanians voted for President. About 2.6 million of those voters used either a no-excuse mail-in ballot or an absentee ballot. President Biden received about 80,000 more votes than former President Trump. The results were certified, and Governor Wolf signed the Certificate of Ascertainment on November 24, 2020. Compl. ¶¶ 249, 252.

---

[1] Since plaintiffs filed the complaint, Veronica Degraffenreid has succeeded Kathy Boockvar as Secretary of the Commonwealth. Acting Secretary Degraffenreid has been substituted as a defendant. *See* Fed. R. Civ. P. 25(d).

1

Plaintiffs challenge various aspects of that election.[2] Their complaint, however, brings frivolous claims that depend on gross mischaracterizations of Pennsylvania law. The egregious misrepresentations in plaintiffs' complaint are not new.[3] Indeed, as it relates to Pennsylvania, plaintiffs' complaint extensively quotes from earlier cases, without any indication that these plaintiffs have conducted their own investigation. *See, e.g.*, Compl. ¶¶ 219–232, 234–238. Like those earlier cases, the factual predicate for plaintiffs' federal claims against the Pennsylvania defendants is that state officials administered an election in conflict with state law. But that factual predicate falsely represents what Pennsylvania law requires.

Plaintiffs first allege that Pennsylvania officials unilaterally eliminated a statutorily required signature verification process for no-excuse, mail-in ballots and absentee ballots. Compl. ¶¶ 217–219, 232(a). Yet the Supreme Court of Pennsylvania definitively ruled just a few months ago that "county boards of elections are prohibited from rejecting absentee or mail-in ballots based on signature comparison conducted by county election officials or employees." *In re Nov. 3, 2020 Election*, 240 A.3d 591, 611 (Pa. 2020), *cert. denied,* No. 20-845, 2021 WL 666798 (Feb. 22, 2021).

Plaintiffs also allege that Pennsylvania officials authorized counties to contact voters who mailed a ballot with some ministerial error to allow those voters to correct the error, despite a

---

[2] Although plaintiffs filed their complaint on December 22, 2020, they did not serve the Pennsylvania defendants until February 25, 2021.

[3] The allegations in plaintiffs' complaint are indistinguishable from those found in many failed lawsuits. *See, e.g.*, *Texas v. Pennsylvania*, No. 22O155, 2020 WL 7296814 (U.S. Dec. 11, 2020); *Bognet v. Sec'y Commonwealth of Pa.,* 980 F.3d 336 (3d Cir. 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020); *Metcalfe v. Wolf*, No. 636 M.D. 2020, 2020 WL 7241120 (Pa. Commw. Ct. Dec. 9, 2020); *Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020); *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020); *In re Canvassing Observation*, 241 A.3d 339 (Pa. 2020); *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591 (Pa. 2020).

contrary instruction in Pennsylvania's election code. Compl. ¶¶ 220–222, 224, 232(c). But Pennsylvania's highest court ruled that the election code does not require that minor defects in mail-in ballots disqualify a ballot. *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1078 (Pa. 2020), *cert. denied,* No. 20-845, 2021 WL 666798 (Feb. 22, 2021). And Pennsylvania's election code "says nothing about what should happen if a county notices these errors before election day." *Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377, 384 (3d Cir. 2020). Rather, "[s]ome counties stay silent and do not count the ballots; others contact the voters and give them a chance to correct their errors." *Id.* Either is permitted under the election code, and allowing counties to choose is "perfectly rational." *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 6821992, at *12 (M.D. Pa. Nov. 21, 2020).

Elsewhere, plaintiffs recycle allegations that certain counties denied poll watchers access needed to observe the tallying of mail-in votes, supposedly in violation of state law. Compl. ¶¶ 232(c)-(d). Here, again, Pennsylvania's highest court definitively ruled that the named counties had provided all the access required under Pennsylvania law. *See In re Canvassing Observation*, 241 A.3d 339, 349–51 (Pa. 2020), *cert. denied,* No. 20-845, 2021 WL 666798 (Feb. 22, 2021).

Plaintiffs next allege that after the Supreme Court of Pennsylvania ruled, for the 2020 general election only, that Pennsylvania's Constitution required a three-day extension of the statutory deadline for counties to receive mailed ballots, *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 369-72 (Pa. 2020), *cert denied*, 141 S.Ct. 732 (Mem) (2021), Pennsylvania failed to segregate the ballots received during the court-ordered grace period. Compl. ¶ 226. That is false. Pennsylvania not only segregated ballots received during the grace period—which are

3

insufficient to affect the outcome of any federal election—but those ballots remain segregated and have not been included in the reported results of the presidential election. *See* Department of State, Official Returns, https://www.electionreturns.pa.gov/ (notifying the public that "[t]he vote totals for President and Representative in Congress do not include any votes from mail ballots received between 8 p.m. on election day and 5 p.m. the following Friday").

By falsely characterizing Pennsylvania law's and election administration, plaintiffs have brought a lawsuit characteristic of the many other flawed suits that have preceded it.

## LEGAL STANDARD

Plaintiffs bear the burden of establishing a court's personal and subject matter jurisdiction, and can defeat a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(2) only if the complaint's well-pleaded allegations, taken as true, establish that the court has jurisdiction. *Dermansky v. Univ. of Colorado*, 445 F. Supp. 3d 1218, 1220 (D. Colo. 2020); *Zvelo, Inc. v. Check Point Software Techs., Ltd.*, 418 F. Supp. 3d 664, 668 (D. Colo. 2019).

Rule 12(b)(6) authorizes a court to dismiss an action if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Wilson v. Pauling*, 457 F. Supp. 3d 965, 971 (D. Colo. 2020) (cleaned up). Courts need accept only well-pleaded allegations as true—conclusory statements do not enjoy the same presumption. *Id.*

## ARGUMENT

This Court does not have jurisdiction over the claims against Governor Wolf and Acting Secretary Degraffenreid because neither defendant is subject to personal jurisdiction in Colorado, because the Eleventh Amendment immunizes each of them, and because no plaintiff has Article III standing. On top of these jurisdictional defects, this case must be dismissed because plaintiffs fail to state a plausible claim to relief.

### I.   This Court Lacks Personal Jurisdiction over Governor Wolf and Secretary Acting Degraffenreid

A district court may not exercise jurisdiction over an out-of-state defendant unless the plaintiff establishes that the State in which the court is based would allow the exercise of jurisdiction, and also that exercising jurisdiction would not offend the Due Process Clause. *C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1322 (10th Cir. 2019). Because Colorado asserts jurisdiction over out-of-state defendants to the maximum extent allowed under the Due Process Clause, the two inquiries are the same here. *Id.*

Due process allows jurisdiction over an out-of-state defendant only if "the defendant purposefully established minimum contacts within the forum State and the assertion of personal jurisdiction would comport with fair play and substantial justice." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (cleaned up). An out-of-state defendant whose contact with the forum State is "continuous and systematic" may be subject to that State's jurisdiction for all purposes. *Id.* at 903–04. Otherwise, case-specific jurisdiction is limited to when the out-of-state defendant has "purposefully directed its activities at residents of the forum state," and the plaintiff's injuries arise from those forum-related activities. *Id.* (cleaned up).[4]

Here, all Governor Wolf's and Acting Secretary Degraffenreid's allegedly unlawful acts happened in Pennsylvania. *See* Compl. ¶¶ 214–257. Those same acts pertained only to the casting and counting of ballots from Pennsylvania residents. *Id.* Administering an election in Pennsylvania is not activity directed at Colorado.

---

[4] Even if either defendant had any contact with Colorado, plaintiffs still must demonstrate the exercise of personal jurisdiction would not "offend traditional notions of fair play and substantial justice." *Old Republic*, 877 F.3d at 908. Plaintiffs could not do so here. The claims in this case have repeatedly been unsuccessfully litigated in forums in which defendants are subject to the court's personal jurisdiction.

While plaintiffs allege that venue is proper in this court because the relevant acts happened in Colorado, *id.* ¶ 35, the complaint's actual allegations contradict that statement, *id.* ¶¶ 214–257. Just two plaintiffs are Colorado residents. *Id.* ¶¶ 8, 12. Those two submitted an affidavit and statement, respectively, in support of the complaint. *See* Compl., Ex. 3, Cutunilli Decl., ECF No. 1-4; Compl., Ex. 7, Yarbrough Decl., ECF No. 1-8. Neither document contends that Governor Wolf or Acting Secretary Degraffenreid directed any activity at them or at Colorado. Instead, plaintiff professes a number of conspiratorial beliefs about Facebook's political influence and about how Dominion's voting machines function. *See generally* Cutunilli Decl. The other expresses only a feeling that "reported 'irregularities' with Dominion machines could have affected the voting process" in Pennsylvania. Yarbrough Decl. ¶ 22.

This Court previously has concluded that it cannot exercise jurisdiction over out-of-state government officials for acts that transpired outside Colorado. In *Taylor v. Casper City Council Corp. Members*, a suit against Wyoming officials was dismissed because "all of the acts of both the State and Local Government Defendants of which Plaintiff complains occurred in Wyoming pursuant to their capacities as government officials or employees of the State of Wyoming." No. 10-cv-127, 2010 WL 1904541, at *3 (D. Colo. Apr. 14, 2010), *report and recommendation adopted sub nom. John-Arthur v. Casper City Council Corp. Members*, No. 10-cv-127, 2010 WL 1856338 (D. Colo. May 7, 2010). Similarly, in *Cohen v. Waxman*, a suit against a U.S. Congressman was dismissed because the plaintiff did not "allege or demonstrate that [the defendant] conducted any activities in Colorado or had any contact with him in Colorado." No. 08-cv-2188, 2009 WL 3390487, at *5 (D. Colo. Oct. 21, 2009). Instead, "[a]ll of the events constituting the alleged unconstitutional conduct occurred in Washington, D.C." *Id.*

As in these two earlier cases, neither Governor Wolf nor Acting Secretary Degraffenreid is subject to jurisdiction in Colorado for acts that occurred in Pennsylvania, and bore only on votes cast in Pennsylvania.

## II. The Eleventh Amendment Divests This Court of Jurisdiction

Separately, this Court lacks jurisdiction because the "Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). State officials—such as Governor Wolf and Acting Secretary Degraffenreid—sued in their official capacity enjoy the same immunity. *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019).[5]

An exception to this immunity, first recognized in *Ex Parte Young*, 209 U.S. 123 (1908), allows suits against "individual state officers acting in their official capacities" to proceed "if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Williams*, 928 F.3d at 1214. The principle behind this exception is that "an unconstitutional

---

[5] The complaint's caption names Governor Wolf and then-Secretary Boockvar as defendants being sued "individually." If that designation might suggest defendants are being sued in their personal capacity, the complaint otherwise signals that defendants are instead named in their official capacity. The complaint explicitly references *Ex Parte Young*'s exception to Eleventh Amendment, Compl. ¶ 243, an exception relevant only if defendants are being sued in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (explaining defenses available in personal- and official-capacity suits). Later, the complaint alleges that defendants' unconstitutional acts "stripped" them of their official capacity. Compl. ¶¶ 249–255. This allegation both invokes the principles animating *Ex Parte Young* and clarifies what plaintiffs mean by suing Governor Wolf and then-Secretary Boockvar "individually."

If, however, plaintiffs intend to sue defendants personally, plaintiffs' claims must be dismissed because, among all the other flaws, the complaint fails to allege any unlawful act by the Governor or Secretary specifically. In a personal-capacity suit, a defendant is liable only for her own acts. *Kentucky*, 473 U.S. at 166. And even if plaintiffs had made those allegations, defendants would be entitled to qualified immunity. Qualified immunity protects state officials sued in their personal capacity when the constitutional right allegedly violated was not clearly established at the time of the relevant conduct. *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009). That is true here. Indeed, plaintiffs' federal claims depend on state actors having flouted state law. But the challenged acts were endorsed by the Supreme Court of Pennsylvania as consistent with, or compelled by, Pennsylvania law. If executing state law as interpreted by the state's highest court violates a federal right because, in a federal court's view, state actors in fact violated state law, that right is not clearly established. Instead, such a right would radically alter foundational principles of federalism as the Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

statute is void, and therefore does not impart to the official any immunity from responsibility to the supreme authority of the United States." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

Plaintiffs' complaint suggests this exception applies here. Compl. ¶ 243. But the exception identified in *Ex Parte Young* permits suits seeking prospective relief; the Supreme Court has refused to extend the exception to suits seeking retrospective relief. *Green*, 474 U.S. at 68. The relief plaintiffs ask for here, including damages, is retrospective. Labeling some requests as seeking "equitable" relief, as plaintiffs do, does not avoid the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 666–68 (1974).

The 2020 election is over, and a new president has been inaugurated. There are no ongoing actions to enjoin, so the Eleventh Amendment bars this suit.

## III. This Court Lacks Jurisdiction Because No Plaintiff Has Standing

Article III limits a federal court's jurisdiction to cases in which the plaintiff has an actual stake. *Defs. of Wildlife v. Everson*, 984 F.3d 918, 944–45 (10th Cir. 2020). For a plaintiff to satisfy that standard, she must demonstrate that the court can redress a concrete and particularized injury caused by the defendant. *Id.* at 945. An injury is not particularized, and thus insufficient to confer standing under Article III, if it is a generalized grievance. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014).

Trying to satisfy their constitutional burden, plaintiffs—some of whom admit to not voting, *see* Compl., Ex. 1, O'Rourke Decl. ¶ 11, ECF No. 1-2; Yarbrough Decl. ¶ 9—allege that they have been injured by Governor Wolf's and Acting Secretary Degraffenreid's allegedly unconstitutional acts because those acts diluted, diminished, or disadvantaged plaintiffs' votes. Compl. ¶¶ 304, 319–320, 332, 343, 353, 355. As a factual matter, plaintiffs' allegations are nonsensical: No plaintiff claims to have voted in Pennsylvania, so no plaintiff could have had his or her vote compromised by the actions of Governor Wolf or Acting Secretary Degraffenreid.

8

What is more, as with every other part of this case, plaintiffs' theory of standing already has been rejected this election cycle. Complaints of vote dilution are generalized grievances, incapable of conferring standing, if the supposed disadvantage derives from actions of state government that affect all voters equally. *Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020); *Bognet v. Sec'y Commonwealth of Pa.,* 980 F.3d 336, 349–50, 355–60 (3d Cir. 2020). Plaintiffs readily concede this case is no different, asserting the actions of which they complain injured "every registered voter in the country." Compl. ¶ 319. Likewise, a stake in the offices of President and Vice President, Compl. ¶¶ 305, 343, is an insufficient basis to challenge the administration of a state's election, *see Texas v. Pennsylvania*, No. 22O155, 2020 WL 7296814, at *1 (U.S. Dec. 11, 2020) (rejecting argument that Texas's stake in federal officer holders confers "a judicially cognizable interest in the manner in which another State conducts its elections").

To the extent that plaintiffs claim their interest in this litigation is ensuring that all voters may exercise the right to vote for President and Vice President in a manner consistent with the Constitution, Compl. ¶ 305, it is similarly insufficient to confer standing. An interest that "only lawful ballots are counted" or an interest in seeing that "government be administered according to the law" are generalized interests that do not permit standing. *Wood*, 981 F.3d at 1314; *see also Bognet*, 980 F.3d at 348–49. At times, plaintiffs use conclusory labels—saying the injuries they have suffered are "individual and personal," Compl. ¶ 304—but "it does not follow from the labeling of the right to vote as 'personal' . . . that any alleged illegality affecting voting rights rises to the level of an injury in fact." *Bognet,* 980 F.3d at 358. Because neither defendant took any action that injured any plaintiffs' right to vote, or injured any legally cognizable interest any

9

plaintiff had in the administration of the 2020 election, plaintiffs lack standing and this action must be dismissed.

## IV. Plaintiffs Fail to State Any Claim that Could Allow Relief

In addition to these jurisdictional problems, plaintiffs have not plausibly alleged any claim to relief. Plaintiffs' first three counts invoke 42 U.S.C. §§ 1983, 1985, 1986, and 1988 to vindicate purportedly infringed constitutional rights.[6] But a viable claim under those statutes depends on the violation of a constitutional right. None of the three counts meets that predicate.

Count I alleges that the plaintiffs who actually voted did so in an election in which state actors in distant states—including Pennsylvania—violated the Constitution's Electors Clause by modifying election laws passed by state legislatures. Compl. ¶¶ 295–296, 305–308. For this count, plaintiffs allege that governors and state cabinet secretaries, who have no legislative responsibilities, legislated rules that governed the 2020 election. *Id.* ¶¶ 296, 308, 311. But the complaint contains no allegation identifying any way in which a defendant did so. Plus, as has been repeatedly and definitively concluded, Pennsylvania's election officials administered the 2020 election consistent with Pennsylvania's constitution and election code. *See generally In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058; *In re Canvassing Observation*, 241 A.3d 339; *In re Nov. 3, 2020 Election*, 240 A.3d 591; *Pa. Democratic Party*, 238 A.3d 345; *Bognet,* 980 F.3d 336; *Donald J. Trump for President*, 830 F. App'x 377.

To the extent that plaintiffs argue that a state's election code is not subject to a state's constitution, Supreme Court precedent forecloses that argument. A state legislature's authority for the manner in which elections for federal office are conducted does not empower them to act

---

[6] 42 U.S.C. § 1988 does not provide a cause of action. *Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir. 1985).

10

"in defiance of provisions of the State's constitution." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 818 (2015). That is true because, as has long been understood, the exercise of a state's legislative power is the state's "supreme authority, except as limited by the constitution of the state." *McPherson v. Blacker*, 146 U.S. 1, 25 (1892). Therefore, remedying a conflict between Pennsylvania's election code and its constitution, as the Supreme Court of Pennsylvania did when it extended the deadline for counties to receive mailed ballots, does not violate the federal Constitution.[7]

Earlier this election cycle, the Supreme Court was presented with the exact argument obliquely made here, by parties asking that court to vacate the Supreme Court of Pennsylvania's decision ordering the three-day grace period. The Supreme Court declined to do so. *Republican Party of Pennsylvania v. Degraffenreid*, No. 20-542, 2021 WL 666401 (Feb. 22, 2021) (denying petition for a writ of certiorari). Supreme Court precedent, then, still forecloses the constitutional theory that plaintiffs advance here.

Count II contends that Governor Wolf and Acting Secretary Degraffenreid violated both the Fourteenth Amendment's Equal Protection Clause, Compl. ¶¶ 330–333, and the Fifteenth Amendment, Compl. ¶ 336. Neither claim has merit.

The Equal Protection Clause prohibits every state from denying "any person *within its jurisdiction* the equal protection of the laws." U.S. Const. amend XIV, § 1 (emphasis added). Individuals outside Pennsylvania, such as plaintiffs, may not complain of unequal treatment under Pennsylvania laws that do not apply to them.

If any plaintiff were subject to Pennsylvania's election laws, the complaint still would fail to state a violation of the Equal Protection Clause. Assuming plaintiffs' argument is that state

---

[7] Even if remedying such a conflict violates the Electors Clause, plaintiffs are not the parties to vindicate that constitutional interest because they "are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes." *Bognet*, 980 F.3d at 350.

officials created favored groups of voters by failing to compel counties to uniformly exercise statutory discretion, *see* Compl. ¶¶ 331–332, that claim is untenable because "[r]easonable county-to-county variation is not discrimination." *Donald J. Trump for President*, 830 F. App'x at 388. "Even when boards of elections 'vary ... considerably' in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal protection." *Id.* (quoting *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635–36 (6th Cir. 2016)). Assuming instead that plaintiffs invoke the prohibition against race-based classification, Compl. ¶¶ 335–343, their claim cannot survive because plaintiffs do not allege any such classification. Indeed, plaintiffs do not allege that they were treated differently from one another, or that any subset of plaintiffs was treated differently than anyone else.

The Fifteenth Amendment guarantees that the right "to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend XV, § 1. Here, plaintiffs' claim must be dismissed because plaintiffs do not allege that any defendant burdened or restricted a plaintiff's right to vote in any way, let alone because of race.[8] Instead, plaintiffs complain of actions that *allowed* others to vote. Compl. ¶¶ 217, 219–220, 224–225. But "[e]xpanding the right to vote for some residents of a state does not burden the rights of others." *Donald J. Trump for President*, 2020 WL 6821992, at *12. Of course, neither Governor Wolf nor Acting Secretary Degraffenreid could have burdened any plaintiff's right to vote, as no plaintiff votes in Pennsylvania. Compl. ¶¶ 6–13.

Count III alleges that Pennsylvania officials violated the Fourteenth Amendment's due process protections because those officials unfairly administered the election in ways that both

---

[8] Two plaintiffs did not vote in the 2020 election. One admits that he also did not vote in prior elections, and that those decisions reflected his own "firmly held belief." O'Rourke Decl. ¶ 11. The other admits not voting because of his own doubt that voting matters. Yarbrough Decl. ¶¶ 9–10.

12

debased election standards and favored one candidate over another. Compl. ¶¶ 359–361. A state's election administration implicates the Due Process Clause "only in the exceptional case where a state's voting system is fundamentally unfair." *Curtis v. Oliver*, 479 F. Supp. 3d 1039, 1133 (D.N.M. 2020) (cleaned up). Garden variety irregularities do not amount to fundamental unfairness. *Id.* at 1133–34 (citing *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978)).

Plaintiffs do not allege facts evidencing fundamental unfairness. Plaintiffs' claims of unfairness depend on identifying state-sponsored deviations from the election code, but plaintiffs misrepresent what Pennsylvania's election code requires. *Supra* Background. As Pennsylvania's Supreme Court conclusively ruled, Pennsylvania's election code does not permit disqualifying votes based on signature verification, *In re Nov. 3, 2020 Election*, 240 A.3d at 611, does not require disqualifying ballots for technical errors on a ballot's envelope, *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d at 1078, and no county denied a poll watcher the access required under state law, *In re Canvassing Observation*, 241 A.3d at 349–51. The United States Supreme Court denied a petition for certiorari seeking review of all three state-law decisions. *Trump v. Degraffenreid*, No. 20-845, 2021 WL 666798 (Feb. 22, 2021). Plaintiffs' contrary factual statements about Pennsylvania law are wrong.

As to the extension of the receipt deadline for mail-in votes, there is no allegation, nor could there be, that that generally applicable modification lowered election standards or favored one candidate. Moreover, that small group of ballots did not factor in the final tally of votes.

Next, plaintiffs allege that on November 2 Pennsylvania reported having mailed out 2.7 million ballots, but on November 4 reported having mailed out 3.1 million ballots, leaving an unexplained increase of 400,000 ballots. Compl. ¶ 231. But plaintiffs, and the report they cite for these statistics, is misleading. Pennsylvania has separate laws governing no-excuse, mail-in

13

ballots and absentee mail-in ballots. 25 Pa. Stat. § 3146.6 (absentee); 25 Pa. Stat. § 3150.16 (no-excuse). Plaintiffs' allegations conflate different numbers, and do not acknowledge that Pennsylvania maintains two distinct forms of mail-in ballots. By October 27, Pennsylvania had mailed 3.1 million ballots total. Of those, 2.7 million were no-excuse mail-in ballots—the cited number. Another 400,000 absentee ballots had been mailed, too. The numbers add up.

Similarly, plaintiffs note that the same misguided report on which they rely for discrepancies in the total number of ballots mailed also reported that Pennsylvania's election registry failed to log the date that about 9,000 ballots were mailed to voters, logged another 58,000 ballots as having been returned by a voter before having been mailed, and logged about 51,000 ballots as having been returned the day after being mailed. Compl. ¶ 229. The report plaintiffs cite uses these numbers to conclude that "it is IMPOSSIBLE for anyone to contend that fraud did not occur" in Pennsylvania elections. Letter from Rep. Ryan to Rep. Perry (Dec. 15, 2020).[9] Plaintiffs' claims against defendants allege constitutional violations, not fraud. The alleged incongruities, then, have no relevance here.

In any event, Pennsylvania allows voters to apply for a no-excuse mail-in ballot in person and return the ballot in person, even doing so all at once. 25 Pa. Stat. § 3146.5(b)(2). Given that option, 51,000 ballots having been returned the day after they were mailed is not plausibly evidence of anything untoward. For the rest of the reportedly anomalous figures, neither plaintiffs nor the cited report supplies any details that might suggest the existence of fraud with the specificity required under Federal Rule of Civil Procedure 9(b). Indeed, neither offers *any* details suggestive of fraud. The noted discrepancies are best explained as human error.

---

[9] http://www.repfrankryan.com/Display/SiteFiles/390/OtherDocuments/2020/Scott%20Perry%20Election%20Irregularities%20Letter%2012.15.2020.pdf

Finally, Count VI, through which plaintiffs seek a declaratory judgment for defendants'
purportedly unconstitutional acts, fails for the same reasons as Counts I–III: Plaintiffs have not
alleged any unconstitutional acts. And Count VII must be dismissed because "permanent
injunctive relief" is not a cause of action; injunctions are remedies available to plaintiffs who
have a suffered a legally redressable injury. *Bellwether Cmty. Credit Union v. Chipotle Mexican
Grill, Inc.*, 353 F. Supp. 3d 1070, 1088 (D. Colo. 2018). That is not the case here.

## CONCLUSION

Because this court lacks both personal and subject matter jurisdiction, and because
plaintiffs have not pleaded any claim entitling them to relief, this case must be dismissed.


Dated: March 18, 2021                          Respectfully submitted,

                                               Josh Shapiro
                                               Attorney General
                                               Commonwealth of Pennsylvania

                                               Michael J. Fischer
                                               Chief Deputy Attorney General

                                               /s/ Jacob Boyer
                                               Jacob Boyer
                                               Deputy Attorney General
                                               Pennsylvania Office of Attorney General
                                               1600 Arch Street, Suite 300
                                               Philadelphia, PA 19103
                                               (267) 768-3968
                                               jboyer@attorneygeneral.gov

                                               *Attorneys for Governor Tom Wolf and
                                               Acting Secretary of the Commonwealth
                                               Veronica Degraffenreid*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2021 I electronically filed the foregoing Motion to

Dismiss and Memorandum in Support of Motion to Dismiss with the Clerk of the Court using the

CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Jacob Boyer
Jacob Boyer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

Plaintiffs, on their own behalf
and of a class of similarly
situated persons,

v.

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, and DOES 1-10,000,

Defendants.

---

## REPLY IN SUPPORT OF MOTION TO DISMISS
## PLAINTIFFS' COMPLAINT

---

# INTRODUCTION

In Plaintiffs' Response and Brief in Opposition to Defendant Dominion's Motion to Dismiss (the "Response"), Plaintiffs confirm that they lack standing to bring their general grievances, are not seeking to overturn the 2020 presidential election, may only be seeking nominal damages, and are most interested in a ruling from a federal court or a jury that Dominion Voting Systems, Inc. ("Dominion") is a state actor. Plaintiffs want to argue at the pleadings stage the "facts"—albeit those derived from untrustworthy sources promoting debunked conspiracy theories. They also contend that Dominion's Motion to Dismiss is moot because they plan to file for leave to amend the Complaint after failing to timely file an amended complaint.[1] Plaintiffs, nonetheless, overlook the Complaint's substantial legal flaws. Nothing stated in the Response alters the analysis. They lack standing, fail to adequately state claims for relief against Dominion (and the other Defendants), and fail to adequately plead a class action. The case must be dismissed pursuant to Rules 12(b)(1) and 12(b)(6).

# STANDARDS OF REVIEW

Plaintiffs incorrectly assert that the Federal Rules of Civil Procedure "embody 'notice pleading.'" *See* Resp. to Dominion's Mot. to Dismiss ("Resp."), at 8. Under the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a claim is sufficient to withstand a motion to dismiss under Rule 12(b)(6) of the

---

[1] Plaintiffs have since filed a Motion for Leave to File Amended Complaint (the "Motion for Leave"), which attached a proposed First Amended Class Action Complaint and Jury Demand (the "Proposed Amended Complaint"). Notably, the Proposed Amended Complaint would add <u>no</u> new claims against Dominion. Dominion will be filing an opposition to the Motion for Leave that explains that, notwithstanding the amendment, Plaintiffs' allegations against Dominion still would be subject to dismissal for lack of standing and failure to state a claim and thus any amendment is futile.

1

Federal Rules of Civil Procedure only when, accepting as true the facts alleged in the complaint

but not any legal conclusions, the claim has "facial plausibility," that is, it allows the court "to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678; *see also Twombly*, 550 U.S. at 570 (the plaintiff must allege enough by way of

factual content to "nudge" her claim "across the line from conceivable to plausible"). *Twombly*

and *Iqbal* thus brought an end to "notice pleading" under the federal rules.[2]

## **ARGUMENT**

Plaintiffs' Response confirms that none of the five claims for relief against Dominion—

Counts I, II, III, VI, and VII—survive scrutiny under Rules 12(b)(1) or 12(b)(6).

### I.  **Plaintiffs' Assert Implausible and Non-Justiciable Claims.**

As described in the Motion to Dismiss, Plaintiffs' claims, which rely upon complaints

and affidavits from dismissed lawsuits and untrustworthy sources to support their allegations, are

so devoid of merit that they do not involve a federal controversy. *See* Dominion's Mot. to

Dismiss, at 5–6. To try to distinguish this case from those dismissed cases, Plaintiffs now

represent that they are not seeking to overturn the 2020 presidential election but rather are

requesting that this Court (or a jury) make findings of fact regarding whether Dominion is a state

actor. *See* Resp., at 13. But even if Dominion was deemed a state actor under 42 U.S.C. § 1983,

Plaintiffs still must possess standing and assert a plausible claim. *See Brown v. Buhman*, 822

F.3d 1151, 1161 n.9 (10th Cir. 2016) (explaining "[t]here can be no 'violation' of § 1983"

because the statute "is a remedial vehicle"). In short, the Complaint suffers from the very same

threshold flaws that condemned the related lawsuits. Claims based on complaints and affidavits

---

[2] Tellingly, Plaintiffs provide no statement regarding the standard of review under Rule 12(b)(1)
of the Federal Rules of Civil Procedure.

from dismissed lawsuits, and misinformation regarding the election, have no place in federal court.

## II.  Plaintiffs Lack Standing.

Dominion and the other Defendants who have filed responsive pleadings have identified the fundamental flaw in the Complaint—lack of Article III standing. Specifically, Plaintiffs fail to allege a concrete and particularized injury-in-fact because they assert general grievances that theirs[3] and every other registered voter's vote was diluted, and not concrete and particularized harm that affected them in a personal, individualized way. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992) ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Wood v. Raffensperger*, 981 F.3d 1307, 1315 (11th Cir. 2020) ("[I]rregularities in the tabulation of election results do not affect [a plaintiff] differently from any other person" and thus does not confer standing).

### a.  Plaintiffs' arguments are irrelevant.

Plaintiffs make several arguments in response: (1) they have adequately pleaded a particularized injury-in-fact because they seek nominal damages; (2) there is a common right of voters such that the impact of the votes cast in one state may be affected by votes cast in other states; (3) they are not asserting general grievances because the claims are on behalf of

---

[3] Plaintiffs fail to respond how registered voters who did not vote, such as named Plaintiffs O'Rourke and Yarbrough, could possibly have had their votes diluted.

"registered voters" and not the public at-large; and (4) their claims can be redressed through nominal damages.[4] Each argument is equally unavailing.

First, even if Plaintiffs are seeking nominal damages for their civil rights claims—as opposed to the $160 billion in damages pleaded in the Complaint—the availability of nominal damages without proof of actual injury for certain constitutional violations does not establish an injury-in-fact. Plaintiffs quote a passage from *Hughes v. Lott*, articulating that "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." 350 F.3d 1157, 1162 (11th Cir. 2003).[5] This statement, however, refers to which types of damages are available for claims of constitutional violations. Article III standing, which was not at issue in the case, requires that each plaintiff demonstrate that "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180 (2000). Specifically, for an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Plaintiffs have not, and cannot, meet this aspect of injury in fact. Therefore, even though, for example, procedural due process claims may be actionable for nominal damages under Section 1983 without proof of actual injury, *see Carey*, 435 U.S. at 266, Plaintiffs still have to establish each element of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) ("Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily

---

[4] These same arguments are reasserted in Plaintiffs' Motion to Amend.
[5] Plaintiffs incorrectly attribute the quote to *Carey v. Piphus*, 435 U.S. 247, 255 (1978), a case cited by the Eleventh Circuit in *Hughes*.

4

granting the right to sue to a plaintiff who would not otherwise have standing.'" (quoting *Raines
v. Byrd*, 521 U.S. 811, 820 n.3 (1997))). They have not.[6]

Second, Plaintiffs selectively quote passages from *Anderson v. Celebrezze* and *Karcher v.
Daggett* as support for the overbroad assertion that any registered voter has standing to challenge
the election laws and processes of another state in a presidential election because presidents are
elected nationally, and the impact of the votes cast in one state may be affected by votes cast in
other states. *See* Resp., at 17–18. Neither case, however, addresses standing or provides support
for Plaintiffs establishing a concrete and particularized injury in fact.

In *Anderson*, the U.S. Supreme Court held that Ohio's March filing deadline for
independent candidates violated the Fourteenth Amendment because it impermissibly limited
political participation by an identifiable political group—Ohio's independent-minded voters—
whose members shared a particular viewpoint. 460 U.S. 780, 792–94 (1983) (reasoning that the
state's interest in regulating ballot access for presidential candidates was not sufficiently
important to prevent Ohio voters from voting for a candidate who would be on the ballot based
on the deadlines in other states). By requiring that candidates file eight months before the
November election, the deadline discriminated against candidates and voters whose political
preferences were outside the existing political parties. *Id.* at 794. The Court did not address
standing and did not hold that voters outside of Ohio had standing to challenge Ohio's filing
deadline. This case is thus distinguishable from *Anderson* for numerous reasons, including that

---

[6] The thrust of Plaintiffs' argument appears to be that "Americans have been deprived of the
reasonable appearance of a fair Presidential election." *See* Resp., at 20. It is unfortunate that a
large segment of the U.S. population does not trust the election results. Deprivation of the
reasonable appearance of a fair election, however, is not a concrete and particularized injury
traceable to Dominion that can be possibly redressed. It simply highlights why Plaintiffs' claims
are general grievances.

Plaintiffs allege that all "registered voters" have been injured, and not that Defendants discriminated against any particular group of voters.

      *Karcher*, which involved a challenge to the constitutionality of New Jersey's congressional reapportionment statute, is also not on point. Plaintiffs quote a passage from the concurring opinion in the case but curiously omit the first sentence of the paragraph, which clarifies that the passage pertains to equal protection claims against a state for adopting discriminatory election rules. *Karcher v. Daggett*, 462 U.S. 725, 748 (1983) (Stevens, J., concurring) ("The Equal Protection Clause requires *every State* to govern impartially. When a *State adopts rules* governing its election machinery or defining electoral boundaries, those rules must serve the interests of the entire community." (emphasis added)). Of course, private companies who provide voting systems, such as Dominion, cannot adopt state election rules. Plaintiffs have not alleged that Dominion has done so. And, nonetheless, "state actors counting ballots in violation of state election law . . . is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment." *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 354, 356 (3d Cir. 2020).

      Third, Plaintiffs dispute, without citation to any authority, that their claims are general grievances because they believe the "general interest of the members of the public" differs from the interests of "all registered voters." *See* Resp., at 20. "All registered voters," however, is not a specific enough subset of the general public to grant standing. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."). This is especially true for claims alleging vote dilution. *Wood*, 981 F.3d at 1314–

6

15 (explaining that "'no single voter is specifically disadvantaged' by improperly counted votes, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote'" and that therefore "[v]ote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing'" (quoting *Bognet*, 980 F.3d at 356)).

Fourth, Plaintiffs argue that they have standing because their claims are redressable through nominal damages. *See* Resp., at 22. Dominion agrees that if Plaintiffs' claims are based on a completed violation of a legal right, then a request for nominal damages satisfies the *redressability* element for Article III standing. The U.S. Supreme Court recently confirmed this in the passage from *Uzuegbunam v. Preczewski* quoted in Plaintiffs' Response. For this very reason, Dominion limited its redressability argument in the Motion to Dismiss to Plaintiffs' requests to void the certification of election results. Plaintiffs' argument nevertheless misses the mark because redressabilty is just one element of Article III standing. A later passage from *Uzuegbunam* confirms that the other elements of standing must also be met:

> This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as a particularized injury); plead a cognizable cause of action; and meet all other relevant requirements. We hold only that, for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.

No. 19-968, 2021 WL 850106, at *7 (Mar. 8, 2021) (internal citations omitted). Plaintiffs have not satisfied these other elements of Article III standing.

### b. Plaintiffs did not respond to Dominion's other standing arguments.

Absent in the Response is any counter to Dominion's arguments that (i) the individual and personal nature of a person's right to vote does not, by itself, confer standing; (ii) Plaintiffs

lack prudential standing to bring their Electors Clause claim; and (iii) Plaintiffs' allegations that Defendants "acted in concert with each other, and other persons, to unconstitutionally legislate rules, change procedures, and implement a scheme and device to interfere and manipulate the Election" are not traceable to Dominion. In fact, despite spending the majority of the Response recycling allegations and making new ones, nothing in the Response or the Complaint alleges how Dominion acted in concert with the other Defendants. Plaintiffs have therefore conceded these points. *See Scull v. Wolf*, No. 20-cv-01624-NYW, 2020 WL 7384842, at *7 (D. Colo. Dec. 16, 2020) (explaining that because plaintiff did "not [ ] respond to" defendant's argument on a Rule 12(b)(1) motion, "it [was] effectively conceded for the purposes of [the] motion").

### III. Plaintiffs Have Not Pleaded a Plausible Claim for Relief.

As described in Dominion's Motion to Dismiss, Plaintiffs fail to plausibly allege they are entitled to relief on their constitutional claims under Section 1983. In response to these deficiencies, Plaintiffs put forth countless generalized allegations—many of which are absent from their Complaint or their Proposed Amended Complaint—that attempt to explain Dominion's business and interactions with state governments to support their argument that Dominion is a state actor. *See, e.g.*, Resp., at 5–6, 10–13. This Court has clarified, however, that "[i]f the allegations are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (internal quotations omitted). Plaintiffs' claims are implausible and must be dismissed under Rule 12(b)(6).

### a.   Plaintiffs' color of law argument lacks significance.

Plaintiffs spend the vast majority of their Response arguing that Dominion is a state actor

by virtue of the election-related services it provides. These arguments are primarily predicated on

allegations absent from the Complaint (and the Proposed Amended Complaint, for that matter)

and therefore fall outside of what this Court may consider in deciding Dominion's Motion to

Dismiss.[7] *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) ("Generally, the sufficiency of a

complaint must rest on its contents alone."); *Mott v. Narconon Fresh Start*, No. 14-cv-01293-

PAB-KMT, 2015 WL 1259277, at *4 n.4 (D. Colo. Mar. 17, 2015) ("Although plaintiffs'

arguments rely in part on facts outside the complaint, plaintiffs do not articulate a basis upon

which the Court could appropriately consider such facts."). Plaintiffs' allegations are not limited

to matters of public record. Based on the information alleged in the Complaint, which includes

nothing more than the existence of contracts between Dominion and various states, Plaintiffs fail

to plausibly allege that Dominion qualifies as a state actor under Section 1983. *See, e.g.*, *Wittner*

*v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013) ("Payments under government contracts

and the receipt of government grants and tax benefits are insufficient to establish a symbiotic

relationship between the government and a private entity.").

Even if Plaintiffs have adequately pleaded a plausible argument that Dominion is a state

actor, or would be permitted to amend in order to do so, it does not save the Complaint. Acting

under color of law[8] is not, itself, liable conduct. While Plaintiffs are correct that a Section 1983

---

[7] For instance, Plaintiffs point to a Software License Agreement between Dominion and Dupage
County, Illinois—a county (and even state) wholly absent from Plaintiffs' Complaint and
Proposed Amended Complaint.
[8] Dominion does not admit that it has acted under color of law. Rather, it accepts as true—for the
purposes of this motion only—the plausible allegations in the Complaint.

claim "is only applicable to conduct occurring under color of law," Resp., at 9, Plaintiffs ignore

that Section 1983 *also* requires a violation of the Constitution or federal law, as well as standing.

*See Buhman*, 822 F.3d at 1161 n.9. Plaintiffs have not and cannot establish standing or their

underlying constitutional claims. Their color of law argument simply doesn't matter.

### b.  The constitutional claims must be dismissed under Rule 12(b)(6).

#### i.  *Electors clause claim*

Plaintiffs did not respond to Dominion's arguments in the Motion to Dismiss regarding

their Electors Clause claim and thus appear to have conceded this claim as well. *See Doe v.

DiStefano*, No. 18-cv-1462-WJM-KLM, 2019 WL 1254943, at *3 (D. Colo. Mar. 19, 2019)

(Because plaintiff "does not respond to the [Defendant's] argument, . . . it is effectively conceded

for the purposes of this [Rule 12(b)(6)] motion."). The closest Plaintiffs get to addressing the

claim is by contending, with no factual support, that "individuals under color of authority . . .

unconstitutionally changed the rules governing their respective elections." Resp., at 21. As

Dominion explained in its Motion to Dismiss, Plaintiffs do not—and indeed, cannot—set forth

even a single factual allegation explaining how Dominion was involved in purportedly altered

voting laws without legislative approval. And, by Plaintiffs' own admission, their claim solely

concerns state law, *see id*., which cannot form the basis of an Electors Clause claim under

Section 1983 and thus must be dismissed. *See King v. Whitmer*, No. CV 20-13134, 2020 WL

7134198, at *11 (E.D. Mich. Dec. 7, 2020) (explaining that raising Electors and Election Clause

claims under Section 1983 based on violations of state election laws is inappropriate as they are

"state law claims disguised as federal claims").

### ii. *Equal protection claim*

Relying again on the concurring opinion in *Karcher*, Plaintiffs appear to argue that the alleged "vote dilution" they claim occurred constitutes a violation of equal protection. Again, their reliance on *Karcher* is misplaced. The quote utilized by Plaintiffs states that, "[i]f [the election rules adopted by States] serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time . . . they violate the constitutional guarantee of equal protection." *Karcher*, 462 U.S. at 748 (Stevens, J., concurring). Plaintiffs' theory, however, is that all votes cast in the 2020 election were allegedly diluted, which, by its very definition, is not a particular political group. Their allegations of vote dilution do not fit within the paradigm of equal protection and thus their equal protection claim must be dismissed. *See, e.g.*, *Bognet*, 980 F.3d at 354–55 (explaining that claims of vote dilution under an equal protection theory pertains to certain votes "being weighed differently" from the votes of a preferred class due to unequal treatment).

### iii. *Due process claim*

In support of their procedural due process claim, Plaintiffs appear argue that they were denied sufficient process under the Constitution because the adjudication of ballots identified for further review by Dominion's voting systems is performed by state officials without poll watchers observing and can be completed by any person with authorization. Resp., at 4. They further contend that because Dominion "provide[s] the technology to electronically adjudicate" ballots, *see* Resp., at 1, it somehow has a hand in this adjudication process. This argument is nonsensical. Plaintiffs have alleged no causal connection between Dominion's voting systems

11

flagging ballots and a state's review of those ballots because none exists. Dominion simply follows a state's given process for reviewing votes, as dictated by state law. Plaintiffs' dispute is with how states adjudicate ballots, and not with Dominion.[9]

As for Plaintiffs' substantive due process claim, Plaintiffs continue to rely solely on debunked and misconstrued reports, along with a slew of opinions from the news media, to allege the existence of large-scale election irregularities. *See Curry v. Baker*, 802 F.2d 1302, 1314, 1315 (11th Cir. 1986) (explaining that "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation"). These allegations are insufficient to support a plausible claim for relief; accordingly, this claim must be dismissed.

### c. Plaintiffs provide no response to Dominion's arguments that they have failed to state claims for violations of Sections 1985, 1986, and 1988.

Plaintiffs' Response focuses almost exclusively on why they believe Dominion is a state actor and tellingly does not respond to Dominion's arguments that they have failed to state a claim under Sections 1985, 1986, and 1988. *See DiStefano*, 2019 WL 1254943, at *3. As described in Dominion's Motion to Dismiss, an element of a claim under Section 1985 is "the existence of a conspiracy," and the Complaint contains no factual allegations that there was an agreement between Dominion and the other Defendants or any sort of meeting of the minds. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000). Likewise, noticeably absent

---

[9] Regardless, as described in the Motion to Dismiss, Plaintiffs cannot show that they were deprived of some "definite liberty or property interest," *S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998), because the right to vote is neither a property nor liberty interest. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 230–33 (5th Cir. 2020) (noting that it could not identify any courts treating the right to vote as a property interest, and holding that the right also is not a liberty interest). Plaintiffs provide no response and thus concede this argument. *See DiStefano*, 2019 WL 1254943, at *3. Therefore, their procedural due process claim must be dismissed.

from the Response is any fact giving rise to the alleged conspiracy underpinning the Complaint.

A conspiracy is simply not pleaded. Plaintiffs also do not address why their general grievances

fall within the class-wide or race-based animus required under Section 1985. *See Grove v.

Groome*, 817 F. App'x 551, 557 (10th Cir. 2020). Political animus, which is all Plaintiffs come

close to alleging, does not suffice. *See, e.g.*, *Brown v. Reardon*, 770 F.2d 896, 905 (10th Cir.

1985).

Therefore, to the extent Plaintiffs are asserting claims under Section 1985, they

conceded and must be dismissed. Because claims asserted under Section 1986 are dependent

upon the validity of a Section 1985 claim, the Section 1986 claims also must be dismissed. *Id*.[10]

### d.  Plaintiffs' declaratory judgment claim against Dominion must be dismissed.

Based on the allegations in the Complaint, Plaintiffs' declaratory judgment claim appears

to request that this Court declare Defendants' actions in connection with the 2020 presidential

election unconstitutional and *ultra vires*. Plaintiffs have since clarified that that they are not

seeking to overturn the 2020 presidential election results. It remains a mystery what exactly

Plaintiffs seek with this claim.

Plaintiffs, however, cannot seek a declaratory judgment that Dominion is a state actor for

purposes of Section 1983. Not only do Plaintiffs admit that this is an issue of fact, *see* Resp., at 3,

but such a claim does not satisfy the elements for a cause of action under the Declaratory

Judgment Act. Because Plaintiffs lack standing to assert their substantive claims, *see supra*, and

a declaration that Dominion is a state actor would not resolve any dispute because "[t]here can be

no 'violation' of § 1983 separate and apart from the underlying constitutional violations," *see*

---

[10] As explained in the Motion to Dismiss, Section 1988 is a procedural statute that does not
create an independent cause of action. *See id*. at 907.

*Buhman*, 822 F.3d at 1162 n.9, a declaration would not resolve any actual controversy. *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008) (citing 28 U.S.C. § 2201(a) of the Declaratory Judgment Act and explaining that a "plaintiff must present the court with a suit based on an 'actual controversy,' a requirement the Supreme Court has repeatedly equated to the Constitution's case-or-controversy requirement"). Instead, a declaration on this question would constitute an impermissible advisory opinion. *See Johnson v. Interstate Transit Lines*, 163 F.2d 125, 130 (10th Cir. 1947) (explaining that absent an actual controversy, "there is no justiciable controversy and the case must be characterized as one for an advisory opinion and as being academic rather than justiciable").

### IV. This Case Should Be Dismissed Under Rule 12.

Defendants' motions to dismiss can be decided pursuant Rules 12(b)(1) and 12(b)(6). No facts outside the Complaint are necessary to determine that Plaintiffs lack standing and have not asserted plausible claims for relief,[11] despite Plaintiffs' decision to treat their Response akin to a response to a motion for summary judgment under Rule 56. *See Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991) (explaining that courts must convert a motion under Rule 12(b) into one for summary judgment under Rule 56 if it considers matters outside the complaint). The numerous "evidence" referenced by Plaintiffs in the Response is irrelevant to the analysis. *See id.* ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally

---

[11] While the non-legal sources cited by Dominion in its Motion to Dismiss highlight the implausibility of Plaintiffs' claim and challenge the veracity of the allegations against Dominion, this Court need not take judicial notice or rely upon them to dismiss the Complaint.

sufficient to state a claim for which relief may be granted."). The Complaint must be dismissed at the pleadings stage.[12]

## **CONCLUSION**

For the foregoing reasons and those stated in the Motion to Dismiss, the claims against Dominion must be dismissed with prejudice. Dominion again reserves the right to seek attorneys' fees and costs pursuant to Rules 5 and 11(c) of the Federal Rules of Civil Procedure.

Dated March 23, 2021

s/ *Stanley L. Garnett*_____
Stanley L. Garnett
David B. Meschke
Amanda K. Houseal
Bridget C. DuPey
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO  80202-4432
Phone: 303.223.1100
Email: sgarnett@bhfs.com
            dmeschke@bhfs.com
            ahouseal@bhfs.com
            bdupey@bhfs.com

Attorneys for Defendant Dominion Voting Systems, Inc.

---

[12] Even if Plaintiffs' Complaint could survive Rules 12(b)(1) and 12(b)(6), Plaintiffs confirmed in the Response that their proposed class is every registered voter. Should this Court reach the issue, the class allegations should be stricken under Rules 23(c)(1)(A) and 23(d)(1)(D) because the Complaint fails to adequately plead a class action, the proposed class is overbroad, and common issues do not predominate. Adding 152 named Plaintiffs and placing them into subclasses, as outlined in the Proposed Amended Complaint, do not resolve these issues. Dominion therefore reiterates its right to move to strike the class allegations in a separate motion.

15

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 23rd day of March 2021, a true and correct copy of the foregoing Reply in Support of Motion to Dismiss Plaintiff's Complaint was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Stanley L. Garnett*
Stanley L. Garnett

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L.
CARTER, LORI CUTUNILLI, LARRY D.
COOK, ALVIN CRISWELL, KESHA
CRENSHAW, NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs, on their own behalf and of a class of
similarly situated persons,

v.

DOMINION VOTING SYSTEMS INC., a
Delaware corporation, FACEBOOK, INC., a
Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit
organization, MARK E. ZUCKERBERG,
individually, PRISCILLA CHAN,
individually, BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually, TOM
WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L.
THOMSEN, individually, MARGE
BOSTELMAN, individually, JULIE M.
GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

## DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

---

## I.    INTRODUCTION

Plaintiffs' opposition fails to overcome Facebook's dispositive arguments requiring dismissal of the Complaint.  Plaintiffs admit their claims rest on allegations about how the purported "actions of key players who participated in the administration of the 2020 President election" left them "questioning the integrity" of the election.  Dkt. 40 at 1.  They also concede that resolving their doubts about the election results is the purpose of their self-proclaimed "private attorney general" suit.  *Id.* at 2.  But Plaintiffs' general and subjective feelings about the election cannot satisfy the basic prerequisites for a cognizable claim against Facebook in this jurisdiction or anywhere else.

Plaintiffs cannot escape the fact that they have not alleged any specific Facebook conduct in Colorado that gives rise to their sweeping claims against Facebook about the election's administration in other states.  Nor have Plaintiffs explained how they have suffered any personal and particularized injury based on their general dissatisfaction with the election's administration, much less how any of the remedies they seek could redress that grievance.  Plaintiffs do not have standing as purported private attorneys general to raise claims based on the fact that others voted in the election or even to vindicate their own subjective perceptions about the integrity of the election.  Plaintiffs seek to litigate their generalized election grievances months after courts and legislatures in the relevant states affirmed their states' election rules, the relevant state legislatures and Congress confirmed the election results, a new President was inaugurated, and the U.S. Supreme Court agreed that actual state attorneys general lacked standing to bring the same sort of challenges to election conduct in other states.

1

Plaintiffs likewise cannot justify bringing any of their constitutional claims against Facebook—a private company. Facebook's ordinary private conduct in running a social media platform, allowing its employees to engage in private philanthropy, or publishing information about how to register to vote is a far cry from state conduct. And Plaintiffs cannot plead their claims around either the applicable Section 230 immunity or Facebook's entitlement to exercise its own well-settled First Amendment rights.

The Complaint should be dismissed with prejudice.[1]

## II. PLAINTIFFS FAIL TO SHOW THAT FACEBOOK'S CONDUCT AROSE OUT OF ITS CONTACTS WITH COLORADO

Plaintiffs assert that personal jurisdiction over Facebook lies in Colorado because "[c]ertain Plaintiffs are located within the District of Colorado, and most of the Plaintiffs and class members currently use Facebook services, have been targeted as users, have been shadow banned by Facebook, or other members of the enterprise, or have been injured through the bad faith censorship of important content." Dkt. 40 at 23-24. These allegations cannot establish either general or specific personal jurisdiction over Facebook in Colorado on the constitutional claims that Plaintiffs have alleged.

Plaintiffs premise their personal jurisdiction argument on an incorrect statement of the law. A court may not "obtain either general or specific jurisdiction over a defendant" by "[a]pplying

---

[1] While Plaintiffs' brief invokes 18 U.S.C. §§ 1961, 1962, and 1964 (Dkt. 40 at 3), and makes several vague references to racketeering (*e.g.*, *id.* at 20), their Complaint alleges no cause of action under these statutes. Plaintiffs further seek to rely on a litany of internet sources, which are not cited in the Complaint. "[A] document [that] is neither quoted nor referenced in the operative pleading, nor sufficiently alleged as authentic and undisputed, . . . may not be considered for a Rule 12(b)(6) analysis." *Stephens v. Embassy Cite Mgmt., LLC*, 2021 WL 857770, at *4 (D. Colo. Mar. 8, 2021).

the 'minimum contacts' analysis."  Dkt. 40 at 24.  General jurisdiction instead lies over a

corporation only in the jurisdiction where the corporation is "at home."  *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  There is no dispute that Facebook is not "at

home" in Colorado because neither Facebook's "place of incorporation" nor its "principal place

of business" are in the state.  *Id.*  In fact, Plaintiffs concede Facebook is a "Foreign Entity" to

Colorado.  Dkt. 40 at 25 (citing Facebook's registration statement).

Plaintiffs' specific personal jurisdiction argument fares no better.  The mere fact that

certain Plaintiffs reside in Colorado cannot confer specific jurisdiction over Facebook in this

state—the question of specific personal jurisdiction looks at a defendant's conduct in the state, not

the residency of the plaintiffs.  *See Anzures v. Flagship Restaurant Group*, 819 F.3d 1277, 1281

(10th Cir. 2016) (observing that "the fact that [Plaintiff] was affected in Colorado (because he

resides there) is insufficient to authorize personal jurisdiction over defendants").  To establish

specific personal jurisdiction, Plaintiffs must show that actual conduct by Facebook in Colorado

gave rise to their specific claims related to the election's administration.  This they cannot do as

their laundry list of purported election grievances pertain to events that took place wholly in other

states.

The same holds true of Plaintiffs' new, unpled assertion that Facebook sometimes works

with a non-defendant Colorado-based fact checking company, which, even if true, would not

satisfy the requirements of specific personal jurisdiction over their election-related constitutional

claims.  Plaintiffs do not plead that this fact checking entity engaged in any Colorado conduct

related to their specific claims surrounding the election and voting in other states.  And Facebook

having an agent in Colorado to accept service of process does not satisfy Plaintiffs' burden either

3

as "service, in and of itself, is an inadequate contact with the state . . . to create specific

jurisdiction." *Costilla v. Hall & Ludlam*, 2017 WL 2591428, at \*4 (D. Colo. June 15, 2017)

(citation omitted).  Given their conclusory allegations, Plaintiffs fail to establish any basis for this

Court to conclude it has personal jurisdiction over Facebook in Colorado on these particular

claims.

### III.   PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR CLAIMS

Plaintiffs assert several purported standing arguments, none of which hold water.  In

essence, Plaintiffs seem to contend that seeking nominal damages means they have satisfied

Article III standing.  Dkt. 40 at 21–22 (citing *Uzuegbunam v. Preczewski*, 592 U.S. ___ (Mar. 8,

2021) (slip op.)).  But the mere fact that nominal damages *may* in appropriate circumstances

redress a completed constitutional injury says nothing about whether Plaintiffs have alleged that

they personally have suffered a cognizable injury here that is specific, concrete, and sufficiently

particularized to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Nor

does it show that any of Plaintiffs' general grievances with the election are fairly traceable to

Facebook's conduct.

Plaintiffs continue to allege that "[a]ll qualified voters have a constitutionally protected

right to vote," the purported denial of which they seek to vindicate. Dkt. 40 at 21–23.  Yet Plaintiffs

still fail to explain with any specificity how their right to vote has been denied by the fact that

citizens in other states were allowed, encouraged, or helped to vote.  *Id.*  Quite the opposite,

Plaintiffs attest they either voted or voluntarily chose not to vote based on subjective feelings about

whether their preferred choice in candidate would prevail.[2]  Nor do they ever explain how any "alleged violation of the right to vote arises from an invidious classification … to which [they] are subject" that caused their votes to be "discounted."  *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 358 (3d Cir. 2020) (quoting *Reynolds v. Sims*, 377 U.S. 533, 55 n.29 (1964)).  Plaintiffs have no personal injury that can be redressed by their claims for relief or the courts generally—nominal damages or not.

Numerous federal courts have already reached this same conclusion in dismissing claims resting on the same purported injury to voters writ large or subjective perceptions related to the election's administration or outcome.  *See, e.g., Feehan v. Wisc. Elections Comm.*, 2020 WL 7250219, at *8 (E.D. Wisc. Dec. 9, 2020) (dismissing case as voter has no judicially cognizable interest in challenging state and local regulations facilitating expanded voting options); *King v. Whitmer*, 2020 WL 7134198, at *9 (E.D. Mich. Dec. 7, 2020) (same); *Bowyer v. Ducey*, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020) (rejecting vote dilution claim based on alleged problems with election administration where "[a]bsent from the Complaint is an allegation that Plaintiffs . . . were deprived of their right to vote").  As the Eleventh Circuit explained in *Wood v. Raffensperger*,

---

[2]  *See* Compl. Exh. 1 (Affidavit of Kevin Patrick O'Rourke), ¶ 11 ("I have, for the previous two presidential election cycles, not voted . . ."); *Id.* Exh. 2 (Affidavit of Nathaniel L. Carter), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America"); *Id.* Exh. 3 (Affidavit of Lori Ann Cutinilli), ¶ 4 ("I participated as a Colorado registered voter in the November 3, 2020 presidential election"); *Id.* Exh. 5 (Affidavit of Larry D. Cook), ¶ 3 (" I am a registered voter in Los Angeles County and have voted in most elections, including the 2020 Presidential election held on November 3rd, 2020"); *Id.* Exh. 6 (Affidavit of Kesha Charmaine Crenshaw), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America"); *Id.* Exh. 7 (Statement of Neil Yarbrough), ¶ 9 (Colorado Plaintiff stating "I'm sorry and embarrassed to say that I have no faith in our elections, and did not even vote in this last election"); *Id.* Exh. 8 (Statement of Amie D. Trapp), ¶ 6 ("I participated as a voter in the November 3, 2020 federal election for President and Vice President of the United States of America")

registered voters have no general standing to challenge the basic administration of an election, such as the counting of ballots, under the Electors Clause, Equal Protection Clause, and Due Process Clause as "no single voter is specifically disadvantaged if a vote is counted improperly." 981 F.3d 1307, 1314–15 (11th Cir. 2020).  A voter's claims about "vote dilution in th[at] context" are nothing more than "a paradigmatic generalized grievance."  *Id.*; *see also, e.g.*, *Gill v. Whitford*, 138 S.Ct. 1916, 1933 (2018) (plaintiffs cannot plead claims "about group political interests" rather than "individual legal rights" as federal courts are "not responsible for vindicating generalized partisan preferences").  So too here.

It is fatal to Plaintiffs' cause that they continue to base their standing arguments on the mere assertion that "every registered voter was deprived of a fair and legitimate process administered by the relevant state actors."  Dkt. 40 at 22.  These allegations, parroted from the litany of already dismissed cases, fail to establish standing and, on their face, are the sort of generalized "the law . . . has not been followed" grievance that cannot establish standing.  *Lance v. Coffman*, 549 U.S. 437, 442 (2007); see *also* Dkt. 22 at 6 (collecting cases); Dkt. 41 at 6 (collecting cases).[3]  This suit is of the same ilk.

Nor do Plaintiffs ever address how Facebook's conduct as a private company is traceable in any way—much less "fairly traceable"—to their alleged grievance that voting rights were somehow infringed in the election.  This is a separate and independent legal requirement for standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Plaintiffs do not and cannot

---

[3]  In fact, one court recently referred counsel in a similar case to the Grievance Committee for bringing election-related claims on debunked election fraud allegations and legal bases foreclosed by precedent, especially where counsel continued to press the same arguments after being confronted with obvious fatal problems with their suit.  *Wisconsin Voters Alliance v. Pence*, 2021 WL 686359, at *2 (D.D.C. Feb. 19, 2021).

plausibly allege that Facebook's mere publication of content online from other users somehow prohibited them from being able to vote or have their vote counted, and certainly it could not have done so on the basis that they belong to a protected class of voters.

And, finally, Plaintiffs never address how most of the relief they seek beyond nominal damages could remedy any purported injury to general voting rights from the administration of the last election.  For example, despite their contention that this suit is not "the latest in a series of failed attempts to overturn the 2020 Presidential election" (Dkt. 40 at 2), they in fact seek a declaration that "the actions of the Defendants," including state officials in Michigan, Georgia, Pennsylvania, and Wisconsin, related to the election were "unconstitutional and ultra vires, thereby making them legal nullities."  Compl., Prayer for Relief.  Plaintiffs are not entitled to re-litigate the results of the 2020 election and seek a re-do in every jurisdiction in America.

## IV.    PLAINTIFFS FAIL TO SHOW THAT FACEBOOK IS A STATE ACTOR

Plaintiffs concede their constitutional claims require Facebook be a state actor.  Dkt. 40 at 18.  Yet Plaintiffs make only two arguments—both of which are foreclosed by precedent—that Facebook's ordinary private business conduct is actually state action.

*First*, Plaintiffs allege that Facebook's monitoring of its social media platform is state action because its private social media platform is equivalent to a "company town."  Dkt. 40 at 15-16 (citing *Marsh v. Alabama*, 326 U.S. 501, 505-06 (1946)).  But the Supreme Court has rejected Plaintiffs' theory that merely providing a forum for speech transforms a private company into a state actor subject to the First Amendment's protections.  *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (First Amendment "prohibits only *governmental* abridgement of speech" and "does not prohibit *private* abridgement of speech.").  Multiple federal

7

courts likewise have confirmed that Facebook's provision of a social media forum does not transform its private editorial decisions about what to publish and what not to publish into state action or censorship. *See, e.g.*, *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. Oct. 2, 2020) ("To the extent that the constitutional claims are free speech claims premised on the blocking of the plaintiffs' accounts, they fail because Facebook is not a state actor."); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) (same).[4] Rather, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State''—which "'very few' functions fall into." *Manhattan*, 139 S.Ct. at 1928–29. The state has never—much less traditionally or exclusively—been known to operate social media platforms. *Id.* at 1929 (stating that "[t]he relevant function in this case is operation of public access channels on a cable system," and holding that function "has not traditionally and exclusively been performed by government"). Such a function is hardly equivalent to stepping into the shoes of the State to operate all the "municipal functions" of a town as the State typically does. There is no basis to treat Facebook as a state actor merely because it offers one popular online option among an endless multitude of online forums upon which Plaintiffs can post content. Indeed, Plaintiffs' efforts to

---

[4] *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) (dismissing First Amendment claims against Facebook, Google, and Twitter); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook cannot be deemed a state actor," and therefore "Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit"), *aff'd per curiam*, 774 F. App'x 162 (4th Cir. Aug. 7, 2019); *Fehrenbach v. Zeldin*, 2018 WL 4242452, at *2–3 (E.D.N.Y. Aug. 6, 2018) (dismissing claims against Facebook for failure to establish it is a state actor); *Nyabwa v. Facebook*, 2018 WL 585467, at *1–2 (S.D. Tex. Jan. 26, 2017) (same); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (same); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *2–3 (N.D. Cal. Oct. 25, 2010); *see also Green v. AOL*, 318 F.3d 465, 472 (3d Cir. 2003) (AOL is not "transformed" into a state actor because it "opens it network to the public"); *Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000) (same).

use the courts to force Facebook—a private company—to publish their preferred content would

violate Facebook's First Amendment rights—not the other way around.  *See infra* at 11.

    *Second*, Plaintiffs implausibly allege that Facebook "administer[ed the] elections of public

officials" merely because it did not prevent its CEO from making private donations to certain

organizations or published online content about how to register and vote.[5]  Dkt. 40 at 17–18.

Again, Plaintiffs fail to plead that Facebook itself ever donated anything to anyone.  But Plaintiffs

also fail to provide any caselaw refuting Facebook's showing that "mere allegations regarding the

donation of money are not sufficient to allege concerted activity between a private individual and

a state actor for purposes of Section 1983."  Dkt. 23 at 11.  The well-established rule in the Tenth

Circuit is that wholly conclusory assertions made about a "joint enterprise" involving a private

actor is not enough to transform that private actor's conduct into state action.  *See Sooner Prods.*

*Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983) ("mere conclusory allegations with no

supporting factual averments are insufficient; the pleadings must specifically present facts tending

to show agreement and concerted action"); *Silva v. US Bank, Nat'l Assoc.*, 294 F. Supp. 3d 1117,

1133 (D. Colo. 2018) (same).

    It is also not enough for Plaintiffs to assert in conclusory fashion that Facebook's

independent editorial decisions about what to publish on its platforms somehow transform

Facebook into having administered an election.  A private entity's independent conduct is never

---

[5]  Plaintiffs make several conclusory references to Facebook serving as the "alter ego" of Mark
Zuckerberg.  Not only are their allegations against Mr. Zuckerberg absurd, Plaintiffs also
fundamentally misunderstand, at best, or intentionally misstate, at worst, the legal framework for
their conclusory alter ego references.  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 n.2 (10th Cir.
1993) (explaining alter ego tests allow a *principal* to be held liable for the actions of its agent
where the *principal* "exercises extensive control over the acts of the" agent).  Regardless, Plaintiffs
fail to explain how the conclusory allegations they recite could meet any possible alter ego test.

state conduct. And there is plainly no conduct to suggest that any of the state defendants "ha[ve] so far insinuated [themselves] into a position of interdependence with a private party that [they] must be recognized as a joint participant in the challenged activity.'" *Brill v. Correct Care Solutions, LLC*, 286 F. Supp. 3d 1210, 1216 (D. Colo. 2018) (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447, 1451 (10th Cir. 1995)).[6]

## V. PLAINTIFFS CANNOT STATE A CLAIM AGAINST SECTION 230'S CONSTITUTIONALITY

Plaintiffs summarily assert that Section 230 is unconstitutional both on its face and as applied to Facebook. As an initial matter, nowhere in Plaintiffs' Complaint do they bring a facial challenge to Section 230's constitutionality—nor could they bring that claim.

Plaintiffs have no standing to assert that Section 230 is unconstitutional because the statute merely provides immunity from liability to private "interactive computer service" providers based on content created by others. Section 230 does not compel speech or even require that any particular speech be published or removed by a company. Quite the opposite, it ensures the law will not be used to force private entities to censure or publish any particular speech out of a fear of liability for doing so. Plaintiffs have no First Amendment or any other constitutional right implicated by Section 230. *United States v. Ramos*, 695 F.3d 1035, 1047 (10th Cir. 2012) ("'A

---

[6] Moreover, a long line of courts have already rejected Plaintiffs' underlying arguments that the CTCL grants to which they point could give rise to any constitutional claim even against the organization that actually made these grants. Dkt. 41 at 1-2, fn. 1 (collecting eight federal district court cases, three unanimous appellate panels, and two Supreme Court Justice statements rejecting claims); *see also id.* at 9–10 (collecting cases that a private actor's mere donation of funds to state actors does not transform the private actor into a state actor). This correct and unanimous consensus that CTCL was not transformed into a state actor demonstrates Plaintiffs had no reasonable legal basis to bring these constitutional claims against Facebook, which is several steps further removed from these grants.

10

party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights.'") (quoting *Cty. Court v. Allen*, 442 U.S. 140, 154–55 (1979)).

Plaintiffs thus cannot state a constitutional claim against Section 230. Put simply, Section 230 is not government censorship. While "[t]he First Amendment … protects the right to be free from government abridgement of speech," the government "is not required to assist others in funding the expression of particular ideas, including political ones." *Ysursa v. Pocatello Ed. Ass'n*, 555 U.S. 353, 358 (2009). Facebook's decisions about what content appears on its platform, as exercised through its editorial decisions, is conduct protected by the First Amendment. *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) ("[W]e reaffirm unequivocally the protection afforded to editorial judgment.").

Indeed, numerous courts have already affirmed that an internet forum's "actions … in determining whether certain [content is] contrary to the [forum's] guidelines and thereby subject to removal" fall within the First Amendment's protections. *See, e.g.*, *La'Tiejira v. Facebook*, 272 F. Supp. 3d 981, 987 (S.D. Tex. 2017) (Facebook's editorial decisions "arise from the exercise of Facebook Defendants' free speech right to publish others' speech on its platform"); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) (website has a "First Amendment right to distribute and facilitate protected speech"); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) (online publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms because "the First Amendment's protections apply whether or not a speaker articulates, or even has, a coherent or precise message, and whether or not the speaker generated the underlying content in the first place"); *Davison*, 370 F. Supp. 3d at

629 ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit.").[7]

## VI.  SECTION 230 BARS LIABILITY FOR PLAINTIFFS' CLAIMS

Plaintiffs fail to address the fact that Section 230(c)(1) provides Facebook with immunity for editorial decisions made on its platform, focusing instead entirely on Section 230(c)(2).  Dkt. 23 at 12-14.  Plaintiffs' failure to address Section 230(c)(1) thus alone compels dismissal because it implies that Plaintiffs either agree that Facebook is immune from liability under Section 230(c)(1) or they have no response.  *Cf. Sands v. Integon Nat'l Ins. Co.*, 2020 WL 7027442, at *5 n.3 (D. Colo. Nov. 30, 2020) ("Defendants made additional arguments in their reply that are not in direct response to plaintiff's response brief.  As a result, the Court will not consider those arguments.")

Rather than address Facebook's argument head on, Plaintiffs pivot to argue that Facebook is not immune under Section 230(c)(2).  Dkt. 40 at 17-18.  And their sole challenge to immunity under the statute rests on its conclusory allegation that Facebook lacked "good faith" under Section 230(c)(2).  Dkt. 40 at 5, 12–13.

 But it is well-settled law that Section 230(c)(1) applies with equal force to bar liability on Plaintiffs' claims.  *See, e.g., Ben Ezra, Weinstein, & Co. v. AOL*, 206 F.3d 980, 986 (10th Cir. 2000) (Section 230 was enacted "to forbid the imposition of publisher liability on an [ICS] for the

---

[7]  In seeking an order to prevent Facebook or its employees from donating money to private causes, publishing information about how to register to vote, and the like, Plaintiffs ironically seek to rely on *Buckley v. Valeo*, 424 U.S. 1 (1976), a case that held certain provisions in a statute seeking to impose campaign finance limits on private actors like Facebook and its employees were an unconstitutional restriction on the private entities' speech.

exercise of its editorial and self-regulatory functions."); *Green v. AOL*, 318 F.3d 465, 481 (3d Cir. 2003) ("Section 230 'specifically proscribes liability'" "relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.").[8] Congress specifically recognized in enacting Section 230 that "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems" and thus expressly sought to give providers immunity to ensure any failure to achieve perfection in their moderation of content did not subject them to liability. *Zeran v. AOL*, 129 F.3d 327, 331 (4th Cir. 1997); *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("It would make nonsense of [Section 230] to say that [ICS] must lack the capacity to police content when the Act expressly provides them with immunity for doing just that."). And Section 230(c)(1) by its plain terms also does not impose any "good faith" requirement on a platform's editorial decisions.

Rather, Section 230(c)(2) covers Facebook's alleged content moderation under the good faith standard even assuming all of Plaintiffs' allegations as true. As courts have recognized,

---

[8] *See also Lancaster v. Alphabet Inc.*, 2016 WL 3648608, at *2-3 (N.D. Cal. July 8, 2016) (claim cannot be premised on decision to remove certain content); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (decision to "remov[e] content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher"); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (affirming Section 230 immunity barred liability on claims "arising from MySpace's decisions to delete Riggs's user profiles on its social networking website yet not delete other profiles"); *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) (Section 230 immunity applied to claims "seek[ing] to hold Facebook liable as a publisher for hosting, and later blocking, [plaintiff's] online content"); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007) ("Deciding whether or not to remove content or deciding when to remove content falls squarely within Ask.com's exercise of a publisher's traditional rule and is therefore subject to the CDA's broad immunity."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) ("so long as a third party willingly provides the essential published content, the [ICS] receives full immunity, regardless of the specific editing or selection process")

13

"traditional editorial functions often include subjective judgments" and "permitting litigation and scrutiny [of mere] motive could result in the 'death by ten thousand duck-bites'" that would fundamentally undermine Section 230. *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *8 (N.D. Cal. Oct. 26, 2011); *see also Domen v. Vimeo, Inc.*, 2021 WL 922749, at *2-4 (2d Cir. Mar. 10, 2021) (observing that Section 230(c)(2) "explicitly provides protection for restricting access to content that providers consider objectionable, . . . granting significant subjective discretion"). "[C]lose cases [thus] . . . must be resolved in favor of immunity, lest [courts] cut the heart out of section 230." *Roommates.Com*, 521 F.3d at 1174. Here, Plaintiffs at most seem to allege that they believe Facebook does not publish or moderate content in a manner consistent with the First Amendment's content neutral standards. But, again, the First Amendment does not apply to Facebook, and Facebook's decisions not to publish certain content cannot alone constitute bad faith as a result. *Domen*, 2021 WL 922749, at *4 ("Given the massive amount of user-generated content available on interactive platforms, imperfect exercise of content-policing discretion does not, without more, suggest that enforcement of content policies was not done in good faith"). Moreover, mere claims that a platform selectively enforces its content moderation policies are insufficient to survive a motion to dismiss under Section 230(c)(2). *See, e.g.*, *e360insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) (bad faith inadequately plead where plaintiff merely complained others were allowed to engage in similar conduct); *Holomaxx Techs v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1105 (N.D. Cal. 2011). Plaintiffs have neither alleged, nor plead, any bad faith conduct sufficient to avoid a motion to dismiss their claims.

Regardless, Plaintiffs' exclusive focus on the independent good faith exception in § 230(c)(2) is similarly misplaced. Plaintiffs nowhere allege any conduct by Facebook that could

14

rise to the level of "bad faith" here.  Instead, Plaintiffs conflate the test for the *reasonableness* of a *state actor's* conduct and the good faith exception in Section 230(c)(2), which governs an interactive computer service's conduct.  Dkt. 40 at 17-18.  These are not the same.

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs' lawsuit and all of its claims are irrevocably and fundamentally flawed.  Plaintiffs also fail to address many of the arguments raised by Facebook in its Motion to Dismiss, including numerous pleading failures related to its various claims.  Dkt. 23 at 14–15.  This suit should be dismissed with prejudice.

Dated: March 23, 2021

Respectfully submitted,


/s/ Joshua S. Lipshutz

Joshua S. Lipshutz
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone:     202.955.8217
Facsimile:      202.530.9614
Email:           jlipshutz@gibsondunn.com

Ryan T. Bergsieker
Natalie J. Hausknecht
**GIBSON, DUNN & CRUTCHER LLP**
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone:     303.298.5700
Facsimile:      303.298.5907
Email:           rbergsieker@gibsondunn.com
                    nhausknecht@gibsondunn.com

Craig B. Streit
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:     415.393.8225
Facsimile:      415.374.8487
Email:           cstreit@gibsondunn.com

*Attorneys for Facebook, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2021, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.


*/s/ Joshua S. Lipshutz*
Joshua S. Lipshutz

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
VERONICA DEGRAFFENREID, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

## ENTRY OF APPEARANCE OF MICHAEL FISCHER FOR DEFENDANTS GOVERNOR TOM WOLF AND ACTING SECRETARY VERONICA DEGRAFFENREID

---

To the Clerk of this Court and all parties of record:

I hereby enter my appearance in this case as counsel for Governor Tom Wolf and Acting Secretary of the Commonwealth Veronica Degraffenreid. I certify that I am a member in good standing of the bar of this Court. Governor Wolf and Acting Secretary Degraffenreid reserve all rights to raise any jurisdictional or other arguments, through a motion pursuant to Federal Rule of Civil Procedure 12 or otherwise.

Dated: March 28, 2021                    Respectfully submitted,

                                         /s/ *Michael J. Fischer*
                                         Michael J. Fischer (PA Bar No. 322311)
                                         Chief Deputy Attorney General
                                         Pennsylvania Office of Attorney General
                                         1600 Arch Street, Suite 300
                                         Philadelphia, PA 19103
                                         (215) 560-2171
                                         mfischer@attorneygeneral.gov

                                         Attorney for Governor Tom Wolf and
                                         Acting Secretary of the Commonwealth
                                         Veronica Degraffenreid

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be electronically filed with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

/s/ *Michael J. Fischer*
Michael J. Fischer

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action NO. 1:20-cv-3747-NRN

KEVIN O'ROURKE, *et al.*,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., *et al.*,

Defendants.

---

## GEORGIA DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO AMEND

---

Defendants Governor Brian Kemp and Secretary of State Brad Raffensperger ("Georgia Defendants") respond as follows to Plaintiffs' Motion for Leave to File Amended Complaint (Doc. 48):

### Introduction

Plaintiffs' proposed amended complaint seeks to add 152 additional named plaintiffs from 33 different states, only three of which are Georgia residents. The factual allegations remain the same debunked myths and conspiracy theories regarding the presidential election in Georgia that have been repeatedly rejected by courts, as shown in the Georgia Defendants' motion to dismiss (Doc. 47). More importantly, the amended complaint still suffers from the same jurisdictional defects as the current complaint—namely, the lack of personal jurisdiction over the Georgia Defendants and Plaintiffs' lack of Article III standing, even with the addition of

the proposed new plaintiffs. Because the amended complaint would still be subject to dismissal, the Court should deny the amendment as futile and dismiss the action with prejudice.

## Argument

The Court has discretion in considering whether leave to amend Plaintiffs' complaint should be granted. *TV Comm'ns Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1028 (10th Cir. 1992). While Rule 15(a) provides that leave to amend a complaint should be freely given, "a district court may refuse to allow amendment if it would be futile." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (holding that district court did not abuse its discretion in denying leave to amend where the amended complaint would be futile). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Id.* (quoting *Lind v. Aetna Health, Inc.*, 466 F.3d 1195, 1199 (10th Cir. 2006)); *see also Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("the district court may dismiss without granting leave to amend when it would be futile to allow the plaintiff an opportunity to amend his complaint"); *TV Comm'ns Network*, 964 F.2d at 1028 ("Where a complaint, as amended, would be subject to dismissal, leave to amend need not be granted.").

For the reasons discussed further below, the proposed amended complaint fails to cure the jurisdictional defects in the current complaint and would still be subject to dismissal. Therefore, the amendment would be futile and leave to amend should be denied.

### A. The amended complaint still fails to state a basis for personal jurisdiction over the Georgia Defendants.

As shown in the Georgia Defendants' motion to dismiss, the original Complaint failed to allege any facts that would establish sufficient minimum contacts with Colorado for the exercise of personal jurisdiction over the Georgia Defendants in this Court, and the proposed amended

complaint fails to remedy this defect. The amendment also purports to add the Georgia Attorney

General as a defendant, but does not include *any* specific factual allegations against him,

including any facts supporting personal jurisdiction. Indeed, nowhere in the lengthy amendment

are there any factual allegations that establish a basis for specific or general jurisdiction over the

Georgia Defendants, for the official actions they took in Georgia pertaining to a Georgia

election. Plaintiffs fail to allege that the Georgia Defendants' actions were purposefully directed

at residents of Colorado or that the litigation results from alleged injuries that arise out of or

relate to those activities. *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004).

Plaintiffs' motion to amend alludes to "contractual relations" between the State of

Georgia and Dominion as a basis for personal jurisdiction (*see* Doc. 48 at 5), but that basis is too

tenuous and remote to establish personal jurisdiction over Governor Kemp and Secretary

Raffensperger. Plaintiffs cite to no authority that a contractual relationship between co-

defendants can subject a non-resident defendant to jurisdiction in any state in which the co-

defendant is domiciled. And the law is clear that, even in a dispute between Dominion and the

State of Georgia, the contract between the parties to provide voting equipment would still be

insufficient by itself to establish jurisdiction over the Georgia Defendants in Colorado.[1] *See*

*Benton*, 375 F.3d at 1077 ("A contract between an out-of-state party and a resident of the forum

state cannot, standing alone, establish sufficient minimum contacts with the forum."); *Ruggieri v.*

*Gen. Well Serv., Inc.*, 535 F. Supp. 525, 535 (D. Colo. 1982) ("Jurisdiction is not proper in

---

[1] Additionally, the contract between Dominion and the Georgia Secretary of State expressly
provides that the agreement is governed by Georgia law and any judicial action arising out of the
agreement is to be brought in a Georgia court. (See Doc. 39-4 at 36).

Colorado merely because one of the parties to the contract was a Colorado resident.");

*Automated Quill, Inc. v. Chernow*, 455 F. Supp. 428, 432 (D. Colo. 1978) ("The mere existence

of a contract executed by a Colorado resident is insufficient to confer personal jurisdiction over

an absent non-resident defendant."); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)

("If the question is whether an individual's contract with an out-of-state party alone can

automatically satisfy sufficient minimum contacts in the other party's home forum, we believe

the answer clearly is that it cannot."). Accordingly, the contract between Dominion and the

Georgia Secretary of State is insufficient for the Court to exercise jurisdiction over the Georgia

Defendants in this action.

Because the proposed amended complaint does not cure the lack of personal jurisdiction

over the Georgia Defendants, leave to amend should be denied as futile. *See TV Comm'ns*

*Network*, 964 F.2d at 1028 (holding that district court did not abuse its discretion by denying

leave to amend complaint where plaintiff had made no showing it could cure deficiencies in

current complaint); *Parker v. WI Waterstone, LLC*, 790 F. App'x 926, 930 (10th Cir. 2019)

(holding amendment would be futile because it did not cure jurisdictional defect); *Strauss v.*

*Angie's List, Inc.*, No. 2:17-CV-02560-HLT-TJJ, 2018 U.S. Dist. LEXIS 187068, at *50 (D.

Kan. Nov. 1, 2018) (denying request to amend complaint because court lacked personal

jurisdiction over defendants, making amendment futile).

**B. The amended complaint still fails to establish Article III standing.**

Like the current complaint, the proposed amended complaint lacks a sufficient factual

showing that the named Plaintiffs have suffered an injury in fact such that they can demonstrate

Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[T]he

4

requirement of an 'injury in fact,' requires 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1181 (10th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560).

While the current complaint does not include a single Georgia voter as a named plaintiff, the amended complaint seeks to add three Georgia voters as plaintiffs. But this does not fix the problem, because the amended complaint still fails to demonstrate that the named Plaintiffs (including the proposed Georgia Plaintiffs) have suffered a concrete and particularized injury. Although Plaintiffs point to their generalized right to vote that they claim has been injured, they fail to even allege how the acts of the Georgia Defendants have affected them in a "personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Plaintiffs continue to erroneously argue that there is some sort of nationalized right to vote in a presidential election that entitles any American voter to sue officials in another state if that voter is unhappy with the way that state administered its election. (*See* Doc. 48 at 12).

Plaintiffs' broad theory has no basis in law. To the contrary, courts have been clear that Plaintiffs' generalized grievance regarding the State of Georgia's administration of its election is insufficient to establish an injury in fact. *See Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018); *Lance v. Coffman*, 549 U.S. 437, 440– 41 (2007) (holding that "a generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing). As noted in the Georgia Defendants' motion to dismiss, the Eleventh Circuit recently held that even *Georgia voters* lack standing to assert generalized grievances regarding Georgia's

5

administration of the 2020 presidential election. *Wood v. Raffensperger*, 981 F.3d 1307, 1314

(11th Cir. 2020). As the Court explained in *Wood*,

> A generalized grievance is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575 (internal quotation marks omitted). Wood cannot explain how his interest in compliance with state election laws is different from that of any other person. Indeed, he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered."

*Id.* Accordingly, Plaintiffs' addition of three Georgia voters as plaintiffs still does not cure their

lack of standing because their claim is still a generalized grievance that this Court lacks

jurisdiction to consider.

Additionally, the fact that Plaintiffs are seeking class certification under Rule 23 does not

obviate their need to establish Article III standing, because "even named plaintiffs who represent

a class 'must allege and show that they personally have been injured, not that injury has been

suffered by other, unidentified members of the class to which they belong.'" *Spokeo*, 136 S. Ct.

at 1547 n.6 (2016) (citation omitted); *see also Clark v. Strad Energy Servs.*, No. 17-cv-1242-

WJM-KMT, 2018 U.S. Dist. LEXIS 128942, at *12 (D. Colo. Aug. 1, 2018) (holding that "a

plaintiff lacks standing to bring class claims on behalf of a class under the laws of states to which

plaintiff has never been subject or where plaintiff has never resided").

There is simply no legal basis upon which to find that 152 voters in 33 different states

have standing to sue the Georgia Defendants for official actions they took as state officials in

administering the Georgia election. Because the Court would still lack subject matter jurisdiction

to consider Plaintiffs' amended complaint, the amendment would be futile and leave to amend

should be refused. *See Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (holding that

6

because plaintiff in the original complaint lacked standing and the addition of proposed plaintiffs in amended complaint failed to cure this defect, the futile amendment was properly rejected).

For these reasons and those shown in the Georgia Defendants' motion to dismiss, as well as the pending motions to dismiss of the remaining Defendants, the Court should dismiss the action with prejudice without granting Plaintiffs leave to amend. *See Brereton*, 434 F.3d at 1219.

Respectfully submitted, this 29th day of March, 2021.


/s/ *Charlene S. McGowan*
Charlene S. McGowan
Georgia Bar No. 697316
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)


*Attorney for Brian Kemp and Brad Raffensperger*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE FILE AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record via electronic notification.

Dated: March 29, 2021.

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-3747-NRN

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

### GOVERNOR TOM WOLF'S AND ACTING SECRETARY VERONICA DEGRAFFENREID'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Plaintiffs in this case traffic in many of the same specious assertions that gave birth to an unprecedented effort to undermine Pennsylvania's 2020 general election. In that way, this case is no different from any of the frivolous litigation that has preceded it. In some ways, however, this case is more reckless than its forerunners because the basis for this Court's jurisdiction is as flimsy as conceivable, and by this point plaintiffs' claims already have been universally rejected. Those jurisdictional and substantive flaws are as clear from the proposed amended complaint as they were from the initial complaint. So granting plaintiffs leave to file their proposed amended complaint, or any amended complaint, would be futile. Indeed, with slight exceptions at the margins, the motion that defendants would file seeking dismissal of the amended complaint would be nearly indistinguishable from the one already filed seeking dismissal of the original complaint.

Justice demands that this frivolous litigation ends swiftly. The motion for leave should be denied and this case, and the false narrative about the 2020 election, should be put to rest.[1]

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) allows a party, with leave of the court, to amend a pleading. While courts "should freely give leave when justice so requires," FED. R. CIV. 15(a)(2), "freely give leave" does not mean always. Denying a motion for leave to amend a complaint is justified "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Jensen v. W. Jordan City*, 968 F.3d 1187, 1202 (10th Cir. 2020).

## ARGUMENT

The federal rules' solicitousness of useful amendments to pleadings is not an invitation to prolong irredeemably flawed litigation. For that reason, courts need not allow parties to make futile amendments to their pleadings. *Jensen*, 968 F.3d at 1202. An "amendment is futile if the complaint, as amended, would be subject to dismissal." *Barnes v. Harris*, 783 F.3d 1185, 1197 (10th Cir. 2015).

---

[1] At the March 11, 2021 status hearing, the Court ruled that plaintiffs are not entitled to amend the complaint as of a right under Rule 15(a)(1), and required them to formally move for leave to amend. If the Court revisits that decision and dockets the amended complaint, the Court should then immediately dismiss the amended complaint *sua sponte* rather than require defendants to file a new motion to dismiss. As laid out in defendants' motion to dismiss, ECF No. 49, and again in this brief, this Court does not have jurisdiction, the existing Pennsylvania defendants are entitled to immunity under Eleventh Amendment, and plaintiffs' claims are all patently frivolous. Each is grounds for *sua sponte* dismissal. *See City of Albuquerque v. Soto Enterprises, Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) (approving of *sua sponte* dismissal for a lack of subject-matter jurisdiction); *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008) (ruling district court may raise Eleventh–Amendment immunity *sua sponte*); *McKinney v. State of Okl., Dep' of Hum. Servs.*, 925 F.2d 363, 365 (10th Cir. 1991) (approving of *sua sponte* dismissal when "patently obvious" that plaintiff cannot prevail); *Bueno v. Chekush*, 355 F. Supp. 3d 987, 997–98 (D. Colo. 2018) (dismissing claims *sua sponte* because defendants were entitled to sovereign immunity).

2

Plaintiffs' proposed amended complaint is a model of futility. It does nothing to address that this Court does not have jurisdiction over any of the meritless claims against Governor Tom Wolf and Acting Secretary Veronica Degraffenreid, or over the equally insubstantial claim against newly added defendant Attorney General Josh Shapiro.

## I.   Plaintiffs' Proposed Amendment Does Not Cure the Absence of Jurisdiction

Governor Wolf and Acting Secretary Degraffenreid's motion to dismiss identified three jurisdictional reasons to dismiss plaintiffs' complaint: (1) neither defendant is subject to personal jurisdiction in Colorado; (2) the Eleventh Amendment immunizes both defendants; and (3) no plaintiff has standing. The proposed amendment resolves none of the three.

First, as described in defendants' motion to dismiss, Mot. to Dismiss at 5–7, ECF No. 49, neither Governor Wolf nor Acting Secretary Degraffenreid has directed any activity at Colorado. The original complaint's allegations against the Pennsylvania defendants related to acts affecting only the casting and counting of votes in Pennsylvania. Compl. ¶¶ 214–257, ECF No. 1. The same is true of the proposed amended complaint both as it relates to Governor Wolf and Acting Secretary Degraffenreid, and also as it relates to Attorney General Shapiro. Proposed Am. Compl. ¶¶ 527–587, ECF No. 48-1.

Second, Governor Wolf and Acting Secretary Degraffenreid remain entitled to immunity under the Eleventh Amendment.[2] Mot. to Dismiss at 7–8. Counts I–III of the original and proposed amended complaint assert various constitutional claims based on allegations that Pennsylvania officials improperly administered the 2020 general election. That election is over,

---

[2] The proposed amended complaint still is not clear on whether the suit is against Governor Wolf and Acting Secretary Degraffenreid in each official's official or personal capacity. The proposed amendment adds new defendants that are explicitly named in their official capacity, suggesting that the defendants named "individually" are being sued in their personal capacity. But the proposed amendment still contains language communicating that plaintiffs are using "individually" to mean that the defendants have lost the protection that the Eleventh Amendment affords official state actors, and thus would be subject to the exception identified in *Ex Parte Young*. Am. Compl. ¶¶ 581, 584–585.

3

so the remedies plaintiffs seek for these three counts, which include a request for damages, *see* Proposed Am. Compl. at 115, are necessarily retrospective. And while the proposed amended complaint would add Pennsylvania plaintiffs, Am. Compl. ¶¶ 170–177, the Eleventh Amendment applies to suits brought by citizens of the defendant state, *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *see also Allen v. Cooper*, 140 S. Ct. 994, 1000 (2020) (explaining that reach of Eleventh Amendment is not limited to its text).

Third, plaintiffs still do not have standing because, as in the original complaint, the alleged injuries are just generalized grievances. Instead of fixing this problem, the proposed amended complaint actually amplifies it. The proposed amended complaint alleges that the interests it seeks to vindicate belong to "every registered voter," Proposed Am. Compl. ¶ 664, and that defendants' allegedly unconstitutional acts "hurt[] every registered voter in the country irrespective of voter affiliation," *id.* ¶ 677. Later, in what is perhaps the proposed amended complaint's most compelling statement against plaintiffs' own standing, the amended complaint alleges that:

> "The Defendants, and each of them, have participated in conduct and actions resulting in, among other things, unconstitutional agreements, illegal modifications of election law, illegal administration of the federal election process, the unconstitutional certification of the Election, all of which has damaged the Plaintiffs, but, more broadly, every registered voter in America, all of whom have an interest in free and fair elections to determine the President of the United States of America." *Id.* ¶ 693.

Consistent with the general nature of the injuries that plaintiffs hope to vindicate, the class they want to certify is all registered voters in the country. *Id.* ¶ 240.

Also like the original complaint, the proposed amended complaint gestures at the notion that plaintiffs' injuries here are vote dilution or disadvantage, *id.* ¶¶ 8, 661, 676, 679, 714, and also announces an interest in general compliance with the law, *id.* ¶¶ 662–663. Those theories are unchanged from the original complaint, and for the same reasons discussed in defendants'

4

motion to dismiss, *see* Mot. to Dismiss at 8–10, they would not allow plaintiffs to survive a motion to dismiss.

Plaintiffs' motion for leave does not articulate an answer to these jurisdictional problems that is any more cogent than what can be inferred from the proposed amended complaint. Plaintiffs begin by defending Colorado as a convenient forum, and thus proper for venue. Mot. for Leave at 5, ECF No. 48. That inverts the issues. Venue and personal jurisdiction are distinct, and a venue's convenience is not considered unless a court's jurisdiction is secure. *See, e.g.*, *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979); *see also* 28 U.S.C. § 1391(b). Separately, plaintiffs maintain that Pennsylvania's hiring of a Colorado-based company to perform a service for Pennsylvanians, in Pennsylvania, subjects Pennsylvania officials to jurisdiction in Colorado. Mot. for Leave at 5. But hiring a Colorado-based company to perform services in Pennsylvania, which bear only on Pennsylvanians, is not activity purposefully directed at Colorado, which is the relevant inquiry. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, No. 19-368, Slip. Op. at 5–6 (U.S. Mar. 25, 2021) (explaining standard for personal jurisdiction).

For standing under Article III, plaintiffs' motion states broadly that plaintiffs may seek nominal damages, that voting is a constitutionally protected right, and that there is a national interest in the presidential election. Mot. for Leave at 6–8. None of that has anything to do with the Article III flaw in this case: Plaintiffs have not suffered any individualized, concrete injury.

To the extent that plaintiffs believe every single voter in the country is individually injured by any supposed impropriety in the election of a federal official, Mot. for Leave at 6–8, the Supreme Court already rejected that outlandish argument when Texas made it just a few months ago. In its motion to file a bill of complaint in the Supreme Court challenging

Pennsylvania's election, Texas argued that it had standing because it had an individualized

interest in the election of federal officials, including the Vice President, who would represent

Texas. *See* Brief in Support of Motion for Leave to File at 12–15, *Texas v. Pennsylvania*, No.

22O155 (U.S. Dec. 7, 2020). The Supreme Court denied Texas's motion for leave "for lack of

standing under Article III of the Constitution" because "Texas has not demonstrated a judicially

cognizable interest in the manner in which another State conducts its elections." *Texas v.*

*Pennsylvania*, No. 22O155, 2020 WL 7296814, at *1 (U.S. Dec. 11, 2020). Plaintiffs' theory of

standing is no different.

Given the absence of jurisdiction, the proposed amendment is a quintessential example of

futility. The motion for leave to amend should be denied first for this reason.

## II.   Plaintiffs' Proposed Amendment Does Not State Any Claim for Relief

Independent of jurisdiction, granting leave to amend would be futile because the

proposed amended complaint does not advance claims to relief that are any more plausible than

the baseless claims brought in the original complaint. As in the original complaint, Counts I-III

of the proposed amended complaint have at their core the same type of allegation: State actors

violated state election laws in ways that violate the federal Constitution. But in support of those

counts, the proposed amended complaint repeats false representations about Pennsylvania law.

Plaintiffs still allege that Pennsylvania law requires signature verification of votes cast

through either a no-excuse, mail-in ballot or an absentee ballot. Am. Compl. ¶¶ 529–532, 552–

555(a). That is false. *In re Nov. 3, 2020 Election*, 240 A.3d 591, 611 (Pa. 2020), *cert. denied,* No.

20-845, 2021 WL 666798 (Feb. 22, 2021) (holding that "county boards of elections are

prohibited from rejecting absentee or mail-in ballots based on signature comparison conducted

by county election officials or employees").

6

Plaintiffs still allege that allowing counties to contact voters to cure ministerial errors on their no-excuse, mail-in ballot or absentee ballot violates Pennsylvania law. Am. Compl. ¶¶ 533–540, 557. That is false. *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1078 (Pa. 2020), *cert. denied,* No. 20-845, 2021 WL 666798 (Feb. 22, 2021) (holding that ministerial errors on mailed ballot do not disqualify ballot); *see also Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377, 384 (3d Cir. 2020) (holding that Pennsylvania's election code "says nothing about what should happen if a county notices [ministerial] errors before election day" and that counties may contact voters to correct errors); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 6821992, at *12 (M.D. Pa. Nov. 21, 2020) (holding it is "perfectly rational" for county to contact voter about ministerial error).

Plaintiffs still allege that some Pennsylvania counties did not allow poll watchers the access those watchers are entitled to under state law. Am. Compl. ¶¶ 555(c)–556. That is false. *See In re Canvassing Observation*, 241 A.3d 339, 349–51 (Pa. 2020), *cert. denied,* No. 20-845, 2021 WL 666798 (Feb. 22, 2021) (holding that county boards of elections had properly positioned poll watchers).

Plaintiffs still allege that Pennsylvania broke its promise to segregate all mailed ballots received between election day and the following Friday. Am. Compl. ¶ 546. That is false. *See* Official Returns, https://www.electionreturns.pa.gov/ (notifying public that "[t]he vote totals for President and Representative in Congress do not include any votes from mail ballots received between 8 p.m. on election day and 5 p.m. the following Friday.").

Plaintiffs still allege irregularities in the logging of mailed ballots in the state's election registry, Am. Compl. ¶¶ 549–551, while omitting critical aspects of Pennsylvania's election

7

code, including that no-excuse, mail-in ballots are distinct from absentee ballots, 25 Pa. Stat.

§ 3146.6 (absentee); 25 Pa. Stat. § 3150.16 (no-excuse), and that a voter can request and cast a

no-excuse, mail-in ballot in person, 25 Pa. Stat. § 3146.5(b)(2).

Because Counts I-III in plaintiffs' proposed amended complaint falsely characterize state

law and misrepresent ways in which state officials deviated from state law, the claims in the

proposed amended complaint that depend on those misrepresentations will not survive a motion

to dismiss under Rule 12(b)(6).

Finally, the proposed amended complaint would add one new count against Attorney

General Shapiro. The claim is that Pennsylvania's recent bipartisan, no-excuse mail-in voting

statute is facially unconstitutional. Am. Compl. ¶¶ 844–858. But the proposed amended

complaint offers no insight into what makes that statute facially unconstitutional. The proposed

complaint fails to identify which constitution—Pennsylvania's or the nation's—the statute

supposedly violates, to say nothing of which provision in the unspecified constitution plaintiffs

believe is implicated.[3]

## CONCLUSION

Because amending the complaint is futile, the motion for leave to do so should be denied.

Alternatively, if plaintiffs are allowed to amend the complaint, the amended complaint should be

dismissed *sua sponte*.

---

[3] An earlier facial challenge to the same statute—a case that plaintiffs borrowed from in their
original complaint, Compl. ¶¶ 234–236—unsuccessfully argued the same statute offended Pennsylvania's
Constitution. *See Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020), *cert. denied*, No. 20-810, 2021 WL
666795 (U.S. Feb. 22, 2021).

Dated: March 29, 2021                    Respectfully submitted,

                                         JOSH SHAPIRO
                                         Attorney General
                                         Commonwealth of Pennsylvania

                                         MICHAEL J. FISCHER
                                         Chief Deputy Attorney General

                                         /s/ Jacob Boyer
                                         JACOB BOYER
                                         Deputy Attorney General
                                         Pennsylvania Office of Attorney General
                                         1600 Arch Street, Suite 300
                                         Philadelphia, PA 19103
                                         (267) 768-3968
                                         jboyer@attorneygeneral.gov

                                         *Attorneys for Governor Tom Wolf and*
                                         *Acting Secretary of the Commonwealth*
                                         *Veronica Degraffenreid*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2021 I electronically filed the foregoing Opposition to

Plaintiffs' Motion for Leave to Amend with the Clerk of the Court using the CM/ECF system

which will send notification of such filing to all counsel of record.

/s/ Jacob Boyer
Jacob Boyer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH and
AMIE TRAPP,

       Plaintiffs,

v.

DOMINION VOTING SYSTEMS, INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, individually,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR., individually, and
DOES1-10,000,

       Defendants.

---

## DEFENDANTS GOVERNOR GRETCHEN WHITMER AND SECRETARY OF STATE JOCELYN BENSON'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND COMPLAINT

# TABLE OF CONTENTS

Page

Table of Contents ....................................................................................... i

Index of Authorities .................................................................................. ii

introduction ............................................................................................... 1

Statement of Facts ................................................................................... 2

Argument ................................................................................................... 6

I.      Plaintiffs' motion to amend the complaint must be denied regarding
        the Michigan Defendants where Plaintiffs still fail to allege any facts
        supporting this Court's exercise of personal jurisdiction over
        Defendants. ..................................................................................... 6

        A.      Legal standard ....................................................................... 6

        B.      Plaintiffs' proposed amended complaint against the Michigan
                Defendants is futile and would be subject to dismissal if filed. ............ 7

                1.      No personal jurisdiction .......................................... 7

                2.      Plaintiffs fail to state a claim for relief. ................... 10

Conclusion and Relief Requested ........................................................ 15

Appendix Page 1213

# INDEX OF AUTHORITIES

Page

**Cases**

*Albright v. Oliver*, 510 U.S. 266 (1994) ........................................................................ 12

*Bailey v. Antrim County, et al.*, Antrim Circuit Court No. 20-9238 ............................ 4

*Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998) ...................................................... 12

*Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir.
2020) ........................................................................................................................... 11

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ........................................... 8, 10

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) ......................................................... 11

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ........................................................... 8, 9

*Davis v. Secretary of State*, 2020 WL 5552822 (Mich. Ct. App., Sept. 16, 2020)... 2, 13

*Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020
WL 5997680 (W.D. Pa. Oct. 10, 2020) ..................................................................... 11

*Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM
(VCF), 2020 WL 5626974 (D. Nev. Sept. 18, 2020) ................................................ 11

*Election Integrity Fund v. City of Lansing,* 2020 WL 6605987  (Oct. 19. 2020,
W.D. Mich) .................................................................................................................. 4

*Election Integrity Fund, et al. v. Secretary of State*, Case No. 20-00169,
Michigan Court of Claims ......................................................................................... 3

*Far West Capital, Inc. v. Towne*, 46 F.3d 1071 (10th Cir. 1995) ................................ 9

*Foman v. Davis*, 371 U.S. 178 (1962) ........................................................................... 7

*Frank v. U.S. West, Inc.*, 3 F.3d 1357 (10th Cir. 1993) ................................................ 7

*Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999) ..................................................... 7

*Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224 (D. Colo. 2014) ........... 10

*Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408 (1984) ........................... 8

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................... 7

*King, et al. v. Whitmer, et al.*, 2020 WL 7134198 (E.D. Mich., Dec. 7, 2020) ........ 3, 11

*Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580 (6th Cir.
2012) ............................................................................................................ 12

*Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) ............................ 13

*Romstad v. City of Colorado Springs*, 650 F. App'x 576 (10th Cir. 2016) ................ 14

*Ryan, et al. v. Benson,* Michigan Court of Claims, 20-00198 ....................................... 4

*SGI Air Holdings II LLC v. Novartis Int'l*, 192 F.Supp.2d 1195 (D.Colo.2002)........ 10

*Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011) ................................................. 9

*Surefoot LC v. Sure Foot Corp.,* 531 F.3d 1236 (10th Cir. 2008) .............................. 14

*TH Agriculture & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282
(10th Cir. 2007) ............................................................................................... 10

*Wood v. Raffensperger*, No. 1:20-CV-04651-SDG, 2020 WL 6817513 (N.D. Ga.
Nov. 20, 2020) ................................................................................................. 11

**Statutes**

Mich. Comp. Laws § 168.46 ........................................................................................... 5

Mich. Comp. Laws § 168.759 ......................................................................... 2, 3, 6, 13

Mich. Comp. Laws § 168.761 ......................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 15(a) ........................................................................... 6

Appendix Page 1215

## INTRODUCTION

Plaintiffs have added insult to injury in this matter by moving to amend their complaint to re-allege frivolous claims and to add yet a new one. Plaintiffs allege a familiar litany of far-fetched claims of fraud and irregularity in the conducting of the November election in Michigan. Many of these made-up and misrepresented "fraud" claims have already been rejected by multiple courts. *See, e.g, Texas v. Pennsylvania, et al.*, 20-220155 and *King, et al. v. Whitmer, et al.,* 20-815. And a post-election audit conducted in numerous jurisdictions in Michigan, including the City of Detroit, confirmed the accuracy and integrity of the November 2020 general election.[1]

Like the original complaint, Plaintiffs' amended complaint offers nothing other than conspiracy theories fed by misunderstandings of Michigan law and unaccompanied by any actual evidence of fraud. Further, the amended complaint does nothing to correct Plaintiffs' jurisdictional defect. Plaintiffs do not have a credible, non-frivolous argument to support this Court's exercise of personal jurisdiction over Michigan Defendants Governor Gretchen Whitmer, Secretary of State Jocelyn Benson, and proposed new Defendant Michigan Attorney General Dana Nessel. Because allowing amendment would be futile, the motion to amend the complaint must be denied as to these Defendants.

---

[1] *See* More than 250 audits confirm accuracy and integrity of Michigan's election, March 2, 20201, available at https://www.michigan.gov/sos/0,4670,7-127-93094-553386--,00.html, (accessed March 29.)

## STATEMENT OF FACTS

Plaintiffs filed their original complaint on December 22, 2020 but did not serve Governor Whitmer and Secretary Benson until February 22, 2021. These Defendants timely filed a motion to dismiss the original complaint on March 15, 2021, but Plaintiffs filed a motion to amend their complaint the same day.

Plaintiffs' proposed amended complaint makes the following factual allegations against the Michigan Defendants.

Plaintiffs allege that Secretary Benson mailed unsolicited applications for absent voter ballots to 7.7 million registered voters in Michigan in May 2020. (Plfs' Mot to Amend, Amend. Comp., ¶ 431.) Plaintiffs allege that this act flooded Michigan with "mail-in votes" and "removed protections designed to deter voter fraud." *Id.*, ¶¶ 432-433. Plaintiffs point out the Benson used the "US Mail" to accomplish these acts. *Id.*, ¶ 434. Plaintiffs quote portions of Mich. Comp. Laws § 168.759 and allege that the "Michigan Legislature did not include the secretary of state as a means for distributing through the US Mail unsolicited absentee ballots without application by a voter." *Id.*, ¶ 435-436. However, Michigan courts held that the Secretary's mailing did not violate Michigan election law, specifically Mich. Comp. Laws § 168.759. *See Davis v. Secretary of State*, 2020 WL 5552822 at *1 (Mich. Ct. App., Sept. 16, 2020), leave denied 951 N.W.2d 911 (Mich., Dec. 28, 2020.)

Plaintiffs further allege that in June 2020, Secretary Benson implemented an online platform through which registered voters in Michigan could request an absent voter ballot application "without signature verification as expressly required under Michigan law." *Id.*, ¶ 439. Plaintiffs then quote portions of Mich. Comp.

Laws § 168.759, 168.761 and allege that Secretary Benson's "unconstitutional modifications of Michigan's election rules resulted in the distribution of millions of absentee ballot applications without verifying voter signatures as required" by Michigan law. *Id.*, ¶¶ 440-443. However, the online program was only available to registered voters who possessed a Michigan driver's license or state identification card and had electronically stored signatures on file that could be verified by the voter's local clerk.[2] Moreover, a Michigan court declined to enjoin operation of the platform with respect to the November 2020 general election. *See Election Integrity Fund, et al. v. Secretary of State*, Case No. 20-00169, Michigan Court of Claims.

Plaintiffs then make numerous allegations regarding the processing of absent voter ballots cast in the City of Detroit, Wayne County, Michigan. (Plfs' Mot to Amend, Amend. Comp, ¶¶ 447-463.) These allegations regarding the presence of challengers and the signature verification process repeat those alleged, and rejected, in numerous cases before state and federal courts in Michigan. *See, e.g., King, et al. v. Whitmer, et al.*, 2020 WL 7134198 (E.D. Mich., Dec. 7, 2020).

Plaintiffs further allege that Defendants Zuckerberg and Chan through the Center for Tech and Civic Life (CTCL) "funneled" millions of dollars to primarily democratic jurisdictions in Michigan to use for various unlawful, election-related activities. *Id.*, §§ 466-468. Plaintiffs acknowledge that the State of Michigan did not receive this grant money, rather local jurisdictions applied directly to CTCL for

---

[2] *See Michigan Department of State launches online absentee voter application*, 6/12/20, available at https://www.michigan.gov/sos/0,4670,7-127--531796--,00.html, (accessed March 15).

the grants.  *Id.*, ¶¶ 394-397.  But in denying an injunction motion, a federal court in Michigan observed that grants went to both conservative and progressive jurisdictions.  *See Election Integrity Fund v. City of Lansing,* 2020 WL 6605987 at *2 (Oct. 19. 2020, W.D. Mich).[3]

Plaintiffs thereafter make several allegations regarding a case pending before the state court in Michigan, *Bailey v. Antrim County, et al.*, Antrim Circuit Court No. 20-9238, in which the plaintiff alleged that Dominion Voting Systems software used in Antrim County "flipped" votes from Trump to President Biden.  *Id.*, ¶¶ 477-481.  Plaintiffs reference a purported "forensic" report prepared by Allied Security Operations Group that concluded Dominion's software was intentionally designed to perpetuate fraud.  *Id.*, ¶¶ 480-481.

This report was largely repudiated before Plaintiffs even filed this case and a subsequent post-election audit revealed no significant irregularities in vote totals in Antrim County.[4]  Moreover, Michigan legislators have stated that there is no evidence of fraud perpetuated by Dominion Voting Systems.[5]  And this was confirmed by Secretary Benson's expert report in that case, which concluded that

---

[3] Still pending in Michigan is a state-court lawsuit challenging the legality of these grants to jurisdictions provided by the CTCL in connection with the 2020 election cycle.  *See Ryan, et al. v. Benson,* Michigan Court of Claims, 20-00198.

[4] *See* Antrim County audit shows 12-vote gain for Trump, 12/17/20, The Detroit News, available at https://www.detroitnews.com/story/news/local/michigan/2020/12/17/antrim-county-audit-shows-12-vote-gain-trump/3938988001/ (accessed March 29).

[5] *See* statement by State Senator Ed McBroom, available at https://www.detroitnews.com/story/news/local/michigan/2020/12/17/antrim-county-audit-shows-12-vote-gain-trump/3938988001/ (accessed March 29).

4

the reporting error was the result of human error, not the machines or Dominion's software.[6]  This litigation is ongoing and a Michigan judge will determine whether there is any merit to the claims in that case.

With respect to Governor Whitmer, Plaintiffs complain that she should not have certified Michigan's election results on November 23, 2020 and should not have certified the vote of Michigan's electors on December 14, 2020 because of the allegations of election irregularities.  *Id.*, ¶¶ 470-474, 486-490.  But these were ministerial acts by the Governor under the relevant statutes, *see* Mich. Comp. Laws §§ 168.46, 47, 3 U.S.C. §§ 5-7, and no court had enjoined any part of the process.

Plaintiffs variously allege that Secretary Benson's unconstitutional acts "stripped her of her official capacity" and thus she was "acting outside the scope of her official capacity when she certified" the results of the Presidential election. *Id.*, ¶¶ 482, 484-485.  With respect to Governor Whitmer, Plaintiffs allege that the Governor failed to investigate the above allegations of error "by her subordinate executive officers" and was thus "stripped of her official capacity" and acting in her individual capacity when she certified the elections results to Congress.  *Id.*, ¶¶ 486-490.  As a result, Plaintiffs allege the certification of Michigan's election was "ultra vires and unconstitutional" and "void ab initio."  *Id.*, ¶¶ 491-492.

As for their legal claims against the Michigan Defendants, in Count I they again allege a violation of the Electors Clause of the federal constitution based on

---

[6] *See* Expert report affirms accuracy of Antrim County presidential election results, available at SOS - Expert report affirms accuracy of Antrim County presidential election results (michigan.gov) (accessed March 29).

their alleged failure to conduct the election in accordance with the election laws enacted by the Michigan Legislature. *Id.*, ¶¶ 648-684. In Count II, Plaintiffs again allege a violation of the Equal Protection Clause, the premise of which is as difficult to discern as it was in the original complaint but appears based on disparate treatment of Plaintiffs' and the classes' votes. *Id.*, ¶¶ 685-709. In Count III, Plaintiffs again allege a violation of the Due Process Clause based on Defendants' alleged arbitrary and disparate acts, which resulted in the dilution or debasement of Plaintiffs' and the classes' votes. *Id.*, ¶¶ 710-721. Count VIII is a new claim brought against a new Michigan Defendant, Attorney General Dana Nessel, in her official capacity. *Id.*, ¶¶ 223, 810-830. Plaintiffs allege that Mich. Comp. Laws § 168.759(3), as it was applied in the context of the 2020 presidential election, is unconstitutional because that statute did not authorize Secretary Benson to distribute absent voter ballots applications. *Id.* In Count XII, Plaintiffs' request declaratory judgment against all Defendants, id., ¶¶ 877-879, and in Count XIII, Plaintiffs request injunctive relief against all Defendants, *id.*, ¶¶ 880-882.

## ARGUMENT

I. **Plaintiffs' motion to amend the complaint must be denied regarding the Michigan Defendants where Plaintiffs still fail to allege any facts supporting this Court's exercise of personal jurisdiction over Defendants.**

### A. **Legal standard**

Pursuant to Federal Rule of Civil Procedure 15(a), a court is to freely allow amendment of the pleadings "when justice so requires." The grant or denial of a motion to amend is within the discretion of the court, but "outright refusal to grant

the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999).

**B.** **Plaintiffs' proposed amended complaint against the Michigan Defendants is futile and would be subject to dismissal if filed.**

**1.** **No personal jurisdiction**

For the same reasons asserted in the Michigan Defendants' March 15 motion to dismiss, Plaintiffs' amended complaint fails to sufficiently establish personal jurisdiction over Defendants in Colorado.

The Due Process Clause permits the exercise of personal jurisdiction over nonresident defendants when two conditions are met. First, a defendant must have "minimum contacts" with the forum state. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). Second, if sufficient minimum contacts are shown, due process requires that the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *Id*.

The "minimum contacts" standard can be met in two ways. First, a court may, consistent with due process, exercise *specific* jurisdiction over a nonresident

7

defendant "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (internal quotations omitted). Where a court's exercise of jurisdiction does not directly arise from or relate to a defendant's forum-related activities, the court may nevertheless maintain *general* personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 415-16 (1984). But to be subject to general jurisdiction in a forum state, a defendant's affiliations with that state must be "so 'continuous and systematic' as to render [it] essentially at home" there. *Daimler AG v. Bauman,* 571 U.S. 117, 127 (2014) (internal quotation marks and citation omitted).

Here, Plaintiffs' allegations again fail to establish personal jurisdiction under the traditional "minimum contacts" test. They devote 62 paragraphs in their amended complaint to describing perceived irregularities in the conducting of the November 3, 2020 general election *in* the State of Michigan, by Michigan officials. (Plfs' Mtn to Amend, Amend. Compl., ¶¶ 430-492.) And in Count VIII, they bring a claim against Attorney General Nessel alleging the unconstitutionality of a state statute on as as-applied basis. *Id.*, ¶¶ 880-882. But none of these paragraphs describe any specific actions by Governor Whitmer, Secretary Benson, or the Attorney General that were "purposefully directed at residents" of the State of Colorado. *Burger King Corp.,* 471 U.S. at 472. Nor have Plaintiffs alleged that

8

Governor Whitmer, Secretary Benson or Attorney General Nessel engaged in continuous and systematic contacts with Colorado that would render Defendants at home in the State. *Daimler*, 571 U.S. at 127.

Plaintiffs allege that Secretary Benson used the "US Mail" to send out absent voter ballot applications. (Plfs' Mtn to Amend, Amend. Compl., ¶¶ 434, 436.) But those mailings were directed to registered voters in Michigan. In their motion to amend, Plaintiffs argue that "Defendants [sic] have minimum contacts with Colorado. The four States involved all have established contractual relations with Defendant Dominion, whose domicile is located in Denver, Colorado. Every Defendant used Facebook, the US Mail, and electronic communications over the internet that effected interstate commerce." (Plfs' Motion to Amend, p 5.)

But "[i]t is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts." *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1077 (10th Cir. 1995). Moreover, with respect to internet communications, Plaintiffs must demonstrate that the Michigan Defendants intentionally directed activity at the forum state, Colorado. *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011). Again, Plaintiffs do not sufficiently allege or describe in their amended complaint any of the purported "contacts" by mail, email, or the internet to show that activity by the Michigan Defendants was directed to the residents of Colorado.

Regarding the contract issue, "a defendant is not necessarily subject to personal jurisdiction in a forum state simply because he [or she] enters into a

Appendix Page 1224

contract with a party that resides in that forum." *Greenway Nutrients, Inc. v. Blackburn,* 33 F. Supp. 3d 1224, 1238 (D. Colo. 2014) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478 (1985).) Rather, the contract relied upon to establish minimum contacts must have a "substantial connection" with the forum state. *TH Agriculture & Nutrition, LLC v. Ace European Group Ltd.,* 488 F.3d 1282, 1288 (10th Cir. 2007). "Without substantial connection, there may be no personal jurisdiction . . . ." *Greenway Nutrients, Inc.,* 33 F. Supp. 3d at 1238 (citing *SGI Air Holdings II LLC v. Novartis Int'l,* 192 F.Supp.2d 1195, 1202 (D.Colo.2002).)

Other than generally alleging that Michigan is one of the states that Defendant Dominion has a contract with to provide election systems and software, (Plfs' Mot to Amend, Amend. Comp., ¶ 266), Plaintiffs do not allege any activity by the Michigan Defendants demonstrating they had sufficient minimum contacts with Colorado as a result of the contract with Dominion. In other words, Plaintiffs again have not shown that the Michigan Defendants purposefully directed any activity at the residents of Colorado. *Burger King Corp.,* 471 U.S. at 471-72.

Because Plaintiffs' amended complaint would be subject to dismissal against the Michigan Defendants based on lack of personal jurisdiction, the motion to amend the complaint should be denied as futile.

## 2. Plaintiffs fail to state a claim for relief.

In their proposed amended complaint, Plaintiffs re-allege the same Electors Clause, Equal Protection Clause, and Due Process Clause claims that the Michigan Defendants moved to dismiss for failure to state a claim on March 15. These re-alleged claims fail for the same reasons argued in the previous motion.

Briefly, Plaintiffs' Electors Clause claim, (Plfs' Mot to Amend, Amend. Compl., ¶¶ 648-684), fails because Plaintiffs lack standing to bring this generalized claim, *see King, et al. v. Whitmer, et al.*, 2020 WL 7134198 at \*10 (E.D. Mich., Dec. 7, 2020), and where Plaintiffs' interpretation of the clause is not supported by case law, *id*. at \*11. *See also Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. 2020); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at \*4 (D. Nev. Sept. 18, 2020); *Wood v. Raffensperger*, No. 1:20-CV-04651-SDG, 2020 WL 6817513, at \*5 (N.D. Ga. Nov. 20, 2020), aff'd, 981 F.3d 1307 (11th Cir. 2020) (December 5, 2020, decision); Cf. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (holding that Republican presidential electors had standing to bring Electors Clause claim under Minnesota law) (October 29, 2020 decision).

Plaintiffs' Equal Protection Clause claim, (Plfs' Mot to Amend, Amend. Compl., ¶¶ 685-709), likewise fails because Plaintiffs lack standing to bring this claim on a disparate treatment/vote-dilution theory. *See, e.g., Bognet*, 980 F.3d at 354-55 ("Put another way, '[a] vote cast by fraud or mailed in by the wrong person through mistake,' or otherwise counted illegally, 'has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.' ") (citations omitted); *Wood*, 2020 WL 6817513, at \*8-10 (concluding that vote-dilution injury is not "cognizable in the equal protection framework"); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680 at \*45-46 (W.D. Pa. Oct. 10, 2020)). *See also King*, 2020 WL

7134198 at *9, 12-13 ("Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court," and "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.").[7]

Similarly, Plaintiffs' due process claim, (Plfs' Mot to Amend, Amend. Compl., ¶¶ 710-721), fails for lack of standing for the same reasons their equal protection claim fails since vote dilution or debasement claims are analyzed under equal protection, not due process. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (specific amendment applies over generalized concept of substantive due process). And even if Plaintiffs' allegations were construed as a "fundamental fairness" due process claim, their claim still fails because the kind of unconstitutional irregularities that courts have entertained under the Due Process Clause consist of widespread disenfranchisement through system-wide process failures. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580, 597 (6th Cir. 2012). Here, Plaintiffs complain instead of widespread *enfranchisement*, and essentially seek to *disenfranchise* voters. And in that case, they fail to state a claim under the Due Process Clause.

---

[7] Plaintiffs make several allegations regarding racial discrimination in their Equal Protection Clause claim. But these appear to be included only to avoid any claim by Defendants that the purported unlawful actions were necessary to avoid racial discrimination.

In Count VIII, Plaintiffs purportedly allege that a Michigan election statute, Mich. Comp. Laws § 168.759(3), is unconstitutional as applied in the context of the 2020 presidential election. (Plfs' Mot to Amend, Amend. Compl., ¶¶ 810-830.)  But this is really a disguised claim that Secretary Benson violated § 759(3) because the Secretary is not expressly identified as someone from whom a voter may request or receive an application for an absent voter ballot.

Plaintiffs allege that "Benson, without authority of law, usurped the provisions of the aforementioned statute, and used the US Mail system to mail unsolicited absentee ballots." *Id.*, ¶ 824.  Notably, the Secretary did not mail unsolicited absent voter *ballots* as Plaintiffs misstate several times, she mailed *applications* for absent voter ballots.  Voters had to complete and sign the applications and return them to their local clerks to receive an absent voter ballot. But as noted above, the Michigan appellate courts concluded that Secretary Benson acted within her authority in mailing the applications, and that the mailing did not violate § 759(3).  *See Davis v. Secretary of State*, 2020 WL 5552822 at *1 (Mich. Ct. App., Sept. 16, 2020), leave denied 951 N.W.2d 911 (Mich., Dec. 28, 2020.)  Plaintiffs do not allege or explain how the Michigan court's interpretation of § 759(3) violated Plaintiffs' rights under the Fourteenth Amendment.

Again, Count VIII is nothing more than a false claim that Secretary Benson violated state law.  But the Eleventh Amendment generally does not permit plaintiffs to use the federal courts to litigate state law claims against state officials. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984) ("A federal

13

court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.")  Because this claim would be barred by the Eleventh Amendment, Plaintiffs fail to state a claim for relief in their amended complaint.

In Count XII Plaintiffs request declaratory relief.  (Plfs' Mot to Amend, Amend. Compl., ¶¶ 877-879.)  To obtain declaratory relief Plaintiffs must present the Court with an "actual controversy" similar to the "case or controversy" requirement of standing.  *See Surefoot LC v. Sure Foot Corp.,* 531 F.3d 1236, 1240 (10th Cir. 2008).  But for the reasons discussed above, Plaintiffs have not and cannot do so where they lack standing to bring their claims or their claims are barred by the Eleventh Amendment.  Finally, in Count XIII Plaintiffs request permanent injunctive relief based on the other alleged violations.  (Plfs' Mot to Amend, Amend. Compl., ¶¶ 880-882.)  This claim must be dismissed because an "injunction" "is not an independent cause of action," but rather a "remedy" if a plaintiff can show his or her legal rights have been violated.  *Romstad v. City of Colorado Springs*, 650 F. App'x 576, 585 n.7 (10th Cir. 2016) (citation omitted). Where there is no violation, there is no right to an injunction.  *Id.*  Because Plaintiffs' substantive claims fail, their request for injunctive relief fails as well.[8]

---

[8] To the extent Defendants have allegedly been sued in their individual capacity, they would be entitled to assert the defense of qualified immunity should this case not be dismissed outright.

14

Because Plaintiffs fail to state a claim upon which relief may be granted, allowing Plaintiffs to amend their complaint as to the Michigan Defendants would be futile, and their motion should therefore be denied.  *Frank,* 3 F.3d at 1365; *Gohier*, 186 F.3d at 1218.[9]

## CONCLUSION AND RELIEF REQUESTED

Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Benson request that this Court deny Plaintiffs' motion to amend their complaint.

Dated:  March 29, 2021

Respectfully submitted,

Dana Nessel
Michigan Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

---

[9] Should it be determined that Plaintiffs' amended complaint may be filed as to the Michigan Defendants under Fed. R. Civ. P 15(a), this Court should consider dismissing it sua sponte for the reasons stated herein, and in the Defendants pending motion to dismiss filed March 15, 2021.  *See, e.g., Rockefeller v. Chu,* 471 Fed. Appx. 829, 830 (10th Cir. 2012).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 29, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
Attorney for Defendants Whitmer & Benson
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, NATHANIEL L. CARTER,
LORI CUTUNILLI, LARRY D. COOK,
ALVIN CRISWELL, KESHA CRENSHAW,
NEIL YARBROUGH, and AMIE TRAPP,

Plaintiffs, on their own behalf
and of a class of similarly
situated persons,

v.

DOMINION VOTING SYSTEMS INC.,
a Delaware corporation, FACEBOOK, INC.,
a Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually, BRAD
RAFFENSPERGER, individually, GRETCHEN WHITMER,
individually, JOCELYN BENSON, individually,
TOM WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L. THOMSEN,
individually, MARGE BOSTELMAN, individually,
JULIE M. GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, JR,
individually, and DOES 1-10,000,

Defendants.

---

## DOMINION VOTING SYSTEMS INC.'S RESPONSE IN
## OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE
## AMENDED COMPLAINT PURSUANT TO FRCP 15

---

Defendant Dominion Voting Systems, Inc. ("Dominion"), by and through its counsel, hereby submits this Response in Opposition to Plaintiffs' Motion for Leave to File Amended Complaint Pursuant to FRCP 15.

## **INTRODUCTION**

This Court should deny Plaintiffs leave to file an amended complaint because amendment is futile. Plaintiffs' proposed First Amended Class Action Complaint and Jury Demand (the "Proposed Amended Complaint") does nothing more than expand the size of their already flawed Complaint. It does not (and cannot) cure the fatal flaw in the operative Complaint—lack of Article III standing. Indeed, Plaintiffs' Motion for Leave to File Amended Complaint Pursuant to FRCP 15 (the "Motion to Amend") merely recycles the same faulty standing arguments raised in Plaintiffs' Response to Dominion's Motion to Dismiss ("Plaintiffs' Response") and attempts to substitute state action for Article III standing.[1] Although the Proposed Amended Complaint adds hundreds of "factual" allegations and new claims for relief, the allegations do not rectify the pleading deficiencies and none of the added claims would survive a motion to dismiss. The pertinent issues have been briefed; prolonging this lawsuit simply delays the inevitable. The Motion to Amend must be denied.[2]

---

[1] Before Plaintiffs sought leave to amend, Dominion's Motion to Dismiss explained the standing deficiencies in the operative Complaint. *See* Dominion's Mot. to Dismiss, ECF No. 22, at 14–18. For the Court's convenience, when citing to other filings in this matter, Dominion cites to the applicable ECF document number and corresponding page number (*i.e.*, ECF No. __, at __.).

[2] Dismissal may not be the only consequence for Plaintiffs' continued pursuit of baseless litigation regarding the 2020 Presidential election. As noted by Facebook in its Reply in support of its Motion to Dismiss, a court recently referred counsel in a similar case to the jurisdiction's Grievance Committee for bringing election-related claims on debunked election fraud allegations and legal bases foreclosed by precedent, especially where counsel continued to press the same arguments after being confronted with obvious fatal problems with their suit. *Wis. Voters All. v. Pence*, No. 20-3791 (JEB), 2021 WL 686359, at *2 (D.D.C. Feb. 19, 2021).

## BACKGROUND

Plaintiffs filed the Motion to Amend after several Defendants, including Dominion, filed motions to dismiss, and after Plaintiffs responded to these motions rather than amending their Complaint. All of these motions to dismiss, as well as subsequent motions to dismiss filed by other Defendants,[3] highlight that Plaintiffs lack standing to bring their generalized grievances of vote dilution. Courts across the county have consistently rejected nearly identical claims.

Rather than address the standing deficiencies, Plaintiffs, through the Proposed Amended Complaint, seek to: (1) add 152 new named plaintiffs from various states, *see* Am. Compl., ECF No. 48-1, ¶¶ 53–212, (2) insert hundreds of paragraphs of new factual allegations, *see id.* ¶¶ 53–212, 240–324, and (3) create "subclasses" of the proposed class of "all registered voters." *See id.* ¶¶ 240–51. The Proposed Amended Complaint also would add six new claims for relief—two new Racketeer Influenced and Corrupt Organization Act ("RICO") claims pursuant to 18 U.S.C. § 1962 against Defendants Facebook, CTCL, Zuckerberg, and Chan, *see id.* ¶¶ 747–83, and four constitutional challenges to state laws in Michigan, Georgia, Pennsylvania, and Wisconsin against their respective attorneys general (the "Proposed AG Defendants"). *See id.* ¶¶ 810–76. Notably, none of Plaintiffs' proposed claims are asserted against Dominion.

## STANDARDS OF REVIEW

Although Rule 15 of the Federal Rule of Civil Procedure instructs that leave to amend a complaint should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), a court may deny leave to amend "on account of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the]

---

[3] Plaintiffs served the Complaint on the Defendants at various points in time and thus the Defendants' deadlines to respond to the Complaint varied.

amendment.'" *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1101–02 (10th Cir. 2019)

(alterations in original) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)). "A motion to

amend may be denied for futility 'if the complaint, as amended, would be subject to dismissal.'"

*Gess v. USMS & 10th Cir. Dist. Ct.*, No. 20-cv-01790-PAB-STV, 2021 WL 423436, at *5 (D.

Colo. Feb. 5, 2021) (quoting *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007)). "A

district court is justified in denying a motion to amend as futile only if the proposed amendment

cannot withstand a motion to dismiss or otherwise fails to state a claim." *Id.* (citing *Ketchum v.

Cruz*, 961 F.2d 916, 920 (10th Cir. 1992)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962)

(explaining that futility of amendment is adequate justification to deny leave to amend).

## <u>ARGUMENT</u>

The Motion to Amend should be denied because amendment is futile. The Proposed

Amended Complaint confirms the obvious—Plaintiffs' lack Article III standing to assert a class

action on behalf of every registered voter for generalized grievances of vote dilution.[4] The new

allegations in the Proposed Amended Complaint likewise do not alter the analysis that Plaintiffs

have failed to state a plausible claim for relief. As a result, Plaintiffs' Proposed Amended

Complaint cannot survive a motion to dismiss, and thus leave for amendment would be futile.

*See, e.g.*, *Gess*, 2021 WL 423436, at *5.

### I.   **Plaintiffs lack standing under their legal theory.**

Plaintiffs' claims lack Article III standing for the reasons already stated in Dominion's

Motion to Dismiss and Reply. *See* Dominion's Mot. to Dismiss, ECF No. 22, at 14–18;

---

[4] The Proposed Amended Complaint includes the same five claims asserted against Dominion
from the operative Complaint (Counts I, II, III, XII, and XIII). *See* Am. Compl., ECF No. 48-1,
¶¶ 648–721, 877–882.

Dominion's Reply, ECF. No. 55, at 4–8.[5] To withstand a motion to dismiss on standing grounds, a plaintiff "must show injury in fact, a causal relationship between the injury and the challenged action of the defendant, and a likelihood that the injury will be redressed by a favorable decision." *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947 (10th Cir. 2001). The allegations added in the Proposed Amended Complaint do nothing to correct this pleading deficiency. In fact, the Proposed Amended Complaint does not add a single allegation addressing standing. Under either complaint, Plaintiffs lack standing to bring their claims.

Specifically, the Proposed Amended Complaint still fails to allege any concrete and particularized injury in fact to satisfy standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992). Instead, Plaintiffs reiterate the non-cognizable generalized grievance that Plaintiffs' votes—and the votes of *all registered voters* in the country—were diluted. Such generalized grievances fail to satisfy injury in fact for Article III standing.[6] *See id.* ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Wood v. Raffensperger*, 981 F.3d 1307, 1315 (11th Cir. 2020) ("[I]rregularities in the tabulation of election results do not affect [a plaintiff] differently from any other person" and thus does not confer standing.).

---

[5] Plaintiffs' operative Complaint only addresses standing in two paragraphs. *See* Compl., ECF No. 1, ¶¶ 29, 304. Dominion did not identify any allegations added to the Proposed Amended Complaint that speak to Article III standing.

[6] Plaintiffs' argument that they are seeking class certification on behalf of the 8 already named plaintiffs and the proposed 152 additionally named plaintiffs does not alter the analysis. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." (internal quotations and citations omitted)).

4

Rather than address this standing deficiency, Plaintiffs merely parrot in the Motion to

Amend the same flawed standing arguments asserted previously to this Court. *See* Pls.' Resp.,

ECF No. 39, at 9–13, 17–21; Pls.' Mot. to Amend, ECF No. 48, at 5–8, 9–13. In particular,

Plaintiffs again argue that they have satisfied Article III standing based on the following false

theories: (1) a claim for nominal damages satisfies Article III's standing requirements; (2) their

purported voting rights injury constitutes an injury in fact; (3) standing cannot be separated from

state action doctrine; and (4) they are not asserting generalized grievances because their claims

are on behalf of "all registered voters" rather than the public at-large. Each argument fails.

First, Plaintiffs again assert that "[e]ven nominal damages create standing." Pls.' Mot. to

Amend, ECF No. 48, at 6; *see also* Pls.' Resp., ECF No. 39, at 19, 22. While nominal damages

*may* satisfy the redressability element necessary for Article III standing, *see Uzuegbunam v.*

*Preczewski*, No. 19-968, 2021 WL 850106, at *5–6, *7 (Mar. 8, 2021), nominal damages alone

do not establish injury in fact, which is a separate and independent standing element. *See id.* at

*7. Even alleging nominal damages, Plaintiffs must still establish every standing element,

including injury in fact. *See id.* (explaining that "a request for nominal damages [does not]

guarantee[] entry to court . . . It remains for the plaintiff to establish the other elements of

standing (such as a particularized injury); plead a cognizable cause of action; and meet all other

relevant requirements" (internal citations omitted)).

Plaintiffs again quote a passage from *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir.

2003), articulating that "[n]ominal damages are appropriate if a plaintiff establishes a violation of

a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him

to compensatory damages." Pls.' Mot. to Amend, ECF No. 48, at 6; *see also* Pls.' Resp., ECF

No. 39, at 19.[7] This statement from *Hughes*, however, refers to the *type* of damages that are available for alleged constitutional violations—not Article III standing's injury in fact element. Thus, even though Plaintiffs allege constitutional violations that, if adequately pled, may be actionable for nominal damages, *see Carey*, 435 U.S. at 266, Plaintiffs still must establish each element of Article III standing. *See Spokeo*, 136 S. Ct. at 1547–48 ("Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" (alterations in original) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997))). All told, Plaintiffs fail to demonstrate injury in fact—pleading nominal damages does not alter that conclusion.

Second, Plaintiffs appear to argue that a purported injury to their voting rights suffices as an injury in fact to satisfy standing. *See* Pls.' Mot. to Amend, ECF No. 48, at 6–8; *see* Pls.' Resp., ECF No. 39, at 17–18. Plaintiffs' argument fails for several reasons. To begin with, Plaintiffs assert their claims on behalf of *all registered voters*. Thus, even if Plaintiffs' purported injury is a violation of their constitutional right to vote, such an injury is not "particularized" because it fails to "affect . . . [Plaintiffs] in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Further, Plaintiff's conclusory argument regarding the individual and personal nature of a person's right to vote does not modify the analysis. Broadly alleging illegality affecting individual voting rights does not constitute a particularized injury in fact to satisfy standing. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 358 (3d Cir. 2020) (explaining that merely "labeling . . . the right to vote as 'personal' . . . [such] that *any* alleged illegality affecting voting rights rises to the level of an injury in fact" fails to satisfy standing) (emphasis in original).

---

[7] Plaintiffs once again incorrectly attribute the quote to *Carey v. Piphus*, 435 U.S. 247, 255 (1978), a case cited by the Eleventh Circuit in *Hughes*.

Rather, the standing inquiry for a constitutional voting rights claim focuses on whether the

"alleged violation of the right to vote arises from an invidious classification" where the "'the

favored group has full voting strength and the groups not in favor have their votes discounted.'"

*Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964)). Here, because Plaintiffs bring

claims on behalf of all registered voters, they cannot demonstrate that they fall into an invidious

classification in which their votes were discounted for a favored classification.

In support of their flawed argument that a purported violation of voting rights constitutes

injury in fact for standing, Plaintiffs cite the same cases relied on in their Response—*Anderson v.

Celebrezze*, 460 U.S. 780 (1983), and *Karcher v. Daggett*, 462 U.S. 725 (1983). *See* Pls.' Resp.,

ECF No. 39, at 17–18; Pls.' Mot. to Amend, ECF No. 55, at 6–8. Plaintiffs' reliance on these

cases remains misplaced.[8] Neither case addresses Article III standing. Furthermore, both cases

involve a specific subset of a voting population within a state challenging state legislation that

diminished their voting power relative to other voting populations. *See Anderson*, 460 U.S. at

792–94 (explaining that that Ohio's statute setting an election filing deadline for independent

candidates improperly limited political participation in a specific and identifiable group of

voters—Ohio's independent voters); *Karcher*, 462 U.S. at 748 (explaining that New Jersey's

congressional reapportionment statute placing specific groups of voters into congressional

districts must still serve the interests of all New Jersey voters in to order to comply with the

constitutional guarantee of equal protection). Here, in contrast to *Anderson* and *Karcher*,

Plaintiffs bring their claims on behalf of all registered voters in the country, not any specific

subset of the voting population, and do not allege that their voting rights were diminished over

---

[8] Dominion also discusses and distinguishes these cases at length in its Reply. *See* Reply, ECF
No. 55, at 6–7.

that of another voting populous. Given these fundamental distinctions, *Anderson* and *Karcher* do not support Plaintiffs' standing argument.

Third, Plaintiffs still conflate Article III standing with state action. *See* Pls.' Mot. to Amend, ECF No. 48, at 9–13. The relevant heading in Plaintiffs' Motion to Amend makes this clear in stating that "The Issue of Standing Cannot Be Separated From the Capacity of Dominion, Facebook, CTCL, Zuckerberg and Chan as State Actors." *Id.* at 9.[9] State action, however, is a separate constitutional legal doctrine from Article III standing. On one hand, the state action doctrine determines whether the Constitution, which generally applies only to governmental conduct, could apply to certain private actors' conduct. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991) (explaining that "the conduct of private parties lies beyond the Constitution's scope in most instances"). In short, the state action doctrine provides a framework to determine whether the *defendant's* challenged conduct is governmental such that it triggers the Constitution's protections. *See id.* at 619–20. Standing, on the other hand, is a distinct constitutional requirement, addressing whether a *plaintiff* can bring a claim in federal court. *See Lujan*, 504 U.S. at 560 ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). Thus, state action is wholly irrelevant in determining Article III standing.

Plaintiffs' argument that the state action doctrine cannot be separated from Article III standing is both legally dubious and practically untenable. If a plaintiff could satisfy the standing doctrine by pleading state action, as Plaintiffs suggest here, Article III's standing requirements would be rendered meaningless in actions against government actors. For example, any

---

[9] Plaintiffs' Response also discusses state action at length to no avail. *See* Pls.' Resp., ECF No. 39, at 9–13. Even if Plaintiffs can demonstrate that Dominion is a state actor for purposes of this litigation, which they cannot, they still must satisfy Article III standing.

individual could bring a lawsuit in federal court against a government actor without demonstrating any individual concrete and particularized injury in fact, causation, or redressability. Waiving Article III standing for such claims would not only subject state, local, and other government actors to a flood of meritless litigation across the county, but also ask this Court to re-write Article III's "case or controversy" mandate. The Court need not make such a leap in law and logic to determine whether Plaintiffs' claims satisfy Article III standing.[10]

Fourth, Plaintiffs once more argue that their claims are not a "generalized grievance" because their class composed of all registered voters is distinct from the "general interest of members of the public." Pls.' Mot. to Amend, ECF No. 48, at 13; Pls.' Resp., ECF No. 39, at 20. This distinction is meaningless in the voting rights context because "all registered voters" is not a specific enough subset of the general public to grant standing. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."); *see also Wood*, 981 F.3d at 1314–15 (explaining that "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote'" and that therefore "[v]ote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing'" (quoting *Bognet*, 980 F.3d at 356)).

In sum, the Proposed Amended Complaint fails to cure Plaintiffs' lack of standing, rendering amendment futile. If Plaintiffs had filed an amended complaint as a matter of course within the time period allotted in Rule 15(a)(1)(B), Dominion and the other Defendants'

---

[10] Dominion discusses and rebuts Plaintiffs' state action (or, "color of law") arguments in its Motion to Dismiss and Reply. *See* Dominion's Mot. to Dismiss, ECF No. 22, at 19–21; Dominion's Reply, ECF No. 55, at 9–11.

subsequent motions to dismiss would include the *exact same* standing arguments already submitted to the Court.

## II.   Plaintiffs' claims against Dominion are still subject to dismissal.

The Proposed Amended Complaint includes no new allegations that support its substantive claims against Dominion.[11] Instead, the Proposed Amended Complaint adds conclusory allegations that Dominion acts under color of law and misleading allegations regarding the services Dominion provides, its software license agreements with various governments, purported vulnerabilities in its voting systems, and its role in the adjudication of ballots. *See* Am. Compl., ECF No. 48-1, ¶¶ 34–49, 266–324.

For the reasons articulated in Dominion's Reply, Plaintiffs still fail to state a plausible claim for relief. *See* Dominion's Reply, ECF No. 55, at 8–14. The new allegations do not alter this analysis. For example, the allegations regarding the services Dominion provides and its contracts and agreements appear to be directed to establishing Dominion as a state actor. However, even if the Proposed Amended Complaint plausibly pleads an argument that Dominion is a state actor,[12] acting under color of law is not, itself, liable conduct because Section 1983 also requires a violation of the Constitution or federal law, as well as standing. *See Brown v. Buhman*, 822 F.3d 1151, 1161 n.9 (10th Cir. 2016) (explaining "[t]here can be no 'violation' of [42 U.S.C.] § 1983" because the statute "is a remedial vehicle"). Likewise, the new allegations regarding adjudication of ballots do not support a due process claim because Plaintiffs still have

---

[11] The Proposed Amended Complaint also includes a claim against Defendants Facebook and Zuckerberg under 47 U.S.C. § 230 (Count VII), which was carried over from the operative Complaint. *See* Am. Compl., ECF No. 48-1, ¶¶ 784–809. Count VII is also subject to dismissal because the Proposed Amended Complaint fails to address the flaws in this claim—namely, Plaintiffs lack standing and fail to state a claim under § 230. *See* Facebook's Mot. to Dismiss, ECF No. 23, at 5–9, 13–15; Facebook's Reply, ECF No. 56, at 5–8, 11–16. Thus, Count VII is also futile.

[12] Dominion disagrees that Plaintiffs' conclusory allegations have plausibly alleged so.

10

not alleged a causal connection between Dominion's voting systems flagging ballots and a

state's review of those ballots. None exists. Dominion simply follows a state's given process for

reviewing votes, as dictated by state law. Plaintiffs' dispute pertains to *states'* adjudication of

ballots, not Dominion's.

## III.   Plaintiffs' proposed new claims are also futile.

Not only does the Proposed Amended Complaint not resolve the pleading deficiencies in

the claims asserted against Dominion, but the proposed new claims—none of which are asserted

against Dominion—suffer from similar flaws. The Proposed Amended Complaint asserts six new

claims for relief—two RICO claims under 18 U.S.C. § 1962, and four additional constitutional

claims seeking declaratory judgments. *See* Am. Compl., ECF No. 48-1, ¶¶ 747–876.

### a.   *Plaintiffs cannot satisfy the elements of their proposed RICO claims.*

To state a RICO claim, Plaintiffs must "plausibly allege '(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity.'" *Sullivan v. Univ. of Kan. Hosp.

Auth.*, Nos. 19-3213, 19-3215, and 19-3216, 2021 WL 303142, at *3 (10th Cir. Jan. 29, 2021)

(quoting *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003)). "A pattern of

racketeering activity must include commission of at least two predicate acts." *Deck*, 349 F.3d at

1257. To have standing to bring a RICO claim, a plaintiff must have been "injured in his

business or property by reason of the defendant's violation of § 1962." *Id.*; *see also* 18 U.S.C. §

1964(c) ("Any person injured in his business or property by reason of a violation of section 1962

of this chapter may sue therefor . . . .").

The proposed RICO claims cannot meet these elements and thus are subject to dismissal

for failure to state a claim under Rule 12(b)(6).[13] Among various other flaws, Plaintiffs do not

---

[13] As with Dominion's arguments above, Plaintiffs' RICO claims cannot demonstrate a concrete
and particularized injury to satisfy Article III standing. *See supra* pages 3–4. Thus, Plaintiffs'

have statutory standing to bring a RICO claim. "Plaintiffs who bring civil RICO claims pursuant

to 18 U.S.C. § 1962 must show damage to their business or property as a result of defendants'

conduct." *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002) (citing *Sedima, S.P.R.L. v.

Imrex Co.*, 473 U.S. 479, 496 (1985)).

Plaintiffs' first RICO claim (Count V) alleges that Defendants Facebook, CTCL,

Zuckerberg, and Chan committed a civil RICO violation by engaging in a pattern of racketeering

activity. *See* Am. Compl., ECF No. 48-1, ¶¶ 747–76. Plaintiffs allege that these Defendants

violated several federal laws that constitute "racketeering activity," including mail and wire

fraud, interstate transportation of stolen property, witness tampering, and conspiracy to violate

Plaintiffs' civil rights. *See id.* Count V, however, is devoid of *any* allegations asserting damages

to Plaintiffs' business or property. *See id.* ¶¶ 747–83. Plaintiffs' lone reference to their purported

damages lacks any detail regarding Plaintiffs' business or property. *See id.* ¶ 775. Instead,

Plaintiffs merely allege that "[t]he damages and injury to the Plaintiffs and the Classes were

directly and proximately caused and continue to be caused by Defendants' racketeering activities

of the enterprise." *Id.* Even if Plaintiffs had alleged that Defendants' conduct infringed on their

voting rights, Plaintiffs would still fail to allege statutory standing because Plaintiffs' right to

vote alone is not a cognizable property interest. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978

F.3d 220, 230–33 (5th Cir. 2020) (noting that it could not identify any courts treating the right to

vote as a property interest).

Plaintiffs' second RICO claim (Count VI), which alleges that that Defendants Facebook,

CTCL, Zuckerberg, and Chan conspired to engage in a pattern of racketeering activity under 18

U.S.C. § 1962(d), *see* Am. Compl., ¶¶ 777–83, is also subject to dismissal for lack of statutory

---

RICO claims are also subject to dismissal for lack of subject-matter jurisdiction under Rule
12(b)(1).

standing. Although the Proposed Amended Complaint includes one conclusory allegation stating that "Plaintiffs and the Classes have been and are continuing to be injured . . . including injuries to their business or property," *see id.* ¶ 782, this lone conclusory allegation does not establish a property interest for statutory standing and thus is insufficient to state a RICO claim. *See Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015) (explaining that, to survive a motion to dismiss, "[m]ere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient" to state a claim); *see also Robbins*, 300 F.3d at 1210.

### b. *Plaintiffs' proposed constitutional claims are subject to dismissal.*

In Counts VIII–XI of the Proposed Amended Complaint, Plaintiffs allege constitutional violations against the Proposed AG Defendants in Michigan, Georgia, Pennsylvania, and Wisconsin. *See* Am. Compl., ECF No. 48-1, ¶¶ 810–876. Plaintiffs' theory is that the Proposed AG Defendants violated the Fourteenth Amendment by either (1) failing to enforce state election laws in conducting the 2020 Presidential election, or (2) failing to prevent unconstitutional state election laws and executive actions from being implemented prior to the 2020 Presidential election. *See generally id.* Notwithstanding, Counts VIII–XI are subject to dismissal under Rules 12(b)(1) and 12(b)(2), and thus leave to amend to add them would be futile.

First, Counts VIII–XI fail for lack of subject-matter jurisdiction under Rule 12(b)(1) because Plaintiffs lack Article III standing. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) ("Standing is 'an essential and unchanging part' of the Article III case-or-controversy." (quoting *Lujan*, 504 U.S. at 560)). Plaintiffs fail to plead any concrete and particularized injury required for an injury in fact, and again allege an impermissible generalized grievance against the government common to at least a significant portion of the public. *Lance v.*

13

*Coffman*, 549 U.S. 437, 440–41 (2007). For example, Plaintiffs' only references to injury in

Counts VIII–XI concern "the rights of all voters," s*ee* Am. Compl., ECF No. 48-1, ¶¶ 839, 872,

or a "whole class of voters." *See id.* ¶ 852.

Second, Counts VIII–XI are also subject to dismissal for lack of personal jurisdiction

under Rule 12(b)(2) for the same reasons described in the motions to dismiss filed by other

Defendants that are elected officials in Michigan, Georgia, Pennsylvania, and Wisconsin.

Plaintiffs bear the burden of establishing personal jurisdiction over the Proposed AG Defendants.

*Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988). The Due Process Clause

permits the exercise of personal jurisdiction over nonresident defendants when defendants have

sufficient "minimum contacts" with the forum state and the exercise of personal jurisdiction over

such defendants would not offend "traditional notions of fair play and substantial justice." *Int'l*

*Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Here, the Proposed Amended Complaint fails

to allege sufficient minimum contacts with this forum to establish personal jurisdiction. In fact,

Plaintiffs fail to allege *any* contacts between the Proposed AG Defendants and Colorado that

would provide personal jurisdiction. Allegations that some of the states have contracts with

Dominion are insufficient. *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004)

("A contract between an out-of-state party and a resident of the forum state cannot, standing

alone, establish sufficient minimum contacts with the forum."). This Court would thus lack

personal jurisdiction over these claims.[14]

---

[14] Courts may also properly deny a motion to amend for undue delay when it appears "that the
plaintiff is using Rule 15 to make the complaint 'a moving target,'" *Minter v. Prime Equip. Co*.,
451 F.3d 1196, 1206 (10th Cir. 2006) (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785,
800 (10th Cir. 1998)), when a plaintiff's amendment seeks "to 'salvage a lost cause by untimely
suggestion of new theories of recovery,'" and "to present 'theories seriatim' in an effort to avoid
dismissal." *Id.* (quoting *Hayes v. Whitman*, 264 F.3d 1017, 1027 (10th Cir. 2001) and *Pallottino
v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994)). The new allegations in the Proposed

## <u>CONCLUSION</u>

For the foregoing reasons, Dominion respectfully requests that this Court deny Plaintiffs'

Motion to Amend.

Dated March 29, 2021

s/ *Stanley L. Garnett*_____
Stanley L. Garnett
David B. Meschke
Amanda K. Houseal
Bridget C. DuPey
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO  80202-4432
Phone: 303.223.1100
Email: sgarnett@bhfs.com
      dmeschke@bhfs.com
      ahouseal@bhfs.com
      bdupey@bhfs.com

*Attorneys for Defendant Dominion Voting Systems, Inc.*

---

Amended Complaint are not based on any newly discovered facts that were unavailable to Plaintiffs prior to the filing their original Complaint. Instead, after previewing Dominion's (and the other Defendants') arguments for dismissal, Plaintiffs seek to salvage their lost cause by suggesting new theories of recovery in an effort to keep this litigation afloat. At bottom, Plaintiffs' attempt to manipulate Rule 15 in order to prolong this groundless litigation is the exact type of amendment that courts routinely deny. *See Minter*, 451 F.3d at 1205–06. While Plaintiffs benefit from creating a moving target for their claims, Dominion faces real consequences to needlessly prolonging this flawed litigation. Each day that Plaintiffs' baseless lawsuit survives, Dominion's business and reputation suffer.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of March 2021, a true and correct copy of the foregoing Response in Opposition to Plaintiffs' Motion for Leave to File Amended Complaint Pursuant to FRCP 15 was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Stanley L. Garnett*
Stanley L. Garnett

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747-NRN

KEVIN O'ROURKE, NATHANIEL L.
CARTER, LORI CUTUNILLI, LARRY D.
COOK, ALVIN CRISWELL, KESHA
CRENSHAW, NEIL YARBROUGH, and
AMIE TRAPP,

      Plaintiffs, on their own behalf
      and of a class of similarly
      situated persons,

  v.

DOMINION VOTING SYSTEMS, INC., a
Delaware corporation, FACEBOOK, INC., a
Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit
organization, MARK E. ZUCKERBERG,
individually, PRISCILLA CHAN,
individually, BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually, TOM
WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L.
THOMSEN, individually, MARGE
BOSTELMAN, individually, JULIE M.
GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, Jr.,
individually, and DOES 1-10,000,

      Defendants.

---

## DEFENDANT CENTER FOR TECH AND CIVIC LIFE'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT AND, IN THE ALTERNATIVE, ITS REQUEST TO DISMISS THE AMENDED COMPLAINT

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

LEGAL STANDARD.......................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.      Plaintiffs still lack standing........................................................................................ 4

II.     Plaintiffs still fail to state a claim. ........................................................................... 9

      A.      Plaintiffs still fail to state a § 1983 claim. ......................................................... 9

           1.      Plaintiffs still fail to allege state action................................................... 9

           2.      Plaintiffs still fail to allege a constitutional violation. .......................... 11

      B.      Plaintiffs fail to state a RICO claim................................................................. 13

CONCLUSION................................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ................................................................................. 7, 12

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ...................................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 13

*Bixler v. Foster*,
    596 F.3d 751 (10th Cir. 2010) ................................................................ 13, 14

*Bognet v. Sec'y of Commonwealth of Pa.*,
    980 F.3d, 336 (3d Cir. 2020) ....................................................................... 5, 6

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*,
    873 F.2d 1357 (10th Cir. 1989) ..................................................................... 14

*CGC Holding Co., LLC v. Hutchens*,
    974 F.3d 1201 (10th Cir. 2020) ..................................................................... 14

*Cuin v. Adams Cnty. Bd. of Cnty. Comm'rs*,
    No. 10 Civ. 1704, 2010 WL 4038841 (D. Colo. Oct. 13, 2010) .................... 3

*Davis v. Fed. Elec. Comm'n*,
    554 U.S. 724 (2008) ........................................................................................ 8

*Doe v. Bolton*,
    410 U.S. 179 (1973) ........................................................................................ 6

*Eberlein v. Provident Life & Accident Ins. Co.*,
    No. 06 Civ. 2454, 2008 WL 11363361 (D. Colo. July 1, 2008) .................... 3

*Flagg Bros, Inc. v. Brooks*,
    436 U.S. 149 (1978) ...................................................................................... 10

*Foman v. Davis*,
    371 U.S. 178 (1962) ........................................................................................ 4

*Frost & Frost Trucking Co. v. R.R. Comm'n of Cal.*,
    271 U.S. 583 (1926) ........................................................................................ 7

ii

*Gallagher v. Neil Young Freedom Concert,*
    49 F.3d 1442 (10th Cir. 1995) ........................................... 10

*Gillmor v. Thomas,*
    490 F.3d 791 (10th Cir. 2007) ........................................... 15

*Greenway Nutrients, Inc. v. Blackburn,*
    33 F. Supp. 3d 1224 (D. Colo. 2014)................................. 14

*Hasan v. AIG Prop. Cas. Co.,*
    935 F.3d 1092 (10th Cir. 2019) ........................................... 4

*Hutchinson v. Pfeil,*
    211 F.3d 515 (10th Cir. 2000) ........................................... 4

*Huxall v. First State Bank,*
    842 F.2d 249 (10th Cir.1988) ........................................... 4

*Karcher v. Daggett,*
    462 U.S. 725 (1983) ........................................... 7, 12, 13

*King v. Whitmer,*
    No. 20 Civ. 13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)........................................ 11

*Kinnell v. Graves,*
    265 F.3d 1125 (10th Cir. 2001) ........................................... 13

*Kriston v. Peroulis,*
    No. 09 Civ. 909, 2010 WL 1268087 (D. Colo. Mar. 29, 2010)............................. 15

*Lance v. Coffman,*
    549 U.S. 437 (2007)........................................... 5, 6

*Marsh v. Alabama,*
    326 U.S. 501 (1946)........................................... 10

*Owen v. Medina,*
    No. 12 Civ. 94, 2012 WL 7800837 (D. Colo. Dec. 18, 2012)................................. 4

*Rector v. City & County of Denver,*
    348 F.3d 935 (10th Cir. 2003) ........................................... 7

*Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer,*
    764 F.3d 1268 (10th Cir. 2014) ........................................... 14

*Safe Streets All. v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) ........................................... 13

*Schwab v. Kansas Dep't of Child. & Families*,
No. 20-3099, 2021 WL 982246 (10th Cir. Mar. 16, 2021)........................................ 3

*Schwab v. Ingels*,
No. 18 Civ. 2488, 2020 WL 2037049 (D. Kan. Apr. 28, 2020) ................................ 3

*Scott v. Hern*,
216 F.3d 897 (10th Cir. 2000) ...................................................................... 10

*Seeberger v. Goodman*,
No. 14 Civ. 1063, 2015 WL 13662654 (D.N.M. Apr. 3, 2015) ................................ 3

*Smith v. Allwright*,
321 U.S. 649 (1944) ........................................................................................ 7

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .......................................................................... 4, 5, 6, 8

*Terry v. Adams*,
345 U.S. 461 (1953) .................................................................................... 10

*Tal v. Hogan*,
453 F.3d 1244 (10th Cir. 2006) ............................................................... 14, 15

*Trujillo v. City of Newton*,
No. 12 Civ. 2380, 2013 WL 535747 (D. Kan. Feb. 12, 2013) ................................ 3

*United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
878 F.3d 1224 (10th Cir. 2017) ...................................................................... 4

*Uzuegbunamv. Preczewski*,
No. 19-968, 2021 WL 850106 (U.S. Mar. 8, 2021) ............................................. 8

*West v. Atkins*,
487 U.S. 42 (1988) ........................................................................................ 9

*Wittner v. Banner Health*,
720 F.3d 770 (10th Cir. 2013) ........................................................................ 9

*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020) ...................................................................... 5

## Statutes

18 U.S.C. § 241 ............................................................................................ 14

18 U.S.C. § 1512 .......................................................................................... 14

18 U.S.C. § 1961 .......................................................................................... 14

iv

18 U.S.C. § 1962 ............................................................................................................... 13

18 U.S.C. § 1964 ........................................................................................................... 13, 15

42 U.S.C. § 1983 ......................................................................................................... passim

42 U.S.C. § 1985 ................................................................................................................. 9

42 U.S.C. § 1986 ................................................................................................................. 9

42 U.S.C. § 1988 ................................................................................................................. 9

**Rules**

Federal Rule of Civil Procedure 9 .................................................................................... 14

Federal Rule of Civil Procedure 15 ............................................................................... 3, 4

Appendix Page 1254

## INTRODUCTION

Plaintiffs' proposed amended complaint does nothing to rectify the fundamental flaws that require dismissal of the original complaint for lack of Article III standing and for failure to state a claim. The addition of 152 named plaintiffs—all of whom claim injury only as "registered voters" in the 2020 presidential election—underscores that Plaintiffs present this Court with a generalized grievance that cannot support subject-matter jurisdiction. And rather than retreat from the original complaint's discredited electoral conspiracy theories (which have been rejected by a litany of state and federal courts), Plaintiffs have doubled down by adding baseless claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Enough is enough. These frivolous allegations are an abuse of legal process. The Court should deny Plaintiffs' motion for leave to amend as futile or, in the alternative, dismiss the proposed amended complaint *sua sponte*.

## BACKGROUND

Plaintiffs filed their original complaint in this action on December 22, 2020, seeking $160 billion in damages based on allegations of a sprawling nationwide conspiracy between government officials, private citizens, and private organizations—including Defendant Center for Tech and Civic Life ("CTCL")—to somehow manipulate the results of the 2020 presidential election. ECF 1 ("Compl."). CTCL is a non-profit organization that offered grants to support local election administrators during the COVID-19 pandemic. Plaintiffs' allegations that CTCL's grant program was somehow illegal echoed prior challenges to the program that have been rejected by nineteen judges at every level of the federal judiciary in recent months. *See* ECF 41 ("MTD") at 1 n.1.

Developments since filing have made clear that Plaintiffs are determined to keep this litigation going without regard to law or logic. The earliest-served Defendants, Facebook, Inc. and Dominion Voting Systems, Inc., moved to dismiss the complaint on February 16, 2021. ECF 22, 23. Each identified numerous grounds for dismissal, including (among other arguments) that

1

Plaintiffs clearly lacked standing to bring this suit. ECF 22 at 7-11; ECF 23 at 4-8. Plaintiffs then served Defendant CTCL with the summons and complaint the day after those motions were filed, after the case had been pending for nearly two months. When the undersigned counsel for CTCL proposed to meet and confer in anticipation of moving to dismiss, Plaintiffs' counsel stated (without inquiring about the grounds for CTCL's motion) that they would not only oppose dismissal, but that they also intended to file an amended complaint. When Plaintiffs failed to file that amended complaint, CTCL filed its own motion to dismiss, identifying multiple independent grounds for dismissal of this lawsuit that were apparent on the face of the original complaint— including lack of Article III standing, CTCL not ranking as a "state actor" for purposes of § 1983, and failure to state any viable constitutional claims. *See generally* MTD. The next day, at the March 11 initial status conference in this case, Plaintiffs' counsel made clear that they would defend the original complaint while also seeking leave to amend it, and this Court allowed briefing from Defendants on whether to permit amendment. ECF 45 at 8-10, 23-24.

Plaintiffs have now filed a proposed amended complaint, along with a supporting motion seeking leave to file it. *See* ECF 48 ("Mot."); ECF 48-1 ("Am. Compl."). As it concerns CTCL, the proposed amended complaint adds little. Its primary new features are: (1) a nearly tenfold increase in the number of named plaintiffs, none of whom claim a personal stake in this litigation beyond being a registered voter somewhere in the United States, *see* Am. Compl. ¶¶ 51-212;[1] ECF 48-2 (redline) at 11-29; and (2) new proposed claims under RICO, which rest on the same

---

[1] The proposed amended complaint also includes new class allegations stating that Plaintiffs' counsel is actively fielding inquiries from "a significant number" of other people "who have expressed interest in joining" this lawsuit. *Id.* ¶ 262. An accompanying declaration by Plaintiffs' counsel avers that some of these people have offered "donations of time or money" to support Plaintiffs' counsel's continued pursuit of this clearly meritless case, and that "many more" potential plaintiffs are currently "in process." ECF 48-3 ¶¶ 3, 5.

Appendix Page 1256

generalized grievances about the legality of the 2020 election as Plaintiffs' earlier claims. Am. Compl. ¶¶ 747-83; *see id.* ¶ 770 ("The scheme of the enterprise, and racketeering activities described herein, was a common course of conduct intended to influence the 2020 Presidential election."). The proposed amended complaint otherwise adheres to the same untenable allegations and meritless standing arguments that CTCL and other Defendants have already addressed and refuted. *See* ECF 48-2 at 110-21 (redline reflecting no substantive changes to Counts I-III against CTCL); *id.* at 114 (still alleging harm "to every registered voter in the country").

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) governs when a pleading may be amended. A party may amend once as a matter of course until "21 days after service of a motion under Rule 12(b)." Fed. R. Civ. P. 15(a). Thereafter, amendment requires consent or leave of court. *Eberlein v. Provident Life & Accident Ins. Co.*, No. 06 Civ. 2454, 2008 WL 11363361, at *1 (D. Colo. July 1, 2008). In multiple-defendant cases such as this one, it is an open question whether leave is required as to *all* defendants more than twenty-one days after *any* of them moves to dismiss, or whether amendment is permitted as to each defendant until 21 days after that defendant moves.[2]

---

[2] Specifically, courts within this circuit have identified a "split of authority on Rule 15(a)(1)'s application to multi-defendant cases." *Schwab v. Ingels*, No. 18 Civ. 2488, 2020 WL 2037049, at *4 n.5 (D. Kan. Apr. 28, 2020), *aff'd sub nom. Schwab v. Kansas Dep't of Child. & Families*, No. 20-3099, 2021 WL 982246 (10th Cir. Mar. 16, 2021) (acknowledging the split, but affirming denial of leave to amend on futility grounds without resolving it). Some district courts in the Tenth Circuit hold that once *any* defendant responds to a complaint, the 21-day time limit to amend as of right is triggered as to *all* defendants, even if other defendants file responsive pleadings or motions later. *See Trujillo v. City of Newton*, No. 12 Civ. 2380, 2013 WL 535747, at *1 (D. Kan. Feb. 12, 2013); *Schwab*, 2020 WL 2037049, at *4 (following *Trujillo*). Other courts hold that "[e]ach defendant is treated separately for purposes of amending once as of right." *Cuin v. Adams Cnty. Bd. of Cnty. Comm'rs*, No. 10 Civ. 1704, 2010 WL 4038841, at *1 (D. Colo. Oct. 13, 2010) (alteration in original) (citation omitted); *see also Seeberger v. Goodman*, No. 14 Civ. 1063, 2015 WL 13662654, at *2 (D.N.M. Apr. 3, 2015) (noting both approaches, collecting out-of-circuit authority supporting the *Cuin* approach, and declining to "decide which approach is correct").

3

Although leave to amend a complaint is freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), a court may deny leave if amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1101-02 (10th Cir. 2019). A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for failure to state a claim under Rule 12(b)(6) or failure to establish standing under Rule 12(b)(1). *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017); *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000). The Court may also docket the proposed amended complaint and dismiss it *sua sponte*, applying those same standards. *See Owen v. Medina*, No. 12 Civ. 94, 2012 WL 7800837, at *11 (D. Colo. Dec. 18, 2012).

## ARGUMENT

The proposed amended complaint fails to establish standing or state a claim. Leave to amend should be denied as futile, or the amended complaint should be dismissed *sua sponte*.

### I.     Plaintiffs still lack standing.

The law of standing "limits the category of litigants empowered to maintain a lawsuit in federal court" to those who bring "actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "'irreducible constitutional minimum' of standing" requires: (1) a

---

None of the arguments made in this motion depend on which approach better comports with Rule 15. Even if this Court followed the *Cuin* approach and permitted Plaintiffs' proposed amendments to proceed as of right as to CTCL, the result would be the same. That is because all the reasons explained herein why amendment is futile are also reasons why a court following the *Cuin* approach should docket the proposed amended complaint and dismiss it *sua sponte* under Rule 12(b) for failure to state a claim and lack of jurisdiction. *See Huxall v. First State Bank*, 842 F.2d 249, 250 n.2 (10th Cir.1988) (recognizing *sua sponte* dismissal of claim under Rule 12(b)(6) and approving district court's denial of motion for leave to amend complaint where such amendment would be futile); *Owen v. Medina*, No. 12 Civ. 94, 2012 WL 7800837, at *1, 11 (D. Colo. Dec. 18, 2012) (where Defendants opposing leave to amend "incorporated the arguments asserted in their Motion to Dismiss, the court . . . permit[ted] [plaintiff's] amended pleading," "accepted [it] for filing," ordered it "shall be docketed," and then *sua sponte* "dismissed [it] in its entirety").

concrete and particularized injury-in-fact, (2) a causal connection between that injury and the challenged conduct, and (3) redressability. *See id.*

Plaintiffs' original complaint came nowhere close to establishing any of these elements. It was clear that Plaintiffs lacked injury-in-fact because their assertion that "illegal votes and unconstitutional procedures dilute[d] the votes of the legally registered voter" in the 2020 presidential election (Compl. ¶ 320) was "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *see Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) (explaining that "no single voter is specifically disadvantaged if a vote is counted improperly," and so "[v]ote dilution in this context is a paradigmatic generalized grievance"); *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d, 336, 349, 356 (3d Cir. 2020) (emphasizing that an alleged "right to have government administered in compliance with the . . . Electors Clause" is a generalized grievance that cannot support standing). The original complaint also failed to allege how any of these generalized harms were "fairly traceable" to CTCL's grant program, *see Bognet*, 980 F.3d at 352, and sought declaratory and injunctive relief (much of which was plainly moot) that stood no chance of redressing any asserted injuries. *See* MTD at 4-8.

All of these deficiencies persist in the proposed amended complaint. Accordingly, CTCL incorporates herein the standing arguments set forth in its original motion to dismiss, *see id.*, to which the proposed amended complaint is almost entirely unresponsive. In particular, Plaintiffs still lack any cognizable injury-in-fact. At the heart of each of Plaintiffs' claims—including the new RICO claim—remains the allegation that "*every registered voter* was deprived of a fair and legitimate process." Mot. at 13 (emphasis added); *see, e.g.*, Am. Compl. ¶ 679 (repeating the allegation that "illegal votes and unconstitutional procedures dilute the votes of the legally

5

registered voter"). Plaintiffs therefore fail to satisfy their Article III "burden" to "clearly allege facts demonstrating" a concrete and particularized injury. *See Spokeo*, 136 S. Ct. at 1547. Similarly, nothing in Plaintiffs' proposed amended complaint responds to the previously explained defect that none of their alleged injuries are "fairly traceable" to the conduct of CTCL. *See* MTD at 7. Plaintiffs' lack of standing is as clear on the face of the proposed amended complaint as it was on the face of the original. They appear to be indifferent to the strictures of Article III.

Indeed, none of Plaintiffs' arguments in support of their proposed amendments succeeds. First, Plaintiffs' unsupported assertion that their harm is not "generalized" because "[o]nly *registered* voters have had their right to vote . . . infringed," Mot. at 13 (emphasis added), still ignores clear precedent and bedrock standing principles. An injury that is "suffered equally by all voters . . . is not 'particularized' for standing purposes." *Bognet*, 980 F.3d at 356-57. Instead, alleged electoral irregularities that equally affect all registered "voters, nationwide," Mot. at 5, are a paradigmatic generalized grievance. *See Lance*, 549 U.S. at 442 (plaintiff-voters' allegations that "the law . . . has not been followed" were generalized grievances); *Bognet*, 980 F.3d at 358 (rejecting the proposition that "any alleged illegality affecting voting rights rises to the level of an injury in fact"). A claim of harm to all *registered* voters is indistinguishable for standing purposes from a grievance affecting all *actual* voters. *See Bognet*, 930 F.3d at 358 (explaining a particularized injury to voting rights "exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group").[3] No legal authority

---

[3] Plaintiffs' motion also purports to "satisf[y]" the requirements of "standing and jurisdiction" based in part on the high number of new plaintiffs they now propose to name in the complaint, all of whom claim the same stake in this lawsuit as "registered voters" that their predecessors did. Mot. at 5. But the nearly boundless number of indistinguishable plaintiffs who have been or could be named here is *at best* irrelevant to standing (and actually further evinces the generalized nature of plaintiffs' grievance). *Cf. Doe v. Bolton,* 410 U.S. 179, 189 (1973) (explaining that if any plaintiff has standing "nothing is gained or lost by the presence or absence of the [others]").

whatsoever supports Plaintiffs' view that they are entitled to sue anyone, anywhere for any supposed electoral irregularity.

Second, in support of their standing argument, Plaintiffs cite cases that are wholly inapposite: in fact, none of them even *discusses* Article III injury-in-fact or traceability. *See* Mot. at 7-8. For example, Plaintiffs cite *Smith v. Allwright*, which declared Texas' racially discriminatory all-white Democratic primary unconstitutional. 321 U.S. 649, 644 (1944). And *Frost & Frost Trucking Co. v. Railroad Commission of California*—a *Lochner* era case about highway access and freedom of contract—is even farther afield. 271 U.S. 583, 594 (1926) (holding that a California law, which would have made private carriers' access to California highways conditional upon their agreement to act as common carriers, violated due process). Plaintiffs also invoke cases about a "common right" to vote that are not only irrelevant, but that also reinforce the generalized nature of Plaintiffs' election-related grievances.[4] None of this law is responsive to the elementary Article III defects that CTCL and other Defendants have already explained in detail.

Third, Plaintiffs invoke federal statutes that they seem to think confer standing—namely, the Declaratory Judgment Act, RICO, and certain civil rights statutes. *See* Mot. at 8. None does. The Declaratory Judgment Act alone cannot confer standing; any plaintiff invoking it still "must establish an Article III case or controversy as a prerequisite for declaratory relief" because the statute "is remedial and does not itself confer jurisdiction on federal courts." *Rector v. City & County of Denver*, 348 F.3d 935, 946 (10th Cir. 2003). And with respect to the other statutes,

---

[4] *See* Mot. at 7 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788, 795 (1983) (holding an early filing deadline for only independent candidates imposed unequal burden on independent voters and was not justified by any "important regulatory interests of the state"); *Karcher v. Daggett*, 462 U.S. 725, 748 (1983) (Stevens, J., concurring) (writing separately for himself to state view that Equal Protection Clause proscribes political gerrymandering; *see also infra*, Part II.A.2 (explaining why these cases do not support Plaintiffs on the merits either).

Plaintiffs merely incant the concept of "private attorneys general" seeking "vindication of . . . civil rights" under federal statutes, without identifying any actual, cognizable injury that those statutes could empower them to vindicate. *See* Mot. at 8. None of these statutes expands the jurisdiction of federal courts beyond the limits defined in Article III, much less to the speculative frontiers that Plaintiffs imagine. *See Spokeo*, 136 S. Ct. at 1547 ("[N]o principle is more fundamental . . . than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.").

Finally, as to redressability, it remains "unclear what equitable relief (if any) Plaintiffs seek in this case." MTD at 8 n.6. Plaintiffs' sole contention on redressability consists of a citation to *Uzuegbunam v. Preczewski* for the proposition that "[a] request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right." No. 19-968, 2021 WL 850106, at *7 (U.S. Mar. 8, 2021). But *Uzuegbunam* separately reaffirmed that "(1) an injury in fact (2) that is fairly traceable to the challenged conduct" is also necessary to establish standing. *Id.* at *3. At a minimum, *Uzuegbunam* does not rescue Plaintiffs from their failure to establish the other standing elements. Nor does it explain what prospective injunctive relief (if any) Plaintiffs actually seek in their proposed amended complaint, or how any such prospective relief would redress any alleged harm. *See Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008) ("'[A] plaintiff must demonstrate standing . . . for each form of relief' that is sought.") (citation omitted).

The proposed amended complaint obviously fails to cure Plaintiff's lack of standing.

## II.    Plaintiffs still fail to state a claim.

### A.    Plaintiffs still fail to state a § 1983 claim.

The proposed amended complaint, like the original, asserts various constitutional claims against CTCL, principally under 42 U.S.C. § 1983.[5] And, like the original, it fails to allege (1) "the violation of a [constitutional] right" or (2) that those violations were attributable to a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). CTCL therefore incorporates herein all of its prior arguments regarding Plaintiffs' failure to state a claim. *See* MTD at 8-12. Again, we first address the state actor requirement and then turn to the merits of their legal allegations.

### 1.    Plaintiffs still fail to allege state action.

As explained in CTCL's motion to dismiss, because CTCL is a private non-profit organization, not a government entity, Plaintiffs' § 1983 claims must be dismissed unless they can satisfy one of four recognized bases for treating a private actor's conduct as state action. *See* MTD at 8 (citing *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013)). None of the proposed amended allegations satisfy any of the four tests for state action.

In their Motion, Plaintiffs' primary contentions regarding state action concern Dominion and its role in tabulating votes, not anything relevant to CTCL. *See* Mot. at 10. The only assertion relevant to CTCL is that CTCL "contracted directly with counties and municipalities across the country, to participate in the 2020 Presidential election." *Id.*

That contract-based state action argument fails for two reasons. The first is that the actual allegations show only that CTCL provided COVID-19 response grants to municipalities across the

---

[5] Plaintiffs do not purport to address the defects of their claims under 42 U.S.C. §§ 1985, 1986, and 1988. *See* MTD at 13. Nor do they elaborate upon their prior discussion of the Help America Vote Act and National Voter Registration Act, or attempt to rebut CTCL's explanation that allegations regarding those statutes cannot support a claim against it. *See id.* at 13-14. Any claims founded on any of these other statutes remain meritless.

9

country—not that CTCL itself "participated" in the election. Am. Compl. ¶¶ 24, 394, 468, 518

572, 595, 605. The second is that, as Plaintiffs themselves admit, "[o]bviously, contracting alone

does not automatically transform the conduct of an entity into state-action." Mot. at 11. Yet that is

all Plaintiffs allege CTCL did. Their position collapses upon their own concessions.

The cases that Plaintiffs cite in support of their state-action arguments are manifestly

inapplicable to the facts here. *Terry v. Adams* is about a whites-only political organization that

essentially chose the Democratic Party's candidates for public office in a Texas county, with the

explicit purpose of preventing Black citizens from voting. 345 U.S. 461, 464 (1953). And in *Marsh

v. Alabama*, a corporation owned an entire town: the company paid the sheriff and held title to all

the property, exercising a complete dominion over multiple state functions that bears no

resemblance at all to CTCL's grant program. 326 U.S. 501, 503 (1946). Another case that Plaintiffs

cite, *Flagg Bros, Inc. v. Brooks*, explains that the common feature of *Terry* and *Marsh* is

"exclusivity," 436 U.S. 149, 159 (1978)—but Plaintiffs nowhere identify a public function that

CTCL has exclusively assumed. *See* Mot. at 10. These arguments are simply frivolous.

Plaintiffs fare no better in citing *Gallagher v. Neil Young Freedom Concert*, Mot. at 11, to

support their alternative contention that their state-action allegations satisfy the "joint action" test.

49 F.3d 1442, 1455 (10th Cir. 1995) (holding companies did not engage in "joint activity" with

state university based on "arguably . . . common goal of producing a profitable music concert" nor

based on university's silent acquiescence to private parties' security policies). The joint action test

requires Plaintiffs to show that CTCL and a public actor "share[d] a specific goal to violate the

plaintiff's constitutional rights by engaging in a particular course of action." *Id.* Plaintiffs' "mere

conclusory allegations" of conspiracy between the public and private Defendants here fall well

short of satisfying that stringent test. *See* MTD at 9; *see also Scott v. Hern*, 216 F.3d 897, 907

(10th Cir. 2000) ("When a plaintiff in a § 1983 action attempts to assert the necessary 'state action'
by implicating state officials . . . in a conspiracy with private defendants, . . . the pleadings must
specifically present facts tending to show agreement and concerted action.").

Because CTCL was not a state actor when it created and administered its grant program,
all of the § 1983 claims against CTCL in the proposed amended complaint are futile.

### 2.       Plaintiffs still fail to allege a constitutional violation.

Alternatively, Plaintiffs' § 1983 claims against CTCL go nowhere because they still fail to
allege any cognizable violation of the Electors Clause (Count I), the Equal Protection Clause
(Count II), or the Due Process Clause (Count III). Here, too, it is not a close question.

The proposed amended complaint fails to rectify any of the insurmountable problems that
CTCL has already identified with these claims. Count I of the proposed amended complaint
remains meritless because the Electors Clause still does not provide federal review of every alleged
deviation from state election law,[6] Plaintiffs still have not plausibly alleged that CTCL violated
any particular state law,[7] the Electors Clause still does not apply to the conduct of private entities,
and in all events, any federal cause of action would still belong to the relevant state and its
legislators rather than individual registered voters. *See* MTD at 10-11. For the Equal Protection
claim (Count II), there is still no allegation of invidious discriminatory intent, still no allegation
that Plaintiffs' personal rights to vote or any other fundamental rights were burdened, and still no
allegation that CTCL or any other Defendant adopted any classification that resulted in arbitrary

---

[6] Indeed, Elections and Electors Clause claims brought under Section 1983 based on violations of
state election law are merely "state law claims disguised as federal claims," and caselaw does not
"support[] such an expansive approach" to "federal review." *King v. Whitmer*, No. 20 Civ. 13134,
2020 WL 7134198, at *12 (E.D. Mich. Dec. 7, 2020).

[7] The proposed amended complaint includes as-applied constitutional challenges to state laws
asserted against the Attorneys General of Michigan, Georgia, Pennsylvania, and Wisconsin, *see*
Am. Compl. ¶¶ 810-76, but not CTCL.

or irrational differential treatment of plaintiffs. *See id.* Plaintiffs' Due Process claim (Count III) still fails because Plaintiffs do not identify any procedural due process they were owed or denied and have not alleged any burden that gives rise to a voting system so fundamentally unfair as to violate substantive due process. *See id.* at 12.

Plaintiffs' motion for leave to amend does not mention the Electors Clause claim at all. There are some scattershot references to "equal protection" and "due process," but those references are untethered to any recognizable legal theory and to the extent they invoke case law it is entirely inapposite. *Anderson v. Celebrezze* did not hold, as Plaintiffs suggest, that registered voters in one state would have an Equal Protection or Due Process Clause claim based on how votes were counted in a different state. *See* Mot. at 7 (citing 460 U.S. at 795); *see also id.* at 12 ("Even for voters in State's that do not utilize Dominion, their right to vote for President and Vice President was burdened by this Colorado corporation. This is also true concerning the actions of the other Defendants." (citing nothing)). *Anderson* held that a state's early filing deadline for independent candidates to appear on a general election ballot impermissibly burdened a discrete group of that state's voters, and that the resulting harm was disproportionate to "the state's important regulatory interests" in orderly election administration. 460 U.S. at 788; *see id.* at 792-94. In stark contrast, Plaintiffs have *still* failed to identify any group of voters who were burdened in any way by CTCL's grants—much less burdened so severely as to outweigh the government's interest in safely administering an election during an unprecedented pandemic.

Plaintiffs' citation to *Karcher v. Daggett* is even more baffling. *See* Mot. at 7 (citing 462 U.S. 725, 748 (1983)). That case concerned legislative malapportionment of congressional districts, *see* 462 U.S. at 727, and Plaintiffs quote only a solo concurrence by Justice Stevens explaining his views at the time regarding partisan gerrymandering of congressional districts, *see*

12

Mot. at 7 (citing 462 U.S. at 744 (Stevens, J., concurring)). Neither the case nor the concurrence helps Plaintiffs to make even the "threshold . . . showing that the government discriminated among groups" (much less that CTCL did), *see Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001), and it is not even clear why Plaintiffs think otherwise. *See* MTD at 12.

Plaintiffs' § 1983 claims remain indisputably, undeniably meritless.

### B.     Plaintiffs fail to state a RICO claim.

As noted, the Amended Complaint asserts two new RICO claims against CTCL, along with Facebook, Zuckerberg, and Chan: violations of RICO's civil provisions, 18 U.S.C. § 1962(c), and RICO conspiracy, *id.* § 1962(d). *See* Am. Compl. ¶¶ 747-83 (Counts V and VI). These claims are meritless for at least two independent reasons: Plaintiffs lack statutory standing under RICO and, in any event, otherwise fail to plausibly allege the required elements of a RICO claim.

First, Plaintiffs plainly lack statutory standing to bring either of their RICO claims because they do not allege (1) an injury to their "business or property" that was (2) proximately caused by CTCL. *See* 18 U.S.C. § 1964(c); *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). No alleged facts plausibly identify any injury that any plaintiff suffered to any "business or property." *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885-86 (10th Cir. 2017).[8] And Plaintiffs do not allege that any act by CTCL "led directly" to *any* injury they suffered (to business, property, or otherwise), as required to establish proximate causation under RICO.  *Id.* at 890; *see Bixler*, 596 F.3d at 756; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (courts evaluating RICO causation ask "whether the alleged violation led directly to the plaintiff's injuries").

---

[8] Plaintiffs' allegation that they "have been and are continuing to be injured . . . including injuries to their business or property," Am. Compl. ¶ 782, is conclusory and therefore insufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Second, and in addition to the absence of statutory standing, Plaintiffs completely fail to allege the four elements of a RICO claim: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bixler*, 596 F.3d at 761. To begin with, "there is no RICO claim without there first being racketeering activity." *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1248 (D. Colo. 2014). "The term 'racketeering activity' is defined to include a host of so-called predicate acts" enumerated in 18 U.S.C. § 1961, all of which are either state or federal crimes. *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). Plaintiffs do not plausibly allege that CTCL or the other Defendants have committed any criminal act, much less a "pattern" of such acts. The proposed amended complaint tosses out mentions of "mail fraud" and "wire fraud," Am. Compl. ¶ 253(v)-(w); tampering with a witness, victim, or informant in an official proceeding under 18 U.S.C. § 1512(b), *id.* ¶¶ 757, 758; and conspiracy to interfere with federally protected rights under 18 U.S.C. § 241, *id.*[9] But the proposed amended complaint contains no factual support whatsoever for those conclusory (and offensive) insinuations of criminal activity and certainly fails to allege the elements of any of those potential predicates. That manifest failure to satisfy the racketeering activity element is a sufficient basis to dismiss the entire claim. *See Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006).[10] Further, Plaintiffs' utter failure to plausibly allege any kind of racketeering activity means they have also failed to allege a "pattern" of such activity, or that CTCL and the other Defendants "conduct[ed]" an "enterprise" *through* any such pattern of racketeering activity. *See CGC Holding Co., LLC v. Hutchens*, 974

---

[9] This last statute is not even among those identified as potential RICO predicates in § 1961.

[10] Plaintiffs make absolutely no effort to satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard with respect to their stray references to mail and wire fraud. Their invocation of those predicate acts is clearly meritless. *See Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362-63 (10th Cir. 1989) (affirming dismissal with prejudice of civil RICO complaint for failure to allege mail and wire fraud with particularity).

14

F.3d 1201, 1211 (10th Cir. 2020); *Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007). This failure to plead any elements of a civil RICO claim under § 1964(c) dooms Plaintiffs' additional RICO conspiracy claim under § 1964(d) as well. *See Tal*, 453 F.3d at 1270.[11]

*       *       *       *       *

Plaintiffs' proposed amended complaint comes nowhere close to satisfying applicable legal standards. Their arguments to the contrary range from meritless to frivolous, and from bizarre to downright offensive. No matter how many hundreds of "registered voters" they induce to join their case, Plaintiffs lack standing under elementary principles of constitutional law. That was true of the original complaint and it remains true of this one—in ways that CTCL and other Defendants have thoroughly explained, and that Plaintiffs have ostentatiously failed to remedy. Similarly, despite including many outrageous and false accusations in their filings, Plaintiffs have not stated a claim. Once again, that was true of the original complaint and it remains true of this one—in ways that Plaintiffs had ample time and opportunity to consider. No matter how severely Plaintiffs ignore, distort, or miscite precedent—and no matter what new calumnies they advance—the bottom line is that their case has no business proceeding before this Court (or any other).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for leave to file an amended complaint as futile. In the alternative, if the Court dockets the proposed amended complaint, the Court should immediately dismiss it *sua sponte*.

---

[11] The conspiracy claim also fails for the additional reason that Plaintiffs have not plausibly alleged the elements of a conspiracy, such as a meeting of the minds. *See Kriston v. Peroulis*, No. 09 Civ. 909, 2010 WL 1268087, at *8 n.5 (D. Colo. Mar. 29, 2010).

Respectfully submitted,

_____

Joshua Matz
Michael Skocpol
Marcella Coburn
Louis W. Fisher
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: 212.763.0883
Facsimile: 212.564.0883
Email: jmatz@kaplanhecker.com
       mskocpol@kaplanhecker.com
       mcoburn@kaplanhecker.com
       lfisher@kaplanhecker.com

*Attorneys for Defendant Center for Tech and Civic Life*

16

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 29, 2021, a true and correct copy of the foregoing Brief in Opposition to Plaintiffs' Motion for Leave to Amend the Complaint and, in the Alternative, Request to Dismiss the Amended Complaint was electronically filed with the Court using the CM/ECF system which will send notifications of such filing to all counsel of record.

Joshua Matz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-3747-NRN

KEVIN O'ROURKE, et al.,

Plaintiffs, on their own behalf and of a class of
similarly situated persons,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

---

## I.      INTRODUCTION

While Plaintiffs move to add 152 Plaintiffs, four Defendants, six causes of action, and 473 paragraphs to their complaint, none of the amendments cure the fatal defects Facebook identified in their initial pleading.  In fact, Plaintiffs' proposed amended complaint makes the numerous insurmountable problems with their suit even more readily apparent.

The proposed amendment does not—and cannot—fix the many deficiencies in this lawsuit. Plaintiffs still provide no basis for this Court to exercise personal jurisdiction over Facebook in Colorado.  Nor do Plaintiffs' conclusory allegations show a concrete, particularized injury or meet any other part of their burden to establish Article III standing.  Plaintiffs' claims remain barred by both Section 230 of the Communications Decency Act (CDA) and the First Amendment, and their constitutional claims are still not cognizable because Facebook is not a state actor.

Plaintiffs further state no viable claims against Facebook for several other reasons.  They rely on statutes with no independent cause of action or fail to state even the basic elements of their claims.  Their new racketeering claims likewise contain a host of incurable defects, including the failure to allege any plausible or cognizable racketeering acts.

Plaintiffs had the opportunity to review multiple Defendants' motions to dismiss and yet failed to address the deficiencies in their pleading—indeed, they double-down on many of their initial missteps.[1]  Leave to amend should be denied and the case dismissed with prejudice.

---

[1]  Plaintiffs' doubling-down stands in sharp contrast to the recent retreat from such assertions by Sidney Powell, the attorney who filed many cases with allegations Plaintiffs now parrot here; Ms. Powell has now acknowledged in a formal pleading that no reasonable person would accept the allegations as fact.  *See US Dominion Inc. v. Powell*, No. 21-cv-0040-CJN, Dkt. 22 at 27-28 (D.D.C Mar. 23, 2021).

1

## II.    PROCEDURAL HISTORY

Plaintiffs filed their original compliant on December 22, 2020.  Dkt. 1.  Facebook was not

served until January 5, 2021.  *See* Dkt. 17, ¶ 1.  On January 25, 2021, the parties stipulated to a

three-week extension of Facebook's deadline to move to dismiss or respond to the complaint.  *Id.*

Facebook filed its motion to dismiss on February 16 (Dkt. 23), and several other Defendants filed

motions to dismiss cataloguing the litany of incurable issues with Plaintiffs' action over the next

few weeks.  Dkt. 41 (CTCL Mot. to Dismiss); Dkt. 46 (Whitmer Mot. to Dismiss); Dkt. 47 (Kemp

Mot. to Dismiss); Dkt. 48 (Wolf Mot. to Dismiss).

Plaintiffs submitted their overlong opposition to Facebook's motion to dismiss three weeks

later (Dkt. 40) and did not submit their motion for leave to amend until March 15.  Dkt. 48.

Plaintiffs now seek to add over four hundred new paragraphs, many additional claims, and four

additional Defendants to this suit.  In particular, Plaintiffs seek to add two claims against Facebook,

the Center for Technology and Civil Life (CTCL), Mark Zuckerberg, and Priscilla Chan under the

Racketeering Influenced and Corrupt Organizations Act (RICO).  Dkt. 48, Prop. Compl. at 95–

101.  Plaintiffs also seek to add four state law election-related claims against state officials in

Michigan, Georgia, Pennsylvania, and Wisconsin.  *Id.* at 101–113.

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure grant amendment as of right where the amendment

is made within 21 days after service of a motion under Rule 12(b).  Fed. R. Civ. P. 15(a)(1)(B).

After this period, amendment may only be granted with the court's leave "when justice so

requires."  *Id.* 15(a)(2).  A court may deny leave to amend when amendment would be futile.

*Forman v. Davis*, 371 U.S. 178, 182 (1962).

2

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007); *Midcities Metro. Dist. No. 1 v. U.S. Bank Nat'l. Ass'n.*, 44 F. Supp. 3d 1062, 1068 (D. Colo. 2014) (denying leave to amend where Plaintiff had no standing). The factual allegations in a proposed complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

## IV.    ARGUMENT

Plaintiffs' proposed complaint cannot survive a motion to dismiss. Despite adding purported Colorado residents as Plaintiffs, their conclusory allegations still do not include any specific facts to support the exercise of personal jurisdiction over Facebook in Colorado on these election-related claims. Plaintiffs also continue to base their Article III standing allegations on a generalized grievance common to all registered voters and still never trace their alleged concerns with the 2020 election's administration or outcome to any particular Facebook conduct.

Their claims also continue to suffer from the same fatal defects that Facebook already identified in its prior motion to dismiss. Facebook is still not a state actor, and Plaintiffs' claims seeking to hold Facebook liable for its protected content-moderation decisions on its private social media platform still fail to plead the basic legal predicates of a cognizable claim under any statute. In addition, their ever-expanding complaint is not the sort of "short and plain statement" required by the Federal Rules, and wrongly attempts to shift their burden onto this Court and Defendants to piece together their claims for them. Leave to amend should be denied.

### A.    There Is Still No Basis For Jurisdiction Over Facebook

Plaintiffs' first complaint failed to establish personal jurisdiction over Facebook in

Colorado on their claims.  *See* Dkt. 23; Dkt. 56.  Plaintiffs now assert that personal jurisdiction exists because:  (i) "Facebook and Dominion are doing business in Colorado, and were used by all the [foreign Defendant] States"; (ii) "Colorado is centrally located and the Defendants have minimum contacts with Colorado"; or (iii) "[e]very Defendant used Facebook, the US Mail, and electronic communications over the internet that effected interstate commerce."  Dkt. 48 at 5.

None of these allegations establish personal jurisdiction over Facebook in Colorado on Plaintiffs' claims.  Plaintiffs cannot assert nationwide jurisdiction over Facebook on threadbare and implausible allegations about the purported "damage [to] registered voters of every state" from the 2020 election.  Dkt. 48 at 5.  Instead, Plaintiffs are required to show that the Colorado "activities of the corporate defendant ha[ve] not only been continuous and systematic, but also *gave rise to the liabilities* sued on."  *Daimler AG v. Bauman*, 571 U.S. 117, 126–28 (2014) (emphasis added).  The mere facts that Colorado is centrally located within the United States, that Michigan, Pennsylvania, Georgia, and Wisconsin did business with Dominion, and that "[e]very [foreign state] Defendant used Facebook," (Dkt. 48 at 5), in interstate commerce have nothing to do with whether any specific Facebook conduct in Colorado injured Plaintiffs in a manner that gives rise to their election-related claims.

Even if a Colorado resident's mere use of Facebook could possibly constitute a "minimum contact" with the state *by* Facebook,[2] Plaintiffs still do not show that the out of state conduct

---

[2] Plaintiffs' allegations regarding Facebook's minimum contacts with Colorado arise out of an online connection between the state and Facebook, which the Supreme Court never has held is sufficient to establish a "minimum contact" with the state giving rise to specific personal jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. ___ (Mar. 25, 2021) (slip op.) at 12 n.4 (explaining Court was not "consider[ing] internet transactions, which may raise doctrinal questions of their own"); *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 290 n.9 (2014)

dealing with election administration is related to any of these purported "contacts" between Facebook and Colorado. *Bristol-Myers Squibb Co. v. Sup. Ct.*, 137 S.Ct. 1773, 1381 (2017) ("What is needed – and what is missing here – is a connection between the forum and the specific claims at issue"); *see also Ford Motor Co.*, 592 U.S. ___ (slip op.) at 18 (because the "resident-plaintiffs alleged they suffered in-state injury because of defective products Ford extensively promoted, sold, and serviced in Montana and Minnesota," the "connection between Plaintiffs' claims and Ford's activities in those states . . . is close enough to support specific jurisdiction"). Nowhere in the proposed complaint do any of the Colorado-based Plaintiffs allege that their right to vote was actually barred by Facebook's conduct in Colorado, that Facebook took any action that resulted in their particular vote not being counted in Colorado, or that any of Facebook's purported conduct in Colorado violated any specific law upon which they sue. Personal jurisdiction does not lie over Facebook in Colorado on Plaintiffs' claims.

### B.     Plaintiffs Still Do Not Satisfy Article III's Standing Requirements

Plaintiffs' proposed complaint continues to parrot their deficient standing arguments and fails for the same reasons Facebook already identified. *See* Dkt. 23; Dkt. 56. Not only have Plaintiffs failed to shore up the defects in their original pleading, Plaintiffs double-down on their initial deficiencies, and never allege a concrete and personal injury fairly traceable to Facebook's conduct that could be redressed by the sweeping relief they seek. Plaintiffs seek to add more than a hundred registered voters in various states with no connection to their claims other than being registered voters, all purportedly seeking "to vindicate the rights as registered voters" of a national

---

("[T]his case does not present the very different questions of whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State.")).

class, including sub-classes of "Republican, Democrats, Third-Parties, Independents, and Disgruntled Voters." Dkt. 48 at 4; Dkt. 48-1 ¶¶ 52–212. Indeed, Plaintiffs candidly assert they seek standing simply as "the people." Dkt. 48-1 ¶ 232; *see also id.* ¶ 677 ("This hurts every voter in the country irrespective of voter affiliation"); *id.* ¶ 693 ("all of which damaged the Plaintiffs, but more broadly, every registered voter in America, all of whom have an interest in free and fair elections"). Their standing allegations press the same generalized grievance that court after court has already held inadequate. Dkt. 23 at 5-6.

Plaintiffs nevertheless continue to argue that "nominal damages create standing and jurisdiction of this Court in vindication of rights." Dkt. 48 at 6. Even assuming *arguendo* that Plaintiffs can seek $160 billion in nominal damages (they cannot), this argument cannot satisfy their standing burden to show a concrete, particularized injury fairly traced to Facebook's alleged conduct. Dkts. 23 at 4-8; Dkt. 56 at 4-7. Nor does it satisfy their burden to show that the other relief they seek would redress their generalized grievance about the election's administration or results. *Id.* There is no Article III injury for voters writ large related to the 2020 election based on allegations about the improper counting of votes, *Wood v. Raffensberger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020); state and local laws expanding voting access, *Feehan v. Wisc. Elecs. Comm.*, 2020 WL 7250219, at *8 (E.D. Wisc. Dec. 9, 2020); or vote dilution due to purported issues with election administration, *Bowyer v. Ducey*, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020).[3]

Plaintiffs also have still not addressed their independent obligation to show their

---

[3] *See also* Dkt 47 at 11 (Kemp Mot. to Dismiss) ("The Supreme Court has stated that, in vote dilution and gerrymandering cases, the injury is district specific and not state-wide in nature, and thus, a voter only has standing to bring claims concerning their own district.") (citing *Gill v. Whitford*, 138 S.Ct. 1916, 1930); Dkt. 49 at 9 (Wolf Mot. to Dismiss) (same and collecting cases).

6

generalized grievance with the 2020 election's outcome or administration is fairly traceable to any of Facebook's alleged conduct. As in the original complaint, Plaintiffs' allegations again relate exclusively to Facebook's moderation of content on its private platform and conclusory assertions that Facebook is the alter ego of Mark Zuckerberg. For the same reasons Facebook has already laid out, these allegations do not meet Article III's stringent standing requirements on causation. Dkt. 23 at 4-6; Dkt. 56 at 4-7. And Plaintiffs still fail entirely to explain how their sweeping requests for declaratory and injunctive relief—including a declaration that the certified result of the election in four states was unlawful and should be given no effect—could redress their alleged grievances now that the election is over and a new President is in office.

### C. Section 230 and the First Amendment Bar Plaintiffs' Claims

Section 230 and the First Amendment continue to bar Plaintiffs' claims against Facebook. As Facebook previously argued, Plaintiffs' claims seek to hold Facebook liable for making decisions about what content to allow on its private platform. Plaintiffs' conclusory allegations of purported "censorship" make clear that all of their claims attack the core of Facebook's discretion over whether to allow certain *content posted by others*, including Plaintiffs' new racketeering claims that implausibly attempt to transform Facebook's ordinary exercise of discretion over its platform into an unlawful enterprise. Dkt. 23 at 12-14; Dkt. 56 at 12-15. Both Section 230 and the First Amendment prevent these claims. *See* Dkts. 23 at 8-9, 12-14; Dkt. 56 at 11.

### D. Plaintiffs Fail to Plead Any Cognizable Claims

Plaintiffs continue to allege an eclectic assortment of claims against Facebook and the other Defendants, ranging from purported civil rights violations to civil racketeering claims. But none of these claims could survive a motion to dismiss for several additional reasons.

1.      **Plaintiffs Cannot Plead a Constitutional Challenge to Section 230**

Plaintiffs seek to allege an identical facial and as-applied constitutional challenge to Section 230, which merely adds more paragraphs repeating their earlier allegations that Facebook purportedly removed certain posts from its platform.  In particular, Plaintiffs still make conclusory allegations at greater length that Facebook refused to publish certain conservative viewpoints, information that Facebook "believed would delegitimize the US election or question the veracity of mail-in voting," and negative information about President Biden.  Dkt 48-1 ¶¶ 335-42.

These amendments do nothing to shore up the issues with Plaintiffs' first attempt to plead this claim.  The new allegations parrot their theory that Section 230's bar of their claims against Facebook somehow violates Plaintiffs' First Amendment rights—even though Facebook is not a state actor and courts have consistently held as such.  *See* Dkt. 56 at 8 n.4 (collecting cases). Plaintiffs also still have not explained how application of Section 230's bar to their claims against Facebook could violate any First Amendment right they hold in light of Facebook's own First Amendment rights to make decisions about what to publish on its website.  Dkt. 56 at 13-14. Plaintiffs have not pled any cognizable constitutional theory to challenge Section 230.

2.      **Facebook Is Not a State Actor Subject to the Constitutional Claims**

Plaintiffs now allege that Facebook is a state actor "under every test" ever applied by the Supreme Court to any entity.  Dkt. 48 at 9.  But Plaintiffs never actually plead any allegations that come close to satisfying any of the state action tests.  Because Plaintiffs do not (and cannot) make any new factual allegations that Facebook performed functions "traditionally exclusively performed" by the state equivalent to a company town, so "intertwined" itself with state functions so as to be symbiotic with the state, formed a "close nexus" with the state in the administration of

8

the election, or conducted any other "joint activity" with the state, Plaintiffs have still failed to

state their constitutional claims.  *See* Dkt. 23; Dkt. 56.

### 3.      Plaintiffs Fail to Plead Civil RICO Claims

Plaintiffs do not plead cognizable RICO claims against Facebook.  With respect to

Plaintiffs' enterprise racketeering claim (Count V), "[t]o successfully state a [civil] RICO claim, a

plaintiff must allege four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity," causing an actual injury to plaintiff's business or property.  *Robbins v.*

*Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002).  "Under Rule 9(b), plaintiffs must sufficiently allege

each element of a RICO violation and [at least two] predicate acts of racketeering with

particularity."  *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989 (10th Cir. 1992).

Where Plaintiffs plead that the predicate racketeering acts are based in fraud, those underlying

offenses must also be alleged with particularity under Rule 9(b).  *Lynn v. Brown*, 803 F. App'x

156, 161 (10th Cir. 2020); *see also Ad-X Intern., Inc. v. Kolbjornsen*, 97 F. App'x 263, 265 (10th

Cir. 2004) ("Predicate acts of fraud for a RICO claim must satisfy the heightened pleading standard

of Fed. R. Civ. P. 9.").  Plaintiffs do not meet their burden on any element of their claims.  Indeed,

Plaintiffs do not even bother to recite the basic elements for any unlawful conduct.

### a)      Plaintiffs Do Not Allege Conduct of an Enterprise

Plaintiffs have not adequately alleged that Facebook is part of an "enterprise."  To plead

an enterprise, a plaintiff must allege: "(1) that there is an ongoing organization with a decision-

making framework or mechanism for controlling the group, (2) that various associates function as

a continuing unit, and (3) that the enterprise exists separate and apart from the pattern of

racketeering activity."  *Kearney v. Dimanna*, 195 F.App'x 717, 720 (10th Cir. 2006).  A bare

recitation of these elements without supporting factual averments is insufficient.

Plaintiffs assert that Facebook, Mark Zuckerberg, Priscilla Chan, and CTCL formed an enterprise with the purpose of "affect[ing] the outcome of Presidential elections, and to influence, conceal, intimidate, sue threaten, censor and fact-check those who attempt to expose its unlawful and unconstitutional activities." Dkt. 48-1 ¶ 756. They also allege that the "enterprise utilizes and assembles additional, loosely affiliated organizations and persons to cause unrest and civil discord, racial divisions, and other methods of intimidating the Nationwide Class." *Id.* ¶ 757. But the only alleged activity between Facebook and the other three members of the purported enterprise is vaguely that: (i) Facebook is "described as a partner and funder by CTCL," *id.* ¶ 32; (ii) Mark Zuckerberg is Facebook's CEO, *id.* ¶¶ 329, 347; and (iii) Priscilla Chan is his wife, *id.* ¶ 350.

These general and conclusory allegations are insufficient to plead any cognizable RICO enterprise. *Kearney*, 195 F. App'x at 720. Plaintiffs do not plead facts showing how this alleged enterprise is controlled or how decisions are made. *See* Dkt. 48-1 ¶ 763 (alleging only generally that "[e]ach participant in the enterprise had a systematic linkage with each other to coordinate their activities through corporate or non-profit organization ties, political associates, civic societies, contractual relationships, and financial ties"); *Reich v. Genzyme Corp.*, 2015 WL 13236347, at *8 (D. Colo. Aug. 14, 2015) (holding plaintiffs "have not specifically identified the requisite enterprise" where there was "no particularity in the pleading which identifies the 'organization' by name or with any specificity regarding its existence"). And many of Plaintiffs' vague allegations seem to refer to other unclear and unnamed actors, rather than the named Defendants in this count. *See, e.g.*, 48-1 ¶ 759 ("Defendants continue to participate *as public officials* in charge of the evidence of their misdeeds, use political influence and intimidation to

10

conceal and block access to public records…").  As a result, the proposed complaint "does not connect the defendants' different conduct to the alleged enterprise or provide a plausible basis for finding that the defendants were and are functioning as a continuing unit." *Lynn*, 803 F. App'x at 161.  Nor does it explain how the purported "enterprise exists separate and apart from the [alleged] pattern of racketeering activity." *Id.*; *see also Kearney*, 195 F. App'x at 720 (no enterprise where there was "no indication that the 'association' had any existence or purpose outside of the alleged malicious prosecution and intimidation of [Plaintiff]"); *Johnson v. Myelin Productions*, 2013 WL 4551888, at *3 (D. Colo. Aug. 28, 2013) ("Absent the alleged copyright infringement there would not be an association-in fact among Defendants").

### b) Plaintiffs Do Not Allege Any Racketeering Acts

Plaintiffs fail to allege Facebook engaged in any pattern of racketeering activity.  In their proposed complaint, Plaintiffs allege that Facebook committed several vague acts, none of which are plausible, criminal, or even cognizable under RICO.  To establish a "pattern of racketeering activity," Plaintiffs must point to the "commission of at least two predicate acts." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003); *Sullivan v. University of Kansas Hospital Authority*, 2021 WL 303142, at *3 (10th Cir. Jan. 29, 2021) (affirming dismissal of RICO claim where plaintiff "offered only conclusory allegations of criminal conduct, untethered to any specific factual averments").  These acts may include state law offenses or federal crimes enumerated in 18 U.S.C. § 1961(1).

Plaintiffs first allege in conclusory fashion that Facebook "tamper[ed] with or intimidat[ed] class participants in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 241." Dkt 48-1 ¶ 758.  But 18 U.S.C. § 241 is not even one of the offenses enumerated by Congress as a predicate act for civil

11

liability under RICO.  *See* 18 U.S.C. § 1961(1).  Even if it were, it still would not be a viable predicate act as Plaintiffs point to no official, federal proceeding involving any witnesses or any actual tampering or intimidation.  *Deck*, 349 F.3d at 1257 ("witness tampering is actionable under 18 U.S.C. § 1512 only if it takes place 'in an official proceeding,'" "defined in § 1515(a)(1) to include only federal proceedings").

Plaintiffs next summarily allege that Facebook committed mail and wire fraud to manipulate the 2020 election.  Dkt. 48-1 ¶ 768.  Yet Plaintiffs are "required to do more than just list these alleged predicate acts to state a RICO claim – [they] need[] to plead the elements of each predicate act, and to do so with particularity with respect to those sounding in fraud."  *Lynn*, 803 F. App'x at 161.  This requires Plaintiffs comply with Federal Rule 9(b) for both the mail and wire fraud allegations, including identifying "the time, place and contents of the false representation[s], the identity of the party making the false statements, and the consequences thereof."  *George v. Urban Settlement Servs.*, 833 F. 1242, 1254 (10th Cir. 2016).  Plaintiffs do none of this.  Rather, Plaintiffs list a number of vague lawful actions they allege all Defendants engaged in such as sending "emails and letters between Defendants."  Dkt. 48–1 ¶ 765(f).  Plaintiffs' proposed complaint, however, fails to allege any specific fraudulent statements *Facebook* made, who it made them to, when it made them, and "the content and manner in which the statements misled the plaintiffs."  *See, e.g., Transatlantic, LLC v. Humana, Inc.*, 2016 WL 7319711, at *3 (M.D. Fla. Mar. 4, 2016), *aff'd*, 666 F. App'x. 788 (11th Cir. 2016) (dismissing civil RICO claim despite Plaintiff making "some specific allegations regarding the amount of certain transfers the Plaintiffs claimed constituted racketeering activity").  Plaintiffs' proposed complaint does not provide the factual specificity required to sustain a civil RICO claim at this stage. *See, e.g., Pineda v. Saxon*

12

*Mortg. Servs., Inc.*, 2008 WL 5187813, at *4 (C.D. Cal. Dec. 10, 2008) (collecting cases holding that "[c]ourts should … strive to flush out frivolous RICO allegations at an early stage of the litigation" and such claims must "attribute[e] specific conduct to individual defendants").

### c) Plaintiffs Do Not Plead Any Cognizable RICO Injury

A plaintiff must show that "he was injured in his business or property by reason of the defendant's violation of § 1962" to bring a civil RICO claim. *Deck*, 349 F.3d at 1257. This element "requires that a plaintiff prove but-for and proximate causation," *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1213 (10th Cir. 2020), including that the "alleged violation led directly to the plaintiff's [purported] injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

Here, Plaintiffs do not allege any injury to business or property. Instead, Plaintiffs plead a purported generic "loss of rights," Dkt. 48-1 ¶ 774. But it is well-established that is not an injury cognizable under RICO. *See Deck*, 349 F.3d at 1257; *McCormick v. City of Lawrence*, 325 F. Supp. 2d 1191, 1209 (D. Kan. 2004) ("RICO only provides damages for injury to business or property. Although [the] [p]laintiffs claim that their First Amendment rights are 'property' within the meaning of RICO, the court disagrees.") (citation omitted)), *aff'd*, 130 F. App'x. 987 (10th Cir. 2005); *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 613 (S.D.N.Y. 2015) (collecting cases). In any event, Plaintiffs never actually plead any cognizable injury to their voting rights. They never allege they were actually denied the right to vote or explain how their votes went uncounted as a "direct" result of any purported action of Facebook or other Defendants.

### d) Plaintiffs Do Not Plausibly State a Conspiracy to Violate RICO Under § 1962(d)

Because Plaintiffs' enterprise racketeering claim (Count V) fails for the reasons described above, so too does their conspiracy claim under § 1962(d) (Count VI). To "prevail under 18 U.S.C.

13

§ 1962(d) . . . [Plaintiffs must] show that the [Defendants] conspired to violate RICO in some
way." *CGC Holding Co.*, 974 F.3d at 1211; *see also Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir.
2006). Accordingly, because Plaintiffs have "no viable claim under § 1962(a), (b), or (c), then
[their] subsection (d) conspiracy fails as a matter of law." *Id.*

### 4.    Plaintiffs' Remaining Claims Are Not Cognizable

Plaintiffs purport to bring causes of action under 42 U.S.C. §§ 1985, 1986, and 1988, which
fail for the reasons stated above. But, as Defendants previously explained, these claims fail for
several other reasons, including that Section 1988 is not an independent cause of action and
Plaintiffs have not plead that Facebook is motivated by "racial, or perhaps otherwise class-based,
invidiously discriminatory animus." Dkt. 41 at 13 (collecting cases). The proposed amendment
does not—because it cannot—fix the deficiencies in Plaintiffs' pleadings as to these claims.[4]

### E.    Plaintiffs' Proposed Complaint Fails to Comply With the Federal Rules

Plaintiffs' proposed complaint spends almost 900 paragraphs across 115 pages making
disjointed, conclusory, and repetitive allegations, interspersed with citations to cases, articles, and
websites. The complaint is not the "short and plain statement" required by Fed. R. Civ. P. 8(a).

Overlong complaints characterized by "a vague and rambling collection of legal citations
and generalized averments" and "attach[ments of] pages of documents" unfairly shift the burden
onto the courts and Defendants to "search through and cobble together [Plaintiffs'] claims". *See,
e.g.*, *Serrano v. New Mexico*, 2019 WL 6911116, at *3 (D.N.M. Dec. 18, 2019). Neither the courts

---

[4]    Plaintiffs also challenge the constitutionality of Michigan, Pennsylvania, Wisconsin, and
Georgia statutes. For the reasons described in Facebook's motion to dismiss (Dkt. 23), reply in
support of its motion to dismiss (Dkt. 56), and in section IV.B. *supra*, Plaintiffs cannot bring those
claims, as courts sitting in those states have already held.

nor Defendants are obligated to do so.  *Id.*; *see also Fox v. California Fran. Tax Bd.*, 443 F. App'x.

354, 356 (10th Cir. 2011) (affirming dismissal with prejudice where trial court rejected complaint

that was "difficult to follow[ ] and replete with unnecessary legal citations and analysis"); *Mann*

*v. Boatwright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (99-page complaint's failure to comply with

Rule 8(a) was "sufficient reason to dismiss" as "sheer length . . . made [the complaint]

unintelligible" and it was "not the district court's job to stitch together cognizable claims for

relief"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 428 n.2 (S.D.N.Y.  2010)

("extreme length of the . . . [c]omplaint is an independent ground for dismissal");  *Patel v. Parnes*,

253 F.R.D. 531, 554 n. 198 (C.D. Cal. 2008) (collecting cases).

Plaintiffs assured the Court their proposed complaint would specifically address the issues

identified by Defendants in their prior pleading. They did nothing of the sort.  Plaintiffs have not

stated a claim, filed numerous overlong pleadings in violation of local and federal rules, and

delayed adjudication of their election-related claims until well after the election by their tardy

filing of the complaint and late service of Defendants.  Yet they now seek to add even more

Defendants, hundreds of new Plaintiffs and cross-referenced declarations, 473 more paragraphs

across dozens more pages, and several new non-Colorado state-law claims that have been rejected

by numerous federal and state courts sitting in those actual states.  Denial of leave to amend and

dismissal of their claims with prejudice is appropriate.  *Fox*, 443 F. App'x. at 357; *In re Level 3*

*Commun., Inc. Sec. Litig.*, 2010 WL 5129524, at *7 (D. Colo. Dec. 10, 2010), *aff'd sub nom*, 667

F.3d 1331 (10th Cir. 2012) (135-page "'hydra-like complaint' . . . should, at a minimum, be

dismissed" as "plaintiff received the benefit of defendants' motion to dismiss and, thereafter,

requested leave to file the now-operative complaint").

Dated: March 29, 2021

Respectfully submitted,

*/s/ Joshua S. Lipshutz*

Joshua S. Lipshutz
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, NW
Washington, DC  20036
Telephone:     202.955.8217
Facsimile:      202.530.9614
Email:            jlipshutz@gibsondunn.com

Ryan T. Bergsieker
Natalie J. Hausknecht
**GIBSON, DUNN & CRUTCHER LLP**
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:     303.298.5700
Facsimile:      303.298.5907
Email:            rbergsieker@gibsondunn.com
                     nhausknecht@gibsondunn.com

Craig B. Streit
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone:     415.393.8225
Facsimile:      415.374.8487
Email:            cstreit@gibsondunn.com

*Attorneys for Facebook, Inc.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2021, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

*/s/ Joshua S. Lipshutz*
Joshua S. Lipshutz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO
DEFENDANT CENTER FOR TECH AND CIVIC LIFE'S MOTION TO DISMISS**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following

Response and Brief in Opposition to Defendant Center for Technology and Civic Life's Motion

to Dismiss [Doc. 41], and hereby respectfully request that it be denied or, in the alternative,

determined to be moot, for the reasons set forth below.

## I. INTRODUCTION

This is a civil rights case involving the deprivation of the fundamental, constitutional

rights of all registered voters concerning the 2020 Presidential election (Election), which, as to

Defendant, Center for Technology and Civic Life (CTCL), included a systematic plan and

coordinated effort among members of an unlawful enterprise to infiltrate local elections and

exert improper influence on election officials through payment of nation-state level funding to

targeted municipalities for implementation of privatized election administration plans, including,

but not limited to: purchasing preselected voting technology and alternate ballot collection

machinery; training, directing and compensating election workers assisting with the effort, all of

1

which to inflate voter turnout in historically high Democrat voting areas; and, to illegally alter the results of the Election, as outlined in the Plaintiffs' complaint.

Because Big Tech giants, such as Defendants, Facebook and its CEO, Mark Zuckerberg, and others of the world's most wealthy elite, cannot simply buy local elections to exert their influence directly, in this instance, it was done with great media fanfare by funneling hundreds of millions of dollars, which included the monopoly power of social media influence, though CTCL's alleged charity. Prior to the Election, CTCL had annually administered contributions of less than three-tenths of one percent (00.3%) of the level of funding in 2020—the overwhelming majority of which came from "charitable contributions" from Defendants, Mark Zuckerberg and Priscilla Chan. With evidence that would shock the consciousness of the public, during 2020, CTCL expanded its money-influence empire from its headquarters in Chicago, Illinois, to approximately 2,500 jurisdictions, wherein it executed private contracts (some in the tens of millions of dollars) with local counties and municipalities across the country. However, state records confirm that CTCL is not registered as a charity, nor is it registered to do business, in any state but Illinois.

CTLC's actions are profane to the Constitution on multiple levels. At the macro level, CTCL's coordinated scheme sent significant private funding to select communities around the country, vastly disparate to what state legislators and Congress had authorized and allocated as each State's "fair share" of available election funding. As a result, communities offered varying election processes, and voters were treated differently depending on location, even within the same state. These state actors intentionally created unfair, variable, and unequal levels of access and due process for the Election.

At the micro level, CTCL directed various unlawful activities, including, but not limited to: the purchase and placement of "Zuckerboxes" as an alternate means to intercept and collect ballots, otherwise destined for the US mail; the mass flooding of states with mail-in ballots; the purchase of ballot extractors used to strip ballots from security envelopes, thereby invalidating the votes; the purchase of defective vote counting machinery; and, compensation for colluding poll workers and "grant mentors."

CTCL's actions, however, are constrained by the Constitution, as the actions of CTCL transformed this otherwise private charity into a state actor. This is true, not just because it provided private funding at the level of a State, but because it inserted itself into, and dictated the administration of the Election, a traditionally exclusive function of the State.  CTCL's interference with the Election harmed all registered voters across the country as it impacted the Office of President and Vice President, in which all registered voters possess an interest. Further, every registered voter has the right to vote for the Commander-in-Chief of the Armed Forces. This latter point cannot be overlooked. Additionally, the Plaintiffs have amended their complaint with the addition of RICO counts, wherein CTCL is separately liable for its participation as a member of the unlawful enterprise, associated-in-fact, as presented, in which state action is not necessary.

CTCL's source of funds and the illegal contracts it executed cannot be disputed.  CTCL did not simply provide "COVID-19 relief." That was just the cover for election funding, evidenced by the contracts obligating communities to implement specific Election administration plans.

3

## II.   BACKGROUND

Until 2020, CTCL had been a rather minor participant in previous election efforts having gross reported contributions of $666,904 (2015), $272,161 (2016), $738,060 (2017) and $560,319 (2018).[1] In the last year, however, those contributions skyrocketed by more than forty thousand percent (40,000%) when Zuckerberg and Chan put $350 million of their personal wealth into the coffers of CTCL, as part of the enterprise, outlined by the Plaintiffs.

CTCL began asserting influence with its initial $100,000 grant to Racine, Wisconsin, in May 2020, to not only pay for "planning safe and secure election administration in the City of Racine," but also by imposing a requirement that Racine then grant $10,000 each to Green Bay, Kenosha, Madison, and Milwaukee (collectively the five largest cities in Wisconsin) to pay for similar planning in those cities.[2] These funds ultimately produced a detailed Wisconsin Safe Voting Plan (WSVP), which included specific administration planning tied to Election funding, and added new administration positions that conflicted with duties of elected officials.[3] Despite noting significant challenges experienced with mail-in ballots and early voting during the Wisconsin primary, the WSVP's top strategic recommendation for the Election was to "Encourage and Increase Absentee Voting (By Mail and Early, In-Person)."[4]

By July 2020, CTCL contracted with each of the five Wisconsin cities, which totaled $6.3 million.[5] Racine received an additional $657,000 from CTCL in August 2020, primarily for more than 40 new election staff, additional compensation for staff, and extra ballot drop off boxes.[6]

---

[1] *See* CTCL IRS Form 990 Tax Returns.
[2] CTCL contract with City of Racine (May 28, 2020).
[3] Wisconsin Safe Voting Plan 2020 (Jun. 15, 2020).
[4] *Id.*
[5] Mary Spicuzza, *Wisconsin's Five Largest Cities Awarded $6.3 Million in Effort to Make Elections Safer Amid Coronavirus Pandemic*, Milwaukee Journal Sentinel (Jul. 6, 2020).
[6] CTCL contract with City of Racine (Aug. 31, 2020).

4

In August of 2020, CTCL entered into contracts with Delaware County, Pennsylvania,[7] worth approximately $2.2 million, and Philadelphia, Pennsylvania,[8] worth approximately $10 million. Both contracts were primarily for additional satellite offices, purchasing additional vote processing equipment, additional staff, and additional "hazard pay" for election workers.[9]

Centre County, Pennsylvania, approved a contract with CTCL for more than $860,000 for additional voting equipment, polling stations, and ballot drop boxes.[10] This happened all over the country, and is a matter of public record.

By September 2020, CTCL and Wayne County, Michigan, announced with Defendant Jocelyn Benson a "partnership to support Detroit elections," and funding totaling approximately $3.5 million, primarily for additional satellite clerk's offices, more than thirty (30) additional ballot drop boxes, and the hiring of more than six thousand (6,000) election workers.[11] Notably, the Detroit plan called for revising protocols for ballot counting and sorting.

Other Michigan cities like Lansing,[12] Pontiac,[13] East Lansing,[14] Flint,[15] Saginaw[16] and Muskegon[17] each received CTCL contracts valuing more than $400,000, largely for voting equipment and staff. Grand Rapids contracted with CTCL for over $280,000 for voting equipment, and staff.[18]

---

[7] Delaware County, Pennsylvania, press release (Aug. 19, 2020).
[8] CTCL contract with City of Philadelphia (Aug. 21, 2020).
[9] *See* Delaware County, Pennsylvania, press release (Aug. 19, 2020) and CTCL contract with City of Philadelphia (Aug. 21, 2020).
[10] Centre County, Pennsylvania, Board of Commissioners Agenda (Sept. 24, 2020).
[11] Secretary of State Jocelyn Benson press release dated (Sept. 2, 2020).
[12] Lansing, Michigan, press release (Sept. 4, 2020).
[13] City of Pontiac, Safe Voting Plan Application (Sept. 15, 2020).
[14] East Lansing, Michigan, Regular City Council Meeting Minutes (Sept. 8, 2020).
[15] CTCL contract with City of Flint (Sept. 10, 2020).
[16] Saginaw, Michigan, Council Communication (Sept. 3, 2020).
[17] CTCL contract with Muskegon City, Michigan (Sept. 16, 2020).
[18] City of Grand Rapids Agenda Action Request (Sept. 29, 2020).

5

Predictably, plans submitted to CTCL by communities in Michigan noted the exact same strategic recommendations as the WSVP.[19]

Fulton County, Georgia, received a contract from CTCL for new voting locations and vote counting equipment for more than $6.3 million.[20] DeKalb County, Georgia, received a CTCL contract for $4.8 million for early voting locations, additional election workers, and vote processing equipment.[21]

These contractual relationships created a "sufficiently close nexus" between CTCL, and its municipal customers that insinuated "itself into a position of interdependence [so as] to create a symbiotic relationship." *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1448-1453 (10th Cir. 1995). CTCL and their contracting partners willfully participated in "joint activity" concerning a fundamental right. *Id*. at 1453-1456. Simply put, CTCL was a private partner to local governments in literally thousands of voting jurisdictions. *See Street v. Corrections Corporation of America*, 102 F.3d 810, 814 (6th Cir. 1996). "If a state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor." *Id*. at 1456 (*quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)).

As alleged, CTCL's grant program used the existing COVID-19 crisis to bypass government sourced election funds with the intent to force contractual conditions, some of which have now been determined by state courts to be unlawful—instead of allowing the local governments to use the grants as the jurisdiction deemed fit. This had the effect of unlawfully influencing the Election, to the injury of the Plaintiffs' civil rights.

---

[19] *See, e.g.,* CTCL Contract with City of Lansing (Aug. 27, 2020), and City of Pontiac, Safe Voting Plan Application (Sept. 15, 2020).
[20] Fulton County, Georgia, Agenda Item Summary (Sept. 2, 2020).
[21] Dan Whisenhunt, *DeKalb County Receives Almost $5 Million Grant to Spend on Elections*, Decaturish.com (Oct. 6, 2020).

### III. STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In ruling upon a motion pursuant to Rule 12(b)(6), the court is required to construe the complaint liberally, assume all facts are true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-557. Specific facts are not necessary in a Complaint. Instead, the Plaintiff need only "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Id*. at 555.

The Federal Rules embody "notice pleading" and require only a concise statement of a claim. Thus, dismissal under Rule 12(b)(6) is proper only when the complaint lacks a cognizable legal theory or does not allege facts that, when taken as a whole, raise the claim for relief above mere speculation. *Id*. at 555-556.

As the 10th Circuit explained, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

### IV. PLAINTIFFS HAVE PROPERLY ALLEGED CIVIL RIGHTS CLAIMS AGAINST CTCL

### A. CTCL IS A STATE ACTOR

A Section 1983 claim is only applicable to conduct occurring under color of law. The Supreme Court has developed several approaches to determine whether a private party is engaged in state action. As the 10th Circuit as observed:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the

7

challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' The Court has also inquired whether the State has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them. In addition, the Court has held that if a private party is a 'willful participant in joint activity with the State or its agents,' then state action is present. Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Gallagher*, 49 F.3d at 1447.

Although only one is required, CTCL qualifies as a state actor under every test. The most stringent is the public function test:

While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State. One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158 (1978).

In a landmark 1953 case, the Jaybird Democratic Association had been organized since 1889 as a private club. *Terry v. Adams*, 345 U.S. 461 (1953). The group, which excluded African-Americans, regularly selected persons whom the organization endorsed "for election in the Democratic primary for county office." *Id*. at 470.

Although the Court was split with regard to the manner in which the Jaybirds became state actors, the majority agreed that the Jaybirds were, nonetheless, involved in state action, as a part of an election.

A second line of cases under the public-function doctrine originated with *Marsh v. Alabama*, wherein a corporation was found to have engaged in state action by performing all the necessary municipal functions of a town. 326 U.S. 501 (1946). As noted by Justice Rehnquist in *Flagg Bros. v. Brooks*, these "two branches of the public-function doctrine have in common the feature of exclusivity."

8

Exclusivity is generally defined as: pertaining to the subject alone; not including, admitting, or pertaining to any others; shutting out; debarring from interference or participation; vested in one person alone; apart from others; and, without the admission of others to participation.

CTCL contracted with municipalities across the country from its domicile in Illinois, which conditioned its grant funds upon performance of specific Election activities. These contracts created extensive limitations on the funds, and mandated how the money was to be used. Additionally, CTCL was never in good standing with any of the states outside of Illinois to conduct business, to solicit or make donations, or to execute binding contracts with government agencies. Yet, through massive amounts of funding, CTCL essentially privatized the elections in those jurisdictions, under contract. Further, the conditions in CTCL contracts bound the local jurisdiction to do the bidding of the enterprise agenda. CTCL's election administration conditions attached to the grant funding must in law be deemed to be that of the State. Here, local election officials clearly followed CTCL's directives. This partnership between CTCL and other state actors created a relationship requiring CTCL to be designated as a state actor, as well.

Through these numerous, multi-million dollar, election activity contracts, CTCL assumed a primary role in the administration of elections around the country—a function traditionally and exclusively reserved to the State. CTCL enjoys its status as a private, non-taxable entity, without restraint by the Constitution, and the laws that support it. It is easier to run a private prison, or hold a private Democratic primary for over 60 years, when the private entity does not have to comply with the Constitution.

9

## B.      PLAINTIFFS HAVE STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally

protected right and the deprivation of that right by a person acting under color of state law. 42

U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*,

110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is

as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S.

383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately

touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely

important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice

President of the United States are the only elected officials who represent all the voters in the

Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any

election for the choice of electors for President and Vice President" are abridged. U.S.

Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

Verifiable accuracy of ballot counting is essential for election legitimacy. The national interest in

this election outweighs that of any one State. There is a "pervasive national interest in the

selection of candidates for national office, and this national interest is greater than *any* interest of

an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the

various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the

interest of candidate Anderson, but rather, the *interests of the voters who chose to associate*

*together*…" *Id*. at 788 (emphasis added).

10

Moreover, the Plaintiffs have suffered a particularized injury-in-fact. Every constitutional right violation infers a damage. "Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Carey v. Piphus*, 435 U.S. 247, 255 (1978). The legislative history of section 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

## C.     CASES CITED BY CTCL ARE NOT DISPOSITIVE ON THE ISSUES

CTCL represents that "eight federal district courts, three unanimous appellate panels, and two Supreme Court Justices have rejected attacks on the legality of CTCL's COVID-19 response grant program." (CTCL Motion, p. 1, ¶ 3). However, the cases and decisions cited by CTCL were primarily filed against municipalities that received funding from Zuckerberg and Chan, through CTCL. There, the plaintiffs sought extraordinary relief, under a standard of likelihood of success on the merits, with pleadings that contained substantial defects. As the federal district court stated in Wisconsin:

> Though this is a federal lawsuit seeking relief in a federal court, Plaintiffs have offered only a political argument for prohibiting municipalities from accepting money from private entities to assist in the funding of elections for public offices. *They do not challenge any specific expenditure of the money; only its source. They make no argument that the municipalities that received the funds used them in an unlawful way to favor partisan manner.* Their brief is bereft of any legal argument that would support the kind of relief they seek. They cite Article I, section 4, of the United States Constitution, but that section governs the election of senators and representatives, and they fail to explain how, even if they had standing, the Cities' use of funds donated by a private party could have affected any such election.

*Wis. Voters All. v. City of Racine, Case Number:* 1:20-cv-1487, Docket #49, *Order Granting Defendant's Motion to Dismiss*. [Emphasis added].

Appendix Page 1300

Aside from the obvious pleading deficiencies of these various voter alliance groups, these plaintiffs where political action groups, not voters. Each of these cases sought to enjoin the national election process by requesting extraordinary relief on a scale that the federal district courts could not grant. Not one of the cases cited by CTCL was ever determined on the merits, all were denied injunctive relief, and all were dismissed ,either voluntarily or involuntarily. None of these cases involved any party to this lawsuit, nor did these decisions determine or reject the legality of CTCL's COVID-19 response grant program.

Here, the Plaintiffs' claims, in fact, challenge the specific expenditures of the money obtained and spent from CTCL, *and* the source of funds obtained from an association-in-fact of a well-funded cabal of wealthy progressives. The Plaintiffs, here, aver that the municipalities were obligated to use the funds received from CTCL in an unconstitutional and partisan manner—all while CTCL was not registered in the respective states, in which it was conducting business.

The Wisconsin Supreme Court recently determined that a county clerk's interpretation of Wisconsin law that rendered all Wisconsin voters as "indefinitely confined" (which allowed mass distribution of mail-in ballots) to be erroneous and unlawful. [22] Just this month, the Wisconsin House of Representative began an investigation[23] into the Zuckerberg and Chan donations funneled through CTCL, and the infiltration of Democrat activists into the State's election machinery.

CTCL is one person, under the law, and its legal capacity to enter into contracts with municipalities and counties across the country, while only registered to do business in Illinois, is a subject to be investigated, here—as is the tax deductibility of the so-called charitable contributions made by Zuckerberg and Chan.

---

[22] *Jefferson v. Dane County*, 2020 WI 90 (Wis. Sup. Ct. 2020).
[23] Wisconsin Spotlight: Special Investigation: Infiltrating the Election-M.D. Kittle, March 9, 2021

The facts indicate that Pennsylvania, Michigan, and Wisconsin, including the
municipalities that eventually contracted with CTCL, may not have had budget shortfalls, due to
the COVID-19 pandemic. These States each had an available surpluses of federal election
HAVA funds in amounts of $9,577,386, $10,406,377, and $4,316,403 respectively.[24]
Nonetheless, jurisdictions within those states accepted the money, with election administration
conditions attached, in spite of having available federal funds to cover any shortfalls.

As is alleged with specificity, this was a coordinated effort by an association-in-fact of
powerful and wealthy individuals to induce local governments to accept money under the guise
of "COVID-19 relief." The scheme was purposefully designed to illegally influence the Election
in favor of one candidate, that is, the one supported by Facebook, Zuckerberg, Chan, CTCL, and
many others involved in the enterprise. The question remains, why did CTCL not simply donate
the funds and allow the municipalities to administer it in a fair and constitutional manner? The
answer is obvious: It was part of a scheme to remove a popular President, and replace him with
their candidate. This motive is as old as the hills, and cannot be ignored because CTCL is
mystified as to how anyone can question its objectives.

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion.
Under claim preclusion, a final judgment forecloses "successive litigation of the very same
claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New
Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Issue preclusion, in contrast, bars "successive
litigation of an issue of fact or law actually litigated and resolved in a valid court determination
essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.* at
748-749.

---

[24] Federal Financial Reports-OMB Number 4040-0014; Pennsylvania (01-09-2020); Michigan (12-23-2019);
Wisconsin (12-30-2019).

### E.     THE CIVIL RIGHTS OF PLAINTIFFS HAVE BEEN BURDENED

"A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 213 (1989). Concurrently, the "Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

The "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to casts their votes effectively…rank among our most precious freedoms." *William v. Rhodes*, 393 U.S. 23, 30-31 (1968). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

The "President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson*, 460 U.S. at 794-795. In that regard, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Id.* at 795. Thus, in a Presidential election, the actions of state actors in one state have "an impact beyond its own borders." *Id.*

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds* at 555. Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.*

"Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 7 (1964).

14

## F.     CTCL'S MOTIONS ARE MOOT

Plaintiffs have filed their motion for leave to amend their complaint. Accordingly, acceptance of the amended complaint renders CTCL's motion moot. Here, the amended complaint adds over 150 Plaintiffs, supplements the factual allegations, and cures any alleged defects in the original complaint with regard to Rule 23.

## G.     PLAINTIFFS CLAIMS ARE REDRESSABLE

Plaintiffs have alleged claims of violations of their Civil Rights, and are seeking nominal damages for these infringements. The Supreme Court recently reaffirmed the sufficiency of pleading nominal damages for Civil Rights violations to satisfy redressability:

> a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

*Uzuegbunam v. Preczewski*, _____ U.S._____ (Mar. 8, 2021).

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court deny Defendant CTCL's motion to dismiss in its entirety, or, in the alternative, deny Defendant's motion as moot, in light of the Plaintiffs' Amended Complaint.

Respectfully submitted this 31st day of March, 2021.

### *PLAINTIFFS COUNSEL:*

By: *s/Ernest J. Walker*           By:     *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)           Gary D. Fielder  (CO 19757)
ERNEST J. WALKER LAW OFFICE           LAW OFFICE OF GARY FIELDER
1444 Stuart St.                       1444 Stuart St.
Denver, CO 80204                      Denver, CO 80204
(720) 306-0007                        (720) 306-0007
ernestjwalker@gmail.com               gary@fielderlaw.net

15

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 31, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' MOTION TO EXTEND TIME FOR SERVICE AND
FOR ALTERNATE SERVICE VIA U.S. MARSHAL**

---

COME NOW Plaintiffs, by and through counsel, who hereby submit the following

Motion to Extend Time for Service up to and including May 21, 2021, and for Alternate Service

Via U.S. Marshall Service, for the reasons set forth below:

1.     Plaintiffs filed their initial Complaint on December 22, 2020 [Doc. 1].

2.     F.R.C.P. 4 establishes a ninety (90) day period from the date of filing a complaint

to serve a defendant.

3.     Since filing Plaintiffs' Complaint, Plaintiffs' counsel has made good faith

attempts to serve all identified Defendants, and several have responded to this matter.

4.     Plaintiffs' counsels' attempts have included use of national and local process

servers, who ultimately rejected service requests because of the political nature of the case, or

that certain Defendants are too high profile, or did not respond to requests at all.

5.     Alternative modes of service via certified U.S. Mail have also been refused by

certain remaining unserved Defendants.

6.      Plaintiffs also sought to file their Amended Complaint, and then have the remaining Defendants served with that complaint, instead. However, the Amended Complaint has not yet been accepted for filing.

7.      The initial ninety (90) day period under F.R.C.P. 4(m) has expired, and the Plaintiffs are continuing to attempt to serve all remaining identified Defendants.

8.      Certain Defendants who have been served and appeared have filed motions seeking to dismiss Plaintiffs claims, and as previously referenced, Plaintiffs have sought to amend their initial Complaint.

9.      Further, all discovery has been voluntarily agreed to be stayed among the Parties who have appeared, while motions are currently pending.

10.     In light of the filing of the Plaintiffs' Amended Complaint, there exists no prejudice to any party that has not been served, and there is no danger of prejudice in the future by serving the remaining Defendants within the next eight weeks.

11.     Additionally, F.R.C.P. 4(c)(3) permits service upon request by Plaintiffs to be made upon a defendant by the U.S. Marshal, or deputy marshal.

12.     Plaintiffs believe service via U.S. Marshal will be the most effective and efficient means to ensure service upon all remaining unserved Defendants and, in fact, may be the only way to actually serve the remaining Defendants.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant an extension of sixty (60) days to effectuate service on all remaining identified Defendants, up to and including Friday, May 21, 2021, and to authorize service of process on all remaining Defendants to be completed by a U.S. Marshal, or deputy Marshal, pursuant to F.R.C.P. 4(c)(3), in accordance with the attached Proposed Order.

Respectfully submitted this 1st day of April, 2021.

**PLAINTIFFS COUNSEL:**

By: *s/Ernest J. Walker*                          By:      *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                  Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE                  LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                       1444 Stuart St.
Denver, CO 80204                                  Denver, CO 80204
(720) 306-0007                                      (720) 306-0007
ernestjwalker@gmail.com                         gary@fielderlaw.net

3

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 1, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## [PROPOSED] ORDER TO EXTEND TIME FOR SERVICE AND
## FOR ALTERNATE SERVICE VIA U.S. MARSHAL

---

Upon Motion and request by Plaintiffs, and otherwise for good cause, it is hereby

Ordered as follows:

1.      Plaintiffs shall be authorized an additional sixty (60) days to serve any remaining

identified Defendant with a copy of the initial Complaint, or Amended Complaint if accepted,

and shall complete service by Friday, May 21, 2021.

2.      Plaintiffs are further authorized to conduct service through the U.S. Marshal

Service for service of the Complaint and/or Amended Complaint by the U.S. Marshal, or deputy

marshal, on any remaining identified Defendants, in this matter.


SO ORDERED this_____day of April, 2021.


_____
Magistrate Judge N. Reid Neureiter

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

MINUTE ORDER

Entered by Magistrate Judge N. Reid Neureiter

It is hereby Plaintiffs' Motion to Extend Time for Service and for Alternate Service Via U.S. Marshall (Dkt. #65) is GRANTED IN PART and DENIED IN PART as follows.

Plaintiffs are granted a 60-day extension to effectuate service on all remaining identified Defendants, up to and including May 21, 2021. But Plaintiffs are not authorized to conduct service through the U.S. Marshals Service. Under Fed. R. Civ. P. 4(c), Plaintiffs bear the responsibility for service of process. Plaintiffs are not proceeding in forma pauperis, and the Court is not persuaded by Plaintiffs' explanation why private process servers cannot serve the remaining Defendants, rather than unnecessarily burdening our federal marshals.

Date: April 2, 2021 _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

MINUTE ORDER

---

Entered by Magistrate Judge N. Reid Neureiter

It is hereby ORDERED that a Motion Hearing is set on Defendants' various
motions to dismiss (Dkt. ##22, 23, 41, 46, 47, & 49) and Plaintiffs' motion to amend

(Dkt. #48) for **April 27, 2021 at 2:00 p.m.** The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time.

Date: April 2, 2021 _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

## PLAINTIFFS' MOTION TO STRIKE THE STATE OF MICHIGAN'S APPEARANCE AND MOTION TO DISMISS, PURSUANT TO F.R.C.P. 12(f)

COME NOW the Plaintiffs, by and through counsel, and, pursuant to F.R.C.P. 12(f), respectfully moves the Court to strike the State of Michigan's Appearance [Docs. 29 and 30], and Motion to Dismiss [Doc. 46].

As grounds therefore, the Plaintiffs state as follows:

### I.        INTRODUCTION

Plaintiffs filed their complaint on December 22, 2020 [Doc. 1], and moved for leave to amend on March 15, 2021 [Doc. 48]. Although Defendants, Gretchen Whitmer and Jocelyn Benson, each held office within the State of Michigan at the time of the 2020 Presidential election, Plaintiffs, in accordance with *Ex parte Young*, 209 U.S. 123 (1908), have asserted claims against them in their individual capacities, for violations of the Constitution. Individuals who violate the Constitution are stripped of their official capacity. Thus, the State is not liable. Plaintiffs have properly averred claims specifically against these Defendants, in their individual capacities, and not as officials of the State.

1

## II.    THE STATE OF MICHIGAN'S ENTRY AND MOTION
## MUST BE STRICKEN

On March 4, 2021, an entry of appearance was made "for and on behalf of Governor Gretchen Whitmer" [Doc. 29], and "for and on behalf of Michigan Secretary of State Jocelyn Benson" [Doc. 30], by Dana Nessel, Michigan Attorney General, through an Assistant Attorney General.  However, neither "Governor Gretchen Whitmer," nor "Michigan Secretary of State Jocelyn Benson," as officials in their State capacities, were sued as part of this lawsuit.

Further, neither "Governor Gretchen Whitmer," nor "Michigan Secretary of State Jocelyn Benson," were served with a summons in their official capacities. In fact, to date, personal service has not been obtained on Defendants, Gretchen Whitmer and Jocelyn Benson, in their individual capacity, which would otherwise require them to appear and respond.

The Attorney General of Michigan has improperly entered her appearance on behalf of Defendants that do not exist, that is, persons in their official capacities.  Further, an Attorney General has no authority to act as a private lawyer on behalf of an individual citizen of the respective state. The individuals named herein from Michigan were stripped of their official capacity by their unconstitutional and *ultra vires* conduct. Entry of appearances on behalf of a governor and secretary of state in their official capacity acts as an entry of appearance on behalf of the respective State, itself.

Yet, the Plaintiffs have not sued a State. Additionally, no State may preemptively cloak public officials who have committed unconstitutional acts with immunity, nor appear in the matter to defend them. As such, the Michigan Attorney General lacks standing to appear on behalf of unnamed parties, outside the claims and jurisdiction of the Court. The Court cannot dismiss claims against persons in certain capacities when no claims were made.

The Michigan Attorney General misunderstands Plaintiffs' Complaint, and the alleged legal capacities of each proper Defendant [Doc. 1, ¶¶ 21-22 ]. Alternately, the State is erroneously characterizing this case and attempting to impart immunity on individual Defendants, contrary to *Ex parte Young*.

In *Ex parte Young*, the Supreme Court stated:

> The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States. It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality with reference, at least, to the Federal Constitution be first raised in a Federal court that court, as we think is shown by the authorities cited hereafter, has the right to decide it to the exclusion of all other courts.

*Id.* at 159-160.

F.R.C.P. 12(f) states:

**Motion to Strike**. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Here, the appearances and motion filed by the Michigan Attorney General on behalf of state officials in their official capacities are immaterial and impertinent, and must be stricken.

3

A State Attorney General may enter an appearance for the purpose of intervening in a
matter, pursuant to F.R.C.P. 24(a)(1), but only for the purpose of defending the constitutional
questions raised for judicial review in § 1983 actions, pursuant F.R.C.P. 5.1.

However, the Michigan Attorney General has not filed a motion to intervene, nor is it
apparent that the office is here to address the constitutional challenge outlined in the Amended
Complaint, which has not been accepted. Accordingly, the improper appearance of the State
Attorney General for what appears to be an attempt to impart immunity on its state actors is itself
unconstitutional, and represents an improper attempt by other state actors to further deprive
Plaintiffs of their civil rights.

### III.   GOVERNMENT OFFICIALS HAVE WRONGFULLY APPEARED FOR A STATE WITHOUT STANDING

The Eleventh Amendment confirms the sovereign status of the States by shielding them
from suits by individuals absent their consent. *Seminole Tribe of Fla.* v. *Florida,* 517 U.S. 44, 54
(1996). To ensure the enforcement of federal law, however, the Eleventh Amendment permits
suits for prospective injunctive relief against state officials acting in violation of federal law.
*Hutto v. Finney*, 437 U.S. 678, 690-691 (1978).

However, the Plaintiffs have not sued a State, nor any State official in his or her
respective official capacity. Individual Defendants holding official positions have only been sued
in their individual capacity for their *ultra vires* actions that have infringed upon the Plaintiffs'
constitutional rights, and in violation of each of their respective oaths of office.

Accordingly, each individual Defendant has been divested of official capacity for their
respective unconstitutional acts, and, as such, are each personally liable in their individual
capacities. *Ex parte Young*, 209 U.S. at 160. Therefore, when properly served, these Defendants

must appear in their individual capacity for the Court to entertain any motions on their behalf. The Defendants herein named have not made an appearance, nor have they moved the Court.

State officials lawfully acting in their official capacity stand in the place of the State, and are effectively actions by the State. Nonetheless, no State is authorized to immunize and defend a State official's unconstitutional actions. *Id.* Accordingly, no State, and no state actor in any official capacity has standing to be in these proceedings to make any demands of this Court—particularly in defense of the unconstitutional actions of individual persons.

A defense is insufficient as a matter of law if it is patently frivolous, or if it is clearly invalid as a matter of law. In such cases, a determination should be made, and the defenses stricken, in order to avoid unnecessary time and money in litigating invalid, spurious issues. *See United States v. 416.18 Acres of Land,* 514 F.2d 627, 637 (7th Cir. 1975). If a defense is insufficient as a matter of law must it be stricken, pursuant to F.R.C.P. 12(f).

The Michigan Attorney General, appearing here, has done so only on behalf of Defendants in their official capacities, i.e., they have appeared on behalf of the State of Michigan. Defenses raised by the Michigan Attorney General are not applicable to these actors in their individual capacities, and have no merit as applied to individual Defendants, only to the State. But the State is not a proper party. Moreover, the Michigan Attorney General has no authority to defend these Defendants in their individual capacities. As such, the State's motion is clearly invalid as a matter of law.

Accordingly, the appearance of the Michigan Attorney General on behalf of the Defendants in their official capacities, for the State of Michigan, and its Motion to Dismiss, must be stricken pursuant to F.R.C.P. 12(f).

### IV. THIS COURT LACKS PERSONAL JURISDICTION OVER THE STATE AND PERSONS IN THEIR OFFICAL CAPACITY

No public officials in their official capacities have been sued, or served with a summons to appear in this matter. Suing any public officer in their official capacity is tantamount to suing the State. Accordingly, no State or public official in their official capacity has been properly brought before this Court. As such, this Court lacks jurisdiction over any Defendant, in his or her official capacity, appearing by and through the Michigan Attorney General.

The Michigan Attorney General, on behalf of the State of Michigan, may seek to intervene in this matter, but only upon proper motion in accordance with F.R.C.P. 24, if applicable under F.R.C.P. 5.1.

### V. THIS COURT LACKS PERSONAL JURISDICTION OVER INDIVIDUAL DEFENDANTS

On April 2, 2021, the Court granted an extension of time of sixty days for the Plaintiffs to personally serve the individual Defendants [Doc. 67]. Accordingly, this Court remains without personal jurisdiction over the Defendants named in this action, in their individual capacities. There exist no waivers of service in the court of record, and the appearances by the Michigan Attorney General do not allege to waive personal service, or aver representation of the Defendants, individually.

### VI. ATTORNEYS GENERAL ARE CONFLICTED BY DUTIES OWED TO THE STATE

The Michigan Attorney General, and her staff, are state officials, who owe a duty to their State, by reason of their office. Attorneys General may not appear as private attorneys for individual defendants, without creating a conflict of interest with the people of the State, whom the Michigan Attorney General has a duty to represent, in her own official capacity.

The representation of private individuals, who, as alleged, have been stripped of their official character for acts taken in conflict with the Constitution, conflicts with the interest of the people who the Michigan Attorney General swore to serve.

As the Kentucky Supreme Court stated many years ago:

> It is true that at common law the duty of the Attorney General was to represent the *king,* he being the embodiment of the state. *See Hancock v. Terry Elkhorn Mining Company, Inc.*, Ky., 503 S.W.2d 710. But under the democratic form of government now prevailing the people are the king, Ky. Const. sec. 4, so the Attorney General's duties are to that sovereign rather than to the machinery of government.

*Commonwealth Ex Rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (1974).

The Plaintiffs, for themselves and others similarly situated, have brought an action against specific state actors, in their individual capacities for violations of their constitutional restraints.  Instead of defending the rights of the people of her State, the Attorney General has appeared in an adversarial position to defend the machinery of government. Whatever the case may be, Michigan is not at risk, and has not been sued.

## VII.    CONCLUSION

No person in his or her official capacity is a party in this matter. As such, the Attorney General of Michigan has no standing to challenge Plaintiffs' claims, nor does this Court have jurisdiction to entertain a motion to dismiss claims against parties that are not before the Court in their proper capacity. Accordingly, the appearances by the State of Michigan, and its motion to dismiss must be stricken, pursuant to Rule 12(f).

## VIII. CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)

Plaintiffs' counsel has conferred back and forth by electronic mail with counsel from the State of Michigan with no agreement as to resolution.

Respectfully submitted this 5th day of April, 2021.

**_PLAINTIFFS COUNSEL:_**

By: _s/Ernest J. Walker_     By:  _s/ Gary D. Fielder_

Ernest J. Walker (MI P58635)      Gary D. Fielder (CO 19757)

ERNEST J. WALKER LAW OFFICE    LAW OFFICE OF GARY FIELDER

1444 Stuart St.            1444 Stuart St.

Denver, CO 80204         Denver, CO 80204

(720) 306-0007          (720) 306-0007

ernestjwalker@gmail.com      gary@fielderlaw.net

## CERTIFICATE OF SERVICE

  The undersigned hereby certifies that on April 5, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_s/Gary D. Fielder_

Gary D. Fielder, Esq.

Law Office of Gary Fielder

1444 Stuart St.

Denver, CO 80204

(720)306-0007

gary@fielderlaw.net

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' MOTION TO STRIKE THE STATE OF GEORGIA'S**
**APPEARANCE AND MOTION TO DISMISS, PURSUANT TO F.R.C.P. 12(f)**

---

COME NOW the Plaintiffs, by and through counsel, and, pursuant to F.R.C.P. 12(f), respectfully moves the Court to strike the State of Georgia's Appearance [Doc. 37], and Motion to Dismiss [Doc.47].

As grounds therefore, the Plaintiffs state as follows:

**I.       INTRODUCTION**

Plaintiffs filed their complaint on December 22, 2020 [Doc. 1], and moved for leave to amend [Doc. 48] on March 15, 2021. Although Defendants, Brian Kemp and Brad Raffensperger, each held office within the State of Georgia, at the time of the 2020 Presidential election (Election), Plaintiffs, in accordance with *Ex parte Young*, 209 U.S. 123 (1908), have asserted claims against each of them, only in their individual capacities, for violations of the Constitution. Individuals who violate the Constitution are stripped of their official capacity. The State is not liable. Plaintiffs have properly averred claims specifically against these Defendants, in their individual capacities, and not as officials of the State.

1

## II.     THE STATE OF GEORGIA'S ENTRY AND MOTION
## MUST BE STRICKEN

On March 9, 2021, an entry of appearance was made "on behalf of Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger" [Doc. 37], by a Georgia Assistant Attorney General. However, neither "Governor Brian Kemp," nor "Secretary of State Brad Raffensperger," as officials in their State capacities, were sued as part of this lawsuit.

Further, neither "Governor Brian Kemp," nor "Secretary of State Brad Raffensperger," were served with a summons in their official capacities. In fact, to date, personal service has not been obtained on Defendants, Brad Kemp and Brad Raffensperger, in their individual capacity, which would otherwise require them to appear and respond.

The Attorney General of Georgia has improperly entered his appearance on behalf of Defendants that do not exist, that is, persons in their official capacities.  Further, an Attorney General has no authority to act as a private lawyer on behalf of an individual citizen of the respective state. The individuals named herein from Georgia were stripped of official capacity by their unconstitutional and *ultra vires* conduct. An entry of appearance on behalf of a governor and secretary of state in their official capacity acts as an entry of appearance on behalf of the respective State, itself.

Yet, the Plaintiffs have not sued a State. Additionally, no State may preemptively cloak public officials who have committed unconstitutional acts with immunity, nor appear in the matter to defend them. As such, the State Attorney General lacks standing to appear on behalf of unnamed parties, outside the claims and jurisdiction of the Court. The Court cannot dismiss claims against persons in certain capacities when no claims were made.

Appendix Page 1324

The Georgia Attorney General misunderstands Plaintiffs' Complaint, and the alleged legal capacities of each proper Defendant [Doc. 1, ¶¶ 19-20]. Alternately, the State is erroneously characterizing this case and attempting to impart immunity on individual Defendants, contrary to *Ex parte Young*.

In *Ex parte Young*, the Supreme Court stated:

> The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States. It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality with reference, at least, to the Federal Constitution be first raised in a Federal court that court, as we think is shown by the authorities cited hereafter, has the right to decide it to the exclusion of all other courts.

*Id.* at 159-160.

F.R.C.P. 12(f) states:

**Motion to Strike**. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Here, the appearances and motion filed by the Michigan Attorney General on behalf of state officials in their official capacities are immaterial and impertinent, and must be stricken.

3

A State Attorney General may enter an appearance for the purpose of intervening in a matter, pursuant to F.R.C.P. 24(a)(1), but only for the purpose of defending the constitutional questions raised for judicial review in § 1983 actions, pursuant F.R.C.P. 5.1.

However, the Georgia Attorney General has not filed a motion to intervene, nor is it apparent that the office is here to address the constitutional challenge outlined in the Amended Complaint, which has not been accepted. Accordingly, the improper appearance of the State Attorney General for what appears to be an attempt to impart immunity on its state actors is itself unconstitutional, and represents an improper attempt by other state actors to further deprive Plaintiffs of their civil rights.

### III.   GOVERNMENT OFFICIALS HAVE WRONGFULLY APPEARED FOR A STATE WITHOUT STANDING

The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. *Seminole Tribe of Fla.* v. *Florida,* 517 U.S. 44, 54 (1996). To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Hutto v. Finney*, 437 U.S. 678, 690-691 (1978).

However, the Plaintiffs have not sued a State, or any State official in his or her respective official capacity. Individual Defendants holding official positions have only been sued in their individual capacity for their *ultra vires* actions that have infringed upon the Plaintiffs' constitutional rights, and in violation of each of their respective oaths of office.

Accordingly, each individual Defendant has been divested of official capacity for their respective unconstitutional acts, and, as such, are each personally liable in their individual capacities. *Ex parte Young*, 209 U.S. at 160. Therefore, if properly served, these Defendants

must appear in their individual capacity for the Court to entertain any motions on their behalf. The Defendants herein named have not made an appearance, nor have they moved the Court.

State officials lawfully acting in their official capacity stand in the place of the State, and are effectively actions by the State. Nonetheless, no State is authorized to immunize and defend a State official's unconstitutional actions. *Id.* Accordingly, no State, and no state actor in any official capacity has standing to be in these proceedings to make any demands of this Court— particularly in defense of the unconstitutional actions of individual persons.

A defense is insufficient as a matter of law if it is patently frivolous, or if it is clearly invalid as a matter of law. In such cases, a determination should be made, and the defenses stricken, in order to avoid unnecessary time and money in litigating invalid, spurious issues. *See United States v. 416.18 Acres of Land,* 514 F.2d 627, 637 (7th Cir. 1975). If a defense is insufficient as a matter of law it must be stricken, pursuant to F.R.C.P. 12(f).

The Georgia Attorney General, appearing here, has done so only on behalf of Defendants in their official capacities, i.e., they have appeared on behalf of the State of Georgia. Defenses raised by the Georgia Attorney General are not applicable to these actors in their individual capacities, and have no merit as applied to individual Defendants, only to the State. But the State is not a proper party. Moreover, the Georgia Attorney General has no authority to defend these Defendants in their individual capacities. As such, the State's motion is clearly invalid as a matter of law.

Accordingly, the appearance of the Georgia Attorney General, on behalf of the Defendants in their official capacities, for the State of Georgia, and its Motion to Dismiss, must be stricken pursuant to F.R.C.P. 12(f).

## IV.     THIS COURT LACKS PERSONAL JURISDICTION OVER THE STATE AND PERSONS IN THEIR OFFICAL CAPACITY

No public officials in their official capacities have been sued, or served with a summons to appear in this matter.  Suing any public officer in their official capacity is tantamount to suing the State. Accordingly, no State or public official in their official capacity has been properly brought before this Court.  As such, this Court lacks jurisdiction over any Defendant, in his or her official capacity, appearing by and through the Georgia Attorney General.

The Georgia Attorney General, on behalf of the State of Georgia, may seek to intervene in this matter, but only upon proper motion in accordance with F.R.C.P. 24, if applicable under F.R.C.P. 5.1.

## V.     THIS COURT LACKS PERSONAL JURISDICTION OVER INDIVIDUAL DEFENDANTS

On April 2, 2021, the Court granted an extension of time of sixty days for the Plaintiffs to personally serve the individual Defendants [Doc. 67]. Accordingly, this Court remains without personal jurisdiction over the Defendants named in this action, in their individual capacities. There exist no waivers of service in the court of record, and the appearances by the Georgia Attorney General do not allege to waive personal service, or aver representation of the Defendants, individually.

## VI.     ATTORNEYS GENERAL ARE CONFLICTED BY DUTIES OWED TO THE STATE

The Georgia Attorney General, and his staff, are state officials, who owe a duty to their State, by reason of their office. Attorneys General may not appear as private attorneys for individual defendants, without creating a conflict of interest with the people of the State, whom the Georgia Attorney General has a duty to represent, in his own official capacity.

6

The representation of private individuals, who, as alleged, have been stripped of their official character for acts taken in conflict with the Constitution, and conflicts with the interest of the people who the Georgia Attorney General swore to serve.

As the Kentucky Supreme Court stated many years ago:

> It is true that at common law the duty of the Attorney General was to represent the *king,* he being the embodiment of the state. *See Hancock v. Terry Elkhorn Mining Company, Inc.*, Ky., 503 S.W.2d 710. But under the democratic form of government now prevailing the people are the king, Ky. Const. sec. 4, so the Attorney General's duties are to that sovereign rather than to the machinery of government.

*Commonwealth Ex Rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (1974).

The Plaintiffs, for themselves and others similarly situated, have brought an action against specific state actors, in their individual capacities for violations of their constitutional restraints.  Instead of defending the rights of the people of his State, the Attorney General has appeared in an adversarial position to defend the machinery of government. Whatever the case may be, Georgia is not at risk, and has not been sued.

## VII.    CONCLUSION

No person in his or her official capacity is a party in this matter. As such, the Attorney General of Georgia has no standing to challenge Plaintiffs' claims, nor does this Court have jurisdiction to entertain a motion to dismiss claims against parties that are not before the Court in their proper capacity. Accordingly, the appearances by the State of Georgia, and its motion to dismiss must be stricken.

## VIII. CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)

Plaintiffs' counsel communicated by with counsel from the State of Georgia, by sending electronic mail today, at the same time as counsel email the Attorney General from Michigan. However, counsel never received a response and no agreement as to resolution has been made.

7

Respectfully submitted this 5th day of April, 2021.

**PLAINTIFFS COUNSEL:**

By: *s/Ernest J. Walker*                       By:        *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)              Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE          LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                    1444 Stuart St.
Denver, CO 80204                              Denver, CO 80204
(720) 306-0007                                   (720) 306-0007
ernestjwalker@gmail.com                  gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 5, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTIONS TO STRIKE MOTIONS TO DISMISS OF MICHIGAN AND GEORGIA (Dkt. ##68 & 69)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before the Court on Plaintiffs' Motions to Strike Michigan's Appearance and Motion to Dismiss Pursuant to F.R.C.P. 12(f) (Dkt. #68) and Plaintiffs' Motion to Strike the State of Georgia's Appearance and Motion to Dismiss, Pursuant to F.R.C.P. 12(f) (Dkt. #69). Plaintiffs' Motions are DENIED.

Plaintiffs have brought this lawsuit against Dominion Voting Systems Inc, Facebook, Inc. the Center for Tech and Civic Life (an Illinois non-profit), and a number of government officials, including Georgia Governor Brian Kemp, Georgia Secretary of State Brad Raffensperger, Michigan Governor Gretchen Whitmer, Michigan Secretary of State Jocelyn Benson; Pennsylvania Governor Tom Wolfe, Pennsylvania Secretary of State Kathy Boockvar, and Wisconsin Governor Tony Evers. Plaintiffs also individually sued all six members of the Wisconsin Election Commission. The individual defendants will be referred to here as the "Government Official Defendants."

With respect to each of the Governmental Official Defendants, the Complaint asserts the officials are "personally liable for [their] individual conduct, acting under color of [their] official authority." *See e.g.,* Comp. (Dkt. #1 at ¶¶ 19–26).

On March 15, 2021, the Michigan government officials (Governor Whitmer and Secretary of State Benson) filed a Motion to Dismiss (Dkt. #46). The motion was filed on the Michigan defendants' behalf by a Michigan Assistant Attorney General. *See id.* at 13. The same day, the Georgia government officials (Governor Kemp and Secretary of State Raffensperer) filed a similar Motion to Dismiss (Dkt. #47). The Georgia motion was filed by a Georgia Assistant Attorney General. *See id.* at 14.

The Georgia and Michigan Motions to Dismiss make predictable arguments, such as lack of personal jurisdiction in Colorado over actions taken by officials located

in another state, and that the Plaintiffs lack standing to enforce Michigan or Georgia voting laws because such claims reflect generalized grievances.

Rather than opposing the Georgia and Michigan Motions to Dismiss on the merits, Plaintiffs seek to strike the motions under Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Nothing in the Georgia or Michigan Motions appears remotely to be "redundant, immaterial, impertinent, or scandalous."

Plaintiffs' Motions to Strike argue that because Plaintiffs have asserted constitutional claims against the Government Official Defendants in the officials' *individual* capacities, Plaintiffs can prevent the Attorney Generals (or Assistant Attorney Generals) of Michigan and Georgia from appearing as counsel to defend this lawsuit on behalf of those Michigan and Georgia state officials. *See, e.g.*, Dkt. #68 at 2 ("The Attorney General of Michigan has improperly entered her appearance on behalf of Defendants that do not exist, that is, persons in their official capacities. Further, an Attorney General has no authority to act as a private lawyer on behalf of an individual citizen of the respective state."). Citing no authority, Plaintiffs argue that because the "Plaintiffs have not sued a State . . . no State may preemptively cloak officials who have committed unconstitutional acts with immunity, nor appear in the matter to defend them." *Id*. Plaintiffs appear to argue that merely because they *allege* that Government Official Defendants have committed *ultra vires* unconstitutional acts in their individual capacities, the Government Official Defendants may be precluded from using the legal resources of their respective States to defend themselves here.

It would be a strange world indeed if the plaintiffs in a lawsuit, merely by clever pleading in a complaint, could preclude a defendant from using the lawyer (or legal department) of his or her choice in defending against the allegations. And here, the allegations of the Complaint are merely allegations. Plaintiffs seem to want to have the Court make a preliminary finding (based only on the allegations of the Complaint) that the Government Official Defendants did violate the Constitution, and use that finding to bar appearances by the Attorney General offices of Michigan and Georgia respectively. Plaintiffs cite no authority that would justify such an order.

Whether the Government Official Defendants' Motions to Dismiss have merit or not is a different question from whether they should be stricken under Rule 12(f). There is nothing insufficient, redundant, immaterial, impertinent, or scandalous about Georgia or Michigan's Motions to Dismiss. Rule 12(f) is not the appropriate method to respond to a Motion to Dismiss. *See Sierra Club v. Tri–State Generation & Transmission Ass'n,* 173 F.R.D. 275, 285 (D.Colo.1997) (motions to strike pursuant to Rule 12(f) are typically "a generally-disfavored, drastic remedy" and rarely granted unless the movant can make a showing of prejudice arising from the challenged allegations). It is not this Court's role to dictate to the states of Georgia or Michigan how they may use the resources of their respective Attorney General Offices. The Motions will not be stricken. If Plaintiffs wish to oppose the Motions on the merits, they should file opposition briefs to the Motions to Dismiss within five days from the date of this Order.

**SO ORDERED**

April 7, 2021

N. Reid Neureiter
United States Magistrate Judge

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

## PLAINTIFFS' REPLY TO DOMINION'S RESPONSE
## RE: PLAINTIFFS' MOTION TO AMEND

Plaintiffs, by and through counsel, submit their Reply to Defendant Dominion Voting

Systems, Inc. (Dominion) Response [Doc. 61] regarding Plaintiffs' Motion to Amend [Doc. 48],

and in support state as follows:

### I.        INTRODUCTION

Plaintiffs are seeking the first amendment of their initial Complaint, filed on December

22, 2020 [Doc. 1]. Although Dominion challenges Plaintiffs' right to assert their claims,

Plaintiffs have satisfied their fundamental pleading requirements to establish a redressable injury,

after a completed violation of a constitutional right, traceable to the actions of Dominion.

As alleged, Dominion's widespread and significant involvement in the 2020 Presidential

election (Election) bound it, as a state actor, to the limits of the Constitution, and Dominion

broke those constraints. Dominion's denials regarding the level of their involvement in the

Election, a factual question to be answered later, must be presently rejected. Plaintiffs have been

wrongfully injured by Dominion, and should be permitted to proceed with claims of damages

their Amended Complaint.

1

## II.   PLAINTIFFS HAVE ESTABLISHED STANDING

Plaintiffs have satisfied their fundamental pleading burden of establishing their right to

proceed with a claim against Dominion:

> To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

*IUzuegbunam v. Preczewski*, 592 U.S. ____ (2021) (slip op., p. 3).

Plaintiffs also sufficiently alleged their claims:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 883, 889 (1990)).

F.R.C.P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave"

and that "[t]he court should freely give leave when justice so requires."

As determined by the Supreme Court, F.R.C.P. 15(a) declares that leave to amend shall

be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his

*mandate is to be heeded*." *Id*. [Emphasis added].

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given. Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.*

## A.  PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

Plaintiffs have alleged violations of their constitutional rights, and generally challenged

the due process Dominion provided to administer the Election, as more fully outlined in their

Amended Complaint. [Doc. 48, Attachment 1.] Cognizable injuries are:

> [a]n "injury in fact"—an invasion of a legally protected interest which is (a)
> concrete and particularized; and (b) "actual or imminent, not 'conjectural' or
> hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 561 (*quoting Whitmore v. Arkansas*, 495 U.S. 149, 155
(1990)).

There, even "purely esthetic purposes" can be enough of an injury:

> Of course, the desire to use or observe an animal species, even for purely esthetic
> purposes, is undeniably a cognizable interest for purpose of standing.

*Id.* (*citing Sierra Club v. Morton,* 405 U.S.727, 734 (1972)).

Plaintiffs' interests in the due process of the Election and their fundamental right to vote

are certainly more significant, and less publicly common, than a denial of esthetic pleasure

derived from wildlife gazing. Importantly, every member of the class has each suffered this

injury, separate and distinct from members of the public:

> [T]he "injury in fact" test requires more than an injury to a cognizable interest. It
> requires that the party seeking review be himself among the injured.

*Id.* (*quoting Sierra Club v. Morton,* 405 U.S. at 734-735).

## B.  A CONSTITUTIONAL INFRINGEMENT IS AN INJURY IN FACT

In *Uzuegbunam*, the Supreme Court clarified that suffering a violation of a constitutional

right is an injury in fact, and further clarified that nominal damages are sufficient to redress that

injury. There, the Court detailed the long history of finding injury in fact from a violation of

rights, including voting rights:

3

An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote, the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. *Ashby v. White*, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K. B. 1703). Dissenting, Lord Holt argued that the common law inferred damages whenever a legal right was violated. Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]." *Id.*, at 955, 92 Eng. Rep., at 137. Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, 3 Salk. 17, 91 Eng. Rep. 665 (K. B. 1703), and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases," *Embrey v. Owen*, 6 Exch. 353, 368, 155 Eng. Rep. 579,585 (1851).

* * *

*Because the common law recognized that "every violation imports damage," Justice Story reasoned that "[t]he law tolerates no farther inquiry than whether there has been the violation of a right." Ibid.* Justice Story also made clear that this logic applied to both retrospective and prospective relief. *Id.,* at 507 (stating that nominal damages are available "wherever there is a wrong" and that, "[a] fortiori, this doctrine applies where there is not only a violation of a right of the plaintiff, but the act of the defendant, if continued, may become the foundation, by lapse of time, of an adverse right").

*Uzuegbunam*, *supra*, slip op., p. 6. [Emphasis added].

That this rule developed at common law is unsurprising in the light of the noneconomic rights that individuals had at that time. *A contrary rule would have meant, in many cases, that there was no remedy at all for those rights, such as due process or voting rights, that were not readily reducible to monetary valuation*.

*Id.* [Emphasis added].

## C.   PLAINTIFFS' INJURIES ARE NOT GENERAL GRIEVANCES

Plaintiffs have not simply claimed general grievances because not all members of the public possessed the right to vote in the Election. Only those who had met minimum eligibility qualifications, and had properly completed a legislatively proscribed registration process, possessed the right, and could legally vote. Instead, this case is "simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations." *Defenders of*

4

*Wildlife*, 504 U.S. at 561. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*.

Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public." *Id*. Certainly, members of the public are each impacted equally by the ultimate results of an election. But members of the public, generally, cannot vote. Members of the public, who are not registered voters, did not possess a right to vote in the Election, and could not legally vote. Members of the public could not have been deprived of due process during the administration of the Election, because they possessed no right to participate.

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020), relied upon by Dominion, supports Plaintiffs' position even though it found that the plaintiff in that case did not have standing to ask a federal court to enforce extraordinary injunctive relief against a sovereign state. Importantly, in *Wood*, the plaintiff did not seek any form of monetary damages against public officials. The *Wood* court explained that the plaintiff "base[d] his standing on his interest in 'ensuring that . . . only lawful ballots are counted,'" and the court reasoned that "[a]ll Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered." *Id*.

But the *Wood* court did not address whether a registered voter possessed a due process right violated by Dominion during its administration of the Election. Instead, the plaintiff in *Wood* argued "that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote." But while recognizing that "[t]o be sure, vote dilution can be a basis for standing," the *Wood* court carved out simple counting errors from this category of standing:

> By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally

5

and thus on the proportional effect of every vote." Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing."

*Id*. (quoting *Bognet v. Sec'y Commonwealth of Pa*., 980 F.3d 336, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020).

Here, Dominion's role far exceeded the simple tabulation of votes, and many more than "a vote" from a "single voter" have been impacted. Dominion's Election administration resulted in a fundamentally unfair process as outlined in their First Amended Complaint. Importantly, Plaintiffs are not seeking extraordinary relief against a sovereign state to stop or overturn the Election, but instead, they seek monetary relief against specific state actors for violation of rights held by many, but not the public generally.

**D.    PLAINTIFFS' INJURIES ARE FAIRLY TRACEABLE TO DOMINION'S STATE ACTION**

Plaintiffs are generally challenging the due process established by Dominion through government contract, and used in 28 states, to administer the Election, as more fully stated in Plaintiffs' Amended Complaint.

> there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'

*Lujan*, 504 U.S at 561 (*quoting Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 41-42 (1976).

State action is a straight line that can be traced between Dominion and Plaintiffs' injuries. *See Tanzin v. Tanvir*, 141 U.S. 486 (2020). In *Tanzin*, the Supreme Court affirmed personal liability of state actors for violation of religious freedoms by reaffirming personal liability on state actors under Section 1983 claims:

The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983. That statute applies to "person[s] ... under color of any statute," and this Court has long interpreted it to permit suits against officials in their individual capacities. Because RFRA uses the same terminology as § 1983 in the very same field of civil rights law, "it is reasonable to believe that the terminology bears a consistent meaning." A suit against an official in his personal capacity is a suit against a person acting under color of law.

*Id*. at 490-91 (internal cites omitted).

This availability of damages under § 1983 is particularly salient in light of RFRA's origins. When first enacted, RFRA defined "government" to include an "official (or other person acting under color of law) of the United States, a State, or a subdivision of a State." It made no distinction between state and federal officials. After this Court held that RFRA could not be enforced against the States, Congress narrowly amended the definition "by striking 'a State, or a subdivision of a State.'" That context is important because RFRA made clear that it was reinstating both the pre-Smith substantive protections of the First Amendment and the right to vindicate those protections by a claim. There is no doubt that damages claims have always been available under § 1983 for clearly established violations of the First Amendment.

*Id*. at 492.

Similarly, Dominion, as a state actor administering the Election in 28 states, violated Plaintiffs' due process rights and burdened their right to vote. Although Dominion argues the factual question about whether it is state actor, for purposes of Plaintiffs' Amended Complaint, Dominion's substantial involvement in the administration of the Election cannot be disputed.

## E.    NOMINAL DAMAGES BY ITSELF CAN REDRESS A PAST INJURY

The constitutional violations suffered by Plaintiffs have been completed, and are no longer speculative:

[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*Defenders of Wildlife*, 504 U.S at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 43 (1976)).

7

"[A] request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 592 U.S \_\_\_\_, \_\_\_\_(2021)(slip op., at p. 2)  Federal questions do not require any amount-in-controversy:

> Congress abolished the statutory amount-in-controversy requirement for federal-question jurisdiction in 1980. Federal Question Jurisdictional Amendments Act, 94 Stat. 2369. And we have never held that one applies as a matter of constitutional law. [F]or purposes of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.

*Id*. (slip op., at p. 11).

Completed violations of constitutional rights are redressable by nominal damages even if unquantifiable:

> Because 'every violation [of a right] imports damage,' nominal damages can redress [a plaintiff's] injury even if he cannot or chooses not to quantify that harm in economic terms.

*Id*. (slip op., at p. 6).

### III.   PLAINTIFFS' CLAIMS ARE NOT FUTILE

### A.   DOMINION CANNOT DISPUTE ITS STATE ACTION

Dominion argues that Plaintiffs' claims are "futile" because it does not accept that it was a state actor during the Election. But whether Dominion's involvement in the Election was sufficient to be a state actor is a specific question of fact that Dominion cannot challenge at this stage.  Further, Plaintiffs have alleged specific facts, not merely conclusory statements, such as Dominion's contract with Georgia to be the "Master Solution" for voting in the State, that when accepted as true (as is required), plausibly allege sufficient involvement of Dominion in the Election to be a state actor.

Dominion further makes factual challenges, and disputes specific allegations of fact, including those from published media articles, expert reports, state analysis, congressional

8

letters, and affidavits under oath in other cases, regarding vulnerabilities with Dominion systems and fatal flaws with its processes, that went uncorrected prior to the Election, which Dominion claims do not rise to constitutional violations. But despite Dominion's disbelief, at this stage, it cannot challenge the multitude of discrepancies, which published reports now include plausible claims of common algorithms used to manipulate results across the country, including in Colorado, and electronic hacking by foreign actors. These allegations, if accepted as true as they must be, demonstrate a complete lack of trustworthiness of the electoral due process administered by Dominion, which generated unverifiable results and cannot be shown to reflect reality.

### B. PLAINTIFFS HAVE SUFFICIENTLY PLEAD CIVIL RICO CLAIMS

Plaintiffs' Amended Complaint has sufficiently pleaded civil RICO violations by Defendants. Dominion challenges Plaintiffs pleading by alleging it did not plead damage to their business or property. Dominion relies on a single case, that merely states it could find no other cases, treating a vote as a "property" interest. Dominion's Brief at 12.

But it should be self-evident that a person's vote has at least an intellectual property interest. Further, the ballot is the physical manifestation of a person's vote, containing the registered voter's identification, delivered in-person or by mail. In fact, ballots were counted in the Election, not "votes."

Dominion was charged by contract with responsibility for processing all ballots, including cyber security, during the administration of the Election where it was contracted. The multitude of flaws pleaded, which cannot be disputed, caused injury to Plaintiffs votes and cannot be verified. Plaintiffs have further sufficiently plead all other RICO elements supported by fact and plausibly connected through unrefuted published media reports, including TIME.

9

## IV.    DOMINION HAS SUFFICIENT MINIMUM CONTACTS

While Dominion is a foreign corporation based in Canada, Dominion claims Denver,

Colorado, as its U.S. headquarters. Dominion maintained offices in Denver during the Election,

and it employed Coloradoans. Dominion also administered the Election in Colorado.  Dominion

was even personally served in Colorado.  While Dominion seemingly argues that other

Defendants may not have minimum contacts to support jurisdiction, it cannot argue that

Dominion lacks the necessary minimum contacts for jurisdiction.

## V.    CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant its Motion to

Amend.

Respectfully submitted this 8th day of April, 2021.

*PLAINTIFFS COUNSEL:*

By: *s/Ernest J. Walker*                                        By:     *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                             Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE                     LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                                    1444 Stuart St.
Denver, CO 80204                                              Denver, CO 80204
(720) 306-0007                                                   (720) 306-0007
ernestjwalker@gmail.com                                gary@fielderlaw.net

Appendix Page 1344

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO
## DEFENDANTS WOLF AND DEGRAFFENREID'S MOTION TO DISMISS

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following

Response and Brief in Opposition to Defendant Tom Wolf's and Acting Secretary Veronica

Degraffenreid's motion to dismiss [Doc. 49], and hereby respectfully request that the motion be

denied or, in the alternative, determined to be moot, for the reasons set forth below.

## I. INTRODUCTION

The Plaintiffs have not sued the State of Pennsylvania. When state actors are in their

official capacity, they represent the State. Naming persons in their official capacity is tantamount

to suing a State. While a citizen may not sue a State for damages, a citizen is allowed to request a

federal court to enjoin a State from prospective unconstitutional behavior. Nonetheless, when

state actors violate the Constitution, they are stripped of their official capacity and are liable in

their individual capacity. That is the holding in *Ex Parte Young*, which is the law of the case in

this matter. The Plaintiffs herein have filed an Amended Complaint, and a request for class

designation. Accordingly, the motion to dismiss filed herein is moot.

1

## II.    BACKGROUND

As is outlined in the Complaint, the Defendants, Kathy Boockvar (Ms. Boockvar) and Tom Wolf (Mr. Wolf), violated the constitutional rights of the Plaintiffs, and of a class of similarly situated persons. All of Ms. Boockvar's and Mr. Wolf's conduct was under color of their official authority of as the secretary of the Commonwealth and governor of Pennsylvania, respectively. By violating the Constitution, Ms. Boockvar and Mr. Wolf are liable in their personal capacity. The grounds upon which the Plaintiffs have made their claims are well documented, and are cited throughout the Complaint.

As such, Ms. Boockvar and Mr. Wolf's actions burdened the rights of the Plaintiffs to vote for the Vice-President and President. These individuals knew that their actions concerned a Presidential election. Both swore an oath to protect and defend the Constitution of the United States. Accordingly, Pennsylvania can state in its pleading that it "held a free, fair, and lawful election in which more than 6.9 million Pennsylvanians voted for President," but the Plaintiffs have established an issue of fact as to whether that is true. Doc. 49, p.1.

Ultimately, the Supreme Court found that the State of Texas had "not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec 11, 2020). Additionally, in *Donald J. Trump for President v. Boockvar et al.*, former President Trump filed a Motion for Expedited Consideration in the United States Supreme Court to evaluate the constitutionality of the three Pennsylvania Supreme Court decisions: *In re November 3, 2020 Gen. Election*, *In re Canvassing Observation*, and *In re Canvass of Absentee & Mail-Ballots of November 3, 2020*. However, the Supreme Court dismissed the case on February 22, 2021, without comment. The Plaintiffs have since filed a constitutional challenge to Act 77, the source of the controversy, in their Amended Complaint.

Numerous other private lawsuits have been filed. However, all of them have named the Defendants, herein, in their official capacity. Here, the Plaintiffs name Ms. Boockvar and Mr. Wolf in their individual capacity, in both the original and amended complaints. That's not a pleadings device or trick—that's how the Constitutions works in conjunction with the Civil Rights Act, and other federal laws prohibiting the violation of rights.

When voters come to the federal courts with valid constitutional claims, pursuant to § 1983, counsel for the plaintiff becomes a private attorney general. In that regard, the Plaintiffs have not requested that the Court impose extraordinary relief, which would require a plaintiff to establish a likelihood of success on the merits. That's not the standard, here. In fact, although the constitutional challenge in the Amended Complaint is a question of law, if the jury finds in favor of the Plaintiffs and determines that Ms. Boockvar and Mr. Wolf violated the Constitution, both are stripped of the protections of their office, which would otherwise cloak them with immunity under the Eleventh Amendment.

At this stage, the Court must accept all well plead facts as true. Thus, the issue is: If a governor, in concert with the secretary of state of that same State, engaged in conduct which violates the constitutional rights of others, even in other States, can those state actors be held responsible? If these state actors are liable for their unconstitutional conduct, who can hold them responsible? According to every Defendant in this lawsuit, the registered voter cannot. They don't have standing, say the Defendants. The registered voter, who mailed in her ballot, or waited in line to vote in a Presidential election, doesn't have standing? If they don't, then who does? Since the Plaintiffs obviously have standing, it is not necessary to labor over the latter question.

3

## III.    THE DEFENDANTS APPEAR IN THEIR INDIVIDUAL CAPACITY

The Defendants, Ms. Boockvar and Mr. Wolf, have been sued their individual capacity. Comp. ¶¶ 23, 24. "A suit against an official in his personal capacity is a suit against a person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983. *Id*. As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has long interpreted it to permit suits against officials in their individual capacities.

*Id*.

The plain language of § 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any citizen of the United States* or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [Emphasis added].

Here, the Defendants are persons under the statute that violated the rights of many citizens of the United States, in Pennsylvania, Colorado, and every other state in the Union. Knowingly violating the rights of voters in a Presidential election has far reaching consequences that effect every registered voter, including the Plaintiffs. In that regard, Defendants, Ms. Boockvar and Mr. Wolf admit to being served on Feb 25, 2021. Doc. 49, p. 2, no. 2. However, the Defendants deny that the Court has personal jurisdiction over them. *Id*. at pp 5-7.

"The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to the Constitutions full extent." *Id*.

4

With that, due process "requires both that the defendant 'purposefully established minimum contacts within the forum State'" and that the "assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held that the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S.____,____ (2021). There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at slip op., p. 2 (*quoting Bristol-Myers*, 582 U.S.____, ____(2017)(slip op., at 5).

The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). "Or put just a bit differently, 'there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore

subject to the State's regulation.'" *Id*. at slip op., p. 6 (*quoting Bristol-Meyers*, 582 U.S., at____-

____,____(slip op., at 5-6, 7)(*quoting Goodyear*, 564 U.S. 915, 919 (2011).

Here, both Ms. Boockvar and Mr. Wolf were responsible for the certification of

Pennsylvania's election, which included the 2020 Presidential election. As outlined with

specificity in the Plaintiffs' Complaint, Ms. Boockvar, "without legislative approval, unilaterally

abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in

ballots. " *Complaint*, Doc. 1, ¶ 232 (a). *See Complaint*, ¶¶ 219-232. As alleged, this "entire

scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it

permitted the illegal removal of ballots from their lock containers prematurely," which created "a

system whereby local officials could review ballots without proper announcement, observation,

and security." *Complaint*, ¶ 232(a)-(h).

These actions were done with the knowledge and consent of the State's chief executive

officer, Mr. Wolf. Accordingly, because of that, and the other unconstitutional acts and laws

concerning Pennsylvania's 2020 Presidential election, both Ms. Boockvar and Mr. Wolf violated

their oaths of office when they signed the Certificate of Ascertainment on November 24, 2020.

*Complaint*, ¶¶ 249, 252. With that, these Defendants' knew that their acts would affect the voting

rights of every person eligible to vote in the United States, which includes the Plaintiffs.

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*,

110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is

as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S.

383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately

touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely

important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significant contacts to Colorado in association with the 2020 Presidential election. See Doc. 39, 40, 64.

After the 2020 Presidential election, when a representative of Dominion cancelled a scheduled appearance at a fact-finding hearing set for November 20, 2020, State Representative Seth Grove, the interim chairman for the State Government Committee and Chair of the Government Oversight Committee, publicly stated:

> It is vitally important voters have faith in the machines they use to cast their ballots. On the heels of Gov. Tom Wolf unilaterally decertifying every voting machine in the Commonwealth, we need to know whether these new machines met expectations, whether they are reliable and whether they are not subject to interference…I was impressed at what appeared to be the willingness that Dominion Voting Systems to address accusations and it would have put 1.3 million Pennsylvanians who used their machines at ease—including myself, thinking Dominion was willing to publicly back up their product which PA taxpayers invested millions to purchase… Unfortunately, last evening. Dominion Voting Systems lawyered up, and backed out of their commitment to the people of Pennsylvania to provide their input in a pubic format.[1]

With regard to personal jurisdiction, as well, counsel for the Defendants filed their motion to dismiss on behalf of "Pennsylvania Governor Tom Wolf and Pennsylvania Acting Secretary of the Commonwealth Veronica Degraffenreid," claiming to substitute the latter for Ms. Boockvar. Doc. 49, p. 1, no.1. Counsel also entered their appearance on behalf of "Defendants Governor Tom Wolf and Acting Secretary Veronica Degraffenreid." Doc. 57. However, Mr. Wolf has not been sued in his official capacity, and Secretary Veronica Degraffenreid hasn't been named, in any capacity.

## IV.    THE PLAINTIFFS HAVE STANDING TO SUE INDIVIDUALS THAT VIOLATE THEIR CONSTITUTIONAL RIGHTS

Last month, the Supreme Court affirmed an individual's right to sue a state official for nominal damages in the latter's individual capacity. *Uzuegbunam v. Preczewski*, 592 U.S.____ (2021). The plaintiffs were former students of Georgia Gwinnet College, who wished to share their faith while enrolled there. *Id*. at slip op., p. 1.

---

[1] Debra Heine, *Dominion Voting Systems 'Lawyer Up,' Abruptly Backs out of Pennsylvania State House Fact-Finding Hearing*, Minnesota Sun, Nov. 21 (2020).

They sued certain college officials charged with enforcement of the college's speech policies, arguing that these policies violated the First Amendment. *Id*. at slip op., p. 2. The college discontinued the polices, and then sought dismissal on the ground that the policy change left the students without standing to sue. *Id*. at slip op., p. 3.

The Supreme Court held:

> Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

*Id*. at slip op., p. 11.

In *Uzuegbunam*, the plaintiffs' request to change the policy of a State institution would require the Court to maintain jurisdiction over a state actor, only through a district court's power to enjoin the prospective, unconstitutional conduct of the institution. Otherwise, the State would not be liable for any money damages accessed against the state actors, operating in their official capacity. Such claims are barred by the Eleventh Amendment. However, the plaintiffs in *Uzuegbunam* had the right to seek nominal damages from the state actors, individually. That's is exactly what is going on, here. What makes a governor or a secretary of state any different than any other state actor? There is no difference. Just like the defendants in *Uzuegbunam*, if a governor and/or secretary of state violate the constitutional rights of others, the latter has standing to sue the former for damages. The Plaintiffs have been saying this from the beginning.

As the Supreme Court stated:

> To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

*Id*. at slip op., p. 3.

Here, the Supreme Court quoted Lord Holt, who, dissenting in case from 1703, "argued

that the common law inferred damages whenever a legal right was violated." *Id*. at slip op., p. 6.

(citing *Ashby v. White*, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K.B.

1703)).        The Supreme Court elaborated:

> Observing that the law recognized 'not merely pecuniary' injury but also 'personal
> injury,' Lord Holt stated that 'every injury imports a damage' and the plaintiff could
> always obtain damages even if the 'does not lose a penny by reason of the
> [violation.].'"

*Id*., quoting Ashby, supra, at 955, 92 Eng. Rep., at 137.

The Supreme Court recognized that, while this common-law doctrine "was not

universally followed," "many adopted the rule in full whenever a person proved that there was a

violation of an "'important right.'" *Id*. at p.7. (*citing Hecht v. Harrison*, 40 P.2d 306, 309-310

(Wyo. 1895). "Nominal damages are not a consolation prize for the plaintiff who pleads, but fails

to prove, compensatory damages." *Id*. at 9. 'They are instead the damages awarded by default

until the plaintiff establishes to some other form of damages, such as compensatory or statutory

damages." *Id*.

"Despite being small, nominal damages are certainly concrete." *Id*. Because nominal

damages are in fact damages paid to the plaintiff, the affect 'the behavior of the defendant

towards the plaintiff' and thus independently provide redress. *Id*. (*quoting Hewitt v. Hewitt*, 482

U.S. 755, 761 (1987).

"Because redressability is an 'irreducible' component of standing [citation], no federal

court has jurisdiction unless it provides a remedy that can redress the plaintiff's injury." *Id*. at

slip op., p. 10 (*quoting Spokeo*, 578 U.S. at 338). Nominal damages are redress, not a byproduct.

*Id*.

10

## V.     PLAINTIFFS HAVE PROPERLY ALLEGED CIVIL RIGHTS
##        CLAIMS AGAINST MS. BOOCKVAR AND MR. WOLF

### A.     MS. BOOCKVAR AND MR. WOLF ARE STATE ACTORS

A Section 1983 claim is only applicable to conduct occurring under color of law. Here,

all of the unconstitutional conduct alleged by the Plaintiffs were committed by Ms. Boockvar

and Mr. Wolf, under color of their official authority as governor and secretary of the

Commonwealth, respectively. Accordingly, there is no question that Ms. Boockvar and Mr. Wolf

are state actors.

Although the Supreme Court found that the State of Texas did not have standing to sue

other States with regard to the latter's' elections, the State of Texas would have standing to sue

certain individual, state actors, for violating the rights of its citizens. Maybe it will join in this

suit, but that question is not before the Court. The issue is can the Plaintiffs sue these named

persons, in their individual capacity.

### B.     PLAINTIFFS HAVE STATED A CLAIM UPON WHICH RELIEF
###        MAY  BE GRANTED

A Section 1983 claim requires a plaintiff to show both the existence of a federally

protected right and the deprivation of that right by a person acting under color of state law. 42

U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

Accordingly, as averred, the Plaintiffs have suffered a particularized injury-in-fact. The

legislative history of section 1983 "demonstrates that it was intended to create a species of tort

liability in favor of persons who are deprived of rights, privileges, or immunities secured to them

by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

Here, the Plaintiffs amended their complaint, attached to their motion for leave to amend.

Doc. 48, Ex. 1. In the Amended Complaint, the Plaintiffs, joined by over 140 more Plaintiffs,

11

eight of whom are from Pennsylvania, filed a constitutional challenge to Pennsylvania's Act 77. With that, the Defendants' motion to dismiss cannot be ruled upon outside of the context of these additional parties and claims.

The Defendants allege that the Plaintiffs' original complaint contains no allegations identifying any way in which a defendant did anything other than administer "the 2020 election consistent with Pennsylvania's constitution and election code." Doc. 49, p. 10. However, now that the Plaintiffs have included the constitutional challenge in their Amended Complaint, the analysis is different.

As was stated by the Supreme Court in Ex parte Young:

> The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The *act to be enforced is alleged to be unconstitutional*, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. *It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional*. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case *stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct*. The State *has no power to impart to him any immunity from responsibility to the supreme authority of the United States*. It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality with reference, at least, to the Federal Constitution be first raised in a Federal court that court, as we think is shown by the authorities cited hereafter, has the right to decide it to the exclusion of all other courts.

Ex parte Young, 209 U.S. 123, 159-160. [Emphasis added].

Admittedly, the Supreme Court was presented with similar arguments made by other parties, challenging the constitutionality of Pennsylvania's election laws. As is stated

in the Defendant's motion to dismiss, the Supreme Court has declined to do so. However, that does not foreclose the issue.

In *Kelly v. Commonwealth*, the Plaintiffs argued that Act 77, as described in the Complaint, was unconstitutional, because it expanded the scope of absentee voting to all voters, which, in effect:

> a.  created an entire class of electors who are shown to have received a mail-in ballot, despite never actually receiving a mail-in ballot; and,
>
> b. similarly produced a whole class of voters who received unsolicited or unrequested mail-in ballots that never voted via mail-in ballot and never intended to vote by mail.

Complaint, ¶¶ 233-238.

There, the Pennsylvania Supreme Court dismissed "the petition for review with prejudice based upon the Petitioner's failure to file their facial constitutional challenge in a timely manner." *Kelly v. Commonwealth*, 240 A.3d 1255, 1256 (2020). Additionally, the Pennsylvania Supreme Court noted that the petitioners "sought to invalidate the ballots of the millions of Pennsylvania voters who utilized the mail-in ballot procedures established by Act 77 and count only those ballots that Petitioners deem to be 'legal votes.'" *Id*. "Alternately, Petitioners advocated the extraordinary proposition that the court disenfranchise all 6.9 million Pennsylvanians who voted in the General Election and instead 'direct the General Assembly to choose Pennsylvania's electors.'" *Id*. Essentially, their request for relief was barred by the doctrine of laches. *Id*. at 1256-1257. The merits of the claim were never reached.

With regard to the Defendants' argument that "Count II contends Governor Wolf and Acting Secretary Degraffenreid" violated both the Equal Protection Clause and the Fifteenth Amendment, counsel for the Defendants again simply concludes that the Plaintiffs are suing

13

these state actors in their official capacity. The motion to dismiss makes no motions on behalf of Ms. Boockvar, and does not address the claims made against her, individually.

While it is true that the Equal Protection clause prohibits every state from denying "any person within its jurisdiction the equal protections of the laws," the Defendants argument that the Plaintiffs "may not complain of unequal treatment under Pennsylvania laws that do not apply to them," belies the Plaintiffs' Amended Complaint that includes a number of Pennsylvanians. Since the filing of the Plaintiff's motion for leave to amend, counsel for the Plaintiffs have received hundreds of additional affidavits, many of whom are also registered voters from Pennsylvania. Simply put, it is improper to dismiss the Plaintiffs' complaints without additional time to argue the merits of the Amended Complaint, and allow others to join, or be added to the prospective classes.

With regard to the Plaintiffs' claim for relief under the Due Process Clause, the Plaintiffs have established a triable issue of fact concerning the fundamental fairness of Pennsylvania's voting system. The cases cited by the Defendants, while instructive with regard to the Pennsylvania Supreme Court's interpretation of Pennsylvania election law, these statutory considerations do not resolve the question of the constitutionality of Act 77. This may have been a deficiency in the Plaintiffs' original Complaint, but one which has been cured by the Amended Complaint. At this juncture, it is unfair to require the Plaintiffs to prospectively argue the issues concerning their Amended Complaint in the context of the Defendants' motion to dismiss the original Complaint.

In its motion to dismiss, the Defendants characterize a report filed by Pennsylvania House of Representative, Francis X. Ryan, as "misleading" and "misguided." Doc. 49, pp. 13-14.

14

The Defendant's further malign Representative Ryan's report that states, "it is
IMPOSSIBLE for anyone to contend that fraud did not occur." Doc, 49, p. 14. Noting that
statement is from a Pennsylvania State Representative, there is clearly a factual issue as to
whether Pennsylvania's election is fundamentally unfair. As stated in that same report:

> The general election of 2020 in Pennsylvania was fraught with inconsistencies,
> documented irregularities and improprieties associated with mail-in balloting,
> precanvassing, and canvassing that the reliability of the mail-in votes in the
> Commonwealth of Pennsylvania is impossible to rely upon.

The Defendants also contend that the factual anomalies cited by the Plaintiffs and in the
Ryan Report do not supply "details that might suggest the existence of fraud with the specificity
required by Federal Rules of Civil Procedure 9(b)." Doc. 49, p. 14. In that regard, the Plaintiffs
have not plead fraud. However, the existence of such would certainly be a factual matter to
investigate further, and to later establish to prove the claimed constitutional violations.

Lastly, the Defendants object to the Plaintiffs request for declaratory and injunctive relief,
which are clarified in the Plaintiff's Amended Complaint.

## VI.   MS. BOOCKVAR AND MR. WOLF'S MOTION TO DISMISS IS MOOT

Plaintiffs have filed their motion for leave to amend their complaint. Accordingly,
acceptance of the Amended Complaint renders Ms. Boockvar and Mr. Wolf's motion moot.
Here, the amended complaint adds over 140 additional Plaintiffs, supplements the factual
allegations, and cures any alleged defects in the original Complaint with regard to Rule 23.

### CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court deny Defendants'
motion to dismiss in its entirety, or, in the alternative, deny Defendants' motion as moot, in light
of the Plaintiffs' Amended Complaint.

Respectfully submitted this 8th day of April, 2021.

**PLAINTIFFS COUNSEL:**


By: *s/Ernest J. Walker*                 By:      *s/ Gary D. Fielder*          
Ernest J. Walker (MI P58635)                          Gary D. Fielder  (CO 19757)
ERNEST J. WALKER LAW OFFICE                   LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                              1444 Stuart St.
Denver, CO 80204                                 Denver, CO 80204
(720) 306-0007                                         (720) 306-0007
ernestjwalker@gmail.com                         gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' REPLY TO GEORGIA DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND

---

Plaintiffs, by and through counsel, submit their Reply to Georgia Defendant's Response [Doc. 58] to Plaintiffs' Motion to Amend [Doc. 48], and state as follows:

### I.      INTRODUCTION

Plaintiffs seek the first amendment of their Complaint, filed on December 22, 2020 [Doc. 1]. the State of Georgia (Georgia) challenges Plaintiffs' right to assert their claims against the individual Defendants Brian Kemp (Kemp)and Brad Raffensperger (Raffensperger). Georgia asserts that all election matters have been "debunked" however limited cases have been decided on the merits as a condition precedent to asserting *res judicata* or issue preclusion. Plaintiffs have satisfied their fundamental pleading requirements to establish a redressable injury, a completed violation of a constitutional right, which is traceable to the actions of the individual Defendants and must be allowed to proceed.

### II.      PLAINTIFFS' AMENDMENT SHOULD BE FREELY GRANTED

Fed. R. Civ. P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

1

As determined by the Supreme Court, Rule 15(a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded*." [emphasis added] *Id.*

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.

*Id.*

Georgia's sole argument in opposition to the Amendment pursuant to Fed. R. Civ. P. 15 authorities, centers around the argument that it is "futile," which appears to allege that Plaintiffs can prove no set of facts that entitle them to relief under a summary judgment standard. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Meade v. Grubbs*, 841 F. 2d 1147, 1148 (10th Cir. 1989).

At this stage in the litigation, federal notice pleading, the Court's review of the sufficiency of the Amended Complaint must presume all of plaintiff's factual allegations are true and construe them in the light most favorable to the Plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Morgan v. City of Rawlins*, 792 F. 2d 975, 978 (10th Cir. 1986). However, if matters outside the pleadings are considered by the court, Fed.R.Civ.P. 12(b)(6) motion is treated as a motion for summary judgment and disposed of pursuant to Fed.R.Civ.P. 56 and 12(b)(6). *Reed v Dunham*, 893 F.2d 285, 287 (10th Cir. 1990).

Georgia's opinion of other election litigation matters is not relevant without denial or rebuttal Affidavits from parties with first-hand knowledge. Statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment. *Trinsey v. Pagliaro*, 229 F. Supp. 647, 649 (1964).

2

### III.     KEMP AND RAFFENSPERGER HAVE NOT PERSONALLY APPEARED

Plaintiffs hereby incorporate by reference the arguments and authorities set forth in their Motions to Strike Georgia's Appearance and Motion to Dismiss [Doc.69] as though fully contained herein. Although this Court has determined that their appearance by the Georgia Attorney General for Defendants Kemp and Raffensperger in their official capacities is sufficient to defend against potential liability in their personal capacities, these Defendants have not consented to this.

### IV.     KEMP AND RAFFENSPERGER HAVE SUFFICIENT CONTACTS

The Defendants, Mr. Kemp and Mr. Raffensperger, have each been sued their individual capacity. Comp. ¶¶ 21-22. "A suit against an official in his personal capacity is a suit against a person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). "The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983." *Id*. As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has long interpreted it to permit suits against officials in their individual capacities.

*Id*.

The plain language of § 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any citizen of the United States* or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Here, the Defendants are persons under the statute that violated the rights of many citizens of the United States, in Georgia, Colorado, and every other state in the Union.

Knowingly violating the rights of voters in a Presidential election has far reaching consequences, that effect every registered voter, including the Plaintiffs. "The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10ᵗʰ Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to the Constitutions full extent." *Id*. With that, due process "requires both that the defendant 'purposefully established minimum contacts within the forum State' and the 'assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*,___U.S.___,___(2021). There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at

4

slip op., at 2 (*quoting Bristol-Myers Squibb v Superior Ct. of CA*, 582 U.S.____(2017) (slip op., at 5)).

Here, both Mr. Kemp and Mr. Raffensperger, were responsible for the certification of Georgia's election, and made changes to Georgia election laws as outlined with specificity in the Plaintiffs' Amended Complaint. Doc. 38, Attach 1 ¶¶ 493-526. Accordingly, both Mr. Kemp and Mr. Raffensperger violated their respective oaths of office when they certified the election. With that, these Defendants' knew that their acts would affect the voting rights of every person eligible to vote in the United States, including Colorado, and which include the Plaintiffs.

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983). There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each

provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significate contacts in Colorado, and the 2020 Presidential election in Georgia. See Doc. 48 Attach. 1.

## V.    PLAINTIFFS HAVE SUFFICIENTLY ESTABLISHED STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). Plaintiffs have satisfied their fundamental pleading burden of establishing their right to proceed with a claim against the Georgia Defendants:

To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct, but must also seek a remedy that redresses that injury.

*Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021).

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 883, 889 (1990)). F.R.C.P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

6

As determined by the Supreme Court, F.R.C.P. 15(a) declares that leave to amend shall

be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his

*mandate is to be heeded*." *Id.* (emphasis added).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper
> subject of relief, he ought to be afforded an opportunity to test his claim on the
> merits. In the absence of any apparent or declared reason—such as undue delay,
> bad faith or dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice to the opposing
> party by virtue of allowance of the amendment, futility of amendment, etc.—the
> leave sought should, as the rules require, be 'freely given. Of course, the grant or
> denial of an opportunity to amend is within the discretion of the District Court,
> but outright refusal to grant the leave without any justifying reason appearing for
> the denial is not an exercise of discretion; it is merely abuse of that discretion and
> inconsistent with the spirit of the Federal Rules.

*Id.*

## VI.    PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

Plaintiffs have alleged violations of their constitutional rights, as more fully outlined in

their First Amended Complaint. [Doc. 48, Attachment 1.] Cognizable injuries are:

> [a]n "injury in fact"—an invasion of a legally protected interest which is (a)
> concrete and particularized; and (b) "actual or imminent, not 'conjectural' or
> hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 561 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155
(1990)) (internal citations omitted).

Importantly, every member of the class has each suffered this injury, separate and distinct

from members of the public:

> [T]he "injury in fact" test requires more than an injury to a cognizable interest. It
> requires that the party seeking review be himself among the injured.

*Id.* (quoting *Sierra Club v. Morton,* 405 U.S. at 734-735).

## A.     A CONSTITUTIONAL INFRINGEMENT IS AN INJURY IN FACT

In *Uzuegbunam*, the Supreme Court clarified that suffering a violation of a constitutional

right is an injury in fact, and further clarified that nominal damages are sufficient to redress that

injury:

> To satisfy the "'irreducible constitutional minimum'" of Article III standing, a
> plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to
> the challenged conduct, but he must also seek (3) a remedy that is likely to redress
> that injury. *There is no dispute that Uzuegbunam has established the first two
> elements*.

*Id*. (citing *Spokeo, Inc.* v. *Robins,* 578 U. S. 330, 338 (2016); and *Gill* v. *Whitford,* 585 U. S. ___
(2018) (slip op., at 13-14)) (emphasis added).

Regarding the history of a violation of a right satisfying an injury in fact, the Court noted:

> An early case about voting rights effectively illustrates this common-law
> understanding. Faced with a suit pleading denial of the right to vote, the court
> rejected the plaintiff's claim because, among other reasons, the plaintiff had not
> established actual damages. Dissenting, Lord Holt argued that the common law
> inferred damages whenever a legal right was violated. Observing that the law
> recognized "not merely pecuniary" injury but also "personal injury," Lord Holt
> stated that "every injury imports a damage" and that a plaintiff could always
> obtain damages even if he "does not lose a penny by reason of the [violation]."
> Although Lord Holt was in the minority, the House of Lords overturned the
> majority decision, thus validating Lord Holt's position, and this principle "laid
> down . . . by Lord Holt" was followed "in many subsequent cases."

*Id*. (internal citations omitted).

## B.     PLAINTIFFS' INJURIES ARE NOT GENERAL GRIEVANCES

Plaintiffs have not simply claimed general grievances because not all members of the

public possessed the right to vote in the Election. Only those who had met minimum eligibility

qualifications, and had properly completed a legislatively proscribed registration process,

possessed the right, and could legally vote. Instead, this case is "simply a case where concrete

injury has been suffered by many persons, as in mass fraud or mass tort situations." *Defenders of*

8

*Wildlife*, 504 U.S. at 561. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*.

Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public." *Id*.

## VII. PLAINTIFFS' CLAIMS ARE NOT PRECLUDED

Although Defendants hold reliance on several prior election related cases, no prior case involved the same parties, same claims, or sought the same remedies, and no prior case involved a determination of the case on its merits.

### A. GEORGIA DEFENDANTS CANNOT DISPUTE ITS STATE ACTION

Defendants Kemp and Raffensperger were undeniably acting under color of law when they committed violations of Plaintiffs' civil rights. Accordingly, they can be held personally liable.

### B. PLAINTIFFS HAVE SUFFICIENTLY PLEAD CIVIL RICO CLAIMS

Plaintiffs' Amended Complaint has sufficiently pleaded civil RICO violations by Defendants. Defendants challenge Plaintiffs pleading by alleging it did not plead damage to their business or property. But it should be self-evident that a person's vote has at least an intellectual property interest. Further, the ballot is the physical manifestation of a person's vote, containing the registered voter's identification, delivered in-person or by mail. In fact, ballots were counted in the Election, not "votes."

## VIII. CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant its Motion to Amend.

9

Respectfully submitted this 8th day of April, 2021.

**PLAINTIFFS COUNSEL:**

By: *s/Ernest J. Walker*                              By:       *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                          Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE                           LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                       1444 Stuart St.
Denver, CO 80204                                      Denver, CO 80204
(720) 306-0007                                        (720) 306-0007
ernestjwalker@gmail.com                               gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

**PLAINTIFFS' REPLY TO MICHIGAN DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION TO AMEND**

Plaintiffs, by and through counsel, submit their Reply to Michigan Defendant's Response [Doc. 60] to Plaintiffs' Motion to Amend [Doc. 48], and hereby respectfully request the motion be stricken, denied or, in the alternative, determined to be moot, for the reasons set forth below:

### I.      INTRODUCTION

Plaintiffs seek the first amendment of their Complaint, filed on December 22, 2020 [Doc. 1]. Michigan asserts that all election matters have been resolved leaving nothing but frivolous lawsuits, conspiracy theories and far-fetched claims.  But limited cases have been decided on the merits.  Further, a Michigan state court issued a decision on March 9, 2021, invalidating the standards issued by Defendant Jocelyn Benson (Benson) which involved inclusion of a mandatory presumption directly effecting the local election officials' duties and signature verification requirements. A violation of law has already been determined.

### II.      PLAINTIFFS' AMENDMENT SHOULD BE FREELY GRANTED

Fed. R. Civ. P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

1

As determined by the Supreme Court, Rule 15(a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded*." [emphasis added] *Id*.

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.

*Id.*

Michigan's argument in opposition to the Amendment pursuant to Fed. R. Civ. P. 15 authorities, is that Plaintiffs claims are "futile," which appears to allege that Plaintiffs can prove no set of facts that entitle them to relief under a summary judgment standard. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Meade v. Grubbs*, 841 F. 2d 1147, 1148 (10th Cir. 1989). At this stage in the litigation, federal notice pleading, the Court's review of the sufficiency of the Amended Complaint must presume all of plaintiff's factual allegations are true and construe them in the light most favorable to the Plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Morgan v. City of Rawlins*, 792 F. 2d 975, 978 (10th Cir. 1986). However, if matters outside the pleadings are considered by the court, Fed.R.Civ.P. 12(b)(6) motion is treated as a motion for summary judgment and disposed of pursuant to Fed.R.Civ.P. 56 and 12(b)(6). *Reed v Dunham*, 893 F.2d 285, 287 (10th Cir. 1990).

Michigan's opinion of other election litigation matters is not relevant without denial or rebuttal Affidavits from parties with first-hand knowledge. Statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment. *Trinsey v. Pagliaro*, 229 F. Supp. 647, 649 (1964).

### III.     WHITMER AND BENSON HAVE SUFFICIENT CONTACTS

The Defendants, Ms. Whitmer and Ms Benson, have each been sued in their individual capacity. Comp. ¶¶ 21-22. "A suit against an official in his personal capacity is a suit against a person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). "The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983." *Id*. As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has long interpreted it to permit suits against officials in their individual capacities.

*Id*.

The plain language of § 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any citizen of the United States* or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Here, the Defendants are persons under the statute that violated the rights of many citizens of the United States, in Michigan, Colorado, and every other state in the Union.

Knowingly violating the rights of voters in a Presidential election has far reaching consequences, that effect every registered voter, including the Plaintiffs. "The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to the Constitutions full extent." *Id*. With that, due process "requires both that the defendant 'purposefully established minimum contacts within the forum State' and the 'assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S.

3

462, 476 (1985). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*,592 U.S.___,___(2021). There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at slip op., at 2 (*quoting Bristol-Myers Squibb v Superior Ct. of CA*, 582 U.S.____(2017) (slip op., at 5)).

Here, both Ms. Whitmer and Ms. Benson were responsible for the certification of Michigan's election, and made changes to Michigan election laws as outlined with specificity in the Plaintiffs' Amended Complaint. Doc. 48, Attach 1 ¶¶ 430-492. Moreover, recently a Michigan state court issued an order that determined the actions of Defendant Benson, to implement a conclusive presumption that all absentee ballot signatures were valid, was in fact in violation of law. *See Genetski v. Benson*, Mich. Case No. 20-216-MM. Accordingly, both Ms. Whitmer and Ms. Benson violated their respective oaths of office when they certified the

election. With that, these Defendants knew that their acts would affect the voting rights of every person eligible to vote in the United States, including Colorado, and which include the Plaintiffs.

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983). There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc.

(Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significant contacts in Colorado, and the 2020 Presidential election in Michigan. *See* Doc. 48 Attach. 1.

## IV.    PLAINTIFFS HAVE SUFFICIENTLY ESTABLISHED STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). Plaintiffs have satisfied their fundamental pleading burden of establishing their right to proceed with a claim against the Georgia Defendants:

> To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct, but must also seek a remedy that redresses that injury.

*Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021). Plaintiffs sufficiently alleged their claims:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 883, 889 (1990)). F.R.C.P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

As determined by the Supreme Court, F.R.C.P. 15(a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded*." *Id*. (emphasis added).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

> party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given. Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.*

## A.   PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

Plaintiffs have alleged violations of their constitutional rights, as more fully outlined in their First Amended Complaint. [Doc. 48, Attachment 1.] Cognizable injuries are:

> [a]n "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 561 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal citations omitted).

Importantly, every member of the class has each suffered this injury, separate and distinct from members of the public:

> [T]he "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.

*Id.* (quoting *Sierra Club v. Morton,* 405 U.S. at 734-735).

## B.   A CONSTITUTIONAL INFRINGEMENT IS AN INJURY IN FACT

In *Uzuegbunam*, the Supreme Court clarified that suffering a violation of a constitutional right is an injury in fact, and further clarified that nominal damages are sufficient to redress that injury:

> To satisfy the "'"irreducible constitutional minimum"'" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *There is no dispute that Uzuegbunam has established the first two elements.*

7

*Id*. (citing *Spokeo, Inc.* v. *Robins,* 578 U. S. 330, 338 (2016); and *Gill* v. *Whitford,* 585 U. S. ___ (2018) (slip op., at 13-14)) (emphasis added). Regarding the history of a violation of a right satisfying an injury in fact, the Court noted:

> An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote, the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. Dissenting, Lord Holt argued that the common law inferred damages whenever a legal right was violated. Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]." Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases."

*Id*. (internal citations omitted).

## C.    PLAINTIFFS' INJURIES ARE NOT GENERAL GRIEVANCES

Plaintiffs have not simply claimed general grievances because not all members of the public possessed the right to vote in the Election. Only those who had met minimum eligibility qualifications, and had properly completed a legislatively proscribed registration process, possessed the right, and could legally vote. Instead, this case is "simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations." *Defenders of Wildlife*, 504 U.S. at 561. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*.

Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public." *Id*.

8

## V.     PLAINTIFFS' CLAIMS ARE NOT PRECLUDED

Although Defendants hold reliance on several prior election related cases, no prior case involved the same parties, same claims, or sought the same remedies, and no prior case involved a determination of the case on its merits.

### A.     MICHIGAN DEFENDANTS CANNOT DISPUTE ITS STATE ACTION

Defendants Whitmer and Benson were undeniably acting under color of law when they committed violations of Plaintiffs' civil rights. Accordingly, they can be held personally liable.

### B.     PLAINTIFFS HAVE SUFFICIENTLY PLEAD CIVIL RICO CLAIMS

Plaintiffs' Amended Complaint has sufficiently pleaded civil RICO violations by Defendants. Defendants challenge Plaintiffs pleading by alleging it did not plead damage to their business or property. But it should be self-evident that a person's vote has at least an intellectual property interest.  Further, the ballot is the physical manifestation of a person's vote, containing the registered voter's identification, delivered in-person or by mail. In fact, ballots were counted in the Election, not "votes."

## VI.     CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant its Motion to Amend.

Respectfully submitted this 8th day of April, 2021.

*PLAINTIFFS COUNSEL:*

By: *s/Ernest J. Walker*                                By:     *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                    Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE             LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                    1444 Stuart St.
Denver, CO 80204                          Denver, CO 80204
(720) 306-0007                                  (720) 306-0007
ernestjwalker@gmail.com                  gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

**PLAINTIFFS' REPLY TO DEFENDANT CENTER FOR TECHNOLOGY AND CIVIC
LIFE'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
COMPLAINT**

Plaintiffs, by and through counsel, submit their Reply to Defendant CTCL's Opposition

[Doc. 62] to Plaintiffs' Motion for Leave to Amend [Doc. 48], and state as follows:

**I.        INTRODUCTION**

Plaintiffs seek the first amendment of their Complaint, filed on December 22, 2020 [Doc.

1]. Although Defendant, Center for Technology and Civic Life (CTCL), challenges Plaintiffs'

right to assert their claims, Plaintiffs have satisfied their fundamental pleading requirements to

establish a redressable injury, a completed violation of a constitutional right, which is traceable

to the actions of CTCL, and must be allowed to proceed. As alleged, CTCL's private funding,

obtained through donations from Defendants Zuckerberg and Chan, and the exercise of

contractual control of the administration of the 2020 Presidential election (Election) by

agreements with hundreds of local jurisdictions, bound it to the limits of the constitution as a

state actor, but CTCL breached the superior authority of the Constitution. CTCL cannot deny

publicly available government contracts as proof of its exercise of control over the election.

1

## II.    PLAINTIFFS' AMENDMENT SHOULD BE FREELY GRANTED

Fed. R. Civ. P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires." As determined by the Supreme Court, Rule 15 (a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded.*" *Id.* (emphasis added)

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.

*Id.*

CTCL's sole argument in opposition to the other conflicting Fed. R. Civ. P. 15 authorities, centers around the argument that it is "futile," which appears to allege that Plaintiffs can prove no set of facts that entitle them to relief under a summary judgment standard. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Meade v. Grubbs*, 841 F. 2d 1147, 1148 (10th Cir. 1989). At this stage in the litigation, federal notice pleading, the Court's review of the sufficiency of the Amended Complaint must presume all of plaintiff's factual allegations are true and construe them in the light most favorable to the Plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Morgan v. City of Rawlins*, 792 F. 2d 975, 978 (10th Cir. 1986).

CTCL's opinion of other election litigation matters are not relevant without denial or rebuttal Affidavits from parties with first hand knowledge. Statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment. *Trinsey v. Pagliaro*, 229 F. Supp. 647, 649 (1964).

### III.    ARGUMENTS

### A.    PLAINTIFFS HAVE SUFFICIENTLY ESTABLISHED STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). Plaintiffs have satisfied their fundamental pleading burden of establishing their right to proceed with a claim against the Georgia Defendants:

> To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct, but must also seek a remedy that redresses that injury.

*Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021). Plaintiffs sufficiently alleged their claims:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 883, 889 (1990)). F.R.C.P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

As determined by the Supreme Court, F.R.C.P. 15(a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded*." *Id*. (emphasis added).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given. Of course, the grant or

denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.*

## B.   PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

Plaintiffs have alleged violations of their constitutional rights, as more fully outlined in their First Amended Complaint. [Doc. 48, Attachment 1.] Cognizable injuries are:

[a]n "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 561 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal citations omitted).

Importantly, every member of the class has each suffered this injury, separate and distinct from members of the public:

[T]he "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.

*Id.* (quoting *Sierra Club v. Morton,* 405 U.S. at 734-735).

## C.   A CONSTITUTIONAL INFRINGEMENT IS AN INJURY IN FACT

In *Uzuegbunam*, the Supreme Court clarified that suffering a violation of a constitutional right is an injury in fact, and further clarified that nominal damages are sufficient to redress that injury:

To satisfy the "'irreducible constitutional minimum'" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *There is no dispute that Uzuegbunam has established the first two elements*.

*Id*. (citing *Spokeo, Inc.* v. *Robins,* 578 U. S. 330, 338 (2016); and *Gill* v. *Whitford,* 585 U. S. ___ (2018) (slip op., at 13-14)) (emphasis added).

4

Regarding the history of a violation of a right satisfying an injury in fact, the Court noted:

> An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote, the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. Dissenting, Lord Holt argued that the common law inferred damages whenever a legal right was violated. Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]." Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases."

*Id*. (internal citations omitted).

### D.   PLAINTIFFS' INJURIES ARE NOT GENERAL GRIEVANCES

Plaintiffs have not simply claimed general grievances because not all members of the public possessed the right to vote in the Election. Only those who had met minimum eligibility qualifications, and had properly completed a legislatively proscribed registration process, possessed the right, and could legally vote. Instead, this case is "simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations." *Defenders of Wildlife*, 504 U.S. at 561. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*. Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public." *Id*.

Plaintiffs have not simply claimed general grievances because not all possessed the right to vote in the Election. Only those who met minimum eligibility qualifications, and had properly completed a legislatively proscribed registration process, could legally vote. Once the voter registration record was accepted, that one person's vote became their property to the exclusion of

all others, that property interest was to be protected like any other form of property by the government agencies and their contracted administrators.

The alleged conduct of the parties, including CTCL, worked a scheme and device to steal votes from their rightful owners to manipulate through technological and other means in conspiracy with a well-funded group of progressive elites that think their individual votes which they are entitled to are not enough.

This is "simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations." *Id*. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*. Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public. *Id*.

## IV.    CTCL IS A STATE ACTOR

CTCL, appears to generally deny the facts, government records, and public records recording its actions, all of which are heavily documented on their website and the publicly available copies of their grant "conditions,", which contractually exerted undue influence and control over the administration of local elections.

CTCL's cannot deny their IRS Form 990 disclosures reflecting a substantial explosion in funds administered by CTCL without any history of an infrastructure to handle the increased volume of business without outside assistance of the enterprise, state records that prove CTCL is not registered as a valid charity or to do business outside of Illinois, press release admissions that they received over $350 Million Dollars from Defendants Zuckerberg and Chan, that they worked hand in hand with Defendant Facebook and its U.S. Politics and Government Team, that it had substantial involvement in setting election policy at a local jurisdictional level, that it

6

mandated the use of unlawful ballot boxes and ballot extractor machinery that tampered with US Mail and destroyed chain of custody of the ballots in violation of federal postal and election laws, and contractually conditioned the COVID-disguised funds aimed directly at the election machinery on the local jurisdictions following its orders.

Further, CTCL implies that its grant program, funded by Defendants Zuckerberg and Chan has survived all legal scrutiny. However, no court case involved CTCL, and all failed to reach a final judgment on the merits in as many as 15 other district court cases, which is a factual misstatement and lacks candor. The cases referenced involved suits initiated by political groups seeking extraordinary relief from the district court, and involved parties suing government jurisdictions, none of which involved CTCL.

As the district court in Wisconsin determined:

> Though this is a federal lawsuit seeking relief in a federal court, Plaintiffs have offered only a political argument for prohibiting municipalities from accepting money from private entities to assist in the funding of elections for public offices. *They do not challenge any specific expenditure of the money; only its source. They make no argument that the municipalities that received the funds used them in an unlawful way to favor partisan manner.* Their brief is bereft of any legal argument that would support the kind of relief they seek. They cite Article I, section 4, of the United States Constitution, but that section governs the election of senators and representatives, and they fail to explain how, even if they had standing, the Cities' use of funds donated by a private party could have affected any such election.

*Wis. Voters All. v. City of Racine, Case Number:* 1:20-cv-1487, Docket #49, *Order Granting Defendant's Motion to Dismiss* (Emphasis added).

## V. PLAINTIFFS HAVE SUFFICIENTLY PLEAD RICO CLAIMS

CTCL actively participated in an association in fact, with the purpose and aim to interfere with the orderly and fair administration of the American election system, and to increase votes for its progressive political ideology through deceptive use of unlawful voting practices. The function of effecting votes through the enterprise scheme and device was to destroy the one

7

person, one vote fairness by increasing the value of a select few individuals by using their cash to multiply the effect of their singular vote.

CTCL asserts that Plaintiffs RICO claims lack an interest in property sufficient to establish a claim for relief. Plaintiffs, a large class of registered voters disagree. A registered voter, having confirmed his registration, is entitled to his vote. This fundamental right is also a property right to that vote, excluding all others. CTCL asserts that there is no property interest involved sufficient to invoke the Civil RICO statutes. However, every vote of every registered voter is sacred property to the voter and to the exclusion of all others. Every Plaintiff named in the Amended Complaint, regardless of the political party has suffered monetary loss of property due in part to the changes in the Administration to include:

This exclusion extends to CTCL and the RICO enterprise, who covet votes that may be abstaining from the voter process. The scheme was devised to work a coordinated effort to flood the US Mail, coordinated through state actors that had the ability to act under color of authority to change or at a minimum create unlawful rules changes to achieve the goal.

CTCL cites authority of cases that address the pleading standard of RICO claims, which are defective in the manner used at this stage. The cases involve dismissal of RICO claims after the parties' failure to establish a cognizable set of facts to survive summary judgment. A review for the deficiency of a complaint at this stage, especially as an attack of a proposed Amended Complaint is simply note ripe.

It is clear by a cursory review of the pleading standards of the cited authorities, the stage of litigation the cases were disposed: "To survive a Rule 12(b)(6) motion, a civil RICO claim must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L v. Imrex Co*., 473 U.S. 479, 496 (1985). CTCL would force Plaintiffs to meet an

unfair and unjust evidentiary standard, while the Court has stayed all discovery and ability of Plaintiffs to establish proper evidence available to all other RICO litigants. This would simply be additional violations of Plaintiffs right of due process and equal protection.

CTCL cannot in good faith deny the specificity of the facts and allegations of Plaintiffs Amended Complaint which clearly outlines the conduct of the named RICO Defendants, that it is an association in fact deduced merely from publicly available information and contracts, that the Defendants had a pattern of said conduct documented by open records, and that the activity involved the interference with the US Mail system, the election system, and utilized a specific and dedicated network owned and controlled by one of the RICO actors.

Additionally, Plaintiffs have identified the association in fact of the well-funded cabal of progressive parties, that the used electronic communication to hold virtual meetings under the direction of a few key individuals, and conspired to unlawfully influence the election through intentional use of the US Mail (Mail Fraud) and that the enterprise was partly funded by Defendants Mark Zuckerberg and Priscilla Chan, and used the Facebook platform and sub-creations as the common network of communication of the enterprise (wire fraud) with its massive election administration machine. Predicate acts include establishing ballot boxes in states where they were illegal, with intention to commit federal crimes of intercepting US Mail in the form of absentee ballots, Censorship of a New York Times Article related to Hunter Biden, which knowingly caused some Democrat voters to state they would never have voted for Biden if Facebook, Zuckerberg and the enterprise had not censored the content, allegedly under Section 230. All electronic and mail communications in furtherance of the enterprise constitute RICO predicate acts.

Respectfully submitted this 8th day of April, 2021.

**PLAINTIFFS COUNSEL:**

By: *s/Ernest J. Walker*   By: *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)   Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE  LAW OFFICE OF GARY FIELDER
1444 Stuart St.        1444 Stuart St.
Denver, CO 80204      Denver, CO 80204
(720) 306-0007       (720) 306-0007
ernestjwalker@gmail.com    gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' REPLY TO PENNSYLVANIA DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND**

---

Plaintiffs, by and through counsel, submit their Reply to Pennsylvania's Opposition [Doc. 59] to Plaintiffs' Motion for Leave to Amend [Doc. 48], and state as follows:

## I.    INTRODUCTION

Plaintiffs seek the first amendment of their Complaint, filed on December 22, 2020 [Doc. 1]. the State of Pennsylvania (Pennsylvania) challenges Plaintiffs' right to assert their claims against the individual Defendants Tom Wolf (Wolf)and Kathy Boockvar (Boockvar), and for automatic substitution of Veronica Degraffenreid (Veronica), in her official capacity. Pennsylvania has not responded to inquiries if it shall be representing the interests of Boockvar, who remains outside the jurisdiction of this Court. Pennsylvania asserts that Plaintiffs claims are frivolous and long settled, however, limited cases have been decided on the merits as a condition precedent to asserting *res judicata* or issue preclusion. Plaintiffs have satisfied their fundamental pleading requirements to establish a redressable injury, a completed violation of a constitutional right, which is traceable to the actions of the individual Defendants and must be allowed to proceed.

1

## II.    PLAINTIFFS' AMENDMENT SHOULD BE FREELY GRANTED

Fed. R. Civ. P. 15(a)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires."

As determined by the Supreme Court, Rule 15(a) declares that leave to amend shall be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his *mandate is to be heeded*." [emphasis added] *Id*.

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.

*Id.*

Pennsylvania's sole argument in opposition to the Amendment pursuant to Fed. R. Civ. P. 15 authorities, centers around the argument that it is "futile," which appears to allege that Plaintiffs can prove no set of facts that entitle them to relief under a summary judgment standard. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Meade v. Grubbs*, 841 F. 2d 1147, 1148 (10th Cir. 1989).

At this stage in the litigation, federal notice pleading, the Court's review of the sufficiency of the Amended Complaint must presume all of plaintiff's factual allegations are true and construe them in the light most favorable to the Plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Morgan v. City of Rawlins*, 792 F. 2d 975, 978 (10th Cir. 1986). However, if matters outside the pleadings are considered by the court, Fed.R.Civ.P. 12(b)(6) motion is treated as a motion for summary judgment and disposed of pursuant to Fed.R.Civ.P. 56 and 12(b)(6). *Reed v Dunham*, 893 F.2d 285, 287 (10th Cir. 1990).

Pennsylvania's opinion of other election litigation matters is not relevant without denial or rebuttal Affidavits from parties with first-hand knowledge. Statements of counsel in their

briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment. *Trinsey v. Pagliaro*, 229 F. Supp. 647, 649 (1964).

## III. WOLF AND BOOCKVAR HAVE SUFFICIENT CONTACTS

The Defendants, Mr. Wolf and Ms. Boockvar, have each been sued their individual capacity. Comp. ¶¶ 23-24. "A suit against an official in his personal capacity is a suit against a person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). "The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983." *Id.* As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has long interpreted it to permit suits against officials in their individual capacities.

*Id.*

The plain language of § 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any citizen of the United States* or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Here, the Defendants are persons under the statute that violated the rights of many citizens of the United States, in Pennsylvania, Colorado, and every other state in the Union.

Knowingly violating the rights of voters in a Presidential election has far reaching consequences, that effect every registered voter, including the Plaintiffs. "The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to the Constitutions full extent." *Id.* With that, due process "requires both that the defendant 'purposefully established minimum

contacts within the forum State' and the 'assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S.___,___(2021).

There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at slip op., at 2 (*quoting Bristol-Myers Squibb v Superior Ct. of CA*, 582 U.S.___(2017) (slip op., at 5)).

Here, both Mr. Wolf and Ms. Boockvar, were responsible for the certification of Pennsylvania's election, and made changes to Pennsylvania election laws as outlined with specificity in the Plaintiffs' Amended Complaint. Doc. 48, Attach 1 ¶¶ 527-587. Accordingly, both Mr. Wolf and Ms. Boockvar violated their respective oaths of office when they certified the

4

election. With that, these Defendants' knew that their acts would affect the voting rights of every person eligible to vote in the United States, including Colorado, and which include the Plaintiffs.

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983). There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc.

(Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significate

contacts in Colorado, and the 2020 Presidential election in Georgia. See Doc. 48 Attach. 1.

## IV.    PLAINTIFFS HAVE SUFFICIENTLY ESTABLISHED STANDING

A Section 1983 claim requires a plaintiff to show both the existence of a federally

protected right and the deprivation of that right by a person acting under color of state law. 42

U.S.C. § 1983; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). Plaintiffs have

satisfied their fundamental pleading burden of establishing their right to proceed with a claim

against the Pennsylvania Defendants:

> To demonstrate standing, the plaintiff must not only establish an injury that is
> fairly traceable to the challenged conduct, but must also seek a remedy that
> redresses that injury.

*Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021). Plaintiffs sufficiently alleged their claims:

> At the pleading stage, general factual allegations of injury resulting from the
> defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that
> general allegations embrace those specific facts that are necessary to support the
> claim."

*Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National*

*Wildlife Federation,* 497 U.S. 883, 889 (1990)). F.R.C.P. 15(a)(2) provides that "a party may

amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when

justice so requires."

As determined by the Supreme Court, F.R.C.P. 15(a) declares that leave to amend shall

be freely given when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[T]his

*mandate is to be heeded.*" *Id*. (emphasis added).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper
> subject of relief, he ought to be afforded an opportunity to test his claim on the
> merits. In the absence of any apparent or declared reason—such as undue delay,
> bad faith or dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice to the opposing

6

> party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given. Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.*

## A.    PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

Plaintiffs have alleged violations of their constitutional rights, as more fully outlined in

their First Amended Complaint. [Doc. 48, Attachment 1.] Cognizable injuries are:

> [a]n "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 561 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155

(1990)) (internal citations omitted).

Importantly, every member of the class has each suffered this injury, separate and distinct from

members of the public:

> [T]he "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.

*Id.* (quoting *Sierra Club v. Morton,* 405 U.S. at 734-735).

## B.    A CONSTITUTIONAL INFRINGEMENT IS AN INJURY IN FACT

In *Uzuegbunam*, the Supreme Court clarified that suffering a violation of a constitutional

right is an injury in fact, and clarified that nominal damages are sufficient to redress that injury:

> To satisfy the "'irreducible constitutional minimum'" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *There is no dispute that Uzuegbunam has established the first two elements*.

*Id*. (citing *Spokeo, Inc.* v. *Robins,* 578 U. S. 330, 338 (2016); and *Gill* v. *Whitford,* 585 U. S. ___ (2018) (slip op., at 13-14)) (emphasis added).

Regarding the history of a violation of a right satisfying an injury in fact, the Court noted:

> An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote, the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. Dissenting, Lord Holt argued that the common law inferred damages whenever a legal right was violated. Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]." Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases."

*Id*. (internal citations omitted).

### C.   PLAINTIFFS' INJURIES ARE NOT GENERAL GRIEVANCES

Plaintiffs have not simply claimed general grievances because not all members of the public possessed the right to vote in the Election. Only those who had met minimum eligibility qualifications, and had properly completed a legislatively proscribed registration process, possessed the right, and could legally vote. Instead, this case is "simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations." *Defenders of Wildlife*, 504 U.S. at 561. This is "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which [did] impair a separate concrete interest of theirs." *Id*.

Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively pronounced to belong to each individual who forms part of the public." *Id*.

### V.   PLAINTIFFS' CLAIMS ARE NOT PRECLUDED

Although Defendants hold reliance on several prior election related cases, no prior case involved the same parties, same claims, or sought the same remedies, and no prior case involved a determination of the case on its merits.

8

## VI.  PENNSYLVANIA DEFENDANTS CANNOT DISPUTE ITS STATE ACTION

Defendants Wolf and Boockvar were undeniably acting under color of law when they committed violations of Plaintiffs' civil rights. Accordingly, they can be held personally liable.

## VII.  PLAINTIFFS HAVE SUFFICIENTLY PLEAD CIVIL RICO CLAIMS

Plaintiffs' Amended Complaint has sufficiently pleaded civil RICO violations by Defendants. Defendants challenge Plaintiffs pleading by alleging it did not plead damage to their business or property. But it should be self-evident that a person's vote has at least an intellectual property interest.  Further, the ballot is the physical manifestation of a person's vote, containing the registered voter's identification, delivered in-person or by mail. In fact, ballots were counted in the Election, not "votes."

## VIII.  CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant its Motion to Amend.

Respectfully submitted this 8th day of April, 2021.

*PLAINTIFFS COUNSEL:*

By: *s/Ernest J. Walker*　　　　　　　　　　By:　*s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)　　　　　　　　　　Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE　　　　　　　　LAW OFFICE OF GARY FIELDER
1444 Stuart St.　　　　　　　　　　　　　　　　　1444 Stuart St.
Denver, CO 80204　　　　　　　　　　　　　　　Denver, CO 80204
(720) 306-0007　　　　　　　　　　　　　　　　(720) 306-0007
ernestjwalker@gmail.com　　　　　　　　　　　　gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 8, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

## PLAINTIFFS' REPLY TO DEFENDANT FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Plaintiffs, by and through counsel, submit their Reply to Defendant Facebook's

Opposition [Doc. 63] to Plaintiffs' Motion to Amend [Doc. 48], and in support state as follows:

### I.     INTRODUCTION

Plaintiffs seek the first amendment of their Complaint, filed on December 22, 2020 [Doc.

1]. Although Defendant, Facebook, Inc. (Facebook), challenges Plaintiffs' right to assert their

claims, Plaintiffs have satisfied their fundamental pleading requirements to establish a

redressable injury, a completed violation of a constitutional right, which is traceable to the

actions of Facebook, and must be allowed to proceed. As alleged, Facebook's widespread and

direct involvement in the administration and bad faith censorship related to the 2020 Presidential

election (Election) bound it to the limits of the constitution as a state actor, but Facebook broke

those constraints.  Facebook's denial of its level of involvement in the Election, and even denial

of minimum contacts with Colorado, is a factual question to be litigated as a legitimate

controversy including disputed issues of material fact that cannot be resolved at this stage.

1

## II.     PLAINTIFFS HAVE ESTABLISHED STANDING AND JURISDICTION

### A.     Facebook has extensive, continuous, and systematic contacts with Colorado

Facebook asserts Plaintiffs Complaint fails to establish personal jurisdiction over

Facebook in Colorado. (Opp., p. 3). The business conduct of Facebook is nationwide and

involves coordinated and conspired activities to, in a politically biased manner, (a) facilitate the

communication network used by the enterprise to interlope into the administration of the national

election; (b) data mine voter information from various sources; (c) coerce election municipalities

to use its platform to create public forums for distribution of information; (d) censor election

related content designed to meet every user of the Facebook platform; and (e) to coordinate and

share its high technology, data mining, and demographic voter information received from its

national-feed platform with other members of the enterprise to achieve the intended goal.

Facebook denies that it does significant business in Colorado, which is on its face

disingenuous and lacks candor to the tribunal. Facebook operates a 26,663 square foot office in

Lower Downtown Denver.[1] Facebook is used by millions of personal and government users in

Colorado providing access to its platform which constitutes a public forum due to its social

media monopoly.[2] The Colorado Secretary of State[3], Attorney General, Governor, and 53 of the

64 Colorado counties maintain Facebook pages utilizing Facebook's platform for dissemination

of election news, election administration and communication, and content. Facebook maintains a

U.S. Politics and Government Team, whose Colorado contact is Jannelle Watson. Facebook

worked in coordination with Defendant Center for Technology and Civic Life in the Colorado

counties of Boulder, Broomfield, Denver, Eagle and Yuma. These are significant contacts.

---

[1] https://www.denverpost.com/2018/11/16/facebook-opens-denver-office/
[2] *FTC v. Facebook, Inc.*, 1:20-cv-03590, Doc. 51, p. 3,¶ 9.
[3] https://www.facebook.com/ColoradoSoS/photos/a.322785844447297/1959081184151080/

Facebook's legal analysis begins with *Daimler v. Bauman*, 571 U.S. 117 (2014), which when considered in relation to the significant business contacts above, establishes that Facebook meets the criteria with "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of actions arising from dealings entirely distinct from those activities." *Id.* at 2849. Facebook additionally satisfies the test of maintaining "continuous and systematic general business contacts." *Id*. at 2849. In Colorado, Facebook's presence includes a U.S. Politics and Government Team contact for the geographical location, an enormous office, and extensive use of its platform by the majority of Executive Branch Public Officers and nearly every county and municipality in Colorado.

The association in fact between Facebook, the Center for Technology and Civic Life (CTCL), and the enormous funding distributed through CTCL to jurisdictions in Colorado for the purchase and implementation of voting equipment and other services contracted with Defendant Dominion Voting Systems, and others, in a continuous and direct coordination of efforts that resulted in the injuries complained of by Plaintiffs. These activities between Colorado government municipalities, state actors, and the other Defendants places in the stream of commerce products that ultimately caused harm, inside the forum, to the injury of Plaintiffs. *Id.*

Facebooks censorship activities, in coordination with other enterprise participants, and its use as the communication network of the enterprise, coupled with the individual involvement of its CEO, Defendant Mark Zuckerberg, and the collective influence wielded over the administration of the national election in Colorado and nationwide, has a causal relationship to the Plaintiffs' injuries that cannot be severed from the activities of the enterprise or this State.

Additionally, the use of Facebook's platform by the overwhelming majority of Colorado counties, creates a national network with direct and close connections to Colorado.

3

**B.      Plaintiffs have satisfied the Article III Standing requirements**

Plaintiffs have satisfied their fundamental burden of establishing their right to proceed with a claim against Facebook. To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct, but must also seek a remedy that redresses that injury. *Uzuegbunam v. Preczewski*, 592 U.S. ___ (2021).

Plaintiffs sufficiently alleged their claims. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 883, 889 (1990)). The *Lujan* court made sufficient distinction between the limited notice pleading requirements relevant to: (1) general factual allegations; (2) the increased standards for summary judgment pursuant to Rule 56; and (3) the adequate evidence standard at the trial stage. *Id* at 561.

The standard applied to notice pleadings is to establish enough factual content to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007); *see also Robbins v. Oklahoma*, 519 F. 3d 1242, 1247 (10th Cir. 2008)

Statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment. *Trinsey v. Pagliaro*, 229 F. Supp. 647, 649 (1964)

The basis of Facebook's argument is that Plaintiffs have failed to allege enough factual content at the notice pleading stage of this litigation, which operates more as an F.R.C.P. 12(b)(1) motion for more definitive statement, but fails to meet the requirements of or reach the level of F.R.C.P 12(b)(6) or 56(c) at this stage of litigation.

### C.     Plaintiffs Have Suffered an Injury In Fact

Plaintiffs have alleged violations of their constitutional rights. Cognizable injuries are:

[a]n "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical.'"

*Defenders of Wildlife*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal citations omitted).

As the Supreme Court stated, one month ago:

To satisfy the "'irreducible constitutional minimum'" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

*Uzuegbunam*, slip op. at p.2.

Here, the Supreme Court quoted Lord Holt, who, dissenting in case from 1703, "argued

that the common law inferred damages whenever a legal right was violated." *Id*. At 6.(citing

*Ashby v. White*, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K.B. 1703).

The Supreme Court elaborated:

Observing that the law recognized 'not merely pecuniary' injury but also 'personal injury,' Lord Holt stated that 'every injury imports a damage' and the plaintiff could always obtain damages even if he 'does not lose a penny by reason of the [violation.].'"

*Id*. at p. 6, (quoting *Ashby*, supra, at 955, 92 Eng. Rep., at 137).

The Supreme Court recognized that, while this common-law doctrine "was not

universally followed, . . . many adopted the rule in full whenever a person proved that there was

a violation of an "'important right.'" *Id*. at p. 7. (*citing Hecht v. Harrison*, 40 P.2d 306, 309-310

(Wyo. 1895). "Nominal damages are not a consolation prize for the plaintiff who pleads, but fails

to prove, compensatory damages." *Id*. at 9. 'They are instead the damages awarded by default

until the plaintiff establishes to some other form of damages, such as compensatory or statutory

damages." *Id*.

"Despite being small, nominal damages are certainly concrete." *Id*. Because nominal

damages are in fact damages paid to the plaintiff, the affect 'the behavior of the defendant

towards the plaintiff' and thus independently provide redress. *Id*. (*quoting Hewitt v. Hewitt*, 482

U.S. 755, 761 (1987).

"Because redressability is an 'irreducible' component of standing [citation], no federal

court has jurisdiction unless it provides a remedy that can redress the plaintiff's injury." *Id*. at 10.

(*quoting Spokeo*, 578 U.S. at 338). Nominal damages are redress, not a byproduct. *Id*.

Plaintiffs have not simply claimed general grievances because not all possessed the right

to vote in the Election. Only those who met minimum eligibility qualifications, and had properly

completed a legislatively proscribed registration process, could legally vote. Once the voter

registration record was accepted, that one person's vote *became their property to the exclusion of

all others*, that property interest was to be protected like any other form of property by the

government agencies and their contracted administrators.

This is "simply a case where concrete injury has been suffered by many persons, as in

mass fraud or mass tort situations." *Id*. This is "a case where plaintiffs are seeking to enforce a

procedural requirement the disregard of which [did] impair a separate concrete interest of theirs."

*Id*. Plaintiffs' qualified voting rights are not merely "public rights that have been legislatively

pronounced to belong to each individual who forms part of the public. *Id*

The national interest in this election outweighs that of any one State. There is a

"pervasive national interest in the selection of candidates for national office, and this national

interest is greater than any interest of an individual State. *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975).

### D.     Plaintiffs Injuries Are Fairly Traceable to Facebook

There must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan* at 560.  It is impossible for Facebook to deny that its activities, independently and coordinated with the other Defendants of the enterprise, funded by Defendants Zuckerberg and Chan, and had a profound effect on the outcome of the 2020 Presidential election, as intended. Facebook cannot in good faith deny they have censored politically dissenting, *non-pornographic*, content in bad faith and in violation of Section 230. The content censored is only offensive to ideology of Zuckerberg and the enterprise.

### E.     A Constitutional Infringement is an Injury In Fact.

The constitutional violations suffered by Plaintiffs have been completed, and are no longer speculative. [I]t must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan at* 561 (quoting *Simon,* 426 U.S. at 38, 43). "[A] request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*.

Federal questions do not require any amount-in-controversy:

> Congress abolished the statutory amount-in-controversy requirement for federal-question jurisdiction in 1980. Federal Question Jurisdictional Amendments Act, 94 Stat. 2369. And we have never held that one applies as a matter of constitutional law. [F]or purposes of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.

*Id*., slip op., p. 11.

7

Completed violations of constitutional rights are redressable by nominal damages even if unquantifiable:

> Because "every violation [of a right] imports damage," nominal damages can redress [a plaintiff's] injury even if he cannot or chooses not to quantify that harm in economic terms.

*Id*.

### III.    PLAINTIFFS' AS APPLIED SECTION 230 CHALLENGE IS RIPE

"Internet and other interactive computer services offer a forum for a true diversity of political discourse." 47 U.S.C. § 230(a)(3). When the government delegates to a private party a function traditionally exclusively reserved to the government then the private party is necessarily a state actor. *Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1442, 1456 (10th Cir. 1995). By giving these private companies special privileges, governments place them in a category distinct from other companies and closer to some functions, like the postal service, that the State has traditionally undertaken. *Biden v. Knight First Amend. Inst*., 593 U.S.___(2021).

The original need for the provisions of 47 U.S.C. § 230 (Section 230) was to create safeguards for minors and other victims of sexual exploitation from the rapidly expanding open forum of the Internet, in 1996. It is a clear distinction that political speech, dissenting speech and other forms of diverse and robust intellectual conversation in the public forum was not the intent of the censorship ideology set forth by granting some level of immunity to "Good Samaritans" for blocking and censoring pornographic material, the real concern of Congress.

The time for a comprehensive analysis of Facebook as a state actor, administrating what has become a monopolized Public Forum, yet privately controlled, and the pending challenge of the constitutionality of Section 230 as applied to the Facebook monopoly is now. It changes nothing that these platforms are not the sole means for distributing speech or information.

A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing whether a company exercises substantial market power, what matters is whether alternatives are comparable. For many of today's digital platforms, nothing is. *Id*, at p. 8.

Facebook asserts that it has immunity from this direct constitutional challenge of its conduct, as it applies to Section 230 immunity, and claims First Amendment protection for its speech, but not that of its political opponents or those of Zuckerberg and the enterprise. No governmental immunity can apply to bad faith and unlawful use of a monopolized Public Forum that has reached a market dominance that allows it to act as judge, jury and executioner of free speech. This is extensively proven by Facebook's expansion of it illegitimate "fact-checking" conglomerate that is politically biased and not regulated by any form of government oversight.

The factual basis of Facebook's claim to immunity, is meritless and has come to an end. As the conduct complained of, and the content censored by Facebook as part of its participation in the enterprise, lacks credulity that it was censoring pornographic content or content that was offensive under any legal standard other that it was offensive to Facebook's political ideology.

## IV. PLAINTIFFS HAVE SATISFIED PLEADING STANDARDS

Facebook cannot have it both ways, it asserts that the 115 page, 900 plus paragraph complaint of concise statements fails to state sufficient facts to justify a claim for relief, then contradicts itself by stating that the factual content fails F.R.C.P. 8(a). There is nothing vague about Plaintiffs' Amended Complaint, the facts, parties and involvement of the Defendants, and claims for relief are pled with specificity to establish a claim for violation of rights under 42 U.S.C. § 1983, RICO laws, and to establish that a well-funded cabal of progressive elites coordinated their efforts to effect the election.

9

## V. PLAINTIFFS RICO CLAIMS ARE SUFFICIENT

Plaintiffs have sufficiently outlined the association in fact of the well funded cabal of progressive parties that conspired to unlawfully influence the election, lead by Mr. Podhorzer, funded by Mark Zuckerberg and Priscilla Chan, and used the Facebook platform and sub-creations as the common network of communication of the enterprise with its massive election administration machine. Predicate acts include establishing ballot boxes in states where they were illegal, with intention to commit federal crimes of intercepting US Mail in the form of absentee ballots, censorship, e.g., of a New York Times Article related to Hunter Biden, which knowingly caused some Democrat voters to state they would never have voted for Biden if Facebook, Zuckerberg and the enterprise had not censored the content, allegedly under Section 230. All electronic and mail communications in furtherance of the enterprise constitute RICO predicate acts.

## VI. CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant its Motion to Amend.


Respectfully submitted this 8th day of April, 2021.


**PLAINTIFFS COUNSEL:**


By: *s/Ernest J. Walker*　　　　　　　　By:　*s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)　　　　　　　Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE　　　　　　LAW OFFICE OF GARY FIELDER
1444 Stuart St.　　　　　　　　　　　　　　1444 Stuart St.
Denver, CO 80204　　　　　　　　　　　　Denver, CO 80204
(720) 306-0007　　　　　　　　　　　　　(720) 306-0007
ernestjwalker@gmail.com　　　　　　　　　gary@fielderlaw.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 9, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Gary D. Fielder*
Gary D. Fielder, Esq.
Law Office of Gary Fielder
1444 Stuart St.
Denver, CO 80204
(720)306-0007
gary@fielderlaw.net

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS KEMP AND RAFFENSERGER'S MOTION TO DISMISS

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Response and Brief in Opposition to Defendant Brian Kemp and Brad Raffensperger's joint motion to dismiss [Doc. 47], and hereby respectfully request that the motion be denied or, in the alternative, determined to be moot, for the reasons set forth below.

## I. INTRODUCTION

The Plaintiffs have not sued the State of Georgia, or any person associated with the State, in their official capacity. This case is not "the latest in long line of baseless challenges to the results of the 2020 Presidential Election in Georgia," and these mischaracterizations cannot be used as grounds for dismissal. The Defendants named herein are persons who violated the Constitution, under color of their official authority. They are stripped of their official capacity and are liable in their individual capacity. That is the holding in *Ex Parte Young*, which is the law of the case in this matter. The Plaintiffs herein have filed an Amended Complaint, and a request for class designation. Accordingly, the motion to dismiss filed herein is moot.

1

## II.  BACKGROUND

As is outlined in the Complaint, the Defendants, Brad Raffensperger (Mr. Raffensperger) and Brian Kemp (Mr. Kemp), violated the constitutional rights of the Plaintiffs, and a class of similarly situated persons. All of Mr. Raffensperger's and Mr. Kemp's conduct was under color of their official authority as the secretary of state and governor of Georgia, respectively. By violating the Constitution, Mr. Raffensperger and Mr. Kemp are liable in their personal capacity. The grounds upon which the Plaintiffs have made their claims are well documented, and are cited throughout the Complaint.

As such, Mr. Raffensperger and Mr. Kemp's actions burdened the rights of the Plaintiffs to vote for the Vice-President and President. These Defendants knew that their actions concerned a Presidential election. Both swore an oath to protect and defend the Constitution of the United States. Accordingly, Georgia cannot state that the Plaintiffs in this matter are relying on "debunked myths, conspiracy theories, and outright lies regarding the election that have been repeatedly rejected by courts." [Doc. 47, pp. 1-2].

Ultimately, the Supreme Court found that the State of Texas had "not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec 11, 2020). Additionally, in case like *Wood v. Raffensperger*, the 11th Curcuit noted that the plaintiff had "moved for extraordinary relief." 981 F.3d 1307 (11th Cir. 2020). There, as in other cases wherein the plaintiff had asked for injunctive relief, the 11th Circuit determined that "Wood lacked standing because he failed to allege the 'first and foremost of standing's three elements': an injury in fact." *Id*. (*quoting Spokeo v. Robins*, 136 S.Ct. 1540, 1547 (2016). The Court also found that the plaintiff's claims were moot.

The Plaintiffs, here, have since filed a constitutional challenge to the Compromise Settlement Agreement and Release with the Democratic Party of Georgia (Settlement). *See* Amended Complaint, Doc. 48, Ex. A, ¶¶ 831-843. Further, this case is a civil rights action for damages. All of this has been spelled out in the Complaint and in other pleadings.

As outlined in the original Complaint, the Settlement materially changed the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it more difficult to challenge defective signatures beyond the expressed statutory procedures. Complaint, ¶¶ 199(a-q). Additionally, the responsibility to ensure a free and fair election must fall on the shoulders of the secretary of state and governor, since both are responsible for certifying their States' general election, which included the 2020 Presidential election. The latter is no small matter. After the revolution, the sovereignty devolved to the people, that is, to the States. Nonetheless, it is now well settled that the federal government has supremacy over the States. Being able to vote for the President and Vice President of the United States is not guaranteed. That right is bestowed upon the State citizen, by request, according to the laws of any particular State. However, once granted, the right to vote becomes one the fundamental rights that the government is duty bound to protect. Every person has a right to remain silent, or defend herself or her property. Those are inalienable rights. Voting is a civil right, granted by the power of the sovereign State, under the Constitution.

Nothing could be more precious than the right to vote for the President. Wars are fought to maintain that right. It is a national right, shared only by the registered voters of any given State. This is not about overturning an election, it is about holding government officials responsible for their behavior.

If a person acting under color of authority violates that precious right, how can that person not be called to answer to a State, wherein a portion of the behavior took place? The federal judicial system is set up for diversity jurisdiction, with the recognition that the Court must be have personal jurisdiction over a party. Those are the issues herein.

Numerous other private lawsuits have been filed. However, all of them have named the Defendants, herein, in their official capacity. Here, the Plaintiffs name Mr. Raffensperger and Mr. Kemp in their individual capacity, in both the original and amended complaints.

When voters come to the federal courts with valid constitutional claims, pursuant to § 1983, counsel for the plaintiff becomes a private attorney general. In that regard, the Plaintiffs have not requested that the Court impose extraordinary relief, which would require a plaintiff to establish a likelihood of success on the merits. That is not the standard, here. In fact, although the constitutional challenge in the Amended Complaint is a question of law, if the jury finds in favor of the Plaintiffs, and determines that Mr. Raffensperger and Mr. Kemp violated the Constitution, both are stripped of the protections of their office, which would otherwise cloak them with immunity under the Eleventh Amendment.

At this stage, the Court must accept all well plead facts as true. Thus, the issue is: If a governor, in concert with the secretary of state of that same State, engage in conduct which violates the constitutional rights of others, even in other States, can those state actors be held responsible? If these state actors are liable for their unconstitutional conduct, who can hold them responsible? According to every Defendant in this lawsuit, the registered voter cannot. They do not have standing, say the Defendants. The registered voter, who mailed in her ballot, or waited in line to vote in a Presidential election, does not have standing? If they do not, then who does? Since the Plaintiffs obviously have standing, it is not necessary to labor over the latter question.

4

## III.  THE DEFENDANTS APPEAR IN THEIR INDIVIDUAL CAPACITY

The Defendants, Mr. Kemp and Mr. Raffensperger, have been sued their individual

capacity. Comp. ¶¶ 19, 20. "A suit against an official in his personal capacity is a suit against a

person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). The phrase

"persons acting under color of law" draws on one of the most well-known civil rights statutes: 42

U.S.C. § 1983. *Id*. As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has
> long interpreted it to permit suits against officials in their individual capacities.

*Id*.

The plain language of Section 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to be
> subjected, *any citizen of the United States* or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress. [Emphasis added].

Here, the Defendants are persons under the statute that violated the rights of many

citizens of the United States, in Georgia, Colorado, and every other state in the Union.

Knowingly violating the rights of voters in a Presidential election has far reaching consequences

that effect every registered voter, including the Plaintiffs. In that regard, Defendants, Mr.

Raffensperger and Mr. Kemp deny that the Court has personal jurisdiction over them. *Id*. at 7-10.

"The law of the forum state and constitutional due process limitations govern personal

jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903

(10th Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to

the Constitutions full extent." *Id*.

5

With that, due process "requires both that the defendant 'purposefully established minimum contacts within the forum State'" and that the "assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held that the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S.____ (2021). There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at slip op., p. 2 (*quoting Bristol-Myers*, 582 U.S.____, ____(2017)(slip op., at 5).

The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). "Or put just a bit differently, 'there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore

6

subject to the State's regulation.'" *Id.* at slip op., p. 6 (*quoting Bristol-Meyers*, 582 U.S., at____-

____,____(slip op., at 5-6, 7)(*quoting Goodyear*, 564 U.S. 915, 919 (2011).

Here, both Mr. Raffensperger and Mr. Kemp were responsible for the certification of

Georgia's election, which included the 2020 Presidential election. As outlined with specificity in

the Plaintiffs' Complaint, Mr. Raffensperger, without legislative approval, unilaterally abrogated

several Georgia statutes requiring signature verification for absentee or mail-in ballots.

*Complaint*, Doc. 1, ¶ 199 (a-q).

> As reported in the recent article:

> Five months after the November 3, 2020 presidential election, officials at the state and county level in Georgia have failed to produce chain of custody records for more than 355,000 absentee vote by mail ballots deposited in drop boxes located around the state for that election. [1]

> As is stated in the article, according to the Georgia Secretary of State's office, 1.3 million

votes were cast as absentee vote by mail ballots. As stated, in pertinent part:

> Based on polling conducted by John McLaughlin & Associates, 700,000 of those absentee vote by mail ballots were sent via mail and 600,000 were deposited in the estimated 300 drop boxes located around the state [that] were manually picked up and transported by election workers to the local county registrar for subsequent counting. [2]

> The legislature did not promulgate rules concerning the collection of ballots from "drop

boxes." Instead, as described in the article:

> According to Georgia Election Code Emergency Rule 183-1-14-0.8-.14, promulgated by the Georgia State Election Board (of which Mr. Raffensperger was the chairman) in July 2020, but not codified by the state legislature at the time as the Georgia Constitution requires, each of Georgia's 159 counties is responsible for documenting the transfer of every batch of absentee ballots picked up at drop boxes and delivered to the county election offices with ballot transfer forms. The forms are required to be signed and dated, with time of pick up by the collection team upon

---

[1] Tiffany Morgan, *Five Months After 2020 Election, Georgia Still Has Not Produced Chain of Custody Records for 355,000 Absentee Vote by Mail Ballots Deposited in Drop Boxes*, Georgia Star News, April 8, 2021.
[2] *Id.*

pick up, and the signed, dated, with time of delivery by the registrar or designee
upon receipt and accepted.[3]

In December, The Georgia Star New "issued Open Records requests to all 159 counties
to obtain copies of the ballot transfer forms."[4] As of last week, "only 59 of Georgia's 159
counties h[ad] provided ballot transfer form data to The Star News."[5] With that, even five
months after the election, "there are no chain of custody documents for 355,918, or 59.3 percent,
of the estimated 600,000 absentee vote by mail ballots deposited in drop boxes and delivered to
county registrar and counted in Georgia's 2020 presidential election."[6]

None of that was authorized by law. These claims are also connected to the drop boxes
being placed by funding provided by Defendants, Mark Zuckerberg and Priscila Chan, through
the efforts of the Center for Technology and Civic Life (CTCL) in placing drop boxes in only
certain areas. This whole scheme was unconstitutional, and the Plaintiffs have focused their
claims on precise actions of all the Defendants, herein. How could these issues still be evolving,
while the Plaintiffs claims are being called baseless, and previously determined? Neither is true.

These actions were done with the knowledge and consent of the State's chief executive
officer, Mr. Kemp. Accordingly, because of that, and the other unconstitutional acts and laws
concerning Georgia's 2020 Presidential election, both Mr. Raffensperger and Mr. Kemp violated
their oaths of office when they certified the election on November 20, 2020. *Complaint*, ¶¶ 529
and 522. With that, these Defendants' knew that their acts would affect the voting rights of every
person eligible to vote in the United States, which includes the Plaintiffs.

---

[3] *Id*.
[4] *Id*.
[5] *Id*.
[6] *Id.*

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added).

Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significant contacts to Colorado in association with the 2020 Presidential election. [*See* Doc. 39, 40, 64].

With regard to personal jurisdiction, as well, counsel for the Defendants filed their motion to dismiss on behalf of "Brian Kemp, Governor of Georgia, and Brad Raffensperger, the Georgia Secretary of State." [Doc.47, p. 1, ¶ 1]. Counsel also entered their appearance on behalf of "Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger." [Doc. 37]. However, neither Mr. Kemp, nor Mr. Raffensperger have been sued in their official capacity.

On July 29, 2019, Mr. Raffensperger announced that Dominion Voting Systems would be the state's new elections vendor, winning a $107 million contract establishing that the contractual ties to Dominion, a Colorado based company, and any conduct related to the negotiation of this contract ties Mr. Raffensperger to Colorado.

### IV.  THE PLAINTIFFS HAVE STANDING TO SUE INDIVIDUALS THAT VIOLATE THEIR CONSTITUTIONAL RIGHTS

Last month, the Supreme Court affirmed an individual's right to sue a state official for nominal damages in the latter's individual capacity. *Uzuegbunam v. Preczewski*, ____U.S.____ (2021). The plaintiffs were former students of Georgia Gwinnet College, who wished to share their faith while enrolled there. *Id*. at slip op., p. 1.

They sued certain college officials charged with enforcement of the college's speech policies, arguing that these policies violated the First Amendment. *Id*. at slip op., p. 2. The college discontinued the polices, and then sought dismissal on the ground that the policy change left the students without standing to sue. *Id*. at slip op., p. 3.

The Supreme Court held:

> Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

*Id*. at slip op., p. 11.

In *Uzuegbunam*, the plaintiffs' request to change the policy of a State institution would require the Court to maintain jurisdiction over a state actor, only through a district court's power to enjoin the prospective, unconstitutional conduct of the institution. Otherwise, the State would not be liable for any money damages accessed against the state actors, operating in their official capacity. Such claims are barred by the Eleventh Amendment. However, the plaintiffs in *Uzuegbunam* had the right to seek nominal damages from the state actors, individually. That is exactly what is going on, here. What makes a governor or a secretary of state any different than any other state actor? There is no difference. Just like the defendants in *Uzuegbunam*, if a governor and/or secretary of state violate the constitutional rights of others, the latter has standing to sue the former for damages. The Plaintiffs have been saying this from the beginning.

As the Supreme Court stated:

> To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury.

*Id*. at slip op., p. 3 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Here, the Supreme Court quoted Lord Holt, who, dissenting in case from 1703, "argued that the common law inferred damages whenever a legal right was violated." *Id*. at slip op., p. 6. (citing *Ashby v. White*, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K.B. 1703)). The Supreme Court elaborated:

> Observing that the law recognized 'not merely pecuniary' injury but also 'personal injury,' Lord Holt stated that 'every injury imports a damage' and the plaintiff could

11

always obtain damages even if the 'does not lose a penny by reason of the [violation.].'"

*Id.*, quoting Ashby, supra, at 955, 92 Eng. Rep., at 137.

The Supreme Court recognized that, while this common-law doctrine "was not universally followed," "many adopted the rule in full whenever a person proved that there was a violation of an "'important right.'" *Id.* at 7 (*citing Hecht v. Harrison*, 40 P.2d 306, 309-310 (Wyo. 1895). "Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages." *Id.* at 9. 'They are instead the damages awarded by default until the plaintiff establishes to some other form of damages, such as compensatory or statutory damages." *Id.*

"Despite being small, nominal damages are certainly concrete." *Id.* Because nominal damages are in fact damages paid to the plaintiff, the affect 'the behavior of the defendant towards the plaintiff' and thus independently provide redress. *Id.* (*quoting Hewitt v. Hewitt*, 482 U.S. 755, 761 (1987).

"Because redressability is an 'irreducible' component of standing [citation], no federal court has jurisdiction unless it provides a remedy that can redress the plaintiff's injury." *Id.* at slip op., p. 10 (*quoting Spokeo*, 578 U.S. at 338). Nominal damages are redress, not a byproduct. *Id.*

## V.  PLAINTIFFS HAVE PROPERLY ALLEGED CIVIL RIGHTS CLAIMS AGAINST MR. RAFFENSPERGER AND MR. KEMP

### A.  MR. RAFFENSPERGER AND MR. KEMP ARE STATE ACTORS

A Section 1983 claim is only applicable to conduct occurring under color of law. Here, all of the unconstitutional conduct alleged by the Plaintiffs were committed by Mr. Raffensperger and Mr. Kemp, under color of their official authority as governor and secretary of

12

state, respectively. Accordingly, there is no question that Mr. Raffensperger and Mr. Kemp are

state actors.

Although the Supreme Court found that the State of Texas did not have standing to sue

other States with regard to the latter's' elections, the State of Texas would have standing to sue

certain individual, state actors, for violating the rights of its citizens. Maybe it will join in this

suit, but that question is not before the Court. The issue is: Can the Plaintiffs sue these named

persons, in their individual capacity?

### B. PLAINTIFFS HAVE STATED A CLAIM UPON WHICH RELIEF MAY BE GRANTED

A Section 1983 claim requires a plaintiff to show both the existence of a federally

protected right and the deprivation of that right by a person acting under color of state law. 42

U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

Accordingly, as averred, the Plaintiffs have suffered a particularized injury-in-fact. The

legislative history of section 1983 "demonstrates that it was intended to create a species of tort

liability in favor of persons who are deprived of rights, privileges, or immunities secured to them

by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

Here, the Plaintiffs amended their complaint, attached to their motion for leave to amend.

[Doc. 48, Ex. 1]. In the Amended Complaint, the Plaintiffs, joined by over 140 more Plaintiffs,

eight of whom are from Georgia, filed a constitutional challenge to Georgia State Law-O.C.G.A.

21-2-386. With that, the Defendants' motion to dismiss cannot be ruled upon outside of the

context of these additional parties and claims.

This Court must conduct a judicial review of the constitutionality of the challenged law

giving rise to a claim for acting under color of law as a matter of due course in a 42 U.S.C. §

1983 proceeding. Although it was not necessary to include a direct challenge as a cause of

13

action, Plaintiffs have now separated the conduct complained of and have included the

constitutional challenge in their Amended Complaint. This Court may additionally certify the

questions of law, upon motion by Plaintiffs, to the Supreme Court of Georgia to include matters

that it deems appropriate.

As was stated by the Supreme Court in *Ex parte Young*:

> The answer to all this is the same as made in every case where an official claims
> to be acting under the authority of the State. The *act to be enforced is alleged to
> be unconstitutional*, and if it be so, the use of the name of the State to enforce an
> unconstitutional act to the injury of complainants is a proceeding without the
> authority of and one which does not affect the State in its sovereign or
> governmental capacity. *It is simply an illegal act upon the part of a state official
> in attempting by the use of the name of the State to enforce a legislative enactment
> which is void because unconstitutional*. If the act which the state Attorney
> General seeks to enforce be a violation of the Federal Constitution, the officer in
> proceeding under such enactment comes into conflict with the superior authority
> of that Constitution, and he is in that case *stripped of his official or representative
> character and is subjected in his person to the consequences of his individual
> conduct*. The State *has no power to impart to him any immunity from
> responsibility to the supreme authority of the United States*. It would be an injury
> to complainant to harass it with a multiplicity of suits or litigation generally in an
> endeavor to enforce penalties under an unconstitutional enactment, and to prevent
> it ought to be within the jurisdiction of a court of equity. If the question of
> unconstitutionality with reference, at least, to the Federal Constitution be first
> raised in a Federal court that court, as we think is shown by the authorities cited
> hereafter, has the right to decide it to the exclusion of all other courts.

*Ex parte Young*, 209 U.S. 123, 159-160 (emphasis added).

Admittedly, the Supreme Court was presented with similar arguments made by

other parties, challenging the constitutionality of Georgia's election laws, however, the

Supreme Court has declined to do so. That does not foreclose the issue or Plaintiffs claims.

## VI.  MR. RAFFENSPERGER AND MR. KEMP'S MOTION TO DISMISS IS MOOT

Plaintiffs have filed their motion for leave to amend their complaint. Accordingly,

acceptance of the Amended Complaint renders Mr. Raffensperger and Mr. Kemp's motion moot.

14

Here, the amended complaint adds over 140 additional Plaintiffs, supplements the factual

allegations, and cures any alleged defects in the original Complaint with regard to Rule 23.

## VII.  CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court deny Defendants'

motion to dismiss in its entirety, or, in the alternative, deny Defendants' motion as moot, in light

of the Plaintiffs' Amended Complaint.

Respectfully submitted this 12th day of April, 2021.

***PLAINTIFFS COUNSEL:***

By: *s/Ernest J. Walker*            By:    *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                 Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE           LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                 1444 Stuart St.
Denver, CO 80204                       Denver, CO 80204
(720) 306-0007                             (720) 306-0007
ernestjwalker@gmail.com              gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2021, a copy of the foregoing
document was electronically filed with the Court using the CM/ECF system which will send
notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
Ernest J. Walker Law Office
1444 Stuart St.
Denver, CO 80204
(720)306-0007

Appendix Page 1427