No. 21-1161

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

---

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

---

## APPELLANTS' APPENDIX F

## 6 of 6 – Pages 1428 to 1684

---

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1515
gary@fielderlaw.net

*Counsel for Plaintiffs-Appellants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS WHITMER AND BENSON'S MOTION TO DISMISS

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Response and Brief in Opposition to Defendant Gretchen Whitmer and Jocelyn Benson's joint motion to dismiss [Doc. 46], and hereby respectfully request that the motion be denied or, in the alternative, determined to be moot, for the reasons set forth below.

### I. INTRODUCTION

The Plaintiffs have not sued the State of Michigan, or any person associated with the State, in their official capacity. This case is not "the last of a series of lawsuits filed since Michigan held its general election on November 3, 2020, [that] alleges a similar litany of far-fetched claims of fraud and irregularity in the conducting of the November election." [Doc. 46, p. 1]. To the contrary, the Defendants named herein are persons who violated the Constitution, under color of their official authority, named in their individual capacity. The Plaintiffs herein have filed an Amended Complaint, and a request for class designation. Accordingly, the motion to dismiss filed herein must be denied, or deemed moot.

10

## II. BACKGROUND

As is outlined in the Complaint, the Defendants, Jocelyn Benson (Ms. Benson) and Gretchen Whitmer (Ms. Whitmer), violated the constitutional rights of the Plaintiffs, and of a class of similarly situated persons, across the country. All of Ms. Benson's and Ms. Whitmer's conduct was under color of their official authority of as the secretary of state and governor of Michigan, respectively. By violating the Constitution, Ms. Benson and Ms. Whitmer are liable in their personal capacity. The grounds upon which the Plaintiffs have made their claims are well documented, and are cited throughout the Complaint.

As such, Ms. Benson and Ms. Whitmer's actions burdened the rights of the Plaintiffs to vote for the Vice-President and President. These Defendants knew that their actions concerned a Presidential election. Both swore an oath to protect and defend the Constitution of the United States. Accordingly, Michigan cannot state that the Plaintiffs' "complaint offers nothing other than conspiracy theories fed by misunderstanding of Michigan law and unaccompanied by any actual evidence of fraud." [Doc. 46, p. 1].

Ultimately, the Supreme Court found that the State of Texas had "not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec 11, 2020). Additionally, in *Johnson, et al. v. Benson, et al.*, the Michigan Supreme Court did not address the constitutionality of the actions complained of, herein. 951 N.W. 2d 310 (Mich. 2020). Instead, the Court was "unclear what the petitioners are asking th[e] Court to do—command a public officer to perform a legal duty (and if so, which officer, and what duty?), or test title to office?" *Id*. Further, in the referenced matter of *Bally, et al. v. Whitmer, et al*., case no. 1:20-cv-1088 (W.D. Mich. 2020), was not decided on its merits.

Numerous other private lawsuits have been filed. However, all of them have named the Defendants, herein, in their official capacity. Here, the Plaintiffs name Ms. Benson and Ms. Whitmer in their individual capacity, in both the original and amended complaints.

When voters come to the federal courts with valid constitutional claims, pursuant to Section 1983, counsel for the plaintiff becomes a private attorney general. In that regard, the Plaintiffs have not requested that the Court impose extraordinary relief, which would require a plaintiff to establish a likelihood of success on the merits. That is not the standard, here. In fact, although the constitutional challenge in the Amended Complaint is a question of law, if the jury finds in favor of the Plaintiffs, and determines that Ms. Benson and Ms. Whitmer violated the Constitution, both are stripped of the protections of their office, which would otherwise cloak them with immunity under the Eleventh Amendment.

At this stage, the Court must accept all well plead facts as true. Thus, the issue is: If a governor, in concert with the secretary of state of that same State, engage in conduct which violates the constitutional rights of others, even in other States, can those state actors be held responsible? If these state actors are liable for their unconstitutional conduct, who can hold them responsible? According to every Defendant in this lawsuit, the registered voter cannot. They do not have standing, say the Defendants. The registered voter, who mailed in her ballot, or waited in line to vote in a Presidential election, does not have standing? If they do not, then who does? Since the Plaintiffs obviously have standing, it is not necessary to labor over the latter question. Nothing could be more precious than the right to vote for the President. Wars are fought to maintain that right. It is a national right, shared only by the registered voters of any given State. This is not about overturning an election, it is about holding government officials responsible for their behavior.

10

## III.  THE DEFENDANTS APPEAR IN THEIR INDIVIDUAL CAPACITY

The Defendants, Ms. Whitmer and Ms. Benson, have been sued their individual capacity. Comp. ¶¶ 19, 20. "A suit against an official in his personal capacity is a suit against a person acting under color of law." *Tanzin v. Tanvir*, 141 S.Ct. 486, 491 (2020). The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983. *Id*. As the Supreme Court affirmed, twelve days before the complaint was filed:

> That statute applies to 'person[s] ... under color of any statute,' and this Court has long interpreted it to permit suits against officials in their individual capacities.

*Id*.

> The plain language of § 1983 reads:

> *Every* person who, under color of *any* statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any citizen of the United States* or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [Emphasis added].

Here, the Defendants are persons under the statute that violated the rights of many citizens of the United States, in Michigan, Colorado, and every other state in the Union. Knowingly violating the rights of voters in a Presidential election has far reaching consequences that effect every registered voter, including the Plaintiffs. In that regard, Defendants, Ms. Benson and Ms. Whitmer deny that the Court has personal jurisdiction over them. *Id*. at pp. 5-7.

"The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). "Colorado's long-arm statute, Colo.Rev.Stat. § 13-1-124, extends jurisdiction to the Constitutions full extent." *Id*.

With that, due process "requires both that the defendant 'purposefully established minimum contacts within the forum State'" and that the "assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id*. at 903 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). Depending "on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Id*.

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state." *Id*. at 904. Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 904 (*quoting Burger King Corp.*, 471 U.S. at 475).

Two weeks ago, the Supreme Court held that the connection between the plaintiffs' claims and a car manufacturer's activities in the forum State was close enough to support specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S.____ (2021). There, the Supreme Court reaffirmed several general principles of law, which include that a plaintiffs' claims "must arise out of or relate to the defendant's contacts" with the forum. *Id*. at slip op., p. 2 (*quoting Bristol-Myers*, 582 U.S.____, ____(2017) (slip op., at 5).

 The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). "Or put just a bit differently, 'there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore

10

subject to the State's regulation.'" *Id*. at slip op., p. 6 (*quoting Bristol-Meyers*, 582 U.S., at____-

____,____(slip op., at 5-6, 7)(*quoting Goodyear*, 564 U.S. 915, 919 (2011)).

Here, both Ms. Benson and Ms. Whitmer were responsible for the certification of

Michigan's election, which included the 2020 Presidential election. These actions were done

with the knowledge and consent of the State's chief executive officer, Ms. Whitmer.

Accordingly, because of that, and the other unconstitutional acts and laws concerning

Michigan's 2020 Presidential election, both Ms. Benson and Ms. Whitmer violated their oaths of

office when they certified the election on November 20, 2020. *Complaint*, ¶¶ 183, 188. With

that, these Defendants knew that their acts would affect the voting rights of every person eligible

to vote in the United States, which includes the Plaintiffs.

In that regard, on March 9, 2020, decided 6 days before the Defendants filed their motion

to dismiss, the Hon. Christopher M. Murray, of the State of Michigan Court of Claims, found

that the Defendant, Ms. Benson, had in fact violated Michigan law when she issued guidance

related to Michigan's signature verification standards.

This precise conduct was complained of by the Plaintiffs. Complaint, ¶ 136-140. In

*Genetski v. Benson*, the Court found that:

> [N]owhere in this state's election law has the Legislature indicated that signatures
> are to be presumed valid, nor did the Legislature require that signatures are to be
> accepted so long as there are any redeeming qualities in the application or return
> envelope as compared with the signature on file. Policy determinations like the one
> at issue — which places the thumb on the scale in favor of a signature's validity —
> should be made pursuant to properly promulgated rules under the APA or by the
> Legislature.

*Genetski v. Benson*, Case No. 20-000216-MN, Michigan Court of Claims, Order of March 9,

2021.

All qualified voters have a constitutionally protected right to vote. *Ex parte Yarbrough*, 110 U.S. 651 (1884). It is "as equally unquestionable that the right to have one's vote counted is as open to protection…as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Beyond that, "in the context of a Presidential election," which ultimately touches upon all of the people's rights, unconstitutional state actions "implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

In *Anderson*, the Court identified a common right of voters, as "the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*. at 795. Of course, state-actors can be punished "when the right to vote at any election for the choice of electors for President and Vice President" are abridged. U.S. Constitution, Amend. 14, Sect. 2. States are accountable for managing the Presidential election.

There is a "pervasive national interest in the selection of candidates for national office, and this national interest is greater than *any* interest of an individual State." *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (emphasis added). Importantly, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. *Anderson*, 460 U.S. at 795. The "primary concern is not the interest of candidate Anderson, but rather, the *interests of the voters who chose to associate together*…" *Id*. at 788 (emphasis added). In *Anderson*, the Supreme Court recognized:

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends*.

*Id*. at 788 (*quoting Storer* v. *Brown,* 415 U. S. 724, 730 (1974)) (emphasis added).

Further, this class action suit was filed in Colorado as it also relates to the business activities of Co-Defendants, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and Center for Technology and Civic Life (CTCL), all of whom have significant contacts to Colorado in association with the 2020 Presidential election. [*See* Docs. 39, 40, 64].

With regard to personal jurisdiction, as well, counsel for the Defendants filed their motion to dismiss on behalf of "Michigan Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Benson" [Doc. 46, p. 1, ¶ 1]. Counsel also entered their appearance on behalf of Michigan Governor Gretchen Whitmer [Doc. 29], and Michigan Secretary of State Jocelyn Benson [Doc. 30]. However, neither Ms. Whitmer, nor Ms. Benson have been sued in their official capacity.

### IV.  THE PLAINTIFFS HAVE STANDING TO SUE INDIVIDUALS WHO VIOLATE THEIR CONSTITUTIONAL RIGHTS

Last month, the Supreme Court affirmed an individual's right to sue a state official for nominal damages in the latter's individual capacity. *Uzuegbunam v. Preczewski*, 592 U.S.____ (2021). The plaintiffs were former students of Georgia Gwinnet College, who wished to share their faith while enrolled there. *Id*. at slip op., p. 1.

They sued certain college officials charged with enforcement of the college's speech policies, arguing that these policies violated the First Amendment. *Id*. at slip op., p. 2. The college discontinued the polices, and then sought dismissal on the ground that the policy change left the students without standing to sue. *Id*. at slip op., p. 3. There, the Supreme Court held:

> Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

*Id*. at slip op., p. 11.

In *Uzuegbunam*, the plaintiffs' request to change the policy of a State institution would require the Court to maintain jurisdiction over a state actor, only through a district court's power to enjoin the prospective, unconstitutional conduct of the institution. Otherwise, the State would not be liable for any money damages accessed against the state actors, operating in their official capacity. Such claims are barred by the Eleventh Amendment. However, the plaintiffs in *Uzuegbunam* had the right to seek nominal damages from the state actors, individually. That is exactly what is going on, here. What makes a governor or a secretary of state any different than any other state actor? There is no difference. Just like the defendants in *Uzuegbunam*, if a governor and/or secretary of state violate the constitutional rights of others, the latter has standing to sue the former for damages. The Plaintiffs have been saying this from the beginning.

As the Supreme Court stated:

> To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

*Id*. at slip op., p. 3.

Here, the Supreme Court quoted Lord Holt, who, dissenting in case from 1703, "argued that the common law inferred damages whenever a legal right was violated." *Id*. at slip op., p. 6. (citing *Ashby v. White*, 2 Raym. Ld. 938, 941-943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K.B. 1703)). The Supreme Court elaborated:

> Observing that the law recognized 'not merely pecuniary' injury but also 'personal injury,' Lord Holt stated that 'every injury imports a damage' and the plaintiff could always obtain damages even if the 'does not lose a penny by reason of the [violation.].'"

*Id*., quoting Ashby, supra, at 955, 92 Eng. Rep., at 137.

The Supreme Court recognized that, while this common-law doctrine "was not universally followed," "many adopted the rule in full whenever a person proved that there was a violation of an "'important right.'" *Id*. at p. 7. (*citing Hecht v. Harrison*, 40 P.2d 306, 309-310 (Wyo. 1895). "Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages." *Id*. at 9. 'They are instead the damages awarded by default until the plaintiff establishes to some other form of damages, such as compensatory or statutory damages." *Id*.

"Despite being small, nominal damages are certainly concrete." *Id*. Because nominal damages are in fact damages paid to the plaintiff, the affect 'the behavior of the defendant towards the plaintiff' and thus independently provide redress. *Id*. (*quoting Hewitt v. Hewitt*, 482 U.S. 755, 761 (1987).

"Because redressability is an 'irreducible' component of standing [citation], no federal court has jurisdiction unless it provides a remedy that can redress the plaintiff's injury." *Id*. at slip op., p. 10 (*quoting Spokeo*, 578 U.S. at 338). Nominal damages are redress, not a byproduct. *Id*.

## V.  PLAINTIFFS HAVE PROPERLY ALLEGED CIVIL RIGHTS CLAIMS AGAINST MS. BENSON AND MS. WHITMER

### A.  MS. BENSON AND MS. WHITMER ARE STATE ACTORS

A Section 1983 claim is only applicable to conduct occurring under color of law. Here, all of the unconstitutional conduct alleged by the Plaintiffs were committed by Ms. Benson and Ms. Whitmer, under color of their official authority as governor and secretary of the Commonwealth, respectively. Accordingly, there is no question that Ms. Benson and Ms. Whitmer are state actors.

10

Although the Supreme Court found that the State of Texas did not have standing to sue other States with regard to the latter's elections, the State of Texas would have standing to sue certain individual, state actors, for violating the rights of its citizens. Maybe it will join in this suit, but that question is not before the Court. The issue is, can the Plaintiffs sue these named persons in their individual capacity?

## B. PLAINTIFFS HAVE STATED A CLAIM UPON WHICH RELIEF MAY BE GRANTED

A Section 1983 claim requires a plaintiff to show both the existence of a federally protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).

Accordingly, as averred, the Plaintiffs have suffered a particularized injury-in-fact. The legislative history of Section 1983 "demonstrates that it was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).

Here, the Plaintiffs amended their complaint, attached to their motion for leave to amend. [Doc. 48, Ex. 1]. In the Amended Complaint, the Plaintiffs, joined by over 140 more Plaintiffs, ten of whom are from Michigan, filed a constitutional challenge to Michigan State Law M.C.L. 168.759(3) as applied. With that, the Defendants' motion to dismiss cannot be ruled upon outside of the context of these additional parties and claims.

The Defendants allege that the Plaintiffs' original complaint "offers nothing other than conspiracy theories fed by misunderstandings of Michigan law and unaccompanied by any factual evidence of fraud." [Doc. 46, p.1]. However, now that the Plaintiffs have included the constitutional challenge in their Amended Complaint, the analysis is different.

As was stated by the Supreme Court in *Ex parte Young*:

> The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The *act to be enforced is alleged to be unconstitutional*, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. *It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional.* If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case *stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.* The State *has no power to impart to him any immunity from responsibility to the supreme authority of the United States.* It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality with reference, at least, to the Federal Constitution be first raised in a Federal court that court, as we think is shown by the authorities cited hereafter, has the right to decide it to the exclusion of all other courts.

*Ex parte Young*, 209 U.S. 123, 159-160 (emphasis added).

Admittedly, the Supreme Court was presented with similar arguments made by other parties, challenging the constitutionality of Pennsylvania's election laws. As is stated in the Defendant's motion to dismiss, the Supreme Court has declined to do so. However, that does not foreclose the issue.

## VI.  MS. BENSON AND MS. WHITMER'S MOTION TO DISMISS IS MOOT

Plaintiffs have filed their motion for leave to amend their complaint. Accordingly, acceptance of the Amended Complaint renders Ms. Benson and Ms. Whitmer's motion moot. Here, the amended complaint adds over 140 additional Plaintiffs, supplements the factual allegations, and cures any alleged defects in the original Complaint with regard to Rule 23.

10

## VII.  CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court deny Defendants'

motion to dismiss in its entirety, or, in the alternative, deny Defendants' motion as moot, in light

of the Plaintiffs' Amended Complaint.

Respectfully submitted this 12th day of April, 2021.

***PLAINTIFFS COUNSEL:***

By: *s/Ernest J. Walker*     By: *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)      Gary D. Fielder  (CO 19757)
ERNEST J. WALKER LAW OFFICE     LAW OFFICE OF GARY FIELDER
1444 Stuart St.          1444 Stuart St.
Denver, CO 80204        Denver, CO 80204
(720) 306-0007         (720) 306-0007
ernestjwalker@gmail.com      gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2021, a copy of the foregoing
document was electronically filed with the Court using the CM/ECF system which will send
notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
Ernest J. Walker Law Office
1444 Stuart St.
Denver, CO 80204
(720)306-0007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747-NRN

KEVIN O'ROURKE, NATHANIEL L.
CARTER, LORI CUTUNILLI, LARRY D.
COOK, ALVIN CRISWELL, KESHA
CRENSHAW, NEIL YARBROUGH, and
AMIE TRAPP,

           Plaintiffs, on their own behalf
           and of a class of similarly
           situated persons,

    v.

DOMINION VOTING SYSTEMS, INC., a
Delaware corporation, FACEBOOK, INC., a
Delaware corporation, CENTER FOR TECH
AND CIVIC LIFE, an Illinois non-profit
organization, MARK E. ZUCKERBERG,
individually, PRISCILLA CHAN,
individually, BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually, TOM
WOLF, individually, KATHY BOOCKVAR,
individually, TONY EVERS, individually,
ANN S. JACOBS, individually, MARK L.
THOMSEN, individually, MARGE
BOSTELMAN, individually, JULIE M.
GLANCEY, DEAN KNUDSON,
individually, ROBERT F. SPINDELL, Jr.,
individually, and DOES 1-10,000,

           Defendants.

---

## DEFENDANT CENTER FOR TECH AND CIVIC LIFE'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 1

I.     Plaintiffs' arguments concerning Article III standing are frivolous. ............................ 2

II.    Plaintiffs' claims are frivolous on the merits. ............................................................ 5

      A.     Plaintiffs *do not even try* to defend the merits of any theory as to
how the Constitution was violated. ................................................................ 6

      B.     CTCL is not a state actor. ................................................................................ 8

CONCLUSION ....................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)................................................................................................ 3, 4

*Anderson v. Celebrezze*,
499 F. Supp. 121 (S.D. Ohio 1980) ............................................................................ 3

*Bowyer v. Ducey*,
No. 20 Civ. 2321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020)................................... 7

*Carey v. Piphus*,
435 U.S. 247 (1978)................................................................................................... 3

*Cousins v. Wigoda*,
419 U.S. 477 (1975)................................................................................................... 3

*Donald J. Trump for President, Inc. v. Boockvar*,
No. 20 Civ. 966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020)................................. 7

*Election Integrity Fund v. City of Lansing*,
No. 20 Civ. 950, 2020 WL 6605987 (W.D. Mich. Oct. 19, 2020) ............................ 5

*Ex Parte Yarbrough*,
110 U.S. 651 (1884)................................................................................................... 3

*Feehan v. Wis. Elections Comm'n*,
No. 20 Civ. 1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)............................... 6

*Flagg Bros., Inc. v. Brooks*,
436 U.S. 149 (1978)................................................................................................... 9

*Gallagher v. Neil Young Freedom Concert*,
49 F.3d 1442 (10th Cir. 1995) .................................................................................. 8

*Horne v. Flores*,
557 U.S. 433 (2009)................................................................................................... 4

*Imbler v. Pachtman*,
424 U.S. 409 (1976)................................................................................................... 3

*Iowa Voter All. v. Black Hawk Cty.*,
No. 20 Civ. 2078, 2021 WL 276700 (N.D. Iowa Jan. 27, 2021)............................... 5

ii

*King v. Whitmer*,
    No. 20 Civ. 13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)...................................... 6, 7

*Lance v. Coffman*,
    549 U.S. 437 (2007)................................................................................................ 2

*Logan v. Pub. Emps. Ret. Ass'n*,
    163 F. Supp. 3d 1007 (D.N.M. 2016) ...................................................................... 7

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982)................................................................................................ 3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................ 2

*Marsh v. Alabama*,
    326 U.S. 501 (1946)................................................................................................ 9

*Minn. Voters All. v. City of Minneapolis*,
    No. 20 Civ. 2049, 2020 WL 6119937 (D. Minn. Oct. 16, 2020)................................. 5

*Pa. Voters All. v. Centre Cty.*,
    No. 20 Civ. 1761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020)................................ 5

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)........................................................................................... 2

*Street v. Corrections Corp. of Am.*,
    102 F.3d 810 (6th Cir. 1996) .................................................................................. 9

*Terry v. Adams*,
    345 U.S. 461 (1953)................................................................................................ 9

*Tex. Voters All. v. Dallas Cty.*,
    No. 20 Civ. 775, 2020 WL 6146248 (E.D. Tex. Oct. 20, 2020)................................. 5

*United States v. Mosley*,
    238 U.S. 383 (1915)................................................................................................ 3

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021)............................................................................................. 4

*West v. Atkins*,
    487 U.S. 42 (1988)................................................................................................. 6

*Wis. Voters All. v. City of Racine*,
    No. 20 Civ. 1487, 2021 WL 179166 (E.D. Wis. Jan. 19, 2021)............................. 4, 5

**Statutes**

42 U.S.C. § 1983 ................................................................................................................ *passim*

42 U.S.C. § 1985 ........................................................................................................................ 5

42 U.S.C. § 1986 ........................................................................................................................ 5

42 U.S.C. § 1988 ........................................................................................................................ 5

Help America Vote Act ............................................................................................................. 5

National Voter Registration Act .............................................................................................. 5

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 2 .................................................................................................... 6

U.S. Const. art. III .......................................................................................................... *passim*

U.S. Const. amend. I ................................................................................................................. 3

U.S. Const. amend. XIV ...................................................................................................... 6, 7

iv

## INTRODUCTION

Since filing this action roughly two months after the 2020 presidential election, Plaintiffs have had several chances to clarify, explain, or rectify the stark deficiencies in their convoluted, 84-page Complaint about nebulous "burden[s]" on the "voting rights of 160 million people." ECF 1 ("Compl.") at ¶ 1. After several defendants (including CTCL) explained in detail that Plaintiffs lack Article III standing and fail to state a claim, Plaintiffs had the opportunity to propose amendments to their complaint. In so doing, however, they still failed to add any plausible allegations in support of standing or a cognizable cause of action against CTCL. In their Opposition to CTCL's Motion to Dismiss, Plaintiffs were given yet another opportunity to explain how they have standing or how their allegations plausibly state a claim. *See* ECF 64 ("Opposition" or "Opp."). But they squandered that chance, too, offering unresponsive bombast and bromide about voting generally, rather than legal argument about the adequacy of their allegations. While not a model of clarity, the Opposition does make one thing apparent: Plaintiffs have neither the intention nor the ability to mount a non-frivolous defense of their Complaint. It should be dismissed.

## ARGUMENT

It remains clear that the Complaint fails to establish standing or state a claim. Indeed, Plaintiffs hardly attempt to show otherwise.[1]

---

[1] Much of Plaintiffs' Opposition is devoted to inflammatory innuendo with no discernable connection to any of the issues raised in CTCL's Motion to Dismiss. For instance, Plaintiffs include a "background" section of several pages, none of which contains even a single citation to their 84-page complaint; instead, they proffer cherry-picked facts drawn from various extra-pleading sources (or no source at all), which distort the reality of CTCL's grant program. Opp. at 4-6. Plaintiffs baselessly and gratuitously insinuate that CTCL is guilty of tax fraud and twice accuse CTCL of operating without a business license—neither of which is relevant to any claim in this case. *See* Opp. at 9, 12. And, as discussed below, even when Plaintiffs do purport to respond to actual arguments that favor dismissal, much of what they argue is completely unresponsive to

1

## I.   Plaintiffs' arguments concerning Article III standing are frivolous.

To reiterate the black-letter precedents cited in CTCL's prior briefs, Article III standing requires Plaintiffs to have personally suffered (1) a concrete and particularized injury (2) that is traceable to the conduct they challenge, and that (3) would likely be redressed by a favorable decision. *E.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see* ECF 41 ("MTD") at 4-7; ECF 62 ("Opp. to AC") at 4-5. At the pleading stage, any complaint filed in federal court must "clearly allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (cleaned up).

CTCL's Motion to Dismiss explained that Plaintiffs come nowhere close to alleging either of the first two elements—injury-in-fact and traceability. *See* MTD at 4-7. That is because Plaintiffs' vague allegations that something illegal happened during the recent presidential election are a classic "generalized grievance," *id.* at 4-6, and because the resulting abstract harm they claim to have suffered is also completely untethered from (much less "fairly traceable" to) anything CTCL is alleged to have done wrong, *id.* at 7; *see also* Opp. to AC at 5. The Supreme Court has repeatedly articulated the longstanding legal principle that compels dismissal of Plaintiffs' claims for lack of standing: "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan v. Defenders of Wildlife*,

---

CTCL's motion. On its face, Plaintiffs' brief cannot be treated as a non-frivolous effort to defend their claims in this litigation.

Appendix Page 1447

504 U.S. 555, 573-74 (1992)). CTCL has also explained that Plaintiffs fail to allege redressability insofar as they seek declaratory and injunctive relief. *See* MTD at 7.[2]

Plaintiffs do not meaningfully engage with any of CTCL's arguments. Instead, they purport to establish standing by citing cobbled-together soundbites from inapposite cases that are not about Article III standing. Two of their cases involved criminal prosecutions: *Ex Parte Yarbrough* was a habeas corpus action brought by federal prisoners, 110 U.S. 651, 652 (1884), and *United States v. Mosley* addressed whether to quash a criminal indictment, 238 U.S. 383, 385 (1915). Another cited case, *Cousins v. Wigoda*, 419 U.S. 477 (1975), was brought by litigants who faced contempt sanctions if they lost the First Amendment issue in that case—and did not even arise in federal court. *See id.* at 480-83. Plaintiffs also cite three cases about the *merits* of § 1983 actions, none of which had anything to do with standing (or voting or elections, for that matter). *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Carey v. Piphus*, 435 U.S. 247 (1978); *Imbler v. Pachtman*, 424 U.S. 409 (1976). Finally, Plaintiffs inexplicably highlight *Anderson v. Celebrezze*, 460 U.S. 780 (1983), even though CTCL's brief in opposition to Plaintiffs' proposed amended complaint pointed out that *Anderson* was not about Article III standing. Opp. to AC at 7 & n.4; *see also id.* at 12 (further explaining *Anderson*'s irrelevance to the merits).[3] In short, none of these

---

[2] CTCL's motion identified a litany of recent federal court decisions that rejected similar claims due to Article III standing defects that are indistinguishable from those in this case. *See* MTD at 5-7.

[3] Because Plaintiffs discuss *Anderson* far more than any other case in their standing argument, and it is at least a § 1983 case that had something to do with Presidential elections, we note some key differences between that case and the present Complaint. In *Anderson*, the plaintiffs were a Presidential candidate, John Anderson, and several individuals who supported his campaign. *Anderson*, 460 U.S. at 782-83. They sued a specific government official (Ohio's Secretary of State) seeking declaratory and injunctive relief to prevent him from enforcing a specific state law (an early ballot-access deadline for independent presidential candidates) that they alleged was unconstitutional. *Id.*; *see Anderson v. Celebrezze*, 499 F. Supp. 121, 123 (S.D. Ohio 1980). That

Appendix Page 1448

cases address any question of Article III injury-in-fact or traceability, much less endorse Plaintiffs'

outlandish position that all registered voters nationwide have Article III standing to challenge any

perceived illegality or irregularity in any election anywhere else in the country.

Plaintiffs cite only two cases that actually discuss the elements of Article III standing. First,

they block-quote the holding of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021), Opp. at 15,

which explains that "[a] request for nominal damages satisfies the redressability element of

standing where a plaintiff's claim is based on a completed violation of a legal right." 141 S. Ct. at

802. But *Uzuegbunam* did not alter or even meaningfully address the injury-in-fact and traceability

elements of standing, which were not directly at issue there. *See id.* at 797. Nothing in that case

affords a non-frivolous response to the argument that Plaintiffs lack standing.

This leaves *Wisconsin Voters Alliance v. City of Racine*, No. 20 Civ. 1487, 2021 WL

179166 (E.D. Wis. Jan. 19, 2021), which is one of many decisions discussed in CTCL's opening

brief that recently dismissed similar challenges to CTCL's grant program for lack of standing. *See*

MTD at 6 (collecting cases). Plaintiffs' futile attempts to distinguish those cases run the gamut

from silly[4] to self-defeating[5] to downright false: Plaintiffs suggest that those cases do not bear on

their standing because they claim that the plaintiffs who lacked standing in those cases were

---

deadline operated to the detriment of each of the plaintiffs in a variety of concrete and particular ways. *See* 460 U.S. at 786 (noting that the ballot-access deadline obviously had a "direct impact" on the excluded candidate himself); *id.* at 790-92 (explaining, for purposes of a balancing-the-interests test relevant to the merits, that it was "clear" that the challenged deadline also "place[d] a particular burden on an identifiable segment of Ohio's independent-minded voters"); *id.* at 795 n.19 (discussing additional burdens the deadline imposed on Anderson supporters outside Ohio). That is why there was never any doubt in *Anderson* that at least one plaintiff satisfied the prerequisites for Article III standing. 460 U.S. 780. *See Horne v. Flores*, 557 U.S. 433, 446 (2009) (if "at least one" plaintiff has standing, a court "need not consider" whether others do).

[4] *E.g.*, "None of these cases involved any party to this lawsuit." Opp. at 12.

[5] *E.g.*, "Not one of the cases cited by CTCL was ever determined on the merits." Opp. at 12. That is because the plaintiffs in those cases lacked Article III standing. *See* MTD at 6.

4

"political action groups, not voters," Opp. at 12, when in fact those cases *all* involved individual voter plaintiffs—and those individual voters were all found to lack Article III standing for reasons that apply to Plaintiffs here.[6] Of course, CTCL explained that in its own prior briefs.

At bottom, Plaintiffs' arguments concerning Article III standing range from irrelevant to unresponsive to downright misleading. These frivolous contentions do not save the Complaint.

## II.     Plaintiffs' claims are frivolous on the merits.

CTCL's motion to dismiss also identifies numerous fatal deficiencies in the Complaint's allegations under 42 U.S.C. §§ 1983, 1985, 1986, and 1988. Plaintiffs offer no response at all to most of those arguments. In fact, the § 1983 claims are the *only* ones Plaintiffs even attempt to defend.[7] And with respect to those claims, they again cite inapposite precedent and leave obvious deficiencies completely unaddressed. To state a claim under § 1983, Plaintiffs must plausibly allege both (1) "the violation of a [constitutional] right" and (2) that those violations were

---

[6] *See Iowa Voter All. v. Black Hawk Cty.*, No. 20 Civ. 2078, 2021 WL 276700, at *1 n.1, *4-8 (N.D. Iowa Jan. 27, 2021); *Wis. Voters All.*, 2021 WL 179166, at *2-3; *Pa. Voters All. v. Centre Cty.*, No. 20 Civ. 1761, 2020 WL 6158309, at *4-5, *6-7 (M.D. Pa. Oct. 21, 2020); *Tex. Voters All. v. Dallas Cty.*, No. 20 Civ. 775, 2020 WL 6146248, at *2, *4-6 (E.D. Tex. Oct. 20, 2020); *Election Integrity Fund v. City of Lansing*, No. 20 Civ. 950, 2020 WL 6605987, at *2 (W.D. Mich. Oct. 19, 2020); *Minn. Voters All. v. City of Minneapolis*, No. 20 Civ. 2049, 2020 WL 6119937, at *1 (D. Minn. Oct. 16, 2020). In two other similar cases brought by the same counsel, the plaintiffs voluntarily dismissed their complaints before the court needed to address standing. *See* ECF 19, *Ga. Voter All. v. Fulton Cty.*, No. 20 Civ. 4198 (N.D. Ga. Nov. 4, 2020); ECF 6, *S.C. Voter's All. v. Charleston Cty.*, No. 20 Civ. 3710 (D.S.C. Nov. 17, 2020).

[7] CTCL's motion to dismiss explained why the Complaint cannot state a claim under 42 U.S.C. §§ 1985, 1986, and 1988: (1) a claim under § 1985 requires plausible allegations of a conspiracy and of racial or other invidious discriminatory animus; (2) a § 1986 claim is contingent on a valid § 1985 claim; and (3) § 1988 does not create a cause of action. MTD at 13. Plaintiffs fail to respond to any of these points. Plaintiffs also persist in refusing either to explain the Complaint's stray citations to the Help America Vote Act or the National Voter Registration Act, or to controvert CTCL's explanation as to why those statutes cannot give rise to any claims against CTCL. *See id.* at 13-14; Opp. to AC at 9 n.5.

5

attributable to a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). The Opposition does not even address the first element, and it is wholly unpersuasive with respect to the second.

### A. Plaintiffs *do not even try* to defend the merits of any theory as to how the Constitution was violated.

CTCL's Motion to Dismiss explained why each of the constitutional theories underlying Plaintiffs' § 1983 claims lack any cognizable basis in law. Amazingly, these points go almost *entirely* unaddressed, much less rebutted, by Plaintiffs' Opposition.

In Count I, Plaintiffs alleged that CTCL violated the Electors Clause, U.S. Const. art. II, § 1, cl. 2. Compl. at 62. Citing recent, on-point authority, CTCL's Motion to Dismiss explained that an alleged violation of state law alone is *not* a violation of the Electors Clause, and that any Electors Clause cause of action here would belong to *states and their legislatures*, not individual voters like Plaintiffs. *See* MTD at 10-11 (citing *King v. Whitmer*, No. 20 Civ. 13134, 2020 WL 7134198, at *12 (E.D. Mich. Dec. 7, 2020); *Feehan v. Wis. Elections Comm'n*, No. 20 Civ. 1771, 2020 WL 7250219, at *12 (E.D. Wis. Dec. 9, 2020)). In Count II, Plaintiffs alleged that CTCL violated the Equal Protection Clause. Compl. at 67. CTCL then pointed out that the Complaint alleges none of the familiar and indispensable ingredients of an equal protection claim: There are no allegations of invidious discrimination or legislative classification, nor any allegations that CTCL imposed a cognizable burden on a fundamental right. *See* MTD at 11-12. Finally, as to Count III, Compl. at 71, CTCL explained why Plaintiffs have not plausibly alleged a violation of either procedural or substantive due process: they allege neither any process they were denied nor any fundamentally unfair voting procedures (let alone such deprivations somehow attributable in any respect to CTCL). MTD at 12.

Plaintiffs' offer *no response whatsoever* in defense of any of these claims—which are the only substantive constitutional violations they allege against CTCL. The phrase "Electors Clause"

does not appear anywhere in their Opposition. Nor does the phrase "equal protection."[8] And the only mention of "due process" is a stray assertion, without citation to any authority and untethered from any allegations in the Complaint, that supposed intra-state differences in voting procedures "created unfair, variable, and unequal levels of access and due process for the Election." Opp. at 2. That is not a coherent legal argument, and it is certainly not the law. *See Boockvar*, 2020 WL 5997680, at *51 (holding that purported unfairness from variable election procedures did not support a due process claim for essentially the same reasons it did not support an equal protection claim); *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1034 (D.N.M. 2016) (Due process is violated only in the "exceptional case where a state's voting system is fundamentally unfair.").

In short, Plaintiffs offer only frivolous arguments—and for the most part offer no arguments at all—to support that they have stated a claim upon which relief can be granted. Meanwhile, Plaintiffs spill pages of ink on baseless accusations and innuendos, vague platitudes about the Presidency, and other irrelevancies. Plaintiffs' decision to forego any credible defense of their claims (while pivoting to a proposed amended complaint that leaves these same defects completely unaddressed, *see* Opp. to AC at 11-13) only reinforces how irreparably deficient and improper this Complaint is.

---

[8] Plaintiffs may have intended their reference to "varying election processes" to imply some sort of claim under the Equal Protection Clause. Opp. at 2. But mere variation in certain election procedures, relating to things like drop boxes and mail-in signature comparisons, is inherent in state and local control of election administration and *does not implicate* equal protection. *See Donald J. Trump for President, Inc. v. Boockvar*, No. 20 Civ. 966, 2020 WL 5997680, at *45 (W.D. Pa. Oct. 10, 2020) (rejecting an equal protection claim based on "uneven implementation" of statewide rules); *see also Bowyer v. Ducey*, No. 20 Civ. 2321, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020) (similar). Nor does Plaintiffs' baseless speculation that CTCL "directed" some unspecified manipulation of votes at the "micro level," Opp. at 3, make out an equal protection violation. *See King*, 2020 WL 7134198, at *12-13 (rejecting equal protection claim based on "nothing but speculation and conjecture" about "'schemes' to, among other things, 'destroy,' 'discard,' and 'switch' votes").

### B.   CTCL is not a state actor.

Independently, it remains obvious that Plaintiffs' § 1983 claims against CTCL also fail for the simple reason that CTCL—a private, non-profit organization—is not a state actor.

In their Opposition, Plaintiffs gesture towards three of the four bases for treating a private actor's conduct as state action: (a) the "joint action test"; and (b) the "public function" test; and (c) "symbiotic relationship." Opp. at 6-8. As CTCL has already explained, MTD at 8-10; Opp. to AC at 9-11, none of these theories is plausibly supported by the allegations set forth in the Complaint.

In trying to satisfy the "symbiotic relationship" test, the only fact that Plaintiffs identify as relevant is that CTCL entered into "contractual relationships" with various localities. Opp. at 6. But as Plaintiffs have already conceded, "[o]bviously, contracting alone does not automatically transform the conduct of an entity into state-action." *See* Opp. to AC at 11. More is needed to satisfy the "narrowly" construed symbiosis test, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1451 (10th Cir. 1995)—at the very least, it requires allegations rising to the level of "long-term dependence" by government on the private entity. *Id.* at 1452; *see also id.* at 1453 ("Payments under government contracts . . . are insufficient to establish a symbiotic relationship between the government and a private entity."). Plaintiffs have alleged nothing like that "long-term dependence" with respect to CTCL's emergency grant program and do not explain how they meet that stringent test.

As to the joint action and public function tests, CTCL has already explained in detail why the cases Plaintiffs cite are wholly inapposite. *See* Opp. to AC at 9-11. A mere relationship between a state and a private actor does not satisfy the joint action test, which requires "a substantial degree of cooperative action" or other "overt and significant" collaboration. *Gallagher*, 49 F.3d at 1454. A "common goal" is not enough unless it is "a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action." *Id.* at 1455. CTCL's alleged contractual

8

relationship with state actors here plainly does not fit the bill. There are no allegations that CTCL itself actually participated in election administration, nor are there any non-conclusory allegations that CTCL and any grantee shared a common goal to violate any Plaintiff's rights.

Plaintiffs' invocation of the "public function" test is even farther afield. As CTCL has already explained, Opp. to AC at 10, the cases Plaintiffs cite—*Terry v. Adams*, 345 U.S. 461, 463 (1953) (about a whites-only county-level political organization with de facto power to select party's candidates), *Marsh v. Alabama*, 326 U.S. 501, 503 (1946) (about a company-owned town), and *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163 (1978) (about a private actor's sale of goods that was *not* state action)—all addressed completely inapposite facts. And none of them suggests that a private nonprofit assumes a role "exclusively reserved to the State," *id.* at 158, by providing monetary grants to be used by others for election administration consistent with their own local needs and regulations.[9]

Plaintiffs cite only a single new state action case in their Opposition. *See Street v. Corrections Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996). But *Street* is wholly inapplicable: There, a private company assumed a quintessential function "traditionally exclusively reserved to the state" by "operating a prison." *Id.* at 814. There is no comparable allegation that CTCL operated or administered any elections itself, or otherwise assumed any exclusive state function.

Because Plaintiffs fail to plausibly allege that CTCL, a private non-profit, acted "under color of" state law, they fail to state a claim against CTCL under § 1983.

---

[9] Without citation, Plaintiffs baselessly claim that "the conditions in CTCL contracts bound the local jurisdiction to do the bidding of the enterprise agenda." Opp. at 9; *see also id.* at 6 (similar unsupported accusations). That is false. *See, e.g.*, Flint City Council Agenda at 39-40 (Sept. 16, 2020), https://www.cityofflint.com/wp-content/uploads/Agenda-Packet-City-Council-9-16-20-Part-1.pdf (a representative CTCL contract that Plaintiffs themselves cite elsewhere, imposing no such condition). And in any event, no such facts are alleged anywhere in Plaintiffs' 84-page complaint (which does not even contain the word "condition").

9

\*       \*       \*       \*       \*

The Complaint comes nowhere close to satisfying applicable legal standards. Plaintiffs lack standing under elementary principles of constitutional law. They fail to state a claim under any of the provisions they invoke. And they fail to allege state action under § 1983. Their arguments to the contrary—to the extent they mount any—are to varying degrees incoherent, misleading, and frivolous (oftentimes all three). Despite ample time, and despite a chance to study the authorities presented by CTCL and other defendants, Plaintiffs have proved unwilling to reconsider their claims. Instead, they have peppered their Opposition with improper attacks on CTCL and flat-out falsehoods. As an initial response to this abusive and outrageous conduct by Plaintiffs and their counsel, and under a straightforward application of the requirements set forth in the Federal Rules of Civil Procedure, the Court should dismiss the Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' original complaint.[10]

---

[10] In the alternative, if the Court dockets the proposed amended complaint, the Court may treat this motion as moot (but should dismiss the proposed amended complaint *sua sponte* for failure to cure any of the defects that justify dismissal of the original complaint).

Respectfully submitted,

Joshua Matz
Michael Skocpol
Marcella Coburn
Louis W. Fisher
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: 212.763.0883
Facsimile: 212.564.0883
Email: jmatz@kaplanhecker.com
      mskocpol@kaplanhecker.com
      mcoburn@kaplanhecker.com
      lfisher@kaplanhecker.com

*Attorneys for Defendant Center for Tech and Civic Life*

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 14, 2021, a true and correct copy of the foregoing Reply in Support of CTCL's Motion to Dismiss was electronically filed with the Court using the CM/ECF system which will send notifications of such filing to all counsel of record.

_____
Joshua Matz

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANTS

---

Plaintiffs, by and through counsel, and pursuant to F.R.C.P. 41(a)(1)(A)(i), hereby submit

Notice of Voluntary Dismissal of the following Defendants, who have not yet appeared:

TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE
BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, and ROBERT F.
SPINDELL, JR.

Respectfully submitted this 19th day of April, 2021.

***PLAINTIFFS' COUNSEL:***

By: *s/ Ernest J. Walker*                   By:    *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)               Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE                LAW OFFICE OF GARY FIELDER
1444 Stuart St.                            1444 Stuart St.
Denver, CO 80204                           Denver, CO 80204
(720) 306-0007                             (720) 306-0007
ernestjwalker@gmail.com                    gary@fielderlaw.net

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANTS
## GRETCHEN WHITMER AND JOCELYN BENSON

---

Plaintiffs, by and through counsel, hereby submit Notice of Voluntary Dismissal of

Defendants Gretchen Whitmer and Jocelyn Benson pursuant to F.R.C.P. 41(a)(1)(A)(ii).

Respectfully submitted this 19th day of April, 2021.

***PLAINTIFFS' COUNSEL:***

By: *s/Ernest J. Walker*     By: *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)     Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE    LAW OFFICE OF GARY FIELDER
1444 Stuart St.          1444 Stuart St.
Denver, CO 80204        Denver, CO 80204
(720) 306-0007          (720) 306-0007
ernestjwalker@gmail.com      gary@fielderlaw.net

***DEFENDANTS' COUNSEL:***

By: *s/Heather S. Meingast*
Heather S. Meingast (P55439) (Michigan)
Michigan Assistant Attorney General
PO Box 30736
525 West Ottawa
Lansing, Michigan 48909
(517)335-7659
meingasth@michigan.gov

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANTS
## BRIAN KEMP AND BRAD RAFFENSPERGER

---

Plaintiffs, by and through counsel, hereby submit Notice of Voluntary Dismissal of

Defendants Brian Kemp and Brad Raffensperger pursuant to F.R.C.P. 41(a)(1)(A)(ii).

Respectfully submitted this 19th day of April, 2021.

**PLAINTIFFS' COUNSEL:**

By: *s/Ernest J. Walker*           By:    *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)             Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE        LAW OFFICE OF GARY FIELDER
1444 Stuart St.                          1444 Stuart St.
Denver, CO 80204                 Denver, CO 80204
(720) 306-0007                      (720) 306-0007
ernestjwalker@gmail.com          gary@fielderlaw.net

**DEFENDANTS' COUNSEL:**

By: */s/ Charlene S. McGowan*
Charlene S. McGowan (GA 697316)
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
(404)458-3658

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

Appendix Page 1463

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANTS
## TOM WOLF AND KATHY BOOCKVAR

---

Plaintiffs, by and through counsel, hereby submit Notice of Voluntary Dismissal of

Defendants Tom Wolf and Kathy Boockvar pursuant to F.R.C.P. 41(a)(1)(A)(ii).

Respectfully submitted this 19th day of April, 2021.

***PLAINTIFFS' COUNSEL:***

By: *s/ Ernest J. Walker*                By: *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)             Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE              LAW OFFICE OF GARY FIELDER
1444 Stuart St.                          1444 Stuart St.
Denver, CO 80204                         Denver, CO 80204
(720) 306-0007                           (720) 306-0007
ernestjwalker@gmail.com                  gary@fielderlaw.net

***DEFENDANTS' COUNSEL:***

By: *s/ Michael J. Fischer*
Michael J. Fischer
Pennsylvania Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
(215) 560-2171
mfischer@attorneygeneral.gov

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*
Ernest J. Walker, Esq.
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-3747-NRN

KEVIN O'ROURKE, *et al.*,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., *et al.*

Defendants.

## NOTICE OF GOVERNOR TOM WOLF AND FORMER-SECRETARY KATHY BOOCKVAR

      Governor Tom Wolf and former-Secretary Kathy Boockvar submit this notice in response to plaintiffs' Notice of Voluntary Dismissal, ECF No. 85. Plaintiffs' notice of dismissal is presented as a stipulation under Rule 41(a)(1)(A)(ii) and bears the signature of the Pennsylvania defendants' counsel. Although the Pennsylvania defendants agree that this case should be dismissed, they did not stipulate to dismissal and did not authorize plaintiffs' counsel to sign the stipulation on their behalf.

      The Pennsylvania defendants had previously informed plaintiffs' counsel that they would enter into a stipulation of dismissal provided that the case was dismissed with prejudice and that the dismissal included Attorney General Josh Shapiro, who is named as a defendant in the proposed amended complaint. *See* Exhibit 1. Plaintiffs were unwilling to stipulate to dismissal with prejudice, and informed defendants' counsel that plaintiffs would seek "voluntary dismissal by court order" if the parties did not agree. *Id.* In response, defendants' counsel stated, "We do

not oppose the voluntary dismissal by plaintiffs of the case against the Pennsylvania defendants."

*Id.*[1]

After plaintiffs filed a stipulation, defendants informed plaintiffs' counsel that if they did not correct their filing by 11 a.m. Eastern Time, the Pennsylvania defendants would correct the record. While plaintiffs' counsel stated that they would withdraw and correct their filing, they have yet to do so.

Plaintiffs' voluntary dismissal comes the same day that the Pennsylvania defendants intended to file for sanctions under Rule 11. The Pennsylvania defendants had previously served a Rule 11 motion on plaintiffs, and had informed plaintiffs that they would file it on April 19, after the safe harbor period under Rule 11(c)(2) had elapsed. While dismissing the claims against the Pennsylvania defendants relieves plaintiffs from the imposition of sanctions under Rule 11, it does not deprive this Court of its inherent authority to impose sanctions on plaintiffs' counsel. *See Jamieson v. Hoven Vision LLC*, No. 20-1122, 2020 WL 7043865, at *1 (D. Colo. Dec. 1, 2020). The Pennsylvania defendants reserve the right to request the imposition of sanctions against plaintiffs in this case based on this Court's inherent authority.

Dated: April 20, 2021                Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

/s/ Jacob Boyer
_____
JACOB BOYER
Deputy Attorney General
Pennsylvania Office of Attorney General

---

[1] Defendants' consent to dismissal is not necessary under Rule 41(a)(1)(A)(i).

1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov

*Attorneys for Governor Tom Wolf and*
*Former Secretary of the Commonwealth*
*Kathy Boockvar*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2021 I electronically filed the foregoing Notice with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

/s/ Jacob Boyer
Jacob Boyer

# EXHIBIT 1

## Boyer, Jacob B.

| | |
|---|---|
| **From:** | Ernie Walker <ernestjwalker@gmail.com> |
| **Sent:** | Tuesday, April 20, 2021 12:30 PM |
| **To:** | Fischer, Michael J. |
| **Cc:** | Bentz, Kristen; Boyer, Jacob B.; gary |
| **Subject:** | Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal |

Mr. Fischer:

I you believe you need to submit additional information to supplement your prior responses for additional clarification of your position, I would be happy to include it with my record of your communication to the court.

Please forward any additional statements you wish to provide at your earliest convenience.

Thank you,
Ernest Walker

On Tue, Apr 20, 2021, 12:24 PM Fischer, Michael J. <mfischer@attorneygeneral.gov> wrote:

> Counsel,
>
> If plaintiffs have not corrected their notice of withdrawal by 1 p.m. Eastern, we will file notice with the Court making our position clear.
>
> Michael J. Fischer
>
> Pennsylvania Office of Attorney General
>
> (215) 347-3929
>
> **From:** Ernie Walker <ernestjwalker@gmail.com>
> **Sent:** Tuesday, April 20, 2021 10:33 AM
> **To:** Fischer, Michael J. <mfischer@attorneygeneral.gov>
> **Cc:** Bentz, Kristen <kbentz@attorneygeneral.gov>; Boyer, Jacob B. <jboyer@attorneygeneral.gov>; gary <gary@fielderlaw.net>
> **Subject:** Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal
>
> Mr. Fischer:

Your last email to me was an unambiguous consent.

I will withdraw the notice and file for the appropriate court order.

I will fully disclose your communication with me to the court.

Thank you,

Ernest Walker

On Tue, Apr 20, 2021, 9:35 AM Fischer, Michael J. <mfischer@attorneygeneral.gov> wrote:

Counsel-

I did not authorize you to sign my name to the notice of dismissal. As I informed you in my email from yesterday morning, we were willing to agree to a stipulated dismissal with the two changes we had requested. You indicated that you were not willing to make both changes and that you were prepared to seek a voluntary dismissal by court order. I informed you that we did not oppose plaintiffs' voluntary dismissal of their claims, but I did not give you the authority to sign my name to a stipulation of dismissal.

Please correct the record with the Court by 11 Eastern this morning. Otherwise, we will file a notice making our position clear.

Michael J. Fischer

Pennsylvania Office of Attorney General

(215) 347-3929

Appendix Page 1472

**From:** Ernie Walker <ernestjwalker@gmail.com>
**Sent:** Monday, April 19, 2021 9:22 PM
**To:** Fischer, Michael J. <mfischer@attorneygeneral.gov>
**Cc:** Bentz, Kristen <kbentz@attorneygeneral.gov>; Boyer, Jacob B. <jboyer@attorneygeneral.gov>; gary <gary@fielderlaw.net>
**Subject:** Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

Thank you.

On Mon, Apr 19, 2021 at 3:21 PM Fischer, Michael J. <mfischer@attorneygeneral.gov> wrote:

Counsel,

We do not oppose the voluntary dismissal by plaintiffs of the case against the Pennsylvania defendants.

Sincerely,

Mike Fischer

Michael J. Fischer

Pennsylvania Office of Attorney General

(215) 347-3929

**From:** Ernie Walker <ernestjwalker@gmail.com>
**Sent:** Monday, April 19, 2021 3:13 PM
**To:** Fischer, Michael J. <mfischer@attorneygeneral.gov>
**Cc:** Bentz, Kristen <kbentz@attorneygeneral.gov>; Boyer, Jacob B. <jboyer@attorneygeneral.gov>; gary <gary@fielderlaw.net>
**Subject:** Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

Mr. Fischer:

Appendix Page 1473

The First Amended Complaint has not been accepted, and Mr. Shapiro is not yet a Defendant. We are preparing a second amended complaint to remove the state constitutional claims from this matter, and Pennsylvania would not have a continued interest in this case. Your consent would not be required, but we would be willing to include Mr. Shapiro on this stipulation.

But Plaintiffs are seeking dismissal of your clients based on jurisdiction issues only, and are not willing to compromise any claims they may later pursue where jurisdiction may otherwise be appropriate, particularly in light of recent Pennsylvania court decisions. Voluntary dismissals under Rule 41 are without prejudice. Plaintiffs will pursue voluntary dismissal by court order if you do not consent.

Please advise regarding your position.

Thank you,

Ernest Walker

On Mon, Apr 19, 2021 at 11:03 AM Fischer, Michael J. <mfischer@attorneygeneral.gov> wrote:

Counsel,

We have two changes to the proposed notice of dismissal. First, we would ask that the dismissal be with prejudice and, second, please include Attorney General Shapiro in the notice, since he was proposed to be added as a defendant in the proposed amended complaint. With those changes, we would agree to the stipulation.

Sincerely,

Mike Fischer

Michael J. Fischer

Chief Deputy Attorney General

Impact Litigation Section

4

Appendix Page 1474

Pennsylvania Office of Attorney General

21 S. 12th Street, 3rd Floor

Philadelphia, PA  19107

P: (215) 560-2171

C: (215) 347-3929

mfischer@attorneygeneral.gov

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers.  Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

---

**From:** Ernie Walker [ernestjwalker@gmail.com]
**Sent:** Monday, April 19, 2021 12:33 PM
**To:** Fischer, Michael J.
**Cc:** Bentz, Kristen; Boyer, Jacob B.; gary
**Subject:** Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

Mr. Fischer:


I have attached a copy of the Notice of Dismissal for Mr. Wolf and Ms. Boockvar that we intend to file with your consent.  Please let me know if you have any objections.


Thank you,

Ernest Walker



On Fri, Apr 16, 2021 at 1:50 PM Fischer, Michael J. <mfischer@attorneygeneral.gov> wrote:

Counsel,


Thank you for your email. We will get back to you with our position on Monday.

Appendix Page 1475

Best,

Mike Fischer


Michael J. Fischer

Chief Deputy Attorney General

Impact Litigation Section

Pennsylvania Office of Attorney General

21 S. 12th Street, 3rd Floor

Philadelphia, PA  19107

P: (215) 560-2171

C: (215) 347-3929

mfischer@attorneygeneral.gov


The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers.  Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

---

**From:** Ernie Walker [ernestjwalker@gmail.com]
**Sent:** Friday, April 16, 2021 11:04 AM
**To:** Bentz, Kristen; Boyer, Jacob B.; Fischer, Michael J.; gary
**Subject:** [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.


Counsel:

After consideration of the jurisdiction issues in this matter, Plaintiffs have decided to pursue voluntary dismissal of Mr. Tom Wolf and Ms. Kathy Boockvar pursuant to Rule 41. Please advise of your position, and we will include with our motion, which we intend to file no later than Monday, April 19.

6

Thank you,

Ernest Walker

Click here to report this email as spam.

This message has been scanned for malware by Websense. www.websense.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' MOTION FOR LEAVE FOR ORDER OF VOLUNTARY
DISMISSAL OF DEFENDANTS TOM WOLF AND KATHY BOOCKVAR**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit their Motion for

Leave for Order of Voluntary Dismissal of Defendants Tom Wolf and Kathy Boockvar, without

prejudice, pursuant to F.R.C.P. 41(a)(2), and for the following reasons:

1.      On March 28, 2021, counsel for Defendants filed his appearance in this matter on behalf

of Defendants Tom Wolf and Kathy Boockvar. [Doc. 57].

2.      On March 29, 2021, Defendants' counsel threatened Plaintiffs' counsel with filing of a

motion seeking sanctions against Plaintiffs "on or after April 19, 2021, unless the complaint and

motion for leave to amend the complaint are withdrawn prior to that date." Exhibit A.

3.      On April 16, 2021, Plaintiffs' counsel advised Defendants' counsel that Plaintiffs had

decided to seek voluntary dismissal of their claims against Defendants Tom Wolf and Kathy

Boockvar due to issues of jurisdiction. Exhibit B.

4.      Later that afternoon, Defendants' counsel responded, "Thank you for your email. We will

get back to you with our position on Monday." Exhibit C.

1

5.      Having not yet received a response, Plaintiffs provided Defendants' counsel with a copy of the proposed stipulated notice of voluntary dismissal on March 19, 2021. Exhibit D.

6.      Defendants' counsel responded noting two objections: (1) a request that the dismissal be "with prejudice," and (2) that it include Attorney General Shapiro. Exhibit E.

7.      Plaintiffs explained that because the amended complaint had not been accepted, Attorney General Shapiro was not yet a Defendant, and consent was unnecessary to dismiss this party/claim, and Plaintiffs would further amend their complaint to dismiss state claims. Exhibit F.

8.      Plaintiffs, however, challenged the request for dismissal of claims "with prejudice," and would not agree to compromise their claims where jurisdiction is proper. Exhibit F.

9.      Defendants' counsel responded with a single statement, "We do not oppose the voluntary dismissal by plaintiffs of the case against the Pennsylvania defendants." Exhibit G.

10.     Plaintiffs' counsel proceeded to file their Notice of Voluntary Dismissal, exactly as had been proposed, sent, and explained to Defendants' counsel. [Doc. 85].

11.     On April 20, 2021, Defendants' counsel advised Plaintiffs' counsel that "I informed you that we did not oppose plaintiffs' voluntary dismissal of their claims, but I did not give you the authority to sign my name to a stipulation of dismissal," and demanded that Plaintiffs "correct the record." Exhibit H.

12.     Plaintiffs' counsel advised Defendants' counsel that they would correct the record and seek voluntary dismissal by court order. Exhibit I.

13.     Plaintiffs desire to voluntarily dismiss Defendants Tom Wolf and Kathy Boockvar pursuant to F.R.C.P. 41(a)(2).

14.     It appears counsel for these Defendants do not oppose voluntary dismissal, but none are

willing to authorize their signature on a stipulation. Exhibit H.

WHEREFORE, Plaintiffs respectfully request an order voluntarily dismissing Defendants Tom

Wolf and Kathy Boockvar, without prejudice, pursuant to F.R.C.P. 41(a)(2).

Respectfully submitted this 20th day of April, 2021.

**PLAINTIFFS COUNSEL:**

By: _s/ Ernest J. Walker_            By:     _s/ Gary D. Fielder_
Ernest J. Walker (MI P58635)            Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE            LAW OFFICE OF GARY FIELDER
1444 Stuart St.            1444 Stuart St.
Denver, CO 80204            Denver, CO 80204
(720) 306-0007            (720) 306-0007
ernestjwalker@gmail.com            gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 20, 2021, a copy of the foregoing
document was electronically filed with the Court using the CM/ECF system which will send
notification of such filing to all counsel of record.

_s/Ernest J. Walker_
Ernest J. Walker, Esq.
Ernest J. Walker Law Office
1444 Stuart St.
Denver, CO 80204
(720)306-0007

3

 Gmail

**Ernie Walker <ernestjwalker@gmail.com>**

## O'Rourke v. Dominion, No. 20-cv-3747 (D. Colo.)

**Fischer, Michael J.** <mfischer@attorneygeneral.gov>                    Mon, Mar 29, 2021 at 7:42 AM
To: "criminaldefense@fielderlaw.net" <criminaldefense@fielderlaw.net>, "ernestjwalker@gmail.com"
<ernestjwalker@gmail.com>
Cc: "Boyer, Jacob B." <jboyer@attorneygeneral.gov>

Counsel-

Please see the attached letter and accompanying motion in the above matter, which have been sent by first-class mail to
the addresses indicated. Consistent with Rule 11(c)(2), we intend to file the motion on or after April 19, 2021, unless the
complaint and motion for leave to amend the complaint are withdrawn prior to that date.

Sincerely,

Michael Fischer

Michael J. Fischer

Chief Deputy Attorney General

Impact Litigation Section

Pennsylvania Office of Attorney General

1600 Arch Street

Suite 300

Philadelphia, PA 19103

P: (215) 560-2171

C: (215) 347-3929

mfischer@attorneygeneral.gov

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential
and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this
message in error, please send a reply e-mail to the sender and delete the material from any and all computers.
Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege.
PA-OAG

This message has been scanned for malware by Websense. www.websense.com

**2 attachments**

Case 1:20-cv-03747-NRN Document 158-1 Filed 09/18/21 USDC Colorado Page 56 of 258

 **3-26-21 O'Rourke v Dominion.pdf**
1667K

 **O'Rourke Rule 11 Motion.pdf**
90K

 Gmail                                                    **Ernie Walker <ernestjwalker@gmail.com>**

---

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Ernie Walker** <ernestjwalker@gmail.com>                                    Fri, Apr 16, 2021 at 9:04 AM
To: kbentz@attorneygeneral.gov, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, "Fischer, Michael J."
<mfischer@attorneygeneral.gov>, gary <gary@fielderlaw.net>
Bcc: Gary Fielder <garyfielder@earthlink.net>, JEFFREY BRODE <jbrode@mac.com>

  Counsel:

  After consideration of the jurisdiction issues in this matter, Plaintiffs have decided to pursue voluntary dismissal of Mr. Tom
  Wolf and Ms. Kathy Boockvar pursuant to Rule 41. Please advise of your position, and we will include with our motion,
  which we intend to file no later than Monday, April 19.

  Thank you,
  Ernest Walker



**Ernie Walker <ernestjwalker@gmail.com>**

---

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Fischer, Michael J.** <mfischer@attorneygeneral.gov>                    Fri, Apr 16, 2021 at 1:49 PM
To: Ernie Walker <ernestjwalker@gmail.com>, "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B."
<jboyer@attorneygeneral.gov>, gary <gary@fielderlaw.net>

Counsel,

Thank you for your email. We will get back to you with our position on Monday.

Best,
Mike Fischer

Michael J. Fischer

Chief Deputy Attorney General

Impact Litigation Section

Pennsylvania Office of Attorney General

21 S. 12th Street, 3rd Floor

Philadelphia, PA  19107

P: (215) 560-2171

C: (215) 347-3929

mfischer@attorneygeneral.gov

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential
and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this
message in error, please send a reply e-mail to the sender and delete the material from any and all computers.
Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege.
PA-OAG

---

**From:** Ernie Walker [ernestjwalker@gmail.com]
**Sent:** Friday, April 16, 2021 11:04 AM
**To:** Bentz, Kristen; Boyer, Jacob B.; Fischer, Michael J.; gary
**Subject:** [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments
unless you recognize the sender and know the content is safe.

[Quoted text hidden]

Pennsylvania Office of Attorney General

Click here to report this email as spam.

This message has been scanned for malware by Websense. www.websense.com

 **Ernie Walker <ernestjwalker@gmail.com>**

---

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Ernie Walker** <ernestjwalker@gmail.com>                          Mon, Apr 19, 2021 at 10:33 AM
To: "Fischer, Michael J." <mfischer@attorneygeneral.gov>
Cc: "Bentz, Kristen <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary
<gary@fielderlaw.net>
Bcc: JEFFREY BRODE <jbrode@mac.com>, Gary Fielder <garyfielder@earthlink.net>

Mr. Fischer:

I have attached a copy of the Notice of Dismissal for Mr. Wolf and Ms. Boockvar that we intend to file with your consent.
Please let me know if you have any objections.

Thank you,
Ernest Walker

[Quoted text hidden]

---

 **Notice of Dismissal - Pennsylvania.pdf**
330K

4/20/2021                                                Gmail - O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

 Gmail                                                                **Ernie Walker <ernestjwalker@gmail.com>**

---

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Fischer, Michael J.** <mfischer@attorneygeneral.gov>                          Mon, Apr 19, 2021 at 11:03 AM
To: Ernie Walker <ernestjwalker@gmail.com>
Cc: "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary
<gary@fielderlaw.net>

Counsel,


We have two changes to the proposed notice of dismissal. First, we would ask that the dismissal be with prejudice
and, second, please include Attorney General Shapiro in the notice, since he was proposed to be added as a
defendant in the proposed amended complaint. With those changes, we would agree to the stipulation.


Sincerely,

Mike Fischer


Michael J. Fischer

Chief Deputy Attorney General

Impact Litigation Section

Pennsylvania Office of Attorney General

21 S. 12th Street, 3rd Floor

Philadelphia, PA  19107

P: (215) 560-2171

C: (215) 347-3929

mfischer@attorneygeneral.gov


The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential
and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this
message in error, please send a reply e-mail to the sender and delete the material from any and all computers.
Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege.
PA-OAG

---

**From:** Ernie Walker [ernestjwalker@gmail.com]
**Sent:** Monday, April 19, 2021 12:33 PM
**To:** Fischer, Michael J.
**Cc:** Bentz, Kristen; Boyer, Jacob B.; gary
**Subject:** Re: [ EXTERNAL ] O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

[Quoted text hidden]

Appendix Page 1487

      **Ernie Walker <ernestjwalker@gmail.com>**

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Ernie Walker** <ernestjwalker@gmail.com>                    Mon, Apr 19, 2021 at 1:12 PM
To: "Fischer, Michael J." <mfischer@attorneygeneral.gov>
Cc: "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary
<gary@fielderlaw.net>
Bcc: JEFFREY BRODE <jbrode@mac.com>, Gary Fielder <garyfielder@earthlink.net>

Mr. Fischer:

The First Amended Complaint has not been accepted, and Mr. Shapiro is not yet a Defendant.  We are preparing a
second amended complaint to remove the state constitutional claims from this matter, and Pennsylvania would not have a
continued interest in this case.  Your consent would not be required, but we would be willing to include Mr. Shapiro on this
stipulation.

But Plaintiffs are seeking dismissal of your clients based on jurisdiction issues only, and are not willing to compromise any
claims they may later pursue where jurisdiction may otherwise be appropriate, particularly in light of recent Pennsylvania
court decisions.  Voluntary dismissals under Rule 41 are without prejudice.  Plaintiffs will pursue voluntary dismissal by
court order if you do not consent.

Please advise regarding your position.

Thank you,
Ernest Walker

[Quoted text hidden]

 Gmail                                    **Ernie Walker <ernestjwalker@gmail.com>**

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Fischer, Michael J.** <mfischer@attorneygeneral.gov>                    Mon, Apr 19, 2021 at 3:21 PM
To: Ernie Walker <ernestjwalker@gmail.com>
Cc: "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary <gary@fielderlaw.net>

Counsel,


We do not oppose the voluntary dismissal by plaintiffs of the case against the Pennsylvania defendants.


Sincerely,

Mike Fischer


Michael J. Fischer

Pennsylvania Office of Attorney General

(215) 347-3929

[Quoted text hidden]

 **Gmail**

**Ernie Walker <ernestjwalker@gmail.com>**

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Fischer, Michael J.** <mfischer@attorneygeneral.gov>                                    Tue, Apr 20, 2021 at 7:35 AM
To: Ernie Walker <ernestjwalker@gmail.com>
Cc: "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary
<gary@fielderlaw.net>

Counsel-

I did not authorize you to sign my name to the notice of dismissal. As I informed you in my email from yesterday morning, we were willing to agree to a stipulated dismissal with the two changes we had requested. You indicated that you were not willing to make both changes and that you were prepared to seek a voluntary dismissal by court order. I informed you that we did not oppose plaintiffs' voluntary dismissal of their claims, but I did not give you the authority to sign my name to a stipulation of dismissal.

Please correct the record with the Court by 11 Eastern this morning. Otherwise, we will file a notice making our position clear.

[Quoted text hidden]

 **Gmail**                                    **Ernie Walker <ernestjwalker@gmail.com>**

---

## O'Rourke v. Dominion Voting Systems - Voluntary Dismissal

**Ernie Walker** <ernestjwalker@gmail.com>                    Tue, Apr 20, 2021 at 8:32 AM
To: "Fischer, Michael J." <mfischer@attorneygeneral.gov>
Cc: "Bentz, Kristen" <kbentz@attorneygeneral.gov>, "Boyer, Jacob B." <jboyer@attorneygeneral.gov>, gary
<gary@fielderlaw.net>

Mr. Fischer:

Your last email to me was an unambiguous consent.

I will withdraw the notice and file for the appropriate court order.

I will fully disclose your communication with me to the court.

Thank you,
Ernest Walker

[Quoted text hidden]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANTS AND CLAIMS FROM FIRST AMENDED COMPLAINT

---

Plaintiffs, by and through counsel, and pursuant to F.R.C.P. 41(a)(1)(A)(i), hereby submit

Notice of Voluntary Dismissal of the following Defendants and claims from Plaintiffs' First

Amended Complaint:

*DEFENDANTS:*

DANA NESSEL, CHRIS CARR, JOSH SHAPIRO, and JOSH KAUL

*CLAIMS:*

COUNT VIII – Constitutional Challenge, Michigan Law – M.C.L. 168.759(3), as
applied;

COUNT IX – Constitutional Challenge, Georgia Law – O.C.G.A. 21-2-386 et
seq., as applied;

COUNT X – Constitutional Challenge, Pennsylvania Law – Act 77, on its face
and as applied; and

COUNT XI – Constitutional Challenge, Wisconsin Law – Wis. Stat. 6.855(3) and
7.15(2m), as applied.

1

Respectfully submitted this 25th day of April, 2021.

**PLAINTIFFS' COUNSEL:**

By: *s/ Ernest J. Walker*                            By:    *s/ Gary D. Fielder*

Ernest J. Walker (MI P58635)                        Gary D. Fielder (CO 19757)

ERNEST J. WALKER LAW OFFICE                  LAW OFFICE OF GARY FIELDER

1444 Stuart St.                                        1444 Stuart St.

Denver, CO 80204                              Denver, CO 80204

(720) 306-0007                                   (720) 306-0007

ernestjwalker@gmail.com                        gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 25, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*

Ernest J. Walker, Esq.

ERNEST J. WALKER LAW OFFICE

1444 Stuart St.

Denver, CO 80204

(720)306-0007

ernestjwalker@gmail.com

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

## PLAINTIFFS' MOTION FOR JUDICIAL NOTICE

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following Motion for Judicial Notice, and hereby respectfully requests that the Court take judicial notice of the following items for purposes of the hearing set for April 27, 2021, with regard to the several motions to dismiss, and the Plaintiffs' motion for leave to file amended complaint.

### I. INTRODUCTION

This case is set for hearing on April 27, 2021, on the outstanding motions. Some of the motions are to dismiss the Plaintiffs' Complaint for failing to state a claim for which relief may be granted, pursuant to Rule 12(b)(6). In that regard, the Court previously remarked that it was interested in the issues concerning standing, state action, damages and redressability. These issues have been briefed by the parties, and most of the items have been listed in the pleadings. However, new evidence has emerged, which may be considered by the Court. Noting the standard of review, the Plaintiffs request that the Court take judicial notice, pursuant to Fed.R.Evid. 201(c)(2), of the following items, for purposes of the motions filed and upcoming hearing to determine the issues outlined in said motions.

1

## II.     THE COURT MUST TAKE JUDICIAL NOTICE OF THE FOLLOWING:

1.     The Plaintiffs are relying on information, reports, affidavits, documents, exhibits,

rulings and orders, from the following cases:

A.     *My Pillow, Inc. v. US Dominion, Inc.*, 1:21-cv-01015 (D. Minnesota 2021);

B.     *US Dominion, Inc., et al. v. Powell*, 1:21-cv-00040 (D.D.C. 2021);

C.     *US Dominion, Inc., et al. v. Giuliani*, 1:21-cv-00213 (D.D.C. 2021);

D.     *US Dominion, Inc., v. My Pillow, Inc, et al.*, 1:21-cv-00445 (D.D.C. 2021);

E.     *US Dominion, Inc., v. FoxNews Network, LLC.* (Superior Ct., Delaware, 2021);

F.     *Maricopa County, et al. v. Karen Fann, et al.*, CV 2020-016840 (Superior Court, Maricopa County, Arizona, 2021);

G.     *Arizona Democratic Party et al.* v. *Karen Fann, et al.*, CV 2021-006646 (Superior Court, Maricopa County, Arizona);

H.     *Eric Coomer v. Donald J. Trump for President Inc., et al.*, 2020CV34319 (Denver Dist. Ct., filed Dec. 22, 2020);

I.     *Prujansky, et al., v. Megan Wolf, et al.*, (Wis. Elections Comm., State of Wisconsin) https://empowerwisconsin.org/wp-content/uploads/2021/04/Racine-Wisconsin-Election-Complaint-Final-4-21-21.pdf;

J.     *Texas v. Pennsylvania*, case 22O155 (U.S. Supreme Court, filed Dec. 7, 2020);

K.     *Federal Trade Comm., v. Facebook, Inc.*, Case 1:20-cv-03590 (D.D.C. 2020);

L.     *Curling, et al., v. Raffensperger, et al.,* 1:17-cv-2989-AT (N.D. Ga.);

M.     *Democratic Party of Georgia, Inc. v. Raffensperger,* case 1:19-cv-05028-WMR (N.D. Ga.);

N.     *Woods v. Raffensperger,* Case 1:19-cv-05028-WMR (N.D. Ga. Nov. 15, 2020) (*See also, Wood v Raffensperger*, 981 F.3d 1307 (11th Cir. 2020), cert denied;

2

O.    *Pearson, et al., v. Kemp.*, Case 1:20-cv-04809-TCM (N.D. Ga. Nov. 25, 2020), *see also Pearson v. Kemp*, No. 20-14480 (11ᵗʰ Cir. 2020), cert. denied;

P.    *King, et al., v. Whitmer*, *et al.*, case 2:20-cv-13134-LVB (E. D. Mich. filed Nov. 25, 2020), *see also King v. Whitmer*, No. 20-2205 (6ᵗʰ Cir. 2020), cert denied;

Q.    *William Bailey v. Antrim County*, case 2020-CZ-9238 (13ᵗʰ Cir. Ct. Mich., filed Dec. 13, 2020);

R.    *Johnson v. Benson*, case 162286, (Mich. 2020); *See also, Johnson v. Secretary of State*, 951 N.W. 2d 310 (Mich. 2020);

S.    *Costantino v. Detroit*, case 20-014780 (3ʳᵈ Cir. Ct. Mich., filed Nov. 9, 2020), *see also Costantino v. Detroit,* 950 N.W.2d 707 (Mich. 2020);

T.    *Bally v. Whitmer*, 1:20-cv-1088 (W.D. Mich., filed Nov. 11, 2020);

U.    *Genetski v. Benson*, Case No. 20-000216-MN (Michigan Court of Claims, Order of March 9, 2021);

V.    *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT (E.D. Pa. filed Aug. 7, 2020);

W.    *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020*), see also Trump v. Boockvar*, 20-3371 (3ʳᵈ Cir., order dated Nov. 27, 2020);

X.    *The Honorable Mick Kelley v. Commonwealth of Pennsylvania*, Case 620 MD 2020, (Commonwealth Ct. of Penn., filed November 21, 2020), *see also Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020), cert. denied;

Y.    *Pennsylvania Voters Alliance, v. Centre County*, case 4:20-cv-01761 (M.D. Penn., filed Sept. 25, 2020)(order entered Oct. 21, 2020), cert. denied;

Z.    *Bognet v. Sec'y Common Wealth of Pa.*, 980 F.3d 336 (3d Cir. 2020), *see also, Bognet v. Degraffenreid*, U.S. Supreme Court case no. 20-740, (certiorari granted, judgement vacated and returned with instructions to dismiss the case as moot);

AA.   *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020);

BB.   *Metcalfe v. Wolf*, No. 636 M.D. 2020, 2020 WL 7241120 (Pa. Commonwealth Ct. Dec. 9, 2020);

CC.   *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020);

DD.   *In re Canvassing Observation*, 241 A.3d 339 (Pa. 2020); and *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591 (Pa. 2020);

EE.   *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 369-72 (Pa. 2020) (*cert. denied*, 141 S.Ct. 732 (2021));

FF.   *Republican Party of Pennsylvania v. Degraffenreid*, No. 20-542, 2021 WL 666401 (Feb. 22, 2021) (592 U.S.___ (2021), *cert. denied*) (slip op. at 5-6) (Justice Thomas, J., dissenting from denial of certiorari);

GG.   *Jefferson v. Dade County*, 2020 WI 90 (Wis. 2020);

HH.   *Trump v. Biden*, 2020 WI 91 (Wis. 2020);

II.   *Wisconsin Voters Alliance v. City of Racine*, case 1:20-cv-01487 (E.D. Wis.);

JJ.   *Feehan v. Wisconsin Elections* Commission, Case 2:20-cv-1771 (E.D. Wis. Nov. 25, 2020);

KK.   *Donald J. Trump, Candidate for President of the United States of America v. The Wisconsin Election Commission*, Case 2:20-cv-01785-BHL (E.D. Wisc. filed Dec. 2, 2020); and

LL.   Wiseenergy.org, *2020 US Presidential Election Related Lawsuits*, http://wiseenergy.org/Energy/Election/2020_Election_Cases.htm.

2.   The Plaintiffs are also relying on the following information, reports, affidavits,

documents, articles or exhibits from the following sources:

A.   Jose A. Esparza, *Report of Review of Dominion Voting Systems Democracy Suite 5.5A*, Tex. Sec'y of State (Jan. 24, 2020), available at https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf;

B.   Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3 (Sept. 17, 2020);

C.   Example plan from CTCL: Wisconsin Safe Voting Plan 2020, Submitted to CTCL, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay available at: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf;

D.  *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, Elizabeth Warren: United States Senator for MA (Dec. 10, 2019), https://www.warren.senate.gov/oversight/letters/warren-klobuchar-wyden-and-pocan- investigate-vulnerabilities-and-shortcomings-of-election-technology-industry-with-ties- to-private-equity;

E.  CONGRESSIONAL TASK FORCE ON ELECTION SECURITY, FINAL REPORT (2018), https://homeland.house.gov/imo/media/doc/TFESReport.pdf; and

F.  Peter Navarro, *Navarro Reports*: *Vol I: The Immaculate Deception, Vol. II: The Art of the Steal, and Vol. III: Yes, President Trump Won* (2020-2021) https://www.dropbox.com/s/584r7xtnngauc4t/The%20Navarro%20Report%20Vol%20I%2C%20II%2C%20III%20-%20Feb.%202%2C%202021.pdf?dl=0.

3.  The Plaintiffs are also relying on the following books, articles, documentaries,

reports and analysis contained in the following:

A.  Patrick Byrne, *The Deep Rig: How Election Fraud Cost Donald J. Trump the White House, By a Man Who did not Vote for Him*, Self-Published (2021);

B.  Simon Ardizzone, Russell Michaels, and Sarah Teale, *Kill Chain: The Cyber War on America's Elections*, HBO (Mar. 26, 2020), available at https://play.hbomax.com/feature/urn:hbo:feature:GXk7d3QAJHI7CZgEAACa0?reentere d=true&userProfileType=liteUserProfile;

C.  Mike Lindell, *Absolute Proof*, Lindell TV: https://lindelltv.com;

D.  Mike Lindell, *Scientific Proof*, Lindell TV: https://lindelltv.com; and

E.  Mike Lindell, *Absolute Interference*, Lindell TV: https://lindelltv.com.

4.  The Plaintiffs are also relying on the following public records:

A.  Center for Technology and Civic Life, IRS Forms 990 for tax years 2015, 2016, 2018 https://apps.irs.gov/app/eos/detailsPage?ein=472158694&name=Center%20for%20Technology%20and%20Civic%20Life&city=Chicago&state=IL&countryAbbr=US&dba=&type=CHARITIES,%20DETERMINATIONLETTERS,%20COPYOFRETURNS&orgTags=CHARITIES&orgTags=DETERMINATIONLETTERS&orgTags=COPYOFRETURNS;

5

B.      Center for Technology and Civic Life, Preliminary list of 2020 election
        grantees:
        https://docs.google.com/spreadsheets/d/1E7P3owIO6UlpMY1GaeE8nJVw2x
        6Ee-iI9d37hEEr5ZA/edit#gid=1993755695;

C.      Center for Technology and Civic Life, List of available Courses related to
        administration of elections: https://www.techandciviclife.org/our-
        work/election-officials/courses/;

D.      Center for Technology and Civic Life, Electiontools.org site link and list of
        election related assistance: https://www.techandciviclife.org/our-
        work/election-officials/electiontools/;

E.      Center for Technology and Civic Life, Donation page
        https://www.techandciviclife.org/donate/;

F.      Center for Technology and Civic Life, Webinar "Engaging Voters on
        Facebook": https://www.techandciviclife.org/facebook-webinar/;

G.      Internal Revenue Service; Exemption Requirements-501(c)(3) Organizations:
        https://www.irs.gov/charities-non-profits/charitable-
        organizations/exemption-requirements-501c3-organizations;

H.      Internal Revenue Service; The Restriction of Political Campaign Intervention
        by Section 501(c)(3) Tax-Exempt Organizations:
        https://www.irs.gov/charities-non-profits/charitable-organizations/the-
        restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-
        organizations;

I.      26 C.F.R. § 1.170A-9, definition of section 170(b)(1)(A) organization related
        to source of donations;

J.      Example Press Release from CTCL, dated Sept 1, 2020:
        https://www.documentcloud.org/documents/7070695-CTCL-CEIR-Press-
        Release-9-1-20-FINAL.html;

K.      Example Grant Agreement between CTCL and Greenville County, Board of
        Elections and Voter Registration, September 15, 2020:
        https://www.greenvillecounty.org/Council/_Agenda/Meetings%20of%20202
        0/Finance/2020.09.28/Greenville%20Safe%20Voting%20Grant.pdf;

L.      United States Patent # 9,202,113 B2, dated December 1, 2015 by Applicant
        Dominion Voting Systems, Inc. Denver, CO(US):
        https://patentimages.storage.googleapis.com/de/c0/45/5c2744d3143350/US9
        202113.pdf;

M.   United States Patent # 8,844,813 B2, dated September 30, 2014 referencing Assignee Dominion Voting Systems, Inc. Denver, CO(US): http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/srchnum.html&r=1&f=G&l=50&d=PALL&s1=8844813.PN;

N.   United States Patent Assignment from Dominion Voting Systems Corporation to HSBC: https://legacy-assignments.uspto.gov/assignments/assignment-pat-50500-236.pdf and: https://assignment.uspto.gov/patent/index.html#/patent/search/resultAssignment?id=50500-236; and,

O.   Example contract, Colorado and Dominion Master Voting Systems Agreement, Feb. 17, 2016 https://www.sos.state.co.us/pubs/elections/VotingSystems/DVS-DemocracySuite/documentation/CDOS-DVS%20Master%20Voting%20Systems%20Agreement%2020160217_Redacted.pdf.

## CONCLUSION

For the reasons above, the Plaintiffs respectfully requests that this Court take judicial notice of the above-referenced items for purposes of the hearing scheduled on April 27, 2021, for purposes of deciding the relevant, outstanding motions to dismiss and the Plaintiffs' motion for leave to amend their complaint.

Dated this 26th day of April, 2021.

Respectfully submitted,

***PLAINTIFFS COUNSEL:***

By: *s/Ernest J. Walker*                          By:    *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)                      Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE               LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                      1444 Stuart St.
Denver, CO 80204                           Denver, CO 80204
(720) 306-0007                                   (720) 306-0007
ernestjwalker@gmail.com                     gary@fielderlaw.net

7

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 26, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Ernest J. Walker*
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge N. Reid Neureiter**

| | |
|---|---|
| Civil Action No: 20-cv-03747-NRN | Date:  April 27, 2021 |
| Courtroom Deputy:  Stacy Libid | FTR:  Courtroom C203 |

_Parties:_                                                    _Counsel:_

KEVIN O'ROURKE,                                Ernest Walker
NATHANIEL L. CARTER,                        Gary Fielder
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

     Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware        David Meschke
corporation,                                                                     Stanley Garnett
FACEBOOK, INC., a Delaware corporation,                      Craig Streit
CENTER FOR TECH AND CIVIC LIFE, an Illinois        Joshua Lipshutz
non-profit organization,                                                      Ryan Bergsieker
MARK E. ZUCKERBERG, individually,                          Joshua Matz
PRISCILLA CHAN, individually,                                     Louis Fisher
BRIAN KEMP, individually,                                             Michael Skocpol
BRAD RAFFENSPERGER, individually,                         Charlene McGowan
GRETCHEN WHITMER, individually,                             Jacob Boyer
JOCELYN BENSON, individually,                                   Michael Fischer
TOM WOLF, individually,                                               Marcella Coburn
KATHY BOOCKVAR, individually,                                 Jacob Boyer
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

     Defendants.

---

## COURTROOM MINUTES

---

**MOTION HEARING VIA VIDEO CONFERENCE**

**2:01 p.m.     Court in session.**

Court calls case. Appearances of counsel.

This matter is before the Court regarding:
-   Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(1) and 12(b)(6) or, in the Alternative, to Strike Pursuant to F.R.C.P. 23 [Docket No. 22];
-   Defendant Facebook, Inc.'s Motion to Dismiss [Docket No. 23];
-   Defendant Center Tech and Civic Life's Motion to Dismiss [Docket No. 41];
-   Defendants Governor Gretchen Whitmer's and Secretary of State Jocelyn Benson's Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(2) and 12(b)(6) [Docket No. 46];
-   Motion to Dismiss of Defendants Brian Kemp and Brad Raffensperger and Brief in Support [Docket No. 47];
-   Plaintiff's Motion for Leave to File Amended Complaint Pursuant to FRCP 15 and Memorandum of Points and Authorities in Support [Docket No. 48];
-   Governor Tom Wolf's and Acting Secretary Veronica Degraffenreid's Motion to Dismiss and Memorandum in Support of Motion to Dismiss [Docket No. 49]; and
-   Plaintiffs' Motion for Judicial Notice [Docket No. 90].

Arguments by counsel.

**3:05 p.m.     Court in recess.**
**3:13 p.m.     Court in session.**

For the reasons set forth on the record, it is

**ORDERED:**  Plaintiffs' Motion for Judicial Notice [Docket No. 90] is **DENIED**.

**ORDERED:**  Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(1) and 12(b)(6) or, in the Alternative, to Strike Pursuant to F.R.C.P. 23 [Docket No. 22] **TAKEN UNDER ADVISEMENT.**

**ORDERED:**  Defendant Facebook, Inc.'s Motion to Dismiss [Docket No. 23] **TAKEN UNDER ADVISEMENT.**

2

**ORDERED:**  Defendant Center Tech and Civic Life's Motion to Dismiss [Docket No. 41] **TAKEN UNDER ADVISEMENT.**

**ORDERED:**  Defendants Governor Gretchen Whitmer's and Secretary of State Jocelyn Benson's Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(2) and 12(b)(6) [Docket No. 46] **TAKEN UNDER ADVISEMENT.**

**ORDERED:**  Motion to Dismiss of Defendants Brian Kemp and Brad Raffensperger and Brief in Support [Docket No. 47] **TAKEN UNDER ADVISEMENT.**

**ORDERED:**  Plaintiff's Motion for Leave to File Amended Complaint Pursuant to FRCP 15 and Memorandum of Points and Authorities in Support [Docket No. 48] **TAKEN UNDER ADVISEMENT**

**ORDERED:**  Governor Tom Wolf's and Acting Secretary Veronica Degraffenreid's Motion to Dismiss and Memorandum in Support of Motion to Dismiss [Docket No. 49] **TAKEN UNDER ADVISEMENT.**

**4:22 p.m.    Court in recess.**

Hearing concluded.
Total in-court time:   02:13

*To order transcripts of hearings, please contact either Patterson Transcription Company at (303) 755-4536 or AB Litigation Services at (303) 629-8534.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS** (**Dkt. ##22, 23, & 41**) **&
PLAINTIFFS' MOTION TO AMEND (Dkt. #48)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

1

This matter is before the Court with the consent of the Parties, referred for all purposes by Chief Judge Philip A. Brimmer pursuant to 28 U.S.C. § 636(c).

This lawsuit arises out of the 2020 election for President of the United States. The original Complaint, filed December 22, 2020 (Dkt. #1) and which purports to be a class action lawsuit brought on behalf of 160 million registered voters, alleges a vast conspiracy between four state governors; secretaries of state; and various election officials of Michigan, Wisconsin, Pennsylvania and Georgia; along with Dominion Voting Systems, Inc.—a private supplier of election and voting technology; the social media company Facebook, Inc.; the Center for Tech and Civic Life ("CTCL")—a non-profit organization dedicated to making elections more secure and inclusive; as well as Facebook founder Mark Zuckerberg and his wife Priscilla Chan.

I use the words "vast conspiracy" advisedly. That is what the Complaint, all 84 pages and 409-plus paragraphs, alleges: that "the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other thing, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Dkt. #1 at 2, ¶ 4.

The named Plaintiffs are from Virginia (Kevin O'Rourke), Michigan (Nathaniel Carter and Kesha Crenshaw), Colorado (Lori Cutunilli and Neil Yarbrough), Alaska (Alvin Criswell), California (Larry D. Cook), and Alabama (Amie Trapp).

Plaintiffs' affidavits, attached to the Complaint, shed light on the personal feelings and motivations in bringing this suit, highlighting their personal anguish stemming from the 2020 presidential election. For example, Mr. O'Rourke, a Virginia certified public accountant and a self-professed "free man, born of a free woman and free man," explains:

> I have lost any faith in the existing form of government and technology monopolies; I am angry; I am frustrated; I cannot sleep at night; I suffer from anxiety as a result of this uncertainty; I have lost my desire to communicate with most people openly and remain guarded as to my interactions and communication with every day people; I feel I have no voice, no rights, and I have been 100% abandoned by the government in all its forms[.]

Dkt. #1-2 at ¶ 36.

> Mr. Carter, a 55-year old Michigander from Benton Harbor, swears that
>
> DOMINION and others were aware or should have been aware that machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside DOMINION. I believe that as a result, my vote during the 2020 Presidential Election was effectively not counted, and the results of the election were predetermined. . . . I believe my vote has be [sic] discounted or eliminated all-together from consideration regarding the choice for the country's highest office.

Dkt. #1-3 at ¶ 19–22.

And Ms. Cutunilli, a business owner and grandmother in Summit County, Colorado, believes that her "constitutional right to participate in fair and honest elections has been violated with [her] vote suppressed." She says, "While I once trusted in the fairness of the United States electoral system I no longer do, with the Dominion Voting System being utilized in Colorado and around the country as well as private 'donations' being unconstitutionally distributed and accepted to interfere with the legitimacy of our elections." *Id.*

Appendix Page 1507

The affidavits of the other Plaintiffs are similar in tone and reflect similar beliefs and sentiments,[1] summarized in the concluding pages of the Complaint, "The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty." Dkt. #1 at 82.

The Complaint asserts seven separate counts. Plaintiffs allege (1) violation of the Electors Clause and imposing of an unconstitutional burden on the right to vote for President and Vice-President; (2) violation of equal protection; (3) violation of due process; (4) the imposition of an unconstitutional burden on the rights to political speech, the right to associate, and freedom of the press; (5) a "Constitutional Challenge" to the actions of Facebook and Mr. Zuckerberg as somehow burdening the Plaintiffs' right to free speech and free press, and questioning whether 47 U.S.C. § 230(c) applies to Facebook; (6) a request for a declaratory judgment that each of the Defendants acted unconstitutionally; and (7) a permanent injunction.

For relief, Plaintiffs in their Complaint seek a mishmash of outcomes, ranging from a permanent injunction restraining Defendants from any further unconstitutional behavior, to a declaratory judgment that 47 U.S.C. §230(c) is unconstitutional as applied to the actions of the Facebook and Mr. Zuckerberg, to a declaration that the actions of the Defendants are unconstitutional and ultra vires "making them legal nullities," to a damage award in the "nominal amount of $1,000 per registered voter [which] equals

---

[1] Plaintiff Larry D. Cook, although convinced that there "was widespread vote fraud and manipulation during the 2020 Presidential Election" is somewhat anomalous, as his affidavit appears to focus on his anti-vaccination beliefs, his support of Q and other Qanon conspiracy theorists, and his distress at having had his anti-vaccine Facebook page and Qanon-related pages removed from the platform. *See* Dkt. #1-6.

damages in the approximate amount of $160 billion dollars" for the alleged
Constitutional wrongs Plaintiffs have suffered. Dkt. #1 at 82–83.

The Defendants who have been served moved to dismiss on a number of
grounds, including pursuant to Rule 12(b)(1) (lack of subject matter jurisdiction);
12(b)(2) (lack of personal jurisdiction), and 12(b)(6) (failure to state a claim). See Dkt.
##22, 23, 41, 46, 47, & 49.

**Procedural Background, Pending and Mooted Motions**

Plaintiffs filed suit on December 22, 2020.

On February 16, 2021, Dominion filed its Motion to Dismiss. *See* Dkt. #22.
Facebook filed its own Motion to Dismiss the same day. *See* Dkt. #23.

On February 26, 2021, the Court stayed all disclosures and discovery pending
resolution of the Motions to Dismiss. *See* Dkt. #28 (Minute Order).

Rather than filing an Amended Complaint as a matter of right, Plaintiffs filed
oppositions to the two Motions to Dismiss on March 9, 2021. *See* Dkt. ##38 & 39.

On March 10, 2021, the Center for Tech and Civic Life ("CTCL") filed its own
Motion to Dismiss. *See* Dkt. #41.

On March 15, 2021, Michigan Governor Gretchen Whitmer and Michigan
Secretary of State Jocelyn Benson filed a Motion to Dismiss. *See* Dkt. #46. The same
day, Georgia Governor Brian Kemp and Georgia Secretary of State Brad Raffensperger
also filed a Motion to Dismiss. *See* Dkt. #47. And on March 18, 2021, Pennsylvania
Governor Tom Wolf and Pennsylvania Acting Secretary of Commonwealth Veronica
Degraffenreid also filed a Motion to Dismiss. *See* Dkt. #49.

In the meantime, on March 15, 2021, Plaintiffs filed a Motion for Leave to File an Amended Complaint, attaching a redlined version of the proposed Amended Complaint. *See* Dkt. #48. The proposed Amended Complaint seeks to add 152 new plaintiffs from 33 different states and breaks the proposed national class of registered voters into subclasses of Republicans, Democrats, Third-Parties, Independents, and "Disgruntled Voters." The proposed Amended Complaint adds six causes of action (including racketeering claims under the federal Racketeer Influenced and Corrupt Organization Act ("RICO") against Facebook, CTCL, Zuckerberg and Chan) and 473 paragraphs.

On March 23, 2021, Facebook and Dominion filed their replies in support of their Motions to Dismiss. *See* Dkt. ##55 & 56.

On March 29, 2021, each of the Defendant groups filed responses objecting to Plaintiffs' Motion for Leave to File the Amended Complaint. *See* Dkt. #58 (Kemp/Raffensperger), #59 (Boockvar/Wolf), #60 (Benson/Whitmer), #61 (Dominion), #62 (CTCL), & #63 (Facebook.).

On April 8, 2021, Plaintiffs filed multiple replies in support of their Motion for Leave to File an Amended Complaint. *See* Dkt. ##71, 73, 74, 75, 76, & 77.

Plaintiffs initially filed responses opposing the various government official defendants' Motions to Dismiss. *See* Dkt. #72 (opposing Wolf and Degraffenreid's Motion to Dismiss), #79 (opposing Kemp and Raffensberger's Motion to Dismiss); & #80 (opposing Whitmer and Benson's Motion to Dismiss). But then, a few days later, on April 19 and 20, 2021, Plaintiffs' voluntarily dismissed the government official defendants from the case. *See* Dkt. ##82–85, & 87.

Thus, remaining for determination are the Motions to Dismiss of Defendants Dominion (Dkt. #22), Facebook (Dkt. #23), and CTCL (Dkt. #41), and Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. #48). The Motions to Dismiss filed by the government official defendants will be denied as moot, as those defendants have been voluntarily dismissed.

**Standard for Considering Rule 12(b)(1) Motion to Dismiss for Lack of Jurisdiction**

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**Standard for Failure to State a Claim Under Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

**Plaintiffs lack Article III standing so the Court lacks jurisdiction to hear the case.**

7

Defendants make numerous arguments as to why Plaintiffs' Complaint should be dismissed, including lack of personal jurisdiction, failure to state a constitutional claim because the remaining Defendants are not state actors, failure to plausibly allege violation of constitutional rights, and reliance on Section 230 of the Communications Decency Act. But one argument appears in all the Motions and, even without addressing the myriad others, it ultimately proves fatal to Plaintiffs' case. The decisive argument is that the Plaintiffs have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. With Plaintiffs not having standing to sue, there is no case or controversy, a necessary predicate for federal court jurisdiction under Article III of the Constitution.

Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that the jurisdiction of the federal courts reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, a federal court lacks the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Article III standing requires Plaintiffs to have personally suffered (1) a concrete and particularized injury (2) that is traceable to the conduct they challenge, and that (3) would likely be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the pleading stage, any complaint filed in federal court must

Appendix Page 1512

"clearly allege facts demonstrating each element." *Id.* (quotation marks and alterations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 1548 (internal quotation marks omitted).

The gravamen of Plaintiffs' Complaint, confirmed by a review of their attached affidavits, is the general assertion that allegedly illegal conduct occurred in multiple states across the country during the recent Presidential election, resulting in Plaintiffs' votes (to the extent each Plaintiff actually voted—some admit they did not) being diluted or discounted in some way, to the point where their votes did not matter.[2] The allegedly illegal conduct supposedly included facilitating the use of more absentee ballots than Plaintiffs think was permissible; the unequal placement of ballot drop boxes; the modification of various state voting rules in a way Plaintiffs believe was inconsistent with state law; the publication by Facebook of certain messages and Facebook's selective censorship of others; the implementation by municipalities across the country of allegedly inaccurate vote-counting technologies; and the charitable funding of certain municipalities' voting inclusion and security programs.

But whatever the grievances, the disputed conduct and the resulting claimed injury impacted 160 million voters in the same way. The Complaint, viewed as whole, is a generalized grievance about the operation of government, or about the actions of the

---

[2] *See* Aff. of Kesha Crenshaw (Dkt. #1-7) ("I am routinely told by people, even my husband, that my vote didn't matter, and that voting is just wasting my time. . . . I have watched what happened on Election Day and since, and now realize that the people who warned me that my vote didn't count were right. I know that I did cast a ballot and voted in the election, but based on reports that I have seen, I have no faith that the outcomes reported are actually the votes that were cast, or that my vote was counted at all. . . . I can see with my own eyes the 'irregularities' that have been reported, and know what I see is not right, has not been explained, and calls into doubt the legitimacy of the election.").

Defendants on the operation of government, resulting in abstract harm to all registered voting Americans. It is not the kind of controversy that is justiciable in a federal court. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (claimed interest in ensuring that "only lawful ballots are counted" is a generalized grievance).

As the Supreme Court of the United States has said in a case involving four Colorado voters who sought to challenge on federal constitutional grounds a Colorado Supreme Court decision relating to redistricting,

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan*, 504 U.S. at 573-74 (1992)). *See also Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance).

The Supreme Court in *Lance* was specific that a case where voters allege only that the law (in that case the Elections Clause) has not been followed will not support standing to sue:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. *See, e.g. Baker v. Carr*, 369 U.S. 186, 207–208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring the Elections Clause claim.

549 U.S. at 1198.

It should be no surprise to Plaintiffs or their counsel that their generalized grievances about their votes being diluted or other votes being improperly counted would be insufficient to grant them the standing required under Article III of the Constitution. Numerous other cases challenging the 2020 election and its surrounding circumstances have been dismissed for precisely this reason (among many other reasons).

For example, on December 11, 2020, the United States Supreme Court denied the State of Texas' attempt to file a bill of complaint challenging the Commonwealth of Pennsylvania's 2020 election procedures on the ground that "Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020).

In *Wood v. Raffensperger*, the Eleventh Circuit held that attorney Lin Wood lacked standing in federal court to enforce Georgia's election laws, in part because his claim that unlawfully processed absentee ballots diluted the weight of his vote was a generalized grievance "that cannot support standing." 981 F.3d at 1314-15.

In *Bognet v. Secretary Commonwealth of Pennsylvania*, where voters and a congressional candidate brought suit against the Secretary of the Commonwealth of Pennsylvania and county boards of election seeking to enjoin the counting of mail-in ballots during a three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and also seeking a declaration that the extension period was unconstitutional, the Third Circuit explained the doctrine of standing in clear terms:

> To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the

Appendix Page 1515

injury that you claim is an injury that does no specific harm to you, or if it
depends on a harm that may never happen, then you lack an injury for which
you may seek relief from a federal court.

980 F.3d 336, 348 (3d Cir. 2020), *cert. granted and judgment vacated with instructions
to dismiss as moot*, ___ S. Ct.___, 2021 WL 1520777 (April 19, 2021). In *Bognet*, the
court held that the plaintiffs lacked standing to sue for alleged injuries attributable to a
state government's violations of the Elections Clause, in part because the relief "would
have no more directly benefitted them than the public at large." *Id.* at 349.[3]

In *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL
5997680 (W.D. Pa. Oct. 10, 2020), the Western District of Pennsylvania dismissed a
legal challenge to election guidance given by the Secretary of the Commonwealth of
Pennsylvania regarding manned security near absentee drop boxes, performing of
signature comparisons for mail-in ballots, and a county-residency requirement for poll
watchers. The claim had been that the plaintiffs would suffer an injury through the non-
equal treatment or dilution of their legitimately cast votes by improperly verified
absentee or mail-in ballots. The court there found the plaintiffs lacked the "concrete" and
"particularized" injury necessary for Article III standing, agreeing that the "claimed injury
of vote dilution caused by possible voter fraud . . . too speculative to be concrete." 2020
WL 5997680, at *32.

In *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev.
2020), the District of Nevada dismissed a lawsuit against Nevada's Secretary of State
that sought to challenge a Nevada law that expanded mail-in voting due to the COVID-
19 pandemic. The law directed city and county election officials to mail paper ballots to

---

[3] While the judgment in this case was vacated by the Supreme Court on mootness
grounds, the reasoning on the issue of standing remains persuasive.

all active registered voters. Plaintiffs sued, claiming an individual right under the

Constitution to have a vote fairly counted, "without being distorted by fraudulently cast

votes"—i.e., vote dilution—and also for violations of the Equal Protection Clause. The

court dismissed the case for lack of standing, finding the claimed injury "impermissibly

generalized" and "speculative." 488 F.Supp.3d at 1000. "As with other '[g]enerally

available grievance[s] about the government,' plaintiffs seek relief on behalf of their

member voters that "no more directly and tangibly benefits them than it does the public

at large." *Id*. (alteration omitted) (quoting *Lujan*, 504 U.S. at 573–74).

In *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz.

Dec. 9, 2020), the District of Arizona rejected a suit by Republican nominees for

Arizona's Presidential Electors and Republican county chairs who sued Arizona's

governor and secretary of state seeking to set aside results of the 2020 election on the

basis of fraud and election misconduct. Claims under both the Elections Clause and the

Equal Protection Clause based on vote dilution were deemed inadequate for lack of

Article III standing: "Defendants contend that Plaintiffs do not have standing to assert

these claims and point out that these allegations are nothing more than generalized

grievances that any one of the 3.4 million Arizonans who voted could make if they were

so allowed. The Court agrees." 2020 WL 7238261, at *5.

In *King v. Whitmer*, Civ. No. 20-13134, 2020 WL 7134198 (E.D. Mich. December

7, 2020), the Eastern District of Michigan rejected a lawsuit bringing claims of

widespread voter irregularities and fraud in the processing and tabulation of votes and

absentee ballots in the 2020 general election. The plaintiffs were registered Michigan

voters and nominees of the Republican Party to be Presidential Electors on behalf of

the State of Michigan. They sued Michigan Governor Whitmer and Secretary of State

Benson in their official capacities, as well as the Michigan Board of State Canvassers.

Applying the doctrine of standing, the court there found that the plaintiffs had failed to

establish that the alleged injury of vote dilution was redressable by a favorable court

decision. 2020 WL 7134198, at *9. And with respect to the claimed violations of the

Elections Clause and Electors Clause, the Court held that where "the only injury

Plaintiffs have alleged is the Elections Clause has not been followed, the United States

Supreme Court has made clear that '[the] injury is precisely the kind of undifferentiated,

generalized grievance about the conduct of government that [courts] have refused to

countenance.'" *Id*. at *10 (quoting *Lance*, 549 U.S. at 442).

In *Feehan v. Wisconsin Elections Commission*, No. 20-cv-1771-pp, 2020 WL

7250219 (E.D. Wis. Dec. 9, 2020), a case involving a Wisconsin political party's

nominee to be a Presidential Elector who brought suit alleging the election was the

subject of wide-spread ballot fraud and violated the equal protection and due process

clause, the court dismissed the suit for lack of standing because the claimed injury was

not particularized:

> The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if
> the Wisconsin election process were, as the plaintiff alleges, "so riddled with
> fraud, illegality, and statistical impossibility that this Court, and Wisconsin's
> voters, courts, and legislators, cannot rely on, or certify, any numbers
> resulting from this election." [ ] The plaintiff has not alleged that, as a voter,
> he has suffered a particularized, concrete injury sufficient to confer
> standing.

2020 WL 7250219, at *9 (internal citation omitted). Many of the allegations found in

Plaintiffs' Complaint are identical to the allegations in the *Feehan* case. *See id*. at *2

(reciting the *Feehan* complaint as alleging "massive election fraud, multiple violations of

the Wisconsin Election Code, see e.g., Wis. Stat. §§ 5.03, et seq., in addition to the

14

Appendix Page 1518

Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution"
based on "dozens of eyewitnesses and the statistical anomalies and mathematical
impossibilities detailed in the affidavits of expert witnesses").

In *Texas Voters Alliance v. Dallas County*, Civ. No. 4:20-CV-00775, 2020 WL
6146248 (E.D. Tex. Oct. 10, 2020), the Eastern District of Texas denied a motion for a
temporary restraining order in a suit brought by a Texas voting rights group and voters
under the Elections Clause, Supremacy Clause and Help Americans Vote Act, which
alleged (similar to the allegations in this case) that by accepting or using CTCL's private
federal election grants, Texas counties acted ultra vires. The court found the plaintiffs
lacked standing to challenge the counties' acceptance of the CTCL grants because the
injury claimed was an "undifferentiated, generalized grievance about the conduct of
government" and "merely alleging that the grants may influence the election result and
lead to possible disenfranchisement is not an injury-in-fact." 2020 WL 6146248, at *4.

In *Iowa Voter Alliance v. Black Hawk County*, C20-2078-LTS, 2021 WL 276700
(N.D. Iowa January 27, 2021), the Northern District of Iowa dismissed a lawsuit brought
by voters and a voter group, which also sought to challenge Iowa counties' acceptance
of CTCL grants which were intended to assist with the unforeseen costs of conducting
an election during the COVID-19 pandemic. The court found

> none of plaintiffs alleged injuries constitutes an injury in fact, as they have
> failed to allege facts showing that the counties' actions resulted in a
> concrete and particularized injury to their right to vote or to their rights under
> the Fourteenth and Ninth Amendments. Instead, they have done no more
> than assert generalized grievances against government conduct or which
> they do not approve.

2021 WL 276700, at *7 (internal quotation marks, citations, and alterations omitted).

Appendix Page 1519

In sum, federal courts addressing these issues, whether in the 2020 or other elections, are nearly uniform in finding the types of election-related harms of which the Plaintiffs complain insufficient to confer standing. The Middle District of North Carolina recently summarized some of these vote-dilution "generalized grievance" decisions:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. *See, e.g., Donald Trump for President, Inc. v. Cegavske*, Case No. 2:20-CV-1445 JCM (VCF), —— F. Supp. 3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); *Martel v. Condos*, Case No. 5:20-cv-131, —— F. Supp. 3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")
>
> Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," *Martel*, —— F. Supp. 3d at ——, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . ..

*Moore v. Circosta*, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020).

In contrast to the veritable tsunami of decisions finding no Article III standing in near identical cases to the instant suit, Plaintiffs' arguments in opposition to Defendants' Motions to Dismiss are cursory and neither cite nor distinguish any of the cases that have found a lack of standing among voter plaintiffs making challenges to the 2020 election. *See* Dkt. #64 at 10–11 (Plaintiffs' Opposition to CTCL's Motion to Dismiss citing cases from 1982, 1915, 1983, 1978, and 1976 and not discussing any of the many standing cases cited in CTLC's moving papers); Dkt. #40 at 21–22 (Plaintiffs' Opposition to Facebook's Motion to Dismiss making the same superficial arguments and citing the same cases); Dkt. #39 at 17–19 (Plaintiffs' Opposition to Dominion's Motion to Dismiss failing to cite or distinguish any of the other standing cases dismissing claims disputing the 2020 election). And in opposing the Motions to Dismiss, Plaintiffs paradoxically make arguments that implicitly concede the generalized, rather than particularized, nature of the injuries about which they complain.

For example, in responding to Dominion's Motion to Dismiss, Plaintiffs attempt to explain their claimed individualized injury as follows:

> The Plaintiffs alleged that their individual rights to vote in a Presidential election, and to be treated equally and fairly, have been burdened by the conduct of Dominion. [. . .] Even for those voters in State's [sic] that do not utilize Dominion, their shared right to vote for the President and Vice President was burdened by this Colorado corporation.

Dkt. #39 at 20. In trying to explain how this injury is particularized to the individual plaintiffs and not all members of the public, Plaintiffs purport to clarify that it is only registered voters—all 160 million of them—who "have had their rights infringed –and this [have] the standing to bring suit." *Id*. But reducing the number of allegedly harmed Plaintiffs from 300 million total Americans to only 160 million registered voters does not make the harm complained of any less generalized nor any more particularized. As the

cases cited above make clear, a claim that "all voters" are affected the same way is no more particularized than a claim that the "general public" is so affected.

In opposing the motions to dismiss, Plaintiffs' only tangentially relevant citation is to a dissenting opinion by Justice Thomas in a denial of certiorari. *See* Dkt. #39 at 21 (citing Justice Thomas's dissent in *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) (denying petitions for writ of certiorari)). It should go without saying that denials of certiorari are not binding authority. *See House v. Mayo*, 324 U.S. 42, 48 (1945) ("[A] denial of certiorari by this Court imports no expression of opinion upon the merits of a case."). And dissenting opinions are, by definition, not the law. But even Justice Thomas's dissent to the denial of certiorari said nothing about the standing of registered voters to challenge a state's use of specific election technology, or standing to challenge a social network's editorial policies because of the impact it might have on the electorate at large, or standing to dispute a non-profit's donations to municipalities for election-related purposes.

Plaintiffs fare no better on the standing issue in their brief opposing Facebook's Motion to Dismiss. *See* Dkt. #40. The alleged complaint against Facebook is that the company, its founder Zuckerberg, and the non-profit CTCL, formed an "obvious conspiracy" working "with local governments to place ballot drop boxes primarily in urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail." *Id.* at 2. According to Plaintiffs, this was part of a

> secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media censorship, propaganda, media manipulation, and lawsuit suppression through the use

of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.

*Id.* at 3. In attempting to describe the supposedly individualized nature of the injury suffered by Plaintiffs at the hands of Facebook to justify standing their standing to sue, Plaintiffs refute their own argument:

> Here, *every registered voter* was deprived of a fair and legitimate process administered by the relevant state actors. Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes do not matter, thereby diminishing the perceived present value of the right to vote in future elections and suppressing subsequent voter turnout. *Registered voters* have been subjected to tumult, mental anguish and division for months. These injuries are bipartisan, and have been suffered by *all registered voters* regardless of whom their vote was cast. Although some registered voters may be content that the candidate of their choice was certified as the winner, questionable election integrity *impacts all registered voters*.

*Id.* at 22–23 (emphasis added). This is almost the hornbook definition of a generalized grievance that broadly affects all of a state's voters in the same way. It is lethal to Plaintiffs' claim to have standing to sue. *See Moore,* 2020 WL 6063332, at *14 ("This harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters."); *Bowyer*, 2020 WL 7238261, at *5 ("[T]hese allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed."); *King*, 2020 WL 7134198, at *10 ('[T]he injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that courts have refused to countenance.'") (alterations omitted) (quoting *Lance*, 549 U.S. at 442).

At oral argument on April 27, 2021, Plaintiffs' counsel tried to say that the numerous other similar cases denying standing were different because those cases involved suits against state actors or state agencies, and here Plaintiffs are suing

Appendix Page 1523

corporations (and a non-profit). This argument ignores that, until they were dismissed, Plaintiffs <u>had</u> sued a number of state governors and secretaries of state. More important, no case makes the distinction that Plaintiffs try to make. Standing, or at least the injury-in-fact element of standing, arises from a plaintiff's claimed injury, not the particular defendant it is seeking to sue, or in what capacity. Here, Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America.

Without Plaintiffs having standing to sue, there is no case or controversy for the Court to address. The complaint therefore will be dismissed for lack of federal jurisdiction.

**Amendment of the Complaint**

The Federal Rules of Civil Procedure grant amendment as of right where the amendment is made within 21 days after service of a motion under Rule 12(b). Fed. R. Civ. P. 15(a)(1)(B). After this period, amendment may only be granted with the court's leave. The grant or denial of an opportunity to amend is within the discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "The court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018).

The Supreme Court has approved denial of leave to amend when any amendment would be futile. *Foman*, 371 U.S. at 182. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007). *See also Midcities Metro. Dist. No. 1 v. U.S. Bank*

20

*Nat'l. Ass'n.*, 44 F. Supp. 3d 1062, 1068 (D. Colo. 2014) (denying leave to amend where Plaintiff had no standing). The factual allegations in a proposed amended complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

The proposed Amended Complaint adds 152 individual plaintiffs and grows in length to 882 paragraphs and 115 pages. *See* Dkt. #48-1. The newly added Plaintiffs are registered voters are from thirty-three different states, spanning from Alabama, Alaska, and Arizona, to West Virginia, Wisconsin, and Wyoming. In connection with the Amended Complaint, Plaintiffs' counsel has submitted an affidavit (Dkt. #48-3) describing how he and his staff have fielded hundreds of phone calls and e-mails while coordinating with individuals seeking to join this suit. According to Plaintiffs' counsel, "Every individual who has made contact has universally believed that they had been damaged and expressed a deep sense of loss of trust and confidence in the electoral process, specifically caused by the actions of the named Defendants." *Id.* at 2, ¶ 6. At oral argument, Plaintiffs' counsel explained that he has collected more than 400 additional affidavits describing the mental anguish and suffering these new prospective Plaintiffs have gone through as a result of the disputed election. He proposed to file those affidavits with the Court. (He should not file them.)

In addition to the existing claims for violation of the Electors Clause, Equal Protection Clause, Due Process Clause, undue burden on the rights to associate and freedom of the press, and the constitutional challenge to 47 U.S.C. § 230(c), the proposed Amended Complaint seeks to add claims for (1) violation of 18 U.S.C. § 1962(c)—enterprise racketeering against Facebook, CTCL, Zuckerberg and Chan; (2)

Appendix Page 1525

racketeering conspiracy against the same defendants; and (3) constitutional challenges to Michigan State Law (M.C.L. 168.759(3)); Georgia State law (O.C.G.A. 21-2-386 et seq.); Pennsylvania state law (Act 77); and Wisconsin state laws (Wis. Stat. 6.855(3) and 7.15(2m)).[4] The Amended Complaint continues to seek a declaratory judgment that each of the Defendants "acted in contravention to the limitations imposed by the Constitution and the laws relate to a federal Presidential election to the injury of Plaintiffs." Dkt. #48-1 at 113, ¶ 878. Plaintiffs also continue to seek "permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters." *Id*. at 114, ¶ 881.

In terms of the factual additions found in the Amended Complaint, Plaintiffs add numerous additional paragraphs. Many of those paragraphs use the language of the RICO statute to paint a picture of the Defendants as co-conspirators in a grand national-level effort to corrupt the Presidential election of 2020. *See* Dkt. 48-1 at 5–7, ¶ 13 ("The 2020 Presidential election was unconstitutionally influenced by a well-funded cabal of powerful people . . ."); ¶ 14 ("This well-funded group of persons, associated in fact . . ."); & ¶¶ 15–28 (describing the actions of the alleged "enterprise," including coordinating with non-profit organizations and local municipalities to make changes to voting procedures).

The new paragraphs also add details about alleged problems with Dominion's electronic voting systems and software. *See id.* at 8, ¶ 42 ("Dominion's voting machines, tabulators, poll books, automated data, and other products and services were and are

---

[4] Although at oral argument, Plaintiffs' counsel made clear that Plaintiffs' are withdrawing their claims purporting to challenge the various state election laws or provisions.

Appendix Page 1526

defective, and not deployed in a workmanlike manner sufficient to ensure the validity of

the election results."); & ¶ 44 ("Dominion's software and other products are susceptible

to hacking, bugs, malware and configuration errors.").

And, in support of the class action allegations, the proposed Amended Complaint

lists a series of supposed "common questions" that could be determined on a class-

wide basis, including, among others:

> Whether Defendants engaged in a scheme and enterprise to
> improperly interfere with the 2020 Presidential election, by the use of
> devices and methods that affected or diluted the Plaintiffs' right to vote in a
> free and fair Presidential election;

> Whether Defendants used the US Mail to further their scheme and
> enterprise and improperly interfere with the 2020 Presidential election;

> Whether Defendants engaged in a conspiracy against the rights and
> liberties of registered voters by employing their scheme and enterprise
> aimed at the election machinery; [and]

> Whether Defendants engaged in a conspiracy against the rights and
> liberties of registered voters by engaging in censorship of political and
> dissenting speech."

*Id.* at 32, ¶ 253(a), (b), (d), & (e). But the Amended Complaint adds nothing meaningful

or different to the injuries claimed by the Plaintiffs.

Just as in the original Complaint, all the supposed injuries relate to Plaintiffs'

votes and the alleged dilution thereof. *See*, *e.g.*, *id.* at 85, ¶¶ 676–79 ("The evidence

establishes that the enterprise has engaged in a scheme to dilute the votes of some,

and count illegal ballots to the benefit of another. This hurts every registered voter in the

country irrespective of voter affiliation. Other than the nefarious, the honest American

voter wants every vote counted to legally determine the President and Vice President.").

Under normal circumstances and in a normal case, where a plaintiff seeks to

amend the complaint for the first time relatively soon after the start of the litigation, even

after responding substantively to a motion to dismiss, it is near automatic for leave to amend to be granted. The exception is where, given the nature of the claims, no amendment can salvage a fatally flawed suit and it is everyone's interest that the litigation be ended. This is such a fatally flawed case.

On the critical question of standing, the proposed Amended Complaint fares no better than the original. Plaintiffs' claim to standing is that these new 152 Plaintiffs, and the class and subclasses that the Amended Complaint hopes to certify, all have "standing to vindicate the [sic] rights as registered voters in a federal Presidential Election." Dkt. #48 at 4. Plaintiffs insist that "it would improper for a federal court to deny registered voters . . . standing to vindicate their rights, protected under the Constitution." *Id*. Plaintiffs maintain that "each of them" has "a right to seek adjudication of federal questions of singular effect over Defendants." *Id.*

But Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury. If a plaintiff has suffered an identifiable, distinct, and particularized injury, redressable by court action, then standing exists. Here, by their own admission, Plaintiffs' claimed injuries are no different than the supposed injuries experienced by all registered voters. This is a generalized injury that does not support the standing required for a genuine case or controversy under Article III of the Constitution.

In their replies in support of the Motion for Leave to Amend, Plaintiffs cite the recent Supreme Court case of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). In *Uzuegbunam*, former students at a state college had wished to exercise their religion by

Appendix Page 1528

sharing their faith on campus. The students obtained a required permit and were distributing religious materials in a designated "free speech zone" when a campus police office asked the students to stop. Campus policy at the time prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of persons." The plaintiffs sued, arguing the policies violated the First Amendment. The college then changed the challenged policies rather than defend them, and argued that the case should be dismissed on the ground that the policy change rendered the request for injunctive relief moot, arguably leaving the students without standing to sue for lack of a redressable case or controversy. But the students had sought nominal damages in addition to injunctive relief. The question for the Supreme Court was whether a plea for nominal damages for an already completed constitutional injury could by itself establish the redressability element of standing.

The Court held that a request for nominal damages alone does satisfy the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right and the plaintiff establishes the first two elements of standing—injury and traceability. 141 S. Ct. at 801–02. But the *Uzuegbunam* decision is clear that a plea for nominal damages only satisfies the *redressability* element of standing, not the requirement for pleading particularized injury: "This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as particularized injury)." *Id*. at 802. In *Uzuegbunam,* there was no debate that the plaintiff had suffered particularized injury—he had tried to

exercise his right to free speech and religion and been stopped by the campus police from doing so.

In this case, by contrast, whether in the original Complaint or the proposed Amended Complaint, Plaintiffs allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted. As outlined in the section above, when the alleged injury is undifferentiated and common to all members of the public or a large group, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). And the injuries complained of in this case are general grievances shared by all registered voters that do not give standing to sue.

Asked at oral argument to direct the Court to the "best case" supporting Plaintiffs' position that they have standing to sue, Plaintiffs' counsel mentioned *Anderson v. Celebreze*, 460 U.S. 780 (1983). *Anderson* involved a suit by independent Presidential candidate John Anderson who challenged the State of Ohio's arguably discriminatory requirements for independent Presidential candidates who sought a place on the Ohio ballot. Ohio required an independent candidate to submit required documents, filing fees, and the requisite signatures many months in advance of the election (by March 20 for the November election), while political party nominees were automatically granted a place a ballot. While Anderson submitted all the necessary paperwork and obtained the requisite number of signatures, he did so after the early filing deadline had passed, and Ohio's Secretary of State refused to accept Anderson's nominating petition. Three days later, Anderson himself and three voters sued in the Southern District of Ohio

challenging the constitutionality of Ohio's early filing deadline for independent candidates. 460 U.S. at 782–83. While the *Anderson* opinion talks a great deal about the right to vote being "fundamental," i*d*. at 788, the case says nothing about standing. Anderson, as a candidate being denied a spot on the ballot, obviously had a particularized injury that granted him standing. The Anderson supporters too had a particularized injury: the candidate they sought to vote for was being denied a spot on the ballot. Their right to vote for the Presidential candidate of their choice was being denied. Even the dissent, which disagreed that Ohio's early registration requirements were unconstitutional, conceded the particularized nature of Anderson's and his supporters' injuries: "Anderson and his supporters would have been injured by Ohio's ballot access requirements; by failing to comply with the filing deadline for nonparty candidates Anderson would have been excluded from Ohio's 1980 general election ballot." *Id*. at 808 (Rehnquist, J., dissenting). Thus, even Plaintiffs' purported "best case" to justify standing provides no support at all.

Therefore, I find that any amendment of this Complaint which seeks to bring suit on behalf of all registered voters in the United States for alleged illegality in the conduct of the 2020 election and associated vote dilution is futile because Plaintiffs cannot allege particularized injury sufficient to establish Article III standing. Leave to amend will be denied. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (explaining that district court may dismiss without granting leave to amend when amendment would be futile, and affirming dismissal without leave to amend for lack of standing, but noting such dismissal should be without prejudice); *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (affirming dismissal for lack of standing and

Appendix Page 1531

approving denial of amendment of pleading on grounds of futility because proposed amendment would not cure the standing deficiency); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (affirming denial of leave to amend on grounds of futility and failure to show how any amendment would cure identified deficiencies). *See also Donald J. Trump for President*, 830 F. App'x at 389 (affirming denial of leave to amend suit challenging 2020 election on grounds of futility because the proposed Second Amended Complaint would not survive a motion to dismiss).

At oral argument, counsel for CTCL pointed out that although Plaintiffs filed an opposition to Dominion and Facebook's Motions to Dismiss and therefore forfeited their ability to amend the Complaint as a matter of right, the timing was different for CTCL's Motion to Dismiss. It is apparently not clear under Tenth Circuit caselaw whether Plaintiffs can still amend as a matter of right. CTCL's proposed solution to avoid any procedural confusion is to allow the amendment and then dismiss the Amended Complaint for lack of standing. As they say, "six of one and half dozen of the other." I deny the amendment on the grounds of futility. A proposed amendment is futile if it would not survive a motion to dismiss. To be clear, if the amendment were allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing. Nothing in the proposed Amended Complaint changes the standing analysis.

Because the Court lacks jurisdiction to hear Plaintiffs' suit, it will not address the many other bases for dismissal raised in Defendants' motions.

**Conclusion**

It is hereby **ORDERED** that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are **GRANTED.** It is further **ORDRED** that

28

Plaintiffs' Complaint (Dkt. #1) is **DISMISSED WITHOUT PREJUDICE** for lack of standing. *See Brereton*, 434 F.3d at 1219 (dismissal for lack of standing should be without prejudice).

Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further **ORDERED** that the Motions to Dismiss filed by those state official defendants (Dkt. ##46, 47, & 49) are **DENIED** as moot.

It is further **ORDERED** that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. #48) is **DENIED** on the grounds of futility.

Dated:          April 28, 2021          _____
                Denver, Colorado         N. Reid. Neureiter
                                         United States Magistrate Judge

29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

**PLAINTIFFS' NOTICE OF CORRECTION OF
PLAINTIFF'S AFFIDAVIT BY INTERLINEATION**

---

COME NOW the Plaintiffs, by and through counsel, and hereby submit the following

Notice of Correction of Plaintiff's Affidavit by Interlineation, to ensure that it accurately reflect

his voting status in the 2020 Presidential Election.

1.      Plaintiff, Kevin O'Rourke, filed his original affidavit with this Court at the time

of the filing of the original complaint.

2.      In his affidavit, Mr. O'Rourke stated that he did not vote in the last two

Presidential election cycles.

3.      The affidavit was unclear, and the Court and counsel for at least one of the

Defendant's has stated on the record that, according to the affidavit, Mr. O'Rourke did not vote

in the 2020 Presidential election.

4.      However, Mr. O'Rourke *did* vote in the 2020 Presidential election, and has made

his claims for damages and other relief. Attached hereto as Plaintiff's Exhibit 1, is a true and

correct copy of Mr. O'Rourke's supplemental affidavit, with his voting record attached.

5.      Plaintiffs understand that this notice will not affect the Court's orders of April 28,

2021, but submits this notice to correct the record.

WHEREFORE, to ensure accuracy in the record, the Plaintiff, Kevin O'Rourke, by and

through counsel hereby respectfully submits this notice to correct his affidavit by interlineation

to ensure that his original affidavit correctly states that he did, in fact, vote in the 2020

Presidential election.

Dated this 29th day of April, 2021.

Respectfully submitted,

***PLAINTIFFS COUNSEL:***

By: *s/Ernest J. Walker*                          By:      *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)               Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE           LAW OFFICE OF GARY FIELDER
1444 Stuart St.                                      1444 Stuart St.
Denver, CO 80204                                Denver, CO 80204
(720) 306-0007                                    (720) 306-0007
ernestjwalker@gmail.com                    gary@fielderlaw.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 29, 2021, a copy of the foregoing
document was electronically filed with the Court using the CM/ECF system which will send
notification of such filing to all counsel of record.

*s/Ernest J. Walker*
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

## Supplemental Affidavit of Kevin Patrick O'Rourke

1) My name is Kevin Patrick O'Rourke and I am a natural person with a place of abode in Virginia.

2) I have registered to vote in Virginia and maintain my professional license there, as well.

3) As stated in my original affidavit, for the previous two presidential election cycles (2012 and 2016), I did not vote.

4) Based upon the statements of opposing counsel and the court in the hearing dated April 27, 2021, it appears to me the parties are confused as to the status of my vote in 2020.

5) I voted in the 2020 Presidential Election, as evidenced by the attached **Annex 1**, a true and correct copy of the verifiable voting record maintained by the Commonwealth of Virginia, through the County of Franklin.

I hereby state and affirm that the foregoing is true, correct, complete, and based upon first-hand knowledge under the laws of the United States of America.

_____
Kevin Patrick O'Rourke

### MARYLAND NOTARY ACKNOWLEDGMENT

State of Maryland

County of ALLEGANY

The foregoing instrument was acknowledged before me this 29th day of April, 2021, by Kevin Patrick O'Rourke, who provided me sufficient evidence of identity.

_____  (Seal)
Signature of Notarial Officer

GREGORY A. HUMBERTSON
Notary Public
Allegany County
Maryland
My Commission Expires Apr. 05, 2022

Notary Registration Number: ____N/A____

My Commission Expires: ____4/5/22____

# Annex #1

 Back to Search

## Voter Information

| | |
|---|---|
| Voter Name: | KEVIN PATRICK OROURKE |
| Voter Number: | 918430695 |
| Status: | Active |
| Date of Status: | 02/10/1999 |
| Residential Address: | 650 Bowman Rd<br>Boones Mill, VA 240653737 |
| Locality: | FRANKLIN COUNTY |
| Precinct: | 503 - BOWMANS |
| Precinct Code: | 0503 |

☐ **I want to update my voter record**
☐ **I want to apply to vote absentee by mail**

## Absentee/Early Voting History

| Election | Status | Application Received | Ballot Issued | Ballot Received |
|---|---|---|---|---|
| 2020 November General | Approved | 10/05/2020 | 10/05/2020 | 10/05/2020 |

## Polling Place

Version 2.5.1.0

Appendix Page 1538

## POLLING PLACE

| | |
|---|---|
| Facility : | FAIRMONT BAPTIST CHURCH |
| Facility Address : | 1669 Bethlehem Rd<br>Boones Mill VA, 240653651 |
| ADA Compliant : | Yes |
| ADA Comment : | COMPLIANT |
| Accessibility Restrictions : | No Restrictions Found |

### Sample Ballot for Next/Upcoming Election

| Show Ballot | + |
|---|---|

### Voter History

| Show Voter History | + |
|---|---|

### Districts

| | |
|---|---|
| Congressional: | 05 |
| State Senate: | 019 |
| House of Delegates: | 009 |
| Election: | BLACKWATER DISTRICT |

### General Registrar Office Contact Information

| | |
|---|---|
| Facility : | Franklin County General Registrar's Office |

Kay Chitwood

Registrar :

Address : 1255 Franklin St # SUITE106
Rocky Mount, VA 24151-1290

Phone : 540-483-3025

Fax : 540-483-6619

Email : kay.chitwood@franklincountyva.gov

URL :

Hours : Monday : 08:30 - 17:00
Tuesday : 08:30 - 17:00
Wednesday : 08:30 - 17:00
Thursday : 08:30 - 17:00
Friday : 08:30 - 17:00
Saturday : Closed
Sunday : Closed

## Electoral Board Members

Chair : Clifford Powell

Vice Chair : Karen (Kay) Saleeby

Secretary : Jody Brown

©2021 Virginia Department of Elections. All rights reserved – Privacy Policy

Some documents contained on this site require Adobe Reader for viewing.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' NOTICE OF APPEAL

---

Notice is hereby given that the Plaintiffs in the above-captioned case, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the order of this Court granting Defendants' Motions to Dismiss [Doc. ##22, 23, &41] and denying Plaintiffs' Motion to Amend Complaint [Doc. 48], entered on April 28, 2021.

Dated this 29th day of April, 2021.

Respectfully submitted,

***PLAINTIFFS COUNSEL:***

By: *s/ Ernest J. Walker*        By:     *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)             Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE        LAW OFFICE OF GARY FIELDER
1444 Stuart St.                             1444 Stuart St.
Denver, CO 80204                  Denver, CO 80204
(720) 306-0007                           (720) 306-0007
ernestjwalker@gmail.com          gary@fielderlaw.net

1

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 29, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Ernest J. Walker*
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 4/30/2021

☐Pro Se ☒Retained ☐CJA ☐FPD ☐USA or other Federal Agency (Appeal Fee Exempt)

Case No: 20-cv-03747-NRN

Date Filed: 4/29/2021

Appellant: Kevin O'Rourke

☐Amended Notice of Appeal
☐Other pending appeals
☐Transferred Successive §2254 or §2255
☐Supplemental Record

Pro Se Appellant:
☐IFP forms mailed/given ☐Motion IFP pending ☐Appeal fee paid
☐IFP denied ☐Appeal fee not paid

Retained Counsel:
☒Appeal fee paid ☐Appeal fee not paid ☐Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals. Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by: s/C. Madrid
Deputy Clerk

Rev. 8/17/2017

cc:    Clerk of the Court, Tenth Circuit Court of Appeals

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS (Dkt. ##22, 23, & 41) & PLAINTIFFS' MOTION TO AMEND (Dkt. #48)

**N. REID NEUREITER**
**United States Magistrate Judge**

1

This matter is before the Court with the consent of the Parties, referred for all purposes by Chief Judge Philip A. Brimmer pursuant to 28 U.S.C. § 636(c).

This lawsuit arises out of the 2020 election for President of the United States. The original Complaint, filed December 22, 2020 (Dkt. #1) and which purports to be a class action lawsuit brought on behalf of 160 million registered voters, alleges a vast conspiracy between four state governors; secretaries of state; and various election officials of Michigan, Wisconsin, Pennsylvania and Georgia; along with Dominion Voting Systems, Inc.—a private supplier of election and voting technology; the social media company Facebook, Inc.; the Center for Tech and Civic Life ("CTCL")—a non-profit organization dedicated to making elections more secure and inclusive; as well as Facebook founder Mark Zuckerberg and his wife Priscilla Chan.

I use the words "vast conspiracy" advisedly. That is what the Complaint, all 84 pages and 409-plus paragraphs, alleges: that "the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other thing, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Dkt. #1 at 2, ¶ 4.

The named Plaintiffs are from Virginia (Kevin O'Rourke), Michigan (Nathaniel Carter and Kesha Crenshaw), Colorado (Lori Cutunilli and Neil Yarbrough), Alaska (Alvin Criswell), California (Larry D. Cook), and Alabama (Amie Trapp).

Appendix Page 1546

Plaintiffs' affidavits, attached to the Complaint, shed light on the personal feelings and motivations in bringing this suit, highlighting their personal anguish stemming from the 2020 presidential election. For example, Mr. O'Rourke, a Virginia certified public accountant and a self-professed "free man, born of a free woman and free man," explains:

> I have lost any faith in the existing form of government and technology monopolies; I am angry; I am frustrated; I cannot sleep at night; I suffer from anxiety as a result of this uncertainty; I have lost my desire to communicate with most people openly and remain guarded as to my interactions and communication with every day people; I feel I have no voice, no rights, and I have been 100% abandoned by the government in all its forms[.]

Dkt. #1-2 at ¶ 36.

> Mr. Carter, a 55-year old Michigander from Benton Harbor, swears that

> DOMINION and others were aware or should have been aware that machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside DOMINION. I believe that as a result, my vote during the 2020 Presidential Election was effectively not counted, and the results of the election were predetermined. . . . I believe my vote has be [sic] discounted or eliminated all-together from consideration regarding the choice for the country's highest office.

Dkt. #1-3 at ¶ 19–22.

And Ms. Cutunilli, a business owner and grandmother in Summit County, Colorado, believes that her "constitutional right to participate in fair and honest elections has been violated with [her] vote suppressed." She says, "While I once trusted in the fairness of the United States electoral system I no longer do, with the Dominion Voting System being utilized in Colorado and around the country as well as private 'donations' being unconstitutionally distributed and accepted to interfere with the legitimacy of our elections." *Id.*

Appendix Page 1547

The affidavits of the other Plaintiffs are similar in tone and reflect similar beliefs and sentiments,[1] summarized in the concluding pages of the Complaint, "The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty." Dkt. #1 at 82.

The Complaint asserts seven separate counts. Plaintiffs allege (1) violation of the Electors Clause and imposing of an unconstitutional burden on the right to vote for President and Vice-President; (2) violation of equal protection; (3) violation of due process; (4) the imposition of an unconstitutional burden on the rights to political speech, the right to associate, and freedom of the press; (5) a "Constitutional Challenge" to the actions of Facebook and Mr. Zuckerberg as somehow burdening the Plaintiffs' right to free speech and free press, and questioning whether 47 U.S.C. § 230(c) applies to Facebook; (6) a request for a declaratory judgment that each of the Defendants acted unconstitutionally; and (7) a permanent injunction.

For relief, Plaintiffs in their Complaint seek a mishmash of outcomes, ranging from a permanent injunction restraining Defendants from any further unconstitutional behavior, to a declaratory judgment that 47 U.S.C. §230(c) is unconstitutional as applied to the actions of the Facebook and Mr. Zuckerberg, to a declaration that the actions of the Defendants are unconstitutional and ultra vires "making them legal nullities," to a damage award in the "nominal amount of $1,000 per registered voter [which] equals

---

[1] Plaintiff Larry D. Cook, although convinced that there "was widespread vote fraud and manipulation during the 2020 Presidential Election" is somewhat anomalous, as his affidavit appears to focus on his anti-vaccination beliefs, his support of Q and other Qanon conspiracy theorists, and his distress at having had his anti-vaccine Facebook page and Qanon-related pages removed from the platform. *See* Dkt. #1-6.

Appendix Page 1548

damages in the approximate amount of $160 billion dollars" for the alleged Constitutional wrongs Plaintiffs have suffered. Dkt. #1 at 82–83.

The Defendants who have been served moved to dismiss on a number of grounds, including pursuant to Rule 12(b)(1) (lack of subject matter jurisdiction); 12(b)(2) (lack of personal jurisdiction), and 12(b)(6) (failure to state a claim). See Dkt. ##22, 23, 41, 46, 47, & 49.

**Procedural Background, Pending and Mooted Motions**

Plaintiffs filed suit on December 22, 2020.

On February 16, 2021, Dominion filed its Motion to Dismiss. *See* Dkt. #22. Facebook filed its own Motion to Dismiss the same day. *See* Dkt. #23.

On February 26, 2021, the Court stayed all disclosures and discovery pending resolution of the Motions to Dismiss. *See* Dkt. #28 (Minute Order).

Rather than filing an Amended Complaint as a matter of right, Plaintiffs filed oppositions to the two Motions to Dismiss on March 9, 2021. *See* Dkt. ##38 & 39.

On March 10, 2021, the Center for Tech and Civic Life ("CTCL") filed its own Motion to Dismiss. *See* Dkt. #41.

On March 15, 2021, Michigan Governor Gretchen Whitmer and Michigan Secretary of State Jocelyn Benson filed a Motion to Dismiss. *See* Dkt. #46. The same day, Georgia Governor Brian Kemp and Georgia Secretary of State Brad Raffensperger also filed a Motion to Dismiss. *See* Dkt. #47. And on March 18, 2021, Pennsylvania Governor Tom Wolf and Pennsylvania Acting Secretary of Commonwealth Veronica Degraffenreid also filed a Motion to Dismiss. *See* Dkt. #49.

Appendix Page 1549

In the meantime, on March 15, 2021, Plaintiffs filed a Motion for Leave to File an Amended Complaint, attaching a redlined version of the proposed Amended Complaint. *See* Dkt. #48. The proposed Amended Complaint seeks to add 152 new plaintiffs from 33 different states and breaks the proposed national class of registered voters into subclasses of Republicans, Democrats, Third-Parties, Independents, and "Disgruntled Voters." The proposed Amended Complaint adds six causes of action (including racketeering claims under the federal Racketeer Influenced and Corrupt Organization Act ("RICO") against Facebook, CTCL, Zuckerberg and Chan) and 473 paragraphs.

On March 23, 2021, Facebook and Dominion filed their replies in support of their Motions to Dismiss. *See* Dkt. ##55 & 56.

On March 29, 2021, each of the Defendant groups filed responses objecting to Plaintiffs' Motion for Leave to File the Amended Complaint. *See* Dkt. #58 (Kemp/Raffensperger), #59 (Boockvar/Wolf), #60 (Benson/Whitmer), #61 (Dominion), #62 (CTCL), & #63 (Facebook.).

On April 8, 2021, Plaintiffs filed multiple replies in support of their Motion for Leave to File an Amended Complaint. *See* Dkt. ##71, 73, 74, 75, 76, & 77.

Plaintiffs initially filed responses opposing the various government official defendants' Motions to Dismiss. *See* Dkt. #72 (opposing Wolf and Degraffenreid's Motion to Dismiss), #79 (opposing Kemp and Raffensberger's Motion to Dismiss); & #80 (opposing Whitmer and Benson's Motion to Dismiss). But then, a few days later, on April 19 and 20, 2021, Plaintiffs' voluntarily dismissed the government official defendants from the case. *See* Dkt. ##82–85, & 87.

Thus, remaining for determination are the Motions to Dismiss of Defendants Dominion (Dkt. #22), Facebook (Dkt. #23), and CTCL (Dkt. #41), and Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. #48). The Motions to Dismiss filed by the government official defendants will be denied as moot, as those defendants have been voluntarily dismissed.

**Standard for Considering Rule 12(b)(1) Motion to Dismiss for Lack of Jurisdiction**

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**Standard for Failure to State a Claim Under Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

**Plaintiffs lack Article III standing so the Court lacks jurisdiction to hear the case.**

Appendix Page 1551

Defendants make numerous arguments as to why Plaintiffs' Complaint should be dismissed, including lack of personal jurisdiction, failure to state a constitutional claim because the remaining Defendants are not state actors, failure to plausibly allege violation of constitutional rights, and reliance on Section 230 of the Communications Decency Act. But one argument appears in all the Motions and, even without addressing the myriad others, it ultimately proves fatal to Plaintiffs' case. The decisive argument is that the Plaintiffs have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. With Plaintiffs not having standing to sue, there is no case or controversy, a necessary predicate for federal court jurisdiction under Article III of the Constitution.

Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, ––– U.S. –––– , 139 S. Ct. 1743, 1746 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that the jurisdiction of the federal courts reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, a federal court lacks the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Article III standing requires Plaintiffs to have personally suffered (1) a concrete and particularized injury (2) that is traceable to the conduct they challenge, and that (3) would likely be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the pleading stage, any complaint filed in federal court must

8

"clearly allege facts demonstrating each element." *Id.* (quotation marks and alterations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id*. at 1548 (internal quotation marks omitted).

The gravamen of Plaintiffs' Complaint, confirmed by a review of their attached affidavits, is the general assertion that allegedly illegal conduct occurred in multiple states across the country during the recent Presidential election, resulting in Plaintiffs' votes (to the extent each Plaintiff actually voted—some admit they did not) being diluted or discounted in some way, to the point where their votes did not matter.[2] The allegedly illegal conduct supposedly included facilitating the use of more absentee ballots than Plaintiffs think was permissible; the unequal placement of ballot drop boxes; the modification of various state voting rules in a way Plaintiffs believe was inconsistent with state law; the publication by Facebook of certain messages and Facebook's selective censorship of others; the implementation by municipalities across the country of allegedly inaccurate vote-counting technologies; and the charitable funding of certain municipalities' voting inclusion and security programs.

But whatever the grievances, the disputed conduct and the resulting claimed injury impacted 160 million voters in the same way. The Complaint, viewed as whole, is a generalized grievance about the operation of government, or about the actions of the

---

[2] *See* Aff. of Kesha Crenshaw (Dkt. #1-7) ("I am routinely told by people, even my husband, that my vote didn't matter, and that voting is just wasting my time. . . . I have watched what happened on Election Day and since, and now realize that the people who warned me that my vote didn't count were right. I know that I did cast a ballot and voted in the election, but based on reports that I have seen, I have no faith that the outcomes reported are actually the votes that were cast, or that my vote was counted at all. . . . I can see with my own eyes the 'irregularities' that have been reported, and know what I see is not right, has not been explained, and calls into doubt the legitimacy of the election.").

9

Defendants on the operation of government, resulting in abstract harm to all registered voting Americans. It is not the kind of controversy that is justiciable in a federal court. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (claimed interest in ensuring that "only lawful ballots are counted" is a generalized grievance).

As the Supreme Court of the United States has said in a case involving four Colorado voters who sought to challenge on federal constitutional grounds a Colorado Supreme Court decision relating to redistricting,

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan*, 504 U.S. at 573-74 (1992)). *See also Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance).

The Supreme Court in *Lance* was specific that a case where voters allege only that the law (in that case the Elections Clause) has not been followed will not support standing to sue:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. *See, e.g. Baker v. Carr*, 369 U.S. 186, 207–208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring the Elections Clause claim.

549 U.S. at 1198.

It should be no surprise to Plaintiffs or their counsel that their generalized grievances about their votes being diluted or other votes being improperly counted would be insufficient to grant them the standing required under Article III of the Constitution. Numerous other cases challenging the 2020 election and its surrounding circumstances have been dismissed for precisely this reason (among many other reasons).

For example, on December 11, 2020, the United States Supreme Court denied the State of Texas' attempt to file a bill of complaint challenging the Commonwealth of Pennsylvania's 2020 election procedures on the ground that "Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020).

In *Wood v. Raffensperger*, the Eleventh Circuit held that attorney Lin Wood lacked standing in federal court to enforce Georgia's election laws, in part because his claim that unlawfully processed absentee ballots diluted the weight of his vote was a generalized grievance "that cannot support standing." 981 F.3d at 1314-15.

In *Bognet v. Secretary Commonwealth of Pennsylvania*, where voters and a congressional candidate brought suit against the Secretary of the Commonwealth of Pennsylvania and county boards of election seeking to enjoin the counting of mail-in ballots during a three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and also seeking a declaration that the extension period was unconstitutional, the Third Circuit explained the doctrine of standing in clear terms:

> To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the

Appendix Page 1555

injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court.

980 F.3d 336, 348 (3d Cir. 2020), *cert. granted and judgment vacated with instructions to dismiss as moot*, ___ S. Ct.___, 2021 WL 1520777 (April 19, 2021). In *Bognet*, the court held that the plaintiffs lacked standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause, in part because the relief "would have no more directly benefitted them than the public at large." *Id.* at 349.[3]

In *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020), the Western District of Pennsylvania dismissed a legal challenge to election guidance given by the Secretary of the Commonwealth of Pennsylvania regarding manned security near absentee drop boxes, performing of signature comparisons for mail-in ballots, and a county-residency requirement for poll watchers. The claim had been that the plaintiffs would suffer an injury through the non-equal treatment or dilution of their legitimately cast votes by improperly verified absentee or mail-in ballots. The court there found the plaintiffs lacked the "concrete" and "particularized" injury necessary for Article III standing, agreeing that the "claimed injury of vote dilution caused by possible voter fraud . . . too speculative to be concrete." 2020 WL 5997680, at *32.

In *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020), the District of Nevada dismissed a lawsuit against Nevada's Secretary of State that sought to challenge a Nevada law that expanded mail-in voting due to the COVID-19 pandemic. The law directed city and county election officials to mail paper ballots to

---

[3] While the judgment in this case was vacated by the Supreme Court on mootness grounds, the reasoning on the issue of standing remains persuasive.

Appendix Page 1556

all active registered voters. Plaintiffs sued, claiming an individual right under the Constitution to have a vote fairly counted, "without being distorted by fraudulently cast votes"—i.e., vote dilution—and also for violations of the Equal Protection Clause. The court dismissed the case for lack of standing, finding the claimed injury "impermissibly generalized" and "speculative." 488 F.Supp.3d at 1000. "As with other '[g]enerally available grievance[s] about the government,' plaintiffs seek relief on behalf of their member voters that "no more directly and tangibly benefits them than it does the public at large." *Id*. (alteration omitted) (quoting *Lujan*, 504 U.S. at 573–74).

In *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020), the District of Arizona rejected a suit by Republican nominees for Arizona's Presidential Electors and Republican county chairs who sued Arizona's governor and secretary of state seeking to set aside results of the 2020 election on the basis of fraud and election misconduct. Claims under both the Elections Clause and the Equal Protection Clause based on vote dilution were deemed inadequate for lack of Article III standing: "Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed. The Court agrees." 2020 WL 7238261, at *5.

In *King v. Whitmer*, Civ. No. 20-13134, 2020 WL 7134198 (E.D. Mich. December 7, 2020), the Eastern District of Michigan rejected a lawsuit bringing claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots in the 2020 general election. The plaintiffs were registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of

<center>13</center>

the State of Michigan. They sued Michigan Governor Whitmer and Secretary of State

Benson in their official capacities, as well as the Michigan Board of State Canvassers.

Applying the doctrine of standing, the court there found that the plaintiffs had failed to

establish that the alleged injury of vote dilution was redressable by a favorable court

decision. 2020 WL 7134198, at *9. And with respect to the claimed violations of the

Elections Clause and Electors Clause, the Court held that where "the only injury

Plaintiffs have alleged is the Elections Clause has not been followed, the United States

Supreme Court has made clear that '[the] injury is precisely the kind of undifferentiated,

generalized grievance about the conduct of government that [courts] have refused to

countenance.'" *Id*. at *10 (quoting *Lance*, 549 U.S. at 442).

In *Feehan v. Wisconsin Elections Commission*, No. 20-cv-1771-pp, 2020 WL

7250219 (E.D. Wis. Dec. 9, 2020), a case involving a Wisconsin political party's

nominee to be a Presidential Elector who brought suit alleging the election was the

subject of wide-spread ballot fraud and violated the equal protection and due process

clause, the court dismissed the suit for lack of standing because the claimed injury was

not particularized:

> The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if
> the Wisconsin election process were, as the plaintiff alleges, "so riddled with
> fraud, illegality, and statistical impossibility that this Court, and Wisconsin's
> voters, courts, and legislators, cannot rely on, or certify, any numbers
> resulting from this election." [ ] The plaintiff has not alleged that, as a voter,
> he has suffered a particularized, concrete injury sufficient to confer
> standing.

2020 WL 7250219, at *9 (internal citation omitted). Many of the allegations found in

Plaintiffs' Complaint are identical to the allegations in the *Feehan* case. *See id*. at *2

(reciting the *Feehan* complaint as alleging "massive election fraud, multiple violations of

the Wisconsin Election Code, see e.g., Wis. Stat. §§ 5.03, et seq., in addition to the

14

Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution"
based on "dozens of eyewitnesses and the statistical anomalies and mathematical
impossibilities detailed in the affidavits of expert witnesses").

In *Texas Voters Alliance v. Dallas County*, Civ. No. 4:20-CV-00775, 2020 WL
6146248 (E.D. Tex. Oct. 10, 2020), the Eastern District of Texas denied a motion for a
temporary restraining order in a suit brought by a Texas voting rights group and voters
under the Elections Clause, Supremacy Clause and Help Americans Vote Act, which
alleged (similar to the allegations in this case) that by accepting or using CTCL's private
federal election grants, Texas counties acted ultra vires. The court found the plaintiffs
lacked standing to challenge the counties' acceptance of the CTCL grants because the
injury claimed was an "undifferentiated, generalized grievance about the conduct of
government" and "merely alleging that the grants may influence the election result and
lead to possible disenfranchisement is not an injury-in-fact." 2020 WL 6146248, at *4.

In *Iowa Voter Alliance v. Black Hawk County*, C20-2078-LTS, 2021 WL 276700
(N.D. Iowa January 27, 2021), the Northern District of Iowa dismissed a lawsuit brought
by voters and a voter group, which also sought to challenge Iowa counties' acceptance
of CTCL grants which were intended to assist with the unforeseen costs of conducting
an election during the COVID-19 pandemic. The court found

> none of plaintiffs alleged injuries constitutes an injury in fact, as they have
> failed to allege facts showing that the counties' actions resulted in a
> concrete and particularized injury to their right to vote or to their rights under
> the Fourteenth and Ninth Amendments. Instead, they have done no more
> than assert generalized grievances against government conduct or which
> they do not approve.

2021 WL 276700, at *7 (internal quotation marks, citations, and alterations omitted).

Appendix Page 1559

In sum, federal courts addressing these issues, whether in the 2020 or other elections, are nearly uniform in finding the types of election-related harms of which the Plaintiffs complain insufficient to confer standing. The Middle District of North Carolina recently summarized some of these vote-dilution "generalized grievance" decisions:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. *See, e.g., Donald Trump for President, Inc. v. Cegavske*, Case No. 2:20-CV-1445 JCM (VCF), ––– F. Supp. 3d ––––, ––––, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); *Martel v. Condos*, Case No. 5:20-cv-131, ––– F. Supp. 3d ––––, ––––, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")
>
> Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," *Martel*, ––– F. Supp. 3d at ––––, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . ..

*Moore v. Circosta*, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020).

In contrast to the veritable tsunami of decisions finding no Article III standing in near identical cases to the instant suit, Plaintiffs' arguments in opposition to Defendants' Motions to Dismiss are cursory and neither cite nor distinguish any of the cases that have found a lack of standing among voter plaintiffs making challenges to the 2020 election. *See* Dkt. #64 at 10–11 (Plaintiffs' Opposition to CTCL's Motion to Dismiss citing cases from 1982, 1915, 1983, 1978, and 1976 and not discussing any of the many standing cases cited in CTLC's moving papers); Dkt. #40 at 21–22 (Plaintiffs' Opposition to Facebook's Motion to Dismiss making the same superficial arguments and citing the same cases); Dkt. #39 at 17–19 (Plaintiffs' Opposition to Dominion's Motion to Dismiss failing to cite or distinguish any of the other standing cases dismissing claims disputing the 2020 election). And in opposing the Motions to Dismiss, Plaintiffs paradoxically make arguments that implicitly concede the generalized, rather than particularized, nature of the injuries about which they complain.

For example, in responding to Dominion's Motion to Dismiss, Plaintiffs attempt to explain their claimed individualized injury as follows:

> The Plaintiffs alleged that their individual rights to vote in a Presidential election, and to be treated equally and fairly, have been burdened by the conduct of Dominion. [. . . ] Even for those voters in State's [sic] that do not utilize Dominion, their shared right to vote for the President and Vice President was burdened by this Colorado corporation.

Dkt. #39 at 20. In trying to explain how this injury is particularized to the individual plaintiffs and not all members of the public, Plaintiffs purport to clarify that it is only registered voters—all 160 million of them—who "have had their rights infringed –and this [have] the standing to bring suit." *Id*. But reducing the number of allegedly harmed Plaintiffs from 300 million total Americans to only 160 million registered voters does not make the harm complained of any less generalized nor any more particularized. As the

<div align="center">17</div>

<div align="right">Appendix Page 1561</div>

cases cited above make clear, a claim that "all voters" are affected the same way is no more particularized than a claim that the "general public" is so affected.

In opposing the motions to dismiss, Plaintiffs' only tangentially relevant citation is to a dissenting opinion by Justice Thomas in a denial of certiorari. *See* Dkt. #39 at 21 (citing Justice Thomas's dissent in *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) (denying petitions for writ of certiorari)). It should go without saying that denials of certiorari are not binding authority. *See House v. Mayo*, 324 U.S. 42, 48 (1945) ("[A] denial of certiorari by this Court imports no expression of opinion upon the merits of a case."). And dissenting opinions are, by definition, not the law. But even Justice Thomas's dissent to the denial of certiorari said nothing about the standing of registered voters to challenge a state's use of specific election technology, or standing to challenge a social network's editorial policies because of the impact it might have on the electorate at large, or standing to dispute a non-profit's donations to municipalities for election-related purposes.

Plaintiffs fare no better on the standing issue in their brief opposing Facebook's Motion to Dismiss. *See* Dkt. #40. The alleged complaint against Facebook is that the company, its founder Zuckerberg, and the non-profit CTCL, formed an "obvious conspiracy" working "with local governments to place ballot drop boxes primarily in urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail." *Id.* at 2. According to Plaintiffs, this was part of a

> secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media censorship, propaganda, media manipulation, and lawsuit suppression through the use

Appendix Page 1562

of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.

*Id.* at 3. In attempting to describe the supposedly individualized nature of the injury suffered by Plaintiffs at the hands of Facebook to justify standing their standing to sue, Plaintiffs refute their own argument:

> Here, *every registered voter* was deprived of a fair and legitimate process administered by the relevant state actors. Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes do not matter, thereby diminishing the perceived present value of the right to vote in future elections and suppressing subsequent voter turnout. *Registered voters* have been subjected to tumult, mental anguish and division for months. These injuries are bipartisan, and have been suffered by *all registered voters* regardless of whom their vote was cast. Although some registered voters may be content that the candidate of their choice was certified as the winner, questionable election integrity *impacts all registered voters*.

*Id.* at 22–23 (emphasis added). This is almost the hornbook definition of a generalized grievance that broadly affects all of a state's voters in the same way. It is lethal to Plaintiffs' claim to have standing to sue. *See Moore,* 2020 WL 6063332, at *14 ("This harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters."); *Bowyer*, 2020 WL 7238261, at *5 ("[T]hese allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed."); *King*, 2020 WL 7134198, at *10 ('[T]he injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that courts have refused to countenance.'") (alterations omitted) (quoting *Lance*, 549 U.S. at 442).

At oral argument on April 27, 2021, Plaintiffs' counsel tried to say that the numerous other similar cases denying standing were different because those cases involved suits against state actors or state agencies, and here Plaintiffs are suing

Appendix Page 1563

corporations (and a non-profit). This argument ignores that, until they were dismissed, Plaintiffs <u>had</u> sued a number of state governors and secretaries of state. More important, no case makes the distinction that Plaintiffs try to make. Standing, or at least the injury-in-fact element of standing, arises from a plaintiff's claimed injury, not the particular defendant it is seeking to sue, or in what capacity. Here, Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America.

Without Plaintiffs having standing to sue, there is no case or controversy for the Court to address. The complaint therefore will be dismissed for lack of federal jurisdiction.

**Amendment of the Complaint**

The Federal Rules of Civil Procedure grant amendment as of right where the amendment is made within 21 days after service of a motion under Rule 12(b). Fed. R. Civ. P. 15(a)(1)(B). After this period, amendment may only be granted with the court's leave. The grant or denial of an opportunity to amend is within the discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "The court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018).

The Supreme Court has approved denial of leave to amend when any amendment would be futile. *Foman*, 371 U.S. at 182. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007). *See also Midcities Metro. Dist. No. 1 v. U.S. Bank*

20

*Nat'l. Ass'n.*, 44 F. Supp. 3d 1062, 1068 (D. Colo. 2014) (denying leave to amend where Plaintiff had no standing). The factual allegations in a proposed amended complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

The proposed Amended Complaint adds 152 individual plaintiffs and grows in length to 882 paragraphs and 115 pages. *See* Dkt. #48-1. The newly added Plaintiffs are registered voters are from thirty-three different states, spanning from Alabama, Alaska, and Arizona, to West Virginia, Wisconsin, and Wyoming. In connection with the Amended Complaint, Plaintiffs' counsel has submitted an affidavit (Dkt. #48-3) describing how he and his staff have fielded hundreds of phone calls and e-mails while coordinating with individuals seeking to join this suit. According to Plaintiffs' counsel, "Every individual who has made contact has universally believed that they had been damaged and expressed a deep sense of loss of trust and confidence in the electoral process, specifically caused by the actions of the named Defendants." *Id.* at 2, ¶ 6. At oral argument, Plaintiffs' counsel explained that he has collected more than 400 additional affidavits describing the mental anguish and suffering these new prospective Plaintiffs have gone through as a result of the disputed election. He proposed to file those affidavits with the Court. (He should not file them.)

In addition to the existing claims for violation of the Electors Clause, Equal Protection Clause, Due Process Clause, undue burden on the rights to associate and freedom of the press, and the constitutional challenge to 47 U.S.C. § 230(c), the proposed Amended Complaint seeks to add claims for (1) violation of 18 U.S.C. § 1962(c)—enterprise racketeering against Facebook, CTCL, Zuckerberg and Chan; (2)

Appendix Page 1565

racketeering conspiracy against the same defendants; and (3) constitutional challenges to Michigan State Law (M.C.L. 168.759(3)); Georgia State law (O.C.G.A. 21-2-386 et seq.); Pennsylvania state law (Act 77); and Wisconsin state laws (Wis. Stat. 6.855(3) and 7.15(2m)).[4] The Amended Complaint continues to seek a declaratory judgment that each of the Defendants "acted in contravention to the limitations imposed by the Constitution and the laws relate to a federal Presidential election to the injury of Plaintiffs." Dkt. #48-1 at 113, ¶ 878. Plaintiffs also continue to seek "permanent injunctive relief against the Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters." *Id.* at 114, ¶ 881.

In terms of the factual additions found in the Amended Complaint, Plaintiffs add numerous additional paragraphs. Many of those paragraphs use the language of the RICO statute to paint a picture of the Defendants as co-conspirators in a grand national-level effort to corrupt the Presidential election of 2020. *See* Dkt. 48-1 at 5–7, ¶ 13 ("The 2020 Presidential election was unconstitutionally influenced by a well-funded cabal of powerful people . . ."); ¶ 14 ("This well-funded group of persons, associated in fact . . ."); & ¶¶ 15–28 (describing the actions of the alleged "enterprise," including coordinating with non-profit organizations and local municipalities to make changes to voting procedures).

The new paragraphs also add details about alleged problems with Dominion's electronic voting systems and software. *See id.* at 8, ¶ 42 ("Dominion's voting machines, tabulators, poll books, automated data, and other products and services were and are

---

[4] Although at oral argument, Plaintiffs' counsel made clear that Plaintiffs' are withdrawing their claims purporting to challenge the various state election laws or provisions.

Appendix Page 1566

defective, and not deployed in a workmanlike manner sufficient to ensure the validity of the election results."); & ¶ 44 ("Dominion's software and other products are susceptible to hacking, bugs, malware and configuration errors.").

And, in support of the class action allegations, the proposed Amended Complaint lists a series of supposed "common questions" that could be determined on a class-wide basis, including, among others:

> Whether Defendants engaged in a scheme and enterprise to improperly interfere with the 2020 Presidential election, by the use of devices and methods that affected or diluted the Plaintiffs' right to vote in a free and fair Presidential election;

> Whether Defendants used the US Mail to further their scheme and enterprise and improperly interfere with the 2020 Presidential election;

> Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by employing their scheme and enterprise aimed at the election machinery; [and]

> Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by engaging in censorship of political and dissenting speech."

*Id.* at 32, ¶ 253(a), (b), (d), & (e). But the Amended Complaint adds nothing meaningful or different to the injuries claimed by the Plaintiffs.

Just as in the original Complaint, all the supposed injuries relate to Plaintiffs' votes and the alleged dilution thereof. *See*, *e.g.*, *id.* at 85, ¶¶ 676–79 ("The evidence establishes that the enterprise has engaged in a scheme to dilute the votes of some, and count illegal ballots to the benefit of another. This hurts every registered voter in the country irrespective of voter affiliation. Other than the nefarious, the honest American voter wants every vote counted to legally determine the President and Vice President.").

Under normal circumstances and in a normal case, where a plaintiff seeks to amend the complaint for the first time relatively soon after the start of the litigation, even

after responding substantively to a motion to dismiss, it is near automatic for leave to amend to be granted. The exception is where, given the nature of the claims, no amendment can salvage a fatally flawed suit and it is everyone's interest that the litigation be ended. This is such a fatally flawed case.

On the critical question of standing, the proposed Amended Complaint fares no better than the original. Plaintiffs' claim to standing is that these new 152 Plaintiffs, and the class and subclasses that the Amended Complaint hopes to certify, all have "standing to vindicate the [sic] rights as registered voters in a federal Presidential Election." Dkt. #48 at 4. Plaintiffs insist that "it would improper for a federal court to deny registered voters . . . standing to vindicate their rights, protected under the Constitution." *Id*. Plaintiffs maintain that "each of them" has "a right to seek adjudication of federal questions of singular effect over Defendants." *Id.*

But Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury. If a plaintiff has suffered an identifiable, distinct, and particularized injury, redressable by court action, then standing exists. Here, by their own admission, Plaintiffs' claimed injuries are no different than the supposed injuries experienced by all registered voters. This is a generalized injury that does not support the standing required for a genuine case or controversy under Article III of the Constitution.

In their replies in support of the Motion for Leave to Amend, Plaintiffs cite the recent Supreme Court case of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). In *Uzuegbunam*, former students at a state college had wished to exercise their religion by

24

sharing their faith on campus. The students obtained a required permit and were distributing religious materials in a designated "free speech zone" when a campus police office asked the students to stop. Campus policy at the time prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of persons." The plaintiffs sued, arguing the policies violated the First Amendment. The college then changed the challenged policies rather than defend them, and argued that the case should be dismissed on the ground that the policy change rendered the request for injunctive relief moot, arguably leaving the students without standing to sue for lack of a redressable case or controversy. But the students had sought nominal damages in addition to injunctive relief. The question for the Supreme Court was whether a plea for nominal damages for an already completed constitutional injury could by itself establish the redressability element of standing.

The Court held that a request for nominal damages alone does satisfy the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right and the plaintiff establishes the first two elements of standing—injury and traceability. 141 S. Ct. at 801–02. But the *Uzuegbunam* decision is clear that a plea for nominal damages only satisfies the *redressability* element of standing, not the requirement for pleading particularized injury: "This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as particularized injury)." *Id*. at 802. In *Uzuegbunam,* there was no debate that the plaintiff had suffered particularized injury—he had tried to

exercise his right to free speech and religion and been stopped by the campus police from doing so.

In this case, by contrast, whether in the original Complaint or the proposed Amended Complaint, Plaintiffs allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted. As outlined in the section above, when the alleged injury is undifferentiated and common to all members of the public or a large group, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). And the injuries complained of in this case are general grievances shared by all registered voters that do not give standing to sue.

Asked at oral argument to direct the Court to the "best case" supporting Plaintiffs' position that they have standing to sue, Plaintiffs' counsel mentioned *Anderson v. Celebreze*, 460 U.S. 780 (1983). *Anderson* involved a suit by independent Presidential candidate John Anderson who challenged the State of Ohio's arguably discriminatory requirements for independent Presidential candidates who sought a place on the Ohio ballot. Ohio required an independent candidate to submit required documents, filing fees, and the requisite signatures many months in advance of the election (by March 20 for the November election), while political party nominees were automatically granted a place a ballot. While Anderson submitted all the necessary paperwork and obtained the requisite number of signatures, he did so after the early filing deadline had passed, and Ohio's Secretary of State refused to accept Anderson's nominating petition. Three days later, Anderson himself and three voters sued in the Southern District of Ohio

Appendix Page 1570

challenging the constitutionality of Ohio's early filing deadline for independent candidates. 460 U.S. at 782–83. While the *Anderson* opinion talks a great deal about the right to vote being "fundamental," i*d*. at 788, the case says nothing about standing. Anderson, as a candidate being denied a spot on the ballot, obviously had a particularized injury that granted him standing. The Anderson supporters too had a particularized injury: the candidate they sought to vote for was being denied a spot on the ballot. Their right to vote for the Presidential candidate of their choice was being denied. Even the dissent, which disagreed that Ohio's early registration requirements were unconstitutional, conceded the particularized nature of Anderson's and his supporters' injuries: "Anderson and his supporters would have been injured by Ohio's ballot access requirements; by failing to comply with the filing deadline for nonparty candidates Anderson would have been excluded from Ohio's 1980 general election ballot." *Id*. at 808 (Rehnquist, J., dissenting). Thus, even Plaintiffs' purported "best case" to justify standing provides no support at all.

Therefore, I find that any amendment of this Complaint which seeks to bring suit on behalf of all registered voters in the United States for alleged illegality in the conduct of the 2020 election and associated vote dilution is futile because Plaintiffs cannot allege particularized injury sufficient to establish Article III standing. Leave to amend will be denied. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (explaining that district court may dismiss without granting leave to amend when amendment would be futile, and affirming dismissal without leave to amend for lack of standing, but noting such dismissal should be without prejudice); *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (affirming dismissal for lack of standing and

27

approving denial of amendment of pleading on grounds of futility because proposed amendment would not cure the standing deficiency); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (affirming denial of leave to amend on grounds of futility and failure to show how any amendment would cure identified deficiencies). *See also Donald J. Trump for President*, 830 F. App'x at 389 (affirming denial of leave to amend suit challenging 2020 election on grounds of futility because the proposed Second Amended Complaint would not survive a motion to dismiss).

At oral argument, counsel for CTCL pointed out that although Plaintiffs filed an opposition to Dominion and Facebook's Motions to Dismiss and therefore forfeited their ability to amend the Complaint as a matter of right, the timing was different for CTCL's Motion to Dismiss. It is apparently not clear under Tenth Circuit caselaw whether Plaintiffs can still amend as a matter of right. CTCL's proposed solution to avoid any procedural confusion is to allow the amendment and then dismiss the Amended Complaint for lack of standing. As they say, "six of one and half dozen of the other." I deny the amendment on the grounds of futility. A proposed amendment is futile if it would not survive a motion to dismiss. To be clear, if the amendment were allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing. Nothing in the proposed Amended Complaint changes the standing analysis.

Because the Court lacks jurisdiction to hear Plaintiffs' suit, it will not address the many other bases for dismissal raised in Defendants' motions.

**Conclusion**

It is hereby **ORDERED** that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are **GRANTED.** It is further **ORDRED** that

Appendix Page 1572

Plaintiffs' Complaint (Dkt. #1) is **DISMISSED WITHOUT PREJUDICE** for lack of standing. *See Brereton*, 434 F.3d at 1219 (dismissal for lack of standing should be without prejudice).

Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further **ORDERED** that the Motions to Dismiss filed by those state official defendants (Dkt. ##46, 47, & 49) are **DENIED** as moot.

It is further **ORDERED** that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. #48) is **DENIED** on the grounds of futility.

Dated:     April 28, 2021
           Denver, Colorado          _____
                                     N. Reid. Neureiter
                                     United States Magistrate Judge

29

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03747

KEVIN O'ROURKE, et al.,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., et al.,

Defendants.

---

## PLAINTIFFS' NOTICE OF APPEAL

---

Notice is hereby given that the Plaintiffs in the above-captioned case, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the order of this Court granting Defendants' Motions to Dismiss [Doc. 22, 23, 41] and denying Plaintiffs' Motion to Amend Complaint [Doc. 48], entered on April 28, 2021.

Dated this 29th day of April, 2021.

Respectfully submitted,

***PLAINTIFFS COUNSEL:***

By: *s/ Ernest J. Walker*                     By:     *s/ Gary D. Fielder*
Ernest J. Walker (MI P58635)              Gary D. Fielder (CO 19757)
ERNEST J. WALKER LAW OFFICE               LAW OFFICE OF GARY FIELDER
1444 Stuart St.                           1444 Stuart St.
Denver, CO 80204                          Denver, CO 80204
(720) 306-0007                            (720) 306-0007
ernestjwalker@gmail.com                   gary@fielderlaw.net

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 29, 2021, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Ernest J. Walker*
ERNEST J. WALKER LAW OFFICE
1444 Stuart St.
Denver, CO 80204
(720)306-0007
ernestjwalker@gmail.com

2

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:20-cv-03747-NRN

O'Rourke et al v. Dominion Voting Systems, Inc. et al
Assigned to: Magistrate Judge N. Reid Neureiter
Cause: 42:1983 Civil Rights Act

Date Filed: 12/22/2020
Date Terminated: 04/28/2021
Jury Demand: Plaintiff
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

### Plaintiff

**Kevin O'Rourke**
*on their own behalf and of a class of
similarly situated persons*

represented by **Ernest John Walker**
Ernest J. Walker Law Offices
3368 Riverside Rd.
Benton Harbor, MI 49022
303-995-4835
Email: ernestjwalker@gmail.com
*ATTORNEY TO BE NOTICED*

**Gary D. Fielder**
Gary D. Fielder, Law Office of
2325 West 72nd Avenue
Denver, CO 80221
303-650-1505
Fax: 303-650-1705
Email: criminaldefense@fielderlaw.net
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Nathaniel L Carter**
*on their own behalf and of a class of
similarly situated persons*

represented by **Ernest John Walker**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Lori Cutunilli**
*on their own behalf and of a class of
similarly situated persons*

represented by **Ernest John Walker**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Larry D Cook**
*on their own behalf and of a class of
similarly situated persons*

represented by **Ernest John Walker**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Alvin Criswell**
*on their own behalf and of a class of*

represented by **Ernest John Walker**
(See above for address)

Appendix Page 1576

*similarly situated persons*                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kesha Crenshaw**                    represented by   **Ernest John Walker**
*on their own behalf and of a class of*                (See above for address)
*similarly situated persons*                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Neil Yarbrough**                    represented by   **Ernest John Walker**
*on their own behalf and of a class of*                (See above for address)
*similarly situated persons*                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amie Trapp**                        represented by   **Ernest John Walker**
*on their own behalf and of a class of*                (See above for address)
*similarly situated persons*                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dominion Voting Systems, Inc.**     represented by   **Amanda Kristine Houseal**
*a Delaware corporation*                               Brownstein Hyatt Farber Schreck LLP-
                                                       Denver
                                                       410 17th Street
                                                       Suite 2200
                                                       Denver, CO 80202-4432
                                                       303-223-1100
                                                       Fax: 303-223-1111
                                                       Email: ahouseal@bhfs.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Bridget C. DuPey**
                                                       Brownstein Hyatt Farber Schreck LLP-
                                                       Denver
                                                       410 17th Street
                                                       Suite 2200
                                                       Denver, CO 80202-4432
                                                       303-223-1100
                                                       Fax: 303-223-1111
                                                       Email: bdupey@bhfs.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **David Meschke**
                                                       Brownstein Hyatt Farber Schreck LLP-
                                                       Denver
                                                       410 17th Street
                                                       Suite 2200
                                                       Denver, CO 80202-4432
                                                       303-223-1219

Email: dmeschke@bhfs.com
*ATTORNEY TO BE NOTICED*

**Stanley L. Garnett**
Brownstein Hyatt Farber Schreck LLP-
Denver
410 17th Street
Suite 2200
Denver, CO 80202-4432
303-223-1100
Fax: 303-223-1111
Email: sgarnett@bhfs.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Facebook, Inc.**                    represented by **Craig Brian Streit**
*a Delaware corporation*                Gibson Dunn & Crutcher LLP-San
                                        Francisco
                                        555 Mission Street
                                        Suite 3000
                                        San Francisco, CA 94105-0921
                                        415-393-8225
                                        Fax: 415-393-8374
                                        Email: cstreit@gibsondunn.com
                                        *ATTORNEY TO BE NOTICED*

                                        **Joshua Seth Lipshutz**
                                        Gibson Dunn & Crutcher LLP-DC
                                        1050 Connecticut Avenue, N.W.
                                        Third Floor
                                        Washington, DC 20036-5303
                                        202-955-8217
                                        Fax: 202-530-9614
                                        Email: jlipshutz@gibsondunn.com
                                        *ATTORNEY TO BE NOTICED*

                                        **Natalie Jean Hausknecht**
                                        Gibson Dunn & Crutcher LLP-Denver
                                        1801 California Street
                                        Suite 4200
                                        Denver, CO 80202-2642
                                        303-298-5783
                                        Fax: 303-313-2826
                                        Email: NHausknecht@gibsondunn.com
                                        *ATTORNEY TO BE NOTICED*

                                        **Ryan Thomas Bergsieker**
                                        Gibson Dunn & Crutcher LLP-Denver
                                        1801 California Street
                                        Suite 4200

Denver, CO 80202-2642
303-298-5774
Fax: 303-298-5907
Email: rbergsieker@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Center for Tech and Civic Life**
*an Illinois non-profit organization*

represented by **Joshua Adam Matz**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
212-763-0883
Email: jmatz@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Louis William Fisher**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
646-761-3270
Email: lfisher@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Marcella E. Coburn**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
929-999-7896
Email: mcoburn@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Michael Skocpol**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
646-761-1161
Email: mskocpol@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark E Zuckerberg**
*individually*

**Defendant**

**Priscilla Chan**
*individually*

Appendix Page 1579

**Defendant**

**Brian Kemp**
*individually*

represented by **Charlene Swartz McGowan**
Georgia Attorney General's Office
40 Capitol Square, S.W.
Atlanta, GA 30334-1300
404-458-3658
Email: cmcgowan@law.ga.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brad Raffensperger**
*individually*

represented by **Charlene Swartz McGowan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gretchen Whitmer**
*individually*

represented by **Heather Stuht Meingast**
Michigan Department of Attorney
General
P.O. Box 30736
Lansing, MI 48909
517-335-7659
Fax: 517-335-7640
Email: meingasth@michigan.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jocelyn Benson**
*individually*

represented by **Heather Stuht Meingast**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Wolf**
*individually*

represented by **Jacob Biehl Boyer**
Pennsylvania Office of Attorney
General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
267-768-3968
Email: jboyer@attorneygeneral.gov
*ATTORNEY TO BE NOTICED*

**Michael John Fischer**
Pennsylvania Office of Attorney
General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
215-560-2171
Email: mfischer@attorneygeneral.gov

*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathy Boockvar**
*individually*

represented by **Jacob Biehl Boyer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael John Fischer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tony Evers**
*individually*

**Defendant**

**Ann S Jacobs**
*individually*

**Defendant**

**Mark L. Thomsen**
*individually*

**Defendant**

**Marge Bostelman**
*individually*

**Defendant**

**Julie M Glancey**

**Defendant**

**Dean Knudson**
*individually*

**Defendant**

**Robert F Spindell, Jr.**
*individually, and Does 1-10,000*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/29/2021 | 94 | NOTICE OF APPEAL as to 92 Order on Motion to Dismiss,,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,,,,,, Order on Motion for Leave,,,,,,,,,,,,,,,,,, by Plaintiff Kevin O'Rourke (Filing fee $ 505, Receipt Number 1082-7842647) (Walker, Ernest) (Entered: 04/29/2021) |
| 04/29/2021 | 93 | NOTICE re 1 Complaint,, *Correction Of Plaintiff Kevin O'Rourke's Affidavit By Interlineation* by Plaintiff Kevin O'Rourke (Attachments: # 1 Affidavit) (Walker, Ernest) (Entered: 04/29/2021) |

| 04/28/2021 | 92 | ORDER ON DEFENDANTS' MOTIONS TO DISMISS (Dkt. ## 22 , 23 , & 41 ) & PLAINTIFFS' MOTION TO AMEND (Dkt. # 48 ) by Magistrate Judge N. Reid Neureiter on 28 April 2021. It is hereby ORDERED that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are GRANTED. It is further ORDERED that Plaintiffs' Complaint (Dkt. # 1 ) is DISMISSED WITHOUT PREJUDICE for lack of standing. Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further ORDERED that the Motions to Dismiss filed by those state official defendants (Dkt. ## 46 , 47 , & 49 ) are DENIED as moot.It is further ORDERED that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. # 48 ) is DENIED on the grounds of futility.(cmadr, ) (Entered: 04/28/2021) |
| --- | --- | --- |
| 04/27/2021 | 91 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Motion Hearing via video conference held on 4/27/2021. ORDER taking under advisement 22 23 41 46 47 and 49 Motions to Dismiss. ORDER taking under advisement 48 Plaintiffs Motion for Leave to File Amended Complaint Pursuant to FRCP 15 and Memorandum of Points and Authorities in Support. ORDER denying 90 Plaintiffs Motion for Judicial Notice. FTR: Courtroom C203. (slibi, ) (Entered: 04/28/2021) |
| 04/26/2021 | 90 | MOTION for Order to *take Judicial Notice* by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/26/2021) |
| 04/25/2021 | 89 | NOTICE of Voluntary Dismissal of Party by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/25/2021) |
| 04/21/2021 | 88 | MINUTE ORDER The Motion Hearing set on April 27, 2021 at 2:00 PM shall be conducted via video conference, by Magistrate Judge N. Reid Neureiter on 4/21/2021. Attached are the video conference instructions and helpful tips. Please contact Stacy Libid at stacy_libid@cod.uscourts.gov if you have any questions regarding video conference. Text Only Entry (Attachments: # 1 Video Conference Tips) (slibi, ) (Entered: 04/21/2021) |
| 04/20/2021 | 87 | MOTION for Leave to *Voluntary Dismiss Defendants TOM WOLF and KATHY BOOCKVAR* 85 Notice of Dismissal of Party by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Email, # 2 Exhibit Email, # 3 Exhibit Email, # 4 Exhibit Email, # 5 Exhibit Email, # 6 Exhibit Email, # 7 Exhibit Email, # 8 Exhibit Email, # 9 Exhibit Email)(Walker, Ernest) (Entered: 04/20/2021) |
| 04/20/2021 | 86 | NOTICE by Defendants Kathy Boockvar, Tom Wolf (Attachments: # 1 Exhibit 1)(Boyer, Jacob) (Entered: 04/20/2021) |
| 04/19/2021 | 85 | NOTICE of Voluntary Dismissal of Party *TOM WOLF and KATHY BOOCKVAR* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 84 | NOTICE of Voluntary Dismissal of Party *BRIAN KEMP and BRAD* |

| | | |
|---|---|---|
| | | *RAFFENSPERGER* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 83 | NOTICE of Voluntary Dismissal of Party *GRETCHEN WHITMER and JOCELYN BENSON* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/19/2021 | 82 | NOTICE of Voluntary Dismissal of Party *TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, and ROBERT F. SPINDELL, JR.* by Plaintiff Kevin O'Rourke (Walker, Ernest) (Entered: 04/19/2021) |
| 04/14/2021 | 81 | REPLY to Response to 41 MOTION to Dismiss filed by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 04/14/2021) |
| 04/12/2021 | 80 | RESPONSE to 46 MOTION to Dismiss for Failure to State a Claim *Pursuant to FRCP 12(b)(2) and 12(b)(6)* MOTION to Dismiss for Lack of Jurisdiction *Pursuant to FRCP 12(b)(2) and 12(b)(6)* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/12/2021) |
| 04/12/2021 | 79 | RESPONSE to 47 MOTION to Dismiss *and Brief in Support* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/12/2021) |
| 04/09/2021 | 78 | MOTION for Leave to *File Reply Brief One Day Out Of Time* 76 Reply to Response to Motion, 75 Reply to Response to Motion, 77 Reply to Response to Motion by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/09/2021 | 77 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/09/2021 | 76 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Walker, Ernest) (Entered: 04/09/2021) |
| 04/09/2021 | 75 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/09/2021) |
| 04/08/2021 | 74 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 73 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 72 | RESPONSE to 49 MOTION to Dismiss filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/08/2021 | 71 | REPLY to Response to 48 MOTION for Leave to *File Amended Complaint* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/08/2021) |
| 04/07/2021 | 70 | ORDER DENYING PLAINTIFFS' MOTIONS TO STRIKE MOTIONS TO DISMISS OF MICHIGAN AND GEORGIA (Dkt. ## 68 & 69 ) by Magistrate Judge N. Reid Neureiter on 7 April 2021.(cmadr, ) (Entered: 04/07/2021) |
| 04/05/2021 | 69 | MOTION to Strike *Georgia's Motion to Dismiss* by Plaintiff Kevin |

| | | O'Rourke. (Fielder, Gary) (Entered: 04/05/2021) |
|---|---|---|
| 04/05/2021 | 68 | MOTION to Strike *Michigan's Motion to Dismiss* by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 04/05/2021) |
| 04/02/2021 | 67 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 2 April 2021. It is hereby ORDERED that a Motion Hearing is set on Defendants' various motions to dismiss (Dkt. ## 22 , 23 , 41 , 46 , 47 , & 49 ) and Plaintiffs' motion to amend (Dkt. # 48 ) for April 27, 2021 at 2:00 p.m. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 04/02/2021) |
| 04/02/2021 | 66 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 2 April 2021. It is hereby Plaintiffs' Motion to Extend Time for Service and for Alternate Service Via U.S. Marshall (Dkt. # 65 ) is GRANTED IN PART and DENIED IN PART as follows.Plaintiffs are granted a 60-day extension to effectuate service on all remaining identified Defendants, up to and including May 21, 2021. But Plaintiffs are not authorized to conduct service through the U.S. Marshals Service. Plaintiffs are not proceeding in forma pauperis, and the Court is not persuaded by Plaintiffs' explanation why private process servers cannot serve the remaining Defendants, rather than unnecessarily burdening our federal marshals. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 04/02/2021) |
| 04/01/2021 | 65 | First MOTION for Extension of Time to *Serve Defendants* by Plaintiff Kevin O'Rourke. (Attachments: # 1 Proposed Order (PDF Only))(Fielder, Gary) (Entered: 04/01/2021) |
| 03/31/2021 | 64 | RESPONSE to 41 MOTION to Dismiss *filed By Center For Technology and Civic Life* filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 03/31/2021) |
| 03/29/2021 | 63 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 03/29/2021) |
| 03/29/2021 | 62 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 03/29/2021) |
| 03/29/2021 | 61 | RESPONSE to 48 MOTION for Leave to *File Amended Complaint RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO FILE AMENDED COMPLAINT PURSUANT TO FRCP 15* filed by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 03/29/2021) |
| 03/29/2021 | 60 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Jocelyn Benson, Gretchen Whitmer. (Meingast, Heather) (Entered: 03/29/2021) |
| 03/29/2021 | 59 | BRIEF in Opposition to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Kathy Boockvar, Tom Wolf. (Boyer, Jacob) (Entered: 03/29/2021) |

| 03/29/2021 | 58 | RESPONSE to 48 MOTION for Leave to *File Amended Complaint* filed by Defendants Brian Kemp, Brad Raffensperger. (McGowan, Charlene) (Entered: 03/29/2021) |
|---|---|---|
| 03/28/2021 | 57 | NOTICE of Entry of Appearance by Michael John Fischer on behalf of Kathy Boockvar, Tom WolfAttorney Michael John Fischer added to party Kathy Boockvar(pty:dft), Attorney Michael John Fischer added to party Tom Wolf(pty:dft) (Fischer, Michael) (Entered: 03/28/2021) |
| 03/23/2021 | 56 | REPLY to Response to 23 MOTION to Dismiss filed by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 03/23/2021) |
| 03/23/2021 | 55 | REPLY to Response to 22 MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE PURSUANT TO F.R.C.P. 23* filed by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 03/23/2021) |
| 03/22/2021 | 54 | ORDER OF REFERENCE. Pursuant to the consent of the parties to the jurisdiction of the magistrate judge 27 , 50 , 51 , 52 , and 53 , this case is referred to Magistrate Judge N. Reid Neureiter for all purposes pursuant to 28 U.S.C. § 636(c), by Chief Judge Philip A. Brimmer on 3/22/2021. Text Only Entry (pabsec2) (Entered: 03/22/2021) |
| 03/19/2021 | 53 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Brian Kemp, Brad Raffensperger All parties consent.. (McGowan, Charlene) (Entered: 03/19/2021) |
| 03/19/2021 | 52 | CONSENT to Jurisdiction of Magistrate Judge by Defendant Center for Tech and Civic Life All parties consent.. (Matz, Joshua) (Entered: 03/19/2021) |
| 03/19/2021 | 51 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Kathy Boockvar, Tom Wolf All parties consent.. (Boyer, Jacob) (Entered: 03/19/2021) |
| 03/19/2021 | 50 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Jocelyn Benson, Gretchen Whitmer All parties consent.. (Meingast, Heather) (Entered: 03/19/2021) |
| 03/18/2021 | 49 | MOTION to Dismiss by Defendants Kathy Boockvar, Tom Wolf. (Boyer, Jacob) (Entered: 03/18/2021) |
| 03/15/2021 | 48 | MOTION for Leave to *File Amended Complaint* by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Amended Complaint, # 2 Exhibit Redline Amended Complaint, # 3 Exhibit Declaration of Counsel)(Fielder, Gary) (Entered: 03/15/2021) |
| 03/15/2021 | 47 | MOTION to Dismiss *and Brief in Support* by Defendants Brian Kemp, Brad Raffensperger. (Attachments: # 1 Exhibit Pearson Transcript, # 2 Exhibit Wood Final Order)(McGowan, Charlene) (Entered: 03/15/2021) |
| 03/15/2021 | 46 | MOTION to Dismiss for Failure to State a Claim *Pursuant to FRCP 12(b)(2) and 12(b)(6)*, MOTION to Dismiss for Lack of Jurisdiction *Pursuant to FRCP 12(b)(2) and 12(b)(6)* by Defendants Jocelyn Benson, Gretchen |

| | | |
|---|---|---|
| | | Whitmer. (Meingast, Heather) (Entered: 03/15/2021) |
| 03/15/2021 | 45 | TRANSCRIPT of TELEPHONIC STATUS CONFERENCE held on 03/11/2021 before Magistrate Judge Neureiter. Pages: 1-30. Prepared by: AB Litigation Services. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 03/15/2021) |
| 03/11/2021 | 44 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 11 March 2021. As discussed at the March 11, 2021 Status Conference (see Dkt. # 43 ) It is hereby ORDERED that the deadline for all the parties to complete and file the Consent/Non-Consent Form (see Dkt. # 3 ), indicating either unanimous consent of the parties or that consent has been declined, is extended up to and including March 19, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 03/11/2021) |
| 03/11/2021 | 43 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Status Conference held on 3/11/2021. ORDER denying 42 Motion to Strike. FTR: Courtroom C204. (slibi, ) (Entered: 03/11/2021) |
| 03/10/2021 | 42 | MOTION to Strike 40 Brief in Opposition to Motion *to Dismiss* by Defendant Facebook, Inc.. (Attachments: # 1 Proposed Order (PDF Only)) (Lipshutz, Joshua) (Entered: 03/10/2021) |
| 03/10/2021 | 41 | MOTION to Dismiss by Defendant Center for Tech and Civic Life. (Matz, Joshua) (Entered: 03/10/2021) |
| 03/09/2021 | 40 | BRIEF in Opposition to 23 MOTION to Dismiss filed by Plaintiff Kevin O'Rourke. (Fielder, Gary) (Entered: 03/10/2021) |
| 03/09/2021 | 39 | BRIEF in Opposition to 22 MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE PURSUANT TO F.R.C.P. 23* filed by Plaintiff Kevin O'Rourke. (Attachments: # 1 Exhibit Fresno County Election Worker Training Guide, # 2 Exhibit Software Lic Agreement, # 3 Exhibit Contract Between Dominion and Michigan, # 4 Exhibit Contract Between Dominion and Georgia)(Fielder, Gary) (Entered: 03/09/2021) |
| 03/09/2021 | 38 | NOTICE of Entry of Appearance by Jacob Biehl Boyer on behalf of Kathy Boockvar, Tom WolfAttorney Jacob Biehl Boyer added to party Kathy Boockvar(pty:dft), Attorney Jacob Biehl Boyer added to party Tom Wolf (pty:dft) (Boyer, Jacob) (Entered: 03/09/2021) |
| | | |

| 03/09/2021 | [37](#) | NOTICE of Entry of Appearance by Charlene Swartz McGowan on behalf of Brian Kemp, Brad RaffenspergerAttorney Charlene Swartz McGowan added to party Brian Kemp(pty:dft), Attorney Charlene Swartz McGowan added to party Brad Raffensperger(pty:dft) (McGowan, Charlene) (Entered: 03/09/2021) |
|---|---|---|
| 03/08/2021 | [36](#) | NOTICE of Entry of Appearance by Louis William Fisher on behalf of Center for Tech and Civic LifeAttorney Louis William Fisher added to party Center for Tech and Civic Life(pty:dft) (Fisher, Louis) (Entered: 03/08/2021) |
| 03/08/2021 | [35](#) | NOTICE of Entry of Appearance by Marcella E. Coburn on behalf of Center for Tech and Civic LifeAttorney Marcella E. Coburn added to party Center for Tech and Civic Life(pty:dft) (Coburn, Marcella) (Entered: 03/08/2021) |
| 03/08/2021 | [34](#) | NOTICE of Entry of Appearance by Michael Skocpol on behalf of Center for Tech and Civic LifeAttorney Michael Skocpol added to party Center for Tech and Civic Life(pty:dft) (Skocpol, Michael) (Entered: 03/08/2021) |
| 03/08/2021 | [33](#) | NOTICE of Entry of Appearance by Joshua Adam Matz on behalf of Center for Tech and Civic LifeAttorney Joshua Adam Matz added to party Center for Tech and Civic Life(pty:dft) (Matz, Joshua) (Entered: 03/08/2021) |
| 03/04/2021 | [32](#) | NOTICE of Change of Address/Contact Information by Ernest John Walker (Walker, Ernest) (Entered: 03/04/2021) |
| 03/04/2021 | [31](#) | NOTICE of Change of Address/Contact Information by Gary D. Fielder (Fielder, Gary) (Entered: 03/04/2021) |
| 03/04/2021 | [30](#) | NOTICE of Entry of Appearance by Heather Stuht Meingast on behalf of Jocelyn BensonAttorney Heather Stuht Meingast added to party Jocelyn Benson(pty:dft) (Meingast, Heather) (Entered: 03/04/2021) |
| 03/03/2021 | [29](#) | NOTICE of Entry of Appearance by Heather Stuht Meingast on behalf of Gretchen WhitmerAttorney Heather Stuht Meingast added to party Gretchen Whitmer(pty:dft) (Meingast, Heather) (Entered: 03/03/2021) |
| 02/26/2021 | [28](#) | Minute ORDER by Magistrate Judge N. Reid Neureiter on 26 February 2021. It is hereby ORDERED that Dominion Voting Systems, Inc.'s Unopposed Motion for Stay of Disclosures and Discovery Pending Ruling on Motions to Dismiss (Dkt. # [25](#) ) is GRANTED. Accordingly, it is further ORDERED that this case is STAYED pending resolution of the two motions to dismiss (Dkt. ## [22](#) & [23](#) ). It is further ORDERED that the Motion to Stay Disclosures and Discovery Pending Ruling on Motion to Dismiss by Defendant Facebook, Inc. (Dkt. # [24](#) ) is DENIED as moot. It is further ORDERED that the Scheduling Conference set for March 11, 2021 at 11:00 a.m. is CONVERTED to a Status Conference. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 02/26/2021) |
| 02/25/2021 | [27](#) | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Nathaniel L Carter, Larry D Cook, Kesha Crenshaw, Alvin Criswell, Lori Cutunilli, Kevin O'Rourke, Amie Trapp, Neil Yarbrough All parties consent.. (Walker, |

| | | |
|---|---|---|
| | | Ernest) (Entered: 02/25/2021) |
| 02/19/2021 | 26 | NOTICE *of Plaintiffs' Withdrawal of Opposition to Facebook's Motion for Stay of Disclosures and Discovery Pending Ruling on Motions to Dismiss* by Defendant Facebook, Inc. (Lipshutz, Joshua) (Entered: 02/19/2021) |
| 02/19/2021 | 25 | Unopposed MOTION to Stay *DISCLOSURES AND DISCOVERY PENDING RULING ON MOTIONS TO DISMISS* by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 02/19/2021) |
| 02/16/2021 | 24 | MOTION to Stay *Disclosures and Discovery Pending Ruling on Motion to Dismiss* by Defendant Facebook, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Lipshutz, Joshua) (Entered: 02/16/2021) |
| 02/16/2021 | 23 | MOTION to Dismiss by Defendant Facebook, Inc.. (Lipshutz, Joshua) (Entered: 02/16/2021) |
| 02/16/2021 | 22 | MOTION to Dismiss *PLAINTIFFS COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE PURSUANT TO F.R.C.P. 23* by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 02/16/2021) |
| 01/26/2021 | 21 | NOTICE of Entry of Appearance by Natalie Jean Hausknecht on behalf of Facebook, Inc.Attorney Natalie Jean Hausknecht added to party Facebook, Inc.(pty:dft) (Hausknecht, Natalie) (Entered: 01/26/2021) |
| 01/26/2021 | 20 | NOTICE of Entry of Appearance by Craig Brian Streit on behalf of Facebook, Inc.Attorney Craig Brian Streit added to party Facebook, Inc. (pty:dft) (Streit, Craig) (Entered: 01/26/2021) |
| 01/26/2021 | 19 | NOTICE of Entry of Appearance by Joshua Seth Lipshutz on behalf of Facebook, Inc.Attorney Joshua Seth Lipshutz added to party Facebook, Inc. (pty:dft) (Lipshutz, Joshua) (Entered: 01/26/2021) |
| 01/25/2021 | 18 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 25 January 2021. It is hereby ORDERED that Dominion Voting Systems, Inc.'s Unopposed Motionfor Extension of Time to File Answer or Response to Complaint (Dkt. # 16 ) is GRANTED. Dominion Voting Systems, Inc. shall answer or otherwise respond toPlaintiffs' Complaint (Dkt. # 1 ) on or before February 16, 2021. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 01/25/2021) |
| 01/25/2021 | 17 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Facebook, Inc.. Facebook, Inc. answer due 2/16/2021. (Bergsieker, Ryan) (Entered: 01/25/2021) |
| 01/25/2021 | 16 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint,, by Defendant Dominion Voting Systems, Inc.. (Garnett, Stanley) (Entered: 01/25/2021) |
| 01/25/2021 | 15 | NOTICE of Entry of Appearance by Ryan Thomas Bergsieker on behalf of Facebook, Inc.Attorney Ryan Thomas Bergsieker added to party Facebook, Inc.(pty:dft) (Bergsieker, Ryan) (Entered: 01/25/2021) |
| | | |

| 01/20/2021 | [14](#) | NOTICE of Entry of Appearance by Bridget C. DuPey on behalf of Dominion Voting Systems, Inc.Attorney Bridget C. DuPey added to party Dominion Voting Systems, Inc.(pty:dft) (DuPey, Bridget) (Entered: 01/20/2021) |
| 01/20/2021 | [13](#) | NOTICE of Entry of Appearance by David Meschke on behalf of Dominion Voting Systems, Inc.Attorney David Meschke added to party Dominion Voting Systems, Inc.(pty:dft) (Meschke, David) (Entered: 01/20/2021) |
| 01/20/2021 | [12](#) | NOTICE of Entry of Appearance by Amanda Kristine Houseal on behalf of Dominion Voting Systems, Inc.Attorney Amanda Kristine Houseal added to party Dominion Voting Systems, Inc.(pty:dft) (Houseal, Amanda) (Entered: 01/20/2021) |
| 01/20/2021 | [11](#) | NOTICE of Entry of Appearance by Stanley L. Garnett on behalf of Dominion Voting Systems, Inc.Attorney Stanley L. Garnett added to party Dominion Voting Systems, Inc.(pty:dft) (Garnett, Stanley) (Entered: 01/20/2021) |
| 01/06/2021 | 10 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:re: [9](#) filed by attorney Ernest John Walker. Attorney has used an incorrect signature format in violation of D.C.COLO.LCivR 5.1(a) and 4.3(a) of the Electronic Case Filing Procedures (Civil cases). **DO NOT REFILE THE DOCUMENT.** In the future, the filer must affix an electronic s/signature followed by a typed, not an inked, signature to all future documents.(Text Only Entry) (cmadr, ) (Entered: 01/06/2021) |
| 01/05/2021 | [9](#) | NOTICE of Entry of Appearance by Ernest John Walker on behalf of All Plaintiffs Attorney Ernest John Walker added to party Nathaniel L Carter (pty:pla), Attorney Ernest John Walker added to party Larry D Cook (pty:pla), Attorney Ernest John Walker added to party Kesha Crenshaw (pty:pla), Attorney Ernest John Walker added to party Alvin Criswell (pty:pla), Attorney Ernest John Walker added to party Lori Cutunilli (pty:pla), Attorney Ernest John Walker added to party Kevin O'Rourke (pty:pla), Attorney Ernest John Walker added to party Amie Trapp(pty:pla), Attorney Ernest John Walker added to party Neil Yarbrough(pty:pla) (Walker, Ernest) (Entered: 01/05/2021) |
| 12/28/2020 | [8](#) | SUMMONSES issued by Clerk. (cmadr, ) (Entered: 12/28/2020) |
| 12/24/2020 | [7](#) | SUMMONS REQUEST as to DOMINION VOTING SYSTEMS INC., FACEBOOK, INC., CENTER FOR TECH AND CIVIC LIFE, MARK E. ZUCKERBERG, PRISCILLA CHAN, BRIAN KEMP, BRAD RAFFENSPERGER, GRETCHEN WHITMER, JOCELYN BENSON, TOM WOLF, KATHY BOOCKVAR, TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, ROBERT F. SPINDELL, JR. re [1](#) Complaint,, by Plaintiff Kevin O'Rourke. (Attachments: # [1](#) Summons Summonses on one PDF file) (Fielder, Gary) (Entered: 12/24/2020) |
| 12/24/2020 | 6 | Administrative Notice: The Summonses submitted contain an incomplete caption and will not be issued. All parties to the action must be listed in the |

| | | caption of the summons. (Text Only Entry) (cmadr, ) (Entered: 12/24/2020) |
|---|---|---|
| 12/23/2020 | 5 | SUMMONS REQUEST as to DOMINION VOTING SYSTEMS INC., FACEBOOK, INC., CENTER FOR TECH AND CIVIC LIFE, MARK E. ZUCKERBERG, PRISCILLA CHAN, BRIAN KEMP, BRAD RAFFENSPERGER, GRETCHEN WHITMER, JOCELYN BENSON, TOM WOLF, KATHY BOOCKVAR, TONY EVERS, ANN S. JACOBS, MARK L. THOMSEN, MARGE BOSTELMAN, JULIE M. GLANCEY, DEAN KNUDSON, ROBERT F. SPINDELL, JR re 1 Complaint,, by Plaintiff Kevin O'Rourke. (Attachments: # 1 Summons Summons in one pdf file) (Fielder, Gary) (Entered: 12/23/2020) |
| 12/23/2020 | 4 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE AND SETTING DEADLINE FOR FILING OF CONSENT/NON-CONSENT FORM by Magistrate Judge N. Reid Neureiter on 23 December 2020. Consent Form due by 2/25/2021. Proposed Scheduling Order due 3/4/2021. Scheduling Conference set for 3/11/2021 11:00 AM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. The Scheduling Conference will be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. (cmadr, ) (Entered: 12/23/2020) |
| 12/22/2020 | 3 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. NO SUMMONS ISSUED. (trvo, ) (Entered: 12/22/2020) |
| 12/22/2020 | 2 | Case assigned to Magistrate Judge N. Reid Neureiter. Text Only Entry. (trvo, ) (Entered: 12/22/2020) |
| 12/22/2020 | 1 | COMPLAINT and Jury Demand against All Plaintiffs (Filing fee $ 402,Receipt Number 1082-7642517)Attorney Gary D. Fielder added to party Kevin O'Rourke(pty:pla), filed by Kevin O'Rourke. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Exhibit Ex. 1 O'Rourke Affidavit, # 3 Exhibit Ex. 2 Carter Affidavit, # 4 Exhibit Ex. 3 Cutunilli Affidavit, # 5 Exhibit Ex. 4 Criswell Affidavit, # 6 Exhibit Ex. 5 Cook Affidavit, # 7 Exhibit Ex. 6 Crenshaw Affidavit, # 8 Exhibit Ex. 7 Yarbrough Statement, # 9 Exhibit Ex. 8 Trapp Statement, # 10 Exhibit Ex. 9 ASOG Report, # 11 Exhibit Ex. 10 Navarro Report, # 12 Exhibit Ex. 11 Amistad Project Report) (Fielder, Gary) (Entered: 12/22/2020) |

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Christopher M. Wolpert<br>Clerk of Court | April 30, 2021 | Jane K. Castro<br>Chief Deputy Clerk |

Mr. Gary D. Fielder
Law Office of Gary Fielder
1444 Stuart Street
Denver, CO 80204

Mr. Ernest J. Walker
ERNEST J. WALKER LAW OFFICE
1444 Stuart Street
Denver, CO 80204

RE:    **21-1161, O'Rourke, et al v. Dominion Voting Systems, Inc., et al**
       Dist/Ag docket: 1:20-CV-03747-NRN

Dear Counsel:

The court has received and docketed your appeal. Please note your case number above.
Copies of the Tenth Circuit Rules, effective January 1, 2021, and the Federal Rules of
Appellate Procedure, effective December 1, 2020, may be obtained by contacting this
office or by visiting our website at http://www.ca10.uscourts.gov. In addition, please note
all counsel are required to file pleadings via the court's Electronic Case Filing (ECF)
system. *See* 10th Cir. R. 25.3. You will find information regarding registering for and
using ECF on the court's website. We invite you to contact us with any questions you
may have about our operating procedures. Please note that all court forms are now
available on the court's web site.

Attorneys must complete and file an entry of appearance form within 14 days of the date
of this letter. *See* 10th Cir. R. 46.1(A). Pro se parties must complete and file the form
within thirty days of the date of this letter. An attorney who fails to enter an appearance
within that time frame will be removed from the service list for this case, and there may
be other ramifications under the rules. If an appellee does not wish to participate in the
appeal, a notice of non-participation should be filed via ECF as soon as possible. The
notice should also indicate whether counsel wishes to continue receiving notice or service
of orders issued in the case.

You are required to file a docketing statement within 14 days of filing the notice of appeal. If you have not yet filed that pleading, you should do so within 14 days of the date of this letter. Please note that under 10th Cir. R. 3.4(B), the appellant is not limited to the issues identified in his docketing statement and may raise other appropriate issues in the opening brief. The court's docketing statement form was updated on January 1, 2019; please make sure you use the current form. It may be found at http://www.ca10.uscourts.gov/clerk/forms.

In addition to the docketing statement, all transcripts must be ordered within 14 days of the date of this letter. If no transcript is necessary, you must file a statement to that effect.

Appellant is not required to file a designation of record, but will be required to file an appendix with appellant's opening brief. *See* 10th Cir. R. 10.1 and 30.1.

Appellant must file an opening brief and appendix within 40 days after the date on which the district clerk notifies the parties and the circuit clerk that the record is complete for purposes of appeal. *See* 10th Cir. R. 31.1(A)(1). Motions for extension of time to file briefs and appendices must comply with 10th Cir. R. 27.1 and 27.6. These motions are not favored.

Briefs must satisfy all requirements of the Federal Rules of Appellate Procedure and Tenth Circuit Rules with respect to form and content. *See* specifically Fed. R. App. P. 28 and 32 and 10th Cir. R. 28.1, 28.2 and 32, as well as 31.3 when applicable. In addition, we encourage all counsel, as applicable, to be familiar with 10th Cir. R. 46.4(B). Seven hard copies of briefs must be provided to the court within five business days of the court issuing notice that the electronic brief has been accepted for filing. *See* 10th Cir. R. 31.5 and the court's CM/ECF User's Manual. Appendices must satisfy the requirements of Fed. R. App. P. Rule 30 and 10th Cir. R. 30.1(A) through (F). Appendix volumes submitted under seal must be accompanied by a separate motion to seal. *See* 10th Cir. R. 30.1(D)(6). All appendices must be filed electronically, and a single hard copy provided to the court within five business days of the court issuing notice that the electronic appendix has been accepted for filing. *See* 10th Cir. R. 30 as well as the court's CM/ECF User's Manual. Counsel are encouraged to utilize the court's Briefing & Appendix checklist when compiling their briefs and appendices.

Appendix Page 1592

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of the Court

cc:     Ryan Thomas Bergsieker
        Jacob Biehl Boyer
        Marcella Coburn
        Bridget C. DuPey
        Stanley L. Garnett
        Amanda Kristine Houseal
        Joshua S. Lipshutz
        Jousha Adam Matz
        Charlene Swartz McGowan
        David Brandon Meschke
        Craig Brian Streit
        Heather Stuht Meingast

CMW/at

Appendix Page 1593

1

| 1 | UNITED STATES DISTRICT COURT |
| | DISTRICT OF COLORADO |
| 2 | |

3  KEVIN O'ROURKE, NATHANIEL L.  .  Case No. 20-cv-03747-NRN
   CARTER, LORI CUTUNILLI,       .
4  LARRY D. COOK, ALVIN          .
   CRISWELL, KESHA CRENSHAW,      .
5  NEIL YARBROUGH, and AMIE      .
   TRAPP, on their own behalf    .
6  and of a class of similarly   .
   situated persons,             .
7                                .
              Plaintiffs,        .
8                                .
   vs.                           .
9                                .
   DOMINION VOTING SYSTEMS,       .
10 INC., a Delaware              .
   corporation, FACEBOOK,         .
11 INC., a Delaware              .
   corporation, CENTER FOR       .
12 TECH AND CIVIC LIFE, an       .  United States District Court
   Illinois non-profit           .  1929 Stout Street
13 corporation, MARK E.          .  Denver, CO  80294
   ZUCKERBERG, Individually,      .
14 PRISCILLA CHAN,               .
   Individually, BRIAN KEMP,      .
15 Individually, BRAD            .
   RAFFENSPERGER, Individually,   .
16 GRETCHEN WHITMER,             .
   Individually, JOCELYN          .
17 BENSON, Individually, TOM     .
   WOLF, Individually, KATHY      .
18 BROCKVAR, Individually,       .
   TONY EVERS, Individually,      .
19 ANN S. JACOBS, Individually,  .
   MARK L. THOMSEN,               .
20 Individually, MARGE           .
   BOSTELMAN, Individually,       .
21 JULIE M. GLANCEY,             .
   Individually, DEAN KNUDSON,    .
22 Individually, ROBERT F.       .
   SPINDELL, JR., Individually,   .
23 and DOES 1-10,000,            .
                                 .
24           Defendants.         .
                                 .  April 27, 2021
25 . . . . . . . . . . . . . . . .  2:01 p.m.

```
 1          TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
            N. REID NEUREITER, UNITED STATES MAGISTRATE JUDGE
 2
       APPEARANCES:
 3
       For the Plaintiff:              Ernest J. Walker Law Offices
 4                                     By:  Ernest J. Walker*
                                       3368 Riverside Road
 5                                     Benton Harbor, MI  49022
                                       (303) 995-4835
 6
       For the Plaintiff:              Gary D. Fielder Law Offices
 7                                     By:  Gary D. Fielder*
                                       2325 West 72nd Avenue
 8                                     Denver, CO  80221
                                       (303) 650-1505
 9
       For the Defendant, Dominion     Brownstein Hyatt Farber
10     Voting Systems, Inc.:             Schreck, LLP
                                       By:  Stanley L. Garnett*
11                                     By:  David Meschke*
                                       410 17th Street
12                                     Suite 2200
                                       Denver, CO  80202
13                                     (303) 223-1100

14     For Defendant, Facebook,        Gibson Dunn & Crutcher, LLP
       Inc.:                           By:  Joshua S. Lipshutz*
15                                     1050 Connecticut Avenue N.W.
                                       Third Floor
16                                     Washington, DC  20036
                                       (202) 955-8217
17
                                       Gibson Dunn & Crutcher, LLP
18                                     By:  Ryan T. Bergsicker*
                                       1801 California Street
19                                     Suite 4200
                                       Denver, CO  80202
20                                     (303) 298-5774

21     For the Center for Tech and     Kaplan Hecker & Fink, LLP
       Civic Life:                     By:  Joshua A. Matz*
22                                     By:  Louis W. Fisher*
                                       By:  Marcella E. Coburn*
23                                     By:  Michael Skocpol*
                                       350 Fifth Avenue, Suite 7110
24                                     New York, NY  10118
                                       (646) 761-3270
25
```

3

```
 1   Appearances continued:

 2   For Defendant Brian Kemp          Georgia Attorney General
     and Brad Raffensperger:           By:  Charlene S. McGowan*
 3                                     40 Capitol Square S.W.
                                       Atlanta, GA  30334
 4                                     (404) 458-3658

 5   For Defendant Gretchen            Michigan Attorney General
     Whitmer and Jocelyn Benson:       By:  Heather S. Meingast*
 6                                     P. O. Box 30736
                                       Lansing, MI  48909
 7                                     (517) 335-7659

 8   For Defendant Tom Wolf            Pennsylvania Attorney General
     and Kathleen Boockvar:            By:  Jacob B. Boyer*
 9                                     1600 Arch Street
                                       Suite 300
10                                     Philadelphia, PA  19103
                                       (267) 768-3968
11
     Court Recorder:                   Clerk's Office
12                                     U.S. District Court
                                       1929 Stout Street
13                                     Denver, CO  80294

14   Transcription Service:            AB Litigation Services
                                       216 16th Street, Suite 600
15                                     Denver, CO  80202
                                       (303) 296-0017
16
     *All appearances telephonic.
17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

4

1              (Time noted:  2:01 p.m.)

2              THE COURT CLERK:  Court is in session.

3              THE COURT:  Good afternoon.  This is Magistrate

4   Judge Reid Neureiter signing in from the Rogers Federal

5   Courthouse in downtown Denver.

6              I'm calling the case 20-cv-03747, O'Rourke versus

7   Dominion Voting Systems.

8              Could I have appearances for the Plaintiff,

9   please?

10             MR. FIELDER:  This is Gary Fielder on behalf of

11  the Plaintiff.  I thought Ernie Walker was also on the line,

12  Your Honor.

13             THE COURT:  All right.  Mr. Fielder, you're a

14  little bit faint.  And are you not using the electronic --

15  the video tele-conference?

16             MR. FIELDER:  I wasn't able to get the link to

17  work, so I had to call in based on the time.

18             Mr. Walker was on the line viewing the courtroom

19  just minutes ago, but I could not get the link to work

20  despite 20 minutes of trying, Your Honor.

21             So I have to appear by telephone.

22             THE COURT:  Who is going to be making the argument

23  today on behalf of the Plaintiff?

24             MR. FIELDER:  I will be, Your Honor.

25             THE COURT:  Okay.  I really -- I need you to sign

5

1  in.  Did you talk to my courtroom -- I mean, I want to be

2  fair to you.  The reason why I shifted it from a telephone

3  call to video tele-conference is that I like the process to

4  be kind of interaction, and it's much more difficult over the

5  phone because you can see me when I'm like holding up my hand

6  to ask you to speak.

7          So, Ms. Libid, --

8          THE COURT CLERK:  I can email him the link, and

9  then he can just right click on it.

10          THE COURT:  We're going to email you a link that

11  you can just right click on.

12          THE COURT CLERK:  Copy it and paste it.

13          THE COURT:  Copy and paste it, rather than --

14          MR. FIELDER:  Okay.

15          THE COURT:  Okay?  It should work.

16          MR. FIELDER:  Well, I've been trying to copy and

17  paste.  I have been trying to copy and paste that one link

18  throughout.  So I just --

19          THE COURT:  All right, well we're going to send --

20  Ms. Libid, what's he supposed to do when he gets this link?

21          THE COURT CLERK:  You would copy the hyperlink and

22  paste it into either Edge or Chrome.  I just sent it.

23          THE COURT:  Okay, copy and paste into either Edge

24  or Chrome.

25          MR. FIELDER:  Could you please send that to

1  GaryFielder at Earthlink.net?

2          THE COURT:  Can you send it to GaryFielder at

3  Firstlink.net, Ms. Libid.

4          MR. FIELDER:  That was Earthlink.net, Your Honor.

5          THE COURT CLERK:  I sent it to your email that we

6  have on the record.  I didn't hear what he said.  I sent it

7  to the email we have on record.  I don't know --

8          THE COURT:  But send it also to Mr. Fielder, Ms.

9  Libid.

10          THE COURT CLERK:  That is who I sent it to.

11          THE COURT:  Okay.  And, Mr. Walker is there.  You

12  were able to sign on.

13          Okay, so Mr. Walker, you're present?

14          MR. WALKER:  I was able to click in.  Yes, Your

15  Honor.

16          THE COURT:  Okay.  All right.  Let's go down

17  through the Defendants, then.

18          We have everybody who is appearing for the

19  Plaintiffs, is that correct?

20          MR. WALKER:  That's correct, Your Honor.

21          THE COURT:  All right.  Let's move on.

22  Appearances for Facebook, please?

23          MR. LIPSHUTZ:  Good afternoon, Your Honor.  Joshua

24  Lipshutz for Facebook, from Gibson Dunn.

25          THE COURT:  Okay.

1          MR. BERGSICKER:  Good afternoon, Your Honor.  Ryan

2    Bergsicker, also from Gibson Dunn, for Facebook.

3          THE COURT:  All right.  Center for Tach and Civic

4    Life?

5          MR. MATZ:  Good afternoon, Your Honor.  This is

6    Joshua Matz appearing from Kaplan Hecker & Fink.  And I am

7    joined, I believe by phone, by my colleagues Michael Skocpol,

8    Marcy Coburn, and Louis Fisher.

9          THE COURT:  Okay, thank you.  And I assume, Mr.

10   Matz, you're going to be the only one speaking on behalf of

11   the Center for Tech and Civic Life?

12         MR. MATZ:  Yes, Your Honor.

13         THE COURT:  All right, thank you.  And the

14   Zuckerberg and Chan Defendants have not been served yet.

15         Is there anybody appearing for the Georgia

16   Attorney General's Office?  I understand that the government

17   official folks appear to have been voluntarily dismissed, but

18   if there's anybody on behalf of Brian Kemp?

19         MS. MCGOWAN:  Yes, Your Honor.  This is Charlene

20   McGowan from the Georgia Attorney General's Office here on

21   behalf of both Brian Kemp and Brad Raffensperger.

22         And the Court is correct that the Plaintiffs did

23   file a stipulation of dismissal as to those two Defendants.

24   I'm happy to answer any questions the Court has today, but I

25   don't intend to argue our motion.

8

1          THE COURT:  All right, thank you.  And on behalf

2   of Jocelyn Benson and Tom Wolf, I guess for the Commonwealth

3   of Pennsylvania?  Anybody here?

4          MS. MEINGAST:  Your Honor, this is Heather

5   Meingast from the State of Michigan.  My Defendants are

6   Gretchen Whitmer and Secretary of State Jocelyn Benson.

7          And so, like Ms. McGowan from Georgia, Michigan is

8   here but we have been dismissed, as well.  And so we're

9   simply just -- intend to listen to the hearing today, unless

10  the Court has any questions.

11         THE COURT:  Okay.  And the folks from

12  Pennsylvania?

13         MR. BOYER:  Good afternoon, Your Honor.  This is

14  Jacob Boyer from Pennsylvania Office of Attorney General on

15  behalf of Governor Wolf and former Secretary Kathleen

16  Boockvar.  The Plaintiffs have moved to dismiss each of those

17  Defendants.  So like Georgia and Michigan, we have no

18  intention of arguing the motions that are before you, but are

19  able to answer questions for the Court.

20         THE COURT:  Okay.  And then did we have -- we had

21  Georgia, Michigan.  Were there any other -- I guess the folks

22  from Wisconsin?  Anybody from Wisconsin here?

23      (No response)

24         THE COURT:  Hearing none.  Okay.  And then on

25  behalf of Dominion Voting Systems?

1          MR. GARNETT:  Good afternoon, Your Honor.  Stan

2     Garnett and Dave Meschke appearing on behalf of Dominion

3     Voting Systems.

4          THE COURT:  Okay.  And for some reason -- Ms.

5     Libid, can we turn up our volume a little bit?  I'll just ask

6     folks to speak up a little bit.  We seem to have a -- we've

7     got our volume turned all the way up and you're just a little

8     faint.  I don't know if other folks are having trouble

9     hearing Mr. Garnett, but if everybody could just speak up a

10    little bit, get close to the microphone, that would be

11    helpful.

12          All right.  So let me just ask whether our

13    Plaintiff's counsel has been able to sign in yet?  Did it

14    work?  Our new link?

15          MR. FIELDER:  Your Honor, I can get to the sign in

16    stage and I can punch sign in, but it doesn't -- I don't have

17    a user name or password.  I'm not sure if somebody could help

18    me with that, or if I could just sign directly in.  I haven't

19    gotten email from anyone.

20          THE COURT CLERK:  I sent the email to the one we

21    have on record.

22          THE COURT:  What email do you need, sir?

23          MR. FIELDER:  Well, I tried to cut and paste the

24    link.

25          THE COURT:  No, what email -- did you receive an

1    email from us here?

2            MR. FIELDER:  I have not received an email, no.

3            THE COURT:  Okay.

4            MR. WALKER:  I think you need it send to

5    GaryFielder at Earthlink.net in order for you to get it where

6    you're at.

7            THE COURT:  Okay.

8            THE COURT CLERK:  But that's not the one we have

9    on record.

10           THE COURT:  That's not the email we have on file,

11   but GaryFielder at Earthlink.net?

12           MR. FIELDER:  And I'm checking the other -- I'm

13   checking the -- I changed my email officially.  It's Gary at

14   FielderLaw.net.

15           THE COURT:  Well, what we have on file is

16   CriminalDefense at FielderLaw.net.  And you're supposed to

17   really update it.

18           MR. FIELDER:  Yes.  I changed that with a

19   pleading.  I changed that with a pleading.  And it's Gary at

20   FielderLaw.net.

21           THE COURT:  All right.  We just sent it to the

22   Earthlink one.

23           MR. FIELDER:  Okay.

24           THE COURT:  All right.  While you try and do that,

25   I'm going to ask some clarifying questions.

1          In your motion to --

2          MR. FIELDER:  Okay, thank you.

3          THE COURT:  Can you tell me what the status of all

4   the State Defendants is?  My understanding is that you've

5   moved to dismiss them all, and you filed a stipulation of

6   dismissal, which takes place automatically, essentially.

7          But I noticed in your amended complaint you have

8   -- you seek declarations as to the invalidity of certain

9   State Statutes.  Are you not seeking in your amended

10  complaint any relief against either State officials in their

11  official or individual capacity, or anything having to do

12  with the legality of certain -- Constitutionality of certain

13  State Statutes?

14          MR. FIELDER:  Yes.

15          THE COURT:  Mr. Fielder, go ahead again, and

16  please speak up.

17          MR. FIELDER:  We are not -- we are dismissing the

18  challenges to the State Statutes, not the challenge to the

19  Section 230.

20          THE COURT:  Okay.  All right.  So, none of the

21  State Defendants have any role to play in this litigation any

22  further, correct?

23          MR. FIELDER:  Correct.  That's correct, Your

24  Honor, not in this case.

25          THE COURT:  Okay.  All right.  So then -- so what

1   we have in front of us, then, are the motions to dismiss by

2   Dominion, the motion to dismiss by Facebook, the motion to

3   dismiss by CTCL, and your motion for leave to amend the

4   complaint.

5           That's my understanding of what's in front of us

6   today, is that correct?

7           MR. FIELDER:  That's correct.

8           THE COURT:  Okay.  I will first hear argument from

9   -- since they are named first as a Defendant, Dominion, on

10  the motion to dismiss.

11          And we'll go to Facebook, and then CTCL, and then

12  I'll hear Plaintiff's response.

13          MR. GARNETT:  Good afternoon, Your Honor, Stan

14  Garnett on behalf of Dominion.

15          And I've been fiddling around with the microphone.

16  Are you able to hear me a little bit better now?

17          THE COURT:  Yes.  If you could just speak up a

18  little bit more, you know, just raise your voice, and I can

19  hear you.  But a little bit louder.

20          MR. GARNETT:  Great.  I will speak as loudly as I

21  can.  And, obviously, if the Court has difficulty hearing me,

22  let me know and I'll up the volume even more.  And if that

23  doesn't work, we'll turn it over to Mr. Meschke, who will be

24  happy to take over the argument.

25              Your Honor, first of all, thank you very much for

1   the time this afternoon to argue these issues.

2          As I indicated, Mr. Meschke and I represent

3   Dominion.

4          We have briefed, I think quite thoroughly, the

5   concerns that we have that we think warrant dismissing the

6   complaint.  And I'm happy to at any time answer questions

7   from the Court with regard to those.

8          But let me briefly cover what we think the issues

9   are and why the Court should dismiss the complaint at this

10  time.

11         Let me also note, as the Court has indicated,

12  there is a motion to amend pending.  The Plaintiffs filed a

13  motion to amend and an amended complaint in March.

14         As we've indicated clearly in our pleadings, the

15  motion to amend, we think, should also be denied because it

16  does not correct the problems in the complaint that's been

17  stated by the Plaintiffs.

18         And under the futility prong of Rule 15, and the

19  cases in the Tenth Circuit, we think that the motion to amend

20  should be denied because it would be futile for the

21  Plaintiffs to amend and file the amended complaint, because

22  they would not be able to proceed, because they still have

23  not cured the fundamental problem of standing.

24         Now, as the Court knows, we have raised the issues

25  around standing in this case since our very earliest entries

1   of appearance several weeks ago.  And we have maintained that

2   the Plaintiffs have not stated a case or controversy, as

3   required under Article III, Section 2, Clause 1, of the

4   United States Constitution.

5            And let me just say a couple of things about

6   standing, Your Honor, before I get into the body of our

7   argument.

8            It is true that in some quarters, and, frankly,

9   among some of the organizations affiliated with the

10  Plaintiffs, standing is treated as if it's some kind of a

11  legal technicality.  Some would deride it as if it's just

12  sort of lawyer talk for an issue that isn't very important,

13  kind of trivial legal issue that keeps a meritorious

14  plaintiff from having their day in court.

15           But, of course, Your Honor, the United States

16  Supreme Court, from the very earliest days of the Republic,

17  has made it clear that standing is a fundamental concept that

18  must be addressed in every case brought in Federal Court.

19           And the reason is because it's essential to

20  maintain the fundamental Constitutional principle of

21  separation of powers, that if standing is not required, as

22  indicated by the Court's jurisprudence establishing what a

23  case in controversy is, then it -- you run the risk of the

24  Courts sliding into a position of essentially regulating the

25  political branches of Government in a way that the

1  Constitution does not envision, and certainly the Founders of

2  our country did not understand.

3          The standing cases, Your Honor, again, go back for

4  a couple hundred years.  But the most recent ones that are

5  always cited are *Lujan v. Defenders of Wildlife,* which was a

6  1992 United States Supreme Court case, and that is restated

7  in virtually every case since then, that standing requires

8  three essential components:

9          A concrete and particularized injury;

10          A injury that is fairly traceable to the

11  challenged conduct; and, finally,

12          An injury that is redressable by a favorable

13  judicial decision.

14          And in the -- both the complaint and the amended

15  complaint that the Plaintiffs have brought forward in this

16  case, they are lacking on the first two components of

17  standing, Your Honor, and that's why we believe they cannot

18  state a case in controversy, and that this case should both

19  be dismissed, and the motion to amend should be denied.

20          THE COURT:  On the third one, the issue of

21  redressability, I noticed you didn't mention that one.  But a

22  recent Supreme Court case seems to indicate that if you ask

23  for nominal damages for a Constitutional violation, that

24  satisfies the redressability element.

25          I thought some of the motions to dismiss said no

1  redressability, and some of the cases that I read about the

2  2020 election that if bounced them on standing also say no

3  redressability.

4           But in your view, does the asking for nominal

5  damages solve the Plaintiffs' redressability problem?

6           MR. GARNETT:  Well, Your Honor, I think that it

7  probably does.  The case that the Court is referring to, of

8  course, is the case that I still cannot pronounce very well

9  that starts with a U.  The Justice Thomas opinion relating to

10  the ability to proselytize on a small college campus.

11           And in that case, the Court clearly did hold that

12  a claim for nominal damages was sufficient to establish

13  redressability, as required by standing.

14           Now, of course, as we note, and I think all of the

15  Defendants have noted, we've been dealing with a moving

16  target as this case has developed and as we've been dealing

17  with both the two complaints, and then the arguments that

18  counsel has made in the briefs on the various issues.

19           I, in an effort to keep my argument this afternoon

20  focused and understandable, and hopefully helpful to the

21  Court, I am willing to concede that they are now asking for

22  nominal damages, and that issue alone would deal with the

23  redressability prong of the standing test.

24           Now, let me mention a couple of things in

25  connection with that.

 1          In the early complaint, and in a subsequent --
 2 some of the initial briefing, the Plaintiffs appeared to be
 3 asking to overturn the 2020 Presidential election as a remedy
 4 that they were seeking.  They appear to have abandoned that
 5 and replaced it now.
 6          And they also were seeking an astronomical amount
 7 of damages, several hundred million dollars, which it was
 8 difficult to tell what that was tied to.
 9          Now they appear to be asking for nominal damages.
10          And because the issues are so fundamental, Your
11 Honor, with the first two prongs of the standing issue, I'm
12 willing to concede for the purpose of argument today that
13 they're now asking for nominal damages.  And if they could
14 meet the other requirements for standing, that would be
15 sufficient for that third prong here.
16          THE COURT:  I think if I read it correctly, they
17 are asking for nominal damages amount of $1,000.00 per
18 Plaintiff.  And you take 160 million registered voters times
19 $1,000.00, and that gives you a $1.6 billion dollar damage
20 figure.  So that was -- that's how you got your hundreds of
21 millions of damages, even while it was a nominal damage
22 request, if my multiplication is correct.
23          MR. GARNETT:  That sounds correct, Your Honor.
24 I'm not sure exactly how one gets to even $1,000.00 of
25 nominal damages, but then again, as we've all noted, we're

1   not yet into a discovery phase.  We don't think we should

2   ever get there to try to explore how they're coming up with

3   that.  But I think that's probably correct.

4           And, again, to answer the Court's question, for

5   the purpose of today's argument, I'm willing to concede to

6   nominal damages meets the redressability argument vis-à-vis

7   the claim has been made against Dominion.

8           THE COURT:  Okay.

9           MR. GARNETT:  Now, Your Honor, the standing cases,

10  of course, are very interesting in their discussions about

11  what the role of the Courts is, and when it is appropriate

12  for a Federal Court to accept jurisdiction of a case to

13  determine an allegation of a Constitutional violation.

14          And one of the most interesting cases is one

15  that's cited in several of the briefs.  And that, of course,

16  is Justice -- Chief Justice Roberts' opinion in the

17  *Hollingsworth v. Perry* decision in 2013, in which Justice

18  Roberts eventually concludes that there was no standing to

19  issue a ruling about the Constitutionality of a gay marriage

20  ban in the State of California, and goes out of his way to

21  stress that the sincerity of the plaintiffs, and the

22  sharpness of the disagreement between the plaintiffs and the

23  defendants in any particular case, which, of course, exists

24  in almost any litigation, has nothing to do with whether or

25  not there's standing.

1          The issue is, and particularly in an election

2     case, whether or not the Plaintiffs have been able to

3     establish a concrete and particularized injury that

4     specifically applies to their particular situation.

5          Now, the Court has the benefit of having a number

6     of Federal Courts address very similar issues, even about the

7     2020 election.

8          And one of them, of course, is the Eleventh

9     Circuit's decision out of Georgia, the *Linwood v.*

10    *Raffensperger* case, in which the Court specifically held the

11    problems with voting as alleged in that case, which, frankly,

12    are very similar to what's been brought forward by the

13    Plaintiffs in this case, are paradigmatic generalized

14    grievances applying equally to all members of the public,

15    and, therefore, they do not present the type of

16    particularized grievance needed for the injury in fact prong

17    of the *Lujon* test.

18          THE COURT:  So, Mr. Garnett, so the Plaintiffs'

19    response to that is "well, we're not seeking to represent

20    members of the public.  We're seeking to represent registered

21    voters."  That's the distinction I perceived in their

22    oppositions to your various motions to dismiss, is that we

23    are a smaller group than the general public.  We're all

24    registered voters, and as registered voters, we're in a

25    different situation than the general public.

1    MR. GARNETT:  Yes, Your Honor.  And I think that

2  effort at establishing a particularized injury sufficient for

3  standing was rejected not only in the *Raffensperger* case, but

4  also in the much older case of *Warth v. Seldon,* the 1975 U.S.

5  Supreme Court case, in which the Court stated that when the

6  assertive arm is shared in substantially equal measure by a

7  large class of citizens, it is not a particularized injury as

8  required to determine standing.

9    In other words, Your Honor, making a distinction,

10  and it's an interesting distinction in this case, since some

11  of the Plaintiffs admit in their declarations that they never

12  voted in the case, which creates some interesting -- in this

13  particular election, which creates its own set of interesting

14  issues.

15    But I think it's clear, Your Honor, under the *Wood*

16  *v. Raffensperger* and *Warth v. Seldon* that when you're talking

17  about a class of registered voters, that is not a significant

18  -- that is a large undifferentiated class of people that is

19  not sufficient to establish the kind of particularized injury

20  with a comparison point, as the Court notes is so necessary

21  in the *Raffensperger* case to determine standing.

22    And I would also --

23    THE COURT:  So out of curiosity, there are

24  election cases that go forward on the merits, not on

25  standing.  And for the person who does have standing to

1 challenge an election result, is it typically the candidate?

2 Is that the kind of particularized injury "if X hadn't

3 happened, I would have been elected.  Therefore, I have the

4 injury" that justifies the Court jumping in and saying "yeah,

5 there's a case for controversy here."

6           MR. GARNETT:  Yes, Your Honor.  The cases that

7 find standing sufficient to proceed will identify some

8 particular category for the Plaintiff that differentiates him

9 or her from the remaining members that gives it what, again,

10 what is called a necessary point of reference.

11           It can be a candidate, it can be, as indicated in

12 some of the apportionment case, it can be the possibility

13 that a certain class of voters based on traditional equal

14 protection forbidden classifications is burdened by a

15 particular approach.

16           It can be -- the other example, of course, is the

17 *Anderson* case in which the Court held in Ohio that the

18 requirement that independent candidates had a different set

19 of -- had different requirements to get on the ballot that

20 burdened them in a way that was distinct from what members of

21 the two political parties had.  And that then in that case

22 created a differentiation.

23           And, of course, we talk about this a little bit

24 with the issue of credential standing, because we weren't

25 clear whether the Plaintiffs were trying to claim credential

1    standing as they came forward.

2           And in that situation, occasionally, and every

3    occasionally, a court can find credential standing where a

4    claim of an individual plaintiff is so closely allied with

5    someone who would have standing, such as, as the Court

6    indicates, a candidate or perhaps a political party, or

7    perhaps a class of individuals who would be prohibited from

8    discrimination under the Equal Protection Clause, then the

9    Court could find credential standing.

10          As we note in our briefs, although we made that

11   argument and made it very forcefully, the Plaintiffs did not

12   respond to it.  And, again, it's pursuant to the cases

13   construing Rule 12.  They've essentially conceded that point.

14          But, yes, there are cases, Your Honor, where the

15   Court could find standing on those bases.  Or, of course, in

16   the apportionment cases where you're dealing with election

17   issues tied within the context of whether particular

18   individuals are being discounted or diluted in their vote

19   authority in a way that's different from others.

20          But, again, this brings forward only the

21   generalized complaints.

22          THE COURT:  So if I get to the standing issue and

23   decide it in your favor, do I need to go through all of the

24   other issues for dismissal?  I know Dominion didn't have a

25   personal jurisdiction issue, but Facebook did, and CTCL did.

1  Failure to state a claim you've all raised.

2          Do I need to get to all of the others if standing

3  is a impediment to bringing this lawsuit?

4          MR. GARNETT:  Your Honor, in Dominion's view, you

5  do not.  We are happy to talk about the problems we think

6  that exist with the complaint, and we do some of that in the

7  brief.

8          And, of course, under the amended complaint, the

9  claims against Dominion remained the same.  They all focus on

10  the three issues of the elections clause, the due process

11  clause, and equal protection clause.

12          But they did add a RICO claim against -- it's pled

13  against other Defendants.

14          But if there's no standing, Your Honor, the Court

15  doesn't need to wrestle with the particulars of those issues.

16          THE COURT:  And is the standing inquiry something

17  that has to be addressed on a claim-by-claim basis, you know,

18  with respect to the -- you know, equal protection is one

19  piece, and they have different claims.

20          Do you have to analyze standing with respect to

21  each claim that's brought?

22          MR. GARNETT:  Well, Your Honor, I don't think you

23  actually do with regard to the three claims that are stated

24  against Dominion, which are then restated as to declaratory

25  judgment claims at the end of the claim, because I think the

1    issues are identical.

2            I wouldn't mean to speak for my colleagues,

3    Facebook and the Center, with regard to the RICO and other

4    claims.  But the issues -- the fundamental problems stated --

5    established with standing with regard to all three claims for

6    relief, including the added on, the two declaratory claims,

7    are sufficient that the Court can determine there's no

8    standing and need not make further analysis beyond that with

9    regard to Dominion.

10           THE COURT:  Okay.  Help me on the traceability

11   piece.  I have a little trouble understanding what

12   traceability means.

13           But is seems that the injury complained of here is

14   that somehow a vote wasn't counted to the degree it should

15   have been because votes that shouldn't have been counted

16   were, or votes that should have been counted were not.

17           And all of that can be traced to Dominion's

18   allegedly flawed computer system for tabulating votes that

19   may be negligent, may be intentional, but somehow doesn't add

20   up correctly.

21           What's the traceability problem?  Because I think

22   you do make an argument about traceability of the injury to

23   the --

24           MR. GARNETT:  We do, Your Honor.  I'm sorry.

25           THE COURT:  Go ahead.

1          MR. GARNETT:  The traceability issue with regard

2    to Dominion is that Dominion's role in this case -- and

3    there's a lot of discussion about State action, of course, in

4    the Plaintiffs' complaint and then in their briefing.  And we

5    make the point that State action is essentially beside the

6    point here.

7          The State action doctrine, of course, has been

8    developed by the Courts as a way to limit the possibility of

9    Constitutional violations under the 1983 and the various

10   Constitutional claims that can be brought.  And there has to

11   be State action, and now and then there is, in a situation

12   like the *Marsh v. Alabama* case, in which a private entity has

13   completely taken over a State's function.

14         That's not what you have here.  Here in this case,

15   there are some contractual relationships between Dominion and

16   various States, but the issue -- there's nothing that

17   Dominion has done that is not essentially just clerical.  In

18   other words, tabulating, calculating, et cetera.

19         So the problem with traceability vis-à-vis

20   Dominion is that there is no remedy that the Court could

21   fashion relating to what Dominion's role as a contractor in

22   this case that would address the issues that the Plaintiffs

23   are complaining about.

24         Dominion, for example, does not certify elections.

25   Dominion does not step in and function as a Secretary of

1  State, as was alleged with the parties that were dismissed

2  here.

3          Dominion is simply a private company that has --

4  provides certain services in connection with elections, but

5  there's no way that a claimed Constitutional violation could

6  be traceable, meaning that this Court could fashion a remedy

7  that would address the issue that they're complaining about

8  here.

9          THE COURT:  Okay.  Well, why don't I hear from --

10  I don't need you to go through your other arguments.

11          MR. GARNETT:  That's fine.

12          THE COURT:  Why don't I hear from Facebook on the

13  issue of standing.  And I'm going to focus on the standing

14  question -- the Center next, but Facebook first.

15          MR. LIPSHUTZ:  Thank you, Your Honor.  Good

16  afternoon.  Joshua Lipshutz from Gibson Dunn.

17          We certainly agree with the arguments that

18  Dominion has presented on standing, although I'm not sure I

19  would concede the redressability point that was conceded by

20  prior counsel.  We can get into that.

21          The bottom line is that the Plaintiffs filed this

22  action after the 2020 election in a state that has no ties to

23  their actual claims, to their election related claims.

24          And this Court should dismiss this case with

25  prejudice for numerous reasons.

1            THE COURT:  Well, let me ask you about the

2    dismissal with prejudice.  I've looked at some Tenth Circuit

3    law, and it seems that a dismissal for lack of standing has

4    to be without prejudice.  Do you agree with that?

5            MR. LIPSHUTZ:  I do agree with that if there is --

6    because of the futility doctrine, Your Honor.  I think when

7    there is -- when it's been shown that amendment would be

8    futile -- and futile, I think -- then I think you cannot

9    dismiss the case with prejudice.

10            At some point a failure to establish standing,

11   like any other failure to plead a case, requires dismissal

12   with prejudice for finality purposes.

13            And I think what's interesting about this case is

14   that we've seen the futility in action.  Plaintiffs filed a

15   motion to amend their complaint, and in filing that motion,

16   have actually told the Court what they think they can do to

17   try and cure the very significant standing problems that

18   exist with this case.

19            And so much like -- we don't have to guess whether

20   the Plaintiffs can cure their defects.  We've seen what they

21   intend to do, and it plainly fails.

22            And, in fact, their proposed amended complaint

23   really makes things worse for them, because they seek to add

24   157 new Plaintiffs who they say they want to add because they

25   are, quote, and this is the amended complaint, paragraph 51,

1   "an assembly of the people of the United States of America."

2            And that is as plain a statement as possible, an

3   admission by the Plaintiff, as to why they lack standing to

4   pursue these claims, or any claims that they're hoping to

5   pursue.

6            They have signed up people, as I understand it, by

7   gathering names on a website that they put together.  They

8   did so purely on the fact -- purely on the basis of -- that

9   somebody clicked themselves and said that they were a citizen

10  of the United States, and collected names, and submitted

11  names in a list without inquiring as to anything, as far as I

12  could tell, about what injury those Plaintiffs suffered.

13           And it goes above and beyond the pleadings, Your

14  Honor, but there's actually a website,

15  DominionClassAction.com, that you can visit and see all of

16  this in action.  They actually just implore anyone to join

17  the class action lawsuit by just putting in their email

18  address and sending in an affidavit.  There's no particular

19  identity required at all, just that you are a voter in the

20  United States.

21           And so I think that really compounds the problem

22  for the Plaintiffs, and makes it clear that the dismissal

23  should be with prejudice and not without prejudice.

24           And there are other reasons beyond standing why

25  the dismissal should be with prejudice on the merits, if this

1  Court were to get there.

2          On the redressability point, I certainly agree

3  that the U.S. Supreme Court has said in its most recent

4  decision that a request for nominal damages may provide the

5  necessary redress for completed violation of a legal right.

6  It may.  But it also may not.

7          And I think there's several problems with the

8  nominal -- so-called nominal damages that are being sought

9  here.

10          First of all, they're not nominal damages.  They

11  are -- I think it's actually billions of dollars, as Your

12  Honor pointed out, that they are seeking.

13          And even on a per-Plaintiff level, it's $1,000.00.

14  $1,000.00 is not nominal damages.  In order to seek $1,000.00

15  per Plaintiff, they presumably have to show some right to

16  obtain $1,000.00.  Typically, there's a statutory right or

17  some other right that you would need to point to, to earn an

18  award of $1,000.00 for each Plaintiff.  That's not what we

19  normally conceive as nominal damages, even on a per-Plaintiff

20  basis.

21          So I would dispute that they're even seeking

22  nominal damages in the first place.  And even if we could say

23  that that is nominal damages, the Supreme Court in that same

24  case made it clear that a request for nominal damages itself

25  does not open the courthouse door.  It has to be the request

1  for nominal damages after the completion of a violation of a

2  legal right.

3         And, again, there I don't see where they have

4  demonstrated any violation of any cognizable legal right, or

5  even alleged as much.

6         So I would not concede the redressability point.

7  I think they fail on all three prongs of the standing

8  analysis.

9         And I certainly agree with counsel that just

10  argued that if Your Honor were to reach the standing analysis

11  and decide that the Plaintiffs have no standing, this Court

12  need not, and in fact should not, go any further in

13  evaluating the merits.

14         But I do think the dismissal should be with

15  prejudice because of the futility part that I raised earlier.

16         THE COURT:  Can I ask one question of Facebook?

17  The link between Facebook's alleged misconduct and the

18  claimed injury, and the claimed injury I perceive to be the

19  dilution of the vote or my vote didn't count, or somehow I

20  lost confidence in the American electoral system because of

21  all of these questionable aspects to the vote counting.

22         The allegation against Facebook, though, seems to

23  be that, you know, this whole censorship issue and you don't

24  allow certain statements to be made, and you do allow other

25  statements to be made, and so you're putting a thumb on the

1    scale with your editorial policies, and, hence, the section

2    of the -- is it 230, it's un-Constitutional somehow.

3              I'm having trouble, and maybe this is a question I

4    need to ask Plaintiffs' counsel, but did you perceive the

5    link between Facebook's alleged misconduct and the injury

6    that the Plaintiffs have suffered?

7              MR. LIPSHUTZ:  I have not, Your Honor.  And I have

8    to say it is somewhat -- it is very perplexing as to what

9    Facebook's connection to any of this is or is alleged to be.

10             And, again, I don't want to go, you know, beyond

11   the claims here, but I would note that on the website, they

12   mention the fact that they just dislike social media, and

13   that's apparently why Facebook is in this case.  The

14   Plaintiffs, on their website, say that you should join the

15   case if you dislike -- because they dislike social media.

16             And so I think that kind of says it all.

17             Facebook has no connection to this case

18   whatsoever.  Any of the Defendants, frankly, have a

19   connection to the case in the sense required by Article III.

20   I don't think there's a valid case or controversy here at

21   all.

22             And we also have many arguments on the merits,

23   section 240, there's a frivolous RICO claim that they try to

24   throw in to the amended complaint.

25             I mean, at the end of the day, Your Honor, I just

1   don't think this is a serious lawsuit. Certainly not against

2   Facebook.

3              And so for that additional reason, I would ask the

4   Court to dismiss this case with prejudice.

5              And, of course, we have our personal jurisdiction

6   arguments, as well, which I'm happy to address if the Court

7   is interested in entertaining them.

8              THE COURT: Yeah, the personal jurisdiction seems

9   problematic. But let's -- why don't I -- I'll give you a

10  chance to rebut on that if the Plaintiffs have something to

11  say on personal jurisdiction.

12             Why don't I hear from the Center on the question

13  of standing.

14             MR. MATZ: Thank you, Your Honor. This is Joshua

15  Matz. I represent the Center for Tech and Civic Life, or

16  CTCL.

17             Like counsel for Facebook, I'll focus on standing.

18  Like them, we feel that there obviously is an injury in facts

19  here.

20             Just to provide some context, because obviously

21  Dominion and Facebook -- CTCL is a non-profit organization

22  that is basically a group of civic technologists,

23  researchers, election administration, data experts, whose

24  goal is to work with jurisdictions around the country to

25  foster a more informed and engaged democracy and to modernize

1    the U.S. electoral system.

2           It is in pursuit of that goal that CTCL provided

3    services to over 2,500 cities and counties around the

4    country.  Many of them in jurisdictions -- in fact, I believe

5    the majority of the jurisdictions that had voted for the

6    Republican candidate in the prior election, but jurisdictions

7    of all stripes on a non-partisan basis to help support

8    election administration.

9           THE COURT:  So let me ask you about that, because

10   that's not in the complaint.  What's in the complaint is that

11   it's funded by Zuckerberg and Chan, and they've got -- you

12   know, their thumb on the scale and they're arguably

13   facilitating under the guise of COVID-19 under the guise of

14   assisting municipalities with COVID-19.

15          Instead, they're putting valid drop boxes only in

16   Democratic areas in order to assist that.

17          So I hear what you're saying, but I'm wondering

18   whether I'm allowed to take, you know, the reality that

19   you're representing into account in determining this motion,

20   or whether you're just giving me background, and I need to

21   just take that with a grain of salt because I can't consider

22   it on a motion to dismiss.

23          MR. MATZ:  It's purely background.  There is no

24   need for you to consider it.

25          One reason I started there was just because the

1  Court may not be aware what the organization does.  Another

2  reason is that although the Plaintiffs lack injury, they have

3  used this case as a soapbox to accuse CTCL, even outside the

4  complaint, of any number of tax frauds and business

5  irregularities, and federal crimes, statements that in the

6  litigation would be defamation.

7       And given their desire to use this soapbox to

8  slander my client, I just thought it would be helpful to open

9  by providing a context, which is not anything the Court needs

10  to account for.

11       On the standing issue, I actually think that the

12  easiest starting point, and, frankly, the end point for it,

13  is the Supreme Court's decision in *Lance v. Coffman,* which

14  has not yet been raised by the parties.

15       But, you know, I would emphasize it because, you

16  know, even more so than *Hollingsworth* and the other cases

17  that have come up, you know, that is one of the key cases in

18  which the Supreme Court made clear that in generalized limits

19  cannot support standing.

20       And it made that clear in the context of a

21  challenge, in fact here in Colorado, that had been brought by

22  a group of individual citizens on the theory that the

23  districts injured their interests in the proper

24  representation and structure.

25       And the Court said in response to this case by a

1  group of individual Coloradoans that was precisely the claim

2  of undifferentiated generalized pleadings about the conduct

3  of government that refused countenance.

4         THE COURT:  What's the citation to the *Lance v.*

5  *Coffman* case?

6         MR. MATZ:  Oh, sorry, Your Honor.  I can pull that

7  real quick.  It's stated in our papers.  It's 549 U.S. 437,

8  from 2007.

9         THE COURT:  Okay.

10         MR. MATZ:  Your Honor, the reason I highlight the

11  *Lance* case is because it has been stated repeatedly,

12  including the myriad of cases surrounding the 2020 election,

13  as the Court may have seen, as the foundation of the

14  principle that when individual voters bring challenges in the

15  generalized manner to the administration of the election, and

16  they say that they were injured because the election wasn't

17  administered in accordance with the law generally, or because

18  candidates that we prefer, you know, have the tough end of it

19  in house and other jurisdictions carried out its procedures.

20         *Lance* states the foundation of a line of cases,

21  including *Raffensperger* in the Eleventh Circuit, and any

22  number of other decisions.  And we cite well over a dozen of

23  them in our briefs.  All of which made clear that that kind

24  of complaint is a generalized grievance that is not an injury

25  in fact.

1        As Chief Judge Pryor put it in the *Raffensperger*

2   case, when he rejected the suit attacking the administration

3   of the Presidential election in Georgia, he said "all

4   Americans, whether they voted in this election or whether

5   they reside in Georgia, could be said to share interest in

6   insuring that a Presidential election is properly

7   administered."

8        And on that basis, he said that the interests that

9   would advance was a generalized grievance.  And I'll

10  highlight -- and I'll come back to this point in just a

11  minute, is that's true of registered voters and everybody

12  else.  Everybody in the country has an interest in the proper

13  administration of the Presidential election.

14       I don't think they're interested in that just

15  because they're registered to vote.  And none of these

16  decisions have been written in a way that is linked to

17  whether someone registered to vote, or not.

18       And so the *Wood* case from Chief Judge Pryor, like

19  I said, a line of cases.  Another one that I would just call

20  to the Court's attention is *Behan v. Wisconsin Elections*

21  *Commission* case cited on December 9th of 2020.  We cite it in

22  our papers.

23       They are Chief Judge Epper in the Eastern District

24  of Wisconsin, survey a wide range of decisions in which a

25  voter or group of voters sued on the theory that their voted

1  had been diluted "by the possibility of unlawful or invalid

2  ballots being counted."

3          And she found that all of those decisions

4  concluded that such harm was too speculative and too

5  generalized to support standing.

6          And this is of particular interest to me as

7  counsel to CTCL.  A whole series of cases articulated that

8  very proposition while rejecting the lack of standing

9  challenges under State and Federal law to CTCL's COVID-19

10  response program.  We cite these cases in our brief.  They

11  are from Federal Districts in Minnesota, Wisconsin, Texas,

12  Pennsylvania, Iowa, and Michigan.

13          In all of those jurisdictions, courts held that

14  individual voter --

15          THE COURT:  Northern District of Iowa.

16          MR. MATZ:  Sorry, Your Honor.  Yes, exactly.

17          THE COURT:  Right.

18          MR. MATZ:  And so there are a whole slew of these

19  decisions in which courts held that challenges to cities and

20  counties that had accepted the CTCL grants, many of the

21  courts held that they failed to state any violation of State

22  or Federal law, but more relevantly here, all of them denied

23  preliminary injunctions, or TROs, or both, and in some cases

24  dismissed outright for lack of standing.

25          And may really shock through those rulings was the

1    very generalized grievance rule that controls here, too.

2              And, again, those cases, as I understand it,

3    mostly involved registered voters.  And the conclusion was

4    that their interests in the administration of the election

5    being generally done right, and votes generally being counted

6    right, is treated under *Lance v. Coffman* as the sort of

7    foundation case as a classic generalized interest.

8              And so when we came to the papers here, part of

9    what was so surprising to us is that, you know, the

10   Plaintiffs are clearly aware of those cases.  In fact, they

11   appear to have plagiarized significant parts of their

12   complaint from the complaints in those cases.

13             They had been put on notice by motions to dismiss

14   that there was a stipulation.  Your Honor asked at length

15   about standing at the March 11th conference.  And so if I

16   were the Plaintiffs, it would have been pretty clear to me

17   that there was a standing concern.

18             What was striking to me when I read their papers,

19   and Your Honor suggests that they're relying on a distinction

20   between the citizenry as a whole and registered voters, and

21   I've already addressed that, and I'll have another few

22   thoughts to share on it in a minute, I think that -- maybe

23   Your Honor did.  I didn't really see that as clearly in their

24   papers.

25             When I read their briefs opposing our motion to

1  dismiss, and their brief in support of their motion for leave

2  to amend, I didn't really see anything other than a general

3  assertion that the integrity of the Presidential election is

4  important, and so anyone, anywhere, who has registered to

5  vote, whether they have voted or not, anywhere in the country

6  can file a suit in any Federal Court against any public or

7  private entity who, in their view, did anything that may have

8  affected the administration or the result of a Presidential

9  election.

10         And in support of that, they did not cite -- and I

11  would highlight this, at least in their papers with respect

12  to CTCL, they did not cite a single case, not one, about the

13  injury in fact requirement.  Not a single case.

14         And they didn't respond to or distinguish a single

15  case that we cited, including *Lance,* including *Raffensperger,*

16  including all of those CTCL cases.  They didn't cite one.

17         They cited that case from the Supreme Court about

18  repressability, and they do have a repressability problem for

19  the reason counsel to Facebook described, but they said

20  nothing about injury.  I've never seen anything like that in

21  a Federal case when injury is squarely put at issue by

22  everybody.  And the Plaintiff says nothing.  The Plaintiff

23  says absolutely nothing about it.

24         You know, and they don't cite any authority for

25  their position, for their very broad view.  To me, you know,

1    that is irresponsible and problematic.

2         Your Honor has suggested that maybe what separates

3    their case from all of these other cases is this idea that

4    they're bringing it with a vote for registered voters.

5         As I've mentioned, there's a few difficulties with

6    that.

7         The first is that any number of cases that were

8    brought and dismissed for lack of standing involved

9    registered voters.

10        The second is that registered voters are not

11   unique in sharing an interest in the proper administration of

12   the election.

13        The third is that they suggest that a whole line

14   of cases were dismissed essentially for a pleading error, or

15   for a briefing error, because what the Plaintiff should have

16   said is that they care about the interests of voters rather

17   than the general integrity of the electoral system.

18        And it's hard for me to think that something like

19   that distinction, the distinction would open the doors to a

20   broader conception of Federal standing to challenge any

21   alleged election administration issue.

22        And then finally, and this was referenced by prior

23   counsel, *Seldon* confirms -- and this is a quote:  "When the

24   asserted harm is a generalized grievance, short in

25   substantially equal measure by all or a large class of

1 citizens, that harm alone normally does not warrant exercise

2 of jurisdiction.

3         And so that confirms the principle that I think is

4 implicit to -- or maybe explicit in many of the other cases

5 surrounding the 2020 election, which is that representing all

6 registered voters doesn't solve the problem that the

7 Plaintiffs face in pursuing a generalized interest in the

8 proper administration of an election generally.  That's an

9 interest everybody in this country has in common.

10         And, again, even if that's their argument, I have

11 to say, at least in the CTCL papers, the Plaintiffs never

12 said that, and they certainly never cited any case that they

13 thought would support that proposition.

14         And this is sort of where I started.  What's a

15 little frustrating about this case from I think CTCL's point

16 of view, is that, you know, we're a non-profit organization

17 trying to do some good in the world.  This lawsuit is

18 frivolous.  It is a waste of our time and our money and our

19 energy.

20         The Plaintiffs can't even cite a single case about

21 the injury in fact.  hey can't be bothered to respond to a

22 single case that we cite against them.  Even after the status

23 conference Your Honor asked them to do so.

24         Instead, they can be troubled to level all sorts

25 of false and outrageous accusations of criminality against us

 1  and the other parties in this case.  They can be troubled to

 2  engage in all sorts of litigation improprieties; the latest

 3  being the judicial notice motion they filed last night, which

 4  is obviously improper, and to which we object.

 5          The filing of a lawsuit is pretty serious

 6  business.  And Article III of the Constitution requires that

 7  Plaintiffs demonstrate an actual, unique, particularized

 8  injury entitling them to a Federal judicial forum.

 9          Plaintiffs come no where close to making that

10  showing.  In their papers with respect to us they don't even

11  try.  They just say that Presidential elections are

12  important, so gee, everyone ought to be able to sue for

13  everything if they've registered to vote, whether or not they

14  actually voted.

15          Respectfully, Your Honor, that's nonsense.  There

16  is not a single case anywhere in the United States that

17  supports that proposition.  Every case that I am aware of

18  forecloses it.

19          And for that reason, we think there's clearly not

20  standing, but that Plaintiffs' argument is contrary or

21  frivolous.

22          And I would, of course, be happy to address any

23  other questions the Court may have.

24          One other point I would just quickly highlight is

25  that we're in a slightly different procedural posture than

43

1  the other Defendants because there is a split in authority

2  within the Tenth Circuit over in a multi-defendant case like

3  this one whether the Plaintiffs are entitled to amend as of

4  right in the circumstances they've found themselves in.

5           And for that reason, our view is that the safe

6  recourse, if the Court does perceive a lack of standing, is

7  to docket the amended complaint and dismiss it *sua sponte,*

8  which is essentially the same standard as it would apply to

9  denying the motion to amend the complaint on grounds of

10  futility.  I just want to flag that to avoid a sort of

11  needless procedural complication.

12           And, of course, we stand by the propositions set

13  forth elsewhere in our brief, and we'll happily address any

14  of them if the Court has any questions.

15           THE COURT:  Okay.  I had not seen this motion to

16  take judicial notice of hundreds of cases and articles, et

17  cetera.  Your view is that should be stricken and improper?

18           MR. MATZ:  Yes, Your Honor, for a few reasons,

19  just to put them on the record.

20           THE COURT:  Okay.

21           MR. MATZ:  The first is that we did not get

22  advance notice about it.  They didn't even confer with us

23  about it.  They just surprised us with it last night.

24           They say that they needed to do it because there

25  was no evidence, which is bizarre, given that the vast

1  majority of materials that they've attached pre-date the

2  filing of the papers in this case.

3         And what we don't yet know for what purpose they

4  asked the Court to take judicial notice.  I have a very

5  strong instinct that it will not adhere to Federal Rule of

6  Evidence 201(b), which limits judicial notice only to the

7  existence of such documents, and not to the truth of any

8  statements or matters contained there, which has, of course,

9  been confirmed by a long line of Tenth Circuit precedent.

10        And so I suspect we would have other objections if

11 we hear the grounds on which they want the Court to grant

12 judicial notice.  But the manner and circumstances of the

13 filing, in our view, by itself is sufficient grounds on which

14 to deny the motion.

15        THE COURT:  Okay.  Let's hear from the Plaintiffs

16 on the issue of -- first this motion to take judicial notice,

17 which does seem like sand bagging in the worst way the day

18 before.  You know, I've been reading the many briefs and

19 pages, and your complaint, your amended complaint, your

20 motion to amend.

21        To say you're relying on all of these cases, and

22 I'm supposed to take judicial notice of them, and a bunch of

23 articles, does not seem like it's consistent with the Rules.

24        So, Plaintiffs' counsel?

25    (No response)

1           THE COURT:  Is Plaintiffs' counsel there?

2      (No response)

3      (Pause)

4           THE COURT:  Is Plaintiffs' counsel there?

5      (No response)

6           MR. WALKER:  I think we lost Mr. Fielder, Your

7  Honor.  Hold on a second.

8           THE COURT:  Okay.

9      (Pause)

10          MR. GARNETT:  Your Honor, this is Stan Garnett.

11 If I may, while we're waiting?

12          THE COURT:  Yes.

13          MR. GARNETT:  We don't want to add to the argument

14 at this point, but we too would object.

15          THE COURT:  Let's wait until Mr. Fielder is on the

16 line, because I want him to hear everything.

17          MR. GARNETT:  All right.

18     (Pause)

19          THE COURT:  Was he able to ever log on, do we

20 know?  Did he ever show up?

21          THE COURT CLERK:  Your Honor, not that I'm aware

22 of.

23          THE COURT:  Okay.

24     (Pause)

25          THE COURT:  Mr. Walker, do you want to try and

 1  call Mr. Fielder and ask him to call in?

 2        (No response)

 3            MR. WALKER:  He does appear in the list of

 4  participants, albeit as muted.  I don't know --

 5            THE COURT:  Ms. Libid, can you un-mute him?

 6            THE COURT CLERK:  I've already tried.  I don't

 7  think it's working.

 8            THE COURT:  Okay.

 9            THE COURT CLERK:  We must have dropped him, but

10  he's still listed there.  I tried un-muting him, but it's not

11  working.

12            THE COURT:  Okay.  Mr. Fielder, if you can hear

13  us, now is the time for you and your Plaintiffs to talk, and

14  you can call in if you're not working -- if the computer is

15  not working.

16        (Pause)

17            THE COURT:  We'll give him about two minutes.

18  But, Mr. Walker, if he doesn't call in, you're going to be at

19  bat.

20        (Pause)

21            MR. WALKER:  Judge, he's switching computers.

22        (Pause)

23            THE COURT:  Is he communicating with you by phone

24  or otherwise?

25        (No response)

```
 1              THE COURT:  Mr. Walker?

 2         (No response)

 3              THE COURT:  Mr. Walker, can you hear me?  I think

 4    you're muted, sir.

 5              THE COURT CLERK:  It looks like Mr. Walker also

 6    dropped.

 7              THE COURT:  Oh no.  So much for technology.  Could

 8    you have Mr. Fielder just dial the phone number?

 9              THE COURT CLERK:  He was called in.

10              THE COURT:  I know.  He  never did video?

11              THE COURT CLERK:  Mr. Fielder?

12              THE COURT:  Yes.

13              THE COURT CLERK:  No.

14         (Pause)

15              THE COURT:  Mr. Walker, I see you on the screen.

16    Can you -- or maybe I don't.  Can you hear me, Mr. Walker?

17    Are you there?  No, I guess that's Mr. Matz.  It's a small

18    picture.

19         (Pause)

20              THE COURT:  All right.  Here's what we're going to

21    do.  We're going to take a break until 3:15 Denver time.  I

22    don't know if Mr. Walker or -- Ms. Libid, if you could email

23    both Mr. Walker and Mr. Fielder and say we're coming back on

24    at 3:15.  Mr. Fielder, if he can't get his computer to work,

25    needs to dial in and we'll hear him by phone.
```

1          But I just can't sit here waiting for people to

2    call in.  We've been going for about an hour.  Everybody take

3    a break.  Don't hang up or disconnect.

4          But somebody communicate with Mr. Fielder, either

5    by telephone or by email, that he needs to try in the next

6    five minutes to get on the computer.  And if that's not

7    working, he should call in and we'll at least be able to hear

8    him by phone like I did for the first five minutes in this

9    process.

10          We'll be in recess until 3:15 Denver time.

11          (Recess from 3:03 p.m. until 3:13 p.m.)

12          THE COURT CLERK:  Court is in session.

13          THE COURT:  This is Magistrate Judge Reid

14    Neureiter.  We're back on the record in the case of O'Rourke

15    versus Dominion.

16          When we broke, Mr. Fielder was not with us.  Mr.

17    Fielder, are you there?

18          MR. FIELDER:  I'm here, Your Honor.  I'm going to

19    use my cell phone to speak and hear.  I don't know what

20    happened to my computer.  I could hear everything and see

21    everything, but all of the sudden I lost my ability to speak

22    and hear.

23          So I'm on the cell phone, but at least you can see

24    me, Your Honor, and I can see you.

25          THE COURT:  Okay.  I now have a pen malfunction.

 1  Ms. Libid, do we have another pen?  I have a low tech problem

 2  as opposed to a high tech problem.

 3          So, Mr. Fielder, just so that you know,

 4  unfortunately because I think the way the system works is

 5  when you speak or when a party speaks and the computer picks

 6  it up, and I can see you, because you're speaking through

 7  your phone, you're teenie-tiny in the lower right hand

 8  corner.  You're not as large as Mr. Walker, who is the person

 9  who spoke last, so I see him really large.

10          But at least we're on.  So I don't know how much

11  of the last -- oh there you are.  Okay, good.

12          Were you able to hear all of the arguments that

13  transpired over the last hour?

14          MR. FIELDER:  Yes, Your Honor.

15          THE COURT:  Okay.  So first, I'd like you to

16  address the unusual motion to take judicial notice that was

17  filed yesterday.  That is not really proper.  It sort of sand

18  bagged the Defendants.

19          I haven't read it.  I hadn't been even alerted to

20  it being filed.  The briefs were done, and we now have oral

21  argument for you to fill me in orally.

22          I'm not going to take judicial notice of anything

23  that you filed yesterday.  It just doesn't make any sense.

24          That's denied.

25          MR. FIELDER:  Okay.  Do you want me to comment on

50

1   that, Your Honor?

2            THE COURT:  No.  I'm just telling you.  The motion

3   to take judicial notice is denied.  It's not consistent with

4   the Rules, and briefing was closed, and there's no basis for

5   putting in a list of cases and a list of newspaper articles

6   and other things.

7            Now let's hear your argument on the standing

8   question.

9            MR. FIELDER:  Well, Your Honor, with regard to

10  standing, it is closely connected to the issue of State

11  action.  And I didn't mean to surprise anybody.  I just

12  listed the cases and their current citation because some of

13  which have been ruled upon in just the last week with regard

14  to the case out of the State of Pennsylvania, the Supreme

15  Court, on April 19th of 2021, granted the writ of certiorari

16  and vacated the lower court's judgment, but sent it back down

17  with instructions to declare that the case was moot.

18           There are also some recent filings from other

19  individuals against the parties here.  A company called My

20  Pillow, Inc. just sued last week Dominion Voting Systems,

21  Inc.

22           THE COURT:  Mr. Fielder, seriously, you're citing

23  the My Pillow guy as your defense in this case?  Come on.

24  Let's talk about standing.  Go to standing.  I've denied your

25  motion to take judicial notice.  Let's talk about standing.

 1           Why didn't you cite a single case of the dozens

 2    that have been issued by Federal District Courts across the

 3    country dismissing the claims exactly like yours o n the

 4    basis of standing.  You didn't mention any of them in either

 5    your motion to amend or your opposition to the motions to

 6    dismiss.  Why not?

 7           Please distinguish this case from the cases in

 8    Iowa, the cases in Wisconsin, the cases in Pennsylvania, that

 9    were all dismissed on the basis of standing.

10           MR. FIELDER:  Because the individuals there were

11    coming to the court and suing government individuals and

12    persons in their official capacities.  Therefore, they were

13    essentially suing the states or sub-divisions of a state.

14           They were asking for extraordinary relief.  All of

15    those cases, all of them, were with regard to a request for a

16    TRO or a preliminary injunction.

17           In those cases, the standard of proof is that the

18    plaintiff must show a likelihood of success on the merits.

19    The standard here is different.

20           This is a completed Constitutional right

21    violation.  This is multiple parties committing multiple

22    violations.

23           However, in the middle of the election -- strike

24    that.  After the election, in the middle of the process

25    before the Electoral College met, many voters expressing

1 | their dissatisfaction hired lawyers that went to court and

2 | asked for extraordinary relief.  We didn't do that.

3 |           On December 10th of 2020, the United States

4 | Supreme Court in the *Panzen* (ph) case, indicated that it has

5 | long since recognized a plaintiff's ability to sue

6 | individuals in their individual capacity.

7 |           THE COURT:  But, sir, let me ask you a question.

8 | Standing is linked to injury.  You have to show a

9 | particularized injury.  What is the -- when I read your

10 | papers, whether it's the original complaint or the amended

11 | complaint, or all of the affidavits that you've attached to

12 | the original complaint, the injury that your clients are

13 | complaining about is assumed that their vote wasn't counted,

14 | that their vote was diluted, that somehow the mechanism of

15 | the election was fiddled with, was interfered with, so that

16 | their votes weren't counted.

17 |           That's the injury.  And if that's the injury,

18 | explain to me how that's a particularized injury that differs

19 | from injury of all other voters or all other Americans,

20 | because that's what you have to have to have standing.  It

21 | has to be linked to the injury that's claimed.

22 |           And when I read your complaint, the injury in this

23 | claim is that it's perception that the vote wasn't counted,

24 | or my vote was diluted.  Right?  That's what you say.

25 |           MR. FIELDER:  No, that's not the claim.  That's

1  not the claim.

2          The claim is that we all have one national right

3  amongst us all, and that's to vote for President and Vice-

4  President.  We've said that multiple times.  That's not a

5  state-based claim.  That's one right that we all share across

6  the country, and it's an extraordinary right.

7          THE COURT:  Okay.  So how is that right -- so

8  that's the right.  And it was that right that was interfered

9  with.  The right to vote.  Correct?

10          MR. FIELDER:  The right to vote for President.

11          THE COURT:  Okay.  And how is that -- your named

12  Plaintiff, Mr. O'Rourke, didn't vote.  So let's pick somebody

13  from Colorado.  The grandmother from Summit County who said

14  her vote was somehow not counted.

15          How was she -- how is she injured?  How is her

16  injury different from my courtroom deputy, who I assume

17  voted, or somebody else?  How is that injury different?

18          MR. FIELDER:  First of all, Mr. O'Rourke did vote,

19  and is really upset that the pleadings say that he didn't

20  vote.  In his affidavit, he said that he voted.

21          THE COURT:  Okay.

22          MR. FIELDER:  And he did vote.  However, if a

23  person votes for President, and then information is revealed

24  that certain persons, Mark Zuckerberg, his wife, they

25  confused the election.  The Presidential election was

1  hundreds of millions of dollars, and they funneled that money

2  through CTCL to impact the election, so that impacted your

3  clerk if she's registered to vote.  If she's a regular person

4  that doesn't want to vote, is not registered to vote, she

5  might have a generalized grievance about it, but it wouldn't

6  have affected her right.

7          Every person that voted doesn't want to believe

8  that their vote is counted, but demands that their vote be

9  counted.  And if there's evidence that the -- that first of

10 all from Dominion, that the votes were weighted, that one

11 vote might count to a fraction, where another counts as --

12 another vote might count four then one, 1.12, for example.

13         That's the evidence that's coming out from the

14 experts.  Not the Plaintiffs.  Not the layers.  But the

15 experts.  Evidence that the voting machines don't work.

16         Law Review articles, law professors, all cited in

17 the complaint and the pleadings, that the ballot marking

18 devices don't work, and that the voting machines are

19 connected to the internet.

20         These are not a generalized grievance.  Maybe they

21 would have been before the election.  But once all of the

22 evidence came out that there was foreign interference, that

23 the machines were connected to the internet, and that they

24 mistabulated the votes, maybe on purpose, but certainly

25 Dominion must take responsibility for being responsible for

1  those voting machines.

2          So we're in a crossroad in our country where we're

3  either going to allow these private entities to tabulate our

4  votes, run the election, set the elections up, and then when

5  something goes wrong and the voters say "hey, that's not

6  right," well, that's a generalized grievance.

7          How was your vote affected?  Well, if swing states

8  are being affected, not to a couple of thousand votes, but

9  hundreds of thousands of votes, which are being adjudicated,

10 and we outlined that in the complaint, that are being

11 adjudicated, that is judged, by either artificial

12 intelligence or by county clerks looking at their computer

13 screens, there is a high error rate on these Dominion

14 machines.

15          I'll give you one example.  There was information

16 that in Maricopa County people were given Sharpies.  Dominion

17 didn't just lead the equipment, they set up the whole

18 election in Maricopa County.  There shouldn't have been a

19 Sharpie within a mile of that place, because everybody knows

20 when you use Sharpies on a ballot, that causes an error

21 reading from the ballot scanner, such that it must be

22 adjudicated.

23          There is facts which indicate that over a hundred

24 thousand votes just in Maricopa County were adjudicated

25 without observation, by who, no one knows.  And that has a

1   substantial impact on everyone in Arizona's right to vote for

2   President, and everyone across the country.

3            And it didn't just happen in one state.  It

4   happened in multiple states.

5            So what could be called a conspiracy theory by

6   some expert who has opined that these machines are being

7   interfered with, that would certainly impact everybody's

8   right to vote.  Why would we even have an election if there's

9   an algorithm in the computer voting machine?

10           And CTCL, they were going all across the country

11  granting hundreds of millions of dollars to municipalities,

12  to cities, and interacting with those jurisdictions'

13  elections.  Not building an ice skating rink or participating

14  in a law enforcement charity.  They were dealing with

15  elections, which is a public function.

16           Any time a corporation, a private individual, or a

17  501(3)(c) --

18           THE COURT:  You're back to the state action issue.

19  I'm wondering about standing and the injury that -- the

20  injury that you've described, the dilution of your right to

21  vote, is precisely the kinds of injuries that all of the

22  cases, the case out of Iowa, the case out of -- even the case

23  out of Iowa had no other case in the Third Circuit, the

24  judgment was reversed and the matter dismissed as moot.

25           But the reasoning still stands.  Their case was

1  dismissed on the basis of lack of standing.  And so the

2  reasoning in that case is no different from the reasoning

3  here.

4          Your clients' injury all is linked to supposedly

5  the dilution of the votes, for not counting their votes, and

6  that is a generalized grievance shared by all 160 million

7  registered voters.  Right?

8          MR. FIELDER:  We've never used the word dilution

9  of votes.  Our claim is that these private entities

10 interfered in a substantial way with the election.

11          And so that could be described as diluting one's

12 vote.  If you're fractionalizing votes or weighting votes,

13 that could be described as diluting votes.  But that's not

14 what those cases stand for in the classic term of vote

15 dilution.  That's not our general theory.

16          What our theory is, is that these private

17 companies interfered with the election in a substantial way,

18 and that affected everybody's rights.  That affected

19 Republicans and Democrats.  It certainly affected

20 Independents who vote for either Republic or Democrat.

21          Many people are disgruntled voters that don't

22 vote, but they have a right to vote, because they feel that

23 the system is corrupt by these private entities.

24          Is the next election going to involve a

25 billionaire that comes in and drops $500 million dollars on

1  elections all over the country, and no one is going to be

2  able to say anything or do anything?

3          THE COURT:  Well, --

4          MR. FIELDER:  Wonder if all of the allegations are

5  proven that these Dominion machines are easily actable,

6  connected to the internet, and are intentionally programmed

7  through this private software, this proprietary software, to

8  impact elections.

9          The only people that can stop them are the people,

10  but not the general people, but those who have the right to

11  vote.  The right to vote is the most precious thing we have,

12  and that's why everyone is so upset.  It's not just a

13  privilege that you might have to take advantage of.  It's

14  your right to vote.  We fight wars over this.

15          People are very, very upset that these elections

16  can't be held properly because of influence by private

17  actors, voting machines connected to the internet, that have

18  algorithms in them --

19          THE COURT:  So, Mr. Fielder, let me posit a

20  question:  So there are two possibilities in an election when

21  one candidate wins and one candidate loses.

22          One is, you know, before the election people see

23  to make sure that the procedures are done right, and State

24  Courts review those, and sometimes they say "okay, this

25  procedure can be implemented, this procedure can't be

1   implemented."

2           It goes up to the Supreme Court of that State, it

3   approves it or doesn't approve it, then it goes to the

4   Supreme Court of the United States.  The Supreme Court of the

5   United States might not see it.  And that happens in states

6   all across the country.

7           And the vote happens, and people file some suits

8   about whether their votes should be counted or not, or

9   recounted or not.  In Georgia, there's a hand recount.  They

10  found that the hand recount confirmed what the ballots said.

11          So, and then when the votes are certified and we

12  get a new President of the United States.

13          That's one possibility that you -- votes happened,

14  procedures get approved by courts or disapproved by courts,

15  and then you go forward with the Constitutional process.

16          The other option is:  Everybody believes, and a

17  large part of the people believe, that the system is rigged

18  by third parties, by corporations, by non-profit

19  organizations, that the votes are rigged.  All of these

20  municipalities are somehow in bed with the corporations to

21  rig the election, that the Republican and Democrat

22  Secretaries of State of Wisconsin and Michigan and Arizona

23  and Georgia, they're all in on it, because that's what you

24  alleged, and somehow this election was rigged.

25          But those two possibilities, people voted, courts

1  approved it, they counted it, got a result, versus this whole

2  thing was rigged, no, by the way, let's spread these rumors

3  and theories about conspiracy all across the country in full

4  rest and unrest, to the point where people literally storm

5  the Congress of the United States making the same points and

6  making the same mark that you're making in this courtroom,

7  arguing that this vote was rigged.

8           And your complaint cites many of the allegations

9  that this election was stolen.  And you, I think, in your

10  complaint are doing a disservice to your clients, because

11  you're saying "disregard what all the courts said, disregard

12  what all the Secretaries of States, and we're going to file

13  another lawsuit trying to challenge all of this and dump in

14  as many conspiracy theories as possible."

15           Isn't that what's going on in this lawsuit?

16  You're not genuinely trying to solve a problem.  You're using

17  this lawsuit as a political statement for some objective.

18           Because if this were a real lawsuit, you would

19  have said something about the dozens of cases that dismiss

20  these kinds of claims on the basis of lack of standing.  And

21  you don't have that here.

22           You didn't respond to a single one of the cases

23  cited by the Defendants on lack of standing.  Why didn't you

24  do that?

25           You didn't mention *Lance v. Coffman,* which is

 1  clearly on point.  Four voters in Colorado brought a lawsuit

 2  three days after the Colorado Supreme Court issued a

 3  decision, challenging the decision as violating the Elections

 4  Clause of the U.S. Constitution.

 5           And the Supreme Court of the United States said

 6  the only injury plaintiffs allege is that the law has not

 7  been followed.  The injury is precisely the kind of

 8  undifferentiated generalized grievance about the conduct of

 9  government that we have refused countenance in the past.

10           How do you respond to that?  There's nothing in

11  your briefing justifying your lawsuit as having any injury

12  that's particularized to your Plaintiffs.

13           So that was a bit of a speech, and I'm going to

14  give you a chance to respond.  But I'm a little bit shocked

15  that you, even today, given this opportunity, you're not

16  responding to these cases.  Supreme Court cases, Tenth

17  Circuit cases, Eleventh Circuit cases, and dozens of District

18  Courts that dismiss cases just like this on the basis of lack

19  of standing.

20           MR. FIELDER:  I'm looking at the *Lance v. Coffman*

21  case now, and I thought that we addressed not necessarily

22  that case particularly, and I apologize for that, but we

23  addressed the issue of standing throughout our pleadings that

24  this is not a generalized grievance.

25           In that case, there was a reapportionment of the

1   districts, and certain people objected, and the court found

2   that that was a generalized grievance.

3          In our pleadings, we've articulated that this is a

4   completed Constitutional right violation.  And these aren't

5   particularized grievances, that they're separated.  They're

6   separated based upon the status of the registered voter to be

7   secure in their vote, to make sure it counts, to make sure

8   that others, particularly private entities that have been

9   made into state actors.

10          Your Honor, this isn't a conspiracy theory.  We

11  were very careful in our complaint.  This has nothing to do

12  with Trump or the Capitol.  In fact, we predicted that things

13  like that would happen in our complaint because we knew that

14  when you have elections that nobody trusts, and that the

15  population I would admit generally is damaged, but the

16  registered voter is the one that has the standing.  Not just

17  to bring a generalized grievance, but an injury.

18          The election happened.  The individuals in the

19  *Lance v. Coffman* case couldn't point to how they had been

20  injured by the redistricting.  But we articulated how our

21  clients were injured specifically by the conduct of the

22  Defendants.  We can't allow this to continue to happen in our

23  Presidential elections.

24          This is state action, and it's interwoven with the

25  issue of standing.  If they're not state actors, then

1  standing would be very difficult to prove.  But if they are

2  state actors -- and we've just mentioned the nominal damages

3  cases to establish that nominal damages are all that are

4  required.

5          However, we have now over 400 affidavits from

6  registered voters from 47 states.  How can those people be

7  frivolous?

8          We're about ready to file a motion to join where

9  we put all of the affidavits in.  We're not trying to

10 overload the Court with papers.  But all of these people feel

11 very passionate --

12          THE COURT:  Can I stop you for a second?

13          MR. FIELDER:  Their rights have been violated.

14          THE COURT:  Can I stop you for a second, Mr.

15 Fielder?

16          MR. FIELDER:  Yes.

17          THE COURT:  So when we started here, you said Mr.

18 O'Rourke did vote.  I'm looking at his affidavit, paragraph

19 11, "I have, for the previous two Presidential election

20 cycles, not voted, as it was my firmly held belief that my

21 vote would be altered, deleted, or fractionalized, based on

22 the will of some other entity or actor."

23          So he's swearing under oath that he didn't vote in

24 the previous two election cycles.  I'm assuming that he --

25 you entered this in the Court when you filed the complaint in

1 December, so that would have included the election cycle of

2 President Trump.

3          So that's why I said that.

4          But in answer to your question, how could 400

5 people --

6          MR. FIELDER:  I talked to Mr. O'Rourke, and there

7 might be some confusion.  He may be talking about the two

8 previous election cycles.  I thought that he voted.  I mean,

9 the overwhelming majority of our clients have voted.

10          THE COURT:  Okay.

11          MR. FIELDER:  And now there's over 400, and the

12 overwhelming majority voted.

13          THE COURT:  Did 400 people who have this belief,

14 that's not helpful.  It's not evidence.  It's not evidence of

15 injuries, for sure.

16          And when you say this isn't about Trump, either in

17 your original complaint or your amended complaint, you

18 included a Tweet that he sent out saying, you know, "stop the

19 steal," or "this election has been stolen."  That tends to

20 take away from the persuasiveness of your argument that this

21 isn't about some political statement to defend the

22 President's view that the election was stolen from him.

23          The other question I have is that you focused in

24 on this Time magazine article, "The Secret History of the

25 Shadow Campaign That Saved The 2020 Election."

1          I think in docket number 40, which is a response

2    to motion to dismiss, you cite that article saying "well,

3    Time magazine doesn't print conspiracy theories unless

4    they're true."  I think that's a quote from your brief.

5          What is it about this article that is

6    demonstrative or supportive of your claim?  It describes an

7    effort by -- and I read it, because you wanted me to.  It's

8    cited in your complaint and your amended complaint, so it's

9    part of the complaint.

10          It describes in great detail seemingly a

11   bipartisan effort on behalf of labor and business and non-

12   profit organizations and municipalities to try and make sure

13   that the vote happened, was secure, that COVID-19 didn't

14   prevent people from getting to the polls.

15          There's nothing in here that describes any

16   illegality at all, and yet you seem to be basing much of your

17   complaint on some kind of conspiracy, as shown by this Time

18   magazine article.

19          So you've got to educate me about why you cited

20   it, and what is it about that article that you think proves a

21   RICO claim.

22          MR. FIELDER:  Well, first of all, we are talking

23   about our precious elections, and so although the article was

24   written from the perspective of those who claimed to have

25   saved democracy, just like the counsel here on behalf of the

1  parties can make passionate arguments on behalf of their

2  Defendants, it basically established that there were a huge

3  group of people that had almost unlimited amounts of money,

4  which includes Facebook.

5          Facebook was right in the middle of this election.

6  Now, normally as a private company, that would not be of

7  concern.  But when their CEO is becoming involved in the

8  election process under the disguise of COVID, it's not a

9  conspiracy theory.  That's degrading to call our position a

10 conspiracy theory.

11         I just mentioned that because it's the magazine of

12 record.  It's not a right wing publication or a publication

13 that we don't trust, much like the New York Times is the

14 paper of record.

15         So when Time magazine outlined all of this

16 information with regard to specifically how individuals

17 interacted with the public function of elections, not just to

18 make sure that Mr. Trump didn't poison the well by his

19 misinformation, but to support their candidate.

20         That was just the admission that we needed to

21 establish that all of this really is true.  They really did.

22 That is to say that Defendants here, they really did infuse

23 all of these municipalities and cities without state

24 regulation, with money, concerning the election, and it was a

25 Presidential election.

1          And although --

2          THE COURT:  So let's accept that as true.  Money,

3 millions of dollars, was given to municipalities.  We heard

4 from the Center's lawyer that it was done without regard to

5 partisan views, but accept it as true that millions of

6 dollars was given to municipalities so that they could use it

7 for election purposes.

8          Do you think the municipal officials were in on

9 it, too, that this was all part of a plot to somehow -- I

10 mean, what is it that's illegal about any of this?

11          And part of the Defendants' motion to dismiss,

12 whether it's Facebook, saying "look, our contributions to the

13 non-profit, that's protected First Amendment activity."  The

14 Center says "nothing that we did is illegal.  It's been

15 challenged in multiple courts across the country, and no

16 court has found that what we did was improper."

17          So what is it about this -- let's call it a

18 conspiracy or an agreement, or -- what is it that's illegal

19 about that?  Yes, it had to do with the election, but if a

20 whole bunch of people want to go out and say "hey, let's rock

21 the boat, let's make sure that folks who are scared to go out

22 because of COVID, they have an opportunity to vote, too."

23          What's illegal about that?

24          MR. FIELDER:  It's illegal in a number of

25 different ways.

1        First of all, there's a lack of equal protection.

2  It's normally the government giving out grants, not the other

3  way around, where private individuals can say "well, anyone

4  who applies could have gotten grants."  But not every

5  municipality wanted to apply or county anted to apply.

6        And so they recruited -- this is all the facts of

7  the case.  CTCL recruited certain mayors and recruited

8  secretaries of state.  This is all in the record.  To get

9  others to take these loans.

10       Once they got the loans, part of the tit-for-tat,

11 part of the consideration, was for the government entities to

12 give up the data, to sharing the voting lists, and that's

13 information that was used by CTCL, by Facebook, and others,

14 to know where to target, to execute some of the very

15 problematic statistical anomalies that have arisen in all of

16 these swing states, all of which has been documented by

17 dozens and dozens of expert witnesses in the cases which,

18 although they may have been dismissed over the last three or

19 for months, ours is the only case which is not coming to the

20 Court asking for extraordinary relief.

21       So it was the redressability element, Your Honor.

22 The Court didn't have -- the Federal Courts didn't have

23 within their remedial powers to go tell a sovereign state

24 what electors to send to Washington.

25       This isn't about overturning the election.  We've

1  never suggested that.  We've never attempted to say that, nor

2  have we come to you, Your Honor, asking for extraordinary

3  relief.

4          If a person like Mr. Wood, who I've never talked

5  to Len Wood, I've never talked to Sidney Powell, or any of

6  these people.  If Len Wood asked for extraordinary relief,

7  then he doesn't have the standing to tell a sovereign state,

8  that is the State of Georgia, to decertify an election or

9  send certain electors.

10          Nor does that person have standing to ask the

11  Federal Court to give that remedy.

12          However, if as a class and as individuals evidence

13  is presented that individuals in concert with other people,

14  like CTCL, Dominion, Mark Zuckerberg, and many others,

15  influenced public officials, had access to data.

16          Now there's information that members of CTCL had

17  access to ballots.  All of this is coming out.  These are

18  Constitutional rights violations.

19          And I understand counsel.  They might disagree.

20  They can call it frivolous, but it's not frivolous to us.

21  It's everything to us.

22          So we've given the Court all of this information

23  to show that we're not acting frivolously.  I understand the

24  Court's articulation of how it normally works, but this

25  election was not normal.

1    All of those other cases involved plaintiffs

2 coming to Federal Court or other courts asking for

3 extraordinary relief, meaning the burden of proof was

4 different, their claims were different, and they were against

5 different parties; that is mostly sovereign states, because

6 the actors were sued in their official capacities.

7    So all of those states are different than this

8 case.  This is a typical class action where either private

9 parties or individual government actors -- a state can't be

10 sued, but individual government actors violated the

11 Constitutional rights of others.

12    And it's a big class, but it's a class that can be

13 sub-divided.  Every person is from a state, and your right to

14 vote is a political right, so you're either a Texan

15 Republican or a New York Democrat, or an Alaskan third party,

16 or a Washington Independent, all of which are different from

17 state-to-state and/or a disgruntled voter.

18    THE COURT:  So we're going to have 50 sub-classes

19 for every state, and within each state we're going to have

20 sub-classes of Democrats, Republicans, and Independents?  So

21 that's 150-200 sub-classes?

22    MR. FIELDER:  Well, they're not that -- there are

23 a lot of sub-classes, but they're not that hard to keep track

24 of because although it is a very serious and big case, the

25 Anderson -- the Secretary of State of Ohio case indicates

1  that there is a national right, and the actions of entities

2  in one state can affect the actions of persons, voters, in

3  another state.

4          So although there may seem to be a number of

5  different classifications, there are millions of people that

6  not only believe that the election was rigged, that's not the

7  point, although books are being written about it now, Your

8  Honor.  Books are being written about it.  None of it is

9  frivolous.  It all needs to be investigated, and it's mostly

10  already out there in the terms of the affidavits, expert

11  reports, articles that are attached to those other lawsuits.

12          THE COURT:  Let me ask you a question?

13          MR. FIELDER:  So although --

14          THE COURT:  Can I ask you a question?

15          MR. FIELDER:  Yes.

16          THE COURT:  Assuming I'm not persuaded by your

17  standing argument with respect to the original complaint,

18  what is it about the amended complaint, if anything, that

19  changes your position on standing?  What cures the standing?

20  If I accept Defendants' arguments that there's no standing

21  with respect to the original complaint, is there anything

22  about the amended complaint that cures the standing problem?

23          MR. FIELDER:  Well, we didn't attach the -- hold

24  on.  I may have gotten the volume back.  But that's okay, I'm

25  going to keep talking to my phone.

1    We may have addressed the issue through the
2  inclusion of all of the affidavits, but we didn't want to
3  just attach 150 affidavits.
4    But now that we have over 400 affidavits, we feel
5  like we have to because every individual has a story as to
6  the gas mileage, or the time off work, or the time that they
7  took to vote.  All of that as a compensatory damage.
8  Everyone is feeling like -- when I say everyone, our clients
9  are feeling like their right to vote was violated.
10    And so when you have these numbers, when you have
11  these kinds of serious numbers, now 400, soon to be 4,000,
12  soon to be 40,000.  We've said this before, Your Honor.  Then
13  those people can't be denied.  You can just look at them and
14  say "get over it, your candidate lost."
15    For some of the people, they didn't vote for Mr.
16  Trump.  This is not about Mr. Trump.  This is about
17  everyone's precious right to vote.
18    And so if private entities can just target six
19  cities and win practically every Presidential election
20  without the ability of the voters to, in unison, say
21  "enough," you can't do that.  That violates all of our
22  rights.
23    You can't just put money in certain
24  municipalities.  That's a violation of equal protection.  You
25  can't fractionalize votes, or allow foreign entities to flip

1    votes, or delete votes.  You can call that vote dilution, but

2    the changing of votes through algorithms and other known risk

3    associated with these voting machines, affects everyone's

4    ability and right to vote.

5              THE COURT:  So let's vote here or there was

6    changed, whether it was intentionally or not.  It's done.

7    It's over.  The vote has been certified.

8              MR. FIELDER:  It's done.

9              THE COURT:  And so what are we talking about?  Why

10   don't you tell your clients, "you know what, let's move

11   forward.  And if you didn't like the outcome of this

12   election, let's figure out a way to either change the

13   candidate or change the message, and your party will win next

14   time.  We'll get out the vote for your guys, and move

15   forward."

16             What are we doing here?  It's over.  I'm not going

17   to be able to solve any problem.

18             MR. FIELDER:  What we're doing here is ensuring

19   the future of the country.  That's what we're doing here.

20             We can't solve everything, but to allow, for

21   example, Dominion.  I could talk about Facebook and their

22   censoring, the fact that they're a town square, they're a

23   public forum.  Even Justice Thomas said Section 230 is ripe

24   for review.

25             These are all matters that need to be brought to

74

1  the Court by people not with a generalized grievance, but

2  with a right to vote.  A heartfelt right to vote, outlined

3  there --

4         THE COURT:  Let me ask you a question on

5  traceability, because you mentioned Facebook is censoring,

6  Section 230, and then you went right to right to vote.

7         How in any of the complaint -- or any of the

8  affidavits of the -- that you did attach, is there a link

9  between Facebook's either pushing of certain messages or

10  censoring in others, and in interference with -- let's pick

11  Ms. -- the Colorado lady.  How did anything that Facebook do

12  affect Ms. Cutunilli's right to vote?  I think it goes to the

13  traceability issue.

14         MR. FIELDER:  Yes.  Well, Facebook had a major

15  impact on the election itself, which might ordinarily be

16  okay, as long as they're in the private realm.  But they

17  didn't stay in the private realm.

18         Their CEO, Mark Zuckerberg, took it upon himself

19  to make sure his candidate won.  We all know that Facebook is

20  being sued by the Federal Trade Commission.  They're being

21  sued by the 49 attorneys general for essentially anti-trust

22  Sherman Act, because they used their power to buy up their

23  competitors and they used their influence to exert their

24  realm.

25         Well, that's what happened here.  If they were

 1  just social media, and if -- if they were just social media,

 2  that would be one thing.  But when their CEO is actively

 3  pouring money to a so-called non-profit to get the data from

 4  these municipalities, get out the vote only in those certain

 5  municipalities, and if they were carried by --

 6          THE COURT:  So I'm confused.  I'm confused.

 7  Facebook is different from Mark Zuckerberg.  Mark Zuckerberg

 8  gave money to the Center, but you're suing Facebook, and

 9  you're claiming that Facebook --

10          MR. FIELDER:  Right.

11          THE COURT:  -- based on their censorship or

12  pushing of --

13          MR. FIELDER:  Right.

14          THE COURT:  -- somehow interfered with, and I'm

15  looking at the affidavit of Lori Cutunilli, she's a Plaintiff

16  in the case, --

17          MR. FIELDER:  Right.

18          THE COURT:  How did what Facebook do, how is Ms.

19  Cutunilli's injury to her right to vote traceable to the

20  allegations against Facebook for not allowing QAnon to

21  publish something, or not allowing some anti-vaccine person

22  to publish something?  Help me understand how her vote was

23  affected by what you allege Facebook was doing.

24          MR. FIELDER:  Well, her vote is like just about

25  everyone else's vote.  When you have a huge social media

1  company that has such a broad outreach, and they are just for

2  one example a thousand suppressing the story with regard to

3  one of the candidate's son, Hunter Biden.  That was a story

4  of public interest.  It should have been publicized.  They

5  chose not to do it.  Why?  Well, because that supported their

6  position.

7          If they were a private actor, that would be okay.

8  But, they participated in concert with their CEO.  They were

9  in concert with CTCL.  They were in concert with a

10  progressive movement.

11          And it wasn't just by accident that the people

12  that they were censoring stood for not only a conservative

13  position, but every other adverse or different opinion.

14          And it's really not about QAnon or vaccines, but

15  people have a right to talk about those types of things.

16          So when these huge social media platforms, which

17  are interacting through their chief executive officer with a

18  public function, then they transform themselves into a state

19  actor.

20          And that's the side of public forum argument which

21  is already being articulated by others separate and apart

22  from state action.

23          So, of course they have an enormous impact on the

24  Presidential election.  Any time they can censor one view and

25  support another view, that has an impact.  If they were

1  private actors, that would be okay.  But they worked in

2  concert with others to certify the election, but really

3  interfere with it and get their candidate to win.  That's a

4  violation of the Constitution.  The voters have been damaged.

5          THE COURT:  Okay, Mr. Fielder.

6          MR. FIELDER:  Some more than others.

7          THE COURT:  We've been going for about 45 minutes.

8  I'm going to give the other side a chance to rebut, so I'm

9  going to give you three minutes now, and I'm not going to

10  interrupt you, and you can say anything you want to support

11  your position.

12          One question I typically ask people when I have

13  oral argument:  What's the one case, if there's one case,

14  that supports your position that you want me to read, what

15  case would that be?  And feel free to give me a couple.

16          But on the issue of standing, what's the case

17  that's most supportive of your position?  And if I read it,

18  the light bulb will go on in my head and I'll say "oh,

19  Fielder is right.  This is the money shot here."

20          MR. FIELDER:  I would direct the Court to two

21  cases that I'm sure the Court has already read.

22          The *Terry v. Adams* case is a big case involving

23  African-Americans in the early 1950s that accused the Jaybird

24  Democratic Association of being a private -- excuse me, a

25  state actor.  They said they were only conducting a straw

1    poll.

2                Well, the Supreme Court found that they were in

3    state action.

4                I would ask the Court to review *Anderson v.*

5    *Calabrese,* the Secretary of State of Ohio, wherein the

6    Supreme Court stated that it's a national right that we have,

7    and the one election only that everybody in the nation

8    participates in, and that national right transcends the

9    actions of someone in one state which might impact a

10   plaintiff in another state.

11               This is a somewhat unusual approach, but on the

12   other hand, it's a legal approach wherein the registered

13   voters are coming to the Court as a class, not for a

14   generalized grievance, but for a completed Constitutional

15   right violation.

16               We've already mentioned the case that -- out of

17   the Supreme Court that was recently decided.  And I can't

18   pronounce the name either, but that's the case that starts

19   with a U.

20               And that case is vitally important because

21   although legislatures, which across the country are now

22   changing their laws to stop private funding, those are sort

23   of subsequent remedial measures, that clearly is evidence

24   that the private entities that did involve themselves in this

25   election should not have happened.

1        So those cases stand for the proposition that

2   individuals can come to Court and seek redress.

3        *Brown v. Board of Education,* which is decided

4   right after the *Terry v. Adams* case, I think was 17 African-

5   American families that came in a class action to stop Topeka

6   from segregating students.

7        So individuals can come to Court in a class,

8   asserting their rights individually and for those similarly

9   situated, to ask for a redress of grievances.  And that's all

10  we meant by an assembly, is that the First Amendment gives us

11  all the right to assemble and speak and petition for redress

12  of grievances.

13        THE COURT:  So you really think *Brown v. Board of*

14  *Education,* the case that did away with separate but equal and

15  allowed African-Americans to attend schools, that's similar

16  to the situation of your clients who feel aggrieved because

17  somehow their right to vote wasn't -- was discounted in some

18  way, in the same way that every other registered voter's

19  right to vote was discounted?

20        MR. FIELDER:  Not every other registered voter,

21  because some people win on elections that are weighted one

22  way or the other.

23        However, it's an important right.  And I'm not for

24  a second going to concede that the right to vote isn't as

25  most precious as any other right that exists.

1     And so in that regard, there is a serious issue

2  concerning private entities involving themselves in local

3  elections, social media companies participating in a

4  concerted effort to have one candidate or the other win.

5  Maybe it's a conservative candidate the next time.

6     There is a Constitutional concern whether private

7  individuals, such as Mark Zuckerberg, can interfere with an

8  election.

9     But more than anything, the proprietary nature of

10 this software is ruining the country's ability to have a

11 stake in their electoral process.

12    What's going on right now, Your Honor, in Maricopa

13 County can't be ignored.  I just put the case in the

14 pleadings yesterday because the case was only filed a couple

15 of days ago.  The Democratic party against one of the state

16 legislatures, trying to stop the forensic analysis of 2.1

17 million votes in Maricopa County.

18    Things like that haven't happened in our country's

19 history.  So what if the result of that audit are positive to

20 the Plaintiffs?  And, of course, it will be.  Well, then

21 where are going to be?  Well, we're going to be right back to

22 our original claims, because all of this is foreseeable.  All

23 of it.

24    THE COURT:  So let's clear that up.  Let's say

25 Arizona does do an audit and they find that there were

1   errors.  So what?  How does that change this lawsuit?  Then

2   they'll try and fix it for the next election.  It's not going

3   to remove the President.  It's not going to do anything.

4   It's going to cause -- you know, the legislature is doing an

5   investigation.  The legislature will decide what the results

6   mean.  Maybe next time they won't hire Dominion.

7           But what does that have to do with us in this

8   lawsuit and what your clients are claiming?  In theory,

9   that's how it should work.  Legislature should do an

10  investigation, the Attorney General should look at things,

11  they'll see what worked, they'll see what didn't work, then

12  they'll change it for the next one and try to do better.

13          But bringing a lawsuit and having a judge declare

14  "oh, you know," do you want -- so is it your proposal here --

15  let's say the motion to dismiss is not denied, and we go

16  forward and we do a scheduling order.  What exactly do you

17  anticipate discovery will be?  You subpoena everybody from

18  the Center, you want to do -- get the proprietary software

19  from Dominion and find out what that's about.

20          How is this lawsuit going to work exactly?  Are

21  the Defendants supposed to depose your 400 Plaintiffs?

22          MR. FIELDER:  I'm sorry, I missed that last --

23          THE COURT:  The last question is:  Are the

24  Defendants supposed to depose your 400 Plaintiffs and ask

25  them about their thoughts and feelings about why they feel

82

1    their vote wasn't counted?  I mean, how -- this isn't

2    something -- a problem that a Court can solve, is my sense.

3              How do you foresee this lawsuit planning out?

4              MR. FIELDER:  Well, a couple of different things.

5              First of all, there's been damage to the

6    Plaintiffs and a lot of other people.

7              For example, in the *Brown v. Board of Education*

8    case, --

9              THE COURT:  No, I don't want to hear about *Brown.*

10   Answer my question:  If we get to a scheduling order, --

11             MR. FIELDER:  I am.

12             THE COURT:  -- how many depositions are you going

13   to take?  How many interrogatories?  Who are you going to

14   depose?  How long is the discovery period going to last?

15             Tell me.  How do you foresee this lawsuit actually

16   working?

17             MR. FIELDER:  I foresee it working over time.  I

18   think that it should be declared a complex lawsuit.  But it

19   will be much like other class actions where there are

20   literally millions of clients that have been affected, and

21   there might be hundreds of depositions.

22             Certainly there are thousands and thousands of

23   emails showing the connectivity between Dominion and state

24   actors, CTCL and state actors, Facebook has integrated itself

25   in these state governments to such a way that all of that's

83

1  going to be issues concerning in the case.

2        For example, in Maricopa, if it's determined that

3  there was voter fraud, election fraud, in Arizona, there will

4  nothing anyone can do about it to change the presidency.

5        However, that will cause damage.  As will the

6  revelations that are being made in other cases which have not

7  been dismissed in Atrium County and other investigations in

8  New Hampshire.

9        People will be damaged.  Their faith in the system

10  will be damaged.  And $1,000.00 per person is a nominal

11  amount when it comes to your right to vote, which is

12  priceless.  That's a jury question.  I don't think the Court

13  should take it out of the jury's determination.

14        But yes, it will be a complex case like many class

15  actions involving tens of thousands of people who have been

16  harmed by either a product or a credit card company or breast

17  implant manufacturer.  There are tons of people that are

18  affected in those types of situations, and it will be very

19  complex.

20        This is very serious.  And to be called frivolous,

21  even with passion, is an insult to me and my clients.  We're

22  taking this very seriously.  It won't be easy.  And others

23  will have to be involved as the case grows.

24        But we're officers of the Court, we're coming to

25  the Court not as conspiracy theorists or any movement.  I

 1  haven't talked to any of those people.  We are representing

 2  clients that know their rights have been aggrieved, and we're

 3  coming to the Court to --

 4        THE COURT:  So hold on a second.  You say you know

 5  their rights have been aggrieved.  That hasn't been proven.

 6  Let's say it plays out and it turns out there hasn't been

 7  anything wrong.  Are your clients going to accept that and

 8  say "well, we took it to court, and the court did an

 9  investigation."

10        I don't think anything that the Court determines,

11  whether you win or whether you lose, your clients aren't

12  going to change their view.  They feel that way.

13        I'm just looking at Ms. -- you know, she just

14  feels that her right to vote has been adversely affected,

15  dramatically affected by the following states, accepting

16  bribes through the Center for Tech and Civic Technology.

17  You're not going to change her mind.  She just feels that

18  way.

19        A lawsuit is not -- you don't always win lawsuits,

20  you know, Mr. Fielder.  Sometimes you lose after you get to

21  trial.

22        MR. FIELDER:  Well, sometimes you lose.  I'm sure

23  that the individuals that were harmed by tobacco companies

24  knew that they could lose, or if they were harmed by Round Up

25  by the millions of people, they knew that they could lose.

1          But those cases still went forward, and people

2   still were able to make their claims.

3          And the other cases, the *Wilderness* case in terms

4   of people believing that their view was being distorted.

5   Well, they've been damaged.  They're coming to the Court to

6   ask for redress of grievances.

7          We wouldn't have standing to ask you to stop the

8   vote or send certain electors to Washington.  But if people's

9   rights have been damaged by private companies who, in

10  concert, have performed deeds in our complaint, almost every

11  paragraph has to be admitted.  That's why I put so many

12  footnotes in there, because you could call me a plagiarist,

13  but I was citing the information from where we got the

14  source.

15         So when 19 to 20 states, sovereign states, go to

16  the Supreme Court and outline by name state actors who

17  violated the Constitution, the State of Texas didn't have

18  standing, but that doesn't mean that individual voters in a

19  class in Texas can't sue the private entities involved in

20  this situation.

21         So that was one --

22         THE COURT:  Well, why doesn't it?  If the State of

23  Texas doesn't have standing to sue Pennsylvania, why on earth

24  would individual voters who are alleging the same kind of

25  injury to their right to vote be able to sue secondary

1  participants in the election process?  That doesn't make

2  sense.

3           MR. FIELDER:  They really weren't secondary.  They

4  were in joint action together, and they created a symbiotic

5  relationship.

6           We've engaged in the intellectual exercise of the

7  standing and state action arguments where I could same the

8  same about the Defendants that they don't want to talk about

9  public function.

10          So if there's state action, and I just lost my

11  concentration a little bit there.  Oh, the State of Texas.

12  We cannot have a sovereign state coming to court and asking

13  the court to tell another sovereign state what to do with

14  regard to its election.

15          This is totally different.  These are individuals

16  as a class suing individuals.  We dismissed those claims, but

17  they were righteous.  We just didn't have, we felt, personal

18  jurisdiction to a certainty.

19          However, it's very common for individuals to sue

20  corporations or other private individuals separate and apart

21  from sovereign states.

22          Of all of those cases that named the governors and

23  secretaries of state in their official capacities were just

24  suing the state.  Suing the State of Pennsylvania.  Suing the

25  State of Michigan.  That requires enormous amounts of

1   evidence.

2            THE COURT:  You've used your five minutes.

3            MR. FIELDER:  Thank you.

4            THE COURT:  Okay.  Thank you, Mr. Fielder.  I'll

5   have a brief rebuttal, starting with Dominion.

6            MR. GARNETT:  Thank you, Your Honor.  It's Stan

7   Garnett on behalf of Dominion.  I'll be very brief.

8            Let me first simply say, however, that counsel

9   said several times that his theories are not conspiracy

10  theories.  They certainly sounded that way in the argument.

11           Regardless, I think it's important that we state,

12  given that we've had to listen to these allegations about

13  Dominion for an hour, that Dominion is an excellent company.

14  It has been vindicated by every legitimate certified audit of

15  its results that has ever been done.  They have done terrific

16  work, and they will continue to do terrific work.

17           And allegations like this in these lawsuits are

18  very damaging, continue to be damaging, to an excellent

19  company that provides great service.

20           Now, with regard to the legal argument, let me

21  simply say this, Your Honor:  Everything counsel said

22  underscores the problems with standing.  Everything is about

23  a generalized grievance.

24           In fact, he himself called it a generalized

25  grievance several times in his argument.  The Court asked

88

1    what case is most applicable.  Obviously, *Wood v.*

2    *Raffensperger* is an excellent case, but without any doubt the

3    Colorado case *Lance v. Coffman* is a terrific case, deals on

4    all fours with the issue of standing, the Court need go no

5    further than that case, which was, in fact, a per curiam U.S.

6    Supreme Court decision in 2007.

7             THE COURT:  Let me ask you quickly, Mr. Garnett.

8    Plaintiffs' counsel seems to emphasize "well, all of those

9    other election related standing cases were suits against

10   states or states actors, and in fact *Lance v. Coffman* was

11   against the Colorado Secretary of State."

12            Here, we're suing private entities, and that's

13   okay.  So that's a distinction that they draw there.  Private

14   entities are not state actors in -- sorry, state government

15   officials.

16            What do you say to that?

17            MR. GARNETT:  Sure.  What I say to that, Your

18   Honor, is every one of the standing cases do not recognize

19   that distinction.  That is simply not a distinction that

20   exists in any of the analyses of the United States Supreme

21   Court.

22            It may be a distinction that counsel wants to

23   make, but the reality is you still have to bring to a Federal

24   Court a case or controversy under Article III, Section 2,

25   Clause 1, of the United States Constitution.  They've failed

 1   to do that in this case.

 2          The mere fact that one case may be seeking one

 3   kind of relief, and another this, and I would note that --

 4   you know, and I think I commented previously.  Who knows what

 5   their $1,000.00 in nominal damages would be tied to and how

 6   they'd come up with that.

 7          But it doesn't make any difference for the issue

 8   of standing.  You still have to have a case or controversy

 9   that meets the three clear standing requirements.

10          THE COURT:  Thank you.  I'll hear from Facebook

11   now.

12      (Poor connection issue causing distorted audio)

13          MR. LIPSHUTZ:  Thank you, Your Honor.  I only have

14   one point that I want to make, which is -- in any of this two

15   hours and change of arguing, how it has anything to do with

16   Colorado.  And that's why Defendants should be dismissed from

17   this case for lack of personal jurisdiction on their claims

18   against Facebook.

19      (Unable to understand what is being said)

20          MR. LIPSHUTZ:  From the United States Supreme

21   Court -- headquartered in California.

22          Facebook is not a Colorado company.  It's not

23   subject to general jurisdiction here.  We would ask the Court

24   to dismiss Facebook for lack of personal jurisdiction, in

25   addition to any other grounds that the Court deems necessary.

90

1          THE COURT:  And for the Center?

2          MR. MATZ:  Thank you, Your Honor.  Just a few

3   brief comments to add.

4       (Poor connection issue causing distorted audio)

5       (Unable to understand what is being said)

6          THE COURT:  Okay, thank you.  So the motions to

7   dismiss by Dominion, Facebook, and the Center, will be taken

8   under advisement, as will the Plaintiffs' motion to amend the

9   complaint.

10          The motion to take judicial notice has been

11  denied.  I'm only going to be consider the materials that

12  were provided in connection with the motions to dismiss and

13  the motion to amend.

14          Is there anything else, Plaintiffs' counsel, that

15  you'd -- any other housekeeping matters or any other things

16  that we -- that I need to address today?

17          MR. FIELDER:  No, Your Honor.  Thank you.

18          THE COURT:  Okay.  Defense counsel for Facebook,

19  anything further?

20          MR. LIPSHUTZ:  Nothing further, Your Honor.

21          THE COURT:  Mr. Garnett, anything further for

22  Dominion?

23          MR. GARNETT:  Nothing, Your Honor.  Thank you for

24  your time today.

25          THE COURT:  Okay.  And for the Center?

1          MR. MATZ:  No, Your Honor.  Thank you for your

2     time.

3          THE COURT:  Okay.  Thank you very much for the

4     arguments.

5          Like I said, I'll take it under advisement.  I

6     hope to get out a decision shortly.

7          We'll be in recess.

8                    (Time noted:  4:22 p.m.)

9                         *  *  *  *  *

10                        CERTIFICATE

11        I, RANDEL RAISON, certify that the foregoing is a

12    correct transcript from the official electronic sound

13    recording of the proceedings in the above-entitled matter, to

14    the best of my ability.

15    

16    

17    _____          April 30, 2021

18    Randel Raison

19    

20    

21    

22    

23    

24    

25