No. 21-1161

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

KEVIN O'ROURKE, et al.,

Plaintiffs-Appellants,

vs.

DOMINION VOTING SYSTEMS, INC., et al.,

Defendants-Appellees.

---

On Appeal from the United States District Court for the District of Colorado
Civil Action No. 1:20-cv-3747
U.S. Magistrate Judge N. Reid Neureiter

---

## APPELLANTS' OPENING BRIEF

---

Gary D. Fielder, Esq.
1444 Stuart St.
Denver, CO 80204
(p) 303-650-1505
gary@fielderlaw.net

*Counsel for Plaintiffs-Appellants*

Oral Argument is requested

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………….. i

TABLE OF AUTHORITIES …………………………………………………… i

INTRODUCTION………………………………………………………………1

STATEMENT OF JURISDICTION………………………………………………1

ISSUES PRESENTED…………………………………………………………….. 1

STATEMENT OF THE CASE

    I.    Historical Background………………………………………….. 2

    II.    Statement of Facts……………………………..............7

    III.    Procedural History…………………………………………… 20

SUMMARY OF ARGUMENT…………………………………………………...23

ARGUMENT……………………………………………………………… 24

    I.    The Plaintiffs have Article III standing …………………………… 24

        A.    Standard of Review...................................................24

        B.    Standing…………………………………………………… 24

        C.    Injury in Fact…………………………………………………25

        D.    A Constitutional Infringement is an Injury in Fact………….. 30

        E.    Causation…………………………………………………… 33

        F.    Redressability…………………………………………………… 34

G.      Plaintiffs Are Only in the Pleading Stage……………………. 34

II.    The District Court Erred by Dismissing the Plaintiffs'
       Complaint for Lack of Subject Matter Jurisdiction………………. 37

       A.      Standard of Review...............................................................37

       B.      Lack of Subject Matter Jurisdiction…………………………..37

       C.      Accepting Well Plead Facts as True…………………………39

       D.      The Cases Relied Upon By the District Court Are Not
               Determinative Regarding the Standing of the Plaintiffs……...41

III.   The District Court Erred by Denying the Plaintiffs' Motion
       To Amend Their Complaint as Futile ……………………………… 50

       A.      Standard of Review...............................................................50

       B.      The District Court Abused Its Discretion……………………. 50

CONCLUSION………………………………………………………….. 53

ORAL ARGUMENT STATEMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDUM

CIRCUIT RULE 28.2(A)ATTACHMENTS

       District Court Opinion and Order

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)……………………………………… 5, 26

*Bailey v. Antrim County*, Case No. 20-9238-CZ (13th Cir. Ct. Mich)……………17

*Baker v. Carr*, 369 U. S. 186 (1962)…………………………………………..25

*Bauchman v. West High School*, 132 F.3d 542 (10th Cir. 1987)…………………..50

*Bell v.* Hood, 327 U.S. 678 (1946)………………………………………….. 38

*Bognet v. Secretary Commonwealth of Pennsylvania,*
     980 F. 3d 336, 348 (3rd Cir. 2021), *cert granted*
     *and judgment vacated with instructions to dismiss as*
     *moot.___*S.Ct.___(2021)………………………………………………... 30

*Bognet v. Degraffenreid*, ___S.Ct.___(2021) ………………………………………30

*Bowyer v. Ducey*, Civ. No. 20-cv-2321, 2020 WL 7238261 (D. Ariz. 2020)…….44

*Bush v. Gore*, 531 U.S. 98 (2000)…………………………………………..28

*Butler v. Kempthorne*, 532 F.3d 1108 (10th Cir. 2008) …………………………...37

*Castaneda v. INS,* 23 F.3d 1576 (10th Cir. 1994) ………………………….37

*Carey v. Piphus*, 435 U.S. 247 (1978)…………………………………………32

*Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571 (10th Cir.1993)……… 51

*Com'rs of County of Arapahoe, Colorado*, 633 F.3d 1022 (10th Cir. 2011)……... 36

*Curling, et al., v. Raffensperger, et al.,*
     Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.)………………………15

*Donald J. Trump for President, Inc. v. Boockvar*,
  493 F. Supp.3d 331(2020)…………………………………………….... 34-36

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991)……………………… 39

*Ex Parte Siebold*, 100 U.S. 371 (1879)……………………………………….... ...
  27

*Ex Parte Yarbrough*, 110 U.S. 651 (1884)……………………………………….27

*Ex Parte Young*, 209 U.S. 123 (1908)…………………………………….. 44, 45

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 (1978) …………………………… 5

*Fairchild v. Hughes*, 258 U.S. 126 (1922)…………………………………….43

*Feehan v. Wisconsin Elections Commissions*,
  506 F.Supp.3d 596 (E.D. Wis. 2020) …………………………………...44

*First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*,
  820 F.2d 1127 (10th Cir. 1987) …………………………………………….50

*Foman v. Davis,* 371 U.S. 436  (1962) …………………………………………….51

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995)……4, 39

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) …………………………………… .29

*Gray v. Sanders*, 372 U.S. 368 (1963) …………………………………………….29

*Grossman v. Novell, Inc.*, 120 F. 3d 1112 (10th  Cir. 1997) ……………………... 52

*Guinn v. United States*, 238 U. S. 347 (1915)…………………………………….27

*Hafer v. Melo*, 52 U.S. 21 (1991) …………………………………………….45

*Hennigh v. City of Shawnee*, 155 F.3d 1249 (10th Cir. 1998) ……………………12

*Holt v. United States*, 46 F.3d 1000 (10th Cir. 1995) ……………………………….37

*Iowa Voter Alliance v. Black Hawk County*,
    C20-2078-LTS. 2021 WL 276700 (N.D. Iowa 2021) ……………………..49

*Jackson v. Metropolitan Edison,* 419 U.S. 345 (1974) ………………………….. 40

*Kentucky v. Graham*, 473 U.S. 159 (1985) ……………………………………… 45

*King v. Whitmer*, Civ. No. 20-cv-13134, 2020
    WL 7134198 (E.D. Mich. 2020)......................................................45, 46, 47

*King v. Whitmer*, 141 S.Ct. 1449 (2021) ……………………………………… 47

*Klebanow v. New York Produce Exch.*, 344 F.2d 294 (2d Cir. 1965)……………51

*Kusper v. Pontikes*, 414 U.S. 51 (1973)………………………………………… 28

*Lance v. Coffman*, 549 U.S. 437 (2007)…………………………………………42

*Lane v. Wilson*, 307 U. S. 268 (1939) ………………………………………… 27

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) ………………………..33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ……………….. 25, 26, 33, 36

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) …………………………………..47

*McPherson v. Blacker*, 146 U.S. 1 (1892) ……………………………………..28

*Mountain View Pharmacy v. Laboratories*, 630 F.2d 1383 (10th Cir. 1980)…….. 51

*Muscogee (Creek) Nation v. Pruitt*, 669 F. 3d 1159, 1166  (10th Cir. 2012)……...44

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*,
    8 F.3d 1285 (10th Cir. 2005) ……………………………………………..38

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)……………….45

*Reynolds v. Sims*, 377 U.S. 533 (1964) ……………………………………… 27, 28

*Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26 (1976)……….. 33

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001) …………………………………37

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)…………………………………...26

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) …………………………..25

*Terry v. Adams*, 345 U.S. 461 (1953) ……………………………………… 5, 12, 40

*Texas Voters Alliance v. Dallas County*,
      495 F. Supp.3d 441 (E.D. Tex. 2020)…………………………………... 48

*Trackwell v. United States*, 472 F.3d 1242 (10th Cir. 2007)………………………37

*TV Communications Network v. Turner Network*,
      964 F. 2d 1022 (10th Cir. 1992)………………………………………51

*Texas v. Pennsylvania*, 141 S.Ct. 1230 (2020) ……………………………… 14, 43

*Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013) …………………………….47

*Transunion v. Ramirez*,  141 S.Ct. 2109  (2021) …………………………… 25, 26

*United States v. Classic*, 313 U. S. 299 (1941)………………………………... 27

*United States v. Mosley*, 238 U. S. 383 (1915)………………………………27

*United States v. Saylor*, 322 U. S. 385 (1944)………………………………27

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792  (2021) …………………… 32,  34, 52

*Ward v. Utah*, 321 F.3d 1263 (10th Cir. 2003) ………………………………24

*Warth v. Seldin*, 422 U.S. 490 (1975) ………………………………………24

*Wesberry v. Sanders*, 376 U.S. 1 (1964) …………………………………….27

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) ............................ 41
*Winsness v. Yocom*, 433 F. 3d 727 (10th Cir. 2006) .................................. 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)...........................46

**Statutes**

18 U.S.C. § 1962(c) ...................................................................52

28 U.S.C. § 1331(a) ...................................................................2

28 U.S.C. § 1332....................................................................... 2

28 U.S.C. § 1343.......................................................................2, 7

28 U.S.C. § 1291....................................................................... 2

42 U.S.C. § 1983....................................................................5, 7, 26, 33

42 U.S.C. § 1988......................................................................6

47 U.S.C. § 230(c).................................................................. 10,20

**Federal Rules of Civil Procedure**

Fed.R.Civ.P 12(b)(1) ...............................................................20, 37

Fed.R.Civ.P 12(b)(6) ...............................................................20

Fed.R.Civ.P. 15(a) ..................................................................50

Fed.R.Civ.P 56......................................................................... 38

## Other Authorities

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3, September 17, 2020………………………….. 17

Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A*, State of Texas, January 24, 2020………………………17

Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)………………………………… 25

## Constitutional Provisions

U.S. Const. Art III, § 2…………………………………........................................ 24

U.S. Const. Art II, § 1 …………………………………….......................................30

U.S. Const. Amend. 11………………………………….......................................44

# INTRODUCTION

The issue on appeal is the standing of the Plaintiffs to pursue their civil rights claims. The district court ruled it lacked subject matter jurisdiction for want of a case and controversy, and that the Plaintiffs' claims were a generalized grievance. The district court dismissed the case and found any further amendment would be futile.

The Plaintiffs' amended complaint included the addition of over one hundred fifty plaintiffs from a total of thirty-eight States, all of whom signed under oath affidavits concerning their damage and status as registered voters from their respective States.

The Defendants' conduct was specifically described in the Complaint and Amended Complaint (complaints). As such, one issue is whether registered voters, in their capacity as citizens of the United States and of their States, have standing in federal court to sue these Defendants for *any* conduct they engaged in regarding the 2020 Presidential election that violated the rights of the Plaintiffs, and other persons similarly situated.[1]

---

[1] In the complaints, Plaintiffs reference damage to "all registered voters," which the Plaintiffs estimated to be 160 million citizens of the United States. Although the vast conduct of the Defendants as described in the complaints affects every registered voter, many may not claim that they are damaged. Plaintiffs would have been better served to have used the phrase "any registered voter."

## JURISDICTION

The district court has jurisdiction pursuant to 28 U.S.C. §§1331(a), (federal question), 1332 (diversity), and 1343(a) (civil rights). On April 26, 2021, the district court dismissed the case without prejudice for lack of standing. This Court has jurisdiction pursuant to 28 U.S.C. 1291. The district court's *Order on Defendant's Motion to Dismiss (Dkt. ##22, 23, & 41) & Plaintiffs' Motion to Amend (Dkt. #48)* is a final order (*Order of Dismissal*). Said *Order of Dismissal* is attached hereto and contained in the Appendix. Ap. 1505-1533.

## ISSUES PRESENTED

I.   Whether the Plaintiffs in the pleadings stage have standing to invoke the jurisdiction of the district court by filing a complaint pursuant to 42 U.S.C. § 1983 against the Defendants for damages causes by their conduct concerning the 2020 Presidential election.

II.  Whether the district court erred by dismissing the case pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction after finding the Plaintiffs had not suffered an injury and determining the complaints to be a generalized grievance.

III. Whether the district court erred by denying the Plaintiffs' motion to amend their complaint and finding that any amendment would be futile because neither the Plaintiffs, nor those seeking to join the suit, could establish that they suffered an injury in fact.

## STATEMENT OF THE CASE

### I.     Historical Background

When the Constitution was ratified, the people had already constituted themselves into the original thirteen States. The people expressed their sovereignty through those States. The new federal government created by those people, through their States, was granted certain powers. Those not so enumerated were reserved to the people and the States.

Currently, all the States choose their electors for President and Vice-President based upon the respective States' popular. The right to vote is not guaranteed by the Constitution. However, once granted, the right to vote becomes one of the fundamental rights of a citizen of the United States.

Congress enacted the Civil Rights Act (Act). The Act protects citizens of the United States from the usurpation of their respective rights, which includes the right to vote. The Act gives citizens of the United States an avenue to vindicate their rights through the filing of a complaint in federal court. The Act grants district courts the jurisdiction to hear cases and controversies between citizens and other persons, the latter of whom is alleged to have violated any of the complaining citizen's rights—including the right to vote.

District courts have historically exercised jurisdiction to hear claims under the Act to vindicate the voting rights of citizens of the United States. Accordingly, a vast body of case law exists that allows attorneys, scholars and citizens to analyze these rights to determine their scope and breath.

Of course, only state actors can violate a citizen's rights. A private person owes no duty, in that regard. Nonetheless, the law has evolved over time to allow citizens to sue private entities that engage in state action. Courts have developed several, well know tests to determine whether a person is a state actor, under the Act. This Court has addressed that issue and employs four tests to determine whether a person is engaged in state action. As the 10th Circuit has observed:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' The Court has also inquired whether the State has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them. In addition, the Court has held that if a private party is a 'willful participant in joint activity with the State or its agents,' then state action is present. Finally, the Court has ruled that a private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995).

The Public Function Test is the most stringent, because a created State

government has very few exclusive responsibilities:

> While many functions have been traditionally performed by
> governments, very few have been exclusively reserved to the State.
> One such area has been elections. While the Constitution protects
> private rights of association and advocacy with regard to the election
> of public officials, our cases make it clear that the conduct of the
> elections themselves is an exclusively public function.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158 (1978). *See also Terry v. Adams*,
345 U.S. 461 (1953).

Each State holds a Presidential election every four years, which is the *only*

election in which the registered voters of the United States collectively participate.

Every other election held by States concern their own laws, and the choice of their

respective representatives at the state, local and federal levels.

Consequently, every registered voter has one shared right to vote for

President and Vice-President. Any persons engaged in state action that

substantially burdens that right is liable under the Act. Thus, a registered voter in

one State has the right to sue persons for acts concerning a Presidential election

committed in another State. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

The district court may be limited by want of personal jurisdiction over a defendant,

but if the voter chooses to travel to the district in which the perpetrator may be

found, jurisdiction is satisfied.

A citizen claimant must have standing, which requires a case and controversy. Generalized grievances cannot form the entire basis of a claim. Nevertheless, when a citizen has evidence that certain persons violated her right to vote, a lawsuit for damages has historically been an acceptable manner through which she may vindicate her rights. Further, if a defendant has violated the rights of other citizens similarly situated, plaintiffs may bring a class action lawsuit.

Understandably, the district court provides a gatekeeping function. Nonetheless, standing is not bestowed. It either exists, or it does not.

Accordingly, if a citizen files a claim under the Act, and sufficiently claims a violation of rights, traceable to the conduct of a defendant, the district court must accept subject matter jurisdiction over the case.

Also, in cases wherein the plaintiffs are represented by counsel, those attorneys become private attorney generals.[2] Far from being frivolous, the Plaintiffs, through counsel, here, have outlined their claims, and the facts upon which they have relied, with specificity in their complaints and in their several responses to the Defendants' motions to dismiss.

---

[2] *See Civil Rights Attorney's Fees Award Act of 1976.* 42 U.S.C. 1988.

## II.    Statement of Facts

28 U. S. C. § 1343, which provides in pertinent part:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * *

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

This statute conferring jurisdiction is related to 42 U.S.C. §1983, under which the Plaintiffs brought this action.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Appellants, Kevin O'Rourke, Nathaniel Carter, Lori Cutunilli, Larry Cook, Alvin Criswell, Neil Yarbrough and Amie Trapp (Plaintiffs), are all citizens of the United States and of their respective States Ap. 104-142. Three of the Plaintiffs are African-American. All the Plaintiffs were registered to vote at the time of 2020 Presidential election. When the Plaintiffs attempted to amend their complaint, an

additional 152 Plaintiffs were joined to the suit, all of whom were also citizens of the United States and their State, which totaled 38. Ap. 860-975.

Each of the additional Plaintiffs also signed under oath affidavits with regard to their citizenship, status as a registered voter, personal knowledge and experience, and the affect and damages, if any, traceable to the Defendants. Ap. 1127-1135. Although not required at that stage of the case, the original Plaintiffs attached their affidavits to the Complaint. They are natural persons. Each Plaintiff had a stake in the 2020 Presidential election.

The right to vote for the President of the United States is sacrosanct. As stated by counsel at the hearing on the motions to dismiss, "we fight wars over this." Ap. 1651, l. 14. Such is the sentiment in all the affidavits—but that's not the end. Plaintiffs alleged "nominal damages" as compensation for the violation of their rights as a minimum basis for recovery. Plus, a jury determines the value of a constitutional right violation, which, in and of itself, is an injury resulting in damage of at least one dollar.

Defendants/Appellees, Dominion Voting Systems, Inc. (Dominion), Facebook, Inc. (Facebook), and the Center for Technology and Civic Life (CTCL), are artificial persons, all of which substantially participated in the 2020 Presidential election.

Facebook is a global tech-giant with approximately three billion online users. Facebook is owned and controlled by Defendant, Mark Zuckerberg (Zuckerberg), one of the wealthiest persons in the world. Prior to the 2020 Presidential election, Zuckerberg and his wife, Defendant, Priscilla Chan (Chan), funneled $350 million, along with other funding and the technical know-how of Facebook, through a small, Illinois charity, CTCL, which prior to 2020 had annual revenues of approximately $1 million. Ap. 29, 77, 865, 1293.

Despite only being registered as a charitable organization in Illinois, CTCL distributed this money through conditional grants across the country, primarily to known, historically Democrat strongholds. Ap. 1291.

Municipalities and other State sub-divisions used the money to, among others, establish alternate drop-off locations for the collection of mail-in ballots. Ap. 33, 46, 72. Ballots deposited in these "drop boxes" where not collected by the U.S. Post Office, which scans every parcel. Ap. 33, 46, 907, 958.

Instead, guidelines were created in numerous States (in cooperation with local and state election officials) which, in many instances, effectively changed election laws to allow for the collection of ballots through these so-called drop boxes. E.g., Ap. 72.

This resulted in a foreseeable disaster. Plaintiff would allege that these drop boxes were used to deposit ballots which were not cast by actual, live, registered voters in the States they were tabulated. This has led to enormous, foreseeable problems with the chain of custody of these deposited ballots (in certain swing states and elsewhere), which has resulted in substantial questions concerning the voter rolls, phantom voters, and other numerous anomalies, many of which are noted in the complaints and the Plaintiffs' responses to the Defendants motions to dismiss. *See* Ap. 1419. All the swing States listed in the complaints cooperated with CTCL to allow for the placement of these drop boxes. Ap. 45-46, 57-58, 65-66, 70-74.

This is state action. As such, CTCL cannot hide behind the private nature of its non-profit status. A 501(C)(3) must be non-political. CTCL claims to be non-partisan, but the facts on that issue, like so many others, are in dispute. Ap. 30-31. Thus, the issue of standing is linked directly to the issue of whether these, otherwise, private entities became state actors through their actions connected to the 2020 Presidential election. *See* Ap. 81, 943.

The Plaintiffs allege that CTCL and Facebook, as alter-egos of Zuckerberg and Chan, participated in a scheme to benefit the latter's candidate of choice, then former Vice-President, Joseph Biden (Biden). Ap. 864-865, 954-959. Facebook

was actively censoring conservative ideology on its platform, while supporting the progressive ideology of Zuckerberg. Ap. 866, 902-903. This conduct violated the First Amendment rights of the Plaintiffs. Ap. 89-93, 951-954.

Facebook is a private corporation, protected by 47 U.S.C. § 230. Ap. 27, 90-93. However, as applied by Facebook to shield its conduct from liability, Section 230 is unconstitutional as violative of the Plaintiffs' rights to due process, freedom of expression and association, all of which are irrevocably connected to the Plaintiffs' right to meaningfully participate in the 2020 Presidential election. Ap. 93-95, 960-963. The Plaintiffs' claims are more than just about "being on Facebook." The act of voting for the Presidency, itself, is an expression of national will, and of utmost importance to each Plaintiff, personally.

Zuckerberg and Chan's injection of enormous amounts of money, influence, organization, and governmental cooperation, specifically with regard to the 2020 Presidential election, converted them, personally, into state actors. Ap. 943. Zuckerberg, like the government, became a funding source for state jurisdictions to perform their public function. CTCL, as an alter ego of Zuckerberg, conditioned the grants on specific, required conduct of the municipality, or other sub-division of a State that accepted the money. Ap. 865, 906, 1293-1295. This conduct shocks the conscious of a reasonable person and forms the basis of the Plaintiffs' claims

against these Defendants for violation of substantive due process. Ap. 88-89, 949-950. Substantive due process claims "are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (internal quotations and citation omitted).

Therefore, Plaintiffs filed their lawsuit alleging damages associated with completed constitutional right violations. Ap. 945, 949, 950, 954. States cannot be sued for damages. However, a line of cases establishes a citizen's right to sue private entities that have engaged in state action. *See Terry v. Adams*, 345 U. S. 461 (1953).

In the 2020 Presidential election, President Donald J. Trump (Trump) ran for reelection. Trump was a populist figure that many despised and accused of spreading "misinformation" throughout the campaign.[3] In an attempt to "fortify" the 2020 Presidential election, pressure was applied to Facebook and other social media companies to regulate information that a cadre of progressives thought was

---

[3] Investigative journalism that there was a *de facto* cabal of progressives that used their influence and money to "fortify" the 2020 Presidential election against Trump's "lies and misinformation." Molly Ball, TIME, *The Secret History of the Shadow Campaign That Saved the 2020 Election* (February 4, 2021).

misleading to the public.[4] Extraordinary lengths were taken to ensure Trump's defeat. The Plaintiffs' Amended Complaint describes in detail these instituted plans. Ap. 860-975. As described, these Defendants brought to bear a highly coordinated effort to elect the candidate of their choice. Such is the case in practically every presidential election—but this one involves state action.

Lawsuits were filed to stop this funding from being used by the municipalities, and other jurisdictions. However, those cases where against the government entities that accepted the grant funding. There, as discussed below, the courts often found the evidence too general and speculative at the time and denied these extraordinary requests for prospective relief based upon the lack of concrete injury.

After the election, other plaintiffs filed ill-fated cases, many of which requested federal district court to issue injunctions against States from certifying its election, or from sending certain Electors to Washington, D.C., for the electoral college vote. Those cases saw plaintiffs suing persons in their official capacity,

---

[4] The Plaintiffs take no political position, except to adhere to and defend the Constitution, and their own rights to vote for their candidate of choice for President and have that vote count in a fundamentally fair process; and, to express themselves, accordingly, while enjoying the rights and privileges of all citizens of the United States—which include the right to counsel, due process, equal protection, to petition government for a redress of grievances, and have a jury decide the issues of material fact that are in dispute, here.

which is tantamount to suing a State. Because damages cannot be sought against a

State, the only requests were for prospective relief. In those settings, the parties

and standards of proof required are different than those here.

Other cases, however, such as *Texas v. Pennsylvania*, filed in the United

States Supreme Court, were serious ventures. There, the Petitioners stated:

> Lawful elections are at the heart of our constitutional democracy. The
> public, and indeed the candidates themselves, have a compelling interest
> in ensuring that the selection of a President—any President—is
> legitimate. If that trust is lost, the American Experiment will founder. A
> dark cloud hangs over the 2020 Presidential election.

Bill of Complaint, *Texas v. Pennsylvania*, case 22O155 (U.S. filed Dec. 7,
2020), p. 1.

Regardless of how these cases were resolved, the affidavits and information

contained in the multiple complaints filed across the country established the

conduct of these Defendants—none of whom were sued in these other cases.

Concurrently, Dominion has managed to divide the country in half. Of

course, that was a foreseeable result of any vote counting system that uses

proprietary software that is not shared with the governmental bodies in charge of

election integrity. The company CEO is not an American citizen. Ap. 895. The

corporation is owned by a private equity firm largely consisting of foreign

investment. Ap. 895.

In the years leading up to the 2020 Presidential election, courts, elected officials, government agencies, academics and experts expressed concerns about the security, accuracy and reliability of Dominion voting systems. For example, in their Complaint, the Plaintiffs cite *Curling, et al., v. Raffensperger, et al.,* Civil Action File No. 1:17-cv-2989-AT, (N.D. Ga.). Ap. 51-52. There, before the election, the *Curling* court found:

> [T]he evidence shows that the Dominion BMD [Ballot Marking Device] does not produce a voter verifiable paper ballot ...Thus...voters must cast a BMD-generated ballot that...has the potential to contain information regarding the voter's choices that does not match what they enter on the BMD...or could cause a precinct scanner to improperly tabulate their votes.

2020 WL 5994029 at *35 (N.D. Ga. Oct. 11, 2020).

The *Curling* court's concluding statement regarding Dominion's obstruction tactics in discovery and verifiable vulnerabilities proved prophetic:

> The Court's Order has delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted...

*Id*. at *58

Before that, in December 2019, U.S. Senator Elizabeth Warren and other members of the Senate Banking and Urban Affairs Committee launched an investigation into Dominion and two other election technology firms responsible for developing, manufacturing and maintaining the vast majority voting machines and software in the United States. The Senators' letter to Dominion expressed grave concerns about the security of electronic voting machines, including the role private equity investment in Dominion has played in the creation and perpetuation of concerns regarding "vulnerabilities and a lack of transparency in the election technology industry." Ap. 25.

Scholars and industry experts have concluded that ballot-marking devices, generally, including the voting machines used by Dominion:

a.   produce ballots that do not necessarily record the vote expressed by the voter when they enter their selections on the touchscreen;

b.   are associated with known risks, which include hacking, bugs and configuration errors that can cause the voting machine to print votes that differ from what the voter entered and verified electronically;

c.   are not defensible, because there is no way to generate convincing public evidence that reported outcomes are correct despite any malfunctions that might have occurred;

d.   are not software independent, and can mark a ballot after the voter has inspected it;

e. the original transaction, i.e., the voter's expression of the votes, is not documented in a verifiable way; and,

f. cannot ensure through an audit that the reported outcome is correct.

Andrew W. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters*, Election Law Journal: Rules, Politics, and Policy, Vol. 19, No. 3, September 17, 2020. (*Dkt. 1, ¶ 42*). Ap. 26.

In early 2020, the Dominion voting system was rejected by the Texas Board of Elections, after the "examiner reports raise concerns about whether the Democracy Suite 5.5A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation." Secretary of State Ruth R. Hughs, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A*, State of Texas, January 24, 2020. (*Dkt. 1, ¶43, fn. 5*). Ap. 27.

After the election, Dominion machines underwent a third-party review as part of a Michigan case following reports of voting irregularities in Antrim County, Michigan.[5] Ap. 48, That case was brought by one citizen that paid for his own experts to request that a Michigan court order an audit of Michigan's 2020 General Election. In that litigation, a forensic report was generated that corroborated similar expert reports discussing known historical issues with Dominion voting machines.

---

[5] *Bailey v. Antrim County*, Case No. 20-9238-CZ (13th Cir. Ct. Mich).

There, as outlined in the complaints, Allied Security Operations Group

(ASOG) released its preliminary report of an audit of the Dominion voting

machines and software used in the Antrim County, Michigan, 2020 general

election. The ASOG Report concludes:

> Dominion Voting System is intentionally and purposefully designed
> with inherent errors to create systemic fraud and influence election
> results. The system intentionally generates an enormously high number
> of ballot errors. The electronic ballots are then transferred for
> adjudication. The intentional errors lead to bulk adjudication of ballots
> with no oversight, no transparency, and no audit trail. This leads to voter
> or election fraud. Based on our study, we conclude that The Dominion
> Voting System should not be used in Michigan. We further conclude
> that the results of Antrim County should not have been certified.

Ap. 48, 921.

However, this report is only a part of a mosaic of evidence averred in the

Plaintiffs' complaints. As are the other Defendants, Dominion is a state actor. Ap.

81, 943, 308-309. It counts the ballots of over half the votes casts across America

in 28 states and more than 1300 jurisdictions. Ap. 24, 895. Additionally, Dominion

performs services in the execution of what is exclusively a public function, i.e.,

here, a Presidential election. As a part of those services, as intricately plead in the

Plaintiffs' Amended Complaint, Dominion's voting machines classify ballots as

either normal, or adjudicated. Ap. 897. Adjudicated ballots are the digital scans of

physical ballots that are flagged by the system's artificial intelligence, separated

for later adjudication to determine the voter's intent. Ap. 897. Ballots sent to adjudication can be altered by administrators. Ap. 898. Adjudication files can be moved between different Results Tally and Reporting terminals with no audit trial of which administrator actually adjudicated the ballot batch, designated for adjudication. Ap. 898. Dominion's election management system provides no meaningful observation of the adjudication process, or audit trial concerning which administrator actually adjudicates the ballots, or the choice of which ballots required adjudication. Ap. 898. This patented adjudication process allows an administrator, or other person with access to a particular Dominion election management system to manually manipulate votes. Ap. 898.

Additionally, Dominion's retaliation lawfare to silence the media, lawyers, researchers, independent broadcasters, witnesses and others, indicate a clear intent to retaliate against those who question the integrity of not just their vote count and the security of its machines, but the responsibility it bears for the general administration of a substantial part of the 2020 Presidential election. Ap. 302.

This case also concerns the rights of the Plaintiffs to have meaningful access to federal courts. The class has not been certified. Nonetheless, by the time of oral arguments on the motions to dismiss, Plaintiffs' counsel had received over 400 affidavits, from voters in 48 States. Ap. 1656, ll. 5-7.

### III.    Procedural History

On December 22, 2020, the Plaintiffs filed their suit in the U.S. District Court of Colorado (district court) for violations of the Act by the Defendants and, among other things, a constitutional challenge to 47 U.S.C. §230(c), as applied to the conduct of Facebook. Ap. 18-101.

After service, on February 16, 2021, Dominion and Facebook filed their motions to dismiss, pursuant to Fed.R.Civ.P 12(b)(1) and (6). Ap. 241-268 & 269-286. Plaintiffs timely responded to those motions. Ap. 300-709 & 710-735. On March 23, 2021, Dominion and Facebook filed their replies. Ap. 1156-1172 & 1173-1190.

On March 9, 2021, the Attorney General of the Commonwealth of Pennsylvania filed his entry of appearance of behalf of Tom Wolf, in his official capacity as the Governor of Pennsylvania, and Veronica Degraffenreid, in her official capacity as the Acting Secretary of the Commonwealth. Ap. 297-299.

Similarly, on March 9, 2021, the Attorney General of Georgia filed his entry of appearance of behalf of Brian Kemp, in his official capacity as the Governor of Georgia, and Brad Raffensperger, in his official capacity as the Secretary of State of Georgia. Ap. 293-296.

The Michigan Attorney General also entered her appearance on behalf of Gretchen Whitmer, in her official capacity as the Governor of Michigan, and Jocelyn Benson, in her official capacity as the Secretary of State of Michigan. Ap. 289-290.

These persons were not named as defendants in their official capacity. Defendants, Tom Wolf, Kathy Boockvar, Brian Kemp, Brad Raffensperger, Gretchen Whitmer and Jocelyn Benson, never entered their appearance in their named, individual capacity.

Thereafter, on March 10, 2021, Plaintiffs filed their motion to amend the complaint, with their attached Amended Complaint. Ap. 845-1135. On that same day, CTCL filed its motion to dismiss the original Complaint. Ap. 736-756.

At this time, Defendants, Zuckerberg and Chan, had not been served. Before the expiration of the previously issued summons, Plaintiffs filed a motion to extend the time necessary to serve those Defendants. Ap. 1306-1310. That motion which was granted to allow Plaintiffs up to May 21, 2021, to serve Zuckerberg and Chan. Ap. 1311-1312. The case was dismissed before that date.

All the parties filed timely responses and replies to the various motions to dismiss and the motion for leave to amend, all of which are in the Appendix.

On April 19 and 20, 2021, the Plaintiffs voluntarily dismissed all the individual persons from Wisconsin, Michigan, Georgia and Pennsylvania, without prejudice. Ap. 1460-1491.

In the interim, the district court set the matter for oral arguments on the motions to dismiss, to proceed on April 27, 2021. *See Transcript of Hearing*, 4/27/21, Ap. 1594-1684. The day after the hearing, the district court granted the served Defendants' motions to dismiss. In its *Order of Dismissal*, the district court found that the "Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America." *Order of Dismissal*, p. 20. For that reason, the district court ruled that the Plaintiffs had no standing, and thus dismissed the Complaint "for lack of federal jurisdiction." *Order of Dismissal*, p. 20.

Additionally, the district court denied the Plaintiffs' motion for leave to amend their complaint. In finding that amendment would be futile, the district court stated, "Plaintiffs allege no particularized injury traceable to the conduct of the Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted." *Order of Dismissal*, p. 26.

Thereafter, the Plaintiffs filed a timely notice of appeal.

## SUMMARY OF ARGUMENT

Plaintiffs have standing to pursue their claims for civil rights violations, as each has suffered a particularized injury from one or more completed violations of their fundamental rights caused by the conduct of Defendants. The Plaintiffs referenced causes of actions for declaratory and injunctive relief are non-specific, and only plead as a means of reserving that portion of the district court's power to enter such orders, as may be necessary throughout the litigation.

The damages were caused by the conduct of the named Defendants, and the remedy requested, here, is retrospective. Thus, their claims are redressable by the district court, at a minimum, for nominal damages—which must be awarded upon a finding of a completed constitutional right violation.

The Defendants are state actors through their voluntary participation in the administration of the 2020 Presidential election, which is exclusively a public function. Plaintiffs do not simply allege a generalized grievance against government conduct, as none of these Defendants are government. At all times material, the Defendants were acting under color of law.

As such, the damages suffered by the Plaintiffs are traceable to the Defendants, despite the fact that a large portion of the general population was harmed. Importantly, not every member of the general public has the right to vote.

Only similarly situated, registered voters would have a right to claim injury for the

conduct, described herein. Accordingly, the district court erred  by dismissing the

Plaintiffs complaint, denying the Plaintiffs' motion to amend, and finding that any

amendment thereto would be futile. The district court never accepted the

allegations contained in the complaints as true, and essentially foreclosed any

citizen of the United States from filing a complaint against these Defendants.

## ARGUMENT

### I.      Plaintiffs have Article III Standing

### A.      Standard of Review

This Court reviews issues of standing de novo. *Winsness v. Yocom*, 433 F.

3d 727, 732 (10th Cir. 2006). "For purposes of ruling on a motion to dismiss for

want of standing, both the trial and reviewing courts must accept as true all

material allegations of the complaint, and must construe the complaint in favor of

the complaining party." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003)

(*quoting Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### B.      Standing

The Constitution limits federal judicial power to the resolution of cases and

controversies. U.S. Const. art. III, § 2. "In limiting the judicial power to 'Cases'

and 'Controversies,' Article III of the Constitution restricts it to the traditional role

of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. (citations and internal quotation marks omitted). Second, there must be a causal connection between the injury and the conduct complained of, hence, the injury alleged must be fairly traceable to the challenged action of the defendant. *Id*. Third, it must be likely that the injury will be redressed by a favorable decision. *Id*. at 561.

## C. Injury in Fact

Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr*, 369 U.S. 186, 204 (1962). "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *Transunion v. Ramirez*, 141 S.Ct. 2109, 2203 (2021) (*citing* Scalia, *The Doctrine of Standing as an*

*Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882

(1983)).

Assessing concreteness includes "whether the asserted harm has a 'close

relationship' to a harm traditionally recognized as providing a basis for a lawsuit in

American courts…'" *Id.* at 2204 (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330,

340-341 (2016)). In delivering the opinion of the Court in *Transunion*, Justice

Kavanaugh stated:

> To appreciate how the Article III 'concrete harm' principle operates in
> practice, consider two different hypothetical plaintiffs. Suppose first
> that a Maine citizen's land is polluted by a nearby factory. She sues the
> company, alleging that it violated a federal environmental law and
> damaged her property. Suppose also that a second plaintiff in Hawaii
> files a federal lawsuit alleging that the same company in Maine violated
> that same environmental law by polluting land in Maine. The violation
> did not personally harm the plaintiff in Hawaii.

*Id.* at 2205.

Here, the Plaintiffs bear the burden of demonstrating that they have standing.

*Lujan*, 504 U.S. at 561. All of them are citizens of the United States and of their

respective State. The Plaintiffs are registered voters, and each has an individual

right to vote for the President and Vice-President of the United States, the latter of

whom "are the only elected officials who represent all the voters in the Nation."

*Anderson v. Celebreeze*, 460 U.S. 780, 794-795 (1983). As such, "in the context of

a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Id*.

In their complaints, the Plaintiffs outlined with specificity how the Defendants substantially burdened their respective right to vote in the 2020 Presidential election. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote," and "to have their votes counted." *Id*. (*citing Ex Parte Yarbrough*, 110 U.S. 651 (1884), and *United States v. Mosley*, 238 U.S. 383 (1915)).

As "equally unquestionable that the right to have one's vote counted is as open to protection. . .as the right to put a ballot in a box." *Mosley*, 238 U.S. at 386.

> The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347, *Lane v. Wilson*, 307 U.S. 268, nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315, nor diluted by ballot-box stuffing, *Ex Parte Siebold*, 100 U. S. 371, *United States v. Saylor*, 322 U.S. 385. As the Court stated in *Classic*, 'Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . .' 313 U. S., at 315.

*Reynolds*, 377 U.S. at 554-555.

"Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). This is particularly true

in the context of a Presidential election. "To be sure, administration of the electoral

process is a matter that the Constitution largely entrusts to the States." *Kusper v.*

*Pontikes*, 414 U.S. 51, 57 (1973). Nonetheless, a Presidential election is a national

expression of choice. "And history has seen a continuing expansion of the scope of

the right of suffrage in this country." *Reynolds*, 377 U.S. at 555.

> The right to vote freely for the candidate of one's choice is of the
> essence of a democratic society, and any restrictions on that right strike
> at the heart of representative government. And the right of suffrage can
> be denied by a debasement or dilution of the weight of a citizen's vote
> just as effectively as by wholly prohibiting the free exercise of the
> franchise.

*Id*.

"The individual citizen has no federal constitutional right to vote for electors

for the President of the United States unless and until the state legislature chooses a

statewide election as the means to implement its power to appoint members of the

electoral college." *Bush v. Gore*, 531 U.S. 98, 104 (2000). A state legislature's

power to select the manner for appointing electors is plenary, as it may select the

electors itself, which was indeed the manner used by state legislatures in several

States for many years after the framing of our Constitution. *Id.* (*citing McPherson*

*v. Blacker*, 146 U.S. 1, 35 (1892)).

Currently, every State has chosen the means of a statewide election to appoint its respective members of the electoral college. As stated by the Supreme Court:

> History now favors the voter, and in each of the several States the citizens themselves vote for Presidential electors. When the state legislatures vest the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity of each voter.

*Id*.

> The Supreme Court has also instructed:

> When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

*Gomillion v. Lightfoot*, 364 US 339 (1960).

The examination continues with the concept that a voter must be real, have the right to vote, and only be allowed to cast *one* ballot that is counted *one* time.[6] The right to meaningfully vote for the President is priceless. As stated by Plaintiffs' counsel at the hearing on the motion to dismiss, "We fight wars over

---

[6] "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963).

this." Ap. 1651, l. 14. A pandemic does not set aside the Constitution and the laws of the United States to allow private persons to fund and substantially impact the administration of a Presidential election in 2500 local election jurisdictions. Ap. 910.

As described by the Plaintiffs in their complaints, the conduct of the Defendants had a direct impact on the result of the 2020 Presidential election, which likely does not reflect the actual will of the American people.[7]

### D.    A Constitutional Infringement is an Injury in Fact

In its order of dismissal, the district court cited *Bognet v. Secretary Commonwealth of Pennsylvania*, wherein the 3rd Circuit stated:

> To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts you own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing.

980 F. 3d 336, 348 (3rd Cir. 2021), *cert granted and judgment vacated with instructions to dismiss as moot. Bognet v. Degraffenreid*, ___S.Ct.___(2021).

---

[7] The President of the United States is ultimately chosen by the Electors of each State. U.S. Const., Art. II, §1. These facts, however, are unprecedented in the history of the United States. Nonetheless, the Plaintiffs take no position, and have never made any requests regarding the legitimacy of the Presidential election. The Plaintiffs are powerless, in that regard. Nonetheless, the damages suffered by the Defendants are the foreseeable result of the Defendants' conduct. The power of persons like Zuckerberg and Chan, Facebook, CTCL and Dominion to affect the outcome of any election is tremendous and fearsome. To deny it is to deny reality.

Here, every original Plaintiff expressed their personal injuries in their

respective affidavits—not to mention those referenced in the complaints—

regarding their damages associated with the violations of their rights by the

Defendants. Recently, the Supreme Court discussed the history of a completed

constitutional violation as a legal injury, noting:

> Early courts required the plaintiff to prove actual monetary damages
> in every case. (Citation omitted). Later courts, however, reasoned that
> *every* legal injury necessarily causes damage, so they awarded
> nominal damages absent evidence of other damages (such as
> compensatory, statutory, or punitive damages), and they did so where
> there was no apparent continuing or threatened injury for nominal
> damages to redress. *See, e.g., Barker* v. *Green,* 2 Bing. 317, 130 Eng.
> Rep. 327 (C. P. 1824) (nominal damages awarded for 1-day delay in
> arrest because "if there was a breach of duty the law would presume
> some damage");[citations omitted]; *Marzetti* v. *Williams,* 1 B. & Ad.
> 415, 417-418, 423-428, 109 Eng. Rep. 842, 843, 845-847 (K. B. 1830)
> (bank's 1-day delay in paying on a check); *id.,* at 424, 109 Eng. Rep.,
> at 845 (recognizing that breach of contract could create a continuing
> injury but determining that the fact of breach of contract by itself
> justified nominal damages).

> The latter approach was followed both before and after ratification of
> the Constitution. *An early case about voting rights effectively
> illustrates this common-law understanding. Faced with a suit
> pleading denial of the right to vote, the court rejected the plaintiff's
> claim because, among other reasons, the plaintiff had not established
> actual damages. Ashby v. White, 2 Raym. Ld. 938, 941-943, 948, 92
> Eng. Rep. 126, 129, 130, 133 (K. B. 1703).* Dissenting, Lord Holt
> argued that *the common law inferred damages whenever a legal right
> was violated.* Observing that the law recognized "not merely
> pecuniary" injury but also "personal injury," Lord Holt stated that
> "every injury imports a damage" and that a plaintiff could always
> obtain damages even if he "does not lose a penny by reason of the

[violation]." Id., at 955, 92 Eng. Rep., at 137. Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, 3 Salk. 17, 91 Eng. Rep. 665 (K. B. 1703), and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases," *Embrey v. Owen,* 6 Exch. 353, 368, 155 Eng. Rep. 579,585 (1851).

The dissent correctly notes that English courts differed in some respects from courts under our system, but Lord Holt's position also prevailed in courts on this side of the Atlantic. Applying what he called Lord Holt's "incontrovertible" reasoning, Justice Story explained that a prevailing plaintiff "is entitled to a verdict for nominal damages" whenever "no other [kind of damages] be proved." *Webb* v. *Portland Mfg. Co.,* 29 F.Cas. 506, 508-509 (No. 17,322) (CC Me. 1838). *Because the common law recognized that "every violation imports damage," Justice Story reasoned that "[t]he law tolerates no farther inquiry than whether there has been the violation of a right." Ibid.* Justice Story also made clear that this logic applied to both retrospective and prospective relief. *Id.,* at 507 (stating that nominal damages are available "wherever there is a wrong" and that, "[a] fortiori, this doctrine applies where there is not only a violation of a right of the plaintiff, but the act of the defendant, if continued, may become the foundation, by lapse of time, of an adverse right." [Emphasis added].

*Uzuegbunam v. Preczewski*, 141 S. Ct. at 798-799.

Delivering the opinion of the Court, Justice Thomas went on to state:

That this rule developed at common law is unsurprising in the light of the noneconomic rights that individuals had at that time. *A contrary rule would have meant, in many cases, that there was no remedy at all for those rights, such as due process or voting rights, that were not readily reducible to monetary valuation. See* D. Dobbs, Law of Remedies § 3.3(2) (3d ed. 2018) (nominal damages are often awarded for a right "not economic in character and for which no substantial non-pecuniary award is available"); *see also Carey* v. *Piphus,* 435 U. S. 247, 266-267 (1978) (awarding nominal damages for a violation of

procedural due process). By permitting plaintiffs to pursue nominal damages whenever they suffered a personal legal injury, the common law avoided the oddity of privileging small-dollar economic rights over important, but not easily quantifiable, nonpecuniary rights. [Emphasis added].

*Id*. at 800.

## E.    Causation

In its order of dismissal, the district court did not address this issue, having found that the allegations contained in the Plaintiffs' complaints fell short of establishing an injury in fact. A §1983 claim requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law. 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982). With regard to this second element of standing to make such a claim:

[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."

*Lujan*, 504 U.S at 560 (*quoting Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42 (1976)).

Suffice it say, Plaintiffs damages are directly traceable to the conduct of the Defendants and, although, different parties may have also been involved, the

causal connection is established through the averments, exhibits, reports and

affidavits contained in the complaints, and other materials referenced therein.

### F.   Redressability

The Plaintiffs have requested that damages be assessed against the

Defendants. A jury decides the amount of money to award upon a finding of a

constitutional right violation, which must be at least one dollar. That does not mean

that the jury is limited to one dollar—but only that some damage must be awarded

if the elements of the claims are satisfied by a preponderance of evidence.

Plaintiffs request nominal damages as the minimum liability of the Defendants.

Even then, a "request for nominal damages satisfies the redressability

element of standing where a plaintiff's claim is based on a completed violation of a

legal right." *Uzuegbunam*, 141 S.Ct. at 801-802.

### G.   Plaintiffs Are Only in the Pleading Stage

The district court cited President Trump's pre-election, legal challenge in the

Western District of Pennsylvania concerning election guidance given by the

Secretary of the Commonwealth regarding manned security near absentee drop

boxes, performing signature comparisons for mail-in ballots, and a county-

residency requirement for poll watchers. *Donald J. Trump for President, Inc. v.*

*Boockvar*, 493 F. Supp.3d 331 (2020). *Order of Dismissal*, p. 12. There, then

President Trump's campaign argued that "drop boxes allow for an unacceptable risk of voter fraud and 'illegal delivery or ballot harvesting' that, when it occurs, will 'dilute' the votes of all lawful voters who comply with the Election Code." *Id.* at 359. The campaign also claimed that it would suffer an injury through the non-equal treatment or dilution of their legitimately cast votes by improperly verified absentee or mail-in ballots. In granting summary judgment on behalf of the defendants, the court stated:

> Defendants argue that the claimed injury of vote dilution caused by possible voter fraud *here is too speculative to be concrete*. The Court agrees. To establish a 'concrete' injury, Plaintiffs rely on a chain of theoretical events…The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is 'certainly impending.' To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is 'certainly impending,' and not just a 'possible future injury.' [Emphasis added].

*Id.* at 377.

"This case is well past the pleading stage," the *Boockvar* court noted, "Extensive fact and expert discovery are complete…and unlike on a motion to dismiss, on summary judgment, [plaintiffs] must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact." *Id.* at 377.

This case does not involve the risk of harm, but a completed constitutional violation. Further, this case was in the pleading stage at the time of the district

court's dismissal. At the pleading stage, general factual allegations of injury

resulting from the defendant's conduct may suffice. *Lujan*, 504 U.S. at 561.

The *Boockvar* court went on to state:

> [A] plaintiff can have standing to bring a voter-fraud claim, but the proof
> of injury there is *evidence of actual fraud in the election and thus the
> suit will be brought after the election has occurred*. [Emphasis added].

*Id*.

Further, as it is with every case cited by the district court, the *Boockvar*

matter was *not* a request for damages against private persons engaged in state

action. The case involved a constitutional challenge to Pennsylvania election laws,

and requests for injunctive relief against the State:

> Indeed, '[c]ommon sense, as well as constitutional law, compels the
> conclusion' that states must be free to engage in 'substantial regulation
> of elections' if 'some sort of order, rather than chaos, is to accompany
> the democratic processes. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

*Id*. at 383.

In response to a summary judgment motion, a plaintiff can no longer rest

on such mere allegations, but must set forth by affidavit or other evidence

specific facts. *Com'rs of County of Arapahoe, Colorado*, 633 F.3d 1022, 1025

(10th Cir. 2011). This case, however, has yet to progress that far.

## II.    The District Court Erred by Dismissing the Plaintiffs'
         Complaint for Lack of Subject Matter Jurisdiction

### A.    Standard of Review

A dismissal for lack of subject matter jurisdiction under Fed.R.Civ.P.

12(b)(1) is reviewed de novo. *Trackwell v. United States*, 472 F.3d 1242, 1243

(10th Cir. 2007).

### B.    Lack of Subject Matter Jurisdiction

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject

matter jurisdiction." Dismissal under Rule 12(b)(1) is not a judgment on the merits

of a plaintiff's case, but only a determination that the court lacks authority to

adjudicate the matter. *See Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir. 1994).

A Rule 12(b)(1) motion to dismiss must be determined from the allegations

of facts in the complaint, without regard to mere conclusory allegations of

jurisdiction. *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). The burden of

establishing subject matter jurisdiction is on the party asserting jurisdiction. *Butler

v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008).

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter

jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.

1995). First, a facial attack on the complaint's allegations as to subject matter

jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack

on the complaint, a district court must accept the allegations in the complaint as true. *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).

Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion. *Id.* at 1002-03 (citations omitted).

Different standards apply, however, to a dismissal based on lack of subject matter jurisdiction under Rule 12(b)(1), and a motion to dismiss for failure to state a claim under Rule 12(b)(6). As the Supreme Court explained in *Bell v. Hood*:

> Jurisdiction...is not defeated...by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law[,] and just as issues of fact[,] it must be decided after[,] and not before[,] the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state

a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

327 U.S. 678, 682 (1946).

### C.    Accepting Well Plead Facts as True

In its *Order of Dismissal*, the district court stated:

The decisive argument is that the *Plaintiffs* have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. [Emphasis added].

*Order of Dismissal*, p. 8.

With that, the district court entertained only a facial challenge to the complaints and did not consider evidence outside of the Plaintiffs' complaints and pleadings. As clear, the district court applied an improper standard in evaluating the Plaintiffs' claims, in that, it did not actually accept as true all of Plaintiffs' plausible allegations and draw all reasonable inferences in their favor.

For example, the district court described Dominion as "a private supplier of election and voting technology," *Order of Dismissal*, p. 2. Facebook as a "social media company," and CTCL as "a non-profit organization dedicated to making elections more secure and inclusive." *Id*. In that regard, the district court refused to assess the Plaintiffs' claims under a recognition that the Defendants are state actors. A §1983 claim is only applicable to conduct occurring under color of law. *Gallagher,* 49 F. 3d at 1447.

> If the state delegates to a private party a function 'traditionally exclusively reserved to the State,' then the private party is necessarily a state actor.

*Id*. at 1456 (*quoting Jackson v. Metropolitan Edison,* 419 U.S. 345, 352 (1974)) (*citing Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991)).

Notably, election administration is one of the few required functions of a

State:

> This test is difficult to satisfy. 'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'[Citation]. Nevertheless, the Supreme Court has found some functions to satisfy this test. *These traditional state functions include administering elections of public officials*. [Emphasis added].

*Id*. (*citing Terry v. Adams,* 345 U.S. 461, 468-70 (1953)).

With that, the status of the Plaintiffs as citizens of the United States that

claim damage under the Act, as averred by their well pleaded facts, establish their

standing. In the order of dismissal, the district court states:

> Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury… Here, by their own admission, Plaintiffs claimed injuries are no different than the supposed injuries experienced by all registered voters.

*Order of Dismissal*, pp. 24.

Nowhere in the record do the Plaintiffs request that the district court bestow

standing. The Plaintiff have standing, on their own. Further, Plaintiffs never

admitted that their injuries are no different than those suffered by all registered

voters, except to express that others may be similarly situated across the country

for purposes of establishing the class.

### D.   The Cases Relied Upon By the District Court Are Not Determinative Regarding the Standing of the Plaintiffs

Citizens are prohibited from suing States for damages. U.S. Const., Art. XI.

However, plaintiffs may sue government officials in their official capacity for

prospective relief. In the line of cases cited by the district court, each one involved

plaintiffs suing States, or their sub-divisions, for such relief.

For example, in *Wood v. Raffensperger*, the 3rd Circuit affirmed the lower

courts finding that plaintiff's request for emergency injunctive relief was not

justiciable. 981 F.3d 1307, 1313 (11th Cir. 2020). *Order of Dismissal*, pp. 10-11.

There, the plaintiff based his standing on his interest in ensuring that "only lawful

ballots are counted." *Id.* at 1314. As the *Wood* Court stated:

> Wood asserts only a generalized grievance. A particularized injury is
> one that effects the plaintiff in a personal and individual way…A
> generalized grievance is undifferentiated and common to all members of
> the public. (Citations and internal quotation marks omitted).

*Id.* at 1314.

The *Wood* Court further noted:

> Wood moved for extraordinary relief. He asked that the district court
> take one of three steps: prohibit Georgia from certifying the results of

the November election; prevent it from certifying results that include 'defective absentee ballots, regardless of whether said ballots were cured;' or declare the entire election defective and order the state to fix the problems caused by the settlement agreement.

*Id*. at 1312.

The 3rd Circuit also found that that even "if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness." *Id*. at 1316. Georgia had "already certified its results." *Id*. at 1317. "Based upon the posture of this appeal," concluded the *Wood* Court, "the challenged action is the denial of an emergency injunction against the certification of election results." *Id*. at 1317.

The district court's reliance on *Lance v. Coffman*, 549 U.S. 437 (2007), is also misplaced. *Order of Dismissal*, p. 10. In *Lance*, the plaintiffs sued the Colorado Secretary of State, in his official capacity, challenging the state supreme court's interpretation of a section of the Colorado Constitution. In finding the plaintiffs failed to establish standing, the United States Supreme Court held:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law — specifically the Elections Clause — has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing.

*Id*. at 1198.

There, Supreme Court identified a generalized grievance as "only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted." *Id*. at 439 (*quoting Fairchild v. Hughes*, 258 U.S. 126, 129 (1922)).

The district court misapplied this standard in finding, here, that the Plaintiffs "allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted." *Order of Dismissal*, p. 26. However, this does not accurately reflect the Plaintiffs' claims, nor their request for retrospective damages.

Similarly, the recent Supreme Court's denial of the State of Texas' attempt to file a bill of complaint challenging the election procedures of several States is not a justification for finding the Plaintiffs, here, have not suffered a particularized, personal injury. *Texas v. Pennsylvania*, 141 S.Ct. 1230 (2020) (finding that "Texas ha[d] not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections.") There, again, the Supreme Court was not asked to examine the claims of natural persons against state actors for damages. The State of Texas was requesting that the Supreme Court, among other things, declare that the Defendant States administered the 2020 Presidential election in violation of the Electors Clause and the Fourteenth Amendment, and that any

electoral college votes casts by electors appointed by these States are similarly in violation of the Constitution. Texas further requested that the Supreme Court enjoin the Defendant States' use of the 2020 election results to appoint presidential electors, authorize a special election, and enjoin those States certifying presidential electors, pending further order of the Court.

In its *Order of Dismissal*, the district court also referenced the dismissal of several cases brought by former Assistant U.S. Attorney General, Sidney Powell, Esq., and others, *some of* the contents of which were referenced in the Plaintiffs' complaints. *See Bowyer v. Ducey*, Civ. No. 20-cv-2321, 2020 WL 7238261 (D. Ariz. December 9, 2020); *King v. Whitmer*, Civ. No. 20-cv-13134, 2020 WL 7134198 (E.D. Mich. December 7, 2020); and *Feehan v. Wisconsin Elections Commissions*, 506 F.Supp.3d 596 (E.D. Wis. December 9, 2020). *Order of Dismissal*, pp. 13-15.

In those cases, the plaintiffs filed complaints against government officials in their official capacity. Generally, "States enjoy sovereign immunity from suits under the Eleventh Amendment." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). However, "a plaintiff may bring suit against individual state officers acting in their official capacity if the complaint alleges an ongoing

violation of federal law and the plaintiff seeks prospective relief." *Id*. *See also Ex Parte Young*, 209 U.S. 123, 155-56 (1908).

As such, courts treat those cases as suits against the States themselves. *See Hafer v. Melo*, 52 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity…should be treated as suits against the State."). *See also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Accordingly, the above referenced cases were suits against sovereign States, and the requested prospective relief proves that point.

As the *King* court noted in its order denying the plaintiffs' request for emergency declaratory judgment and injunctive relief:

> The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act. [*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, n.11 (1984)] (*quoting Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

*King*, *supra*, ECF No. 62, Pg ID 3302.

The *King* court found *Ex Parte Young* did not apply to state law claims against state officials. *Id*. at Pg ID 3304 (*citing Pennhurst*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of

federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.”))

Further, the *King* court correctly noted that a preliminary injunction is “an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.” *Id*. at Pg ID 3300 (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). In *King*, the plaintiffs lacked standing, the defendants were immune, the matter was moot, laches and abstention applied, and the plaintiffs did not establish a likelihood of success on the merits.

There, the plaintiffs were requesting a federal district court to, inter alia, decertify the election results of that particular State and order Defendants “to transmit certified election results that state that President Donald Trump is the winner of the election.” *King*, *supra*, ECF No. 6 at Pg ID 955; ECF No. 7 at Pg ID 1847. The *King* court described the relief sought as “stunning in its scope and breathtaking in its reach.” *King*, *supra*, at p. 2.

Although those cases may have been doomed from the start, the information contained in those matters, in the form of affidavits and expert reports, formed the

basis for *some* of the averments in this case.[8] Discernibly, the dismissal of those cases did not render that evidence incredible as a matter of law.

Plus, a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). A plaintiff who seeks a preliminary injunctive relief must make a clear showing of irreparable injury, and a clear showing of likely of success on the merits. *See Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) ("At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing.").

In ruling upon a motion to dismiss for lack of subject matter jurisdiction, the district court must accept as true all material allegations of the complaint related to Article III standing. *Warth*, 422 U.S. at 501. When a plaintiff is seeking a preliminary injunction, much more is needed. In that context, a plaintiff cannot simply make allegations in his complaint and demand that the courts accept them as true.

---

[8] The plaintiffs in *King* fared no better in the Supreme Court, which denied their writ of certiorari before judgment to the U.S. Court of Appeals for the Sixth Circuit. *King v. Whitmer*, 141 S.Ct. 1449 (2021).

In *Texas Voters Alliance v. Dallas County*, before the 2020 Presidential election, a voters' group and other citizens, again, filed for prospective relief to enjoin four Texas counties from receiving grants from CTCL. 495 F. Supp.3d 441, 449 (E.D. Tex. Oct 10, 2020). As in the cases noted above, the *Texas Voters Alliance* court was faced with a request for preliminary injunction. In relying upon the decision, however, the district court, here, stated that the allegations made in *Texas Voters Alliance* were "similar to the allegations made in this case [in] that by accepting or using CTCL private federal election grants, Texas counties acted ultra vires." Ap. 1519. Plaintiffs in this case made no such accusation. Their complaint is against CTCL, directly, for its conduct across the country, which ultimately did result in the Plaintiffs' rights being substantially burdened by the foreseeable result of its conduct, as outlined in the complaints—not another complaint regarding completely different parties, dissimilar issues and different standards of proof during the pleading stage.

There, as in many of the cases above, the *Texas Voters Alliance* court found the injury claimed was an "undifferentiated, generalized grievance about the conduct of government," and that "merely alleging that the grants *may* influence the election result and lead to *possible* disenfranchisement is not an injury-in-fact." [Emphasis added]. *Id*. at 552.

Specifically, the *Texas Voters Alliance* court found that the plaintiffs were "not claiming their right to vote is being disadvantaged." *Id.* at 452-453. "Plaintiffs are merely alleging that this wider access *may* lead to a result with which they disagree." *Id*. at 453.

In *Iowa Voter Alliance v. Black Hawk County*, the Northern District of Iowa dismissed a similar lawsuit also brought by a local voter's group and other citizens, seeking to "prevent the named counties from using the CTCL grants to help fund the election." C20-2078-LTS. 2021 WL 276700 (N.D. Iowa January 27, 2021). After the plaintiffs were denied a temporary restraining order before the election, the plaintiffs amended their complaint for a declaratory judgment that the named counties' use of the grants violated federal and state law, and for an injunction preventing them from using CTCL, or other private grants, in the future.

Predictably, the *Iowa Voter Alliance* court likewise determined that the plaintiffs did not have standing, as the plaintiffs, there, "failed to allege facts showing that the counties actions resulted in a concrete and particularized injury to their right to vote or to their rights under the Fourteenth and Ninth Amendments." *Id*. at *7. "Instead, they have done no more than assert generalized grievances against government conduct of which they do not approve." *Id*.

Here, CTCL is the state actor, under the circumstances of *this* case. Yet, none of the Defendants are government. The Defendants don't govern the Plaintiffs, nor do they have any legislative, judicial or executive power. Because of that, they don't have immunity from suit under the Eleventh Amendment. Under the Act, they are persons acting under color of official authority.

### III. The District Court Erred by Denying the Plaintiffs' Motion to Amend Their Complaint as Futile

### A. Standard of Review

The district court has discretion when considering whether to allow a plaintiff to amend her complaint. *First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*, 820 F.2d 1127, 1132 (10th Cir. 1987). Thus, the district court's denial of the Plaintiffs' motion to amend their complaint as futile is reviewed for abuse of discretion. *Bauchman v. West High School*, 132 F.3d 542, 559 (10th Cir. 1987). Courts will not overturn a decision absent such abuse. *Id.*

### B. The District Court Abused Its Discretion

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or

futility of amendment. *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir.1993) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The test is whether the proposed amendments, as supported by the affidavits or other evidence, cure the deficiencies in the original complaint. *See, e.g.*, *Mountain View Pharmacy v. Laboratories*, 630 F.2d 1383 (10th Cir. 1980)(court of appeals gave plaintiffs benefit of any supporting allegations contained in sworn factual certificate submitted with the amended complaint when evaluating motion for leave to amend).

Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant language to state a claim for relief. *Mountain View Pharmacy*, 630 F.2d at 1387. A plaintiff must allege sufficient facts to support a cause of action under the law. Conclusory allegations that the defendant violated those laws are insufficient. *Id*. (*citing Klebanow v. New York Produce Exch.*, 344 F.2d 294, 299 (2d Cir. 1965)). *See also TV Communications Network v. Turner Network*, 964 F. 2d 1022, 1028 (10th Cir. 1992).

Plaintiffs sought to amend their complaint primarily to add additional factual allegations, as significantly more was known at the time of the amendment, than when Plaintiffs filed their initial Complaint—not to mention the addition of 152 Plaintiffs.

Noting the district court's ruling that, "if the amendment was allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing," the arguments above apply to this issue, as well. *Order of Dismissal*, p. 28. Except, the Amended Complaint was filed by 160 Plaintiffs from 38 States, and additionally included claims against Zuckerberg, Facebook, CTCL and others for violations of 18 U.S.C. §1962(c)—enterprise racketeering (RICO).

As before, the district court never accepted the factual allegations in the Amended Complaint as true. Instead, the district court misread the recently decided *Uzuegbunam* decision as only instructive with regard to the "redressability" element of standing. *Order of Dismissal*, p. 25. As the Plaintiffs have argued throughout, however, "every violation of a right imports damage." *Uzuegbunam*, 141 S.Ct. at 802. Here, the rights of all the Plaintiffs were violated by the state action of the Defendants. Those completed violations imported damage.

The district court ruled, "Nothing in the proposed Amended Complaint changes the standing analysis." *Order of Dismissal*, p. 28. Accordingly, the district abused its discretion by denying the Plaintiffs' motion to amend on the grounds of futility. If the stated reasons for a denial of a request to amend "are incorrect as a matter of law, the district court will be found to have abused its discretion…". *Grossman v. Novell, Inc.*, 120 F. 3d 1112, 1126 (10th Cir. 1997).

**CONCLUSION**

For the reasons stated herein, the Plaintiffs requests that this Court reverse the district court's order granting dismissal of their case, and further requests that this matter be reinstated with instructions to the district court to allow the Plaintiffs to amend their complaint, pursuant to Fed.R.Civ.P. 15, and, considering the voluntary dismissal of certain parties and claims since the filing of the Amended Complaint, to grant reasonable leave to allow the Plaintiff's to amend their complaint, again, if necessary, consistent with this Court's ruling.

Respectfully submitted on September 20, 2021, by:

*s/ Gary D. Fielder*
Gary D. Fielder, #19757
LAW OFFICE OF GARY D. FIELDER
1444 Stuart St.
Denver, CO 80204
(303) 650-1505 Fax: (303) 650-1705
e-mail: gary@fielderlaw.net

Attorney for the Plaintiffs

## ORAL ARGUMENT STATEMENT

Pursuant to 10th Cir. R. 28.2(C)(4), Plaintiffs/Appellees requests oral

argument to permit the Court to explore the important factual and legal issues in

the case.

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. Ap. P. 32(a)(7)(B), I certify that this brief is proportionally spaced and contains 12,095 words. I relied on my word processor and its Word software to obtain this count. This brief also complies with the typeface and type-style requirements of Fed. R. Ap. P. 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14 point font, a proportionally spaced typeface. I certify that the information on this form is true and correct to the best of my knowledge and belief.

_s/ Gary D. Fielder_
Gary D. Fielder, #19757

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version filed electronically; and (3) the electronic submission was scanned for viruses and found to be virus-free.

*s/ Gary D. Fielder*
Gary D. Fielder, #19757

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 20th day of September, 2021, I electronically filed the foregoing **APPELLANTS' OPENING BRIEF** with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

_s/ Gary D. Fielder_
Gary D. Fielder, #19757

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 1983………………………………………………………… A1

42 U.S.C. § 1988………………………………………………………… A2

**42 U.S. Code § 1983 - Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

A1

**42 U.S. Code § 1988 - Proceedings in vindication of civil rights**

(a)      Applicability of statutory and common law

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

(b) Attorney's fees

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 12361 of title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

A2

(c) Expert fees

In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.

A3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS** (Dkt. ##22, 23, & 41) &
**PLAINTIFFS' MOTION TO AMEND (Dkt. #48)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

1

This matter is before the Court with the consent of the Parties, referred for all purposes by Chief Judge Philip A. Brimmer pursuant to 28 U.S.C. § 636(c).

This lawsuit arises out of the 2020 election for President of the United States. The original Complaint, filed December 22, 2020 (Dkt. #1) and which purports to be a class action lawsuit brought on behalf of 160 million registered voters, alleges a vast conspiracy between four state governors; secretaries of state; and various election officials of Michigan, Wisconsin, Pennsylvania and Georgia; along with Dominion Voting Systems, Inc.—a private supplier of election and voting technology; the social media company Facebook, Inc.; the Center for Tech and Civic Life ("CTCL")—a non-profit organization dedicated to making elections more secure and inclusive; as well as Facebook founder Mark Zuckerberg and his wife Priscilla Chan.

I use the words "vast conspiracy" advisedly. That is what the Complaint, all 84 pages and 409-plus paragraphs, alleges: that "the Defendants engaged in concerted action to interfere with the 2020 presidential election through a coordinated effort to, among other thing, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Dkt. #1 at 2, ¶ 4.

The named Plaintiffs are from Virginia (Kevin O'Rourke), Michigan (Nathaniel Carter and Kesha Crenshaw), Colorado (Lori Cutunilli and Neil Yarbrough), Alaska (Alvin Criswell), California (Larry D. Cook), and Alabama (Amie Trapp).

Plaintiffs' affidavits, attached to the Complaint, shed light on the personal feelings and motivations in bringing this suit, highlighting their personal anguish stemming from the 2020 presidential election. For example, Mr. O'Rourke, a Virginia certified public accountant and a self-professed "free man, born of a free woman and free man," explains:

> I have lost any faith in the existing form of government and technology monopolies; I am angry; I am frustrated; I cannot sleep at night; I suffer from anxiety as a result of this uncertainty; I have lost my desire to communicate with most people openly and remain guarded as to my interactions and communication with every day people; I feel I have no voice, no rights, and I have been 100% abandoned by the government in all its forms[.]

Dkt. #1-2 at ¶ 36.

> Mr. Carter, a 55-year old Michigander from Benton Harbor, swears that
>
> DOMINION and others were aware or should have been aware that machines are unreliable, and susceptible to manipulation by unethical administrators, outside actors, foreign countries, and from employees and contractors from inside DOMINION. I believe that as a result, my vote during the 2020 Presidential Election was effectively not counted, and the results of the election were predetermined. . . . I believe my vote has be [sic] discounted or eliminated all-together from consideration regarding the choice for the country's highest office.

Dkt. #1-3 at ¶ 19–22.

And Ms. Cutunilli, a business owner and grandmother in Summit County, Colorado, believes that her "constitutional right to participate in fair and honest elections has been violated with [her] vote suppressed." She says, "While I once trusted in the fairness of the United States electoral system I no longer do, with the Dominion Voting System being utilized in Colorado and around the country as well as private 'donations' being unconstitutionally distributed and accepted to interfere with the legitimacy of our elections." *Id.*

The affidavits of the other Plaintiffs are similar in tone and reflect similar beliefs and sentiments,[1] summarized in the concluding pages of the Complaint, "The shared, foreboding feeling of impending doom is presently felt by tens of millions of people. All across the country there is a fear that the people are losing their liberty." Dkt. #1 at 82.

The Complaint asserts seven separate counts. Plaintiffs allege (1) violation of the Electors Clause and imposing of an unconstitutional burden on the right to vote for President and Vice-President; (2) violation of equal protection; (3) violation of due process; (4) the imposition of an unconstitutional burden on the rights to political speech, the right to associate, and freedom of the press; (5) a "Constitutional Challenge" to the actions of Facebook and Mr. Zuckerberg as somehow burdening the Plaintiffs' right to free speech and free press, and questioning whether 47 U.S.C. § 230(c) applies to Facebook; (6) a request for a declaratory judgment that each of the Defendants acted unconstitutionally; and (7) a permanent injunction.

For relief, Plaintiffs in their Complaint seek a mishmash of outcomes, ranging from a permanent injunction restraining Defendants from any further unconstitutional behavior, to a declaratory judgment that 47 U.S.C. §230(c) is unconstitutional as applied to the actions of the Facebook and Mr. Zuckerberg, to a declaration that the actions of the Defendants are unconstitutional and ultra vires "making them legal nullities," to a damage award in the "nominal amount of $1,000 per registered voter [which] equals

---

[1] Plaintiff Larry D. Cook, although convinced that there "was widespread vote fraud and manipulation during the 2020 Presidential Election" is somewhat anomalous, as his affidavit appears to focus on his anti-vaccination beliefs, his support of Q and other Qanon conspiracy theorists, and his distress at having had his anti-vaccine Facebook page and Qanon-related pages removed from the platform. *See* Dkt. #1-6.

damages in the approximate amount of $160 billion dollars" for the alleged

Constitutional wrongs Plaintiffs have suffered. Dkt. #1 at 82–83.

The Defendants who have been served moved to dismiss on a number of

grounds, including pursuant to Rule 12(b)(1) (lack of subject matter jurisdiction);

12(b)(2) (lack of personal jurisdiction), and 12(b)(6) (failure to state a claim). See Dkt.

##22, 23, 41, 46, 47, & 49.

**Procedural Background, Pending and Mooted Motions**

Plaintiffs filed suit on December 22, 2020.

On February 16, 2021, Dominion filed its Motion to Dismiss. *See* Dkt. #22.

Facebook filed its own Motion to Dismiss the same day. *See* Dkt. #23.

On February 26, 2021, the Court stayed all disclosures and discovery pending

resolution of the Motions to Dismiss. *See* Dkt. #28 (Minute Order).

Rather than filing an Amended Complaint as a matter of right, Plaintiffs filed

oppositions to the two Motions to Dismiss on March 9, 2021. *See* Dkt. ##38 & 39.

On March 10, 2021, the Center for Tech and Civic Life ("CTCL") filed its own

Motion to Dismiss. *See* Dkt. #41.

On March 15, 2021, Michigan Governor Gretchen Whitmer and Michigan

Secretary of State Jocelyn Benson filed a Motion to Dismiss. *See* Dkt. #46. The same

day, Georgia Governor Brian Kemp and Georgia Secretary of State Brad Raffensperger

also filed a Motion to Dismiss. *See* Dkt. #47. And on March 18, 2021, Pennsylvania

Governor Tom Wolf and Pennsylvania Acting Secretary of Commonwealth Veronica

Degraffenreid also filed a Motion to Dismiss. *See* Dkt. #49.

5

In the meantime, on March 15, 2021, Plaintiffs filed a Motion for Leave to File an Amended Complaint, attaching a redlined version of the proposed Amended Complaint. *See* Dkt. #48. The proposed Amended Complaint seeks to add 152 new plaintiffs from 33 different states and breaks the proposed national class of registered voters into subclasses of Republicans, Democrats, Third-Parties, Independents, and "Disgruntled Voters." The proposed Amended Complaint adds six causes of action (including racketeering claims under the federal Racketeer Influenced and Corrupt Organization Act ("RICO") against Facebook, CTCL, Zuckerberg and Chan) and 473 paragraphs.

On March 23, 2021, Facebook and Dominion filed their replies in support of their Motions to Dismiss. *See* Dkt. ##55 & 56.

On March 29, 2021, each of the Defendant groups filed responses objecting to Plaintiffs' Motion for Leave to File the Amended Complaint. *See* Dkt. #58 (Kemp/Raffensperger), #59 (Boockvar/Wolf), #60 (Benson/Whitmer), #61 (Dominion), #62 (CTCL), & #63 (Facebook.).

On April 8, 2021, Plaintiffs filed multiple replies in support of their Motion for Leave to File an Amended Complaint. *See* Dkt. ##71, 73, 74, 75, 76, & 77.

Plaintiffs initially filed responses opposing the various government official defendants' Motions to Dismiss. *See* Dkt. #72 (opposing Wolf and Degraffenreid's Motion to Dismiss), #79 (opposing Kemp and Raffensberger's Motion to Dismiss); & #80 (opposing Whitmer and Benson's Motion to Dismiss). But then, a few days later, on April 19 and 20, 2021, Plaintiffs' voluntarily dismissed the government official defendants from the case. *See* Dkt. ##82–85, & 87.

Thus, remaining for determination are the Motions to Dismiss of Defendants Dominion (Dkt. #22), Facebook (Dkt. #23), and CTCL (Dkt. #41), and Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. #48). The Motions to Dismiss filed by the government official defendants will be denied as moot, as those defendants have been voluntarily dismissed.

**Standard for Considering Rule 12(b)(1) Motion to Dismiss for Lack of Jurisdiction**

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**Standard for Failure to State a Claim Under Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

**Plaintiffs lack Article III standing so the Court lacks jurisdiction to hear the case.**

Defendants make numerous arguments as to why Plaintiffs' Complaint should be dismissed, including lack of personal jurisdiction, failure to state a constitutional claim because the remaining Defendants are not state actors, failure to plausibly allege violation of constitutional rights, and reliance on Section 230 of the Communications Decency Act. But one argument appears in all the Motions and, even without addressing the myriad others, it ultimately proves fatal to Plaintiffs' case. The decisive argument is that the Plaintiffs have not demonstrated a judicially cognizable interest or injury sufficient to grant them standing to sue. With Plaintiffs not having standing to sue, there is no case or controversy, a necessary predicate for federal court jurisdiction under Article III of the Constitution.

Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that the jurisdiction of the federal courts reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, a federal court lacks the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Article III standing requires Plaintiffs to have personally suffered (1) a concrete and particularized injury (2) that is traceable to the conduct they challenge, and that (3) would likely be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the pleading stage, any complaint filed in federal court must

8

"clearly allege facts demonstrating each element." *Id.* (quotation marks and alterations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 1548 (internal quotation marks omitted).

The gravamen of Plaintiffs' Complaint, confirmed by a review of their attached affidavits, is the general assertion that allegedly illegal conduct occurred in multiple states across the country during the recent Presidential election, resulting in Plaintiffs' votes (to the extent each Plaintiff actually voted—some admit they did not) being diluted or discounted in some way, to the point where their votes did not matter.[2] The allegedly illegal conduct supposedly included facilitating the use of more absentee ballots than Plaintiffs think was permissible; the unequal placement of ballot drop boxes; the modification of various state voting rules in a way Plaintiffs believe was inconsistent with state law; the publication by Facebook of certain messages and Facebook's selective censorship of others; the implementation by municipalities across the country of allegedly inaccurate vote-counting technologies; and the charitable funding of certain municipalities' voting inclusion and security programs.

But whatever the grievances, the disputed conduct and the resulting claimed injury impacted 160 million voters in the same way. The Complaint, viewed as whole, is a generalized grievance about the operation of government, or about the actions of the

---

[2] *See* Aff. of Kesha Crenshaw (Dkt. #1-7) ("I am routinely told by people, even my husband, that my vote didn't matter, and that voting is just wasting my time. . . . I have watched what happened on Election Day and since, and now realize that the people who warned me that my vote didn't count were right. I know that I did cast a ballot and voted in the election, but based on reports that I have seen, I have no faith that the outcomes reported are actually the votes that were cast, or that my vote was counted at all. . . . I can see with my own eyes the 'irregularities' that have been reported, and know what I see is not right, has not been explained, and calls into doubt the legitimacy of the election.").

9

Defendants on the operation of government, resulting in abstract harm to all registered voting Americans. It is not the kind of controversy that is justiciable in a federal court. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (claimed interest in ensuring that "only lawful ballots are counted" is a generalized grievance).

As the Supreme Court of the United States has said in a case involving four Colorado voters who sought to challenge on federal constitutional grounds a Colorado Supreme Court decision relating to redistricting,

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan*, 504 U.S. at 573-74 (1992)). *See also Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance).

The Supreme Court in *Lance* was specific that a case where voters allege only that the law (in that case the Elections Clause) has not been followed will not support standing to sue:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. *See, e.g. Baker v. Carr*, 369 U.S. 186, 207–208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring the Elections Clause claim.

549 U.S. at 1198.

It should be no surprise to Plaintiffs or their counsel that their generalized

grievances about their votes being diluted or other votes being improperly counted

would be insufficient to grant them the standing required under Article III of the

Constitution. Numerous other cases challenging the 2020 election and its surrounding

circumstances have been dismissed for precisely this reason (among many other

reasons).

For example, on December 11, 2020, the United States Supreme Court denied

the State of Texas' attempt to file a bill of complaint challenging the Commonwealth of

Pennsylvania's 2020 election procedures on the ground that "Texas has not

demonstrated a judicially cognizable interest in the manner in which another State

conducts its elections." *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020).

In *Wood v. Raffensperger*, the Eleventh Circuit held that attorney Lin Wood

lacked standing in federal court to enforce Georgia's election laws, in part because his

claim that unlawfully processed absentee ballots diluted the weight of his vote was a

generalized grievance "that cannot support standing." 981 F.3d at 1314-15.

In *Bognet v. Secretary Commonwealth of Pennsylvania*, where voters and a

congressional candidate brought suit against the Secretary of the Commonwealth of

Pennsylvania and county boards of election seeking to enjoin the counting of mail-in

ballots during a three-day extension of the ballot-receipt deadline ordered by the

Pennsylvania Supreme Court, and also seeking a declaration that the extension period

was unconstitutional, the Third Circuit explained the doctrine of standing in clear terms:

> To bring suit, you—and you personally—must be injured, and you must be
> injured in a way that concretely impacts your own protected legal interests.
> If you are complaining about something that does not harm you—and does
> not harm you in a way that is concrete—then you lack standing. And if the

injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court.

980 F.3d 336, 348 (3d Cir. 2020), *cert. granted and judgment vacated with instructions to dismiss as moot*, ___ S. Ct.___, 2021 WL 1520777 (April 19, 2021). In *Bognet*, the court held that the plaintiffs lacked standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause, in part because the relief "would have no more directly benefitted them than the public at large." *Id.* at 349.[3]

In *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020), the Western District of Pennsylvania dismissed a legal challenge to election guidance given by the Secretary of the Commonwealth of Pennsylvania regarding manned security near absentee drop boxes, performing of signature comparisons for mail-in ballots, and a county-residency requirement for poll watchers. The claim had been that the plaintiffs would suffer an injury through the non-equal treatment or dilution of their legitimately cast votes by improperly verified absentee or mail-in ballots. The court there found the plaintiffs lacked the "concrete" and "particularized" injury necessary for Article III standing, agreeing that the "claimed injury of vote dilution caused by possible voter fraud . . . too speculative to be concrete." 2020 WL 5997680, at *32.

In *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020), the District of Nevada dismissed a lawsuit against Nevada's Secretary of State that sought to challenge a Nevada law that expanded mail-in voting due to the COVID-19 pandemic. The law directed city and county election officials to mail paper ballots to

---

[3] While the judgment in this case was vacated by the Supreme Court on mootness grounds, the reasoning on the issue of standing remains persuasive.

all active registered voters. Plaintiffs sued, claiming an individual right under the
Constitution to have a vote fairly counted, "without being distorted by fraudulently cast
votes"—i.e., vote dilution—and also for violations of the Equal Protection Clause. The
court dismissed the case for lack of standing, finding the claimed injury "impermissibly
generalized" and "speculative." 488 F.Supp.3d at 1000. "As with other '[g]enerally
available grievance[s] about the government,' plaintiffs seek relief on behalf of their
member voters that "no more directly and tangibly benefits them than it does the public
at large." *Id.* (alteration omitted) (quoting *Lujan*, 504 U.S. at 573–74).

In *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz.
Dec. 9, 2020), the District of Arizona rejected a suit by Republican nominees for
Arizona's Presidential Electors and Republican county chairs who sued Arizona's
governor and secretary of state seeking to set aside results of the 2020 election on the
basis of fraud and election misconduct. Claims under both the Elections Clause and the
Equal Protection Clause based on vote dilution were deemed inadequate for lack of
Article III standing: "Defendants contend that Plaintiffs do not have standing to assert
these claims and point out that these allegations are nothing more than generalized
grievances that any one of the 3.4 million Arizonans who voted could make if they were
so allowed. The Court agrees." 2020 WL 7238261, at *5.

In *King v. Whitmer*, Civ. No. 20-13134, 2020 WL 7134198 (E.D. Mich. December
7, 2020), the Eastern District of Michigan rejected a lawsuit bringing claims of
widespread voter irregularities and fraud in the processing and tabulation of votes and
absentee ballots in the 2020 general election. The plaintiffs were registered Michigan
voters and nominees of the Republican Party to be Presidential Electors on behalf of

the State of Michigan. They sued Michigan Governor Whitmer and Secretary of State

Benson in their official capacities, as well as the Michigan Board of State Canvassers.

Applying the doctrine of standing, the court there found that the plaintiffs had failed to

establish that the alleged injury of vote dilution was redressable by a favorable court

decision. 2020 WL 7134198, at *9. And with respect to the claimed violations of the

Elections Clause and Electors Clause, the Court held that where "the only injury

Plaintiffs have alleged is the Elections Clause has not been followed, the United States

Supreme Court has made clear that '[the] injury is precisely the kind of undifferentiated,

generalized grievance about the conduct of government that [courts] have refused to

countenance.'" *Id.* at *10 (quoting *Lance*, 549 U.S. at 442).

In *Feehan v. Wisconsin Elections Commission*, No. 20-cv-1771-pp, 2020 WL

7250219 (E.D. Wis. Dec. 9, 2020), a case involving a Wisconsin political party's

nominee to be a Presidential Elector who brought suit alleging the election was the

subject of wide-spread ballot fraud and violated the equal protection and due process

clause, the court dismissed the suit for lack of standing because the claimed injury was

not particularized:

> The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if
> the Wisconsin election process were, as the plaintiff alleges, "so riddled with
> fraud, illegality, and statistical impossibility that this Court, and Wisconsin's
> voters, courts, and legislators, cannot rely on, or certify, any numbers
> resulting from this election." [ ] The plaintiff has not alleged that, as a voter,
> he has suffered a particularized, concrete injury sufficient to confer
> standing.

2020 WL 7250219, at *9 (internal citation omitted). Many of the allegations found in

Plaintiffs' Complaint are identical to the allegations in the *Feehan* case. *See id.* at *2

(reciting the *Feehan* complaint as alleging "massive election fraud, multiple violations of

the Wisconsin Election Code, see e.g., Wis. Stat. §§ 5.03, et seq., in addition to the

Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution"
based on "dozens of eyewitnesses and the statistical anomalies and mathematical
impossibilities detailed in the affidavits of expert witnesses").

In *Texas Voters Alliance v. Dallas County*, Civ. No. 4:20-CV-00775, 2020 WL
6146248 (E.D. Tex. Oct. 10, 2020), the Eastern District of Texas denied a motion for a
temporary restraining order in a suit brought by a Texas voting rights group and voters
under the Elections Clause, Supremacy Clause and Help Americans Vote Act, which
alleged (similar to the allegations in this case) that by accepting or using CTCL's private
federal election grants, Texas counties acted ultra vires. The court found the plaintiffs
lacked standing to challenge the counties' acceptance of the CTCL grants because the
injury claimed was an "undifferentiated, generalized grievance about the conduct of
government" and "merely alleging that the grants may influence the election result and
lead to possible disenfranchisement is not an injury-in-fact." 2020 WL 6146248, at *4.

In *Iowa Voter Alliance v. Black Hawk County*, C20-2078-LTS, 2021 WL 276700
(N.D. Iowa January 27, 2021), the Northern District of Iowa dismissed a lawsuit brought
by voters and a voter group, which also sought to challenge Iowa counties' acceptance
of CTCL grants which were intended to assist with the unforeseen costs of conducting
an election during the COVID-19 pandemic. The court found

> none of plaintiffs alleged injuries constitutes an injury in fact, as they have
> failed to allege facts showing that the counties' actions resulted in a
> concrete and particularized injury to their right to vote or to their rights under
> the Fourteenth and Ninth Amendments. Instead, they have done no more
> than assert generalized grievances against government conduct or which
> they do not approve.

2021 WL 276700, at *7 (internal quotation marks, citations, and alterations omitted).

In sum, federal courts addressing these issues, whether in the 2020 or other elections, are nearly uniform in finding the types of election-related harms of which the Plaintiffs complain insufficient to confer standing. The Middle District of North Carolina recently summarized some of these vote-dilution "generalized grievance" decisions:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. *See, e.g., Donald Trump for President, Inc. v. Cegavske*, Case No. 2:20-CV-1445 JCM (VCF), ⸺ F. Supp. 3d ⸺, ⸺, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); *Martel v. Condos*, Case No. 5:20-cv-131, ⸺ F. Supp. 3d ⸺, ⸺, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")

> Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," *Martel*, ⸺ F. Supp. 3d at ⸺, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . ..

*Moore v. Circosta*, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020).

In contrast to the veritable tsunami of decisions finding no Article III standing in near identical cases to the instant suit, Plaintiffs' arguments in opposition to Defendants' Motions to Dismiss are cursory and neither cite nor distinguish any of the cases that have found a lack of standing among voter plaintiffs making challenges to the 2020 election. *See* Dkt. #64 at 10–11 (Plaintiffs' Opposition to CTCL's Motion to Dismiss citing cases from 1982, 1915, 1983, 1978, and 1976 and not discussing any of the many standing cases cited in CTLC's moving papers); Dkt. #40 at 21–22 (Plaintiffs' Opposition to Facebook's Motion to Dismiss making the same superficial arguments and citing the same cases); Dkt. #39 at 17–19 (Plaintiffs' Opposition to Dominion's Motion to Dismiss failing to cite or distinguish any of the other standing cases dismissing claims disputing the 2020 election). And in opposing the Motions to Dismiss, Plaintiffs paradoxically make arguments that implicitly concede the generalized, rather than particularized, nature of the injuries about which they complain.

For example, in responding to Dominion's Motion to Dismiss, Plaintiffs attempt to explain their claimed individualized injury as follows:

> The Plaintiffs alleged that their individual rights to vote in a Presidential election, and to be treated equally and fairly, have been burdened by the conduct of Dominion. [. . . ] Even for those voters in State's [sic] that do not utilize Dominion, their shared right to vote for the President and Vice President was burdened by this Colorado corporation.

Dkt. #39 at 20. In trying to explain how this injury is particularized to the individual plaintiffs and not all members of the public, Plaintiffs purport to clarify that it is only registered voters—all 160 million of them—who "have had their rights infringed –and this [have] the standing to bring suit." *Id.* But reducing the number of allegedly harmed Plaintiffs from 300 million total Americans to only 160 million registered voters does not make the harm complained of any less generalized nor any more particularized. As the

cases cited above make clear, a claim that "all voters" are affected the same way is no more particularized than a claim that the "general public" is so affected.

In opposing the motions to dismiss, Plaintiffs' only tangentially relevant citation is to a dissenting opinion by Justice Thomas in a denial of certiorari. *See* Dkt. #39 at 21 (citing Justice Thomas's dissent in *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) (denying petitions for writ of certiorari)). It should go without saying that denials of certiorari are not binding authority. *See House v. Mayo*, 324 U.S. 42, 48 (1945) ("[A] denial of certiorari by this Court imports no expression of opinion upon the merits of a case."). And dissenting opinions are, by definition, not the law. But even Justice Thomas's dissent to the denial of certiorari said nothing about the standing of registered voters to challenge a state's use of specific election technology, or standing to challenge a social network's editorial policies because of the impact it might have on the electorate at large, or standing to dispute a non-profit's donations to municipalities for election-related purposes.

Plaintiffs fare no better on the standing issue in their brief opposing Facebook's Motion to Dismiss. *See* Dkt. #40. The alleged complaint against Facebook is that the company, its founder Zuckerberg, and the non-profit CTCL, formed an "obvious conspiracy" working "with local governments to place ballot drop boxes primarily in urban areas, which has the purpose and effect of avoiding or intercepting the U.S. Mail." *Id.* at 2. According to Plaintiffs, this was part of a

> secret conspiracy among a "cabal" formed by an "informal alliance between left-wing activists and business titans," to "fortify" the election through new voting machines, new election laws, hundreds of millions in cash, new poll workers, millions of new mail-in ballots, social media censorship, propaganda, media manipulation, and lawsuit suppression through the use

of threats, intimidation and strategic lawsuits against public participation, which takes credit for impacting the outcome of the election.

*Id.* at 3. In attempting to describe the supposedly individualized nature of the injury suffered by Plaintiffs at the hands of Facebook to justify standing their standing to sue, Plaintiffs refute their own argument:

> Here, *every registered voter* was deprived of a fair and legitimate process administered by the relevant state actors. Further, the lack of legitimacy not only devalues and dilutes the votes that were cast, but also reinforces the notion that individual votes do not matter, thereby diminishing the perceived present value of the right to vote in future elections and suppressing subsequent voter turnout. *Registered voters* have been subjected to tumult, mental anguish and division for months. These injuries are bipartisan, and have been suffered by *all registered voters* regardless of whom their vote was cast. Although some registered voters may be content that the candidate of their choice was certified as the winner, questionable election integrity *impacts all registered voters*.

*Id.* at 22–23 (emphasis added). This is almost the hornbook definition of a generalized grievance that broadly affects all of a state's voters in the same way. It is lethal to Plaintiffs' claim to have standing to sue. *See Moore,* 2020 WL 6063332, at *14 ("This harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters."); *Bowyer*, 2020 WL 7238261, at *5 ("[T]hese allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed."); *King*, 2020 WL 7134198, at *10 ('[T]he injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that courts have refused to countenance.'") (alterations omitted) (quoting *Lance*, 549 U.S. at 442).

At oral argument on April 27, 2021, Plaintiffs' counsel tried to say that the numerous other similar cases denying standing were different because those cases involved suits against state actors or state agencies, and here Plaintiffs are suing

corporations (and a non-profit). This argument ignores that, until they were dismissed, Plaintiffs <u>had</u> sued a number of state governors and secretaries of state. More important, no case makes the distinction that Plaintiffs try to make. Standing, or at least the injury-in-fact element of standing, arises from a plaintiff's claimed injury, not the particular defendant it is seeking to sue, or in what capacity. Here, Plaintiffs' claimed injuries are general, unparticularized, and shared with every other registered voter in America.

Without Plaintiffs having standing to sue, there is no case or controversy for the Court to address. The complaint therefore will be dismissed for lack of federal jurisdiction.

**Amendment of the Complaint**

The Federal Rules of Civil Procedure grant amendment as of right where the amendment is made within 21 days after service of a motion under Rule 12(b). Fed. R. Civ. P. 15(a)(1)(B). After this period, amendment may only be granted with the court's leave. The grant or denial of an opportunity to amend is within the discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "The court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018).

The Supreme Court has approved denial of leave to amend when any amendment would be futile. *Foman*, 371 U.S. at 182. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007). *See also Midcities Metro. Dist. No. 1 v. U.S. Bank*

*Nat'l. Ass'n.*, 44 F. Supp. 3d 1062, 1068 (D. Colo. 2014) (denying leave to amend where Plaintiff had no standing). The factual allegations in a proposed amended complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

The proposed Amended Complaint adds 152 individual plaintiffs and grows in length to 882 paragraphs and 115 pages. *See* Dkt. #48-1. The newly added Plaintiffs are registered voters are from thirty-three different states, spanning from Alabama, Alaska, and Arizona, to West Virginia, Wisconsin, and Wyoming. In connection with the Amended Complaint, Plaintiffs' counsel has submitted an affidavit (Dkt. #48-3) describing how he and his staff have fielded hundreds of phone calls and e-mails while coordinating with individuals seeking to join this suit. According to Plaintiffs' counsel, "Every individual who has made contact has universally believed that they had been damaged and expressed a deep sense of loss of trust and confidence in the electoral process, specifically caused by the actions of the named Defendants." *Id.* at 2, ¶ 6. At oral argument, Plaintiffs' counsel explained that he has collected more than 400 additional affidavits describing the mental anguish and suffering these new prospective Plaintiffs have gone through as a result of the disputed election. He proposed to file those affidavits with the Court. (He should not file them.)

In addition to the existing claims for violation of the Electors Clause, Equal Protection Clause, Due Process Clause, undue burden on the rights to associate and freedom of the press, and the constitutional challenge to 47 U.S.C. § 230(c), the proposed Amended Complaint seeks to add claims for (1) violation of 18 U.S.C. § 1962(c)—enterprise racketeering against Facebook, CTCL, Zuckerberg and Chan; (2)

racketeering conspiracy against the same defendants; and (3) constitutional challenges

to Michigan State Law (M.C.L. 168.759(3)); Georgia State law (O.C.G.A. 21-2-386 et

seq.); Pennsylvania state law (Act 77); and Wisconsin state laws (Wis. Stat. 6.855(3)

and 7.15(2m)).[4] The Amended Complaint continues to seek a declaratory judgment that

each of the Defendants "acted in contravention to the limitations imposed by the

Constitution and the laws relate to a federal Presidential election to the injury of

Plaintiffs." Dkt. #48-1 at 113, ¶ 878. Plaintiffs also continue to seek "permanent

injunctive relief against the Defendants to enjoin them from continuing to burden the

rights of the Plaintiffs and all similarly situated registered voters." *Id.* at 114, ¶ 881.

In terms of the factual additions found in the Amended Complaint, Plaintiffs add

numerous additional paragraphs. Many of those paragraphs use the language of the

RICO statute to paint a picture of the Defendants as co-conspirators in a grand national-

level effort to corrupt the Presidential election of 2020. *See* Dkt. 48-1 at 5–7, ¶ 13 ("The

2020 Presidential election was unconstitutionally influenced by a well-funded cabal of

powerful people . . ."); ¶ 14 ("This well-funded group of persons, associated in fact . . .");

& ¶¶ 15–28 (describing the actions of the alleged "enterprise," including coordinating

with non-profit organizations and local municipalities to make changes to voting

procedures).

The new paragraphs also add details about alleged problems with Dominion's

electronic voting systems and software. *See id.* at 8, ¶ 42 ("Dominion's voting machines,

tabulators, poll books, automated data, and other products and services were and are

---

[4] Although at oral argument, Plaintiffs' counsel made clear that Plaintiffs' are
withdrawing their claims purporting to challenge the various state election laws or
provisions.

defective, and not deployed in a workmanlike manner sufficient to ensure the validity of

the election results."); & ¶ 44 ("Dominion's software and other products are susceptible

to hacking, bugs, malware and configuration errors.").

And, in support of the class action allegations, the proposed Amended Complaint

lists a series of supposed "common questions" that could be determined on a class-

wide basis, including, among others:

> Whether Defendants engaged in a scheme and enterprise to
> improperly interfere with the 2020 Presidential election, by the use of
> devices and methods that affected or diluted the Plaintiffs' right to vote in a
> free and fair Presidential election;
>
> Whether Defendants used the US Mail to further their scheme and
> enterprise and improperly interfere with the 2020 Presidential election;
>
> Whether Defendants engaged in a conspiracy against the rights and
> liberties of registered voters by employing their scheme and enterprise
> aimed at the election machinery; [and]
>
> Whether Defendants engaged in a conspiracy against the rights and
> liberties of registered voters by engaging in censorship of political and
> dissenting speech."

*Id.* at 32, ¶ 253(a), (b), (d), & (e). But the Amended Complaint adds nothing meaningful

or different to the injuries claimed by the Plaintiffs.

Just as in the original Complaint, all the supposed injuries relate to Plaintiffs'

votes and the alleged dilution thereof. *See, e.g.*, *id.* at 85, ¶¶ 676–79 ("The evidence

establishes that the enterprise has engaged in a scheme to dilute the votes of some,

and count illegal ballots to the benefit of another. This hurts every registered voter in the

country irrespective of voter affiliation. Other than the nefarious, the honest American

voter wants every vote counted to legally determine the President and Vice President.").

Under normal circumstances and in a normal case, where a plaintiff seeks to

amend the complaint for the first time relatively soon after the start of the litigation, even

after responding substantively to a motion to dismiss, it is near automatic for leave to amend to be granted. The exception is where, given the nature of the claims, no amendment can salvage a fatally flawed suit and it is everyone's interest that the litigation be ended. This is such a fatally flawed case.

On the critical question of standing, the proposed Amended Complaint fares no better than the original. Plaintiffs' claim to standing is that these new 152 Plaintiffs, and the class and subclasses that the Amended Complaint hopes to certify, all have "standing to vindicate the [sic] rights as registered voters in a federal Presidential Election." Dkt. #48 at 4. Plaintiffs insist that "it would improper for a federal court to deny registered voters . . . standing to vindicate their rights, protected under the Constitution." *Id.* Plaintiffs maintain that "each of them" has "a right to seek adjudication of federal questions of singular effect over Defendants." *Id.*

But Plaintiffs misunderstand the nature of the standing inquiry. Standing is not something that is granted or denied by a court. A plaintiff has standing to sue because of the nature of the injury she has suffered and the circumstances which caused that injury. If a plaintiff has suffered an identifiable, distinct, and particularized injury, redressable by court action, then standing exists. Here, by their own admission, Plaintiffs' claimed injuries are no different than the supposed injuries experienced by all registered voters. This is a generalized injury that does not support the standing required for a genuine case or controversy under Article III of the Constitution.

In their replies in support of the Motion for Leave to Amend, Plaintiffs cite the recent Supreme Court case of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). In *Uzuegbunam*, former students at a state college had wished to exercise their religion by

sharing their faith on campus. The students obtained a required permit and were distributing religious materials in a designated "free speech zone" when a campus police office asked the students to stop. Campus policy at the time prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of persons." The plaintiffs sued, arguing the policies violated the First Amendment. The college then changed the challenged policies rather than defend them, and argued that the case should be dismissed on the ground that the policy change rendered the request for injunctive relief moot, arguably leaving the students without standing to sue for lack of a redressable case or controversy. But the students had sought nominal damages in addition to injunctive relief. The question for the Supreme Court was whether a plea for nominal damages for an already completed constitutional injury could by itself establish the redressability element of standing.

The Court held that a request for nominal damages alone does satisfy the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right and the plaintiff establishes the first two elements of standing—injury and traceability. 141 S. Ct. at 801–02. But the *Uzuegbunam* decision is clear that a plea for nominal damages only satisfies the *redressability* element of standing, not the requirement for pleading particularized injury: "This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as particularized injury)." *Id.* at 802. In *Uzuegbunam,* there was no debate that the plaintiff had suffered particularized injury—he had tried to

exercise his right to free speech and religion and been stopped by the campus police from doing so.

In this case, by contrast, whether in the original Complaint or the proposed Amended Complaint, Plaintiffs allege no particularized injury traceable to the conduct of Defendants, other than their general interest in seeing elections conducted fairly and their votes fairly counted. As outlined in the section above, when the alleged injury is undifferentiated and common to all members of the public or a large group, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). And the injuries complained of in this case are general grievances shared by all registered voters that do not give standing to sue.

Asked at oral argument to direct the Court to the "best case" supporting Plaintiffs' position that they have standing to sue, Plaintiffs' counsel mentioned *Anderson v. Celebreze*, 460 U.S. 780 (1983). *Anderson* involved a suit by independent Presidential candidate John Anderson who challenged the State of Ohio's arguably discriminatory requirements for independent Presidential candidates who sought a place on the Ohio ballot. Ohio required an independent candidate to submit required documents, filing fees, and the requisite signatures many months in advance of the election (by March 20 for the November election), while political party nominees were automatically granted a place a ballot. While Anderson submitted all the necessary paperwork and obtained the requisite number of signatures, he did so after the early filing deadline had passed, and Ohio's Secretary of State refused to accept Anderson's nominating petition. Three days later, Anderson himself and three voters sued in the Southern District of Ohio

challenging the constitutionality of Ohio's early filing deadline for independent candidates. 460 U.S. at 782–83. While the *Anderson* opinion talks a great deal about the right to vote being "fundamental," i*d.* at 788, the case says nothing about standing. Anderson, as a candidate being denied a spot on the ballot, obviously had a particularized injury that granted him standing. The Anderson supporters too had a particularized injury: the candidate they sought to vote for was being denied a spot on the ballot. Their right to vote for the Presidential candidate of their choice was being denied. Even the dissent, which disagreed that Ohio's early registration requirements were unconstitutional, conceded the particularized nature of Anderson's and his supporters' injuries: "Anderson and his supporters would have been injured by Ohio's ballot access requirements; by failing to comply with the filing deadline for nonparty candidates Anderson would have been excluded from Ohio's 1980 general election ballot." *Id.* at 808 (Rehnquist, J., dissenting). Thus, even Plaintiffs' purported "best case" to justify standing provides no support at all.

Therefore, I find that any amendment of this Complaint which seeks to bring suit on behalf of all registered voters in the United States for alleged illegality in the conduct of the 2020 election and associated vote dilution is futile because Plaintiffs cannot allege particularized injury sufficient to establish Article III standing. Leave to amend will be denied. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (explaining that district court may dismiss without granting leave to amend when amendment would be futile, and affirming dismissal without leave to amend for lack of standing, but noting such dismissal should be without prejudice); *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (affirming dismissal for lack of standing and

approving denial of amendment of pleading on grounds of futility because proposed amendment would not cure the standing deficiency); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (affirming denial of leave to amend on grounds of futility and failure to show how any amendment would cure identified deficiencies). *See also Donald J. Trump for President*, 830 F. App'x at 389 (affirming denial of leave to amend suit challenging 2020 election on grounds of futility because the proposed Second Amended Complaint would not survive a motion to dismiss).

At oral argument, counsel for CTCL pointed out that although Plaintiffs filed an opposition to Dominion and Facebook's Motions to Dismiss and therefore forfeited their ability to amend the Complaint as a matter of right, the timing was different for CTCL's Motion to Dismiss. It is apparently not clear under Tenth Circuit caselaw whether Plaintiffs can still amend as a matter of right. CTCL's proposed solution to avoid any procedural confusion is to allow the amendment and then dismiss the Amended Complaint for lack of standing. As they say, "six of one and half dozen of the other." I deny the amendment on the grounds of futility. A proposed amendment is futile if it would not survive a motion to dismiss. To be clear, if the amendment were allowed, the proposed Amended Complaint would nevertheless be subject to dismissal for lack of standing. Nothing in the proposed Amended Complaint changes the standing analysis.

Because the Court lacks jurisdiction to hear Plaintiffs' suit, it will not address the many other bases for dismissal raised in Defendants' motions.

**Conclusion**

It is hereby **ORDERED** that the Motions to Dismiss of Defendants Dominion, Facebook, and CTCL (Dkt. ##22, 23, & 41) are **GRANTED.** It is further **ORDRED** that

Plaintiffs' Complaint (Dkt. #1) is **DISMISSED WITHOUT PREJUDICE** for lack of standing. *See Brereton*, 434 F.3d at 1219 (dismissal for lack of standing should be without prejudice).

Because Plaintiffs have voluntarily dismissed the claims against the various state officials of Georgia, Michigan, Pennsylvania, and Wisconsin (Brian Kemp, Brad Raffensperger, Gretchen Whitmer, Jocelyn Benson, Tom Wolf, Kathy Boockvar, Tony Evers, Ann S. Jacobs, Mark Thomsen, Marge Bostelman, Julie E. Glancey, Dean Knudson, and Robert F. Spindell, Jr.), it is further **ORDERED** that the Motions to Dismiss filed by those state official defendants (Dkt. ##46, 47, & 49) are **DENIED** as moot.

It is further **ORDERED** that Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. #48) is **DENIED** on the grounds of futility.

Dated:     April 28, 2021
           Denver, Colorado              _____
                                         N. Reid. Neureiter
                                         United States Magistrate Judge

29